UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ACCENT DELIGHT INTERNATIONAL LTD.
and XITRANS FINANCE LTD.,

                            Plaintiffs,

           -against-

SOTHEBY'S and SOTHEBY'S, INC.,

                          Defendants.

**COMPLAINT**

Plaintiffs, for their Complaint, allege, with knowledge as to their own acts and otherwise on information and belief, that:

## NATURE OF THE ACTION

1.      Sotheby's—one of the world's largest and most famous art brokers and auction houses—materially assisted the largest art fraud in history. Plaintiffs, two companies based in the British Virgin Islands, were the victims. Yves Bouvier, their art advisor, masterminded the fraud. Sotheby's was the willing auction house that knowingly and intentionally made the fraud possible. Sotheby's actions instilled Plaintiffs' trust and confidence in Bouvier and rendered the whole edifice of fraud plausible and credible.

2.      For more than ten years, Bouvier served as Plaintiffs' agent, counselor, and representative as Plaintiffs acquired 38 art masterworks for more than $2 billion. Plaintiffs believed that Bouvier was negotiating with sellers on their behalf and paid Bouvier a commission for his services. In fact, Bouvier's detailed accounts of hard-fought negotiations with sellers were pure fiction. Instead, Bouvier was negotiating for steep discounts and pocketing the difference for himself.  He repeatedly and blatantly misrepresented the acquisition prices for the paintings.

Indeed, the price Bouvier actually paid for Plaintiffs' collection was approximately half the total price at which Bouvier falsely claimed the works had been acquired and Bouvier charged Plaintiffs. Through this scheme, Bouvier defrauded Plaintiffs of over $1 billion.

3.      To perpetrate this fraud, Bouvier needed Sotheby's: as a broker for the transactions, and as a respected authority in the art world to help him justify the fraudulent prices he charged to Plaintiffs. Sotheby's was uniquely positioned to understand—and to facilitate—Bouvier's breathtaking fraud. It knew the actual prices Bouvier paid to the sellers and the fraudulently inflated prices Bouvier induced Plaintiffs to pay to him.

4.      Sotheby's aided and abetted Bouvier's fraud. Before transactions, Sotheby's gave Bouvier written materials designed to induce Plaintiffs to pay inflated, fraudulent prices. After transactions, Sotheby's lent a veneer of legitimacy and expertise to those fraudulent prices by providing Bouvier with inflated appraisals on demand. Sotheby's intentionally omitted the sales to Bouvier from the transaction histories listed in these appraisals. In short, Sotheby's assisted Bouvier in acquiring artworks at prices the sellers were willing to accept while helping him charge Plaintiffs fraudulently inflated prices (and concealing the actual acquisition prices from Plaintiffs).

**PARTIES**

5.      Plaintiff Accent Delight International Ltd. is an entity incorporated in the British Virgin Islands. It is owned by a trust settled by and for the benefit of members of the Rybolovlev family.

6.      Plaintiff Xitrans Finance Ltd. is an entity incorporated in the British Virgin Islands. It is owned by a trust settled by and for the benefit of members of the Rybolovlev family.

7.      Defendant Sotheby's, doing business in New York under the name Sotheby's

Holdings, is a publicly traded corporation incorporated under the laws of Delaware with its

principal place of business at 1334 York Avenue, New York, New York. Founded in 1744,

Sotheby's is in the business of selling art at auction and brokering private sales. It also provides

professional appraisals of artworks by experts. Sotheby's is one of the world's oldest and most

prestigious art companies. According to its website, Sotheby's "has been entrusted with the sale

of many of the world's treasures" and has built a "reputation for excellence based on the expert

knowledge and scholarship of [its] specialists."

8.      Defendant Sotheby's, Inc. is the wholly owned U.S. subsidiary of Sotheby's.

## JURISDICTION AND VENUE

9.      Subject-matter jurisdiction exists under 28 U.S.C. § 1332(a)(2) because Plaintiffs

are citizens of a foreign state, Defendants are citizens of New York, and the amount in

controversy exceeds $75,000.

10.      Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendants reside in this

judicial district.

## FACTS

11.      Sotheby's aided and abetted the fraud designed by Yves Bouvier. (For purposes

of this Complaint, the term "Bouvier" refers to Yves Bouvier and persons and entities acting on

his behalf and under his control.)

### Bouvier's Fraudulent Scheme

12.      Bouvier's fraud depended on the creation and violation of trust. Bouvier was first

introduced to Plaintiffs' representative, Dmitry Rybolovlev, in 2003 through a mutual

connection, Tania Rappo. Rappo was the godmother of one of Rybolovlev's daughters, and he considered her like a family member. Rappo fostered Rybolovlev's trust in Bouvier.

