UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACCENT DELIGHT INTERNATIONAL LTD. and XITRANS FINANCE LTD., <br><br> Plaintiffs, <br><br> -against- <br><br> SOTHEBY'S and SOTHEBY'S, INC., <br><br> Defendants. | Case No. 18-cv-09011 (JMF) |

## REPLY DECLARATION OF SAVERIO LEMBO

I, Saverio Lembo, declare as follows:

1. I am an attorney licensed to practice law in Geneva, Switzerland. I am a partner in the law firm of Bär & Karrer.

2. I submit this reply declaration in supplement to my previous declaration dated January 18, 2019, ECF No. 41, and in further support of Sotheby's motion to dismiss the Amended Complaint or, in the alternative, to stay this action pending resolution of the Swiss Civil Suit.

3. I have reviewed the declaration of Ms. Sandrine Giroud dated February 15, 2019 ("Giroud Decl."), ECF No. 53, submitted by Plaintiffs in opposition to Sotheby's motion to dismiss. In addition to relying primarily on unsupported speculation and mere argument, the Giroud declaration misstates Swiss law and procedure in several respects. I have included below clarifications of several points raised in the declaration.

1

**Security for Party Costs**

4.     The claim that certain of the Sotheby's Entities may each be required to pay security for party costs in an amount of approximately CHF 6.6 million, and that Sotheby's will be "reluctant" to pay those costs, *see* Giroud Decl. ¶¶ 12-15, is based entirely on unsupported speculation.

5.     Although it is correct that Article 99 of the Swiss Civil Procedure Code ("SCCP") authorizes a defendant in Swiss civil proceedings to request security for costs from non-resident claimants, the actual amount of any costs requirement necessarily varies from case to case, and can be either reduced or increased according to the discretion of the Swiss tribunal based on the particular circumstances of the case. SCCP Art. 99, ¶ 1; Geneva Law of application of the civil code ("LaCC") Art. 23, ¶ 1. Ms. Giroud acknowledges as much in her declaration. *See* Giroud Decl. ¶ 14. In particular, Article 23 of the LaCC authorizes Geneva tribunals to modify the required security where it finds that the proposed requirement would be out of proportion with the value of the claims at issue, the interests of the parties involved, and the amount of work required by counsel. LaCC Art. 23, ¶ 1. A Swiss tribunal may also modify the amount of security for costs it ordered at any point during the proceedings, should the assessment of the presumed costs change. SCCP Art. 100, ¶ 2.

6.     There is likewise no basis for the speculation that *each* Sotheby's Claimant will be subject to an individual security costs requirement, and in fact the Swiss tribunal is unlikely to issue such an order. While the necessity of security costs will be examined for each non-resident Sotheby's Claimant on a party-by-party basis, *see* Urwyler/Grütter, in Brunner/Gasser/ Schwander, DIKE Kommentar ZPO, Art. 99, N 14; Suter/von Holzen, in Sutter-Somm/Hasenböhler/Leuenberger, ZPO-Kommentar, Art. 99, N 38, it is in fact not unusual in

2

Swiss litigation for claimants to pay security costs on a *joint* rather than individual basis. *See, e.g.*, Decision of the Geneva Civil Chamber of the Court of Justice dated June 10, 2016, ACJC/814/2016, para. A; Decision of the Geneva Civil Chamber of the Court of Justice dated December 4, 2015, ACJC/1481/2015, Merits.

7. Finally, there is no basis for Ms. Giroud's rank speculation that the Sotheby's Entities will be "reluctant" to pay whatever security costs are required. *See* Giroud Decl. ¶ 12. The Sotheby's Entities have been prosecuting the Swiss Civil Suit since November 2017 and I have no reason to believe that they would withdraw that litigation to avoid a payment of security costs. As discussed in my prior declaration, the Sotheby's Entities have already complied with the Swiss tribunal's requirement that they advance the tribunal's costs, *see* ECF No. 41 ¶ 20, and certainly will also do so with respect to any party security costs should the latter be requested.

**Party and Third-Party Discovery Obligations**

8. Ms. Giroud's characterizations of the obligations of parties and witnesses to provide relevant evidence in Swiss litigation are misleading in several respects.

