# EXHIBIT H

# NEGATIVE DECLARATORY JUDGMENT REQUEST

(art. 202 CPC)

(VALUE IN DISPUTE: currently CHF 0.-, as things stand)

Filed by

**SOTHEBY'S SA**, a company incorporated under Swiss law, with its corporate seat at Talstrasse 83, 8001 Zurich and its branch office at rue François-Diday 2, 1204 Geneva

**SOTHEBY'S**, a company incorporated under English law, with its corporate seat at 34-35 New Bond St, Mayfair, London W1A 2AA, United Kingdom

**SOTHEBY'S, INC.**, a company incorporated under the laws of the State of New York, United States of America, with its corporate seat at 1334 York Avenue, NY 10021, United States of America

**SOTHEBY'S KUNSTAUKTIONEN GESELLSCHAFT M.B.H.,** a company incorporated under Austrian law, with its corporate seat at 5 Herrengasse, 1010 Vienna, Austria

**Mr. Samuel VALETTE**, domiciled at ██████████████████ London, United Kingdom

All electing their address for service at the law firm Bär & Karrer SA, 12, quai de la Poste, 1211 Geneva 11 and represented by Mr. Saverio Lembo and Ms. Aurélie Conrad Hari, attorneys.

**Sotheby's Claimants**

**Voluntary co-claimants**

Vs.

**Mr.  Dmitriy RYBOLOVLEV**, domiciled at  ██████ Monte Carlo, Principality of Monaco

**Ms. Ekaterina RYBOLOVLEVA**, domiciled at ████████████ ████████ Monte Carlo, Principality of Monaco

**XITRANS FINANCE LTD**, a company incorporated under the laws of the British Virgin Islands, with its corporate seat at Akara Building, 24 De Castro Street, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands

**ACCENT DELIGHT INTERNATIONAL LTD**, a company incorporated under the laws of the British Virgin Islands, with its corporate seat at Jipfa Building, 3rd floor, 142 Main Street, Road Town, Tortola, British Virgin Islands

**BOLTON TRUSTEES LIMITED**, a company incorporated under Cyprus law, with its corporate seat at 195 Arch. Makarios III Avenue, Neocleous House, Limassol, 3030, Republic of Cyprus

**MERCO TRUSTEES LIMITED**, a company incorporated under Cyprus law, with its corporate seat at 195 Arch. Makarios III Avenue, Neocleous House, Limassol, 3030, Republic of Cyprus

**MONTRAGO TRUSTEES LIMITED**, a company incorporated under Cyprus law, with its corporate seat at 195 Arch. Makarios III Avenue, Neocleous House, Limassol, 3030, Republic of Cyprus

All electing their address for service at the law firm Poncet Turretini Avocats, 8-10 rue de Hesse, 1211 Geneva 11 and represented by Messrs Carlo Lombardini and Alain Macaluso, attorneys.

**Ms. Elena RYBOLOVLEVA**, domiciled at ████████████████ Cologny but electing her address for service at the law firm Bonnant & Associés, 5, ch. de Kermély, 1206 Geneva and represented by Mr. Marc Bonnant and Ms. Caroline Schumacher, attorneys.

**Defendants**

In the framwork of the proceedings initiated jointly with

**Mr. Yves BOUVIER**, domiciled at ████████████████████████ Singapour, Republic of Singapore

**MEI INVEST LIMITED**, a company incorporated under Hong Kong law, with its corporate seat at Room 303 - 3/F., St. George's Building, 2 Ice House Street, Central, Hong Kong, Hong Kong Special Administrative Region of the People's Republic of China

**ARROW FINE ART L.L.C.**, a company incorporated under the laws of the State of Wyoming, United States of America, with its corporate seat at 2120 Carey Avenue, Suite 310, Cheyenne, WY 82001, United States of America

**KINSRIDE FINANCE LTD**, a company incorporated under the laws of the British Virgin Islands, with its corporate seat at Vanterpool Plaza, 2nd Floor, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands

**THE EAGLE OVERSEAS CO LTD**, a company incorporated under Hong Kong law, with its corporate seat at 3rd Floor, Jonsim Place - 228 Queen's Road East Wanchai, Hong Kong, Hong Kong Special Administrative Region of the People's Republic of China

**ART FAMILY PTE LTD**, a company incorporated under Singapore law, with its corporate seat at 32 Changi North Crescent, #02-01SR, Le Freeport, Singapore 499643, Republic of Singapore

**BLANCAFLOR INVESTMENTS LTD**, a company incorporated under the laws of the British Virgin Islands, with its corporate seat at 3rd Floor, Yamraj Building, Market Square, Road Town, Tortola, British Virgin Islands

All electing their address for service at the law firm Monfrini Bitton Klein, Place du Molard 3, 1204 Geneva and represented by Messrs. Yves Klein and David Bitton, attorneys.

**Bouvier Claimants**

**Voluntary co-claimants**

**Table of content**

Preamble.................................................................................6
A  **Prayers for relief** ..........................................................9
B  **Value in dispute**.........................................................11
C  **Facts**.............................................................................12
    I      **The Parties** .......................................................**12**
        1   The Sotheby's entities.................................................. 12
        2   Mr. Samuel Valette ...................................................... 13
        3   Mr. Yves Bouvier and his entities................................... 14
        4   The Defendants............................................................ 16
            4.1  Dmitriy Rybolovlev and his entities................................ 16
            4.2  Mrs Elena Rybolovleva .................................................. 17
            4.3  Mrs Ekaterina Rybolovleva ........................................... 18
    II     **The relationship between Sotheby's and Mr. Yves Bouvier ......18**
        1   In general ................................................................... 18
        2   The 12 artworks purchased by Blancaflor from Sotheby's and
            transfered by Mr. Bouvier to Mr. Rybolovlev ............................ 21
            2.1  *L'Homme assis au Verre* de Picasso ................................. 24
            2.2  *La Méditerranée* by Maillol and *Le Baiser* by Rodin.............. 27
            2.3  *Nu au Châle Vert* by Matisse ......................................... 32
            2.4  *L'Eternel Printemps* by Rodin ......................................... 36
            2.5  *Femme de Venise IX* by Giacometti .................................. 39
            2.6  *Le Domaine D'Arnheim* by Magritte ................................. 42
            2.7  *Eve* by Rodin ............................................................. 50
            2.8  *Serpents d'eau II* by Klimt ............................................. 52
            2.9  *Tête* by Modigliani ...................................................... 61
            2.10 *Au lit – Le baiser* by Toulouse-Lautrec .............................. 70
            2.11 The *Salvator Mundi* by Leonardo Da Vinci.......................... 72
            2.12 General conclusions regarding the sale of the 12 Artworks
                 to Yves Bouvier and his companies.................................... 80
        3   Valuation of artworks .................................................... 84
            3.1  Valuation services offered by Sotheby's ............................ 84
            3.2  The valuations requested by Mr. Bouvier........................... 88
            3.3  Conclusion on the valuations ........................................ 105
        4   Subsequent consignments of some of the 12 Artworks by Mr.
            Bouvier .................................................................... 106
    III    **The dispute between Mr. Yves Bouvier and Mr. Dmitry
         Rybolovlev and how Sotheby's became aware of it .................110**
        1   The press coverage further to Mr. Bouvier's arrest .................. 110
        2   Mr. Rybolovlev's contacts with Sotheby's further to the public
            allegations of fraud against Mr. Bouvier ................................. 111
    IV    **The threat of Mr. Dmitry Rybolovlev against the Sotheby's
         entities and Mr. Valette.................................................**114**
        1   The worldwide legal battle initiated by Mr. Rybolovlev against
            Mr. Bouvier ............................................................... 114
        2   The discovery proceedings initiated by the Rybolovlev's entities
            against Sotheby's, Inc. ................................................. 116
D  **The merits** ...................................................................**120**
    I      **Introductory Remark** ........................................**120**
    II     **Admissibility** ....................................................**122**
            1.1  Jurisdiction of the Court.............................................. 122

|      | 1.2 | The Interest of the Sotheby's Claimants to Act in a Negative Determination of the Law ................................. 124 |
|------|-----|---|
|      | 1.3 | Compliance with the Deadline for Filing Suit .................... 125 |
| **III** | **The Parties....................................................................125** | |
|      | 1 | Plaintiffs as voluntary co-claimants (so-called "*simple consorts*") 125 |
|      | 2 | The Defendants.................................................... 126 |
| **IV** | **The Defendants' Absence of Claim Against the Sotheby's Claimants.................................................................126** | |

PRIVILEGED AND CONFIDENTIAL

## Preamble

The dispute between the Russian oligarch, Mr. Dmitry Rybolovlev, and his art dealer Mr. Yves Bouvier, has been broadly reported in the media worldwide. This saga has now started more than three years ago with the arrest of Mr. Bouvier on 25 February 2015 in Monaco. This saga is based on a purported fraud on the one side and encompasses, on the other, allegations of no less than spying, conspiracy, justice manipulation and corruption.

Since this arrest that was widely reported in the media, Mr. Rybolovlev has initiated numerous criminal and civil proceedings against or concerning Mr. Bouvier and Mr. Bouvier's entities, including proceedings in Monaco, France, Singapore, New York and Switzerland. In a nutshell, Mr. Rybolovlev claims to have been defrauded by Mr. Bouvier of an amount in excess of USD 1 billion corresponding to the margin between the price Mr. Bouvier paid to acquire each artwork, plus the commission that Mr. Rybolovlev claims he had paid to Mr. Bouvier for his services, and the allegedly inflated prices Mr. Bouvier actually charged Mr. Rybolovlev in selling him the artworks for what would become one of the most impressive private art collections of the century.

One may then wonder what the role of the Sotheby's entities in this imbroglio is. The answer is very straightforward: none.

Obviously, the Sotheby's entities are well known in the art industry as comprising one of the two major auction houses in the world, dealing with the most valuable artworks worldwide. This is probably what makes it an interesting target for Mr. Rybolovlev.

However, the Sotheby's entities never entered into any contractual relationship with the Russian oligarch regarding any of the works of art at issue in this dispute. Moreover, Mr. Rybolovlev never allowed himself to be known to the Sotheby's entities as the buyer or the seller of any works of art.

Whilst Mr. Bouvier did acquire several dozens of artworks via certain Sotheby's entities, some of which he allegedly resold to Mr. Rybolovlev at a markup, the Sotheby's entities only learned about Mr. Bouvier's allegedly marked up resales to Mr. Rybolovlev when this entire scandal exploded in the press, *i.e.* as of February 2015. Following the public revelations, the Sotheby's entities eventually learned that 12 of the 41 artworks they sold to Mr. Bouvier – or more specifically to his entity Blancaflor – were eventually re-sold to entities controlled by Mr. Rybolovlev (the "**Artworks**") (see below CIII).

Mr. Bouvier never informed Sotheby's that he was acting on behalf of Mr. Rybolovlev or anyone else in acquiring the Artworks. Even more so, the Sotheby's entities were not aware of the price Mr. Bouvier would charge for any of the art

works to, if he did decide to resell them. As far as the Sotheby's entities were aware, Mr. Bouvier was purchasing and the artworks on his own behalf, and therefore could resell or keep them, as was his right. The Sotheby's entities currently still are unaware of the true nature of the relationship between Mr. Bouvier and the Russian oligarch as well as the underlying modalities to the transfer of the artworks to him, outside of what the press has reported (see below CIII1).

Until recently, Mr. Rybolovlev never targeted any Sotheby's entity in his allegations of fraud, and rightly so. When Mr. Rybolovlev sought information and documents from Sotheby's, Inc. by filing discovery proceedings in New York, Sotheby's Inc. could not make a determination with respect to the dispute between Mr. Rybolovlev and Mr. Bouvier, and adhered to its obligations of confidentiality that prevented Sotheby's Inc. from disclosing the requested information without a court order. It is in the context of these discovery proceedings that Mr. Rybolovlev pronounced false accusations against the Sotheby's entities. He then claimed that the Sotheby's entities and one of its employees, Mr. Samuel Valette, had aided and abetted Mr. Bouvier in committing his fraud by providing him with valuations of artworks, the purpose of which would have been to mislead and deceive Mr. Rybolovlev (see below CIV).

Such allegations are ungrounded and strongly disputed.

Further to the threat directed against the Sotheby's entities by Mr. Rybolovlev's entities in the New York proceedings, Sotheby's was prompted to react immediately to prevent becoming the new target of the next judicial battle that the Russian oligarch contemplated initiating (see below CIV2).

Mr. Rybolovlev's about-face in his treatment of the Sotheby's entities demonstrates his general inconsistency and ambiguity in pursuing his claims, as illustrated most clearly by his allegations with respect to the sale of the *Salvator Mundi* last November. This masterpiece of Leonardo da Vinci was central to the campaign he has waged against Mr. Bouvier, alleging that the latter over-charged him for this painting alone by around USD 40 million. Whilst Mr. Bouvier had paid USD 83 million for the painting, he then allegedly charged Mr. Rybolovlev USD 127 million. Last November, however, Mr. Rybolovlev sold that same painting for an absolute record price exceeding USD 450 million, thereby making this painting the most expensive work of art ever sold at auction (see below N 287).

Sotheby's shall then demonstrate below that it cannot be blamed and does not bear any liability towards Mr. Rybolovlev and/or his entourage or entities. Sotheby's will then describe below how the sale of the 12 Artworks were processed detailing its exact involvement with Mr. Bouvier and its unawarenessof Mr. Bouvier's intent in respect of these 12 Artworks (see below CII2). Sotheby's shall also detail

the insurance valuations requested by Mr. Bouvier and the context of such insurance valuations (see below CII3) to finally demonstrate that no liability ground can be invoked against Sotheby's or Mr. Valette (see below DIV).

PRIVILEGED AND CONFIDENTIAL

## A    Prayers for relief

For the reasons set-out below, Sotheby's SA, Sotheby's, Sotheby's Inc. Sotheby's Kunstauktionen Gmbh and Mr. Samuel Valette respectfully requests that the:

## THE COURT OF FIRST INSTANCE

### I   As to the form

1.  Declares the present submission admissible.

### II  On the merits

<u>Preliminarily</u>

2.  Rules on the request for measures to safeguard interests worthy of protection filed in the framework of the proceedings C/27203/2017 by Sotheby's SA, Sotheby's, Sotheby's Inc., Sotheby's Kunstauktionen Gmbh and Mr. Samuel Valette by way of separate letter filed with the Geneva Court of First Instance following the filing of the present claim on 11 July 2018.

3.  Joins the present claim, filed today by Sotheby's SA, Sotheby's, Sotheby's Inc., Sotheby's Kunstauktionen Gmbh and Mr. Samuel Valette in the framework of the proceedings C/27203/2017, with the claim filed today by Mr. Yves Bouvier, MEI Invest Limited, Arrow Fine Art LLC, Kinsride Finance Ltd, The Eagle Overseas Co Ltd, Art Family Pte Ltd and Blancaflor Investments Ltd in the proceedings C/27203/2017.

<u>Principally</u>

4.  Declares that Sotheby's SA, Sotheby's, Sotheby's Inc., Sotheby's Kunstauktionen Gmbh and Mr. Samuel Valette have no liability or debt of any sort toward Mr. Dmitri Rybolovlev and/or Mrs. Elena Rybolovleva and/or Ms. Ekaterina Rybolovleva and/or Xitrans Finance Ltd and/or Accent Delight International Ltd and/or Merco Trustees Limited and/or Montrago Trustees Limited and/or Bolton Trustees Limited.

<u>Subsidiarily</u>

5.  Guides Sotheby's SA, Sotheby's, Sotheby's Inc., Sotheby's Kunstauktionen Gmbh and Mr. Samuel Valette in proving, by all legal means, the facts alleged in the present submission.

<u>In any event</u>

6. Orders Mr. Dmitri Rybolovlev, Ms. Elena Rybolovleva, Ms. Ekaterina Ry-
   bolovleva, Xitrans Finance Ltd, Accent Delight International Ltd, Merco Trus-
   tees Limited, Montrago Trustees Limited and Bolton Trustees Limited to
   bear all costs and expenses of the proceedings.

7. Dismisses any other or adverse relief sought by Mr. Dmitri Rybolovlev,
   Ms. Elena Rybolovleva, Ms. Ekaterina Rybolovleva, Xitrans Finance Ltd, Ac-
   cent Delight International Ltd, Merco Trustees Limited, Montrago Trustees
   Limited and Bolton Trustees Limited.

8. Reserves in favour of Sotheby's SA, Sotheby's, Sotheby's Inc., Sotheby's
   Kunstauktionen Gmbh and Mr. Samuel Valette the right to modify, clarify
   and/or amplify their prayers for relief.

## B    Value in dispute

According to art. 221 point 1 letter c of the Swiss Civil Procedure Code (CPC), the claim indicates the amount of the value in dispute.

The present proceeding seeks a negative declaratory judgment acknowledging that the Defendants have no valid claim against Sotheby's Claimants. Since the latter sustain and shall establish in this proceeding that there is no claim against them owed by the Defendants, the value in dispute, from Sotheby's Claimants' stand-point, is nil (at least as long as the Defendants have not quantified their claim).

One shall further note that, as it stands, Sotheby's Claimants would actually not even be in a position to give any value as they would merely have to guess and make hypotheses to come up with a figure on the purported claim the Defendants purportedly hold against them. Indeed, the Defendants have so far neither sub-stantiated nor quantified their claim, notwithstanding their threats of filling an im-mediate suit before the London courts (see below CIV2).

Such a situation is obviously atypical and is due to the peculiar nature of a negative declaratory request, where the roles of the parties are reversed. In that sense, the formal claimant in the proceedings is actually the alleged debtor of the claim. Therefore, the mere reversal of the roles in the procedure shall not with it reverse the burden of proof of the parties nor of the rules on the apportionnement of pro-cedural costs. The formal claimant, i.e. the alleged debtor, must not, as a result of the reversal of the procedural roles, be placed in a situation where the debtor has to specify the amount of the claim even before such claim has been quantified and advance the costs of the proceeding in order to finance the trial in the place and stead of the effective claimant, i.e. the alleged creditor.

Needless to say that, irrespective of the identity of the party that has to bear the costs, it would be particularly odd to request the formal claimant – i.e. the defend-ant on the merits – to quantify the claim of its opposing party without knowing the exact details of the claim that the creditor plans to invoke, and at the risk of in-creasing the actual amount of the claim.

For such reasons, given the particular nature of the negative declaratory request, the formal claimant shall not be requested to quantify the claim prior the formal defendant has not quantified its claim.

As a consequence, in the present case, the value at stake shall be considered as being nil, so long as the Defendants have not quantified their claim. The value at stake could be reassessed further to the filing of the Defendants' reply – and pos-sible counterclaim.

For the sake of completeness, Sotheby's Claimants specify that, given the amount of the claim, i.e. an amount in excess of USD 1 billion, claimed by the Defendants against Mr. Yves Bouvier following the sale of 37 artworks by Mr. Bouvier's entities to Mr. Rybolovlev, there is little doubt that the claim to be raised by the Defendants against Sotheby's Claimants will exceed CHF 10 million (being the maximum relevant threshold for the advance on cost to be ordered according to the cantonal statute on court costs in civil matters). It must be recalled however that the alleged claim of the Defendants against the Sotheby's Claimants should necessarily fall short of the claim raised against Mr. Bouvier since only 12 artworks – out of the 37 that Mr. Rybolovlev or its entities purchased via Mr. Bouvier – were purchased through Sotheby's.

## C    Facts

## I    The Parties

### 1    The Sotheby's entities

1    Sotheby's SA is a Swiss company incorporated in Zurich under the laws of Switzerland, since 1991.

    **EV**:    Extract from the Register of Commerce of Zurich regarding Sotheby's SA    Exhibit 1

2    Sotheby's SA has a branch in Geneva registered at 2, Rue François-Diday, 1204 Genève.

    **EV**:    Extract from the Register of Commerce of Geneva regarding Sotheby's SA,    Exhibit 2
            Geneva Branch

3    Sotheby's, Inc., is incorporated in New York and has its corporate seat at 1334 York Avenue, NY 10021, United States of America.

    **EV**:    Certificate of incorporation regarding Sotheby's, Inc., New York    Exhibit 3

4    Sotheby's is incorporated under the laws of England and Wales and has its corporate seat at 34-35 New Bond Street, Mayfair, London W1A 2AA, United Kingdom ("**Sotheby's London**").

    **EV**:    Certificates of incorporation regarding Sotheby's London    Exhibit 4

5    All the above entities are separate legal entities that together form part of Sotheby's global network of 80 offices in 40 countries ("**Sotheby's**").

    **EV**:    Extract form Sotheby's internet website    Exhibit 5

6      Sotheby's is the first international auction house that was established back in 1774.

> **EV**:     Extract from Sotheby's internet website                                    Exhibit 5
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Sotheby's representatives[1]

7      Sotheby's is listed on the New York Stock Exchange.

> **EV**:     Extract from Sotheby's internet website                                    Exhibit 5
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Sotheby's representative

8      Besides organizing auction sales, the various Sotheby's entities also conduct private sales and offer a broad range of services to art-owners, buyers and sellers, including providing valuations, museum services, tax and heritage services, as well as financial services.

> **EV**:     Extract form Sotheby's internet website                                    Exhibit 5
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Sotheby's representative

**2      Mr. Samuel Valette**

9      Mr. Valette is an art specialist, of French origins ("**Mr. Valette**").

> **EV**:     Testimony of Mr. Samuel Valette
>
> Testimony of Sotheby's representative

10     Mr. Valette was employed by an art gallery in Paris (Galerie d'Orsay), prior to joining Sotheby's France in 2003.

> **EV**:     Testimony of Mr. Samuel Valette
>
> Testimony of Sotheby's representative

11     Back in 2003, he was hired as a senior cataloguer in the Impressionist and Modern Art department at Sotheby's France.

---

[1]     The Sotheby's Claimants clarify herewith that when they refer to the testomony of Sotheby's as means of evidence, such refers to the hearing of the representatives of every Sotheby's entity that is party to the present proceedings.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

12   He was promoted to the head of the Impressionist and Modern Art department at Sotheby's Paris in 2008.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

13   In January 2011, Mr. Valette was offered the position of Senior Director, Impressionist and Modern Art, in the London office of Sotheby's UK.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

14   Since the end of 2013, Mr. Valette has assumed the role of Vice Chairman of Private Sales Worldwide for Impressionist and Modern Art, as well as Senior International Specialist in the same Department, but continued to operate out of London as an employee of Sotheby's UK.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

15   His work focused in part on sourcing art works for auction as well as private sales to then coordinate worldwide transactions.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

**3**   **Mr. Yves Bouvier and his entities**

16   Mr. Yves Bouvier is a Swiss citizen, currently domiciled ███████████ ███████████ Singapour, Republic of Singapour ("**Mr. Bouvier**").

**EV**:   Testimony of Mr. Yves Bouvier

17   He is well known in the art market for having expanded his company Natural Le Coultre SA, based in Geneva, offering services for the storage, packing and shipping of art works and other valuable items. His company at relevant times was the largest tenant of the Freeport in Geneva, where many collectors store and trade art, and he was the owner of several other freeports worldwide.

| | | |
|---|---|---|
| **EV**: | Testimony of Mr. Yves Bouvier | |
| | Extracts from Natural LeCoultre SA website | Exhibit 6 |
| | Testimony of Mr. Samuel Valette | |
| | Testimony of Sotheby's representative | |
| | Press article: "*Yves Bouvier: une ascension fulgurante dans le monde de l'art*", Le Temps, 26 February 2015 | Exhibit 7 |
| | Press article: "*Ce visionnaire qui a parié sur l'Asie*", Bilan, 4 September 2013 | Exhibit 8 |

18    Mr. Bouvier controlled various other entities, among them Blancaflor Investments Ltd., a company registered under the laws of the British Virgin Islands and having its corporate seat at 3rd Floor, Yamraj Building, Market Square, Road Town, Tortola, the British Virgin Islands ("**Blancaflor**").

| | |
|---|---|
| **EV**: | Testimony of Mr. Yves Bouvier |

19    As detailed below (see below CII2), Mr. Yves Bouvier purchased and sold various art works with one or more of the Sotheby's entities.

