# EXHIBIT C

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| ACCENT DELIGHT INTERNATIONAL LTD. and XITRANS FINANCE LTD., |
| Plaintiffs, |
| v. |
| SOTHEBY'S and SOTHEBY'S, INC., |
| Defendants. |

No. 1:18-cv-09011-JMF-RWL

**LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON
THE TAKING OF EVIDENCE ABROAD IN CIVIL MATTERS
TO OBTAIN EVIDENCE FROM TETIANA M. BERSHEDA**

In conformity with Articles 1 and 3 of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention"), the United States District Court for the Southern District of New York respectfully requests international judicial assistance to obtain evidence from Tetiana M. Bersheda ("Ms. Bersheda") for use in the above-captioned civil proceeding currently pending before this Court (the "U.S. Action" or "Action"). The evidence is sought by Defendants in the Action, Sotheby's and Sotheby's, Inc. (together, "Sotheby's"). As set forth below, Ms. Bersheda is a critical fact witness whose evidence is relevant to Plaintiffs' allegations in this Action and Sotheby's defenses thereto.

The U.S. Action is a civil proceeding in which Plaintiffs allege that Sotheby's aided and abetted an alleged fraud and breach of fiduciary duty committed by Yves Bouvier ("Mr. Bouvier"). Plaintiffs allege that Plaintiffs and Mr. Bouvier agreed (at a time and in a manner unspecified by Plaintiffs) that Mr. Bouvier would act as their agent to acquire art masterworks on their behalf. Mr. Bouvier allegedly purchased 38 art masterworks from various sellers, resold the works to

Plaintiffs at markups, and pocketed the difference for himself.  Plaintiffs assert that Sotheby's aided and abetted Mr. Bouvier's alleged fraud and breach of fiduciary duty with respect to 14 of the art masterworks, 12 of which Mr. Bouvier acquired from third parties in private sales facilitated by Sotheby's entities before he sold them to Plaintiffs.

At all times relevant to this dispute, Ms. Bersheda served as a representative of Plaintiffs and Plaintiffs' principal, Dmitry Rybolovlev ("Mr. Rybolovlev"), in their interactions with Mr. Bouvier and his representatives.  In the course of discovery in this proceeding, Plaintiffs have identified Ms. Bersheda as someone who has first-hand knowledge and documents regarding those communications, which will be critical evidence of the relationship between Plaintiffs (including Mr. Rybolovlev) and Mr. Bouvier and the representations that were made between them.  That evidence goes to whether there was an underlying fraud or breach of fiduciary duty, which are essential elements of Plaintiffs' claims against Sotheby's.

The assistance requested is for the appropriate judicial authority of the United Kingdom to compel the appearance of Ms. Bersheda to produce documents and give oral testimony relevant to the claims and defenses in the Action.  The evidence is intended for use at trial.

1. **Sender/Requesting Judicial Authority:**

   The Honorable Jesse M. Furman
   United States District Court for the Southern District of New York
   40 Centre Street, Room 2202
   New York, New York 10007
   United States of America

2. **Central Authority of the Requested State:**

   The Senior Master
   Foreign Process Section
   Room E16
   Queen's Bench Division
   Royal Courts of Justice
   Strand

London WC2A 2LL,
England, United Kingdom

3. **Persons to Whom the Executed Request Is to be Returned:**

Marcus A. Asner
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019
United States of America

Email: Marcus.Asner@arnoldporter.com
Tel: +1 212 836 7222
Fax: +1 212 836 8689

4. **Names and Addresses of the Parties and Their Representatives:**

    a. **Plaintiffs:**

Accent Delight International Ltd.
Jipfa Building, 3rd Floor
142 Main Street
Road Town, Tortola
British Virgin Islands

Xitrans Finance Ltd.
Akara Building
24 De Castro Street
Wickhams Cay 1
Road Town
Tortola
British Virgin Islands

<u>Counsel for Plaintiffs:</u>
Daniel Kornstein
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
Email: dkornstein@ecbalaw.com
Tel: +1 212 763 5000

    b. **Defendants:**

Sotheby's
1334 York Avenue
New York, New York 10021

United States of America

Sotheby's, Inc.
1334 York Avenue
New York, New York 10021
United States of America

<u>Counsel for Defendants:</u>
Marcus A. Asner
Sara L. Shudofsky
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019
Email: Marcus.Asner@arnoldporter.com
Email: Sara.Shudofsky@arnoldporter.com
Tel: +1 212 836 7222

Jane Wessel
Arnold & Porter Kaye Scholer (UK) LLP
Tower 42
25 Old Broad Street
London EC2N 1HQ
United Kingdom
Email: Jane.Wessel@arnoldporter.com
Tel: +44 (0)20 7786 6260

**5.   Nature of the Proceedings and Summary of the Facts:**

The U.S. Action is a civil lawsuit in which Plaintiffs allege that Sotheby's aided and abetted

Mr. Bouvier's purported fraud and breach of fiduciary duty, and breached its contractual

obligations to Plaintiffs.   A copy of the Amended Complaint ("Am. Compl.") and Sotheby's

Answer ("Sotheby's Answer") in the U.S. Action are attached hereto as Exhibits 1 and 2.

Plaintiffs' action arises from a longstanding dispute between Mr. Rybolovlev, a Russian

oligarch, and Mr. Bouvier.   Plaintiffs are companies incorporated in the British Virgin Islands;

they are owned by trusts settled by and for the benefit of members of the family of Mr. Rybolovlev.

Mr. Rybolovlev is Plaintiffs' principal.   Plaintiffs allege that Mr. Bouvier defrauded them of over

one billion dollars when he served as their art advisor.   According to Plaintiffs, Plaintiffs and Mr.

Bouvier agreed that Mr. Bouvier would act as Plaintiffs' agent to acquire art masterworks on their behalf.  Mr. Bouvier allegedly purchased 38 art masterworks from various private sellers, resold the works to Plaintiffs at markups as high as 145%, and pocketed the difference for himself. Plaintiffs assert that Sotheby's aided and abetted Mr. Bouvier's alleged fraud and breach of fiduciary duty with respect to 14 of the art masterworks;  Mr. Bouvier acquired 12 of those 14 art masterworks from third parties in private sales facilitated by Sotheby's entities before he sold them to Plaintiffs.  Plaintiffs also allege that Sotheby's breached a Tolling Agreement with Plaintiffs when Sotheby's filed a declaratory judgment action in Switzerland in 2017.

Sotheby's contends that, at all times relevant to this dispute, Ms. Bersheda served as a global business and legal advisor to Plaintiffs and Mr. Rybolovlev; more specifically, Ms. Bersheda served as a liaison on behalf of Mr. Rybolovlev in his dealings with Mr. Bouvier.  Ms. Bersheda is thus a critical fact witness.  In their response to Sotheby's interrogatories in this case, Plaintiffs have identified Ms. Bersheda as having: (i) "knowledge or information concerning . . . the allegations in the Complaint"; (ii) "communicated with [Mr.] Bouvier on [Plaintiffs'] behalf or at [Plaintiffs'] direction concerning one or more of the Works" at issue in the case; (iii) "knowledge of any valuation that [Plaintiffs] obtained or attempted to obtain from [Mr.] Bouvier" concerning the artworks at issue; and (iv) "knowledge or information concerning [Plaintiffs'] alleged suspicion and discovery that [Mr.] Bouvier had defrauded [them]."  *See* Plaintiffs' Responses and Objections to Sotheby's First Set of Interrogatories at 4-7, attached hereto as Exhibit 3 ("Plaintiffs' Responses to Interrogatories").[1]

---

[1]  Pursuant to the Protective Order in the U.S. Action, Plaintiffs have designated as CONFIDENTIAL MATERIAL certain portions of Plaintiffs' Responses to Interrogatories.  Those portions have been redacted from Exhibit 3 and are not being relied upon in connection with this Letter of Request.

Plaintiffs have also identified Ms. Bersheda as having "knowledge or information concerning [Plaintiffs'] initial receipt, and [Plaintiffs'] transmittal, review, discussion, and/or use, of" Sotheby's privileged materials. *Id.* at 7. Specifically, Sotheby's recently learned that, since April 2016, and unbeknownst to Sotheby's at the time, Ms. Bersheda has possessed and made use of Sotheby's attorney work product and attorney-client communications (the "Privileged Materials" or "Materials"). *See* Sotheby's Letter-Motion for Conference Regarding Need for Discovery, Dkt. 75 (Aug. 26, 2019), attached hereto as Exhibit 4 ("Sotheby's Letter-Motion"); Plaintiffs' Letter to Court Regarding Sotheby's Letter-Motion, Dkt. 76 (Aug. 27, 2019), attached hereto as Exhibit 5. The Privileged Materials consist of two documents. The first document is an outline that Sotheby's counsel, Arnold & Porter, created for an interview it conducted with Samuel Valette, an employee of Sotheby's UK who served as the primary contact between Sotheby's UK and Mr. Bouvier. The second document summarizes information gathered concerning the artworks at issue in the U.S. Action. On October 21, 2016, a representative of Plaintiffs, Simona Fedele ("Ms. Fedele"), sent copies of the Privileged Materials—apparently at Ms. Bersheda's direction—to Brian Cattell and Sergey Chernitsyn, as well as to Ms. Bersheda. *See* Sotheby's Letter-Motion at Ex. A [Exhibit 4]. In the October 21, 2016 cover email from Ms. Fedele to Ms. Bersheda and others, Ms. Fedele refers to proceedings (the "1782 proceedings") in this Court in which Plaintiffs sought documents from Sotheby's for use in foreign litigation against Mr. Bouvier concerning the same transactions at issue in the U.S. Action. *See id.* Ms. Bersheda is uniquely situated to provide information regarding whether Plaintiffs obtained the Privileged Materials unlawfully and whether they have used or are using the Privileged Materials in connection with the U.S. Action.

Sotheby's understands that Ms. Bersheda is a lawyer and does not seek to obtain information protected by the attorney-client privilege.  Rather, Sotheby's seeks testimony and documents regarding Ms. Bersheda's communications with third parties on Plaintiffs' (including Mr. Rybolovlev's) behalf, which are not privileged.  Sotheby's understands that its requests for testimony and documents would be subject to the rules governing privileges and confidentiality in the United Kingdom.

6. **Evidence to be Obtained and Purpose:**

    a. **Evidence to be Obtained:**

Sotheby's seeks oral testimony and documents from Ms. Bersheda for use at trial. Specifically, Ms. Bersheda, who engaged in direct communications with Mr. Bouvier and his representatives on behalf of Plaintiffs (including Mr. Rybolovlev), is in unique possession of evidence relevant to Plaintiffs' allegations in the Action and Sotheby's defenses thereto.  Appendix A sets forth the topics of oral testimony sought from Ms. Bersheda.

    b. **The Evidence Is Sought for Use at Trial:**

This Court understands that the powers of the English High Court of Justice to assist this Court's efforts to obtain evidence in the United Kingdom are listed in Section 2 of the Evidence (Proceedings in Other Jurisdictions) Act 1975, and that such assistance may not be provided when the evidence is sought only to be used for pre-trial purposes.  This Court finds that the evidence requested is not being sought for mere pre-trial discovery, but rather is being sought to be used as proof in the actual trial in these proceedings.

    c. **Purpose of the Evidence Sought:**

Ms. Bersheda is a critical fact witness in the U.S. Action.  She interacted with Mr. Bouvier and his representatives regarding transactions that are the subject of the U.S. Action.  *See*

7

Plaintiffs' Responses to Interrogatories at 5 [Exhibit 3].  Ms. Bersheda was present at multiple meetings between Mr. Rybolovlev and Mr. Bouvier, often serving as a translator between the two businessmen, since they do not have a common language.   Mr. Bouvier's interactions with Plaintiffs and Sotheby's, including all of his interactions with Plaintiffs through Ms. Bersheda, are at the heart of Plaintiffs' U.S. Action against Sotheby's.  In addition, as Plaintiffs' representative, Ms. Bersheda was in possession of Sotheby's Privileged Materials, and the Materials were disseminated at her direction and on behalf of Plaintiffs and Mr. Rybolovlev to other individuals. *See* Sotheby's Letter-Motion at Ex. A [Exhibit 4].

Ms. Bersheda is in unique possession of critical evidence that bears on the essential elements of Plaintiffs' claims and Sotheby's defenses to those claims.

*First*, a threshold element of Plaintiffs' claims against Sotheby's of aiding and abetting fraud and aiding and abetting a breach of fiduciary duty is proof of the alleged underlying fraud and breach of fiduciary duty by Mr. Bouvier.  *See* Sotheby's Answer at 50-51 [Exhibit 2].  Ms. Bersheda's testimony and documents are relevant, and indeed critical, to proving or disproving whether Mr. Bouvier committed fraud or breached his alleged fiduciary duty to Plaintiffs, given that Ms. Bersheda interacted with Mr. Bouvier and his representatives regarding transactions that are the subject of the U.S. Action.  *See* Plaintiffs' Responses to Interrogatories at 5 [Exhibit 3].

*Second*, a central allegation of Plaintiffs' case is that Sotheby's provided valuations of some of the works to Mr. Bouvier, which according to Plaintiffs were intended by Sotheby's to be passed along by Mr. Bouvier to Plaintiffs to justify the higher prices Mr. Bouvier charged Plaintiffs for those works.  *See, e.g.*, Am. Compl. ¶ 4 [Exhibit 1].  Sotheby's denies those allegations and asserts that it did not know what Mr. Bouvier planned to do with any work of art he acquired in a transaction brokered by Sotheby's and did not know the price that Mr. Bouvier planned to later

charge for any work of art, if he did decide to re-sell it.  Further, Sotheby's contends—based on information learned long after the events at issue in the Amended Complaint—that Mr. Bouvier sought the valuations from Sotheby's at Plaintiffs' request because, among other reasons, Plaintiffs wanted to use the valuations to secure loans from one or more financial institutions in Singapore, using one or more of the works as collateral.  If, in fact, it was Plaintiffs—and not Mr. Bouvier— who wanted these valuations, then Sotheby's provision of the valuations to Mr. Bouvier cannot have aided and abetted any alleged fraud of Plaintiffs or breach of a fiduciary duty to them. Plaintiffs have acknowledged that Ms. Bersheda communicated with Mr. Bouvier on Plaintiffs' behalf and that she has knowledge concerning valuations that Plaintiffs obtained or attempted to obtain from Mr. Bouvier.  *See* Plaintiffs' Responses to Interrogatories at 5-6 [Exhibit 3].  Sotheby's also contends that Ms. Bersheda has knowledge of communications with various financial institutions, including financial institutions in Singapore, regarding obtaining credit, loans, or financing on Plaintiffs' and Mr. Rybolovlev's behalf using the artworks as collateral.  Accordingly, Ms. Bersheda's knowledge of and information regarding requests for valuations from Mr. Bouvier and communications with financial institutions are of critical importance to Sotheby's defenses to Plaintiffs' claims.

*Third*, testimony and documents regarding how Plaintiffs came to be in possession of and used the Privileged Materials are relevant to Sotheby's defenses.  As a representative of Plaintiffs who possessed and oversaw the dissemination of the Privileged Materials, Ms. Bersheda is uniquely situated to provide information regarding whether Plaintiffs obtained the Privileged Materials unlawfully and have used or are using the Privileged Materials in connection with the U.S. Action.  Any such evidence, moreover, would go more fundamentally to the very integrity of the U.S. Action.

While Sotheby's will also depose Mr. Rybolovlev in this Action, Ms. Bersheda's testimony is unique in that she communicated directly with Mr. Bouvier or his representatives on behalf of Plaintiffs and Mr. Rybolovlev, as Mr. Rybolovlev and Mr. Bouvier do not speak a common language. Such communications are direct evidence of whether an agency or fiduciary relationship existed between Plaintiffs and Mr. Bouvier, as Plaintiffs allege, and what representations were made about the prices and valuations of the art masterworks at issue in the U.S. Action, which is directly relevant to whether Plaintiffs can prove an underlying fraud or breach of fiduciary duty. And any communications she had with financial institutions to obtain loans using the artworks as collateral, as discussed above, are also critically relevant to Sotheby's defenses to Plaintiffs' claims, as is her testimony regarding the acquisition and use of the Privileged Materials.

**7. Identity and Address of the Person to be Examined:**

Tetiana M. Bersheda



Chelsea
London
SW1X 0DQ
United Kingdom

**8. Questions to be Put to the Person to be Examined or Statement of the Subject Matter About Which She Is to be Examined:**

It is requested that Ms. Bersheda be questioned by lawyers for Sotheby's with respect to the topics set forth in Appendix A.

**9. Documents and Other Property to be Inspected:**

This Court requests that Ms. Bersheda produce the following documents (including electronic documents) which are in her possession, custody, or power:

    a.    The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr.

Bouvier), or (ii) other third parties regarding Pablo Picasso's *L'Homme Assis Au Verre* in or around March to April 2011.  *See* Am. Compl. ¶¶ 40-52.

b.   The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Aristide Maillol's *La Méditerranée* in or around April 2011.  *See* Am. Compl. ¶¶ 53-60.

c.   The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Auguste Rodin's *Le Baiser* in or around April 2011.  *See* Am. Compl. ¶¶ 61-65.

d.   The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Henri Matisse's *Nu au Châle Vert* in or around June 2011 and in or around October 2014.  *See* Am. Compl. ¶¶ 66-75.

e.   The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Auguste Rodin's *L'Éternel Printemps* in or around June and July 2011.  *See* Am. Compl. ¶¶ 76-84.

f.   The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Alberto Giacometti's *Femme de Venise IX* in or around September and October 2011.  *See* Am. Compl. ¶¶ 85-89.

g.   The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Rene Magritte's *Le Domaine d'Arnheim* in or around August to December 2011.  *See* Am. Compl. ¶¶ 90-100.

h.   The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Amedeo Modigliani's *Nu Couché au Coussin Bleu* in or around December 2011, and October 2014 to January 2015. *See* Am. Compl. ¶¶ 101-110.

i.   The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Auguste Rodin's *Eve* in or about January to March 2012, and March to December 2014.  *See* Am. Compl. ¶¶ 111-122.

j.   The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Gustav Klimt's *Wasserschlangen II* in or around August and September 2012, July to September 2013, and October 2014.  *See* Am. Compl. ¶¶ 123-134.

k.   The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Amedeo Modigliani's *Tête* in or

12

around December 2011, June to September 2012, and September to December 2014.  *See* Am. Compl. ¶¶ 135-157.

l.    The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Henri de Toulouse-Lautrec's *Au Lit: Le Baiser* in or around October 2012 to February 2013 and December 2014 to March 2015.  *See* Am. Compl. ¶¶ 158-165.

m.    The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Leonardo da Vinci's *Christ as Salvator Mundi* in or around March to May 2013, and March 2014 to January 2015.  *See* Am. Compl. ¶¶ 166-188.

n.    The communications, including the emails and their attachments and any other communications, between Ms. Bersheda and (i) Mr. Bouvier (or persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding a viewing of Leonardo da Vinci's *Christ as Salvator Mundi* in New York City in 2013.  *See* Am. Compl. ¶ 168.

o.    The communications, including the emails and their attachments, between Ms. Bersheda and (i) Mr. Bouvier (and persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Paul Gauguin's *Otahi (Alone)* in or around October 2014 to February 2015.  *See* Am. Compl. ¶¶ 189-193.

p.    The communications between Ms. Bersheda and Mr. Bouvier (or persons working with or on behalf of Mr. Bouvier), dated January 23-24, 2015 and

13

February 13, 2015, regarding Plaintiffs' or their representatives' (including Mr. Rybolovlev's) efforts to obtain valuations for the art masterwork, Leonardo da Vinci's *Christ as Salvator Mundi*.

q.   The communications between Ms. Bersheda and C2L Expertises, dated February 2013 and May 2013, regarding Plaintiffs' or their representatives' (including Mr. Rybolovlev's) efforts to obtain valuations and/or appraisals for the art masterworks that Plaintiffs purchased from Mr. Bouvier.

r.   The communications between Ms. Bersheda and Mr. Bouvier, dated December 2014 and February 2015, discussing or attaching a potential escrow agreement relating to the contemplated sale of an apartment and certain of the artworks at issue in this case.

s.   The communications, dated December 2014, between Ms. Bersheda, Mr. Bouvier, and Mr. Yuri Bogdanov regarding Mr. Rybolovlev's cash flow and/or liquidity difficulties.

t.   The communications between Ms. Bersheda and (i) Mr. Bouvier (or persons working with or on behalf of Mr. Bouvier), or (ii) other third parties regarding Plaintiffs' or their representatives' (including Mr. Rybolovlev's) efforts to obtain loans from financial institutions, in Singapore or elsewhere, using one or more of the art masterworks Plaintiffs acquired through Mr. Bouvier as collateral, including the actual or attempted use of any Sotheby's valuations in connection with those efforts.  *See* Plaintiffs' Interrogatory Responses at 6 [Exhibit 3].

u.   The communications between Ms. Bersheda and any financial institution, in Singapore or elsewhere, regarding Plaintiffs' efforts to obtain loans using one or

more of the art masterworks that Plaintiffs acquired through Mr. Bouvier as collateral, including the actual or attempted use of any Sotheby's valuations in connection with those efforts.  *See* Plaintiffs' Responses to Interrogatories at 6 [Exhibit 3].

v.      The communications and documents concerning the Privileged Materials, including all documents that incorporate, reference, or summarize information obtained from the Privileged Materials.  Exhibit 4 shows that Ms. Bersheda had in her possession the Privileged Materials since at least October 21, 2016.

w.      The communications between Ms. Bersheda and James Gallon, including communications concerning the Privileged Materials.

x.      The communications between Ms. Bersheda and Brian Cattell, including communications concerning the Privileged Materials.  *See* Sotheby's Letter-Motion at Ex. A [Exhibit 4].

y.      The communications between Ms. Bersheda and Sergey Chernitsyn, including communications concerning the Privileged Materials.  *See id.*

**10. Any Requirement That the Evidence be Given on Oath or Affirmation and Any Special Form to be Used:**

This Court respectfully requests that Ms. Bersheda testify under oath or affirmation, that the witness be duly sworn in accordance with the applicable procedures of England, that the testimony be transcribed by a qualified court reporter to be selected by the legal representative of Sotheby's, and that a videographic record be taken of the deposition.

**11. Special Methods or Procedure to be Followed:**

The following is respectfully requested:

a.      That Sotheby's representatives be permitted to attend the deposition and be appointed by the English Court to conduct the deposition (*i.e.*, examine the witness on the topics listed in Appendix A) while an English barrister is present in a supervisory role;

b.      That the other parties to the litigation be permitted to attend the deposition and examine the witness on the topics listed in Appendix A;

c.      That Ms. Bersheda be permitted to be represented by her own counsel at her own expense at the deposition should she wish to do so and that she not be required to give evidence that is privileged against disclosure under the laws of either the United States or England;

d.      That the deposition be taken under the Federal Rules of Civil Procedure of the United States of America ("FRCP"), except to the extent such procedure is incompatible with the law of England;

e.      That the testimony be recorded verbatim by stenographic and videographic means in English, that a stenographer and videographer licensed in the United Kingdom be permitted to attend the deposition in order to record the testimony, and that the parties' representatives be provided with a copy of the transcript and recording;

f.      That there be excluded from the deposition, if permitted under the law of England, all persons other than the attorney conducting the examination of Ms. Bersheda, the attorneys for the parties, the English barrister (referred to in (a) above), the stenographer and videographer, and other officials of the court of England normally present during such proceedings;

g.      That the examination be conducted orally;

16

h.      That the deposition be allowed to continue until completed, except that the deposition shall not exceed a total of seven hours per day, and shall not exceed a total of fourteen hours;

i.      That Ms. Bersheda be permitted to produce the documents and deposition testimony to the parties to the litigation and certify to the court that she has done so, in place of filing at court;

j.      That Sotheby's be permitted to produce the documents and deposition testimony to the parties to the litigation; and

k.      That the documents of which production is sought be produced by Ms. Bersheda at least forty-five days prior to the date of Ms. Bersheda's deposition, and that copies be provided to:

> Marcus A. Asner
> Sara L. Shudofsky
> Arnold & Porter Kaye Scholer LLP
> 250 West 55th Street
> New York, New York 10019
> Email: Marcus.Asner@arnoldporter.com
> Email: Sara.Shudofsky@arnoldporter.com
> Tel: +1 212 836 7222
>
> Jane Wessel
> Arnold & Porter Kaye Scholer (UK) LLP
> Tower 42
> 25 Old Broad Street
> London EC2N 1HQ
> United Kingdom
> Email: Jane.Wessel@arnoldporter.com
> Tel: +44 (0)20 7786 6260

**12. Request for Notification of the Time and Place of Execution of the Request and Identity and Address of Any Person to be Notified:**

It is requested that the deposition be taken as soon as can practicably be arranged.  It is requested that the deposition be conducted at the London office of Arnold & Porter, or at a location mutually agreed upon by the parties and the witness, and that the witness and the counsel listed

17

below be notified of the date, time, and place of the deposition as soon as convenient.  If possible, it is requested that notice be furnished to the witness and counsel at least thirty days prior to the deposition.

