# EXHIBIT 54

**Valette, Samuel**

| | |
|---|---|
| **From:** | Valette, Samuel |
| **Sent:** | Tuesday, January 27, 2015 1:33 PM |
| **To:** | Yves Bouvier (NLC) (yb@falnlc.sg) |
| **Subject:** | Private & Confidential Draft Val |
| **Attachments:** | Private&Confidential.pdf; YB.pdf |

Bonsoir Yves,

Voici le DRAFT document du département des tableaux anciens. Ils placent la valeur à $100.000.000 et insistent sur la rareté et la difficulté à estimer. Dis-moi si ça te convient.

Très amicalement,

Sam.

**Sotheby's,**
**Registered Office: 34-35 New Bond Street, London W1A 2AA**
**Registered in England and Wales, No. 874867**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016

STRICTLY PRIVATE AND CONFIDENTIAL

Sotheby's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016                    STH0002465

Leonardo da Vinci
CHRIST AS SALVATOR MUNDI, CIRCA 1499
Oil on walnut panel
*45.4 cm x 65.6 cm (25.8 in x 17.9 in)*

$100,000,000

PROVENANCE
King Charles I of England (1600-1649),
Greenwich (by 1649); sold at the
Commonwealth Sale, 1651, £30 to Stone;
John Stone, 1651-1660;
King Charles II of England, Whitehall
(1660-1685);
King James II of England, (1685-1688?);
Probably taken from Whitehall, ca. 1688,
by his son-in-law, John Sheffield, 3rd Earl
of Mulgrave, later 1st Duke of Buckingham
and Normanby (died 1721), Buckingham
House, London;
By descent to his wife, Catherine Darnley,
Duchess of Buckingham (died 1743);
By descent to Charles Herbert Sheffield,
natural son of John Sheffield (Buckingham
House sold to the George III in 1761);
Sold, "Pictures Brought from Buckingham-
House," London, Prestage, 24 February
1763, lot 53 ("L. Da Vinci ... A Head of our
Saviour") for £2-10-0;
Sir John Charles Robinson, Newton
Manor, Dorset, 1900;
From whom acquired for £120 (as Luini) by
Sir Francis Cook, 1st Bt. (1901), Doughty
House, Richmond;
By descent to Sir Frederick Lucas Cook,
2nd Bt. (1901-1920), Doughty House,
Richmond; By descent to Sir Herbert
Frederick Cook, 3rd Bt. (1920-1939),
Doughty House, Richmond; By descent to
Sir Francis Ferdinand Maurice Cook, 4t
Bt., Doughty House, Richmond (1939-
1958);



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016    STH0002466

Cook Collection Sale, Sotheby's, London, June 25, 1958, lot 40 (as "Boltraffio"), £45 to Kuntz
Private Collection, USA; where acquired by the present owner

EXHIBITED
Wolverhampton, Municipal Art Gallery, Sacred Art; A Selection of Paintings from the Cook Collection Lent by Sir Francis Cook, Bt., and the Trustees, June 1947;
Bolton, Bolton Art Gallery 9 August – 6 September 1947, cat. no. 17; Eastbourne, Towner Art Gallery, 1948, cat. no. 106 (as Milanese school, c. 1500);
London, National Gallery, Leonardo da Vinci; Painter at the Court of Milan, 9 November 2011 – 5 February 2012, cat. no. 91, (as by Leonardo da Vinci).

LITERATURE
T. Borenius in H. Cook ed. A Catalogue of the Paintings at Doughty House, Richmond, Vol. I, London 1913, no. 106, p. 123 (as a free copy after Boltraffio's original then in the collection of the late G.B. Vittadini, Arcore);W. Suida, Leonardo und sein Kreis, Munich 1929, p. 140;
M.W. Brockwell ed., Abridged Catalogue of the Pictures at Doughty House Richmond Surrey in the Collection of Sir Herbert Cook, Bart, London 1932, p. 30, no. 106 (as Milanese School);
K. Clark, The Drawings of Leonardo da Vinci in the collection of Her Majesty the Queen at Windsor Castle, London 1935;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016                    STH0002467

second edition, revised with the assistance of C. Pedretti, London 1968-69, p. 94 (as a replica after a lost original by Leonardo); W.E. Suida, in W.R. Valentiner and W. E. Suida, et. al., Leonardo da Vinci Loan Exhibition, exhib. cat., Los Angeles 1949, pp. 85-86 (as a version of a composition connected with Leonardo);

L.H. Heydenreich, 'Leonardos 'Salvator Mundi' in Raccolta Vinciana, vol. XX (1964), p. 109, no. 6; reprinted in Heydenreich, ed. Passavant, Leonardo-Studien (Munich 1988), p. 112, no. 6 (in a ruinous state);

J. Snow-Smith, 'The Salvator Mundi of Leonardo da Vinci' in Arte Lombarda, vol. 50, 1978, p. 69 (as a copy after the de Ganay painting which she here proposes as Leonardo's lost original);

P. Trutty-Coohill, Studies in the School of Leonardo da Vinci: Paintings in Public Collections in the United States with a Chronology of the Activity of Leonardo and his Pupils and Catalogue of Auction Sales, unpub. Ph.D. diss., Pennsylvania State University, 1982, pp. 144 and 153n10. (list only);

