K5SHACC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ACCENT DELIGHT INTERNATIONAL
LTD, et al.,

                  Plaintiffs,

           v.                           18 Civ. 9011 (JMF)

SOTHEBY'S, et al.,

                                        Telephone Conference

                  Defendants.

------------------------------x

                                        New York, N.Y.
                                        May 28, 2020
                                        2:15 p.m.

Before:

                  HON. JESSE M. FURMAN,

                                        District Judge

                         APPEARANCES

EMERY CELLI BRINCKERHOFF & ABADY, LLP
       Attorneys for Plaintiffs
BY:  DANIEL JOSEPH KORNSTEIN
     ZOE ANTONIA SALZMAN

ARNOLD & PORTER KAYE SCHOLER LLP
       Attorneys for Defendants
BY:  MARCUS ASNER
     SARA LYNN SHUDOFSY
     BENJAMIN C. WOLVERTON

                 SOUTHERN DISTRICT REPORTERS, P.C.

                        (212) 805-0300

K5SHACC

(The Court and all parties present telephonically)

THE COURT:  Good afternoon.  This is Judge Furman, let me confirm that the court reporter, Raquel, is on the line.

THE REPORTER:  Yes, I am.

THE COURT:  Good afternoon.  Good to have you again.

Let me take appearances of the parties, starting with plaintiff.  Mr. Kornstein, are you on the line?

MR. KORNSTEIN:  Yes, I am, your Honor.

THE COURT:  Do you want to state the appearances for anyone else representing plaintiff?

MR. KORNSTEIN:  Yes.  Zoe Salzman is also representing plaintiff.

THE COURT:  Good afternoon to you both.

For defendants, Mr. Asner, are you on the line?

MR. ASNER:  Yes, I am, your Honor.  I'm on with Sara Shudofsky and then Ben Wolverton, but he will not be having a speaking role.

THE COURT:  All right.  Thank you and good afternoon to all of you.

A couple ground rules before we get started, first, please identify yourself by name before you say anything else, just to ensure that the court reporter and I know who is speaking.  Number two, when you're not speaking, please put yourself on mute to minimize any background noise, but remember to unmute yourself if or when it comes time to speak.  If

K5SHACC

you're here in listen only mode, just make sure you're on mute if we haven't muted you ourselves.  If I hear a chime during the call, that means that someone has presumably either joined or left, and I may pause to take stock of what happened.

A reminder to everyone on the call that recording this call is prohibited by law.  It is a court conference.  At the same time, a reminder to the parties that it is a public proceeding as it would if it were in open court.  Therefore, as I gather there are, there are folks listening in.

One final note, I have one or two times over the last month or two of proceeding in this manner gotten disconnected from court conference.  If that happens, just be patient.  I will make my way back.  So fingers crossed that that won't happen.

With that, let's proceed.  There are two items on my agenda.  One is the discovery dispute that was raised in the joint status letter, and defendants have submitted their response on that which appears at docket No. 173.  The second is the pending partial summary judgment motion.

Let's start with the discovery dispute.  I have read the parties' letters, that is, the plaintiffs' views in the status letter and the defense response.  I guess I'm a little frustrated by what seems to be the either/or positions that you've taken, or at least taken in part, which is to say that it feels to me like there should be room for compromise here.

K5SHACC

I will say that if forced to choose that I would be inclined to say right now that defendants have the better of the argument because the materials that they're seeking are, I think, directly relevant to the claims in the case, and there are likely to be responsive documents that are flagged by the searches for those terms.  And in particular I'd be -- I'm inclined to think they have the better of the argument if plaintiffs have not, as defendants suggest, come back with any proposed alternative time period, custodian limitation, or modified terms that would limit the number of hits.

So that's sort of my preliminary reaction. Mr. Kornstein, I'm happy to hear from you since defendants have had the most recent word, but that's sort of where I stand.

MR. KORNSTEIN:  This is Dan Kornstein.  My colleague Ms. Salzman will respond.

