UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACCENT DELIGHT INTERNATIONAL LTD. and XITRANS FINANCE LTD., <br><br>                Plaintiffs, <br><br>       -against- <br><br> SOTHEBY'S and SOTHEBY'S, INC., <br><br>              Defendants. | **18 Civ. 9011 (JMF)** <br><br><br> **SECOND AMENDED COMPLAINT** |

Plaintiffs, for their Amended Complaint, allege, with knowledge as to their own acts and otherwise on information and belief, that:

## NATURE OF THE ACTION

1.      Sotheby's—one of the world's largest and most famous art brokers and auction houses—materially assisted the largest art fraud in history. Plaintiffs, two companies based in the British Virgin Islands, were the victims. Yves Bouvier, their art advisor, masterminded the fraud. Sotheby's was the willing auction house that knowingly and intentionally made the fraud possible. Sotheby's actions instilled Plaintiffs' trust and confidence in Bouvier and rendered the whole edifice of fraud plausible and credible.

2.      For more than ten years, Bouvier served as Plaintiffs' agent, counselor, and representative as Plaintiffs acquired 38 art masterworks for more than $2 billion. Plaintiffs believed that Bouvier was negotiating with sellers on Plaintiffs' behalf and paid Bouvier a commission for his services. Actually, Bouvier's detailed accounts of hard-fought negotiations with sellers were pure fiction. Instead, Bouvier was negotiating for much lower prices, selling to Plaintiffs at markups as high as 145%, and pocketing the difference for himself. He repeatedly

and blatantly misrepresented the acquisition prices for the paintings. Indeed, the price Bouvier in reality paid for Plaintiffs' collection was approximately half the total price at which Bouvier falsely claimed the works had been acquired and Bouvier charged Plaintiffs. Through this scheme, Bouvier defrauded Plaintiffs of over $1 billion.

3.      To perpetrate this fraud, Bouvier needed Sotheby's: as a broker for the transactions, and as a respected authority in the art world to help him justify the fraudulent prices he charged to Plaintiffs. Sotheby's was uniquely positioned to understand—and to facilitate—Bouvier's breathtaking fraud. It knew the actual prices Bouvier paid to the sellers and the fraudulently inflated prices Bouvier induced Plaintiffs to pay to him.

4.      Sotheby's aided and abetted Bouvier's fraud and, in doing so, also violated its own Code of Business Conduct. Before transactions, Sotheby's gave Bouvier written materials designed to induce Plaintiffs to pay inflated, fraudulent prices. After transactions, Sotheby's lent a veneer of legitimacy and expertise to those fraudulent prices by providing Bouvier with inflated appraisals on demand. Sotheby's intentionally omitted the sales to Bouvier from the transaction histories listed in these appraisals. In short, Sotheby's assisted Bouvier in acquiring artworks at prices the sellers were willing to accept while helping him charge Plaintiffs fraudulently inflated prices (and concealing the actual acquisition prices from Plaintiffs).

**PARTIES**

5.      Plaintiff Accent Delight International Ltd. is an entity incorporated in the British Virgin Islands. It is owned by a trust settled by and for the benefit of members of the family of Dmitry Rybolovlev.

6.     Plaintiff Xitrans Finance Ltd. is an entity incorporated in the British Virgin Islands. It is owned by a trust settled by and for the benefit of members of the family of Dmitry Rybolovlev.

7.     Defendant Sotheby's, doing business in New York under the name Sotheby's Holdings, is a publicly traded corporation incorporated under the laws of Delaware with its principal place of business at 1334 York Avenue, New York, New York. Founded in 1744, Sotheby's is in the business of selling art at auction and brokering private sales. It also provides professional appraisals of artworks by experts. Sotheby's is one of the world's oldest and most prestigious art companies. According to its website, Sotheby's "has been entrusted with the sale of many of the world's treasures" and has built a "reputation for excellence based on the expert knowledge and scholarship of [its] specialists."

8.     In the words of its Code of Business Conduct, Sotheby's "values" include "integrity," "trust," and "the highest standards of conduct." That Code is "a guide to conducting business with integrity and in keeping with our core values. Sotheby's is committed to operating with clear and firm ethical standards, at every auction, in every transaction, no matter where we are." "Directors, officers and managers are required to: Serve as models of ethical behavior."

9.     Defendant Sotheby's, Inc. is the wholly owned U.S. subsidiary of Sotheby's.

## JURISDICTION AND VENUE

10.     Subject-matter jurisdiction exists under 28 U.S.C. § 1332(a)(2) because Plaintiffs are citizens of a foreign state, Defendants are citizens of New York, and the amount in controversy exceeds $75,000.

11.     Venue is proper under 28 U.S.C. § 1391(b)(1) because Defendants reside in this judicial district.

**FACTS**

12.      Sotheby's aided and abetted the fraud designed by Yves Bouvier. (For purposes of this Complaint, the term "Bouvier" refers to Yves Bouvier and persons and entities acting on his behalf and under his control.) It did not act in keeping with its own Code of Business Conduct.

### *Bouvier's Fraudulent Scheme*

13.      Bouvier's fraud depended on the creation and violation of trust. Bouvier was first introduced to Plaintiffs' representative, Dmitry Rybolovlev, in 2003 through a mutual connection, Tania Rappo. Rappo was the godmother of one of Rybolovlev's daughters, and he considered her like a family member. Rappo fostered Rybolovlev's trust in Bouvier.

14.      From 2003 through 2015, Bouvier, along with Rappo, worked to acquire art masterworks on Plaintiffs' behalf. Plaintiffs and Bouvier agreed that he would act as their agent. Bouvier held himself out to Plaintiffs as an intermediary acting on their behalf, not as a seller in the marketplace. Plaintiffs trusted him.

15.      Bouvier acquired 38 masterworks for Plaintiffs—including paintings by Picasso, da Vinci, Rothko, and Modigliani—in 37 transactions. (Two works by Picasso were acquired together in one transaction.)

16.      Plaintiffs paid more than $2 billion for the collection. They generally paid Bouvier a two-percent commission on the purchase price of each work. Bouvier's charging of a commission is evidence that he was acting as Plaintiffs' consultant and agent, not as a dealer entitled to the markups he could generate on the open market.

17.     Consistent with usual practice in the market for fine art, Plaintiffs were generally unaware of the sellers' identities. The transactions were confidential, and Bouvier insisted on serving as Plaintiffs' exclusive representative.

18.     Bouvier repeatedly lied to Plaintiffs and withheld material information from them. He told Plaintiffs he was negotiating with sellers on their behalf, when in fact he had generally already agreed to acquire the paintings at lower prices. The negotiations over the higher prices were fabricated.

19.     By acquiring the paintings at lower prices than he represented, rather than fulfilling his fiduciary duties as Plaintiffs' agent, Bouvier pocketed hundreds of millions of dollars in fraudulent gains. He also paid Rappo about $100 million in kickbacks for her role in the scheme.

### *Plaintiffs Attempt to Bring Bouvier to Justice*

20.     In European civil law countries, crime victims can start criminal proceedings. As Bouvier's lies, misrepresentations, and deliberate omissions came to light, Plaintiffs started criminal proceedings against him and Rappo in Monaco. Plaintiff Accent Delight International Ltd. also joined criminal proceedings started by a third party against Bouvier in Paris.

21.     Bouvier has been charged with fraud and complicity in money laundering in Monaco and has been charged with repeated handling of stolen goods in France. Magistrates in both countries are continuing to investigate Bouvier's crimes.

22.     Plaintiffs sued Bouvier for civil damages in Singapore, his domicile and the site of his art warehousing business. Bouvier has taken measures to liquidate his assets and place them beyond the reach of the Singapore courts.

23.     Plaintiffs also brought criminal charges against Bouvier in Switzerland.

24.     Bouvier was taken in for questioning in Monaco in 2015. Police recovered from him a USB flash drive containing several scanned Sotheby's logos, the electronic signatures of Samuel Valette, Sotheby's Vice Chairman for Private Sales Worldwide, and Dr. Franka Haiderer, Sotheby's Senior Director and Chairman for Valuations in Europe.

### *Sotheby's Aids and Abets Bouvier's Fraud*

25.     Bouvier's method of operation was consistent: Having already agreed, in most cases, to buy a work at one price, he lied to Plaintiffs by pretending he was still negotiating with the seller on their behalf, inducing Plaintiffs to pay an inflated price.

26.     Sotheby's has admitted its involvement in Bouvier's scheme. According to Sotheby's, "Sotheby's facilitated the sale of 12 of the 37 works to Bouvier, consigned for auction 2 of the [w]orks on Bouvier's behalf (1 of which it previously sold him), and conducted valuations for 4 of the [w]orks (2 of which it previously sold him)." Sotheby's made this admission in a brief filed on June 29, 2018 in the U.S. Court of Appeals for the Second Circuit. *See* Memorandum of Law in Support of Motion for Stay Pending Appeal (ECF No. 16-2) at 5 n.4, No. 18-1755 (2d Cir. June 29, 2018). "'Sotheby's' refers to Sotheby's, Inc., a U.S. corporation with its principal place of business in New York." *Id. at* 1 n.1.

