UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ACCENT DELIGHT INTERNATIONAL LTD.
and XITRANS FINANCE LTD.,

       Plaintiffs,

   -against-

SOTHEBY'S and SOTHEBY'S, INC.,

       Defendants.

**18 Civ. 9011 (JMF)**

---

### DECLARATION OF MIKHAIL SAZONOV

 MIKHAIL SAZONOV, under penalty of perjury, pursuant to 28 U.S.C. § 1746, declares that the following is true and correct:

 1. I managed finances and investments for entities associated with Dmitry Rybolovlev and his family trusts, including Plaintiffs, from 2001 until 2017. I have personal knowledge of the facts set forth in this declaration, which I submit in support of Plaintiffs' motion for partial summary judgment that Yves Bouvier defrauded Plaintiffs and breached his fiduciary duty to them.

 2. In this declaration, I will explain how I first met Yves Bouvier; how Mr. Rybolovlev explained to me that Bouvier would act as Plaintiffs' art agent in exchange for a 2% commission; how inexperienced Mr. Rybolovlev and I were in the art market and how much we relied on Bouvier; how Bouvier became a trusted advisor and close personal friend to both of us; how, over the course of more than a decade, Bouvier sent me emails and told me that he was negotiating hard for Plaintiffs to pay the lowest price possible for the artworks; how Bouvier told me over and over again that his 2% fee was his commission and his sole compensation; and how

we ultimately learned at the end of 2014 that Bouvier had systematically defrauded Plaintiffs by fabricating all of these negotiations he told me about and secretly marking up the prices of the art and pocketing the difference in addition to getting his commission

***Bouvier Introduced to Me as Plaintiffs' Art Agent***

3.      In or about 2002 or 2003, Mr. Rybolovlev introduced me to Bouvier at an in-person meeting in Geneva. I believe this meeting took place at the freeport where Bouvier stored paintings for customers. The freeport is a system of warehouses for the storage of art and other valuable items. We spoke about the storage of a Chagall painting Mr. Rybolovlev had recently acquired. I believe Tania Rappo, a close family friend of the Rybolovlevs, was also present.

4.      Approximately a few weeks after the meeting, Mr. Rybolovlev explained to me that he had an agreement with Bouvier to act as the art agent for Plaintiffs. He told me he and Bouvier had agreed that Bouvier would receive a 2% commission on the sales price of each artwork bought by Plaintiffs through him. As Mr. Rybolovlev explained it to me, Bouvier's role was to find the artworks and negotiate the best price for them on Plaintiffs' behalf. Mr. Rybolovlev also explained to me that Bouvier had agreed that he would act as an intermediary between Plaintiffs and the sellers and that he would transmit the entirety of the sale price, intact, from Plaintiffs to the sellers of the artworks.

5.      Mr. Rybolovlev tasked me to be a liaison with Bouvier.

6.      Neither Mr. Rybolovlev nor I was familiar with the art world or had any experience in buying and selling art masterpieces.

7.      At first, it was not clear that Plaintiffs would buy multiple artworks. I thought we might work with Bouvier to buy just one or two paintings. Gradually, over time,

Plaintiffs began to buy more artworks. By then, Bouvier had ingratiated himself to become a trusted advisor and personal friend of both myself and Mr. Rybolovlev.

8.      Over the years, on many occasions, Bouvier told me he had the biggest business in the freeport. He said he knew the people who stored artworks in the freeport, so he knew when they acquired art and when they wanted to sell art. He claimed this access gave him unique information, which others did not have, about art coming onto the market.

9.      Time and again, Bouvier emphasized to me that everything about art deals, including the sellers' identities, had to be confidential. Bouvier explained to me that there were many reasons sellers wanted to keep their identity confidential in the art market, including not wanting it known when they had to liquidate their art assets. He also said to me it was in Mr. Rybolovlev's interest to keep his identity confidential, otherwise sellers would try to take advantage of him and increase the price because he was a well-known, wealthy businessman. Bouvier explained to me that, given these concerns, the role of an art agent like him was to act as a screen in the middle, to protect the identities of both the sellers and the purchasers.

10.      Bouvier also repeatedly discouraged us from buying art through third parties other than himself, telling me that he was the only trustworthy person in the art market and that everyone else would just try to take advantage of Mr. Rybolovlev. Bouvier told me that only he could negotiate these deals bypassing other intermediaries and that he had the unique knowledge, expertise, and contacts needed to secure these artworks at the lowest price possible. These topics were all a repeated theme in many of my conversations with Bouvier.

11.      For example, in December 2012 Bouvier sent me an email discouraging Plaintiffs from buying an artwork from Gagosian Gallery, writing: "I can hardly believe that an 'Armenian Fox' like Gagosian could sell a more beautiful painting for less. Gagosian has the

highest fees of any professionals and is obliged to take huge commissions on all sales to keep the galleries and exhibits running." This email is attached as Exhibit 1. Later on, in March 2013, I told Bouvier that Mr. Rybolovlev had heard from a business acquaintance about an opportunity to buy Da Vinci's *Salvator Mundi*; Bouvier told me that we should have him negotiate the purchase for Plaintiffs, as he could get us a better deal than if Mr. Rybolovlev went directly to the sellers.

