UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ACCENT DELIGHT INTERNATIONAL LTD.
and XITRANS FINANCE LTD.,

Plaintiffs,

-against-

SOTHEBY'S and SOTHEBY'S, INC.,

Defendants.

**18 Civ. 9011 (JMF)**

---

## DECLARATION OF DMITRY RYBOLOVLEV

Dmitry Rybolovlev, under penalty of perjury, pursuant to 28 U.S.C. § 1746, declares that the following is true and correct:

1.      Plaintiffs are companies owned by a trust settled by and for the benefit of members of my family. Plaintiffs gave me powers of attorney to act on their behalf to buy and sell artwork, including the works at issue in this case that were bought and sold through Sotheby's. I have personal knowledge of the facts set forth in this declaration, which I submit in support of Plaintiffs' motion for partial summary judgment.

2.      This case arises out of Sotheby's aiding and abetting of Yves Bouvier's huge fraud and breach of his fiduciary duties to Plaintiffs. In this declaration, I explain how I met Bouvier, how we agreed he would act as an art agent for entities associated with me (*i.e.,* Plaintiffs), how I believed for over a decade that Bouvier was my trusted advisor and friend who was acting in good faith for Plaintiffs and in their best interests to buy art at the best price, and how I learned at the end of 2014 that Bouvier had massively defrauded Plaintiffs by secretly charging them more for the artworks that they actually cost.

1

*The Agreement with Bouvier to Act as Plaintiffs' Agent*

3.      I first met Bouvier at the Geneva freeport, a system of warehouses used to store art and other valuables, in 2002. I went there to see *Le Grand Cirque* by Marc Chagall, which was the first painting I bought.

4.      A copy of the invoice for the Chagall is attached here as Exhibit 1.

5.      I went to see the Chagall with Tania Rappo, who was a close friend of my family, one of the few people we knew well in Geneva, and the godmother to my youngest daughter. Rappo had advised me to purchase the Chagall and brokered that sale for me.

6.      Bouvier told me he was an owner of one of the companies that had warehouses in the freeport. He offered to help find some missing documentation for the Chagall. I believed the meeting with Bouvier at the freeport was a chance encounter. But, after I discovered Bouvier's fraud and litigation was filed against him, I learned that the Chagall seller, Finatrading Development, Ltd., was owned by Bouvier.

7.      At this time, my family and I had recently moved into a new house in Geneva, and it had a lot of spotlighted spaces on the walls where the previous owner had hung art. I was interested in buying some art to fill these spaces, and the Chagall was the first piece I bought. I thought I might want to buy some more art, but I did not yet know exactly what kind of art or how many works. Over time, however, art became a significant investment for Plaintiffs.

8.      I did not have any experience in the art market and did not know anything about how it worked.

9.      After that first meeting with Bouvier, Rappo recommended to me that I meet with Bouvier again and said he wanted to make a proposal to me. She said he could be useful because a lot of paintings were stored in his space at the freeport.

10.    Rappo again and again urged me to meet with Bouvier to hear his proposal.

11.    Eventually, I agreed and Rappo organized a second meeting with Bouvier.

12.    This meeting took place at my house in Geneva. In addition to myself and Bouvier, Rappo and my wife Elena Rybolovleva were present. My daughter Ekaterina, who was approximately 12 or 13 at the time, may also have been present. We met for approximately one hour in the living room of our house. Bouvier spoke in French, and Rappo acted as the translator between him and me because I do not speak French.

13.    Bouvier appeared to me to be a calm, impressive, and intelligent person. His demeanor reminded me of a Swiss banker. I formed a good impression of him and he appeared to me to be trustworthy.

14.    In the meeting, Bouvier told me that during the Chagall purchase, there were, unfortunately, too many middlemen, and we could not bypass all of them, and that had increased the purchase price. In the art market, Bouvier said, it was better to buy directly from the owners.

15.    Bouvier said he was uniquely positioned to assist me in buying artworks because so many paintings were stored in his freeport premises and he knew the owners personally and knew immediately if they were interested in selling. He said he could help me buy artworks using his unique knowledge and by making direct connections to the sellers of the artworks, without going through middlemen who just charged additional fees.

16.    I asked Bouvier what he would charge to perform this service and he said he would take a commission of 2% of the sales price of each artwork he negotiated on my behalf. I agreed to his terms.

17. Bouvier was proposing to act as an intermediary at the art market, to negotiate on my behalf with the sellers to secure the lowest possible price. He never said, in that first meeting or in any of the other many discussions we had over the course of more than a decade, that he would be the actual seller of the artworks. He did not describe himself as an art dealer. I also did not understand Bouvier to be sufficiently wealthy to finance the purchase of art masterpieces on his own.

