UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ACCENT DELIGHT INTERNATIONAL LTD.
and XITRANS FINANCE LTD.,

                    Plaintiffs,

       -against-

SOTHEBY'S and SOTHEBY'S, INC.,

                    Defendants.

18 Civ. 9011 (JMF)

**PLAINTIFFS' MEMORANDUM OF LAW IN FURTHER SUPPORT OF
PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiffs*

<u>TABLE OF CONTENTS</u>

<u>PAGE NO.</u>

TABLE OF AUTHORITIES ...................................................................................iii-viii

REALITY CRASHES IN ON SOTHEBY'S ..................................................................1

WHY PLAINTIFFS' MOTION SHOULD BE GRANTED ...........................................1

WHY SOTHEBY'S MOTION SHOULD BE DENIED.................................................1

THE REST OF THE STORY a/k/a WHAT SOTHEBY'S OMITS................................3

ARGUMENT ................................................................................................................10

I.     PLAINTIFFS' MOTION SHOULD BE GRANTED: THE UNDERLYING FRAUD AND FIDUCIARY BREACH ARE NOT MATERIALLY DISPUTED ...................................................................................................10

     A.    Sotheby's Admits Bouvier's Fraud............................................................10

     B.    Sotheby's Cannot Dispute Reasonable Reliance .......................................11

     C.    Indisputable Facts Establish Bouvier as Plaintiffs' Fiduciary ..................12

          1.    No Genuine Dispute Exists About Bouvier's Agency Agreement..................................................................................12

          2.    It Is Undisputed that by 2011 Bouvier Had Fostered a Relationship of Trust and Reliance with Plaintiffs ....................14

II.    SOTHEBY'S MOTION SHOULD BE DENIED: DISPUTED ISSUES OF FACT AND BASIC ERRORS OF LAW ........................................................14

     A.    Aiding and Abetting: Disputed Issues of Fact ..........................................14

          1.    The Governing Legal Standard....................................................14

          2.    Whether Sotheby's Had "Actual Knowledge" Is Disputed. ..........16

          3.    Whether Sotheby's "Substantially Assisted" Is Also Disputed.....22

     B.    Both of Plaintiffs' Claims Were Timely Filed on October 2, 2018...........26

     C.    Defendants Are Liable for the Wrongful Acts of Their Agents ................31

          1.    Defendants Directed Valette's Dealings with Bouvier..................31

          2.    Defendants Controlled the Terms of *All* Bouvier Transactions.....32

3.    Valette Had Authority to Alter Legal Relations and Signed the Contracts with Bouvier. ..........................................................33

CONCLUSION...................................................................................................................34

<u>TABLE OF AUTHORITIES</u>

**Cases**

*ABF Cap. Mgmt. v. Askin Cap. Mgmt.*,
    957 F. Supp. 1308 (S.D.N.Y. 1997)..................................................................... 23

*Abu Dhabi Com. Bank v. Morgan Stanley & Co.*,
    888 F. Supp. 2d 431 (S.D.N.Y. 2012)................................................................. 18

*Acco, Ltd. v. Rich Kids Jean Corp.*,
    No. 15 Civ. 7425, 2017 WL 4350576 (S.D.N.Y. May 3, 2017)........................... 16

*Aetna Cas. and Sur. Co. v. Leahey Const. Co.*,
    219 F.3d 519 (6th Cir. 2000) .............................................................................. 16

*Anwar v. Fairfield Greenwich Ltd.*,
    728 F. Supp. 2d 372 (S.D.N.Y. 2010)............................................................. 18, 22

*Balta v. Ayco Co.*,
    626 F.Supp.2d 347 (W.D.N.Y. 2009)................................................................... 27

*Benjtez v. N.Y.C. Bd. of Educ.*,
    73 N.Y.2d 650 (1989)........................................................................................ 26

*Benson v. JPMorgan Chase Bank, N.A.*,
    No. C-09-5272, 2010 WL 1526394 (N.D. Cal. Apr. 15, 2010)........................... 21

*Berdeaux v. OneCoin Ltd.*,
    No. 19 Civ. 4074, 2021 WL 4267693 (S.D.N.Y. Sept. 20, 2021) ...................... 20

*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*,
    No. 14 Civ. 10067, 2017 WL 3610511 (S.D.N.Y. Aug. 21, 2017) ..................... 22

*Brown Media Corp. v. K & L Gates, LLP*,
    586 B.R. 508 (E.D.N.Y. 2018) ........................................................................... 27

*Brown v. Vanie*,
    637 F.2d 272 (5th Cir. 1981) .............................................................................. 34

*Cabrera v. Jakabovitz*,
    24 F.3d 372 (2d Cir. 1994).................................................................................. 34

*Carbon Inv. Partners, LLC v. Bressler*,
    No. 20 Civ. 3617, 2021 WL 3913526 (S.D.N.Y. Sept. 1, 2021)................... 17, 21

*Chaufffers, Teamsters & Helpers Loc. No. 391 v. Terry*,
    494 U.S. 558 (1990)........................................................................................... 34

*City of Almaty v. Sater,*
  503 F.Supp.3d 51 (S.D.N.Y. 2020)............................................................... 29, 30

*Cohen v. S.A.C. Trading Corp.,*
  711 F.3d 353 (2d Cir. 2013)....................................................................... 27

*Cornelia Fifth Ave., LLC v. Canizales,*
  No. 12 Civ. 7660, 2016 WL 5390894 (S.D.N.Y. Sept. 26, 2016) .................................. 24

*Cronin v. Exec. House Realty,*
  No. 80 Civ. 7254, 1982 WL 1303 (S.D.N.Y. May 5, 1982)........................................... 15

*Cusimano v. Schnurr,*
  137 A.D.3d 527 (1st Dep't 2016) ................................................................ 27

*De Sole v. Knoedler Gallery, LLC,*
  137 F. Supp. 3d 387 (S.D.N.Y. 2015)............................................................. 16

*Dreieck Finanz AG v. Sun,*
  No. 89 Civ. 4347, 1990 WL 11537 (S.D.N.Y. Feb. 9, 1990) ......................................... 23

*Erbe v. Lincoln Rochester Tr. Co.,*
  3 N.Y.2d 321 (1957) .............................................................................. 28

*FDIC v. First Interstate Bank of Des Moines,*
  885 F.2d 427 (8th Cir. 1989) ..................................................................... 15

*Flycell, Inc. v. Schlossberg LLC,*
  No. 11 Civ. 0915, 2011 WL 5130159 (S.D.N.Y. Oct. 28, 2011) ................................. 19, 25

*Fraternity Fund Ltd. V. Beacon Hill Asset Mgmt., LLC,*
  479 F. Supp. 2d 349 (S.D.N.Y. 2007)......................................................... 19, 22

*Glynwell Invs, N.V. v. Prudential Sec. Inc.,*
  No. 92 Civ. 9267, 1995 WL 362500 (S.D.N.Y. June 16, 1995)....................................... 31

*Graham v. HSBC Mortg. Corp.,*
  No. 18 Civ. 4196, 2019 WL 3066399 (S.D.N.Y. July 12, 2019) ...................................... 28

*IDT Corp. v. Morgan Stanley Dean Witter & Co.,*
  12 N.Y.3d 132 (2009) ............................................................................. 26

*In re Agape Litig.,*
  773 F. Supp. 2d 298 (E.D.N.Y. 2011) ............................................................. 22

*In re Allou Distributors, Inc.,*
  446 B.R. 32 (Bankr. E.D.N.Y. 2011).............................................................. 15

*In re JVJ Pharmacy Inc.*,
    630 B.R. 388 (S.D.N.Y. 2021) ....................................................................... 34

*In re Nat'l Century Fin. Enters., Inc.*,
    846 F. Supp. 2d 828 (S.D. Ohio 2012) ........................................................... 16

*JP Morgan Chase Bank v. Winnick*,
    406 F. Supp. 2d 247 (S.D.N.Y. 2005).............................................. 17, 20, 23

*Kaufman v. Cohen*,
    307 A.D.2d 113 (1st Dep't 2003) .............................................................. 26, 27

*Kirschner v. Bennett*,
    No. 07 Civ. 8165, 2012 WL 13060078 (S.D.N.Y. June 18, 2012)................... 25

*Liu Yao-Yi v. Wilmington Tr. Co.*,
    301 F. Supp. 3d 403 (W.D.N.Y. 2017) ........................................................... 18

*Malmsteen v. Berdon, LLP*,
    477 F. Supp. 2d 655 (S.D.N.Y. 2007) ............................................................ 26

*Mansor v. JPMorgan Chase Bank, N.A.*,
    183 F. Supp. 3d 250 (D. Mass. 2016) ............................................................ 22

*Marini v. Adamo*,
    644 F. App'x 33 (2d Cir. 2016) ...................................................................... 11

*Marini v. Adamo*,
    995 F. Supp. 2d 155 (E.D.N.Y. 2014) ...................................................... 11, 12

*Marketxt Holdings Corp. v. Engel & Reiman, P.C.*,
    693 F. Supp. 2d 387 (S.D.N.Y. 2010)............................................................. 26

*McDaniel v. Bear Stearns & Co.*,
    196 F. Supp. 2d 343 (S.D.N.Y. 2002)............................................................. 21

*Metge v. Baehler*,
    762 F.2d 621 (8th Cir.1985) ........................................................................... 17

*Mouawad Nat. Co. v. Lazare Kaplan Int'l Inc.*,
    476 F. Supp. 2d 414 (S.D.N.Y. 2007)............................................................. 34

*N.Y. Marine & Gen. Ins. Co. v. Tradeline, (L.L.C.)*,
    266 F.3d 112 (2d Cir. 2001)............................................................................ 31

*N.Y.S. Workers Comp. Bd. v. Cody Mgmt., Inc.*,
    146 A.D.3d 1110 (3d Dep't 2017) .................................................................. 27

*Overton v. Art Fin. Partners LLC,*
    166 F. Supp. 3d 388 (S.D.N.Y. 2016)....................................................................24, 25

*Paolucci v. Mauro,*
    74 A.D.3d 1517 (3d Dep't 2010) ...................................................................................26

*Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.,*
    No. 07 Civ. 8828, 2013 WL 3929630 (S.D.N.Y. July 30, 2013) ....................................10

*Pension Comm. of Univ. of Montreal v. Banc of Am. Sec., LLC,*
    652 F. Supp. 2d 495 (S.D.N.Y. 2009)..............................................................17, 23, 25

*Phoenix Light SF Ltd. v. Ace Sec. Corp.,*
    975 N.Y.S.2d 369 (Sup. Ct. N.Y. Cnty. 2013) .............................................................29

