UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                          :

ACCENT DELIGHT INTERNATIONAL LTD. et al.,     :

                             Plaintiffs,        :

                                                         :               18-CV-9011 (JMF)

                 -v-                            :

                                                         :       <u>OPINION AND ORDER</u>

SOTHEBY'S et al.,                            :

                                               :

                             Defendants.      :

------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

         Between 2002 and 2014, Plaintiffs in this case — Accent Delight International Ltd. and

Xitrans Finance Ltd. — and their principal, Dmitry Rybolovlev, spent approximately $2 billion

dollars to acquire a world-class art collection, comprised of masterpieces by the likes of

Leonardo da Vinci, Henri de Toulouse-Lautrec, Henri Matisse, and other greats.  At some point

thereafter, they discovered that Yves Bouvier, an art broker who assisted in acquiring the works,

had cheated them by buying the works himself for one price and charging them another price —

millions or tens of millions of dollars higher.  That discovery has spawned litigation around the

world, mostly between Plaintiffs (or their principal) and Bouvier, but some involving others.

This case is in the latter category.  Plaintiffs sue Sotheby's and Sotheby's, Inc. (together,

"Sotheby's"), alleging that the auction house aided and abetted Bouvier in committing fraud and

breaching his fiduciary duties.  In particular, they contend that Sotheby's provided substantial

assistance to Bouvier in connection with their acquisition of fifteen works of art for which they

paid in excess of $1 billion — hundreds of millions more than Bouvier had paid.

Now pending are several motions.  First, Plaintiffs move to strike the entirety of a deposition of Bouvier taken in Switzerland pursuant to letters rogatory.  ECF No. 491 ("Pls.' Mot. to Strike Mem.").  Second, Sotheby's moves for summary judgment with respect to all of Plaintiffs' claims.  ECF No. 435; *see* ECF No. 438 ("Defs.' MSJ Mem.").  Third, Plaintiffs cross-move for partial summary judgment on two underlying issues: that Bouvier defrauded them and that he breached his fiduciary duties to them.  ECF No. 413; *see* ECF No. 414 ("Pls.' MSJ Mem."), at 2.  And finally, each side moves to exclude certain testimony from the other side's expert witnesses.  *See* ECF Nos. 370 (Guy Stair Sainty), 372 (Robert Wittman), 395 (William H. Smith).[1]  For the reasons that follow, Plaintiffs' motion to strike is largely DENIED; Sotheby's motion for summary judgment is GRANTED in part and DENIED in part; Plaintiffs' motion for partial summary judgment is DENIED; Sotheby's motion to preclude the testimony of Robert Wittman is GRANTED in part and DENIED in part; Sotheby's motion to preclude in part the testimony of Guy Stair Santy is GRANTED; and Plaintiffs' motion to preclude in part the testimony of William H. Smith is DENIED.  The net result is that the claims for aiding and abetting Bouvier's breach of fiduciary duty are dismissed as to all transactions except one, and the claims for aiding and abetting Bouvier's fraud survive as to five transactions.

## PLAINTIFF'S MOTION TO STRIKE

The Court begins with Plaintiffs' motion to strike Bouvier's deposition testimony because it bears on what evidence the Court may consider in connection with the parties' other motions.  Plaintiffs move to strike Bouvier's oral deposition testimony, which was taken in Switzerland pursuant to letters rogatory, on two grounds.  Pls.' Mot. to Strike Mem. 1; *see also*

---

[1]     Additionally, as noted below, the parties move to seal or redact various documents that were filed in connection with these motions.

ECF No. 492-1 ("Bouvier Tr."), at 1.  First, they argue that Bouvier's oral testimony is inadmissible because he relied on pre-written answers while testifying.  *See* Pls.' Mot. to Strike Mem. 1-3.  Second, they contend that his oral testimony is inadmissible because he selectively invoked his privilege against self-incrimination and thus deprived Plaintiffs of a meaningful opportunity for cross-examination.  *See id.* at 3-5.[2]  The Court will address each of these arguments in turn.

Under Rule 28 of the Federal Rules of Civil Procedure, depositions may be taken in a foreign country pursuant to a letter of request.  Fed. R. Civ. P. 28(b)(1)(B).  The Rule provides that "[e]vidence obtained in response to a letter of request need not be excluded merely because it is not a verbatim transcript, because the testimony was not taken under oath, or because of any similar departure from the requirements for depositions taken within the United States."  Fed. R. Civ. P. 28(b)(4).  Applying this Rule, the Second Circuit held in *United States v. Salim*, 855 F.2d 944, 946-48 (2d Cir. 1988), that a deposition taken in France under French law was admissible at trial in a criminal case even though counsel for both the government and the defense had submitted their questions for the witness in advance and were not present while a judge asked the witness the questions.  The Circuit noted that depositions taken pursuant to letters rogatory will be admissible "unless the manner of examination required by the law of the host nation is so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable."  *Id.* at 953.  Thus, deposition testimony taken

---

[2]      Plaintiffs also move to strike written answers Bouvier submitted in connection with his deposition.  *See* Pls.' Mot. to Strike Mem. 1; *see also* ECF No. 492-2 ("Bouvier Answers").  But as Sotheby's notes, neither party relies on the written answers in their summary judgment briefing.  ECF No. 500 ("Defs.' Mot. to Strike Opp'n"), at 3.  Accordingly, that portion of Plaintiffs' motion is denied without prejudice to renewal by way of a motion *in limine* if Sotheby's seeks to offer the written answers as evidence at trial.  *See, e.g.*, *Avila v. Target Corp.*, No. 21-CV-907 (PKC), 2022 WL 14059076, at *2 (E.D.N.Y. Oct. 24, 2022).

pursuant to letters rogatory may be admissible even where it takes the form of written testimony — or is functionally converted to a "deposition based on written questions." *Id.* at 951; *see also FTC v. Qualcomm Inc.*, No. 17-CV-220, 2018 WL 6575550, at *3 (N.D. Cal. Dec. 12, 2018).

In light of Rule 28(b)(4), Bouvier's deposition is not automatically excludable because the parties submitted written questions in advance and Bouvier prepared written answers to aid his testimony.  In addition, Bouvier's reliance on his written answers throughout his deposition does not render his testimony "so prone to inaccuracy or bias," *Salim*, 855 F.2d at 953, as to warrant exclusion.  Notably, at depositions taken in the United States, courts routinely allow witnesses "to rely on notes or documents" as long as they "demonstrate[] an independent recollection and the testimony is of a detailed nature." *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.,* 689 F. Supp. 2d 585, 594-95 (S.D.N.Y. 2010) (citing *United States v. Rinke,* 778 F.2d 581, 588 (10th Cir. 1985)), *amended on reconsideration* (Mar. 23, 2010). Bouvier's testimony was sufficiently detailed to meet this standard: He consulted his notes when confirming prices of artworks and the dates on which he purchased them, *e.g.*, Bouvier Tr. 130-31, 156, 217, 236-37, and to confirm other details, *e.g.*, *id.* at 99 (whether he sent supporting documentation to Plaintiffs for a particular work); *id.* at 140 (whether he discussed the subject line of a particular email with someone).  Bouvier also demonstrated an independent recollection of the events in question.  Indeed, he answered several sets of follow-up questions from Plaintiffs' lawyers.  *See, e.g.*, *id.* at 196-97, 278-79, 312-13, 328-30.  In these ways, the deposition comported with "our fundamental principles of fairness" and reliability even though it did not precisely follow American procedures.  *Salim*, 855 F.2d at 953.

Additionally, Plaintiffs were not wholly denied reasonable opportunities for cross examination, a critical factor in assessing the deposition's fairness and accuracy.  *See, e.g.*, *New*

*Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*, No. 99-CV-2436 (DLC), 1999 WL 820560, at *2 (S.D.N.Y. Oct. 13, 1999).  In *Salim*, defense counsel provided an initial set of cross-examination questions and, after the witness provided testimony, submitted additional questions.  855 F.2d at 947-48.  The Circuit held that, despite the "lack of spontaneity inherent in a deposition on written questions," cross-examination was not rendered impossible because the attorney had "ample opportunity to pose new questions to the witness."  *Id.* at 954.  So too here. Plaintiffs submitted written cross-examination questions with the letters of request, *see* ECF No. 505, at 2, and had the opportunity to ask follow-up questions during the two-day deposition, *see, e.g.*, Bouvier Tr. 196-97, 278-79, 312-13, 328-30.  Although Bouvier did invoke his privilege against self-incrimination at certain points throughout the deposition, *see, e.g., id.* at 288-92, he answered many of Plaintiffs' written and verbal questions.  Accordingly, Plaintiffs did not wholly lack a meaningful opportunity to cross-examine Bouvier and are thus not entitled to the "extreme sanction" of striking the deposition in its entirety.  *Hall v. Briggs*, 216 F.3d 1072, 2000 WL 766434, at *1 (2d Cir. 2000) (summary order); *cf. CFPB v. Access Funding, LLC*, No. 16-CV-3759, 2021 WL 2915118, at *21 (D. Md. July 12, 2021) (striking deposition testimony where the deposition ended during the middle of the defense counsel's cross-examination and the plaintiffs failed to re-subpoena the witness, "frustrat[ing] the purpose of cross-examination"); *Antonucci v. Morgan Stanley Dean Witter & Co.*, No. 02-CV-5246 (GBD), 2005 WL 627556, at *5-7 (S.D.N.Y. Jan. 11, 2005), *adopted*, 2005 WL 5300159 (S.D.N.Y. May 23, 2005) (striking deposition testimony where the defendants lacked necessary documents prior to the deposition due to the plaintiff's delays).

That said, Bouvier's selective invocation of the privilege against self-incrimination raises the question of whether portions of his deposition testimony should be stricken.  *See, e.g.*,

*Lawson v. Murray*, 837 F.2d 653, 656 (4th Cir. 1988) ("Even when the witness refuses to answer questions relevant to matters at issue, striking only portions of the testimony may be the more reasonable remedy . . . .").  Indeed, Plaintiffs do not — and could not — contend that they were altogether denied the opportunity to cross-examine Bouvier.  Instead, they identify four discrete topics on which Bouvier invoked the privilege: (1) questions regarding misrepresentations of the prices he charged Plaintiffs and, relatedly, the "due diligence" services he claimed he provided, *see* Pls.' Mot. to Strike Mem. 3; (2) questions regarding his relationship with Sotheby's, *see id.* at 4; (3) questions regarding his relationship with an associate named Jean-Marc Peretti, *see id.*; and (4) questions regarding his involvement with Plaintiffs prior to the art transactions at issue in this case, *see id.* at 3-4.  The Court will address each topic in turn, assessing whether Bouvier's assertion of the privilege on the topic materially "preclude[ed]  inquiry into the details of his direct testimony" such that Plaintiffs were "deprived of the right to test the truth of his direct testimony." *United States v. Brooks*, 82 F.3d 50, 54 (2d Cir. 1996); *see, e.g.*, *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 640-41 (9th Cir. 2012) (applying the same standard in the civil context).

The Court concludes that that standard is not met with respect to the first three topics flagged by Plaintiffs.  As to the first topic, although Bouvier did assert his right to silence for questions not directly related to Sotheby's, Bouvier Tr. 325-27, he answered extensive questions, including from Plaintiffs, regarding the "due diligence" he allegedly provided, *see, e.g.*, *id.* at 198-99, 323-24.  He did not, therefore, refuse to answer all cross-examination questions probing the veracity of his testimony regarding due diligence.  As to the second topic, although Bouvier did initially state that he would refuse to answer questions from Plaintiffs regarding any agreements he had with Sotheby's in connection to the dispute with Rybolovlev, *see id.* at 67-68,

he went on to answer the question, *id.* at 68.  Thus, Plaintiffs have no basis to argue that they were denied a meaningful opportunity to cross-examine Bouvier on the topic.  As to the third topic, although Bouvier refused to answer some questions regarding the compensation he paid Peretti in connection with the works at issue in this case, *see id.* at 318-19, 320, he did describe his working relationship with Peretti, *see id.* at 315-18, 320, 321, and answered follow-up questions from Plaintiffs regarding Peretti, *see id.* at 321.  Moreover, Bouvier's relationship with Peretti is not central to the issues in this case.  Accordingly, the Court declines to strike Bouvier's testimony on the first three topics that Plaintiffs flag in their motion.

By contrast, the Court concludes that a portion of Bouvier's testimony as to the last topic — regarding his involvement with Plaintiffs prior to the transactions at issue in this case — should be stricken.  In response to questions posed by the tribunal, Bouvier testified that he and Plaintiffs entered into written sales contracts for four art acquisitions — Van Gogh's *Paysage avec un Olivier*, Picasso's *Les Noces de Pierrette*, Modigliani's *Nu Couché aux Bras Levés*, and Picasso's *Mousquetaire à la Pipe* — and that all later transactions "arose from the framework contract of the first transaction."  *Id.* at 23-25.  But he then refused to answer almost every question relating to the acquisition of those four works.  *E.g.*, *id.* at 288-92, 301.  It is true that Sotheby's was not involved in these four transactions.  *See* Defs.' Mot. to Strike Opp'n 4.  But the transactions are relevant to Plaintiffs' claims regarding Bouvier's alleged breach of fiduciary duty.  And indeed, in opposition to Plaintiffs' motion for partial summary judgment, Sotheby's argues that these four sales contracts show that Bouvier was not Plaintiffs' agent, but rather an arms-length dealer and therefore did not owe a fiduciary duty to Plaintiffs.  Defs.' MSJ Mem. 27. Bouvier's invocation of his right to silence in response to critical questions with respect to these four transactions thus "preclude[d] inquiry into the details of his direct testimony" on a matter at

the heart of this litigation.  *Brooks*, 82 F.3d at 54.  Accordingly, Bouvier's direct testimony regarding these four initial purchases must be and is stricken.[3]

To the extent that Plaintiffs seek to strike other Bouvier testimony regarding the period before the transactions at issue in this case, the motion is denied.  Bouvier testified that he first met Rybolovlev in 2002 in connection with the purchase of a Chagall painting; Bouvier conducted the "factoring" for the owners.  Bouvier Tr. 20-21.  When Plaintiffs' counsel asked later what Bouvier meant by "factoring," he invoked his right to silence but then appeared to waive that invocation by stating that his company acted as an "escrow-agent" for the sellers.  *Id.* at 69-70.  In other words, Bouvier did not actually refuse to answer questions regarding this first meeting with Rybolovlev, so there is no basis to strike his testimony on the subject.  Bouvier also refused to answer questions regarding other pre-Sotheby's transactions.  *See, e.g.*, *id.* at 292-97, 301-04.  But Plaintiffs do not identify any portion of the deposition transcript in which he did answer questions about these transactions, so his refusal to answer did not materially affect Plaintiffs' "right to test the truth of his direct testimony."  *Brooks*, 82 F.3d at 54.

In short, Plaintiffs' motion to strike Bouvier's deposition testimony is denied with one narrow exception: The Court strikes the portions of Bouvier's deposition that address the four early purchases involving written sales contracts.

---

[3]     To be clear, the Court does *not* strike the following testimony from page 81 of the deposition transcript: "Q: So in this transaction [*Les Noces de Pierrette*], did you act as an agent? A: "No, I have never acted as an agent in any of the transactions."  Bouvier Tr. 81.  Plaintiffs include this in their description of Bouvier's testimony about the four initial transactions, Pls.' Mot. to Strike Mem. 4, but Bouvier's answer goes beyond these transactions.  His invocation of his right to silence with respect to the first four transactions did not preclude Plaintiffs from questioning him about his relationship with Plaintiffs more broadly.

## FACTUAL BACKGROUND

With that, the Court turns to the relevant background.  The following facts, taken from admissible materials submitted in connection with the pending motions, are either undisputed or viewed in the light most favorable to the non-moving parties.  *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

### A.  The Cast of Characters

Plaintiffs are two companies owned by a trust settled for the benefit of Rybolovlev's family.  ECF No. 444 ("Pls.' SOF"), ¶ 4.[4]  Rybolovlev, a Russian billionaire, bought and sold artwork on behalf of Plaintiffs.  *Id.*; ECF No. 465, ¶ 62.  He worked closely with his business associate, Mikhail Sazonov, who managed Plaintiffs' finances and investments.  Pls.' SOF ¶ 2.  In 2002, Rybolovlev met Bouvier, an art dealer and the owner of an art shipping company, through Tania Rappo, Rybolovlev's close friend.  Pls.' SOF ¶¶ 7-8; Bouvier Tr. 20.  For the next twelve years, Plaintiffs worked with Bouvier to purchase world-class works of art.  Pls.' SOF ¶ 14; ECF No. 416 ("Sazonov Decl."), ¶ 17.  As part of his art business, Bouvier operated through two distinct entities, Blancaflor Investments Ltd. ("Blancaflor") and Mei Invest Ltd. ("Mei"), and worked with Peretti to source deals.  *See* ECF No. 481 ("Pls.' Counter SOF"), ¶ 216; Bouvier Tr. 73, 142; Sazonov Decl. ¶¶ 63, 100.

Defendants are Sotheby's, a Delaware corporation, and Sotheby's Inc., a wholly owned subsidiary of Sotheby's.  ECF No. 470 ("Defs.' SOF"), ¶¶ 1-3.  Other relevant entities — though not Defendants here — include Sotheby's English subsidiary, Sotheby's UK; its Austrian

---

[4]      ECF No. 444 and other documents cited in this Opinion and Order are currently filed under seal.  As discussed below, the Court reserves judgment on whether or to what extent these documents should be unsealed pending further submissions from the parties.

subsidiary, Sotheby's Kunstauktionen GmbH ("Sotheby's Austria"); and its Swiss subsidiary, Sotheby's AG ("Sotheby's Switzerland").  *Id.* ¶¶ 4, 7, 8.  Bouvier frequently worked with these Sotheby's entities to buy and sell art, conducting over eight hundred transactions with Sotheby's entities between 2005 and 2015.  ECF No. 481 ("Pls.' Counter SOF"), ¶ 433; ECF No. 294-6.

