UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ACCENT DELIGHT INTERNATIONAL LTD.,

                                  Plaintiff,

            -against-

SOTHEBY'S and SOTHEBY'S, INC.,

                                  Defendants.

---

Case No. 18-cv-09011 (JMF)

**\*ORAL ARGUMENT REQUESTED\***

<br>

## MEMORANDUM OF LAW OF DEFENDANTS SOTHEBY'S AND SOTHEBY'S, INC. IN SUPPORT OF THEIR MOTIONS *IN LIMINE*

<br>

**ARNOLD & PORTER KAYE SCHOLER LLP**

250 West 55th Street
New York, NY 10019-9710

**HOGAN LOVELLS US LLP**

555 Thirteenth Street, N.W.
Washington, D.C. 20004

*Attorneys for Defendants Sotheby's and Sotheby's, Inc.*

**TABLE OF CONTENTS**

I.    DEFENDANTS' MOTIONS TO EXCLUDE .......................................................... 1

    A.    DOCUMENTS AND TESTIMONY RELATED TO THE
        ELEVEN TRANSACTIONS AT ISSUE IN CLAIMS
        DISMISSED BY THE COURT................................................................. 1

    B.    THE FOUR INSURANCE VALUATIONS ............................................. 3

    C.    DEFENDANTS' COMMON INTEREST AGREEMENT WITH
        BOUVIER................................................................................................ 4

    D.    BOUVIER'S INVOCATION OF HIS RIGHT NOT TO ANSWER ......... 7

    E.    THE ERRONEOUS PRIVILEGE LOG ENTRY..................................... 12

    F.    DEFENDANTS' COMPLIANCE WITH THEIR OWN POLICIES....... 13

    G.    THE DISPUTE BETWEEN SOTHEBY'S, INC. AND THE
        *SALVATOR MUNDI* OWNERS ............................................... 15

    H.    THE WILDENSTEIN AND ACQUAVELLA DOCUMENTS
        AND TESTIMONY................................................................................. 19

    I.    EVIDENCE REGARDING BOUVIER'S ARREST OR OTHER
        CRIMINAL PROCEEDINGS ................................................................ 23

II.   DEFENDANTS' MOTION TO LIMIT THE TESTIMONY OF
    SANFORD HELLER............................................................................................ 255

III.  DEFENDANTS' MOTION TO INTRODUCE EVIDENCE IN
    CONNECTION WITH DETERMINING COMPENSATORY
    DAMAGES, IF ANY............................................................................................ 299

IV.   DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S IMPROPER
    COUNTER DESIGNATIONS ............................................................................ 344

V.    DEFENDANTS' MOTION TO PROTECT SENSITIVE CLIENT AND
    BUSINESS INFORMATION FROM DISCLOSURE IN OPEN COURT ....... 355

CONCLUSION.............................................................................................................. 36

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Austin v. Metro-N. Commuter R.R.*,
    No. 22-CV-1645, 2023 WL 3317906 (S.D.N.Y. May 9, 2023) ............................................ 26

*Bank of China v. NBM LLC*,
    359 F.3d 171 (2d Cir. 2004) ........................................................................................................ 26

*Belvin v. Electchester Mgmt., LLC*,
    No. 17-CV-6303 (NGG) (MMH), 2022 WL 10586743 (E.D.N.Y. Oct. 18, 2022) ............... 23

*City of Almaty, Kazakhstan v. Ablyazov*,
    No. 15-CV-5345 (JGK), 2022 WL 16901995 (S.D.N.Y. Nov. 11, 2022) ............................ 23

*Cmty. Co-op Dev. Found. v. Nat'l Westminster Bank USA*,
    112 F.3d 503 (2d Cir. 1996) ........................................................................................................ 30

*Connaughton v. Chipotle Mexican Grill, Inc.*,
    29 N.Y. 3d 137 (2017) ................................................................................................................. 32

*Cont'l Cas. Co. v. PricewaterhouseCoopers, LLP*,
    15 N.Y.3d 264 (2010) .................................................................................................................. 33

*Danco Enterprises, LLC v. LiveXLive Media, Inc.*,
    209 A.D.3d 428 (N.Y. App. Div. 2022) .................................................................................... 30

*First Nationwide Bank v. Gelt Funding Corp.*,
    27 F.3d 763 (2d Cir. 1994) .......................................................................................................... 33

*Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*,
    502 F. Supp. 3d 760 (S.D.N.Y. 2020) ....................................................................................... 32

*Giles v. Rhodes*,
    No. 94-CV-6385, 2000 WL 1425046 (S.D.N.Y. Sept. 27, 2000) ........................................... 27

*Gorbea v. Verizon New York, Inc.*,
    No. 11-CV-3758 (KAM) (LB), 2014 WL 2916964 (E.D.N.Y. June 25, 2014) ...................... 3

*Halkedis v. Two E. End Ave. Apartment Corp.*,
    161 A.D.2d 281 (N.Y. App. Div. 1990) .................................................................................... 29

*Hamza v. Saks Fifth Ave.*,
    No. 07-CV-5974 (FPS), 2011 WL 6187078 (S.D.N.Y. Dec. 5, 2011) .................................... 3

*In re 650 Fifth Ave. & Related Properties*,
    934 F.3d 147 (2d Cir. 2019) ..................................................................................................... 7, 8

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
681 F. Supp. 2d 141, 153 (D. Conn. 2009) ............................................................ 9

*In re Gen. Motors LLC Ignition Switch Litig.*,
No. 14-MC-2543, 2016 WL 4410008 (S.D.N.Y. Aug. 18, 2016) .......................... 28

*In re Illusions Holdings Inc.*,
189 F.R.D. 316 (S.D.N.Y. 1999) ........................................................................... 28

*In re Res. Fund Sec. and Derivative Litig*,
Nos. 09-MD-2011 (PGG), 2012 WL 12354234 (S.D.N.Y. Oct. 3, 2012) ............. 34

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
868 F.3d 132 (3d Cir. 2017) ................................................................................... 6

*Kausal v. Singh*,
55 Misc. 3d 127(A) (N.Y. App. Term 2017) ........................................................ 30

*King v. Wang*,
No. 14-CV-7694 (LJL), 2021 WL 5237195 (S.D.N.Y. Nov. 9, 2021) .................. 32

*King v. Wang*,
No. 14-CV-7694 (LJL), 2021 WL 5283950 (S.D.N.Y. Nov. 12, 2021) ................ 33

*Kumiva Grp., LLC v. Garda USA, Inc.*,
146 A.D.3d 504 (N.Y. App. Div. 2017) ......................................................... 30, 32

*Lama Holding Co. v. Smith Barney Inc.*,
88 N.Y.2d 413 (N.Y. 1996) ............................................................................ 29, 32

*LiButti v. United States*,
107 F.3d 110 (2d Cir. 1997) ................................................................. 8, 9, 10, 11

*Lugosch v. Pyramid Co. of Onondaga*,
435 F.3d 110 (2d Cir. 2006) ................................................................................. 35

*Michelson v. United States*,
335 U.S. 469 (1948) .............................................................................................. 24

*N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*,
481 F. Supp. 3d 216 (S.D.N.Y. 2020) .................................................................. 30

*Negrete v. Citibank, N.A.*,
759 F. App'x 42 (2d Cir. 2019) ............................................................................ 33

*Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
No. 03-CV-5238, 2006 WL 3782994 (N.D. Ill. Dec. 21, 2006) ........................... 13

*Partylite Gifts, Inc. v. MacMillan*,
    No. 10-CV-1490, 2012 WL 13059665 (M.D. Fla. Sept. 13, 2012) ........................................ 6

*Ridge v. Davis*,
    No. 18-CV-8958 (JCM), 2022 WL 16737299 (S.D.N.Y. Nov. 7, 2022) .............................. 24

*Rodriguez v. Vill. of Port Chester*,
    535 F. Supp. 3d 202 (S.D.N.Y. 2021) .................................................................................... 26

*S.E.C. v. McGinn, Smith & Co.*,
    752 F. Supp. 2d 194 (N.D.N.Y.) ............................................................................................. 11

*Stephen v. Hanley*,
    No. 03-CV-6226 (KAM) (LB), 2009 WL 1471180 (E.D.N.Y. May 21, 2009) .................... 24

*Tribble v. Evangelides*,
    670 F.3d 753 (7th Cir. 2012) .................................................................................................. 27

*Warren Distrib. Co. v. InBev USA L.L.C.*,
    No. 07-CV-1053 (RBK), 2008 WL 4371763 (D.N.J. Sept. 18, 2008) .................................... 6

*Wendel v. Int'l Real Est.. News, LLC*,
    No. 19-CV-21658, 2020 WL 13421523 (S.D. Fla. June 29, 2020) .......................................... 6

*Willingham v. Cty. of Albany*,
    593 F. Supp. 2d 446, 452 (N.D.N.Y. 2006) ........................................................................... 11

## INTRODUCTION

Pursuant to Rule 6.B.i of the Court's Individual Rules and Practices in Civil Cases, Defendants Sotheby's and Sotheby's, Inc. (collectively, "Defendants") respectfully submit these motions *in limine* seeking:  (1) to exclude certain exhibits and testimony proffered by Plaintiff Accent Delight International Ltd. ("Plaintiff"); (2) to exclude expert testimony from a fact witness, Sanford Heller; (3) to allow Defendants to proffer certain evidence in connection with determining Plaintiff's damages, if any; (4) to strike Plaintiff's improper counter-deposition designations; and (5) to protect sensitive client and business information from disclosure in open court.