13.     From 2003 through 2015, Bouvier, along with Rappo, worked to acquire art masterworks on Plaintiffs' behalf. Plaintiffs and Bouvier agreed that he would act as their agent. Bouvier held himself out to Plaintiffs as an intermediary acting on their behalf, not as a seller in the marketplace. Plaintiffs trusted him.

14.     Bouvier acquired 38 masterworks for Plaintiffs—including paintings by Picasso, da Vinci, Rothko, and Modigliani—in 37 transactions. (Two works by Picasso were acquired together in one transaction.)

15.     Plaintiffs paid more than $2 billion for the collection. They generally paid Bouvier a two-percent commission on the purchase price of each work.

16.     Consistent with usual practice in the market for fine art, Plaintiffs were generally unaware of the sellers' identities. The transactions were confidential, and Bouvier insisted on serving as Plaintiffs' exclusive representative.

17.     Bouvier repeatedly lied to Plaintiffs and withheld material information from them. He told Plaintiffs he was negotiating with sellers on their behalf, when in fact he had generally already agreed to acquire the paintings at lower prices. The negotiations over the higher prices were fabricated.

18.     By acquiring the paintings at lower prices than he represented, rather than fulfilling his fiduciary duties as Plaintiffs' agent, Bouvier pocketed hundreds of millions of dollars in fraudulent gains. He also paid Rappo about $100 million in kickbacks for her role in the scheme.

***Bouvier Serially Defrauds Plaintiffs With a Pattern of Deception***

19.     Bouvier's method of operation was consistent: Having already agreed, in most cases, to buy a work at one price, he lied to Plaintiffs by pretending he was still negotiating with the seller on their behalf, inducing Plaintiffs to pay an inflated price.

20.     Three transactions illustrate Bouvier's pattern of deception.

<u>The Modigliani Painting</u>

21.     In December 2011, Bouvier worked to acquire Amedeo Modigliani's *Nu Couché au Coussin Bleu* on Plaintiffs' behalf.

22.     Bouvier agreed with the painting's owner to purchase it for approximately $95 million.

23.     Unbeknownst to Plaintiffs, the transaction was already agreed upon and had been set into motion on December 17, 2011.

24.     Six days later, however, Bouvier emailed Plaintiffs' representative: "I do not know the price. . . . If [Rybolovlev] likes this painting, I will look into it."

25.     The next day, Bouvier told Plaintiffs' representative: "[T]he owner is . . . very rich and certainly has other solutions. He is not obligated to sell this painting and not solely to us. For now, we must firstly maintain a trust relationship with him and secondly make him waste time in order to negotiate better."

26.     In January 2012, Bouvier sent Plaintiffs an invoice for $118 million. Relying on Bouvier's false representation that this was the true purchase price, Plaintiffs paid Bouvier this amount, plus $2.36 million in commission.

27.     Bouvier paid Rappo, Rybolovlev's close family confidant, a $5 million kickback on this transaction. This payment was kept secret from Plaintiffs.

<u>The Klimt</u>

28.     In September 2012, Bouvier worked to acquire Gustav Klimt's *Wasserschlangen II* on Plaintiffs' behalf.

29.     Bouvier's friend and associate Jean-Marc Peretti represented Bouvier at a meeting with the seller in Paris on September 11, 2012. There, Peretti agreed on Bouvier's behalf to purchase the painting for a net amount of $112 million. (Peretti has been the subject of criminal investigations in France, including a 2009 investigation for running an illegal gambling ring, according to the *New Yorker*.)

30.     The same day, however, Bouvier sent Plaintiffs' representative an email describing high-stakes negotiations with the seller: "They're holding back for 180 [million dollars] and are at the breaking point; I think they are ready at 190. But I should be able to twist them to reach 185 with the payment of a deposit and the balance in 30 days. What should we do???"

31.     Plaintiffs' representative authorized Bouvier to pay up to $185 million for the painting. Bouvier claimed to have reached a deal to buy *Wasserschlangen II* for $183.8 million.

32.     The negotiations that Bouvier described to Plaintiffs were fabricated. $183.3 million was not the true purchase price. In fact, Bouvier agreed through Peretti at the September 11 meeting to buy *Wasserschlangen II* for $112 million.

33.     On September 13, 2012, Bouvier sent Plaintiffs an invoice for $183.8 million for *Wasserschlangen II*. Relying on Bouvier's representation that this was the true purchase price, Plaintiffs paid Bouvier this amount. Plaintiffs also paid Bouvier $3,676,050 in commission.

34.     Bouvier secretly paid Rappo a $4.78 million kickback on this transaction. This payment was kept secret from Plaintiffs.

The da Vinci

35.    *Christ as Salvator Mundi* is one of approximately 15 authenticated paintings by Leonardo da Vinci that exist today.