9. To begin with, the assertion that "an adverse party is under no obligation to be forthcoming if requested to testify or provide documents," *see* Giroud Decl. ¶ 39, is wrong. Article 160 of the SCCP requires both parties and third-party witnesses to cooperate in the taking of evidence in Swiss civil proceedings, without regard to where those persons reside. SCCP Art. 160, ¶ 1. Indeed, the SCCP specifically requires all persons, regardless of domicile, to: (i) provide truthful testimony; (ii) produce physical records upon request; and (iii) allow examination of their person or property by an expert. *See id.*

10. Ms. Giroud's characterizations of the Swiss court's powers to enforce a party's obligations to provide evidence are incomplete and therefore also misleading. *See* Giroud Decl.

3

¶ 39. Where a party refuses, without justification, to abide by its obligation to cooperate in providing evidence, a Swiss tribunal is to take such refusal into consideration when ruling. SCCP Art. 164. *See* BK ZPO-Rüetschi, Art. 164, N 4; BSK ZPO-Schmid, Art. 164, N 1; CR CPC-Jeandin, Art. 164, N 4, 6, 7. A Swiss tribunal is thus authorized to draw inferences adverse to that party when appraising the evidence in the case. *See* Higi, in Brunner/Gasser/Schwander, DIKE Kommentar ZPO, Art. 164, N 4; Hasenböhler, in Sutter-Somm/Hasenböhler/Leuenberger, Kommentar zur Schweizerischen Zivilprozessordnung, Art. 164, N 4. It is for precisely this reason that it is very uncommon for Swiss litigants to flout their evidentiary obligations—to do so would allow the court to assume that the requesting party's allegations with respect to the requested evidence are true, to the detriment of the refusing party's legal position. *See* CR CPC-Jeandin, Art. 164, N 6 f.

11. Third-parties face other legal consequences for an unjustified refusal to cooperate with the Swiss tribunal's efforts to gather evidence. In particular, Article 167 of the SCCP authorizes several potential sanctions that an uncooperative third-party witness may face, including monetary fines and sanctions for non-compliance, and responsibility for the costs incurred in enforcing that witness's participation. SCCP Art. 167, ¶ 1. This is true regardless of where a particular witness is domiciled, given that Switzerland has ratified several international treaties, namely the Hague Convention of March 1, 1954 on civil procedure and the Hague Convention of March 18, 1970 on the taking of evidence abroad in civil or commercial matters, which aim in particular to enforce a third-party's obligations to cooperate with the Swiss tribunal's proceedings. In this case, given the close connection that exists between Mikhail Sazonov and the defendants in the Swiss Civil Suit (Dmitry Rybolovlev in particular), it is my opinion that a Swiss tribunal would likely take into consideration when assessing the case any

4

refusal to cooperate on the part of Mr. Sazonov, should he evade his obligations to cooperate with the gathering of evidence notwithstanding the enforcement measures available to the Swiss tribunal.

12. Finally, Ms. Giroud exaggerates the extent to which relying upon mutual legal assistance mechanisms for gathering evidence would "complicate and delay the proceedings," *see* Giroud Decl. ¶¶ 5, 40, to the extent relying upon those mechanisms proves necessary in the Swiss Civil Suit at all. The use of mutual legal assistance procedures to gather evidence from third parties located outside Switzerland is in fact a usual process for Swiss tribunals in multi-jurisdictional proceedings when witnesses are abroad, just as it is common for Swiss courts to adjudicate the type of "complex cross border cases" that Ms. Giroud seems to believe the Swiss judicial system is poorly equipped to accommodate. Giroud Decl. ¶¶ 49-50. There is no basis for her assessment as to capabilities of the Swiss judicial system.

**The Swiss Tribunal's Jurisdiction**

13. Finally, Ms. Giroud makes several misstatements in connection with her various speculations that the Swiss court will decline to exercise jurisdiction over the Sotheby's Entities' claims.