20    Blancaflor was the entity of Mr. Bouvier that entered into the various purchase and sale agreements with the various Sotheby's entities, and executed the various contracts with such entities. Under these contracts, various Sotheby's entities, on behalf of the owners of artworks, transferred title to Blancaflor.

| | | |
|---|---|---|
| **EV**: | Agreement between Sotheby's SA, Geneva and Blancaflor regarding the sale of *Homme assis au verre* by Picasso, dated 1 April 2011 | Exhibit 9 |
| | Agreement between Sotheby's, Inc. and Blancaflor regarding the sale of *Le Baiser* by Rodin and *Méditéranée* by Maillol, dated 12 April 2011. | Exhibit 10 |
| | Agreement between Sotheby's UK and Blancaflor regarding the sale of *Nu au Châle Vert* by Matisse, dated 27 June 2011. | Exhibit 11 |
| | Agreement between Sotheby's UK and Blancaflor regarding the sale of *L'Eternel Printemps* by Rodin, undated. | Exhibit 12 |
| | Agreement between Sotheby's UK and Blancaflor regarding the sale of *Femme de Venise IX* by Giacometti, dated 8 November 2011. | Exhibit 13 |
| | Agreement between Sotheby's UK and Blancaflor regarding the sale of *Le Domaine d'Arnheim* by Magritte, dated 8 December 2011. | Exhibit 14 |
| | Agreement between Sotheby's UK and Blancaflor regarding the sale of *Eve* by Rodin, dated 8 March 2012. | Exhibit 15 |

PRIVILEGED AND CONFIDENTIAL

| | |
|---|---|
| Agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 11 September 2012. | Exhibit 16 |
| Amendment to the 11 September 2012 agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 30 January 2013 | Exhibit 17 |
| Amendment to the 11 September 2012 agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 2 April 2013 | Exhibit 18 |
| Amendment to the 11 September 2012 agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 5 July 2013 | Exhibit 19 |
| Agreements between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 15 and 23 July 2013 | Exhibit 20 |
| Agreement between Sotheby's UK and Blancaflor regarding the sale of *Tête* by Modigliani, dated 25 September 2012. | Exhibit 21 |
| Agreement between Sotheby's, Inc. and Blancaflor regarding the sale of *Au Lit, Le Baiser* by Toulouse-Lautrec, dated 3 and 8 October 2012. | Exhibit 22 |
| Agreement between Sotheby's, Inc. and Blancaflor regarding the sale of *Christ as Salvator Mundi* by Da Vinci, dated 2 May 2013. | Exhibit 23 |

Testimony of Mr. Yves Bouvier

Testimony of Mr. Samuel Valette

## 4    The Defendants

## 4.1    Dmitriy Rybolovlev and his entities

21    Mr. Dmitriy Rybolovlev is a Russian oligarch, who has been ranked as the 166th richest man in the world by Forbes in 2016 with assets amounting to USD 7.7 billion ("**Mr. Rybolovlev**").

**EV:**    Deposition of Mr. Dmitri Rybolovlev

Extract from Dmitri Rybolovlev's Wikipedia page dated 10 July 2017          Exhibit 24

22    Since January 2011, he is domiciled in ██████████████████ ██████ Monte Carlo, Monaco.

**EV:**    Deposition of Mr. Dmitri Rybolovlev

23    Before his relocation to Monaco, Mr. Rybolovlev was domiciled in Geneva.

**EV:**    Deposition of Mr. Dmitri Rybolovlev

24    Xitrans Finance Limited is incorporated since 2 May 2002 in the British Virgin Island and has its corporate seat at Akara Building, 24 De Castro Street, Wickhams Cay 1, Road Town, Tortola, BVI ("**Xitrans**").

**EV:**    Deposition of Mr. Dmitri Rybolovlev

25    M. Rybolovlev is the holder of a power of attorney for Xitrans.

**EV:**    Deposition of Mr. Dmitri Rybolovlev

26    Accent Delight International Limited was incorporated on 8 October 2010 in the British Virgin Island and has its corporate seat at Jipfa Building, 3rd floor, 142 Main Street, Road Town, Tortola, BVI ("**Accent**").

**EV**:    Deposition of Mr. Dmitri Rybolovlev

27    M. Rybolovlev is the holder of a power of attorney for Accent.

**EV**:    Deposition of Mr. Dmitri Rybolovlev

28    Both Xitrans and Accent are formally owned by the Cyprus Domus Trust, whose settlor and beneficiary is believed to be Ms. Ekaterina Rybolovleva, the eldest daughter of Mr. Rybolovlev.

**EV:**    Deposition of Mr. Dmitri Rybolovlev

## 4.2    Mrs. Elena Rybolovleva

29    Mrs. Elena Rybolovleva is the former wife of Mr. Dmitri Rybolovlev.

**EV**:    Deposition of Mrs. Elena Rybolovleva

Deposition of Mr. Dmitri Rybolovlev

30    She is domiciled at ██████████████ inCologny.

**EV**:    Deposition of Mrs. Elena Rybolovleva

Deposition of Mr. Dmitri Rybolovlev

31    She was married with Mr. Dmitri Rybolovlev until 2015.

**EV**:    Deposition of Mrs. Elena Rybolovleva

Deposition of Mr. Dmitri Rybolovlev

PRIVILEGED AND CONFIDENTIAL

32    The divorce settlement was entered into by the spouses in 2015, the details of which is unknown to the Sotheby's Claimants.

   **EV**:   Deposition of Mrs. Elena Rybolovleva

           Deposition of Mr. Dmitri Rybolovlev

33    She was still married to Mr. Rybolovlev when the various Sotheby's entities sold each of the 12 artworks to Blancaflor.

   **EV**:   Deposition of Mrs. Elena Rybolovleva

           Deposition of Mr. Dmitri Rybolovlev

**4.3   Ms. Ekaterina Rybolovleva**

34    Ms. Ekaterina Rybolovleva is the eldest daughter of Mr. Rybolovlev.

   **EV**:   Deposition of Mrs. Ekaterina Rybolovleva

           Deposition of Mr. Dmitri Rybolovlev

35    She is domiciled with her father at ███████████████████████ ████ Monaco, Principauté of Monaco.

   **EV**:   Deposition of Mrs. Ekaterina Rybolovleva

           Deposition of Mr. Dmitri Rybolovlev

**II    The relationship between Sotheby's and Mr. Yves Bouvier**

**1    In general**

36    Mr. Yves Bouvier – through his entities – purchased artworks from various Sotheby's entities and also consigned various artworks to be sold by various Sotheby's entities over the years.

   **EV**:   Testimony of Mr. Samuel Valette

           Testimony of Mr. Yves Bouvier

           Testimony of Sotheby's representative

37    Through his entities, Mr. Bouvier not only purchased artworks from Sotheby's, but also consigned several of them for auctions conducted by Sotheby's

   **EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

38    Mr. Valette first met Mr. Bouvier in 2007.

   **EV**:   Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Testimony of Sotheby's representative

39    Between 2007 and 2015, the various Sotheby's entities sold a total of 41 works of art to Blancaflor or other entities owned by Mr. Bouvier. In each of these occasions, the Sotheby's entity, as agent of the owner of the work, conveyed title to Blancaflor. The Sotheby's entities later learned, when the case opposing Mr. Bouvier to Mr. Rybolovlev came to light in the media, as well as through contacts instigated by Mr. Rybolovlev's counsels and by means of court proceedings (see below CIII), that Mr. Bouvier subsequently sold 12 of these artworks to Mr. Rybolovlev or one of his companies.

   **EV**:   Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Testimony of Sotheby's representative

40    Also, in 2007, Mr. Bouvier indicated that he wanted to sell an artwork, the *Nymphéas* by Claude Monet[2].

   **EV**:   Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Testimony of Sotheby's representative

41    Within this context, Mr. Valette was contacted by Mr. Jean-Marc Peretti ("**Mr. Peretti**"), who presented himself as Mr. Bouvier's art adviser.

   **EV**:   Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Testimony of Sotheby's representative

---

[2]    For the sake of clarity, we outline that this painting is not the same paintings also called *Nymhpéas* that Mr. Rybolovlev apparently bought from Mr. Bouvier.

42   Mr. Valette is the person at Sotheby's UK who had been contacted by Mr. Peretti as he was a specialist in the Impressionist and Modern Art Department at Sotheby's Paris.

   **EV**:   Testimony of Mr. Samuel Valette

   Testimony of Mr. Yves Bouvier

   Testimony of Sotheby's representative

43   At that time, employees of the Sotheby's entities knew that the Sotheby's entities were competing with Christie's to get the consignment of the *Nymphéas* for auction.

   **EV**:   Testimony of Mr. Samuel Valette

   Testimony of Mr. Yves Bouvier

   Testimony of Sotheby's representative

44   Sotheby's UK eventually was granted the consignment of the artwork.

   **EV**:   Testimony of Mr. Samuel Valette

   Testimony of Mr. Yves Bouvier

   Testimony of Sotheby's representative

45   The latter was sold at auction on 19 June 2007 for GBP 18.5 million, *i.e.* approximately USD 36.7 million, which marked the world record for Monet at auction at that time.

   **EV**:   Testimony of Mr. Samuel Valette

   Testimony of Mr. Yves Bouvier

   Testimony of Sotheby's representative

46   As far as the Sotheby's entities and Mr. Valette are aware, Mr. Rybolovlev was not related to this transaction.

   **EV**:   Testimony of Mr. Samuel Valette

   Testimony of Mr. Yves Bouvier

   Testimony of Sotheby's representative

47      The auction proved a success and Mr. Peretti then introduced Mr. Bouvier to Mr. Valette over celebratory drinks that evening.

     **EV**:    Testimony of Mr. Samuel Valette

            Testimony of Mr. Yves Bouvier

            Testimony of Sotheby's representative

48      Mr. Valette and Mr. Peretti kept in touch from time to time after the 19 June 2007 auction. Mr. Peretti from would on occasion ask Mr. Valette his opinion on various works of art, and also consigned another painting to a Sotheby's entity on Mr. Bouvier's behalf. As far as the Sotheby's entities are aware, Mr. Rybolovlev also had no involvement with this particular work of art.

     **EV**:    Testimony of Mr. Samuel Valette

            Testimony of Mr. Yves Bouvier

            Testimony of Sotheby's representative

**2      The 12 artworks purchased by Blancaflor from Sotheby's and transfered by Mr. Bouvier to Mr. Rybolovlev**

49      In 2010, Mr. Bouvier informed Mr. Valette that he was looking for masterpieces and asked Mr. Valette to inform him of any artworks that may become available for him to buy.

     **EV**:    Testimony of Mr. Samuel Valette

            Testimony of Mr. Yves Bouvier

            Testimony of Sotheby's representative

50      Mr. Valette knew Mr. Bouvier since the *Nymphéas* sale (see above CII1) and thus viewed Mr. Bouvier as an important client that had the capabilities to deal with this level of artworks.

     **EV**:    Testimony of Mr. Samuel Valette

            Testimony of Mr. Yves Bouvier

            Testimony of Sotheby's representative

51      Mr. Bouvier did not provide any particular detail to Mr. Valette as to his intent nor the purpose of his request.

     **EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

52    In particular, neither Mr. Valette nor any other employee of a Sotheby's entity was informed whether Mr. Bouvier was looking for such pieces for himself, his entities, one or more investors or any third party.

   **EV**:   Testimony of Mr. Samuel Valette

   Testimony of Mr. Yves Bouvier

   Testimony of Sotheby's representative

53    Sotheby's deals with many purchasers who act in a variety of capacities, including as collectors, consortiums of investors, art dealers or intermediaries.

   **EV**:   Testimony of Mr. Samuel Valette

   Testimony of Sotheby's representative

54    Mr. Bouvier did not specify how many pieces he was looking for.

   **EV**:   Testimony of Mr. Samuel Valette

   Testimony of Mr. Yves Bouvier

   Testimony of Sotheby's representative

55    Whether a purchaser is buying for himself, or a group of investors, or may eventually resell the artwork, is a matter for the purchaser to decide for himself, and is a decision that he may or may not elect to share.

   **EV**:   Testimony of Mr. Samuel Valette

   Testimony of Sotheby's representative

56    This is especially true for art dealers who can either purchase on their own account as final purchasers or on behalf of a consortium of art investors of which they form part, or else in view of reselling to a third party or as representative of a third party, without the identity of the principal being revealed.

   **EV**:   Testimony of Mr. Samuel Valette

   Testimony of Sotheby's representative

57    As described above (see above CI3) Mr. Bouvier at the relevant times was a re-
      nowned figure in the art world.

  **EV**:    Press article: "*Yves Bouvier: une ascension fulgurante dans le monde de*    Exhibit 7
             *l'art*", Le Temps, 26 February 2015

             Press article: "*Ce visionnaire qui a parié sur l'Asie*", Bilan, 4 September 2013    Exhibit 8

             Testimony of Mr. Samuel Valette

             Testimony of Mr. Yves Bouvier

             Testimony of Sotheby's representative

58    He was known as the owner of Natural Le Coultre, an art services company and
      the largest tenant in the Geneva Freeport, and was expanding his business activi-
      ties in Singapore, notably.

  **EV**:    Press article: "*Yves Bouvier: une ascension fulgurante dans le monde de*    Exhibit 7
             *l'art*", Le Temps, 26 February 2015

             Press article: "*Ce visionnaire qui a parié sur l'Asie*", Bilan, 4 September 2013    Exhibit 8

             Testimony of Mr. Samuel Valette

             Testimony of Mr. Yves Bouvier

             Testimony of Sotheby's representative

59    Given his role and position, he had access to major art players worldwide, including
      collectors.

  **EV**:    Press article: "*Yves Bouvier: une ascension fulgurante dans le monde de*    Exhibit 7
             *l'art*", Le Temps, 26 February 2015

             Press article: "*Ce visionnaire qui a parié sur l'Asie*", Bilan, 4 September 2013    Exhibit 8

             Testimony of Mr. Samuel Valette

             Testimony of Mr. Yves Bouvier

             Testimony of Sotheby's representative

60    As detailed below, from March 2011 through May 2013, the various Sotheby's en-
      tities sold to Blancaflor, Mr. Bouvier's entity, 12 artworks that they later learned
      were subsequently sold to Mr. Rybolovlev or an entity controlled by him (the "**12
      Artworks**") (see below CII2).

  **EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

61    With respect to each of the 12 Artworks, the counterparty of the Sotheby's entity involved was Blancaflor, which is the entity that took title to each artwork.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

62    While generally aware that Mr. Bouvier could be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to resell to another, neither Sotheby's nor its employees knew precisely what Mr. Bouvier planned to do with such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know the price (or any other modality) at which Mr. Bouvier planned to later charge for said artwork, if he did decide to resell it.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

63    Only later did Sotheby's learn via press reports, *i.e.* in February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

        Absence of evidence to the contrary

**2.1**   ***L'Homme assis au Verre* de Picasso**

64    In March 2011, Mr. Valette indicated to Mr. Bouvier that an artwork by Picasso, *L'Homme assis au Verre*, may be available for sale by its owner.

> **EV**: Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

65   Mr. Bouvier requested Mr. Valette to provide him with a note describing the painting.

> **EV**: Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

66   By email dated 18 March 2011, Mr. Valette sent Mess. Bouvier and Peretti a note detailing the history and details of *L'Homme assis au verre.*

> **EV**: Email dated 18 march 2011 from Mr. Samuel Valette to Mr. Yves Bouvier and      Exhibit 25
> Mr. Jean-Marc Peretti
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

67   Mr. Valette specified that Sotheby's UK would call the owner a few days later to obtain a firm price on the picture:

> *"Cher Yves, Cher Jean-Marc,*
>
> *Voici la note comme convenu avec les expositions, un commentaire sur son importance, les photos de Picasso et les photos de 3 tableaux comparables dans des Musées. On fera le film mardi devant le tableau. On rappellera le client mardi après-midi pour avoir un prix ferme".[3]*

> **EV**: Email dated 18 march 2011 from Mr. Samuel Valette to Mr. Yves Bouvier and      Exhibit 25
> Mr. Jean-Marc Peretti
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

---

[3]   Quotations are reproduced exactly as the original, unless otherwise specified, so typos have not been corrected.

68    Following discussions with the seller, a price of USD 62'000'000 was agreed upon (inclusive of the buyer's premium).

    **EV**:   Testimony of Mr. Samuel Valette

           Testimony of Mr. Yves Bouvier

           Testimony of Sotheby's representative

69    A sale agreement was signed in Geneva on 1 April 2011 (the "**Picasso Agreement**").

    **EV**:   Agreement between Sotheby's SA, Geneva and Blancaflor regarding the sale      Exhibit 9
           of *Homme assis au verre* by Picasso, dated 1 April 2011.

           Testimony of Mr. Samuel Valette

           Testimony of Mr. Yves Bouvier

           Testimony of Sotheby's representative

70    Sotheby's SA entered into the agreement as agent of the seller – as typically is the case for confidentiality purposes for both the seller and the buyer – and Mr. Bouvier indicated that his company Blancaflor was to be the acquirer.

    **EV**:   Agreement between Sotheby's SA, Geneva and Blancaflor regarding the sale      Exhibit 9
           of *Homme assis au verre* by Picasso, dated 1 April 2011.

           Testimony of Mr. Samuel Valette

           Testimony of Mr. Yves Bouvier

           Testimony of Sotheby's representative

71    Mr. Bouvier then signed the Picasso Agreement in his capacity as representative of Blancaflor.

    **EV**:   Agreement between Sotheby's SA, Geneva and Blancaflor regarding the sale      Exhibit 9
           of *Homme assis au verre* by Picasso, dated 1 April 2011.

           Testimony of Mr. Samuel Valette

           Testimony of Mr. Yves Bouvier

           Testimony of Sotheby's representative

72    Payment was received on 5 April 2011 on a Swiss bank account held by Sotheby's.

    **EV**:   Testimony of Sotheby's representative

Testimony of Mr. Samuel Valette

73     While generally aware that Mr. Bouvier could be the ultimate purchaser, or one of
       a group of investors, or purchasing with the intent to resell from one to another, neither
       Sotheby's nor its employees knew precisely what Mr. Bouvier planned to do with
       such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know
       the price (or any other modality) at which Mr. Bouvier planned to later charge for
       said artwork, if he did decide to resell it.

       **EV**:    Testimony of Mr. Samuel Valette

              Testimony of Mr. Yves Bouvier

              Testimony of Sotheby's representative

74     Only later did Sotheby's learn via press reports, *i.e.* in February 2015, when the
       arrest of Mr. Bouvier made the headlines (then later in the framework of the dis-
       cussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judi-
       cial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had
       allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies.
       At the time when the various Sotheby's entities sold these 12 Artworks to Mr.
       Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned,
       and, even less so, the price charged by Mr. Bouvier and the details of such resale.

       **EV**:    Testimony of Mr. Samuel Valette

              Testimony of Mr. Yves Bouvier

              Testimony of Sotheby's representative

              Absence of evidence to the contrary

**2.2**    *La Méditerranée* **by Maillol and** *Le Baiser* **by Rodin**

75     Shortly after the acquisition of *L'Homme assis au Verre*, Mr. Bouvier also indicated
       to Mr. Valette that he was looking for a monumental sculpture.

       **EV**:    Testimony of Mr. Samuel Valette

              Testimony of Mr. Yves Bouvier

              Testimony of Sotheby's representative

76     One or more of the Sotheby's entities had at that time two sculptures from two
       different sellers that Mr. Valette thought may be of interest Mr. Bouvier.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

77   Those were (i) *La Méditerranée* by Maillol and (ii) *Le Baiser* by Rodin.

78   Mr. Bouvier asked, by email dated 9 April 2011, to be provided with some infor-mation about the above sculptures, notably as to *Le Baiser*:

> *"Bonjour Sam,*
>
> *Je vois déjà mon ami demain dimanche.*
>
> *Afin d'avoir un maximum d'argument, peux-tu me dire ou sont les autres tirages du Baiser, surtout si ils sont en Musée, fonda-tion…*
>
> *Par ailleurs le numero suivant est-il destiné au privé ou à la vente publique?*
>
> *As-tu des nouvelles du fumeur?*
>
> *Bonne journée*
>
> *Yves"*

**EV**:   Email dated 9 April 2011 from Mr. Yves Bouvier to Mr. Samuel Valette          Exhibit 26

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

79   Mr. Valette then sent a short note on the same day to Mr. Bouvier describing the history and details of *La Méditerranée*.

**EV**:   Email dated 9 April 2011 from Mr. Samuel Valette to Mr. Yves Bouvier          Exhibit 27

Testimony of Mr. Samuel Valette

Hearing of Mr. Yves Bouvier

Testimony of Sotheby's representative

80    Mr. Bouvier confirmed shortly after to Mr. Valette that he was willing to purchase those two pieces.

    **EV**:    Testimony of Mr. Samuel Valette

            Testimony of Mr. Yves Bouvier

            Testimony of Sotheby's representative

81    A sale agreement dated April 12, 2011 was executed on April 14, 2011 between Sotheby's, Inc. and Blancaflor (the "**Rodin and Maillol Agreement**").

    **EV**:    Agreement between Sotheby's, Inc. and Blancaflor regarding the sale of *Le*      Exhibit 10
            *Baiser* by Rodin and *Méditéranée* by Maillol, dated 12 April 2011.

            Testimony of Mr. Samuel Valette

            Testimony of Mr. Yves Bouvier

            Testimony of Sotheby's representative

82    The price agreed upon (inclusive of the buyer's premium) for the two sculptures amounted to:

•    EUR 4'230'000.- for *Le Baiser*; and

•    EUR 5'170'000.- for *La Méditerranée*

    **EV**:    Agreement between Sotheby's, Inc. and Blancaflor regarding the sale of *Le*      Exhibit 10
            *Baiser* by Rodin and *Méditéranée* by Maillol, dated 12 April 2011.

            Testimony of Mr. Samuel Valette

             Testimony of Mr. Yves Bouvier

             Testimony of Sotheby's representative

83    Again, Mr. Bouvier indicated that the acquirer would be his entity Blancaflor.

    **EV**:    Agreement between Sotheby's, Inc. and Blancaflor regarding the sale of *Le*      Exhibit 10
            *Baiser* by Rodin and *Méditéranée* by Maillol, dated 12 April 2011.

            Testimony of Mr. Samuel Valette

             Testimony of Mr. Yves Bouvier

             Testimony of Sotheby's representative

PRIVILEGED AND CONFIDENTIAL

84    Mr. Bouvier signed the Rodin and Maillol Agreement on behalf of Blancaflor in Geneva and the signed document was sent back to Sotheby's, Inc. from the Blancaflor offices in Geneva.

> **EV**:   Agreement between Sotheby's, Inc. and Blancaflor regarding the sale of *Le*                Exhibit 10
> *Baiser* by Rodin and *Méditéranée* by Maillol, dated 12 April 2011.
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

85    According to the Agreement, title to the artworks was to pass to Blancaflor upon receipt of full payment.

> **EV**:   Agreement between Sotheby's, Inc. and Blancaflor regarding the sale of *Le*                Exhibit 10
> *Baiser* by Rodin and *Méditéranée* by Maillol, dated 12 April 2011.
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

86    Mr. Bouvier had not told Mr. Valette that he would later sell those sculptures.

> **EV**:   Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

87    Mr. Valette had some understanding that Mr. Bouvier might transfer those pieces to another, as Mr. Bouvier had vaguely referred to a friend he was about to meet that he was to convince about the works.

> **EV**:   Email dated 9 April 2011 from Mr. Yves Bouvier to Mr. Samuel Valette              Exhibit 26
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Sotheby's representative

88    By email dated 14 April 2011, Mr. Valette sent Mr. Bouvier two letters confirming that both *Le Baiser* and *La Méditerranée* were located in the premises of Sotheby's, Inc. in New York.