<u>Counsel for Defendants:</u>
Marcus A. Asner
Sara L. Shudofsky
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019
Email: Marcus.Asner@arnoldporter.com
Email: Sara.Shudofsky@arnoldporter.com
Tel: +1 212 836 7222

Jane Wessel
Arnold & Porter Kaye Scholer (UK) LLP
Tower 42
25 Old Broad Street
London EC2N 1HQ
United Kingdom
Email: Jane.Wessel@arnoldporter.com
Tel: +44 (0)20 7786 6260

<u>Counsel for Plaintiffs:</u>
Daniel Kornstein
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
Email: dkornstein@ecbalaw.com
Tel: +1 212 763 5000

**13. Request for Attendance or Participation of Judicial Personnel of the Requesting Authority at the Execution of the Letter of Request:**

No attendance of United States judicial personnel is requested.

**14. Specification of Privilege or Duty to Refuse to Give Evidence Under the Law of the United States:**

The witness may refuse to give evidence only insofar as she has a privilege or duty to refuse to give evidence under the laws of the United States or the laws of England.

The parties to the U.S. Action have agreed, and this Court has ordered, that any confidential material produced or disclosed by the parties or any third parties will be kept confidential, according to the Local Rules of the Court and/or any protective order entered in the case.

**15. Fees and Costs:**

The fees and costs incurred which are reimbursable under the second paragraph of Article 14 or under Article 26 of the Hague Convention shall be borne by Sotheby's.

**16. Specification of the Date by which the Requesting Authority Requires Receipt of the Response to the Letter of Request:**

The Requesting Authority requests that the deposition take place as soon as practicable after the Requested State receives this Letter of Request, and that the requested documents be produced at least forty-five days prior to the date of the deposition. Expedient treatment of this Letter of Request will allow the parties and the witness to arrange a mutually agreeable date for testimony and avoid disruption to the witness's business or personal plans.

**17. Signature and Seal of the Requesting Authority:**

This Court expresses its appreciation for the assistance and courtesy of the courts of the United Kingdom in this matter, and states that it shall be ready and willing to assist the courts of the United Kingdom in a similar manner when required.

Dated: _____, 2019
      New York, New York

Respectfully Submitted,


By: _____
HON. JESSE M. FURMAN
UNITED STATES DISTRICT JUDGE
United States District Court for the
Southern District of New York

19

**SEAL OF THE COURT**

<u>**Appendix A**</u>
<u>**Topics for Oral Testimony**</u>

I.    **Background Information**

    A.    **Description:**  General background information.

    B.    **Topics:**

        1.    Name.

        2.    Residence(s).

        3.    Education.

        4.    Professional background and experience.

        5.    Employment.

II.   **Work on Behalf of Plaintiffs and Mr. Rybolovlev in Connection with Artworks at Issue in U.S. Action**

    A.    **Description:** As part of the exchange of information in the U.S. Action, Plaintiffs have represented to Sotheby's that Ms. Bersheda communicated with Mr. Bouvier on Plaintiffs' and Mr. Rybolovlev's behalf regarding the artworks at issue in the U.S. Action, including with respect to valuations Plaintiffs obtained or attempted to obtain from Mr. Bouvier (and which Mr. Bouvier thereafter sought from Sotheby's).  *See* Plaintiffs' Responses to Interrogatories at 5-6 [Exhibit 3].  More generally, Plaintiffs have stated that Ms. Bersheda has knowledge and information concerning the allegations in the Amended Complaint.  *See id.* at 4.  They also have stated that Ms. Bersheda has knowledge and information regarding Plaintiffs' (including Mr. Rybolovlev's) alleged suspicion and discovery that Mr. Bouvier defrauded them.  *See id.* at 7.

    B.    **Topics:**

        1.    The nature of Plaintiffs' (and their representatives') relationship with Mr. Bouvier.  *See, e.g.*, Am. Compl. ¶¶ 13-19 [Exhibit 1]; Plaintiffs' Responses to Interrogatories at 5 [Exhibit 3].

        2.    Communications with Mr. Bouvier (and his representatives) regarding the artworks at issue in the U.S. Action.  *See, e.g.*, Plaintiffs' Responses to Interrogatories at 5 [Exhibit 3].

        3.    Valuations Plaintiffs obtained or attempted to obtain from Mr. Bouvier or other persons or entities for the artworks at issue in the U.S. Action.  *See, e.g.*, Plaintiffs' Responses to Interrogatories at 6 [Exhibit 3].

4.   Communications with financial institutions regarding the artworks at issue in the U.S. Action.  *See, e.g.*, Plaintiffs' Responses to Interrogatories at 5-6 [Exhibit 3].

5.   Plaintiffs' (including Mr. Rybolovlev's) discovery of the alleged fraud by Mr. Bouvier.  *See, e.g.*, Plaintiffs' Responses to Interrogatories at 7 [Exhibit 3].

**III.   Receipt and Use of Privileged Materials**

A.   **Description:**  As set forth in Exhibit 4, since at least as early as October 21, 2016, Ms. Bersheda has possessed and made use of Sotheby's Privileged Materials.  On that day, a representative of Plaintiffs, Ms. Fedele, sent copies of the Privileged Materials—apparently at Ms. Bersheda's direction—to Brian Cattell and Sergey Chernitsyn, along with Ms. Bersheda.  Plaintiffs have represented to Sotheby's that Ms. Bersheda has knowledge and information concerning Plaintiffs' receipt, transmittal, review, and/or use of Sotheby's Privileged Materials.  *See* Plaintiffs' Responses to Interrogatories at 7 [Exhibit 3].

B.   **Topics:**

1.   How the Privileged Materials were obtained.  *See id.*

2.   Review and use of the Privileged Materials.  *See id.*

3.   Transmittal of the Privileged Materials.  *See id.*

4.   Communications regarding the Privileged Materials.  *See id.*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ACCENT DELIGHT INTERNATIONAL LTD.
and XITRANS FINANCE LTD.,

                    Plaintiffs,

          -against-

SOTHEBY'S and SOTHEBY'S, INC.,

                    Defendants.

**18 Civ. 9011 (JMF)**

**AMENDED COMPLAINT**

---

Plaintiffs, for their Amended Complaint, allege, with knowledge as to their own acts and otherwise on information and belief, that:

### NATURE OF THE ACTION

1.      Sotheby's—one of the world's largest and most famous art brokers and auction houses—materially assisted the largest art fraud in history. Plaintiffs, two companies based in the British Virgin Islands, were the victims. Yves Bouvier, their art advisor, masterminded the fraud. Sotheby's was the willing auction house that knowingly and intentionally made the fraud possible. Sotheby's actions instilled Plaintiffs' trust and confidence in Bouvier and rendered the whole edifice of fraud plausible and credible.

2.      For more than ten years, Bouvier served as Plaintiffs' agent, counselor, and representative as Plaintiffs acquired 38 art masterworks for more than $2 billion. Plaintiffs believed that Bouvier was negotiating with sellers on Plaintiffs' behalf and paid Bouvier a commission for his services. Actually, Bouvier's detailed accounts of hard-fought negotiations with sellers were pure fiction. Instead, Bouvier was negotiating for much lower prices, selling to Plaintiffs at markups as high as 145%, and pocketing the difference for himself. He repeatedly

and blatantly misrepresented the acquisition prices for the paintings. Indeed, the price Bouvier in reality paid for Plaintiffs' collection was approximately half the total price at which Bouvier falsely claimed the works had been acquired and Bouvier charged Plaintiffs. Through this scheme, Bouvier defrauded Plaintiffs of over $1 billion.

3.      To perpetrate this fraud, Bouvier needed Sotheby's: as a broker for the transactions, and as a respected authority in the art world to help him justify the fraudulent prices he charged to Plaintiffs. Sotheby's was uniquely positioned to understand—and to facilitate— Bouvier's breathtaking fraud. It knew the actual prices Bouvier paid to the sellers and the fraudulently inflated prices Bouvier induced Plaintiffs to pay to him.

4.      Sotheby's aided and abetted Bouvier's fraud and, in doing so, also violated its own Code of Business Conduct. Before transactions, Sotheby's gave Bouvier written materials designed to induce Plaintiffs to pay inflated, fraudulent prices. After transactions, Sotheby's lent a veneer of legitimacy and expertise to those fraudulent prices by providing Bouvier with inflated appraisals on demand. Sotheby's intentionally omitted the sales to Bouvier from the transaction histories listed in these appraisals. In short, Sotheby's assisted Bouvier in acquiring artworks at prices the sellers were willing to accept while helping him charge Plaintiffs fraudulently inflated prices (and concealing the actual acquisition prices from Plaintiffs).

## PARTIES

5.      Plaintiff Accent Delight International Ltd. is an entity incorporated in the British Virgin Islands. It is owned by a trust settled by and for the benefit of members of the family of Dmitry Rybolovlev.

6. Plaintiff Xitrans Finance Ltd. is an entity incorporated in the British Virgin Islands. It is owned by a trust settled by and for the benefit of members of the family of Dmitry Rybolovlev.

7. Defendant Sotheby's, doing business in New York under the name Sotheby's Holdings, is a publicly traded corporation incorporated under the laws of Delaware with its principal place of business at 1334 York Avenue, New York, New York. Founded in 1744, Sotheby's is in the business of selling art at auction and brokering private sales. It also provides professional appraisals of artworks by experts. Sotheby's is one of the world's oldest and most prestigious art companies. According to its website, Sotheby's "has been entrusted with the sale of many of the world's treasures" and has built a "reputation for excellence based on the expert knowledge and scholarship of [its] specialists."

8. In the words of its Code of Business Conduct, Sotheby's "values" include "integrity," "trust," and "the highest standards of conduct." That Code is "a guide to conducting business with integrity and in keeping with our core values. Sotheby's is committed to operating with clear and firm ethical standards, at every auction, in every transaction, no matter where we are." "Directors, officers and managers are required to: Serve as models of ethical behavior."

9. Defendant Sotheby's, Inc. is the wholly owned U.S. subsidiary of Sotheby's.

## JURISDICTION AND VENUE

10. Subject-matter jurisdiction exists under 28 U.S.C. § 1332(a)(2) because Plaintiffs are citizens of a foreign state, Defendants are citizens of New York, and the amount in controversy exceeds $75,000.

11. Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendants reside in this judicial district.

**FACTS**

12.     Sotheby's aided and abetted the fraud designed by Yves Bouvier. (For purposes of this Complaint, the term "Bouvier" refers to Yves Bouvier and persons and entities acting on his behalf and under his control.) It did not act in keeping with its own Code of Business Conduct.

### *Bouvier's Fraudulent Scheme*

13.     Bouvier's fraud depended on the creation and violation of trust. Bouvier was first introduced to Plaintiffs' representative, Dmitry Rybolovlev, in 2003 through a mutual connection, Tania Rappo. Rappo was the godmother of one of Rybolovlev's daughters, and he considered her like a family member. Rappo fostered Rybolovlev's trust in Bouvier.

14.     From 2003 through 2015, Bouvier, along with Rappo, worked to acquire art masterworks on Plaintiffs' behalf. Plaintiffs and Bouvier agreed that he would act as their agent. Bouvier held himself out to Plaintiffs as an intermediary acting on their behalf, not as a seller in the marketplace. Plaintiffs trusted him.

15.     Bouvier acquired 38 masterworks for Plaintiffs—including paintings by Picasso, da Vinci, Rothko, and Modigliani—in 37 transactions. (Two works by Picasso were acquired together in one transaction.)

16.     Plaintiffs paid more than $2 billion for the collection. They generally paid Bouvier a two-percent commission on the purchase price of each work. Bouvier's charging of a commission is evidence that he was acting as Plaintiffs' consultant and agent, not as a dealer entitled to the markups he could generate on the open market.

17.     Consistent with usual practice in the market for fine art, Plaintiffs were generally unaware of the sellers' identities. The transactions were confidential, and Bouvier insisted on serving as Plaintiffs' exclusive representative.

18.     Bouvier repeatedly lied to Plaintiffs and withheld material information from them. He told Plaintiffs he was negotiating with sellers on their behalf, when in fact he had generally already agreed to acquire the paintings at lower prices. The negotiations over the higher prices were fabricated.

19.     By acquiring the paintings at lower prices than he represented, rather than fulfilling his fiduciary duties as Plaintiffs' agent, Bouvier pocketed hundreds of millions of dollars in fraudulent gains. He also paid Rappo about $100 million in kickbacks for her role in the scheme.

### *Plaintiffs Attempt to Bring Bouvier to Justice*

20.     In European civil law countries, crime victims can start criminal proceedings. As Bouvier's lies, misrepresentations, and deliberate omissions came to light, Plaintiffs started criminal proceedings against him and Rappo in Monaco. Plaintiff Accent Delight International Ltd. also joined criminal proceedings started by a third party against Bouvier in Paris.

21.     Bouvier has been charged with fraud and complicity in money laundering in Monaco and has been charged with repeated handling of stolen goods in France. Magistrates in both countries are continuing to investigate Bouvier's crimes.

22.     Plaintiffs sued Bouvier for civil damages in Singapore, his domicile and the site of his art warehousing business. Bouvier has taken measures to liquidate his assets and place them beyond the reach of the Singapore courts.

23.     Plaintiffs also brought criminal charges against Bouvier in Switzerland.

24. Bouvier was taken in for questioning in Monaco in 2015. Police recovered from him a USB flash drive containing several scanned Sotheby's logos, the electronic signatures of Samuel Valette, Sotheby's Vice Chairman for Private Sales Worldwide, and Dr. Franka Haiderer, Sotheby's Senior Director and Chairman for Valuations in Europe.

### Sotheby's Aids and Abets Bouvier's Fraud

25. Bouvier's method of operation was consistent: Having already agreed, in most cases, to buy a work at one price, he lied to Plaintiffs by pretending he was still negotiating with the seller on their behalf, inducing Plaintiffs to pay an inflated price.

26. Sotheby's has admitted its involvement in Bouvier's scheme. According to Sotheby's, "Sotheby's facilitated the sale of 12 of the 37 works to Bouvier, consigned for auction 2 of the [w]orks on Bouvier's behalf (1 of which it previously sold him), and conducted valuations for 4 of the [w]orks (2 of which it previously sold him)." Sotheby's made this admission in a brief filed on June 29, 2018 in the U.S. Court of Appeals for the Second Circuit. *See* Memorandum of Law in Support of Motion for Stay Pending Appeal (ECF No. 16-2) at 5 n.4, No. 18-1755 (2d Cir. June 29, 2018). "'Sotheby's' refers to Sotheby's, Inc., a U.S. corporation with its principal place of business in New York." *Id. at* 1 n.1.

27. Sotheby's was uniquely positioned to understand both sides of Bouvier's fraudulent scheme: the prices that sellers were willing to accept and that he paid, and the fraudulently inflated prices he charged to Plaintiffs. Rather than alert Plaintiffs or the authorities, or even end its involvement, Sotheby's continued its lucrative business with Bouvier.

28. Demonstrating its close involvement with Bouvier's scheme, and their common interests, in November 2017, Sotheby's allied itself with Bouvier as a co-plaintiff and filed a joint submission in a civil "conciliation" proceeding against Plaintiffs in Geneva, Switzerland.

Although it appears that Sotheby's would have had a basis to bring its own legal claims against Bouvier if it was truly innocent in the fraud he perpetrated, it is telling that Sotheby's chose not to do that. Instead, Sotheby's did the exact opposite. It aligned itself with Bouvier in bringing the Swiss proceeding and making a joint filing.

29.     Samuel Valette, Sotheby's Vice Chairman for Private Sales Worldwide, maintained a close relationship with Bouvier, for many years. They communicated regularly. Valette, a specialist in impressionist and modern art, frequently contacted Bouvier to suggest works that Plaintiffs might want to acquire.

30.     Valette, on behalf of Sotheby's, would "source" works of art for Bouvier to sell to Plaintiffs, comment on their quality and importance within the artist's body of work, and sometimes issue appraisals. Valette did so in emails to Bouvier and his associate Jean Marc Peretti, which Valette knew would be forwarded to Plaintiffs' representative. Peretti has been the subject of criminal investigations in France, including a 2009 investigation for running an illegal gambling ring, according to *The New Yorker* magazine.

31.     To Plaintiffs, whatever Valette said or did, because of his position, was on behalf of Sotheby's and carried the imprimatur of Sotheby's. Bouvier would refer Plaintiffs to Valette and to Sotheby's to confirm what he was saying to Plaintiffs.

32.     Alexander Bell, Sotheby's Co-Chairman of Old Master Paintings, and Bruno Vinciguerra, Sotheby's Chief Operating Officer, also dealt with Bouvier.

33.     At all relevant times, Vinciguerra, Valette, and Bell were employees, agents, and servants of Sotheby's, acting within the scope of their duties.

34.     Sotheby's valued its relationship with Bouvier. Bouvier is a major player in the art world. He is associated with global "freeport" businesses where fine art is stored tax-free. In

the 14 transactions involving Bouvier and Plaintiffs that it brokered, Sotheby's earned tens of millions, or perhaps even hundreds of millions, of dollars in commissions. Bouvier was also valuable to Sotheby's because he did other business with Sotheby's, unrelated to Plaintiffs.

35.     Bouvier was—and remains—one of Sotheby's most important business contacts.

36.     Citing its confidentiality obligations to Bouvier, Sotheby's refused to voluntarily provide Plaintiffs with documents that would show the extent of Bouvier's fraud, including correspondence between Bouvier and Valette. Plaintiffs obtained some of those documents by court order under 28 U.S.C. § 1782.

37.     The limited documents Plaintiffs have obtained already through section 1782 show that Sotheby's knew Bouvier was acting as Plaintiffs' agent; Sotheby's brokered the sales to Bouvier at the discounted prices Bouvier wanted; at Bouvier's request, Sotheby's repeatedly created and modified appraisals and other documents about respective artworks designed to assist Bouvier in duping Plaintiffs into paying inflated prices; and Sotheby's concealed the evidence that Bouvier had in fact purchased the artworks at much lower prices by omitting the sales to Bouvier from the works' transaction histories it prepared.

38.     Plaintiffs relied on the false appraisals, transaction histories, and other documents Sotheby's created for these artworks, believing that Sotheby's was an independent and reliable authority in the art world.

39.     Sotheby's pattern of deception is evident throughout all the sales to Plaintiffs in which it played a role.

<u>Picasso's *L'Homme Assis Au Verre*</u>

40.     Sotheby's brokered the sale of Picasso's *L'Homme Assis Au Verre* to Plaintiffs in the spring of 2011.

41.     In March 2011, Valette and Bouvier exchanged a series of emails about *L'Homme Assis au Verre*. The tone of the emails is friendly, collaborative, and informal (using the informal "you" (the French "tu")) and signed with first names "Yves" and "Sam."[1]

42.     On March 18, 2011, Valette emailed both Bouvier and his associate Peretti, attaching a formal description of the artwork and writing in his cover email: "As agreed, here is the note with the expositions, a commentary on its importance, the photos of Picasso and the photos of the 3 comparable paintings in museums."

43.     On March 22, 2011, Bouvier emailed Valette to ask when he would have a "definitive price" for the work and suggested that "a price in USD would be the best adapted." Valette responded: "Message received about the dollars. We were asking ourselves that question."

44.     On March 23, 2011, Valette assured Bouvier he was negotiating in dollars "as we agreed" and was trying to make sure "the price would be reasonable." This appears to be yet another violation of Sotheby's Code of Business Conduct, which requires: "Business decisions must be made in the best interest of Sotheby's and our clients, not motivated by your personal interest or gain."

45.     On March 24, 2011, Valette emailed Bouvier a formal description of the work, writing in his cover email: "Here is a text on the artwork, more focused on its composition. We should have the price tomorrow."

46.     Two days later, on March 26, 2011, Bouvier forwarded Valette's formal description to Plaintiffs' representative.

---

[1]     Unless otherwise indicated, the quotes from emails are translations from the original French.

47. Plaintiffs relied on Valette's description because of his role at Sotheby's. They viewed his description of the work as authoritative and relied on it in deciding to purchase this artwork.

48. Relying on Bouvier's false statements about the price of the work the seller was willing to accept, Plaintiffs agreed to buy the work for $107.5 million. Plaintiffs gave this money to Bouvier to transmit to the sellers, believing Bouvier was acting as their honest agent.

49. Plaintiffs also paid a commission of $2.15 million for the services Bouvier rendered in negotiating the purchase of this work.

50. In fact, unbeknownst to Plaintiffs, Bouvier bought the work from Sotheby's on April 1, 2011 for $62 million. Valette signed the contract of sale on behalf of Sotheby's Geneva-based office. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $45.5 million more for this work than he paid for it, i.e. a markup of 73.4%.

51. On April 8, 2011, Valette emailed Bouvier a certificate for the artwork, asking Bouvier: "Please let me know if it works for you." Valette's request that Bouvier confirm if the certificate "works for you" suggests he knows that Bouvier needs the certificate for his client (*i.e.* Plaintiffs' representative) and that he is willing to make changes for Bouvier if needed. The attached certificate is a Word document, which further suggests a willingness to make changes as needed to accommodate Bouvier's needs. The certificate is formally addressed on Sotheby's letterhead to "Monsieur Yves Bouvier" and uses a formal tone (including the formal "you" (the French "vous")) completely unlike Bouvier's and Valette's usual email correspondence. This and other similarly formal emails and appraisal certificates were intended by Valette to be forwarded by Bouvier to Plaintiffs to convince them to buy at the inflated prices Bouvier was trying to convince them were legitimate. The formal tone was designed to mislead Plaintiffs into thinking

10

that Bouvier and Valette had an arms-length relationship and that Sotheby's valuations and appraisals of the works could be trusted.

52. Approximately one hour later, Valette emailed the certificate to Bouvier as a PDF document, noting in his cover email "this might be easier to use."

Malliol's <em>La Méditerranée</em>

53. On April 9, 2011, Valette emailed Bouvier with a description of Malliol's <em>La Méditerranée</em>. Valette's email begins: "Here is the information on the Malliol, La Méditerranée."

54. Later the same day, Valette emailed Bouvier with information about how much other Malliol works had sold for.

55. Valette also emailed Bouvier an attachment of a formal description of this work, without any cover email. The attachment was a Word file.

56. The next day, April 12, 2011, Bouvier agreed to buy the work from Sotheby's for €5.17 million. The contract was signed by Sotheby's New York office.

57. Two days later, after Sotheby's had already sold the work to Bouvier, on April 14, 2011, Valette emailed Bouvier two formal certificates—one for the Malliol and another for Rodin's <em>Le Baiser</em> (discussed below). The certificates were PDF files. Valette's cover email to Bouvier stated: "Here are the expected certificates. The two artworks are actually at Sotheby's in New York. Does the client want to send his transporters to pick them up or does he prefer that they be delivered to the freeport? Thanks for letting me know what the client prefers." This email makes clear that Valette knew that Bouvier was buying on behalf of a "client" (<em>i.e.</em> Plaintiffs' representative), not himself as Sotheby's has since tried to claim.

58. On April 15, 2011, Sotheby's staff provided Bouvier with additional references about the work—even though he had already agreed to purchase it.