J. Snow-Smith, The Salvator Mundi of Leonardo da Vinci, Seattle 1982, pp. 11, 12, fig. 7 (as after Boltraffio. She rejects it as Leonardo's original because it differs from Hollar's etching in the lack of a jewel in the centre of stole, the cross hatching in the neckband and Christ's lack of a beard [all areas that had been obscured by the later repainting]);

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016          STH0002468

E. Danziger and J. Somerville, 'Concordance of Cook Collection paintings' no. 106, Online supplement to E. Danziger 'The Cook collection, its founder and its inheritors' in The Burlington Magazine, vol. CXLVI, July 2004, pp. 444-458 (list only);

M. Kemp, Leonardo, rev. ed., Oxford 2011, pp. 208-9, 258, pl. 19 (as Leonardo's original version);

L. Syson, Leonardo da Vinci; Painter at the Court of Milan, exhib. cat. London 2011, pp. 47-48, 282-283, 298-303, cat. 91 (as by Leonardo, datable to 1499 onwards);

P. Joannides, Review of Leonardo da Vinci; Painter at the Court of Milan in Paragone, July 2011, pp. 57-58 ("a new attribution that carried conviction". Joannides accepts the painting as an autograph work by Leonardo, and writes that the "some of the drapery might be by an assistant" as he believes is the case with some of the Belle Ferronière's bodice);

M. Bailey, The Art Newspaper, September 2011, (as a rediscovery by Leonardo, it records that the attribution is accepted by Luke Syson, Nicholas Penny, Carmen Bambach, Andrea Bayer, Keith Christiansen, Everett Fahy, David Alan Brown, Mina Gregori, Maria Teresa Fiorio, Pietro Marani, David Ekserdjian and Martin Kemp. It notes that the only scholar who does not accept the attribution is Carlo Pedretti);

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016

STH0002469

M. Kemp, 'Sight and Salvation' in Nature, vol. 479, 11 November 2011, pp. 174-5.11 (as by Leonardo; also suggesting that it was the "Christ in the Manner of God the Father" recorded in 1525 in the collection of Gian Giacomo Caprotti, called Salaì);
C.C. Bambach, 'Seeking the universal painter' Apollo, vol. CLXXV, no. 595, February 2012, p. 84, fig 4 ("much of the original paint surface may be by Boltraffio, but with passages done by Leonardo himself, namely Christ's proper right blessing hand, portions of the sleeve, his left hand and the crystal orb he holds." [her view, contrary to that of most scholars, perhaps explained by the fact that those parts Bambach speculates as being by Boltraffio are the least well preserved, whilst those she considers to be by Leonardo are the best preserved]);
C. Robertson, 'Leonardo da Vinci' in The Burlington Magazine, vol. XLIV, February 2012, p. 133 it ("displays qualities of conception that are strongly associated with Leonardo" yet he finds it hard to accept as an unambiguously autograph work, along with the Madonna of the Yarnwinder and the Madonna Litta);

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016    STH0002470

P. C. Marani, Dossier de l'art, no. 195, April 2012, pp. 60-62; as by Leonardo and noting that this view was also taken by the following scholars who had seen it in the restoration studios of the National Gallery in 2008: Nicholas Penny, Luke Syson, Martin Kemp, Carmen Bambach and Maria Teresa Fiorio; Marani also notes that others saw the painting as the work of one of Leonardo's most gifted assistants – views expressed by Alvar Gonzales Palacios and Cesare de Seta (in Sole 24 ore and La Repubblica ; and that Carlo Pedretti, in an interview in Corriere deal serra, had expressed doubts but admitted he had never seen the picture after restoration);

F. Ames-Lewis, Isabella and Leonardo; The Artistic Relationship between Isabella D'Este and Leonardo da Vinci, 1500-1506, New Haven-London 2012, pp. 192-221, figs. 96, 100 (as by Leonardo. It is "seriously damaged, but has passages of high quality painting" (p.200) and is almost certainly the painting which Hollar based his etching on, and is painted in a way that "was entirely characteristic of Leonardo's own technical treatment". It "is an important new addition to Leonardo da Vinci's oeuvre" (p.204));

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016                    STH0002471

M. Kemp, Christ to Coke; How Image Becomes Icon, Oxford 2012, pp. 35-7, fig. 1.12 (as by Leonardo and datable to c. 1505-09);

M. Kemp, 'News from Leonardo: Do the Ayes Have It?' in IFAR Journal, vol. 13, no. 4, 2012/13, pp. 36-53, as Leonardo, but with the comment, "I would be delighted if all the Leonardo scholars accepted the Salvator Mundi, but indeed there are still questions about it...We will probably need another fifty years or so for complete consensus" (p.51) [Subsequent correspondence with Kemp clarifies that the scholars to whom he was referring who did not accept it were Carlo Pedretti and Frank Zöllner. Pedretti's negative comment was made without seeing the painting or a recent photograph (formulating his judgement from the 1913 black-and-white photograph showing the painting in its over-painted state). Zöllner also initially commented without having seen the picture, but having seen a high-resolution image of the painting has confirmed that in the next edition of his Taschen Leonardo book, the caption will read "Leonardo da Vinci"



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016

STH0002472

FURTHER NOTES

Leonardo is considered by many to be the greatest figure in Western art and his celebrated *Mona Lisa* is without question the most famous painting in the world. It is testament to Leonardo's genius that this position of pre-eminence, which has endured over five centuries, should have been established by a production of fewer than twenty paintings (see Appendix 1). The emergence of the present work and its widespread acceptance by scholars as an autograph work by the master, following a lengthy period of study and restoration, may be considered perhaps the most important art-historical re-discovery of the last hundred years.