THE COURT:  All right.  Ms. Salzman.

MS. SALZMAN:  Thank you, Judge.  This is Zoe Salzman.

So I actually think that the documents Sotheby's described in its letter filed on May 25 that they're seeking are already covered by the terms, and we have a little more information now that we have a better understanding of Sotheby's position than we did when we wrote to the Court last week.  So, first, with the term "Christie!," there it seems that Sotheby's is primarily seeking two categories of documents: emails we exchanged with Christie's and valuations

K5SHACC

that Christie's provided in connection with the case.  Both of those categories of documents are going to be produced in this case.  For the emails, we have agreed already in the ESI protocol to run the search term "Christies.com."  So all emails that our custodians exchanged with Christie's will be captured by that search term, and that is a narrower search term the inclusion of the dot-com to get the Christie's domain name narrows the search term from what Sotheby's is seeking here, which is just the genetic "Christie" and yields a lot of false hits because the plaintiffs received a lot of emails about news in the art world, advertising about events in the art world which contain the more generic term "Christie!" or "Christie's."

So we do believe, and I don't think there's any basis to dispute, that using search term "Christies.com" will pull all emails that our custodians exchanged with Christie's for our review.

The second category of documents, the valuations that Christie's provided to plaintiff, we have already agreed and pursuant to your Honor's ruling back in January, the order is ECF No. 174, we are required to produce all documents regarding the value of the works.  Certainly, we believe that will cover and we intend to produce all valuations we received from Christies.com -- I'm sorry, from Christie's concerning all of the artworks at issue in this case.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K5SHACC

With respect to the term "Heller," there again, I think that we are going to be producing already the documents Sotheby's says it is searching.  They identify particularly with Heller affidavits that Mr. Heller previously provided in connection with one of the artworks at issue in this case, as well as valuations that Mr. Heller's firm provided.  The valuations, as I just said, for Christie's are covered by the Court's prior order and certainly will be produced in this case.  The Heller affidavit will also be produced in this case.  In fact, they are part of the initial production we will be making tomorrow, May 29.

So, there again, I think that we are producing the documents that Sotheby's has identified as potentially relevant.  Running the broader terms they're seeking here, "Christie's," which has a hit count of 6,820 hits, and "Heller," which has a hit count of 3,403 hits, is extremely burdensome.  Neither side has agreed to run search terms that are anything close to that large.  Hit terms with far lower hit -- I'm sorry, search terms with far lower hit counts were eliminated for both sides due to concerns with undue burden.  And certainly Sotheby's is not searching search terms, at least as they've told us, which yielded counts above 3,000 hits.

We are talking in this case about a very large volume of ESI.  While I can appreciate the Court's frustration on this particular dispute, the parties made a lot of headway through

extensive meet-and-confer to adopt date range restrictions, custodian restrictions, and Boolean restrictions to further narrow down the volume of ESI to minimize the burden to both sides.  And with these two search terms, it's not for want of trying that we can't seem to narrow them down further. Sotheby's did propose and we did try running a more restrictive time frame for these terms, but it yields still these high hit counts that we summarized in our letter.  The hit counts were even higher before we ran the restricted time period.

As for restricting by custodian, for these terms, unfortunately, it just doesn't seem that it's helpful.  The custodians who are most likely to have responsive documents that Sotheby's is wanting to see are the same custodians who are likely to have exchanged other emails with The Heller Group about unrelated transactions or to have received these advertising or art news updates that contain the term "Christie's."

So I do think, and of course as we laid out in our letter, we have already agreed to run not only the names of all the artworks but many derivations of those names, as well as derivations of the artists' names, far broader list than is being sought from Sotheby's.

So I do think that we have -- you know, there's always a risk of under-inclusion with any ESI search.  Sotheby's paints the picture of, you know, there could have been an email

K5SHACC

that didn't reference the name of the artist or the artwork, and that's true on their side as well.  That is a risk that we are taking when we craft ESI protocols.  But considering the burden of these hit counts and all the documents that Sotheby's has identified it is looking for which we've agreed to produce, we do think these terms are too burdensome and disproportionate to the needs of the case.