27.     Sotheby's was uniquely positioned to understand both sides of Bouvier's fraudulent scheme: the prices that sellers were willing to accept and that he paid, and the fraudulently inflated prices he charged to Plaintiffs. Rather than alert Plaintiffs or the authorities, or even end its involvement, Sotheby's continued its lucrative business with Bouvier.

28.     Demonstrating its close involvement with Bouvier's scheme, and their common interests, in November 2017, Sotheby's allied itself with Bouvier as a co-plaintiff and filed a joint submission in a civil "conciliation" proceeding against Plaintiffs in Geneva, Switzerland.

Although it appears that Sotheby's would have had a basis to bring its own legal claims against Bouvier if it was truly innocent in the fraud he perpetrated, it is telling that Sotheby's chose not to do that. Instead, Sotheby's did the exact opposite. It aligned itself with Bouvier in bringing the Swiss proceeding and making a joint filing.

29.     Samuel Valette, Sotheby's Vice Chairman for Private Sales Worldwide, maintained a close relationship with Bouvier, for many years. They communicated regularly. Valette, a specialist in impressionist and modern art, frequently contacted Bouvier to suggest works that Plaintiffs might want to acquire.

30.     Valette, on behalf of Sotheby's, would "source" works of art for Bouvier to sell to Plaintiffs, comment on their quality and importance within the artist's body of work, and sometimes issue appraisals. Valette did so in emails to Bouvier and his associate Jean Marc Peretti, which Valette knew would be forwarded to Plaintiffs' representative. Peretti has been the subject of criminal investigations in France, including a 2009 investigation for running an illegal gambling ring, according to *The New Yorker* magazine.

31.     To Plaintiffs, whatever Valette said or did, because of his position, was on behalf of Sotheby's and carried the imprimatur of Sotheby's. Bouvier would refer Plaintiffs to Valette and to Sotheby's to confirm what he was saying to Plaintiffs.

32.     Alexander Bell, Sotheby's Co-Chairman of Old Master Paintings, and Bruno Vinciguerra, Sotheby's Chief Operating Officer, also dealt with Bouvier.

33.     At all relevant times, Vinciguerra, Valette, and Bell were employees, agents, and servants of Sotheby's, acting within the scope of their duties.

34.     Sotheby's valued its relationship with Bouvier. Bouvier is a major player in the art world. He is associated with global "freeport" businesses where fine art is stored tax-free. In

the 14 transactions involving Bouvier and Plaintiffs that it brokered, Sotheby's earned tens of millions, or perhaps even hundreds of millions, of dollars in commissions. Bouvier was also valuable to Sotheby's because he did other business with Sotheby's, unrelated to Plaintiffs.

35.     Bouvier was—and remains—one of Sotheby's most important business contacts.

36.     Citing its confidentiality obligations to Bouvier, Sotheby's refused to voluntarily provide Plaintiffs with documents that would show the extent of Bouvier's fraud, including correspondence between Bouvier and Valette. Plaintiffs obtained some of those documents by court order under 28 U.S.C. § 1782.

37.     The limited documents Plaintiffs have obtained already through section 1782 show that Sotheby's knew Bouvier was acting as Plaintiffs' agent; Sotheby's brokered the sales to Bouvier at the discounted prices Bouvier wanted; at Bouvier's request, Sotheby's repeatedly created and modified appraisals and other documents about respective artworks designed to assist Bouvier in duping Plaintiffs into paying inflated prices; and Sotheby's concealed the evidence that Bouvier had in fact purchased the artworks at much lower prices by omitting the sales to Bouvier from the works' transaction histories it prepared.

38.     Plaintiffs relied on the false appraisals, transaction histories, and other documents Sotheby's created for these artworks, believing that Sotheby's was an independent and reliable authority in the art world.

39.     Sotheby's pattern of deception is evident throughout all the sales to Plaintiffs in which it played a role.

<u>Picasso's *L'Homme Assis Au Verre*</u>

40.     Sotheby's brokered the sale of Picasso's *L'Homme Assis Au Verre* to Plaintiffs in the spring of 2011.

41.     In March 2011, Valette and Bouvier exchanged a series of emails about *L'Homme Assis au Verre*. The tone of the emails is friendly, collaborative, and informal (using the informal "you" (the French "tu")) and signed with first names "Yves" and "Sam."[1]

42.     On March 18, 2011, Valette emailed both Bouvier and his associate Peretti, attaching a formal description of the artwork and writing in his cover email: "As agreed, here is the note with the expositions, a commentary on its importance, the photos of Picasso and the photos of the 3 comparable paintings in museums."

43.     On March 22, 2011, Bouvier emailed Valette to ask when he would have a "definitive price" for the work and suggested that "a price in USD would be the best adapted." Valette responded: "Message received about the dollars. We were asking ourselves that question."

44.     On March 23, 2011, Valette assured Bouvier he was negotiating in dollars "as we agreed" and was trying to make sure "the price would be reasonable." This appears to be yet another violation of Sotheby's Code of Business Conduct, which requires: "Business decisions must be made in the best interest of Sotheby's and our clients, not motivated by your personal interest or gain."

45.     On March 24, 2011, Valette emailed Bouvier a formal description of the work, writing in his cover email: "Here is a text on the artwork, more focused on its composition. We should have the price tomorrow."

46.     Two days later, on March 26, 2011, Bouvier forwarded Valette's formal description to Plaintiffs' representative.

---

[1]     Unless otherwise indicated, the quotes from emails are translations from the original French.

47.     Plaintiffs relied on Valette's description because of his role at Sotheby's. They viewed his description of the work as authoritative and relied on it in deciding to purchase this artwork.

48.     Relying on Bouvier's false statements about the price of the work the seller was willing to accept, Plaintiffs agreed to buy the work for $107.5 million. Plaintiffs gave this money to Bouvier to transmit to the sellers, believing Bouvier was acting as their honest agent.

49.     Plaintiffs also paid a commission of $2.15 million for the services Bouvier rendered in negotiating the purchase of this work.

50.     In fact, unbeknownst to Plaintiffs, Bouvier bought the work from Sotheby's on April 1, 2011 for $62 million. Valette signed the contract of sale on behalf of Sotheby's Geneva-based office. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $45.5 million more for this work than he paid for it, i.e. a markup of 73.4%.

51.     On April 8, 2011, Valette emailed Bouvier a certificate for the artwork, asking Bouvier: "Please let me know if it works for you."  Valette's request that Bouvier confirm if the certificate "works for you" suggests he knows that Bouvier needs the certificate for his client (*i.e.* Plaintiffs' representative) and that he is willing to make changes for Bouvier if needed. The attached certificate is a Word document, which further suggests a willingness to make changes as needed to accommodate Bouvier's needs. The certificate is formally addressed on Sotheby's letterhead to "Monsieur Yves Bouvier" and uses a formal tone (including the formal "you" (the French "vous")) completely unlike Bouvier's and Valette's usual email correspondence. This and other similarly formal emails and appraisal certificates were intended by Valette to be forwarded by Bouvier to Plaintiffs to convince them to buy at the inflated prices Bouvier was trying to convince them were legitimate. The formal tone was designed to mislead Plaintiffs into thinking

that Bouvier and Valette had an arms-length relationship and that Sotheby's valuations and appraisals of the works could be trusted.

52.     Approximately one hour later, Valette emailed the certificate to Bouvier as a PDF document, noting in his cover email "this might be easier to use."

Malliol's <em>La Méditerranée</em>

53.     On April 9, 2011, Valette emailed Bouvier with a description of Malliol's *La Méditerranée*. Valette's email begins: "Here is the information on the Malliol, La Méditerranée."

54.     Later the same day, Valette emailed Bouvier with information about how much other Malliol works had sold for.

55.     Valette also emailed Bouvier an attachment of a formal description of this work, without any cover email. The attachment was a Word file.

56.     The next day, April 12, 2011, Bouvier agreed to buy the work from Sotheby's for €5.17 million. The contract was signed by Sotheby's New York office.

57.     Two days later, after Sotheby's had already sold the work to Bouvier, on April 14, 2011, Valette emailed Bouvier two formal certificates—one for the Malliol and another for Rodin's *Le Baiser* (discussed below). The certificates were PDF files. Valette's cover email to Bouvier stated: "Here are the expected certificates. The two artworks are actually at Sotheby's in New York. Does the client want to send his transporters to pick them up or does he prefer that they be delivered to the freeport? Thanks for letting me know what the client prefers." This email makes clear that Valette knew that Bouvier was buying on behalf of a "client" (*i.e.* Plaintiffs' representative), not himself as Sotheby's has since tried to claim.