***Bouvier Was Both a Close Friend and a Trusted Advisor***

12.    While it occasionally happened that Plaintiffs bought a piece of furniture or a modest artwork for decorative purposes without Bouvier's involvement, Bouvier was supposed to negotiate all of Plaintiffs' art purchases and sales that were of any significance. That meant Bouvier had a monopoly on the information we received about those deals and about the art market more generally.

13.    It was my understanding over the years, both from speaking with Mr. Rybolovlev and from watching him interact with Bouvier, that Mr. Rybolovlev considered Bouvier both a close personal friend as a well as his trusted art advisor.

14.    Mr. Rybolovlev had a small inner circle of close friends, of approximately three to five people. Bouvier was one of those few. Mr. Rybolovlev quite often invited Bouvier to his birthday parties, to his home, and to dinners, soccer matches, and other family and social events with him.

15.    I also came to consider Bouvier a personal friend. We had lunch together approximately once a month and we also spent some time together as friends on other occasions. For example, we discussed renting office space together and Bouvier visited me at my home in Geneva. Bouvier also came to my birthday party and we met each other's spouses.

***Bouvier Claimed to Be Negotiating on Behalf of Plaintiffs with Artwork Owners***

16.    The usual way it worked with Bouvier was that he would recommend to Mr. Rybolovlev a particular artwork and give his advice on the appropriate purchase price. Bouvier would make these recommendations through me, Tania Rappo, or Mr. Rybolovlev's personal assistant, because Bouvier did not speak Russian and Mr. Rybolovlev did not speak French or English. If Mr. Rybolovlev was interested in the artwork, then Bouvier would often arrange a viewing so that Mr. Rybolovlev, sometimes me, or sometimes both of us, could view the artwork. Bouvier usually gave us photos, documents, and literature about the work. I would then communicate Mr. Rybolovlev's instructions to Bouvier on the maximum price, or cap, Plaintiffs could pay to purchase a given artwork. This amount was set based on the advice Bouvier had given us about the appropriate price.

17.    Between 2002 and 2014, Bouvier sourced 38 works for Plaintiffs' collection, worth hundreds of millions of dollars; 20 of the works were bought before January 2011.

18.    **Lowest Prices Possible.** Both Mr. Rybolovlev and I told Bouvier many times over the course of our dealings that Plaintiffs wanted to pay as little as possible to acquire the artworks. For example, in one April 2008 email, I wrote to Bouvier: "DR confirms the price of 37.8 *if it is the absolute minimum* we can get."[1] This email is attached as Exhibit 2 at P0013998.  In September 2012, Bouvier emailed to ask me if he should start the negotiations for the Klimt and I responded: "Yes, start the negotiation gradually. ***Maybe you can arrange for it not to be so catastrophically expensive***!" This email is attached as Exhibit 3.  Some examples of

---

[1] References to "DR" by myself and Mr. Bouvier are to Dimitry Rybolovlev.

other emails instructing Bouvier to negotiate the lowest price are attached here as Exhibit 4 (P0014091 (me writing "***Try to bring it down*** [the €5m]"); P0023007 (me writing: "***The goal is to pay as little as possible*** . . ."); P0023008 (me writing: "***Get the minimum*** and then call me for confirmation with DR. Thanks!"); P0015102 (me writing: "DR wanted to know ***if you can get it any cheaper***."); P0015115 (Bouvier writing "I've already got 30E, ***DR wants us to try to reduce it*** ideally to 25E. I will try . . ."))).

19.    **Hard Negotiations.** Bouvier repeatedly and frequently told me, both orally and in writing, that he was negotiating hard with the owners of the artworks to try to secure the best price. I now know that all of these negotiations were false. But at the time, I was completely convinced by them. For example, in the course of negotiating a work by Picasso in 2008, Bouvier emailed me: "***I negotiated hard***. Right now, after a ***long and difficult negotiation***, I am at 42. ***The seller is very old and has heart issues***. Unfortunately for you, I think I can only get the price lower by proposing a fast payment . . . If you could let me know what you can manage at best as a payment deadline, it would be helpful in continuing the negotiations. If it's a short delay to payment, then I can try to negotiate ten percent less on the price already negotiated, for 37.8." *See* Ex. 2 at P0013998.

20.    In another example, in June 2010, Bouvier emailed me about the negotiation he claimed to be conducting with the seller of a Van Gogh: "***Good news. He just contacted me and he's cracked and accepted €18*** with payment before the end of June." This email is attached as Exhibit 6 at P0014148.

21.    In December 2010, Bouvier sent me an email describing negotiations he claimed to be conducting with the seller of an El Greco painting: "It's too hard with him, I've already managed to get him to say his price. ***I cry, he cries. I told him it's not going to happen,***

*in brief, it's the game. Please confirm that if I can get to 40 I can agree*." This email is attached as Exhibit 7 at P0014274.

22.    On October 7 2011, Bouvier responded to my request for "news" about the Giacometti negotiation: "Nothing yet, still waiting, and I don't want to follow up before Monday." Later, on October 10, 2011, Bouvier wrote to me: "Very good news, *with great difficulty I achieved a price of CHF 45 million* with a very rapid payment. . ." This email is attached as Exhibit 8.