18. After Bouvier left the meeting at my house, Rappo stayed behind and spoke further with me and my wife Elena. She said Bouvier was a serious person and trustworthy. She praised his proposal as a unique opportunity and said it would cut down on costs because Bouvier could go directly to the sellers, rather than having to go through their intermediaries who would charge additional fees. Rappo's opinion was important to me. She was one of my few close friends, had been living in Geneva for longer than I had, and knew more about the art market than me. For these reasons, her seal of approval of Bouvier's proposal carried a lot of weight with me. Years later, after Bouvier's fraud and fiduciary breach came to light, I learned that Rappo had received, over time and without my knowledge, approximately $100 million from Bouvier for promoting him to Plaintiffs and me.

19. After I reached this agreement with Bouvier, I instructed Mikhail Sazonov to act as a liaison between Bouvier and myself. Mr. Sazonov handled my personal and family investment affairs at the time, and it was my standard practice to delegate the details of all business deals to him.

20. Over the next few years, Bouvier and I grew close. I came to think of Bouvier as a close friend, and I had total trust in him. He was one of my closest friends. For example, I invited him to celebrate my birthday with me one year in Hawaii and one year in New

4

York. Only about 15 people came to these celebrations. Another year, I also invited him to celebrate my birthday with me in Monaco and to come to my daughter's birthday party. He came to my home on many occasions, we ate meals together, we traveled together, and we went to soccer matches together. I even allowed him to have access to the secure strongroom in my house in Gstaad, which I have not allowed any other friends to access. He joined the board of my wife's foundation. He also took me to art exhibits and museums and taught me about art.

21.    My understanding of the arrangement with Bouvier was always consistent, from the day we reached agreement during the meeting in my Geneva house and all the way through the end of 2014. During all that time, I believed he was acting as an art agent for Plaintiffs, that his sole compensation was his 2% commission, and that he was transferring all the sales price money he received from Plaintiffs directly to the sellers of the artworks. This understanding was based on what Bouvier himself said to me when we met and on what Mr. Sazonov relayed to me about his discussions with Bouvier. Never was there any hint that he was the seller of any artwork and was taking a secret markup as well as his commission.

22.    Bouvier always took instructions from me, usually relayed by Mr. Sazonov, on the maximum price Plaintiffs could or would pay for an artwork. I would instruct Bouvier to try to negotiate a price beneath that cap and I was clear with him that Plaintiffs wanted to pay as little as possible for the artworks.

23.    Over the years, Mr. Sazonov would relay to me the negotiations Bouvier had told him he was conducting for Plaintiffs. I formed the impression from these discussions that Bouvier was negotiating hard and trying to get the lowest possible price for Plaintiffs from the owners of the artworks.

24.    Sometimes Mr. Sazonov or Bouvier would relay to me that Bouvier was unable to conclude a deal beneath the cap I had set. In those instances, I would rely on Bouvier's advice to decide whether to authorize amounts greater than the original cap. I always understood that Bouvier was seeking instruction and authority from me to pursue and conclude the negotiations.

25.    Bouvier would often come to meet with me to show me photos and documents about the artworks he was recommending Plaintiffs buy. He also showed me what he said were documents that set out comparable prices for similar artworks, which reassured me that the prices he was recommending were reasonable. Many of these documents were provided by Sotheby's. I know this because they either had the Sotheby's logo on them or Bouvier would tell me that they came from Sotheby's. Bouvier claimed he had a close relationship with Sotheby's. It reassured me when he showed me documents from Sotheby's because I understood from him that Sotheby's was providing these documents as a neutral expert in the art market. Bouvier did not tell me Sotheby's had a stake in these purchases.

26.    Because I always believed Bouvier was acting on behalf of Plaintiffs, in their best interests, I never negotiated with Bouvier or instructed Mr. Sazonov to negotiate with him. I would ask Bouvier to tell me what he thought was a reasonable price to pay for each artwork Plaintiffs were considering. I believed that the sale prices he was communicating to me were the product of negotiations he had already conducted on Plaintiffs' behalf. If I had known Bouvier was the owner-seller of the artworks, rather than a trusted agent, I would have negotiated and bargained with him and instructed Mr. Sazonov to do the same, just as I have always negotiated and bargained with the other side in other business deals I have done.

6

27. Bouvier stressed to me that art deals were always confidential. He said sellers did not want their identity to be known and it would also be better for me as a buyer if my identity was not known. He explained that it was the role of an art agent like him to act as a screen between the parties so both sides could keep their identities confidential. I understood from Mr. Sazonov that part of Bouvier's job as an art agent was to act as a sort of escrow agent, so Plaintiffs paid the sales price to Bouvier's company and then he transferred the artwork to Plaintiffs and transferred the sales price to the seller. This made sense to me, since Bouvier had the artwork at the freeport, he could ensure we received it once we had paid the sales price and he had transferred that on to the seller, much in the way that an escrow agent functions in a real estate deal. Before the end of 2014, I never understood Bouvier was taking a markup on the sales prices of the artworks—I thought he was transferring the money Plaintiffs paid him directly to the sellers and that his only compensation was the 2% commission we had agreed on in that meeting in my home in Geneva.