*Primavera Familienstifung v. Askin,*
    130 F. Supp. 2d 450 (S.D.N.Y. 2001)....................................................................20, 25

*Primavera Familienstifung v. Askin,*
    137 F. Supp. 2d 438 (S.D.N.Y. 2001)...........................................................................20

*Ramiro Aviles v. S & P Glob., Inc.,*
    380 F. Supp. 3d 221 (S.D.N.Y. 2019)....................................................................26, 27

*Rolf v. Blyth, Eastman Dillon & Co.,*
    570 F.2d 38 (2nd Cir. 1978)..........................................................................................23

*Sabourin v. Chodos,*
    129 N.Y.S.3d 669 (Sup. Ct. N.Y. Cnty. 2020) ............................................................28

*Sabourin v. Chodos,*
    194 A.D.3d 660 (1st Dep't 2021) ............................................................................28, 31

*Saphir Int'l, SA v. UBS PaineWebber Inc.,*
    25 A.D.3d 315 (1st Dep't 2006) ...................................................................................31

*Schulhof v. Jacobs,*
    157 A.D.3d 647 (1st Dep't 2018) ..................................................................................11

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.,*
    346 F. Supp. 3d 473 (S.D.N.Y. 2018)....................................................................passim

*Slotkin v. Citizens Cas. Co. of New York,*
    614 F.2d 301 (2d Cir. 1979)..........................................................................................34

*SPV Osus Ltd. v. UBS AG,*
    882 F.3d 333 (2d Cir. 2018)..........................................................................................25

*Supreme Showroom Inc. v. Branded Apparel Grp. LLC*,
    No. 16 Civ. 5211, 2018 WL 3148357 (S.D.N.Y. June 27, 2018) ................................... 34

*Turner v. Temptu Inc.*,
    586 F. App'x 718 (2d Cir. 2014) ...................................................................... 14

*Turner v. Temptu Inc.*,
    No. 11 Civ. 4144, 2013 WL 4083234 (S.D.N.Y. Aug. 13, 2013) ................................... 14

*Uddo v. DeLuca*,
    425 F. Supp. 3d 138 (E.D.N.Y. 2019) .............................................................. 19

*Uddo v. DeLuca*,
    837 F. App'x 39 (2d Cir. 2020) ...................................................................... 19

*United States v. Peoni*,
    100 F.2d 401 (2d Cir. 1938)........................................................................... 14

*Valentini v. Citigroup, Inc.*,
    837 F. Supp. 2d 304 (S.D.N.Y. 2011)........................................................ 11, 27

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
    No. 18 Civ. 1876, 2019 WL 2327810 (S.D.N.Y. May 30, 2019) ................................... 22

*Veleron Holding, B.V. v. Morgan Stanley*,
    117 F. Supp. 3d 404 (S.D.N.Y. 2015)........................................................ 31, 33

*Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No 395 Pension Tr. Fund*,
    201 Ariz. 474, 482 (2002).......................................................................... 16, 22

*Wilson v. DiCaprio*,
    278 A.D.2d 25 (1st Dep't 2000) ...................................................................... 14

*Woods v. Barnett Bank of Ft. Lauderdale*,
    765 F.2d 1004 (11th Cir. 1985) ...................................................................... 15

**Rules**

CPLR 213(8) ................................................................................................ 26, 27, 29

CPLR 214(4) .................................................................................................... 26, 29

Fed. R. Civ. P. 11(b)(3) ............................................................................................ 29

**Other Authorities**

Restatement (Second) of Torts § 876 .............................................................................. 22

Restatement (Third) of Agency § 1.01 (2006).......................................................................... 33, 34

Webster's Ninth New Collegiate Dictionary 265 (1990) ............................................................ 13

## REALITY CRASHES IN ON SOTHEBY'S

To avoid trial, Sotheby's tries to hold reality at bay but fails. Sotheby's can no longer wipe away the years of brazen lies, manufactured at an assembly-line pace, that Bouvier told Plaintiffs. The misconduct is undisputed, and Sotheby's opposition to partial summary judgment on Bouvier's wrongdoing never articulates a counter-narrative a jury could accept. Sotheby's own summary judgment motion, built on meritless legal technicalities, fails to insulate Sotheby's from the consequences of its helping Bouvier's factory of falsehood. Now, after pre-trial discovery, the ugly reality is there for all to see and a jury to consider.

## WHY PLAINTIFFS' MOTION SHOULD BE GRANTED

Sotheby's admits that Bouvier sent fraudulent emails filled with material misrepresentations to Plaintiffs about non-existent price negotiations for artwork. Whether or not Bouvier was an arm's length counterparty, his emails to Plaintiffs describing false price negotiations were fraudulent. Since Plaintiffs lacked any notice of that until the end of 2014, their reliance on Bouvier was reasonable.

As for Bouvier's role, no genuinely disputed material facts throw doubt on his status as a fiduciary. Three witnesses establish the origin of Bouvier's role as Plaintiff's agent. The entire course of Bouvier's dealings with Plaintiffs—the fraudulent emails plus other communications between Bouvier and Plaintiffs, including Bouvier's invoices for his 2% commission, as well as Bouvier's correspondence with art galleries—corroborate this agreed-on agency relationship. Sotheby's has no admissible evidence to rebut this proof.

## WHY SOTHEBY'S MOTION SHOULD BE DENIED

Unlike Plaintiffs' motion, Sotheby's motion should be denied because a reasonable jury could conclude that the most probable explanation of *all* the evidence is that Sotheby's had "actual knowledge" of and "substantially assisted" Bouvier's underlying fraud and fiduciary

breach. The universe of evidence—largely Sotheby's own pre-dispute, contemporaneous emails and documents—shows that the key "facts" Sotheby's relies on are either untrue or contested. A jury must weigh Sotheby's new litigation-driven, conclusory, after-the-fact protests of innocence against the damning pre-litigation, contemporaneous evidence, showing that: (a) Sotheby's knew Bouvier was buying on behalf of Dmitry Rybolovlev's entities, Rybolovlev was Bouvier's client, and Bouvier was Rybolovlev's agent; (b) Sotheby's knew Bouvier was secretly marking up prices with inflated Sotheby's valuation estimates, it enabled Bouvier's unusual desire for secrecy, and it concealed Bouvier's ownership of the artworks; (c) Sotheby's assisted Bouvier by giving inflated valuations and other materials to enable his fraud on Plaintiffs; and (d) Sotheby's consciously avoided learning all the details of Bouvier's fraud and fiduciary breach.

Sotheby's tries to brush aside each one of these facts separately by asserting each alone does not prove Sotheby's knew of Bouvier's fraud or assisted in it. But each of those assertions is itself disputed, and, considered together—as they must be—they cumulatively create questions of disputed material fact. A jury is entitled to decide whether the web of circumstantial evidence—all the facts taken together and in conjunction—is more probative than the incredible, self-serving denials of self-interested Sotheby's employees.

Sotheby's time-bar argument relies on the wrong statute of limitations. The three-year period for breach of fiduciary duty does not apply. Plaintiffs pled a valid claim for aiding and abetting fraud, and the basic wrongdoing underpinning both claims is fraud. That means CPLR 213(8) applies, with its six-years from accrual or two-years from when Sotheby's role was discovered or could have been discovered with reasonable diligence. Plaintiffs discovered Sotheby's aiding and abetting in November 2016, when Sotheby's produced documents in response to a § 1782 request, and filed this case less than two years later, in October 2018. The

case is also timely because the statute of limitations is tolled due to Sotheby's continued deception and concealment of its wrongdoing. If Sotheby's disputes the discovery date, that is a question of fact for a jury.

Equally empty is Sotheby's argument that Plaintiffs have sued the wrong defendants. Sotheby's is liable for the wrongdoing of its agent Samuel Valette, whose work with Bouvier was closely controlled and directed in all aspects by Defendants. Again, at the least, disputed questions of fact exist on this agency issue.

### THE REST OF THE STORY a/k/a WHAT SOTHEBY'S OMITS

Sotheby's truncated version of the facts leaves out key points that undermine its position.[1]

**Fraud from the Start.** Soon after reaching an oral agreement with Plaintiffs' representative Dmitry Rybolovlev to serve as an art agent, Bouvier began the fraud. DR Decl. ¶¶ 12-19. Bouvier initially had Plaintiffs sign four purchase contracts with entities they thought were independent third-party sellers but were actually Bouvier's shell companies pocketing huge markups. MS Decl. ¶¶ 58-63. By concealing his ownership of the contracting entities, Bouvier duped Plaintiffs into believing these were arms-length transactions he had negotiated for them in exchange for his 2% commission, which Plaintiffs separately paid him. *Id.* As the years passed, and Bouvier grew closer to Rybolovlev and Plaintiffs' representative Mikhail Sazonov, leading

---

[1] The following citations are used: Second Declaration of Daniel J. Kornstein, dated May 26, 2022 ("2d DJK Decl."); Plaintiffs' Response to Defendants' Statement of Material Facts and Counterstatement of Material Facts, dated May 26, 2022 ("P. 56.1 Resp."); Second Declaration of Dmitry Rybolovlev, dated May 25, 2022 ("2d DR Decl."); Defendants' Response to Plaintiffs' Statement of Material Facts and Counterstatement of Material Facts, (ECF No. 443) ("D. 56.1 Resp."); Declaration of Samuel Valette (ECF No. 459) ("Valette Decl."); Declaration of Marcus A. Asner (ECF No. 461) ("Asner Decl."); Declaration of Mikhail Sazonov (ECF No. 416) ("MS Decl."); Declaration of Daniel J. Kornstein (ECF No. 417) ("DJK Decl."); Declaration of Dmitry Rybolovlev (ECF No. 418) ("DR Decl."); Expert Report of Guy Stair Sainty, ECF No. 390-1 ("Sainty Rep."); Declaration of Elena Rybolovleva (ECF No. 419) ("ER Decl."); Defendants' Memorandum of Law (ECF No. 438) ("Def. Br."). All deposition excerpts are exhibits to the 2d DJK Decl. All citations are cleaned up.

them to believe he was their trusted friend and art adviser, he began a pattern of sending emails

to Sazonov with fabricated price negotiations with the sellers. D. 56.1 Resp. ¶¶ 30-35.

**Enter Sotheby's.**  Bouvier had been a regular client of Sotheby's since the early 2000s.

ECF No. 294-6. Before 2011, most of his transactions with Sotheby's were relatively modest. *Id.*

He was not known as an art dealer, nor was he thought to be sufficiently wealthy to buy world-

class masterpieces. P. 56.1 Resp. ¶ 232. In his dealings with Sotheby's, he usually operated

through an entity called Blancaflor. *Id.* ¶ 35.