Several Sotheby's employees were involved in the art sales at issue in this case.  Most important among them is Samuel Valette, who currently works out of Sotheby's UK as the Senior Director and Vice Chairman of Private Sales Worldwide for the Impressionist and Modern Art Department.  ECF No. 459, ¶ 2.  In 2007, Sotheby's assigned Valette to be Bouvier's Key Client Manager ("KCM").  Pls.' Counter SOF ¶ 254.  The general responsibilities of a KCM are to "help [the client] navigate through the different divisions of Sotheby's" and to serve as the client's point person across Sotheby's offices worldwide.  ECF No. 468-1 ("Vinciguerra Tr."), at 38-40.  Around the same time, Valette also became Peretti's KCM.  Pls.' Counter SOF ¶ 254.  In 2012, Valette became the KCM for Plaintiffs' principal, Rybolovlev, *id.* ¶ 257, although Valette admits that he did "exactly nothing" to cultivate Rybolovlev's business, *id.* ¶¶ 267-70; ECF No. 468-6 ("Valette Tr."), at 64-65.

## B.  The Scheme and the Aftermath

Plaintiffs allege that Bouvier perpetrated what is, at bottom, a fairly straightforward fraud.  They claim he lied to them about the prices of the works they purchased through him and about his supposed negotiations with sellers.  Pls.' MSJ Mem. 4-7.  Plaintiffs allege that, instead of negotiating and buying works on their behalf, Bouvier purchased masterpieces for one price and flipped them to Plaintiffs for as much as double the price.  *Id.*  Sotheby's, Plaintiffs claim, aided and abetted the scheme.  *Id.* at 1-2.  In Plaintiffs' telling, Sotheby's helped Bouvier acquire the works of art and assisted him in selling the pieces at inflated prices to Plaintiffs; Sotheby's

also auctioned two of Plaintiffs' works at Bouvier's request and provided Bouvier with valuations of five of Plaintiffs' works.  *Id.*; *see also id.* at 9.

Plaintiffs first discovered that Bouvier had charged significant, hidden markups on December 31, 2014, when an art advisor named Sandy Heller told Rybolovlev that the prior owner of a painting Plaintiffs had purchased had sold it for $24.5 million less than Plaintiffs had paid.  Pls.' SOF ¶¶ 56-57.  Beginning on January 9, 2015, Plaintiffs brought (or joined) multiple civil and criminal proceedings against (or involving) Bouvier in various jurisdictions around the world, including Monaco, France, Singapore, and Switzerland.  ECF No. 238 ("SAC"), ¶¶ 20, 22-23; *see also* ECF No. 468 ("Kornstein Decl."), ¶¶ 3, 5.  On March 25, 2016, Plaintiffs filed a petition with this Court under 28 U.S.C. § 1782 to obtain documents from Sotheby's related to the transactions with Bouvier.  Kornstein Decl. ¶ 12; *see also In re Accent Delight Int'l Ltd.*, No. 16-MC-125 (JMF), 2016 WL 5818597 (S.D.N.Y. Oct. 5, 2016) (granting Plaintiffs discovery from Sotheby's), *aff'd*, 869 F.3d 121 (2d Cir. 2017).  Sotheby's produced documents to Plaintiffs on November 17, 2016; a month later, on December 16, 2016, Plaintiffs entered into a tolling agreement with Sotheby's, which provided that the next year and ten days would "not be included in determining the applicability of any statute of limitations."  Kornstein Decl. ¶¶ 15, 17.  Plaintiffs filed the instant case on October 2, 2018.  ECF No. 1.

## C.  The Art

At issue in this case are sixteen transactions, conducted between April 2011 and January 2015, that Plaintiffs allege involved Sotheby's: twelve works of art that Plaintiffs purchased from a company owned by Bouvier, the sales of which Sotheby's or a subsidiary allegedly facilitated; two additional works of art for which Sotheby's UK provided valuations; and two works of art that Plaintiffs auctioned through Sotheby's or a subsidiary.  Defs.' SOF ¶¶ 30-31.  The sales

were all private treaty sales that were approved by Sotheby's then-CEO William Ruprecht, its Compliance Department, and its High Value Lot ("HVL") Committee, which was comprised of its General Counsel, Head of Compliance, and Head of Restitution. *See id.* ¶¶ 28-29. The details of each transaction are important in evaluating the parties' motions. Accordingly, the Court will summarize each transaction in chronological order.

### 1. Picasso's *Homme Assis au Verre*

In March 2011, Sotheby's began brokering the sale of Picasso's *Homme Assis au Verre* to Bouvier. On three separate occasions, Valette emailed descriptions of the Picasso to Bouvier and/or Peretti. ECF Nos. 468-28, 468-29, 468-316. On March 23, 2011, Sotheby's employee Melanie Clore emailed then-CEO William Ruprecht to let him know that Sotheby's had an interested buyer for the painting, who had "sent his advisor to see it with Sam Valette." Pls.' Counter SOF ¶ 224 (cleaned up). Eight days later, the seller of the Picasso executed a consignment agreement with Sotheby's Switzerland. Defs.' SOF ¶ 34. That same day, Valette asked two other Sotheby's employees to draft a purchase agreement for the painting. ECF No. 468-225. As this was happening, Bouvier emailed Sazonov that he was "in negotiations" with the seller, starting at $150 million; several hours later, he "confirmed" that he had gotten the seller down to $107.5 million and asked for Sazonov's final okay. ECF Nos. 416-18, 416-12. But these negotiations never happened. Pls.' SOF ¶ 35. The very next day, on April 1, 2011, Blancaflor executed an agreement, countersigned by Valette, purchasing the Picasso for $62 million. Defs.' SOF ¶ 35 *see* ECF No. 468-30. Later that day, Mei invoiced Plaintiffs $107.5 million for the same work. Defs.' SOF ¶ 36.

### 2. Maillol's *La Méditerranée*

Sotheby's, Inc. executed a consignment agreement with the seller of Maillol's *La Méditerranée* on December 16, 2010. *Id.* ¶ 44. In February 2011, Valette emailed a few other Sotheby's employees to let them know that Peretti's "Russian client [i]s in NY next week and is looking for large, colorful works"; in response, Valette's colleague suggested showing Peretti's client Maillol's *La Méditerranée*. Pls.' Counter SOF ¶ 223; *see* ECF No. 468-127. Then, in early April 2011, Valette emailed Bouvier three photographs of the sculpture. Defs.' SOF ¶ 47. Shortly thereafter, on April 12, 2011, Blancaflor executed a purchase agreement for the sculpture with Sotheby's, Inc. for €5.17 million. *Id.* ¶ 49; *see* ECF No. 468-38. The next day, Bouvier emailed Sazonov that he "got the Maillol at [€]8.4 [million]." ECF No. 416-23, at 26.[5] But Bouvier had not conducted any negotiations with the seller. Pls.' SOF ¶ 35. On April 15, 2011, Valette's assistant emailed Bouvier with a compilation of literature references, an exhibition catalog, and the provenance for the sculpture. Defs.' SOF ¶¶ 50, 52. That same day, Mei invoiced Plaintiffs €8.4 million for the sculpture. *Id.* ¶ 55.

### 3. Rodin's *Le Baiser*

Sotheby's, Inc. executed a consignment agreement with the seller of Rodin's *Le Baiser* on July 8, 2010. Defs.' SOF ¶ 43. In early April 2011, Valette emailed Peretti a description of the sculpture, literature references, and photographs. *Id.* ¶ 45. On April 9, 2011, Bouvier emailed Valette, writing "I am already seeing my friend tomorrow . . . . So that I have the maximum arguments, can you tell me where the other casts of *Le Baiser* are . . . ?" ECF No. 468-136. Three days later, Blancaflor executed a purchase agreement with Sotheby's, Inc. to

---

[5]     Citations to ECF No. 416-23 are to the page numbers automatically generated by the Court's Electronic Case Filing ("ECF") system.

buy the Rodin sculpture for €4.23 million.  Defs.' SOF ¶ 49; *see* ECF No. 468-37.  The very next day, Bouvier emailed Sazonov that, "[f]or the Rodin, I concluded at [€]7.5 [million]."  ECF No. 416-23, at 29.  But once again, Bouvier had not conducted any such negotiations with the seller. Pls.' SOF ¶ 35.  On April 15, 2011, Valette's assistant emailed Bouvier with another compilation of literature references on the work.  Defs.' SOF ¶ 53.  That same day, Mei invoiced Plaintiffs €7.5 million for the sculpture.  *Id.* ¶ 56.

### 4.  Matisse's *Nu au Châle Vert*

Bouvier began working to buy and sell Matisse's *Nu au Châle Vert* around February 2011.  On February 5, 2011, he told Sazonov that "the negotiation for the Matisse Nude is too difficult."  ECF No. 416-17.  But that was not the case; Bouvier was not negotiating at all with the seller.  Pls.' SOF ¶ 35.  A few months later, on June 14, 2011, the seller of the Matisse executed a consignment agreement with Sotheby's UK.  Defs.' SOF ¶ 61.

Two days later, on June 16, 2011, and then again on June 20, 2011, Valette emailed Bouvier the provenance, exhibition history, literature references, catalogs, and an Art Loss Register certificate for the painting.  *Id.* ¶¶ 62, 64.  On June 23, 2011, Bouvier informed Sazonov that he would send Plaintiffs an invoice for $85 million for the Matisse.  ECF No. 416-13.  On June 27, 2011, Blancaflor executed a purchase agreement for $60 million countersigned by Valette.  Defs.' SOF ¶ 66; *see* ECF No. 468-46.  Two days later, on June 29, 2011, Mei invoiced Plaintiffs $85 million for the painting.  Defs.' SOF ¶ 67.

In October 2014, Bouvier requested that Valette provide a valuation for the painting.  *Id.* ¶ 179.  On October 22, 2014, Sotheby's prepared a draft valuation of the painting, listing its insurance value at $80 million.  Pls.' Counter SOF ¶ 295.  Two days later, on October 24, 2014, Valette provided Bouvier with what was titled as an "Insurance Value" of $85 million for the

painting. *Id.* ¶ 296; *see* ECF No. 468-183, at 22-27.[6]  The valuation did not list the prior sale to Bouvier in the provenance.  Pls.' Counter SOF ¶ 298.

### 5. Rodin's *L'Éternel Printemps*

On June 16, 2011, and again on June 20 and 22, 2011, Valette emailed Bouvier with information about Rodin's *L'Éternel Printemps*, including its provenance, literature references, and photographs.  Defs.' SOF ¶¶ 74, 76, 78, 80.  Also on June 22, 2011, Bouvier told Sazonov that he was "beginning the negotiation with the owner" of the sculpture and that the asking price was £32 million.  ECF No. 416-14.  This negotiation never happened.  Pls.' SOF ¶ 35.

On July 1, 2011, the seller of the Rodin executed a consignment agreement with Sotheby's UK.  Defs.' SOF ¶ 82.  Less than a week later, on July 6, 2011, Blancaflor executed a purchase agreement for $13.2 million, countersigned by Valette.  *Id.* ¶ 83; *see* ECF No. 468-52. On July 25, 2011, Valette sent Bouvier another email with the provenance and literature references, as well as additional commentary on the sculpture.  Defs.' SOF ¶ 84.  On July 27, 2011, Mei invoiced Plaintiffs £30 million for the Rodin.  *Id.* ¶ 86.

### 6. Giacometti's *Femme de Venise IX*

On several occasions between September 12, 2011, and October 14, 2011, Valette emailed Peretti and Bouvier literature references and commentary on Giacometti's *Femme de Venise IX*, along with photographs of the sculpture.  Defs.' SOF ¶¶ 91, 93, 95, 97, 99, 103.  On October 10, 2011, Bouvier emailed Sazonov with the "[v]ery good news" that, "with great

---

[6]     Citations to ECF No. 468-183 are to the page numbers automatically generated by the Court's ECF system.

difficulty," he had negotiated a price of 45 million Swiss francs for the sculpture.  ECF No. 416-8.  This negotiation did not happen.  Pls.' SOF ¶ 35.

On October 12, 2011, the seller of the Giacometti and Sotheby's UK executed a consignment agreement for the work.  Defs.' SOF ¶ 101.  The next day, Mei invoiced Plaintiffs 45 million Swiss francs for the work.  *Id.* ¶ 102.  On November 8, 2011, Blancaflor executed a purchase agreement for only 26.1 million Swiss francs countersigned by Valette.  *Id.* ¶ 105; *see* ECF Nos. 468-63, 468-64, 468-370.

### 7.  Magritte's *Le Domaine d'Arnheim*

In 2009, Sotheby's had a draft valuation for Magritte's *Le Domaine d'Arnheim* of £1.2 million.  Pls.' Counter SOF ¶ 347.  Two years later, on November 10, 2011, Valette sent Bouvier an informal email letting him know that the owner was willing to sell the painting for $25 million.  *Id.* ¶ 348.  The next day, the seller of the Magritte executed a consignment agreement for the painting with Sotheby's UK.  Defs.' SOF ¶ 112.  On that very same day, Valette sent Bouvier a draft email, stating that a different Magritte, *L'Empire des Lumières*, would sell at auction for $40 to $60 million.  Pls.' Counter SOF ¶ 350.  A few hours later, Valette re-sent the email using a more formal tone — addressing Bouvier as "Monsieur Bouvier" instead of the usual "Yves."  *Id.* ¶ 350; *compare* ECF No. 459-79 *with* ECF No. 468-357.  Three days later, Valette emailed Bouvier again with a revised version of the November 11, 2011 email, stating that for a private sale, *L'Empire des Lumières* would likely sell for around €40 million.  Pls.' Counter SOF ¶ 351; *see* ECF No. 467-5.  Bouvier forwarded the email to Sazonov.  Pls.' Counter SOF ¶ 352.

A week later, Bouvier emailed Sazonov describing his purported negotiations with the seller; he stated that the seller was stuck at $50 million but that Bouvier had proposed $43.5

million and was waiting to hear back.  ECF No. 416-20.  These negotiations never happened.

Pls.' SOF ¶ 35.  A few days later, on November 25, 2011, Valette emailed his colleagues at

Sotheby's to let them know that the deal for the Magritte was done and that Blancaflor was the

buyer.  ECF No. 468-68.  On December 5, 2011, Mei invoiced Plaintiffs $43.5 million for the

painting.  Defs.' SOF ¶ 113.  On December 8, 2011, Blancaflor executed a purchase agreement

for $24.1 million countersigned by Valette.  Defs.' SOF ¶ 114; *see* ECF Nos. 204-70, 204-211.

### 8. Modigliani's *Nu Couché au Coussin Bleu*

In 2009, as part of negotiations with the then-owner of Modigliani's *Nu Couché au

Coussin Bleu*, Sotheby's stated that the insurance value it recommended was $50 million.  Pls.'

Counter SOF ¶ 306; ECF No. 468-186.  In 2010, a Sotheby's employee emailed his colleagues

that "[t]he updated appraisal value . . . was $45,000,000."  ECF No. 468-350.  In December

2011, Valette sent a formal email to Bouvier noting that the appraisal value of this Modigliani

"would likely be between USD 70 million (low range) and USD 90 million (high range), or even

more."  ECF No. 468-187.  Rybolovlev testified that Bouvier showed him this email, which

helped convince Plaintiffs to purchase the painting.  ECF No. 467 ("Rybolovlev Decl."), ¶ 23.

On January 16, 2012, Mei invoiced Plaintiffs $118 million for the painting.  Defs.' SOF ¶ 188.

But Bouvier paid only $96 million for it.  Pls.' Counter SOF ¶ 313.  Sotheby's did not broker the

sale to Bouvier, *id.* ¶ 312, although some Sotheby's employees, including Valette, were aware of

the sale after it happened, ECF No. 468-382 (email from a Sotheby's employee reporting that he

had heard that the Modigliani was sold "to a Russian for 100").

On October 22, 2014, Sotheby's prepared a draft insurance valuation listing the value of

the Modigliani painting at $100 million.  Pls.' Counter SOF ¶ 309.  Two days later, on October

24, 2014, Valette provided Bouvier with what was titled as an "Insurance Value" of $110 million

for the painting.  *Id.* ¶ 310; ECF No. 468-183, at 4-9.  The following year, in September 2015, Sotheby's provided an auction estimate for the painting of between $60 and $80 million.  Pls.' Counter SOF ¶ 314.  Around the same time, Sotheby's expert, William Smith, prepared a draft appraisal, listing the fair market value of the painting at $75 million and the liquidation value at $48 million.  *Id.* ¶ 315.

### 9. Rodin's *Eve*

In November 2010, a Sotheby's employee emailed that "Peretti's big client is looking urgently for a Rodin *Eve* bronze (lifesize) so he asked Sam [Valette] for help."  ECF No. 468-126.  About a year and a half later, in February and March 2012, Valette sent several emails to Bouvier and Peretti with literature references, provenance, exhibition history, and photographs of Rodin's *Eve*.  Defs.' SOF ¶¶ 115, 117, 119, 121, 123.  On February 29, 2012, Bouvier informed Sazonov that his negotiations for the Rodin were "ongoing," and that he wanted to keep the price under $30 million.  ECF No. 416-21, at 3.[7]  These negotiations never happened.  Pls.' SOF ¶ 35.

On March 6, 2012, the seller of the Rodin executed a consignment agreement for the sculpture with Sotheby's UK.  Defs.' SOF ¶ 125.  Two days later, on March 8, 2012, Blancaflor executed a purchase agreement for $16 million countersigned by Valette.  *Id.* ¶ 126; *see* ECF No. 468-16.  That same day, March 8, 2012, Mei invoiced Plaintiffs $26.25 million for the Rodin.  Defs.' SOF ¶ 127.

### 10. Klimt's *Wasserschlangen II*

On July 24, 2012, the seller of Klimt's *Wasserschlangen II* and Sotheby's Austria executed a consignment agreement for the painting.  *Id.* ¶ 132.  On September 11, 2012, Bouvier

---

[7]       This citation is to the page number automatically generated by the Court's ECF system.

wrote to Sazonov with an update about his purported negotiations with the sellers of the Klimt, saying that they were "stuck at 180 and ready to walk," but that he thought that "they would do 190" and that he could "twist them to get 185." ECF No. 416-22. These negotiations did not happen. Pls.' SOF ¶ 35. That same day, Blancaflor executed a purchase agreement with the sellers, acquiring the painting for $126 million. Defs.' SOF ¶ 133; *see* ECF No. 459-21. Both Ruprecht and Sotheby's COO Bruce Vinciguerra were personally involved in negotiating this sale. *See, e.g.*, Vinciguerra Tr. 280; ECF No. 468-3 ("Ruprecht Tr."), at 33; ECF No. 468-79. In fact, it was Ruprecht who ultimately informed Sotheby's Austria employees once the sale was completed. ECF No. 468-78. Two days later, on September 13, 2012, Mei invoiced Plaintiffs $183.8 million for the painting. Defs.' SOF ¶ 134.