## I.    DEFENDANTS' MOTIONS TO EXCLUDE

### A.    Documents and Testimony Related to the Eleven Transactions at Issue in Claims Dismissed by the Court

Documents and testimony that pertain to Defendants' alleged culpability for transactions no longer at issue should be excluded under FRE 402 and 403.  At summary judgment, the Court dismissed Plaintiff's claims as to eleven of the sixteen transactions for which Plaintiff was seeking damages on the ground (among others) that Plaintiff had not raised a genuine dispute of material fact as to whether Defendants had actual knowledge of Bouvier's alleged fraud.[1] Notwithstanding that ruling, Plaintiff seeks to introduce into evidence 48 documents (including sales contracts between Bouvier and Defendants or their subsidiaries, Sotheby's UK's insurance valuations, internal emails among employees of Defendants and their subsidiaries, emails

---

[1] The Court found the same with respect to Plaintiff's breach of fiduciary duty claim regarding Lautrec's Red *Au Lit: Le Baiser* (the only breach of fiduciary duty claim that was timely filed, putting aside the *Salvator Mundi*).

between Bouvier and Plaintiff, and invoices submitted by Bouvier to Plaintiff) that relate only to Plaintiff's now-terminated claims.[2]

Defendants do not object to documents involving a dismissed transaction where the document arguably reflects what Defendants understood about Bouvier's art market activities, including as to confidentiality, or his relationship to Rybolovlev. *See*, *e.g.*, PX-131 (email stating that Bouvier had a "fast moving billionaire" client who did not speak English); PX-135 (email asking Bouvier whether "the client" would like to have his own transporters pick up a work); PX-322 (email directing that employees on hand during viewing should not wear Sotheby's logos); PX-366 (email indicating that employees of Defendants' Switzerland-based subsidiary should not be involved in transaction). Although the evidence will show that these documents do not support Plaintiff's version of events, Defendants recognize their potential probative value with respect to Plaintiff's claims.

In sharp contrast, the exhibits Defendants are challenging are not probative of anything other than alleged wrongdoing by Defendants with respect to transactions that are no longer part of the case, and their introduction would be highly prejudicial. Plaintiff seeks, for example, to introduce evidence that, following the auction of Lautrec's Red *Au Lit: Le Baiser*, Sotheby's UK agreed at Bouvier's request to expedite his receipt of the sale proceeds. Plaintiff does so notwithstanding the Court's ruling that "there is no evidence that Sotheby's knew Plaintiffs were entitled to the proceeds of the auction." *See* March 1, 2023 Opinion and Order ("Mar. 1 Opinion"), ECF No. 510, at 50. Similarly, Plaintiff seeks to introduce communications in which

---

[2] In addition to the exhibits listed in Point B relating to the insurance valuations, the exhibits covered by this section of Defendants' motion are PX-6, 7, 8, 9, 10, 12, 15, 22, 29, 30, 31, 33, 41, 42, 43, 44, 45, 46, 48, 51, 54, 55, 56, 57, 58, 59, 61, 64, 128, 129, 130, 215, 216, 230, 231, 235, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246, 288, and 371.

Bouvier made misrepresentations to Plaintiff regarding the purchase price for artworks no longer in the case, made misrepresentations regarding negotiations for artworks no longer in the case, and submitted invoices for artworks no longer in the case.

Plaintiff should not be allowed to introduce these documents. They have no probative value other than to improperly suggest that Defendants committed wrongdoing with respect to transactions no longer at issue. The challenged documents will confuse the jury about the scope of the case and prejudice Defendants, inviting jurors to speculate about whether Plaintiff has claims for additional transactions and suggesting that they should consider multiple other allegations concerning transactions not at issue. Allowing the challenged documents would also require Defendants to litigate transactions not in the case, prolonging the trial and creating further jury confusion. Plaintiff should be precluded from introducing any evidence, including documents or testimony, that goes to Defendants' and Bouvier's alleged malfeasance in transactions as to which the Court has already found the evidence insufficient to go to trial. *See Hamza v. Saks Fifth Ave.*, No. 07-CV-5974 (FPS), 2011 WL 6187078, at *6–7 (S.D.N.Y. Dec. 5, 2011) (excluding evidence that related only to dismissed claims); *Gorbea v. Verizon New York, Inc.*, No. 11-CV-3758 (KAM) (LB), 2014 WL 2916964, at *2 (E.D.N.Y. June 25, 2014) (excluding evidence relating only to claims dismissed at summary judgment).

> **B.    The Four Insurance Valuations**

The Court should exclude Plaintiff's proffered documents regarding the four insurance valuations prepared by Sotheby's UK for Bouvier in October 2014 (as well as the February 2015 updated version of the valuation for Gauguin's *Otahi Seule)*, and any testimony concerning those valuations. *See* PX-165, PX-169, PX-248, PX-249, PX-354. Three of the valuations were for artworks (Matisse's *Nu au Châle Vert*, Gauguin's *Otahi Seule*, and Modigliani's *Nu Couché au Coussin Bleu*) as to which the Court has dismissed Plaintiff's claims, and therefore evidence

regarding those valuations (and the valuations themselves) should be excluded for the reasons set forth in Point I.A above. The Court has already ruled, consistent with this conclusion, that in light of the dismissal of Plaintiff's claims with respect to these three works, Defendants' proffered expert testimony regarding the reasonableness of Sotheby's UK's insurance valuations for the works is "irrelevant—and thus inadmissible." Mar. 1 Opinion at 70 & n.21.

Sotheby's UK's insurance valuation for the Klimt likewise should be excluded because, as the Court noted at summary judgment, it is not relevant to determining whether Defendants had knowledge of Bouvier's alleged fraud. The Klimt valuation "post-date[s] the sale[] by approximately two years" and therefore is "not evidence of Sotheby's knowledge of fraud or breach of fiduciary duty at the time the transaction[] occurred." *Id.* at 49 n.13. And Plaintiff does not and cannot claim, as it does with respect to the insurance valuation for the *Salvator Mundi*, that Plaintiff relied on the Klimt valuation (or the other three October 2014 or the updated Gauguin valuations) in any way that is material to Plaintiff's case.[3] *See id.* at 31 (rejecting Plaintiff's argument that equitable estoppel based on those valuations could save its claims). Accordingly, the Klimt valuation, like the other insurance valuations proffered by Plaintiff, is not probative as to any issue remaining in the case. Plaintiff should not be permitted to offer these valuations (including drafts and other documents referring to them) or seek to admit testimony about them into evidence.

### C.    Defendants' Common Interest Agreement with Bouvier

Plaintiff should not be permitted to introduce evidence concerning a common interest agreement that Defendants' counsel entered into with Bouvier's counsel in May 2017—long

---

[3] Plaintiff argues that Sotheby's *Salvator Mundi* insurance valuation tricked Plaintiff into believing that it did not have a claim against Defendants and thereby supports Plaintiff's invocation of equitable estoppel to save its otherwise untimely breach of fiduciary duty claim.

after the transactions at issue in this litigation—regarding Rybolovlev's ongoing dispute with Bouvier and the dispute that was developing between Defendants and Plaintiff. Under that agreement, which was confirmed by email on January 9, 2018, Defendants' and Bouvier's respective U.S. counsel agreed that their clients' legal teams had, since May 2017, communicated confidentially regarding each side's disputes with Rybolovlev and pursuant to a common interest between their clients, and that they would assert privilege over their past and future communications with each other regarding those disputes. *See* PX-300.

Plaintiff presumably wants to use the May 2017 agreement to argue that Defendants were in cahoots with Bouvier at the time of the transactions at issue and have continued to aid and abet him since. That is a wholly improper purpose, consistent with exploiting the jury's likely lack of familiarity with the routine litigation practice of parties entering into such agreements when a plaintiff is pursuing allegations against them both. The common interest agreement protected discussions between lawyers many years after the events at issue. It is not in any way probative of whether, during the relevant time period, Defendants had knowledge of Bouvier's alleged fraud or breach of fiduciary duty, and it is not in any way probative of whether Defendants assisted in such fraud or breach. Any use of the agreement would be highly prejudicial.