36.    Bouvier arranged for the painting to be shown to Rybolovlev in person on March 22, 2013.

37.    At some point in March 2013, Bouvier reached agreement with the owners of the da Vinci—Warren Adelson, Alexander Parish, and Robert Simon—to purchase the painting for $83 million.

38.    On April 10 and 11, 2013, however, Bouvier had an email exchange with Plaintiffs' representative, in which he described hard-nosed negotiations to purchase *Salvator Mundi* on Plaintiffs' behalf. Bouvier claimed that Plaintiffs' $100 million offer was "rejected without a moment's hesitation," and that the seller was "[o]ne tough nut, but I'll fight and take as long as necessary." Bouvier later said that a deal was "clinched" at $127.5 million—"[t]erribly difficult, but it's a very good deal with regard to this unique masterpiece by Leonardo."

39.    All of these representations were false. The negotiations were fabricated. Unbeknownst to Plaintiffs, Bouvier had already agreed to buy *Salvator Mundi* from Adelson, Parish, and Simon for $83 million.

40.    On May 3, 2013, Bouvier sent Plaintiffs an invoice for $127.5 million. Relying on Bouvier's representation that this was the true purchase price, Plaintiffs paid Bouvier this amount. Plaintiffs also paid Bouvier $1.275 million in commission.

41.    Bouvier secretly paid Rappo a $4.92 million kickback on this transaction. This payment was kept secret from Plaintiffs.

### *Sotheby's Aids and Abets Bouvier's Fraud*

42.      Sotheby's has admitted its involvement in Bouvier's scheme. According to

Sotheby's, "Sotheby's facilitated the sale of 12 of the 37 works to Bouvier, consigned for auction

2 of the [w]orks on Bouvier's behalf (1 of which it previously sold him), and conducted

valuations for 4 of the [w]orks (2 of which it previously sold him)." Sotheby's made this

admission in a brief filed on June 29, 2018 in the U.S. Court of Appeals for the Second Circuit.

*See* Memorandum of Law in Support of Motion for Stay Pending Appeal (ECF No. 16-2) at 5

n.4, No. 18-1755 (2d Cir. June 29, 2018). "'Sotheby's' refers to Sotheby's, Inc., a U.S.

corporation with its principal place of business in New York." *Id.* at 1 n.1.

43.      Sotheby's was uniquely positioned to understand both sides of Bouvier's

fraudulent scheme: the prices that sellers were willing to accept and that he paid, and the

fraudulently inflated prices he charged to Plaintiffs. Rather than alert Plaintiffs or the authorities,

Sotheby's continued its lucrative business with Bouvier.

44.      Demonstrating its close involvement with Bouvier's scheme, and their common

interests, in November 2017 Sotheby's allied itself with Bouvier as a co-plaintiff in a civil

proceeding against Plaintiffs in Geneva, Switzerland.

### Sotheby's Maintains a Close Relationship with Bouvier

45.      Samuel Valette, Sotheby's Vice Chairman for Private Sales Worldwide,

maintained a close relationship with Bouvier, for many years. They communicated regularly.

Valette, a specialist in impressionist and modern art, frequently contacted Bouvier to suggest

works that Plaintiffs might want to acquire.

46.      Valette, on behalf of Sotheby's, would "source" works of art for Bouvier to sell to

Plaintiffs, comment on their quality and importance within the artist's body of work, and

sometimes issue appraisals. Valette did so in emails to Bouvier and Peretti, which Valette knew would be forwarded to Plaintiffs' representative.

47.     To Plaintiffs, whatever Valette said or did, because of his position, was on behalf of Sotheby's and carried the imprimatur of Sotheby's. Bouvier would refer Plaintiffs to Valette and to Sotheby's to confirm what he was saying to Plaintiffs.

48.     Alexander Bell, Sotheby's Co-Chairman of Old Master Paintings, also dealt with Bouvier.

49.     At all relevant times, Valette and Bell were employees, agents, and servants of Sotheby's, acting within the scope of their duties.

50.     Sotheby's valued its relationship with Bouvier. Bouvier is a major player in the art world. He is associated with global "freeport" businesses where fine art is stored tax-free. In the 14 transactions involving Bouvier and Plaintiffs that it brokered, Sotheby's earned tens of millions, or perhaps even hundreds of millions, of dollars in commissions. Bouvier was also valuable to Sotheby's because he did other business with Sotheby's, unrelated to Plaintiffs.

51.     Bouvier was—and remains—one of Sotheby's most important business contacts.

52.     Citing its confidentiality obligations to Bouvier, Sotheby's refused to voluntarily provide Plaintiffs with documents that would show the extent of Bouvier's fraud, including correspondence between Bouvier and Valette. Plaintiffs obtained some of those documents by court order under 28 U.S.C. § 1782.