14. First, Ms. Giroud's accusation that the Sotheby's Entities engaged in a "bad faith attempt to secure a forum Sotheby's seems to deem more favorable" is baseless. *See* Giroud Decl. ¶ 20. There are several reasons that Switzerland is the most appropriate jurisdiction to litigate this dispute, most particularly that it is the country in which many events giving rise to the claims of fraud and breach of fiduciary duty which the Sotheby's Entities are alleged to have aided and abetted took place. *See* ECF No. 41, ¶ 26. Moreover, Ms. Giroud's claim that the Sotheby's Entities' basis for Swiss jurisdiction "relies almost entirely on its co-plaintiff [Yves]

5

Bouvier's conduct in Switzerland," *see* Giroud Decl. ¶ 28, is false. As explained in my prior declaration, there are good reasons the Swiss courts likely will exercise jurisdiction over the claims brought by the Sotheby's Entities against Plaintiffs based on the Sotheby's Entities' alleged conduct in facilitating sales of artworks to Mr. Bouvier, many of which were negotiated or executed in Switzerland or involved the physical transfer of artworks to Switzerland, and all of which made use of the Swiss financial system. *See* ECF No. 41 at ¶ 26 (citing conduct Plaintiffs allege took place in Switzerland in their Amended Complaint against Sotheby's). Indeed, Plaintiffs themselves, in the criminal complaint they filed in Switzerland against Mr. Bouvier—and in which they alleged conduct involving "[p]ossible collaboration" by Sotheby's and Sotheby's UK's employee Samuel Valette, *see* ECF No. 42-2 (Swiss Criminal Complaint) ¶¶ 15, 152-61—argued that Switzerland was the proper forum for their claims. *See id.* ¶ 29.

15. The Sotheby's Entities likewise had legitimate reasons to include Elena Rybolovleva as a defendant in the Swiss Civil Suit, notwithstanding Ms. Giroud's unsubstantiated accusation that the Sotheby's Entities did so for improper purposes. Giroud Decl. ¶¶ 22, 43. Ms. Rybolovleva was married to Mr. Rybolovlev during a period of time in which Plaintiffs appear to have acquired many of the artworks over which they claim to have been defrauded. *See* ECF No. 55 (February 15, 2019 Declaration of Daniel J. Kornstein) ¶ 16 (identifying December 2008 as the date Ms. Rybolovleva filed for divorce against Mr. Rybolovlev); *see also* June 26, 2015 Letter from counsel for Plaintiffs to Sotheby's UK, which the Sotheby's Entities' filed with the Swiss tribunal as Exhibit 52 to their July 11, 2018 Statement of Claim, p. 4 (identifying 13 works of art allegedly acquired by Plaintiffs prior to

6

December 2008). A true and correct copy of the June 26, 2015 Letter, as it was filed with the Swiss tribunal, is attached hereto as Exhibit A.

16. Plaintiffs' U.S.-based counsel suggests that Ms. Rybolovleva's December 2008 filing of divorce proceedings against Mr. Rybolovlev ended any involvement she may have had in this dispute, *see* ECF No. 55 ¶ 16, but that is far from clear. While the Sotheby's Entities admittedly lack insight into Plaintiffs' corporate organization and ownership, Plaintiffs describe themselves as trusts settled "by and for the benefit of members of the family of Dmitry Rybolovlev." *See* ECF No. 29 (Amended Complaint) ¶¶ 5-6; *see also Bouvier v. Accent Delight Int'l Ltd.*, [2015] SGCA 45, ¶ 8 (Sing.) (describing Plaintiffs in August 21, 2015 Singapore Court of Appeal's decision as "BVI companies owned wholly by the family trusts of a well-known Russian billionaire, Dmitry Rybolovlev"). A true and correct copy of the Singapore Court of Appeal's August 21, 2015 decision is attached hereto as Exhibit B.