> **EV**:   Email dated 14 April 2011 from Mr. Samuel Valette to Mr. Yves Bouvier             Exhibit 28

Testimony of Mr. Samuel Valette

Hearing of Mr. Yves Bouvier

Testimony of Sotheby's representative

89    Mr. Valette asked Mr. Bouvier whether his client wanted the sculptures to be sent to the Freeports in Geneva or whether he would deal with the delivery.

**EV**:   Email dated 14 April 2011 from Mr. Samuel Valette to Mr. Yves Bouvier          Exhibit 28

Testimony of Mr. Samuel Valette

Hearing of Mr. Yves Bouvier

Testimony of Sotheby's representative

90    Mr. Valette was however unaware who Mr. Bouvier's client was or the content of the deal between Mr. Bouvier and his client, and never asked about it.

**EV**:   Email dated 14 April 2011 from Mr. Samuel Valette to Mr. Yves Bouvier          Exhibit 28

Testimony of Mr. Samuel Valette

Hearing of Mr. Yves Bouvier

Testimony of Sotheby's representative

91    In particular, Mr. Valette was unaware of the price of any sale by Mr. Bouvier to his client, or any details about any such sale, if any. Neither Mr. Valette, nor any other employee of any Sotheby's entity, knew precisely what Mr. Bouvier planned to do with the pieces. Nor did Mr. Valette or any employee of any Sotheby's entity know the price that Mr. Bouvier planned to later charge for these pieces, if he did decide to resell them.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

Absence of evidence to the contrary

92    Only later did the Sotheby's entities learn via press reports, *i.e.* in February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier

had allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, the Sotheby's entities and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

Absence of evidence to the contrary

### 2.3   *Nu au Châle Vert* by Matisse

93   In June 2011, Mr. Valette discussed with Mr. Bouvier the possibility for the latter to buy an artwork by Matisse.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

94   Mr. Bouvier indicated that he was interested in acquiring *Nu au Châle Vert* by Matisse.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

95   Sotheby's then located the work in a private collection in the United States and approached the owner to ask whether or not they were interested in selling.

**EV**   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

96   The seller was in contact with Philip Hook, an employee of Sotheby's UK.

**EV**   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

97     Mr. Bouvier proved interested and requested that the artwork be transported to the Geneva Freeport.

>   **EV**:   Testimony of Mr. Samuel Valette
>
>   Testimony of Mr. Yves Bouvier
>
>   Testimony of Sotheby's representative

98     Mr. Valette, working with others from one or more Sotheby's entities, organized the transportation of the work to the Geneva Freeport.

>   **EV**:   Testimony of Mr. Samuel Valette
>
>   Testimony of Mr. Yves Bouvier
>
>   Testimony of Sotheby's representative

99     In this context, Sotheby's SA's Geneva office contacted Mr. Bouvier to discuss some details on the viewing in Geneva.

>   **EV**:   Testimony of Mr. Samuel Valette
>
>   Testimony of Mr. Yves Bouvier
>
>   Testimony of Sotheby's representative

100    Mr. Bouvier also wanted a framer to view the painting.

>   **EV**:   Testimony of Mr. Samuel Valette
>
>   Testimony of Mr. Yves Bouvier
>
>   Testimony of Sotheby's representative

101    For unknown reason, Mr. Bouvier was upset about Sotheby's SA's Geneva office being involved in this respect.

>   **EV**:   Testimony of Mr. Samuel Valette
>
>   Testimony of Mr. Yves Bouvier
>
>   Testimony of Sotheby's representative

102    He then gave clear instructions to Mr. Valette, on 20 June 2011, according to which nobody in Geneva was to know about this transaction:

>       *"Hello*

*Je pensais que personne de Geneve devait connaître cette opera-
tion!!!!!!! (sic!)*

*Je ne peux pas travailler dans ses conditions (sic!) Yves"*

**EV**:    Email dated 20 June 2011 from Mr. Yves Bouvier to Mr. Samuel Valette            Exhibit 29

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

103    On the same day, Mr. Valette discussed this request internally with employees of
Sotheby's UK in London and Sotheby's SA in Geneva, and confirmed to Mr. Bouvier
that nobody from Sotheby's SA's office in Geneva would be present before, during
or after the visits:

*"Re-bonjour Yves*

*Le necessaire a été fait: Ramon et l'encadreur peuvent contacter
Haller et auront acces au tableau pour le mesurer. Je te confirme
également que, mis a part moi, il n'y aura plus personne de So-
thebys avant, pendant et apres aucune des visites. J'ai une dis-
cussion tres tres claire et directe a ce sujet avec mes collegues
de "risk management" a Londres. Le message a été bien entendu
et accepte.*

*Bien a toi,*

*Sam"*

**EV**:    Email dated 20 June 2011 from Mr. Samuel Valette to Mr. Yves Bouvier            Exhibit 30

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

104    Still on 20 June 2011, Mr. Valette provided Mr. Bouvier with a descriptive note on
the artwork.

**EV**:    Email dated 20 June 2011 from Mr. Samuel Valette to Mr. Yves Bouvier            Exhibit 31

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

105    Mr. Bouvier confirmed shortly after that he wanted to purchase this artwork.

    **EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

106    Sotheby's UK, as the seller's agent, and Mr. Bouvier's entity, *i.e.* Blancaflor, en-
tered into a sale agreement on 27 June 2011 (the "**Matisse Agreement**").

    **EV**:    Agreement between Sotheby's UK and Blancaflor regarding the sale of *Nu au*          Exhibit 11
*Châle Vert* by Matisse, dated 27 June 2011

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

107    This Matisse Agreement was signed in Paris Charles-de-Gaulle Airport, whilst the
property was located in Geneva.

    **EV**:    Agreement between Sotheby's UK and Blancaflor regarding the sale of *Nu au*          Exhibit 11
*Châle Vert* by Matisse, dated 27 June 2011.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

108    The sale price agreed upon was USD 60'000'000 (inclusive of the buyer's pre-
mium).

    **EV**:    Agreement between Sotheby's UK and Blancaflor regarding the sale of *Nu au*          Exhibit 11
*Châle Vert* by Matisse, dated 27 June 2011.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

109    Title passed onto Blancaflor upon receipt of the full sum, which was received in early July 2011 by wire transfer from the Compagnie Bancaire Helvétique, in Geneva.

    **EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of *Nu au*      Exhibit 11
            *Châle Vert*  by Matisse, dated 27 June 2011.

          Testimony of Mr. Samuel Valette

110    Generally speaking, Sotheby's could contemplate that Mr. Bouvier could be the ultimate purchaser, or one of a group of investors, or purchasing an artwork with the intent to resell to another. In any event, Sotheby's and its employees were not aware of the intentions harboured by Mr. Bouvier with respect to such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know the price (or any other modality) at which Mr. Bouvier planned to later resell said artwork, if he did decide to resell it.

    **EV**:   Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

111    Only later did Sotheby's learn via press reports, *i.e. in* February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

    **EV**:   Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

          Absence of evidence to the contrary

**2.4**    ***L'Eternel Printemps* by Rodin**

112    In around June 2011, Sotheby's UK was contacted by a client who wanted to sell its property, a marble of *L'Eternel Printemps* by Rodin.

    **EV**   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

113   It was decided within the Sotheby's UK team that Mr. Valette could enquire with Mr. Bouvier whether he may be interested in this piece.

   **EV**   Testimony of Mr. Samuel Valette

         Testimony of Sotheby's representative

114   Mr. Bouvier asked Mr. Peretti to view the work and then offered USD 12 million net to the owner.

   **EV**:   Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Testimony of Sotheby's representative

115   The client accepted that offer.

   **EV**   Testimony of Mr. Samuel Valette

         Testimony of Sotheby's representative

116   The sale agreement was entered into on 5 July 2011 between Sotheby's UK, as representative of the seller, and Blancaflor (the "**Rodin Agreement**").

   **EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of *L'E-ternel Printemps* by Rodin, undated.                        Exhibit 12

         Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Testimony of Sotheby's representative

117   The total purchase price amounted to USD 13'200'000 (inclusive of the buyer's premium).

   **EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of *L'E-ternel Printemps* by Rodin, undated.                        Exhibit 12

         Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Testimony of Sotheby's representative

118    The price was paid by Blancaflor on 5 July 2011 by wire transfer from the Compagnie Bancaire Helvétique, in Geneva.

    **EV**:   Testimony of Sotheby's representative

          Testimony of Mr. Yves Bouvier

119    Mr. Bouvier requested that this artwork be delivered to the Geneva Freeport.

    **EV**:   Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

120    Once again, Mr. Valette did not know and did not inquire whether this artwork would be kept by Mr. Bouvier or whether he intended to resell it, immediately or later.

    **EV**:   Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

121    While generally aware that Mr. Bouvier could be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to resell to another, neither Sotheby's nor its employees knew precisely what Mr. Bouvier planned to do with such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know the price (or any other modality) at which Mr. Bouvier planned to later charge for said artwork, if he did decide to resell it.

    **EV**:   Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

122    Only later did Sotheby's learn via press reports, *i.e.* in February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

Absence of evidence to the contrary

## 2.5 *Femme de Venise IX* by Giacometti

123    In September or October 2011, Mr. Bouvier reached out to Mr. Valette to inform him that he was interested in purchasing the *Femme de Venise IX* by Giacometti.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

124    Mr. Valette searched for this sculpture and located it in Switzerland.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

125    Mr. Valette contacted Sotheby's Zurich who knew and could approach the owner over any interest in selling. The owner indicated that it would agree to sell it for CHF 25'000'000.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

126    The offer was conveyed to Mr. Bouvier who tried to negotiate the price.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

127    The owner however refused to discount the amount.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

128     Mr. Bouvier eventually agreed to purchase it for CHF 26'100'000 (inclusive of the buyer's premium).

   **EV**:   Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

129     The sale agreement was entered into by Sotheby's UK, as seller's agent, and Blancaflor on 8 November 2011 (the "**Giacometti Agreement**").

   **EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of        Exhibit 13
          *Femme de Venise IX* by Giacometti, dated 8 November 2011.

          Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

130     The Giacometti Agreement was signed on 8 November 2011.

   **EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of        Exhibit 13
          *Femme de Venise IX* by Giacometti, dated 8 November 2011.

          Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

131     The sale was conditional upon Sotheby's UK's receipt of a written confirmation of the authenticity of the sculpture.

   **EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of        Exhibit 13
          *Femme de Venise IX* by Giacometti, dated 8 November 2011.

          Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

132     Mr. Bouvier further instructed Mr. Valette to have the sculpture shipped to the Geneva Freeport:

> *"Nous demanderons dès que la sculpture nous est livrée demain une licence d'exportation afin de te faire parvenir la sculpture au port franc au plus vite."*

| | | |
|---|---|---|
| **EV**: | Agreement between Sotheby's UK and Blancaflor regarding the sale of *Femme de Venise IX* by Giacometti, dated 8 November 2011. | Exhibit 13 |
| | Email dated 7 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier | Exhibit 32 |
| | Testimony of Mr. Samuel Valette | |
| | Testimony of Mr. Yves Bouvier | |
| | Testimony of Sotheby's representative | |

133    Payment of the price was received by Sotheby's UK on 10 November 2011 from Blancaflor.

   **EV**:    Testimony of Sotheby's representative

134    Generally speaking, Sotheby's could contemplate that Mr. Bouvier could be the ultimate purchaser, or one of a group of investors, or purchasing an artwork with the intent to resell to another. In any event, Sotheby's and its employees were not aware of the intentions harboured by Mr. Bouvier with respect to such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know the price (or any other modality) at which Mr. Bouvier planned to later resell said artwork, if he did decide to resell it.

   **EV**:    Testimony of Mr. Samuel Valette

      Testimony of Mr. Yves Bouvier

      Testimony of Sotheby's representative

135    Only later did Sotheby's learn via press reports, *i.e.* in February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

   **EV**:    Testimony of Mr. Samuel Valette

      Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

Absence of evidence to the contrary

## 2.6 Le *Domaine D'Arnheim* by Magritte

136 In November 2011, Mr. Bouvier reached out to Mr. Valette with a new specific request.

**EV**: Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

137 Indeed, he informed Mr. Valette that he was looking for *Le Domaine D'Arnheim* by Magritte.

**EV**: Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

138 The absolute record for the sale of a Magritte was, back then, set at USD 12'600'000.-.

**EV**: Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

139 Mr. Valette reported to Mr. Bouvier on 10 November 2011 that he had spoken with the owner of *Le Domaine D'Arnheim* and that the owner was willing to sell it for USD 25'000'000:

> *"Bonjour Yves,*
>
> *Voici une image du Magritte dont nous avons parle.*
>
> *Apres beaucoup d'insistance le proprietaire nous a confie qu'il ac-cepterait de s'en separer pour 25,000,000 USD.*
>
> *Merci de me dire si tu souhaites que nos poursuivions.*
>
> *Amities,*

*Sam."*

| | | |
|---|---|---|
| **EV**: | Email dated 10 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier | Exhibit 33 |
| | Testimony of Mr. Samuel Valette | |
| | Testimony of Mr. Yves Bouvier | |
| | Testimony of Sotheby's representative | |

140   On 11 November 2011, Mr. Valette responded to a request from Mr. Bouvier for a description of the overall state of the market for works of art by Magritte.

| | | |
|---|---|---|
| **EV**: | Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier | Exhibit 34 |
| | Testimony of Mr. Samuel Valette | |
| | Testimony of Mr. Yves Bouvier | |
| | Testimony of Sotheby's representative | |

141   Mr. Valette wrote Mr. Bouvier a high-level summary of the strength of the market, and used as a reference in that description an estimate of a masterpiece by Magritte, *i.e. l'Empire des Lumières*, to illustrate the strength of the market.

| | | |
|---|---|---|
| **EV**: | Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier | Exhibit 35 |
| | Testimony of Mr. Samuel Valette | |
| | Testimony of Mr. Yves Bouvier | |
| | Testimony of Sotheby's representative | |

142   Mr. Valette then estimated that the sale price at auction for *l'Empire des Lumières* would be within the range of USD 40'000'000 to 60'000'000.- and noted the momentum which was particularly favorable in the art market at auctions:

> *"(…) Les dernières ventes nous ont montré que les enchères sont plus fortes que jamais pour ses meilleurs tableaux.*
>
> *Au vu de la demande insatisfaite que nous connaissons et de la puissance financière des intervenants sur le marché actuel, je vous confirme qu'une estimation de vente aux enchères pour un grand tableau iconique tel que l'Empire des Lumières ci-dessous se situerait autour de 40,000,000 – 60,000,000 US$, avec un résultat qui je pense devrait approcher la fourchette haute de l'estimation. Un tel tableau ferait l'objet d'une compétition intense*

> *entre les plus grands collectionneurs et les plus grands musées du monde.*
>
>  *(…)"*

**EV**:    Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier          Exhibit 35

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

143    On the same day, and following a request from Mr. Bouvier to include additional works by Magritte in Mr. Valette's assessment of the market, Mr. Valette provided additional information to Mr. Bouvier in respect of lower value sales that occurred recently for Magritte.

**EV**:    Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier          Exhibit 35

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

144    In this context, Mr. Valette noted that a Magritte had been sold a week before at auction for USD 10'100'000.- whilst this painting was not considered as an iconic piece of the artist:

> *"(…) Les dernières ventes nous ont montré que les enchères sont non seulement plus fortes que jamais pour ses meilleurs tableaux mais également très soutenues pour les tableaux de niveau inférieur. Par exemple la semaine dernière le tableau suivant (dimension 65x54 cm) s'est vendu 10,100,000 US$. Il ne s'agit pas d'un tableau faisant partie d'une série majeure de l'artiste. Le prix atteint est un bon baromètre de la forte demande actuelle pour les œuvres de Magritte. (…)"*

**EV**:    Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier          Exhibit 35

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

145     Mr. Valette also referred to a small gouache, *Le maître d'école*, that had been sold
        in February earlier the same year for USD 4'000'000.-:

> "(…) Autre indication importante: le marché des œuvres sur pa-
> pier. Deux fois cette année, le précèdent [sic!] record a été battu.
> Cette petite gouache, Le maitre d'école, une image iconique, *s'est
> vendu plus de 4,000,000 US$ en février de cette année."*

**EV**:   Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier        Exhibit 35

        Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

146     Based on such records, Mr. Valette specified that given the prices achieved by such
        works, a big iconic piece by Magritte, such as *l'Empire des Lumières* (which is a
        different and less valuable picture than the *Le Domaine D'Arnheim* by Magritte -
        the piece the Mr. Bouvier was interested in purchasing), would likely be sold at
        auction for a price ranging around USD 40'000'000.- to 60'000'000.-:

> *"Au vu de ces éléments récents et de la demande insatisfaite il
> est clair que l'estimation d'un grand tableau iconique tel que l'Em-
> pire des Lumières ci-dessous se situerait autour de **40,000,000-
> 60,000,000 US$,** avec un résultat qui je pense devrait appro-
> cher la fourchette haute de l'estimation. Un tel tableau ferait l'ob-
> jet d'une compétition intense entre les plus grands collection-
> neurs et les plus grands musées du monde."*

**EV**:   Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier        Exhibit 35

        Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

147     Fifteen minutes later, Mr. Valette sent a revised email to Mr. Bouvier, this time
        adding the dimensions of the works he was referring to as Mr. Bouvier had re-
        quested over the phone to Mr. Valette.

**EV**:   Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier        Exhibit 36

        Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

148   Slightly later on the same day, Mr. Valette sent a new email to Mr. Bouvier further to the request of the latter, indicating what would likely be the price of a major painting such as *l'Empire des Lumières* (which, again, is a different and less valuable picture than the *Le Domaine D'Arnheim* by Magritte - the piece Mr. Bouvier was interested in purchasing), but this time in a private sale.

**EV**:   Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier      Exhibit 37

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

149   Whilst Mr. Valette had indicated that the price of *l'Empire des Lumières* would likely be within the range of USD 40'000'000.- to USD 60'000'000.- at auction due to the potential competition that could occur between collectors, he specified that in a private sale, the price would merely be in the lower range and may be negotiated around EUR 40'000'000.-:

"(...)

> *Au vu des éléments récents, et de la demande insatisfaite, il est clair qu'en vente privée un grand tableau iconique tel que l'Empire des Lumières ci-dessous se négocierait autour de 40 millions d'euros. Par ailleurs un tel tableau en vente publique ferait l'objet d'une compétition intense entre les plus grands collectionneurs et les plus grands musées du monde."*

**EV**:   Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier      Exhibit 37

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

150   Mr. Bouvier indeed had requested Mr. Valette to focus his estimate on private market, not on a public sale.

**EV**:   Email dated 11 November 2011 from Mr. Samuel Valette to Mr. Yves Bouvier      Exhibit 37

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

151    All of these emails were in connection with Mr. Valette's efforts to sell *Le Domaine D'Arnheim* to Mr. Bouvier.  In providing his opinion on what *l'Empire des Lumières* might sell for at auction or in a private sale, Mr. Valette was not providing a formal valuation (see below CII3.1); rather, the purpose of his emails was to describe for Mr. Bouvier the overall state of the market for works of art by Magritte.

   **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

152    Mr. Bouvier then indicated that he wanted to see the *Le Domaine D'Arnheim* by Magritte.

   **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

153    The owner however did not want to ship its painting and therefore the viewing was organized at the owner's place.

   **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

154    Mr. Bouvier did not attend the viewing but Mr. Jean-Marc Peretti attended.

   **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

155    Negotiations were made directly between the owner and Mr. Peretti during that viewing.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

156   The owner and Mr. Peretti agreed on a price amounting to USD 24'100'000 (inclusive of the buyer's premium).

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

157   The agreement was signed between Sotheby's UK, as the seller's agent, and Blancaflor on 8 December 2011 (the "**Magritte Agreement**").

**EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of *Le*          Exhibit 14
*Domaine d'Arnheim* by Magritte, dated 8 December 2011.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

158   The artwork was by then located at the Geneva Freeport where it was also to be released to the purchaser, *i.e.* Blancaflor, upon payment of the price in full.

**EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of *Le*          Exhibit 14
*Domaine d'Arnheim* by Magritte, dated 8 December 2011.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

159   Such payment was made on 9 July 2011 by Blancaflor through its bank .

**EV**:   Testimony of Sotheby's representative

160   It should be noted that Mr. Bouvier never indicated to Mr. Valette that his e-mails were transmitted to third parties.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

161    Sotheby's learned much later when it received documents through Mr. Rybolovlev's counsel, that Mr. Bouvier appeared to have forwarded a portion of Mr. Valette's emails to a representative of Mr. Rybolovlev (see below CIII2). Mr. Valette was not aware of that at the time, and did not consider that his opinion about the estimated price of a major and very expensive painting such as *l'Empire des Lumières* might be used to convince someone into paying an inflated price for a different and less important work of art, *Le Domaine D'Arnheim* by Magritte, by suggesting that it would achieve a similar price as *l'Empire des Lumières* if sold.

    **EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of *Le*      Exhibit 14
          *Domaine d'Arnheim* by Magritte, dated 8 December 2011.

          Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

162    While generally aware that Mr. Bouvier could be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to resell to another, neither Sotheby's nor its employees knew precisely what Mr. Bouvier planned to do with such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know the price (or any other modality) at which Mr. Bouvier planned to later charge for said artwork, if he did decide to resell it.

    **EV**:   Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

163    Only later did Sotheby's learn via press reports, *i.e.* in February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

    **EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

Absence of evidence to the contrary

## 2.7    *Eve* by Rodin

164    Early 2012, Mr. Bouvier informed Mr. Valette that he was looking for an *Eve* by Rodin.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

165    Mr. Valette conducted searches and located this sculpture in the United States.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

166    Mr. Valette flew to the United States with Mr. Peretti to view the sculpture in Kentucky, USA.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

167    Mr. Peretti made an offer at USD 15 million.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

168    Such offer was accepted by the owner and on 8 March 2012, Sotheby's UK, as the seller's agent, entered into a purchase agreement with Blancaflor for the sale of the sculpture *Eve* by Rodin (the "**Rodin II Agreement**").

**EV**:    Agreement between Sotheby's UK and Blancaflor regarding the sale of *Eve*    Exhibit 15
by Rodin, dated 8 March 2012

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

169   The price of the sale amounted to USD 16'000'000 (inclusive of the buyer's premium).

**EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of *Eve*        Exhibit 15
by Rodin, dated 8 March 2012

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

170   The Rodin II Agreement was signed in Geneva by both parties on 8 March 2012.

**EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of *Eve*        Exhibit 15
by Rodin, dated 8 March 2012

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

171   The title was to pass on to Blancaflor upon full payment and the property was to be released at the Geneva Freeport.

**EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of *Eve*        Exhibit 15
by Rodin, dated 8 March 2012.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

172   Payment occurred on 15 March 2012 and was debited from Blancaflor's account at Compagnie Bancaire Helvétique in Geneva.

**EV**:   Testimony of Sotheby's representative

173   While generally aware that Mr. Bouvier could be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to resell to another, neither Sotheby's nor its employees knew precisely what Mr. Bouvier planned to do with such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know

the price (or any other modality) at which Mr. Bouvier planned to later charge for said artwork, if he did decide to resell it.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

174    Only later did Sotheby's learn via press reports, i.e. in February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

Absence of evidence to the contrary

## 2.8    *Serpents d'eau II* **by Klimt**

175    In September 2012, Mr. Valette learned that one of the Sotheby's entities had secured the consignment of the *Serpent d'eau II* by Klimt.  Mr. Valette inquired of Mr. Bouvier whether he may be interested in purchasing the Klimt masterpiece.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

176    Mr. Valette took a plane to Geneva to meet with Mr. Bouvier in September 2012 and informed him that *Serpents d'eau II* by Klimt might be available for sale.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

177     Mr. Valette informed Mr. Bouvier that the price would be in the range of USD 140'000'000 inclusive of Sotheby's commission.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

178     Mr. Bouvier immediately confirmed his interest.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

179     Mr. Valette was however not involved at all in the management of the relationship with the owner. Such relationship was dealt with by other colleagues at other Sotheby's entities.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

180     Mr. Valette was only in charge of dealing with the relationship with Mr. Bouvier as he had established a relationship with him and was his contact at the Sotheby's entities.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

181     In particular, Mr. Valette did not know the price discussed with the owner nor the amount of the commission Sotheby's Kunstauktionen GMBH received.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Sotheby's representative

182     Mr. Bouvier indicated that he would like to view the painting.

    **EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

183   Mr. Valette organized a viewing in Vienna, where the artwork was stored.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

184   Such viewing took place on 3 September 2012.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

185   Mr. Valette attended this meeting with Mr. Bouvier.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

186   Mr. Bouvier came with another man who Mr. Valette did not know. Mr. Valette later learned that this man was Mr. Rybolovlev.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

187   Mr. Rybolovlev simply greeted Mr. Valette but did not enter into any discussion with him.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Deposition of Mr. Dimitri Rybolovlev

        Testimony of Sotheby's representative

PRIVILEGED AND CONFIDENTIAL

188     Mr. Valette was not invited into the room during the viewing that took place only
        between Mr. Bouvier and Mr. Rybolovlev.