11

59.     Also on April 15, 2011, relying on Bouvier's misrepresentations about the price of the work, Plaintiffs agreed to buy it for €8.4 million. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs €3.23 million more for this work than he paid for it, i.e. a markup of 38.4%.

60.     Plaintiffs also paid Bouvier a €168,000 in commission for his work negotiating the sale.

Rodin's <em>Le Baiser</em>

61.     On April 4, 2011, Valette emailed Bouvier's associate, Peretti, a description of Rodin's *Le Baiser*.

62.     On April 9, 2011, Bouvier emailed Valette with the subject line "Urgent" and wrote: "I am already seeing my friend tomorrow Sunday."  Bouvier requested more information about the work "so that I have the maximum arguments." This email again made clear to Valette that Bouvier was not buying for himself but rather on behalf of a client, *i.e.* Bouvier's "friend," Plaintiffs' representative. It is obvious from this exchange that Valette knew who the "friend" was. Valette swiftly responded with the information Bouvier needed to make the "maximum arguments" to Plaintiffs in order to convince them to buy the work at an inflated price.

63.     On April 13, 2011, Bouvier falsely told Plaintiffs he had "closed the deal" to buy the work for €7.5 million. Plaintiffs relied on Bouvier's misrepresentations and paid him €7.5 million for the work, as well as an additional €150,000 in commission for his work in negotiating the sale.

64.     On April 14, 2011, Bouvier agreed to buy the work from Sotheby's for €4.23 million. Sotheby's New York signed the contract. This meant that, with Sotheby's assistance,

Bouvier charged Plaintiffs €3.27 million more for this work than what he paid for it, i.e. a markup of 77.3%.

65.    On April 14, 2011, Valette emailed Bouvier a PDF file with a formal certificate for the work and the same cover email he sent about the Malliol, asking how "the client" preferred to get the works.

Matisse's <em>Nu au Châle Vert</em>

66.    On June 15, 2011, Valette sent emails to Bouvier's associate, Peretti, attaching photos of Matisse's <em>Nu au Châle Vert</em>. Valette's cover emails had no content, suggesting they had previously discussed the work in person or on the phone.

67.    On June 16, 2011, Valette sent an email to Bouvier attaching various documents about the artwork, including PDF excerpts from catalogues and a formal description of the work in Word.

68.    Valette and Bouvier then exchanged a series of emails about Bouvier getting access to the work.

69.    On June 20, 2011, Bouvier forwarded an email to Valette saying a Sotheby's representative had denied access to the work and instructing him to "do what is necessary" to ensure access.

70.    A minute later, Bouvier sent a separate email to Valette with no subject line, angrily writing: "I thought no one in Geneva was supposed to know about this operation!!!!!!! I cannot work under these conditions."

71.    Valette hastened to reassure Bouvier, emailing later that morning that he had done "the necessary" to ensure access to the work, adding: "I can also confirm that, other than me, there will be no one else from Sotheby's before, during, or after any of the visits. I had a very

13

clear and direct discussion on this subject with my colleagues in 'risk management' in London. The message has been clearly heard and accepted."

72.     The same day, Valette sent another email to Bouvier with additional information about the work, "as promised."

73.     On June 23, 2011, relying on Bouvier's misrepresentations, Plaintiffs agreed to pay $85 million for the work. Plaintiffs also paid Bouvier a commission of $2.2 million for his services in negotiating the sale.

74.     Four days later, on June 24, 2011, Bouvier bought the work from Sotheby's for $60 million. The contract was signed by Valette on behalf of Sotheby's London office. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $25 million more for this work than he paid for it, i.e. a markup of 42%.

75.     Three years later, on October 24, 2014, Valette emailed Bouvier with a formal appraisal of the work, writing in his cover email: "Here are the expected documents," making it clear he was responding to Bouvier's request. The appraisal is signed by Valette and addressed to "Mr. Confidential Client One Hundred and Thirty Four." Valette's valuation lists the value of the work at $85,000,000—suspiciously, exactly the price Bouvier had falsely induced Plaintiffs to pay for it three years earlier. Sotheby's appraisal also omitted the 2011 sale to Bouvier for $60 million from the section listing the transaction history. There is no legitimate reason to omit that sale, which Valette certainly knew about since he brokered the sale and personally signed the contract. The omission was done to conceal Bouvier's fraud from Plaintiffs.

Rodin's *L'Éternel Printemps*

76.     On June 15, 2011, Valette emailed Peretti with some information about Rodin's

*L'Éternel Printemps*. Valette's email noted that the last estimate from 2008 was for $8 million to

$12 million.

77.     On June 16, 2011, Valette emailed Peretti again, this time attaching a Word

version of a formal certificate for this work and noting that the seller was willing to sell for $12.5

million.

78.     That same day, Valette sent the same email and attachment to Bouvier. The email

suggests seeing the statue with "Jean-Marc [Peretti]" the following week, indicating that Valette

clearly knows that Peretti is Bouvier's associate even though he chooses to keep separate paper

trails with them. This was part of a pattern on Valette's part—to separately email the same

information to Bouvier and Peretti.

79.     On June 20, 2011, Valette emailed Bouvier: "Here is the new file on Éternel

Printemps as promised" and attaching a new version of the certificate (still in Word). Valette

repeatedly generated and changed Sotheby's certificates at Bouvier's request like this.

80.     On July 1, 2011, Valette emailed Bouvier with a contract to purchase the work for

$13.2 million. This contract was signed by Valette on behalf of Sotheby's London office.

Bouvier paid Sotheby's this money on July 5, 2011.

81.     On July 11, 2011, Valette forwarded an email to Bouvier from Holli Chandler,

Sotheby's Business Manager of Impressionist & Modern Art, describing the arrangements to

ship the work to Bouvier's Geneva freeport. Chandler's email states that the shippers "will make

a stop at Vulcan in Paris for *the buyer* to view the sculpture." This email makes clear that both

Chandler and Valette were aware that Bouvier was really buying on behalf of someone else, *i.e.* Plaintiffs.

82.    Valette later emailed Bouvier that Sotheby's would order the shippers to give Bouvier "free access to the piece so you can position it at your convenience at Vulcan."

83.    On July 25, 2011, Valette emailed Bouvier a PDF file of the certificate for this work "as promised."

84.    Plaintiffs paid Bouvier £30 million for this work based on his false representations about the price. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs £21.8 million (approximately $35.5 million) more for this work than he paid for it, i.e. a markup of 73%. Plaintiffs also paid Bouvier a commission of £600,000 for his services in brokering the sale.

### Giacometti's *Femme de Venise IX*

85.    In September and October 2011, Valette emailed both Bouvier and Peretti separately with information about Giacometti's *Femme de Venise IX.* This is a continued pattern on Valette's part of keeping the paper trail between Bouvier and Peretti separate.

86.    On October 4, 2011, Bouvier emailed Valette, copying Peretti, with the subject line "Urgent."  Bouvier asked Valette to send him the Giacometti file, specifying that he wanted it as a Word document. Valette promptly complied, sending the certificate in Word as Bouvier had requested.

87.    On October 14, 2011, Valette sent Bouvier a contract of sale for this work for CHF 26.1 million. Valette signed the contract on behalf of Sotheby's London office.

88.    On October 17, 2011, Plaintiffs paid Bouvier CHF 45 million for this work. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs CHF 18.9 million more for this

work than he paid for it, i.e. a markup of 42%. Plaintiffs also paid Bouvier a commission of CHF 900,000 for his services in negotiating this sale.

89.    On November 8, 2011, Valette re-sent the Sotheby's contract for this work to Bouvier, who then counter-signed.

Magritte's <em>Le Domaine d'Arnheim</em>

90.    On August 25, 2011, Valette emailed Peretti about Magritte's *Le Domaine d'Arnheim*, asking to talk because he had "news."

91.    On November 10, 2011, Valette's Sotheby's colleague Isadora Katsis emailed Bouvier some information about this work, noting "Here is an image of the Magritte we have discussed. After a lot of insistence, the owner has confided to us that he will accept to separate from it for 25.000.000 USD." The tone of this email is informal and friendly, using the informal "you" (the French "tu"), as is typical of Valette's emails to Bouvier.

92.    The next day, November 11, 2011, Valette sent Bouvier a long and unusually formal email about a different Magritte painting, *Empire des Lumières*. The tone of this email is markedly different from Valette's usual communication style with Bouvier. For example, it is addressed to "Mr. Bouvier," whereas Valette typically refers to Bouvier by his first name, "Yves"; it uses the formal "you" (the French "vous"), whereas Valette typically uses the informal "tu" in his correspondence with Bouvier; it is signed with Valette's full name and Sotheby's title, whereas Valette usually signs his emails to Bouvier as simply "Sam"; and the entire tone is formal and written as though Valette and Bouvier did not know each other. The email begins: "It is a pleasure to discuss with you the current market for surrealist artworks and those of Magritte in particular." It goes on to discuss how an "iconic painting like Empire des Lumières" would sell at auction for about $40 million to $60 million.

17

93. Later the same day, Valette sent a new version of this email to Bouvier. This email is similarly formal in composition and address, but differs from the first in its inclusion of discussion of additional Magritte works. This new email also offers the same estimate of $40 million to $60 million for *Empire des Lumières* but omits any reference to an auction. No explanation is offered in this, or any other email between Valette and Bouvier, for the changes to the document. This suggests that Valette and Bouvier communicated by phone in the interim period between the two emails and Valette sent the new, different email at Bouvier's request.

94. During this same day, Valette continued to email both Bouvier and Peretti about the Magritte painting *Domaine D'Arnheim* that he was actually trying to sell. The tone of these emails was Valette's usual informal style with Bouvier and Peretti.

95. Three days later, Valette sent yet another version of the formal email about Magritte's work to Bouvier. The same formal tone and substance appear. But Valette now estimated that *Empire des Lumières* would sell for €40 million (changing the prices from U.S. dollars to Euros and omitting the range he had previously provided). Again, there is no explanation in this or any other email between Bouvier and Valette for this change, suggesting that Bouvier and Valette spoke on the phone and Valette made these changes at Bouvier's request. The formal tone of this email and its predecessors suggests that Valette knew and intended for Bouvier to forward it to Plaintiffs—and that Valette did not want Plaintiffs to know that he had a close, friendly, and collaborative relationship with Bouvier.

96. That is exactly what happened. On November 15, 2011, Bouvier forwarded Valette's email to Plaintiffs' representative, using it as the basis to urge Plaintiffs to purchase *Domaine D'Arnheim*, which Bouvier described as "more beautiful and more important" and "worth at least as much as 'Empire des Lumières.'"

18

97. Plaintiffs relied on Valette's email, trusting his assessment and valuation because of his affiliation with Sotheby's and his apparent independence, just as Bouvier and Valette intended.

98. On December 2, 2011, Sotheby's employee Holli Chandler wrote to Bouvier's assistant that: "I understand from Sam [Valette] that *the client* would very much like to receive the painting at the earliest possible opportunity." This is further evidence that Sotheby's knew Bouvier was buying on behalf of someone else, *i.e.* Plaintiffs.

99. On December 7, 2011, Plaintiffs paid $43.5 million for Magritte's *Domaine D'Arnheim*, believing this was its true purchase price.

100. On December 8, 2011, Bouvier bought the work from Sotheby's for $24.1 million. Valette signed the contract of sale on behalf of Sotheby's London office. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $19.4 million more for this work than he paid for it, i.e. a markup of 80.5%. Plaintiffs also paid Bouvier a commission of $870,000 for his services brokering the sale.

## Modigliani's *Nu Couché au Coussin Bleu*

101. On December 21, 2011, Valette emailed Bouvier and Peretti in his usual informal tone, writing "as promised, here is info on the Modigliani" and noting "at present, I do not have a price."

102. On December 23, 2011, Valette sent Bouvier another one of his formal emails, offering a: "succinct analysis of the Modigliani market." This email uses the same unusually formal address, including "Dear Mr. Bouvier," the formal "you," and a complete name and title in the signature. The email estimates the value of *Nu Couché au Coussin Bleu* between $70 million and $90 million. Valette's email also emphasized the high demand for Modigliani's *Nu*'s

on the market. The unusual formal tone of this email makes it clear Valette intended it to be forwarded to Plaintiffs.

103.    Bouvier responded on December 24, 2011, using the usual informal style, and asking Valette to confirm "when the painting will arrive to us for the presentation." This email further confirms that Valette knew Bouvier was buying on behalf of someone else, to whom he would be making a "presentation." Valette responded in his usual informal tone.

104.    On December 23, 2011, Bouvier emailed Plaintiffs' representative: "I do not know the price. . . . If [Rybolovlev] likes this painting, I will look into it."

105.    The next day, Bouvier told Plaintiffs' representative: "[T]he owner is . . . very rich and certainly has other solutions. He is not obligated to sell this painting and not solely to us. For now, we must firstly maintain a trust relationship with him and secondly make him waste time in order to negotiate better."

106.    Plaintiffs purchased this work for $118 million, believing that was the true purchase price.

107.    Bouvier actually purchased this work for $96 million. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $22 million more for this work than he paid for it, i.e. a markup of 22.91%. Plaintiffs also paid Bouvier a commission of $2.36 million for his services in negotiating the sale.

108.    Bouvier paid Rappo, Rybolovlev's close family confidante, a $5 million kickback on this transaction. This payment was kept secret from Plaintiffs.

109.    On October 24, 2014, Valette provided Bouvier with a valuation for this work. Signed by Valette on Sotheby's letterhead, it was addressed to "Mr. Confidential Client One

245af

Hundred and Thirty Four." It valued the work at $110,000,000 and omitted the 2012 sale to Bouvier for $96 million from the transaction history.

110.    On January 9, 2015, Sotheby's Chief Operating Officer Bruno Vinciguerra emailed Peretti and Valette about Sotheby's possibly selling this work during the spring auction in New York, offering a guarantee of up to $70 million. Vinciguerra used Peretti's first name ("Jean Marc") and signed "All my very best."[2]  Vinciguerra wrote: "we could achieve once again for you an exceptional result," suggesting he and Peretti had previously worked together.

Rodin's <em>Eve</em>

111.    On January 25, 2012, Valette emailed Peretti a photo of Rodin's *Eve*. There was no cover note.

112.    On February 2, 2012, Valette emailed Peretti a Word file document about the work, asking in his cover email if this "suits them."

113.    The next day, he sent the same information to Bouvier.

114.    On February 13, 2012, Valette emailed both Bouvier and Peretti with a PDF about the work, writing in his cover email: "Here is a try of a new doc with more photos – thanks for letting me know if it suits you better."

115.    In response to a later inquiry from Bouvier, Valette told him that the work sold in 2008 for $18,969,000.

116.    After a series of emails about arranging to bring the work to Geneva, Bouvier's employee wrote to Sotheby's employees Holli Chandler and Valette on March 6, 2012 that "*Our client* would like us collect directly the crate in Frankfurt with our truck." The reference to "client" again made clear to Sotheby's that Bouvier was buying on behalf of someone else.

---

[2]        This email is in English and not translated.

117.     On March 7, 2012, Valette sent Bouvier a contract of sale for the work for $16

million. Valette signed the contract of sale on behalf of Sotheby's London office. It is striking

that Sotheby's and Valette agreed to sell the painting to Bouvier for less than it had sold for four

years earlier. Sotheby's owed a duty to the sellers of this and other artworks, as well as to its

shareholders, to maximize the sale prices. But again and again, it appears Sotheby's sold to

Bouvier for less than it claimed was market value, suggesting either that Sotheby's valuations

were false or that Sotheby's violated its duty to the sellers and its shareholders.

118.     On March 8, 2012, Plaintiffs paid $26.25 million for this work, believing that was

the true purchase price. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs

$10.25 million more for this work than he paid for it, i.e. a markup of 64.1%. Plaintiffs also paid

Bouvier a commission of $525,000 for his work negotiating the sale.

119.     On March 21, 2014, Valette emailed a certificate for this work to Bouvier. The

certificate omitted the 2012 sale to Bouvier, which Valette had personally brokered.

120.     On December 18, 2014, Valette emailed Bouvier: "After reflection, my

colleagues and I think that the magnificent Eve by Rodin that belongs to your client would be

particularly shown to advantage at the big sculpture exposition we are preparing. . . ."  This

email makes clear again that Valette knew Bouvier bought this work on behalf of a client. It also

uses the formal "you" and is formally signed by Valette.

121.     Valette sent a slightly different version of this formal email to Bouvier

approximately one hour later. This time the email named Simon Stock, who Valette described as

Sotheby's head of sculpture sales, as the Sotheby's colleague in agreement with Valette about

the best option for sale. There is no explanation in this email (or any others between Bouvier and

Valette) for the change.

22

122. Bouvier forwarded this email to Plaintiffs' representative the next day, December 19, 2014, and recommended Plaintiffs sell the painting through Sotheby's rather than through a private sale.

## Klimt's *Wasserschlangen II*

123. On August 29, 2012, Valette emailed Bouvier and Peretti to confirm a viewing in Vienna of Klimt's *Wasserschlangen II* that Sotheby's had organized.

124. The viewing took place on September 3, 2012. Bouvier and Valette were present.

125. On September 11, 2012, Bouvier and Sotheby's signed a contract of sale for this work for $126 million. Thereafter, Valette acted on behalf of Sotheby's Vienna office to extend the contract multiple times because of delays in obtaining an export license from the Austrian government.

126. Later that same day, Bouvier sent Plaintiffs' representative an email describing high-stakes negotiations with the seller: "They're holding back for 180 [million dollars] and are at the breaking point; I think they are ready at 190. But I should be able to twist them to reach 185 with the payment of a deposit and the balance in 30 days. What should we do???" Bouvier later claimed to have clinched the deal at $183.8 million. These negotiations were all fabricated.

127. Plaintiffs paid Bouvier $183.8 million for this work. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $57.8 million more for this work than he paid for it, i.e. a markup of 45.87%. Plaintiffs also paid Bouvier a commission of $3,676,050.

128. Bouvier secretly paid Rappo a $4.78 million kickback on this transaction. This payment was kept secret from Plaintiffs.

129. The export license was finally obtained on July 16, 2013; Sotheby's sale to Bouvier closed the same day.

130. Also on the same day, Valette emailed Bouvier a certificate for this work that omitted the sale to Bouvier. Valette later provided Bouvier with a certificate from the Art Loss Register that also omitted the sale to Bouvier from the "Provenance Provided" section.

131. On July 24, 2013, Valette emailed Bouvier and Peretti to tell them the work had been delivered to Bouvier's Geneva freeport. Bouvier responded: "Super congratulations."

132. On September 24, 2013, Valette separately emailed Bouvier and Peretti an article from Der Standard (Austria) which reported that Sotheby's had sold the work for $120 million. The emails had no subject line and there was no cover note or explanation in Valette's email, suggesting he spoke to Bouvier and/or Peretti on the phone about the article.

133. Bouvier then forwarded the article to Plaintiffs' representative, falsely claiming the article was inaccurate and offering to provide Plaintiffs with "proof" of payment to Sotheby's.

134. On October 24, 2014, Valette sent Bouvier a formal valuation for this work. The valuation, signed by Valette and on Sotheby's letterhead, was addressed to "Mr. Confidential Client One Hundred and Thirty Four." It listed the value of the work at $180 million— extremely similar to the value Plaintiffs paid for it—and omitted the $126 million sale to Bouvier from the transaction history, even though Valette had personally brokered that sale.

### Modigliani's *Tête*

135. In December 2011 and again in June 25, 2012, Valette emailed Peretti and Bouvier with photos and information about Modigliani's *Tête*, indicating the owners were willing to sell. One email referenced a similar sculpture sold by Christie's in 2010 for €43 million.

136.     On June 26, 2012, Bouvier responded, asking Valette to email him the file in "normal format" so that he could include translations. Bouvier also emailed Valette to ask him to include additional information about comparable sales on the list Valette had sent; Valette swiftly complied.

137.     Later that day, Bouvier forwarded some of Valette's documentation to the Plaintiffs' representative, with an email copied in large part from Valette's email.

138.     On June 29, 2012, Bouvier emailed Valette to ask if the sellers would try a public sale if they did not get a private buyer; Valette responded that the "sellers are extremely concerned about confidentiality – the private transaction corresponds perfectly with their mentality and their desire for absolute discretion."

139.     On June 30, 2012, Valette emailed Bouvier about the expected timing for the work to be transported to Bouvier's Geneva freeport. Bouvier emailed the next day, July 1, 2012, asking Valette to find a 1956 Ceroni catalogue "for the mid-July presentation." This email made clear to Valette that Bouvier was buying for a client, to whom he would first be presenting the work.

140.     Valette later emailed Bouvier on July 9, 2012 with advice about how best to place and stage the artwork during this presentation. Valette also wrote later that day to advise Bouvier he had obtained the Ceroni and offered to personally deliver it to Geneva himself.

141.     On July 11, 2012, Valette emailed Bouvier and Peretti, telling them and sending a photo showing that the work had arrived at Bouvier's Geneva freeport. Peretti wrote back tersely: "Call me thanks."

142.     On July 24, 2012, Valette emailed Bouvier another long, formal email, describing the work and estimating that it was worth between €70 million to €90 million or "maybe more."

By this point in time, Valette had already arranged for delivery of the sculpture to Bouvier's freeport. Valette forwarded this email to Peretti, with the cover note: "Here is the text." This formal email was yet another email intended to be forwarded to Plaintiffs.

143.    The very next day, July 25, 2012, Valette emailed a different version of this long formal email to Bouvier, this time estimating that the work was worth €80 million to €100 million. No explanation exists in this email (or any other email between Valette and Bouvier) for the significantly higher estimated price just one day later.

144.    The same day, Bouvier forwarded Valette's email to Plaintiffs' representative, invoking Sotheby's valuation of the work in the €80 million to €100 million as authoritative and suggesting that he would get a similar valuation from Christie's. Bouvier never provided Plaintiffs with any valuation from Christie's.

145.    On September 24, 2012, Valette sent Bouvier a contract of sale for the work for €31.5 million. It is notable that Sotheby's and Valette were willing to sell to Bouvier for a fraction of what they had told him they estimated the work to be worth, suggesting again either that the valuation was false or that Sotheby's was willing to violate its duty to its sellers and shareholders to maximize the sale price of the artworks it sold.

146.    In December 2012, months after receiving a contract of sale for the *Tete* for €31.5 million, Bouvier falsely told Plaintiffs he was engaged in negotiations with the sellers of this work, including saying that the sellers wanted a "minimum price" of €65 million for the work, suggesting he might be able to make a personal investment of some of the purchase price in order to get the deal done, and offering to waive his commission fee in order to clinch the deal at €36.5 million plus a Degas painting, *Danseuse en Rose*, owned by Plaintiffs.  On December 28, 2012, Bouvier wrote to Sazonov, "[t]he offer of 36.5 + Degas was refused with no possible

discussion. After discussions, I finally had to settle on 37.5 E + Degas, so as not to blow the deal." Sazanov responded, "Wow. Well negotiated." Plaintiffs ultimately paid Bouvier €37.5 million plus the Degas for the work. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs €6 million more for this work than he paid for it, plus the Degas painting. Bouvier kept the Degas, further establishing the falsity of his representations to Sazanov that the seller was demanding the painting. Plaintiffs also paid €500,000 in commission fees to Bouvier.

147. A year later, on August 4, 2014, Plaintiffs were attempting to purchase another painting, Rothko's *No. 6*, through Bouvier. Bouvier falsely stated to Plaintiffs that the sellers of the Rothko would sell the painting for €80 million plus Modigliani's *Tête* valued at €60 million, for what Bouvier told Plaintiffs was a total purchase price for the Rothko of €140 million. This followed another series of fabricated negotiations that Bouvier misrepresented to Plaintiffs had occurred with the Rothko sellers.

148. That was all false: the Rothko sellers had never expressed any interest in *Tête*. Bouvier actually bought the Rothko for $83.5 million on August 12, 2014.

149. Moreover, Bouvier, Peretti, Valette, and Sotheby's Chief of Operations Bruno Vinciguerra had secretly arranged without Plaintiffs' knowledge that Sotheby's would sell *Tête* at auction in New York. A consignment agreement was signed between Bouvier and Sotheby's on September 11, 2014.