It has long been known that Leonardo painted a composition depicting Christ as Salvator Mundi, which is recorded in more than twenty painted copies (most from the 16th century), as well as from a reproductive etching made by Wenceslaus Hollar in 1650. Recorded as being in the collection of King Charles I of England, the original was thought to be lost. Although the present painting had been known for over a century, it was largely inaccessible to scholars, being held in private collections (in England from 1900, and, after 1958, in the United States). More significantly, however, in explaining its having been overlooked is the fact that its appearance had been radically altered by over-painting, which obscured much of its original painted surface. This disfiguring repainting had evidently been undertaken some time ago and the painting is recorded in this crude state in a photograph preserved at the Witt Library of the Courtauld Institute, London, taken when the painting was in the Cook collection in England. At the time of its re-emergence in 2005, it was also evident that the picture's support, a walnut panel, had been compromised by attempts to minimize its curvature and stabilize its movement, the most recent being a mahogany-and-oak cradle affixed in the late nineteenth century.

A comprehensive program to examine, treat, and study the painting was begun with Dianne Dwyer Modestini (Senior Research Fellow and Paintings Conservator for the Samuel H. Kress Program at the Conservation Center of the Institute of Fine Arts, New York University) supervising the overall conservation of the painting and undertaking the cleaning and restoration of the paint surface; Monica Griesbach (a specialist conservator in private practice, specializing in wood panels) was responsible for the treatment of the panel support; and technical studies were undertaken by Nica Gutman Rieppi (Conservation Center of the Institute of Fine Arts) and Charlotte Hale (Paintings Conservator of the Metropolitan Museum of Art). As this process of treatment and technical examination coupled with art-historical research progressed, the real possibility of Leonardo's authorship became evident and the painting was shown to a number of the leading scholars in this field in order to try to establish a consensus on its attribution. After the initial phase of conservation had been completed in the autumn of 2007 the painting was seen by Mina Gregori (University of Florence) and Nicholas Penny (Director, National Gallery, London; then Curator of Sculpture, National Gallery of Art, Washington). Shortly thereafter the painting was studied at the Metropolitan Museum of Art by museum curators Carmen Bambach, Andrea Bayer, Keith Christiansen, and Everett Fahy, and by Michael Gallagher (head of the department of painting conservation). In late May 2008, the painting was brought to the National Gallery in London at the invitation of Nicholas Penny and Luke Syson (Curator of Italian Paintings, now Curator of European Sculpture and Decorative Arts, Metropolitan Museum), who had earlier seen the painting in New York. It was then examined, together with the National Gallery's *Virgin of the Rocks,* by several invited Leonardo specialists: Carmen Bambach, David Alan Brown (Curator of Italian Painting, National Gallery of Art, Washington), Maria Teresa Fiorio (Raccolta Vinciana, Milan), Martin Kemp (Emeritus Professor of Art History, University of Oxford), and Pietro C. Marani (Professor of Art History, Politecnico di Milano). More recently, following the completion of conservation treatment in 2010, the painting has again been studied in New York by several of the above, as well as by Vincent Delieuvin (Curator of Italian Paintings, Musée du Louvre), David Ekserdjian (Professor of History of Art and Film, University of Leicester), David Rosand (Professor of Art History, Columbia University), and Patricia Rubin (Director, Institute of Fine Arts, New York University).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016          STH0002473

The study and examination of the painting by these scholars resulted in a strong consensus of opinion that the *Salvator Mundi* was painted by Leonardo da Vinci and that it is the single original painting from which the many copies and versions depend. Individual opinions vary slightly in the matter of dating. Most place the painting at the end of Leonardo's Milanese period in the late 1490s, contemporary with the completion of the Last Supper. Others believe it to be slightly later, painted in Florence (where Leonardo moved in 1500), contemporary with the *Mona Lisa*. One scholar has suggested that the painting was begun in Milan and completed in Florence, over a period of a few years. Whilst the overwhelming view of the principal scholars in this field has been in favour of the attribution to Leonardo, there is, perhaps inevitably with a re-discovery of this importance, scepticism expressed by a minority of those scholars who have considered it.  Amongst these is Carlo Pedretti, whose negative opinion, however, was made without seeing the picture post-restoration.  Questions about the extent of workshop assistance have been raised by both Bambach and Robertson (see Literature) but others, who had not been consulted prior to the 2011/2012 National Gallery exhibition, such as Joannides (see Literature) have joined the overall consensus in supporting the attribution to the painting.  It is to be expected that the forthcoming publication,  *The Lost Christ of Leonardo Da Vinci,* due to be published by Yale University Press, London, in the autumn of 2013, (with contributions by David Ekserdjian, Martin Kemp, Pietro Marani, Robert Simon, Margaret Dalivalle, Dianne Modestini,  Monica Griesbach, Nica Gutman Rieppi, Beth Price, and Ken Sutherland will further strengthen the general consensus of the painting's autograph status within the Leonardo scholarly community.