THE COURT:  Can you just elaborate, I don't quite understand in a world where Boolean search is an option why you couldn't figure out some additional modifier term, "Heller and" some list of terms that would presumably weed out most of the kind of promotional unrelated communications that you're describing and be more likely to zero in on the core of what the defendants are seeking.  So I just don't quite understand why that wasn't a readily achievable compromise.

MS. SALZMAN:  Again, Judge, we were able to do that with many of the terms.  With these two, I think it's defendants' position that we need to run the terms that are very broad.  And with Christie's we have a more narrow term, "Christies.com," which we've agreed to run.

THE COURT:  Give me one second.

MS. SALZMAN:  And which -- yeah.

THE COURT:  Let me just make sure, Mr. Kornstein, you're still on the line?

MR. KORNSTEIN:  Yes, I am.

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K5SHACC

THE COURT:  All right.  Mr. Asner, you're still on the line?

MR. ASNER:  Yes, I am.

THE COURT:  Ms. Shudofsky, you're still on the line?

MS. SHUDOFSKY:  Yes, your Honor.

THE COURT:  And is the court reporter still on the line?

THE REPORTER:  Yes.

THE COURT:  Whoever just joined, reminder to please mute yourself, and no recording of this conference is permitted.

Keep going, Ms. Salzman.

MS. SALZMAN:  Thank you, Judge.

THE COURT:  I still don't quite understand why that isn't achievable here.

MS. SALZMAN:  As I was saying, I don't think it's through want of trying.  Neither side -- as articulated by defendants, the search they want us to run here is very broad. They have not and I don't see from the email, the letter they sent into the Court, any proposal with a Boolean search connector that would narrow these terms.  They seem to be on a fishing expedition for any communication with Christie's or The Heller Group that is not already captured by the artworks or the artist names, which would be, I think, the natural Boolean connector to suggest to make sure there's some relevance

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K5SHACC

between the communication and the case at hand here. "Christies.com" is a more specific term which will capture all emails exchanged with Christie's.  I don't see the relevance to Sotheby's, and I don't think they've argued there's any relevance, in seeing art advertising and art news alerts that the plaintiffs got that contain the term "Christie's."

And with respect to "Heller," again, we have -- they will be receiving many communications with The Heller Group and the valuations and affidavits Mr. Heller has provided, but to look at every exchange ever with The Heller Group, which has provided a lot of different services over the years to plaintiff, that's the part that's unduly burdensome.  We're happy to run Boolean searches that connect it to this case, but I think that is already captured by the search terms we're already running, and Sotheby's hasn't proposed any Boolean connectors that they think might help target the documents they say they're looking for.

THE COURT:  And last question, what's the hit rate on "Christies.com"?

MS. SALZMAN:  I will look that up quickly.  I don't have that at my fingertips, but I believe it is a couple of thousand.  I can get that for you in just a few minutes, your Honor.

THE COURT:  All right.  In the meantime, let me turn to defendants, Mr. Asner or Ms. Shudofsky, whoever's taking the

K5SHACC

lead on this.

MR. ASNER:  Sure.  This is Marcus Asner.  Good afternoon, your Honor.

Let me just actually go with "Heller" first, although really the issues are really similar.  With respect to "Heller," I think we don't have the issue of them agreeing to "Christies.com" or a specific email address.  I think the point is not that they're going to have to produce everything that has the search term "Heller," but rather that's the universe of things that they would then do searches on.  And it's the same thing with "Christie's."  That's the universe of documents that they could do -- that they would have to review, and nothing precludes them from doing their document review in an intelligent way to quickly get rid of the sort of material that Ms. Salzman is describing, plainly not relevant.

With "Heller," I think things are limited because under Mr. Rybolovlev's own affidavit or testimony in Monaco, it appears that he did not actually meet Mr. Heller until December of 2014, and the parties have already agreed to a cutoff of the ESI.  I think it's March 26, 2016.  So the time period is already going to be limited.