58.     On April 15, 2011, Sotheby's staff provided Bouvier with additional references about the work—even though he had already agreed to purchase it.

59.     Also on April 15, 2011, relying on Bouvier's misrepresentations about the price of the work, Plaintiffs agreed to buy it for €8.4 million. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs €3.23 million more for this work than he paid for it, i.e. a markup of 38.4%.

60.     Plaintiffs also paid Bouvier a €168,000 in commission for his work negotiating the sale.

Rodin's <em>Le Baiser</em>

61.     On April 4, 2011, Valette emailed Bouvier's associate, Peretti, a description of Rodin's *Le Baiser*.

62.     On April 9, 2011, Bouvier emailed Valette with the subject line "Urgent" and wrote: "I am already seeing my friend tomorrow Sunday."  Bouvier requested more information about the work "so that I have the maximum arguments." This email again made clear to Valette that Bouvier was not buying for himself but rather on behalf of a client, *i.e.* Bouvier's "friend," Plaintiffs' representative. It is obvious from this exchange that Valette knew who the "friend" was. Valette swiftly responded with the information Bouvier needed to make the "maximum arguments" to Plaintiffs in order to convince them to buy the work at an inflated price.

63.     On April 13, 2011, Bouvier falsely told Plaintiffs he had "closed the deal" to buy the work for €7.5 million. Plaintiffs relied on Bouvier's misrepresentations and paid him €7.5 million for the work, as well as an additional €150,000 in commission for his work in negotiating the sale.

64.     On April 14, 2011, Bouvier agreed to buy the work from Sotheby's for €4.23 million. Sotheby's New York signed the contract. This meant that, with Sotheby's assistance,

Bouvier charged Plaintiffs €3.27 million more for this work than what he paid for it, i.e. a markup of 77.3%.

65.     On April 14, 2011, Valette emailed Bouvier a PDF file with a formal certificate for the work and the same cover email he sent about the Malliol, asking how "the client" preferred to get the works.

Matisse's <em>Nu au Châle Vert</em>

66.     On June 15, 2011, Valette sent emails to Bouvier's associate, Peretti, attaching photos of Matisse's *Nu au Châle Vert*. Valette's cover emails had no content, suggesting they had previously discussed the work in person or on the phone.

67.     On June 16, 2011, Valette sent an email to Bouvier attaching various documents about the artwork, including PDF excerpts from catalogues and a formal description of the work in Word.

68.     Valette and Bouvier then exchanged a series of emails about Bouvier getting access to the work.

69.     On June 20, 2011, Bouvier forwarded an email to Valette saying a Sotheby's representative had denied access to the work and instructing him to "do what is necessary" to ensure access.

70.     A minute later, Bouvier sent a separate email to Valette with no subject line, angrily writing: "I thought no one in Geneva was supposed to know about this operation!!!!!!! I cannot work under these conditions."

71.     Valette hastened to reassure Bouvier, emailing later that morning that he had done "the necessary" to ensure access to the work, adding: "I can also confirm that, other than me, there will be no one else from Sotheby's before, during, or after any of the visits. I had a very

clear and direct discussion on this subject with my colleagues in 'risk management' in London. The message has been clearly heard and accepted."

72.     The same day, Valette sent another email to Bouvier with additional information about the work, "as promised."

73.     On June 23, 2011, relying on Bouvier's misrepresentations, Plaintiffs agreed to pay $85 million for the work. Plaintiffs also paid Bouvier a commission of $2.2 million for his services in negotiating the sale.

74.     Four days later, on June 24, 2011, Bouvier bought the work from Sotheby's for $60 million. The contract was signed by Valette on behalf of Sotheby's London office. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $25 million more for this work than he paid for it, i.e. a markup of 42%.

75.     Three years later, on October 24, 2014, Valette emailed Bouvier with a formal appraisal of the work, writing in his cover email: "Here are the expected documents," making it clear he was responding to Bouvier's request. The appraisal is signed by Valette and addressed to "Mr. Confidential Client One Hundred and Thirty Four." Valette's valuation lists the value of the work at $85,000,000—suspiciously, exactly the price Bouvier had falsely induced Plaintiffs to pay for it three years earlier. Sotheby's appraisal also omitted the 2011 sale to Bouvier for $60 million from the section listing the transaction history. There is no legitimate reason to omit that sale, which Valette certainly knew about since he brokered the sale and personally signed the contract. The omission was done to conceal Bouvier's fraud from Plaintiffs.

Rodin's *L'Éternel Printemps*

76.      On June 15, 2011, Valette emailed Peretti with some information about Rodin's

*L'Éternel Printemps*. Valette's email noted that the last estimate from 2008 was for $8 million to

$12 million.

77.      On June 16, 2011, Valette emailed Peretti again, this time attaching a Word

version of a formal certificate for this work and noting that the seller was willing to sell for $12.5

million.

78.      That same day, Valette sent the same email and attachment to Bouvier. The email

suggests seeing the statue with "Jean-Marc [Peretti]" the following week, indicating that Valette

clearly knows that Peretti is Bouvier's associate even though he chooses to keep separate paper

trails with them. This was part of a pattern on Valette's part—to separately email the same

information to Bouvier and Peretti.

79.      On June 20, 2011, Valette emailed Bouvier: "Here is the new file on Éternel

Printemps as promised" and attaching a new version of the certificate (still in Word). Valette

repeatedly generated and changed Sotheby's certificates at Bouvier's request like this.

80.      On July 1, 2011, Valette emailed Bouvier with a contract to purchase the work for

$13.2 million. This contract was signed by Valette on behalf of Sotheby's London office.

Bouvier paid Sotheby's this money on July 5, 2011.

81.      On July 11, 2011, Valette forwarded an email to Bouvier from Holli Chandler,

Sotheby's Business Manager of Impressionist & Modern Art, describing the arrangements to

ship the work to Bouvier's Geneva freeport. Chandler's email states that the shippers "will make

a stop at Vulcan in Paris for *the buyer* to view the sculpture."  This email makes clear that both

Chandler and Valette were aware that Bouvier was really buying on behalf of someone else, *i.e.* Plaintiffs.

82.     Valette later emailed Bouvier that Sotheby's would order the shippers to give Bouvier "free access to the piece so you can position it at your convenience at Vulcan."

83.     On July 25, 2011, Valette emailed Bouvier a PDF file of the certificate for this work "as promised."

84.     Plaintiffs paid Bouvier £30 million for this work based on his false representations about the price. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs £21.8 million (approximately $35.5 million) more for this work than he paid for it, i.e. a markup of 73%. Plaintiffs also paid Bouvier a commission of £600,000 for his services in brokering the sale.

Giacometti's <em>Femme de Venise IX</em>

85.     In September and October 2011, Valette emailed both Bouvier and Peretti separately with information about Giacometti's *Femme de Venise IX*. This is a continued pattern on Valette's part of keeping the paper trail between Bouvier and Peretti separate.

86.     On October 4, 2011, Bouvier emailed Valette, copying Peretti, with the subject line "Urgent."  Bouvier asked Valette to send him the Giacometti file, specifying that he wanted it as a Word document. Valette promptly complied, sending the certificate in Word as Bouvier had requested.

87.     On October 14, 2011, Valette sent Bouvier a contract of sale for this work for CHF 26.1 million. Valette signed the contract on behalf of Sotheby's London office.

88.     On October 17, 2011, Plaintiffs paid Bouvier CHF 45 million for this work. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs CHF 18.9 million more for this

work than he paid for it, i.e. a markup of 42%. Plaintiffs also paid Bouvier a commission of CHF 900,000 for his services in negotiating this sale.

89.     On November 8, 2011, Valette re-sent the Sotheby's contract for this work to Bouvier, who then counter-signed.

Magritte's <em>Le Domaine d'Arnheim</em>

90.     On August 25, 2011, Valette emailed Peretti about Magritte's <em>Le Domaine d'Arnheim</em>, asking to talk because he had "news."

91.     On November 10, 2011, Valette's Sotheby's colleague Isadora Katsis emailed Bouvier some information about this work, noting "Here is an image of the Magritte we have discussed. After a lot of insistence, the owner has confided to us that he will accept to separate from it for 25.000.000 USD."  The tone of this email is informal and friendly, using the informal "you" (the French "tu"), as is typical of Valette's emails to Bouvier.

92.     The next day, November 11, 2011, Valette sent Bouvier a long and unusually formal email about a different Magritte painting, <em>Empire des Lumières</em>. The tone of this email is markedly different from Valette's usual communication style with Bouvier. For example, it is addressed to "Mr. Bouvier," whereas Valette typically refers to Bouvier by his first name, "Yves"; it uses the formal "you" (the French "vous"), whereas Valette typically uses the informal "tu" in his correspondence with Bouvier; it is signed with Valette's full name and Sotheby's title, whereas Valette usually signs his emails to Bouvier as simply "Sam"; and the entire tone is formal and written as though Valette and Bouvier did not know each other. The email begins: "It is a pleasure to discuss with you the current market for surrealist artworks and those of Magritte in particular."  It goes on to discuss how an "iconic painting like Empire des Lumières" would sell at auction for about $40 million to $60 million.