23.    On April 10, 2013, Bouvier emailed me with repeated updates about the negotiation he claimed to be doing with the seller of the Da Vinci, telling me: "90 was not considered"; "100 rejected without delay [or] reflection!"; "*He's a real tough one but I am fighting* . . ."; "*Concluded at 127.5 Incredibly difficult, but it's a great deal* for this unique masterpiece by Leonardo." This email is attached as Exhibit 9 at P0015210-11.

24.    Other examples of emails Bouvier sent me claiming to describe the hard negotiations he was conducting are attached as Exhibit 10 (P0014002 ("*I got him to crack at 37.5* . . ."); P0014095 ("You can now tell DR that the deal is done at 5E, *he just accepted after a long negotiation*."); P0014250 ("*They're trying to negotiate, but I'm not budging* by a cent or a minute from our proposal."); P0014251 ("*Unwavering firmness paid off*, we've got the painting for the price of $45, but I did promise fast payment.")).

25.    **Independent Sellers.** Bouvier always described the owners of the artworks as independent third parties. He never referred to himself as the seller or gave me any indication that he was the actual owner or seller of the artwork in question. For example, in April 2008, Bouvier sent me an email saying he was beginning negotiations for a Picasso; he wrote: "I will try to do my best but *the seller is very old*. Advantage: he wants a quick transaction which is

a negotiating advantage. Disadvantage: it will be hard to buy time because he wants to plan his succession." Ex. 2 at P0013999.

26.     In November 2009, Bouvier emailed me: "I *dined with him [the seller] and spent the evening talking with him*. He's not too pressed for money, but he wants to plan for the future. I think after all my arguments, I think I can get him to accept 6E. I hope to still do better, but to do that I need to know at what price I can agree." This email is attached as Exhibit 11.

27.     On March 31, 2011, Bouvier wrote to me about the seller of Picasso's *Homme Assis Au Verre*: "I need a response; *it is imperative that I leave him after concluding so that he won't be able to go back*." This email is attached as Exhibit 12.

28.     In June 2011, Bouvier emailed me about the owner of the Matisse, explaining "*the owner is paranoid and complicated*." "I don't want to take any risk with the seller and, above all, to give him a pretext to go back." This email is attached as Exhibit 13.

29.     On July 22, 2011, Bouvier emailed me about the Rodin sculpture *Éternel Printemps*: "After the presentation of an exceptional Rodin marble this Thursday to Dimitri, *I am beginning the negotiation with the owner*." This email is attached as Exhibit 14.

30.     In February 2013, Bouvier emailed me about the Green Toulouse Lautrec: "*I told DR that I had negotiated a super and final price of 14M E, because the seller had an opportunity to invest*. He rejected an offer of 13M E from another collector. . . . Today, I have no guarantee I can still get this work at 14.0." This email is attached as Exhibit 15 at P0015101.

31.     In August 2014, Bouvier emailed me about negotiations he claimed to have had with the seller of the Rothko, writing: "*I've convinced the seller* of the importance of

Modigliani's Tete, he agrees to take it in exchange for 60M E." This email is attached as Exhibit 16 at P0015528.

32.     All of these emails and similar verbal communications from Bouvier led me to believe he was engaged with real third-party sellers. I had no reason to think his accounts of these negotiations were false and in fact he was himself the seller of the artworks.

33.     **Acting as an Agent**. In all of my interactions with Bouvier over the years, it always appeared to me that he was acting as an agent, not as an independent seller. For example, Bouvier always kept me informed about the status of his supposed negotiations, recommended negotiation strategies, and sought authority from Mr. Rybolovlev to make or increase an offer to the seller. Again, I would act as the liaison between Bouvier and Mr. Rybolovlev in these discussions. For example, in an April 2008 email to me about buying a Picasso, Bouvier wrote: "On the practical side, ***to get a green light from Dimitry, can you ask him if I am authorized to agree*** if I manage to get 37.8?" Ex. 2 at P0013998.

34.     In a February 5, 2011 email about the Matisse, Bouvier wrote: "***the negotiation for the Matisse Nude is too difficult*** and I don't think I can get it. ***Thank you for asking Dimitri if he wants me to keep negotiating and up to what amount I can go*** . . ." This email is attached as Exhibit 17 at P0014314.

35.     In a March 31, 2011 email about Picasso's *Homme Assis Au Verre*, Bouvier told me: "***I am in negotiations***, start 150 which between us makes a lot of sense in relation to the importance. Clearly it's not possible. ***I am talking about 100 max***. I think that in relation to the financial conditions, I might be able to split at 125. ***But I would like to do better! Between 110 and 120.*** Can you tell me how much you can release quickly, 10%? 50%? Or more? ***And on what price I can do a deal***." This email is attached as Exhibit 18 at P0014344.

36.     In November 2011, Bouvier forwarded me an email from Samuel Valette at Sotheby's with information about Magritte and then asked: "***Do you want me to move forward in the negotiation? If so, I need a budget*** and conditions because negotiations will be done in one single go in front of the painting." This email is attached as Exhibit 19 at P0014501.

37.     A few days later, he updated me on the negotiations he claimed to be conducting for the Magritte: "I tried but 42 is mission impossible even at 42.5. ***He is stuck at 50***. I need a little more, in principle I don't want to offer 45, I'll offer 44 take it or leave it . . ." This email is attached as Exhibit 20 at P0014515.