28. Bouvier told me that confidentiality is one of the cornerstones of the art market and that when you buy art, the original seller is unknown because sale of art usually signals liquidity problems on seller's side. I understood from him that trying to find out the original owner is not something done in the art market. Bouvier almost never told me who the actual sellers were, except on a couple of occasions where he would identify the seller as part of his explanation for why the negotiation was so difficult. For example, when Plaintiffs purchased Modigliani's *Nu couché au coussin bleu*, Bouvier told us the seller was Steve Cohen and he did not need the money, so Plaintiffs would have to pay more to buy this painting.

29. Bouvier always discouraged me from working with anyone other than him and encouraged me to work exclusively with him. One time, I remember that after I met with

7

Larry Gagosian, a famous art dealer, Bouvier and Rappo became very nervous and told me he was dangerous and unreliable. Because I came to deeply trust Bouvier, even when I did hear about an artwork from someone else, I always insisted on bringing in Bouvier to negotiate the deal for Plaintiffs, believing that he would get the lowest possible prices. This happened, for example, with the Da Vinci painting in 2013 where a business acquaintance of mine initially relayed to me a proposal to buy this work, but then I had Bouvier come in to negotiate the purchase rather than trying to do the deal with the sellers through another intermediary.

30.    In all these interactions with Bouvier, from when I first met him in about 2002 until the end of 2014, he was always explicit and clear that he was acting as Plaintiffs' "agent," in their best interests. He never told me he was taking a markup on the prices.

31.    Early in our relationship, Bouvier sent me a letter on April 1, 2003, which was also consistent with my understanding that he was working as Plaintiffs' agent in exchange for a commission. In this letter, Bouvier gave me advice on the price and strategy to buy a Van Gogh painting, consistent with the way an art agent advises his principal. He also wrote that he "did not want to share *my commission* with an American broker." I understood from this letter that Bouvier was acting as Plaintiffs' agent in this deal and perhaps also as the agent for the seller, which seemed consistent to me with the concept of an escrow agent. This letter is attached as Exhibit 2.

32.    I have also always consistently described Bouvier as an agent, even before this litigation or any litigation stemming from Bouvier's (and Sotheby's) misconduct. For example, in an affidavit I signed in my divorce case in 2009, long before I knew about the fraud and fiduciary breach or had any legal dispute with Bouvier or Sotheby's, I swore: "I am, of course, fully aware of the role played by Mr. Yves Bouvier of NLC in bringing potential

8

purchases to Elena's or my attention and *acting as an intermediary* in any purchases that were taken forward." This affidavit is attached as Exhibit 3 (emphasis added).

*I Discover Bouvier's Fraud*

33.     In 2014, Plaintiffs were trying to sell some of the artworks. I was surprised when Bouvier was unable to sell any of the works for what Plaintiffs had paid or more. Towards the end of 2014, as this had been going on for about six months, I began to wonder if Plaintiffs had paid more for the works than they were worth. At that time I still did not suspect Bouvier of pocketing a secret markup for himself, I just began to doubt whether he was as good a negotiator as he had always claimed.

34.     Then, in November 2014, Yuri Bogdanov, who worked for me, showed me an article in the New York Times which said that the Da Vinci painting had been sold for between $70 and $80 million. This was much lower than the $127.5 million Plaintiffs had paid. I had not seen or heard of this article before then. This article raised questions for me, but even still, I did not suspect Bouvier of fraud.

35.     On the evening of November 22, 2014, Bouvier came to my apartment in Monaco to meet with me. He had been invited to come my birthday party that evening. Before the party started, we met to discuss the artworks. Mr. Bogdanov was also there and he acted as the translator. I asked Bouvier why the artworks were not selling. Bouvier responded that the market was tough at this time and he was doing everything possible and would eventually sell all the paintings. I was skeptical and asked how the market could be so bad for *all* these artworks, which were masterpieces. I thought masterpieces should always sell. Bouvier continued to reassure me all the works would eventually sell for a good profit.

9

36.    I then asked Bouvier about the New York Times article. He said the article was wrong and the price it quoted did not take into account commissions, fees, and other expenses. I was not really surprised to hear that the media might have been inaccurate in its reporting on the deal, so this explanation was quite reassuring to me. I still did not suspect Bouvier of any fraud.

37.    During the party after, Rappo came to me and told me Bouvier felt bad after our meeting and that he was really working very hard to sell the artworks. This also reassured me. I spoke to Bouvier again later in the evening and he told me the same and again said that the works would sell.

38.    Bouvier was still someone I viewed as a close friend. I had trusted him for so many years by that point, it did not enter into my head that he had been lying to me all this time.

39.    All of that changed a little over a month later. On New Year's Eve 2014, I was in St. Bart's for vacation. I had lunch at the Le Roc hotel with some friends and a man named Sandy Heller, who was introduced to me by one of my friends as a prominent art advisor. We spoke about art and Mr. Heller told me that he had represented the seller of Modigliani's *Nu couché au coussin bleu*, one of the paintings Plaintiffs bought. Mr. Heller told me that the sales price for this painting was $93.5 million—but I knew Plaintiffs had paid $118 million for it. This time, unlike with the New York Times article, I had no doubt about the accuracy of the information.