**Enter Peretti.**  Bouvier often used Jean-Marc Peretti when dealing with Sotheby's. *Id.* ¶

216. Peretti, who owned a small art gallery in Geneva, had been investigated by the authorities

for ties to organized crime and illegal gambling. Valette Tr. 106:18-107:4; Sainty Rep. 17-18.

Sotheby's employees understood that Peretti and Bouvier worked together, that Peretti was

Bouvier's associate, and that he was authorized to act for Blancaflor. P. 56.1 Resp. ¶ 216.

**Enter Valette.**  In 2007, Samuel Valette, then a young, hungry art cataloguer at

Sotheby's Paris office, met Bouvier and Peretti. Valette Tr. 104:25-106:17. Valette cultivated a

friendship with Bouvier. He gifted Bouvier £10,000 worth of wine, P. 56.1 Resp. ¶ 458, and even

vacationed on Bouvier's luxury yacht (which Valette at his deposition pretended was a mere

"motorboat"), *id.* ¶ 464. Sotheby's designated Valette as Key Client Manager ("KCM") for

Bouvier, Peretti, and Blancaflor. *Id.* ¶¶ 254-55. A KCM is supposed to cultivate and service a

particular Sotheby's client. *Id.* ¶¶ 259-66.

**Bouvier's Deals with Sotheby's Skyrocket.**  Starting in 2011, after Valette became

Bouvier's KCM, the value of Bouvier's transactions with Sotheby's rose sharply as Bouvier

started buying masterpieces on Plaintiffs' behalf through Sotheby's. *Id.* ¶¶ 432-40, 442, 457,

459-61. As Bouvier's purchases soared, so did Valette's compensation, which heavily depended on commissions. *Id.* ¶¶ 443-56, 462-63 & 467.

**Valette Fails to Act as Rybolovlev's KCM.**  In 2012, the year after Plaintiffs' purchases with Sotheby's dramatically increased, Sotheby's appointed Valette as Rybolovlev's KCM. *Id.* ¶¶ 256-57. A reasonable jury could see this as evidence that Sotheby's knew Bouvier represented Rybolovlev and wanted the same KCM to manage both of them to facilitate the lucrative Bouvier-Rybolovlev relationship. A jury might also consider it suspicious that, after becoming Rybolovlev's KCM, Valette: (a) never did anything to cultivate his business, (b) ignored emails from other Sotheby's people urging potential Rybolovlev projects, (c) cancelled any meeting he was asked to attend about his efforts to develop "this important client," and (d) even said he never googled Rybolovlev, or otherwise read up on him. *Id.* ¶¶ 267-70; Valette Tr. 58:4-60:16; 2d DR Decl. ¶¶ 37-38. Valette failed to attend an April 22, 2013, meeting—only one month after the Da Vinci showing he went to at Rybolovlev's Manhattan apartment—called specifically by Sotheby's Client Development department to do more to cultivate Rybolovlev's business. P. 56.1 Resp. ¶¶ 248, 270. Valette did not even tell Client Development about the Da Vinci sale. Valette Tr. 94:19-95:5. A reasonable jury could conclude that Valette's total disregard of his responsibilities as Rybolovlev's KCM was motivated by his desire not to disrupt a scheme so profitable to both him and his most important client, Bouvier.

It makes no sense that Valette would ignore Rybolovlev. Cultivating clients like Rybolovlev is an existential need for Sotheby's. Valette's primary job is to get business for Sotheby's. He testified that he had to "get hundreds of millions of pounds and hundreds of millions of dollars for these auctions. We live or die—sorry to be dramatic—by the results of these auctions. . . . My job as a senior international specialist was to get business for these

auctions, get pictures. So I was traveling all day every week twice week on the road to get business, get pictures, consign, convince people to sell." Valette Tr. 30:2-24. A jury could conclude that Valette's decision to ignore a billionaire collector who could be a massive source of business for Sotheby's resulted from a desire to support Valette's other source of access to Rybolovlev, Bouvier.

**Sotheby's Knew Bouvier Was Acting as Agent for Rybolovlev and the Plaintiffs.**

Sotheby's internal emails from 2010-11 describe Rybolovlev as Peretti's "client," his "big client," and his "Russian client." P. 56.1 Resp. ¶¶ 217-23. Starting in 2011 with Plaintiffs' first Sotheby's purchase, Valette and other Sotheby's employees distinguished between Bouvier/Peretti as an "agent," "adviser," or "curator," and Rybolovlev as a "client," "principal," or "buyer." *Id.* ¶¶ 217-53. Valette also knew that Rybolovlev was important to Bouvier and admits that, at minimum, he knew that Bouvier was immediately "flipping" the Works to Plaintiffs. *Id.* ¶¶ 231 & 439. A reasonable jury could easily conclude that Valette knew Bouvier was buying on behalf of Rybolovlev, regardless of what Valette now says.

**Sotheby's Prepared Materials for Bouvier to Show Rybolovlev.**  Throughout the relevant time, Valette put together various materials—descriptions, informal valuations, research, photos, provenance, etc.—for Bouvier to pass on to his principal to persuade Rybolovlev to buy. *Id.* ¶¶ 387-404. Valette typically wrote to Bouvier and Peretti informally, addressing and signing emails with first names only. *Id.* ¶ 387. But when Valette understood the materials (at times after being modified by Valette per Bouvier's instructions) were to be forwarded to Rybolovlev, he re-sent them with more formality: using Sotheby's letterhead or email signature, addressing "Monsieur Yves Bouvier," and employing the formal "vous" rather than the familiar "tu." *Id.* ¶¶ 387-404. This is a badge of fraud. Wittman Tr. 203:3-13.

Bouvier used these bespoke Sotheby's materials to defraud Plaintiffs. P. 56.1 Resp. ¶ 373; 2d DR Decl. ¶¶ 2-6. The files Bouvier gave Plaintiffs for the Works were full of documents from Sotheby's. P. 56.1 Resp. ¶ 404.

**Sotheby's Knew Bouvier Was Secretly Marking Up Prices.**  This knowledge can be inferred in at least four different ways. *First,* Sotheby's discussed Bouvier's mark ups. In December 2012, Valette and Senior Vice President Grégoire Billault discussed whether Rybolovlev would pay Sotheby's and Bouvier/Peretti's fees on top of the sales price of a Rothko. P. 56.1 Resp. ¶¶ 276-80. Of the $25 million in fees for Sotheby's and Peretti that Billault estimated for this sale, Sotheby's fee would have been 10% or $7.5 million. *Id.* A reasonable jury could conclude Sotheby's knew Peretti/Bouvier would charge their principal a markup of $17.5 million.

*Second,* Sotheby's created inflated estimates of some of the Works, tailored to Bouvier's requests, that Bouvier forwarded to Plaintiffs to justify the inflated prices he was misrepresenting to them. *Id.* ¶¶ 347-73. For example, in July 2012, when Rybolovlev was considering buying Modigliani's *Tête*, Valette sent a formal email to Bouvier talking about the sculpture's importance and estimating its value to be between €70-90 million "maybe more." *Id.* ¶ 359. The next day, Valette sent another formal email, almost identical to the first one, but this time estimating the value at €80-100 million. *Id.* ¶ 360. Bouvier used these emails to help convince Rybolovlev to buy the Work. Crucially, Valette never tried to obtain these prices for his clients, the sellers. Instead, he sold *Tête* to Bouvier for €31.5 million, who turned around and charged Plaintiffs the marked-up price of €62.5 million. *Id.* ¶¶ 364-66. A reasonable jury could conclude Valette created emails with prices he knew were inflated to help Bouvier defraud Plaintiffs into paying those higher prices.

*Third*, violating its own strict "major valuation" procedures, Sotheby's created inflated valuations of some of the Works, customized to Bouvier's demands, that matched, at times exactly, the prices paid by Plaintiffs. *Id.* ¶¶ 281-346. A reasonable jury could conclude that these valuations show that Sotheby's knew about the markups and tailored its valuations to match them to help Bouvier conceal and continue the fraud.

*Fourth*, Sotheby's enabled Bouvier's unusual demands for secrecy (*id.* ¶¶ 347-86) and concealed his ownership of the Works from provenance listings in the valuations it prepared (*id.* ¶¶ 298-300; 318-19; 321-22; 151) and also in its catalogue listings for re-sale of *Tête* and Toulouse-Lautrec's Red *Au Lit: Le Baiser* (2d DJK Decl. Exs. 112, 312). At Bouvier's direction, Valette removed a reference to Bouvier's purchase of the Da Vinci from a cover letter enclosing the valuation. P. 56.1 Resp. ¶¶ 335 & 341. Had Sotheby's shown Bouvier as the last owner in any of these documents, Plaintiffs would have been alerted to the fraud. A reasonable jury could conclude that Sotheby's departed from its usual protocols to help Bouvier conceal the scheme.

**Sotheby's Consciously Avoided Learning All the Details of Bouvier's Fraud.** "You cannot, you know, deliberately close your eyes and ignore facts that are staring you in the eyes," testified Sotheby's Worldwide Compliance Officer. *Id.* ¶ 407.

Yet Sotheby's did that with Bouvier. Sotheby's and Valette were financially motivated not to ask questions about Bouvier's actions. Bouvier often gave Valette carte blanche to broker deals with the sellers for a price far above market, secure in the knowledge that Plaintiffs would pay a markup many times that. *Id.* ¶¶ 429-30. This arrangement, and the magnitude and volume of the deals Bouvier brought to Sotheby's because of his representation of Plaintiffs, earned Sotheby's millions. *Id.* ¶¶ 432-61. Valette personally received ███████ in commissions in just the first year Bouvier bought Sotheby's Works for Plaintiffs. *Id.* ¶ 462.

Sotheby's relies on KCMs and specialists like Valette, whose compensation is partly commission based, to raise any concerns they have about clients like Bouvier. *Id.* ¶ 419. Such a system financially incentivizes specialists not to report concerns about their clients. *Id.* Valette made no reports, even though he knew of at least one criminal investigation of Peretti. Valette Tr. 106:18-111:7; Sainty Rep. 17-18.

So strong was Sotheby's cooperation with Bouvier that, even after Bouvier had been arrested and his fraudulent scheme made public, Sotheby's COO Bruno Vinciguerra authorized a payment of millions of dollars to Bouvier for the sale of Plaintiffs' painting as "[a] small commercial gesture that should pay off." P. 56.1 Resp. ¶¶ 474-75.