On October 22, 2014, Sotheby's prepared what it described as a draft insurance valuation for the painting, valuing it at $160 million. Pls.' Counter SOF ¶ 318. Two days later, on October 24, 2014, Valette provided Bouvier with what was titled an insurance valuation of $180 million for the painting. *Id.* ¶ 319. In both valuation documents, the provenance section did not include the sale to Blancaflor. *Id.* ¶¶ 318-19.

### 11. Modigliani's *Tête* (Sale)

In 2010, Valette had a document in his file listing the fair market value of Modigliani's *Tête* at €8 million. Pls.' Counter SOF ¶ 358; *see* ECF No. 468-213. Two years later, on June 29, 2012, the seller of the Modigliani and Sotheby's UK executed a consignment agreement for the work, agreeing to a minimum payment to the seller of €55 million. Defs.' SOF ¶ 146; ECF No. 459-9. On July 24, 2012, Valette sent Bouvier an email with a description of the sculpture and a valuation estimate of €70 to €90 million, "perhaps even more." Pls.' Counter SOF ¶ 359; ECF No. 468-214. Less than twelve hours later, Valette sent Bouvier an almost identical description

of the work, but with an estimated value of between €80 and €100 million.  Pls.' Counter SOF
¶ 359; *see* ECF No. 468-215.  Bouvier forwarded the second email to Plaintiffs.  Pls.' Counter
SOF ¶ 363.

On September 25, 2012, Blancaflor executed a purchase agreement for €31.5 million
countersigned by Valette.  Defs.' SOF ¶ 147; *see* ECF No. 468-98.  A few months later, on
December 29, 2012, Bouvier wrote to Sazonov describing his purported negotiations with the
seller.  He said that his initial proposal of "36.5 + Degas" was rejected, so he upped it to "37.5 +
Degas."  ECF No. 416-26.  This negotiation never happened.  Pls.' SOF ¶ 35.  On January 7,
2013, Mei invoiced Plaintiffs €62.5 million for the painting.  Defs.' SOF ¶ 148.

### 12. Lautrec's Green *Au Lit: Le Baiser*

On September 26, 2012, the owner of Lautrec's Green *Au Lit: Le Baiser* and Sotheby's
Switzerland executed a consignment agreement.  Defs.' SOF ¶ 149.  Shortly thereafter, on
October 8, 2012, Blancaflor executed a purchase agreement for $7.5 million countersigned by
Valette.  *Id.* ¶ 150; *see* ECF No. 468-374.

On December 11, 2012, Valette emailed Peretti with a photograph, literature references,
the provenance, and the exhibition history for the painting.  Defs.' SOF ¶ 151.  Between
February 7, 2013, and February 11, 2013, Bouvier wrote to Sazonov describing his purported
negotiations with the seller; he explained that he had negotiated for €14 million, which
Rybolovlev rejected, so he proposed offering something above €13 million.  ECF No. 416-15.
Once again, however, this negotiation never happened.  Pls.' SOF ¶ 35.  Shortly thereafter, on
February 14, 2013, Valette "urgently" requested that another Sotheby's employee compile "the
usual research doc for the Lautrec" and send it to him in a "'clean' email."  Pls.' Counter SOF
¶ 397; ECF No. 468-108.  The provenance section in the research document Sotheby's prepared

did not list the 2012 sale to Bouvier.  Pls.' Counter SOF ¶ 397.  That same day, Mei invoiced Plaintiffs €13.75 million for the painting.  Defs.' SOF ¶ 157.

### 13. Da Vinci's *Salvator Mundi*

On March 11, 2013, Bouvier asked Valette for information about a newly discovered da Vinci painting — *Salvator Mundi*.  ECF No. 468-194. Valette informed Bouvier that his colleague in London, Alexander Bell, thought the sale price for the da Vinci would likely be between $30 and $40 million.  *Id.*; Pls.' Counter SOF ¶ 331.  Thus began the process for brokering a sale: On March 21, 2013, another Sotheby's employee informed Bell that "an advisor is coming in this afternoon . . . to view da Vinci's *Salvator Mundi* and then we are scheduled for a visit to the client's house tomorrow morning."  *Id.* ¶ 239 (cleaned up). Rybolovlev had purchased an apartment at 15 Central Park West in New York the prior year, something which at least some Sotheby's employees knew.  *See* ECF No. 468-157.  Sotheby's, however, disputes that Valette or Bell knew that the Central Park West apartment was Rybolovlev's.  *See* ECF No. 484-2, at 138; Pls.' Counter SOF, ¶¶ 240-42.

In late March and April 2013, Valette sent Bouvier several emails with information about the da Vinci painting, including a treatment report, literature references, exhibition history, provenance, and photographs.  Defs.' SOF ¶¶ 162, 165, 167, 169, 171.  On April 10 and 11, 2013, Bouvier and Sazonov discussed Bouvier's purported negotiations; Bouvier wrote that he was "fighting hard and taking as much time as needed" and that the seller had rejected offers of $90 million, $100 million, $120 million, and $125 million, before finally accepting $127.5 million.  ECF No. 416-9.  But these negotiations never happened.  Pls.' SOF ¶ 35.  On May 1, 2013, the sellers of the da Vinci and Sotheby's, Inc. executed a consignment agreement for the painting.  Defs.' SOF ¶ 173.  The next day, Blancaflor and Sotheby's, Inc. executed a purchase

agreement for $83 million.  *Id.* ¶ 174; *see* ECF No. 459-23.  On May 3, 2013, Mei invoiced

Plaintiffs $127.5 million for the da Vinci.  Defs.' SOF ¶ 175.

In early 2015, at Bouvier's request, Valette asked Bell to prepare a valuation of the da

Vinci and suggested $125 million.  Pls.' Counter SOF ¶¶ 332-33.  Bell responded that he could

not value the painting at more than $100 million.  *Id.* ¶ 333.  On January 27, 2015, Bell drafted a

cover letter for the valuation, addressed to Bouvier, noting that Bouvier had acquired it in 2013;

Valette forwarded the cover letter to Bouvier for his approval.  *Id.* ¶¶ 335-36; *see* ECF No. 468-

356.  Twenty minutes later, Valette wrote back to Bell and asked for a few edits to the cover

letter, including taking out the reference to Bouvier's purchase in 2013 and changing the

valuation to €100 million.  Pls.' Counter SOF ¶ 338; ECF No. 468-199.  Bell responded that "the

most" he "could live with is €95m," Pls.' Counter SOF ¶ 339 (cleaned up), although he

ultimately agreed to change the valuation to €100 million, *id.* ¶ 340.  On January 28, 2015,

Valette sent the updated valuation to Bouvier.  *Id.* ¶ 341.

### 14. Gauguin's *Otahi Seule*

On September 16, 2013, Mei invoiced Plaintiffs €120 million for Gauguin's *Otahi Seule*.

Defs.' SOF ¶ 193.  Sotheby's did not broker this sale.  *Id.* ¶ 30.  On October 22, 2014, Sotheby's

prepared a draft valuation of the painting, listing its insurance value at $80 million.  Pls.' Counter

SOF ¶ 321.  Two days later, on October 24, 2014, Valette provided Bouvier with what was titled

an "Insurance Value" of $120 million for the painting.  *Id.* ¶ 322; *see* ECF No. 468-183, at 16-

21.  Neither the draft nor the final valuations listed the prior sale to Bouvier in the provenance.

Pls.' Counter SOF ¶¶ 321-22.  On February 19, 2015, Sotheby's provided Bouvier with a new

valuation of $140 million.  *Id.* ¶ 323.  Plaintiffs resold the painting later that year for $50 million.

*Id.* ¶ 329.

### 15. Modigliani's *Tête* (Auction)

In September 2014, Plaintiffs purchased Rothko's *No. 6* from Mei for €140 million; as a partial payment for the painting, Plaintiffs agreed to trade in Modigliani's *Tête*.  Defs.' SOF ¶ 198; *see* ECF Nos. 461-28 (purported invoice for the Rothko, listing "Trade-in of the 'HEAD' in stone of MODIGLIANI"), 468-117.  Instead of providing the Modigliani to the seller of the Rothko, however, Bouvier, on September 15, 2014, executed a consignment agreement with Sotheby's, Inc. for auction of the Modigliani.  Defs.' SOF ¶ 199; ECF No. 459-24.  In preparing the auction catalog, a Sotheby's employee emailed Valette with the subject "Blancaflor designation" and asked how to designate the provenance of the Modigliani.  ECF No. 468-118.  Valette's response: "Maybe better to cover the tracks slightly and designate as: Property from a Private European Collection."  *Id.*  In the end, the provenance was listed simply as "Acquired from the above."  ECF No. 468-119, at 30.  On November 4, 2014, Sotheby's sold the Modigliani at auction in New York for a hammer price of $63 million.  ECF No. 417-26.  Plaintiffs did not receive any of the sale proceeds.  Sazonov Decl. ¶ 102.

### 16. Lautrec's Red *Au Lit: Le Baiser*

On December 19, 2014, Valette provided Bouvier with an auction estimate for Lautrec's Red *Au Lit: Le Baiser* of between £9 and £12 million.  *Id.* ¶ 468.  Later that day, Valette provided Bouvier with an updated auction estimate of between £10 million and £15 million.  *Id.* ¶ 469.  On December 23, 2014, Blancaflor and Sotheby's UK executed a consignment agreement, using the lower estimate range, and countersigned by Valette.  Defs.' SOF ¶ 203; *see* ECF No. 459-25.  Sotheby's Executive Committee, consisting of Ruprecht, Vinciguerra, and an Executive Board Member, approved the consignment.  *See* ECF No. 468-120.

Sotheby's sold the painting at auction on February 3, 2015, for £9.5 million. Pls.'

Counter SOF ¶ 473. On March 16, 2015, Sotheby's paid Bouvier £4 million in connection with

the sale of the painting and other works. *Id.* ¶ 479. Bouvier never provided Plaintiffs with any

of the proceeds from the sale. *Id.* ¶ 481. At this point, Bouvier had been arrested and news

about his alleged fraud was publicized, *id.* ¶ 474; after negotiations with Bouvier and Plaintiffs,

Sotheby's decided to hold the remainder of the proceeds from the sale in escrow, *id.* ¶ 482.

## MOTIONS FOR SUMMARY JUDGMENT

The Court turns then to the parties' cross-motions for summary judgment. Summary

judgment is appropriate when the admissible evidence and pleadings demonstrate "no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). A dispute over

an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). In ruling on a motion

for summary judgment, a court must view all evidence "in the light most favorable to the non-

moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004),

and must "resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion

Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where, as here, both sides move for summary judgment, "neither side is barred from

asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of

law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "[T]he

court must evaluate each party's motion on its own merits, taking care in each instance to draw

all reasonable inferences against the party whose motion is under consideration." *Id.* To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleadings, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## A. Sotheby's Motion for Summary Judgment

The Court begins with Sotheby's motion. Sotheby's moves for summary judgment on four grounds. First, it argues that Plaintiffs' claims for fifteen of the sixteen transactions are time barred. Second, it contends that, for twelve of the sixteen transactions, neither Defendant was involved. Third, it asserts that there is no evidence that Sotheby's had "actual knowledge" of the alleged fraud or breach of fiduciary duty. And finally, it avers that, for thirteen of the sixteen transactions, there is no evidence that Sotheby's provided "substantial assistance" to Bouvier. *See* Defs.' MSJ Mem. 1-2. The Court will address each argument in turn.

### 1. Timeliness

The Court begins with the question of timeliness. Plaintiffs bring two categories of claims against Sotheby's: for aiding and abetting fraud and for aiding and abetting breach of fiduciary duty. "The statute of limitations for each aiding and abetting claim is determined by

the underlying tort." *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 393 (S.D.N.Y. 2010). Under New York law, which applies here, the statute of limitations for fraud is "six years from the commission of the fraud or . . . two years from the date that the fraud was discovered, or could reasonably have been discovered, whichever is later." *Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007) (citing N.Y. C.P.L.R. §§ 203(g), 213(8)). For breach of fiduciary duty claims, "New York law does not provide a single statute of limitations . . . . Rather, the choice of the applicable limitations period depends on the substantive remedy that the plaintiff seeks." *Spinnato v. Unity of Omaha Life Ins. Co.*, 322 F. Supp. 3d 377, 396 (E.D.N.Y. 2018); *see also Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 544-45 (2d Cir. 1999) ("In applying a Statute of Limitations it is basic that one look to the essence of plaintiff's claim and not to the form in which it is pleaded."). Where, as here, "the remedy sought is purely monetary in nature," courts generally apply a three-year statute of limitations. *Spinnato*, 322 F. Supp. 3d at 396. But "[i]f the claim is based on fraud," then the six-year period applicable to fraud claims applies. *Id.* (citing *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009); *Klein v. Gutman*, 784 N.Y.S.2d 581, 584 (2d Dep't 2004)); *see also Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 361 (2d Cir. 2013).

Whether to apply the fraud statute of limitations to a non-fraud claim turns on whether the fraud claim is "essential" or "incidental" to the non-fraud claim. *See, e.g.*, *Spinnato*, 322 F. Supp. 3d at 396. In *Corcoran*, the Second Circuit adopted a two-prong test for making this determination: "A fraud action is not incidental," the court declared, "only when: (1) the fraud occurred separately from and subsequent to the injury forming the basis of the alternate claim; and (2) the injuries caused by the fraud are distinct from the injuries caused by the alternate claim." 202 F.3d at 545 (citing *Harkin v. Culleton*, 554 N.Y.S.2d 478, 481-82 (1st Dep't 1990)).

*Corcoran* involved an underlying claim of battery.  *See* 202 F.3d at 542-43.  But the Second

Circuit did not purport to limit the two-prong test to battery claims (or any other subset of

claims).  And since *Corcoran*, the Second Circuit has applied the test to other kinds of claims,

including, as relevant here, a claim for breach of fiduciary duty.  *See Murphy v. Morlitz*, 751 F.

App'x 28, 30 (2d Cir. 2018) (summary order) (breach of fiduciary duty); *ITT Corp. v. Lee*, 663

F. App'x 80, 85 (2d Cir. 2016) (summary order) (breach of contract).  Accordingly, the Court

concludes that the *Corcoran* test is the law of the Circuit and applies here.

 The Court feels compelled to state that it reaches that conclusion with some misgiving.

*Harkin* did not (at least expressly) adopt the test for which the *Corcoran* court cited it.  And

while such a bright-line test may make some sense where the gravamen of the fraud claim is

concealment of a pre-existing tort, such as battery, it is a more awkward fit in other

circumstances.  More significantly, the test is arguably inconsistent with the approach that most

New York State courts have taken, which turns on a more qualitative assessment of whether the

essence or gravamen of a claim is fraud.  *See, e.g.*, *IDT Corp.*, 12 N.Y.3d at 139-40; *N.Y. State*

*Workers' Comp. Bd. v. Fuller & LaFiura, CPAs, P.C.*, 46 N.Y.S.3d 266, 272 (3d Dep't 2017);

*Carbon Cap. Mgmt., LLC v. Am. Ex. Co.*, 932 N.Y.S.2d 488, 495 (2d Dep't 2011); *Paolucci v.*

*Mauro*, 903 N.Y.S.2d 584, 587 (3d Dep't 2010); *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 164-66

(1st Dep't 2003); *see also Erbe*, 3 N.Y.2d at 325-26.  Be that as it may, this Court is "bound on

matters of New York law by decisions of . . . the Court of Appeals for the Second Circuit.  Thus,

absent an intervening decision by the New York Court of Appeals" — and, here, Plaintiffs have

not cited, and the Court has not found, any such decision — the Court "must apply the Second

Circuit's" test for determining whether Plaintiffs' fraud claim is "incidental" to their fiduciary

duty claim.  *Kaye Scholer LLP v. CNA Holdings, Inc.*, No. 08-CV-5547 (NRB), 2010 WL

1779917, at *2 (S.D.N.Y. Apr. 28, 2010) (citations omitted); *see also, e.g.*, *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 653 (S.D.N.Y. 2021) ("A district court must follow a precedential opinion of the Second Circuit unless and until it is overruled by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit." (cleaned up)).

Applying the *Corcoran* test, the Court easily concludes that Plaintiffs' fraud claim is "incidental" to their fiduciary duty claim and, thus, the three-year statute of limitations period applies to the latter.  First, as a quick glance at Plaintiffs' Local Rule 56.1 Statement makes plain, "[t]he underlying facts that makeup the Plaintiffs' breach of fiduciary duty claim are identical to those that represent the core of the fraud claim."  *Spinnato*, 322 F. Supp. 3d at 397; *accord Matana v. Merkin*, 957 F. Supp. 2d 473, 492-93 (S.D.N.Y. 2013); *see also, e.g.*, Pls.' SOF ¶¶ 30-35, 46, 48, 58-59 (describing conduct that underlies both the fraud and the breach of fiduciary duty claims).  Indeed, the alleged Bouvier misrepresentations that are "alleged in connection with the fiduciary duty claim[] could have also been taken from the portion of the complaint dedicated to fraud."  *Spinnato*, 322 F. Supp. 3d at 397.  Second, and in any event, "[t]he alleged injuries and relief sought are also the same."  *Id.*; *accord Murphy*, 751 F. App'x at 30 (holding that the plaintiff could not invoke the longer fraud statute of limitations because he "allege[d] no fraud damages distinct from the damages allegedly attributable to the breach of fiduciary duty," so his "fraud allegations [were] therefore incidental to his breach of fiduciary duty claim"); *see also* SAC ¶¶ 243, 249.  In short, Plaintiffs' fraud allegations are "incidental" to their breach of fiduciary duty claims, as that term is construed in *Corcoran*, so they "may not benefit from" the fraud statute of limitations for their fiduciary claim.  *Murphy*, 751 F. App'x at 30.  In light of that conclusion (and the one-year-and-ten-day tolling agreement that the parties

entered), it is undisputed that Plaintiffs' fiduciary claims are untimely except as to the January

2015 auction of Lautrec's Red *Au Lit: Le Baiser*.

In an effort to save any untimely fiduciary duty claims, Plaintiffs invoke the doctrine of

equitable estoppel.  Pls.' MSJ Opp'n 29-31.  Equitable estoppel is an "extraordinary remedy."

*Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y. 2014) (internal quotation marks

omitted), *aff'd*, 579 F. App'x 7 (2d Cir. 2014) (summary order).  Under New York law, it tolls

the statute of limitations "[1] where the defendant conceals from the plaintiff the fact that he has

a cause of action and [2] where the plaintiff is aware of the cause of action, but the defendant

induces him to forego suit until after the period of limitations has expired."  *Koral v. Saunders*,

36 F.4th 400, 409-10 (2d Cir. 2022) (cleaned up).  To invoke equitable estoppel, a plaintiff "must

articulate particular acts by the defendant that prevented the timely filing of an action."  *Wei Su

v. Sotheby's, Inc.*, 490 F. Supp. 3d 725, 730 (S.D.N.Y. 2020).  The doctrine (absent a fiduciary

relationship, as is the case here) requires that the plaintiff was misled by "an actual

misrepresentation" or omission of a required disclosure, that the plaintiff was diligent in seeking

the facts underlying its claim, and that the defendant's concealment of the alleged fraud entailed

"more than the fraud itself, unconfessed."  *Koral*, 36 F.4th at 410-11; *see also Koch v. Christie's

Int'l PLC*, 699 F.3d 141, 157 (2d Cir. 2012) ("Reasonable diligence is a prerequisite to the

applicability of equitable tolling.").  Here, Plaintiffs' equitable estoppel arguments are based

principally on two acts by Sotheby's: (1) its alleged provision of inflated valuations for certain

works; and (2) its assertion in a July 6, 2015 letter from counsel that it was an innocent third

party in the Bouvier-Rybolovlev affair.  Pls.' MSJ Opp'n 29-30.[8]

---

[8]     Plaintiffs also invoke Sotheby's accelerated payments to Bouvier from the auction of
Lautrec's Red *Au Lit: Le Baiser*.  *See* Pls.' MSJ Opp'n 29.  But that action cannot support
equitable estoppel because it is a basis for the underlying claim against Sotheby's.  *See* SAC

The latter argument, which is the only proffered basis for equitable estoppel as to ten of the sixteen transactions, is easily rejected.  The July 6, 2015 letter referred only to the auction of one work, Lautrec's Red *Au Lit: Le Baiser* — and, as noted above, there is no dispute that Plaintiffs' claim as to that one transaction is timely.  ECF No. 468-384; *see* Pls.' MSJ Opp'n 29-30.  Plaintiffs do not explain how, let alone point to evidence proving that, the letter intentionally concealed the auction house's alleged aiding and abetting of Bouvier's breach of fiduciary duty as to *other* transactions.  Accordingly, there is no basis to invoke equitable estoppel for the transactions involving Picasso's *Homme Assis au Verre*, Maillol's *La Méditerranée*, Rodin's *Le Baiser*, Rodin's *L'Éternel Printemps*, Giacometti's *Femme de Venise IX*, Magritte's *Le Domaine d'Arnheim*, Rodin's *Eve*, Modigliani's *Tête* (sale and auction), and Lautrec's Green *Au Lit: Le Baiser*, and Plaintiffs' claims for aiding and abetting a breach of fiduciary duty as to those transactions must be dismissed as untimely.[9]

---

¶¶ 213-14, 219, 225; Pls.' MSJ Mem. 9; *see also City of Almaty v. Sater*, 503 F. Supp. 3d 51, 66 (S.D.N.Y. 2020) ("For equitable estoppel to apply, 'a plaintiff may not rely on the same act that forms the basis for the claim.'" (quoting *Ross v. Louise Wise Servs.*, 8 N.Y.3d 478, 491 (2007)).  In addition, Plaintiffs seek to rely on statements that Sotheby's made in 2016 to third parties — the sellers of the Klimt and the da Vinci — disclaiming knowledge of Rybolovlev.  Pls.' MSJ Opp'n 30.  This too is unavailing.  For equitable estoppel to apply, the fraudulent "cover-up" must have been directed to the plaintiff him or herself.  *See Twersky*, 993 F. Supp. 2d at 445-46 ("[E]quitable estoppel is only appropriate where the plaintiff is prevented from filing an action within the applicable statute of limitations due to defendants' misconduct toward the potential plaintiff, not a community at large." (internal quotation marks omitted)); *Zumpano v. Quinn*, 6 N.Y.3d 666, 675 (2006) ("Plaintiffs do not allege any specific misrepresentation *to them* by defendants, or any deceptive conduct sufficient to constitute a basis for equitable estoppel." (emphasis added)); *accord Doe v. Kolko*, No. 06-CV-2096 (SLT), No. 06-CV-2215 (SLT), 2008 WL 4146199, at *4 (E.D.N.Y. Sept. 5, 2008) (finding no equitable estoppel where the alleged tactics pressuring the plaintiffs to forgo filing suit were directed at third parties).

[9]    In addition, three of the transactions — for Picasso's *Homme Assis au Verre*, Maillol's *La Méditerranée*, Rodin's *Le Baiser* — occurred more than four years and ten days prior to the July 6, 2015 letter.  Thus, Plaintiffs claims as to these three transactions were already time barred when the letter was sent.

For the other five transactions, Plaintiffs point also to Sotheby's 2014 and 2015 valuations. At Bouvier's request, Valette provided Bouvier with draft, and then final, insurance valuations for Matisse's *Nu au Châle Vert*, Klimt's *Wasserschlangen II*, Modigliani's *Nu Couché au Coussin Bleu*, and Gauguin's *Otahe Seule*, on October 22, 2014, and October 24, 2014, respectively. Pls.' Counter SOF ¶¶ 295-96; 318-19, 309-10, 321-22. In each case, the final valuation was between $5 and $40 million higher than the draft valuation. *Id.* Similarly, Valette provided Bouvier with a valuation for da Vinci's *Salvator Mundi* in January 2015, after he pushed Sotheby's Old Masters expert to get the valuation up to €100 million. *Id.* ¶¶ 332-33, 338-41. Sotheby's provided each of these valuations within four years of Plaintiffs' purchases of the respective works. Plaintiffs argue that because each valuation was close or identical to the amount they paid for the relevant work, the valuations prevented them from uncovering Sotheby's role in aiding and abetting Bouvier's breach. Pls.' MSJ Opp'n 29.

But Plaintiffs present no evidence that Sotheby's knew the insurance valuations for the Matisse, the Modigliani, the Klimt, and the Gauguin would ultimately be provided to Plaintiffs. Additionally, there is little evidence that Sotheby's intentionally manipulated the valuations. Without evidence on both fronts, Sotheby's actions in providing valuations to its client do not support equitable estoppel. *See Wei Su*, 490 F. Supp. 3d at 730-31. By contrast, the Court concludes that whether equitable estoppel applies to the da Vinci claim turns on genuine disputes of material fact. Plaintiffs have provided evidence that Sotheby's knew Bouvier purchased *Salvator Mundi* on behalf of Plaintiffs, *see, e.g.*, Pls.' Counter SOF ¶¶ 239-48; and that Valette worked closely with Bouvier to adjust its valuation — over the objection of Sotheby's own Old Masters expert, *see, e.g.*, *id.* ¶¶ 333, 339-40 — and to alter its cover letter, including by deleting any reference to Bouvier's earlier purchase of the piece from the provenance. *Id.* ¶¶ 335-36,

31

338.  From this evidence, a reasonable jury could infer that Sotheby's assisted Bouvier in

obtaining an inflated valuation to conceal his breach, that Sotheby's knew Bouvier had

previously purchased the work on behalf of Plaintiffs, and that Bouvier was therefore likely to

provide the da Vinci's inflated valuation to Plaintiffs.  That — combined with the fact that

Plaintiffs began to make efforts to uncover Sotheby's role, if any, in Bouvier's scheme less than

a year and a half later, *see, e.g.*, Kornstein Decl. ¶ 12 (describing Plaintiffs' Section 1782

application) — could support application of equitable estoppel as to this claim.  *See Gen.*

*Stencils, Inc. v. Chiappa*, 18 N.Y.2d 125 (1966) (holding that equitable estoppel could apply

where the defendant had stolen petty cash from his employer and then concealed that theft by

forging entries in the books); *see also Koral*, 36 F.4th at 412 (concluding that the defendant's

misreporting of his assets raised a genuine issue of fact as to whether the defendant fraudulently

concealed an earlier sale, triggering equitable estoppel).  Thus, summary judgment is granted to

Sotheby's on Plaintiffs' claims for aiding and abetting a breach of fiduciary duty as to all

transactions except the purchase of da Vinci's *Salvator Mundi* and the auction of Lautrec's Red

*Au Lit: Le Baiser*.

Not content to limit Plaintiffs' fiduciary duty claims to the shorter limitations period,

Sotheby's urges the Court to apply the same period to the fraud claims as well.  Defs.' MSJ

Mem. 5.  In some cases, courts have indeed held that a plaintiff alleging fraud cannot benefit

from the fraud statute of limitations, but these courts have not (generally, at least) done so on

account of the *Corcoran* test.  Instead, they have done so where they have concluded that the

plaintiff included a fraud claim only as a tactic "to litigate stale claims," *Midwest Mem'l Grp.,*

*LLC v. Int'l Fund Servs. (Ir.) Ltd.*, No. 10-CV-8660 (PAC), 2011 WL 4916407, at *5 (S.D.N.Y.

Oct. 17, 2011), or the fraud was merely the means of covering up a prior breach of fiduciary

duty, *see id.* at *5; *see also Marketxt Holdings Corp.*, 693 F. Supp. 2d at 393-94.  By contrast, where the plaintiff's fraud claim was "independently viable," courts have held that the longer statute of limitations still applies.  *Marketxt Holdings Corp.*, 693 F. Supp. 2d at 394-95.  The latter is the case here, as confirmed by the fact that — as discussed below — Sotheby's opposes Plaintiffs' motion for summary judgment with respect to whether Bouvier committed fraud on only one narrow ground (reliance) and does not dispute that a fraud occurred.  *See* ECF No. 464 ("Pls.' MSJ Opp'n"), at 10.  Put differently, Plaintiffs could have brought *only* fraud claims and, in that instance, would plainly have been entitled to the six-year statute of limitations and two-year discovery rule.  Neither logic nor law mandates that because they also brought fiduciary duty claims the result should be different.

Thus, Plaintiffs' fraud claims are subject to the six-year statute of limitations and the two-year discovery rule — although, in light of the parties' tolling agreement, the relevant time periods are (approximately) seven years and three years, respectively.  In light of that, it is undisputed that Plaintiffs' fraud claims with respect to at least eleven of the sixteen transactions are timely, to wit: the sales of Giacometti's *Femme de Venise IX*, Magritte's *Le Domaine d'Arnheim*, Rodin's *Eve*, Klimt's *Wasserschlangen II*, Modigliani's *Tête*, Lautrec's Green *Au Lit: Le Baiser*, da Vinci's *Salvator Mundi*; the valuations of Modigliani's *Nu Couché au Coussin Bleu*, Gauguin's *Otahi Seule*; and the auctions of Modigliani's *Tête* and Lautrec's Red *Au Lit: Le Baiser*.  *See* Defs.' SOF ¶ 30; Defs.' MSJ Mem. 4; Pls.' MSJ Opp'n 27.  The other five transactions, however, occurred more than seven years prior to Plaintiffs' initiation of this suit.  But Plaintiffs argue that they are nevertheless timely based on either the two-year discovery rule set forth in N.Y. C.P.L.R. § 213(8) or pursuant to the doctrine of equitable estoppel.  Pls.' MSJ Opp'n 27-31.  Plaintiffs claim that they did not learn the extent of Sotheby's involvement in

Bouvier's alleged fraud until November 2016, when Sotheby's produced documents in the related Section 1782 case.  Pls.' MSJ Opp'n 27.

Under the discovery rule, a plaintiff has "two years from the date that the fraud was discovered[] or could reasonably have been discovered" to file a lawsuit.  *Guilbert*, 480 F.3d at 147.  Actual notice triggers the running of the statute of limitations, as does inquiry notice "if the plaintiff does not pursue a reasonable investigation."  *Koch*, 699 F.3d at 155; *see also Shalik v. Hewlett Assocs., L.P.*, 940 N.Y.S.2d 304, 305 (2d Dep't 2012) ("The two-year period begins to run when the circumstances reasonably would suggest to the plaintiff that he or she may have been defrauded, so as to trigger a duty to inquire on his or her part.").  Significantly, however, "knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute."  *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009).  Additionally, where a plaintiff has knowledge of fraud by a third party but does not know the extent of the *defendant's* involvement in the fraud, New York courts have found that notice of the fraud alone does not trigger the discovery period.  *See, e.g.*, *Sabourin v. Chodos*, 129 N.Y.S.3d 669, 682 (Sup. Ct. 2020) (holding that the two-year timer started running only when the plaintiffs learned of the defendant's involvement in a fraud scheme, even though they already knew the defendant's clients were involved), *aff'd in relevant part*, 150 N.Y.S.3d 42 (1st Dep't 2021); *Saphir Int'l, SA v. UBS PaineWebber Inc.*, 807 N.Y.S.2d 58, 60 (1st Dep't 2006) (affirming denial of summary judgment on fraud claims where the plaintiff incurred huge losses but lacked information about the defendants' involvement in that scheme until the defendant pleaded guilty to stock fraud).  Finally, the discovery rule is not triggered where the plaintiff has knowledge only of facts that could reasonably be consistent with non-fraudulent activities.  *See Norddeutsche Landesbank Girozentrale v. Tilton*, 48 N.Y.S.3d 98, 103-05 (1st Dep't 2017).

Applying these standards here, the Court cannot say that Plaintiffs' remaining fraud claims are untimely.  Although Plaintiffs had learned of Bouvier's fraud by December 31, 2014 — when Heller informed Rybolovlev that Modigliani's *Nu Couché au Coussin Bleu*, which Plaintiffs had purchased for $118 million, had actually sold for $93.5 million, Pls.' SOF ¶¶ 56-57 — it does not follow that the two-year discovery rule was triggered at the time.  Yes, Plaintiffs were aware then of Sotheby's involvement with Bouvier, as many of the documents they had received from Bouvier in connection with their art purchases bore Sotheby's stamp, were forwarded directly from Sotheby's, or referenced Bouvier's work with Sotheby's.  *E.g.*, ECF Nos. 468-42, at 14 (administrative file bearing Sotheby's stamp); 468-47, at 22 (same); 468-75, at 3 (email forwarded from Sotheby's); 468-76, at 4-5 (email from Bouvier describing his work with Sotheby's); 468-89, at 3 (same); *see also* Kornstein Decl. ¶ 19 (averring that the administrative files were provided to Plaintiffs).[10]  But that fact is arguably consistent with the non-fraudulent sale of high-end art.  *See Tilton*, 48 N.Y.S.3d at 103-05.  Similarly, the fact that, in January 2015, Heller told Sazonov that he believed that those complicit in Bouvier's fraud "could stretch to Jean-Marc Peretti and the upper ranks of Sotheby[']s," ECF No. 483-6, does not mean that Plaintiffs had knowledge of Sotheby's allegedly fraudulent acts.  Drawing all inferences in favor of Plaintiffs, as the Court must, this evidence shows "mere suspicion" on the part of a third party.  *See Sargiss*, 12 N.Y.3d at 532.  The bottom line is that whether Plaintiffs had notice of Sotheby's alleged involvement in the fraud prior to November 2016, when Sotheby's produced documents to Plaintiffs showing the extent of its involvement with Bouvier,

---

[10]    Citations are to the page numbers automatically generated by the Court's ECF system.

Pls.' MSJ Opp'n 27; *see also* Kornstein Decl. ¶¶ 15-16, is a disputed fact.  It follows that the

Court cannot grant summary judgment to Sotheby's on that basis.[11]

In sum, Sotheby's motion for summary judgment on timeliness grounds is granted as to

Plaintiffs' fiduciary duty claims with respect to the fourteen transactions other than da Vinci's

*Salvator Mundi* and Lautrec's Red *Au Lit: Le Baiser*, and it is otherwise denied.

## 2.  Agency

Sotheby's next argues that, for twelve of the sixteen transactions, Plaintiffs have sued the

wrong parties.  The twelve include nine sales (Picasso's *Homme Assis au Verre*; Matisse's *Nu au*

*Châle Vert*; Rodin's *L'Éternel Printemps*; Giacometti's *Femme de Venise IX*; Magritte's *Le*

*Domaine d'Arnheim*; Rodin's *Eve*; Klimt's *Wasserschlangen II*; Modigliani's *Tête*; and

Lautrec's Green *Au Lit: Le Baiser*); one auction (Lautrec's Red *Au Lit: Le Baiser*); and two

insurance valuations (Modigliani's *Nu Couché au Coussin Bleu* and Gauguin's *Otahi Seule*).

Defs.' MSJ Mem. 11; Defs.' SOF ¶ 31.  Plaintiffs do not dispute that these twelve transactions

were handled by Sotheby's subsidiaries in Europe — as opposed to the two Defendants here.

Defs.' SOF ¶ 31; Pls.' MSJ Opp'n 31-34.  But they argue that Defendants can be held liable on

the ground that the subsidiaries were acting as Defendants' agents.  *See* Pls.' MSJ Opp'n 31.

They do not seek to pierce the corporate veil.  *See id.* at 34 n.6.

As a general rule, a corporate parent such as Sotheby's is not liable for the actions of its

subsidiaries.  *See, e.g.*, *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir. 1996);

*Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 421 (S.D.N.Y. 2007).  But

a corporate parent can be held liable for the actions of its subsidiary if the subsidiary was acting

---

[11]     In light of that conclusion, the Court need not and does not reach Plaintiffs' argument
about equitable estoppel for the aiding-and-abetting fraud claims.

as its agent. *See, e.g.*, *Elbit Sys., Ltd. v. Credit Suisse Grp.*, 917 F. Supp 2d 217, 225-26 (S.D.N.Y. 2013) (finding that the plaintiff had adequately pleaded that a subsidiary was acting as an agent for its corporate parent). New York law "provides that an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Bigio v. Coca-Cola Co.*, 675 F.3d 163, 175 (2d Cir. 2012). "An essential element of agency is the principal's right to control the agent's actions." *Hollingsworth v. Perry*, 570 U.S. 693, 713 (2013) (quoting Restatement (Third) of Agency § 1.01 cmt. f (2005)); *see also In re Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 79 (2d Cir. 2019) ("Establishment of an agency relationship requires facts sufficient to show (1) the principal's manifestation of intent to grant authority to the agent, and (2) agreement by the agent. In addition, the principal must maintain control over key aspects of the undertaking." (cleaned up)). Also critical is the "agent's power to alter legal relations between the principal and third persons." *Mouawad Nat'l Co.*, 476 F. Supp. 2d at 422.