The Court has twice questioned Plaintiff's claimed relevance of the interactions between Defendants' and Bouvier's legal teams, and it should reject any use of those interactions by Plaintiff at trial. First, in January 2020, the Court rejected Plaintiff's argument that communications between Defendants' and Bouvier's counsel, and any litigation coordination between them, were relevant to show bias and motivation on the part of Bouvier and Defendants' witnesses, ruling that such communications were either protected by a common-interest privilege or not relevant, and that in either case producing and logging such communications was not

proportional to the needs of the case.  *See* ECF Nos. 125, 134.  Second, the Court rejected

Plaintiff's subsequent attempt to obtain those same communications, noting that the Court "is

skeptical that counsel's communications would be relevant or proportional."  April 27, 2021 Tr.,

ECF No. 286, at 11:24–12:11.  Although the Court required Defendants to produce the

agreement itself in light of the minimal burden to Defendants, it was "a little skeptical about

whether and to what extent that is really relevant to [Bouvier's] deposition."  *Id.*

There is no relevant purpose for which Plaintiff could introduce documents or testimony

at trial regarding the common interest agreement.  Other courts have found common interest

agreements to be irrelevant and unduly prejudicial in similar circumstances.  *See In re Wellbutrin*

*XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 153–54 (3d Cir. 2017)

("[C]ommunication between [defendants] acknowledging a common interest is hardly surprising

and does not come close to supporting an inference that there was an unlawful conspiracy to

stifle competition."); *Warren Distrib. Co. v. InBev USA L.L.C.*, No. 07-CV-1053 (RBK), 2008

WL 4371763, at *3 (D.N.J. Sept. 18, 2008) ("The fact that a joint defense agreement was signed

is not evidence of the conspiracy plaintiffs allege existed."); *Wendel v. Int'l Real Est.. News,*

*LLC*, No. 19-CV-21658, 2020 WL 13421523, at *4 (S.D. Fla. June 29, 2020) ("[T]he mere fact

that [two parties] entered into a common interest agreement after the alleged events in this action

is simply not relevant to [the parties'] actions at the time of their alleged misconduct. . . .  [E]ven

if the agreement had some limited probative value . . . , any such probative value is substantially

outweighed by the unfair prejudice Plaintiff would face if such evidence was admitted at trial.");

*Partylite Gifts, Inc. v. MacMillan*, No. 10-CV-1490, 2012 WL 13059665, at *2 n.2 (M.D. Fla.

Sept. 13, 2012) ("The mere fact that [two parties] entered into a Common Interest Agreement

after the litigation was filed is simply not relevant" to the defendant's actions "at the time of the alleged misconduct."). This Court should find the same.

### D.    Bouvier's Invocation of His Right Not to Answer

Plaintiff has designated testimony from Bouvier's deposition in which he refused to answer two questions: (1) whether he and Sotheby's have a common interest agreement,[4] Bouvier Tr., ECF No. 492-1, at 67:13–19, 69:1–13; and (2) whether he did his own due diligence before purchasing works through Sotheby's and, if so, why he did "another due diligence before reselling" the works to Plaintiff, *id.* at 325:21–31, 326:18–327:17. Plaintiff has also proposed a jury instruction that would invite the jury to draw "the strongest inference against Sotheby's on these issues that the evidence permits." The deposition designations should be excluded as irrelevant, unduly prejudicial, and confusing. In the event the Court admits one or both segments of the testimony, the jury instruction should limit any potential inference to an inference that the answer to the first question was "yes" and the answer to the second was that Bouvier did not do due diligence before acquiring works from Sotheby's and did not do additional due diligence after, but should direct the jury that no adverse inference may be drawn against Defendants.

"[T]he admissibility of a nonparty's privilege invocation is governed by Rules 401 and 403 of the Federal Rules of Evidence." *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 171 (2d Cir. 2019). If it is admitted, courts then consider whether to allow an adverse inference *against a party* under "a number of non-exclusive factors": (1) "the nature of the relevant relationships," which is "the most significant circumstance" and "should be examined [. . .] from the perspective of a non-party witness's loyalty to [the party]"; (2) "the degree of control of the

---

[4] The question posed was: "Can you tell us if you have a collaboration agreement with Sotheby's regarding this procedure or more generally the dispute between you and Mr. Rybolovlev and his entities?"

party over the non-party witness"; (3) "the compatibility of the interests of the party and non-party witness in the outcome of the litigation"; and (4) "the role of the non-party witness in the litigation." *LiButti v. United States*, 107 F.3d 110, 123–24 (2d Cir. 1997). "[T]he overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *Id.* at 124.

To start, Plaintiff's designations are not relevant to the issues in the case, and Plaintiff's only goal is to use Bouvier's invocation unfairly against Defendants. For all the reasons discussed in Point I.C above, Plaintiff should not be permitted to introduce either the common interest agreement itself or any testimony about it into evidence, and therefore Bouvier's invocation as to that agreement should be excluded on the same basis. Relatedly, the proffered testimony and the sought-after adverse inference, relating to an agreement between lawyers years after the events at issue, do not "make[] a consequential fact more or less probable." *See In re 650 Fifth Ave. & Related Properties*, 934 F.3d at 171. Finally, any probative value of Plaintiff's offering, and there is none, is substantially outweighed by the resulting prejudice to Defendants. Bouvier's invocation was based on Plaintiff's pursuit of criminal and civil allegations against Bouvier in Switzerland. Plaintiff's attempt to raise an air of criminality regarding Bouvier's conduct and impute it to Defendants would be highly prejudicial.

Regarding due diligence, Plaintiff does not appear to have any interest in establishing any facts on this issue. As the Court found in connection with Plaintiff's effort to exclude all of Bouvier's testimony, Bouvier "answered extensive questions, including from Plaintiff[], regarding the 'due diligence' he allegedly provided." Mar. 1 Opinion at 6. But in making its designations for trial, Plaintiff disregarded almost all of Bouvier's responses in which he explained what specific services he provided that constituted his due diligence services. The

answer to the question at issue—whether Bouvier did any due diligence independent from that which Defendants performed—has no bearing on whether there was agreement between Bouvier and Plaintiff that he would be Plaintiff's agent receiving a commission.  Instead, Plaintiff seeks the adverse inference for its own sake—again, to prejudice Defendants by raising an air of criminality regarding Bouvier that it hopes to impute to Defendants.  Any limited probative value is far outweighed by the resulting prejudice to Defendants, which is precisely Plaintiff's goal.

The Court accordingly should rule that the deposition designations at issue are inadmissible as irrelevant and/or prejudicial under FRE 402 and 403.  If, however, the Court finds that one or both segments of the testimony and invocation are admissible, the factors that apply in considering whether to allow an adverse inference *against a party* based on the nonparty's invocation of rights, *see LiButti*, 107 F.3d at 123–24, strongly favor Defendants here. Most importantly, Defendants do not have control over Bouvier.  Defendants spent more than two years trying to obtain Bouvier's testimony, and succeeded only after prolonged litigation abroad.  *See, e.g.*, ECF Nos. 291, 303.  To the extent Plaintiff argues that an adverse inference against Defendants is appropriate because Defendants aided and abetted Bouvier, that would improperly pre-judge the ultimate question reserved for the jury.  *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 153 (D. Conn. 2009) ("When the party and the non-party witness are claimed co-conspirators, generally courts have required there to be sufficient, independent proof of a conspiracy between them before permitting the jury to draw an adverse inference against the party.").  Further, Defendants were not responsible for Bouvier's decision to refuse to answer questions and, like Plaintiff, they could not force him to do so.  Defendants likewise were not responsible for the criminal and civil proceedings in Switzerland that Plaintiff was attempting to reopen at the time of Bouvier's deposition, which

9

Bouvier cited repeatedly as the reason for his decision not to answer questions that he viewed as not relevant to Plaintiff's litigation in the United States against Defendants.  Defendants' lack of control is further evidenced by Bouvier's refusal to answer questions relating to the first four contracts he executed with Plaintiff, a subject area into which Defendants have no visibility and as to which Bouvier's testimony might have been useful in rebutting evidence that Plaintiff will offer at trial, but as to which the Court has ruled all of Bouvier's testimony inadmissible.  *See* Mar. 1 Opinion at 7–8 ("Bouvier's invocation of his right to silence in response to critical questions with respect to these four transactions thus 'preclude[d] inquiry into the details of his direct testimony' on a matter at the heart of this litigation.").  Nor were Defendants and Bouvier's interests aligned as it pertained to the questions Bouvier refused to answer, as Bouvier's invocation only hampers Defendants' ability to cross-examine Plaintiff's witnesses rather than advances Defendants' interests.  More generally, Defendants have not transacted with Bouvier since Plaintiff's allegations against Bouvier became public—a fact that Bouvier complained about at his deposition.  *See* Bouvier Tr., ECF No. 492-1, at 68:14–17 (complaining that Sotheby's owed Bouvier the proceeds from the sale of Lautrec's Red *Au Lit, Le Baiser*, which Sotheby's UK has held in escrow pending completion of Plaintiff's and Bouvier's litigation).  There is no "loyalty" component, *see LiButti*, 107 F.3d at 123, in their relationship. Indeed, Defendants have conceded in this case that Bouvier made multiple false representations to Plaintiff regarding his negotiations with the owners of the works at issue, one of the elements necessary for Plaintiff to establish that Bouvier committed fraud.[5]

---

[5] With respect to the fourth *LiButti* factor, there is no dispute that Bouvier is a central character in this case, but that factor is eclipsed by the other factors, especially since the Bouvier testimony that Plaintiff has designated is either irrelevant or only minimally probative of any issue here.

Under these circumstances, an adverse inference against Defendants would be unjustified and would not "advance the search for the truth." *LiButti*, 107 F.3d at 124. "The purpose underlying the allowance of an adverse inference in civil cases is equitable, not punitive, and serves to vitiate the prejudice to the party denied discovery by invocation of the privilege." *Willingham v. Cty. of Albany*, 593 F. Supp. 2d 446, 452 (N.D.N.Y. 2006). As discussed above, Plaintiff was not "denied discovery" by Bouvier's invocation. Plaintiff was already aware of the existence of a common interest agreement, and the due diligence question had no probative value, or at most only limited probative value, especially given Bouvier's response to "extensive questions," including from Plaintiff, about his due diligence, *see* Mar. 1 Opinion at 6–7. In *S.E.C. v. McGinn, Smith & Co.*, after finding that the nonparty witness had testified as to most of the questions the adverse party would ask and that an adverse inference was only appropriate for the questions he had not answered, the court found that an adverse inference even against an aligned party would be "inequitable," reasoning that although the party and the witness were married and had identical interests, the aligned party did not control the witness and was also "deprived of the testimony of [the witness]." 752 F. Supp. 2d 194, 210–12 (N.D.N.Y.), *order vacated in other part on reconsideration sub nom. S.E.C. v. Wojeski*, 752 F. Supp. 2d 220 (N.D.N.Y. 2010). Here, where Defendants' and Bouvier's interests are not aligned and certainly not "identical," and where Defendants have no control over Bouvier, the balance of factors strongly weighs against allowing the jury to draw any inference against Defendants.