53.     For the time being, Plaintiffs are not allowed to use those documents to support the allegations of this Complaint. Concurrently with the filing of this Complaint, Plaintiffs will seek leave to use those documents to supplement their allegations here.

9

Sotheby's Pitches Deals to Plaintiffs Through Bouvier

54.     Sotheby's knew that Bouvier was not acting for himself, but rather for Plaintiffs.

55.     On April 9, 2011, in an email to Valette concerning the purchase of Auguste Rodin's *Le Baiser*, Bouvier referred to Plaintiffs' representative as "my friend."

56.     Similarly, in an April 14, 2011 email to Bouvier relating to the purchase of Aristide Malliol's *La Mediterranée*, Valette referred to Plaintiffs' representative as "the client."

57.     Knowing that Bouvier was Plaintiffs' agent, Sotheby's repeatedly contacted Bouvier to suggest works that Plaintiffs might want to buy.

58.     Sotheby's also estimated the value of those works, with Valette explaining in emails how important the works were in the artist's overall production. Sotheby's estimates supported the fraudulently inflated prices Bouvier later charged to Plaintiffs.

59.     Sotheby's knew when it pitched these deals that Bouvier intended to charge Plaintiffs an undisclosed markup in excess of the true acquisition price.

60.     Plaintiffs relied on Valette's comments on the value of the works because of Valette's authority as an expert on behalf of Sotheby's, one of the two preeminent art auction houses in the world. Valette's emails, on behalf of Sotheby's, to Bouvier were important in engendering Plaintiffs' trust and confidence in Bouvier.

61.     For instance, on November 14, 2011, Valette sent Bouvier an email discussing the market for works by surrealist painter René Magritte. Valette knew that Bouvier was going to forward this email to Plaintiffs to encourage them to buy a Magritte. He wrote the email for that purpose.

62.     In the email, Valette said that a major Magritte work, such as *The Empire of Light*, would sell for around €40 million in a private sale.

10

63.     Bouvier forwarded the email to Plaintiffs the next day, as Valette intended. Bouvier told Plaintiffs that a different Magritte painting, *The Domain of Arnheim*, was "more beautiful" and "more important" than *The Empire of Light*, and that their market value would be comparable.

64.     At some point in the next three weeks, Bouvier agreed to purchase the painting. On December 5, 2011, he sent Plaintiffs an invoice for $43.5 million, plus $870,000 in commission, for *The Domain of Arnheim*. This price was inflated; the price Bouvier paid was far lower.

65.     Similarly, in July 2012, Valette emailed Bouvier with information about Modigliani's sculpture *Tête*. Valette knew that Bouvier was going to forward this email to Plaintiffs to encourage them to buy the sculpture. He wrote the email for that purpose. The email suggested that the market value of the sculpture was between €80 to €100 million.

66.     In December 2012, Bouvier exchanged emails with Plaintiffs' representative describing negotiations with the owner of *Tête*. At that point, however, Bouvier had already acquired *Tête*. The negotiations he described to Plaintiffs were fabricated.

67.     On January 7, 2013, Bouvier sent Plaintiffs an invoice for €62.5 million for *Tête*. Relying on Bouvier's representations that this was the true purchase price, Plaintiffs paid Bouvier €62.5 million. The price which the seller was willing to accept and at which Bouvier acquired the work was much lower.

68.     In the summer of 2014, when Plaintiffs agreed to part with *Tête* as partial consideration for the purchase of Mark Rothko's *No. 6*, Sotheby's again played a critical role.

69.     Bouvier had agreed to purchase *No. 6* from its owners for $80 million, but he claimed in emails to Plaintiffs' representative that the fictitious "seller" demanded €140 million.

Plaintiffs agreed to this fraudulently inflated price. Plaintiffs and Bouvier agreed that he would transfer *Tête* to the "seller" in satisfaction of €60 million of the total €140 million purchase price.

70.     Instead, Sotheby's sold *Tête* at a public auction in New York in November 2014. Sotheby's did so despite knowing that the work was part of Plaintiffs' collection, and despite knowing that Bouvier lacked the authority to sell it—or at least never verifying whether he did. Indeed, Bouvier himself testified to the Monaco authorities regarding another artwork consigned to Sotheby's: "Sotheby's did not verify the [work]'s ownership. Mr. Valette and his team accepted to do the transaction based on my good reputation. Mr. Valette did not know that the paintings belonged to one of Mr. Rybolovlev's companies. No certificate of authority was required."

71.     Bouvier kept the auction proceeds for himself and has never accounted to Plaintiffs for them. The real sellers of *No. 6*, the Moueix family, never had any interest in *Tête* at all.

## Sotheby's Arranges and Brokers the Klimt and da Vinci Transactions

72.     Despite its knowledge that Bouvier was charging Plaintiffs secret markups, Sotheby's promoted and brokered the Klimt and da Vinci transactions through Bouvier.