17. Further complicating Ms. Rybolovleva's involvement in this dispute is the fact that her divorce proceedings against her husband, while apparently filed in December 2008, continued until as late as October 20, 2015, and featured allegations by Ms. Rybolovleva that Mr. Rybolovlev was intentionally transferring assets to overseas trusts to keep them beyond her reach. *See, e.g.*, Agustino Fontevecchia, *The Saga of Russian Billionaire Dmitry Rybolovlev's $4.5B Divorce Comes to An End*, Forbes.com (Oct. 20, 2015), available at https://www.forbes.com/sites/afontevecchia/2015/10/20/the-saga-of-russian-billionaire-dmitry-rybolovlevs-4-5b-divorce-comes-to-an-end/#189084642cfc, a true and correct copy of which is attached hereto as Exhibit C; *see also* ECF No. 42, Ex. A (*Rappo v. Accent Delight Int'l Ltd.*, [2017] SGCA 27, ¶ 84 (Sing.)) ("It is undisputed . . . that the motivation for [Mr. Rybolovlev's transfer of artworks to Singapore] was because he wanted to shield his assets, including the

7

artworks, from the Russian authorities, whom he feared might attempt to appropriate his assets, and also from Elena, with whom he was embroiled in divorce proceedings.").

18.     While Mr. Rybolovlev and Ms. Rybolovleva evidently settled their divorce proceedings in October 2015, reaching a settlement the terms of which are confidential, *see* Exhibit C, the Sotheby's Entities had (and have) no insight into whatever potential claims Ms. Rybolovleva may have in connection with Plaintiffs' acquisitions of art or Mr. Rybolovlev's attempt to shield those works of art from Ms. Rybolovleva's reach, regardless of when Plaintiffs acquired those works. The Sotheby's Entities likewise have no insight into whatever claims of ownership over Plaintiffs' artworks Ms. Rybolovleva may have acquired as part of her confidential divorce settlement with Mr. Rybolovlev. The Sotheby's Entities therefore had (and still have) good reasons to include Ms. Rybolovleva as a defendant in the Swiss Civil Suit.

19.     Those reasons exist today just as they did when the Sotheby's Entities filed their Notice of Conciliation. Although Ms. Rybolovleva stated at the parties' conciliation hearing that the claimants in the Swiss Civil Suit do not owe any debt or liability to her, her statement was far from a clear waiver of all potential claims against the Sotheby's Entities—indeed, Ms. Rybolovleva's counsel continued as part of her statement that Ms. Rybolovleva's acknowledgment did "not imply any admission by my principal of the developments in fact [and] in law set out in" the Notice of Conciliation and was made "without prejudice to relationships binding or not binding on the other parties to the proceedings." ECF No. 41, Ex. D at 8. Given the complexity of assessing whether Ms. Rybolovleva held potential claims against the Sotheby's Entities in the first place, coupled with the lack of clarity as to exactly what Ms. Rybolovleva claimed to be acknowledging at the conciliation hearing, continuing their claims against Ms. Rybolovleva was the prudent thing for the Sotheby's Entities to do.

8

20. Ms. Giroud's allegation that the Sotheby's Entities "triggered conciliation in the Swiss Civil Suit even though it was not compulsory in that case" is baseless and misleading. *See* Giroud Decl. ¶ 43. As explained in my previous declaration, the general rule in Switzerland is that the filing of a Notice of Conciliation is a mandatory first step in initiating litigation. ECF No. 41 ¶ 6; SCCP Art. 197; D. Hofmann/C. Lüscher, Le Code de procédure civile, 2nd ed., 2015, p. 161. While a claimant may waive this requirement when all defendants are domiciled outside of Switzerland, this was not an option in this case for the Sotheby's Entities given the inclusion of Ms. Rybolovleva as a defendant. Even assuming, however, that all of the defendants in the Swiss Civil Suit had been domiciled abroad, as a practical matter the case would have proceeded in exactly the same manner as it has. It is accepted practice for Swiss litigants to initiate litigation by filing a Notice of Conciliation even in cases where a claimant does have the ability to waive that requirement, and in fact that is the practice recommended by both the Swiss legal academic community and the Swiss Federal Council. *See, e.g.*, Message of the Swiss Federal Council, FF 2006 6841, p. 6938; BSK ZPO-Infanger, Art. 199, N 6.

21. Attached as Exhibit D are true and correct copies of the relevant portions of the SCCP cited above, along with their English translations.

22. Attached as Exhibit E is a true and correct copy of the relevant portion of the LaCC cited above, along with its English translation.

23. Attached as Exhibit F are true and correct copies of the relevant portions of the Swiss judicial, doctrinal, and Federal Council opinions cited above, along with their English translations.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at ___Geneva___ on the 1st day of March, 2019.

_____
Saverio Lembo

10