   **EV**:     Testimony of Mr. Samuel Valette

             Testimony of Mr. Yves Bouvier

             Deposition of Mr. Dimitri Rybolovlev

             Testimony of Sotheby's representative

189     The viewing lasted for about half an hour.

   **EV**:     Testimony of Mr. Samuel Valette

             Testimony of Mr. Yves Bouvier

             Deposition of Mr. Dimitri Rybolovlev

             Testimony of Sotheby's representative

190     Mr. Bouvier and Mr. Rybolovlev then left.

   **EV**:     Testimony of Mr. Samuel Valette

             Testimony of Mr. Yves Bouvier

             Deposition of Mr. Dimitri Rybolovlev

             Testimony of Sotheby's representative

191     Around a week later, Mr. Valette received a call from Mr. Bouvier confirming his
        interest.

   **EV**:     Testimony of Mr. Samuel Valette

             Testimony of Mr. Yves Bouvier

             Testimony of Sotheby's representative

192     Another meeting was scheduled between Mr. Valette, Mr. Jean-Marc Peretti and
        Mr. Bill Ruprecht, former CEO of Sotheby's, Inc. and took place on 11 September
        2012 in Paris.

   **EV**:     Testimony of Mr. Samuel Valette

             Testimony of Mr. Yves Bouvier

             Deposition of Mr. Jean-Marc Peretti

PRIVILEGED AND CONFIDENTIAL

Testimony of Sotheby's representative

193    The discussion was led by Mr. Ruprecht, with Mr. Valette also present.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

194    Mr. Peretti and Mr. Ruprecht eventually agreed on a price of USD 126'000'000 (inclusive of the buyer's premium).

**EV**:   Agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regard-      Exhibit 16
ing the sale of *Serpents d'Eau II* by Klimt, dated 11 September 2012.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

195    A letter agreement was signed between Sotheby's Kunstauktionen GMBH and Blancaflor on 11 September 2012 in Geneva (the "**Klimt Agreement**").

**EV**:   Agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regard-      Exhibit 16
ing the sale of *Serpents d'Eau II* by Klimt, dated 11 September 2012.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

196    The sale was however conditional upon (i) receipt of the licence for permanent export as well as (ii) the resolution and settlement with all the heirs of the former owner:

> *"2. You and Sotheby's agree that the sale of the Property under this Agreement and Sotheby's and the seller's obligations here-under will be subject to the fulfilment of all the following condi-tions preceding (the "Conditions") not later that 27[th] April 2013 (unless expressly extended by Sotheby's and the seller of the Property) (the "Conditions deadline"):*
>
> *(a)   The receipt by Sotheby's of a licence allowing the permanent export of the Property from Austria to the Geneva Freeport; and*

PRIVILEGED AND CONFIDENTIAL

> (b)  The full and final resolution and settlement of all claims made
>       by the heirs of [redacted] in respect of the Property to Sothe-
>       by's satisfaction."

**EV**:  Agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regard-      Exhibit 16
ing the sale of *Serpents d'Eau II* by Klimt, dated 11 September 2012.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

197   The status of this artwork was unusual due to the fact that it had been the subject
of a forced sale during the Second World War.

**EV**:  Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

198   As a consequence, its sale would be complicated as an export licence would need
to be obtained from the Austrian authorities which, as a practical matter, required
in effect that the heirs of the prior owner to agree to the sale.

**EV**:  Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

199   On 28 September 2012, Mr. Valette informed Mr. Bouvier that the discussions were
still ongoing with the heirs of the prior owners.

**EV**:  Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

200   He also confirmed that lawyers from various Sotheby's entities were involved,
which was necessary to clarify the legal requirements for this special artwork to be
sold and exported from Austria given its nature:

> "Un mot pour vous tenir au courant: la negociation a eu lieu toute
> la journee et les discussions vont continuer au long du week-end.
> Nos avocats sont optimistes et j'aurai du nouveau dans les jours
> qui viennent. On peut se parler demain au tel pour un debrief
> complet.

**EV**:  Email dated 28 September 2012 from Mr. Samuel Valette to Mr. Yves Bouvier and Mr. Jean-Marc Peretti                  Exhibit 38

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

201   Obtaining the necessary agreement from the heirs of the prior owner, as well as the export licence, took much longer than expected. The deadline to complete the sale was extended on various occasions.

**EV**:  Email dated 28 September 2012 from Mr. Samuel Valette to Mr. Bouvier and Mr. Jean-Marc Peretti                  Exhibit 38

Amendment to the 11 September 2012 agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 30 January 2013                  Exhibit 17

Amendment to the 11 September 2012 agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 2 April 2013                  Exhibit 18

Amendment to the 11 September 2012 agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 5 July 2013                  Exhibit 19

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

202   The sale was finally completed by agreement dated 15 and 23 July 2013 (the "**Klimt Agreement**")

**EV**:  Agreements between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 15 and 23 July 2013                  Exhibit 20

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

203   Again, the sale was entered into by Sotheby's Kunstauktionen GMBH, as the seller's agent, and Blancaflor.

**EV**:   Agreements between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 15 and 23 July 2013          Exhibit 20

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

204   The payment was made by several transfers from Blancaflor's account opened with a Swiss bank.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

205   Blancaflor took title to the piece.

**EV**:   Agreements between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 15 and 23 July 2013          Exhibit 20

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

206   Whilst Mr. Valette met Mr. Rybolovlev at the viewing and may have inferred from this that he had some interest in the painting, he did not receive any indication as to the reason why he was there and did not inquire either.  Mr. Rybolovlev never sought or volunteered to explain his role, and Mr. Valette understood that he (Mr. Rybolovlev) intended to only interact with Mr. Bouvier, not Sotheby's.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Deposition of Mr. Dmitri Rybolovlev

Testimony of Sotheby's representative

207   Moreover, Mr. Valette was neither aware of the nature of the relationship between the two, nor of any agreement between them regarding any possible resale of the painting.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

208   According to allegations that Mr. Rybolovlev's entities have submitted in the course of the discovery proceedings in the United States (see below CIV2), Mr. Bouvier, simultaneously to his negotiations to purchase this work, was emailing with representatives of Mr. Rybolovlev in which, according to Mr. Rybolevlev's allegations, Mr. Bouvier allegedly made inaccurate representations regarding the negotiations and the price that Mr. Bouvier would be paying for the work. Neither Sotheby's nor Mr. Valette were aware of these emails at the time, and, in any event, were unaware of any information that Mr. Bouvier was conveying to Mr. Rybolovlev regarding this artwork.

   **EV**:   Testimony of Mr. Samuel Valette

      Testimony of Mr. Yves Bouvier

      Testimony of Sotheby's representative

209   While generally aware that Mr. Bouvier could be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to resell to another, neither Sotheby's nor its employees knew precisely what Mr. Bouvier planned to do with such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know the price (or any other modality) at which Mr. Bouvier planned to later charge for said artwork, if he did decide to resell it.

   **EV**:   Testimony of Mr. Samuel Valette

      Testimony of Mr. Yves Bouvier

      Testimony of Sotheby's representative

210   Only later did Sotheby's learn via press reports, *i.e.* in February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

   **EV**:   Testimony of Mr. Samuel Valette

      Testimony of Mr. Yves Bouvier

      Testimony of Sotheby's representative

Absence of evidence to the contrary

211   According to press reports, Mr. Rybolovlev resold *Serpents d'Eau II* for $170 million in November 2015.

**EV**:   Press article "*The tangled history of Klimt's $170m' Water Serpents*", Finan-   Exhibit 39
cial Times, 11 January 2018.

Testimony of Sotheby's representative

## 2.9   *Tête* by Modigliani

212   In June 2012, Mr. Valette learned that the former owner of the *Tête* by Modigliani had passed away, and that the members of the family that had inherited the *Tête* wanted to sell it.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

213   This family had been in contact with the Sotheby's entities for some time already as they had already sold various artworks through one or more of the Sotheby's entities.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

214   When Mr. Valette learned that the heirs were interested in selling the *Tête*, he set about trying to find a potential buyer.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

215   The various employees involved deemed the piece to be an outstanding one.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

216   There were a few meetings with the sellers in order first to secure the consignment of this artwork.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

217    The sellers made it clear that they wanted to sell quickly and also insisted on a private sale to ensure confidentiality.

    **EV**:    Testimony of Mr. Samuel Valette

          Testimony of Sotheby's representative

218    Given the sales that had been concluded within the past year with Mr. Bouvier, the team within Sotheby's UK logically considered Mr. Bouvier as a potential buyer for this artwork. Mr. Valette contacted Mr. Bouvier on 25 June 2012, to inform him of the availability of this major piece of art.

    **EV**:    Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

219    Mr. Valette referred to this artwork as the "*chef-d'oeuvre absolu de la sculpture de Modigliani*" and detailed it as follows:

> *"C'est la plus grande, la plus expressive, la plus harmonieuse sculpture de l'artiste. Elle est supérieure à celle de la Tate Gallery de Londres, supérieures à celle due MOMA, supérieures à celle du Guggenheim et incomparable avec ce qui peut se trouver en collection privée. Je t'ai mis en copie la production complète des Têtes de Modigliani répertoriées dans le Ceroni pour comparaison."*

    **EV**:    Email dated 25 June 2012 from Mr. Samuel Valette to Mr. Yves Bouvier, and its attachments.    Exhibit 40

          Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

220    Mr. Valette further specified that another sculpture of the same series but not of the same quality had been sold two years earlier for EUR 43 millions:

> *"La sculpture vendue par Christie's en juin 2010 pour 43 millions d'euros ne possédait pas la même amplitude (près de 10cm de moins) était plus agressive dans ses traits et la pierre avait beaucoup noirci avec le temps ce qui lui faisait perdre en expressivité."*

**EV**: Email dated 25 June 2012 from Mr. Samuel Valette to Mr. Yves Bouvier, and its attachments.    Exhibit 40

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

221    Mr. Valette then emphasized the details of this artwork and what made it unique of its kind, which should then entail that its value would not be comparable to the one sold by Christies:

> "Ici les traits sont sculptés avec une infinie délicatesse, la pierre a gardé sa couleur d'origine, les arêtes ne sont pas émoussées. Elle rayonne de puissance et de beauté. Il n'y a aucune chance d'en trouver une plus belle sur le marché. C'est tout simplement la plus belle sculpture de Modigliani qui ne pourra jamais être achetée."

**EV**: Email dated 25 June 2012 from Mr. Samuel Valette to Mr. Yves Bouvier, and its attachments.    Exhibit 40

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

222    Mr. Valette finally insisted on this unique opportunity to acquire such an extraordinary sculpture but made it clear that the sellers were aware of the peculiarity of their piece:

> "Cette pièce n'est jamais passé en vente aux enchères. Elle possède une provenance extraordinaire et a été exposée des 1912 à Paris, au Salon d'Automne. Elle est dans la même famille depuis 1956. Les clients sont vendeurs mais ils sont très conscients de ce qu'ils possèdent et il faudra se positionner a un niveau solide pour la signer."

**EV**: Email dated 25 June 2012 from Mr. Samuel Valette to Mr. Yves Bouvier, and its attachments.    Exhibit 40

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

223   From there on, Mr. Valette and his colleagues worked together in view of selling this artwork.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

224   The sellers consigned it to Sotheby's UK for a private sale and initially indicated that they would agree on a sale of a price of EUR 55'000'000.- net for them.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

225   By email dated 29 June 2012, Mr. Bouvier asked Mr. Valette whether the piece could be sold at auction:

> *"Bonsoir Sam*
>
> *Petite question, si cette sculpture ne trouve pas preneur en vente privée, pense-tu qu'elle risque de passer en vente publique? (…)"*

**EV**:   Emails dated 29 June 2012 between Mr. Samuel Valette and Mr. Yves Bouvier.        Exhibit 41

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

226   Mr. Valette indicated that, to his understanding, the sellers were extremely concerned about confidentiality and that therefore a public sale was unlikely:

> *"Bonsoir Yves,*
>
> *Je ne pense pas; les vendeurs sont extremement soucieux d ela confidentialite – la transaction privee correspond parfaitement a leur mentalite et a leur souhait de discretion absolue; (…)"*

**EV**:   Emails dated 29 June 2012 between Mr. Samuel Valette and Mr. Yves Bouvier        Exhibit 41

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

227   Mr. Bouvier was interested in this sculpture and requested Mr. Valette to organize a viewing in Geneva, which Mr. Valette did.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

228   Mr. Valette then organized the shipment of the sculpture to the Geneva Freeport and the viewing took place on 24 July 2012.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

229   Mr. Bouvier proved interested but indicated that he considered that the price, *i.e.* EUR 55'000'000.- was too high.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

230   Mr. Peretti advised Mr. Bouvier on this artwork and also was in contact with Mr. Valette. He also assisted with the viewing in Geneva.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

231   In an effort to convince Mr. Bouvier to make an offer for the work, Mr. Valette reverted back to Mr. Bouvier after the viewing, highlighting again the exceptional nature of this piece and also emphasizing its importance as given to it by the artist itself:

"*Cher Yves,*

*Je trouve cette piece absolument extraordinaire. C'est a coup sur la plus belle sculpture de l'artiste en mains privees et je ne lui*

> *connais aucune piece superieure en collection publique. Les pro-*
> *portions sont parfaites. C'est la plus grande des Tetes que Modi-*
> *gliani a executee. Le fait qu'il l'ait placee sur le plus haut piedestal*
> *lors du Salon d'Automne de 1912 est egalement un magnifique*
> *temoignage de l'importance que l'artiste lui-même lui accordait.*
>
> *Cette sculpture reunit tout les criteres chers aux collectionneurs*
> *les plus pointus: un sujet iconique, une provenance parfaite et*
> *documentee, un etat de conservation excellent, une tres grande*
> *rarete. (…)"*

**EV**:   Email dated 24 July 2012 from Mr. Samuel Valette to Mr. Yves Bouvier                Exhibit 42

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

232   Mr. Valette then gave Mr. Bouvier some information on comparable transactions, and provided him with his estimate of the value of this extraordinary sculpture:

> *"Cette sculpture fait partie d'un cercle tres restrait de chef-*
> *d'oeuvres de la sculpture modern, au meme titre que l'homme*
> *qui marche de Giacomette ou les dos de Matisse, par exemple.*
> *Pour mémoire, L'homme qui marche, d'une edition de 6, avait*
> *realis 103 millions de dollars en 2010. Les dos de Matisse, d'une*
> *edition de 10, ont été vendus dans le cadre d'une vente privee*
> *autour de 150 millions de dollars en 2011. Contrairement a ces*
> *pieces, la Tete est une sculpture unique, taillee a meme la pierre*
> *par Modigliani.  Il est extremement difficile d emettre un prix sur*
> *un tel chef-d'œuvre. En prenant en compte la rarefaction*
> *doeuvres de ce calibre disponible sur le marche (voir le prix de*
> *43 millions d'euros obtenus ne 2010 pour une piece inferieure),*
> *l'impossibilite de trouver une œuvre superieure de Modigliani, et*
> *la tres forte demande actuelle pour les plus grands chef-d'œuvres*
> *de la sculpture moderne, c'est une piece dont la valeur devrait se*
> *situer entre 70 et 90 millions d'euros, peut-etre même plus.*
>
> *Je serais ravie d'en discuter plus en avant le moment venu. (…)"*

**EV**:   Email dated 24 July 2012 from Mr. Samuel Valette to Mr. Yves Bouvier                Exhibit 42

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

PRIVILEGED AND CONFIDENTIAL

Testimony of Sotheby's representative

233    Mr. Valette also forwarded this email to Mr. Peretti, who was advising Mr. Bouvier on this transaction, a couple of minutes later.

**EV**:   Email dated 24 July 2012 from Mr. Samuel Valette to Mr. Jean-Marc Peretti          Exhibit 43

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

234    Mr. Valette had a discussion the day after with Mr. Bouvier regarding this sculpture and Mr. Bouvier asked him whether the value of this sculpture may reach EUR 100 million.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

235    Mr. Valette had indeed indicated in his email an estimate in the range of EUR 70-90 million or even above:

> "(…)En prenant en compte la rarefaction doeuvres de ce calibre disponible sur le marche (voir le prix de 43 millions d'euros obtenus ne 2010 pour une piece inferieure), l'impossibilite de trouver une œuvre superieure de Modigliani, et la tres forte demande actuelle pour les plus grands chef-d'œuvres de la sculpture moderne, c'est une piece dont **la valeur devrait se situer entre 70 et 90 millions d'euros, peut-etre même plus**."

**EV**:   Email dated 24 July 2012 from Mr. Samuel Valette to Mr. Yves Bouvier          Exhibit 42

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

236    Mr. Valette confirmed, as he had indicated in his email of the day before that it was extremely difficult to put a price on such a unique sculpture and agreed that its price may well be within the range of EUR 80 to 100 million, which he confirmed in the same email he sent to Mr. Bouvier with those new values.

**EV**:   Email dated 25 July 2012 from Mr. Samuel Valette to Mr. Yves Bouvier               Exhibit 44

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

237   Mr. Bouvier however did not make any offer in the following days. He requested to see the sculpture again in August.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

238   A new viewing took place in August, which Mr. Valette did not attend.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

239   Meanwhile, the sellers were enquiring as to why the sculpture had not yet been sold.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

240   Finally, on 19 September 2012, Mr. Bouvier, despite Mr. Valette's statements that the piece could be worth significantly more, reverted to Mr. Valette and made an offer for EUR 30'000'000.-.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

241   This offer was much lower than the initial asking price, and Mr. Valette was surprised that the offer was so low.

**EV**:   By assessment

242     The offer was conveyed to the sellers who accepted it the day after, even though the offer was significantly lower than the original consignment price of EUR 55'000'000.

    **EV**:     Testimony of Mr. Samuel Valette

        Testimony of Sotheby's representative

243     The sale agreement was then concluded between Sotheby's UK, as the seller's agent and Blancaflor as the buyer (the "**Modigliani Tête Agreement**").

    **EV**:     Agreement between Sotheby's UK and Blancaflor regarding the sale of *Tête* by     Exhibit 21
        Modigliani, dated 25 September 2012.

        Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

244     The Modigliani Tête Agreement was signed in Geneva on 25 September 2012 by Mr. Valette and Mr. Bouvier.

    **EV**:     Agreement between Sotheby's UK and Blancaflor regarding the sale of *Tête* by     Exhibit 21
        Modigliani, dated 25 September 2012.

        Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

245     The total price was set at EUR 31'500'000 (inclusive of the buyer's premium).

    **EV**:     Agreement between Sotheby's UK and Blancaflor regarding the sale of *Tête* by     Exhibit 21
        Modigliani, dated 25 September 2012.

        Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Testimony of Sotheby's representative

246     While generally aware that Mr. Bouvier could be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to resell to another, neither Sotheby's nor its employees knew precisely what Mr. Bouvier planned to do with such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know the price (or any other modality) at which Mr. Bouvier planned to later charge for said artwork, if he did decide to resell it.

**EV**:     Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

247     Only later did Sotheby's learn via press reports, *i.e.* in February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

**EV**:     Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

Absence of evidence to the contrary

248     As described below (see below CII4) the Modigliani *Tête* was eventually consigned to Sotheby's by Blancaflor in view of being auctioned off, and then resold for USD 70'000'000.- on 4 November 2014 in New York (see below N 370).

## 2.10     *Au lit – Le baiser* **by Toulouse-Lautrec**

249     The work entitled *Au lit – Le baiser de Toulouse-Lautrec was* part of an estate in Switzerland that indicated its intention to sell. The work was offered by Sotheby's to Mr. Bouvier who expressed interest.

**EV**:     Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

250     A sale agreement was concluded on 3 and 8 October 2012 between Sotheby's, Inc., as the seller's agent, and Blancaflor for the purchase of *Au lit, Le baiser* by Toulouse-Lautrec (the "**Lautrec Agreement**").

**EV**:     Agreement between Sotheby's and Blancaflor regarding the sale of *Au Lit- Le*          Exhibit 22
*Baiser* by Toulouse-Lautrec, dated 3 and 8 October 2012.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

251   The sale price amounted to USD 7'500'000 (inclusive of the buyer's premium).

**EV**:   Agreement between Sotheby's and Blancaflor regarding the sale of *Au Lit- Le*   Exhibit 22
*Baiser* by Toulouse-Lautrec, dated 3 and 8 October 2012.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

252   The price was paid by Blancaflor on 16 October 2012.

**EV**:   Testimony of Sotheby's representative

253   The artwork was released at the Geneva Freeport.

**EV**:   Agreement between Sotheby's and Blancaflor regarding the sale of *Au Lit- Le*   Exhibit 22
*Baiser* by Toulouse-Lautrec, dated 3 and 8 October 2012.

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

254   While generally aware that Mr. Bouvier could be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to resell to another, neither Sotheby's nor its employees knew precisely what Mr. Bouvier planned to do with such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know the price (or any other modality) at which Mr. Bouvier planned to later charge for said artwork, if he did decide to resell it.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

255   Only later did Sotheby's learn via press reports, *i.e.* in February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had

allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

Absence of evidence to the contrary

### 2.11   The *Salvator Mundi* by Leonardo Da Vinci

256   By email dated 11 March 2013, Mr. Bouvier asked Mr. Valette to enquire about a painting by Leonardo Da Vinci, called *Salvator Mundi.*

**EV**:   Emails dated 11 March 2013 between Mr. Yves Bouvier and Mr. Samuel Valette       Exhibit 45

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

257   Upon receipt of that request, Mr. Valette contacted Mr. Alexander Bell, Co-Chairman Worldwide of Sotheby's Old Master Paintings Department and an employee of Sotheby's UK ("**Mr. Bell**"), to enquire whether he had any information on the *Salvator Mundi*.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Alexander Bell

Testimony of Sotheby's representative

258   This painting had already triggered some attention as it had only recently been re-discovered and the owners reportedly had been unsuccessful in their efforts to sell the piece.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Alexander Bell

Testimony of Sotheby's representative

259     Mr. Bell confirmed to Mr. Valette that he knew one or more of the owners of this painting and thought they might be willing to sell as previous efforts to sell the piece had failed.

>       **EV**:    Testimony of Mr. Samuel Valette
>
>             Testimony of Mr. Alexander Bell
>
>             Testimony of Sotheby's representative

260     Mr. Bell further indicated that the owners initially wanted USD 200 million for this painting, but would now consider USD 100 million.

>       **EV**:    Testimony of Mr. Samuel Valette
>
>             Testimony of Mr. Alexander Bell
>
>             Testimony of Sotheby's representative

261     Mr. Bell initially estimated at that time the painting to be worth at sale around USD 30-40 million or possibly within the range of 40-60 million.