150. In an email titled "Modi terms" and dated November 3, 2014, Vinciguerra wrote to Peretti, copying Valette, documenting that Sotheby's "will pay you $25 mil tomorrow" if a specified client won the auction, in installments of $15 million and $10 million. This appears to be a highly unusual transaction, as Sotheby's is supposed to protect the anonymity of buyers and sellers in its auctions.

151. On November 4, 2014, Sotheby's sold Tête at auction in New York for a "hammer price" of $63 million (a total purchase price of $70.725 million with commissions and fees).

152. Sotheby's catalogue entry for the auction did not list the sale of *Tête* to Bouvier.

153. Neither Sotheby's nor Bouvier obtained Plaintiffs' permission to sell this work at auction.

154. Sotheby's sold the work without Plaintiffs' permission despite knowing that the work was part of Plaintiffs' collection, and despite knowing that Bouvier lacked the authority to sell it. Indeed, Bouvier himself testified to the Monaco authorities regarding another artwork consigned to Sotheby's: "Sotheby's did not verify the [work]'s ownership. Mr. Valette and his team accepted to do the transaction based on my good reputation."

155. "Before offering property for sale," states Sotheby's Code of Business Conduct, "we must be satisfied that we have conducted the level of due diligence required to be satisfied that the property we are handling is authentic and that there are no known legal obstacles to selling and passing title . . . . Sotheby's standards go beyond the legal requirements." Sotheby's 2017 Annual Report also emphasizes that: "Prior to offering a work of art for sale, we perform due diligence activities to authenticate and determine the ownership history of the property being sold."

156. Bouvier has never accounted to Plaintiffs for the proceeds of the auction and has never given Plaintiffs the Rothko painting they purchased.

157. On December 4, 2014, Valette emailed Bouvier's employee to confirm that Sotheby's was sending Bouvier $15 million from the *Tête* sale.

Toulouse-Lautrec's *Au Lit: Le Baiser*

158.    On October 8, 2012, Sotheby's sold Toulouse-Lautrec's *Au Lit: Le Baiser* to Bouvier for $7.5 million. Valette signed the contract on behalf of Sotheby's.

159.    On December 11, 2012, Valette emailed Peretti information about the work—since Bouvier had already purchased this work, the information was clearly designed for someone else. The Sotheby's transaction list omitted the October 2012 sale to Bouvier that Valette had brokered.

160.    On February 14, 2013, Valette sent the same information to Bouvier.

161.    This coincided with Bouvier's efforts to defraud Plaintiffs into overpaying him for this work. Throughout February 2013, Bouvier falsely represented to Plaintiffs a series of fabricated negotiations with the work's sellers.

162.    Plaintiffs paid Bouvier €13.75 million for this work (approximately $18.4 million), believing it was the true purchase price. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs approximately $10.9 million more for this work than he paid for it, i.e. a markup of 145.33%. Plaintiffs also paid Bouvier a commission of €275,000 for his work in negotiating the sale.

163.    On December 18, 2014, Valette sent Bouvier a formal email about the work, indicating that Sotheby's recommended selling it in London rather than New York. The formal tone of this email suggests it was written to be forwarded to Plaintiffs. The auction catalogue entry Valette later sent Bouvier for this work omitted the 2012 sale to Bouvier for $7.5 million from the transaction history and instead valued the work at $15.68 million to $23.52 million (or €12.59 million to €18.89 million)—tracking what Plaintiffs had paid. Valette sent this catalogue entry to Bouvier with another formal email cover note, clearly designed to be forwarded.

29

164. On February 17, 2015, Valette sent Bouvier another formal email with a breakdown of fees and costs for an estimated sales price of £9 million. The formal tone of this email suggests that it too was designed to be forwarded to Plaintiffs.

165. On March 18, 2015, Bouvier emailed Valette to request as soon as possible an accounting with specific numbers for the February sale of this work, explaining he needed to be able to show an adjudication of a debt. Valette quickly delivered the requested information.

<u>Da Vinci's *Christ as Salvator Mundi*</u>

166. *Christ as Salvator Mundi* is one of approximately 15 authenticated paintings by Leonardo da Vinci that exist today.

167. On March 11, 2013, Bouvier emailed Valette to ask his colleague Alexander Bell, Sotheby's Co-Chairman of Old Master Paintings, about the price for the work and to tell him "he has a client."

168. Valette arranged for the painting to be shown to Rybolovlev in person in his Central Park West apartment in New York on March 22, 2013. Both Valette and Bouvier were present at this showing.

169. On March 24, 2013, Valette told one of the da Vinci sellers that "the Russian" (*i.e.* Rybolovlev) wanted to pay less than $100 million.

170. On March 27, 2013, one of the da Vinci sellers wrote to the others that he had spoken with Valette, who told him "the client wants a meeting in Paris on 10 April with his #1 advisor, Sam, and me . . . Sam knows the advisor well and has dealt with him before . . . Advisor has the ability to close and this is the way Sam has always dealt with them…Sam said this meeting and agreeing is their standard mode."

171.    On April 10, 2013, Valette, Bouvier, and one of the da Vinci sellers met as planned in Paris. During that meeting, Bouvier offered to buy the da Vinci for $68 million plus another painting valued at $12 million.

172.    On April 10 and 11, 2013, however, Bouvier had an email exchange with Plaintiffs' representative, in which he described hard-nosed negotiations to purchase *Salvator Mundi* on Plaintiffs' behalf. Bouvier claimed that Plaintiffs' $100 million offer was "rejected without a moment's hesitation," and that the seller was "[o]ne tough nut, but I'll fight and take as long as necessary." Bouvier later said that a deal was "clinched" at $127.5 million—"[t]erribly difficult, but it's a very good deal with regard to this unique masterpiece by Leonardo."

173.    All of these representations were false. The negotiations were fabricated.

174.    On May 2, 2013, Bouvier paid $83 million to buy the work from Sotheby's.

175.    On May 3, 2013, Bouvier sent Plaintiffs an invoice for $127.5 million. Relying on Bouvier's representation that this was the true purchase price, Plaintiffs paid Bouvier this amount. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $44.5 million more for this work than he paid for it, i.e. a markup of 53.62%. Plaintiffs also paid Bouvier $1.275 million in commission.

176.    Bouvier secretly paid Rappo a $4.92 million kickback on this transaction. This payment was kept secret from Plaintiffs.

177.    A year later, on March 3, 2014, Sotheby's Chief of Operations Bruno Vinciguerra emailed Valette and Peretti an article from *The New York Times* stating the *Salvator Mundi* had been sold privately for over $75 million. There was no cover note.

178.    In November 2014, Plaintiffs and Rybolovlev became aware of this article in *The New York Times*.

179.    Plaintiffs began to suspect Bouvier had defrauded them. Plaintiffs' representative confronted Bouvier. Bouvier said the media underreported the price because the total price included various fees and commissions of which the media was not aware.

180.    It has been publicly reported that Bouvier's text messages, produced in the criminal proceedings against him in France, reveal that Bouvier then texted Peretti: "I am in the shit. He does not have cash and wants to place all Picasso and Rodin for public sale. [...] We will talk about that tomorrow."

181.    In December 2014, Plaintiffs discovered the true purchase price of *Nu Couché au Coussin Bleu*. At that point, Plaintiffs became certain Bouvier had defrauded them.

182.    In January 2015, after Plaintiffs' representative confronted him, Bouvier contacted Valette to request that Sotheby's appraise *Salvator Mundi*. Sotheby's agreed.

183.    On January 27, 2015, Valette emailed Bouvier a draft valuation for the work for $100 million and a cover letter from Alexander Bell indicating that Bouvier had acquired the work in 2013. Valette asked Bouvier in his cover email to let him know if this worked for him.

184.    On January 28, 2015, Valette sent Bouvier a revised valuation of the work for €100 million. Converting the price into euros brought the value much closer to the price Bouvier had charged Plaintiffs for the work. Valette also forwarded a new letter from Bell which omitted the 2013 sale to Bouvier.

185.    Sotheby's knew Bouvier was trying to justify the fraudulent price he charged Plaintiffs, and it chose to help him do so.

186.    On November 21, 2016, Sotheby's filed an action seeking a declaratory judgment that it did not breach its obligations to the sellers of *Salvator Mundi. Sotheby's, Inc. v. R.W. Chandler, LLC et al.*, No. 16-CV-9043 (S.D.N.Y.). (The case was quickly resolved by a

confidential settlement unavailable to Plaintiffs or to the public.) In that action, Sotheby's claimed it was unaware of Bouvier's relationship with Rybolovlev when it arranged for Rybolovlev to view *Salvator Mundi*. Sotheby's has also claimed in correspondence that Rybolovlev was "completely unknown" to it.

187.    As set forth above, and in violation of its own Code of Business Conduct and requirement to "cooperate fully and honestly with any investigation" into a violation of its "internal rules," Sotheby's claim to have no knowledge of Rybolovlev is demonstrably false, based on all of the statements Valette made, and all of the documented history of Sotheby's deliberately aiding and abetting Bouvier's fraud on Plaintiffs.

188.    Moreover, Sotheby's arranged for Rybolovlev to view the da Vinci in his apartment at 15 Central Park West. When the apartment was purchased for $88 million in 2011, it was the most expensive individual purchase of an apartment ever in New York City. The connection between the apartment and the Rybolovlev family was widely reported in the press and is common knowledge. It is inconceivable that Sotheby's would arrange a viewing of one of the world's most valuable masterworks in one of the world's most expensive apartments, in the presence of the person widely reported by the press to be the apartment's owner and entirely for his benefit, without knowing who he was.

Gauguin's <em>Otahi</em>

189.    On October 24, 2014, Valette sent Bouvier a valuation of Paul Gauguin's *Otahi (Alone)* at $120 million. The valuation is addressed to Mr. Confidential Client One Hundred and Thirty Four and is signed by Valette.

190.    On February 19, 2015, Valette emailed a new version of the valuation to Bouvier, writing in his cover email: "Here is the new document concerning the magnificent Gauguin."

The new valuation attached to this email lists the value of the work at $140 million. No explanation is provided in this email or in any other email between Valette and Bouvier to justify the price increase, but it is clear from the cover note that it was done at Bouvier's request, likely by phone.

191.     Bouvier had charged Plaintiffs €120 million, plus approximately €2.4 million in commission, for *Otahi* in 2013. At the exchange rates at the time Valette sent the valuation, €120 million was approximately equal to $140 million.

192.     Plaintiffs do not know the price Bouvier paid for this painting.

193.     The transaction history listed in both the Sotheby's valuations omits the sale to Bouvier.

### *Sotheby's Functions as One Single Entity*

194.     Sotheby's dominates and controls its wholly owned foreign subsidiaries and functions as a single integrated global business, supervised from New York. Sotheby's used such domination to commit the wrongful acts that injured Plaintiffs. The wholly owned foreign subsidiaries are mere instrumentalities of Sotheby's wrongdoing.

195.     Sotheby's describes its wholly owned foreign subsidiaries as "offices" or "locations," not as independent entities.

196.     Sotheby's has one chief executive officer, one worldwide general counsel, one global head of compliance, one director of communications—all based in its New York headquarters. Its website, branding, marketing materials, and letterhead are the same around the world.

197.     Sotheby's maintains consolidated financial statements. Its wholly owned foreign subsidiaries are not treated as independent profit and loss centers, and do not deal at arms-length

34

with each other. On information and belief, Sotheby's transfers assets between its wholly owned foreign subsidiaries. The subsidiaries do not have their own executives and do not appoint their own leadership. Rather, Sotheby's is centrally managed from New York.

198.    In some of the transactions that Sotheby's arranged for Bouvier, including the *Salvator Mundi* sale, the contracts were signed by Sotheby's, Inc. In others, the contracts were signed by one of Sotheby's wholly owned foreign subsidiaries, which Sotheby's dominates and controls.

199.    Irrespective of which subsidiaries technically employ Valette and Bell, Valette and Bell were acting on behalf of Sotheby's, Inc. during their dealings with Bouvier. As Valette's title reflects—Vice Chairman of Private Sales Worldwide—he is empowered to act and does act on behalf of Sotheby's and all of its subsidiaries.

200.    Sotheby's, Inc. has repeatedly acknowledged as much. For example, as it explained in its declaratory judgment complaint filed in this Court, Valette and Bell negotiated the *Salvator Mundi* deal on behalf of Sotheby's, Inc. with Bouvier and the sellers of that painting.

201.    In the declaratory judgment complaint, Sotheby's, Inc. described Valette as its employee.

202.    In an affidavit filed in other proceedings in this Court, a Sotheby's executive has testified that Valette "managed" the relationship between Sotheby's, Inc. and Bouvier. Declaration of Aimee Scillieri (ECF No. 153), *In re Application of Accent Delight Int'l*, No. 16-MC-125 (S.D.N.Y. Mar. 13, 2018).

203.    Sotheby's subsidiaries, Vinciguerra, Valette, and Bell were instrumentalities of Sotheby's wrongful conduct.

204.     To date, Sotheby's has not terminated Valette's employment or, to Plaintiffs' knowledge, disciplined him in any way.

205.     Sotheby's failure to discipline Valette mocks its own Code of Business Conduct. According to that Code, "Sotheby's regards violation of the law and of this Code as a serious matter . . . . Discipline for Code violations . . . can range from reprimand to termination of employment."

206.     The Code further states: "Be alert when you hear yourself or somewhere else say: 'Everybody else in the art world does it.' 'No one will find out.' 'It's more expensive to do it that way.' 'I was told to do it.' If you have doubt about what to do in a particular situation, ask yourself: 'Is it legal?' 'Is it fair?' 'Would this action hold up under scrutiny by others?' 'What would this look like if reported on the front page of a major news publication?' 'Is it a violation of Sotheby's Code or other Policy?'"

207.     Sotheby's massively and in wholesale fashion violated its own ethical code.

**FIRST CLAIM**
**Aiding and Abetting Fraud**

208.     Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

209.     Sotheby's had actual knowledge that Bouvier was defrauding Plaintiffs. Sotheby's and Bouvier had an intimate business relationship for years. Sotheby's knew Bouvier was Plaintiffs' agent. Sotheby's knew the price that Bouvier obtained in transactions it brokered. Yet, Sotheby's sent Bouvier emails designed to get Plaintiffs to pay inflated prices for other works. And Sotheby's gave Bouvier materially misleading appraisals on demand. These appraisals deliberately omitted Bouvier's acquisitions of the works in the provenance history to conceal the real seller and to create the false impression that Plaintiffs paid fair prices.

210.     Sotheby's provided substantial assistance to Bouvier, causing injury to Plaintiffs. Sotheby's affirmatively assisted Bouvier by arranging for him to acquire artworks at certain prices that the sellers were willing to accept, and by sending him emails intended to help him convince Plaintiffs to pay Bouvier fraudulently inflated prices. Sotheby's helped Bouvier conceal his fraud by providing materially misleading appraisals that falsely suggested the artworks were worth what Plaintiffs paid for them.

211.     As a result of Sotheby's aiding and abetting Bouvier's fraud, Plaintiffs have sustained damages in an amount to be determined at trial but not less than $380,000,000 plus interest.

212.     Sotheby's conduct was willful, wanton, reckless, and intentional.

## SECOND CLAIM
### Aiding and Abetting Breach of Fiduciary Duty

213.     Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

214.     Sotheby's knowingly participated in Bouvier's breach of his fiduciary obligations by providing him with substantial assistance. Bouvier was Plaintiffs' fiduciary. Bouvier held himself out as a skilled expert in the art market. Plaintiffs relied on Bouvier to provide them with strategic advice about the art market and to negotiate high-stakes transactions on their behalf. Plaintiffs had confidence in Bouvier because of their years of business dealings and because of Rappo's personal connection to Rybolovlev.

215.     Bouvier breached his fiduciary duties to Plaintiffs by acting disloyally and contrary to Plaintiffs' interests. Rather than act on Plaintiffs' behalf to acquire artworks at fair, negotiated prices that sellers were willing to accept, Bouvier seized those opportunities for his own benefit. He then harmed Plaintiffs' interests by charging them inflated prices on the basis of false representations.

37

216.     Sotheby's knew that Bouvier was Plaintiffs' agent and that Plaintiffs relied on his counsel. It strategized to sell Plaintiffs art through Bouvier and approached Bouvier about new opportunities for Plaintiffs. By brokering sales to Bouvier at certain prices, sending Bouvier emails designed to encourage Plaintiffs to pay inflated prices, misleadingly appraising works at inflated prices, and omitting Bouvier's acquisitions of the works in the provenance history to conceal the real seller, Sotheby's participated in Bouvier's breach of his fiduciary duties to Plaintiffs.

217.     As a result of Sotheby's aiding and abetting Bouvier's breach of fiduciary duty, Plaintiffs have sustained damages in an amount to be determined at trial but not less than $380,000,000 plus interest.

218.     Sotheby's conduct was willful, wanton, reckless, and intentional.

### THIRD CLAIM
**Breach of Contract – Declaratory Judgment**

219.     Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

220.     In December 2016, Plaintiffs and Sotheby's (including its New York, English, Swiss and Austrian subsidiaries) entered into a one-year written Tolling Agreement.

221.     The Tolling Agreement contains a New York choice of law clause and an exclusive New York forum selection clause.

222.     Among other things, the Tolling Agreement required each party to the agreement to "provide 14 days written notice ("Notice of Suit"), as provided in paragraph 8 [of the Tolling Agreement,] prior to filing or commencing any litigation or other legal proceeding against any other party" based on claims or defenses "arising out of the direct or indirect involvement of Sotheby's with Yves Bouvier." Tolling Agreement ¶¶ 3, 1.

223. Paragraph 8 of the Tolling Agreement, referred to above, states: "All notices required hereunder shall be in writing and shall be deemed duly given on (1) business day after being sent at the address given below by reputable overnight courier service (charges prepaid), as follows: If to the Collectors [Plaintiffs]: c/o Daniel J. Kornstein, Esq., Emery Celli Brinckerhoff & Abady LLP, 600 Fifth Avenue, 10th Floor, New York, NY 10020."

224. Sotheby's filed a civil proceeding in Geneva, Switzerland on November 17, 2017 against Plaintiffs (among others) without complying with the notice provision of the Tolling Agreement quoted above. The purpose of this filing was to invoke the international Lugano Convention to block a contemplated suit by Plaintiffs in the United Kingdom. Under the Lugano Convention, if a suit is filed in a signatory country—such as Switzerland—and if another suit involving the same cause of action and between the same parties is filed in a court in a second signatory country, the second jurisdiction must stay its proceedings until jurisdiction in the first court has been established. Once the jurisdiction of the first court has been established, the proceedings in the second court must be dismissed.

225. As Sotheby's has stated in its Form 10-Q filed with the Securities and Exchange Commission, it filed the Swiss conciliation proceeding "in response to the stated intent of [Plaintiffs] to initiate litigation in the U.K."

226. Sotheby's did not give any advance notice of any kind that it was filing a civil action in Switzerland, much less 14 days written notice sent by overnight courier service to Plaintiffs' counsel.

227. Plaintiffs have abided by the terms of the Tolling Agreement.

228. Sotheby's breached the Tolling Agreement.

229.     Plaintiffs are entitled to a judgment declaring that Sotheby's breached the Tolling Agreement.

## FOURTH CLAIM
### Breach of Contract – Damages

230.     Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

231.     As a result of Sotheby's breach of the Tolling Agreement, Plaintiffs have sustained damages, in the form of legal fees in the course of responding to the improperly filed civil proceeding in Switzerland.

## FIFTH CLAIM
### Breach of Contract – Injunction

232.     Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

233.     As a result of Sotheby's breach of the Tolling Agreement, Plaintiffs are entitled to a mandatory injunction directing Sotheby's, its agents and employees, and the wholly owned subsidiaries under its control to withdraw the improperly brought Swiss civil proceeding.

234.     Sotheby's improperly filed the civil suit in Switzerland in order to use the Lugano Convention to block Plaintiffs from suing Sotheby's in the United Kingdom, which is a signatory to the Lugano Convention, thereby improperly depriving Plaintiffs of their choice of jurisdiction.

235.     As a result, Plaintiffs have suffered irreparable harm for which monetary damages are an inadequate remedy.

WHEREFORE, Plaintiffs demand judgment as follows:

a.     On the first and second claims, directing Defendants to pay to Plaintiffs compensatory damages in an amount to be determined at trial, but in any event no less than $380,000,000 plus interest;

b.        On the first and second claims, directing Defendants to pay to Plaintiffs punitive damages in an amount to be determined at trial;

c.        On the third claim, declaring that Defendants breached the Tolling Agreement;

d.        On the fourth claim, directing Defendants to pay to Plaintiffs compensatory damages in an amount to be determined at trial, including the attorney's fees and related costs expended by Plaintiffs in responding to the improperly brought Swiss civil proceeding;

e.        On the fifth claim, preliminarily and permanently enjoining Defendants, their subsidiaries under their control, and their agents and employees, to withdraw the Swiss civil proceeding filed on November 17, 2017; and

f.        Awarding Plaintiffs costs, disbursements, and such other and further relief as the Court may deem just and proper.

Dated:  November 21, 2018
        New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        & ABADY LLP


                                        /s/
                                        Daniel J. Kornstein
                                        O. Andrew F. Wilson
                                        Zoe Salzman
                                        Douglas E. Lieb

                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020
                                        (212) 763-5000

                                        *Attorneys for Plaintiffs*

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ACCENT DELIGHT INTERNATIONAL LTD. and XITRANS FINANCE LTD., <br><br>                    Plaintiffs, <br><br>         v. <br><br> SOTHEBY'S and SOTHEBY'S, INC., <br><br>                    Defendants. | No. 1:18-cv-09011-JMF-RWL |

**ANSWER AND JURY DEMAND OF
DEFENDANTS SOTHEBY'S AND SOTHEBY'S, INC.**

Defendants Sotheby's and Sotheby's, Inc. (collectively, "Sotheby's"),[1] by and through their undersigned counsel, answer the Amended Complaint (the "Amended Complaint") filed by Plaintiffs Accent Delight International Ltd. and Xitrans Finance Ltd. (collectively, "Plaintiffs") on November 21, 2018, as follows:

The headings of the Amended Complaint set forth Plaintiffs' characterization of this action, to which no response is required. To the extent a response is required to the headings of the Amended Complaint, the allegations in the headings of the Amended Complaint are denied.

**NATURE OF THE ACTION**

1.      Denies the allegations in paragraph 1 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding

---

[1] The Amended Complaint generally uses the word Sotheby's without specifying the specific entity to which any particular allegation applies, and it is apparent that in multiple instances the word is used to reference an entity that is not one of the two Defendants in this action. This Answer uses the defined term "Sotheby's" to refer to the two Defendants in this action.

Plaintiffs' corporate structure, Plaintiffs' relationship to Yves Bouvier,[2] or any alleged

defrauding of Plaintiffs by Bouvier, and avers as follows:  Although Sotheby's and its affiliated

entities were generally aware that Bouvier could either be the ultimate purchaser, or one of a

group of investors, or purchasing with the intent to resell to another, Sotheby's and its affiliated

entities at no point knew what Bouvier ultimately planned to do with any work of art he acquired

in a transaction brokered by Sotheby's, Inc. or its affiliated entities.  Nor did Sotheby's or its

affiliated entities know the price that Bouvier planned to later charge for any work of art, if he

did decide to re-sell it.  While Sotheby's and its affiliated entities later learned through press

reports, court filings, and other means that Bouvier subsequently sold certain pieces to Dmitry

Rybolovlev by way of Plaintiffs, Sotheby's and its affiliated entities were not aware of any re-

sales at the time they took place; nor did Sotheby's or its affiliated entities know the prices that

Plaintiffs claim Bouvier charged them at the time of such re-sales.  If Bouvier defrauded

Plaintiffs or breached any fiduciary duty to them, Sotheby's and its affiliated entities had no

knowledge of any such fraud or breach of fiduciary duty, and have no liability whatsoever to

Plaintiffs.

     2.      Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 2 of the Amended Complaint.