Provenance
The confirmed modern history of the painting began in 1900 when it was acquired by Sir Francis Cook, the founder of what became known as the Cook Collection of Doughty House, Richmond, Surrey. Cook had purchased the *Salvator Mundi* as a work by Luini from or through his trusted advisor, Sir J. C. Robinson, the former Director of the South Kensington (later Victoria and Albert) Museum. The attribution of the painting soon shifted towards Boltraffio; it was as a "free copy after Boltraffio" that the *Salvator Mundi* was catalogued the 1913 catalogue of the Cook Collection. Although subsequently cited in various articles and books, the painting was illustrated only once (in Snow-Smith's 1982 volume), and it was as a copy after Boltraffio that the picture was sold in the 1958 auction of Cook pictures at Sotheby's.

The early provenance of Leonardo's *Salvator Mundi* had been the subject of varied speculation before the reappearance of the present painting. Hollar's etching, specifically subscribed "after the original" is dated 1650, when the printmaker was resident in Antwerp. Proposals that he had seen Leonardo's painting in France (either in the French Royal Collections or at Nantes) or in the collection of Thomas Howard, the Earl of Arundel and Surrey (or his widow Alethea) – whether in England or, later, in Antwerp -- cannot be substantiated. There is no record of any painting potentially identifiable identified with the *Salvator Mundi* in these collections at that time.

Rather evidence indicates that Hollar would have seen the painting during his tenure in England, where he lived for six years until 1644 when he, a Royalist, fled to the Continent. As is the case with many of his other reproductive prints, Hollar would have utilized his own drawn copy after the original for the etching then published in 1650.

The source for Hollar's composition was in fact a painting documented in the greatest of English collections – that of King Charles I. Significantly, Hollar had access to the Royal Collection —he was employed to instruct the King's children in drawing— and made copies after many works in it. The posthumous inventory drawn up after the execution of Charles in 1649, and associated with the "Sale of the Late King's Goods" contains the earliest reference to be associated with the *Salvator Mundi*:

" [49] A peece of Christ done by Leonardo at 30: 00: 00/

Sold to Stone a/o 23 Oct. 1651"

"A True Inventory of severall Pictures, now in ye custody of Mr Henry Browne &c. viewed and. apprised ye 8o septembr 1649: / The pictures wch were. in both ye Closetts at Grenewch," [L.R. MS., f.5], as cited in Oliver Millar, *The Inventories and Valuations of the King's Goods; 1649-1651* (Walpole Society, vol. 43), Glasgow 1972, p. 63.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016                    STH0002474

As the research recently undertaken by Margaret Dalivalle (see forthcoming publication) has indicated, the painting can be traced following its sale for £30 to John Stone in 1651. It appears in an undated inventory of Stone's holdings as:

"It 49 A pic. of Christ by Leanare ----030 00 00"

Taylour family, British Library, Additional MS 37682 *fs*. 24; 24 *v*; 25, cited by Dalivalle

Nine years later Stone was compelled to return it to the Royal Collection following the Restoration. In a manuscript inventory signed "John Stone," the picture was described as:

"a peece of Christ by Leonard --030-00-00"

Inventory of May 14, 1660, cited by Dalivalle

Once returned to the Royal Collection, the painting appears, now more fully described, in the inventory of the collection of Charles II drawn up by Thomas Chiffinch in the early 1660s:

"Leonard de Vince O.r Savio.r w.th a gloabe in one hand & holding up y.e other".

"An Inventory of all his Ma: ties Pictures in White-Hall," folio 19 (15), under paintings "In the King's Closet", item no. 311. (Manuscript in Surveyor's Office, St. James's Palace)., cited by Dalivalle.

On the death of Charles II in 1685, the painting would have passed to his successor, his brother James II, but the *Salvator Mundi* was no longer present when the inventory of James II's pictures was compiled in 1688. Its exit from the Royal Collection most likely came through the agency of John Sheffield, 1st Duke of Buckingham, 3rd Earl of Mulgrave, and Marquis of Normanby (1648-1721). Buckingham (or Mulgrave as he was often called) was a notable figure at the court of James II. He served as Lord Chamberlain and was to marry Catherine Darnley, the natural daughter of James II by Catherine Sedley, Duchess of Dorchester. Several paintings from the Royal Collection migrated to that of the Duke of Buckingham, whether by inheritance, gift, or theft. It is perhaps not unconnected that he was the very person whom James II charged with preparing the 1688 inventory of his collection.

Following Buckingham's death in 1721 and that of his wife in 1743, his property passed to his natural son, Charles Herbert Sheffield (ca. 1706-1774). In 1761 Charles sold the family's London residence, Buckingham House, to George III, who would rebuild it as Buckingham Palace. Two years later Charles sent his father's art collection to auction. The sale, conducted in London by Mr. Prestage on Feb. 24, 1763 of "Pictures Brought from Buckingham-House" included as lot 53:

"L. Da. Vinci ... A Head of our Saviour"

One priced copy of the sale catalogue survives (at the Rijksbureau voor Kunsthistorische Documentatie, The Hague) with an indication of the sale price for the Leonardo (£2-10-0), but no mention of the purchaser. Research continues to discover the whereabouts of the painting between 1763 until its acquisition for Sir Francis Cook by Sir Joseph Charles Robinson in 1900.