So while, you know, the plaintiff said that they would -- that all of the material would be captured by not including the term "Heller," that's not true.  It's seen in our own communications.  Oftentimes people will have different

K5SHACC

names for a piece of art or if people are immersed in talking about a particular piece of art, they don't actually talk about the name of the art at all or the piece at all, but rather just use generics because they're all in the middle of the same conversation.  So we're not asking them to produce everything from Sandy Heller, but what we are asking them to do is to use this as a universe of documents to review it.

And so with that, let me go to "Christie's."  It's similar, but I think the real issue there would be even if you had "Christies.com," while that would sweep in communication to and from Christie's, it wouldn't actually capture internal communications where people are talking about Christie's or some of the relevant material that would be responsive from Christie's, and it wouldn't also produce or deal with, hit on documents that were created by Christie's that were found within their own ESI.  So it would just be limited to communications that have "Christies.com," and that would likely lose a lot of the relevant information.

So with respect to the negotiations, I think it's a little bit of a red herring to suggest that we did not suggest any Boolean logic.  What actually happened here with the negotiations was that they had originally agreed in December to go ahead and search further communications with "Christie's," and then that raised an issue of the hit count.  And Sotheby's responded by coming up with very reasonable limitations with

K5SHACC

respect to proposals for possibly limiting it with respect to time or limiting it with respect to particular custodians, but all we've been getting back is no.  I think 6,000 documents, or however many there are, with "Christie's" -- I guess there are 3,400 with "Heller" and 6,800 with respect to "Christie's" -- in light of the importance of these particular documents, given that plaintiffs themselves have used the documents we're seeking in their case of trying to prove fraud against Bouvier, we don't think that that is actually that burdensome for them to review this, intelligently obviously, and to produce responsive documents.  Keep in mind, while the plaintiffs are -- they're smaller companies, behind them is a billionaire who is seeking over $308 million from Sotheby's.  In a case of this size, reviewing documents like this or these quantities of documents is not really that burdensome in the -- when compared to the sorts of cases that routinely appear before this court.

THE COURT:  All right.  Thank you.

Ms. Salzman, I don't know if you came up with the information I had asked earlier.  If you care to --

MS. SALZMAN:  I did, Judge.

THE COURT:  Go ahead.

MS. SALZMAN:  Thank you, Judge.  So this is Ms. Salzman again, for the court reporter.

I don't have an exact count because there was an issue with processing the data to custodians, so I haven't received

K5SHACC

an updated count since that was fixed.  But with those two custodians eliminated, there were 156 documents that contain the term "Christies.com."  So there is not a huge volume of communication with Christie's, between our custodians and Christie's.  And what we're seeing instead is, as I said, just a lot of false hits because the term "Christie's" is very commonly used in the art world.  So on that point, I have asked our vendor, just while we were speaking, if they can get me the total hit count, but based on the inclusion of two more custodians, I don't believe it would be significantly different.

Just to respond briefly to Mr. Asner, this idea that we are reneging on an agreement we made is incorrect.  We have agreed to produce communications with Christie's that are relevant and responsive to this case.  We are not reneging on that.  That is what I was saying earlier.  Emails we exchanged with Christie's about any of the artworks in this case or any of the issues in this case will be produced.

In terms of the importance of the documents, again, these are actually very tangential documents.  These are, in terms of, I think, what Sotheby's is focused on according to their letter, the valuation estimates that plaintiffs got from Mr. Heller and from Christie's many, many years ago during the period of time before we brought the Section 1782 proceeding and obtained documents from Sotheby's when the plaintiffs were

K5SHACC

trying to understand the extent, the magnitude, of Mr. Bouvier's fraud, and because we did not know how much Mr. Bouvier paid to acquire the works that he later resold to us at an inflated margin, we were trying to understand from Christie's and Mr. Heller how much are these actually worth to get a sense of how big the fraud was. We don't need to guess that anymore. We have that information very concretely. Sotheby's has produced records showing exactly how much Mr. Bouvier paid for the artwork.