93.     Later the same day, Valette sent a new version of this email to Bouvier. This email is similarly formal in composition and address, but differs from the first in its inclusion of discussion of additional Magritte works. This new email also offers the same estimate of $40 million to $60 million for *Empire des Lumières* but omits any reference to an auction. No explanation is offered in this, or any other email between Valette and Bouvier, for the changes to the document. This suggests that Valette and Bouvier communicated by phone in the interim period between the two emails and Valette sent the new, different email at Bouvier's request.

94.     During this same day, Valette continued to email both Bouvier and Peretti about the Magritte painting *Domaine D'Arnheim* that he was actually trying to sell. The tone of these emails was Valette's usual informal style with Bouvier and Peretti.

95.     Three days later, Valette sent yet another version of the formal email about Magritte's work to Bouvier. The same formal tone and substance appear. But Valette now estimated that *Empire des Lumières* would sell for €40 million (changing the prices from U.S. dollars to Euros and omitting the range he had previously provided). Again, there is no explanation in this or any other email between Bouvier and Valette for this change, suggesting that Bouvier and Valette spoke on the phone and Valette made these changes at Bouvier's request. The formal tone of this email and its predecessors suggests that Valette knew and intended for Bouvier to forward it to Plaintiffs—and that Valette did not want Plaintiffs to know that he had a close, friendly, and collaborative relationship with Bouvier.

96.     That is exactly what happened. On November 15, 2011, Bouvier forwarded Valette's email to Plaintiffs' representative, using it as the basis to urge Plaintiffs to purchase *Domaine D'Arnheim*, which Bouvier described as "more beautiful and more important" and "worth at least as much as 'Empire des Lumières.'"

97.     Plaintiffs relied on Valette's email, trusting his assessment and valuation because of his affiliation with Sotheby's and his apparent independence, just as Bouvier and Valette intended.

98.     On December 2, 2011, Sotheby's employee Holli Chandler wrote to Bouvier's assistant that: "I understand from Sam [Valette] that *the client* would very much like to receive the painting at the earliest possible opportunity." This is further evidence that Sotheby's knew Bouvier was buying on behalf of someone else, *i.e.* Plaintiffs.

99.     On December 7, 2011, Plaintiffs paid $43.5 million for Magritte's *Domaine D'Arnheim*, believing this was its true purchase price.

100.    On December 8, 2011, Bouvier bought the work from Sotheby's for $24.1 million. Valette signed the contract of sale on behalf of Sotheby's London office. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $19.4 million more for this work than he paid for it, i.e. a markup of 80.5%. Plaintiffs also paid Bouvier a commission of $870,000 for his services brokering the sale.

### Modigliani's *Nu Couché au Coussin Bleu*

101.    On December 21, 2011, Valette emailed Bouvier and Peretti in his usual informal tone, writing "as promised, here is info on the Modigliani" and noting "at present, I do not have a price."

102.    On December 23, 2011, Valette sent Bouvier another one of his formal emails, offering a: "succinct analysis of the Modigliani market." This email uses the same unusually formal address, including "Dear Mr. Bouvier," the formal "you," and a complete name and title in the signature. The email estimates the value of *Nu Couché au Coussin Bleu* between $70 million and $90 million. Valette's email also emphasized the high demand for Modigliani's *Nu*'s

on the market. The unusual formal tone of this email makes it clear Valette intended it to be forwarded to Plaintiffs.

103.    Bouvier responded on December 24, 2011, using the usual informal style, and asking Valette to confirm "when the painting will arrive to us for the presentation." This email further confirms that Valette knew Bouvier was buying on behalf of someone else, to whom he would be making a "presentation." Valette responded in his usual informal tone.

104.    On December 23, 2011, Bouvier emailed Plaintiffs' representative: "I do not know the price. . . . If [Rybolovlev] likes this painting, I will look into it."

105.    The next day, Bouvier told Plaintiffs' representative: "[T]he owner is . . . very rich and certainly has other solutions. He is not obligated to sell this painting and not solely to us. For now, we must firstly maintain a trust relationship with him and secondly make him waste time in order to negotiate better."

106.    Plaintiffs purchased this work for $118 million, believing that was the true purchase price.

107.    Bouvier actually purchased this work for $96 million. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $22 million more for this work than he paid for it, i.e. a markup of 22.91%. Plaintiffs also paid Bouvier a commission of $2.36 million for his services in negotiating the sale.

108.    Bouvier paid Rappo, Rybolovlev's close family confidante, a $5 million kickback on this transaction. This payment was kept secret from Plaintiffs.

109.    On October 24, 2014, Valette provided Bouvier with a valuation for this work. Signed by Valette on Sotheby's letterhead, it was addressed to "Mr. Confidential Client One

Hundred and Thirty Four." It valued the work at $110,000,000 and omitted the 2012 sale to Bouvier for $96 million from the transaction history.

110.    On January 9, 2015, Sotheby's Chief Operating Officer Bruno Vinciguerra emailed Peretti and Valette about Sotheby's possibly selling this work during the spring auction in New York, offering a guarantee of up to $70 million. Vinciguerra used Peretti's first name ("Jean Marc") and signed "All my very best."[2]  Vinciguerra wrote: "we could achieve once again for you an exceptional result," suggesting he and Peretti had previously worked together.

Rodin's <em>Eve</em>

111.    On January 25, 2012, Valette emailed Peretti a photo of Rodin's *Eve*. There was no cover note.

112.    On February 2, 2012, Valette emailed Peretti a Word file document about the work, asking in his cover email if this "suits them."

113.    The next day, he sent the same information to Bouvier.

114.    On February 13, 2012, Valette emailed both Bouvier and Peretti with a PDF about the work, writing in his cover email: "Here is a try of a new doc with more photos – thanks for letting me know if it suits you better."

115.    In response to a later inquiry from Bouvier, Valette told him that the work sold in 2008 for $18,969,000.

116.    After a series of emails about arranging to bring the work to Geneva, Bouvier's employee wrote to Sotheby's employees Holli Chandler and Valette on March 6, 2012 that "Our client would like us collect directly the crate in Frankfurt with our truck." The reference to "client" again made clear to Sotheby's that Bouvier was buying on behalf of someone else.

---

[2]         This email is in English and not translated.

117.    On March 7, 2012, Valette sent Bouvier a contract of sale for the work for $16 million. Valette signed the contract of sale on behalf of Sotheby's London office. It is striking that Sotheby's and Valette agreed to sell the painting to Bouvier for less than it had sold for four years earlier. Sotheby's owed a duty to the sellers of this and other artworks, as well as to its shareholders, to maximize the sale prices. But again and again, it appears Sotheby's sold to Bouvier for less than it claimed was market value, suggesting either that Sotheby's valuations were false or that Sotheby's violated its duty to the sellers and its shareholders.

118.    On March 8, 2012, Plaintiffs paid $26.25 million for this work, believing that was the true purchase price. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $10.25 million more for this work than he paid for it, i.e. a markup of 64.1%. Plaintiffs also paid Bouvier a commission of $525,000 for his work negotiating the sale.

119.    On March 21, 2014, Valette emailed a certificate for this work to Bouvier. The certificate omitted the 2012 sale to Bouvier, which Valette had personally brokered.

120.    On December 18, 2014, Valette emailed Bouvier: "After reflection, my colleagues and I think that the magnificent Eve by Rodin that belongs to your client would be particularly shown to advantage at the big sculpture exposition we are preparing. . . ."  This email makes clear again that Valette knew Bouvier bought this work on behalf of a client. It also uses the formal "you" and is formally signed by Valette.

121.    Valette sent a slightly different version of this formal email to Bouvier approximately one hour later. This time the email named Simon Stock, who Valette described as Sotheby's head of sculpture sales, as the Sotheby's colleague in agreement with Valette about the best option for sale. There is no explanation in this email (or any others between Bouvier and Valette) for the change.

122.    Bouvier forwarded this email to Plaintiffs' representative the next day, December 19, 2014, and recommended Plaintiffs sell the painting through Sotheby's rather than through a private sale.

Klimt's *Wasserschlangen II*

123.    On August 29, 2012, Valette emailed Bouvier and Peretti to confirm a viewing in Vienna of Klimt's *Wasserschlangen II* that Sotheby's had organized.

124.    The viewing took place on September 3, 2012. Bouvier and Valette were present.

125.    On September 11, 2012, Bouvier and Sotheby's signed a contract of sale for this work for $126 million. Thereafter, Valette acted on behalf of Sotheby's Vienna office to extend the contract multiple times because of delays in obtaining an export license from the Austrian government.