38.     On February 29, 2012, Bouvier wrote to me: "I will negotiate the price of Eve today . . . The announced price is 40 USD but I want it for under 30. ***It goes without saying I will keep you informed before agreeing***." He later updated me: "Deal done at 26,250, rapid payment." The emails are attached as Exhibit 21 at 14581 & 14582.

39.     In September 2012, Bouvier emailed me about the negotiations he claimed he was doing for the Klimt and pretended to seek my instructions: "***They're stuck at 180 and ready to walk; I think they would do 190. But I will have to twist them to get 185 with quick payment and sale at 30 days. What to do??? Do you have suggestions?***" This email is attached as Exhibit 22 at P0014904.

40.     Some other examples of emails Bouvier sent me where he acted the way an agent would, sharing his negotiation strategy and seeking authority to move the negotiation forward, are attached as Exhibit 23 (P0014097 ("***are you ok with these prices?***"); P0014195 ("I need to finish ***the negotiation for Dimitri*** this week . . ."); P0014246 ("Please keep me informed as soon as possible of Dimitri's position. My suggestion would be to make a lower offer, valid for very little time with a condition of fast payment."); P0014342 ("FYI tomorrow I will

negotiate the painting tomorrow."); P0014343 ("I'll be in a meeting to negotiate for the painting around 11:30 a.m. In order to negotiate as closely as possible and not miss this painting, Dimitri told me payment could be quick, depending on the price, can you confirm this."); P0014353 ("Following my meeting yesterday with Dimitri, you can confirm that I got the Maillol at 8.4E with payment to follow."); P0023185 ("For the Rodin, I concluded at 7.5E same condition."); P0014478 ("***Can you confirm*** I can agree a 1E and what timing?")).

41.     **Offers to Invest.** Sometimes Bouvier would tell me he could invest some money himself to complete a deal he claimed was advantageous for Plaintiffs. For example, in 2010, Bouvier offered to invest in some drawings by Picasso, emailing me: "I think we need to try to close at 9E. At this price, if Dimitri doesn't want to hang them at his place, we can do a financial deal and ***I'm ready to invest with him***." This email is attached as Exhibit 24 at P0014200.

42.     Other examples of emails Bouvier sent me offering to invest are attached as Exhibit 25 (P0014958 (offering to invest 10-15% for *Tête*); P0015522 (offering to invest 5€ in the Rothko)).

43.     These offers to invest further convinced me that the prices Bouvier claimed to have negotiated were financially sound investments for Plaintiffs and that Bouvier was acting in Plaintiffs' best interests. They did not make me think Bouvier was himself the seller.

44.     **Offers to Waive Commission.** Bouvier also offered sometimes to reduce or waive his commission to conclude a deal. These offers further convinced me that Bouvier was acting in Plaintiffs' best interests and that he was well compensated by his commission and therefore willing to reduce it or waive it on occasion. For example, for the Magritte, Bouvier

updated me on the status of the negotiation he claimed to be having with the seller, writing: "Given the importance of this work, I proposed 43.5 USD with the offer open until Friday 12:00. I allowed myself to propose this number telling myself that it's your number 42.5 + my fees 2% of around 1 for a total of 43.5 If Dimitri doesn't agree with this increase, *I'll waive my fees*." Ex. 20 at P0014515.

45.    In December 2012, Bouvier emailed me about the negotiation he said he had for Modigliani's *Tête*: "The proposal of 36.5 + Degas was rejected without any possible discussion. After discussions so as not to miss out definitely on the deal, I finally concluded at 37.5 E + Degas. *In order to stay within DR's budget of 36.5, I will waive my fees* on the total value of this acquisition, so that way the total cost for DR is similar." This email is attached as Exhibit 26 at P0014968.

46.    **We Never Negotiated with Bouvier.** Because we believed Bouvier was our agent, neither Mr. Rybolovlev nor I ever negotiated with Bouvier or questioned the prices Bouvier said Plaintiffs had to pay, because we believed Bouvier was acting in Plaintiff's best interests, to negotiate the best possible price for us. If we had understood him to be the seller of the works, we would have negotiated with him. I am familiar with Mr. Rybolovlev's usual business practices and have acted as his representative in many other business deals. Mr. Rybolovlev's usual business practice is to negotiate hard with sellers and to seek multiple quotes or look for comparable items to ensure he is paying the best price possible. If we had understood Bouvier was the actual seller of the artworks, we would have engaged in the same negotiations and verifications with him. We didn't do that, because we believed *he* was conducting those negotiations and doing those verifications *on our behalf*, as our agent.

47.     For every purchase Plaintiffs made, Bouvier told me that the prices Plaintiffs were paying for the artworks were the lowest possible obtainable from the sellers.

48.     All of these statements and actions by Bouvier convinced me that he was working hard to protect Plaintiffs' best interests and to ensure they paid the lowest price possible for the artworks.

49.     I believed Bouvier was both an expert in the art market and our trusted agent, so I relied on him completely when it came to his representations about the purchase price required to acquire an artwork and the negotiations he claimed to have had to secure that price. I never suspected at the time that Bouvier's descriptions of hard-fought negotiations were lies. I thought they reflected real negotiations. I relayed them to Mr. Rybolovlev. We relied on the representations Bouvier made to acquire the paintings for the prices Bouvier claimed to have negotiated, several times for more than the cap Mr. Rybolovlev had initially wanted to set.