40.    As I sat there at lunch hearing this, I realized that Bouvier must have taken the extra $24.5 million for himself. I was in complete shock. One of my friends at the table said I

10

looked very pale. He thought that I was having a heart attack. I excused myself from the table to try to collect my thoughts and control my emotions.

41.     I called Mr. Sazonov to discuss with him what I had learned. Mr. Sazonov sounded just as shocked as I felt. We talked about how, if this was what Bouvier had done to us with this painting, he most likely had done the same with the other artworks Plaintiffs had bought through him. I realized the scale of the fraud was staggering.

42.     The next day, I asked to meet with Mr. Heller again. We met that morning at the hotel where I was staying. This time, I went over some of the other artworks Plaintiffs had purchased through Bouvier and I asked Mr. Heller for his rough estimate of what these works were worth. Again and again, he gave me numbers that were far lower than the prices Plaintiffs had paid based on Bouvier's assurances that these were the lowest prices he could get us after intense negotiations. I felt staggered by the shock of what Bouvier had done and his betrayal of my friendship and my trust.

43.     Since that moment, I have learned through discovery in this and other cases the true extent of Bouvier's fraud.

44.     For the reasons given here, and in the other declarations and exhibits, and in the accompanying memorandum of law, Plaintiffs' motion for partial summary judgment on the issues of Bouvier's fraud and breach of fiduciary should be granted.

45.     I have reviewed a certified translation of this declaration in Russian and I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: March 22, 2022
Canouan, Saint Vincent and the Grenadines

_____
Dmitry Rybolovlev

11

ОКРУЖНОЙ СУД СОЕДИНЕННЫХ ШТАТОВ
ЮЖНЫЙ ОКРУГ НЬЮ-ЙОРКА

| | |
|---|---|
| ACCENT DELIGHT INTERNATIONAL LTD. и XITRANS FINANCE LTD.,<br><br>Истцы,<br><br>-против-<br><br>SOTHEBY'S и SOTHEBY'S, INC.,<br><br>Ответчики. | 18 Civ. 9011 (JMF) |

## ПОКАЗАНИЯ ДМИТРИЯ РЫБОЛОВЛЕВА

Дмитрий Рыболовлев, будучи осведомленным об ответственности за дачу заведомо ложных свидетельских показаний и действуя в соответствии с 28 U.S.C. § 1746, заявляет, что следующие показания являются правдивыми и соответствуют действительности:

1.      Истцы – это компании, находящиеся во владении траста, который был создан членами моей семьи и для их выгоды. Истцы наделили меня полномочиями покупать и продавать произведения искусства от их имени, включая произведения искусства, которые являются предметом настоящего спора, и которые приобретались и продавались через Sotheby's. Я лично осведомлен о фактах, изложенных мною в этих показаниях, которые я предоставляю в поддержку ходатайства Истцов о вынесении судебного решения по ряду вопросов в порядке упрощенного судопроизводства.

2.      Предметом этого спора является пособничество Sotheby's в крупномасштабном мошенничестве со стороны Ива Бувье, а также пособничество в его нарушении фидуциарных обязательств перед Истцами. В этих показаниях я поясню, как я встретил Бувье; как мы договорились о том, что он будет выступать в качестве агента в сфере искусства, который будет представлять интересы компаний, связанных со мной (т.е. Истцов); как я на протяжении более десяти лет был уверен в том, что Бувье был моим верным консультантом и другом, который добросовестно действовал в лучших интересах Истцов для того, чтобы приобрести произведения искусства по лучшей цене. Я также дам

1

показания о том, как в конце 2014 года я узнал, что Бувье совершил крупное мошенничество в отношении Истцов и втайне взимал с них суммы, которые в действительности превышали реальную стоимость произведений искусства.

***Соглашение с Бувье о том, что он будет действовать в качестве агента Истцов***

3.      Я впервые встретил Бувье в 2002 году в Женевском фрипорте, который представляет собой систему складских помещений для хранения произведений искусства и иных ценностей. Я пришел туда для того, чтобы посмотреть картину Шагала, которая в итоге стала первой картиной, приобретенной мной.

4.      Копия счета за картину Шагала прилагается к настоящим показаниям в качестве Приложения 1.

5.      Я был вместе с Таней Раппо, близким другом моей семьи, одной из немногих, кого мы хорошо знали в Женеве. Она также была крестной матерью моей младшей дочери. Раппо советовала мне приобрести картину Шагала и помогала мне в этой сделке.

6.      Бувье сказал мне, что он владеет одной из компаний, которая имела хранилища во фрипорте. Он предложил мне помочь с поиском некоторых недостающих документов в отношении картины Шагала. На тот момент я думал, что моя встреча с Бувье во фрипорте была полной случайностью. Но после того, как я обнаружил факт мошенничества Бувье и в отношении него был инициирован судебный процесс, я узнал, что компания-продавец картины Шагала Finatrading Development, Ltd. принадлежала Бувье.