Sotheby's also violated their own due diligence requirements. Sotheby's must do an initial "know your client" due diligence before transacting with any new client, which includes pro forma checks and more serious checks for pending criminal investigations and verifying the source of funds. *Id.* ¶¶ 408-17.

In 2013, Sotheby's looked into whether Bouvier was acting as an agent or principal in his deals with Sotheby's. *Id.* ¶¶ 418, 420. This investigation included Rybolovlev, *id.* ¶ 249, which a reasonable jury could conclude is further evidence that Sotheby's knew Bouvier was buying on Rybolovlev's behalf.

But the 2013 exercise was useless. All Sotheby's Worldwide Compliance Officer did was ask Bouvier and Peretti questions and then accept their unsubstantiated answers that they were not agents and had sufficient funds, without doing any further investigation or confronting them with contrary evidence. *Id.* ¶¶ 420-31.

**Valette Is Not Credible.**  Valette went to great lengths to deny knowledge of Rybolovlev. He disingenuously denied knowing that the March 2013 showing of the Da Vinci,

which he attended, took place at Rybolovlev's apartment on Central Park West (Valette Tr. 69:16-72:23), despite having emailed another Sotheby's employee a few days earlier: "What you and I need to organize is a presentation to the client at his place . . . near Central Park" and that he would get her the address. *Id.* ¶ 241. Sotheby's was contractually required to show the painting only at the client/purchaser's home. *Id.* ¶ 243. Sotheby's documented Rybolovlev's purchase of this apartment the same month Valette was appointed his KCM. *Id.* ¶¶ 244, 257.

Equally unbelievable is Valette's testimony that when he saw Rybolovlev at the apartment during the showing, he did not recognize him or realize the apartment was his. Valette Tr. 69:16-72:23. Valette had met Rybolovlev in person less than a year before. P. 56.1 Resp. ¶ 273. He had been Rybolovlev's KCM since 2012, and the KCM "should not only know how they [the clients] look like, but what they do, to the best of your knowledge they're trying to be—to have maximum information."  Billault Tr. 325:8-17; P. 56.1 Resp. ¶¶ 258-66. Valette's denial that he recognized Rybolovlev at the Central Park West apartment in March 2013, to put it mildly, raises questions about Valette's credibility in general.

## ARGUMENT

### I.   PLAINTIFFS' MOTION SHOULD BE GRANTED: THE UNDERLYING FRAUD AND FIDUCIARY BREACH ARE NOT MATERIALLY DISPUTED

#### A.   Sotheby's Admits Bouvier's Fraud

Sotheby's admits that "[n]one of these purported negotiations" in Bouvier's emails to Plaintiffs actually "took place." D. 56.1 Resp. ¶ 35.[2]  The core fraud, then, is undisputed.

---

[2] Sotheby's other 56.1 responses about Bouvier's fraudulent emails (¶¶ 30-34) are argument without evidence, in violation of Local Rule 56.1. *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07 Civ. 8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013). These responses should "be deemed admissions of the stated facts." *Id.*

### B.      Sotheby's Cannot Dispute Reasonable Reliance

The undisputed facts show that Plaintiffs did not act recklessly. *Schulhof v. Jacobs*, 157

A.D.3d 647, 648 (1st Dep't 2018) ("The issue of reasonable reliance can be resolved on a

summary judgment motion."). And Sotheby's fails to meet the controlling test for disputing

reasonable reliance. "[N]egligence is not on its own sufficient, in this Circuit, to preclude

reasonable reliance. Instead, what 'minimal diligence' requires is only that plaintiffs not act

recklessly. *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 319 (S.D.N.Y. 2011).

Sotheby's does not genuinely dispute Plaintiffs' lack of expertise in the art market,

pointing out only that Rybolovlev bought a *single* painting before working with Bouvier and

admitting that he did so under the guidance of Tania Rappo, Bouvier's co-conspirator. D. 56.1

Resp. ¶¶ 1, 3, 5-7. Similarly, a plaintiff with no expertise in rare coins reasonably relied even

though he "did not perform any due diligence" and was "a sophisticated investor with ample

resources." *Marini v. Adamo*, 995 F. Supp. 2d 155, 193 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33

(2d Cir. 2016); *see also Schulhof,* 157 A.D.3d at 648 ("Plaintiff's success as a businessman does

not preclude a finding of reliance.").

As in *Valentini*, Plaintiffs here "were not provided with the full and objective disclosure

of non-misleading factual material." 837 F. Supp. 304 at 319. There is no dispute Plaintiffs read

the fraudulent materials Bouvier provided to them; Sotheby's faults them only for not asking for

more documents. D. 56.1 Resp. ¶¶ 30-35; Def. Br. 43. But that is not enough to disprove

reasonable reliance because "[a] failure to demand additional information" is "a qualitatively

different kind of failure than the failure to carefully read documents already in one's own

possession." *Id.*

Nor would any additional inquiry have uncovered the fraud because Bouvier "always had

convincing excuses," providing Plaintiffs with Sotheby's inflated valuations and other material.

11

*Marini I,* 995 F. Supp. 2d at 166, 194. 2d *E.g.* DR Decl. ¶¶ 5, 19-22, 28-31; 2d DKJ Decl. Ex. 106; MS Decl. ¶¶ 9-11, 19-49, 65, 89, 92.

Sotheby's misfocuses on the sales contract for *Noces de Pierrette* in October 2004, which called for payment to be split between two entities, one of which was The Eagle Overseas Co. Ltd. No suspicion would arise from a seller of a masterpiece wanting payment to be split between two corporate recipients. Sotheby's consignment agreement for the Da Vinci was with *three* entities. Valette Decl. Ex. 12. Nor does Sotheby's have any evidence that Plaintiffs knew, or had any reason to know, that Eagle was Bouvier's entity when this contract was signed in October 2004. Sazonov did not learn until later that any of the contracting parties were Bouvier's. MS Decl. ¶¶ 59-63. Sotheby's never asked Sazonov *when* he learned that information. Sazonov Tr. 39:15-46:4. That he knows it *now* is irrelevant. That Sazonov did not notice, *two years later* in October 2006, when a new contract was signed for *Mousquetaire*, that MEI had the same address as Eagle is not even surprising, much less suspicious. *Contra* D. 56.1 Resp. ¶ 31. Sazonov's testimony is also corroborated by a deceptive email Bouvier sent him in October 2006, that he would "organize a meeting with the ***owner***" of *Mousquetaire*—a statement inconsistent with Bouvier being the owner. MS Decl. Ex. 5 at P000006463 (emphasis added).

### C.     Indisputable Facts Establish Bouvier as Plaintiffs' Fiduciary

#### 1.     No Genuine Dispute Exists About Bouvier's Agency Agreement

No evidence rebuts Rybolovlev's testimony that he reached a verbal agreement with Bouvier to act as his agent in exchange for a 2% commission. D. 56.1 Resp. ¶ 11. Rybolovlev's testimony is both detailed (DR Decl. ¶¶ 13-17; DR Tr. at 16:15-19:24) and corroborated by both his ex-wife who was present (ER Decl. ¶¶ 9-12) and by Sazonov, who learned of it soon after (MS Decl. ¶ 4). It is also corroborated by the contemporaneous written record, including dozens of emails Bouvier sent Sazonov over the years, stating that he was negotiating on Plaintiffs'

behalf. D. 56.1 Resp. ¶¶ 11, 31-34, 36-38, 41-42. Sotheby's does not even try to explain how these emails could be consistent with anything other than Bouvier acting as Plaintiffs' agent. *Id.* ¶¶ 33-34. Bouvier's correspondence with art galleries also confirms his status as Plaintiffs' agent. DJK Decl. Exs. 9-11.

Bouvier's tainted deposition "testimony" does not support a different conclusion. First, the deposition is inadmissible. ECF No. 455; 2d DJK Decl. ¶¶ 25-32. In addition, the first four transactions refute Bouvier's testimony that there was never *any* verbal agreement between him and Plaintiffs. None of the four contracts for those transactions said anything about Bouvier's role or his 2% compensation (because Plaintiffs thought these contracts were with third parties unconcerned with Bouvier's compensation)—yet Bouvier was paid 2% of the purchase price on these initial four transactions and the others. MS Decl. ¶ 62, Exs. 31-34. Those 2% payments mean some verbal agreement existed, or else where did the 2% come from? The only evidence of the terms of such an agreement comes from Plaintiffs.

Bouvier's interchangeable use of "fee" and "commission" for his payments further corroborates Plaintiffs' position. D. 56.1 Resp. ¶ 36. "Commission" is defined as "a fee paid to an agent or employee for transacting a piece of business or performing a service, *esp*: a percentage of the money received from a total paid to the agent responsible for the business." Webster's Ninth New Collegiate Dictionary 265 (1990). And Bouvier's invoice description of his work as "administrative and due diligence services" describes what Plaintiffs thought Bouvier was doing for them as their agent. MS Decl. ¶ 77.

Sotheby's selective reference to a Singapore court decision backfires. That ruling was non-final and without *res judicata* effect, without a full evidentiary record, and confined to whether a worldwide *ex parte Mareva* injunction was properly entered. 2d DJK Decl. Ex. 365

¶ 59. Even so, the Singapore court found "a good arguable case of dishonesty on Mr. Bouvier's part," *id.* ¶ 59, and that "the email correspondence appears damning and does suggest that Mr. Bouvier presented himself to Mr. Rybolovlev and Mr. Sazonov as though he was negotiating on [their] behalf," *id.* ¶ 45. The court said that correspondence "strongly suggests that Mr. Bouvier was acting as an agent of [Plaintiffs] and was negotiating for the artworks on their behalf. It is thus consistent with the agent-principal relationship [Plaintiffs] are contending for." *Id.*

### 2. It Is Undisputed that by 2011 Bouvier Had Fostered a Relationship of Trust and Reliance with Plaintiffs

There is no real dispute that by 2011, when Sotheby's got involved, Bouvier had built a relationship of trust, confidence, and friendship with Plaintiffs over nine years, including negotiating the purchase of 20 artworks for them. D. 56.1 Resp. ¶ 14. Thus "the requisite high degree of dominance and reliance . . . existed *prior to the transaction giving rise to the alleged wrong*." Def. Br. 35 (emphasis added) (quoting *Turner v. Temptu Inc.*, No. 11 Civ. 4144 (JMF), 2013 WL 4083234, at *8 (S.D.N.Y. Aug. 13, 2013), *aff'd*, 586 F. App'x 718 (2d Cir. 2014)).