Thus, if a purported principal lacks control over a purported agent, there is no agency relationship. *See, e.g., Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 278-79 (2d Cir. 2013) (finding no agency relationship where the purported principals did not retain the authority to instruct the purported agents how to complete the transactions at issue); *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 296 (2d Cir. 1984) (finding no agency relationship where the purported principal lacked knowledge about, and was unconcerned with, actions of the purported agent in extending credit to third parties). A parent and subsidiary engaged in the usual concomitants of the corporate relationship — (1) the parent investing in the subsidiary; (2) the parent doing business with the subsidiary; and (3) the parent advising the subsidiary on profitability — are not, without more, in an agency relationship. *See Bigio*, 675 F.3d at 175-76.

Similarly, a parent sharing corporate officers and directors with a subsidiary does not automatically create an agency relationship.  *See, e.g.*, *In re Parmalat Sec. Litig.*, 501 F. Supp. 2d 560, 588-89 (S.D.N.Y. 2007) (finding no agency relationship despite the fact that the corporations shared officers and directors and that one financed the other), *aff'd sub nom. Pappas v. Bank of Am. Corp.*, 309 F. App'x 536 (2d Cir. 2009); *accord United States v. Bestfoods*, 524 U.S. 51, 68-70 (1998).

 Applying these principles here, the Court concludes that genuine disputes of material fact preclude summary judgment on these grounds as to ten of the twelve transactions at issue, namely the nine sales and the auction.  First, as a general matter, Sotheby's exercised a level of control over its subsidiaries that went beyond the standard concomitants of a parent-subsidiary relationship.  It is true that the Sotheby's subsidiaries had their own boards of directors and exercised control over their own assets.  Defs.' SOF ¶¶ 11, 12, 15, 16, 19, 20.  But Sotheby's, the parent corporation, reported income, expenses, assets, employment figures, and other financials for all its subsidiaries together, without distinguishing among them, in filings with the Securities and Exchange Commission.  *E.g.*, ECF No. 468-15, at 14, 36, 49.  Employees worldwide could be compensated with shares in Sotheby's.  *Id.* at 35.  Sotheby's also had a code of business conduct it applied worldwide to all employees, boards of directors, consultants, and other third parties representing Sotheby's.  ECF Nos. 468-17, 468-18, 468-19.  Similarly, Sotheby's had worldwide compliance policies.  ECF No. 468-4, at 108-09.  Although the different subsidiaries had some independent and specific responsibilities, Sotheby's COO acknowledged that he "was still at the center federating . . . the direction of the company."  Vinciguerra Tr. 38.

 Putting aside whether that would be enough, Sotheby's also had control over specific types of transactions, regardless of which subsidiary originated the transaction.  For example,

every private treaty sale had three levels of approval — first, by the HVL Committee for sales
over $1.5 million; second, by the Compliance Department based on a due diligence checklist;
and third, by certain executives for sales with a commission margin of ten percent or less or with
net proceeds to the seller of more than $10 million.  ECF No. 468-2, at 224-25; Defs.' SOF ¶ 28.
The HVL Committee (which was comprised of executives from the Sotheby's parent
corporation), Compliance Department, and CEO signed off on *every* sale at issue here.  ECF
Nos. ECF Nos. 468-16, 468-30, 468-46, 468-52, 468-63, 468-64, 468-68, 468-70, 468-81, 468-
96, 468-98, 468-101.  Similarly, certain consignment agreements for auctions, including for
Lautrec's Red *Au Lit: Le Baiser*, required approval from the Executive Committee, which
included the Sotheby's CEO, COO, and a Sotheby's board member.  *See* ECF No. 468-120.
Finally, the Sotheby's CEO or its General Counsel were required to approve confidential
accounts for certain clients, so as to limit access by other Sotheby's employees to those clients'
information.  Ruprecht Tr. 111; *see* ECF No 468-234.  This evidence of control supports a
finding of agency.  *See Maung Ng We v. Merrill Lynch & Co.*, No. 99-CV-9687 (CSH), 2000
WL 1159835, at *7 (S.D.N.Y. Aug. 15, 2000) ("The essence of control in an agency sense is in
the necessity of the consent of the principal on a given matter." (emphasis omitted)).

Supporting that conclusion, Sotheby's directed which of the ten transactions would go
through which subsidiaries.  For example, for Picasso's *Homme Assis au Verre*, the proceeds
from the sale were initially attributed to Sotheby's Switzerland but later moved behind the scenes
to another Sotheby's entity.  ECF No. 468-93 (email noting that although the sale had to be
"push[ed] . . . through on Geneva's books as its physically in CH," the finance department would
"reallocate the revenue to [another Sotheby's entity] behind the scenes").  For Matisse's *Nu au
Châle Vert*, a Sotheby's employee suggested that the location of the painting upon delivery to the

buyer would "affect the Sotheby's corporate header we use" — i.e., which subsidiary was reflected on the contract — and "the jurisdiction under which the sale would take place."  ECF No 468-27.  Even though Sotheby's agreement with the seller was negotiated by David Ober, the Chairman of Sotheby's Southeast in Florida, *see* ECF No. 468-45, both the consignment agreement between Sotheby's and the seller and the sales agreement between Sotheby's and Blancaflor were on Sotheby's UK letterhead.  Defs.' SOF ¶¶ 61, 66.  For Klimt's *Wasserschlangen II*, Sotheby's CEO negotiated and finalized the deal, and then informed the local subsidiary that the deal was complete.  Ruprecht Tr. 33; ECF No. 468-78; *see also A.W. Fiur Co. v. Ataka & Co.*, 422 N.Y.S.2d 419, 421-23 (1st Dep't 1979) (holding a parent company liable for the contracts of its subsidiary where the parent was the party negotiating the contracts and oversaw the business relationship and the subsidiary's role was only to sign the contracts).  And for Lautrec's Green *Au Lit: Le Baiser*, Sotheby's switched the sales contract from Sotheby's UK letterhead to Sotheby's Switzerland and then back to Sotheby's UK, to avoid "questions from the buyer."  ECF Nos. 468-103, 468-355.

Finally, for all twelve of these transactions, Valette was Bouvier's KCM — his primary point of contact at Sotheby's.  Pls.' Counter SOF ¶ 254.  Vinciguerra testified that a KCM's responsibilities included "help[ing] [the client] navigate through the different divisions of Sotheby's."  Vinciguerra Tr. 38-39.  To that extent, at least, the KCMs, including Valette, thus operated companywide, not within one specific subsidiary.

Taken together, these facts are sufficient for a reasonable jury to find that Sotheby's exercised sufficient control over its subsidiaries to be held liable for their actions with respect to the nine sales and one auction.  *See, e.g.*, *In re Parmalat Sec. Litig.*, 594 F. Supp. 2d 444, 452-55 (S.D.N.Y. 2009) (denying summary judgment on agency grounds where the subsidiary firms had

agreed to adhere to policies, standards, and procedures set by the parent company; the parent company had reviewed the subsidiaries' compliance with such policies; the parent company had controlled whether subsidiaries accepted or rejected engagements with third parties; and the parent company was able to transfer employees between subsidiaries); *see also Elbit Sys., Ltd.*, 917 F. Supp 2d at 225-26 (identifying a parent company's managerial authority over subsidiaries and a code of conduct applicable to all subsidiaries as evidence of an agency relationship).

By contrast, the Court concludes that there is no basis to hold Defendants liable for the two insurance valuations. Both were provided by Sotheby's UK. Defs.' SOF ¶ 180. Unlike with the sales and the auction, Plaintiffs have pointed to no evidence suggesting the involvement of any executives from Sotheby's in crafting these valuations. It is true that Valette, Bouvier's KCM, signed the valuations. ECF No. 459-74, at 16-17 (Gauguin's *Otahi Seule*); *id.* at 22-23 (Modigliani's *Nu Couché au Coussin Bleu*).[12] But without additional involvement from Defendants, that alone is insufficient to create a genuine dispute of material fact as to whether Sotheby's UK was acting as an agent for Defendants in providing those valuations. *Cf. Bestfoods*, 524 U.S. at 69 ("[It is a] well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately." (cleaned up)). While Valette could, and at times did, assist Bouvier in working with various Sotheby's entities, the evidence before the Court shows that Valette worked only with Sotheby's UK in providing the valuations. Moreover, there is no indication that Sotheby's directed or controlled Sotheby's UK's actions in providing these valuations. The evidence thus does not show this "essential element of agency," *Hollingsworth*,

---

[12]    These citations are to the page numbers automatically generated by the Court's ECF system.

570 U.S. at 713, so no reasonable jury could find that Sotheby's UK was acting as Sotheby's agent in providing these valuations.

Accordingly, the Court denies Sotheby's motion for summary judgment on these grounds as to the nine sales and one auction, but grants the motion with respect to the valuations of Modigliani's *Nu Couché au Coussin Bleu* and Gauguin's *Otahi Seule*.

### 3.   Aiding-and-Abetting Liability

The Court turns, then, to the merits of Plaintiffs' remaining claims.  Under New York law, Plaintiffs must show the following three elements to establish liability for aiding and abetting fraud: "(1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."  *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) (cleaned up); *accord Oster v. Kirschner*, 905 N.Y.S.2d 69, 72 (1st Dep't 2010).  To establish liability for aiding and abetting a breach of fiduciary duty (relevant only to the transactions involving da Vinci's *Salvator Mundi* and Lautrec's Red *Au Lit: Le Baiser*), Plaintiffs must show: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 293 (2d Cir. 2006) (internal quotation marks omitted).  Because Plaintiffs allege that "the same activity . . . constitute[s] the primary violation underlying both claims" — namely, Bouvier's misrepresentations about his purported negotiations and the prices of the art —the aiding-and-abetting claims are substantially similarly.  *See In re re Platinum-Beechwood Litig.*, 453 F. Supp. 3d 645, 650 (S.D.N.Y. 2020).

Sotheby's argues that Plaintiffs' claims fail for either of two reasons: because no reasonable jury could find that Sotheby's had knowledge of Bouvier's purported fraud and

because no reasonably jury could find that Sotheby's provided substantial assistance to advance Bouvier's commission of the fraud.  *See* Defs.' MSJ Mem. 16-17.  For present purposes, Sotheby's does not dispute that there *was* a fraud — it merely argues that it was not aware of the fraud and did not substantially assist it.  In evaluating whether that is the case or not, the Court must consider each of the remaining fourteen transactions separately.  The Court will also evaluate the two transactions dismissed on agency grounds — Modigliani's *Nu Couché au Coussin Bleu* and Gauguin's *Otahi Seule* — in the alternative.  It will first examine the evidence of Sotheby's knowledge and then turn to the evidence of its substantial assistance.

> ### a.  Actual Knowledge

"Actual knowledge is required to impose liability on an aider and abettor under New York law."  *Krys*, 749 F.3d at 127 (cleaned up); *accord Pennington v. D'Ippolito*, 855 F. App'x 779, 784 (2d Cir. 2021) (summary order) (granting summary judgment on aiding-and-abetting fraud claim because the plaintiff "cannot plausibly demonstrate that [the defendant] had actual knowledge of [the] alleged fraud"); *Lerner*, 459 F.3d at 294 (holding that, for a claim of aiding and abetting a breach of fiduciary duty, the plaintiff must allege actual knowledge of the fiduciary's breach of duty).  "[C]onstructive knowledge — the possession of information that would cause a person exercising reasonable care and diligence to become aware of the fraud — is insufficient."  *de Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011); *see also, e.g.*, *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546-47 (S.D.N.Y. 2007); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 202-03 (S.D.N.Y. 2006).  It is unsettled whether conscious avoidance — which "occurs when it can almost be said that the defendant actually knew because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be abl[e] to

deny knowledge," *Vasquez v. H.K. & Shanghai Banking Corp.*, No. 18-CV-1876 (PAE), 2019

WL 2327810, at \*15 (S.D.N.Y. May 30, 2019) — can satisfy the knowledge requirement.

*Compare id.*, and *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349,

368 (S.D.N.Y. 2007), *with Zamora v. FIT Int'l Grp. Corp.*, 834 F. App'x 622, 628 (2d Cir. 2020)

(summary order), *and Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 415-16 (S.D.N.Y. 2021).

But mere suspicion of impropriety alone does not suffice. *See, e.g.*, *Heinert v. Bank of Am. N.A.*,

835 F. App'x 627, 630-31 (2d Cir. 2020) (summary order) (holding that the plaintiffs failed to

plead actual knowledge despite allegations that the defendants had flagged the underlying

tortfeasors' bank accounts for suspicious activity); *Rosner v. Bank of China*, 349 F. App'x 637,

638-39 (2d Cir. 2009) (summary order) (finding that the plaintiff had not alleged knowledge of

the underlying fraud despite allegations that the defendant had "reason to suspect" a money

laundering scheme).

Marshaling evidence of actual knowledge sufficient to survive summary judgment is not

an easy task. Courts in this Circuit have declined to find actual knowledge from facts that are

consistent with "normal, lawful business practices." *Krys*, 749 F.3d at 132; *see also de Abreu*,

812 F. Supp. 2d at 324-25 (finding no actual knowledge where the defendant had been aware of

the underlying tortfeasor's use of "black market currency traders" because the use of such traders

was commonplace in Brazil, where the tortfeasor was based); *Krys v. Butt*, 486 F. App'x 153,

157 (2d Cir. 2012) (summary order) (affirming dismissal of aiding-and-abetting breach of

fiduciary duty claims where the plaintiffs alleged that the defendants had knowledge of the

challenged bank transfers but not that they had knowledge that the transfers were unauthorized).

Similarly, evidence that a defendant processed atypical transactions on behalf of an alleged

tortfeasor is, without more, insufficient to show actual knowledge. *See Heinert v. Bank of Am.*,

*N.A.*, 410 F. Supp. 3d 544, 550 (W.D.N.Y. 2019) ("[A]llegations concerning a bank's willingness to 'bend its rules' to accommodate influential customers by processing irregular transactions does not give rise to a 'strong inference' of actual knowledge that those customers are engaged in fraud."), *aff'd* 835 F. App'x 627; *Liu Yao-Yi v. Wilmington Tr. Co.*, 301 F. Supp. 3d 403, 421 (W.D.N.Y. 2017) (atypical money transfers do not support an inference of actual knowledge); *Rosner v. Bank of China*, No. 06-CV-13562 (VM), 2008 WL 5416380, at *6-7 (S.D.N.Y. Dec. 18, 2008) (allegations that the defendant bank processed repeated transfers and withdrawals of large sums of money in and out of certain accounts did not support actual knowledge), *aff'd* 349 F. App'x 637.

At the same time, circumstantial evidence can be enough to show actual knowledge. *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018); *Oster*, 905 N.Y.S.2d at 72. So, for example, allegations or evidence that a defendant actively participated in a fraud may be sufficient to show actual knowledge. *See, e.g.*, *King Cnty. v. IKB Deutsche Industriebank AG*, 751 F. Supp. 2d 652, 664-65 (S.D.N.Y. 2010) (allegations that the defendant manipulated financial models and constructed investment vehicles for ratings agencies sufficient to infer actual knowledge of the agencies' fraud); *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 253-55 (S.D.N.Y. 2005) (Lynch, J.) (allegations that one of the defendants actively participated in drafting and negotiating fraudulent contracts and received emails referencing fraudulent contracts raised a strong inference of actual knowledge). In addition, courts have found a sufficiently strong inference of actual knowledge based on evidence that a defendant reviewed documents or otherwise had access to information that would have revealed or indicated the fraud. *See, e.g.*, *Carbon Inv. Partners, LLC v. Bressler*, No. 20-CV-3617 (ER), 2021 WL 3913526, at *7 (S.D.N.Y. Sept. 1, 2021) (the defendant regularly reviewed documents

regarding the tortfeasor's operations and drafted letters to investors knowing they contained false statements); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12-CV-3723 (RJS), 2016 WL 5719749, at *5 (S.D.N.Y. Sept. 29, 2016) (Sullivan, J.) (the defendants were aware of the tortfeasor's marketing materials and were aware that the tortfeasor's actions contradicted statements in those materials); *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 411-12 (S.D.N.Y. 2015) (the defendant reviewed financial information regarding the tortfeasor's sales, expenses, profits, and markups, and read a report casting suspicion on the provenance of artwork at issue in the alleged fraud).

Applying these standards, the Court finds that genuine disputes of material fact preclude the entry of summary judgment on this ground with respect to five of the transactions at issue: the sale of Magritte's *Le Domaine d'Arnheim*, the sale and auction of Modigliani's *Tête*, the sale of Klimt's *Wasserschlangen II*, and the sale of da Vinci's *Salvator Mundi*.  By contrast, the Court concludes that Plaintiffs have failed to raise a genuine dispute of material fact as to whether Sotheby's had actual knowledge of Bouvier's fraud and breach of fiduciary duty for the other eleven transactions: the sales of Picasso's *Homme Assis au Verre*, Maillol's *La Mediterranée*, Rodin's *Le Baiser*, Matisse's *Nu au Châle Vert*, Rodin's *L'Éternel Printemps*, Giacometti's *Femme de Venise IX*, Rodin's *Eve*, and Lautrec's Green *Au Lit: Le Baiser*; the auction of Lautrec's Red *Au Lit: Le Baiser*; and the valuations of Modigliani's *Nu Couché au Coussin Bleu* and Gauguin's *Otahi Seule*.  The Court will discuss each category in turn.