If the Court admits one or both of the designations, the jury should therefore be instructed that any adverse inference it may draw should be limited to the specific questions Bouvier did not answer and against Bouvier only, and that it may not draw any adverse inference against Defendants. *See, e.g.*, *id.* at 208–09 (finding inference appropriate only as to the nonparty, not

the party, and "only to the extent that the questions to which [the witness] asserted the privilege were not otherwise answered during his testimony in [overlapping] investigation").

     **E.**    **The Erroneous Privilege Log Entry**

Plaintiff should not be permitted to introduce into evidence a privilege log produced by Defendants containing an erroneous entry. *See* PX-151. Defendants presume that Plaintiff intends to use Privilege Entry No. 1943, which, when produced on January 22, 2021 in its initial incorrect form, described a May 31, 2013 e-mail sent by Defendant Sotheby's General Counsel to Defendant Sotheby's Chief Global Compliance Counsel as follows: "Confidential email sent to counsel for legal review and analysis and providing information necessary for counsel to render legal advice regarding issues deemed legally significant by counsel in connection with due diligence of *Rybolovlev*" (emphasis added). The reference to Rybolovlev was an attorney error that misstated the nature of the e-mail, which was sent in connection with Sotheby's due diligence related to *Bouvier* and his affiliated-entity Blancaflor. The entry was amended on July 20, 2021 to read: "Confidential email sent to counsel for legal review and analysis and providing information necessary for counsel to render legal advice regarding due diligence related to Bouvier and Blancaflor."[6] *See* July 20, 2021 Privilege Log, Wolverton Decl. Ex. A.

Plaintiff's use of the original (and incorrect) privilege log entry—or any other amended entry—would be irrelevant, confusing, and prejudicial to Defendants. That outside counsel mislabeled a privilege entry when preparing thousands of entries long after the events at issue has no conceivable relevance. As another court explained when excluding an erroneous privilege entry, "[t]he parties will be held to proving their cases based on the actual evidence, not on misstatements made and corrected by their lawyers," and permitting the privilege log would

---

[6] The privilege log Plaintiff seeks to introduce also contained other inaccuracies that were amended on July 20, 2021.

result in a "trial within a trial" where one party "will be required to call its [] counsel to testify as to the circumstances surrounding the mistake, among other things, and the court's time and resources will be wasted." *Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, No. 03-CV-5238, 2006 WL 3782994, at *13 (N.D. Ill. Dec. 21, 2006).

Plaintiff's use of the erroneous privilege entry would be particularly pernicious here. Plaintiff presumably seeks to argue that, at the time of the email at issue, Sotheby's was conducting an investigation of Rybolovlev, from which a jury presumably could draw inferences about Defendants' knowledge of Rybolovlev's relationship to Bouvier and to the transactions at issue. Plaintiff will of course have opportunities to challenge Defendants' lack of knowledge defense, but it should not be permitted to try to do so by relying on this erroneous and therefore highly prejudicial log entry. Even if Defendants explain to the jury that the log description is the result of attorney error—a task that is virtually impossible without disclosing the contents of the underlying privileged document—the log would still invite the jury to speculate about the privileged document. Realistically, Defendants would have no means of countering Plaintiff's suggestion without waiving privilege and explaining the contents of the document and the larger context of the due diligence inquiry relating to Bouvier in 2013, the privileged nature of which the Court has already upheld. *See* ECF No. 288, at 2; Apr. 27, 2021 Hr'g Tr., ECF No. 286, at 24–33. That result would require a "trial within a trial" and unduly prejudice Defendants; Plaintiff should be required to establish its case based on "actual evidence," not on an erroneous privilege log entry. *See Old Republic*, 2006 WL 3782994, at *13.

### F.    Defendants' Compliance with Their Own Policies

Plaintiff should be precluded from litigating the contents of Defendants' internal policies and introducing those documents into evidence at trial. Plaintiff seeks to introduce ten of Defendants' policy documents, presumably to argue that Defendants violated their own policies

and that any such violation is probative of Defendants' alleged knowledge of Bouvier's fraud (or breach of fiduciary duty in the case of Da Vinci's *Salvator Mundi*).

Violation of an internal policy, even if proven, would not be probative of Defendants' knowledge of fraud or breach of fiduciary duty, and no legitimate purpose would be served by allowing Plaintiff to conduct ten mini-trials about Defendants' compliance with such policies, which would confuse the jury and distract from the issues actually relevant to determining liability. The kitchen sink of policies identified by Plaintiff address a wide range of issues, none of which has anything to do with detecting fraud or breach of fiduciary duty and none of which is relevant to proving what Plaintiff needs to prove in this case. The policies are:

(1) Sotheby's Code of Business Conduct (PX-83), which addresses general issues such as compliance with the law, workplace discrimination and safety, conflicts between personal interests and the company's interests, anti-corruption and anti-bribery, and securities insider trading;

(2) Sotheby's Global Corporate Governance Policy (PX-84), which sets out the approval thresholds for various transactions;

(3) Sotheby's Worldwide Anti-Corruption Policy (PX-202), which addresses legal requirements under the Foreign Corrupt Practices Act and similar laws in other countries;

(4) Sotheby's Private Sales and Post Auction Sales Policy (PX-220), which addressees the process and procedure for private sales and post-auction sales;

(5) Sotheby's Worldwide Anti-Money Laundering, Combatting Terrorist Financing and Anti-Tax Evasion Facilitation Policy (PX-221), which addresses due diligence to avoid participation in money-laundering, terrorist financing, and tax evasion;

(6) Sotheby's "Know Your Client" Guidelines (PX-222), which supplements the Worldwide Anti-Money Laundering Policy and provides guidance specific to each type of clients;

(7) Sotheby's Compliance Checklist for Private Sale (PX-259), which is a process document to be completed for private sales;

(8) Sotheby's Worldwide Guidelines Regarding Property Due Diligence (PX-303), which addresses the transportation of artworks;

(9) Sotheby's High Value Lot Process (PX-310), which sets out the approval process for transactions over certain thresholds; and

(10) Sotheby's High Value Lot Questionnaire (PX-311), which is a process document to be filled out in connection with the High Value Lot approval.

At summary judgment, Plaintiff had argued, "in passing, that Sotheby's violated its own due diligence requirements when reviewing Bouvier's transactions." Mar. 1 Opinion at 54 n.17.

The Court stated:  "Assuming *arguendo* that this is true for all the transactions at issue, it is not sufficient to raise a genuine issue as to Sotheby's knowledge."  *Id*.  For the same reason, purported violations by Defendants of their own policies will not be relevant at trial to proving Defendants' knowledge.  By way of example, the policies relating to money laundering, terrorism financing, and tax evasion are not implicated by any of Plaintiff's claims.

The only probative value of the ten policies designated by Plaintiff is that the policies applied globally across Defendants and their subsidiaries, which is relevant to Plaintiff's argument that the employees of Defendants' foreign subsidiaries acted as agents for Defendants in connection with two transactions (the sales of the Magritte and Modigliani's *Tête*), an open question for the jury to decide.  Defendants agree that it is appropriate for the jury to hear that Defendants' policies applied globally to all subsidiaries, including Sotheby's UK.  The contents of the policies, however, need not and should not be introduced into evidence and litigated for Plaintiff to make that point.  There should be no sideshow mini-trials as to whether Defendants somehow violated their own policies, when such a violation, even if established, would not be probative of whether Defendants had knowledge of Bouvier's fraud or breach of fiduciary duty. Plaintiff's attempt to prove its case through litigation of Defendants' policies should be rejected.

      **G.**      **The Dispute Between Sotheby's, Inc. and the *Salvator Mundi* Owners**

Plaintiff's proffered documents and related testimony concerning a 2016 mediation and litigation between Defendant Sotheby's, Inc. and the three sellers of Leonardo Da Vinci's *Salvator Mundi* (collectively, the "LDV Sellers") should be excluded.  *See* PX-266; PX-433.  As discussed below, the two documents and any related testimony should be excluded on one or more of these grounds:  as rank hearsay, as irrelevant, as confusing to the jury, or as highly prejudicial to Defendants weighed against their minimal probative value.

### 1.    Background

Sometime after Plaintiff's allegations against Bouvier regarding the *Salvator Mundi* were made public, the LDV Sellers began asserting in communications with Defendants that, based on Plaintiff's acquisition of the artwork for $127.5 million, the LDV Sellers were entitled to substantially more than the $80 million they received when Defendant Sotheby's, Inc. facilitated the sale to Bouvier.  The LDV Sellers claimed that Defendant Sotheby's, Inc. breached its contractual obligation to get the highest price possible for them.  *See* PX-433.