73.     Sotheby's arranged a viewing of *Wasserschlangen II* for Plaintiffs on September 3, 2012. Sotheby's also arranged the September 11 meeting in Paris at which Peretti agreed on Bouvier's behalf to buy the painting for $112 million.

74.     Sotheby's brokered the $112 million sale of *Wasserschlangen II* to Bouvier.

75.     Over the next several months, Sotheby's worked to obtain approval of the $112 million sale from the heirs of the painting's original owners in Austria. This approval was

necessary because the Nazis had stolen the painting from the original owner during the Holocaust. The seller and the heirs split the proceeds of the $112 million sale in half.

76.     Similarly, Sotheby's arranged Rybolovlev's March 2013 viewing of *Christ as Salvator Mundi*. Sotheby's also showed the painting to Peretti the preceding day.

77.     A Sotheby's representative participated in a meeting in early April 2013 at which the sellers and Peretti negotiated the terms of the sale.

78.     Sotheby's brokered the sale of *Christ as Salvator Mundi* from Adelson, Parish, and Simon to Bouvier for $83 million.

79.     On November 21, 2016, Sotheby's filed an action seeking a declaratory judgment that it did not breach its obligations to the sellers of *Salvator Mundi. Sotheby's, Inc. v. R.W. Chandler, LLC et al*., No. 16-CV-9043 (S.D.N.Y.). (The case was quickly resolved by a confidential settlement unavailable to Plaintiffs or to the public.) In that action, Sotheby's claimed it was unaware of Bouvier's relationship with Rybolovlev when it arranged for Rybolovlev to view *Salvator Mundi*. Sotheby's has also claimed in correspondence that Rybolovlev was "completely unknown" to them.

80.     Sotheby's claim to have no knowledge of Rybolovlev is not credible.

81.     The viewing took place in a New York apartment at 15 Central Park West. When the apartment was purchased for $88 million in 2011, it was the most expensive individual purchase of an apartment ever in New York City.  A connection between the apartment and the Rybolovlev family was widely reported in the press and is common knowledge.

82.     Rybolovlev, Bouvier, and Valette were all among the small group of people present at the viewing. According to Sotheby's, Bouvier and Rybolovlev went into a separate room of the apartment to view the painting together.

83.     Sotheby's claims that Valette did not know who Rybolovlev was at the time.

84.     It is inconceivable that Sotheby's would arrange a viewing of one of the world's most valuable masterworks in one of the world's most expensive apartments, in the presence of the person widely reported by the press to be the apartment's owner and entirely for his benefit, without knowing who he was. Sotheby's was trying to arrange a private sale of *Salvator Mundi*. In that capacity, according to its website, its job was to "discreetly offer [*Salvator Mundi*] to individual potential purchasers." It would have been professional malpractice for Sotheby's not to know who Rybolovlev was.

85.     Valette and Sotheby's knew exactly who Rybolovlev was, and they knew Bouvier was purporting to act on Plaintiffs' behalf.

### Sotheby's Issues Inflated Appraisals that Conceal Bouvier's Fraud

86.     In late 2014, Sotheby's helped Bouvier cover his tracks with a series of fraudulent appraisals issued in rapid succession. If it had not previously known of Bouvier's fraud, it surely knew by the time it issued the appraisals.

87.     Bouvier requested that Sotheby's appraise *Wasserschlangen II* in October 2014. On October 24, 2014, Sotheby's appraised the value of the painting at $180 million. The appraisal is signed by Valette.

88.     The transaction history listed in the appraisal omits the 2012 sale to Bouvier at the price of $112 million. Sotheby's brokered that sale. That material omission must have been intentional.

89.     The appraisal values *Wasserschlangen II* at roughly the inflated price Bouvier confidentially invoiced to Plaintiffs, not the price Bouvier paid in the Sotheby's sale. But it does

not explain why. Sotheby's knew Bouvier was trying to justify the inflated price he charged Plaintiffs, and it chose to help him do so.

90.     Sotheby's also provided Bouvier with several other appraisals on October 24, 2014. Each time, Sotheby's valued the work at the confidential, inflated price Bouvier charged Plaintiffs, without explaining why. Each time, Sotheby's responded to Bouvier's input in setting the value of the work. Sotheby's was collaborating with Bouvier to conceal his wrongdoing on a wide scale.

91.     On October 24, 2014, Sotheby's appraised Modigliani's *Nu Couché au Coussin Bleu* at $110 million at Bouvier's request. The appraisal approximates the $118 million Bouvier charged to Plaintiffs for this painting, rather than the $93.5 million he paid for it. The transaction history listed in the appraisal omits the 2011 sale to Bouvier at the price the seller was willing to accept.