>       **EV**:    Testimony of Mr. Samuel Valette
>
>             Testimony of Mr. Alexander Bell
>
>             Testimony of Sotheby's representative

262     Mr. Valette informed Mr. Bouvier accordingly per email dated 11 March 2013:

>       *"Apparemment decouvert par deux marchands americains qui ont revendu un part a un investisseur –*
>
>       *Mon collegue directeur du dept de Londres me dit que pour lui il n'y a pas vraiment de probleme d'authenticite et il y croit, mais que c'est plutôt une question de prix et d'etat. Lui me dit qu'il serait autour d eUSD 30/40 voire usd 40/60 et content de l'avoir en vente. Apparemment ils en voulaient au debut 200M et main-tenant 100M!*
>
>       *Attention a l'etat"*

>       **EV**:    Emails dated 11 March 2013 between Mr. Samuel Valette and Mr. Bouvier        Exhibit 45
>
>             Testimony of Mr. Samuel Valette
>
>             Testimony of Mr. Alexander Bell

263    Mr. Bouvier replied immediately to Mr. Valette requesting him to gather information on the price and say to the owners that they have a client:

> *"Peux-tu lui demander de se renseigner sur le prix et dire qu'il a un client."*

**EV**:    Emails dated 11 March 2013 between Mr. Yves Bouvier and Mr. Samuel Valette          Exhibit 45

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

264    After further contact on the phone between Mr. Bouvier and Mr. Valette, the former requested Mr. Valette to organize a viewing in New York as soon as possible.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Alexander Bell

Testimony of Sotheby's representative

265    Meanwhile, the Sotheby's entities, via Mr. Bell, contacted the owners to inform them of the serious interest of a potential buyer to explore and hopefully agree on a consignment of the painting.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Alexander Bell

Testimony of Sotheby's representative

266    The owners agreed to consign the piece with Sotheby's, Inc. and a viewing was organized at Sotheby's, Inc. for 22 March 2013.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Deposition of Mr. Dmitri Rybolovlev

Testimony of Sotheby's representative

267    Mr. Bouvier then requested that a second viewing be organized in a specific apartment in New York.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

268     Mr. Valette attended that second viewing. He had not previously been told the place where it took place, which was a penthouse apartment in Manhattan.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Deposition of Mr. Dmitri Rybolovlev

        Testimony of Sotheby's representative

269     When Mr. Valette arrived at the apartment building, Mr. Bouvier was waiting for him in the lobby. Mr. Bouvier then escorted Mr. Valette to an apartment, where Mr. Bouvier was greeted by a man that Mr. Valette recognized from the viewing in Vienna on the 3 September 2012 of *Serpents d'eau II* by Klimt, and came to understand is Mr. Rybolovlev.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Deposition of Mr. Dmitri Rybolovlev

        Testimony of Sotheby's representative

270     It was the second time Mr. Valette and Mr. Rybolovlev came across each other.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Deposition of Mr. Dmitri Rybolovlev

        Testimony of Sotheby's representative

271     However, as it happened during their first meeting in Vienna on 3 September 2012, Mr. Valette and Mr. Rybolovlev did not speak to each other, the latter was not even introduced to the former.

    **EV**:   Testimony of Mr. Samuel Valette

        Testimony of Mr. Yves Bouvier

        Deposition of Mr. Dmitri Rybolovlev

PRIVILEGED AND CONFIDENTIAL

Testimony of Sotheby's representative

272     Mr. Bouvier and Mr. Rybolovlev went into a separate room to look at the painting in private, while Mr. Valette was waiting in another room for the time of the viewing that lasted around 30-40 minutes.

    **EV**:   Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Deposition of Mr. Dmitri Rybolovlev

         Testimony of Sotheby's representative

273     When the viewing was completed, Mr. Valette left the apartment with the piece.

    **EV**:   Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Deposition of Mr. Dmitri Rybolovlev

         Testimony of Sotheby's representative

274     Whilst Mr. Valette could infer from the presence of Mr. Rybolovlev that he may have had some interest in the piece, he had not been informed of the nature of that interest, or any other detail by Mr. Bouvier.  Among other things, the man who viewed the painting at the apartment with Mr. Bouvier could have been a possible investor, a friend of Mr. Bouvier's, a conservator or consultant working with Mr. Bouvier, a potential follow-on buyer, or someone who might have been interested in purchasing the painting at some later date.

    **EV**:   Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Deposition of Mr. Dmitri Rybolovlev

         Testimony of Sotheby's representative

275     Mr. Bouvier did not make any offer following that viewing in New York. He however indicated later that he would like his representative and adviser, Mr. Peretti, to meet with one of the sellers (who acted as a representative for the group of sellers) in Paris.

    **EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

276     This meeting was scheduled for 10 April 2013 at the Hotel Bristol in Paris. That afternoon, at the suggestion of Mr. Bouvier, Mr. Valette took the seller to La Pina-cotheque de Paris, a museum for which Mr. Bouvier was part owner.  Mr. Bouvier had told Mr. Valette that Mr. Bouvier was considering loaning the painting to the museum if the negotiations for its sale proved successful.

**EV**:   Emails dated 4 and 5 April 2013 between Mr. Yves Bouvier and Mr. Samuel            Exhibit 46
            Valette

            Testimony of Mr. Samuel Valette

            Testimony of Mr. Yves Bouvier

            Testimony of Sotheby's representative

277     The negotiations meeting took place that day between one of the sellers (acting on behalf of all three), his wife, Mr. Valette, and Mr. Peretti.  Negotiations continued over dinner.  At some point during the discussions, Mr. Bell joined the meeting.

**EV**:   Testimony of Mr. Samuel Valette

            Testimony of Mr. Yves Bouvier

            Testimony of Sotheby's representative

278     During that meeting, negotiations on behalf of Blancaflor were led by Mr. Peretti, who discussed directly with the representative seller the owner.

**EV**:   Testimony of Mr. Samuel Valette

            Testimony of Mr. Yves Bouvier

            Testimony of Sotheby's representative

279     They eventually agreed on a price of USD 80'000'000, with conditions.

**EV**:   Testimony of Mr. Samuel Valette

            Testimony of Mr. Yves Bouvier

            Testimony of Sotheby's representative

280     Indeed, the buyer was to pay USD 68'000'000.- cash and the remaining USD 12'000'000.- would be paid by the transfer of a painting by Picasso, *i.e. Le Fumeur*.

> **EV**: Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

281 The sellers requested that USD 20'000'000.- be paid quickly, which the buyer agreed upon.

> **EV**: Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

282 A sale agreement was then entered into by Sotheby's, Inc., as seller's agent, and Blancaflor on 3 May 2013 in Geneva (the "**Salvator Mundi Agreement**").

> **EV**: Agreement between Sotheby's and Blancaflor Investments Ltd regarding the sale of sale of the *Salvator Mundi* by Modigliani, dated 3 May 2013.    Exhibit 23
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

283 The purchase price amounted to USD 83'000'000 (inclusive of the buyer's premium).

> **EV**: Agreement between Sotheby's and Blancaflor Investments Ltd regarding the sale of sale of the *Salvator Mundi* by Modigliani, dated 3 May 2013.    Exhibit 23
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Sotheby's representative

284 According to allegations that Mr. Rybolovlev's entities have submitted in the course of the discovery proceedings in the United States, Mr. Bouvier, simultaneously to his negotiations to purchase this work, was emailing with representatives of Mr. Rybolovlev in which, according to Mr. Rybolovlev's allegations, Mr. Bouvier allegedly made inaccurate representations regarding the negotiations and the price that Mr. Bouvier would be paying for the work. Neither Sotheby's nor Mr. Valette were aware of these emails at the time, and, in any event, were unaware of any information that Mr. Bouvier was conveying to Mr. Rybolovlev regarding this artwork.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Mr. Alexander Bell

Testimony of Sotheby's representative

285    While generally aware that Mr. Bouvier could be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to resell to another, neither Sotheby's nor its employees knew precisely what Mr. Bouvier planned to do with such artwork. Nor did Mr. Valette or any employee of any Sotheby's entity know the price (or any other modality) at which Mr. Bouvier planned to later charge for said artwork, if he did decide to resell it.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

286    Only later did Sotheby's learn via press reports, *i.e.* in February 2015, when the arrest of Mr. Bouvier made the headlines (then later in the framework of the discussions initiated by Mr. Rybolovlev's counsels et finally in the context of the judicial proceedings launched in New York (see below CIV2)) that Mr. Bouvier had allegedly resold 12 of these artworks to Mr. Rybolovlev or to one of his companies. At the time when the various Sotheby's entities sold these 12 Artworks to Mr. Bouvier, Sotheby's and Mr. Valette were not aware that such resale was planned, and, even less so, the price charged by Mr. Bouvier and the details of such resale.

**EV**:    Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

Absence of evidence to the contrary

287    On November 15, 2017, Mr. Rybolovlev resold *Salvator Mundi* at auction for a price of $450 million, or $322.5 million more than Mr. Rybolovlev claims to have paid Mr. Bouvier for the work, thereby setting a new record for the highest price earned for a work of art sold at auction.

**EV**:    Deposition of Mr. Dmitri Rybolovlev

Testimony of Mr. Yves Bouvier

Press article:"´*Salvator Mundi´: Dmitri Rybolovlev est invite à retirer sa*      Exhibit 47
*plainte contre Yves Bouvier*", Le Temps, 16 November 2017

Testimony of Sotheby's representative

## 2.12  General conclusions regarding the sale of the 12 Artworks to Yves Bouvier and his companies

288     As detailed above, the Sotheby's group of entities sold a total in excess of 41 artworks to Mr. Bouvier and its affiliates between 2007 and 2013 (see above CII1).

     **EV**:     Testimony of Sotheby's representative

289     Out of those 41 artworks, some of them were offered at the initiative of a Sotheby's entity that had secured a seller and thought it might be of interest to Mr. Bouvier. Some others were sold to Mr. Bouvier after he specifically informed Mr. Valette that he was looking for a specific artwork.

     **EV**:     Testimony of Sotheby's representative

         Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

290     Only later did the Sotheby's entities discover, once the dispute between Mr. Bouvier and Mr. Rybolovlev exploded in the media, and by means of press reports and through court proceedings (see below CIV), that among the aforementioned works, 12 had allegedly been resold to Mr. Rybolovlev (the "**Works of Art**").

     **EV**:     Testimony of Sotheby's representative

         Testimony of Mr. Samuel Valette

291     The following table summarises the sales of the 12 Artworks sold to Blancaflor by various Sotheby's entities which ultimately were – as reported in the press and indicated in Mr. Rybolovlev's court filings – resold to Mr. Rybolovlev or his companies:

| Work | Date of the sale to Blancaflor | Sale price in agreed currency |
|---|---|---|
| *L'Homme Assis au Verre* **Picasso** | 01.04.2011 | USD 62'000'000.- |

| | | |
|---|---|---|
| *La Méditerranée*<br>**Maillol** | 12.04.2011 | EUR 5'170'000.- |
| *Le Baiser*<br>**Rodin** | 12.04.2011 | EUR 4'230'000.- |
| *Nu au Châle Vert*<br>**Matisse** | 27.06.2011 | USD 60'000'000.- |
| *L'Eternel Printemps*<br>**Rodin** | 05.06.2011 | USD 13'200'000.- |
| *Femme de Venise IX*<br>**Giacometti** | 08.11.2011 | CHF 26'100'000 |
| *Le Domaine D'Arn-heim*<br>**Magritte** | 08.12.2011 | USD 24'100'000.- |
| *Eve*<br>**Rodin** | 08.03.2012 | USD 16'000'000.- |
| *Serpents d'Eau II*<br>**Klimt** | 11.09.2012 | USD 126'000'000.- |
| *Tête*<br>**Modigliani** | 25.09.2012 | EUR 31'500'000.- |
| *Au Lit - Le Baiser*<br>**Toulouse-Lautrec** | 08.10.2012 | USD 7'500'000.- |
| *Salvator Mundi*<br>**Da Vinci** | 02.05.2013 | USD 83'000'000.- |

292   Mr. Bouvier never shared with Mr. Valette nor with any other Sotheby's employee his intention with respect to these artworks. Mr. Valette and his colleagues were not aware of whether or nor Mr. Bouvier purchased these works for himself, as part of a group of investors, or else with the intent to resell to another. Neither Sotheby's nor its employees knew that Mr. Bouvier would resell these artworks, and neither were they aware of the price at which Mr. Bouvier planned to later resell said artwork, if he did decide to resell it.

293   As reported in the press, Mr. Rybolovlev alleges to have purchased (through his entities) 37 works of art from Mr. Bouvier or his entities for a total amount of USD 2'000'000'000.-.

> **EV**:   Press article "*Le Piège – Oligarque contre marchand d'art: révélations sur l'affaire qui fait trembler Monaco et la Suisse*", Vanity Fair, 23 February 2016.   Exhibit 48
>
> Press article "*The Bouvier Affair*", The New Yorker, 8 and 15 February 2016.   Exhibit 49

| | |
|---|---|
| Press article "*Monaco: Yves Bouvier, le roi des ports francs en garde à vue*", Le Temps,26 February 2015. | Exhibit 50 |
| Press article "*Arrest of Swiss Freeport Owner Yves Bouvier Over Art Fraud Ring Rocks Art World*", Artnetnews, 27 February 2015. | Exhibit 51 |
| Letter from Herbert Smith Freehills LLP to Sotheby's dated 26 June 2015 | Exhibit 52 |

Testimony Mr. Yves Bouvier

Deposition Mr. Dmitri Rybolovlev

294    As indicated by Mr. Rybolovlev as well as by Mr. Bouvier, the total of the works of art he sold to the former are the following:

| N° | Artiste | Titre |
|---|---|---|
| *1* | Vincent Van Gogh | *Paysage avec un olivier* |
| *1b* | Vincent Van Gogh | *Paysage avec un olivier* |
| *2* | Pablo Picasso | *Les Noces de Pierrette* |
| *3* | Amedeo Modigliani | *Nu couche aux bras levés* |
| *4* | Pablo Picasso | *Mousquetaire à la pipe* |
| *5* | Amedeo Modigliani | *Jeune fille blonde en buste* |
| *6* | Amedeo Modigliani | *Madame Hébuterne aux Epaules nues* |
| *7* | Amedeo Modigliani | *Nu dolent* |
| *8* | Edgar Degas | *Danseuse en rose* |
| *9* | Pablo Picasso | *La sœur de l'artiste* |
| *10* | Paul Gauguin | *Te Fare (La maison)* |
| *11* | Amedeo Modigliani | *Venus (Nu debout, Nu Médicis)* |
| *12* | Mark Rothko | *No. 1* |
| *13* | Claude Monet | *Nympheas (1897-1898)* |
| *14* | Claude Monet | *Nympheas (1914-1917)* |
| *15* | Toulouse Lautrec | *Le Baiser (Rouge)* |

| 16 | Antiquités | *Ensemble de meubles* |
|---|---|---|
| 17 | Antiquités | *Table en bois doré  / Glided table* |
| 18 | Pablo Picasso | *Joueur de Flûte et femme nue* |
| 19 | El Greco | *St. Sebastien* |
| 20 | Renoir | *Jeunes filles au bord de l'eau* |
| 21 | Pablo Picasso | *L'homme asssis au verre* |
| 22 | Aristide Maillol | *La Méditerrannée (Bronze)* |
| 23 | Auguste Rodin | *Le Baiser (Bronze)* |
| 24 | Henri Matisse | *Nu au châle vert* |
| 25 | Auguste Rodin | *L'éternel Printemps (Marbre)* |
| 26 | Alberto Giacometti | *Femme de Venise IX* |
| 27 | Magritte | *Le domaine d'Arnheim* |
| 28 | Amedeo Modigliani | *Nu couche au coussin bleu* |
| 29 | Auguste Rodin | *Eve* |
| 30 | El Greco | *Portrait de Jesus et Madonna* |
| 31 | Gustave Klimt | *Serpent de l'eau II* |
| 32 | Amedeo Modigliani | *Tête* |
| 33 | Toulouse Lautrec | *Au lit – Le baiser (vert)* |
| 34 | Pablo Picasso | *Tête de femme / Espagnole à l'Eventail* |
| 35 | Leonardo da Vinci | *Le Christ comme Salvator Mundi* |
| 36 | Paul Gauguin | *Otahi / seule* |
| 37 | Mark Rothko | *No. 6. Violet vert et rouge* |

**EV**:     Testimony of Mr. Yves Bouvier

Testimony of Mr. Samuel Valette

Absence of evidence to the contrary

295    Out of those 37 works, 12 only were sourced through Sotheby's. Those 12 works are marked in blue in the table above.

    **EV**:   Testimony Mr. Yves Bouvier

          Testimony Mr. Samuel Valette

          Absence of evidence to the contrary

296    As per Sotheby's knowledge, neither Mr. Rybolovlev nor his entities ever threatened the other dealers that sourced Mr. Bouvier with the other 25 artworks, or at least no such claim was ever reported in the media.

    **EV**:   Absence of evidence to the contrary

297    The Defendants then seem to be very selective in their approach to liability for reasons that are difficult to assess.

    **EV**:   By assessment

## 3    Valuation of artworks

### 3.1    Valuation services offered by Sotheby's

298    Among the various services offered by Sotheby's, valuation is a bespoke service.

    **EV**:   Extract from Sotheby's website – valuation services        Exhibit 53

299    Sotheby's indeed provides

> "Sotheby's Valuation's provides *bespoke inventories and apprais-als which are recognised around the world by government agen-cies, financial institutions and international insurance brokers, in-cluding Her Majesty's Revenue and Customs in the United King-dom and the Internal Revenue Service in the United States*".

    **EV**:   Extract from Sotheby's website – valuation services        Exhibit 53

          Testimony of Mrs. Franka Haiderer

          Testimony of Sotheby's representative

300    Valuation can be requested by anyone, collector, owner, or insurer for instance.

**EV**:    Extract from Sotheby's website – valuation services                Exhibit 53

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

Testimony of Mr. Samuel Valette

301    A valuation requested by an owner can have different purposes, *e.g.* to obtain financial facility by offering the valued artwork as collateral, to insure the artwork and get a value to insure the piece of art, or to establish the value of a piece for tax purposes.

**EV**:    Testimony of Mrs. Franka Haiderer

Testimony of Mr. Sam Valette

Testimony of Sotheby's representative

302    Depending on the purpose of the valuation, the valued price may differ.

**EV**:    Testimony of Mrs. Franka Haiderer

Testimony of Mr. Sam Valette

Testimony of Sotheby's representative

303    There are two types of valuations relevant to this action, *i.e.* (i) fair market value valuations and (ii) insurance valuations.

**EV**:    Testimony of Mrs. Franka Haiderer

Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

304    A fair market value valuation is a single value, not a range, that attempts to approximate what the piece is worth in the present art market, which is usually based on the mean price that the piece could be expected to sell for at an auction.  Among other things, a fair market value valuation is used in connection with collateral loans and for tax purposes.

**EV**:    Testimony of Mrs. Franka Haiderer

Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

305   An insurance valuation, by contrast, is an estimate of what the cost would be to replace a piece at retail with a comparable piece if the original is destroyed.

    **EV**:   Testimony of Mrs. Franka Haiderer

    Testimony of Mr. Samuel Valette

    Testimony of Sotheby's representative

306   By industry standard, an insurance valuation usually provides a higher price for a work of art than a fair market value valuation, for a number of reasons, namely (i) because such a valuation contemplates that the replacement works would have to be purchased at retail, which in case of masterpieces, is hard to determine if not impossible, and (ii) also because there would be one less comparable piece if an original is destroyed, which would increase the value of the remplacement works. For example, the *Salvator Mundi* is one of fewer than twenty surviving paintings accepted as having been painted by Leonardo da Vinci.

    **EV**:   Extract from Sotheby's website – valuation services          Exhibit 53

    Testimony of Mrs. Franka Haiderer

    Testimony of Sotheby's representative

307   Valuation is a sensitive appraisal, which bears some subjectivity. It is also subject to important evolution as prices in the art market can quickly evolve and vary.

    **EV**:   Extract from Sotheby's website – valuation services          Exhibit 53

    Testimony of Mrs. Franka Haiderer

    Testimony of Sotheby's representative

308   Any valuation given by Sotheby's is subject to Sotheby's Conditions of Valuation.

    **EV**:   Sotheby's Conditions of Valuation          Exhibit 54

    Testimony of Mrs. Franka Haiderer

    Testimony of Sotheby's representative

309   Sotheby's acknowledges the peculiar nature of the prices in the market and by emphasizing clearly that they can fluctuate and any valuation is the result of reasonable opinions that can however differ. Article 3 of Sotheby's Conditions of Valuation reads as follows:

        *"3. Valuations are a matter of reasonable opinion and opinions as to value may differ. Particular circumstances affecting the value*

*of individual items may not be known or foreseeable at the time of valuation. Values can also fluctuate as a consequence of external circumstances such as (without limitation) changes in the prevailing market conditions for the item or changes in relevant scholarship."*

**EV**:   Sotheby's Conditions of Valuation, art. 3                                    Exhibit 54

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

310   Sotheby's Conditions of Valuation further specify that valuation for insurance indicates the likely cost of replacing the item valued which, as noted, typically will be higher than the fair market value of a piece were it to be sold at auction:

*"6. Valuations for insurance are given on the basis indicated in the valuation to indicate (unless) otherwise stated in writing) Sotheby's view of the likely cost of replacing the item valued with as near a comparable item as is available for purchase second hand."*

**EV**:   Sotheby's Conditions of valuation, art. 6                                    Exhibit 54

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

311   A special process was put in place for evaluations of an artwork with substantial worth.

**EV**:   Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

312   The resulting formal valuation is the product of a team decision rather than a single individual opinion. Such valuation is never performed by a single member in isolation.

**EV**:   Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

313   The price agreed upon for an insurance valuation at times is then included in a draft valuation that is handed over to the client. Following a client's receipt of a

draft valuation, it is not uncommon for the Sotheby's entity conducting the valuation to engage in a dialogue with the client about the ultimate amount at which a valuation will be issued.

> **EV**:   Testimony of Mrs. Franka Haiderer
>
>   Testimony of Sotheby's representative

314     The valuation is then finalized and recorded within Sotheby's.

> **EV**:   Testimony of Mrs. Franka Haiderer
>
>   Testimony of Sotheby's representative

315     All the insurance valuations requested by and provided to Mr. Bouvier (as will be detailed below CII3.2) were the results of internal discussions among the team and involving senior members of Sotheby's entities. Such valuations were all recorded within Sotheby's UK.

> **EV**:   Testimony of Mrs. Franka Haiderer
>
>   Testimony of Mr. Samuel Valette
>
>   Testimony of Sotheby's representative

## 3.2     The valuations requested by Mr. Bouvier

### 3.2.1     The four initial valuations provided in October 2014 to Mr. Bouvier upon his request

316     Whilst the last purchase by Mr. Bouvier – via his entity Blancaflor – occurred on 3 May 2013 (see above CII2.11), Mr. Bouvier reverted to Mr. Valette in autumn 2014 to request valuations on a few artworks.

> **EV**:   Testimony of Sotheby's representative
>
>   Testimony of Mr. Samuel Valette
>
>   Testimony of Mr. Yves Bouvier

317     Mr. Bouvier initially requested that Sotheby's provides valuations to him for four artworks, of which two had been sold to Blancaflor via Sotheby's entities a few years before, whilst others had not been sold via a Sotheby's entity:

- *Otahi Seule*, by Paul Gauguin – not sold via Sanotheby's to Mr. Bouvier or his entities;

- *Les Serpents d'Eau II* (*Wasserschlangen II*) by Klimt – sold to Blancaflor via Sotheby's Kunstauktionen GMBH on 11 September 2012 (see above CII2.8);

- *Nu au châle vert* by Henri Matisse – sold to Blancaflor via Sotheby's UK on 27 June 2011 (see above CII2.3);

- *Nu couché au coussin bleu* by Amedeo Modigliani – not sold via Sotheby's to Mr. Bouvier or his entities;

**EV**:   Testimony of Sotheby's representative

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

318   Mr. Bouvier requested insurance valuation for those works, which is a service that Sotheby's routinely offers clients. When requesting such valuations of the artworks related thereto, Mr. Bouvier never referred to Mr. Rybolovlev nor provided any indication that such valuations would be requested on his behalf or eventually provided to him.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

319   Sotheby's Conditions of Valuation actually make it clear that the valuation is provided only for the client to whom it is addressed and for the specific purpose indicated and cannot be disclosed to any third party:

> "Sotheby's valuation is Sotheby's copyright and is prepared only for the client to whom it is addressed and only for the specific purpose stated in the valuation, and is not to be used by any other person or for any other purpose, or disclosed to any third party (other that the client's professional advisors for the purpose specified in the valuation) or reproduced or published in any form without Sotheby's prior written consent."