     3.      Denies the allegations in paragraph 3 of the Amended Complaint, except denies

knowledge or information sufficient to form a belief as to the truth of the allegations regarding

Plaintiffs' relationship to Bouvier and any alleged defrauding of Plaintiffs by Bouvier.

---

[2] Consistent with Plaintiffs' definition of "Bouvier" set forth in paragraph 12 of the Amended Complaint, for purposes of this Answer the term "Bouvier" refers to Yves Bouvier and persons and entities acting on his behalf and under his control.

4.      Denies the allegations in paragraph 4 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding Plaintiffs' relationship to Bouvier and any alleged defrauding of Plaintiffs by Bouvier.

## PARTIES

5.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 of the Amended Complaint.

6.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6 of the Amended Complaint.

7.      Denies the allegations in the first sentence of paragraph 7 of the Amended Complaint, except admits that Defendant Sotheby's is a publicly traded corporation incorporated under the laws of Delaware with its principal place of business at 1334 York Avenue, New York, New York.  Denies the allegations in the second sentence of paragraph 7 of the Amended Complaint, except admits that Defendant Sotheby's is affiliated with and a successor to its original auction house business founded in 1744, and is in the business of brokering and facilitating sales of, among other things, fine and decorative art, jewelry, and collectibles, among other lines of business.  Denies the allegations in the third sentence of paragraph 7 of the Amended Complaint, except admits that Sotheby's, Inc. and its affiliated entities provide their clients with professional appraisals of artworks by experts, among other client services.  Denies the allegations in the fourth sentence of paragraph 7 of the Amended Complaint, except admits that Defendant Sotheby's and its affiliated entities do business as one of the world's oldest and most prestigious art auction houses.  Denies the allegations in the fifth sentence of paragraph 7 of the Amended Complaint.

8.     Admits the allegations in paragraph 8 of the Amended Complaint, but avers that the accurate quotations from the referenced excerpts of the Sotheby's Code of Business are: (1) "your guide to conducting our business with integrity and in keeping with our core values. Sotheby's is committed to operating with clear and firm ethical standards every day, at every auction, in every transaction, no matter where we are"; and (2) "Directors, Officers and managers are required to:  Serve as models of ethical behavior and lead by setting a positive example."

9.     The allegations in paragraph 9 of the Amended Complaint state conclusions of law to which no response is required.  To the extent a response is required, denies the allegations in paragraph 9 of the Amended Complaint, except admits that Defendant Sotheby's, Inc. is an indirect, wholly-owned subsidiary of Defendant Sotheby's.

## JURISDICTION AND VENUE

10.     The allegations in paragraph 10 of the Amended Complaint state conclusions of law to which no response is required.  To the extent a response is required, denies knowledge or information sufficient to form a belief as to Plaintiffs' citizenship.

11.     The allegations in paragraph 11 state conclusions of law to which no response is required.

## FACTS

12.     Denies the allegations in the first and third sentences of paragraph 12 of the Amended Complaint.  The second sentence of paragraph 12 of the Amended Complaint creates a defined term to which no response is required, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding what persons or entities have acted on Bouvier's behalf and/or under his control.

4

*Bouvier's Fraudulent Scheme*

13.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the Amended Complaint.

14.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 14 of the Amended Complaint.

15.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 15 of the Amended Complaint.

16.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 16 of the Amended Complaint.

17.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 17 of the Amended Complaint.

18.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 18 of the Amended Complaint.

19.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 19 of the Amended Complaint.

*Plaintiffs Attempt to Bring Bouvier to Justice*

20.     The allegations in the first sentence of paragraph 20 of the Amended Complaint state conclusions of law to which no response is required.  To the extent a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 20 of the Amended Complaint.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of paragraph 20 of the Amended Complaint.

21.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21 of the Amended Complaint.

22.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22 of the Amended Complaint.

23.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 23 of the Amended Complaint.

24.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 of the Amended Complaint.

### *Sotheby's Aids and Abets Bouvier's Fraud*

25.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of the Amended Complaint.

26.     Denies the allegations in paragraph 26 of the Amended Complaint, except admits that the quotations contained in the second and fourth sentences of the paragraph were included in the brief referenced in the third sentence of the paragraph, and avers that the quotation contained in the second sentence of the paragraph should have instead provided that "Sotheby's, Inc. and/or its affiliated entities facilitated the sale of 12 of the 38 [w]orks to Bouvier and consigned for auction 2 of the [w]orks on Bouvier's behalf (1 of which Sotheby's UK previously sold him), while Sotheby's UK conducted valuations for 5 of the [works] (3 of which it and/or its affiliated entities previously sold him)."

27.     Denies the allegations in paragraph 27 of the Amended Complaint.

28.     Denies the allegations in paragraph 28 of the Amended Complaint and avers that Sotheby's, Inc. and affiliated entities filed a joint submission with Bouvier in a civil proceeding in Geneva, Switzerland in November 2017 and that it seeks in that proceeding a judgment

declaring that it has no liability whatsoever to the defendants in the proceeding (which include Plaintiffs). Further avers as follows: Although Sotheby's and its affiliated entities were generally aware that Bouvier could either be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to resell to another, Sotheby's and its affiliated entities at no point knew what Bouvier ultimately planned to do with any work of art he acquired in a transaction brokered by Sotheby's, Inc. or its affiliated entities. Nor did Sotheby's or its affiliated entities know the price that Bouvier planned to later charge for any work of art, if he did decide to re-sell it. While Sotheby's and its affiliated entities later learned through press reports, court filings, and other means that Bouvier subsequently sold certain pieces to Rybolovlev by way of Plaintiffs, Sotheby's and its affiliated entities were not aware of any re-sales at the time they took place; nor did Sotheby's and its affiliated entities know the prices that Plaintiffs claim Bouvier charged them at the time of such re-sales. If Bouvier defrauded Plaintiffs or breached any fiduciary duty to them, Sotheby's and its affiliated entities had no knowledge of any such fraud or breach of fiduciary duty, and have no liability whatsoever to Plaintiffs.

29.    Denies the allegations in paragraph 29 of the Amended Complaint, except admits that Samuel Valette has the title and specialty referenced in the paragraph and that he maintained a professional business relationship with Bouvier over several years.

30.    Denies the allegations in the first and second sentences of paragraph 30 of the Amended Complaint. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 30 of the Amended Complaint.

31.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 31 of the Amended Complaint.

32.     Denies the allegations in paragraph 32 of the Amended Complaint, except admits that Alexander Bell and Bruno Vinciguerra communicated on one or more occasions with Bouvier and his affiliate Jean-Marc Peretti and that their titles are accurately listed.

33.     The allegations in paragraph 33 of the Amended Complaint state conclusions of law to which no response is required.  To the extent a response is required, denies the allegations in paragraph 33 of the Amended Complaint, and avers that during the time period covered in the Amended Complaint, Vinciguerra was employed by Defendant Sotheby's, and Bell and Valette were employed by Sotheby's United Kingdom-based affiliate, Sotheby's ("Sotheby's UK").

34.     Admits the allegations in the first sentence of paragraph 34 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 34 of the Amended Complaint, except admits that Bouvier was at one time a major player in the art world.  Admits the allegations in the third sentence of paragraph 34 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Bouvier continues to be associated with freeport businesses where fine art can be stored tax-free.  Denies the allegations in the fourth sentence of paragraph 34 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding Bouvier's interactions with Plaintiffs concerning any work of art that Bouvier acquired in a transaction brokered by Sotheby's, Inc. or its affiliated entities, and avers that Sotheby's, Inc. and its affiliates earned fees with respect to the 14 transactions identified in the Amended Complaint as negotiated and agreed on a transaction-by-transaction basis, as Sotheby's, Inc. and its affiliates do for any transaction they broker.  Denies the allegations in the fifth sentence of paragraph 34 of the Amended Complaint.

35.     Denies the allegations in paragraph 35 of the Amended Complaint, except admits that Bouvier was formerly a business contact of Sotheby's and its affiliated entities.

36.     Denies the allegations in paragraph 36 of the Amended Complaint and avers that Sotheby's, Inc.'s and its affiliated entities' contractual confidentiality obligations to Bouvier's affiliated entity Blancaflor prevented them from providing the documents Plaintiffs sought in their proceeding under 28 U.S.C. § 1782 absent court order, and that Sotheby's, Inc. provided those documents to Plaintiffs pursuant to such order.

37.     Denies the allegations in paragraph 37 of the Amended Complaint.

38.     Denies the allegations in paragraph 38 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding what Plaintiffs relied upon or believed in connection with their relationship to Bouvier.

39.     Denies the allegations in paragraph 39 of the Amended Complaint.

Picasso's <em>L'Homme Assis Au Verre</em>

40.     Denies the allegations in paragraph 40 of the Amended Complaint.

41.     Admits the allegations in the first sentence of paragraph 41 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 41 of the Amended Complaint, except admits that certain emails exchanged between Valette and Bouvier in March 2011 contained the less formal word "tu" to connote "you," and were signed using first names.

42.     Denies the allegations in paragraph 42 of the Amended Complaint, except admits that on March 18, 2011 Valette emailed Bouvier and Peretti a cataloguing for the artwork and that in sum and substance the translation contained in the paragraph of the excerpted portion of the email into English is accurate.

43.    Admits the allegations in paragraph 43 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portions of the email into English are accurate.

44.    Denies the allegations in paragraph 44 of the Amended Complaint, except admits that Valette emailed Bouvier on March 23, 2011, that in sum and substance the translation contained in the first sentence of the paragraph of the excerpted portion of the email into English is accurate, and that the quotation from the Sotheby's Code of Business Conduct contained in the second sentence of the paragraph is accurate.

45.    Denies the allegations in paragraph 45 of the Amended Complaint, except admits that Valette emailed Bouvier on March 24, 2011 and included a detailed description of the work, and that in sum and substance the translation of the excerpted portion of the email into English is accurate.

46.    Denies the allegations in paragraph 46 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations concerning whether Bouvier forwarded Valette's description of the work to Plaintiffs' representative.

47.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47 of the Amended Complaint.

48.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48 of the Amended Complaint.

49.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 49 of the Amended Complaint.

50. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 50 of the Amended Complaint, except admits that Sotheby's, Inc.'s Switzerland-based affiliate Sotheby's S.A. brokered the sale of Picasso's *L'Homme Assis Au Verre* to Bouvier's affiliated entity Blancaflor on April 1, 2011 for $62 million. Denies the allegations in the second sentence of paragraph 50 of the Amended Complaint, except admits that Valette signed the contract of sale on behalf of Sotheby's S.A. Denies the allegations in the third sentence of paragraph 50 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether or what Bouvier charged Plaintiffs for the work and what any corresponding markup was.

51. Denies the allegations in paragraph 51 of the Amended Complaint, except admits that Valette emailed Bouvier on April 8, 2011 attaching a letter in Word discussing the artwork addressed to "M. Yves Bouvier" and containing the more formal word "vous" to connote "you," and that in sum and substance the translation of the excerpted portion of Valette's email into English is accurate.

52. Denies the allegations in paragraph 52 of the Amended Complaint, except admits that approximately one hour later Valette emailed Bouvier the letter discussing the work in PDF, and that in sum and substance the translation of the excerpted portion of the email into English is accurate.

### Malliol's [sic] *La Méditerranée*

53. Admits the allegations in paragraph 53 of the Amended Complaint, except avers that the correct spelling of the artist's name is Maillol, and with the qualification that, with

11

respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portion of the email into English is accurate.

54.      Admits the allegations in paragraph 54 of the Amended Complaint, except avers that the correct spelling of the artist's name is Maillol.

55.      Denies the allegations in paragraph 55 of the Amended Complaint, except admits that Valette also emailed Bouvier a cataloguing for the work in Word.

56.      Denies the allegations in paragraph 56 of the Amended Complaint, except admits that on April 14, 2011, Bouvier agreed to buy the work for €5.7 million in a sale brokered by Sotheby's, Inc., and that Sotheby's, Inc. signed the sales agreement for the work.

57.      Denies the allegations in paragraph 57 of the Amended Complaint, except admits that Valette emailed Bouvier two letters in PDF format on April 14, 2011 for the Maillol and Rodin's *Le Baiser*, confirming their location in New York; admits that in sum and substance the translation of the first, third, and fourth sentences of the excerpted portion of the email into English is accurate; and avers that the correct spelling of the artist's name is Maillol and that the correct translation of the second sentence of the excerpted portion of the email into English is that "[t]he two artworks are currently at Sotheby's in New York."

58.      Denies the allegations in paragraph 58 of the Amended Complaint, except admits that on April 15, 2011, an employee of Sotheby's UK provided Bouvier with additional references about the work.

59.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 59 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 59 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding

whether and what Bouvier charged Plaintiffs for the work and what any corresponding markup was.

60.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60 of the Amended Complaint.

Rodin's <em>Le Baiser</em>

61.     Admits the allegations in paragraph 61 of the Amended Complaint.

62.     Denies the allegations in paragraph 62 of the Amended Complaint, except admits that Bouvier emailed Valette on April 9, 2011, that in sum and substance the translation of the excerpted portions of the email into English is accurate, and that Valette subsequently responded with the information Bouvier requested.

63.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63 of the Amended Complaint.

64.     Denies the allegations in paragraph 64 of the Amended Complaint, except admits that Sotheby's, Inc. brokered the sale of Rodin's <em>Le Baiser</em> to Bouvier's affiliated entity Blancaflor on April 14, 2011 for €4.23 million and that Sotheby's, Inc. signed the contract of sale, and denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether and what Bouvier charged Plaintiffs for the work and what any corresponding markup was.

65.     Denies the allegations in paragraph 65 of the Amended Complaint, except admits that on April 14, 2011, Valette emailed Bouvier a letter in PDF format confirming the location of the work in New York, and that in sum and substance the translation of the excerpted portion of the email into English is accurate.

13

Matisse's *Nu au Châle Vert*

66.     Admits the allegations in the first sentence of paragraph 66 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 66 of the Amended Complaint, except admits that Valette's emails to Peretti contained no content, and states that the remaining allegations in the second sentence of paragraph 66 of the Amended Complaint are characterizations of Valette's emails to which no response is required and that the documents at issue speak for themselves.

67.     Denies the allegations in paragraph 67 of the Amended Complaint, except admits that on June 16, 2011 Valette emailed Bouvier various documents concerning the work, and that those documents included PDF excerpts from catalogues and a Word document describing the work.

68.     Admits the allegations in paragraph 68 of the Amended Complaint.

69.     Denies the allegations in paragraph 69 of the Amended Complaint, except admits that Bouvier forwarded an email to Valette on June 20, 2011, and that in sum and substance the translation of the excerpted portion of the email into English is accurate and relates to a request from Bouvier that he be given access to the work.

70.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 70 of the Amended Complaint, except admits that in sum and substance the translation of the excerpted portion of the email into English is accurate.

71.     Denies the allegations in paragraph 71 of the Amended Complaint, except admits that Valette responded to Bouvier later that morning, and that in sum and substance the translation of the excerpted portion of the email into English is accurate.

14

72. Admits the allegations in paragraph 72 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portion of the email into English is accurate.

73. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 73 of the Amended Complaint.

74. Denies the allegations in paragraph 74 of the Amended Complaint, except admits that Sotheby's UK brokered the sale of Matisse's *Nu au Châle Vert* to Bouvier's affiliated entity Blancaflor on June 27, 2011 for $60 million and that Valette signed the contract of sale on behalf of Sotheby's UK, and denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether and what Bouvier charged Plaintiffs for the work and what any corresponding markup was.

75. Denies the allegations in paragraph 75 of the Amended Complaint, except admits that Valette emailed Bouvier on October 24, 2014, that in sum and substance the translation of the excerpted portion of the email into English is accurate, and that Valette attached to the email an insurance valuation for the work identifying its retail replacement value at $85 million.

### Rodin's *L'Éternel Printemps*

76. Admits the allegations in paragraph 76 of the Amended Complaint.

77. Denies the allegations in paragraph 77 of the Amended Complaint, except admits that on June 16, 2011, Valette emailed Peretti noting that the seller of the work wished to sell it for $12.5 million, and that Valette's email attached a Word version of a cataloguing for the work.

78.     Denies the allegations in paragraph 78 of the Amended Complaint, except admits that Valette sent the same email and attachment to Bouvier on the same day and that in sum and substance the translation of the excerpted portion of the email into English is accurate.

79.     Denies the allegations in paragraph 79 of the Amended Complaint, except admits that Valette emailed Bouvier on June 20, 2011, that in sum and substance the translation of the excerpted portion of the email into English is accurate, and that Valette sent Bouvier a revised Word version of the cataloguing for the work.

80.     Admits the allegations in the first and third sentences of paragraph 80 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 80 of the Amended Complaint, except admits that the contract was signed by Valette on behalf of Sotheby's UK.

81.     Denies the allegations in the first sentence of paragraph 81 of the Amended Complaint, except admits that on July 11, 2011, Valette forwarded an email to Bouvier from Holli Chandler, Sotheby's UK's Business Manager of Impressionist & Modern Art, and that Chandler's email discussed arrangements to ship the work to the Rodolphe Haller Freeport in Geneva, Switzerland.  As to the second sentence of paragraph 81 of the Amended Complaint, admits that in sum and substance the translation of the excerpted portion of the email into English is accurate, but denies that the translated words "the buyer" are italicized in the original French version.  Denies the allegations in the third sentence of paragraph 81 of the Amended Complaint.

82.     Denies the allegations in paragraph 82 of the Amended Complaint, except admits that Valette later emailed Bouvier regarding access to the piece and avers that the correct

translation of the excerpted portion of the email into English is "free access to the piece which you will be able to position to your liking at Vulcan."

83.      Denies the allegations in paragraph 83 of the Amended Complaint, except admits that on July 25, 2011 Valette emailed Bouvier a PDF file of the cataloguing for the work, and that in sum and substance the translation of the excerpted portion of the email into English is accurate.

84.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first and third sentences of paragraph 84 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 84 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether and what Bouvier charged Plaintiffs for the work and what any corresponding markup was.

Giacometti's <em>Femme de Venise IX</em>

85.      Admits the allegations in the first sentence of paragraph 85 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 85 of the Amended Complaint.

86.      Admits the allegations in the first and second sentences of paragraph 86 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portion of the email into English is accurate.  Denies the allegations in the third sentence of paragraph 86 of the Amended Complaint, except admits that Valette sent a responsive email to Bouvier on October 4, 2011 and included the requested cataloguing for the work as a Word file.

87.     Admits the allegations in the first sentence of paragraph 87 of the Amended Complaint. Denies the allegations in the second sentence of paragraph 87 of the Amended Complaint, except admits that Valette signed the contract on behalf of Sotheby's UK.

88.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first and third sentences of paragraph 88 of the Amended Complaint. Denies the allegations in the second sentence of paragraph 88 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether and what Bouvier charged Plaintiffs for the work and what any corresponding markup was.

89.     Admits the allegations in paragraph 89 of the Amended Complaint, except denies that the referenced document was a "Sotheby's contract" and avers that the contract was signed by Valette on behalf of Sotheby's UK.

Magritte's <em>Le Domaine d'Arnheim</em>

90.     Admits the allegations in paragraph 90 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portion of the email into English is accurate.

91.     Denies the allegations in paragraph 91 of the Amended Complaint, except admits that Isadora Katsis emailed Bouvier on November 10, 2011, that the email, written in French, contains the less formal word "tu" and not the word "vous" to connote "you," and avers that in sum and substance the translation of the excerpted portion of the email into English is accurate.

92.     Denies the allegations in paragraph 92 of the Amended Complaint, except admits that Valette emailed Bouvier on November 11, 2011 describing Magritte's <em>Empire des Lumières</em>,

and that the email, written in French, contains the more formal word "vous" and not the word "tu" to connote "you" and is addressed to "Monsieur Bouvier" from "Sam Valette," including his title, and avers that the correct translation of the excerpted portion of the email into English is "It was a pleasure to discuss with you the current market for Surrealist artworks and those of Magritte in particular."

93.    Admits the allegations in the first and second sentences of paragraph 93 of the Amended Complaint. Denies the allegations in the third sentence of paragraph 93 of the Amended Complaint, except admits that Valette's email also estimated that the work might sell for around $40 to $60 million but did not refer to a sale at auction. Denies the allegations in the fourth and fifth sentences of paragraph 93 of the Amended Complaint, and states that Plaintiffs' allegations in those sentences are characterizations of Valette's emails to which no response is required and that the documents at issue speak for themselves.

94.    Denies the allegations in paragraph 94 of the Amended Complaint, except admits that Valette emailed Bouvier and Peretti concerning Magritte's *Le Domaine d'Arnheim* on November 11, 2011 and that Valette was trying to sell that work to Bouvier.

95.    Denies the allegations in paragraph 95 of the Amended Complaint, except admits that on November 14, 2011 Valette emailed Bouvier a revised version of the email he previously had sent him, with a change in estimate to €40 million, and states that the allegations in the fourth sentence of paragraph 95 are characterizations of Valette's emails to which no response is required and that the documents at issue speak for themselves.

96.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 of the Amended Complaint.

97.     Denies the allegations in paragraph 97 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding what Plaintiffs relied on or trusted and why they may have done so.

98.     Denies the allegations in paragraph 98 of the Amended Complaint, except admits that Chandler sent an email to Bouvier's assistant on December 2, 2011, and that in sum and substance the translation of the excerpted portion of the email into English is accurate but denies that the original French included any italicization.

99.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 99 of the Amended Complaint.

100.     Denies the allegations in the first sentence of paragraph 100 of the Amended Complaint, except admits that Sotheby's UK brokered the sale of the work to Bouvier's affiliated entity Blancaflor on December 8, 2011 for $24.1 million.  Denies the allegations in the second sentence of paragraph 100 of the Amended Complaint, except admits that Valette signed the sales agreement on behalf of Sotheby's UK.  Denies the allegations in the third sentence of paragraph 100 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether and what Bouvier charged Plaintiffs for the work and what any corresponding markup was.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of paragraph 100 of the Amended Complaint.

<u>Modigliani's *Nu Couché au Coussin Bleu*</u>

101.     Denies the allegations in paragraph 101 of the Amended Complaint, except admits that Valette emailed Bouvier and Peretti on December 21, 2011, that the email uses less

20

formal salutations, and that in sum and substance the translation of the excerpted portion of the email into English is accurate.

102.     Denies the allegations in the first sentence of paragraph 102 of the Amended Complaint, except admits that Valette emailed Bouvier on December 23, 2011, and that the translation into English of the excerpted portion of the email is in sum and substance accurate. Denies the allegations in the second sentence of paragraph 102 of the Amended Complaint, except admits that the email, written in French, begins with the greeting "Dear Mr. Bouvier," contains the more formal word "vos" to connote "your," and contains Valette's complete name and title in the signature. Admits the allegations in the third sentence of paragraph 102 of the Amended Complaint. Denies the allegations in the fourth sentence of paragraph 102 of the Amended Complaint, except admits that Valette's email referred to the high demand for Modigliani's *Nu*'s on the art market. Denies the allegations in the fifth sentence of paragraph 102 of the Amended Complaint.

103.     Denies the allegations in the first sentence of paragraph 103 of the Amended Complaint, except admits that Bouvier sent an email to Valette on December 24, 2011, that the email, written in French, refers to Valette by his first name and is signed by Bouvier using his first name, that it contains the less formal word "tu" and not the word "vous" to connote "you," and that in sum and substance the translation of the excerpted portion of the email into English is accurate. Denies the allegations in the second sentence of paragraph 103 of the Amended Complaint. Denies the allegations in the third sentence of paragraph 103 of the Amended Complaint, except admits that Valette responded to Bouvier's email and that the email refers to Bouvier by his first name and is signed by Valette using his first name and contains the less formal word "tu" and not the word "vous" to connote "you."

104.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 104 of the Amended Complaint.

105.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 105 of the Amended Complaint.

106.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106 of the Amended Complaint.

107.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 107 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 107 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether and what Bouvier charged Plaintiffs for the work and what any corresponding markup was.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 107 of the Amended Complaint.

108.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 108 of the Amended Complaint.