The painting's fifty-eight year tenure in the Cook Collection is one of relative disregard. It appeared in the collection catalogue of Herbert Cook, himself a scholar of distinction who published on Leonardo, as a free copy after Boltraffio, and it is astonishing to note that the photographer who recorded the Long Gallery at Doughty House, where the painting hung, positioned his camera in front of the *Salvator Mundi* but pointing away from it, so that it does not appear in the image. That the painting had by then been overpainted is evident from the Gray photograph referenced in the 1913 catalogue. That it remained so is confirmed by manuscript notes in the 1932 catalogue by the Cook curator Kaines-Smith, who wrote "frightfully overpainted" and "not to be restored." (These references courtesy of the Cook Collection archivist John Somerville). In reports drawn up by the restorer W.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016

STH0002475

H. Drown in the early 1940s the painting is among "Pictures mostly in bad condition which must be tested to ascertain whether of sufficient quality & value to justify the necessary outlay for restoration" and is listed with the note "Most amateur state of repaint."

With London under threat of bombardment during the war, what were determined to be the significant paintings in the Cook Collection were evacuated to Cothay or Porthallow, Francis Cook's two country estates. The *Salvator Mundi* remained at Doughty House, evidently in the cellar. The house sustained extensive bomb damage in 1944, but the painting miraculously was not damaged. In 1947 and 1948 the *Salvator Mundi*, catalogued as "Milanese School, c. 1500," was included in an exhibition of "Sacred Art" which toured three provincial museums. At the conclusion of that exhibition it was placed in storage at Addison Crescent. There it was made accessible to dealers and collectors who came to see "what they wanted or that might be for sale." It evidently remained there unnoticed or unwanted it was consigned to Sotheby's in 1958.

How, when, and where Charles I acquired the painting is unknown. One possibility is that the painting came into his possession through James, Third Marquis of Hamilton, a noted collector and intimate of the King who purchased an unspecified painting by Leonardo from the great Venetian collector Bartolomeo della Nave in 1638. Another, perhaps more likely origin would be France, and specifically the French Royal Collections, through the King's marriage to Henrietta Maria, the daughter of Henry IV of France and Marie de'Medici. On her marriage to Charles in 1625 Henrietta Maria did not travel lightly from France: "The new Queen brought to England with her a huge quantity of expensive possessions; including diamonds, pearls, rings, diamond buttons, satin and velvet gowns, embroidered cloaks, skirts, velvet chapelles; 10,000 livres worth of plate, chandeliers, pictures, books, vestments and bedroom sets for her, her ladies in waiting, twelve Oratorian priests and her pages." There are, unfortunately, no listings of the paintings that she brought to England, but in the posthumous inventory of Charles I's collection of 1649, the *Salvator Mundi* is listed as being in the "Closets at Greenwich." –the personal quarters of The Queens House, Henrietta Maria's residence, at Greenwich. (This may explain the painting's absence from van der Doort's 1639 inventory of the Royal Collection, which omitted works in the Queen's apartments). That the subject of the painting was so overtly Catholic makes the Queen's ownership of it more likely as she was famously and somewhat unpopularly the Catholic Queen married to the titular head of the Church of England.

One possibility as to the panel's earliest provenance has been raised by Kemp (see *Literature*, 'Sight and Salvation', 2011) who notes that Leonardo's pupil, Gian Giacomo Caprotti, called Salaì, owned a 'Christ in the Manner of God the Father' according to documents of 1525 that record his property after his death.

Panel
The support for the *Salvator Mundi* is a walnut panel, which was later thinned when affixed to a supplementary panel (marouflage) and cradle, now removed. The panel has survived in very close to its original dimensions. The original barbed edges of the panel survive on all four sides, although color was subsequently applied on all sides save the bottom, which remains unpainted. A raised lip of gesso is visible on all sides in raking light. The extreme left edge of the panel is irregular and intrudes into the barb, reaching but not intruding into the limit of the original paint surface at more than one point –thereby indicating that the panel has been slightly trimmed, probably by a few millimeters. The width of the panel varies from 17 7/8 (45.4 cm) along the top of the panel to 17 5/8 inches (44.8 cm) along the bottom edge.

While poplar is by far the predominant wood support for Italian paintings in general and was utilized, particularly in early works, by the master (*The Annunciation, Ginevra de'Benci, Mona Lisa*, the *Virgin and Child with St. Anne,* the London *Virgin of the Rocks*), walnut panels were both recommended by Leonardo and utilized by him, especially during his time in Milan (*St. Jerome, The Lady with an Ermine, Portrait of a Musician*, and "*La Belle Ferronnière,*" *St. John the Baptist*).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016        STH0002476

Preliminary Drawings

Two drapery studies in the Royal Library at Windsor Castle are preparatory to Leonardo's *Salvator Mundi*. Both (RL152524 and RL152525) are considered autograph drawings by Leonardo, and are generally dated to the early 1500s. Each is drawn in red chalk on reddish orange prepared paper with white pale chalk and heightening and pen and ink. RL152524, which measures 139 by 22 mm. is concerned with the up-stretched right arm of Christ, the cuff of the sleeve, and folds on the drapery that envelop the arm. RL152525 (which measures 164 by 152 mm) depicts a model wearing the tunic that will cover Christ, and methodically indicates the folds and pleats that will fall across his chest, as well as the placement of the stole. Certain compositional changes are visible in the drawing --in the shape of ornamental designs, in their placement in the central lozenge, and the overall arrangement of the drapery, which at this stage does not seem to take into account the inclusion of the blessing hand. A second drawing on the same sheet, at the lower right, provides an initial concept of that arm.