So I'm not arguing that we don't have to produce the valuation estimates. As I said before, we're going to produce them, but the idea that they are core documents in our case and essential to this case is simply not true given where this case is now as opposed to, you know, Mr. Bouvier's initial Section 1782 brought in 2015 when there was far less information available to all the parties.

Then, finally, I would just say again that Mr. Asner's argument that making us review over almost 7,000 documents that contain the term "Christie's" and 3,400 documents that contain the term "Heller" is disproportionately burdensome. Sotheby's is a multibillion-dollar company, multinational company, with far more resources and staff than is available to our clients, yet they have not agreed to review a single term with hit counts even half as large as these. As we said in or letter, even terms such as artist names, artists who produced artwork

K5SHACC

that are at issue in this case, such as Matisse and Magritte, even when those were restricted to one custodian and a very limited time range concerning exactly the time range when the transaction at issue in our case occurred, Sotheby's refused to run hit counts that were in the range of a thousand to 1,600. So it is our position that that would be a double standard to say that it's not disproportionately burdensome for us to produce -- to review 6,800 documents and 3,400 documents.

THE COURT:  All right.  I really don't like in the business of prescribing search terms.  I think it's much better for parties to agree, given the superiority of their knowledge and what have you.  Here's what I'm going to do.  I think it's clear to me that you all can put some further effort into trying to resolve this and figuring out some additional search terms with Boolean searches that would narrow the number down from the number that it's at now, which I agree is high but may ultimately be necessary to review.

So what I want you to do is to meet and confer about this in an effort to figure out some sort of agreed-upon narrowing principle.  I want a letter from you, joint letter, within one week of today indicating whether you have agreed; if not, what terms each side proposes, and the number of hits that those terms produce.  So you can give me whatever proposals you want, but I want proposals from both sides and with specific details as to how many hits it produces and why you think that

K5SHACC

that proposal is appropriate.  And needless to say, my hope is I hope you guys can agree upon something and don't necessarily need to come to me to resolve a disagreement, in which case you should just let me know that it has been resolved.

All right, Ms. Salzman?

MS. SALZMAN:  Yes, Judge.  Thank you.

THE COURT:  Mr. Asner?

MR. ASNER:  That's fine, your Honor.  Thank you.

THE COURT:  All right.  As I said, I am prepared to address the summary judgment motion, but before I do that, let me check and see if there's anything else that either side needs to raise or wants to discuss.

So Mr. Kornstein?

MR. KORNSTEIN:  No, your Honor.

THE COURT:  Mr. Asner?

MR. ASNER:  No, your Honor.

THE COURT:  All right.  In that case, I'll turn to the summary judgment motion, and I do have a ruling on that.  For the court reporter's benefit, I think the Court has emailed this either to you or to the court reporters generally.  So if you haven't gotten it already, you should be able to get it, but let me proceed.

Plaintiffs move for partial summary judgment on their third and fourth claims in which they allege that defendants breached the parties' tolling agreement by filing a lawsuit

K5SHACC

against plaintiffs in Switzerland without first giving plaintiffs notice.  Whether defendants breached rises or falls on whether plaintiffs' October 27, 2017, letter to the Court -- requesting permission to use the Section 1782 discovery "in new foreign proceedings soon to be commenced in the UK against Sotheby's UK" and others -- qualifies as a notice of suit within the meaning of the parties' tolling agreement.  If it did, then plaintiffs terminated the agreement before defendants filed their action in Switzerland, and plaintiffs' breach claim would fail.  If the October 27 letter did not qualify as a notice of suit, then defendants' filing the Switzerland action without notice to plaintiffs would indeed constitute a breach.