126.    Later that same day, Bouvier sent Plaintiffs' representative an email describing high-stakes negotiations with the seller: "They're holding back for 180 [million dollars] and are at the breaking point; I think they are ready at 190. But I should be able to twist them to reach 185 with the payment of a deposit and the balance in 30 days. What should we do???"  Bouvier later claimed to have clinched the deal at $183.8 million. These negotiations were all fabricated.

127.    Plaintiffs paid Bouvier $183.8 million for this work. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $57.8 million more for this work than he paid for it, i.e. a markup of 45.87%. Plaintiffs also paid Bouvier a commission of $3,676,050.

128.    Bouvier secretly paid Rappo a $4.78 million kickback on this transaction. This payment was kept secret from Plaintiffs.

129.    The export license was finally obtained on July 16, 2013; Sotheby's sale to Bouvier closed the same day.

130.    Also on the same day, Valette emailed Bouvier a certificate for this work that omitted the sale to Bouvier. Valette later provided Bouvier with a certificate from the Art Loss Register that also omitted the sale to Bouvier from the "Provenance Provided" section.

131.    On July 24, 2013, Valette emailed Bouvier and Peretti to tell them the work had been delivered to Bouvier's Geneva freeport. Bouvier responded: "Super congratulations."

132.    On September 24, 2013, Valette separately emailed Bouvier and Peretti an article from Der Standard (Austria) which reported that Sotheby's had sold the work for $120 million. The emails had no subject line and there was no cover note or explanation in Valette's email, suggesting he spoke to Bouvier and/or Peretti on the phone about the article.

133.    Bouvier then forwarded the article to Plaintiffs' representative, falsely claiming the article was inaccurate and offering to provide Plaintiffs with "proof" of payment to Sotheby's.

134.    On October 24, 2014, Valette sent Bouvier a formal valuation for this work. The valuation, signed by Valette and on Sotheby's letterhead, was addressed to "Mr. Confidential Client One Hundred and Thirty Four."  It listed the value of the work at $180 million—extremely similar to the value Plaintiffs paid for it—and omitted the $126 million sale to Bouvier from the transaction history, even though Valette had personally brokered that sale.

Modigliani's <em>Tête</em>

135.    In December 2011 and again in June 25, 2012, Valette emailed Peretti and Bouvier with photos and information about Modigliani's *Tête*, indicating the owners were willing to sell. One email referenced a similar sculpture sold by Christie's in 2010 for €43 million.

136.    On June 26, 2012, Bouvier responded, asking Valette to email him the file in "normal format" so that he could include translations. Bouvier also emailed Valette to ask him to include additional information about comparable sales on the list Valette had sent; Valette swiftly complied.

137.    Later that day, Bouvier forwarded some of Valette's documentation to the Plaintiffs' representative, with an email copied in large part from Valette's email.

138.    On June 29, 2012, Bouvier emailed Valette to ask if the sellers would try a public sale if they did not get a private buyer; Valette responded that the "sellers are extremely concerned about confidentiality – the private transaction corresponds perfectly with their mentality and their desire for absolute discretion."

139.    On June 30, 2012, Valette emailed Bouvier about the expected timing for the work to be transported to Bouvier's Geneva freeport. Bouvier emailed the next day, July 1, 2012, asking Valette to find a 1956 Ceroni catalogue "for the mid-July presentation."  This email made clear to Valette that Bouvier was buying for a client, to whom he would first be presenting the work.

140.    Valette later emailed Bouvier on July 9, 2012 with advice about how best to place and stage the artwork during this presentation. Valette also wrote later that day to advise Bouvier he had obtained the Ceroni and offered to personally deliver it to Geneva himself.

141.    On July 11, 2012, Valette emailed Bouvier and Peretti, telling them and sending a photo showing that the work had arrived at Bouvier's Geneva freeport. Peretti wrote back tersely: "Call me thanks."

142.    On July 24, 2012, Valette emailed Bouvier another long, formal email, describing the work and estimating that it was worth between €70 million to €90 million or "maybe more."

By this point in time, Valette had already arranged for delivery of the sculpture to Bouvier's freeport. Valette forwarded this email to Peretti, with the cover note: "Here is the text." This formal email was yet another email intended to be forwarded to Plaintiffs.

143.    The very next day, July 25, 2012, Valette emailed a different version of this long formal email to Bouvier, this time estimating that the work was worth €80 million to €100 million. No explanation exists in this email (or any other email between Valette and Bouvier) for the significantly higher estimated price just one day later.

144.    The same day, Bouvier forwarded Valette's email to Plaintiffs' representative, invoking Sotheby's valuation of the work in the €80 million to €100 million as authoritative and suggesting that he would get a similar valuation from Christie's. Bouvier never provided Plaintiffs with any valuation from Christie's.

145.    On September 24, 2012, Valette sent Bouvier a contract of sale for the work for €31.5 million. It is notable that Sotheby's and Valette were willing to sell to Bouvier for a fraction of what they had told him they estimated the work to be worth, suggesting again either that the valuation was false or that Sotheby's was willing to violate its duty to its sellers and shareholders to maximize the sale price of the artworks it sold.

146.    In December 2012, months after receiving a contract of sale for the *Tete* for €31.5 million, Bouvier falsely told Plaintiffs he was engaged in negotiations with the sellers of this work, including saying that the sellers wanted a "minimum price" of €65 million for the work, suggesting he might be able to make a personal investment of some of the purchase price in order to get the deal done, and offering to waive his commission fee in order to clinch the deal at €36.5 million plus a Degas painting, *Danseuse en Rose*, owned by Plaintiffs.  On December 28, 2012, Bouvier wrote to Sazonov, "[t]he offer of 36.5 + Degas was refused with no possible

discussion.  After discussions, I finally had to settle on 37.5 E + Degas, so as not to blow the

deal."  Sazanov responded, "Wow.  Well negotiated."  Plaintiffs ultimately paid Bouvier €37.5

million plus the Degas for the work. This meant that, with Sotheby's assistance, Bouvier charged

Plaintiffs €6 million more for this work than he paid for it, plus the Degas painting.  Bouvier kept

the Degas, further establishing the falsity of his representations to Sazanov that the seller was

demanding the painting.  Plaintiffs also paid €500,000 in commission fees to Bouvier.

147.    A year later, on August 4, 2014, Plaintiffs were attempting to purchase another

painting, Rothko's *No. 6*, through Bouvier. Bouvier falsely stated to Plaintiffs that the sellers of

the Rothko would sell the painting for €80 million plus Modigliani's *Tête* valued at €60 million,

for what Bouvier told Plaintiffs was a total purchase price for the Rothko of €140 million. This

followed another series of fabricated negotiations that Bouvier misrepresented to Plaintiffs had

occurred with the Rothko sellers.

148.    That was all false: the Rothko sellers had never expressed any interest in *Tête*.

Bouvier actually bought the Rothko for $83.5 million on August 12, 2014.

149.    Moreover, Bouvier, Peretti, Valette, and Sotheby's Chief of Operations Bruno

Vinciguerra had secretly arranged without Plaintiffs' knowledge that Sotheby's would sell *Tête*

at auction in New York. A consignment agreement was signed between Bouvier and Sotheby's

on September 11, 2014.

150.    In an email titled "Modi terms" and dated November 3, 2014, Vinciguerra wrote

to Peretti, copying Valette, documenting that Sotheby's "will pay you $25 mil tomorrow" if a

specified client won the auction, in installments of $15 million and $10 million. This appears to

be a highly unusual transaction, as Sotheby's is supposed to protect the anonymity of buyers and

sellers in its auctions.

151.    On November 4, 2014, Sotheby's sold Tête at auction in New York for a "hammer price" of $63 million (a total purchase price of $70.725 million with commissions and fees).

152.    Sotheby's catalogue entry for the auction did not list the sale of *Tête* to Bouvier.

153.    Neither Sotheby's nor Bouvier obtained Plaintiffs' permission to sell this work at auction.

154.    Sotheby's sold the work without Plaintiffs' permission despite knowing that the work was part of Plaintiffs' collection, and despite knowing that Bouvier lacked the authority to sell it. Indeed, Bouvier himself testified to the Monaco authorities regarding another artwork consigned to Sotheby's: "Sotheby's did not verify the [work]'s ownership. Mr. Valette and his team accepted to do the transaction based on my good reputation."

155.    "Before offering property for sale," states Sotheby's Code of Business Conduct, "we must be satisfied that we have conducted the level of due diligence required to be satisfied that the property we are handling is authentic and that there are no known legal obstacles to selling and passing title . . . . Sotheby's standards go beyond the legal requirements." Sotheby's 2017 Annual Report also emphasizes that: "Prior to offering a work of art for sale, we perform due diligence activities to authenticate and determine the ownership history of the property being sold."