**_Bouvier Contemporaneously Described His Fee as a "Commission"_**

50.     Bouvier was always compensated with a fee that was a percentage of the price of the artwork. This fee was almost always 2%, although Bouvier would sometimes offer to reduce or waive it. Bouvier described this fee, in both written and verbal communications, as his "commission."

51.     Some of the emails Bouvier sent referring to his fee as his "commission" are attached here as Exhibit 27 (P0013991 (email from Bouvier to me providing his bank information for payment of the "commissions"); P0014012 (same); P0003120 (email from Bouvier asking me to wait on payment "for the commission); P0014024 (same); P0013945 (email from Bouvier to me, referring to the "commission."); P0014038-39 (email exchange

between me and Bouvier where both refer to "commissions"); P0003122-23 (email exchange between me and Bouvier where both refer to "commissions").

52.    Likewise, emails that I exchanged contemporaneously with Bouvier or with my colleagues referred to the payments to Bouvier as his "commission." Some of the emails sent by me describing Bouvier's payment as a "commission" are attached here as Exhibit 28 (P0013987 (email from me to Bouvier asking "where would you like me to pay your commission (2%, right?)?"); Bouvier provides his banking information for the "2%" without disputing the use of the term "commission")); P0022945 (email from me to Bouvier requesting bank information for payment of "commission"); P0014025 (email from me to Bouvier requesting instructions for paying the commission); P0014037-40 (email exchange between me and Bouvier where we both refer to "commissions"); P0022964 (email from me to Bouvier about paying commission); P0003122 (email exchange between me and Bouvier where we both refer to "commissions"); P0014157 (email between me and a colleague about Bouvier's "commission").

53.    Based on what Bouvier told me, I believed a 2% commission was standard for an art agent for negotiating the purchase of masterpieces like the ones Plaintiffs bought.

54.    After the fraud was revealed, Plaintiffs hired Sandy Heller to be their art agent and he charged a a similar rate of commission. A copy of Mr. Heller's contract is attached as Exhibit 29 at SH0019 ⁋ 7.

55.    Bouvier once emailed me that it was "not acceptable" for a seller's intermediary to get a 10% commission. This email is attached as Exhibit 30 at P0024740.

56.    Bouvier made nearly $50 million in commissions from Plaintiffs over the years.

***Bouvier Determined What Documents Were Needed for Each Purchase***

57.    I also relied on Bouvier's advice about what kind of documentation was standard in the art market and what documents were needed for each artwork Plaintiffs purchased.

58.    **Four Contracts with Sellers.** For the first four artworks Plaintiffs acquired through Bouvier, we had contracts with entities I believed were the sellers of the artworks. Specifically:

(a) on July 26, 2003, Xitrans signed a contract to purchase Van Gogh's *Landscape with an Olive Tree* from a seller called Arrow Fine Art (attached here as Exhibit 31).

(b) on October 25, 2004, Xitrans signed a contract to purchase Picasso's *Les Noces de Pierrette* from a seller called Eagle Overseas (attached here as Exhibit 32).

(c) on April 10, 2006, Xitrans signed a contract to purchase Modigliani's *Nu couche au bras levés* from a seller called Kinsride (attached here as Exhibit 33).

(d) on October 16, 2006, Xitrans signed a contract to purchase Picasso's *Mousquetaire à la pipe* from MEI Invest (attached here as Exhibit 34).

59.    When these contracts were signed, I thought the entities Plaintiffs were contracting with (Arrow Fine Art, Eagle Overseas, Kinsride, and MEI Invest) were the owners of the artworks, or entities established to shield the owners' true identities. I believed they were independent third parties. I did not think these entities belonged to or had any connection with Bouvier or that Bouvier was the actual seller of the artworks. Bouvier did not tell me at the time of these contracts that any of these entities belonged to him.

60. For example, on October 4, 2006, Bouvier sent me an email telling me he was in Paris and would "organize a meeting **with the owner**" of *Mousquetaire* to try to secure better terms for Plaintiffs. This email is attached as Exhibit 5 at P000006463. Like all of Bouvier's other communications with me, this email led me to understand that Bouvier was engaged in discussions with a third-party seller of this artwork—it did not suggest at all that he was himself the seller.

61. Since I believed at the time we signed these four contracts that these entities were independent third-party sellers, I did not think these contracts were inconsistent with our agreement with Bouvier that he would act as Plaintiffs' agent in exchange for a commission on the purchase price.

62. Plaintiffs separately paid Bouvier his 2% commission on the sales prices of each of these four sales.

63. Approximately one year later, in or about the fall of 2007, I learned that MEI Invest was an entity owned by Bouvier. I only learned that Arrow Fine Art, Eagle Overseas, and Kinsride were also Bouvier entities after 2015, after Bouvier's fraud was exposed and we obtained discovery in this and other litigation.

64. **Bouvier Recommends Invoices Instead of Contracts**. Approximately one year after the purchase of Picasso's *Mousquetaire a la pipe*, in about November 2007, Plaintiffs were working through Bouvier to acquire a Modigliani painting called *Bust-length Portrait of Young Blond Girl*. Bouvier told me orally that we should not use a contract for this purchase, but rather should proceed on the basis of invoices.