7.      На тот момент прошло немного времени с тех пор, как я и моя семья переехали в новый дом в Женеве. На стенах в нем было много подсвеченных зон, где у предыдущего хозяина висели произведения искусства. Мне хотелось приобрести несколько произведений искусства, чтобы заполнить эти зоны, и первой я купил картину Шагала. Я задумывался о том, чтобы приобрести больше работ, однако точно не знал, какие произведения покупать и в каком количестве. Тем не менее, со временем искусство стало для Истцов предметом серьезных инвестиций.

8.      У меня не было какого-либо опыта на рынке искусства, и я ничего не знал о том, как он функционировал.

9.      После той первой встречи с Бувье Раппо посоветовала мне встретиться с ним снова и сообщила, что Бувье хотел сделать мне коммерческое предложение. Она сказала, что Бувье мог бы быть мне полезен, так как в его помещениях во фрипорте хранилось множество картин.

10.      Раппо настойчиво убеждала меня встретиться с Бувье для того, чтобы выслушать его предложение.

11.      В конце концов я согласился, и Раппо организовала вторую встречу с Бувье.

12.      Эта встреча произошла в моем доме в Женеве. Помимо меня и Бувье, на встрече присутствовала Раппо и моя супруга Елена Рыболовлева. Возможно там также была моя дочь Екатерина, которой на тот момент было приблизительно 12 или 13 лет. Наша встреча длилась около одного часа и проходила в гостиной нашего дома. Бувье говорил по-французски, а Раппо выступала в качестве переводчика между Бувье и мной, так как я не говорю на французском.

13.      Бувье показался мне спокойным, вдумчивым и интеллигентным человеком. Его манера поведения показалась мне похожей на поведение швейцарских банкиров. У меня сформировалось хорошее мнение о нем и он показался мне заслуживающим доверие.

14.      На встрече Бувье сообщил мне, что в сделке по Шагалу, к сожалению, было слишком много посредников и нам не удалось обойти их всех, что в итоге увеличило покупную цену. Бувье подчеркнул, что на рынке искусства лучше приобретать произведения у продавцов напрямую.

15.      Бувье сказал, что обладает уникальными возможностями, чтобы помогать мне приобретать произведения искусства, так как в его помещениях во фрипорте хранилось большое количество картин, он был лично знаком с их собственниками и мог бы сразу же узнать, если бы они захотели продать свои произведения искусства. Бувье сказал, что он был готов помочь мне покупать произведения искусства, используя свои уникальные знания, путем установления прямых контактов с продавцами этих произведений и без обращения к посредникам, которые просто взимали бы дополнительные комиссии.

16.    Я спросил Бувье, сколько будут стоить его услуги, на что он сказал, что возьмет комиссию в размере 2 процентов от покупной цены каждого из произведений искусства, которые будут приобретены через него в моих интересах. Я согласился на его условия.

17.    Предложение Бувье сводилось к тому, что он будет действовать как посредник на рынке искусства и вести переговоры от моего имени с продавцами произведений искусства для того, чтобы заключить сделку по минимально возможной цене. Он никогда не говорил (ни на той первой встрече, ни в ходе множества разговоров, которые у нас с ним были на протяжении более десяти лет), что на самом деле он будет продавцом произведений искусства. Он не отзывался о себе как об арт-дилере. Для меня было очевидно, что Бувье не обладал денежными средствами, которые были необходимы для того, чтобы самостоятельно профинансировать покупку шедевров.

18.    После того как Бувье покинул встречу, которая проходила в моем доме, Раппо задержалась и продолжила общаться со мной и с моей супругой Еленой. Она сказала, что Бувье серьезный человек и ему можно доверять. Она восторженно отозвалась о предложении Бувье как об уникальном шансе и подчеркнула, что оно позволит снизить затраты, так как Бувье мог бы общаться с продавцами напрямую, а не через посредников, которые взимали бы дополнительную комиссию. Мнение Раппо было важным для меня. Она была одной из немногих моих близких друзей, она жила в Женеве дольше чем я и лучше меня разбиралась в рынке искусства. По этим причинам ее одобрение предложения Бувье играло для меня большую роль. Годы спустя, после того как вскрылись мошенничество и нарушение фидуциарных обязательств со стороны Бувье, я узнал, что за это время Раппо втайне от меня получила от Бувье приблизительно 100 миллионов долларов США за продвижение его интересов перед Истцами и мной.

19.    После того как мы с Бувье заключили это соглашение, я поручил Михаилу Сазонову взять на себя коммуникацию между Бувье и мной. В то время г-н Сазонов управлял моими личными и семейными инвестициями, и для меня было обычным делом делегировать ему сопровождение любых коммерческих сделок.