## II. SOTHEBY'S MOTION SHOULD BE DENIED: DISPUTED ISSUES OF FACT AND BASIC ERRORS OF LAW

Unlike Plaintiffs' motion, Sotheby's is riddled with reasons to deny summary judgment.

### A. Aiding and Abetting: Disputed Issues of Fact

Sotheby's aiding and abetting is a disputed issue of fact.

### 1. The Governing Legal Standard.

Learned Hand articulated the classic legal test when he defined an aider and abettor as one who "in some sort associate[s] himself with the venture, . . . participate[s] in it as something that he wishes to bring about, [and] . . . seek[s] by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938). Since then, the Restatement (Second) of Torts and most states (including New York) have followed Hand's definition. *See, e.g.*, *Wilson v. DiCaprio,* 278 A.D.2d 25, 26 (1st Dep't 2000). It

fits the facts here.

In refining Hand's formula over time, most jurisdictions, including New York, have required proof that an aider and abettor: (1) had actual knowledge of the underlying wrong, and (2) substantially assisted it. The parties here disagree about the nature and quantum of such proof. Sotheby's seems to say the proof needs to be a virtual confession from the aider and abettor and that individual pieces of circumstantial evidence must be considered individually rather than together. This is incorrect.

A jury can find Sotheby's liable based on circumstantial evidence and reasonable inferences from such evidence. *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 496 (S.D.N.Y. 2018). Such "inference[s] may be supported by (1) showing a motive for participating in a fraudulent scheme and a clear opportunity to do so, or (2) identifying circumstances indicative of conscious behavior." *In re Allou Distributors, Inc.*, 446 B.R. 32, 51 (Bankr. E.D.N.Y. 2011); *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1012 (11th Cir. 1985) ("[K]nowing assistance can be inferred from atypical business actions."). Circumstantial evidence like expert testimony that "assist[s] the jurors in understanding the function of" market participants such as Sotheby's and the "importance of various information" to such participants is part of this analysis. *FDIC v. First Interstate Bank of Des Moines*, 885 F.2d 427, 435 (8th Cir. 1989); *Cronin v. Exec. House Realty*, No. 80 Civ. 7254, 1982 WL 1303, at *8 (S.D.N.Y. May 5, 1982) ("questionable business practice" that increased profits for bank but put investors at risk, evidence of bank vouching for fraudster, and unusual patterns of money transfers relevant to bank's actual knowledge of fraud).

When the correct legal test is applied here—where Sotheby's has not advanced *any* narrative that would explain the *totality* of the circumstantial evidence, and where Plaintiffs have

documented a straightforward and sordid account of aiding and abetting a conman—a jury should decide who it believes regarding Sotheby's "actual knowledge" and "substantial assistance."

### 2.    Whether Sotheby's Had "Actual Knowledge" Is Disputed.

Ample evidence exists from which a reasonable jury could conclude that Sotheby's "knew a combination of facts from which the fraud would have been obvious." *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 412 (S.D.N.Y. 2015).

A jury should evaluate Valette's self-serving and less-than-credible denials that he knew of the markups. The credibility of the main tortfeasor and his accomplice are classic jury questions. *See Acco, Ltd. v. Rich Kids Jean Corp.*, No. 15 Civ. 7425, 2017 WL 4350576, at *11 (S.D.N.Y. May 3, 2017) (inferring actual knowledge in the face of defendant's "less-than-credible" trial testimony that he had no knowledge of plaintiffs or fraud).

Valette's lack of knowledge of the exact markups is also irrelevant because "[t]he knowledge requirement" can be met, "even though the [defendant] may not have known of all the details of the primary fraud." *Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 536 (6th Cir. 2000); *see also In re Nat'l Century Fin. Enters., Inc.*, 846 F. Supp. 2d 828, 872 (S.D. Ohio 2012) (denying defendant's motion for summary judgment where defendant "may not have known all of the intricacies of how [the primary tortfeasor] carried out its fraudulent operations (few had such knowledge), but substantial evidence exists to support a conclusion that [defendant] had sufficient knowledge to appreciate that its representations to investors were untrue"). A "general awareness" of Bouvier's "fraudulent scheme" is enough. *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No 395 Pension Tr. Fund*, 201 Ariz. 474, 482, 488 (2002) (*en banc*).

16

Plaintiffs are not required to have an "email, memorandum, or other [Sotheby's] document that expressly admits knowledge of the fraud." *Pension Comm. of Univ. of Montreal v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 503-04 (S.D.N.Y. 2009). Sotheby's email admission in 2012 that it knew Bouvier/Peretti were charging their client an inflated 23% markup (P. 56.1 Resp. ¶¶ 276-80) is the kind of "knowledge of the specific financial circumstances at issue in the alleged fraud [that] can give rise to a sufficiently strong inference" of actual knowledge. *Carbon Inv. Partners, LLC v. Bressler*, No. 20 Civ. 3617, 2021 WL 3913526, at *7 (S.D.N.Y. Sept. 1, 2021); *see also JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 254 (S.D.N.Y. 2005) (emails "contain[ed] language which could reasonably be understood to demonstrate [the defendants'] actual knowledge" of the fraud). A 23% commission is way above art market standard. *See* Sainty Rep. p. 4-5 (commissions range between 2-10%); Smith Tr. 278:4-12 (2-6%). This email alone suffices to defeat summary judgment on the actual knowledge prong.

The Court also should not "ignore[] the remaining evidence that plaintiffs have provided which . . . would permit a reasonable jury to infer that [Sotheby's] had actual knowledge of the underlying fraud." *Pension Comm.*, 652 F. Supp. 2d at 503. At least six categories of circumstantial evidence, when "[t]aken together," as they must be, "giv[e] rise to a strong inference of actual knowledge." *Carbon*, 2021 WL 3913526, at *7; *see also Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (reversing summary judgment and concluding that "[a]lthough the facts . . . are unremarkable taken in isolation, we find that taken together, they present what should have been a jury issue on the question of aiding-and-abetting liability").

    **(i)**    **Sotheby's Knowledge of the Fiduciary-Principal Relationship**. Sotheby's knew Rybolovlev was a "client of Mr. Bouvier," P. 56.1 Resp. ¶ 219, and that Bouvier was

Rybolovlev's agent, *id.* ¶¶ 216-53. In one 2011 email, for example, Valette described "the client" as "a ***young, fast moving billionaire business man*** . . . [who] does not speak English and all deals require an interpreter and the curator"—a description that matches Rybolovlev. *Id.* ¶ 277. For the 2012 Klimt viewing, which Rybolovlev attended, Valette distinguished between "the advisor" (*i.e.* Bouvier) and "the principal" (*i.e.* Rybolovlev), writing: "I should know later today/tomorrow if ***the principal*** is coming. If he is we will need to make sure the premises are 'cleared' before he gets there but let's worry about this if he comes." *Id.* ¶ 238.

Sotheby's knowledge of the agency relationship is a key building block in proving knowledge of the fraud that must be evaluated "in combination with the additional evidence presented by plaintiffs" about Sotheby's knowledge of the fraud. *See Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 477-78 (S.D.N.Y. 2012).

**(ii)    Sotheby's Facilitating Bouvier's Extreme Secrecy**. Sotheby's facilitated Bouvier's desire to keep Rybolovlev in the dark about the details of Bouvier's transactions on Plaintiffs' behalf. P. 56. Resp. ¶¶ 374-86. A jury could infer from this that Sotheby's knew Bouvier was lying to Plaintiffs and intended to assist him in perpetuating this fraud. *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 443 (S.D.N.Y. 2010) (aiding and abetting defendants' "familiarity" with the primary tortfeasor, "general experience" in the industry, and "knowledge of . . . red flags," including "lack of transparency," sufficed for actual knowledge).

Sotheby's enabling Bouvier's unusual secrecy, even going so far as to change its normal operations (*e.g.* P. 56.1 Resp. ¶¶ 376-78, 382), supports the inference that Sotheby's knew Bouvier was lying to Plaintiffs and intended to help him hide the true prices. *See Liu Yao-Yi v. Wilmington Tr. Co.*, 301 F. Supp. 3d 403, 421 (W.D.N.Y. 2017) ("[A]ctual knowledge may be inferred—particularly where there are clear allegations that the aider and abettor has manifestly

changed its normal operating procedures to encourage the primary tortfeasor's fraudulent conduct."); *Flycell, Inc. v. Schlossberg LLC*, No. 11 Civ. 0915, 2011 WL 5130159, at *9 (S.D.N.Y. Oct. 28, 2011) (finding actual knowledge where defendants acquiesced to primary tortfeasor's emailed request to "prepare[] documents to conceal [his] ownership" in companies used to defraud plaintiffs); *Uddo v. DeLuca*, 425 F. Supp. 3d 138, 157 (E.D.N.Y. 2019), *aff'd*, 837 F. App'x 39 (2d Cir. 2020) (finding aiding and abetting by asking others "not to tell . . . about the line of credit," thus forestalling discovery of the breach).

      **(iii)**    **Sotheby's Inflated Formal Valuations**. A reasonable jury could conclude that Sotheby's creation of inflated valuations that closely matched the prices Bouvier charged Plaintiffs shows Sotheby's knowledge of the inflated prices. P. 56.1 Resp. ¶¶ 297, 311, 320, 325, 345. The jury could disbelieve Sotheby's arguments that these are nominal "insurance valuations," Def. Br. 25, especially since Plaintiffs needed fair market valuations for loan applications, P. 56.1 Resp. ¶¶ 283-84, and disbelieve Sotheby's incredible argument that the close alignment to the prices Plaintiffs paid was mere coincidence. Sotheby's had recently sold or valued the same Works for significantly lower prices. *Id.* ¶¶ 293-95, 306-09, 318-19, 321-23, 331, 333. Sotheby's also later valued many of these same Works at significantly lower figures. *Id.* ¶¶ 303-04, 314. Sotheby's own expert valued three of the same Works for far less the year after Sotheby's valuations. *Id.* ¶¶ 305, 315, 346. This evidence "tend[s] to show either that [Sotheby's] knew that the values were false or that it was aware of the possibility that they were phony, but nevertheless complied with [Bouvier's] request." *Fraternity Fund Ltd. V. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 370 (S.D.N.Y. 2007).