Beginning with the sale of Magritte's *Le Domaine d'Arnheim* (in December 2011) and Modigliani's *Tête* (in January 2013), the record suggests that Valette adjusted his estimated valuations of these two works to suit Bouvier, before Bouvier sold the works to Plaintiffs.  First, for the Magritte, one day after informing Bouvier that the owner was willing to sell for $25

million, Valette emailed Bouvier a draft, and then a final, description of the market for Magritte works and informed him that a similar, iconic Magritte would sell for $40 to $60 million.  Pls.' Counter SOF ¶¶ 348, 350.  Three days later, Valette sent an almost identical email to Bouvier, but he changed his estimated sales value for this other Magritte to €40 million.  *Id.* ¶ 351.  A few weeks later, Plaintiffs purchased the painting for $43.5 million, Defs.' SOF ¶ 113, close to the value Valette had provided in his second email.  While Valette provided an estimated value for a different Magritte than the one Plaintiffs purchased, it is a reasonable inference that he provided the estimate to suggest a price for *Le Domaine d'Arnheim*.  It is also reasonable to infer that Valette knew Bouvier would forward his estimates to another person as he provided Bouvier with a draft, a final email, and then a new final email with an updated price, all presumably at Bouvier's request; notably, these emails were formal in tone — in contrast to the informal tone Valette normally used when emailing Bouvier.  And, after providing these estimates, Valette sold the Magritte to Bouvier's company for $24.1 million, just below the price the seller had originally proposed.  Pls.' Counter SOF ¶ 355.  Plaintiffs have thus presented evidence that Valette was aware of Bouvier's price manipulation, the essence of his scheme.  *See, e.g.*, *De Sole*, 137 F. Supp. 3d at 411-12 (on a motion to dismiss, finding sufficient allegations of actual knowledge where, among other things, the defendant was aware of the sale price of the paintings at issue and that the tortfeasor was charging unusually high markups to the ultimate buyer).

Construed in the light most favorable to Plaintiffs, the evidence of Sotheby's actual knowledge of the fraud surrounding the sale and subsequent auction (in November 2014) of Modigliani's *Tête* is even stronger.  Two years after Sotheby's estimated the fair market value of the sculpture to be €8 million, and a month after the seller consigned it to Sotheby's for €55 million, Valette sent Bouvier a formal email, estimating the value at €70 to €90 million.  Pls.'

Counter SOF ¶¶ 358-59, 361.  Less than twelve hours later, Valette sent Bouvier an almost identical email, this time valuing the sculpture at €80 to €100 million.  *Id.* ¶ 360.  From this evidence, a jury could certainly infer that Valette and Bouvier spoke in the intervening twelve hours and that Valette raised his estimate at Bouvier's request.  Put differently, Valette provided Bouvier with materials inflating the price of the sculpture — circumstantial evidence of Valette's knowledge of Bouvier's scheme.  *See, e.g.*, *Silvercreek Mgmt.*, 346 F. Supp. 3d at 491 (denying summary judgment where there was evidence that the defendant had designed deals that enabled the tortfeasor to inflate its financials); *Abu Dhabi Com. Bank v. Morgan Stanley & Co.*, 888 F. Supp. 2d 431, 477-78 (S.D.N.Y. 2012) (finding actual knowledge where the defendants, ratings agencies, rated capital notes highly despite knowing that the notes deserved a lower rating).

In addition, Valette's email correspondence with another Sotheby's employee supports the inference that Valette knew Bouvier was not disclosing all relevant information to Plaintiffs in connection with the November 2014 auction of the Modigliani, including the fact that he had previously purchased the sculpture.  For example, when preparing the provenance section of the auction booklet for the sculpture, Valette instructed the employee: "Maybe better to cover the tracks slightly and designate as: Property from a Private European Collection."  ECF No. 468-118.  Ultimately, the sculpture's provenance was listed only as "Acquired from the above."  ECF No. 468-119, at 30.  From this and the other evidence discussed above, a reasonable jury could infer that Valette knowingly hid Bouvier's involvement in buying, selling, and auctioning the sculpture.  *See, e.g.*, *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 505-06, 509-10 (S.D.N.Y. 2009) (finding sufficient evidence of actual knowledge where the defendant bank made statements to auditors and investors knowing they were inconsistent with the truth).

The sales of Klimt's *Wasserschlangen II* and da Vinci's *Salvator Mundi* present closer calls.  With respect to the former, there is evidence that Sotheby's knew that Bouvier was seeking to purchase the painting on behalf of someone else; that the viewing demanded an unusually high level of confidentiality; and that Valette saw Rybolovlev at the viewing.  *See* Pls.' Counter SOF ¶ 238; ECF No. 468-148.  With respect to the latter, there is also evidence from which a jury could find that Sotheby's knew Bouvier was purchasing the da Vinci for Rybolovlev.  *See* Pls.' Counter SOF ¶¶ 239, 240-42, 246-48; ECF No. 468-157.  In addition, in March 2013, Valette told Bouvier that his colleague had estimated the sale price of the da Vinci to be between $30 and $40 million.  Pls.' Counter SOF ¶ 331.  Less than two months later, however, Bouvier paid $83 million, more than double the estimated sale price.  Defs.' SOF ¶ 174.  These facts alone would probably fall short of what would permit a jury to find actual knowledge of the fraud or breach of fiduciary duty on the part of Sotheby's.  But when paired with the evidence discussed above of Sotheby's actual knowledge of Bouvier's fraud with respect to prior transactions, it is just enough to get Plaintiffs over the summary judgment threshold as to these two transactions.[13]

By contrast, the Court concludes that there is insufficient evidence of actual knowledge for the remaining transactions to survive summary judgment.  First, for the auction of Lautrec's Red *Au Lit: Le Baiser*, Plaintiffs do not point to any evidence suggesting that Sotheby's had

---

[13]    For both the Klimt and da Vinci sales, Plaintiffs also point to the *subsequent* valuations that Sotheby's provided, which matched the prices Plaintiffs paid for the works, not the prices Bouvier paid.  *See* Pls.' Counter SOF ¶¶ 319-20 (Klimt); *id.* ¶¶ 341, 343, 345 (da Vinci). Because these valuations post-date the sales by approximately two years, they are not evidence of Sotheby's knowledge of fraud or breach of fiduciary duty at the time the transactions occurred.  *Berdeaux*, 561 F. Supp. 3d at 415.  For similar reasons, the Court will not consider evidence that, in September 2015, Sotheby's provided a draft appraisal of the da Vinci of $38 million, Pls.' Counter SOF ¶ 346, significantly lower than the insurance valuation.

actual knowledge that Bouvier was committing fraud or breaching a fiduciary duty by failing to remit the auction proceeds to Plaintiffs. Pls.' MSJ Mem. 9. It is undisputed that Sotheby's auctioned this work on February 3, 2015, and, further, that Bouvier did not provide Plaintiffs with the proceeds from the auction. Pls.' Counter SOF ¶¶ 473, 481. But there is no evidence that Sotheby's knew Plaintiffs were entitled to the proceeds of the auction. Valette executed the consignment agreement with Bouvier, not Plaintiffs. *Id.* ¶ 472. Even if Valette was aware that Plaintiffs had owned the work, and that they had agreed to have Bouvier auction it, *see, e.g.*, *id.* ¶¶ 469-70 (Valette sent an informal email to Bouvier with the auction catalogue for Lautrec's Red *Au Lit, Le Baiser*, and then a formal email ten minutes later, suggesting that Valette knew Bouvier was forwarding the email to a client), Sotheby's was contractually obligated to provide the proceeds to Bouvier, not Plaintiffs. *See* ECF No. 468-329. Thus, there is no evidence in the record (except perhaps Sotheby's knowledge with respect to the Magritte and Modigliani sales discussed above, which is not enough) from which a jury could find that Sotheby's had actual knowledge as to Lautrec's Red *Au Lit: Le Baiser*.

For two transactions — the sales of Maillol's *La Méditerranée* and Rodin's *Le Baiser* (which predated the Magritte and Modigliani sales) — the only evidence Plaintiffs put forth in support of Sotheby's actual knowledge of the alleged fraud is evidence that Sotheby's knew Bouvier was buying art for another person. But that is not uncommon in the high-end art world. *See* ECF No. 370-3 ("Sainty Rep."), at 6 (discussing the characteristics of art dealers); ECF No. 400-9 ("Smith Rebuttal Rep."), at 3-4 (same).[14] For example, shortly after Bouvier had purchased both Maillol's *La Méditerranée* and Rodin's *Le Baiser*, but before Plaintiffs had

---

[14]    Here and immediately below, the Court cites to portions of the experts' reports that are not subject to the parties' *Daubert* motions addressed later in this Opinion and Order.

purchased them from Bouvier, Valette emailed Bouvier and asked: "Does the client want to send his carriers to pick them up or does he prefer that they be delivered to the free port?"  ECF No. 468-138.  This is merely evidence that Bouvier was engaged in "normal, lawful business practices."  *Krys*, 749 F.3d at 132; *see also 2006 Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp.*, 816 F. Supp. 2d 222, 237-38 (S.D.N.Y. 2011) (granting summary judgment on aiding-and-abetting fraud claim where the defendant's "knowledge at the time of [the tortfeasor's] fraud did not constitute clear evidence of his misappropriation").  Without more, that is not enough for a reasonable jury to infer actual knowledge on Sotheby's part.

For another two transactions — Rodin's *Eve* (which occurred after the Magritte sale but before the Modigliani sale) and Lautrec's Green *Au Lit: Le Baiser* (which post-dated both) — Plaintiffs again point to evidence that Sotheby's knew Bouvier was buying on behalf of another.  For Rodin's *Eve*, two years before Plaintiffs purchased it, a Sotheby's employee emailed another that a "big client" of Peretti was looking for an *Eve* sculpture, so Peretti had asked Valette for help.  Pls.' Counter SOF ¶ 222; ECF No. 468-126.  Although the prior sale of the Magritte is certainly a factor in assessing Sotheby's knowledge, it does not save Plaintiffs here; the only other evidence of knowledge is woefully inadequate.  So too, for Lautrec's Green *Au Lit: Le Baiser*, the only evidence of knowledge is that a few months after Bouvier purchased the painting, and the same day Plaintiffs purchased it from Bouvier, Valette "urgently" requested that another Sotheby's employee prepare the "usual research doc" for the painting, Pls.' Counter SOF ¶ 397; ECF No. 468-108, presumably so that Bouvier could provide it to Plaintiffs.  Although Sotheby's knowledge with respect to the Magritte and Modigliani sales is certainly a factor, there is insufficient other evidence to support an inference of actual knowledge.

For another two transactions — the sale of Matisse's *Nu au Châle Vert* (which predated the Magritte and Modigliani sales) and the valuation of Gauguin's *Otahi Seule* — Plaintiffs point to subsequent valuations Sotheby's provided that they claim are suspect.[15]  Sotheby's drafted valuations on October 22, 2014, and then provided final valuations to Bouvier on October 24, 2014.  Pls.' Counter SOF ¶¶ 295-96, 321-22.  In both cases, the final valuations were meaningfully higher than the draft valuations Sotheby's had prepared two days earlier.  *Id.*  For the Gauguin, Sotheby's also provided Bouvier with another valuation four months later, showing an even higher price. *Id.* ¶ 323.  These valuations closely tracked the inflated prices Plaintiffs paid for the works, rather than the lower prices Bouvier paid.  *Id.* ¶¶ 297, 325.[16]  But even viewing this evidence in the light most favorable to Plaintiffs — i.e., inferring that Sotheby's provided these artificially inflated valuations to cover up Bouvier's fraud — this is insufficient to show that Sotheby's had actual knowledge of the underlying fraud itself.  Evidence that post-dates Bouvier's sales, by up to two years, *see* Defs.' SOF ¶ 30 (showing the dates of Plaintiffs' purchases), is insufficient, without more, to show that Sotheby's had knowledge of the fraud at the time Bouvier allegedly perpetrated it.  *See, e.g.*, *Berdeaux*, 561 F. Supp. 3d at 413-14 (holding that a defendant's investigation into fraud six months after fraudulent transactions was

---

[15]     For the Matisse, Plaintiffs also have evidence that Sotheby's was aware Bouvier purchased the art on behalf of someone else, *see* Pls.' Counter SOF ¶ 235, but, as discussed above, the fact that Sotheby's knew Bouvier was purchasing art with the purpose of reselling it to another person does not show actual knowledge of fraud.

[16]     For the Matisse, Plaintiffs also point to a subsequent "valuation" Sotheby's issued that was much lower than the valuation it provided to Bouvier; in 2015 and 2016, Sotheby's issued auction estimates of between $30 and $50 million.  Pls.' Counter SOF ¶¶ 303-04.  Sotheby's disputes that this valuation is the same type of valuation it provided Bouvier, which is titled "Insurance Valu[ation]," and which Sotheby's expert William H. Smith argues is intended to be higher than other types of valuations.  ECF No. 400-3 ("Smith Rep."), at 7-9.

insufficient to show actual knowledge at the time of the transactions).  Put simply, the fact that Sotheby's, two years on, provided valuations that aligned with the prices Bouvier charged Plaintiffs for the paintings sheds no light on Sotheby's knowledge at the relevant time.

For Modigliani's *Nu Couché au Coussin Bleu*, Plaintiffs point as well to a subsequent valuation, but, as just discussed, that is not evidence of Sotheby's knowledge at the time of the alleged fraud.  Plaintiffs also cite "valuations" that Sotheby's had *before* Bouvier's sale to Plaintiffs.  Pls.' Counter SOF ¶¶ 306-307.  Specifically, Plaintiffs point to two Sotheby's internal emails valuing the Modigliani at $50 million and $45 million for purposes of obtaining insurance and a bank loan, respectively.  *Id.*  A year later, in 2011, Valette sent a formal email to Bouvier opining that the painting was worth between $70 and $90 million.  *Id.* ¶ 308.  Bouvier paid $96 million for the painting, *id.* ¶ 313, slightly above the high end of Valette's estimate; Plaintiffs then purchased the painting from Bouvier on January 16, 2012, albeit not through Sotheby's.  Defs.' SOF ¶ 188.  At most, however, this evidence shows that Valette knew Bouvier was looking to purchase the painting on behalf of someone else and provided his opinion of the value of the work to assist with the sale.  There is nothing to suggest that Valette artificially inflated the value of the painting at Bouvier's request so that Bouvier could charge Plaintiffs more.  This stands in stark contrast to the evidence for Magritte's *Le Domaine d'Arnheim*, where Valette emailed Bouvier valuation figures only one day after learning how much the seller wanted, *id.* ¶¶ 348, 350, and the evidence for Modigliani's *Tête*, for which Valette increased his valuation estimate a mere twelve hours after initially sending it to Bouvier, *id.* ¶¶ 359-60.

For the final three transactions — Picasso's *Homme Assis au Verre*, Rodin's *L'Éternel Printemps*, and Giacometti's *Femme de Venise IX* (all of which, critically, predated the sale of the Magritte and the Modigliani) — the evidence Plaintiffs put forth constitutes, at most, "red

flags," warning signs that should arguably have alerted Sotheby's to Bouvier's fraud but do not qualify as evidence of actual knowledge.  *See, e.g.*, *Heinert*, 835 F. App'x at 631; *de Abreu*, 812 F. Supp. 2d at 323; *Chemtex, LLC*, 490 F. Supp. 2d at 547.  The "red flags" Plaintiffs raise are Sotheby's confidentiality requirements for each of these sales.  For the Picasso, Valette requested that that the following confidentiality clause be added to the contract: "[S]otheby['s will not communicate on the sale of the picture, the picture itself, the sale price[,] and the buyer."  ECF No. 468-225.  For the Rodin, Valette confirmed that there would be "no mention of value on the paperwork[]."  ECF No. 468-57.  And for the Giacometti, Sotheby's drafted a "bespoke release note" that did not list the value of the property in order to keep it confidential.  ECF No. 468-236.  Complete confidentiality, combined with the fact that, at least for the Picasso and the Rodin, Sotheby's knew Bouvier was purchasing the art on behalf of someone else, *see* ECF Nos. 468-133, 468-144, was arguably a warning sign of "some impropriety."  *Zamora*, 834 F. App'x at 628.  But absent evidence that Sotheby's knew of prior frauds involving Bouvier — as there was for the Klimt and the da Vinci transactions discussed above — it is not enough to prove actual knowledge of the underlying fraud.  *Id.*[17]

In short, because actual knowledge is an essential element of an aiding-and-abetting fraud claim, and because Plaintiffs have not provided evidence sufficient to raise a genuine dispute of material fact with respect to eleven of the transactions, Sotheby's is entitled to summary judgment dismissing Plaintiffs' fraud-related claims with respect to these eleven transactions,

---

[17]     Plaintiffs argue, in passing, that Sotheby's violated its own due diligence requirements when reviewing Bouvier's transactions.  Pls.' MSJ Opp'n 9.  Assuming *arguendo* that this is true for the all the transactions at issue, it is not sufficient to raise a genuine issue as to Sotheby's knowledge.  *See Berman v. Morgan Keegan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (summary order) ("'Know Your Customer' obligations are, standing alone, far from sufficient to support a strong inference that [the defendant] had actual knowledge of [the] fraud.").

including the two dismissed above on agency grounds.  The same is true for the aiding-and-abetting a breach of fiduciary duty claim as to Lautrec's Red *Au Lit: Le Baiser*.  By contrast, Sotheby's is not entitled to summary judgment with respect to Plaintiffs' fraud claims concerning the sales of Magritte's *Le Domaine d'Arnheim*, Klimt's *Wasserschlangen II*, Modigliani's *Tête*, and da Vinci's *Salvator Mundi*, and the auction of Modigliani's *Tête*, or with respect to Plaintiffs' fiduciary duty claims concerning the sale of da Vinci's *Salvator Mundi*.

### b.  Substantial Assistance

In addition to actual knowledge, Plaintiffs must establish that Sotheby's provided substantial assistance to Bouvier in perpetrating the frauds and breach of his fiduciary duty at issue.  "Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.  That is, the injury must be a direct or reasonably foreseeable result of the conduct."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 345 (2d Cir. 2018) (internal citations and quotation marks omitted); *see In re Platinum-Beechwood Litig.*, 453 F. Supp. 3d at 650.  In establishing substantial assistance, "[t]he critical test is not . . . whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud."  *Winnick*, 406 F. Supp. 2d at 257; *see also Pension Comm.*, 652 F. Supp. 2d at 510-11 (finding sufficient evidence of substantial assistance, even though the defendants' actions were routine, because the defendants made a "substantial contribution to the perpetration of fraud").