Thereafter, Sotheby's, Inc. and the LDV Sellers entered into mediation in an effort to resolve their dispute.  No resolution was reached.  On November 21, 2016, Defendant Sotheby's, Inc. filed an action in this District against the LDV Sellers seeking a declaration that it had complied with all of its contractual obligations to the LDV Sellers.  The parties subsequently resumed settlement discussions and resolved their dispute, and Defendant Sotheby's, Inc. dismissed its suit before any answer was filed and before any discovery was taken.  *See Sotheby's, Inc. v. R.W. Chandler, LLC*, No. 16-CV-9043 (S.D.N.Y.).

Plaintiff has proffered as exhibits the LDV Sellers' mediation statement and Sotheby's, Inc.'s declaratory judgment complaint, and it intends to call the LDV Sellers to testify.  *See* PX-266; PX-433; Joint Pretrial Order ("JPTO"), ECF No. 548, Part X.A.10–12 (indicating that the LDV Sellers will testify regarding "interactions with Sotheby's employees after the sale of the artwork").

### 2.    The Two Documents and Related Testimony Should be Excluded

The mediation statement and the declaratory judgment complaint should both be excluded, and the LDV Sellers should not be permitted to testify about the allegations they made or threatened to make against Defendants, about the brief litigation between the LDV Sellers and Defendant Sotheby's, Inc., or about the resolution of their dispute.

As an initial matter, the proffered mediation statement (PX-433) is inadmissible under FRE 801 because it is hearsay.  Further, any testimony by the LDV Sellers about their dispute with Defendant Sotheby's, Inc. (including about the mediation), as well as the complaint filed by Defendants Sotheby's, Inc. in connection with that dispute, are irrelevant to the issues to be resolved at this trial.  Plaintiff is free to elicit testimony from the LDV Sellers about the *Salvator Mundi* transaction, their interactions with Defendants and their subsidiaries, their negotiations with Bouvier or Jean-Marc Peretti, and any other facts pertaining to the issues before the jury.  Both Plaintiff and Defendants have marked as trial exhibits numerous contemporaneous documents and communications regarding the sale of the *Salvator Mundi* that were produced in discovery by Defendants, Plaintiff, and the LDV Sellers, and witnesses called by Defendants and Plaintiff, including the LDV Sellers themselves, will testify at trial regarding the underlying facts of the transaction and the events leading up to the transaction.  *See* PX-16, 26, 52, 65, 77–81, 118, 142–147, 170, 210, 283–285, 291, 301, 355–60, 403, 405–10, 429, 430, 438; DX-45–51, 90, 149–68, 195, 202, 219–42, 505, 534–53, 664–72; JPTO Part X.A.10–12.  Plaintiff therefore will have a full opportunity to explore any relevant details regarding the *Salvator Mundi*.  What is *not* relevant to the trial, however, is that more than three years after the 2013 transaction, the LDV Sellers believed they had claims against Defendant Sotheby's, Inc. and that Defendant Sotheby's, Inc. denied that the LDV Sellers had any such claims.

Moreover, any probative value of introducing documents or testimony stemming from the dispute between the LDV Sellers and Defendant Sotheby's, Inc. is far outweighed by the prejudicial impact to Defendants of suggesting that factual and legal allegations made by other people about conduct relating to their own separate contractual relationship with Defendants are somehow relevant to the jury in deciding the claims before it.  The LDV Sellers' allegations that

Defendant Sotheby's, Inc. breached its contractual obligations to represent the LDV Sellers would also require Defendants to litigate the collateral issue of whether Defendant Sotheby's, Inc. complied with those obligations, which is not at issue here and which has no bearing on whether Defendants knew of Bouvier's fraud or breach of fiduciary duty and substantially assisted him.  Plaintiff should be held to prove its claims against Defendants based on evidence of Defendants' conduct, not on the allegations, the litigation, and the mediation of some *other* dispute that is not before the jury and will therefore confuse the jury and prejudice Defendants.

The prejudice to Defendants is compounded by the fact that their dispute with the LDV Sellers was settled in its infant stages, before any answer was filed or discovery taken.  In its summary judgment papers, Plaintiff relied on paragraphs 33 through 35 of the declaratory judgment complaint, in which Defendant Sotheby's, Inc. alleged that, at the viewing for the *Salvator Mundi*, Samuel Valette encountered an unknown man at the viewing at the apartment and did not learn "until much later" that the man was Rybolovlev.  PX-266, ¶ 35.  As Valette's deposition testimony in this case made clear, that allegation was wrong—Valette testified that he came to know that Rybolovlev was one of Bouvier's clients in 2012, and that by the time of the viewing he recognized the man who was present as Rybolovlev.  Valette Dep., Wolverton Decl. Ex. B, at 63:2–64:24, 69:16–71:6, 128:4–129:13.  The inaccuracy in the complaint, a function of attorney error, was never amended, as the case settled quickly after filing.  But to explain the error, Defendants would need to offer testimony from their litigation counsel about the drafting of the complaint, even though New York law generally prohibits any lawyer from "act[ing] as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact."  N.Y. Rule of Prof. Conduct 3.7(a).  Plaintiff should not be permitted to use this erroneous allegation drafted by counsel to impeach Valette's testimony.

Indeed, Plaintiff took the same position in a parallel situation during discovery when it vociferously objected to any effort by Defendants to examine Plaintiff's witness regarding erroneous allegations made in Plaintiff's complaint in this litigation.  In the First Amended Complaint filed in June 2019, Plaintiff incorrectly conflated two separate artworks by Lautrec (one red, one green) that Plaintiff and Xitrans Finance Ltd. had acquired from Bouvier, and Plaintiff alleged—erroneously—that Defendants took various actions with respect to the green painting, which it claimed aided and abetted fraud by Bouvier.  *See* Am. Compl., ECF No. 66, ¶¶ 158–65.  That mistake, which presumably was the result of attorney error rather than a misstatement by one or more of Plaintiff's witnesses, was corrected only in May 2021 in the final months of discovery.  *See* Second Am. Compl., ECF No. 285, ¶¶ 158–62, 192–209.  Yet at Defendants' deposition of Plaintiff's and Xitrans's 30(b)(6) designee—who was testifying as a corporate representative on behalf of Plaintiff and not just in his personal capacity—Plaintiff's counsel objected and instructed the witness not to answer on the ground that it was "totally improper" to examine a witness about allegations in Plaintiff's complaint when those allegations were "just not true" and had subsequently been corrected.  Pl.'s 30(b)(6) Dep., Wolverton Decl. Ex. C, at 165:9–167:20.

In light of the above-discussed hearsay, lack of relevance, confusion, and prejudice, the mediation statement and the declaratory judgment complaint should both be excluded, and Plaintiff should not be permitted to elicit testimony from the LDV Sellers about their threatened litigation, the litigation itself, or the resolution of their dispute with Defendants.

## H.    The Wildenstein and Acquavella Documents and Testimony

Plaintiff seeks to introduce two sets of documents produced by third-parties that Plaintiff claims will show that, in connection with Bouvier's negotiation for an artwork in 2002 and purchase of another in 2004, Bouvier "held himself out to third parties as Plaintiffs' agent."  Pl.'s

56.1 Statement, ECF No. 415, ¶ 42.  Plaintiff should be precluded from introducing these documents and related testimony at trial because (1) the proffered documents do not support Plaintiff's intended use, are not probative of Bouvier's relationship to Plaintiff, and will unduly prejudice Defendants; (2) parsing the meaning of third-party documents that neither Plaintiff nor Defendants were privy to will waste time and risk jury confusion by requiring a set of mini-trials on the documents' disputed significance; and (3) use of the 2004 documents will confuse the jury and prejudice Defendants by injecting into the trial requirements that apply when a financial institution sells an artwork, which do not apply to the transactions at issue here.

### 1.    Documents and Background

The first set of proposed trial exhibits (PX-315, 346, 347, 351) were produced by the art gallery Wildenstein & Co. ("Wildenstein").  These documents seemingly relate to Bouvier's potential purchase in 2002 of a Gauguin painting called *Te Fare*.  Bouvier did not purchase the work at that time; he purchased it in 2008 following a separate negotiation.  In the proffered documents, Bouvier identified his "client" and his "customer" for the prospective purchase as Rybolovlev.  *See* PX-347, PX-351.  Bouvier recommended that Wildenstein set an asking price of $50 million for the artwork so that Bouvier's "customer," who is "keen to negotiate," would feel satisfied with a reduction in price to $45 million following negotiations, and he asked Wildenstein's permission to share that asking price with Rybolovlev.  *See* PX-351.  Although Plaintiff intends to call a custodian of records from Wildenstein to authenticate the proffered documents, *see* JPTO Part X.B.5, it has not identified any witness who can testify regarding the contents, context, or meaning of the documents, or provide any other detail regarding Bouvier's proposed transaction or communications with Wildenstein.