92.     On October 24, 2014, Sotheby's appraised Henri Matisse's *Nu au Chale Vert* at $85 million at Bouvier's request. The appraisal is signed by Valette. Bouvier had charged Plaintiffs $85 million, plus approximately $2.2 million in commission, for this painting in 2011. The transaction history listed in the appraisal omits the 2011 sale to Bouvier at the price Bouvier paid.

93.     On October 24, 2014, Sotheby's appraised Paul Gauguin's *Otahi (Alone)* at $120 million at Bouvier's request. The appraisal is signed by Valette. Bouvier had charged Plaintiffs €120 million, plus approximately €2.4 million in commission, for *Otahi* in 2013. Plaintiffs do not know the price Bouvier paid for this painting. The transaction history listed in the appraisal omits the 2013 sale to Bouvier.

Plaintiffs Discover the Fraud As Sotheby's Continues to Help Bouvier Conceal It

94.     Sotheby's failure to disclose Bouvier's fraud to Plaintiffs allowed Bouvier to
continue to perpetuate his scheme. But for Sotheby's omissions, Plaintiffs would have
discovered Bouvier's fraud much earlier and substantially mitigated their losses. But Sotheby's
remained silent. Inasmuch as Bouvier's wrongful conduct would not have been possible without
Sotheby's substantial assistance, Sotheby's is liable for Plaintiffs' damages after Sotheby's first
involvement in the scheme.

95.     Even as Bouvier's fraud began to come to light, Sotheby's continued to provide
him with inflated appraisals on demand to justify the fraudulent prices he charged Plaintiffs.

96.     In November 2014, Plaintiffs and Rybolovlev became aware of an article in *The
New York Times* reporting that the purchase price of *Christ as Salvator Mundi* in the 2013
Sotheby's sale was $75 to $80 million. The article had been published several months earlier.

97.     Plaintiffs began to suspect Bouvier had defrauded them. Plaintiffs' representative
confronted Bouvier. Bouvier said the media underreported the price because the total price
included various fees and commissions of which the media was not aware.

98.     In December 2014, Plaintiffs discovered the true purchase price of *Nu Couché au
Coussin Bleu*. At that point, Plaintiffs became certain Bouvier had defrauded them.

99.     In January 2015, after Plaintiffs' representative confronted him, Bouvier
contacted Valette to request that Sotheby's appraise *Salvator Mundi*. Sotheby's agreed.

100.     Sotheby's issued an appraisal on January 28, 2015. At Bouvier's request,
Sotheby's valued *Salvator Mundi* at €100 million.

101.     Sotheby's appraisal includes a transaction history, but it omits the 2013 sale to
Bouvier. Sotheby's brokered that sale. The omission must have been intentional.

102.    The appraisal values *Salvator Mundi* at the inflated price Bouvier confidentially invoiced to Plaintiffs, not the price Bouvier negotiated in the Sotheby's sale that the seller was willing to accept. But it does not explain why. Sotheby's knew Bouvier was trying to justify the fraudulent price he charged Plaintiffs, and it chose to help him do so.

### *Plaintiffs Attempt to Bring Bouvier to Justice*

103.    In European civil law countries, crime victims can start criminal proceedings. As Bouvier's lies, misrepresentations, and deliberate omissions came to light, Plaintiffs started criminal proceedings against him and Rappo in Monaco. Plaintiff Accent Delight International Ltd. also joined criminal proceedings started by a third party against Bouvier in Paris.

104.    Bouvier has been charged with fraud and complicity in money laundering in Monaco and has been charged with repeated handling of stolen goods in France. Magistrates in both countries are continuing to investigate Bouvier's crimes.

105.    Plaintiffs sued Bouvier for civil damages in Singapore, the site of his art warehousing business. Bouvier has taken measures to liquidate his assets and place them beyond the reach of the Singapore courts.

106.    Plaintiffs also brought criminal charges against Bouvier in Switzerland.

107.    Bouvier was taken in for questioning in Monaco in 2015. Police recovered from him a USB flash drive containing several scanned Sotheby's logos, Valette's electronic signature, and the electronic signature of another Sotheby's official, Dr. Franka Haiderer, Senior Director and Chairman for Valuations in Europe.

108.    To date, Sotheby's has not terminated Valette's employment or, to Plaintiffs' knowledge, disciplined him in any way.

### *Sotheby's Functions as One Single Entity*

109.    Sotheby's dominates and controls its wholly owned foreign subsidiaries and functions as a single integrated global business, supervised from New York. Sotheby's used such domination to commit the wrongful acts that injured Plaintiffs. The wholly owned foreign subsidiaries are mere instrumentalities of Sotheby's wrongdoing.

110.    Sotheby's describes its wholly owned foreign subsidiaries as "offices" or "locations," not as independent entities.