**EV**:   Sotheby's Conditions of Valuation, Article 8                    Exhibit 54

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

320   All the valuations provided were expressly referred to as insurance valuations with the following specification:

> *"For the item listed within this document we have provided an Insurance value for the purpose of Retail replacement, subject to the Conditions of Valuation included in this document as at 24 October 2014. This value is based on our reasonable opinion of the actual retail purchase price or probable cost of having to re-place the item with comparable items in similar conditions at to-day's date."*

| | | |
|---|---|---|
| **EV**: | Insurance valuation dated 24 October 2014 related to *Otahi Seule* by Gaugin | Exhibit 55 |
| | Insurance valuation dated 24 October 2014 related to *Nu Couché au Coussin bleu* by Modigliani | Exhibit 56 |
| | Insurance valuation dated 24 October 2014 related to *Nu au Châle Vert* by Matisse | Exhibit 57 |
| | Insurance valuation dated 24 October 2014 related to *Serpents d'Eau II* by Klimt | Exhibit 58 |
| | Insurance valuation dated 28 January 2015 related to *Christ Comme Salvator Mundi* by De Vinci | Exhibit 59 |
| | Insurance Valuation of *Otahi Seule* by Gauguin dated 19 February 2015 | Exhibit 60 |
| | Testimony of Mr. Samuel Valette | |
| | Testimony of Sotheby's representative | |
| | Testimony of Mrs. Franka Haiderer | |

321   Mr. Bouvier was referred to amongst the Sotheby's entities as "Mr. Confidential Client one hundred and thirty four".

| | | |
|---|---|---|
| **EV**: | Insurance valuation dated 24 October 2014 related to *Otahi Seule* by Gaugin | Exhibit 55 |
| | Insurance valuation dated 24 October 2014 related to *Nu Couché au Coussin bleu* by Modigliani | Exhibit 56 |
| | Insurance valuation dated 24 October 2014 related to *Nu au Châle Vert* by Matisse | Exhibit 57 |
| | Insurance valuation dated 24 October 2014 related to *Serpents d'Eau II* by Klimt | Exhibit 58 |
| | Insurance valuation dated 28 January 2015 related to *Christ Comme Salvator Mundi* by De Vinci | Exhibit 59 |
| | Insurance Valuation of *Otahi Seule* by Gauguin dated 19 February 2015 | Exhibit 60 |

Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

Testimony of Mrs. Franka Haiderer

322  Such anonymous reference often is used by the Sotheby's entities for confidenti-
ality purposes when the valuations refer to high value artworks also to keep the
client confidential internally and ensure that only the upper management can ac-
cess such information but not all levels of staff.

> **EV**: Testimony of Mr. Samuel Valette
>
> Testimony of Sotheby's representative
>
> Testimony of Mrs. Franka Haiderer

323  On 24 October 2014, Mr. Valette sent per email the four requested valuations to
Mr. Bouvier.

> **EV**: Letter from Mr. Samuel Valette to Mr. Yves Bouvier dated 24 October 2014   Exhibit 61
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer

i)  **Valuation of *Nu au Châle Vert* by Matisse**

324  Sotheby's UK provided Mr. Bouvier with an insurance valuation for *Nu au Châle
vert* by Matisse and valued this artwork at USD 85'000'000.

> **EV**: Insurance valuation of *Nu au Châle Vert* by Matisse dated 24 October 2014   Exhibit 57
>
> Testimony of Mr. Yves Bouvier
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer

325  Such artwork had been sold via Sotheby's UK to Blancaflor in a private sale for
USD 60'000'000.- on 27 June 2011, *i.e.* more than three years before (see above
CII2.3).

> **EV**: Valuation of *Nu au Châle Vert* by Matisse – Sotheby's internal commentaries   Exhibit 62

Testimony of Sotheby's representative

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

326   The insurance valuation provided by Sotheby's UK was notably based on the fact that the highest price for a Matisse at auction had been set 5 years before, in Paris on 23 February 2009, where a still-life painting that was estimated within the range of EUR 12-18 million had hit the record price of EUR 35'905'000.-.

**EV**:   Agreement between Sotheby's UK and Blancaflor regarding the sale of *Nu au*        Exhibit 11
*Châle Vert*  by Matisse, dated 27 June 2011

Testimony of Sotheby's representative

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

327   A large nude was considered significantly more desirable. In addition, the painting had never appeared at auction before.

**EV**:   Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

Testimony of Mr. Samuel Valette

328   Interestingly, a large odalisque by Matisse, from the Rockefeller collection, did sell at Christie's in New York in May 2018 for USD 80'700'000.-.

**EV**:   Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

Testimony of Mr. Samuel Valette

Update 2018 – Sotheby's internal note related to recent prices of Matisse's        Exhibit 63
works

**ii)**   **Valuation of *Otahi Seule* by Gauguin**

329   An insurance valuation was also provided by Sotheby's UK to Mr. Bouvier on the same day in respect of *Otahi Seule* by Gauguin. No Sotheby's entity had been involved in selling this piece to Mr. Bouvier or his entities.

**EV**:   Insurance valuation of *Otahi Seule* by Gauguin dated 24 October 2014        Exhibit 55

Testimony of Mr. Yves Bouvier

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

330    Such artwork was valued on 24 October 2014 by Sotheby's UK at USD 120'000'000.-.

**EV**:    Insurance valuation of *Otahi Seule* by Gauguin dated 24 October 2014          Exhibit 55

Testimony of Mr. Yves Bouvier

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

331    This insurance valuation was notably based on the fact that *Otahi* is one of the finest paintings from Gauguin that still remained in private hands.  In nearly 10 years, no comparable painting by Gauguin had been sold at auction, which increased the rarity of the artist and therefore its value, which Sotheby's UK expressed as follows:

> "Otahi *is one of the finest paintings remaining in private hands from Gauguin's celebrated Tahitian period. The extraordinary compositions and vivid palette are precisely what made Gauguin's art so influential at the turn-of-the-century and what continues to excite and enthral collectors today. The one comparables illustrated below represent the highest price paid at auction to date. Both examples were sold nearly 10 years ago and since that time no other work of comparable importance or desirability have appeared at auction."*

**EV**:    Valuation of *Otahi Seule* by Gaugin –Sotheby's internal commentaries          Exhibit 64

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

332    Sotheby's UK's valuation was also based on the fact that one of its clients had offered in 2013 an amount in excess of USD 200'000'000.- to acquire *Nafea Faaipoipo*. Such offer had been declined by the owner:

> *"In 2013 a client well known to us offered in excess of $200 mil-lion for Nafea Faaipoipo (illustrated below), which was rejected because the owner wanted $250 million."*

**EV**:   Valuation of *Otahi Seule* by Gaugin – Sotheby's internal commentaries          Exhibit 64

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

333    Also, Sotheby's had at the time received another offer of $80'000'000.- for another work by Gauguin that had been rejected for being too low:

> *"A further work illustrated below had a firm offer of $80 million, which was also rejected for being too low."*

**EV**:   Valuation of *Otahi Seule* by Gaugin – Sotheby's internal commentaries          Exhibit 64

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

**iii)**     **Valuation of *Nu couché au coussin bleu***

334    Sotheby's UK also provided an insurance valuation to Mr. Bouvier for *Nu couché au coussin bleu* by Modigliani. No Sotheby's entity had been involved selling this piece to Mr. Bouvier or his entities.

**EV**:   Insurance valuation dated 24 October 2014 related to *Nu Couché au Coussin*          Exhibit 56
          *bleu* by Modigliani

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

335    Such artwork was valued on 24 October 2014 at USD 110'000'000.-.

**EV**:   Insurance valuation dated 24 October 2014 related to *Nu Couché au Coussin*          Exhibit 56
          *bleu* by Modigliani

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

336    Sotheby's UK's insurance valuation was notably based on the fact that another painting by Modigliani had set a record price at auction in 2010 for USD 68'962'496.- for *Nu assis sur un divan*.

  **EV**:   Valuation of *Nu couché au Coussin bleu* – Sotheby's internal commentaries          Exhibit 65

  Testimony of Mrs. Franka Haiderer

  Testimony of Sotheby's representative

337    *Nu couché au coussin bleu* was however considered by Sotheby's UK as being of superior quality and amongst the most iconic and desirable works of modern art:

> "Modigliani's nude are amongst the most iconic and desirable works of modern art. This extraordinary example is one of the finest; being in a horizontal format, with visible facial features and enlivened by the blue cushion. In recent years few works of this quality have appeared at auction. The examples below represent the highest prices paid for works of art by the artist; however Nu couché au coussin bleu *has a richer colouration and line, and is of a reclining nude."*

  **EV**:   Valuation of *Nu couché au Coussin bleu* – Sotheby's internal commentaries          Exhibit 65

  Testimony of Mr. Samuel Valette

  Testimony of Mrs. Franka Haiderer

  Testimony of Sotheby's representative

338    Another painting was actually sold at auction by Christie's in New York on 9 November 2015 for USD 170'404'992, significantly higher than the insurance valuation issued.

  **EV**:   2018 Update – Recent prices Sotheby's internal note on Modigliani          Exhibit 66

  Testimony of Mr. Samuel Valette

  Testimony of Mrs. Franka Haiderer

  Testimony of Mrs. Sotheby's representative

339    Another work by Modigliani, *Nu couché (sur le côté gauche)* was recently sold on 14 May 2018 at auction in New York by a Sotheby's entity for a price of USD 157'159'008.-.

| EV: | 2018 Update – Recent prices Sotheby's internal note on Modigliani | Exhibit 66 |
|---|---|---|

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

### iv)    Valuation of *Serpents d'Eau II*

340    Finally, Sotheby's UK also provided Mr. Bouvier with an insurance valuation for *Serpents d'Eau II* by Klimt on the same day.

| EV: | Insurance valuation dated 24 October 2014 related to *Serpents d'Eau II* by Klimt | Exhibit 58 |
|---|---|---|

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

341    This artwork was then valued by Sotheby's UK on 24 October 2014 at USD 180'000'000.-.

| EV: | Insurance valuation dated 24 October 2014 related to *Serpents d'Eau II* by Klimt | Exhibit 58 |
|---|---|---|

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

342    This artwork had been sold via Sotheby's Kunstauktionen GMBH to Mr. Bouvier two years before in a private sale, *i.e.* in September 2012 (see above CII2.8) for a price of USD 126'000'000.- after negotiations. The initial asking price by the seller was USD 140'000'000.-.

| EV: | Testimony of Mr. Samuel Valette | |
|---|---|---|

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

| | Agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regarding the sale of *Serpents d'Eau II* by Klimt, dated 11 September 2012. | Exhibit 16 |
|---|---|---|

343     The fair market value of this artwork had been originally estimated at the time, *i.e.* in 2012 by the Sotheby's entities at USD 140'000'000.-, before settling on USD 126'000'000.- during negotiations with Mr. Bouvier.

> **EV**:   Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer
>
> Testimony of Sotheby's representative
>
> Agreement between Sotheby's Kunstauktionen GMBH and Blancaflor regard-      Exhibit 16
> ing the sale of *Serpents d'Eau II* by Klimt, dated 11 September 2012.

344     The insurance valuation provided by Sotheby's on 24 October 2014 was notably based on the fact that the prices for Klimt's works had continuously risen for the past 10 years.

> **EV**:   Valuation of *Serpents d'Eau II* by Klimt – Sotheby's internal commentaries      Exhibit 67
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer
>
> Testimony of Sotheby's representative

345     Sotheby's UK referred in particular to *Bildnis von Adele Bloch-Bauer I* by Klimt that had been sold in June 2006 for USD 135'000'000.

> **EV**:   Valuation of *Serpents d'Eau II* by Klimt – Sotheby's internal commentaries      Exhibit 67
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer
>
> Testimony of Sotheby's representative

346     Sotheby's also referred to the *Portrait of Adele Bloch-Bauer II* by Klimt that had been estimated for auction within USD 18-25 million. This painting was eventually sold at auction by Christie's on 8 November 2006 for USD 87'936'000, which set a record price at the time at auction for Klimt.

> **EV**:   Valuation of *Serpents d'Eau II* by Klimt – Sotheby's internal commentaries      Exhibit 67
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer
>
> Testimony of Sotheby's representative

347    Incidentally, one can note that *Portrait of Adele Bloch-Bauer II* was sold privately in 2016 for a price of USD 150'000'000.-.

> **EV**:    Update 2018  – Recent prices Sotheby's internal note on Klimt                    Exhibit 68
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer

348    Sotheby's UK's valuation team further emphasized that the *Serpents d'Eau II* was the finest allegorical work in private hands and one of the most important from the artist's oeuvre. It was further unlikely that any work of comparable significance would be sold in a near future:

> *"The comparables provided below represent the highest known price s paid for any work of art by Gustav Klimt. The widely publicised sale of Adele Block Bauer I in 2006 made a new record price for the artist, which was swiftly followed by a new record price made at auction in November. The Wasserschlangen II is not only the finest allegorical work in private hands, but also one of the most important from the artist's celebrated oeuvre. In the past 10 years the prices for Klimt's work have continued to rise, though no works of comparable worth have been raded. Furthermore, no other work of comparable significance to the Wasserschlangen II is likely to be sold in the future because of the restrictive export policies in Austria concerning works of national importance, such as other paintings by Klimt. The sale of this work was only possible because of tis exemption on grounds of being restituted."*

> **EV**:    Valuation of *Serpents d'Eau II* by Klimt – Sotheby's internal commentaries          Exhibit 67
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer
>
> Testimony of Sotheby's representative

### 3.2.2    The valuation of the Salvator Mundi requested by Mr. Bouvier in January 2015

349    In January 2015, Mr. Bouvier contacted Mr. Valette to request an insurance valuation on the *Salvator Mundi* by Da Vinci.

> **EV**:    Testimony of Mr. Yves Bouvier

Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

350   Mr. Bouvier asked Mr. Valette to provide him with an informal statement of the painting's insurance value.

> **EV**:   Testimony of Mr. Yves Bouvier
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer
>
> Testimony of Sotheby's representative

351   At that time, neither Mr. Valette nor any other employee of a Sotheby's entity had any indication of any dispute between Mr. Bouvier and Mr. Rybolovlev nor of the fact that the artworks purchased by Blancaflor, in particular the Salvator Mundi, had been ultimately sold to Mr. Rybolovlev.

> **EV**:   Testimony of Mr. Yves Bouvier
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer
>
> Testimony of Sotheby's representative

352   Neither Mr. Bouvier did indicate that the insurance valuation sought was intended for Mr. Rybolovlev.

> **EV**:   Testimony of Mr. Yves Bouvier
>
> Testimony of Mr. Samuel Valette
>
> Testimony of Mrs. Franka Haiderer
>
> Testimony of Sotheby's representative

353   On 23 January 2015, Mr. Bouvier provided Mr. Valette with an insurance certificate according to which the painting *Salvator Mundi* had been insured for a declared value of EUR 110'139'000.-.

> **EV**:   Email from Mr. Bouvier to Mr. Valette dated 23 January 2015 and its attach-   Exhibit 69
> ment
>
> Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

354     The insurance coverage had been entered into by one of the entity of Mr. Bouvier, *i.e.* Fine Art Transports Natural Le Coultre S.A, Geneva.

    **EV**:   Email from Mr. Bouvier to Mr. Valette dated 23 January 2015 and its attachment       Exhibit 69

          Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

355     Mr. Bouvier requested that the valuation state the painting's declared and insured value, but said he did not need a formal valuation necessarily, and that an informal letter stating the painting's insurance value would suffice. Mr. Bouvier also made clear that he would like the valuation to be as high as possible.

    **EV**:   Email from Mr. Bouvier to Mr. Valette dated 23 January 2015 and its attachment       Exhibit 69

          Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Sotheby's representative

356     Upon receipt of Mr. Bouvier's request for valuation, Mr. Valette contacted Mr. Alexander Bell, Co-Chairman Worldwide of Sotheby's Old Master Paintings Department and an employee of Sotheby's UK, who had been involved in the sale of the *Christ as Salvator Mundi* (see above CII2.11).

    **EV**:   Testimony of Mr. Samuel Valette

          Testimony of Mr. Alexandre Bell

          Testimony of Mrs. Franka Haiderer

          Testimony of Sotheby's representative

357     Internal discussions occurred between Mr. Bell, Mrs. Haiderer, Senior Director and Chairman of Valuation at Sotheby's UK as well as with Mr. Valette.

    **EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Alexandre Bell

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

358   In their discussions, Mr. Valette advocated to Mr. Bell on behalf of Mr. Bouvier and suggested that a valuation could be issued for as much as $125 million, but Mr. Bell was sceptical of that value given the physical condition of the painting, which had been damaged and heavily restored.  Mr. Bell initially indicated that he felt a valuation of not more than $100 million USD would be appropriate.  Mr. Bell also insisted on performing a formal insurance valuation of the work, but agreed to also include a cover letter describing the work in positive terms.

   **EV**:   Testimony of Mr. Samuel Valette

      Testimony of Mr.  Alexandre Bell

      Testimony of Mrs. Franka Haiderer

      Testimony of Sotheby's representative

359   Mr. Bell and Mrs. Haiderer prepared a valuation report that was sent to Mr. Bouvier as a draft on 27 January 2015. The draft included a draft cover letter describing the work. Given that input from the owner of a work is often sought during the valuation process, it was not unusual to send a draft valuation to Mr. Bouvier set-ting out Sotheby's initial position on its valuation.

   **EV**:   Email from Mr. Samuel Valette to Mr. Yves Bouvier dated 27 January and its            Exhibit 70
      attachment

      Testimony of Mr. Samuel Valette

      Testimony of Mr. Yves Bouvier

      Testimony of Mrs. Alexandre Bell

      Testimony of Mrs. Franka Haiderer

      Testimony of Sotheby's representative

360   The valuation set the value of the painting at USD 100'000'000.- and emphasized the uniqueness of this artwork.

   **EV**:   Email from Mr. Samuel Valette to Mr. Yves Bouvier dated 27 January 2015            Exhibit 70
      and its attachment

      Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Mrs. Alexandre Bell

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

361     Mr. Bouvier reverted to Mr. Valette to enquire whether the value could be indicated in EUR as the painting had been insured for an amount in excess of EUR 100'000'000.-.  Mr. Bouvier also asked Mr. Valette to revise the first sentence of the cover letter, which had included a reference to the date of Blancaflor's acquisition of the painting.

   **EV**:   Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Mrs. Alexandre Bell

          Testimony of Mrs. Franka Haiderer

          Testimony of Sotheby's representative

362     After further internal discussions, and in light of Bouvier's request that the currency be changed, Sotheby's UK agreed on a valuation at EUR 100'000'000.- considering that given the uniqueness of this artwork and its rarity, the difference was not much relevant also taking into consideration that the euro was declining back then. Under the Euro/USD exchange rate at the time, the EUR 100'000'000 was equivalent to approximately USD 113'400'000.

   **EV**:   Testimony of Mr. Samuel Valette

          Testimony of Mr. Yves Bouvier

          Testimony of Mrs. Alexandre Bell

          Testimony of Mrs. Franka Haiderer

          Testimony of Sotheby's representative

363     A final insurance valuation, signed by Mrs. Franka Haiderer, and a revised cover letter were then sent to Mr. Bouvier on 28 January 2015 indicating a value of EUR 100'000'000.-.

   **EV**:   Email from Mr. Samuel Valette to Mr. Yves Bouvier dated 28 January 2015          Exhibit 71

| | |
|---|---|
| Insurance valuation of *Christ Comme Salvator Mundi* by De Vinci, dated 28 January 2015 | Exhibit 59 |
| Email from Mr. Samuel Valette to Mr. Yves Bouvier dated 28 January 2015 and its attachment | Exhibit 72 |
| Testimony of Mr. Samuel Valette | |
| Testimony of Mr. Yves Bouvier | |
| Testimony of Mrs. Alexandre Bell | |
| Testimony of Mrs. Franka Haiderer | |
| Testimony of Sotheby's representative | |

364   As noted above (see above N 287), on November 15, 2017 Mr. Rybolovlev resold *Salvator Mundi* at auction for a price of $450 million, or $322.5 million more than Mr. Rybolovlev claims to have paid Mr. Bouvier for the work, thereby setting a new record for the highest price earned for a work of art sold at auction.

| | | |
|---|---|---|
| **EV**: | Press article:" ´*Salvator Mundi´: Dmitri Rybolovlev est invite à retirer sa plainte contre Yves Bouvier*", Le Temps, 16 November 2017 | Exhibit 47 |

### 3.2.3   The revised valuation of *Otahi Seule* in February 2015

365   In February 2015, Mr. Valette was contacted by Mr. Bouvier with respect to the valuation of *Otahi Seule* by Gauguin.

| | |
|---|---|
| **EV**: | Testimony of Mr. Yves Bouvier |
| | Testimony of Mr. Samuel Valette |
| | Testimony of Mrs. Franka Haiderer |
| | Testimony of Sotheby's representative |

366   Another painting by Gauguin, the *Nafeafaa Ipoipo* was reported to have been sold for USD 300'000'000.- in a private sale to Qatar.

| | | |
|---|---|---|
| **EV**: | Update 2018 – Sotheby's internal note on Gaugin recent prices | Exhibit 73 |
| | Testimony of Mr. Yves Bouvier | |
| | Testimony of Mr. Samuel Valette | |
| | Testimony of Mrs. Franka Haiderer | |

PRIVILEGED AND CONFIDENTIAL

Testimony of Sotheby's representative

367    Mr. Bouvier then enquired whether the valuation of his painting shall be reviewed.

   **EV**:    Testimony of Mr. Yves Bouvier

         Testimony of Mr. Samuel Valette

         Testimony of Mrs. Franka Haiderer

         Testimony of Sotheby's representative

368    Mr. Valette discussed this internally and it was agreed that, given the record sale that had just occurred on a painting by Gauguin, the value was to be reviewed in view of the value of this artist that was clearly increasing.

   **EV**:    Update 2018 – Sotheby's internal note on Gaugin recent prices          Exhibit 73

         Testimony of Mr. Samuel Valette

         Testimony of Mrs. Franka Haiderer

         Testimony of Sotheby's representative

369    It was agreed amongst Mr. Valette and another expert from the Impressionist and Modern Art Department that the valuation of *Otahi Seule* could be increased by USD 20'000'000.-.

   **EV**:    Testimony of Mr. Samuel Valette

         Testimony of Mrs. Franka Haiderer

         Testimony of Sotheby's representative

370    A new insurance valuation report was issued by Sotheby's UK in favour of Mr. Bouvier on 19 February 2015.

   **EV**:    Email from Mr. Valette to Mr. Bouvier dated 19 February 2015          Exhibit 74

         Insurance Valuation of *Otahi Seule* by Gauguin dated 19 February 2015          Exhibit 60

         Testimony of Mr. Samuel Valette

         Testimony of Mrs. Franka Haiderer

         Testimony of Sotheby's representative

371    According to this new valuation, *Otahi Seule* was valued at USD 140'000'000.-.

**EV**:   Email from Mr. Valette to Mr. Bouvier dated 19 February 2015          Exhibit 74

Insurance Valuation of *Otahi Seule* by Gauguin dated 19 February 2015          Exhibit 60

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

## 3.3   Conclusion on the valuations

372   It is not unusual for customers such as Mr. Bouvier to ask for insurance valuations so that they may get appropriate insurance for pieces they had purchased.  As there was nothing unusual in Mr. Bouvier's requests, neither Mr. Valette, nor any other employee of any Sotheby's entity asked Mr. Bouvier specifically what he planned to do with the various insurance valuations provided to him. In particular, Sotheby's group of entities and their employees were unaware at the time of the fact that those valuations subsequently were handed over to Mr. Rybolovlev.