109.    Denies the allegations in the first sentence of paragraph 109 of the Amended Complaint, except admits that on October 24, 2014, Sotheby's UK provided Bouvier an insurance valuation for the work, delivered by Valette.  Denies the allegations in the second sentence of paragraph 109 of the Amended Complaint, except admits that the insurance valuation provided to Bouvier was signed by Valette on the letterhead of Sotheby's UK and was addressed to "Mr. Confidential Client One Hundred and Thirty Four."  Denies the allegations in the third sentence of paragraph 109 of the Amended Complaint, except admits that Sotheby's UK

assessed the retail replacement value of the work at $110 million and that the insurance valuation did not refer to a 2012 sale to Bouvier or its purchase price.

110.     Denies the allegations in the first sentence of paragraph 110 of the Amended Complaint, except admits that on January 9, 2015 Vinciguerra emailed Peretti and Valette about possibly selling the work during the May auction in New York, stating that Sotheby's, Inc. anticipated offering a guarantee of $70 million following inspection of the work.  Admits the allegations in the second sentence of paragraph 110 of the Amended Complaint.  Denies the allegations in the third sentence of paragraph 110 of the Amended Complaint, except admits that the quoted excerpt of the email is accurate, and states that the remaining allegations in the third sentence of paragraph 110 are characterizations of Vinciguerra's email to which no response is required and that the document at issue speaks for itself.

<u>Rodin's *Eve*</u>

111.     Admits the allegations in paragraph 111 of the Amended Complaint.

112.     Denies the allegations in paragraph 112 of the Amended Complaint, except admits that on February 2, 2012, Valette emailed Peretti a document in Word about the work, and avers that the correct translation of the excerpted portion of the email into English is "works for you."

113.     Denies the allegations in paragraph 113 of the Amended Complaint, except admits that the following day Valette sent to Bouvier the same document in Word he previously emailed Peretti (with a typographical error corrected), along with two other PDF documents.

114.     Admits the allegations in paragraph 114 of the Amended Complaint, except avers that the correct translation of the excerpted portion of the email into English is "Here is an attempt of a new doc with more photos - thank you for telling me if it is better."

115.    Admits the allegations in paragraph 115 of the Amended Complaint.

116.    Denies the allegations in the first sentence of paragraph 116 of the Amended Complaint, except admits that on March 6, 2012, after a series of emails about arranging to bring the work to Geneva, an individual identified as an employee of Fine Arts Transport Natural le Coultre SA wrote an email to Chandler, and avers that the accurate quotation from the referenced email is "Our client would like us to collect directly the crate in Frankfurt with our truck." Denies the allegations in the second sentence of paragraph 116 of the Amended Complaint.

117.    Admits the allegations in the first sentence of paragraph 117 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 117 of the Amended Complaint, except admits that Valette signed the contract of sale on behalf of Sotheby's UK. Denies the allegations in the third sentence of paragraph 117 of the Amended Complaint.  The allegations in the fourth sentence of paragraph 117 of the Amended Complaint state conclusions of law to which no response is required.  Denies the allegations in the fifth sentence of paragraph 117 of the Amended Complaint.

118.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 118 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 118 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether and what Bouvier charged Plaintiffs for the work and what any corresponding markup was.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 118 of the Amended Complaint.

119.    Denies the allegations in the first sentence of paragraph 119 of the Amended Complaint, except admits that on March 21, 2014, Valette emailed Bouvier a cataloguing for the

work.  Denies the allegations in the second sentence of paragraph 119 of the Amended

Complaint, except admits that Valette emailed a description of the work and that the description

did not refer to a 2012 sale to Bouvier, which Valette had brokered.

120.    Admits the allegations in the first sentence of paragraph 120 of the Amended

Complaint, with the qualification that, with respect to the translation of the referenced French

email, it admits only that in sum and substance the translation of the excerpted portion of the

email into English is accurate.  Denies the allegations in the second sentence of paragraph 120 of

the Amended Complaint.  Denies the allegations in the third sentence of paragraph 120 of the

Amended Complaint, except admits that the email contains the more formal word "votre" to

connote "your," and includes Valette's signature block after his name.

121.    Denies the allegations in paragraph 121 of the Amended Complaint, except

admits that Valette sent an email to Bouvier approximately one hour later, which included some

of the same information, identified Simon Stock as Sotheby's UK's head of sculpture sales and

stated that Stock was in agreement with Valette, and states that the remaining allegations in

paragraph 121 of the Amended Complaint are characterizations of Valette's emails to which no

response is required and that the documents at issue speak for themselves.

122.    Denies knowledge or information sufficient to form a belief as to the truth of the

allegations in paragraph 122 of the Amended Complaint.

Klimt's <em>Wasserschlangen II</em>

123.    Admits the allegations in paragraph 123 of the Amended Complaint.

124.    Admits the allegations in paragraph 124 of the Amended Complaint.

125.    Denies the allegations in the first sentence of paragraph 125 of the Amended

Complaint, except admits that on September 11, 2012 Bouvier signed a contract of sale for the

work on behalf of his affiliated entity Blancaflor with Sotheby's, Inc.'s Austria-based affiliate Sotheby's Kunstauktionen Gesellschaft M.B.H, with a sale price of $126 million. Denies the allegations in the second sentence of paragraph 125 of the Amended Complaint, except admits that Valette helped facilitate four contract extensions on behalf of Sotheby's Kunstauktionen Gesellschaft M.B.H. due to delays in obtaining an export license from the Austrian government.

126.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 126 of the Amended Complaint.

127.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 127 of the Amended Complaint. Denies the allegations in the second sentence of paragraph 127 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether and what Bouvier charged Plaintiffs for the work and what any corresponding markup was. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 127 of the Amended Complaint.

128.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 128 of the Amended Complaint.

129.     Admits the allegations in paragraph 129 of the Amended Complaint.

130.     Denies the allegations in paragraph 130 of the Amended Complaint, except admits that on July 16, 2013 Valette emailed Bouvier a cataloguing for the work and later provided a certificate from the Art Loss Register, and that neither document referred to Bouvier's acquisition of the work.

131.     Admits the allegations in paragraph 131 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French emails, it admits only

that in sum and substance the translation of the excerpted portion of the email into English is accurate.

132.    Denies the allegations in paragraph 132 of the Amended Complaint, except admits that Valette separately sent different versions of an article from *Der Standard* reporting that Sotheby's Kunstauktionen Gesellschaft M.B.H. had sold the work for $120 million and that the emails contained no subject or cover note, and that the version sent to Bouvier was in French while the version sent to Peretti was in German, and states that the remaining allegations in the second sentence of paragraph 132 are characterizations of Valette's emails to which no response is required and that the documents at issue speak for themselves.

133.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 133 of the Amended Complaint.

134.    Denies the allegations in the first sentence of paragraph 134 of the Amended Complaint, except admits that on October 24, 2014, Sotheby's UK provided Bouvier an insurance valuation for the work, delivered by Valette.  Denies the allegations in the second sentence of paragraph 134 of the Amended Complaint, except admits that the insurance valuation was signed by Valette on letterhead for Sotheby's UK, and was addressed to "Mr. Confidential Client One Hundred and Thirty Four."  Denies the allegations in the third sentence of paragraph 134 of the Amended Complaint, except admits that Sotheby's UK assessed the retail replacement value of the work at $180 million and that the insurance valuation did not refer to Bouvier's acquisition of the work, which Valette had brokered.

Modigliani's <em>Tête</em>

135.    Admits the allegations in paragraph 135 of the Amended Complaint.

27

136.     Admits the allegations in the first sentence of paragraph 136 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portion of the email into English is accurate.  Denies the allegations in the second sentence of paragraph 136 of the Amended Complaint, except admits that Bouvier requested additional information about comparable sales on the list Valette previously had sent him, and that Valette complied with that request.

137.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 137 of the Amended Complaint.

138.     Admits the allegations in paragraph 138 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portion of the email into English is accurate.

139.     Admits the allegations in the first sentence of paragraph 139 of the Amended Complaint.  Admits the allegations in the second sentence of paragraph 139 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portion of the email into English is accurate.  Denies the allegations in the third sentence of paragraph 139 of the Amended Complaint.

140.     Admits the allegations in paragraph 140 of the Amended Complaint.

141.     Admits the allegations in the first sentence of paragraph 141 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 141 of the Amended Complaint, except admits that Peretti wrote back "Call me thank you."

142.    Denies the allegations in the first sentence of paragraph 142 of the Amended Complaint, except admits that on July 24, 2012, Valette sent Bouvier an email describing the work and estimating its worth as between €70 and €90 million or maybe more, and that in sum and substance the translation of the excerpted portion of the email into English is accurate. Denies the allegations in the second sentence of paragraph 142 of the Amended Complaint, except admits that Valette had by this point arranged for delivery of the sculpture to Bouvier's freeport.  Admits the allegations in the third sentence of paragraph 142 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portion of the email into English is accurate.  Denies the allegations in the fourth sentence of paragraph 142 of the Amended Complaint.

143.    Denies the allegations in the first sentence of paragraph 143 of the Amended Complaint, except admits that on July 25, 2012, Valette emailed a different version of the email he previously had sent Bouvier describing the work, and that Valette's July 25, 2012 email estimated the value of the work to be between €80 and €100 million.  Denies the allegations in the second sentence of paragraph 143 of the Amended Complaint, and states that Plaintiffs' allegations concerning differences between Valette's emails are characterizations of those emails to which no response is required and that the documents at issue speak for themselves.

144.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 144 of the Amended Complaint.

145.    Admits the allegations in the first sentence of paragraph 145 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 145 of the Amended Complaint.

146.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first through fifth sentences of paragraph 146 of the Amended Complaint. Denies the allegations in the sixth sentence of paragraph 146 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether or what Bouvier charged Plaintiffs for the work and what any corresponding markup was.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the seventh and eighth sentences of paragraph 146 of the Amended Complaint.

147.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 147 of the Amended Complaint.

148.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 148 of the Amended Complaint.

149.     Denies the allegations in the first sentence of paragraph 149 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding what Plaintiffs knew or may have learned from Bouvier.  Denies the allegations in the second sentence of paragraph 149 of the Amended Complaint, except admits that a consignment agreement between Bouvier's affiliated entity Blancaflor and Sotheby's, Inc. was signed on September 15, 2014.

150.     Denies the allegations in the first sentence of paragraph 150 of the Amended Complaint, except admits that Vinciguerra wrote to Peretti, copying Valette, that Sotheby's, Inc. would the next day pay $25 million to Bouvier followed by payments of $15 million and $10 million if an unspecified client won the auction.  Denies the allegations in the second sentence of paragraph 150 of the Amended Complaint.

151.     Admits the allegations in paragraph 151 of the Amended Complaint.

152.    Denies the allegations in paragraph 152 of the Amended Complaint, except admits that the catalogue entry for the auction of the work did not state that Bouvier's affiliated entity Blancaflor previously had purchased the work.

153.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 153 of the Amended Complaint regarding what Bouvier did or did not do with respect to Plaintiffs, admits that Sotheby's had no contact with Plaintiffs regarding the sale of the work, denies that it had any knowledge regarding Plaintiffs' relationship to the work or that it had any obligation to seek or obtain Plaintiffs' permission regarding the sale of the work, and avers that Bouvier represented to it that he had authority to sell the work.

154.    Denies the allegations in the first sentence of paragraph 154 of the Amended Complaint.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 154 of the Amended Complaint

155.    Admits the allegations in the first sentence of paragraph 155 of the Amended Complaint, and avers that at all relevant times Sotheby's and its affiliated entities abided by the Sotheby's Code of Business Conduct.  Denies the allegations in the second sentence of paragraph 155 of the Amended Complaint, except admits that the quoted excerpt from Defendant Sotheby's 2017 Annual Report is accurate.

156.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 156 of the Amended Complaint.

157.    Admits the allegations in paragraph 157 of the Amended Complaint.

### Toulouse-Lautrec's *Au Lit: Le Baiser*

158.    Denies the allegations in paragraph 158 of the Amended Complaint, except admits that Sotheby's UK brokered the sale of Toulouse-Lautrec's *Au Lit: Le Baiser* to Bouvier's

affiliated entity Blancaflor on October 8, 2012 for $7.5 million, and that Valette signed the contract of sale on behalf of Sotheby's UK.

159.   Denies the allegations in paragraph 159 of the Amended Complaint, except admits that on December 11, 2012, Valette emailed Peretti information about the work.

160.   Admits the allegations in paragraph 160 of the Amended Complaint.

161.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 161 of the Amended Complaint.

162.   Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 162 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 162 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether or what Bouvier charged Plaintiffs for the work and what any corresponding markup was.

163.   Denies the allegations in the first sentence of paragraph 163 of the Amended Complaint, except admits that Valette emailed Bouvier on December 18, 2014 concerning a different painting by Toulouse-Lautrec, also named *Au Lit: Le Baiser*; that Valette recommended selling the work in London rather than in New York; and that Valette's email contained the more formal word "votre" to connote "your" and included Valette's signature block.  Denies the allegations in the second sentence of paragraph 163 of the Amended Complaint.  Denies the allegations in the third sentence of paragraph 163 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether or what Bouvier charged Plaintiffs for the work.  Denies the allegations in the fourth sentence of paragraph 163 of the Amended Complaint.

164.    Denies the allegations in the first sentence of paragraph 164 of the Amended Complaint, except admits that Valette emailed Bouvier on February 17, 2015 with a breakdown of the work's estimate, guarantee, hammer price, and commissions, and that Valette's email contained the more formal word "votre" to connote "your" and included Valette's full name. Denies the allegations in the second sentence of paragraph 164 of the Amended Complaint.

165.    Admits the allegations in the first sentence of paragraph 165 of the Amended Complaint.  Denies the allegations in the second sentence of paragraph 165 of the Amended Complaint, except admits that Valette provided Bouvier with the requested information.

Da Vinci's *Christ as Salvator Mundi*

166.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 166 of the Amended Complaint.

167.    Admits the allegations in paragraph 167 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portion of the email into English is accurate.

168.    Denies the allegations in paragraph 168 of the Amended Complaint.

169.    Denies the allegations in paragraph 169 of the Amended Complaint.

170.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 170 of the Amended Complaint.

171.    Denies the allegations in the first sentence of paragraph 171 of the Amended Complaint, except admits that Valette, Peretti, and one of the Da Vinci sellers met in Paris on April 10, 2013.  Admits the allegations in the second sentence of paragraph 171 of the Amended Complaint.

33

172.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 172 of the Amended Complaint.

173.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 173 of the Amended Complaint.

174.    Denies the allegations in paragraph 174 of the Amended Complaint, except admits that Sotheby's, Inc. brokered the sale of Da Vinci's *Christ as Salvator Mundi* to Bouvier's affiliated entity Blancaflor on May 2, 2013 for $83 million, the date on which the contract of sale was signed.

175.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of paragraph 175 of the Amended Complaint. Denies the allegations in the third sentence of paragraph 175 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether and what Bouvier charged Plaintiffs for the work and what any corresponding markup was.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of paragraph 175 of the Amended Complaint.

176.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 176 of the Amended Complaint.

177.    Admits the allegations in paragraph 177 of the Amended Complaint.

178.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 178 of the Amended Complaint.

179.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 179 of the Amended Complaint.

180.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 180 of the Amended Complaint.

181.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 181 of the Amended Complaint.

182.     Denies the allegations in paragraph 182 of the Amended Complaint, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether and when Plaintiffs' representative confronted Bouvier and admits that Sotheby's UK agreed to provide an insurance valuation of the work upon Bouvier's request.

183.     Denies the allegations in paragraph 183 of the Amended Complaint, except admits that on January 27, 2015, Valette emailed Bouvier a draft insurance valuation for the work provided by Sotheby's UK identifying its retail replacement value at $100 million, along with a cover letter from Bell indicating that Bouvier had acquired the work in 2013, and that in sum and substance the translation of the excerpted portion of the email into English is accurate.

184.     Denies the allegations in the first sentence of paragraph 184 of the Amended Complaint, except admits that on January 28, 2015, Valette emailed Bouvier a revised insurance valuation for the work identifying its retail replacement value at €100 million.  Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 184 of the Amended Complaint.  Admits the allegations in the third sentence of paragraph 184 of the Amended Complaint.

185.     Denies the allegations in paragraph 185 of the Amended Complaint.

186.     Denies the allegations in the first sentence of paragraph 186 of the Amended Complaint, except admits that, on November 21, 2016, Sotheby's, Inc. filed an action seeking a declaratory judgment that it did not breach its obligations to the sellers of *Christ as Salvator*

*Mundi*, and that the case citation following this sentence is accurate. Denies the allegations in the second sentence of paragraph 186 of the Amended Complaint, except admits that Sotheby, Inc.'s declaratory action was settled and that the settlement is confidential. Denies the allegations in the third sentence of paragraph 186 of the Amended Complaint and refers the Court to the referenced complaint for a complete and accurate statement of its contents. Denies the allegations in the fourth sentence of paragraph 186 of the Amended Complaint.

187.    Denies the allegations in paragraph 187 of the Amended Complaint, except admits that the quotation from the Sotheby's Code of Business Conduct is accurate.

188.    Denies the allegations in the first sentence of paragraph 188 of the Amended Complaint. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of paragraph 188 of the Amended Complaint. Denies the allegations in the fourth sentence of paragraph 188 of the Amended Complaint.

<u>Gauguin's *Otahi*</u>

189.    Denies the allegations in the first sentence of paragraph 189 of the Amended Complaint, except admits that on October 24, 2014 Sotheby's UK provided Bouvier with an insurance valuation for Gauguin's *Otahi Seule* identifying its retail replacement value at $120 million. Admits the allegations in the second sentence of paragraph 189 of the Amended Complaint.

190.    Admits the allegations in the first sentence of paragraph 190 of the Amended Complaint, with the qualification that, with respect to the translation of the referenced French email, it admits only that in sum and substance the translation of the excerpted portion of the email into English is accurate. Denies the allegations in the second sentence of paragraph 190 of the Amended Complaint, except admits that the second insurance valuation of the work

identified its retail replacement value at $140 million. Denies the allegations in the third sentence of paragraph 190 of the Amended Complaint, and states that the allegations in that sentence are characterizations of Valette's emails to which no response is required and that the documents at issue speak for themselves.

191.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 191 of the Amended Complaint.

192.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 192 of the Amended Complaint.

193.    Denies the allegations in paragraph 193 of the Amended Complaint, except admits that the insurance valuations provided to Bouvier did not refer to Bouvier's acquisition of the work.

### *Sotheby's Functions as One Single Entity*

194.    Denies the allegations in paragraph 194 of the Amended Complaint.

195.    Denies the allegations in paragraph 195 of the Amended Complaint, except admits that, at times, the subsidiaries of Defendant Sotheby's may have been referred to colloquially as "offices or "locations."

196.    Admits the allegations in the first sentence of paragraph 196 of the Amended Complaint. Denies the allegations in the second sentence of paragraph 196 of the Amended Complaint.

197.    Admits the allegations in the first sentence of paragraph 197 of the Amended Complaint. Denies the allegations in the second through fourth sentences of paragraph 197 of the Amended Complaint. Denies the allegations in the fifth sentence of paragraph 197 of the

Amended Complaint, except admits that the headquarters of Defendant Sotheby's is in New York.

198.    Denies the allegations in paragraph 198 of the Amended Complaint, except admits that some of the sales contracts for works referenced in the Amended Complaint were signed by Sotheby's, Inc., others by Sotheby's UK, and others by Sotheby's S.A. or Sotheby's Kunstauktionen Gesellschaft M.B.H.

199.    Denies the allegations in paragraph 199 of the Amended Complaint.

200.    Denies the allegations in paragraph 200 of the Amended Complaint and refers the Court to the referenced complaint for a complete and accurate statement of its contents.

201.    Denies the allegations in paragraph 201 of the Amended Complaint and refers the Court to the referenced complaint for a complete and accurate statement of its contents.

202.    Denies the allegations in paragraph 202 of the Amended Complaint and refers the Court to the referenced declaration for a complete and accurate statement of its contents.

203.    Denies the allegations in paragraph 203 of the Amended Complaint.

204.    Admits the allegations in paragraph 204 of the Amended Complaint, except avers that Valette is employed not by Defendant Sotheby's but by Sotheby's UK, which has not fired or disciplined him, and that there was no basis for doing so.

205.    Denies the allegations in paragraph 205 of the Amended Complaint, except admits that the quoted portions of the Sotheby's Code of Conduct are accurate and avers that at all relevant times it has complied with the Code of Conduct.

206.    Admits that the quoted portions of the Sotheby's Code of Conduct are accurate and avers that at all relevant times it has complied with the Code of Conduct.

207.    Denies the allegations in paragraph 207 of the Amended Complaint.

## FIRST CLAIM
## Aiding and Abetting Fraud

208.     In response to the allegations in paragraph 208 of the Amended Complaint,
repeats each response contained in paragraphs 1 through 207 of the Amended Complaint as if
fully set forth herein.

209.     Denies the allegations in paragraph 209 of the Amended Complaint and avers as
follows:  Although Sotheby's and its affiliated entities were generally aware that Bouvier could
either be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to
resell to another, Sotheby's and its affiliated entities at no point knew what Bouvier planned to
do with any work of art he acquired in a transaction brokered by Sotheby's, Inc. or its affiliated
entities.  Nor did Sotheby's or its affiliated entities know the price that Bouvier planned to later
charge for any work of art, if he did decide to re-sell it.  While Sotheby's and its affiliated
entities later learned through press reports, court filings, and other means that Bouvier
subsequently sold certain pieces to Rybolovlev by way of Plaintiffs, Sotheby's and its affiliated
entities were not aware of any re-sales at the time they took place; nor did Sotheby's or its
affiliated entities know the prices that Plaintiffs claim Bouvier charged them at the time of such
re-sales.  If Bouvier defrauded Plaintiffs or breached any fiduciary duty to them, Sotheby's and
its affiliated entities had no knowledge of any such fraud or breach of fiduciary duty, and have
no liability whatsoever to Plaintiffs.

210.     Denies the allegations in paragraph 210 of the Amended Complaint.

211.     Denies the allegations in paragraph 211 of the Amended Complaint.

212.     Denies the allegations in paragraph 212 of the Amended Complaint.

## SECOND CLAIM
### Aiding and Abetting Breach of Fiduciary Duty

213. In response to the allegations in paragraph 213 of the Amended Complaint, repeats each response contained in the preceding paragraphs as if fully set forth herein.

214. Denies the allegations in the first sentence of paragraph 214 of the Amended Complaint. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in the remaining sentences of paragraph 214 of the Amended Complaint and avers as follows: Although Sotheby's and its affiliated entities were generally aware that Bouvier could either be the ultimate purchaser, or one of a group of investors, or purchasing with the intent to resell to another, Sotheby's and its affiliated entities at no point knew what Bouvier planned to do with any work of art he acquired in a transaction brokered by Sotheby's, Inc. or its affiliated entities. Nor did Sotheby's or its affiliated entities know the price that Bouvier planned to later charge for any work of art, if he did decide to re-sell it. While Sotheby's and its affiliated entities later learned through press reports, court filings, and other means that Bouvier subsequently sold certain pieces to Rybolovlev by way of Plaintiffs, Sotheby's and its affiliated entities were not aware of any re-sales at the time they took place; nor did Sotheby's and its affiliated entities know the prices that Plaintiffs claim Bouvier charged them at the time of such re-sales. If Bouvier defrauded Plaintiffs or breached any fiduciary duty to them, Sotheby's and its affiliated entities had no knowledge of any such fraud or breach of fiduciary duty, and have no liability whatsoever to Plaintiffs.

215. Denies knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 215 of the Amended Complaint.

216. Denies the allegations in paragraph 216 of the Amended Complaint.

217. Denies the allegations in paragraph 217 of the Amended Complaint.

218.    Denies the allegations in paragraph 218 of the Amended Complaint.

### THIRD CLAIM
### Breach of Contract – Declaratory Judgment

219.    In response to the allegations in paragraph 219 of the Amended Complaint, repeats each response contained in the preceding paragraphs as if fully set forth herein.