The Hollar Etching of 1650

Hollar's etching of the composition records a near half-length figure of a bearded adult Christ with long ringlets framing his face. He appears frontally against a plain background, an aura of light suggested behind his head. He wears a pleated garment, the top edge of which is delineated by an elaborate knot-work neckband. Below and attached to it, at the centre of his chest, appears decorative knot-work embroidery around an ovular stone and a square stone above. Across Christ's chest an x-shaped stole appears, also decorated with knot patterns and with an ovular stone at the crossing. A robe is draped over his proper left shoulder. Christ's right hand is raised in benediction; his left holds a transparent orb. The subscription of Hollar's print ("Leonardus da Vinci pinxit. Wenceslaus Hollar fecit Aqua forti, secundum Originale, Ao1650") informs us that Hollar has based his etching on what he believed to be an original painting by Leonardo and that it was printed in 1650.

Those scholars who have studied the present painting directly are agreed in dating the painting either at the very end of Leonardo's Milanese period (ca. 1498-99) at about the time of the completion of *The Last Supper,* or during his Florentine period (1500-1506), roughly contemporary with the *Mona Lisa*.

Earlier attempts at dating the composition –made without knowledge of the original painting—were more speculative. The most common dating of 1503-1504 was largely based on the association of the composition and the Windsor drawings with the request of Isabella d'Este for a *Young Christ*. So follow Clark, Popham, Clayton, and Bambach. Heydenreich put his first version of the composition at about this time and the second in the years 1507-13. Marani considered the date to be after 1503-4 (1989), but subsequently placed the painting ca. 1510-13 (1994) before suggesting it should be dated to the 1490s (2005). Pedretti (1973, 1983, and 2008) dated the drawings ca. 1510-1515 and Snow-Smith located the painting accordingly ("probably started earlier, was well along by 1511, even if not completed prior to 1513"). Fiorio (2000) suggested a date of 1506/7, or earlier, but has more recently (2005) proposed a date contemporary with the *Last Supper*, that is, 1495-97. Bartalini (1996) also placed the painting at the end of Leonardo's first period in Milan (ending 1499) and Bertelli (2006) similarly dated the drawings ca. 1499. Zöllner placed the painting broadly between 1500 and 1510, while Kemp (1981), without proposing a specific date, associated the painting with Republican Florence, noting that it was on S. Salvatore day that the Medici were expelled in 1494. It is to be expected that further discussion of the painting's date will be forthcoming.

Pentimenti

Perhaps the most obvious and significant *pentimento* in the present painting involves the thumb of Christ's right (blessing) hand. This was originally drawn in a more vertical orientation than that finally painted. While not fully realized, this first position of the thumb is both revealed in infra-red photography and is visible in mid-treatment photographs taken of the painting while being conserved. The position of the thumb would have been modified by the artist in the course of the painting's creation; in its ultimate resolution the position of the thumb corresponds to that found in the Hollar print and in of all the other painted versions of the composition.

## Sotheby's

27 January 2015 | Valuation Number 70256545 | Page 13

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016                                                   STH0002477

Infra-red photography reveals that the left descending band of the stole, extending from Christ's hand to the crossing, was originally positioned at a different, less severe angle. The right ascending band was originally positioned slightly above, but at essentially the same angle as, the band in the finished composition. The top of the crossing of the two bands was originally above and to the right of its final position. As first positioned, the crossing of the stole was centered directly below the jeweled ornament attached to the neck-band. It was then shifted below and to the left. A likely reason for this change would be to reflect the shift of the stole caused by the raising of Christ's right hand in benediction.

The first position of the left band recalls that summarily sketched by Leonardo in the Windsor drawing (RL12525). That drawing would appear to have recorded the drapery patterns on a model whose arms were not raised, or at least one in which the position of the arms was not considered. In the drawing the drapery folds at the left descend down and out to the left from the neckline before bending in to the right to form part of the "omega-tuck" pattern. As realized in the painting, the fold is more vertical and is then bordered by folds descending from the arm of Christ.

As revealed in infra-red imaging, the lower edge of the neck-band was originally positioned slightly below but following a similar curve as found in the finished composition. Brushed horizontal drawing is visible below.

Infra-red imaging indicates that the central jeweled ornament was first conceived as a larger design, both broader and longer than ultimately realized. The pattern of dark preparation revealed in the infra-red image corresponds to some degree with the reserve for this area summarily sketched by Leonardo in the Windsor drawing (RL12525).

In the course of conservation treatment, a wholly distinct decorative pattern (recorded in photographs) was visible to the eye in some areas beneath the knot-work orphrey design of the stole. That pattern, apparently sketched in a white or a pale-yellow paint, seems to consist primarily of rounded, elliptical forms; while elements of the design are discernible, it has so far proven difficult to record the overall pattern. This first design is most clearly seen in the upper half of the right ascending band of the stole, near the central crossing. Another fragment of the design is visible through the blue blouse below and to the right of the central ornament. These patterns are visible in natural light. From what can be discerned, the pattern closely resembles a decorative knot design recorded on a sheet at Windsor (RL12351verso), datable ca. 1493-94 (Clark-Pedretti, 1968-69, I, p. 41).

Examination of Christ's left hand (holding the orb at the right) by infra-red imaging reveals *pentimenti* in the positioning and length of the fingers: the index and middle fingers were originally longer than finally realized (the contours of the extended finger-tips are clearly visible) and the third and fourth fingers appear to have been positioned disparately. Brushed drawing to fix the contour of the heel of the palm seen through the orb is also apparent.