A court may grant summary judgment with respect to a contract dispute "only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008*).  "Whether contract language is ambiguous is a question of law that is resolved by reference to the contract alone." *O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc.*, 37 F.3d 55, 58-59 (2d Cir. 1994).  A contract is ambiguous if its language is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally

K5SHACC

understood in the particular trade or business." *Sayers v.
Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d
1091, 1095 (2d Cir. 1993). Conversely, "a contract is
unambiguous if the language it uses has a definite and precise
meaning, as to which there is no reasonable basis for a
difference of opinion." *Lockheed Martin Corp. v. Retail
Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).

As the parties acknowledge, this is not the first time
I have been asked to opine on whether plaintiffs' October 27
letter constituted a "notice of suit" within the meaning of the
parties' agreement.  Defendants moved to dismiss
plaintiffs' claim on the ground that the letter qualified as
such a notice as a matter of law because the tolling agreement
required only that a notice of suit be written, not that it
also be sent by overnight courier service.  I rejected that
argument on the ground that paragraph 3 and paragraph 8, read
together, were "most reasonably read to require service by
overnight courier."  Accent Delight Int'l Ltd. v. Sotheby's,
394 F. Supp. 3d 399, 414 (S.D.N.Y. 2019).  Indeed, I explained
to "read" as provided in paragraph 3 -- if you could just mute
your phone since no one else is speaking at the moment, that
would be great.

Indeed, I explained, to "read 'as provided in
paragraph 8' to require only that the notice be 'in writing'
would render the phrase 'as provided in paragraph 8'

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K5SHACC

superfluous because paragraph 3 already requires '14 days' written notice.'" *Id.*  I noted that Sotheby's argument to the contrary -- that paragraph 8 merely described an optional way of calculating when notice would deem to have been effected -- was "unpersuasive with viewed in the context of the whole agreement because timing and the measurement of time are the central points of the agreement." *Id.*  I then included by saying that "at most, the relevant provisions of the tolling agreement are ambiguous, which is enough to deny Sotheby's motion." *Id.*

The issue is now squarely presented and, that last throwaway line notwithstanding, I conclude that the language of the parties' agreement is unambiguous and that plaintiffs' letter did not qualify as a "notice of suit" because it was not sent "by reputable overnight courier service."  That reading of the contract is not only, as I previously concluded, the "most reasonable one," it is the only one that "gives full meaning and effect to all of the agreement's provisions." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 157 (2d Cir. 2016).  Defendants' arguments to the contrary are unpersuasive.  First, defendants attempt to distinguish the definition of "notice of suit" from whether a notice can be "deemed duly given" by a method other than delivery by overnight courier.  That's opposition docket No. 87 at page 7. Even if true, however, paragraph 8 would require service by

K5SHACC

overnight courier in order for the notice to be "deemed duly given"; at best, then, the October 27 letter was not "duly given."

Second, defendants contend that courts applying New York law "routinely overlook the failure of a party serving notice to comply with the specific service requirements under the agreement at issue."  That's pages 13 to 16 of the opposition.  But that is true only in "certain limited circumstances."  *USI Ins. Servs. LLC v. Miner*, 801 F. Supp. 2d 175, 182 (S.D.N.Y. 2011).  It is true, for instance, when it would be "hypertechnical" to enforce a specific notice provision -- *see Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 925 (2d Cir. 1977) -- most notably, when "the adversary party does not claim ... prejudice by the deviation," *Baygold Assocs., Inc. v. Congregation Yetev Lev of Monsey, Inc.,* 81 A.D.3d 763, 764 (N.Y. App. Div. 2011).  To overlook defendants' failure here, however, would prejudice plaintiffs and undermine the "valuable function" of specific notice requirements -- namely, allowing a party to "distinguish between posturing" and an "actual intent to terminate the agreement."  *Art of War Music Publ'g, Inc. v. Andrews,* 2000 WL 245908, at *2 (S.D.N.Y. Mar. 3, 2000).  As I explained in my motion to dismiss ruling, timing and the measurement of time were central to the parties' agreement, which was designed to make clear when litigation could be commenced.  There is no

K5SHACC

indication that plaintiffs intended or understood their court filing constituted a notice of suit.  Nor is there evidence that they understood that the tolling agreement terminated before defendants filed suit in Switzerland.  Had they known, plaintiffs may well have beaten defendants to the courthouse door and initiated proceedings in the United Kingdom immediately after the 14-day period had expired.