156.    Bouvier has never accounted to Plaintiffs for the proceeds of the auction and has never given Plaintiffs the Rothko painting they purchased.

157.    On December 4, 2014, Valette emailed Bouvier's employee to confirm that Sotheby's was sending Bouvier $15 million from the *Tête* sale.

Toulouse-Lautrec's Green *Au Lit: Le Baiser*

158.     On October 8, 2012, Sotheby's sold Toulouse-Lautrec's *Au Lit: Le Baiser* to Bouvier for $7.5 million. Valette signed the contract on behalf of Sotheby's. This painting is primarily in green color and is referred to here as the Green Toulouse-Lautrec, so as not to be confused with a painting of the same name primarily in red ("the Red Toulouse-Lautrec") discussed at Paras 192-226 below.

159.     On December 11, 2012, Valette emailed Peretti information about the work—since Bouvier had already purchased this work, the information was clearly designed for someone else. The Sotheby's transaction list omitted the October 2012 sale to Bouvier that Valette had brokered.

160.     On February 14, 2013, Valette sent the same information to Bouvier.

161.     This coincided with Bouvier's efforts to defraud Plaintiffs into overpaying him for this work. Throughout February 2013, Bouvier falsely represented to Plaintiffs a series of fabricated negotiations with the work's sellers.

162.     Plaintiffs paid Bouvier €13.75 million for this work (approximately $18.4 million), believing it was the true purchase price. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs approximately $10.9 million more for this work than he paid for it, i.e. a markup of 145.33%. Plaintiffs also paid Bouvier a commission of €275,000 for his work in negotiating the sale.

163.

Da Vinci's *Christ as Salvator Mundi*

164.     *Christ as Salvator Mundi* is one of approximately 15 authenticated paintings by Leonardo da Vinci that exist today.

165.    On March 11, 2013, Bouvier emailed Valette to ask his colleague Alexander Bell, Sotheby's Co-Chairman of Old Master Paintings, about the price for the work and to tell him "he has a client."

166.    Valette arranged for the painting to be shown to Rybolovlev in person in his Central Park West apartment in New York on March 22, 2013. Both Valette and Bouvier were present at this showing.

167.    On March 24, 2013, Valette told one of the da Vinci sellers that "the Russian" (*i.e.* Rybolovlev) wanted to pay less than $100 million.

168.    On March 27, 2013, one of the da Vinci sellers wrote to the others that he had spoken with Valette, who told him "the client wants a meeting in Paris on 10 April with his #1 advisor, Sam, and me . . . Sam knows the advisor well and has dealt with him before . . . Advisor has the ability to close and this is the way Sam has always dealt with them…Sam said this meeting and agreeing is their standard mode."

169.    On April 10, 2013, Valette, Bouvier, and one of the da Vinci sellers met as planned in Paris. During that meeting, Bouvier offered to buy the da Vinci for $68 million plus another painting valued at $12 million.

170.    On April 10 and 11, 2013, however, Bouvier had an email exchange with Plaintiffs' representative, in which he described hard-nosed negotiations to purchase *Salvator Mundi* on Plaintiffs' behalf. Bouvier claimed that Plaintiffs' $100 million offer was "rejected without a moment's hesitation," and that the seller was "[o]ne tough nut, but I'll fight and take as long as necessary." Bouvier later said that a deal was "clinched" at $127.5 million—"[t]erribly difficult, but it's a very good deal with regard to this unique masterpiece by Leonardo."

171.    All of these representations were false. The negotiations were fabricated.

172.    On May 2, 2013, Bouvier paid $83 million to buy the work from Sotheby's.

173.    On May 3, 2013, Bouvier sent Plaintiffs an invoice for $127.5 million. Relying on Bouvier's representation that this was the true purchase price, Plaintiffs paid Bouvier this amount. This meant that, with Sotheby's assistance, Bouvier charged Plaintiffs $44.5 million more for this work than he paid for it, i.e. a markup of 53.62%. Plaintiffs also paid Bouvier $1.275 million in commission.

174.    Bouvier secretly paid Rappo a $4.92 million kickback on this transaction. This payment was kept secret from Plaintiffs.

175.    A year later, on March 3, 2014, Sotheby's Chief of Operations Bruno Vinciguerra emailed Valette and Peretti an article from *The New York Times* stating the *Salvator Mundi* had been sold privately for over $75 million. There was no cover note.

176.    In November 2014, Plaintiffs and Rybolovlev became aware of this article in *The New York Times*.

177.    Plaintiffs began to suspect Bouvier had defrauded them. Plaintiffs' representative confronted Bouvier. Bouvier said the media underreported the price because the total price included various fees and commissions of which the media was not aware.

178.    It has been publicly reported that Bouvier's text messages, produced in the criminal proceedings against him in France, reveal that Bouvier then texted Peretti: "I am in the shit. He does not have cash and wants to place all Picasso and Rodin for public sale. [...] We will talk about that tomorrow."

179.    In December 2014, Plaintiffs discovered the true purchase price of *Nu Couché au Coussin Bleu*. At that point, Plaintiffs became certain Bouvier had defrauded them.

180.    In January 2015, after Plaintiffs' representative confronted him, Bouvier contacted Valette to request that Sotheby's appraise *Salvator Mundi*. Sotheby's agreed.

181.    On January 27, 2015, Valette emailed Bouvier a draft valuation for the work for $100 million and a cover letter from Alexander Bell indicating that Bouvier had acquired the work in 2013. Valette asked Bouvier in his cover email to let him know if this worked for him.

182.    On January 28, 2015, Valette sent Bouvier a revised valuation of the work for €100 million. Converting the price into euros brought the value much closer to the price Bouvier had charged Plaintiffs for the work. Valette also forwarded a new letter from Bell which omitted the 2013 sale to Bouvier.

183.    Sotheby's knew Bouvier was trying to justify the fraudulent price he charged Plaintiffs, and it chose to help him do so.

184.    On November 21, 2016, Sotheby's filed an action seeking a declaratory judgment that it did not breach its obligations to the sellers of *Salvator Mundi*. *Sotheby's, Inc. v. R.W. Chandler, LLC et al.*, No. 16-CV-9043 (S.D.N.Y.). (The case was quickly resolved by a confidential settlement unavailable to Plaintiffs or to the public.) In that action, Sotheby's claimed it was unaware of Bouvier's relationship with Rybolovlev when it arranged for Rybolovlev to view *Salvator Mundi*. Sotheby's has also claimed in correspondence that Rybolovlev was "completely unknown" to it.

185.    As set forth above, and in violation of its own Code of Business Conduct and requirement to "cooperate fully and honestly with any investigation" into a violation of its "internal rules," Sotheby's claim to have no knowledge of Rybolovlev is demonstrably false, based on all of the statements Valette made, and all of the documented history of Sotheby's deliberately aiding and abetting Bouvier's fraud on Plaintiffs.

186.    Moreover, Sotheby's arranged for Rybolovlev to view the da Vinci in his apartment at 15 Central Park West. When the apartment was purchased for $88 million in 2011, it was the most expensive individual purchase of an apartment ever in New York City. The connection between the apartment and the Rybolovlev family was widely reported in the press and is common knowledge. It is inconceivable that Sotheby's would arrange a viewing of one of the world's most valuable masterworks in one of the world's most expensive apartments, in the presence of the person widely reported by the press to be the apartment's owner and entirely for his benefit, without knowing who he was.

Gauguin's <em>Otahi</em>

187.    On October 24, 2014, Valette sent Bouvier a valuation of Paul Gauguin's *Otahi (Alone)* at $120 million. The valuation is addressed to Mr. Confidential Client One Hundred and Thirty Four and is signed by Valette.

188.    On February 19, 2015, Valette emailed a new version of the valuation to Bouvier, writing in his cover email: "Here is the new document concerning the magnificent Gauguin." The new valuation attached to this email lists the value of the work at $140 million. No explanation is provided in this email or in any other email between Valette and Bouvier to justify the price increase, but it is clear from the cover note that it was done at Bouvier's request, likely by phone.

189.    Bouvier had charged Plaintiffs €120 million, plus approximately €2.4 million in commission, for *Otahi* in 2013. At the exchange rates at the time Valette sent the valuation, €120 million was approximately equal to $140 million.

190.    Plaintiffs do not know the price Bouvier paid for this painting.

191.    The transaction history listed in both the Sotheby's valuations omits the sale to Bouvier.

*Resale of the Red Toulouse-Lautrec, Au Lit, Le Baiser*

192.    In December 2009, Plaintiffs had acquired through Bouvier a different painting by Toulouse-Lautrec, also called *Au Lit, Le Baiser*.