65. In that conversation, Bouvier explained that it was standard in the art market to proceed on the basis of invoices rather than contracts. He also said that preparing

contracts slowed down the process and could result in missing out on a deal. He told me that to succeed in the art market you had to be ready to act quickly and that being able to provide prompt payment could help secure lower purchase prices.

66.    Bouvier persuaded me, and I trusted him after already working with him successfully to buy the first four paintings, so I agreed on behalf of Plaintiffs to use invoices rather than contracts going forward.

67.    Bouvier then further explained to me that the invoice would be issued by his company MEI Invest. He explained that MEI would function as a *de facto* escrow agent in the deal, accepting the money from Plaintiffs and the art from the seller, and then passing the art on to Plaintiffs and the money on to the seller. Bouvier said the purchase price should be paid to MEI Invest rather than directly to the seller of the artwork so as to ensure complete confidentiality of the transaction, which was highly valued in the art world, and also to protect Plaintiffs, because MEI would only release the money when it had custody of the artwork. Bouvier told me that it was standard practice in the art market for an art agent like himself to act as a sort of escrow agent like this. Again, this made sense to me, I trusted Bouvier, and I had no reason to doubt what he was saying, so I agreed to proceed this way. I do not think I specifically recalled at the time that MEI Invest was the same entity that had signed the *Mousquetaire* sales contract over a year before and I do not recall Bouvier discussing this with me.

68.    Thereafter, for the rest of the artworks Plaintiffs purchased through Bouvier, MEI Invest would issue us a sales invoice documenting the sale price of the artwork and Plaintiffs would pay for the artwork based on these invoices, believing that these were the true sales prices Bouvier had negotiated with the sellers on Plaintiffs' behalf.

69.    The purchase invoices for the works bought through Sotheby's, or translations of those invoices, are attached here as follows:

(a) The purchase invoice for Picasso's *L'Homme Assis Au Verre* is attached here as Exhibit 35.

(b) The purchase invoice for Maillol's *La Méditerranée* is attached here as Exhibit 36.

(c) The purchase invoice for Rodin's *Le Baiser* is attached here as Exhibit 37.

(d) The purchase invoice for Matisse's *Nu au Châle Vert* is attached here as Exhibit 38.

(e) The purchase invoice for Rodin's *L'Éternel Printemps* is attached here as Exhibit 39.

(f) The purchase invoice for Giacometti's *Femme de Venise IX* is attached here as Exhibit 40.

(g) The purchase invoice for Magritte's *Le Domaine d'Arnheim* is attached here as Exhibit 41.

(h) The purchase invoice for Rodin's *Eve* is attached here as Exhibit 42.

(i) The purchase invoice for Klimt's *Wasserschlangen II* is attached here as Exhibit 43.

(j) The purchase invoice for Modigliani's *Tête* is attached here as Exhibit 44.

(k) The purchase invoice for the Green Toulouse-Lautrec's *Au Lit: Le Baiser* is attached here as Exhibit 45.

(l) The purchase invoice for Da Vinci's *Christ as Salvator Mundi* is attached here as Exhibit 46.

70.     I caused payment to be made on these purchase invoices by Plaintiffs, believing that they reflected the actual sales prices Bouvier had negotiated for Plaintiffs and that Bouvier's entity MEI Invest would transmit these prices intact to the sellers of the works.

71.     **MEI Was An Intermediary, Not the Seller.** Throughout all of these transactions, I never thought MEI was the actual seller of the artworks. It was always my understanding that MEI was providing *de facto* escrow services the way Bouvier had explained to me was typical of art agents. I believed MEI took the purchase money from Plaintiffs and remitted it intact to the sellers, while transmitting the artwork from the sellers to Plaintiffs.

72.     **Bouvier Separately Invoiced His Commissions**. On each of these transactions, Plaintiffs also separately paid Bouvier his commission.

73.     In or about 2010, Plaintiffs' banks insisted that Bouvier's commission could only be paid based on an invoice. My email explaining this to Bouvier is attached here as Exhibit 47.

74.     Before that, Plaintiffs had sometimes paid Bouvier's commission just on the basis of an email from Bouvier. Thereafter, Bouvier would invoice Plaintiffs, in his personal capacity, for his commission.

75.     The commission invoices for the works bought through Sotheby's, or translations of those invoices, are attached here as follows:

(a)   The commission invoice for Picasso's *L'Homme Assis Au Verre* is attached here as Exhibit 48.

(b)   The commission invoice for Malliol's *La Méditerranée* is attached here as Exhibit 49.

(c)   The commission invoice for Rodin's *Le Baiser* is attached here as Exhibit 50.

(d)    The commission invoice for Matisse's *Nu au Châle Vert* is attached here as Exhibit 51.

(e)    The commission invoice for Rodin's *L'Éternel Printemps* is attached here as Exhibit 52.

(f)    The commission invoice for Giacometti's *Femme de Venise IX* is attached here as Exhibit 53.

(g)    The commission invoice for Magritte's *Le Domaine d'Arnheim* is attached here as Exhibit 54.

(h)    The commission invoice for Rodin's *Eve* is attached here as Exhibit 55.

(i)    The commission invoice for Klimt's *Wasserschlangen II* is attached here as Exhibit 56.