20.    На протяжении последующих лет мы с Бувье сблизились. Я начал считать Бувье надежным другом и полностью ему доверял. Он был одним из моих самых близких друзей. Например, я приглашал его отметить мой день рождения один раз на Гавайях, а в другой –

4

в Нью-Йорке. На эти празднования моего дня рождения были приглашены около самых близких 15 человек. В другой год я также приглашал его отметить мой день рождения в Монако и посетить торжество по поводу дня рождения моей дочери. Он часто приходил ко мне домой, мы вместе обедали, путешествовали и посещали футбольные матчи. Я даже дал ему доступ в защищенное хранилище в моем доме в Гштаде, этого доступа не было ни у кого из моих друзей. Он также водил меня на художественные выставки и в музеи и рассказывал мне об искусстве.

21.     Мое понимание соглашения с Бувье всегда оставалась неизменным с того дня, как мы достигли этого соглашения во время встречи в моем доме в Женеве вплоть до конца 2014 года. Все это время я верил, что Бувье действовал как агент Истцов на рынке искусства, что его компенсация ограничивалась комиссией в 2 процента и что все суммы, которые он получал от Истцов, переводились им напрямую продавцам произведений искусства. Такое понимание основывалось на том, что сам Бувье говорил мне на наших встречах, а также на той информации, которую г-н Сазонов передавал мне по результатам их обсуждений с Бувье. Ни разу не было даже намека на то, что Бувье выступал в качестве продавца какого-либо из произведений искусства и что он втайне забирал себе наценку на произведения искусства в дополнение к своей комиссии.

22.     Бувье всегда получал инструкции от меня (они обычно передавались через г-на Сазонова) по поводу максимальной покупной цены, которую Истцы могли или хотели бы заплатить за то или иное произведение искусства. Я давал Бувье указания пытаться согласовать покупную цену ниже этого лимита, и я всегда давал ему ясно понять, что Истцы хотели бы платить за произведения искусства как можно меньше.

23.     На протяжении многих лет г-н Сазонов передавал мне информацию о ходе переговоров, которые, как говорил Бувье, он вел в интересах Истцов. Исходя из этих обсуждений, у меня сложилось ощущение, что Бувье упорно вел переговоры и пытался добиться минимально возможной цены для Истцов со стороны владельцев произведений искусства.

24.     Иногда г-н Сазонов или Бувье сообщали мне, что Бувье не сможет заключить сделку по цене в пределах установленного мной лимита. В таких случаях я полагался на советы Бувье, чтобы определиться с тем, стоит ли выделять дополнительные средства для покупки

5

произведения. Мне всегда казалось, что Бувье хотел получить от меня указания и инструкции о том, как вести и закрывать переговоры.

25. Бувье часто встречался со мной, чтобы показать мне фотографии и документы о произведениях искусства, которые он рекомендовал купить Истцам. Он также показывал мне документы, в которых, по его словам, были указаны сопоставимые цены на аналогичные произведения искусства, что убеждало меня в разумности рекомендуемых им цен. Многие из этих документов были предоставлены компанией Sotheby's. Я знаю это, потому что на них был логотип Sotheby's или Бувье говорил мне, что они получены от Sotheby's. Бувье утверждал, что у него есть тесные связи с Sotheby's. Это внушало мне доверие, потому что по словам Бувье Sotheby's предоставляли эти документы в качестве независимого эксперта на рынке искусства. Бувье не сообщал мне, что Sotheby's непосредственно участвовали в каких-либо из этих сделок.

26. Поскольку я всегда считал, что Бувье действует от имени Истцов, в их интересах, я никогда не вел переговоры с Бувье и не поручал г-ну Сазонову вести с ним переговоры. Я спрашивал у Бувье, что он считает разумной ценой за каждое произведение искусства, покупку которых рассматривали Истцы. Я полагал, что цены, о которых он мне говорил, были результатом переговоров, которые он уже провел от имени Истцов. Если бы я знал, что Бувье является владельцем-продавцом произведений искусства, а не доверенным агентом, я бы вел переговоры и торговался с ним и поручил г-ну Сазонову сделать то же самое, точно так же как я всегда вел переговоры и торговался с другой стороной по другим коммерческим сделкам, которые я заключал.

27. Бувье подчеркивал, что сделки с предметами искусства всегда носят конфиденциальный характер. Он говорил, что продавцы не хотят, чтобы их личность была известна, и для меня как покупателя также будет лучше, если моя личность не будет известна. Он объяснял, что роль такого агента по искусству, как он, заключается в том, чтобы служить ширмой между сторонами, чтобы обе стороны могли сохранить конфиденциальность. Как я понял из слов г-на Сазонова, часть работы Бувье как арт-агента заключалась в том, чтобы действовать в качестве своего рода эскроу-агента, поэтому истцы платили цену покупки компании Бувье, а затем он передавал произведения искусства истцам и переводил цену покупки продавцам. По моему мнению, это имело смысл,

6

поскольку Бувье хранил произведения искусства во фрипорте, и он мог гарантировать, что мы получим их, как только заплатим цену покупки и он передаст ее продавцу, подобно тому, как эскроу-агент действует в сделках с недвижимостью. До конца 2014 года я не понимал, что Бувье берет наценку на стоимость произведений искусства - я думал, что он переводит деньги, которые Истцы платят ему, непосредственно продавцам, и что его единственным вознаграждением являются 2% комиссионных, о которых мы договорились на той встрече в моем доме в Женеве.