      The jury might also consider that none of these valuations complied with Sotheby's internal valuations guidelines or industry standards. P. 56.1 Resp. ¶¶ 285-92. While Sotheby's

says it does not tailor valuations to client requests, *id.* ¶ 337, the email correspondence demonstrates that Sotheby's increased the Da Vinci valuation from $100 million to €100 million at Bouvier's request and over Sotheby's expert Alex Bell's protestation that "€95 million is already really stretching it," *id.* ¶¶ 333-41. And although Valette had previously approved a letter noting that Bouvier had acquired the work in 2013, he removed that crucial information at Bouvier's insistence. *Id.* These documents "could reasonably be understood to demonstrate [Sotheby's] actual knowledge" of the fraud. *Winnick*, 406 F. Supp. 2d at 254; *see also Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 510 (S.D.N.Y. 2001) *amended on reconsideration in part*, 137 F. Supp. 2d 438 (S.D.N.Y. 2001) (documents showed awareness they "did not accurately reflect" value).

It does not matter that the valuations were created after the sale of the works to Plaintiffs. The valuations are important evidence of Sotheby's knowledge of the fraud. And unlike in *Berdeaux v. OneCoin Ltd*., No. 19 Civ. 4074, 2021 WL 4267693, at *20 (S.D.N.Y. Sept. 20, 2021), here Sotheby's continued to aid and abet Bouvier's fraud and breach of fiduciary duty after these valuations. *See* P. 56.1 Resp. ¶¶ 468-83. These valuations spell out what Sotheby's had known since 2011: Bouvier was lying to Plaintiffs about the prices he paid for works to charge huge markups, and was invoking Sotheby's reputation to support the prices he charged.

(iv)     **Sotheby's Informal Valuations, Descriptions, and Materials**. Throughout, Valette provided Bouvier with informal valuations and other materials for works that Bouvier was either trying to sell to Plaintiffs or had already sold them. P. 56.1 Resp. ¶¶ 348-73, 393-97. For example, Valette created inflated estimates tailored to Bouvier's demands for the Magritte, writing a formal email that estimated it was worth $40 to $60 million, then three days later re-drafting that email to revise the estimate to €40 million, an amount which matched almost

exactly Bouvier's markup of €43,500,000. *Id.* ¶¶ 34-53. Sotheby's sold this work to Bouvier for $24,100,000. *Id.* ¶ 355. Valette did the same thing for *Tête. Id.* ¶¶ 359-66.

A jury could find Valette knew Bouvier was using these materials to further his ongoing scheme to defraud Plaintiffs. *Id.* ¶ 393. Evidence of Sotheby's "knowledge of the specific financial circumstances at issue . . . give[s] rise to a sufficiently strong inference" of actual knowledge, particularly where, as here, "defendant, having such knowledge, helps prepare documents that serve as the vehicles by which the fraud is perpetrated." *Carbon*, 2021 WL 3913526 at *7. Sotheby's arguments may "go to the persuasiveness and credibility of various portions of Plaintiffs' showing, but not to its sufficiency as a matter of law," so they fail to show "that genuine issues of fact do not exist." *Silvercreek*, 346 F. Supp. 3d at 488.

**(v)    Valette's Close Relationship with Bouvier.** An inference of actual knowledge is also supported by Valette's close relationship with Bouvier and Bouvier's importance to Sotheby's business. P. 56.1 Resp. ¶¶ 464-66. Bouvier was one of Sotheby's most important clients, and his scheme to defraud Plaintiffs brought in many of Sotheby's top sales. *Id.* ¶¶ 432-63. Valette personally earned over $1 million in 2011 alone from Bouvier sales. *Id.* ¶ 462.

These facts further support an inference of actual knowledge. *See Benson v. JPMorgan Chase Bank, N.A.*, No. C-09-5272, 2010 WL 1526394, at *4 (N.D. Cal. Apr. 15, 2010) (actual knowledge supported by allegations "that the bank maintained a close business relationship" with tortfeasor "and that considerable resources of the bank were consumed in the management of" his accounts, which were "amongst the largest accounts handled" at that bank's branch); *McDaniel v. Bear Stearns & Co.*, 196 F. Supp. 2d 343, 357-58 (S.D.N.Y. 2002) (actual knowledge found where relationship involved "close personal friends" and "motive and the opportunity to engage in" fraud were shown through "desire to continue to collect clearing fees

21

and other income it received from" tortfeasor); *Mansor v. JPMorgan Chase Bank, N.A.*, 183 F. Supp. 3d 250, 270 (D. Mass. 2016) (finding strong inference of actual knowledge where allegations included "close relationship" and "regular[] assist[ance]" to tortfeasor).

    **(vi)**    **Sotheby's Consciously Avoided Learning the Details of the Fraud**. A jury could also consider evidence that Sotheby's consciously avoided learning all the details of Bouvier's fraud and breach of fiduciary duty. P. 56.1 Resp. ¶¶ 420-31. *BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, No. 14 Civ. 10067, 2017 WL 3610511, at *10 (S.D.N.Y. Aug. 21, 2017) ("[W]here certain facts indicated a party *should have been* aware of a breach, that party cannot disclaim its discovery simply because it avoided express actual knowledge").[3]

    "[R]egardless of the merits of" whatever "alternative interpretation" Sotheby's might spin about this evidence, consideration of such alternative interpretations "properly belongs to a jury." *Silvercreek*, 346 F. Supp. 3d at 489.

### 3.    Whether Sotheby's "Substantially Assisted" Is Also Disputed

    "Substantial assistance does not mean assistance that is necessary to commit the fraud. The test is whether the assistance makes it 'easier' for the violation to occur, not whether the assistance was necessary." *Wells Fargo,* 201 Ariz. at 489. This is especially true where, as here, a defendant is economically motivated to aid in the fraud. Restatement (Second) of Torts § 876 cmt. D. Sotheby's substantially assisted the fraud at every step. P. 56.1 Resp. ¶¶ 216-404. This more than suffices for a jury to find "a substantial contribution to the perpetration of the fraud."

---

[3] *See also In re Agape Litig.*, 773 F. Supp. 2d 298, 308-09 (E.D.N.Y. 2011) (scienter sufficient where "plaintiff has plausibly alleged that a defendant made certain decisions specifically to avoid attributable knowledge of the underlying fraudulent scheme"); *Vasquez v. Hong Kong & Shanghai Banking Corp.*, No. 18 Civ. 1876, 2019 WL 2327810, at *15 (S.D.N.Y. May 30, 2019) (same); *Fraternity Fund*, 479 F. Supp. 2d at 368 (same); *Anwar*, 728 F. Supp. 2d at 443 (same); *BlackRock*, 2017 WL 3610511, at *10 (same).

*Winnick,* 406 F. Supp. 2d at 257; *see also Silvercreek*, 346 F. Supp. 3d at 487 ("substantial

assistance can take many forms, such as executing transactions" or helping a firm to present an

"enhanced financial picture to others").

Sotheby's concedes that for three of the Works a jury could find Sotheby's substantially

assisted Bouvier's fraud, Def. Br. 4, but tries to avoid its involvement in the remaining Works.

But in the context of such a "highly interdependent scheme in which both parties benefited from

[Bouvier's] fraudulent activity," evidence showing that Sotheby's "actively assisted and

facilitated the fraudulent scheme itself, as opposed to assisting in the preparation of the

[misrepresentation] documents themselves, [is] sufficient." *ABF Cap. Mgmt. v. Askin Cap.*

*Mgmt.*, 957 F. Supp. 1308, 1328 (S.D.N.Y. 1997). Because "a jury rationally could find that the

fraud was continuous, that the intricate scheme of" sourcing, brokering, papering, and then

justifying the sales "was an integral part of the fraudulent scheme, and that [Sotheby's] thus gave

substantial assistance to the fraud while it was ongoing," Sotheby's motion should be denied.

*Dreieck Finanz AG v. Sun*, No. 89 Civ. 4347, 1990 WL 11537, at *5 (S.D.N.Y. Feb. 9, 1990).

A jury could also find that Sotheby's brokerage services alone suffice to show substantial

assistance. *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2nd Cir. 1978)

("[S]ubstantial assistance might include . . .  executing transactions or investing proceeds, or

perhaps . . . financing transactions."). Sotheby's incorrectly argues this was merely "part of its

regular business operation" and so cannot constitute substantial assistance. Def. Br. 22.  But

"[e]ven assuming that [Sotheby's] only performed clerical and ministerial tasks, [Sotheby's]

ignores the principle that the critical test for substantial assistance is not whether the alleged

aiding and abetting conduct was routine, but whether it made a substantial contribution to the

perpetration of the fraud." *Pension Comm.*, 652 F. Supp. 2d at 511.

"A reasonable jury could find that without" Sotheby's sourcing and brokering sales of the Works, Bouvier "would have never" had the opportunity to fraudulently sell these Works to Plaintiffs, which "adequately establishes a sufficiently triable issue of fact to preclude a grant of summary judgment." *Cornelia Fifth Ave., LLC v. Canizales*, No. 12 Civ. 7660, 2016 WL 5390894, at *9 (S.D.N.Y. Sept. 26, 2016). A jury can hold Sotheby's liable "regardless of whether [Sotheby's] role itself involved wrongdoing." *Silvercreek*, 346 F. Supp. 3d at 491.

Sotheby's cannot hide behind its use of normal auction house functions to facilitate a massive fraud from which it derived enormous profit. "[A] reasonable juror could determine—based on facts such as defendants' storage of the [Works] and facilitation of [Bouvier and Plaintiffs'] viewing and receipt of the Work[s]—that defendants were a proximate cause of [Bouvier's] ability to carry out his scheme." *Overton v. Art Fin. Partners LLC*, 166 F. Supp. 3d 388, 413-14 (S.D.N.Y. 2016).

Sotheby's misstates that for eight of the Works, "there is no evidence that Plaintiffs received a *single document* from Sotheby's." Def. Br. 23. On the contrary, almost all the documents Sotheby's provided to Bouvier about the Works were passed on to Plaintiffs. *See* P. 56.1 Resp. ¶ 404. These written materials provided substantial assistance in a number of ways. First, a reasonable jury could conclude that Sotheby's documents provided to Plaintiffs before the purchase assisted Bouvier in convincing Plaintiffs to buy at Bouvier's exorbitant prices. *Id.* ¶¶ 348-63; 2d DR Decl. ¶¶ 2-25, 27-35. Second, a jury could conclude that documents originally created by Sotheby's and provided to Plaintiffs after the purchase of a Work as part of the "file" for the Work, including documents that omitted Bouvier's ownership from the provenance and commentary praising the value and authenticity of the works, helped Bouvier to conceal and continue the fraud. *E.g.* P. 56.1 Resp. ¶¶ 298-300, 318-19, 321-22, 335, 341. And third, a

reasonable jury could find that Sotheby's informal and formal valuations that aligned with the prices Plaintiffs paid helped conceal the fraud. *Id.* ¶¶ 297, 311, 320, 325, 345.