Here, Plaintiffs have sufficient evidence to survive that critical test at trial with respect to the five transactions that remain at issue.  That is undisputed with respect to the sales of the Magritte and the Modigliani.  Defs.' MSJ Mem. 21 n.21.  As for the auction of Modigliani's *Tête*, Sotheby's prepared the auction materials, including the provenance that intentionally

omitted mention of Blancaflor, advertised the sculpture, and held the auction.  ECF Nos. 468-

118, 468-119; ECF No. 417-25, at 1, 10.  After the auction, Sotheby's remitted payment to

Blancaflor.  ECF No. 417-26.  Although such actions may have been standard practice for

Sotheby's, they still "made a substantial contribution" to Bouvier's fraud.  *Pension Comm.*, 652

F. Supp. 2d at 511.  Sotheby's, through Valette, prepared the provenance for the Modigliani,

omitting reference to Blancaflor, and thus enabling Bouvier to keep his role in buying and selling

the sculpture hidden.  Moreover, the auction of the Modigliani proximately caused Plaintiffs'

injuries; Plaintiffs were damaged because Bouvier kept the proceeds of the auction instead of

using the Modigliani to offset the cost of a Rothko painting, so the auction was the necessary

step in enabling Bouvier to reap those profits.  Drawing all inferences in favor of Plaintiffs, a

jury could find that Sotheby's actions substantially assisted Bouvier's fraud.

  Plaintiffs have also provided sufficient evidence of Sotheby's substantial assistance for

the sale of the da Vinci.  On multiple occasions, Valette emailed Bouvier documents containing a

treatment report, the provenance, exhibition history, photographs, and literature references for

the painting.  Defs.' SOF ¶¶ 162, 165, 167, 169, 171.  The parties dispute whether Plaintiffs

received all of these documents, *e.g.*, *id.* ¶ 167, 169, although Plaintiffs have evidence that they

did, ECF Nos. 468-113, 468-114, 468-115; Kornstein Decl. ¶ 24; Rybolovlev Decl. ¶ 33.

Moreover, as discussed above, Sotheby's was integral in facilitating the viewing of the da Vinci.

As with the Modigliani auction, these may be standard steps for an auction house like Sotheby's

to take, but a reasonable jury could nonetheless find that they made a "substantial contribution"

to Bouvier's fraud and breach of fiduciary duty.  *Pension Comm.*, 652 F. Supp. 2d at 511.

  The sale of the Klimt presents a much closer question, but the Court concludes that there

is just enough evidence to support an inference of substantial assistance.  On August 29, 2012,

about two weeks before the sale, Valette coordinated a viewing of the Klimt and saw Rybolovlev at that viewing.  Pls.' Counter SOF ¶ 238.  Rybolovlev testified that Bouvier introduced Valette as coming from Sotheby's, which helped convince Rybolovlev that the Klimt and Bouvier's recommended price were legitimate.  Rybolovlev Decl. ¶ 26.  In other words, construing the facts in the light most favorable to Plaintiffs, the Klimt viewing, and Valette's presence there, were critical to Bouvier's ability to convince Plaintiffs to purchase the Klimt.  On top of that, during this period, Sotheby's CEO and COO were involved in negotiating the sale of the Klimt from its prior owners.  Ruprecht Tr. 33; Vinciguerra Tr. 280.  Sotheby's executives' heavy involvement in the negotiations, combined with the viewing that Valette coordinated, are sufficient evidence of Sotheby's substantial assistance to Bouvier.

### 4.  Conclusion

In conclusion, Sotheby's motion for summary judgment is GRANTED with respect to all of Plaintiffs' claims for aiding and abetting a breach of fiduciary duty other than the claim relating to the sale of da Vinci's *Salvator Mundi*.  The motion is also GRANTED with respect to Plaintiffs' fraud-related claims relating to the following eleven sales, auctions, and valuations: Picasso's *Homme Assis au Verre*, Maillol's *La Méditerranée*, Rodin's *Le Baiser*, Matisse's *Nu au Châle Vert*, Rodin's *L'Éternel Printemps*, Giacometti's *Femme de Venise IX*, Rodin's *Eve*, Lautrec's Green *Au Lit: Le Baiser*, Modigliani's *Nu Couché au Coussin Bleu*, Gauguin's *Otahi Seule*, and Lautrec's Red *Au Lit: Le Baiser*.  By contrast, the motion is DENIED with respect to Plaintiffs' fraud-related claims relating to Magritte's *Le Domaine d'Arnheim*, Klimt's *Wasserschlangen II*, Modigliani's *Tête* (sale and auction), and da Vinci's *Salvator Mundi*.

### B.  Plaintiffs' Motion for Partial Summary Judgment

The Court need not dwell long on Plaintiffs' motion for partial summary judgment.

Plaintiffs move for summary judgment as to only two issues: first, that Bouvier defrauded

Plaintiffs and, second, that Bouvier breached his fiduciary duty to Plaintiffs.  Pls.' MSJ Mem. 2.

As to the former, the Court concludes that there are genuine disputes of material fact with respect

to the sole element of fraud that Sotheby's disputes: reasonable reliance on the part of Plaintiffs.

*See* Defs.' MSJ Mem. 36; *see also, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.,

LLC*, 13 F.4th 247, 259 (2d Cir. 2021) (reciting the five elements of fraud under New York law).

Notably, it is "rare" for a court to grant summary judgment on the issue of reasonable reliance,

*Glob. Mins. & Metals Corp. v. Holme*, 824 N.Y.S.2d 210, 215 (1st Dep't 2006), because "[t]he

question of what constitutes reasonable reliance . . . is so fact-intensive," *Schlaifer Nance & Co.

v. Est. of Andy Warhol*, 119 F.3d 91, 98 (2d Cir. 1997).  And here, there are enough facts in the

record from which a reasonable jury could find that Plaintiffs' reliance was unreasonable,

particularly as to the later transactions at issue.  *See* Defs.' MSJ Mem. 36-45.  Accordingly,

Plaintiffs' motion for summary judgment on the issue of reasonable reliance — and, by

extension, on their underlying fraud claims generally — must be and is DENIED.[18]

As to the breach of fiduciary duty, the Court similarly concludes that there are triable

issues of fact with respect to whether Plaintiffs had a fiduciary relationship with Bouvier.  *See*

---

[18]     Sotheby's does not dispute that Plaintiffs have established the other four elements of
fraud, namely (1) a material misrepresentation or omission of fact (2) made by Bouvier with
knowledge of its falsity (3) and intent to defraud (4) that resulted in damage to Plaintiffs.  *See
Loreley Fin.*, 13 F.4th at 259.  The Court concludes, substantially for the reasons stated in
Plaintiffs' memorandum of law, *see* Pls.' MSJ Mem. 10-16, 25, that these elements are supported
by the record.  Accordingly, it may be that the Court should treat these elements as "established"
pursuant to Rule 56(g) of the Federal Rules of Civil Procedure.  The parties should confer and
address whether that would be appropriate in their proposed Joint Pretrial Order.

Defs.' MSJ Mem. 27-36; *see also Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020) (reciting the three elements of a breach of fiduciary duty claim).  For instance, Plaintiffs' sales contracts for the first four paintings they purchased from Bouvier did not mention any agency relationship, ECF Nos. 416-31, 416-32, 416-33, 416-34; Bouvier did not consistently invoice Plaintiffs for a commission, as would be typical for an agent, ECF Nos. 416-48, 461-37, 461-49, 461-54; and it is far from clear that Plaintiffs had the type of longstanding trust relationship with Bouvier that could constitute a fiduciary relationship, Defs.' MSJ Mem. 34-35. *See also In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 79 (2d Cir. 2019) ("Generally, whether an agency relationship exists is a mixed question of law and fact." (cleaned up)). Accordingly, Plaintiffs' motion for summary judgment on the issue of a fiduciary relationship — and on their underlying breach of fiduciary duty claims — must be and is DENIED.[19]

## MOTIONS TO PRECLUDE EXPERT TESTIMONY

The Court now turns from the parties' motions for summary judgment to their motions to preclude expert testimony.  Both sides filed *Daubert* motions seeking to exclude some or all of the testimony of the other side's experts.  More specifically, Sotheby's moves to preclude the testimony of Robert Wittman in its entirety, *see* ECF No. 372, and the testimony of Guy Stair Sainty in part, *see* ECF No. 370, while Plaintiffs move to preclude the testimony of William H. Smith in part, *see* ECF No. 395.  The Court need only address these motions to the extent that

---

[19]    As with the fraud claim, Sotheby's does not dispute that Plaintiffs have established the other two elements of a breach of fiduciary duty, namely (1) misconduct by Bouvier and (2) damages directly caused by that misconduct.  *See Yukos Cap. S.A.R.L.*, 977 F.3d at 241.  Once again, the Court concludes, substantially for the reasons stated in Plaintiffs' memorandum of law, *see* Pls.' MSJ Mem. 24-25, that these elements are supported by the record.  Accordingly, here too, the parties should confer and address in their proposed Joint Pretrial Order whether it would be appropriate to treat these elements as "established."

they remain live following the rulings on summary judgment above.  That is, to the extent that any expert testimony pertains only to claims that are no longer in the case (e.g., the transactions as to which there is no evidence of Sotheby's actual knowledge), it is no longer relevant and need not be addressed.  Subject to that proviso, and for the reasons that follow, Sotheby's motion to preclude Wittman's testimony is granted in part and denied in part; Sotheby's motion to partially preclude Sainty's testimony is granted; and Plaintiffs' motion to partially preclude Smith's testimony is denied.

## A.  Applicable Legal Standards

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)  the testimony is based on sufficient facts or data;
>
> (c)  the testimony is the product of reliable principles and methods; and
>
> (d)  the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case.").  "The Rule 702 inquiry is a flexible one

that depends upon the particular circumstances of the particular case at issue." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) (internal quotation marks omitted); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150-52 (1999) (explaining that because "there are many different kinds of experts, and many different kinds of expertise," a court must be granted "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable").

The focus of the Court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Ultimately, "expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted). The Court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Nor should an expert be permitted to "supplant the role of counsel in making argument at trial," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004), or be permitted to merely "construct[] a factual narrative based upon record evidence," *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227 (PAC), 2015 WL 5003528, at *2 (S.D.N.Y. Aug. 20, 2015), *aff'd*, 899 F.3d 87 (2d Cir. 2018). Relatedly, expert testimony regarding "an ultimate determination that [is] exclusively within [the jury's] province," including witness credibility, must be precluded, *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005), as must an expert's testimony "on issues of law," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

By contrast, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21 (internal quotation marks omitted). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596. Moreover, "[a]lthough a district court should admit expert testimony only where it is offered by a qualified expert and is relevant and reliable, exclusion remains the exception rather than the rule." *In re Gen. Motors*, 2016 WL 4077117, at *2 (internal quotation marks omitted); *see also Nimely*, 414 F.3d at 395 ("Rule 702 embodies a liberal standard of admissibility for expert opinions . . . .").

## B. Sotheby's Motions

The Court will begin with Sotheby's motions, to exclude Wittman's testimony in its entirety, *see* ECF No. 372-1 ("Defs.' Wittman Mem."), and to exclude Sainty's testimony in part, *see* ECF No. 370-1 (Defs.' Sainty Mem.).

### 1. Robert Wittman

Wittman is a former FBI Special Agent and art crimes investigation expert. ECF No 372-3 ("Wittman Rep."), at 2-7; *see* ECF No 401 ("Pls.' Sainty & Wittman Opp'n"), at 18-19. He offers three primary opinions based on his "experience and expertise as an investigator of art fraud" and his review of materials from this case. Wittman Rep. 7-8. First, he offers opinions on "indicia of fraudulent conduct in the art industry" and that experienced actors in the art market, including auction houses, are aware of these indicia. *Id.* at 8-11. Second, he opines that Bouvier and Peretti's interactions with Plaintiffs were "consistent with the typical conspiratorial conduct of people who are attempting to engage in fraudulent art transactions." *Id.* at 12. And third, he avers that Sotheby's conduct "is consistent with the typical conduct of people who are assisting a

person who is engaged in fraudulent activity." *Id.* at 18 (emphases removed).  Sotheby's argues that all of these opinions improperly "invade the provinces of the judge and jury," make witness credibility determinations, do not assist the jury in understanding relevant evidence, and are substantially more prejudicial than probative.  Defs.' Wittman Mem. 1.  The Court agrees in many respects, but not with Sotheby's contention that Wittman should be precluded altogether.

At the outset, to the extent that Sotheby's seeks to preclude Wittman from testifying altogether, it goes too far.  Plaintiffs are correct in asserting that the high-value art market and how transactions in that market usually occur are specialized topics "beyond the ken of the average juror." *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994); *see* Pls.' Sainty & Wittman Opp'n 23-24.  Given that, and given Wittman's lengthy experience and expertise in investigating and detecting fraud in that market, *see* Wittman Rep. 8-9, he may testify generally about the indicia of fraudulent conduct in the high-end art market; about conduct that is uncommon or suspicious in that market; and about conduct that is typical of those who engage in art fraud, *see, e.g.*, *Howard Univ. v. Borders*, No. 20-CV-4716 (LJL), 2022 WL 11817721, at *12 (S.D.N.Y. Oct. 20, 2022) (permitting an expert to testify about an art gallery's inventory based on his decades of experience with art galleries and museums); *United States v. Zhong*, 26 F.4th 536, 556 (2d Cir. 2022) (permitting expert testimony regarding the typical structure of a particular type of criminal enterprise); *United States v. Robinson*, No. 98-CR-167 (DLC), 2000 WL 65239, at *3 (S.D.N.Y. Jan. 26, 2000) (allowing expert testimony "regarding the modus operandi of financial fraud schemes" on the ground that it "would no doubt be of assistance to [the] jury"); *cf. United States v. Ojeikere*, No. 03-CR-581 (JGK), 2005 WL 425492, at *5 (S.D.N.Y. Feb. 18, 2005) (barring expert testimony about a fraud scheme that "is simple and easy to understand," as the testimony would not "assist the jury in understanding the evidence").

The fact that Wittman may use the terms "fraud" or "agent" in the course of his testimony on those subjects, *see* Defs.' Wittman Mem. 6-7, does not render it inadmissible.  He makes plain that he uses those terms in a non-legal sense.  *E.g.*, ECF No. 401-8, at 170-71; *see also, e.g.*, *In re Air Disaster at Lockerbie Scot. on Dec. 21, 1988*, 37 F.3d 804, 826 (2d Cir. 1994) (permitting an expert to opine that the appellants had engaged in "fraud" because it was clear he used the term in a non-legal sense), *abrogated on other grounds by Zicherman v. Korean Air Lines Co.*, 516 U.S. 217 (1996).  And to the extent there is any danger that jurors would confuse Wittman's testimony on these issues for testimony on legal terms or the ultimate legal issues they are to decide, the proper remedy is curative instructions, not exclusion.  Sotheby's is on firmer ground in asserting that some of Wittman's indicia of fraud are premised on assumptions about disputed issues, *see* Defs.' Wittman Mem. 19-22 — for instance, whether there was an agency relationship between Bouvier and Rybolovlev — but that does not render his testimony inadmissible so long as it is left to the jury to decide whether those assumptions are valid.  That is, Sotheby's arguments "that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  *Boucher*, 73 F.3d at 21 (internal quotation marks omitted).

That said, Plaintiffs and Wittman also go too far in at least two respects.  First, the Court will not permit Wittman to "usurp the jury's function by providing an overall conclusion of [tortious] conduct," *Zhong*, 26 F.4th at 556 (cleaned up), or to "supplant the role of counsel in making argument at trial," *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d at 541.  Wittman's report crosses those lines when he moves from offering general opinions about fraud in the high-end art market to offering specific opinions about the facts in this case, as when he opines that "[t]he patterns present in *this* case closely resemble those present in several fraud cases I investigated," Wittman Rep. 8 (emphasis added), or that Bouvier and Peretti's interactions with

Plaintiffs were "consistent with the typical conspiratorial conduct of people who are attempting to engage in fraudulent art transactions," Wittman Rep. 2; *see also Howard Univ.*, 2022 WL 11817721, at *11 (permitting expert testimony regarding general standards of care for art museums and galleries, but excluding testimony that drew inferences based on evidence admitted). He crosses these red lines too when he merely rehashes evidence in the case without providing any expert analysis, as when he describes the contents of invoices and emails, *see, e.g.*, Wittman Rep. 12, 14-16, 17, or when he opines on the inferences to be drawn from such evidence, such as whether Bouvier had a relationship of trust with Plaintiffs, whether Bouvier and Plaintiffs had agreed upon a 2% commission for his services, and whether Bouvier charged undisclosed markups, *see, e.g.*, *id.* 16-18. *See Anderson News, L.L.C.*, 2015 WL 5003528, at *2 ("An expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." (cleaned up)). At best, Wittman's proposed testimony about the content and meaning of evidence that will be before the jury would be unhelpful commentary on "lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 708 (2d Cir. 1989). At worst, it would usurp the jury's function. In either case, it would be impermissible.

Second, at times, Wittman runs afoul of the rule that an expert may not offer "evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, as well as testimony regarding the intent or motive of parties, or a party's state of mind." *Anderson News, L.L.C.*, 2015 WL 5003528, at *2 (internal quotation marks omitted); *see, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 479 (S.D.N.Y. 2016) (excluding expert testimony that "impermissibly speculate[d]," based on the documents in evidence, on the parties' "state of mind or intent"). He does that, for instance, when he opines based on his reading of

emails in the record that Sotheby's "was aware that Bouvier was buying on behalf of a principal" and that Sotheby's knew the principal to be Rybolovlev.  Wittman Rep. 18.  He does it too when he opines on whether or to what extent the indicia of fraud that he describes from his experience are known "to experienced actors in the industry, including auction houses."  Wittman Rep. 9-10.  Making matters worse, he does not ground most of these opinions on any specific experiences derived from his background investigating art fraud.  Instead, they are mere *ipse dixit* and must be excluded on that basis as well.  *Gen Elec. Co.*, 522 U.S. at 146; *see also Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-CV-8645 (KBF), 2018 WL 1889763, at *3 (S.D.N.Y. Apr. 18, 2018) ("[C]onclusory opinions — often referred to as *ipse dixit* — fail to provide a methodology that would allow a court to assess reliability."), *aff'd*, 773 F. App'x 607 (Fed. Cir. 2019).[20]

### 2. Guy Stair Sainty

Sainty is an art dealer with decades of experience in buying, selling, and reviewing art.  *See* Sainty Rep. 2-3; *see* Pls.' Sainty & Wittman Opp'n 3.  He offers four overarching opinions: first, that Bouvier's conduct was consistent with acting as Plaintiffs' art agent, and not an art dealer, Pls.' Sainty & Wittman Opp'n 1; second, that Sotheby's had access to information about the roles of Bouvier, Peretti, and Rybolovlev within the art market, *id.*; third, that Sotheby's did not perform adequate due diligence on Bouvier, *id.* at 1-2; and fourth, that Sotheby's valuations did not meet market standards, *id.* at 2.  Sotheby's does not seek to preclude those portions of Sainty's opinions that discuss general standards within the art market and what was generally known within the art market during the relevant period.  Defs.' Sainty Mem. 3-5.  Instead,

---

[20]     Subject to the foregoing limitations, Wittman's testimony should not run afoul of Rule 403's balancing test and the Court need not address those issues specifically here.