Second, Plaintiff seeks to introduce documents produced by Acquavella Galleries, and testimony from Nicholas Acquavella, concerning Bouvier's purchase of Picasso's *Les Noces de*

20

*Pierrette* through Acquavella Galleries in 2004. *See* PX-2; PX-3; PX-4; PX-5; PX-313; PX-314. (This is one of the first four artworks purchased at the beginning of Plaintiff's relationship with Bouvier.) The owner of the artwork was a financial institution, GE Capital, which required Acquavella Galleries to sell the work "only to principals, directly." PX-2. Further, GE Capital required that "[i]f the potential buyer is a client previously unknown to [Acquavella Galleries, then Acquavella Galleries] would require proof of funds before presenting an offer to the owner of the painting [GE Capital]." *Id.* That was so because GE Capital "was very focused on the source of funds used to buy the Work." Acquavella Decl., ECF No. 390-6, ¶ 12.[7] Consistent with GE Capital's requirements, Acquavella Galleries requested that Bouvier provide the "source of funds" to be used for the purchase, and Bouvier identified Rybolovlev as the source of funds to be used. PX-314. Thereafter, the work was sold to Eagle Overseas Company Ltd., a Bouvier-affiliated entity, and not to Rybolovlev or Xitrans (the entity Rybolovlev was using at the time for artwork purchases). DX-6. According to Mr. Acquavella's declaration, Acquavella Galleries "was never privy to the nature of any professional or legal relationship between Mr. Bouvier and Mr. Rybolovlev." Acquavella Decl., ECF No. 390-6, ¶ 12.

### 2. The Proffered Evidence Should Not Be Admitted

Plaintiff apparently intends to rely on the above documents and testimony as evidence that Bouvier held himself out as an agent for Rybolovlev and his related entities in connection with Bouvier's 2002 negotiations with Wildenstein and his 2004 purchase from Acquavella Galleries, presumably to establish that Bouvier had agreed by those dates to act as Plaintiff's agent. But the proffered documents and testimony do not support Plaintiff's intended use.

---

[7] During discovery, Mr. Acquavella executed a declaration on behalf of Acquavella Galleries in lieu of that entity's deposition under FRCP 30(b)(6).

In the Wildenstein documents, Bouvier identified Rybolovlev alternatively as (1) a "client" of his, an ambiguous term that sheds no light on the nature of their legal relationship, and (2) as Bouvier's "customer," which connotes an arms' length relationship. Further, that Bouvier proposed that Wildenstein set an asking price that was *higher* than Rybolovlev (his purported fiduciary) would want to pay so that the price could be negotiated down, and requested Wildenstein's permission to share information with Rybolovlev that Wildenstein had shared with Bouvier, undermines Plaintiff's assertion that the document shows that Bouvier "held himself out" to Wildenstein as Rybolovlev's agent. The proffered Acquavella documents similarly do not support Plaintiff's planned use, showing only that Bouvier identified Rybolovlev as the source of funds for the purchase as required by the artwork's owner, a financial institution that is subject to stringent anti-money laundering laws. Coupled with (1) Mr. Acquavella's attestation that Acquavella Galleries did not have any visibility into the nature of Bouvier's relationship to Rybolovlev and (2) the fact that, notwithstanding its purported obligation to sell the artwork "only to principals, directly," Acquavella ultimately sold the artwork to Bouvier's entity (and not Rybolovlev or Xitrans, who would be the "principal" according to Plaintiff's allegations), these documents and any testimony from Mr. Acquavella will not be probative as to whether Bouvier held himself out as Rybolovlev's agent, let alone on the question of whether there was in fact an agency agreement between Plaintiff and Bouvier.

Moreover, any limited probative value of the proffered Wildenstein and Acquavella evidence is far outweighed by the risks of issue confusion, misleading the jury, unfair prejudice to Defendants, waste of time, and undue delay. Plaintiff's proffered evidence would require mini-trials on a negotiation and a transaction that occurred long ago (more than twenty years and almost twenty years ago, respectively) as to which none of Plaintiff's trial witnesses can

testify.  Without any context as to the underlying facts, the jury will be left to guess as to the

contents and meaning of documents drafted long ago by individuals not present at trial.  That

Acquavella Galleries requested and obtained Rybolovlev's name as the source of funds for the

purchase (given the requirements applicable to its financial institution client) raises the further

risk that the jury could assume that Defendants and its subsidiaries transacting with Bouvier

(which are *not* financial institutions) were obligated to make the same inquiries.  The Court

should avoid the confusion of the issues, misleading of the jury, and prejudice to Defendants that

would result from Plaintiff's proposed detour from the facts that actually are at issue in this

case.  *See City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-5345 (JGK), 2022 WL 16901995,

at *6 (S.D.N.Y. Nov. 11, 2022) (excluding evidence as a "multi-ringed sideshow of mini-trials

on collateral issues that may have only tangential bearing, if at all, to the issues and claims

disputed in this case"); *see also Belvin v. Electchester Mgmt., LLC*, No. 17-CV-6303 (NGG)

(MMH), 2022 WL 10586743, at *5 (E.D.N.Y. Oct. 18, 2022) (finding that testimony about

statements that predated claims "would confuse the issues and the jury in a manner that

substantially outweighs [its] limited probative value" and that "[i]t would be a poor use of

judicial resources and the parties' time to conduct a mini-trial").

## I.     Evidence Regarding Bouvier's Arrest or Other Criminal Proceedings

The Court should preclude as irrelevant and prejudicial any mention at trial of Bouvier's

arrest by Monaco authorities in February 2015, as well as any mention of the criminal nature of

subsequent investigations or proceedings with respect to Bouvier, Peretti, or Tania Rappo in

Monaco or Switzerland.

Introduction of any such information would have no probative value while causing

significant prejudice to Defendants.  None of the criminal investigations has resulted in a

conviction.  The criminal proceedings initiated against Bouvier in Monaco were dismissed upon

findings by the Monaco Court of Appeal that improper influence was exerted on the integrity of the proceeding by individuals affiliated with Plaintiff. *See* DX-59. The criminal investigation in Switzerland is pending, after its initial dismissal was reversed on appeal. The existence of these dismissed or current investigations is not relevant to the jury's determination of the issues, as they are not evidence of any fact to be decided, and their criminal nature would color the jury's assessment of Bouvier and Peretti and unfairly prejudice Sotheby's. *See Michelson v. United States*, 335 U.S. 469, 482 (1948) ("Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness."); *Ridge v. Davis*, No. 18-CV-8958 (JCM), 2022 WL 16737299, at *6 (S.D.N.Y. Nov. 7, 2022) ("[A]ny probative value that these pending—and thus unproven—charges may have on Plaintiff's character for truthfulness is far outweighed by their potential prejudicial effect on the jury."); *Stephen v. Hanley*, No. 03-CV-6226 (KAM) (LB), 2009 WL 1471180, at *8 (E.D.N.Y. May 21, 2009) (excluding unproven charges under Rule 403).

The Court should therefore preclude any reference to Bouvier's arrest and preclude any reference to the criminal nature of any proceeding Plaintiff has initiated against Bouvier, Peretti, or Rappo in Monaco or Switzerland. To the extent a party needs to reference the Monaco or Switzerland proceedings for an appropriate purpose, such as to introduce an opposing party's statement, the party should refer to it only as "a foreign legal proceeding Plaintiff initiated against [Name of Individual]," without any reference to its criminal nature.[8]

---

[8] In the event the Court admits Plaintiff's deposition designations as to Bouvier's invocation of his right not to answer (which it should not do for the reasons discussed in Point I.D), the jury should hear Bouvier's testimony that the basis for his invocation was that Plaintiff is pursuing both criminal and civil liability against him in Switzerland.

## II.    DEFENDANTS' MOTION TO LIMIT THE TESTIMONY OF SANFORD HELLER

Plaintiff should be precluded from calling their lay witness Sanford Heller to testify as an undisclosed expert.  In a witness list provided on June 2, 2023, Plaintiff stated that it would call Heller to testify about three topics:  (1) "meeting Dimitry Rybolovlev and revealing Bouvier's fraud to him," (2) "the high-end art market and practices and policies of auction houses generally," and (3) "the indicia of an agency relationship in the art market."  *See* JPTO Part X.A.9.  Plaintiff had never before disclosed that Heller would testify in the capacity of an expert.

Defendants do not object to Heller providing testimony on the first topic, which is consistent with Heller's capacity to testify as a lay witness about his involvement in relevant facts, and which Defendants explored at their deposition of Heller in September 2021.  But the latter two subjects constitute expert testimony, and are impermissible because Plaintiff failed to comply with the requirements of Federal Rule of Civil Procedure 26(a)(2).

Expert testimony under Rule 702 involves "scientific, technical, or other specialized knowledge" that "will help the trier of fact to understand the evidence or to determine a fact in issue."  By Plaintiff's own account of the topics on which Heller will testify, his testimony would not be about Heller's own interactions with Rybolovlev or Plaintiff, but rather would be based on specialized knowledge, obtained in his role as an art advisor, regarding the "high-end art market and practices and policies of auction houses generally" and the "indicia of an agency relationship" in that market.  This is quintessential expert testimony.  The Court recognized "that the high-value art market and how transactions in that market usually occur are specialized topics."  Mar. 1 Opinion at 63.  And Plaintiff itself has identified two experts to testify about such matters.  *See id.* (Wittman will "testify generally about the indicia of fraudulent conduct in

the high-end art market"); *id.* at 67 (Sainty will testify "about the high-end art market and auction houses generally").