111.    Sotheby's has one chief executive officer, one worldwide general counsel, one global head of compliance, one director of communications—all based in its New York headquarters. Its website, branding, marketing materials, and letterhead are the same around the world.

112.    Sotheby's maintains consolidated financial statements. Its wholly owned foreign subsidiaries are not treated as independent profit and loss centers, and do not deal at arms length with each other. On information and belief, Sotheby's transfers assets between its wholly owned foreign subsidiaries. The subsidiaries do not have their own executives and do not appoint their own leadership. Rather, Sotheby's is centrally managed from New York.

113.    In some of the transactions that Sotheby's arranged for Bouvier, including the *Salvator Mundi* sale, the contracts were signed by Sotheby's, Inc. In others, the contracts were signed by one of Sotheby's wholly owned foreign subsidiaries, which Sotheby's dominates and controls.

114.    Irrespective of which subsidiaries technically employ Valette and Bell, Valette and Bell were acting on behalf of Sotheby's, Inc. during their dealings with Bouvier. As

Valette's title reflects—Vice Chairman of Private Sales *Worldwide*—he is empowered to act and does act on behalf of Sotheby's and all of its subsidiaries.

115.    Sotheby's, Inc. has repeatedly acknowledged as much. For example, as it explained in its declaratory judgment complaint filed in this Court, Valette and Bell negotiated the *Salvator Mundi* deal on behalf of Sotheby's, Inc. with Bouvier and the sellers of that painting.

116.    In the declaratory judgment complaint described in paragraph 79 above, Sotheby's, Inc. described Valette as *its* employee.

117.    In an affidavit filed in other proceedings in this Court, a Sotheby's executive has testified that Valette "managed" the relationship between Sotheby's, Inc. and Bouvier. Declaration of Aimee Scillieri (ECF No. 153), *In re Application of Accent Delight Int'l*, No. 16-MC-125 (S.D.N.Y. Mar. 13, 2018).

118.    Sotheby's subsidiaries, Valette, and Bell were instrumentalities of Sotheby's wrongful conduct.

**FIRST CLAIM**
**Aiding and Abetting Fraud**

119.    Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

120.    Sotheby's had actual knowledge that Bouvier was defrauding Plaintiffs. Sotheby's and Bouvier had an intimate business relationship for years. Sotheby's knew Bouvier was Plaintiffs' agent. Sotheby's knew the price that Bouvier obtained in transactions it brokered. Yet, Sotheby's sent Bouvier emails designed to get Plaintiffs to pay inflated prices for other works. And Sotheby's gave Bouvier materially misleading appraisals on demand. These appraisals deliberately omitted Bouvier's acquisitions of the works to create the false impression that Plaintiffs paid fair prices.

121.    Sotheby's provided substantial assistance to Bouvier, causing injury to Plaintiffs. Sotheby's affirmatively assisted Bouvier by arranging for him to acquire artworks at certain prices that the sellers were willing to accept, and by sending him emails intended to help him convince Plaintiffs to pay Bouvier fraudulently inflated prices. Sotheby's helped Bouvier conceal his fraud by providing materially misleading appraisals that falsely suggested the artworks were worth what Plaintiffs paid for them.

122.    As a result of Sotheby's aiding and abetting Bouvier's fraud, Plaintiffs have sustained damages in an amount to be determined at trial but not less than $380,000,000 plus interest.

123.    Sotheby's conduct was willful, wanton, reckless, and intentional.

### SECOND CLAIM
**Aiding and Abetting Breach of Fiduciary Duty**

124.    Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

125.    Sotheby's knowingly participated in Bouvier's breach of his fiduciary obligations by providing him with substantial assistance. Bouvier was Plaintiffs' fiduciary. Bouvier held himself out as a skilled expert in the art market. Plaintiffs relied on Bouvier to provide them with strategic advice about the art market and to negotiate high-stakes transactions on their behalf. Plaintiffs had confidence in Bouvier because of their years of business dealings and because of Rappo's personal connection to Rybolovlev.

126.    Bouvier breached his fiduciary duties to Plaintiffs by acting disloyally and contrary to Plaintiffs' interests. Rather than act on Plaintiffs' behalf to acquire artworks at fair, negotiated prices that sellers were willing to accept, Bouvier seized those opportunities for his own benefit. He then harmed Plaintiffs' interests by charging them inflated prices on the basis of false representations.

127.    Sotheby's knew that Bouvier was Plaintiffs' agent and that Plaintiffs relied on his counsel. It strategized to sell Plaintiffs art through Bouvier and approached Bouvier about new opportunities for Plaintiffs. By brokering sales to Bouvier at certain prices, sending Bouvier emails designed to encourage Plaintiffs to pay inflated prices, and misleadingly appraising works at inflated prices, Sotheby's participated in Bouvier's breach of his fiduciary duties to Plaintiffs.