**EV**:   Testimony of Mr. Yves Bouvier

Testimony of Mr. Samuel Valette

Testimony of Mrs. Franka Haiderer

Testimony of Sotheby's representative

373   Sotheby's, Inc. learned from counsel for Mr. Rybolovlev in or around March 2015 that Mr. Rybolovlev had apparently received those valuations, when counsel for Mr. Rybolovlev contacted Sotheby's, Inc. and provided documents that had apparently been passed on from Mr. Bouvier to Mr. Rybolovlev (see below CIII2).

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

374   However, the valuations provided were intended for the client only and the client was not authorized to disclose such valuation to any third party, except its professional advisor related to the purpose specified in the valuation as expressly set forth in the Conditions of Valuation:

> *"8. Sotheby's valuation is Sotheby's copyright and is prepared only for the client to whom it is addressed and only for the specific purpose stated in the valuation, and is not to be used by any other person or for any other purpose, or disclosed to any third party (other than the client's professional advisors for the purpose*

> *specified in the valuation) or reproduced or published in any form*
> *without Sotheby's prior written consent."*

    **EV**:    Sotheby's Conditions of Valuations, Article 8            Exhibit 54

         Testimony of Mr. Samuel Valette

         Testimony of Mrs. Franka Haiderer

         Testimony of Sotheby's representative

## 4    Subsequent consignments of some of the 12 Artworks by Mr. Bouvier

375    Whilst Mr. Bouvier in May 2013 purchased the last of the artworks he acquired from Sotheby's and then sold to Mr. Rybolovlev, Mr. Bouvier consigned some pieces with Sotheby's to be sold at auction after that period.

    **EV**:    Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Testimony of Sotheby's representative

376    On 11 September 2014, Mr. Bouvier, formally Blancaflor, consigned the *Tête* by Modigliani (that he had previously purchased via Sotheby's (see above CII2.9) to be sold at auction in New York on 4 November 2014.

    **EV**:    Guarantee and Consignment Agreement dated 11 September 2014 between    Exhibit 75
         Sotheby's Inc. and Blancaflor Investments Ltd on the consignment of *Tête*
         by Modigliani

         Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

         Testimony of Sotheby's representative

377    In view of the sale of the *Tête* at auction, Sotheby's had estimated its price within the range of USD 45-65 million.

    **EV**:    Guarantee and Consignment Agreement dated 11 September 2014 between    Exhibit 75
         Sotheby's Inc. and Blancaflor Investments Ltd on the consignment of *Tête*
         by Modigliani

         Testimony of Mr. Samuel Valette

         Testimony of Mr. Yves Bouvier

PRIVILEGED AND CONFIDENTIAL

Testimony of Sotheby's representative

378   The *Tête* was eventually sold for USD 70'000'000.- on 4 November 2014.

**EV**:   Excerpt from sales catalogue related to the *Tête* by Modigliani dated 4 No-   Exhibit 76
vember 2014

379   Mr. Bouvier never indicated in any way to any Sotheby's entity and/or any of their
employees that he consigned this sculpture on behalf of any third party.

**EV**:   Testimony of Mr. Yves Bouvier

Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

380   Mr. Bouvier, when signing the consignment agreement on behalf of Blancaflor ac-
tually represented and guaranteed to Sotheby's that Blancaflor was the sole owner
of the property and had the right to consign the property for sale:

> *"6. Representations and Warranties; Indemnity. You represent
> and warrant to us and the purchaser that: you are the sole and
> absolute owner of the Property and have the right to consign the
> Property for sale; (…)"*

**EV**:   Guarantee and Consignment Agreement dated 11 September 2014 between   Exhibit 75
Sotheby's Inc. and Blancaflor Investments Ltd on the consignment of *Tête*
by Modigliani

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

381   In Autumn 2014, Mr. Bouvier contacted Mr. Valette to discuss the consignment of
a few artworks Mr. Bouvier wanted to sell, *i.e.* (i) the *Eve* by Rodin that he had
previously purchased via Sotheby's UK on 8 March 2012 (see above CII2.7) (ii)
*Joueur de flute et femme nue* by Picasso, (iii) Au Lit – Le baiser by Toulouse Lautrec
(that he had previous purchased via Sotheby's, Inc. (see above 248), and (iv) *Tête
de Femme* and *Espagnole à l'éventail* by Picasso.

**EV**:   Testimony of Mr. Yves Bouvier

Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

382    Out of those various pieces, Mr. Bouvier eventually only consigned *Le Baiser*, with a few other works.

**EV**:   Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

383    On 24 December 2014, Mr. Bouvier, as representative of Blancaflor, consigned the following works with Sotheby's, those works having the following pre-sale estimate values, including *Au Lit – Le Baiser* that he had previously acquired via Sotheby's (see above 248):

- *Au Lit – Le Baiser* by Toulouse Lautrec              GBP 9-12 million

- *Etude pour une baignade, Asnières* by Georges Seurat    GBP 5-7 million

- *Moskau II* by Wassily Kandinsky                    GBP 6-8 million

- *Le Penseur* by Rodin                                GBP 3-4 million

- *L'Eternel Printemps* by Rodin                    GBP 1.8-2.5 million

**EV**:   Consignment agreement signed between Sotheby's UK and Blancaflor dated        Exhibit 77
23 December 2014 related to the consignment of several artworks

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

384    Mr. Bouvier never indicated to any Sotheby's entities and/or their employees that he would have consigned those works on behalf of a third party.

**EV**:   Consignment agreement signed between Sotheby's UK and Blancaflor dated        Exhibit 77
23 December 2014 related to the consignment of several artworks

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

385    In any event, the seller had represented and guaranteed to Sotheby's when entering into the consignment agreement that it "*is the sole and absolute owner of the item or is properly authorised by the owner to sell the item*".

**EV**: Consignment agreement signed between Sotheby's UK and Blancaflor dated 23 December 2014 related to the consignment of several artworks — Exhibit 77

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

386   The estimate made by the Sotheby's group of entities as to the sale of *Au lit – Le baiser* eventually amounted to GBP 10-15'000'000.- without guarantee.

**EV**: Email from Mr. Samuel Valette to Mr. Yves Bouvier dated 19 December 2014 and its attachment — Exhibit 78

Email from Mr. Samuel Valette to Mr. Yves Bouvier dated 19 December 2014 and its attachment — Exhibit 79

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

387   Sotheby's UK had however offered Mr. Bouvier with a guarantee amounting at GBP 9'430'861.-, thereby meaning that this minimum price would be paid to Blancaflor irrespective of any sale during the auction.

**EV**: Testimony of Sotheby's representative

388   *Au Lit – Le Baiser* was sold at auction on 3rd February 2015 at a price of GBP 9'500'000.- (or GBP 11'521'800.- inclusive of the commissions) inclusive of the buyer's premium).

**EV**: Artnet page related to the sale of *Au Lit – Le Baiser*, dated 3 February 2015 — Exhibit 80

Testimony of Mr. Samuel Valette

Testimony of Mr. Yves Bouvier

Testimony of Sotheby's representative

### III   The dispute between Mr. Yves Bouvier and Mr. Dmitry Rybolovlev and how Sotheby's became aware of it

### 1   The press coverage further to Mr. Bouvier's arrest

389   Following Mr. Bouvier's arrest on 25 February 2015, Mr. Rybolovlev made public allegations against Mr. Bouvier according to which the latter would have defrauded him by around one billion.

| **EV**: | Press article "*Le Piège – Oligarque contre marchand d'art: révélations sur l'affaire qui fait trembler Monaco et la Suisse*", Vanity Fair, 23 February 2016. | Exhibit 48 |
| --- | --- | --- |
| | Press article "*The Bouvier Affair*", The New Yorker, 8 and 15 February 2016. | Exhibit 49 |
| | Press article "*Monaco: Yves Bouvier, le roi des ports francs en garde à vue*", Le Temps, 26 February 2015 | Exhibit 50 |
| | Press article "*Arrest of Swiss Freeport Owner Yves Bouvier Over Art Fraud Ring Rocks Art World*", Artnetnews, 27 February 2015. | Exhibit 51 |
| | Testimony of Mr. Samuel Valette | |
| | Testimony of Sotheby's representative | |

390   The Sotheby's Claimants and the other Sotheby's entities discovered such allegations in the media at that time, *i.e.* in February 2015. Although Sotheby's had been in discussions with Mr. Bouvier concerning possibly consigning for auction additional items, those conversations ceased following Mr. Bouvier's arrest. Based on the facts reported in the press in February 2015 that loudly referred to the da Vinci painting, Mr. Valette and Sotheby's entities learnt for the first time that Mr. Bouvier would have resold the *Salvator Mundi*, acquired previously by Mr. Bouvier via Sotheby's (see above CII2.11), to Mr. Rybolovlev in a disputed transaction encompassing a price higher than the price paid to Sotheby's.

| **EV**: | Testimony of Mr. Samuel Valette | |
| --- | --- | --- |
| | Testimony of Sotheby's representative | |
| | Press article "Monaco: Yves Bouvier, le roi des ports francs en garde à vue", Le Temps, 26 February 2015. | Exhibit 50 |
| | Press article "*Arrest of Swiss Freeport Owner Yves Bouvier Over Art Fraud Ring Rocks Art World*", Artnetnews, 27 February 2015. | Exhibit 51 |
| | Email dated 20 February 2015 from Mr. Samuel Valette to Mr. Yves Bouvier | Exhibit 81 |
| | Email dated 20 February 2015 from Mr. Samuel Valette to Mr. Yves Bouvier | Exhibit 82 |

**2    Mr. Rybolovlev's contacts with Sotheby's further to the public allegations of fraud against Mr. Bouvier**

391    In March 2015, counsel for Mr. Rybolovlev, Ms. Tetiana Bersheda, reached out to Sotheby's, Inc. and provided Sotheby's, Inc. with a number of emails written from Mr. Valette to Mr. Bouvier, as well as certain documents (a letter from Sotheby's and a consignment agreement) that had apparently been redacted.  Ms. Bersheda asked whether Sotheby's, Inc. could confirm the authenticity of the emails and documents.

    **EV**:    Testimony of Sotheby's representative

392    Sotheby's Claimants also discovered that Mr. Bouvier had transmitted some of the emails Mr. Valette had sent to him.

    **EV**:    Testimony of Sotheby's representative

           Testimony of Mr. Samuel Valette

393    Mr. Rybolovlev's counsel was further seeking information and documents from Sotheby's on the artworks purchased by Mr. Bouvier via Sotheby's.

    **EV**:    Testimony of Sotheby's representative

394    Sotheby's, Inc. indicated to Mr. Rybolovlev's counsel that it was subject to confidentiality undertaking and was therefore not in a position to provide him with any document related to the purchases of Mr. Bouvier or his entities without prior consent of those.

    **EV**:    Testimony of Sotheby's representative

395    Sotheby's UK then confirmed such impossibility to disclose any document absent any court order for the same reason. Such position was also confirmed later on in writing by the Sotheby's entities' UK counsel.

    **EV**:    Letter from Arnold & Porter UK LLP to Herbert Smith Freehills Llp dated 6 July          Exhibit 83
           2015

           Testimony of Sotheby's representative

396    Neither Mr. Bouvier nor Blancaflor consented to such disclosure.

    **EV**:    Testimony of Mr. Yves Bouvier

           Testimony of Sotheby's representative

397    Mr. Rybolovlev eventually got access to those within the discovery proceedings his entities filed in New York on 25 March 2016 (see below CIV2).

     **EV**:   Testimony of Sotheby's representative

398    Within the course of those discussions, Sotheby's UK became aware of the total list of the 37 artworks acquired by Mr. Rybolovlev via Mr. Bouvier since Mr. Rybolovlev's counsel informed Sotheby's UK accordingly.

     **.EV**:   Letter from Herbert Smith Freehills to Sotheby's UK dated 26 June 2015     Exhibit 52

        Testimony of Sotheby's representative

399    Also, on 26 June 2015, Mr. Rybolovlev's UK counsel in London contacted Sotheby's UK in connection with the sale of the *Au Lit – Le Baiser* that had been sold at auction on 3 February 2015.

     **EV**:   Letter from Herbert Smith Freehills to Sotheby's UK dated 26 June 2015     Exhibit 52

        Testimony of Sotheby's representative

400    Mr. Rybolovlev's counsel informed Sotheby's UK that this painting was the property of Mr. Rybolovlev's entities, *i.e.* Accent and Xitrans, requesting that any proceeds of that sale be paid to their clients but not to Mr. Bouvier or any of his entities.

     **EV**:   Letter from Herbert Smith Freehills to Sotheby's UK dated 26 June 2015     Exhibit 52

        Testimony of Sotheby's representative

401    Sotheby's further informed Mr. Rybolovlev's counsel that the painting of Toulouse Lautrec had been sold for a total price (inclusive of buyer's premium) of GBP 11'521'800.-.

     **EV**:   Letter from Arnold & Porter UK LLP to Herbert Smith Freehills LLP dated 6     Exhibit 83
        July 2015

        Testimony of Sotheby's representative

402    Sotheby's then informed HSF that it was not in a position to comment on the legal nature of the relationship between Mr. Rybolovlev and Blancaflor. However, it pointed out again that Sotheby's had contracted with Blancaflor without having been made aware of any representation by the latter on behalf of any other third party. Consequently, Blancaflor was the seller for Sotheby's:

        *"(…) Sotheby's contracted with Blancaflor and was unaware that Blancaflor was allegedly not the owner of the Painting. To the extent that Blancaflor did, indeed, act as Mr Rybolovlev's agent*

> *in entering into the Consignment Agreement with Sotheby's for the sale of the Painting, he did so as agent for an undisclosed principal Whether it was principal or agent, Blancaflor was the seller. Mr Rybolovlev was not a party to the contract and Sotheby's had no legal obligations to him under the Consignment Agreement. The existence, nature, extent and validity of the termination of any agency between Mr Rybolovlev and Blancaflor are matters to be determined between Mr Rybolovlev and Blancaflor."*

**EV**:   Letter from Ashurst to Herbert Smith Freehills dated 18 September 2015      Exhibit 84

Testimony of Sotheby's representative

403   On 9 October 2015, Sotheby's counsel wrote to both Mr. Rybolovlev and Blancaflor's counsels to inform them about the completion of the sale of the painting and receipt of the full payment from the purchaser.

**EV**:   Letter from Ashurst to Herbert Smith Freehills dated 9 October 2015      Exhibit 85

Testimony of Sotheby's representative

404   Sotheby's further informed them that due to the partial payments already made in favour of Blancaflor based on the guarantees given to the latter, the remaining proceeds payable to Blancaflor in respect of the painting amounted to GBP 2'531'050.

**EV**:   Letter from Ashurst to Herbert Smith Freehills dated 9 October 2015      Exhibit 85

Testimony of Sotheby's representative

405   However, given the dispute between both Mr. Rybolovlev and Mr. Bouvier, both claiming that they were ultimately (*i.e.* Xitrans for Mr. Rybolovlev) entitled to the proceeds of the sale of *Au Lit – Le Baiser* and the reported allegations in the press against Mr. Bouvier, Sotheby's confirmed, as it had previously already indicated, that:

> *"(…) will hold the remainder of the proceeds of the sale of the Painting, being the Amount, and will not release the Amount until the earlier of:*
>
> *(a)   receipt of a written joint instruction from, or on behalf of, Xitrans and Blancaflor; and*
>
> *(b)   receipt of any final order from a Court of competent jurisdiction which is binding on Sotheby's (…)."*

> **EV**:   Letter from Ashurst to Herbert Smith Freehills dated 9 October 2015        Exhibit 85
>
> Testimony of Sotheby's representative

406   So far, Sotheby's UK has not been informed by either Xitrans or Blancaflor of any joint consent or a court order.

> **EV**:   Testimony of Sotheby's representative
>
> Absence of evidence to the contrary

407   As a consequence, the proceeds of the sale amounting to GBP 2'531'050.- are still retained by Sotheby's UK.

> **EV**:   Testimony of Sotheby's representative

## IV   The threat of Mr. Dmitry Rybolovlev against the Sotheby's entities and Mr. Valette

### 1   The worldwide legal battle initiated by Mr. Rybolovlev against Mr. Bouvier

408   Since early 2015, Mr. Rybolovlev and his entities have initiated significant legal battles worldwide against Mr. Bouvier and his entities.

> **EV**:   Press article "*Le Piège – Oligarque contre marchand d'art: révélations sur l'affaire qui fait tembler Monaco et la Suisse*", Vanity Fair, 23 February 2016.        Exhibit 48
>
> Press article "*The Bouvier Affair*", The New Yorker, 8 and 15 February 2016.        Exhibit 49
>
> Press article "*Monaco: Yves Bouvier, le roi des ports francs en garde à vue*", Le Temps, 26 February 2015.        Exhibit 50
>
> Press article "*Arrest of Swiss Freeport Owner Yves Bouvier Over Art Fraud Ring Rocks Art World*", Artnetnews, 27 February 2015.        Exhibit 51

409   Except in a discovery proceedings initiated in the United States, Sotheby's is not a party to any of these proceedings and therefore its knowledge thereof is limited to what was reported in the press or communicated to it in the context of the US proceedings or directly by Mr. Rybolovlev's counsel, when the latter initiated conztact with the Sotheby's entities (see below CIV2 and above CIII1).

> **EV**:   Testimony of Sotheby's representative

410   Mr. Rybolovlev and his entities first filed a criminal complaint in Monaco, further to which Mr. Bouvier was arrested on 15 February 2015.

| **EV**: | Press article "*Le Piège – Oligarque contre marchand d'art: révélations sur l'affaire qui fait tembler Monaco et la Suisse*", Vanity Fair, 23 February 2016 | Exhibit 48 |
| --- | --- | --- |
| | Press article "*The Bouvier Affair*", The New Yorker, 8 and 15 February 2016. | Exhibit 49 |
| | Press article "*Monaco: Yves Bouvier, le roi des ports francs en garde à vue*", Le Temps, 26 February 2015. | Exhibit 50 |
| | Press article "*Arrest of Swiss Freeport Owner Yves Bouvier Over Art Fraud Ring Rocks Art World*", Artnetnews, 27 February 2015. | Exhibit 51 |

411    In March 2015, Mr. Rybolovlev and his entities also initiated proceedings in Singapore and obtained a freezing injunction against Mr. Bouvier and MEI Invest that was eventually lifted.

| **EV**: | Press article "*Le Piège – Oligarque contre marchand d'art: révélations sur l'affaire qui fait tembler Monaco et la Suisse*", Vanity Fair, 23 February 2016 | Exhibit 48 |
| --- | --- | --- |
| | Press article "*The Bouvier Affair*", The New Yorker, 8 and 15 February 2016. | Exhibit 49 |
| | Singapore Court of Appeal judgment dated 18 April 2017 | Exhibit 86 |

412    As to the claim on the merits filed before the Singaporean court, such claim was rejected given that the Singapore courts did not consider themselves competent to rule on the dispute.

| **EV**: | Singapore Court of Appeal judgment dated 18 April 2017 | Exhibit 86 |
| --- | --- | --- |

413    The Singapore Court of Appeal ultimately denied jurisdiction on 17 March 2016 directed Mr. Rybolovlev and his entities to make a venue selection as between Monaco and Switzerland, while making clear that, in its view, Switzerland was the appropriate forum given the close connection of the facts with Geneva:

> "[…]la teneur, le fond et la forme des transactions entres les parties étaient intimement liés à la Suisse et au droit suisse. En fait, nous ne voyons aucun connexion d'importance entre ces transactions et une quelconque autre juridiction, que ce soit Singapour ou une autre."

| **EV**: | Singapore Court of Appeal judgment dated 18 April 2017, N 82 | Exhibit 86 |
| --- | --- | --- |
| | Deposition of Mr. Dimitri Rybolovlev | |

414    In addition, Mr. Rybolovlev's entities filed a criminal complaint in Switzerland against Mr. Bouvier and his entities.

| EV: | Press article "*Le parquet genevois hérite de l'affaire Bouvier*", Le Temps, 8 February 2018 | Exhibit 87 |

Testimony of Mr. Yves Bouvier

Deposition of Mr. Dmitri Rybolovlev

415    To this day, none of the Sotheby's entities or Mr. Valette are prosecuted in this proceeding.

EV:    Testimony of Sotheby's representative

Absence of evidence to the contrary

416    From press reports, Claimants understand that this criminal proceedings is currently under investigation before the Geneva public prosecutor office.

| EV: | Press article "*Le parquet genevois hérite de l'affaire Bouvier*", Le Temps, 8 February 2018 | Exhibit 87 |

Testimony of Mr. Yves Bouvier

Deposition of Mr. Dmitri Rybolovlev

417    The sole proceeding directed so far against one of Sotheby's entities, *i.e.* Sotheby's, Inc., is a discovery proceedings initiated by Mr. Rybolovlev and some of his entities in New York in spring 2016 as detailed below (see below CIV2).

EV:    Testimony of Sotheby's representative

## 2    The discovery proceedings initiated by the Rybolovlev's entities against Sotheby's, Inc.

418    In March 2016, counsel for entities affiliated with Mr. Rybolovlev (the "Rybolovlev Entities") filed a proceeding in the United States District Court for the Southern District of New York to obtain from Sotheby's, Inc. and the sellers of the *Salvator Mundi* documents and information to be used against Mr. Bouvier in then-pending foreign proceedings between Mr. Rybolovlev and Mr. Bouvier.

EV:    Testimony of Sotheby's representative

419    Following Rybolovlev Entities' initiation of this proceeding, Sotheby's, Inc. reached an agreement with the Rybolovlev Entities under which Sotheby's, Inc. would not oppose the discovery application provided that (i) the documents sought would be limited to only transactional documents exchanged between Sotheby's and Mr. Bouvier, and communications between Mr. Bouvier or his agents and Mr. Valette,

and (ii) notice would be given to Mr. Bouvier to give him the opportunity to inter-vene and object in the proceedings if he so wished.

> **EV**:   Testimony of Sotheby's representative

420   Following the intervention of Mr. Bouvier disputing the application about the pro-priety of such a production to the Rybolovlev Entities, the court issued an order on 5 October 2016 granting the application for the production Sotheby's, Inc..

> **EV**:   New York Court Order dated 5 October 2016                              Exhibit 88
>
>     Testimony of Sotheby's representative

421   Such discovery was however subject to a Protective Order issued on 1 November 2016 limiting the categories of documents produced to those agreed between So-theby's, Inc. and the Rybolovlev Entities, and according to which the discovery materials could only be used by the plaintiffs in the Monaco, France and Singapore.

> **EV**:   New York Court Protective Order dated 1st November 2016               Exhibit 89
>
>     Testimony of Sotheby's representative

422   The Plaintiffs were therefore prevented from using such materials outside of the pending proceedings in these jurisdictions.

> **EV**:   New York Court Protective Order dated 1st November 2016               Exhibit 89
>
>     Testimony of Sotheby's representative

423   Further to an appeal against the order dated 5 October 2016, the United States Court of Appeals for the second Circuit affirmed such order on 28 August 2017.

> **EV**:   New York Court of Appeals Order dated 28 August 2017                  Exhibit 90
>
>     Testimony of Sotheby's representative

424   The Rybolovlev entities were then provided with the materials they sought as per the Order dated 5 October 2016 and Protective Order dated November 1, 2016 on November 16, 2016 (the "**Discovery Material**").

> **EV**:   Testimony of Sotheby's representative

425   On October 27, 2017, the Rybolovlev Entities filed a letter with the U.S. District Court seeking permission to use the documents and communications they previ-ously obtained from Sotheby's, Inc. in new proceedings they intended to file in the United Kingdom against Sotheby's UK and one of its employee, Mr. Valette, and Mr. Bouvier.

| | | |
|---|---|---|
| **EV**: | Letter from Emery, Celli, Brinkerhoff & Abady  LLP to Judge Jesse Furman, dated 27 October 2017] | Exhibit 91 |

426     The Petitioners claimed that they discovered they had a new claim against Sotheby's UK and its employee when they reviewed the Discovery Material.

| | | |
|---|---|---|
| **EV**: | Letter from Emery, Celli, Brinkerhoff & Abady  LLP to Judge Jesse Furman, dated 27 October 2017] | Exhibit 91 |
| | Petitioner's Memorandum *of law in support of Motion pursuant to the protective order to use documents in the United Kingdom* dated 6 November 2017 | Exhibit 92 |

427     Petitioners further alleged that the Discovery Material would have revealed that *"Sotheby's had assisted Bouvier in misleading Petitioners as to the true value of the masterpieces sold to Petitioners and by working in concert with Bouvier to create fraudulent records that lent credence to the artificially inflated prices Bouvier represented to Petitioners"*.

| | | |
|---|---|---|
| **EV**: | Petitioner's Memorandum *of law in support of Motion pursuant to the protective order to use documents in the United Kingdom*dated 6 November 2017, p. 2 | Exhibit 92 |

428     Their counsel went further in alleging that "*Sotheby's UK and its agents aided and abetted Bouvier's fraud on Petitioner by, among other things, assisting Bouvier in misleading Petitioners as to the true value of the masterpieces sold to Petitioners and by working in concert with Bouvier to create fraudulent records that lent credence to the artificially inflated prices Bouvier represented to Petitioners*".

| | | |
|---|---|---|
| **EV**: | Declaration of Daniel J. Kornstein filed before the New York Court dated 6 November 2017, §12 *in fine* | Exhibit 93 |

429     Petitioners pursued by declaring their firm intent to initiate proceedings in England against Sotheby's UK and Mr. Valette and were therefore seeking the authorization to use the Discovery Material in the UK proceeding.

| | | |
|---|---|---|
| **EV**: | Letter from Emery, Celli, Brinkerhoff & Abady  LLP to Judge Jesse Furman, dated 27 October 2017] | Exhibit 91 |
| | Petitioner's Memorandum *of law in support of Motion pursuant to the protective order to use documents in the United Kingdom*dated 6 November 2017 | Exhibit 92 |
| | Declaration of David Michael Edwards on 6 November 2017 | Exhibit 94 |

430     They further specified that it was contemplated at present that Accent and Mr. Rybolovlev would bring the proceeding, although other claimants may be added:

> " At present, it is contemplated that the Proposed Proceedings would be brought by: (i) Accent Delight International Limited (i.e., the First Petitioner); and (ii) Dmitry Rybolovlev as claimants. It is possible that further individuals or entities may be added to the claim as claimant parties."

**EV**:     Declaration of David Micheal Edwards on 6 November 2017, para. 5          Exhibit 94

431   Such allegations are strongly and categorically disputed by the Sotheby's Claimants.

**EV**:     Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

432   As demonstrated in the present statement of claim, the Sotheby's Claimants did sell various works to Mr. Bouvier and his entities (see above CII2).

433   The Sotheby's Claimants categorically deny having in any way aided or abetted Mr. Bouvier in deceiving the Defendants, if such deception in fact occurred.

**EV**:     Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

434   Such statements by Mr. Rybolovlev's entities threatening Sotheby's UK and Mr. Valette of lawsuits against them prompted Sotheby's entities and Mr. Valette to react.

**EV**:     Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

435   As demonstrated above, none of Sotheby's entities or Mr. Valette have ever been aware of the sales processed by Mr. Bouvier or his entities to Mr. Rybolovlev's entities nor the prices charged for them or how such sales might have been arranged or structured.

**EV**:     Testimony of Mr. Samuel Valette

Testimony of Sotheby's representative

436   Given the worldwide battle directed against Mr. Bouvier and his entities by Mr. Rybolovlev for the past three years, Sotheby's entities and Mr. Valette considered

that they were to safeguard their interests and to start proceedings to get a declaratory judgment acknowledging the lack of any liability towards Mr. Rybolovlev or his affiliates.

EV:    File of the proceedings

Testimony of Sotheby's representative

437    A request for conciliation was filed before this court on 17 November 2017.

438    Further to the filing of this proceedings, the Rybolovlev Entities filed a new petition in the New York proceedings to be granted the authorization to also use the Discovery Material in the Geneva proceedings that had just started.

439    Such request was granted by the New York court on December 22, 2017.

EV:    New York South District Court Order dated 22 December 2017        Exhibit 95

440    A conciliation hearing took place on 11 April 2018.

EV:    Minutes of 11 April 2018 conciliation        Exhibit 96

441    During that hearing, Mrs. Elena Rybolovleva stated, through her counsel, that she did not have any claim against the Sotheby's Claimants whatsoever but however refused to acknowledge any of the factual or legal developments in the respective requests of the claimants:

> *"Ma mandante reconnaît que les demandeurs n'ont aucune responsabilité ni dette d'aucune sorte à son égard. Cette reconnaissance ne porte aucune admission de la part de ma mandante des développements en fait sou en droit exposés dans la requête. Cette reconnaissance intervient également sans préjudice des rapports liant ou non les autres parties à la procédure."*

EV:    Minutes of 11 April 2018 conciliation        Exhibit 96

442    As no settlement could occur, an authorization to proceed was delivered to Sotheby's Claimants.

EV:    Authorisation to proceed rendered on 11 April 2018        Exhibit 97

## D    The merits

### I    Introductory Remark

As stated at the beginning of this brief, the Sotheby's Claimants are completely unaware of the purported foundation and the scope of the claim that some of the Defendants have presented against them in the Discovery Process in New York.

In such a context, some of the Defendants have merely stated that they intend to bring an action against the Sotheby's Claimants on the ground that the Sotheby's Claimants have supposedly participated, as accomplices, in the fraud allegedly committed against them by Mr. Bouvier (see above CIV).

The general context of the alleged fraud against Mr. Bouvier is known to the the Sotheby's Claimants only in light of the elements reported by the press, as well as in light of the information received directly from Mr. Rybolovlev 's attorneys in the spring of 2015 (see above CIII2) or in the Discovery Process (see above CIV2).

Broadly speaking, it follows that Mr. Rybolovlev complains that Mr. Bouvier sold him 38 works for a price too high compared to the price for which Mr. Bouvier had acquired them.

While Mr. Bouvier claims that he has fulfilled his legal obligations and that he has made the sales to Mr. Rybolovlev – or his entities – Mr. Rybolovlev claims, on the contrary, that Mr. Bouvier was appointed by Mr. Rybolovlev to gather a collection for him and that he was therefore acting as his agent, meaning that he acquired the 38 works on behalf of Mr. Rybolovlev. Therefore, Mr. Bouvier was not authorized to resell the works for a higher price, but only to pay a commission of 2% on the purchase price at which Mr. Bouvier acquired the works.

While threatening to possibly sue the Sotheby's Claimants, the Rybolovlev entities suggested that they considered that the Sotheby's Claimants participated in the fraud by sending, in particular to Mr. Bouvier, some valuations of some the works he had acquired.

These allegations are fully contested and result from pure fabrication on the part of the Defendants.

Indeed, as the Sotheby's Claimants have demonstrated in this Application, the Sotheby's Claimants were completely unaware of the relationship between Mr. Bouvier and Mr. Rybolovlev or their respective entities.

In particular, the Sotheby's Claimants were unaware of the nature of the contractual relationship between them and the prices at which Mr. Bouvier resold the works he had acquired from Sotheby's But again, the Sotheby's Claimants were also unaware that the valuations sought by Mr. Bouvier in October 2014 and January 2015 were intended for Mr. Rybolovlev.

This means that the Sotheby's Claimants do not know on what basis Mr. Rybolovlev and his companies could seek to base any claim against them.

However, since no contractual relationship has ever existed between Sotheby's. and Mr. Rybolovlev and/or his companies in connection with the sale of the Art Works (see above CII3.3), any claim by the Defendants could result from extracontractual liability within the meaning of art. 41 et seq. of the CO.

Given the lack of knowledge by the Sotheby's Claimants. of any particulars relating to the alleged contention by the Defendants, they are in no way able to detail their position in law in this brief.

They will therefore limit themselves to this brief, required statement and reserve already the right to complete it in due time.

## II   Admissibility

### 1.1   Jurisdiction of the Court

In the presenc case, given the lack of a contractual relation between the Defendants and the Sotheby's Claimants, the former's claim would allegedly be based on illegal conduct.

According to the Federal Court, the action seeking to establish that the plaintiff does not address the issue of damage for wrongful act for which the defendant claims compensation must be started where the contested claim should be judged in the event of a conviction.[4] The alleged author of a damage thus has a choice of alternative jurisdictions provided by articles 5 para. 3 of CL and 129 of the CPIL at his disposal to start a finding action.[5]

In light of the content of article 129 of the CPIL, the Swiss courts of the domicile or, in the absence of a domicile, those of the habitual residence of the defendant have jurisdiction regarding actions based on a wrongful act. In addition, the Swiss courts have jurisdiction over the place of the act or the place of the result of the act. The Lugano Convention has a rule similar to article 5, para. 3, which provides that, in tort, a person domiciled in a State bound by that convention may be sued in a court of the place where the harmful event occurred or is likely to occur. The Federal Court, echoing the European case law, specified that the place of the offense covered by art. 5, para. 3 of CL is as much the one where the act was committed as the one where its result occurred.[6]

The place where the act was committed, within the meaning of the above-mentioned provisions, is the place where the act was performed, *i.e.* the place where

---

[4]   ATF 125 III 346, c. 4b, JdT 2001 I p. 67; ATF 4A_305/2012, cons. 2.2 ; see also ATF 133 III 282 cons. 3.2.

[5]   ATF 133 III 282, c. 4.1, JdT 2008 I 147; ATF 125 III 346, c. 4b, JdT 2001 I p. 67; DUTOIT, Swiss Private International Law, 5th ed., 2016, N 6 *ad* art. 129 LDIP; HOFMANN/KUNZ, Basler Kommentar – LugÜ, 2011, N 521 and 538 *ad* art. 5 CL.

[6]   ATF 125 III 346, c. 4a, JdT 2001 I p. 69; TF 4P.88/2000 of 10 May 2000, c. 3.b.bb.

the conduct which allegedly caused the damage took place (place of the causing event).[7] For allegedly unlawful statements, the place of the causing event is the place where such statements were orally uttered in the presence of third parties, or, in the case of statements in writing, the place from which they were sent.[8]. Similarly, according to the Federal Court, if the author has used a contract to commit the wrongful act in question, the courts of the place where the contract was negotiated or concluded constitutes the place where the unlawful act was committed, and the courts of that place have jurisdiction to hear such dispute.[9]

It should be noted that, when the damage results from several actions, all of which have contributed to causing the damage, the jurisdiction for the place is multiplied, in the sense that the Swiss Court for the place of only one of these actions has jurisdiction regarding all the claims of the injured party.[10] In such case, the court may adjudicate the entire damage.[11]

In addition, article 86, para. 1, of the Geneva Law for Judicial Organization provides that the District Court has jurisdiction for all acts in front of the contentious or non-contentious civil court that the law does not assign to another judicial or administrative authority.

In the present case, it is not clear which unlawful act could have been committed by Mr. Valette, any more than one can see on what basis Sotheby's could be liable for the alleged damage caused to Mr. Rybolovlev and his companies (see below DIV). The Sotheby's Claimants understand, however, that the Defendants would hold them to be complicit in the actions by Mr. Bouvier – something which is firmly disputed - in view of the threats made by some of the Defendants in the Discovery Proceedings. Whatever the assumption is, and in accordance with the above-mentioned rules, the Court clearly has jurisdiction. In is indeed in this city that was based Mr. Bouvier, such that the inspections of the works of art and the execution of the majority of the sale agreements between Sotheby's and Blancaflor were undertaken in Geneva. In addition, the sale of *L'Homme assis au Verre* by Picasso, first agreement cristalising the relation between Sotheby's and Mr. Bouvier's company, expressly specifies a choice of forum clause in favour of the Geneva courts. Even more so, it is the city where the works were sent to, meaning that the ownership over the paintings was transferred to Blancaflor at the Freeports of Geneva.

This is furthermore recognized by the highest courts in Singapore, which rejected the application of companies controlled by Mr. Rybolovlev against, inter alia, Mr.

---

[7]   ATF 131 III 153, c. 6.2; ATF 125 III 346, c. 4c, SJ 2000 p.29; Bonomi, Romand Comment – CPIL and CL, Basel 2011, N 128 *ad* art. 5 CL.

[8]   ATF 133 III 282, c. 5.2; ATF 125 III 346, c. 4c, SJ 2000 p.29; Bonomi, Romand Comment – CPIL and CL, Basel 2011, N 128 *ad* art. 5 CL. Applies also to emails, according to Marti, Berner Comment ZPO, 2012, N 23 *ad* art. 36.

[9]   TF 4P.88/2000 from 10 May 2000, c. 3.b.bb; Hofmann/Kunz, Basler Comment – LugÜ, 2011, N 561 *ad* art. 5 CL and cited ref.; ATF 113 II 476; ATF 4C.343/1999 from 3 February 2000.-

[10]  Bonomi, Romand Comment – CPIL and CL, Basel 2011, N 30 *ad* art. 129 CPIL. See TF 5A_873/2010 from 3 May 2011, c. 4.1.2; ATF 131 III 153, c. 6.3; TF 4C.98/2003 from 15 June 2003, c. 2.2; TF 4C.343/1999 from 3 February 2002, c. 2b; ATF 125 III 346 c. 4a and 4c/aa.

[11]  Hofmann/Kunz, Basler Comment – LugÜ, 2011, N 60  622ss *ad* art. 5 CL and cited ref..

Bouvier, on the ground that the application should have been filed in Switzerland (see above N 118):

> "*Switzerland is the jurisdiction that has the closest connection to the parties' relationship*[12]."

In light of the foregoing, the most relevant acts to judge the present dispute were committed in Geneva, meaning that Geneva is the most appropriate forum[13]. Consequently, the jurisdiction of the Tribunal must be given.

**1.2    The Interest of the Sotheby's Claimants to Act in a Negative Determination of the Law**

Under article 88 of the Code of Civil Procedure (CCP), the plaintiff brings an action for a declaration of law to have a court find that a law or legal relationship exists or does not exist.

According to the case-law of the Federal Court, a negative action is possible only when the plaintiff has an interest worthy of protection, in fact or in law, after immediate recognition of the legal situation.[14] As such, the interest, for any party, of obtaining a suitable forum in case of imminent legal proceedings against it is an interest worthy of protection within the meaning of art. 88 of the CCP.[15] The same is true regarding the interest in conducting a trial in a particular country, in particular because of the language, the costs and the efficiency of its jurisdiction.[16]

In the case at hand, the interest of the Sotheby's Claimants in filing this action is beyond doubt in view of the threats made by the Defendants, according to which they would like to implicate Sotheby's its employees in their dispute with Mr. Bouvier by filing an action against them in London (see above CIV).

For almost 3 years, the Defendants have spared no effort in conducting judicial warfare against Mr. Bouvier and his companies in multiple foreign jurisdictions (see above CIII).

In view of the explicit threats made against them by some of the Defendants, the Sotheby's Claimants had to react in order to have the Respondents' lack of any claim against them noted as soon as possible. Indeed, since Sotheby's is a publicly traded group, Sotheby's certainly cannot simply wait for the goodwill of vexatious plaintiffs, especially when such plaintiffs claim an alleged damage exceeding one

---

[12]   Judgment of the Singapore Court of Appeals dated 18 avril 2017, case N [2017] SGCA 27 between Yves Bouvier and al. against Accent Delight International Ltd and al., N 88.

[13]   See also the judgment of the Singapore Court of Appeals dated 18 avril 2017, case N [2017] SGCA 27 between Yves Bouvier and al. against Accent Delight International Ltd and al., N 101. More generally, see NN 68ss.

[14]   ATF 141 III 68, consid. 2.3; ATF 135 III 378, consid. 2.2.

[15]   TF 4A_417/2017 from 14 March 2018, consid. 5.4.

[16]   TF 4A_417/2017 from 14 March 2018, consid. 5.3 et 5.4.

billion US dollars. Sotheby's must protect the interests of its group and its share-holders, and must therefore ensure that the absence of any claim by the Defend-ants against any of its entities or employees is noted as soon as possible and use the most efficient proceedings to that end.

Sotheby's must also protect its reputation and avoid any damage to it. However, the Defendants have demonstrated, in their actions against Mr. Bouvier and their use of the press in connection with the multiple proceedings started against him, that they will stop at nothing to harm as much as possible the reputation of their opponent. By seeking to have the Respondents' lack of a claim against them noted by the courts, the Plaintiffs hope to minimize the damage to their reputation by initiating the proceedings seeking such a finding without delay, thus avoiding the Defendants' rumors and threats to spread without any attempt being made to en-sure that the legal situation is recognized as soon as possible.

In the light of the above, the interest of the Sotheby's Claimants in filing the pre-sent negative affirmative action is clear.

## 1.3    Compliance with the Deadline for Filing Suit

A conciliation hearing was held on April 11, 2018. The conciliation attempt was unsuccessful and an authorization to proceed was issued on the same day. Filed within the statutory period of three months (article 209 (3) of the CCP), this action for a declaration of a negative right is therefore admissible.

## III    The Parties

## 1    Plaintiffs as voluntary co-claimants (so-called "*simple consorts*")

According to art. 71, para. 1, of the CCP, any persons whose rights and duties result from similar facts or legal bases may act or be jointly operated.

Moreover, according to para. 3 of the same provision, each consort may proceed independently of the others. In other words, every single consort acts or defends its own cause[17]. Thus, each consort can file its own conclusions, so that the simple consorts' applications must be judged independently of each other and may lead to different judgments.[18]

In this case, the Sotheby's Claimants are acting as simple consorts at the costs of Plaintiffs Bouvier in these proceedings in response to the threat of legal action by the Defendants based, in part, on the same facts. Since the Sotheby's Claimants cannot in any event make any statement as to the facts relating to the relationship

---

[17]   Commentaries on Code of Civil Procedure - JEANDIN, n 10 *ad* 71.
[18]   ATF 125 III 95 consid. 2a/aa, JdT 1999 I 449; PO Komm-STAEHELIN/SCHWEIZER, n 11 *ad* art. 70.

between Mr. Bouvier and Mr. Rybolovlev, respectively their companies, the Sotheby's Claimants file this brief independently of the Bouvier Claimants.

## 2      The Defendants

As to the Defendants, the Sotheby's Claimants are unaware of precisely which natural persons or legal entities would be likely to file suit against them. In accordance with the recent threats made in the Discovery Proceedings by Mr. Rybolovlev's entities, they expressly indicated that Accent and Mr. Rybolovlev would be the plaintiffs against the Sotheby's Claimants, while stating at the same time that other natural persons and legal entities could also be plaintiffs (see above).

Accordingly, the Sotheby's Claimants must file suit against Mr. Rybolovlev's entities and those persons around him who might be able to act against them in connection with the works he has acquired from Mr. Bouvier.

## IV     The Defendants' Absence of Claim Against the Sotheby's Claimants

In the absence of any contractual relation between the Sotheby's Claimants and the Defendants, only extracontractual liability within the meaning of art. 41 et seq. CO could be alleged by the Defendants.

Swiss law, applicable to this litigation under art. 133, para. 2, of the CPIL, and for the reasons mentioned above, includes a regime of tort - called in French*"responsabilité aquilienne"*- based on art. 41 of the CO.

As stipulated in article 41, para. 1, of the CO, any person who unlawfully causes harm to another, whether intentionally, negligently or recklessly, is bound to repair it. According to the Federal Court, this presupposes that the injured party proves that the following four conditions have been cumulatively met: an unlawful act, a fault on the part of the author, an injury, and a causal relationship (natural and proper) between the wrongful act and the harm caused.[19]

In this case, however, it is clear that none of these conditions is met.

First of all, it is difficult to see what faulty behavior could be blamed on Mr. Valette.

Indeed, according to the Federal Court, in case of purely economic damage - that is to say, damage that has occurred without the integrity of a person being damaged, or the damage, destruction or loss of a thing - only the violation of a norm

---

[19]     ATF 132 III 122, c. 4.1; TF 4A_569/2011 from 8 December 2011 c. 1; ATF 118 II 521 consid. 3b and quoted ref. Seef also MARKUS *in* Berner Kommentar, ZPO, 2012, N 52 *ad* art. 88.

whose purpose is to protect the party injured in relation to its rights by the offending act constitutes an unlawful act.[20] The perpetrator must also have acted with a lack of diligence for such fault to be attributable to him.[21]

In this case, and in the light of the elements mentioned (see above CII), it is not clear what behavior of the Sotheby's Claimants could constitute an unlawful act within the meaning of art. 41 of the CO. Only a violation of a penal norm by the Sotheby's Claimants could lead to the application of art. 41 of the CO. However, none of the acts described in the "In Fact" section of this brief constitutes a criminal act. No fault has been committed in the relation to the sale of the Art Works by the Sotheby's Claimants.

For these reasons alone, this Court can only note the absence of any liability for Mr. Valette.

But again, there is no causality between the allegedly charged conduct by the Sotheby's Claimants and the damage alleged by the Defendants.

Mr. Bouvier was able to sell 41 works of art to Mr. Rybolovlev and his companies, out of which only 12 were acquired from Sotheby's. This is proof that Mr. Bouvier did not need the help of Mr. Valette or Mr. Sotheby's to sell works of art to Mr. Rybolovlev's companies. One also fails to see how Mr. Valette.'s behavior would have made Mr. Rybolovlev decide to buy the Art Works, knowing that the latter and Mr. Valette have not maintained any contact or relationship of any kind and they have met only twice, meetings during which only courtesies might have been exchanged (see *above* N 187 and 271). Moreover, the evaluations signed by Mr. Valette himself were done and only provided to Mr. Bouvier towards the end of 2014, while the sales of the 12 Art Works were executed between 11 April 2011 and 2 May 2013 (!). Lastly, it should be remembered that these evaluations concern only 5 works out of a total of 37. In such circumstances, it is difficult to see how the Defendants could argue that a causal relationship exists between the actions of the Sotheby's Claimants - which do not constitute, in any state, an unlawful act no matter the circumstances - and the damage that the Defendants have allegedly suffered.

But there is more.

It is doubtful whether Mr. Rybolovlev – as well as the companies he controls – have suffered any damage. According to consistent case-law, damage is defined as the involuntary diminution of net wealth; it is equal to the difference between the current amount of the injured party's assets and the value of said assets had the harmful event never occurred[22].

---

[20]   WERRO, La responsabilité civile, 2nd ed., Berne 2011, N 308; ATF 133 III 323, c. 5.1; TF 4A_285/2017 from 3 April 2018 c. 6.1; ATF 133 III 323, c. 5.1; ATF 132 III 122 c. 4.1.

[21]   TF 2C_111/2011 du 7.7.2011, c. 5.1.

[22]   TF 6B_814/2017 du 9 mars 2018, c. 1.1.1.

In the present case, the Sotheby's Claimants are not in a position to make a determination regarding the status of the Defendants' estate. At the very most, they can point out that, after reading the press, one of the works sold by Sotheby's to Mr. Bou-vier was subsequently auctioned by Mr. Rybolovlev for more than USD 450'000'000- (see above N 287). It is therefore advisable, when calculating the damage, to take into account the capital gain obtained through the sale of this painting. The aforementioned sale, however, concerns only one work among the 12 artworks sold to Blancaflor and which are the subject of these proceedings. The Sotheby's Claimants are not aware of whether the Defendants sold other works and at what price, nor are they aware of the increase in value of the works that the Defendants allegedly still own.

In light of the foregoing, it is clear that the conditions for liability are not met in any way and that the Defendants have no claim whatsoever against the Sotheby's Claimants.

* * *

Given the foregoing explanations, Sotheby's SA, Sotheby's, Sotheby's Inc., Sotheby's Kunstauktionen GMBH and Mr. Samuel Valette prevail in their prayers for relief as specified in the beginning of the present submission.


For Sotheby's SA, Sotheby's, Sotheby's Inc., Sotheby's Kunstauktionen GMBH and Mr. Samuel Valette:


Saverio Lembo                                    Aurélie Conrad Hari


Encl.: Bundle of 97 exhibits