220.    Admits the allegations in paragraph 220 of the Amended Complaint.

221.    Admits the allegations in paragraph 221 of the Amended Complaint.

222.    Denies the allegations in paragraph 222 of the Amended Complaint, except admits that the quote contained in the paragraph is accurate and refers the Court to the full Tolling Agreement for a complete and accurate statement of its contents.

223.    Denies the allegations in paragraph 223 of the Amended Complaint, except admits that the quote contained in the paragraph is accurate and refers the Court to the full Tolling Agreement for a complete and accurate statement of its contents.

224.    Denies the allegations in the first and second sentences of paragraph 224 of the Amended Complaint, except admits that Sotheby's, Inc., Sotheby's UK, Sotheby's Kunstauktionen Gesellschaft M.B.H., and Sotheby's S.A. filed a civil proceeding in Geneva, Switzerland on November 17, 2017 against Plaintiffs and others. The allegations in the third and fourth sentences of paragraph 224 of the Amended Complaint state conclusions of law to which no response is required.

225.    Denies the allegations in paragraph 225 of the Amended Complaint, except admits that the quote contained in the paragraph is accurate.

226.    The allegations in paragraph 226 of the Amended Complaint state conclusions of law to which no response is required. To the extent a response is required, denies the allegations

in paragraph 226 of the Amended Complaint and avers that Plaintiffs terminated the Tolling Agreement prior to the filing of the Swiss civil proceeding.

227.    Denies the allegations in paragraph 227 of the Amended Complaint.

228.    Denies the allegations in paragraph 228 of the Amended Complaint.

229.    Denies the allegations in paragraph 229 of the Amended Complaint.

## FOURTH CLAIM
### Breach of Contract – Damages

230.    In response to the allegations in paragraph 230 of the Amended Complaint, repeats each response contained in the preceding paragraphs as if fully set forth herein.

231.    Denies the allegations in paragraph 231 of the Amended Complaint.

## FIFTH CLAIM
### Breach of Contract – Injunction

232.    In response to the allegations in paragraph 232 of the Amended Complaint, repeats each response contained in the preceding paragraphs as if fully set forth herein.

233.    Denies the allegations in paragraph 233 of the Amended Complaint and avers that this Fifth Claim was dismissed by the Court by decision dated June 25, 2019; accordingly, there is no claim for this relief pending in this action.

234.    Denies the allegations in paragraph 234 of the Amended Complaint and avers that this Fifth Claim was dismissed by the Court by decision dated June 25, 2019; accordingly, there is no claim for this relief pending in this action.

235.    Denies the allegations in paragraph 234 of the Amended Complaint and avers that this Fifth Claim was dismissed by the Court by decision dated June 25, 2019; accordingly, there is no claim for this relief pending in this action.

## DEFENSES AND AFFIRMATIVE DEFENSES

Sotheby's asserts the following defenses without admitting or conceding that they are

affirmative defenses for which Sotheby's carries the burden of proof, and without waiving or conceding any argument that Plaintiffs must satisfy the burden of proof under the applicable law. Sotheby's reserves the right to assert any additional defenses to the extent permitted by applicable law as and when discovery and/or further investigation show that such defenses are applicable.

## FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack standing.

## SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs lack capacity to sue.

## THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs are not the real party or parties in interest.

## FOURTH DEFENSE

The Amended Complaint fails to state a claim upon which relief can be granted.

## FIFTH DEFENSE

The Amended Complaint fails to set forth Plaintiffs' claims with particularity as required under Federal Rule of Civil Procedure 9(b).

## SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable statutes of limitations, statutes of repose, and any other statutory or common law defense based on the passage of time.

## SEVENTH DEFENSE

Plaintiffs' Fifth Claim was dismissed by the Court by decision dated June 25, 2019; accordingly, there is no claim for this relief pending in this action.

**EIGHTH DEFENSE**

Plaintiffs have failed to join one or more necessary and indispensable parties, including, without limitation, Dmitry Rybolovlev; Yves Bouvier; persons or entities acting on behalf of or under the employment, control, direction, or ownership of Rybolovlev or Bouvier; and other third parties who engaged in or unreasonably failed to prevent the alleged misconduct and alleged injuries that form the basis of Plaintiffs' Amended Complaint.

**NINTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by the doctrines of collateral estoppel, res judicata, waiver, and/or laches.

**TENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because Sotheby's conduct was not a cause of the harm, injuries, and/or damages alleged by Plaintiffs.

**ELEVENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because none of Sotheby's acts, conduct, omissions, or statements alleged in the Amended Complaint provided any, much less substantial, assistance to the alleged fraud by Bouvier.

**TWELFTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, because the alleged culpable conduct of Sotheby's, none being admitted, was so insubstantial as to be insufficient to be a proximate or substantial contributing cause of Plaintiffs' damages or losses.

**THIRTEENTH DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by the doctrines of unclean hands and estoppel. Should discovery show that Plaintiffs or its agents acted inequitably in responding to

the alleged harms, such conduct should be taken into account in assessing Plaintiffs' claims and whether, and to what extent, they are entitled to relief in this action.

## FOURTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

## FIFTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by their failure to mitigate damages. Plaintiffs have failed to take appropriate and necessary steps to mitigate any alleged damages. Among other things, they failed to take adequate steps to monitor or limit any alleged wrongful overcharging by Bouvier.

## SIXTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the economic loss doctrine and/or the doctrine of remoteness.

## SEVENTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because they are speculative and remote and because of the impossibility of ascertaining and allocating the damages alleged.

## EIGHTEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs knew or reasonably should have known the characteristics and quality of each work of art at issue and therefore could not have justifiably relied on the alleged misrepresentations or omissions set forth in the Amended Complaint.

## NINETEENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs' alleged claims and/or damages were caused by persons and/or entities other than Sotheby's. Accordingly, Plaintiffs

may not recover against Sotheby's. Alternatively, any assessment of liability against Sotheby's must be reduced in proportion to the relative fault of such other persons and/or entities, whether or not such persons and/or entities have been named in any litigation or proceeding, and whether or not such persons and/or entities have settled with Plaintiffs or otherwise have had judgment entered against them.

## TWENTIETH DEFENSE

The alleged injuries asserted by Plaintiffs are too speculative, derivative, and/or remote from the alleged wrongful conduct to be a basis for liability as a matter of law and due process.

## TWENTY-FIRST DEFENSE

The alleged conduct of Sotheby's was not the but-for, proximate, or legal cause of Plaintiffs' purported injuries, harm, or damages. Plaintiffs' alleged injuries, if any, were the result of superseding and/or intervening causes, including but not limited to the acts and omissions of third parties acting separately and independently from Sotheby's, over which Sotheby's had no control and for which Sotheby's was not responsible. Moreover, the claims set forth in the Amended Complaint are barred, in whole or in part, because the purported injuries, harm, or damages (if any) were caused, in whole or in part, by Plaintiffs' own conduct, and/or that of its contractors or agents, which constitutes superseding and intervening cause(s).

## TWENTY-SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, because any harm to or reliance by Plaintiffs caused by misconduct alleged in the Amended Complaint was caused by the intervening acts, superseding negligence, and/or subsequent conduct or fault on the part of a person or entity over whom Sotheby's had neither control nor a right of control, and therefore Sotheby's is entitled to an apportionment of any damages accordingly.

## TWENTY-THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent they seek to recover for the acts or omissions of third parties, because any third party engaging in the acts alleged by Plaintiffs was not acting as Sotheby's agent or servant, at the instruction of Sotheby's, or within Sotheby's control.

## TWENTY-FOURTH DEFENSE

Plaintiffs' claims are barred by the terms and conditions of the agreements they entered into with Sotheby's and/or third parties.

## TWENTY-FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the applicable provisions of the United States Constitution or the Constitution of the State of New York. These provisions include, but are not limited to, the First Amendment to the United States Constitution and Article I, Section 8 of the Constitution of the State of New York, which protect Sotheby's commercial speech because it was neither false nor misleading.

## TWENTY-SIXTH DEFENSE

The representations or statements alleged to have been made were true and accurate at the time made and/or otherwise were made in good faith, with a reasonable belief as to their validity and accuracy and with a reasonable belief that all conduct was lawful.

## TWENTY-SEVENTH DEFENSE

Plaintiffs' claims are barred by lack of privity.

## TWENTY-EIGHTH DEFENSE

Plaintiffs did not rely to their detriment upon any lawful statement in determining whether to purchase the works of art at issue.

## TWENTY-NINTH DEFENSE

To the extent Plaintiffs seek to impose liability for broad, general statements regarding the value or quality of products that were made to and reasonably understood by Plaintiffs as opinion, such statements cannot constitute aiding and abetting fraud or aiding and abetting breach of fiduciary duty as a matter of law.

## THIRTIETH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by the alteration, modification, and illicit and/or illegal use or misuse by third parties of communications made or documents prepared by Sotheby's.

## THIRTY-FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, to the extent they seek to recover any damages, restitution, costs, or other payments that have been paid or borne by other persons or entities. Any verdict of judgment that might be recovered must be reduced by those amounts that already have been or will in the future, with reasonable certainty, be paid to Plaintiffs by others or indemnify Plaintiffs.

## THIRTY-SECOND DEFENSE

Sotheby's is entitled to a credit, set-off, or offset for all sums of money received or available from or on behalf of any tortfeasor(s) for the same injuries alleged in Plaintiffs' Amended Complaint, including but not limited to any and all settlements Plaintiffs may reach with any tortfeasor(s).

## THIRTY-THIRD DEFENSE

Sotheby's alleged liability, if any, must be limited in accordance with the percentage of fault allocated to it by the ultimate trier of fact and/or law. A defendant may only be severally

liable for any injuries or expenses. Plaintiffs' alleged damages are not indivisible but comprise separate and discrete costs.

## THIRTY-FOURTH DEFENSE

Plaintiffs' claims for punitive damages, statutory damages, civil penalties, and other relief are prohibited under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, and Article 1, Section 5 of the New York Constitution. Plaintiffs' claims for punitive damages, statutory damages, civil penalties, and other relief:

a.      have no basis in law or fact;

b.      are not recoverable because the Amended Complaint's allegations are legally insufficient to support or allow the imposition of punitive damages or other relief against Sotheby's consistent with the United States Constitution, the New York Constitution, New York law, or any other applicable law;

c.      cannot be sustained because the laws setting forth the standard(s) for determining liability for, and the amount(s) of, punitive damages or other relief fail to give Sotheby's prior notice of the conduct for which punitive damages or other relief may be imposed and the severity of the penalty that may be imposed, and are void for vagueness in violation of Sotheby's due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by Article 1, Section 5 of the New York Constitution;

d.      cannot be sustained because any award of punitive damages or other relief exceeding the limits authorized by law would violate Sotheby's due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by Article 1, Sections 5 and 6 of the New York Constitution and would be improper under the laws or common law of New York or under any other applicable law;

e.       cannot be sustained because any award of punitive damages or other relief without the apportionment of the award separately and severally between or among the alleged joint tortfeasors, as determined by the percentage of the wrong(s) allegedly committed by each tortfeasor, would violate Sotheby's due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and by Article 1, Sections 5, 6, and 11 of the New York Constitution; and

f.       cannot be sustained because subjecting Sotheby's to punitive damages, statutory damages, civil penalties, or other relief that is penal in nature without the same protections accorded to criminal defendants would violate Sotheby's rights guaranteed by, *inter alia,* the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and by Article 1, Sections 5, 6, 11, and 12 of the New York Constitution.

## THIRTY-FIFTH DEFENSE

Plaintiffs are not entitled to any relief in the form of restitution or rescission because they cannot restore the *status quo ante.*

## THIRTY-SIXTH DEFENSE

To the extent Plaintiffs seek equitable relief, such claims are barred because Plaintiffs have an adequate remedy at law and cannot otherwise satisfy the elements for equitable relief.

## THIRTY-SEVENTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot establish facts sufficient to support the requisite elements of a claim for aiding and abetting fraud under New York law, if that law is applicable, including, without limitation, (1) the existence of an alleged underlying fraud under the applicable law, (2) Sotheby's actual knowledge of the alleged

underlying fraud, and (3) acts by Sotheby's that substantially assisted the alleged underlying fraud.

## THIRTY-EIGHTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot establish facts sufficient to support the requisite elements of a claim for aiding and abetting breach of fiduciary duty under New York law, if that law is applicable, including, without limitation, (1) the existence of an alleged underlying breach of fiduciary duty under the applicable law, (2) Sotheby's actual knowledge of the alleged underlying breach of fiduciary duty, and (3) acts by Sotheby's that substantially assisted the alleged underlying breach of fiduciary duty.

## THIRTY-NINTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot establish facts sufficient to support the requisite elements of a claim for aiding and abetting fraud under the laws of New York, the United Kingdom, Switzerland, Monaco, and/or Singapore, if the law of one or more of those jurisdictions is applicable, or under the laws of any other jurisdiction(s) whose laws may be applicable to Plaintiffs' First Claim of Aiding and Abetting Fraud.

## FORTIETH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot establish facts sufficient to support the requisite elements of a claim for aiding and abetting breach of fiduciary duty under the laws of New York, the United Kingdom, Switzerland, Monaco, and/or Singapore, if the laws of one or more of those jurisdictions is applicable, or under the laws of any other jurisdiction(s) whose laws may be applicable to Plaintiffs' Second Claim of Aiding and Abetting Breach of Fiduciary Duty.

## FORTY-FIRST DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs cannot establish facts sufficient to support the requisite elements of a claim for breach of contract.

## FORTY-SECOND DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the Tolling Agreement is not enforceable.

## FORTY-THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Sotheby's performance under the Tolling Agreement was excused.

## FORTY-FOURTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because the Tolling Agreement terminated on or about October 27, 2017.

## FORTY-FIFTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Sotheby's has complied with any and all applicable statutes, regulations, and/or laws and has acted in good faith and without malice.

## FORTY-SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, because Sotheby's treated Bouvier in the same responsive and professional manner it treats all of its clients, including by responding promptly to client requests and attempting to serve the client's business needs to the extent possible and permissible.

## FORTY-SEVENTH DEFENSE

Sotheby's relies upon all defenses contained in any applicable state statute or law.

## FORTY-EIGHTH DEFENSE

Sotheby's intends to rely upon any other defense that may become available or appear during the course of investigation, preparation, or discovery and hereby reserves the right to amend this Answer to assert any such defense. Sotheby's also reserves the right to assert other and related defenses as may become available upon a determination of the law applicable to the action or any part thereof or claim therein.

Sotheby's is currently without knowledge or information sufficient to form a belief as to whether other defenses or affirmative defenses apply in this matter. Accordingly, Sotheby's expressly reserves the right to raise any additional defenses or affirmative defenses that may be applicable to this case.

## DEFENDANTS' PRAYER FOR RELIEF

WHEREFORE, Defendants Sotheby's and Sotheby's, Inc. deny all of Plaintiffs' prayer for relief and respectfully request judgment in their favor and against Plaintiffs:

a. Denying all of the relief requested by Plaintiffs in the Amended Complaint and dismissing the Amended Complaint with prejudice;

b. Awarding Defendants their reasonable attorneys' fees and costs; and

c. Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Defendants Sotheby's and Sotheby's, Inc. hereby demand a trial by jury on all issues so triable.

Dated:  July 23, 2019
       New York, New York

Respectfully submitted,

ARNOLD & PORTER KAYE SCHOLER LLP

By:     */s/ Marcus A. Asner*
           Marcus A. Asner
           Sara L. Shudofsky
           Benjamin C. Wolverton
           Mitchell Russell Stern
           250 West 55th Street
           New York, NY  10019-9710
           T:  (212) 836-8000
           F:  (212) 836-8689
           Marcus.Asner@arnoldporter.com
           Sara.Shudofsky@arnoldporter.com
           Benjamin.Wolverton@arnoldporter.com
           Mitchell.Stern@arnoldporter.com

           *Attorneys for Defendants Sotheby's and Sotheby's, Inc.*

# EXHIBIT 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ACCENT DELIGHT INTERNATIONAL LTD.
and XITRANS FINANCE LTD.,

                        Plaintiffs,

          -against-

SOTHEBY'S and SOTHEBY'S, INC.,

                        Defendants.

18 Civ. 9011 (JMF)

---

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO SOTHEBY'S
## FIRST SET OF INTERROGATORIES

Plaintiffs Accent Delight International Ltd. and Xitrans Finance Ltd. ("Plaintiffs"), by and through their attorneys Emery Celli Brinckerhoff & Abady LLP, respond to the First Set of Interrogatories (the "Requests") served by Defendants Sotheby's and Sotheby's Inc. (Defendants) as follows:

## PRELIMINARY STATEMENT

Although Plaintiffs are making a diligent and good faith effort to gather the information with which to respond to Defendants' Interrogatories, because discovery in this matter is ongoing, Plaintiffs responses may be incomplete. Accordingly, all of the following responses are given without prejudice to and with express reservation of Plaintiffs' right to supplement or modify their responses to the extent required by applicable law to incorporate later discovered information, and to rely upon any and all such information at trial or otherwise.

In response to each Interrogatory, Plaintiffs will set forth and explain their objections, if any, to that Interrogatory, and then set forth the information that is provided in response to the

Interrogatory. Plaintiffs are willing to discuss an appropriate resolution of any issues regarding any given objection to a specific Interrogatory.

## DEFINITIONS AND INSTRUCTIONS

1.      Plaintiffs object to Defendants' Definitions and Instructions on the grounds that they are overbroad, unduly burdensome and purport to require Plaintiffs to perform tasks beyond their obligations under the Federal Rules of Civil Procedure ("Federal Rules") or the Local Rules of the United States District Court for the Southern District of New York ("Local Rules"). Plaintiffs will respond pursuant to their obligations under the Federal Rules and the Local Rules.

2.      Plaintiffs object to Defendants' Definitions and Instructions to the extent that they do not limit the Interrogatories to only information that is material to this action. By responding to each Interrogatory, Plaintiffs do not concede the materiality or relevance of the subject to which they refer.  Plaintiffs' responses are made expressly subject to, and without waiving or intending to waive, any questions, or objections as to the breadth, burdensomeness, competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, of any of the documents or information produced, or of the subject matter thereof, in any proceeding including the trial of this action or any subsequent proceeding.

3.      Defendants' Definitions and Instructions do not exclude privileged or otherwise protective communications for the documents and/or information sought. Plaintiffs object to each Interrogatory to the extent that it calls for the production of information which is privileged, whether by the attorney-client privilege, the work product doctrine or otherwise. Such material is not properly discoverable under Rule 26, 33, and 34 of the Federal Rules. Plaintiffs' privileged communications and work product will not be included in their discovery responses.

4.      Plaintiffs object to each of Defendants' Interrogatories to the extent that they seek documents or information concerning contacts between attorney and client during the pendency of this or any other litigation, particularly in in light of Instruction No. 6 that purports to impose an obligation to continually update the responses to the Interrogatories "between the time that the responses are served and the time of trial." Plaintiffs object to this instruction because any such request for confidential information between attorney and client regarding the Interrogatories seeks information protected by privilege. Plaintiffs construe such communications and information to be beyond the scope of each Interrogatory. In addition, inadvertent production information which is privileged, or is otherwise immune from discovery, shall not constitute a waiver of any privilege or of any other ground for objecting to discovery, or its subject matter, or the information contained therein, or of Plaintiffs' right to object to the use of any such information during any proceeding in this litigation or otherwise.

5.      Plaintiffs object to the definition of the term "You" and "Your," on the grounds that the definition is overbroad and ambiguous and seeks information that is privileged.

6.      Plaintiffs object to the definitions of the terms "Bouvier," "Sotheby's," and "Beneficial Owner," on the grounds that these definitions are overbroad and ambiguous.

## INTERROGATORIES

1.      Identify all of Your Beneficial Owners and all of Your principals, owners, directors, beneficiaries, subsidiaries, affiliates, parts, divisions, employees, agents, and consultants, and the relative ranks thereof.

**Response**:  In addition to reasserting their specific objections to Defendants' Definitions and Instructions, Plaintiffs object to this request on the basis that it is overbroad and not proportional to the needs of this case and it seeks information that is not relevant to any party's claims or defenses. Plaintiffs designate their response to this Interrogatory as CONFIDENTIAL MATERIAL, pursuant to the Protective Order. Subject to the foregoing objections and construing the request to pertain only to Plaintiffs Accent

Delight Intl. Ltd. and Xitrans Finance Ltd., █████████████████████████
██████████████████████████████████████████████████████████████████████
████████████████████

2.      Identify all Persons with knowledge or information concerning, or with whom

You have discussed, the allegations in the Complaint and/or the Amended Complaint.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions
> and Instructions, Plaintiffs object to this request on the basis that it is overbroad and not
> proportional to the needs of this case and that it seeks information protected by the
> attorney work product and attorney client privileges.
>
> Subject to the foregoing objections and construing the request to pertain only to Plaintiffs
> Accent Delight Intl. Ltd. and Xitrans Finance Ltd., Plaintiffs understand the following
> persons have knowledge or information concerning the Complaint and/or the Amended
> Complaint: Dmitriy Rybolovlev, Mikhail Sazonov, Yuri Bogdanov, Sandy Heller,
> Stephen Cohen, Tetiana Bersheda, Sergey Chernitsyn, Yves Bouvier, Tania Rappo, Jean-
> Marc Peretti, Linda Seleshi, Franco Momente, Ramon Casais, Alain Chiaro, Alain Perret,
> Yves Meyer, Nadia Maradei, Samuel Valette, other Sotheby's employees, and the
> original sellers of the Works.
>
> Secondly, in addition to their attorneys, Plaintiffs have discussed the allegations in the
> Complaint and/or the Amended Complaint with the following persons: Dmitriy
> Rybolovlev, Mikhail Sazonov, and Yuri Bogdanov.

3.      Identify all Persons with knowledge or information concerning any transaction

involving one or more of the Works, and for each such Person identify the Work about which

such Person has knowledge or information.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions
> and Instructions, Plaintiffs object to this request on the basis that it is overbroad and not
> proportional to the needs of this case and that it seeks information protected by the
> attorney work product and attorney client privileges.
>
> Subject to the foregoing objections and construing the request to pertain only to Plaintiffs
> Accent Delight Intl. Ltd. and Xitrans Finance Ltd., Plaintiffs understand the following
> persons have knowledge or information concerning transactions concerning the Works:
> Dmitriy Rybolovlev, Mikhail Sazonov, Yuri Bogdanov, Bolton Trustees Ltd, Yves
> Bouvier, Tania Rappo, Jean-Marc Peretti, Linda Seleshi, Franco Momente, Ramon
> Casais, Alain Chiaro, Alain Perret, Yves Meyer, Nadia Maradei, Samuel Valette,
> Andreas Röthely, Didier Kolly, Delphine Zarb, Sandy Heller, Steven Cohen, and the
> sellers of the Works. Plaintiffs will supplement this response with more information

4

correlating persons with knowledge with the specific Works about which Plaintiffs understand they have knowledge.

4.      Identify all Persons who communicated with Bouvier on Your behalf or at Your direction concerning one or more of the Works, and for each such Person identify the Work about which such Person communicated.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions and Instructions, Plaintiffs object to this request to the extent that it seeks information protected by the attorney work product and attorney client privileges. Subject to these objections, Dmitriy Rybolovlev, Mikhail Sazonov, Yuri Bogdanov, and Tetiana Bersheda communicated on Plaintiffs' behalf concerning the Works.

5.      Identify all Persons with knowledge or information concerning the alleged agency or fiduciary relationship between You and Bouvier, described in the Amended Complaint at, inter alia, Paragraphs 2, 14, 16, 19, and 214.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions and Instructions, Plaintiffs object to this request to the extent that it seeks information protected by the attorney work product and attorney client privileges. Subject to these objections, Dimitry Rybolovlev, Elena Rybolovlev, Mikhail Sazonov, Yuri Bogdanov, Yves Bouvier, Linda Seleshi, Franco Momente, Ramon Casais, Alain Chiaro, Alain Perret, Yves Meyer, Nadia Maradei, Tania Rappo, Jean-Marc Peretti, and Samuel Valette all have knowledge or information concerning the fiduciary relationship between Yves Bouvier and the Plaintiffs.

6.      Identify all Persons with knowledge or information concerning the alleged fraud committed by Bouvier against You, as described in the Amended Complaint.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions and Instructions, Plaintiffs object to this request to the extent that it seeks information protected by the attorney work product and attorney client privileges. Subject to these objections, Dmitriy Rybolovlev, Mikhail Sazonov, Yuri Bogdanov, Yves Bouvier, Tania Rappo, Jean-Marc Peretti, Samuel Valette and other Sotheby's employees have knowledge or information concerning the fraud committed by Bouvier.

7.      Identify all Financial Institutions and Persons associated with them, whether in Singapore or anywhere else, with which or whom You communicated, transacted, or attempted to communicate or transact, concerning one or more of the Works, including in connection with

any attempt to use one or more of the Works either as collateral or in any other way in order to

obtain, among other things, credit, loans, or financing, and all Person(s) with knowledge or

information about any such communications, transactions, or attempted transactions.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions and Instructions, Plaintiffs object to this request on the grounds that it is overbroad and not proportional to the needs of this case. Plaintiffs designate the following response as CONFIDENTIAL MATERIAL, subject to the Protective Order. Subject to these objections, Plaintiffs identify the following Financial Institutions and Associated Persons:



| **Financial Institution** | **Associated Persons** |
|---|---|

8.      Identify all Persons with knowledge of any valuation that You obtained or

attempted to obtain from Bouvier and/or Sotheby's, or through Bouvier and/or Sotheby's,

concerning any of the Works, and for each such Person identify the valuation about which such

Person has knowledge.

> **Response**:  Subject to the specific objections to Defendants' Definitions and Instructions, Plaintiffs identify the following Persons with knowledge of any valuation that Plaintiffs obtained or attempted to obtain from Bouvier and/or Sotheby's, or through Bouvier and/or Sotheby's, concerning any of the Works: Yuri Bogdanov, Yves Bouvier, Jean-Marc Peretti, Samuel Valette, other Sotheby's officials, Tetiana Bersheda and the Persons identified in response to Interrogatory No. 7, above.

9.      Identify all Persons with knowledge or information concerning Your alleged

reliance on the "appraisals, transaction histories, and other documents Sotheby's created for the[]

[Works]," as described in the Amended Complaint at Paragraph 38.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions and Instructions, Plaintiffs identify Dmitry Rybolovlev, Mikhail Sazonov, Yuri Bogdanov, Yves Bouvier, Samuel Valette and other Sotheby's officers, Tania Rappo, and Jean-Marc Peretti.

10.     Identify all Persons with knowledge or information concerning Your alleged

suspicion and discovery that Bouvier had defrauded You, as described in the Amended

Complaint at Paragraphs 179 through 181.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions
> and Instructions, Plaintiffs identify Dmitriy Rybolovlev, Mikhail Sazonov, Yuri
> Bogdanov, and Tetiana Bersheda.

11.     Identify all Persons with knowledge or information concerning Your acquisition

and/or purchase of an oceanfront estate located at 501 County Road in Palm Beach, Florida from

Trump properties, LLC.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions
> and Instructions, Plaintiffs object to this request on the grounds that it is overbroad, not
> proportional to the needs of this case, and seeks information is not relevant to any party's
> claims or defenses.

12.     Identify all Persons with knowledge or information concerning Your initial

receipt, and Your transmittal, review, discussion, and/or other use, of the Privileged Documents.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions
> and Instructions, Plaintiffs object to this Interrogatory on the grounds that it seeks
> information protected by the attorney client and work product privileges, and information
> that is not relevant to any party's claims or defenses. Subject to these objections,
> Plaintiffs identify the following: James Gallon, Jonty Buirsky, Tetiana Bersheda, Brian
> Cattell, Simona Fedele, Sergey Chernitsyn, and Eric Bechenit.

13.     Identify all Persons You retained, directed, hired, or paid to investigate Bouvier,

Tania Rappo, Jean-Marc Peretti, Sotheby's, or Arnold & Porter, or who otherwise did so or

offered to do so on Your behalf.

> **Response**:  In addition to reasserting their specific objections to Defendants' Definitions
> and Instructions, Plaintiffs object to this Interrogatory on the grounds that it seeks
> information protected by the attorney work product and attorney client privileges.

Dated:  New York, New York
            October 7, 2019

                              EMERY CELLI BRINCKERHOFF
                                 & ABADY LLP

                              By: _____/s_____
                                      Daniel J. Kornstein
                                      O. Andrew F. Wilson
                                      Zoe Salzman
                                      Douglas E. Lieb
                              600 Fifth Avenue, 10th Floor
                              New York, New York 10020
                              (212) 763-5000

                              *Attorneys for Plaintiffs*

# EXHIBIT 4

# Arnold & Porter

Marcus A. Asner
+1 212.836.7222 Direct
Marcus.Asner@arnoldporter.com

August 26, 2019

<u>VIA ECF</u>

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Centre Street, Room 2202
New York, New York 10007

Re:     *Accent Delight International Ltd. et al. v. Sotheby's et al.*, 18-cv-9011

Dear Judge Furman:

We write respectfully on behalf of Sotheby's and Sotheby's, Inc. (together, "Sotheby's") to request a pre-motion conference regarding Sotheby's need for discovery into a serious matter that has recently come to light:  since April 2016, Plaintiffs have possessed and made use of two highly sensitive documents that are Sotheby's attorney work product and attorney-client communications (the "Materials").  We have requested immediate discovery into Plaintiffs' acquisition and use of the Materials, but following an exchange of letters and a meet and confer, the parties have reached an impasse as to the propriety, scope, and timing of such discovery.  This has stymied our ability to determine the particulars of Plaintiffs' conduct and the extent of any resulting prejudice.

Sotheby's received copies of the Materials after we submitted a demand to counsel for Yves Bouvier following Intervenors' reference to the Materials in their Memorandum of Law in Support of Motion for Destruction of Documents Obtained Via Section 1782 Petition, filed on July 27, 2019 in *In re Accent Delight Int'l Ltd.*, 16-MC-00125.  ECF No. 192 at 16 n.2.  The passage stated:  "[A] search of a computer possessed by [Tetiana] Bersheda that was authorized by the investigating magistrate in the Monaco criminal proceeding against Rybolovlev, Bersheda, and others determined that Bersheda possessed, and disseminated in or about October 2016 . . . highly confidential and privileged documents stolen from Sotheby's."  *Id*.  Bouvier's counsel also provided a copy of the October 21, 2016 transmittal email referenced in the footnote.  That email is attached hereto as Exhibit A, along with redacted copies of the Materials.

Arnold & Porter prepared the Materials in or about April 2016 in connection with our internal review of Sotheby's role in the transactions at issue here, and as part of our cooperation with a now-closed investigation by the U.S. Attorney's Office for the Southern District of New York.  The first document, titled "Sotheby's - Sam Valette Interview Outline," provides a comprehensive roadmap, running nine single-spaced pages, for a meeting with Samuel Valette, the primary contact between Sotheby's UK and Bouvier, before he appeared for questioning at the SDNY.  The second document, titled "Grand Jury Subpoena - Blancaflor Sales & Resales Data," summarizes information

# Arnold&Porter

The Honorable Jesse M. Furman
August 26, 2019
Page 2

gathered concerning artworks listed on a grand jury subpoena.  Both documents are clearly marked as attorney-client privileged communications and/or work product.  The transmittal email, whose subject line references the "1782 application," shows Plaintiffs' representatives discussing the Materials on October 20-21, 2016,[1] around the time of the October 19 conference in that proceeding at which the Court granted Sotheby's motion limiting discovery to the contours to which Plaintiffs had agreed.  *See* ECF No. 68.

Sotheby's has met and conferred with Plaintiffs, unsuccessfully, in an effort to reach agreement on discovery into their acquisition and use of the Materials.  The limited information we learned has raised new questions and concerns.  Plaintiffs represent that a James Gallon, purportedly an unrelated third party, received the Materials by mistake on April 5-6, 2016 during his stay at the Westbury Hotel in London, whereupon Gallon—after noticing that the documents concerned Rybolovlev—transported them to *Monaco*, where he gave them to an employee of Rybolovlev's affiliate Rigmora Holdings Ltd. named Jonty Buirski, whom Gallon knows socially.[2]  On April 19, 2016, Plaintiffs' NY counsel received the Materials from Plaintiffs' lawyer Fedele.  NY counsel report that they deleted the Materials immediately upon recognizing what they were.  However, Plaintiffs themselves—and other of their agents and lawyers, including Bersheda, the lawyer who was directing and coordinating Plaintiffs' legal claims relating to the Bouvier transactions at the time—continued to possess and use the Materials.  We do not yet know the full extent of that use, but have learned from NY counsel:  (1) that one of Plaintiffs' lawyers, whose name has not been provided, incorporated the Materials into an internal document; and (2) that Plaintiffs have shared the Materials with the press.

Discovery into all of these areas is warranted.  Plaintiffs' NY counsel represent that they have not used the Materials in this action, that Plaintiffs' acquisition and use of the Materials took place abroad, and that the (limited) information provided to us is therefore more than they are obligated to provide.  We disagree.  Neither we nor Plaintiffs' NY counsel are in a position to know what impact Plaintiffs' possession and use of the Materials has had on proceedings before this Court.  Given the sensitive nature of the Materials, and the detailed disclosure of the thought processes and theories of Sotheby's attorneys contained in them, there is at a minimum a real possibility that

---

[1] The transmittal email was sent by Plaintiffs' attorney (and Bersheda's associate) Simona Fedele to Brian Cattell of Harmony International and Sergey Chernitsyn, and copied Bersheda.

[2] The Materials had been delivered to the Westbury Hotel on April 5, 2016, in a sealed envelope marked "CONFIDENTIAL" and addressed to Marcus Asner, who stayed at the hotel that night in advance of the Valette interview.  Located across the street from Sotheby's UK's office, it is where Sotheby's lawyers and employees often stay when visiting the office.

# Arnold&Porter

The Honorable Jesse M. Furman
August 26, 2019
Page 3

Plaintiffs and Bersheda used the Materials and their contents to obtain an unfair advantage in this litigation. Although we accept NY counsel's representation that they have not themselves seen the Materials or (knowingly) used any information contained in them, we have reason to believe that Bersheda, who had the Materials at her disposal for three years, played a central role in directing all of Plaintiffs' litigations. Discovery is needed to determine whether and how Bersheda, Plaintiffs, and their other agents used the Materials. NY counsel have represented that, after receiving our letter regarding the Materials on July 30, 2019, they instructed that the Materials no longer be shared with the press and took action to ensure that lawyers who had the document incorporating the Materials deleted it. But discovery is needed to learn all of the relevant facts regarding what happened *up until July 30, 2019.* We know that, at a minimum, Plaintiffs' representatives used the Materials in connection with the § 1782 proceeding; created an internal document using them; and shared them with the press.

Moreover, Plaintiffs' story about how they obtained the Materials is highly suspect. It is not credible that an innocent third party staying at a hotel in London, having mistakenly received a sealed envelope addressed to someone else and marked confidential, would—instead of returning the package to hotel staff—choose to transport the documents to Monaco and deliver them to a Rybolovlev affiliate. That story cries out to be tested. It is critical that the true facts be revealed, so that Sotheby's may seek any appropriate remedy regarding both the acquisition and subsequent use of the Materials.

Sotheby's seeks immediate, targeted discovery to identify and obtain documents and testimony from: (1) those individuals with knowledge of the circumstances under which the Materials were initially obtained; (2) those individuals who received, transmitted, and used the Materials; and (3) those individuals who created, circulated, and received the internal document that incorporated the Materials. The Court has the authority to order the fact-finding we seek, including targeted discovery into how a party came to possess and/or use its adversary's privileged materials. *See, e.g., Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, No. 1:15-CV-2457-GHW, 2019 WL 1244493, at *6 (S.D.N.Y. Mar. 18, 2019) (noting inherent authority to conduct investigation into potentially improper litigation behavior); *Knitting Fever, Inc. v. Coats Holdings Ltd.*, No. CV05-1065 (DRH)(WDW), 2012 WL 13098758, at *1 (E.D.N.Y. Aug. 27, 2012) (court ordered depositions and "directed [plaintiff] to furnish documents and computer hardware for inspection" regarding receipt of privileged materials); *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1296 (D. Utah 2016) (court stayed case so parties could "conduct discovery on the allegations of misconduct and file sanctions motions, if any, based on a more complete record"), *aff'd*, 890 F.3d 868 (10th Cir. 2018); *Ponte v. Sage Bank*, 255 F. Supp. 3d 344, 346 (D.R.I. 2015) (court ordered "limited discovery relating to how [plaintiff] came into possession of the privileged information").

# Arnold&Porter

The Honorable Jesse M. Furman
August 26, 2019
Page 4

> We thank the Court for its consideration of this request.

> Respectfully,

> /s/ Marcus A. Asner
> Marcus A. Asner

> *Attorneys for Defendants Sotheby's and
> Sotheby's, Inc.*

Cc: All counsel of record (via ECF)

# EXHIBIT A

| | |
|---|---|
| **De:** | Simona Fedele |
| **Envoyé:** | vendredi 21 octobre 2016 11:16 |
| **À:** | 'bcattell@harmonyconsult.com' |
| **Cc:** | Tetiana TB. Bersheda; Sergey Chernitsyn |
| **Objet:** | 1782 application - documents |
| **Pièces jointes:** | doc 1.pdf; doc 2.pdf; FW: Da Vinci |

Dear Brian,

Please find below a link for you to download the rest of the publicly available documents filed in the 1782 proceedings:

Link: http://gofile.me/2aHiJ/KlWVwqUhb
Password: T6bF3dLkwP2
Valid until: 28 October 2016

I attach here the documents you discussed yesterday with Tetiana.

Kind regards,

Simona Fedele

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
4/6/2016

### Sotheby's - Sam Valette Interview Outline
### April 6, 2016



PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
4/6/2016



PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
4/6/2016



PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
4/6/2016



4

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
4/6/2016



PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
4/6/2016



PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
4/6/2016



PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
4/6/2016



PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT
4/6/2016



PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT / DRAFT

**Grand Jury Subpoena - Blancaflor Sales & Resales Data**



72715997v3

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT / DRAFT



72715997v3

PRIVILEGED AND CONFIDENTIAL
ATTORNEY CLIENT COMMUNICATION
ATTORNEY WORK PRODUCT / DRAFT



# EXHIBIT 5

# EMERY CELLI BRINCKERHOFF & ABADY LLP

RICHARD D. EMERY
ANDREW G. CELLI, JR.
MATTHEW D. BRINCKERHOFF
JONATHAN S. ABADY
EARL S. WARD
ILANN M. MAAZEL
HAL R. LIEBERMAN
DANIEL J. KORNSTEIN
O. ANDREW F. WILSON
ELIZABETH S. SAYLOR
KATHERINE ROSENFELD
DEBRA L. GREENBERGER
ZOE SALZMAN
SAM SHAPIRO

ATTORNEYS AT LAW
600 FIFTH AVENUE AT ROCKEFELLER CENTER
10TH FLOOR
NEW YORK, NEW YORK 10020

TEL: (212) 763-5000
FAX: (212) 763-5001
www.ecbalaw.com

DIANE L. HOUK

ALISON FRICK
DAVID LEBOWITZ
DOUGLAS E. LIEB
ALANNA KAUFMAN
EMMA L. FREEMAN
DAVID BERMAN
ASHOK CHANDRAN

August 27, 2019

*By ECF*

Hon. Jesse M. Furman
U.S. District Judge
Southern District of New York

     *Re:*    *Accent Delight Int'l Ltd. et al. v. Sotheby's et al.*, No. 18-CV-9011

Your Honor:

We write on Plaintiffs' behalf to oppose Sotheby's letter motion of August 26, 2019, requesting a pre-motion conference concerning discovery it has not yet served ("Sotheby's Ltr.", Dkt. #75). The Court should deny Sotheby's precipitous request for ambiguous relief.

Three-and-a-half years ago, Plaintiffs were given two apparently privileged documents belonging to Sotheby's (the "Documents") by an unrelated third party. Our firm has never reviewed or used the Documents, and they have not been and will never be used in this lawsuit. When Sotheby's approached us in late July 2019 about this issue, we took its concerns seriously, promptly investigated, and responded in good faith. As we have explained to Sotheby's directly, we have made as many disclosures as we think appropriate, short of disclosing attorney-client communications or attorney work product. If the Court has additional questions that call for the disclosure of privileged information, we would be pleased to answer them *in camera*.

While we agree that this is a matter of importance, adequate measures have been taken to address it. Sotheby's has neither legal nor factual grounds to conduct a separate discovery proceeding that intrudes into attorney-client communications and attorney work product created by Plaintiffs' counsel around the world. This case is in discovery. Discovery about matters relevant to this lawsuit should proceed in the ordinary course.

***Our Understanding of the Facts***. In response to Sotheby's July 30 inquiry, we conducted an investigation. Sotheby's letter accurately summarizes the basic information we learned about James Gallon receiving the Documents at the Mayfair Hotel on the night of April 5-6, 2016 and giving the documents to Jonty Buirski, a social acquaintance from Monaco whom Mr. Gallon knew to be associated with Dmitry Rybolovlev. (We understand that Mr. Gallon lived or frequently spent extended periods of time in Monaco during the relevant period.)

EMERY CELLI BRINCKERHOFF & ABADY LLP
Page 2

     Foreign counsel for Plaintiffs emailed the materials to our firm on April 19, 2016. The nature of the Documents was not readily apparent from the cover note. That the Documents were privileged was clear to us upon opening an attachment. We immediately deleted the Documents and have not used or relied upon them in any way since. Neither the pleadings in this case nor our filings in the § 1782 proceedings contain information drawn from the Documents.[1] We do not believe the use or non-use of the Documents in any foreign jurisdiction to be germane to this case. The use of apparently privileged materials in any foreign jurisdiction or any foreign legal proceedings would be governed by foreign laws and ethics rules. Nonetheless, to the best of our knowledge, the Documents have not been used in any legal proceeding in any other jurisdiction.

     We did not inform Sotheby's of our receipt and destruction of the documents in 2016 because the fact that our clients received the Documents from a third party was confidential and privileged client information. We did not believe we had a basis, let alone an obligation, to breach our clients' confidence by informing Sotheby's. *See, e.g.*, N.Y. R. Prof'l Conduct 4.4; NYSBA Ethics Op. 945; ABA Formal Ethics Op. 06-440. The appropriate remedy under such circumstances would have been, at most, to prevent the use of the privileged material in litigation between the parties. *See, e.g.*, *Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 325-26 (S.D.N.Y. 1997). We would not use such information in this litigation in any event. We have explained this position to Sotheby's and have not received any authority to the contrary.

     We are aware of one internal memo created by Plaintiffs' counsel in another jurisdiction that incorporated information from the Documents. We have not reviewed or used it. Out of an abundance of caution, we have instructed all counsel who possess that memo or the Documents to delete and not use them, consistent with applicable laws and ethical rules in their jurisdictions.

     ***Sotheby's Overbroad and Premature Request***. Plaintiffs properly declined Sotheby's request to "consent" to a sweeping inquiry into the use of the Documents or any information derived from them by all of Plaintiffs' counsel anywhere in the world. Sotheby's assertion that it is entitled to probe whether the Documents informed Plaintiffs' decision to *bring* this case, even though they were not and will not be used in the case, is misguided for several reasons.

     First, based upon privileged conversations with our clients and their representatives, we can represent with confidence that we have not based our decisions in this case on the Documents, as those decisions have an independent basis. Sotheby's speculation in its letter about Tetiana Bersheda's role is inaccurate. We would be willing to elaborate further *in camera*.

     Second, any meaningful attempt by Sotheby's to explore this issue would necessarily infringe Plaintiffs' privileges. Plaintiffs' decision to file this case was based on the advice of counsel in multiple jurisdictions. Sotheby's cannot parse the reasons why Plaintiffs brought this lawsuit without infringing those privileges. We are unaware of any authority allowing Sotheby's to invade those privileges here because our clients received the Documents.

---

[1]    Sotheby's claim that Plaintiffs "used the Materials in connection with the § 1782 proceeding" is misleading. Sotheby's Ltr. 3. The cover email from Simona Fedele sends two public relations professionals a link to filings from the public docket in the § 1782 proceedings and also provides them with the Documents. The suggestion that Plaintiffs used the Documents in the § 1782 proceedings in any way is inaccurate and without basis.

EMERY CELLI BRINCKERHOFF & ABADY LLP
Page 3

Third, the extent to which information derived from the Documents may have affected the choice to file suit around the margins is largely unknowable. Whether counsel in a foreign jurisdiction might have made a different suggestion two years ago if they had never seen the Documents, which might in turn have led Plaintiffs to chart a different course, is in many respects a fundamentally unanswerable question—in addition to being clearly privileged.

Finally, Sotheby's simply assumes that Plaintiffs were obligated not to use the Documents. The New York attorney ethics rules, with which we have complied, govern our Firm's conduct. Foreign ethics rules govern Plaintiffs' foreign counsel. Plaintiffs (which are British Virgin Islands entities) and non-lawyers associated with Plaintiffs are not bound by attorney ethics, but only by law. That foreign non-lawyers could not freely use privileged documents given to them by third parties is hardly obvious. To clarify this issue, we repeatedly invited Sotheby's to identify any legal prohibition it believes Plaintiffs or their agents may have breached by considering the Documents. Sotheby's declined. Absent any standard to guide the parties or reason to believe that it would have been *improper* for Plaintiffs to consider the Documents, no reason exists to conduct a rudderless inquiry into whether Plaintiffs did so.

***A Separate Discovery Track is Unwarranted***. We again asked Sotheby's to provide legal authority supporting its request for a separate discovery track to explore how Plaintiffs got the Documents and what Plaintiffs did with them around the world; it again declined.[2]

Sotheby's cannot claim to be "stymied" from getting information without having served a single interrogatory or document demand. Sotheby's Ltr. 1. Sotheby's has the tools of the Federal Rules at its disposal right now and does not need Plaintiffs' consent or the Court's authorization to proceed. Plaintiffs will honor their obligations under the Rules. Should Plaintiffs make objections that the parties cannot resolve, the Court can rule as necessary. Plaintiffs cannot be expected to agree in advance to requests not served or to produce witnesses not within their control. No emergent circumstances exist that would warrant such extraordinary measures.[3]

While an objection to requests not yet served on Plaintiffs would be premature, we note that this case is not the appropriate forum to manage the use of the Documents around the globe. For the purposes of this case, the essential point is that the Documents have not been and will not be used here. We reiterate our commitment to address any remaining concerns in a manner consistent with our obligations to our clients. Sotheby's premature request for vague relief should be denied, but we are prepared to discuss these issues further at the Court's convenience.

---

[2]     The cases it now cites confirm that its request is both premature and disproportionate. *See, e.g.*, *Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, No. 1:15-CV-2457, 2019 WL 1244493, at *6 (S.D.N.Y. Mar. 18, 2019) (ordering additional discovery in connection with post-discovery hearing on Rule 11 sanctions for filing frivolous claims); *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1296 (D. Utah 2016) (staying case for targeted discovery after filing of motion for terminating sanctions); *Ponte v. Sage Bank*, 255 F. Supp. 3d 344, 346 (D.R.I. 2015) (limited discovery ordered after filing of motion to enjoin litigation counsel from using a privileged document that he expressly threatened to use).

[3]     If the Court does create a separate discovery track, it should be reciprocal. Sotheby's has relevant information: Were the Documents delivered to Mr. Asner as intended? If so, did he take them with him, leave them behind, or discard them? Did he lose them? If he did not get the Documents, did he inform hotel staff? Were efforts made to find the Documents? With what result? Were the Documents intentionally disclosed to Mr. Gallon?

E MERY C ELLI B RINCKERHOFF & A BADY LLP
Page 4

                                         Respectfully submitted,

                                         /s/

                                         Daniel J. Kornstein
                                         O. Andrew F. Wilson
                                         Zoe Salzman
                                         Douglas E. Lieb

c.       All counsel of record (by ECF)