In the infra-red digital composite photograph and, more clearly in the infra-red reflectogram, a difference in the preparation can be noted. A diagonal line running from lower left to upper right and crossing through the middle phalanges of the small and ring fingers and just below the thumb separates a darker area above from a lighter area below. This line roughly corresponds to the location of the contour of Christ's proper right shoulder and suggests that the motif of the raised blessing hand may not have been part of the first conception of the composition.

Other technical observations, including the discussion of incisions in the paint surface and the presence of fingerprints are treated in the Technical Examination Report by Nica Gutman Rieppi.

This painting appears to be the only version in which Christ's blouse is blue. Pigment analysis of the present painting indicates an ultramarine (lapis lazuli) pigment.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016                    STH0002478

<u>Forthcoming  Literature:</u>
*The Lost Christ of Leonardo Da Vinci,* monograph due to be published by Yale University Press, London, in the autumn of 2013, This will contain contributions by David Ekserdjian, Martin Kemp, Pietro Marani, and Robert Simon discussing art-historical aspects of the painting, an article by Margaret Dalivalle on the painting's provenance, a discussion of the painting's conservation by Dianne Modestini, the structural work on the panel by Monica Griesbach, and technical analyses based on recent scientific testing by Nica Gutman Rieppi, Beth Price, and Ken Sutherland.

APPENDIX 1
<u>The generally recognized corpus of authentic paintings by Leonardo</u>
*Madonna of the Carnation* --Munich, Alte Pinakothek

*Annunciation* --Florence, Galleria degli Uffizi

*Portrait of Ginevra de'Benci* --Washington, National Gallery of Art

*Adoration of the Magi* (unfinished) Florence, Galleria degli Uffizi

*Madonna and Child (Benois Madonna)* –St. Petersburg, Hermitage Museum

*St. Jerome* (unfinished) --Rome, Pinacoteca Vaticana

*Portrait of a Musician* – Milan, Pinacoteca Ambrosiana

*Virgin of the Rocks* (First Version) – Paris, Musée du Louvre

*Lady with an Ermine (Cecilia Gallerani)* – Cracow, Czartoryski Museum

*Portrait of a Lady (La Belle Ferronière)* – Paris, Musée du Louvre

*Virgin of the Rocks* (Second Version) – London, National Gallery

*Christ as Salvator Mundi* – Private collection

*Mona Lisa*—Paris, Musée du Louvre

*Virgin and Child with St. Anne* -- Paris, Musée du Louvre

*St John the Baptist* -- Paris, Musée du Louvre

*The Last Supper,* mural painting in the refectory of Santa Maria delle Grazie, Milan
*Madonna of the Yarnwinder,* existing in two versions, considered to be painted in part by Leonardo  - Duke of Buccleuch and Private collection

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016          STH0002479

Lost Works

1) *The Battle of Anghiari* –a large, incomplete fresco in the Palazzo Vecchio, Florence, which was covered and presumably destroyed by Vasari in the 1550s. Recent attempts have been made using sophisticated imaging devices to discover whether any remnants might exist under the present wall. These have so far proven unsuccessful.

2) *Leda and the Swan* – While there is no absolute proof that an original by Leonardo existed, the composition is known through several copies; most scholars believe that Leonardo's painting had been destroyed by the end of the eighteenth century.



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016                                                  STH0002480

For the item listed within this document we have provided Insurance value for the purpose of Retail replacement, subject to the Conditions of Valuation included in this document as at DRAFT 27 January 2015. These values are based on our reasonable opinion of the actual retail purchase price or probable cost of having to replace the items with comparable items in similar condition at today's date.

NAME
Title
Date: DRAFT 27 January 2015



## Sotheby's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016                    STH0002481

SUMMARY

INSURANCE VALUE

| | VALUE |
|---|---|
| | $100,000,000 |
| TOTAL: | $100,000,000 |



**Sotheby's**
27 January 2015 | Valuation Number 70256545 | Page 18

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016    STH0002482

## SOTHEBY'S CONDITIONS OF VALUATION

1. Sotheby's in London ("Sotheby's") valuation is based upon Sotheby's opinion, having regard to the degree and conditions of examination undertaken, as to (unless otherwise stated in writing) the range of values within which Sotheby's would expect item(s) to sell if consigned to Sotheby's for sale at auction. As used in these Conditions, the term "valuation" includes all related drafts, summaries, letters, extracts and "pre-sale estimations" provided to the client by Sotheby's.

2. Unless otherwise stated in writing, Sotheby's valuation is based upon a preliminary visual inspection of the item(s) without cleaning, restoration, detailed inspection or disassembly and without research into an item's background or further tests and analysis. The valuation relies upon such information as is provided by the client (or the client's agent), and assumes that each item is free from any third party interests, restrictions or claims and that it could be sold without restriction (including, without limitation, as to export) as an individual lot in the international auction market.

3. Valuations are a matter of reasonable opinion and opinions as to value may differ. Particular circumstances affecting the value of individual items may not be known or foreseeable at the time of valuation. Values can also fluctuate as a consequence of external circumstances such as (without limitation) changes in the prevailing market conditions for the item or changes in relevant scholarship. In addition, the preliminary nature of the valuation work carried out may mean that the identification, attribution and value of items might be subject to change on further examination or research. Unless otherwise stated in writing, Sotheby's valuation only reflects the inherent characteristics of

the item(s) being valued and does not reflect the surrounding circumstances of the item(s) being valued (such as, without limitation, the item(s)' provenance or place in a wider collection, or the existence of several similar items available for sale at the same time). Sotheby's submits its valuation based on the client's understanding and agreement that Sotheby's does not accept liability on any of the above counts and Sotheby's gives no representation, warranty or guarantee in respect of an item's origin, provenance, attribution, condition, date, age or authenticity.

4. For the reasons given above, estimated and reserve prices on sale by auction may vary from the values provided for items in the valuation and Sotheby's makes no representation or warranty that the item will realise the amount at which it is valued upon a subsequent public or private sale. The valuation does not take into account any sale expenses, commissions and taxes (including capital taxes) which might apply or become due on a sale of the item(s).

5. Sotheby's does not establish whether the items valued are safe, functioning or fit for the purpose for which they were intended, and gives no warranty or representation as to such matters.

6. Valuations for insurance are given on the basis indicated in the valuation to indicate (unless otherwise stated in writing) Sotheby's view of the likely cost of replacing the item valued with as near a comparable item as is available for purchase second hand. Sotheby's offers its valuation services as an auction house and does not have expertise as a retail outlet and can accept no responsibility for the accuracy of its estimates in respect of retail profit margins or other factors

applicable to the retail trade. Also, the cost of making facsimile or new replacements of items is likely to be greatly in excess of the values quoted in the valuation. Sotheby's is unable to advise as to such costs, estimates for which should be obtained from appropriate manufacturers.

7. Without prejudice to the above, where estimates are given of values of items as at past dates, such estimates are statements of opinion and not of fact. There may not be any adequate comparables by reference to which such values can be established and, in any event, no assurance can be given that such values will be accepted by the Inland Revenue or any other competent authority, court or tribunal.

8. Sotheby's valuation is Sotheby's copyright and is prepared only for the client to whom it is addressed and only for the specific purpose stated in the valuation, and is not to be used by any other person or for any other purpose, or disclosed to any third party (other than the client's professional advisors for the purpose specified in the valuation) or reproduced or published in any form without Sotheby's prior written consent. The addressee of the valuation agrees to indemnify Sotheby's and its affiliated companies, and its and their servants, employees and officers against all liabilities and expenses incurred by them as a result of any breach of the above commitment by such addressee or arising from related claims by third parties in connection with Sotheby's valuation. To the fullest extent permissible by law, Sotheby's excludes any liability to any third party (including arising out of Sotheby's negligence) in respect of the valuation.

9. The client requesting the valuation represents and warrants to Sotheby's that they are the owner of the item(s) or are duly authorized by the owner(s) to have the item(s) valued. The client agrees not to call upon Sotheby's to give evidence in legal or other proceedings concerning the contents of a valuation.

10. Without prejudice to any other provision of these Conditions, save insofar as any liability Sotheby's may have relates to personal injury or death, any claim against Sotheby's (howsoever arising and including negligence) in relation to the conduct or content of a valuation, shall be limited to the estimated value (or, in the case of a range of estimated values, the mid estimate) of the item as set out in the valuation.

11. In order to fulfil the services requested by the client Sotheby's may disclose information to third parties (e.g. shippers). Some countries do not offer equivalent legal protection of personal information to that offered within the EU. It is Sotheby's policy to require that any such third parties respect the privacy and confidentiality of our clients' information and provide the same level of protection for clients' information as provided within the EU, whether or not they are located in a country that offers equivalent legal protection of personal information. By agreeing to these Conditions of Valuation, clients agree to such disclosure. The client can prevent the use of his personal information for marketing purposes by contacting us at +44 (0)20 7293 6667.

12. In the event that any part of these Conditions should be held to be unenforceable for any reason, the remaining portions of these Conditions shall remain in full force and effect. These Conditions and all transactions to which they apply shall be construed in accordance with English law. In the event of disputes hereunder, the parties hereto submit in favour of Sotheby's to the exclusive jurisdiction of the Courts of England.

## Sotheby's

27 January 2015 | Valuation Number 70256545 | Page 19

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016                    STH0002483



Sotheby's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016

STH0002484



CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016

STH0002485

Sotheby's

Mr Yves Bouvier
Avenue de Sécheron 6
GENÈVE 1202
Switzerland


27th January 2015


Dear Mr Bouvier,

Please find enclosed our valuation document for the exquisitely beautiful and highly important work by Leonardo da Vinci that you acquired in 2013. No Old Master Painting of comparable importance has appeared on the market since then (nor had one for at least a decade before). Our valuation, therefore, takes account of the price levels achieved by the greatest modern works of art to have appeared on the international market in the past few years. It could certainly be argued, however, that nothing has appeared on the market in any category in recent years to rival the art historical significance and rarity of the Salvator Mundi.

I hope this is all that you require for the time being, but please do not hesitate to contact me should you require any further information.

Kind regards,


Alexander Bell
Joint International Department Head
Co-Chairman, Old Master Paintings, Sotheby's Worldwide
Tel: +44 (0)20 7293 5420 | Fax: +44 (0)20 7293 5943
Email: alex.bell@sothebys.com

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER DATED NOV. 1, 2016                                        STH0002486