Finally, defendants attempt to rely on the negotiation history of the tolling agreement.  *See* the opposition at pages 11 to 13.  But where, as here, "the contract is clear and unambiguous on its face, the courts must determine the intent of the parties from within the four corners of the instrument." *Consol. Edison, Inc. v. Ne. Utils*., 426 F.3d 524, 527 (2d Cir. 2005).

For these reasons, I grant plaintiffs' motion for partial summary judgment -- that is, as to liability -- with respect to the fourth claim.  By contrast, I conclude that plaintiffs' third claim under the Declaratory Judgment Act should be dismissed as duplicative.  *See, for example, City of Perry, Iowa v. Procter & Gamble Co.*, 188 F.Supp.3d 276, 286 (S.D.N.Y. 2016) where I dismissed a claim for declaratory judgment where other claims "will necessarily settle the issues for which the declaratory judgment is sought, meaning that the declaratory judgment claim will serve no useful purpose." Notably, plaintiffs here do not argue otherwise.  To the

K5SHACC

contrary, they themselves consent to such dismissal.  *See* ECF No. 96 at pages 8-9.  Accordingly, and for those reasons, I deny plaintiffs' motion for partial summary judgment on the third claim and dismiss that claim.

So that is my ruling.  I'll issue an order, bottom line order, consistent with that.  Unless there's anything else to discuss, I think that does it for today.  Pursuant to the case management plan, I believe that you have until -- where is it -- November 30 of this year to complete fact discovery.  I am guessing that between the pandemic and the letters rogatory that that may need to be adjusted, but obviously, I would hope to keep things moving as quickly as possible.  But my sense is that it's premature to discuss that at this point, but let me check with you folks and see if there's anything else to discuss on top of that.

Mr. Kornstein?

MR. KORNSTEIN:  No, your Honor.

THE COURT:  Mr. Asner?

MR. ASNER:  I agree, your Honor, it's premature.  I think it's something that we would have to discuss with plaintiffs and come back to you if there is an issue with respect to the dates.

THE COURT:  All right.  Great.  Let me just say generally that my sincere hope in this case, and all others for that matter, to keep things moving as normally and swiftly as

K5SHACC

possible, but the "as possible" is a critical caveat. Number one, it was anticipated as far back as the case management plan in this case when the world was a simpler place.

THE LAW CLERK:  This is Judge Furman's law clerk. Judge, are you still on the line?

MR. ASNER:  Still have Marcus Asner on the line.

MR. KORNSTEIN:  Yes, and Dan Kornstein.

THE LAW CLERK:  Great, and Ms. Salzman and Shudofsky.

MS. SALZMAN:  Yes.

MS. SHUDOFSKY:  Yes.

THE LAW CLERK:  And do we still have Raquel?

We'll give judge a minute.  I'm sure he'll be back shortly.

(Recess)

THE COURT:  All right.  I'm back.  Judge Furman again. My apologies.  I had that happen a couple times, and I will look into it.

In any event, I was in the midst of saying that it was anticipated as far as back as the case management plan when the world as a simpler place that there may be issues in this case, given the need to seek and get evidence from abroad, that would warrant adjusting that schedule and that, I assume, may remain the case.  On top of that, the pandemic has obviously made things a little bit more complicated.  I recognize that, and if

K5SHACC

it turns out that despite your due diligence one or both of those things means that you can't complete things, then I would understand and hope that you could agree upon some reasonable extension.  But my sincere hope is to keep things on track as much as possible, and so to that extent would hope and assume that you can proceed notwithstanding those complications.

With that, and since you said you had nothing further to discuss, I'll adjourn and wish everybody good health and safety and thank you for joining me on the telephone.  Thank you very much.

(Adjourned)