193.    Plaintiffs paid €18,000,000 for this work, believing that to be its true purchase price.

194.    On December 15, 2014, Bouvier forwarded information about this Toulouse-Lautrec, which is primarily red in color (hereinafter the "Red Toulose-Lautrec") to Valette, who promptly forwarded it to Peretti. The Red Toulouse-Lautrec is a different painting than the Green Toulouse-Lautrec described above at Paras 158 et seq.

195.    Thereafter, Valette and Peretti agreed Sotheby's would re-sell the Red Toulouse-Lautrec at auction.

196.    Valette and Vinciguerra then persuaded other Sotheby's employees to value this painting for more than others thought it was worth and to offer Bouvier and Peretti a guaranty on favorable terms for this and other works.

197.    On December 18, 2014, Valette sent Bouvier a formal email about the Red Toulouse-Lautrec, thanking Bouvier for consulting Sotheby's about it, praising it as exceptional, recommending selling it in London rather than New York, and promising to deliver the next day a catalogue presentation. The formal tone and the substance of this email suggest it was written to be forwarded to Plaintiffs and that Valette knew Bouvier was acting merely an agent.

198.    The same day, Valette sent Bouvier a series of similarly formal emails about other works owned by Plaintiffs including Picasso's *Joueur de Flute*, Picasso's *Tete de Femme* and

*Espagnole a l'Eventail*, and Rodin's *Eve*, which Valette described as "belonging to your [Bouvier's] client." The tone and substance of these emails also make it clear that Valette knew Bouvier was acting as an agent on behalf of a client.

199.    Bouvier forwarded Valette's formal email about the Red Toulouse-Lautrec to Plaintiffs' representative.

200.    The next day, on December 19, 2014, Valette sent Bouvier a draft of the catalogue entry for the Red Toulouse-Lautrec, which estimated the value of the work between £9,000,000 and £12,000,000. There was no cover note.

201.    Just over two hours later, Valette wrote Bouvier an email in his usual informal style (addressing him with the informal "toi"/"you") and attaching what he described as a "new version" of the proposed catalogue entry for the Red Toulouse-Lautrec, now estimating the work was worth between £10,000,000 and £15,000,000 (or €12.59 million to €18.89 million, or $15.68 million to $23.52 million).

202.    Less than ten minutes later, Valette wrote Bouvier a formal email attaching the same version of the catalogue, valuing the Red Toulouse-Lautrec between £10,000,000 and £15,000,000.

203.    Valette and Bouvier then continued to email each other on the same email chain, reverting to their usual informal tone and style.

204.    Bouvier forwarded Valette's formal email and revised catalogue entry about the Red Toulouse-Lautrec to Plaintiffs' representative.

205.    Bouvier later explained to Plaintiffs' representative that, in "normal times," he would have expected to sell the Red Toulouse-Lautrec for €25,000,000 (*i.e.* more than the

€18,000,000 Plaintiffs had paid for it), but Sotheby's lower estimate was due to ongoing "economic uncertainty."

206.     On December 24, 2014, Sotheby's signed a contract with Bouvier, consigning the Red Toulouse-Lautrec for sale at auction on February 3, 2015.

207.     The contract used the lower estimate of £9,000,000 and £12,000,000, suggesting Valette provided the higher estimate at Bouvier's request in order to deceive Plaintiffs into thinking the work was worth closer to what they had paid for it.

208.     Despite Valette's knowledge Bouvier was acting as an agent, there is no evidence Sotheby's did any due diligence to ensure Plaintiffs consented to the sale of the Red Toulouse-Lautrec.

209.     At the February 3, 2015 auction, Sotheby's sold the Red Toulouse-Lautrec for £9,500,000.

210.     Sotheby's agreed with the purchaser of the Red Toulouse-Lautrec that he would pay the sales price and associated fees in three installments: (1) £1,152,180 March 15, 2015; (2) £5,184,810 by May 30, 2015; (3) £5,184,810 by August 3, 2015.

211.     On February 17, 2015, Valette sent Bouvier another formal email with a breakdown of the fees and costs for the sale of this work at £9,500,000 million. Valette then forwarded this work to Peretti. The formal tone of this email suggests that it too was designed to be forwarded to Plaintiffs.

212.     On February 25, 2015, Bouvier was arrested in Monaco, and his fraud on Plaintiffs was exposed in the international press that Valette, Vinciguerra, and other Sotheby's employees received.

213.    On March 2, 2015, with full knowledge of the now-public fraud, Sotheby's agreed to accelerate a payment to Bouvier of £4,000,000 from the sale of the Red Toulouse-Lautrec and other works, a month sooner than it was due before the fraud was public.

214.    Vinciguerra thereafter authorized giving Bouvier an advance of this amount of $2,000,000 before it was due even on the accelerated schedule, calling it a "small commercial gesture."

215.    On March 9, 2015, the purchaser of the Red Toulouse-Lautrec wrote to Sotheby's to express concern that the work he had purchased was part of the now-public Bouvier fraud. Sotheby's falsely denied this.

216.    On March 12, 2015, Valette met in person with Bouvier, and reassured him that Sotheby's would make payment of £4,000,000 on March 16.

217.    On or about March 15, 2015, the buyer of the Red Toulouse-Lautrec paid his first installment to Sotheby's of £1,152,180.

218.    Despite its knowledge of the now-public fraud, Sotheby's did not place any hold on these funds or conduct any due diligence into whether it should transfer these funds to Bouvier.

219.    On March 16, 2015, Sotheby's gave Bouvier £4,000,000.

220.    Meanwhile, Sotheby's continued to falsely tell the buyer of the Red Toulouse-Lautrec that it was not involved in the Bouvier fraud.

221.    On March 18, 2015, Bouvier emailed Valette to request as soon as possible an accounting with specific numbers for the February sale of this work, explaining he needed it to be able to show an adjudication of a debt. Valette quickly delivered the requested information.

222.    Bouvier never gave Plaintiffs any of the money he received from Sotheby's for the re-sale of the Red Toulouse-Lautrec.

223.    Specifically, Bouvier never gave Plaintiffs the £1,152,180 first installment paid by the buyer of the Red Toulouse-Lautrec.

224.    In October 2015, Sotheby's informed Plaintiffs it was holding the rest of the sale proceeds of the Red Lautrec and refused to deliver them to Plaintiffs absent a court order or Bouvier's consent.

225.    As a result of Sotheby's misconduct, Plaintiffs have  never received any of the £9,500,000 Sotheby's received for the re-sale of the Red Toulouse-Lautrec.

### *Sotheby's Functions as One Single Entity*

226.    Sotheby's dominates and controls its wholly owned foreign subsidiaries and functions as a single integrated global business, supervised from New York. Sotheby's used such domination to commit the wrongful acts that injured Plaintiffs. The wholly owned foreign subsidiaries are mere instrumentalities of Sotheby's wrongdoing.

227.    Sotheby's describes its wholly owned foreign subsidiaries as "offices" or "locations," not as independent entities.

228.    Sotheby's has one chief executive officer, one worldwide general counsel, one global head of compliance, one director of communications—all based in its New York headquarters. Its website, branding, marketing materials, and letterhead are the same around the world.

229.    Sotheby's maintains consolidated financial statements. Its wholly owned foreign subsidiaries are not treated as independent profit and loss centers, and do not deal at arms-length with each other. On information and belief, Sotheby's transfers assets between its wholly owned

foreign subsidiaries. The subsidiaries do not have their own executives and do not appoint their own leadership. Rather, Sotheby's is centrally managed from New York.

230.    In some of the transactions that Sotheby's arranged for Bouvier, including the *Salvator Mundi* sale, the contracts were signed by Sotheby's, Inc. In others, the contracts were signed by one of Sotheby's wholly owned foreign subsidiaries, which Sotheby's dominates and controls.

231.    Irrespective of which subsidiaries technically employ Valette and Bell, Valette and Bell were acting on behalf of Sotheby's, Inc. during their dealings with Bouvier. As Valette's title reflects—Vice Chairman of Private Sales Worldwide—he is empowered to act and does act on behalf of Sotheby's and all of its subsidiaries.

232.    Sotheby's, Inc. has repeatedly acknowledged as much. For example, as it explained in its declaratory judgment complaint filed in this Court, Valette and Bell negotiated the *Salvator Mundi* deal on behalf of Sotheby's, Inc. with Bouvier and the sellers of that painting.

233.    In the declaratory judgment complaint, Sotheby's, Inc. described Valette as its employee.

234.    In an affidavit filed in other proceedings in this Court, a Sotheby's executive has testified that Valette "managed" the relationship between Sotheby's, Inc. and Bouvier. Declaration of Aimee Scillieri (ECF No. 153), *In re Application of Accent Delight Int'l*, No. 16-MC-125 (S.D.N.Y. Mar. 13, 2018).

235.    Sotheby's subsidiaries, Vinciguerra, Valette, and Bell were instrumentalities of Sotheby's wrongful conduct.

236.    To date, Sotheby's has not terminated Valette's employment or, to Plaintiffs' knowledge, disciplined him in any way.

237.    Sotheby's failure to discipline Valette mocks its own Code of Business Conduct. According to that Code, "Sotheby's regards violation of the law and of this Code as a serious matter . . . . Discipline for Code violations . . . can range from reprimand to termination of employment."

238.    The Code further states: "Be alert when you hear yourself or somewhere else say: 'Everybody else in the art world does it.' 'No one will find out.' 'It's more expensive to do it that way.' 'I was told to do it.' If you have doubt about what to do in a particular situation, ask yourself: 'Is it legal?' 'Is it fair?' 'Would this action hold up under scrutiny by others?' 'What would this look like if reported on the front page of a major news publication?' 'Is it a violation of Sotheby's Code or other Policy?'"

239.    Sotheby's massively and in wholesale fashion violated its own ethical code.

## FIRST CLAIM
### Aiding and Abetting Fraud

240.    Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

241.    Sotheby's had actual knowledge that Bouvier was defrauding Plaintiffs. Sotheby's and Bouvier had an intimate business relationship for years. Sotheby's knew Bouvier was Plaintiffs' agent. Sotheby's knew the price that Bouvier obtained in transactions it brokered. Yet, Sotheby's sent Bouvier emails designed to get Plaintiffs to pay inflated prices for other works. And Sotheby's gave Bouvier materially misleading appraisals on demand. These appraisals deliberately omitted Bouvier's acquisitions of the works in the provenance history to conceal the real seller and to create the false impression that Plaintiffs paid fair prices.

242.     Sotheby's provided substantial assistance to Bouvier, causing injury to Plaintiffs. Sotheby's affirmatively assisted Bouvier by arranging for him to acquire artworks at certain prices that the sellers were willing to accept, and by sending him emails intended to help him convince Plaintiffs to pay Bouvier fraudulently inflated prices. Sotheby's helped Bouvier conceal his fraud by providing materially misleading appraisals that falsely suggested the artworks were worth what Plaintiffs paid for them.

243.     As a result of Sotheby's aiding and abetting Bouvier's fraud, Plaintiffs have sustained damages in an amount to be determined at trial but not less than $380,000,000 plus interest.

244.     Sotheby's conduct was willful, wanton, reckless, and intentional.

## SECOND CLAIM
### Aiding and Abetting Breach of Fiduciary Duty

245.     Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

246.     Sotheby's knowingly participated in Bouvier's breach of his fiduciary obligations by providing him with substantial assistance. Bouvier was Plaintiffs' fiduciary. Bouvier held himself out as a skilled expert in the art market. Plaintiffs relied on Bouvier to provide them with strategic advice about the art market and to negotiate high-stakes transactions on their behalf. Plaintiffs had confidence in Bouvier because of their years of business dealings and because of Rappo's personal connection to Rybolovlev.

247.     Bouvier breached his fiduciary duties to Plaintiffs by acting disloyally and contrary to Plaintiffs' interests. Rather than act on Plaintiffs' behalf to acquire artworks at fair, negotiated prices that sellers were willing to accept, Bouvier seized those opportunities for his own benefit. He then harmed Plaintiffs' interests by charging them inflated prices on the basis of false representations.

248.     Sotheby's knew that Bouvier was Plaintiffs' agent and that Plaintiffs relied on his counsel. It strategized to sell Plaintiffs art through Bouvier and approached Bouvier about new opportunities for Plaintiffs. By brokering sales to Bouvier at certain prices, sending Bouvier emails designed to encourage Plaintiffs to pay inflated prices, misleadingly appraising works at inflated prices, and omitting Bouvier's acquisitions of the works in the provenance history to conceal the real seller, Sotheby's participated in Bouvier's breach of his fiduciary duties to Plaintiffs.

249.     As a result of Sotheby's aiding and abetting Bouvier's breach of fiduciary duty, Plaintiffs have sustained damages in an amount to be determined at trial but not less than $380,000,000 plus interest.

250.     Sotheby's conduct was willful, wanton, reckless, and intentional.

### THIRD CLAIM
**Breach of Contract – Declaratory Judgment**

251.     Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

252.     In December 2016, Plaintiffs and Sotheby's (including its New York, English, Swiss and Austrian subsidiaries) entered into a one-year written Tolling Agreement.

253.     The Tolling Agreement contains a New York choice of law clause and an exclusive New York forum selection clause.

254.     Among other things, the Tolling Agreement required each party to the agreement to "provide 14 days written notice ("Notice of Suit"), as provided in paragraph 8 [of the Tolling Agreement,] prior to filing or commencing any litigation or other legal proceeding against any other party" based on claims or defenses "arising out of the direct or indirect involvement of Sotheby's with Yves Bouvier." Tolling Agreement ¶¶ 3, 1.

255.    Paragraph 8 of the Tolling Agreement, referred to above, states: "All notices required hereunder shall be in writing and shall be deemed duly given on (1) business day after being sent at the address given below by reputable overnight courier service (charges prepaid), as follows: If to the Collectors [Plaintiffs]: c/o Daniel J. Kornstein, Esq., Emery Celli Brinckerhoff & Abady LLP, 600 Fifth Avenue, 10th Floor, New York, NY 10020."

256.    Sotheby's filed a civil proceeding in Geneva, Switzerland on November 17, 2017 against Plaintiffs (among others) without complying with the notice provision of the Tolling Agreement quoted above. The purpose of this filing was to invoke the international Lugano Convention to block a contemplated suit by Plaintiffs in the United Kingdom. Under the Lugano Convention, if a suit is filed in a signatory country—such as Switzerland—and if another suit involving the same cause of action and between the same parties is filed in a court in a second signatory country, the second jurisdiction must stay its proceedings until jurisdiction in the first court has been established. Once the jurisdiction of the first court has been established, the proceedings in the second court must be dismissed.

257.    As Sotheby's has stated in its Form 10-Q filed with the Securities and Exchange Commission, it filed the Swiss conciliation proceeding "in response to the stated intent of [Plaintiffs] to initiate litigation in the U.K."

258.    Sotheby's did not give any advance notice of any kind that it was filing a civil action in Switzerland, much less 14 days written notice sent by overnight courier service to Plaintiffs' counsel.

259.    Plaintiffs have abided by the terms of the Tolling Agreement.

260.    Sotheby's breached the Tolling Agreement.

261. Plaintiffs are entitled to a judgment declaring that Sotheby's breached the Tolling Agreement.

## FOURTH CLAIM
### Breach of Contract – Damages

262. Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

263. As a result of Sotheby's breach of the Tolling Agreement, Plaintiffs have sustained damages, in the form of legal fees in the course of responding to the improperly filed civil proceeding in Switzerland.

## FIFTH CLAIM
### Breach of Contract – Injunction

264. Plaintiffs repeat and reallege the allegations in the preceding Paragraphs.

265. As a result of Sotheby's breach of the Tolling Agreement, Plaintiffs are entitled to a mandatory injunction directing Sotheby's, its agents and employees, and the wholly owned subsidiaries under its control to withdraw the improperly brought Swiss civil proceeding.

266. Sotheby's improperly filed the civil suit in Switzerland in order to use the Lugano Convention to block Plaintiffs from suing Sotheby's in the United Kingdom, which is a signatory to the Lugano Convention, thereby improperly depriving Plaintiffs of their choice of jurisdiction.

267. As a result, Plaintiffs have suffered irreparable harm for which monetary damages are an inadequate remedy.

WHEREFORE, Plaintiffs demand judgment as follows:

a. On the first and second claims, directing Defendants to pay to Plaintiffs compensatory damages in an amount to be determined at trial, but in any event no less than $380,000,000 plus interest;

b.      On the first and second claims, directing Defendants to pay to Plaintiffs punitive

damages in an amount to be determined at trial;

c.      On the third claim, declaring that Defendants breached the Tolling Agreement;

d.      On the fourth claim, directing Defendants to pay to Plaintiffs compensatory

damages in an amount to be determined at trial, including the attorney's fees and related costs

expended by Plaintiffs in responding to the improperly brought Swiss civil proceeding;

e.      On the fifth claim, preliminarily and permanently enjoining Defendants, their

subsidiaries under their control, and their agents and employees, to withdraw the Swiss civil

proceeding filed on November 17, 2017; and

f.      Awarding Plaintiffs costs, disbursements, and such other and further relief as the

Court may deem just and proper.

Dated:  May 11, 2021
        New York, New York

                                        EMERY CELLI BRINCKERHOFF ABADY
                                        WARD & MAAZEL LLP

                                        _____/s/_____
                                        Daniel J. Kornstein
                                        O. Andrew F. Wilson
                                        Zoe Salzman
                                        Scout Katovich
                                        Andrew Jondahl
                                        Ananda Burra

                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020
                                        (212) 763-5000

                                        *Attorneys for Plaintiffs*