(j)    The commission invoice for Modigliani's *Tête* is attached here as Exhibit 57.

(k)    The commission invoice for the Green Toulouse-Lautrec's *Au Lit: Le Baiser* is attached here as Exhibit 58.

(l)    The commission invoice for Da Vinci's *Christ as Salvator Mundi* is attached here as Exhibit 59.

76.    I caused payment to be made on these commission invoices by Plaintiffs, believing that they reflected Bouvier's commission and his sole compensation for acting as Plaintiffs' art agent for these transactions.

77.    The wording Bouvier used in his invoices was consistent with what I understood Bouvier to be doing for Plaintiffs—performing various administrative and due diligence services as their art agent to help them find and buy masterpieces for the best possible prices. Some emails showing that this was my understanding are attached here as Exhibit 60

(P0015160 (internal email attaching Bouvier's invoice and describing it as "commission");

P0015421-23 (email from Plaintiffs to HSBC attaching Bouvier's invoice and describing it as

"commission"); P0014263 (email from me asking Bouvier for an invoice for his commission;

Bouvier responds with his usual invoice, P0014264 & P0014266)).

78.    **The Fees Were Commissions, Not Expense Reimbursement.** I

understood the 2% fees Plaintiffs were paying Bouvier for his assistance negotiating the

purchase of each artwork to be a commission, not reimbursement of costs incurred by Bouvier as

he has since tried to claim.

79.    If the payments were reimbursements for costs, then they would have been

a variable figure reflecting the actual costs incurred for each artwork, which I would have

expected to see itemized in Bouvier's invoices and supported by invoices from third parties.

80.    Plaintiffs' constant payment of a fixed percentage of the sales price is

consistent with my understanding that this was a commission, not an expense reimbursement.

81.    My understanding is reinforced by Plaintiffs having paid separately for the

longterm insurance and storage costs associated with the artworks.

82.    Other administrative costs associated with the purchase of these artworks

were paid for by the owners of the artworks. For example, the seller typically paid for any

condition reports that were needed as well as for transport of the work (although many of the

works were already in the freeport at the time of the acquisition, so there were no transport costs

for anyone). For the works purchased through Sotheby's, I have learned through discovery in this

case that Sotheby's paid for the costs of insuring and shipping the work to the freeport. *See*

Kornstein Decl. Exs. 13-23 to Sotheby's contracts ⸿2 or ⸿ 3.

83.    **Consistent Understanding of Bouvier's Role.** Throughout the entirety of our work with Bouvier, whether he was using contracts, invoices, or emails to document the deals, my understanding of Plaintiffs' arrangement with Bouvier was always the same: Bouvier was acting as an art agent for Plaintiffs to negotiate the best price possible for the artworks; the only profit Bouvier was making was his commission; the purchase prices Bouvier communicated to me or Mr. Rybolovlev were the actual prices agreed upon with the third-party owners of the artworks; and Bouvier passed on the sales price intact from Plaintiffs to the sellers of the work.

84.    Bouvier never told me that he was marking up the sales prices as well as getting his commission. Before December 31, 2014, no one else ever said or suggested that to me either. Until then, I always believed, that Bouvier was passing on the sales prices intact from Plaintiffs to the sellers of the artworks.

85.    I never believed Plaintiffs were paying Bouvier *both* a markup on the sales price and a commission and I would never have authorized such double-dipping if I had known about it.

### We Discover Bouvier's Fraud at the End of 2014

86.    In 2014, Mr. Rybolovlev and I asked Bouvier to sell some of the artworks.

87.    Over the course of approximately the next six months, Bouvier was unable to sell the works at or above the prices Plaintiffs paid for them. I was surprised by this, since I knew the works were masterpieces and Bouvier had always assured me that Plaintiffs were paying a good price for these works.

88.    I expressed surprise and dismay to Bouvier when he projected re-sale prices that were lower than the prices Plaintiffs had paid. For example, in an email I wrote to Bouvier on December 15, 2014, I said: "I'll try to discuss these options with Dmitri, but

estimates for the paintings that are lower than our purchase price…" A copy of this email is attached as Exhibit 61 at P0015622.

89.     Bouvier made excuses, telling us that the market was bad and that the works would eventually sell for more than Plaintiffs had paid for them.

90.     On November 21, 2014, my colleague Yuri Bogdanov emailed me a link to a New York Times article that reported that Da Vinci's *Salvator Mundi* had been sold for between $70 and $80 million, which was much lower than the price ($127.5 million) Plaintiffs had paid for this work. A copy of this email and the enclosed article are attached as Exhibit 62.

91.     I had not seen or heard of this New York Times article before. Yuri and I emailed together about whether the article was accurate and I suggested he show the article to Mr. Rybolovlev.

92.     I still did not contemplate the possibility that Bouvier had defrauded us. This was partly because I deeply trusted Bouvier and partly because he had told me many times that the press was often inaccurate in its reporting about art deals. For example, in or about September 2013, Bouvier had sent me an article from the Austrian press reporting a sale price for the Klimt which was lower than what Plaintiffs had paid for it, writing in his cover email: "I don't know where this information comes from. If you have any doubts about the additional amount, I am at your disposal to provide you with proof of the transfer of compensation to the heirs of the dispossessed families (14 people) on the Sotheby's account." A copy of this email is attached here as Exhibit 63 at P0030723. I believed Bouvier that the article was inaccurate and was reassured by his offer to get me proof from Sotheby's.

93.     On or about New Year's Eve, 2014, I received approximately two or three phone calls from Mr. Rybolovlev, who was vacationing at the time in St. Barts. In total, we

spoke for approximately an hour and a half that night. Mr. Rybolovlev appeared to be very upset, shocked, and angry. He told me he had met Sandy Heller, an art advisor who had represented the seller of the Modigliani *Nu couché au coussin bleu*. Mr. Rybolovlev told me he learned from Mr. Heller that the seller of this painting had received substantially less than what Plaintiffs had paid for it. It then became clear that Bouvier must have pocketed the difference.

94.    I recall Mr. Rybolovlev saying, in Russian, "Bouvier swindled us!" We discussed how, if Bouvier had defrauded Plaintiffs with this Modigliani purchase, he had probably done the same with the other artworks and the scope of the fraud might be in the hundreds of millions of dollars.

95.    There are really no words to capture how deeply upset and betrayed by Bouvier I felt then and still feel now. I had considered Bouvier to be my friend as well as our trusted advisor.

**How Bouvier Defrauded Plaintiffs**

96.    Since that night, December 31, 2014, on the phone with Mr. Rybolovlev, I have learned through discovery in this case and other cases the true extent of Bouvier's fraud and the way he perpetrated it.

97.    I now realize that all of the negotiations Bouvier claimed to be conducting with third-party sellers were false.

98.    For example, when Bouvier emailed me on April 10, 2013 to tell me the Da Vinci sellers rejected $100 million "without delay reflection!" and he had "concluded at 127.5" the "incredibly difficult" negotiation for the Da Vinci, that was false. *See* Ex. 9. Based on these representations, Plaintiffs paid $127.5 million for the Da Vinci. Ex. 46. In fact, I now know

that Bouvier had actually negotiated that same day to buy the Da Vinci for $83 million. *See* Kornstein Decl. Ex. 28; *see also* Kornstein Decl. Ex. 23.

99.     Similarly, on November 15, 2011, Bouvier forwarded me an email from Sotheby's to explain that Magritte's *Domaine d'Arnheim* was worth more than €40 million. This email is attached as Exhibit 64. Thereafter, Bouvier sent me a series of emails in which he claimed to be negotiating hard, that the seller was "stuck at 50," and that he had finally concluded the deal for $43.5 million. *See* Ex. 20. Based on these representations, Plaintiffs paid $43.5 million for this Magritte on December 7, 2011. *See* Ex. 41. I now know that, the next day, December 8, 2011, Bouvier signed a contract to purchase this work from Sotheby's for $24.1 million. *See* Kornstein Decl. Ex. 18.

100.     Right up until he was detained by the Monaco authorities on February 25, 2015, Bouvier continued to try to mislead and defraud us. For example, Bouvier told me repeatedly in January and February 2015 that the seller of the Rothko was threatening legal action for failure to pay for the painting. I learned through discovery in later litigation that Bouvier had even gone so far as to create a phony lawyer's letter purporting to be from the seller of the Rothko and threatening legal action if Plaintiffs did not complete payments for that artwork. A copy of this letter is attached as Exhibit 65. This letter was addressed to Bouvier at MEI Invest and purported to be from a lawyer working for a company known as Blancaflor, which was described as the owner and seller of the Rothko. *Id.* But, as we learned from discovery in this and other litigation, Blancaflor was Bouvier's entity and Bouvier himself already owned the Rothko at the time of this letter, having purchased it in August 2014 for $83.5 million cash while telling me the sale price was $140 million.

101.    This web of lies was Bouvier's *modus operandi*. In total, I have learned since 2015 that Bouvier retained approximately $1 billion in secret markups, on top of the approximately $50 million in commissions Plaintiffs paid him. I have also learned that Bouvier paid approximately $100 million to Rappo—but neither he nor Rappo ever told me about those payments. With Sotheby's assistance, Bouvier's fraud resulted in Plaintiffs overpaying for the Sotheby's Works at issue in this case by at least $320 million. *See* Kornstein Decl. Ex. 29.

102.    Bouvier convinced Plaintiffs to exchange Modigliani's *Tête* for a $60 million credit on the Rothko. A translation of a copy of the invoice reflecting this is attached here as Exhibit 66. *See also supra* Ex. 16. But we later learned the Rothko sellers never wanted or got *Tête*; instead, Bouvier and Sotheby's sold it at auction in November 2014 and Bouvier kept all the sale proceeds. *See* Kornstein Declaration, Exs. 25, 26.

103.    Bouvier also convinced Plaintiffs to auction Toulouse Lautrec's Red *Au Lit, Le Baiser* with Sotheby's. *See* Kornstein Declaration, Ex. 27. But then Bouvier and Sotheby's refused to remit to Plaintiffs $14,370,387.12, the proceeds of this painting which sold at auction by Sotheby's in 2015 and, we learned from discovery in this case, Sotheby's distributed some of the sale proceeds to Bouvier even after learning he had been arrested for fraud, and froze the rest.

104.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: March 22, 2022
Netanya, Israel

_____
Mikhail Sazonov