28.    Бувье говорил мне, что конфиденциальность является одним из краеугольных камней арт-рынка и что, когда вы покупаете произведения искусства, личность первоначального продавца неизвестна, потому что продажа искусства может дать рынку сигнал о финансовых проблемах продавца. Я понял из его слов, что попытки выяснить первоначального владельца — это не то, что делается на рынке искусства. Бувье почти никогда не говорил мне, кто на самом деле является продавцом, за исключением нескольких случаев, когда он называл имя продавца при попытках объяснить, почему переговоры были такими трудными. Например, когда истцы покупали картину Модильяни "Nu couché au coussin bleu", Бувье сказал нам, что продавцом был Стив Коэн, и что ему не нужны деньги, поэтому истцам придется заплатить больше, чтобы купить эту картину.

29.    Бувье всегда отговаривал меня от сотрудничества с кем-либо, кроме него, и призывал работать исключительно с ним. Однажды, я помню, после моей встречи с Ларри Гагосяном, известным арт-дилером, Бувье и Раппо очень занервничали и сказали мне, что он опасен и ненадежен. Поскольку я глубоко доверял Бувье, даже когда я слышал о произведении искусства от кого-либо другого, я всегда настаивал на привлечении Бувье для переговоров по сделке для истцов, полагая, что он получит лучшие цены. Так произошло, например, с картиной да Винчи в 2013 году, когда первоначально мой деловой партнёр вышел на меня и передал предложение купить эту работу, но затем я привлёк Бувье для переговоров о покупке вместо того, чтобы попытаться заключить сделку с продавцами через другого посредника.

30.    Во всех этих взаимодействиях с Бувье, начиная с момента нашей первой встречи в 2002 году и до конца 2014 года, он всегда четко и ясно говорил, что действует как "агент" истцов и в их интересах. Он никогда не говорил мне, что берет наценку по сделкам.

31.    В начале наших отношений Бувье прислал мне письмо от 1 апреля 2003 года, которое также соответствовало моему пониманию, что он работает как агент истцов в обмен на комиссионные. В этом письме Бувье дал мне совет относительно цены и стратегии покупки картины Ван Гога, в соответствии с тем, как агент по искусству консультирует своего принципала. Он также написал, что "не хочет делить мои комиссионные с американским брокером". Я понял из этого письма, что Бувье действовал как агент Истцов в этой сделке и возможно также как агент продавца, это для меня соответствовало концепции эскроу-агента. Это письмо прилагается в качестве Приложения 2.

32.    Я также всегда последовательно описывал Бувье как агента, даже до этого судебного процесса или любого судебного процесса, вытекающего из неправомерных действий Бувье (и Sotheby's). Например, в письменных показаниях под присягой, которые я подписал в деле о разводе в 2009 году, задолго до того, как я узнал о мошенничестве и нарушении фидуциарных прав или имел какие-либо юридические споры с Бувье или Sotheby's, я заявил о под присягой: "Я, конечно, полностью осведомлен о роли, которую играл г-н Ив Бувье из NLC, представляя вниманию Елены или моему потенциальные приобретения и **выступая в качестве посредника в любых приобретениях искусства**, которые были осуществлены". Это письменное показание под присягой прилагается в качестве Приложения 3 (выделение добавлено).

*Я обнаружил мошенничество Бувье*

33.    В 2014 году Истцы пытались продать некоторые из произведений искусства. Я был удивлен, когда Бувье не смог продать ни одну из работ за ту сумму, которую заплатили Истцы, или дороже. К концу 2014 года, когда это продолжалось уже около шести месяцев, я начал задаваться вопросом, не заплатили ли Истцы за работы больше, чем они реально стоили. В то время я все еще не подозревал Бувье в тайной наценке для себя, я просто начал сомневаться в том, что он был настолько хорошим переговорщиком, как он всегда утверждал.

34.    Затем, в ноябре 2014 года, Юрий Богданов, который работал на меня, показал мне статью в New York Times, в которой говорилось, что картина да Винчи была продана за 70-80 миллионов долларов. Это было гораздо меньше, чем 127,5 млн долларов, которые

заплатили Истцы. До этого я не читал и не слышал об этой статье. Эта статья вызвала у меня вопросы, но, несмотря на это, я все еще не заподозрил Бувье в мошенничестве.

35.    Вечером 22 ноября 2014 года Бувье пришел в мою квартиру в Монако, чтобы встретиться со мной. Он был приглашен на вечеринку по случаю моего дня рождения. Перед началом вечеринки мы встретились, чтобы обсудить произведения искусства. Г-н Богданов также был там и переводил наш разговор. Я спросил Бувье, почему работы не продаются. Бувье ответил, что рынок в это время был сложным, он делает все возможное и в конце концов продаст все картины. Я был настроен скептически и спросил, как на рынке может быть так плохо для всех этих произведений искусства, которые являются шедеврами. Я думал, что шедевры всегда должны продаваться. Бувье продолжал уверять меня, что все работы в конечном итоге будут проданы с хорошей прибылью.

36.    Затем я спросил Бувье о статье в "Нью-Йорк Таймс". Он сказал, что статья была ошибочной, а указанная в ней цена не учитывала комиссионные, гонорары и другие расходы. Я не очень удивился, услышав, что СМИ могли неточно осветить сделку, поэтому такое объяснение меня вполне успокоило. Я по-прежнему не подозревал Бувье в мошенничестве.

37.    Уже после вечеринки ко мне подошла Раппо и сказала, что Бувье чувствовал себя плохо после нашей встречи и что он действительно очень старается продать работы. Это также успокоило меня. Позже вечером я снова поговорил с Бувье, и он сказал мне то же самое и снова заявил, что работы будут проданы.

38.    Бувье по-прежнему был для меня близким другом. К тому моменту я доверял ему столько лет, что мне и в голову не приходило, что все это время он мне лгал.

39.    Все изменилось чуть больше месяца спустя. В канун Нового года 2014 года я был в Сент-Бартсе на каникулах. Я обедал в отеле Le Roc с друзьями и человеком по имени Сэнди Хеллер, которого один из моих друзей представил мне как выдающегося консультанта по искусству. Мы говорили об искусстве, и г-н Хеллер рассказал мне, что он представлял интересы продавца картины Модильяни "Nu couché au coussin bleu", одной из картин, купленных Истцами. Г-н Хеллер сказал мне, что цена этой картины составила 93,5 миллиона долларов, но я знал, что Истцы заплатили за нее 118 миллионов долларов. На этот раз, в отличие от статьи в New York Times, я не сомневался в точности информации.

9

40.    Когда я сидел за обедом и слушал это, я понял, что Бувье, должно быть, присвоил 24,5 миллиона долларов себе. Я был в полном шоке. Один из моих друзей за столом сказал, что я сильно побледнел. Он подумал, что у меня случился сердечный приступ. Я вышел из-за стола, чтобы попытаться собраться с мыслями и справиться с эмоциями.

41.    Я позвонил г-ну Сазонову, чтобы обсудить с ним то, что я узнал. Господин Сазонов был потрясен так же, как и я. Мы говорили о том, что если Бувье так поступил с нами в отношении этой картины, то, скорее всего, он поступил так же и с другими произведениями искусства, которые истцы приобрели через него. Я понял, что масштабы мошенничества были ошеломляющими.

42.    На следующий день я снова попросил о встрече с г-ном Хеллером. Мы встретились в то утро в отеле, где я остановился. На этот раз я просмотрел некоторые другие произведения искусства, приобретенные истцами через Бувье, и попросил г-на Хеллера дать приблизительную оценку стоимости этих работ. Снова и снова он называл мне цифры, которые были намного ниже тех цен, которые заплатили истцы, основываясь на заверениях Бувье в том, что это были минимально возможные цены, которые он смог нам предложить после напряженных переговоров. Я был потрясен тем, что сделал Бувье, его предательством моей дружбы и моего доверия.

43.    С того момента в ходе раскрытия доказательств в этом и других делах я узнал об истинных масштабах мошенничества Бувье. В отношении работ Sotheby's, о которых идет речь в данном деле, Бувье при содействии Sotheby's удалось обмануть Истцов на сумму не менее 380 миллионов долларов.

44.    По причинам, изложенным в этих показаниях, а также в других заявлениях и доказательствах и в прилагаемом меморандуме, ходатайство истцов о частичном упрощенном судебном решении по вопросам мошенничества Бувье и нарушения фидуциарных обязательств должно быть удовлетворено.

45.    Я прочитал заверенный перевод этих показаний на русский язык и, будучи осведомленным об ответственности за дачу заведомо ложных показаний по законам

Соединенных Штатов Америки, подтверждаю, что изложенные выше показания являются правдивыми.

Дата:  22 марта 2022 г.

Кануан, Сент-Винсент и Гренадины

Дмитрий Рыболовлев

*Настоящий документ является достоверным переводом оригинала с английского языка на русский язык*

*Переводчик Габдрахманов Д.Ф.*

11

TRANSLATOR'S CERTIFICATION STATEMENT

I, Daniel F. Gabdrakhmanov (license No 107718 0201607), certify that I translated the attached document titled Declaration of Dmitry Rybolovlev from English into Russian and that, to the best of my ability, it is a true and correct translation. I further certify that I am competent in both English and Russian to render and certify such translation.

March 23, 2022

Daniel F. Gabdrakhmanov

Enclosures:

 (1) Original Declaration of Dmitry Rybolovlev in English;

 (2) Translated Declaration of Dmitry Rybolovlev in Russian.