Plaintiffs relied on Sotheby's documents. *E.g.* Rybolovlev Tr. 96:21-99:6; 2d DR Decl. ¶¶ 2-25, 27-35; Rybolovleva Tr. 76: 17-77:6. In any event, "there is no rule of law requiring that an aider and abettor's substantial assistance must be something directly relied upon by the plaintiff." *Kirschner v. Bennett*, No. 07 Civ. 8165, 2012 WL 13060078, at *10 (S.D.N.Y. June 18, 2012).

Sotheby's "standard catalogues, photographs, and research materials," Def. Br. 24, must be "considered together" with Sotheby's other involvement. *Primavera Familienstifung*, 130 F. Supp. 2d at 511. A reasonable jury could determine—based on these materials, in conjunction with Sotheby's other assistance, including sourcing works, brokering sales, and "facilitat[ing] . . . viewing and receipt of the Work[s]—that defendants were a proximate cause of [Bouvier's] ability to carry out his scheme." *Overton*, 166 F. Supp. 3d at 413-14.

Finally, "there is at least a jury question as to whether the" inflated valuations and documents concealing Bouvier's ownership in the provenance "did substantially assist the fraud because they effectively operated to conceal" the true details of the transactions involving the Works "by creating an inference that there was no problem . . . to find." *Kirschner*, 2012 WL 13060078, at *12; *see also Pension Comm.*, 652 F. Supp. 2d at 511 (finding that statements that "concealed" fraud constituted substantial assistance); *Flycell*, 2011 WL 5130159, at *9 (defendant aided and abetted fraud by preparing "documents to conceal [tortfeasors] ownership"). Here, unlike *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 346 (2d Cir. 2018), where the court found, on a motion to dismiss, that the "link between the . . . Defendants' actions (or inactions) and the harm suffered" too attenuated, Sotheby's involvement was integral to every

step of the scheme. Because "issues of proximate cause are generally fact matters to be resolved

by a jury," the role of post-sale Sotheby's materials in the fraud should not be determined at this

stage. *Benjtez v. N.Y.C. Bd. of Educ.*, 73 N.Y.2d 650, 659 (1989).

>    **B.**    **Both of Plaintiffs' Claims Were Timely Filed on October 2, 2018**

Sotheby's incorrect time-bar analysis relies on the wrong statute of limitations and

overlooks disputed facts.

**CPLR 213(8) Governs.** The statute of limitations for fraud (CPLR 213(8)), not the

shorter one for fiduciary breach (CPLR 214(4)), applies to both claims here because (1) the fraud

claim is properly pled and (2) fraud is the essence of the fiduciary claim. *E.g., Kaufman v.

Cohen*, 307 A.D.2d 113, 119 (1st Dep't 2003).

First, unlike in Sotheby's cases, Plaintiffs' aiding and abetting fraud claim is properly

pled, "independently viable," and neither "incidental" nor used as a tactic "to litigate stale

claims." *Cf. Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 395

(S.D.N.Y. 2010) (plaintiff's fraud claim not pled "with sufficient particularity"); *see Ramiro

Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 274-75 (S.D.N.Y. 2019) (applying CPLR

213(8) to viable fraud claims, while separately considering whether fiduciary breach allegations

were based on fraud).

Second, CPLR 213(8) also applies to the fiduciary breach claim because fraud is essential

to that claim, *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009), and

because "there would be no injury but for the fraud," *Paolucci v. Mauro*, 74 A.D.3d 1517, 1520

(3d Dep't 2010). Where, as here, the timeliness of a "breach of fiduciary duty claim . . . turns on

the viability of [an accompanying] fraud cause of action," *Kaufman*, 307 A.D.2d at 119, 122, and

Plaintiffs' fraud claim is viable, the fiduciary breach claim borrows from the fraud limitations

period. *See Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 667 (S.D.N.Y. 2007). This is so

even where the fiduciary breach claim is "essentially identical" to the fraud claim. *Balta v. Ayco Co.*, 626 F.Supp.2d 347, 358 (W.D.N.Y. 2009).[4]

Fraud is the essence of both claims here. The fiduciary breach claim is based on Bouvier's fraud. It could *not* exist without the fraud, but the fraud claim *could* exist without the breach of fiduciary duty. Whether Bouvier was an arms-length art dealer or a fiduciary art agent, he lied to Plaintiffs about the negotiations and prices of the artworks, and CPLR 213(8) applies to a "cause of action for beach of fiduciary duty based on allegations of actual fraud." *Kaufman*, 307 A.D.2d at 119; *see also Ramiro Aviles*, 380 F. Supp. 3d at 274-75 (S.D.N.Y. 2019); *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 & n.3 (2d Cir. 2013); *Cusimano v. Schnurr*, 137 A.D.3d 527, 530 (1st Dep't 2016); *Balta*, 626 F.Supp.2d at 356 (collecting cases).

The fraud statute, CPLR 213(8), is therefore the operative statute of limitations for both claims, providing for the greater of six years of accrual or two years after Sotheby's wrongful conduct was discovered or could, with reasonable diligence, have been discovered. *See Kaufman*, 307 A.D.2d at 119, 122; *N.Y.S. Workers Comp. Bd. v. Cody Mgmt., Inc.*, 146 A.D.3d 1110, 1115 (3d Dep't 2017).

**Applying the Six-Year Rule.** Sotheby's concedes that all but the first five transactions are timely under the six-year accrual rule. Def. Br. 4. The rest are timely under the two-year rule.

**Applying the Two-Year Discovery Rule.** Plaintiffs could not have discovered the extent of Sotheby's involvement before November 2016, when Sotheby's produced documents in the § 1782 case. 2d DJK Decl. ¶¶ 12-16. Between January 2015 and November 2016,

---

[4] *See also*, *e.g.*, *Ramiro Aviles*, 380 F. Supp. 3d at 296 ("individual fiduciary breach claims based on [plausible fraud] allegations, then, are timely"); *Valentini*, 837 F. Supp. 2d at 326 (applying fraud limitations period to fiduciary claim that defendant made "various omissions and misstatements"); *Brown Media Corp. v. K & L Gates, LLP*, 586 B.R. 508, 526 (E.D.N.Y. 2018) (failure to disclose was "core of Plaintiffs' breach of fiduciary duty claim" which was therefore subject to fraud limitations period).

Plaintiffs diligently engaged in a worldwide legal battle to understand the scope of the fraud. *Id.* ¶¶ 2-11. The § 1782 proceedings in this Court, an attempt to obtain documents for use in litigation against Bouvier in foreign jurisdictions, unexpectedly uncovered Sotheby's participation. *Id.* ¶ 16. Before then, Plaintiffs so trusted Sotheby's that they consigned Rodin's *L'Eternel Printemps* for Sotheby's May 2016 auction. *Id.* ¶ 11.

Because Plaintiffs neither knew nor had reason to know of Sotheby's role in Bouvier's fraud before November 2016, the two-year discovery period started from that date. In *Sabourin v. Chodos,* the court applied CPLR 213(8) to deny defendant Chodos's motion for summary judgment because, even though plaintiff knew of the fraud by an investor in his company in 2008, he only learned of the misconduct of Chodos (the investor's attorney) through discovery in a 2013-14 arbitration. 129 N.Y.S.3d 669, 678 (Sup. Ct. N.Y. Cnty. 2020). The court denied the time-bar motion because, before discovery in the arbitration, plaintiff could not have pled a fraud claim against Chodos with particularity sufficient "to satisfy" the state equivalent of Fed. R. Civ. P. 9(b). The First Department affirmed. 194 A.D.3d 660, 661 (1st Dep't 2021) (*"Sabourin II"*).

Before Sotheby's produced documents in November 2016, Plaintiffs were not "possessed of knowledge of facts from which [Sotheby's aiding and abetting] could be reasonably inferred." *Erbe v. Lincoln Rochester Tr. Co.*, 3 N.Y.2d 321, 326 (1957). "[K]nowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute." *Id.*; *see also Graham v. HSBC Mortg. Corp.*, No. 18 Civ. 4196, 2019 WL 3066399, at *3 (S.D.N.Y. July 12, 2019) ("A claim based on fraud accrues as soon as the claim becomes enforceable, i.e., when all elements of the tort can be truthfully alleged in a complaint," and the "discovery rule postpones the accrual of a cause of action from the time when the tort is complete to the time when the plaintiff has discovered sufficient facts to make him aware that he has a cause of action");

*Phoenix Light SF Ltd. v. Ace Sec. Corp.*, 975 N.Y.S.2d 369, *5 (Sup. Ct. N.Y. Cnty. 2013) ("[T]he statute of limitations does not begin to run until plaintiff is on notice of every element of the claim, which, in the case of fraud, includes scienter."); Fed. R. Civ. P. 11(b)(3) (factual contentions in a pleading must "have evidentiary support").

Plaintiffs' October 2018 complaint was timely because it was filed less than two years after the earliest date Plaintiffs could reasonably have been on notice of Sotheby's "actual knowledge" and "substantial assistance," and more than a year before Plaintiffs' claims were tolled under the parties' agreement. 2d DJK Decl. ¶¶ 15-18.

**Equitable Estoppel.** Regardless of whether CPLR 214(4) or 213(8) applies, both of Plaintiffs' claims are also timely under the doctrine of equitable estoppel. *See City of Almaty v. Sater*, 503 F.Supp.3d 51, 66-67 (S.D.N.Y. 2020); *Simcuski v. Saeli,* 44 N.Y.2d 442, 448-49 (1978). Sotheby's is estopped because it engaged in "distinct acts designed to conceal [its] prior wrongdoing." *City of Almaty,* 503 F.Supp.3d at 66. Sotheby's colluded with Bouvier to provide valuations to Plaintiffs that aligned with the fraudulently inflated prices Bouvier charged Plaintiffs for five works, as late as January 2015. P. 56.1 Resp. ¶¶ 295-343. In March 2015, it accelerated millions in payments to Bouvier for the Red Toulouse-Lautrec despite knowing the Work was involved in the fraud. *Id.* ¶¶ 473-82. Throughout the rest of 2015, Sotheby's thwarted Plaintiffs' efforts to obtain the remaining Lautrec funds and to learn more about the fraud, including Sotheby's role. 2d DJK Decl. ¶¶ 7-11.

In a July 6, 2015 letter from Sotheby's counsel Arnold & Porter to Plaintiffs' counsel, for example, Sotheby's said it "wishes to co-operate with you in assisting with your enquiries," but went on to falsely state that: "Neither Sam Valette nor others at Sotheby's had any reason to believe that the Painting either was not owned by the Consignor [Bouvier], or that the Consignor

did not have authority to transact, and also had no understanding that your clients claim that they have an interest in the Painting. There was, therefore, no reason to contact your clients, ***and indeed they were entirely unknown to Sotheby's*** . . . .  Sotheby's is an innocent third-party caught up in the dispute between your clients and Mr. Bouvier." *Id.* ¶ 9 & Ex. 370 (emphasis added). Discovery has proven these statements were lies: Valette was Rybolovlev's KCM, knew Rybolovlev was Bouvier's "client," and knew Bouvier was re-selling Rybolovlev's works including the Lautrec. P. 56.1 Resp. ¶¶ 257, 219, 399-401. Nor, despite professing a "wish[ ] to co-operate," did Sotheby's co-operate or voluntarily produce any of its documents, claiming it was bound by confidentiality with Bouvier. 2d DJK Decl. ¶¶ 9-11 & Ex. 370.

Sotheby's made similar false statements to the Klimt sellers in March 2016, claiming it had no knowledge the painting was sold to Rybolovlev, *id.* Ex. 381, even though Valette saw him at the 2012 viewing, P. 56.1 Resp. ¶ 238, and Sotheby's 2013 investigation into Bouvier included Rybolovlev, *id.* ¶ 249. Sotheby's kept up this pretense in November 2016 when it sued the Da Vinci sellers and falsely alleged that Rybolovlev was unknown to Valette. 2d DJK Decl. Ex. 382 ¶ 34.

In *City of Almaty*, the court found similar allegations sufficient for equitable estoppel, emphasizing: (1) "the manner in which [defendant] conducted the transactions," (2) a settlement agreement between defendant and a third party which helped keep the misconduct concealed, and (3) that defendant had been "in communication with [plaintiffs'] investigatory firm" for years, but had "actively concealed his role" in the scheme. 503 F. Supp. 3d at 67-68.

Under these circumstances, "the statute of limitations is tolled until [Plaintiffs] either acquire[] actual knowledge of the facts that comprise [their] cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of

30

sufficient facts to out [them] on notice." *Glynwell Invs, N.V. v. Prudential Sec. Inc.*, No. 92 Civ. 9267, 1995 WL 362500, at *3 (S.D.N.Y. June 16, 1995). That was not until November 2016; this case was timely filed in October 2018, less than two years later. 2d DJK Decl. ¶¶ 16-18.

**Disputed Fact Questions.** If Sotheby's disputes November 2016 or denies its concealing of the fraud, that would create disputed questions of fact for the jury. *E.g., Sabourin II,* 194 A.D.3d at 661 (reversing summary judgment because whether "plaintiffs were in possession of facts that would have triggered inquiry notice" was a disputed fact for trial); *Saphir Int'l, SA v. UBS PaineWebber Inc.*, 25 A.D.3d 315, 316 (1st Dep't 2006) (same).

### C.    Defendants Are Liable for the Wrongful Acts of Their Agents

Defendants[5] are responsible for the misconduct of their agents, Valette and his colleagues, because they "manifest[ed]" their consent to have Valette "act on [their] behalf and subject to [their] control." *N.Y. Marine & Gen. Ins. Co. v. Tradeline, (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001). Defendants "maintain[ed] control over key aspects of the undertaking" in fact, not just on paper, for the relevant dealings. *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 453-54 (S.D.N.Y. 2015).

#### 1.    Defendants Directed Valette's Dealings with Bouvier.

At all relevant times, Sotheby's corporate leadership in New York oversaw and directed the relationship with Bouvier who—thanks to the fraud—was a "very important client" for the global conglomerate. P. 56.1 Resp. ¶¶ 432-39. Sotheby's CEO William Ruprecht and Sotheby's COO Bruno Vinciguerra approved the terms of the Bouvier transactions and directed Valette's

---

[5] Defendant Sotheby's is a Delaware corporation and is the ultimate corporate parent of all Sotheby's entities. It wholly owns Defendant Sotheby's, Inc., a New York corporation that owns all the relevant foreign auction entities. P. 56.1 Resp. ¶¶ 1-8. Because the corporate leadership is the same for the two U.S. entities (Ruprecht Tr. 11:2-12:20) and there is no relevant distinction between the U.S. entities for the agency analysis, Defendants are referred to collectively as "Sotheby's" or "the parent."

negotiation of them (regardless of which Sotheby's entity was the contractual counterparty). *Id.*
¶¶ 21, 23, 28-29, 34-35, 66, 82-83, 105, 112, 114, 125-26, 133, 146-47, 150, 203; *see also id.* ¶¶
9-10. COO Vinciguerra repeatedly met with Bouvier's associate Peretti to foster their
relationship with Sotheby's. Vinciguerra 162:2-164:16, 331:18-332:25, 343:14-344:10.
Sotheby's Global Head of Compliance supposedly "investigated" Bouvier—with authorization
from Vinciguerra—and rubberstamped Valette's continued dealings with Bouvier. P. 56.1 Resp.
¶ 420, 424. Ruprecht "[led] the negotiation" and "quarterback[ed]" one of the largest Bouvier
transactions, *id.* ¶ 133, and personally approved granting Bouvier a "confidential client account"
that would shield his transactions from other Sotheby's employees, *id.* ¶¶ 112, 133, 382. Even
when Valette catered to Bouvier's secrecy demands and excluded the local subsidiary's
employees, Sotheby's CEO and COO were still controlling the deals. *E.g. id.* ¶¶ 133, 112
(CEO's approval required to "erase[]" this deal from Sotheby's records and make Bouvier's
account "anonymous").

Contrary to the position it takes here, Sotheby's declaratory judgment action against the
Da Vinci sellers described Valette as *its* agent. "Sotheby's" (defined as Sotheby's Inc., the New
York entity) claimed Valette was "*Sotheby's London-based* Vice Chairman of Private Sales
Worldwide," not an agent of Sotheby's UK. 2d DJK Decl. Ex. 382 ¶ 25. And, while Sotheby's
now argues that the Delaware and New York entities did not "provide *any* of the five insurance
valuations at issue" in this case, Def. Br. at 14, in the Da Vinci suit, Sotheby's New York—not
Sotheby's UK—alleged it "provided Bouvier with an insurance valuation for the *Salvator
Mundi*." 2d DJK Decl. Ex. 382 ¶ 51.

### 2.    Defendants Controlled the Terms of *All* Bouvier Transactions.

*Every single transaction* relating to the Works was individually approved by Defendants'
High Value Lot Committee. P. 56.1 Resp. ¶¶ 29, 34-35, 66, 82-83, 105, 112, 114, 125-26, 133,

146-47, 150. This approval included the terms of sale, compensation for Sotheby's, and compensation for Valette and other Sotheby's employees. *Id.* "Incentive structures that reward the agent for achieving results affect the agent's actions. In an organization, assigning a specified function with a functionally descriptive title to a person tends to control activity because it manifests what types of activity are approved by the principal to all who know of the function and title, including their holder." Restatement (Third) of Agency § 1.01 cmt. f(1) (2006). Sotheby's global CEO and COO appointed Valette the "Worldwide" Vice Chairman for Private Sales in Impressionist & Modern Art and increased Valette's compensation as a reward for the Bouvier relationship. P. 56.1 Resp. ¶ 23.

Unlike the cases cited by Sotheby's, here the parent's C-suite executives oversaw the details of the relationship with Bouvier, supervised the negotiations with him and the sellers, and signed off on the essential terms and any discounts offered by Valette. Valette and Sotheby's subsidiaries lacked "discretion" to enter into these massive transactions "on [their] own initiative," so the requisite control exists. *Veleron Holding*, 117 F. Supp. 3d at 454.

### 3. Valette Had Authority to Alter Legal Relations and Signed the Contracts with Bouvier.

Another hallmark of Valette's agency is his authority to alter legal relations between Sotheby's and third parties. Valette signed all but one of the sales contracts for the Works, regardless of which entity was the contracting party. P. 56.1 Resp. ¶¶ 35, 49, 66, 83, 105, 114, 126, 147, 150, 174. For example, after Valette expressed concern when the Green Toulouse-Lautrec contract was switched from UK to Switzerland letterhead, saying "this would raise questions for the buyer," the contract was switched back to UK letterhead. *Id.* ¶ 150.

Valette was the "public face" of Sotheby's to Bouvier and Plaintiffs, with Sotheby's knowing consent, and maintained the "primary client relationship" with Bouvier, even as

Sotheby's "exercised ultimate control over the business." *Supreme Showroom Inc. v. Branded Apparel Grp. LLC*, No. 16 Civ. 5211, 2018 WL 3148357, at *10 (S.D.N.Y. June 27, 2018).

Regardless, Valette's ability to "alter legal relations between" Sotheby's and Bouvier is also only one factor in the agency analysis and is not dispositive. *See Mouawad Nat. Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 423 (S.D.N.Y. 2007); *see also Supreme Showroom*, 2018 WL 3148357, at *9 ("the power to bind a principal is not the *sine qua non* of an agency relationship"); Restatement (Third) of Agency § 1.01 (2006) cmt. c ("Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf.").

Valette's role as agent is at least a fact question that "must be resolved at trial." *In re JVJ Pharmacy Inc.*, 630 B.R. 388, 407 (S.D.N.Y. 2021). Because Sotheby's cannot show that "the facts are insufficient to support a finding of agency," it cannot win summary judgment on this issue. *Cabrera v. Jakabovitz*, 24 F.3d 372, 386 (2d Cir. 1994); *see also Slotkin v. Citizens Cas. Co. of New York*, 614 F.2d 301, 317 (2d Cir. 1979) ("The jury should have been allowed to resolve the fact questions" about agency).[6]

## CONCLUSION

Plaintiff's motion for partial summary judgment should be granted, and Defendants' motion for summary judgment should be denied. "The time has come to borrow William of Occam's Razor," *Chaufffers, Teamsters & Helpers Loc. No. 391 v. Terry*, 494 U.S. 558, 575 (1990) (Brennan, J., concurring), and give a jury the opportunity to choose "the simple and obvious explanation" of all the evidence. *Brown v. Vanie*, 637 F.2d 272, 281-82 (5th Cir. 1981).

---

[6] Plaintiffs do not argue veil-piercing, so Sotheby's arguments on that issue are irrelevant.

Dated: New York, New York
       May 26, 2022

Respectfully submitted,

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By:  /s/ Daniel J. Kornstein
        Daniel J. Kornstein

600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiffs*

_