Sotheby's seeks to preclude his testimony to the extent that he offers factual conclusions regarding the conduct or knowledge of Bouvier and Sotheby's. *See id.*

Sotheby's is on firm ground, for many of the same reasons discussed above in reference to Wittman. There is no problem with Sainty testifying about the high-end art market and auction houses generally; about the indicia of an agency relationship; or about the market standards for valuations generally. But like Wittman, he may not tread on the jury's role by giving his opinion on the ultimate issues in the case, including whether Plaintiffs and Bouvier had a principal-agent relationship, *e.g.*, Sainty Rep. 7, and whether Bouvier "manipulate[d]" Plaintiffs into paying higher prices, *id.*; *see DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, No. 11-CV-564 (BMC), 2019 WL 1515231, at *7 (E.D.N.Y. Feb. 21, 2019) (prohibiting an expert from testifying "that defendants' conduct was anticompetitive or unlawful, [or] . . . that defendants did or did not engage in a price-fixing scheme, because that is the ultimate determination for the jury to make"); *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 471-72 (S.D.N.Y. 2005) (holding that expert testimony opining that "the conduct of certain defendants[] and non-parties violated th[e] law" was inadmissible). Nor may he do counsel's job in summation and simply rehash the facts of the case or summarize evidence, as he does, for example, when he describes and interprets communications between Bouvier and Plaintiffs, Sainty Rep. 7; draws inferences from the invoices Bouvier's company gave to Plaintiffs, *id.* at 6-7, 8; suggests that Sotheby's took into account how much money Peretti would make on sales, *id.* at 8 n.13; opines on whether Sotheby's performed due diligence on Bouvier, *id.* at 19-20; describes notes from a valuation committee meeting, *id.* at 22; and recites the contents of emails between Valette and Bouvier discussing the value of works by Magritte and Modigliani, *id.* at

22-24; *see, e.g.*, *Anderson News, L.L.C.*, 2015 WL 5003528, at *2; *Highland Cap. Mgmt.*, 379 F. Supp. 2d at 468-69.

Additionally, Sainty crosses the line by offering opinions on the credibility and state of mind of Sotheby's, its employees, and Bouvier.  For instance, he opines on what Sotheby's and its employees actually knew, Sainty Rep. 12; *see also id.* at 16 (opining that Sotheby's actions suggest that "it already knew that Bouvier was buying for Mr. Rybolovlev"); *id.* at 18 ("Sotheby's own employees were surprised by the speed on these transactions [with Bouvier]."); what Sotheby's should have known, *id.* at 10-11; Bouvier's motivations and state of mind, *id.* at 7; and the credibility of Sotheby's employees' statements regarding what they knew, *id.* at 11, 12.  Relatedly, his testimony runs afoul of the helpfulness requirement when he simply rehashes the deposition testimony of Sotheby's employees, *id.* at 12-13, or discusses Sotheby's due diligence and valuation policies and procedures, *id.* at 13-14, 22, as to which he has neither personal knowledge nor expertise, *see Am. Home Assurance Co. v. Merck & Co.*, 462 F. Supp. 2d 435, 449 (S.D.N.Y. 2006) (permitting expert testimony on industry custom but excluding testimony directed to the expert's understanding of the specific policy at issue); *Jensen v. Cablevision Sys. Corp.*, 372 F. Supp. 3d 95, 116 (E.D.N.Y. 2019) ("Interpreting admissible evidence without having personal knowledge or experience is improper.").  To the extent that Sotheby's policies are relevant to the claims remaining in the case, Plaintiffs may offer the policies themselves and make arguments on the basis of them.  *See In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).

### 3. Conclusion

In short, Wittman may testify generally about the indicia of fraudulent conduct in the high-end art market; about conduct that is uncommon or suspicious in that market; and about

conduct that is typical of those who engage in art fraud.  Sainty may testify generally about the high-end art market and auction houses, standards for art valuations, and about the indicia of an agency relationship in the context of art sales.  But the Court will not permit either expert (or any other, for that matter) to tread on the role of the jury by offering his own conclusions about the facts of this case or to usurp the role of counsel by giving a factual recitation of the evidence or making arguments about what inferences to draw from the evidence.  Nor will either expert be permitted to testify about the credibility or state of mind of the parties or others.

### C.  Plaintiffs' Motion to Preclude in Part the Testimony of William H. Smith

Finally, Plaintiffs move to preclude in part the testimony of Smith, an art appraiser and the Chairman of Gurr Johns, an art valuation and advisory firm.  Smith Rep. 1; *see* ECF No. 411, at 1-2.  In his initial expert report, Smith opines on the general standards for issuing valuations, discusses Sotheby's valuations of five works at issue in this case (Matisse's *Nu au Châle Vert*, Modigliani's *Nu Couché au Coussin Bleu*, Gauguin's *Otahi Seule*, da Vinci's *Salvator Mundi*, and Klimt's *Wasserschlangen II*), and provides his own valuations of those works.  Smith Rep. 3-4.  In his rebuttal report, he responds to all of Sainty's opinions and to Wittman's opinions on indicia of assisting fraudulent activity.  Plaintiffs move to exclude Smith's testimony regarding Sotheby's due diligence, his testimony that Sotheby's insurance valuations were not excessive, and his testimony that the auction house's valuation standards comply with industry standards.  ECF No. 399 ("Pls.' Smith Mem.").

Some of Smith's testimony is irrelevant — and thus inadmissible — in light of the Court's rulings above on summary judgment and Sotheby's *Daubert* motions.[21]  But beyond that, Plaintiffs' motion falls short.  First, Smith's testimony about Sotheby's valuations is based primarily on his decades of experience as an art appraiser, as well as the common standards for appraising art.  Smith Rep. 2, 7-12.  Smith assesses Sotheby's valuations first by analyzing how Sotheby's calculated its valuations, then by looking at later sales to see how accurate Sotheby's valuations were, and finally by completing his own "retroactive valuations" of the works at issue. *Id.* at 16-19.  With respect to the retroactive valuations, Plaintiffs contend that they are unreliable.  Smith had, in 2015, provided draft fair market valuations for several paintings, including the da Vinci, which were significantly lower than the valuations he completed for this report.  Pls.' Smith Mem. 5-6.  And, Plaintiffs argue, Smith did not follow any reliable methodology for these valuations, *id.* at 6, in large part because he did not explain to Plaintiffs' satisfaction which comparable works he used in developing his valuations and how he selected them, *id.* at 7-8, and because he did not view the works in person, *id.* at 8.

But Plaintiffs' assessment of Smith's methodology is faulty.  Smith testified that, in developing his retroactive valuations, he relied on the documentation Sotheby's had used, which included comparator pieces for the Klimt, listed their prices, and explained the relative superiority of *Wasserschlangen II*.  ECF No. 400-1 ("Smith Tr."), at 56, 70-71; *see* ECF No. 400-7, at 7-8.[22]  And Smith himself provided further explanations of the relationship between a

---

[21]     That includes his proposed testimony regarding Matisse's *Nu au Châle Vert*, Modigliani's *Nu Couché au Coussin Bleu*, and Gauguin's *Otahi Seule*, as the Court granted summary judgment to Sotheby's on Plaintiffs' claims as to those works.

[22]     The latter citation is to the page numbers automatically generated by the Court's ECF system.

comparator Klimt and *Wasserschlangen II* in his report and during his deposition.  Smith Rep.

17; Smith Tr. 70-71.  Plaintiffs are correct that Smith did not use comparable pieces for the da

Vinci, but Smith explains why: It would be both impossible and potentially detrimental to try to

find comparators to that work.  Smith Rep. 19; Smith Tr. 34-36.  Instead, Smith provided other

documentation in his report to support his valuation.  ECF No. 400-5, at 9-17.  In his deposition,

he explained the discrepancy between his retroactive valuation of the da Vinci and his

substantially lower 2015 valuation, noting that he had less information for the 2015 valuation

and prepared it for a different purpose that justified a more conservative valuation estimate.

Smith Tr. 45, 56.  He further explained that providing a valuation from photographs is an

accepted practice.  Smith Rebuttal Rep. 22.

      The principles that Smith articulates — and follows — are consistent with those

approved by other courts for art appraisals.  *See King v. Wang*, No. 14-CV-7694 (LJL), 2021 WL

5237195, at *12-13 (S.D.N.Y. Nov. 9, 2021) (collecting cases and noting that appraisers should

identify comparators and explain how they selected them and that appraisals could be based on

both subjective and objective factors).  To the extent Plaintiffs argue that Smith deviates from

these principles or challenge his underlying assumptions, the proper remedies are "[v]igorous

cross-examination" and "presentation of contrary evidence," not exclusion.  *Daubert*, 509 U.S. at

596.  The cases cited by Plaintiffs to the contrary are distinguishable.  For example, in *Davis v.

Carroll*, 937 F. Supp. 2d 390 (S.D.N.Y. 2013), the court excluded the testimony of an art

appraisal expert who specifically stated that he had never used the type of appraisal he did in his

report before and did not explain what factors he had used to appraise the works.  *Id.* at 416-17.

Similarly, in *Oleg Cassini, Inc. v. Electrolux Home Prods., Inc.*, No. 11-CV-1237 (LGS), 2014

WL 1468118 (S.D.N.Y. Apr. 15, 2014), the court excluded the expert testimony of an appraiser

Case 1:18-cv-09011-JMF   Document 510   Filed 03/01/23   Page 72 of 76

because the appraiser provided neither the sources she had used nor information that showed how she had arrived at her valuations. *Id.* at *8. By contrast, Smith provides explanations of how he arrived at his valuations; includes the materials he reviewed; and relies on standards recognized in the U.K. (where the valuations took place), *see* Smith Tr. 12-13. Accordingly, Smith's retroactive valuations are permissible expert testimony.

For similar reasons, Smith's analysis of Sotheby's insurance valuations, *see* Smith Rep. 13-17, passes muster. Smith takes the sales price from Sotheby's sale to Bouvier and then calculates the differential between that and the insurance valuation. *Id.* at 13. He provides a general explanation of how institutions like Sotheby's set insurance valuations and then specifically comments on the valuations for the Klimt and the da Vinci. *Id.* at 14-17. Contrary to Plaintiffs' argument, Pls.' Smith Mem. 10-14, Smith does not draw entirely unsupported conclusions regarding the insurance valuations. Nor is his use of hindsight unreliable. He explains the basis for the differential between the sales price and Sotheby's insurance valuation, even where the differential was higher than standard. Smith Rep. 16-17. He does not merely rely on his "professional judgment" in making these assessments. *See City of Almaty v. Ablyazov*, No. 15-CV-5345 (AJN), 2021 WL 5154110, at *13 (S.D.N.Y. Nov. 5, 2021) (Nathan, J.) (excluding a portion of an expert report where the expert provided no justification for certain numerical adjustments she made that were based only her professional judgment). Smith then looks to sales of the same work (in the case of the da Vinci) or a similar work (in the case of the Klimt) to confirm his assessment of the insurance values. Smith Rep. 16-17. As the insurance value should estimate the replacement value of the work, Smith Rep. 12, comparing the later sales price of *Salvator Mundi* to the insurance valuation is clearly a reasonable and reliable tool. *See* Smith Tr. 195, 198-201 (providing a justification for using the later sale of the da Vinci).

Smith looks to a later sale of a different Klimt than *Wasserschlangen II*, but it is one of the works

Sotheby's used as a comparator in developing the insurance valuation.  Thus, using the later sale

to double-check the insurance valuation is not unreasonable.  Based on his analysis, Smith's

conclusion that Sotheby's valuations "conform to the professional standards of the industry,"

Smith Rep 20, is also well supported and reliable.  Again, to the extent Plaintiffs seek to

challenge Smith's assumptions, they may do so on cross-examination; his assumptions are not so

unreasonable as to warrant exclusion.[23]

Finally, Plaintiffs' arguments for excluding Smith's opinions in his rebuttal report

regarding Sotheby's due diligence also fall short.  Plaintiffs argue that Smith admits to not being

an expert in art fraud or compliance and, thus, that he is not qualified to testify about Sotheby's

due diligence efforts.  Pls.' Smith Mem. 21-22; *see also* Smith Tr. 81, 86.  But Plaintiffs

characterize Smith's expertise too narrowly.  Smith opines, based on his decades of experience in

the art market as an advisor and dealer, about the compliance and due diligence requirements for

high-end art transactions.  Smith Rebuttal Rep. 1-2, 12-15.  Smith's experience is in "a field

closely related to the area of the proposed testimony" and, thus, meets the gatekeeping

requirements of Rule 702.  *Broadspring, Inc. v. Congoo, LLC*, No. 13-CV-1866 (JMF), 2014 WL

4100615, at *17-18 (S.D.N.Y. Aug. 20, 2014).  Contrary to Plaintiffs' argument, Pls.' Smith

Mem. 21, Smith's opinions on fraud and due diligence are not "beyond the scope of his

---

[23]     Smith's testimony regarding Sotheby's valuation of *Wasserschlangen II* is arguably
irrelevant because the valuations post-dated, by two years, the sale at issue and thus, as discussed
above, shed little or no light on Sotheby's knowledge at the time of the transactions.  (By
contrast, Smith's testimony regarding Sotheby's valuation of *Salvator Mundi* is relevant to the
issue of equitable estoppel.)  But Plaintiffs do not make that argument in their motion, so the
Court need not and does not address it here.

expertise," *Davis*, 937 F. Supp. 2d at 413, so Plaintiffs' motion to preclude them must be and is denied.  Again, Plaintiffs are free to cross-examine Smith and present competing evidence.

In short, Plaintiffs' motion to preclude part of Smith's testimony must be and is denied.

## CONCLUSION

For the foregoing reasons, the Court rules as follows on the pending motions:

- Plaintiffs' motion to strike Bouvier's testimony is DENIED, except as to his testimony on the four initial sales contracts, which is stricken;

- Sotheby's motion for summary judgment is GRANTED in part and DENIED in part;

- Plaintiffs' motion for partial summary judgment is DENIED;

- Sotheby's motion to preclude the testimony of Plaintiffs' expert Robert Wittman is GRANTED in part and DENIED in part;

- Sotheby's motion to preclude in part the testimony of Plaintiffs' expert Guy Stair Sainty is GRANTED; and

- Plaintiffs' motion to preclude in part the testimony of Sotheby's expert William H. Smith is DENIED.

The net result of the Court's rulings on summary judgment is that all of Plaintiffs' claims are dismissed except for (1) their aiding-and-abetting fraud claims based on the sale of Magritte's *Le Domaine d'Arnheim*, the sale of Klimt's *Wasserschlangen II*, the sale and auction of Modigliani's *Tête*, and the sale of da Vinci's *Salvator Mundi*; and (2) their aiding-and-abetting breach of fiduciary duty claims based on the sale of da Vinci's *Salvator Mundi*.

Unless and until the Court orders otherwise, the parties shall submit a proposed Joint Pretrial Order and associated materials (in accordance with Section 5 of the Court's Individual Rules and Practices in Civil Cases, available at https://www.nysd.uscourts.gov/hon-jesse-m-furman) **within forty-five days of the date of this Opinion and Order**.  (The Court will schedule a trial date — or a conference to discuss a trial date — after reviewing the parties'

submissions.)  In the meantime, the Court is of the view that the parties should try to settle this

case without the need for a trial that would be expensive, risky, and potentially embarrassing to

both sides.  To that end, the Court directs the parties **to confer immediately** about the prospect

of settlement and conducting a settlement conference before Magistrate Judge Robert W.

Lehrburger (or before a mediator appointed by the Court or retained privately).  If the parties

agree that a settlement conference would be appropriate, they should promptly advise the Court

and, if needed, seek an appropriate referral and extension of the pretrial deadlines.

One housekeeping matter remains: The parties, and two third parties, filed a slew of

letter-motions to seal portions of their motion papers.  ECF Nos. 369, 381, 398, 402, 407, 420,

423, 427, 434, 469, 473, 475, 478, 490, and 499; *see also* ECF Nos. 404, 472, and 487.  The

Court granted these letter-motions, in most cases only temporarily, pending its decision on the

underlying motions.  ECF Nos. 374, 387, 408, 425, 428, 429, 450, 476, 485, 495, 504.  It is well

established that filings that are "relevant to the performance of the judicial function and useful in

the judicial process" are considered "judicial documents" to which a presumption in favor of

public access attaches.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).

Significantly, assessment of whether the presumption in favor of public access is overcome must

be made on a document-by-document basis.  *See, e.g.*, *Brown v. Maxwell*, 929 F.3d 41, 48 (2d

Cir. 2019).  And the mere fact that information is sealed or redacted by agreement of the parties

is not a valid basis to overcome the presumption.  *See, e.g.*, *United States v. Wells Fargo Bank*

*N.A.*, No. 12-CV-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015).  In light of

this Opinion and Order, and to facilitate the Court's review of the parties' requests, the parties

shall, **no later than two weeks from the date of this Opinion and Order**, submit a joint letter

with a single chart listing each and every document that any party or third party believes should

remain under seal or in redacted form (with a hyperlinked reference to the docket number of the document), the party or third party who seeks to keep the document under seal, a *succinct* (i.e., two- or three-word) justification for the request, and a hyperlink reference to any prior letter-motion that addresses the document.  For the sake of completeness, the parties should include in this chart any document that the Court has already determined should be kept under seal permanently and include a hyperlinked reference to the Court's prior ruling in the chart.  To the extent that the parties (and, as relevant, third parties) agree that a document previously filed under seal or in redacted form can or should be filed publicly, the parties should include that in the letter, with a hyperlinked reference to the relevant document.

The Clerk of Court is directed to terminate ECF Nos. 370, 372, 395, 413, 435, 491, and 493.

SO ORDERED.

Dated: March 1, 2023
      New York, New York

JESSE M. FURMAN
United States District Judge