If Plaintiff had wanted to have Heller opine on the high-end art market, the practices of auction houses, and the indicia of an agent in the art market, it needed to comply with the rules governing expert disclosure and testimony.  Before a party may proffer expert testimony, the party must "satisfy the reliability requirements" for such testimony and "disclose [the witness] as an expert" under Rule 26(a)(2).  *Bank of China v. NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004); *see* Fed. R. Civ. P. 26(a)(2)(C)–(D) (requiring disclosure, within the time ordered, on "the subject matter" the expert witness is expected to present with "a summary of the facts and opinions to which the witness is expected to testify"); *Rodriguez v. Vill. of Port Chester*, 535 F. Supp. 3d 202, 215 (S.D.N.Y. 2021) ("The disclosure must be sufficient to give the opposing party a reasonable opportunity to prepare for effective cross examination[.]"); *Austin v. Metro-N. Commuter R.R.*, No. 22-CV-1645, 2023 WL 3317906, at *2 (S.D.N.Y. May 9, 2023) (excluding expert testimony where "Plaintiff's disclosures are so bare-bones as to deprive Defendants of any reasonable opportunity to prepare for cross examination or arrange for rebuttal expert testimony").

Plaintiff has failed to comply with the requirements of Rule 26(a)(2).  Heller did not provide "a summary of the facts and opinions to which the witness is expected to testify," and did not provide the necessary disclosure "at the times" this Court required.  Fed. R. Civ. P. 26(a)(2)(C), (D).  Defendants had no opportunity to depose him as to any expert opinion or move to exclude portions of any such opinion, as Defendants did with respect to the two testifying experts Plaintiff has retained.  *See* Mar. 1 Opinion at 68 (excluding portions of Sainty's expert opinions on the ground that it "cross[ed] the line by offering opinions on the credibility and state

of mind of Sotheby's, its employees, and Bouvier"); *see also id.* at 64 (noting that "Wittman's report crosses those lines . . . [by] offering specific opinions about the facts in this case"). The deadline for exchanging expert reports was October 13, 2021. *See* ECF No. 345. Plaintiff's attempt to introduce Heller's expert opinions on the eve of trial comes almost two years too late.

Plaintiff also cannot credibly claim that Heller's testimony regarding "the high-end art market and practices and policies of auction houses generally" and "the indicia of an agency relationship in the art market" is appropriate lay opinion testimony. Lay opinion testimony is admissible only where it is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "*not based on scientific, technical, or other specialized knowledge* within the scope of Rule 702." Fed. R. Evid. 701 (emphasis added). Expert and lay testimony are mutually exclusive, and "any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702" constitutes expert testimony. Fed. R. Evid. 701 advisory committee's notes to 2000 amendment. In distinguishing expert from lay testimony, "a court must focus on 'the reasoning process' by which a witness reached his proffered opinion." *United States v. Garcia*, 413 F.3d 201, 215 (2d Cir. 2005). "If the opinion rests '*in any way*' upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701." *Id.* (emphasis added). The "duty to disclose a witness *as an expert* is *not* excused when a witness who will testify as a fact witness *and* as an expert witness is disclosed as a fact witness." *Tribble v. Evangelides*, 670 F.3d 753, 759 (7th Cir. 2012), *as amended* (Feb. 2, 2012).

Courts in the Second Circuit have consistently rejected efforts to characterize testimony similar to that proffered from Heller as appropriate lay testimony. *See, e.g.*, *Giles v. Rhodes*, No.

94-CV-6385, 2000 WL 1425046, at *7 (S.D.N.Y. Sept. 27, 2000) (excluding testimony that was "paradigmatic expert testimony" based on "specialized knowledge," "founded not on [witness's] personal knowledge about the facts of the case"); *In re Illusions Holdings Inc.*, 189 F.R.D. 316, 319 (S.D.N.Y. 1999) (precluding testimony for failure to comply with Rule 26(a)(2) where "the testimony at issue involves expert, not lay, opinion(s)"); *see also* Fed. R. Evid. 701 advisory committee's notes to 2000 amendment (explaining that the rules regarding expert testimony are designed to "ensure[] that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 . . . by simply calling an expert witness under the guise of a layperson"). This Court has held similarly, rejecting the argument that witnesses were "capable of applying their experiential knowledge to the facts presented to them in the course of their employment" to offer opinions that the Court found "plainly fall within the realm of an expert." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2016 WL 4410008, at *3 (S.D.N.Y. Aug. 18, 2016) (quotation omitted).

Heller may provide lay testimony regarding his own interactions with Rybolovlev or Plaintiff insofar as the testimony is "based only on personal perceptions," is helpful to clearly understanding his testimony or to determining a fact in issue, and is not based on his specialized knowledge as an art dealer. Fed. R. Evid. 701; *Garcia*, 413 F.3d at 211 ("Rule 701 simply recognizes lay opinion as an acceptable 'shorthand' for the 'rendition of facts that the witness personally perceived.'"). He cannot opine on what standards he thinks govern the art market, what policies and practices he thinks auction houses employ, or what facts indicate an agency relationship in the art market. His testimony on all such matters should be precluded.

### III.    DEFENDANTS' MOTION TO INTRODUCE EVIDENCE IN CONNECTION WITH DETERMINING COMPENSATORY DAMAGES, IF ANY

If the jury finds Defendants liable on any of the fraud claims, Plaintiff must prove that it incurred "out of pocket" damages, which will require Plaintiff to establish, among other things, the "actual value" of each artwork when Plaintiff purchased it.  Plaintiff's position on compensatory damages, as reflected in its proposed jury instruction, is that the price Bouvier paid the original owners is *ipso facto* the actual value.  *See* JPTO Part XIII.A.  Plaintiff is wrong. "Actual value" is for the jury to decide based on all relevant evidence.  In addition to the amount that Bouvier paid the original owner, which Defendants agree is one relevant data point, the jury should consider the full range of evidence relevant to the actual value of each artwork, including the amount another buyer paid when Plaintiff resold the work and any facts showing that the original owners accepted less from Bouvier than they otherwise could have received.  In the event Plaintiff fails to prove the actual value of any work, or fails to prove that the amount Plaintiff paid Bouvier *exceeded* the actual value, the jury should be allowed to find that Plaintiff has not proven compensatory damages.  Indeed, at least one New York court has dismissed a fraud claim on the basis that the plaintiff profited from a resale following the allegedly fraudulent transaction.  *See, e.g.*, *Halkedis v. Two E. End Ave. Apartment Corp.*, 161 A.D.2d 281, 282 (N.Y. App. Div. 1990); 60A N.Y. Jur. 2d Fraud and Deceit § 178 ("One who makes a profit as the result of a transaction into which they were induced to enter by a fraudulent representation or concealment suffers no actual pecuniary damage and, therefore, has no cause of action for fraud.").

New York applies the "out of pocket" rule to determine compensatory damages in a fraud case, which limits damages to "actual pecuniary loss" caused by the fraud, meaning what a plaintiff "lost because of the fraud" and not "what [it] might have gained." *Lama Holding Co. v.*

*Smith Barney Inc.*, 88 N.Y.2d 413, 421 (N.Y. 1996).  Damages are determined in three steps: first, Plaintiff "must show the actual value of the consideration it received"; second, Plaintiff must prove that the fraud "directly caused [Plaintiff] to agree to deliver consideration that was greater than the value of the received consideration"; and third, "the difference between the value of the received consideration and the delivered consideration" is calculated, which (if greater than zero) "constitutes 'out of pocket' damages."  *Kumiva Grp., LLC v. Garda USA, Inc.*, 146 A.D.3d 504, 506 (N.Y. App. Div. 2017) (fraudulent inducement claim); *accord Danco Enterprises, LLC v. LiveXLive Media, Inc.*, 209 A.D.3d 428, 429 (N.Y. App. Div. 2022) (fraud claim); *N.Y. Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 236 (S.D.N.Y. 2020) (dismissing case for "fail[ure] to plausibly allege cognizable damages" because plaintiff "d[id] not allege the value of the work performed by the DBT" and "fail[ed] to allege the value of the consideration it delivered to the DBT").

Under the first step of the analysis, Plaintiff must prove the "actual value" of what it received in each transaction at issue—*i.e.*, the value of the works (and of Bouvier's services). Citing no apposite support, Plaintiff is seeking an automatic determination that the price Bouvier paid for each work constitutes the actual value of the work.  That is not the law.  A "negotiated price" does not automatically constitute the "actual value on the relevant date for purposes of a damages calculation," since the actual value could have been less than, but also "equal to or greater than," the purchase price.  *Kumiva Grp.*, 146 A.D.3d at 507–08.  The "actual value" of each artwork is for the jury to decide.  *See Kausal v. Singh*, 55 Misc. 3d 127(A) (N.Y. App. Term 2017) (upholding jury verdict of no damages where "plaintiff presented no competent evidence of the actual value" received from defendant" such that "'out of pocket damages ha[d] not been proven"); *Cmty. Co-op Dev. Found. v. Nat'l Westminster Bank USA*, 112 F.3d 503 (2d Cir. 1996)

(noting that "[t]he district judge correctly instructed the jury to 'award plaintiffs sufficient money to compensate them for out of pocket loss, if any'").

Relevant evidence of actual value can come from multiple sources, including the amounts that other buyers paid for the artworks on resale and the factual circumstances of a transaction indicating that Bouvier paid a below-market price for the work. For example, facts showing that the *Tête* and *Salvator Mundi* owners sold their property in private sales and not at public auctions, in contrast to the later public auctions of those works, are all relevant for the jury's consideration, along with the amounts other buyers were willing to pay on resale and facts showing that Bouvier's tactics with the original owners drove them to accept below-market amounts. The fact that the *Salvator Mundi* and the *Tête* sold at auction for amounts significantly higher than Bouvier's purchase price undermines Plaintiff's argument that Bouvier's purchase price reflects the actual value Plaintiff received when it purchased the works. Indeed, Plaintiff's conflicting arguments regarding the *Tête* illustrate the relevance of considering multiple data points in determining actual value, and reinforce the fallacy of Plaintiff's logic on damages. Plaintiff would have the jury be instructed that the *Tête* was worth €31.5 million (approximately $41 million) when Plaintiff bought it, because that is the price Bouvier paid the owners of the *Tête* to buy it. But for purposes of Plaintiff's fraud claim regarding the auction of the *very same* work—as to which out of pocket damages is also the proper measure of damages, with its three-part test—Plaintiff is necessarily arguing that the actual value of the *Tête* (which it sold to Bouvier in partial payment for Rothko's *No. 6*) is the auction price of $67 million.

Defendants intend to show that Bouvier's purchase prices do *not* reflect the actual values of the artworks at issue, and Plaintiff will obviously be free to make its own arguments at trial. But the actual value of each work is for the jury to decide, and in doing so the jury should

consider the full range of evidence that bears on the actual value of the artworks at issue, and not just, as Plaintiff would erroneously have it, on the singular data point of Bouvier's purchase price. *See, e.g.*, *King v. Wang*, No. 14-CV-7694 (LJL), 2021 WL 5237195, at *13 (S.D.N.Y. Nov. 9, 2021) (finding, when reviewing reliability of expert opinion, that "an appraisal based on comparable sales cannot rest on one sale alone—even a prior sale of the identical property; any one sale might be idiosyncratic and not representative of the current fair market value of the item to be appraised"); *Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, 502 F. Supp. 3d 760, 799 (S.D.N.Y. 2020) (applying Tennessee law for "out of pocket" damages and finding that "Plaintiffs have not proven the 'actual value' of Paradiso and its assets" because although "Plaintiffs have presented evidence regarding the purchase price of Paradiso," the witness "provided a very clear explanation of his focus on investing in 'special situations'—finding non-economic sellers who would sell assets at a valuation below the economic value of the assets").

Plaintiff's faulty damages calculation is an attempt to obtain breach of fiduciary duty damages through the back door. Damages in New York for breach of fiduciary duty are calculated under a "benefit of the bargain" approach, whereby a plaintiff can recover the markup received by the fiduciary. But Plaintiff's breach of fiduciary duty claims (except for the *Salvator Mundi*) have all been dismissed—and the applicable damages model, "out of pocket" damages, does *not* include "the greater profit that could have been made but for the false representations." *Lama Holding*, 88 N.Y.2d at 420–21. A claim that Plaintiff "would have made a lower offer" if Bouvier "had not made any misrepresentations does not suffice to demonstrate that [Plaintiff] suffered any actual pecuniary loss." *Kumiva*, 146 A.D.3d at 508. New York law bars the kind of lost profits that Plaintiff is seeking. *See Connaughton v. Chipotle Mexican Grill, Inc.*, 29 N.Y. 3d 137, 142–43 (2017) ("[T]here can be no recovery of profits which would have been realized

in the absence of fraud.”); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994) (for fraudulently induced loan, “any amount recovered by the fraudulently induced lender necessarily reduces the damages that can be claimed as a result of the fraud”); *Negrete v. Citibank, N.A.*, 759 F. App’x 42, 47–48 (2d Cir. 2019) (The “claimed damages for fraud, based on Citibank’s alleged misrepresentations about not charging markups, are all barred from recovery by New York’s ‘out-of-pocket’ rule,” because plaintiffs’ alleged damages “are precisely the profits” they “would have made were it not for the allegedly fraudulent markups”).

Moreover, it is Plaintiff that bears the burden of showing the actual value of what it received. Although Plaintiff stated in its initial disclosures that “[t]he precise amount of damages suffered by Plaintiff[] will be determined with discovery and/or expert opinion,” Plaintiff opted not to offer any expert opinion, including an appraisal, of the actual value of the works. In any event, Plaintiff must be held to its proof on its alleged “out of pocket” damages at trial. *See King v. Wang*, No. 14-CV-7694 (LJL), 2021 WL 5283950, at *2 (S.D.N.Y. Nov. 12, 2021) (after excluding expert opinion on fair market value of artworks, finding plaintiff could only support its damages theory based on evidence developed during discovery and could not adduce any new expert testimony); *see also Cont’l Cas. Co. v. PricewaterhouseCoopers, LLP*, 15 N.Y.3d 264, 271–72 (2010) (dismissing case because “plaintiffs could have come forward with portfolio valuations showing the amount of the claimed overvaluation of the portfolio on the day of their respective investments” but failed to do so).

For all the reasons discussed above, the Court should select Defendants’ proposed jury instruction on compensatory damages; reject Plaintiff’s position that the “actual value” of each artwork at issue is, *ipso facto*, the price Bouvier paid to purchase it, and instruct the jury to determine “actual value” for each artwork; and allow Defendants to offer into evidence all

relevant documents and testimony in support of "actual value," including the amounts that other buyers paid for the artworks on resale at auction or private sale, and facts showing that the original owners accepted less than the market value from Bouvier.

## IV.    DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S IMPROPER COUNTER DESIGNATIONS

The vast majority of Plaintiff's counter-designations far exceed the scope of Fed. R. Evid. 106 by offering testimony helpful to Plaintiff that is unnecessary to complete Defendants' initial designations.  *See In re Res. Fund Sec. and Derivative Litig*, Nos. 09-MD-2011 (PGG), 2012 WL 12354234, at \*4 (S.D.N.Y. Oct. 3, 2012) ("The Second Circuit has interpreted Rule 106 to justify the admission of previously excluded portions of partially received documents or statements only when necessary to explain the admitted portion, to place it into context, to ensure a fair and impartial understanding of the admitted portion, or to correct a misleading impression that might arise from excluding it."); *id.* at \*5 ("Rule 106 is aimed at permitting excerpts of testimony or other evidence to be understood in context; its purpose is not to permit an adversary to create a full record as to a particular issue.").

Defendants alerted Plaintiff to Defendants' objections on this basis and asked that, with respect to any witness whose testimony is admissible under Fed. R. Civ. P. 32 (*i.e.*, a witness other than Plaintiff's witnesses, whose testimony would be inadmissible hearsay), Plaintiff change their counter-designations to affirmative designations.  Plaintiff declined to do so, stating that Defendants can "construe that designation as a new designation from us on a new topic" and make reply designations.  Defendants oppose any effort by Plaintiff to require Defendants to present to the jury Plaintiff's purported counter-designated testimony during Defendants' presentation of any witness Plaintiff could have itself called but has elected not to call.

## V.    DEFENDANTS' MOTION TO PROTECT SENSITIVE CLIENT AND BUSINESS INFORMATION FROM DISCLOSURE IN OPEN COURT

The Court should limit references to the identity of any clients of Defendants and their subsidiaries, as well as any references to the artworks they own, so that such information will not be disclosed to the public at trial.  The information should be made available to the jury and the witnesses (meaning that the jury and the witnesses will see unredacted documents containing the information), but the parties and the witnesses should be instructed to refrain from disclosing such information in open court and the trial record should contain the redacted documents.[9]

Disclosure of client names and information about their art collections is irrelevant and prejudicial.  The Court has already ruled at summary judgment that redactions of such information from publicly-filed documents, including in many of the same documents that are now part of the parties' proposed trial exhibits, "are narrowly tailored to 'preserve higher values,'" including "privacy interests" and "confidential business or client information."  ECF No. 519; *see Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006).  Public disclosure at trial of client names and information about their art collections, including public disclosure of the identities of the sellers of Magritte's *Domaine d'Arnheim*, Modigliani's *Tête*, and Klimt's *Wasserschlangen II*,[10] is not necessary to the determination of Plaintiff's claims and would harm the clients' privacy interests and Defendants' competition interests.  *See* ECF Nos. 381, 434, 475.  Defendants therefore respectfully request that the Court require such information to be redacted from publicly-filed documents and that such information not be disclosed in open court.

---

[9] Defendants have submitted redacted and highlighted copies of their proposed trial exhibits for the Court's review.

[10] Defendants do not seek to preclude reference to the identities of the sellers of the *Salvator Mundi*, whom Plaintiff intends to call as trial witnesses.

## **CONCLUSION**

For the foregoing reasons, Sotheby's motions *in limine* should be granted.

Dated: New York, New York
       August 31, 2023

ARNOLD & PORTER KAYE SCHOLER LLP

By:   */s/ Marcus A. Asner*
     Marcus A. Asner
     Sara L. Shudofsky
     Benjamin C. Wolverton
     Yiqing Shi
     Sahrula Kubie
     250 W. 55th Street
     New York, NY 10019-9710
     Tel: 212.836.8000
     Fax: 212.836.8689
     marcus.asner@arnoldporter.com
     sara.shudofsky@arnoldporter.com
     benjamin.wolverton@arnoldporter.com
     yiqing.shi@arnoldporter.com
     sahrula.kubie@arnoldporter.com

     Neal Kumar Katyal *(Pro hac vice)*
     Will Havemann *(Pro hac vice forthcoming)*
     HOGAN LOVELLS US LLP
     555 Thirteenth Street, N.W.
     Washington, D.C. 20004
     Tel: 202.637.5600
     Fax: 202.637.5910
     neal.katyal@hoganlovells.com
     will.havemann@hoganlovells.com

     *Attorneys for Defendants Sotheby's and Sotheby's, Inc.*