128.    As a result of Sotheby's aiding and abetting Bouvier's breach of fiduciary duty, Plaintiffs have sustained damages in an amount to be determined at trial but not less than $380,000,000 plus interest.

129.    Sotheby's conduct was willful, wanton, reckless, and intentional.

### THIRD CLAIM
### Breach of Contract – Declaratory Judgment

130.    Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

131.    In December 2016, Plaintiffs and Sotheby's (including its New York, English, Swiss and Austrian subsidiaries) entered into a one-year written Tolling Agreement.

132.    The Tolling Agreement contains a New York choice of law clause and an exclusive New York forum selection clause.

133.    Among other things, the Tolling Agreement required each party to the agreement to "provide 14 days written notice ("Notice of Suit"), as provided in paragraph 8 [of the Tolling Agreement,] prior to filing or commencing any litigation or other legal proceeding against any other party" based on claims or defenses "arising out of the direct or indirect involvement of Sotheby's with Yves Bouvier." Tolling Agreement ¶¶ 3, 1.

134.    Paragraph 8 of the Tolling Agreement, referred to above, states: "All notices required hereunder shall be in writing and shall be deemed duly given on (1) business day after being sent at the address given below by reputable overnight courier service (charges prepaid), as

follows: If to the Collectors [Plaintiffs]: c/o Daniel J. Kornstein, Esq., Emery Celli Brinckerhoff & Abady LLP, 600 Fifth Avenue, 10th Floor, New York, NY 10020."

135.    Sotheby's filed a civil proceeding in Geneva, Switzerland on November 17, 2017 against Plaintiffs (among others) without complying with the notice provision of the Tolling Agreement quoted above. The purpose of this filing was to invoke the international Lugano Convention to block a contemplated suit by Plaintiffs in the United Kingdom. Under the Lugano Convention, if a suit is filed in a signatory country—such as Switzerland—if another suit is filed in a court in a second country, the second jurisdiction must stay its proceedings until jurisdiction in the first court has been established. Once the jurisdiction of the first court has been established, the proceedings in the second court must be dismissed.

136.    As Sotheby's has stated in its Form 10-Q filed with the Securities and Exchange Commission, it filed the Swiss conciliation proceeding "in response to the stated intent of [Plaintiffs] to initiate litigation in the U.K."

137.    Sotheby's did not give any advance notice of any kind that it was filing a civil action in Switzerland, much less 14 days written notice sent by overnight courier service to Plaintiffs' counsel.

138.    Plaintiffs have abided by the terms of the Tolling Agreement.

139.    Sotheby's breached the Tolling Agreement.

140.    Plaintiffs are entitled to a judgment declaring that Sotheby's breached the Tolling Agreement.


## FOURTH CLAIM
### Breach of Contract – Damages

141.    Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

22

142.     As a result of Sotheby's breach of the Tolling Agreement, Plaintiffs have

sustained damages, in the form of legal fees in the course of responding to the improperly filed

civil proceeding in Switzerland.

**FIFTH CLAIM**
**Breach of Contract – Injunction**

143.     Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

144.     As a result of Sotheby's breach of the Tolling Agreement, Plaintiffs are entitled to

a mandatory injunction directing Sotheby's, its agents and employees, and the wholly owned

subsidiaries under its control to withdraw the improperly brought Swiss civil proceeding.

145.     Sotheby's improperly filed the civil suit in Switzerland in order to use the Lugano

Convention to block Plaintiffs from suing Sotheby's in the United Kingdom, which is a signatory

to the Lugano Convention, thereby improperly depriving Plaintiffs of their choice of jurisdiction.

146.     As a result, Plaintiffs have suffered irreparable harm for which monetary damages

are an inadequate remedy.

WHEREFORE, Plaintiffs demand judgment as follows:

a.     On the first and second claims, directing Defendants to pay to Plaintiffs

compensatory damages in an amount to be determined at trial, but in any event no less than

$380,000,000 plus interest;

b.     On the first and second claims, directing Defendants to pay to Plaintiffs punitive

damages in an amount to be determined at trial;

c.     On the third claim, declaring that Defendants breached the Tolling Agreement;

d.     On the fourth claim, directing Defendants to pay to Plaintiffs compensatory

damages in an amount to be determined at trial, including the attorney's fees and related costs

expended by Plaintiffs in responding to the improperly brought Swiss civil proceeding;

e.      On the fifth claim, preliminarily and permanently enjoining Defendants, their

subsidiaries under their control, and their agents and employees, to withdraw the Swiss civil

proceeding filed on November 17, 2017; and

f.      Awarding Plaintiffs costs, disbursements, and such other and further relief as the

Court may deem just and proper.

Dated:  October 2, 2018
        New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

_____
Daniel J. Kornstein
O. Andrew F. Wilson
Douglas E. Lieb

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiffs*