UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ACCENT DELIGHT INTERNATIONAL LTD.,

Plaintiff,

-*against*-

SOTHEBY'S and SOTHEBY'S INC.,

Defendants.

Case No. 18-cv-9011(JMF)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTIONS IN LIMINE**

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff*

TABLE OF CONTENTS

PAGE NO.

I.      SOTHEBY'S MOTIONS TO EXCLUDE SHOULD BE DENIED ........................1

        A.      Valuations and Evidence Regarding Other Works Are Relevant .................1

                1.      Evidence of Actual Knowledge ........................................................1

                2.      Evidence of Bouvier's Fraud and Breach of Fiduciary Duty ...........5

                3.      Evidence of Sotheby's Motive and Credibility.................................6

        B.      Defendants' Common Interest Agreement with Bouvier .............................7

        C.      The Jury Can Draw an Adverse Inference Based on Bouvier Invoking
                His Right Not to Answer .............................................................................9

                1.      The Designated Bouvier Testimony is Relevant ...............................9

                2.      The Jury Can Draw an Adverse Inference Against Sotheby's .........9

        D.      The So-Called "Erroneous" Privilege Log Entry Is Admissible .................11

        E.      Sotheby's Own Policies Are Relevant and Admissible................................12

        F.      The Dispute Between Sotheby's, Inc. and the *Salvator Mundi* Owners........14

                1.      Sotheby's Own Complaint Is Admissible Non-Hearsay ..................14

                2.      The Mediation Statement is Also Admissible ..................................15

        G.      The Wildenstein and Acquavella Evidence Is Relevant to Agency .............15

        H.      Evidence Regarding Bouvier's Arrest or Other Criminal Proceedings.........17

II.     SANFORD HELLER'S TESTIMONY SHOULD NOT BE LIMITED..................17

III.    BOUVIER'S CONTEMPORANEOUS PURCHASE PRICES, NOT
        YEARS' LATER RESALE PRICES, SET THE VALUE OF THE WORKS
        AT THE TIME OF THE FRAUD ........................................................................19

        A.      Sotheby's Ignores the Contemporaneous Timing Transactions ...................19

        B.      Years' Later Resale Prices Are Irrelevant to the Artworks' Value at the
                Time of the Fraud, and Sotheby's Seeks to Introduce Those Prices for
                Improper Motives..........................................................................................23

C.      Accent Does Not Seek "Lost Profits" or "Benefit of the Bargain"
        Damages...........................................................................................................25

IV.     ACCENT'S COUNTER DEPOSITION DESIGNATIONS ARE PROPER ............27

V.      SEALING TESTIMONY AND EXHIBITS IS UNWARRANTED OR
        PREMATURE ........................................................................................................28

CONCLUSION....................................................................................................................31

TABLE OF AUTHORITIES

PAGE NO.

**Cases**

*Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*,
   No. 08 Civ. 7508, 2013 WL 1155420 (S.D.N.Y. Mar. 20, 2013) .............................................. 3

*Allen v. WestPoint-Pepperell, Inc.*,
   945 F.2d 40 (2d Cir. 1991)........................................................................................................ 6

*Arthur Properties, S.A. v. ABA Gallery, Inc.*,
   No. 11 Civ. 4409 LAK, 2011 WL 5910192 (S.D.N.Y. Nov. 28, 2011) ............................ 20, 22

*Baena v. Woori Bank*,
   515 F. Supp. 2d 414 (S.D.N.Y. 2007).......................................................................................... 3

*Berdeaux v. OneCoin Ltd.*,
   561 F. Supp. 3d 379 (S.D.N.Y. 2021).......................................................................................... 3

*Blackmon v. Bracken Constr. Co., Inc.*,
   338 F.R.D. 91 (M.D. La. 2023) ................................................................................................... 8

*Cmty. Ass'n of the E. Harlem Triangle, Inc. v. Butts*,
   200 A.D.3d 599 (1st Dep't 2021) .............................................................................................. 21

*Connaughton v. Chipotle Mexican Grill, Inc.*,
   29 N.Y.3d 137 (2017)................................................................................................................ 27

*Coventry Cap. US LLC v. EEA Life Settlements, Inc.*,
   No. 17 Civ. 7417, 2017 WL 5125544 (S.D.N.Y. Nov. 2, 2017) ............................................... 30

*Credit Suisse First Bos. v. Utrecht-Am. Fin. Co.*,
   84 A.D.3d 579 (1st Dep't 2011) ................................................................................................ 22

*Danco Enter.s, LLC v. LiveXlive Media, Inc.*,
   209 A.D.3d 428 (1st Dep't 2022) .............................................................................................. 21

*Dawson v. Merck & Co.*,
   No. 11 Civ. 1876, 2021 WL 242148 (E.D.N.Y. Jan. 24, 2021)................................................. 30

*Est. of Kollsman v. Comm'r of Internal Revenue*,
   113 T.C.M. (CCH) 1172 (T.C. 2017) ....................................................................................... 23

*Est. of Kollsman v. Comm'r of Internal Revenue*,
   777 F. App'x 870 (9th Cir. 2019) ....................................................................................... 21, 23

*Est. of Newberger v. Comm'r of Internal Revenue,*
    110 T.C.M. (CCH) 615, 2015 WL 9426272 (T.C. 2015) ................................ 21, 24

*Faller Group, Inc. v. Jaffe,*
    564 F. Supp. 1177 (S.D.N.Y. 1983) ........................................................... 22

*Feld v. Fireman's Ins. Co.,*
    No. 12 Civ. 1789, 2019 WL 13254353 (D.D.C. June 21, 2019) ............................ 11

*First Nationwide Bank v. Gelt Funding Corp.,*
    27 F.3d 763 (2d Cir. 1994) ........................................................................ 27

*Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC,*
    502 F. Supp. 3d 760 (S.D.N.Y. 2020) ......................................................... 22

*Halkedis v. Two E. End Ave. Apt. Corp.,*
    161 A.D.2d 281 (1st Dep't 1990) ................................................................ 24

*Harris Corp. v. Fed. Express Corp.,*
    No. 607 Civ. 1819, 2010 WL 11474447 (M.D. Fla. July 19, 2010) .......................... 7

*Heckler & Koch, Inc. v. German Sport Guns GmbH,*
    No. 11 Civ. 01108, 2014 WL 12756372 (S.D. Ind. May 15, 2014) ........................ 11

*Hotaling v. A.B. Leach & Co.,*
    247 N.Y. 84 (1928) ................................................................................. 24

*In re Parmalat Sec. Litig.,*
    258 F.R.D. 236 (S.D.N.Y. 2009) ................................................................ 30

*In re Refco Inc. Sec. Litig.,*
    No. 07 Civ. 8663 (JSR), 2011 WL 13243784 (S.D.N.Y. Mar. 28, 2011) ................. 22

*In re Upper Brook Co.,*
    No. 22 Mc. 97, 2023 WL 172003 (S.D.N.Y. Jan. 12, 2023) ................................ 30

*Interpool Ltd. v. Patterson,*
    874 F. Supp. 616 (S.D.N.Y. 1995) ............................................................. 26

*Island Intell. Prop. LLC v. Deutsche Bank AG,*
    No. 09 Civ. 2675, 2012 WL 526722 (S.D.N.Y. Feb. 14, 2012) .............................. 7

*Ismail v. Cohen,*
    899 F.2d 183 (2d Cir. 1990) ........................................................................ 3

*John Paul Mitchell Sys. v. Quality King Distribs., Inc.,*
    106 F. Supp. 2d 462 (S.D.N.Y. 2000) ......................................................... 11

iv

*Kaushal v. Singh*,
 55 Misc.3d 127(A), 55 N.Y.S.3d 692 (App. Term. 1st Dep't 2017) ...................................... 21

*Keator v. State*,
 23 N.Y.2d 337 (1968) ..................................................................................................... 21

*King v. Wang*,
 No. 14 Civ. 7694 (LJL), 2021 WL 5237195 (S.D.N.Y. Nov. 9, 2021) ........................... 21, 23

*Koito Mfg. Co. v. Turn-Key-Tech, L.L.C.*,
 02 Civ. 0273, 2003 WL 25674799 (S.D. Cal. Apr. 10, 2003) .................................................. 8

*Kumiva Grp., LLC v. Garda USA Inc.*,
 146 A.D.3d 504 (1st Dep't 2017) ............................................................................... 21, 22, 26

*Lamdin v. Broadway Surface Advert. Corp.*,
 272 N.Y. 133 (1936) ....................................................................................................... 26

*LiButti v. United States*,
 107 F.3d 110 (2d Cir. 1997) .......................................................................................... 9, 10

*Liu Yao-Yi v. Wilmington Tr. Co.*,
 301 F. Supp. 3d 403 (W.D.N.Y. 2017) ............................................................................. 13

*Lugosch v. Pyramid Co. of Onondaga*,
 435 F.3d 110 (2d Cir. 2006) ......................................................................................... 29, 30

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
 500 F.3d 171 (2d Cir. 2007) ............................................................................................. 24

*Negrete v. Citibank, N.A.*,
 237 F. Supp. 3d 112 (S.D.N.Y. 2017) ............................................................................... 26

*Negrete v. Citibank, N.A.*,
 759 Fed. App'x 42 (2d Cir. 2019) ..................................................................................... 26

*New York Wheel Owner LLC v. Mammoet Holding B.V.*,
 481 F. Supp. 3d 216 (S.D.N.Y. Aug. 21, 2020) ................................................................. 21

*Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
 322 F.3d 147 (2d Cir. 2003) ............................................................................................. 15

*Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*,
 No. 03 Civ. 5238, 2006 WL 3782994 (N.D. Ill. Dec. 21, 2006) ............................................ 12

*Partylite Gifts, Inc. v. MacMillan*,
 No. 10 Civ. 1490-T-27EAJ, 2012 WL 13059665 (M.D. Fla. Sept. 13, 2012) .......................... 8

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) ................................................................................................. 28

*RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am.*,
    No. 18 Civ. 6449, 2023 WL 2403258 (E.D.N.Y. March 7, 2023) ........................... 12

*S.E.C. v. McGinn, Smith & Co.*,
    752 F. Supp. 2d 194 (N.D.N.Y. 2010) ............................................................. 10, 11

*Sager v. Friedman*,
    270 N.Y. 472 (1936) ................................................................................................ 26

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) ............................................................................ 21, 22

*Schulhof v. Jacobs*,
    54 Misc.3d 1221(A), 2017 WL 825863 (Sup. Ct. N.Y. Cnty. Feb. 27, 2017) ........................ 21

*Schulhof v. Jacobs*,
    70 N.Y.S.3d 462 (1st Dep't 2018) ........................................................................ 21

*Scoma v. City of New York*,
    No. 16 Civ. 6693, 2021 WL 1784385 (E.D.N.Y. May 4, 2021) ............................. 11

*Skinner v. City of New York*,
    No. 15 Civ. 6126, 2017 U.S. Dist. LEXIS 104650 (E.D.N.Y. April 7, 2017) ........................ 11

*Starr Found. v. Am. Int'l Grp., Inc.*,
    76 A.D.3d 25 (1st Dep't 2010) .............................................................................. 26

*Tourangeau v. Nappi Distributors*,
    No. 2:20 Civ.00012, 2023 WL 2164381 (D. Me. Feb. 22, 2023) ............................ 29

*TVT Recs. v. Island Def Jam Music Grp.*,
    250 F. Supp. 2d 341 (S.D.N.Y. 2003) ............................................................... 13, 16

*U.S. ex rel. Health Dimensions Rehab., Inc. v. RehabCare Grp., Inc.*,
    No. 12 Civ. 00848, 2013 WL 5340910 (E.D. Mo. Sept. 23, 2013) ........................... 7

*United States v. Broad. Music, Inc.*,
    426 F.3d 91 (2d Cir. 2005) ..................................................................................... 20

*United States v. Castro*,
    813 F.2d 571 (2d Cir. 1987) ................................................................................... 28

*United States v. Hild*,
    No. 19 Crim. 602, 2022 WL 17484992 (S.D.N.Y. Dec. 7, 2022) ........................... 18

*United States v. McKeon*,
    738 F.2d 26 (2d Cir. 1984) ................................................................... 15

*United States v. Mendlowitz*,
    No. 17 Crim. 248, 2019 WL 6977120 (S.D.N.Y. Dec. 20, 2019) ........................... 18

*United States v. Mendlowitz*,
    No. 21-2049, 2023 WL 2317172 (2d Cir. 2023) ......................................... 18

*United States v. Patel*,
    No. 3:21 Crim. 220, 2023 WL 2643815 (D. Conn. Mar. 27, 2023) ....................... 18

*United States v. Ramirez*,
    894 F.2d 565 (2d Cir. 1990) .................................................................. 3

*United States v. Rutkoske*,
    506 F.3d 170 (2d Cir. 2007) ............................................................ 2, 3

*United States v. Williams*,
    930 F.3d 44 (2d Cir. 2019) .................................................................. 28

*United States v. Yannotti*,
    541 F.3d 112 (2d Cir. 2008) ................................................................ 18

*Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*,
    Nos. 6:12 Civ. 00196, 6:13 Civ. 00743, 2018 WL 3135847
    (N.D.N.Y. June 27, 2018) ................................................................... 12

*W. T. Grant Co. v. Srogi*,
    52 N.Y.2d 496 (1981) ....................................................................... 21

*Wendel v. Int'l Real Estate News*,
    No. 19 Civ. 21658, 2020 WL 13421523 (S.D. Fla. June 29, 2020) ......................... 8

*Williams v. Rushmore Loan Mgmt. Servs. LLC*,
    No. 3:15 Civ. 673, 2017 WL 822793 (D. Conn. Mar. 2, 2017) ....................... 13, 16

*Willingham v. County of Albany*,
    593 F. Supp. 2d 446 (N.D.N.Y. 2006) ............................................... 10, 11

*Yukos Cap. S.A.R.L. v. Feldman*,
    977 F.3d 216 (2d Cir. 2020) ................................................................ 26

**Other Authorities**

N.Y. Pattern Jury Instr. Civil § 3.20 ......................................................... 20

Sotheby's, *Peak Performance: The Art Market Beyond $1 Million 2018-2022*,
*available at* https://www.sothebys.com/en/docs/pdf/sothebys-insight-report-the-art-
market-beyond-1-million-march-2023-1-pdf.pdf?locale=en....................................................... 24

**Rules**

Fed. R. Civ. P. 32(a)(6)................................................................................................ 27

Fed. R. Civ. P. 32(a)(6), Advisory Committee's Note to 1970 Amendment........................27

Fed. R. Civ. P. 77(b) .................................................................................................... 28

Fed. R. Evid. 106 ......................................................................................................... 27

Fed. R. Evid. 1-07 ........................................................................................................ 27

Fed. R. Evid. 1-07 Note,
*Preliminary Draft of Proposed Rules of Evidence for the United States District Courts
and Magistrates* (March, 1969) ................................................................................. 27

All Sotheby's *in limine* motions should be denied, except one. Plaintiff does not oppose their motion to exclude evidence of Bouvier's arrest, so long as Sotheby's is precluded from introducing similar evidence relating to irrelevant, pending charges against Plaintiff's representatives. *See* Pl. Br. at 22-25.[1]

## I.      SOTHEBY'S MOTIONS TO EXCLUDE SHOULD BE DENIED

### A.      Valuations and Evidence Regarding Other Works Are Relevant

#### 1.      Evidence of Actual Knowledge

Evidence relevant to Sotheby's actual knowledge should not be excluded.

**October 2014 Valuations.** Sotheby's actual knowledge must be assessed in light of the information Sotheby's accumulated over time, rather than in a silo, transaction by transaction. *See* Summary Judgment Order at 49, ECF No. 510 ("MSJ Order") (holding Sotheby's actual knowledge of fraud for Da Vinci and Klimt transactions consists in part of Valette's earlier price adjustments and knowledge of Bouvier's prior fraud with the Magritte and Modigliani works). Viewing Sotheby's knowledge cumulatively, the valuations it created in October 2014 are relevant to proving its actual knowledge of the fraud.

First, the October 2014 valuations are further proof that Sotheby's possessed actual knowledge of Bouvier's fraud from 2011 onwards because they establish a consistent pattern of Valette adjusting valuations at Bouvier's request to aid and abet Bouvier's fraud. "Beginning with the sale of Magritte's *Le Domaine d'Arnheim* (in December 2011) and Modigliani's *Tête* (in January 2013), the record suggests that Valette adjusted his estimated valuations of these two works to suit Bouvier, before Bouvier sold the works to Plaintiffs." MSJ Order at 46. "It is also

---

[1] References to Accent's memorandum of law in support of its motion *in limine* (ECF No. 550) are "Pl. Br." and to Sotheby's memorandum of law in support of its motion *in limine* (ECF No. 553) are "D. Br." References to "Opp. Kornstein Decl." are to the October 5 Declaration of Daniel J. Kornstein filed in opposition to Sotheby's motion. For ease of reference, this brief follows the order of argument set forth in Sotheby's opening brief. All citations in this brief have been "cleaned up" unless otherwise noted.

reasonable to infer that Valette knew Bouvier would forward his estimates to another person as he provided Bouvier with a draft, a final email, and then a new final email with an updated price, all presumably at Bouvier's request; notably, these emails were formal in tone — in contrast to the informal tone Valette normally used when emailing Bouvier." *Id.* at 47. So too in October 2014: Sotheby's created draft valuations of four artworks; two days later, and ***after*** discussing the drafts with Bouvier, Valette sent Bouvier the valuations, omitting Bouvier from the provenance and dramatically increasing the values to closely match what Accent paid for those works. PX-354; PX-165; Valette Tr. 263:16-264:12. Bouvier then sent those valuations to Accent. PX-248. Just a few months later, in early 2015, Valette similarly inflated the Da Vinci and Gauguin valuations to closely match Accent's purchase prices. MSJ Order at 22. The jury can find that the October 2014 valuations were part of a pattern in which Bouvier asked Valette to match Accent's purchase prices, and, given Valette's knowledge of the fraud by that time, Valette agreed to do so to further aid and abet and conceal the fraud, knowing the valuations would be forwarded to Accent and Rybolovlev just like Valette's 2011 and 2012 formal emails.

The similarity between Sotheby's manipulations in 2014 and 2015 and its earlier 2011 and 2012 manipulations supports Sotheby's actual knowledge in 2011, 2012, 2013, and 2014. For example, in *United States v. Rutkoske*, 506 F.3d 170 (2d Cir. 2007), the defendant was convicted of securities fraud for manipulating NetBet stock prices. The Second Circuit affirmed the admission at trial of the defendant's conversations with a colleague about how to manipulate the prices of a different company's stock, despite those conversations having occurred four years after the NetBet scheme. *Id.* at 174, 177. The court rejected a *per se* rule that later similar act evidence inherently lacks relevancy, holding that the "similarity between the [two] schemes" and the defendant's claim to lack knowledge of the NetBet scheme made evidence of the latter

scheme admissible to show knowledge of the former. *Id.* at 178; *see also United States v. Ramirez*, 894 F.2d 565, 567, 569 (2d Cir. 1990) (upholding admission of later attempted cocaine sale to show knowing participation in cocaine trade during earlier transaction); *Ismail v. Cohen*, 899 F.2d 183, 185, 188–89 (2d Cir. 1990) (upholding admission of police officer's attack on another civilian, two months after same officer's alleged attack on plaintiff, to show pattern and intent for first attack); *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, No. 08 Civ. 7508, 2013 WL 1155420, at *8 (S.D.N.Y. Mar. 20, 2013) (admitting evidence of what defendants knew not just when they issued false ratings of investment products, but also during the entire period they marketed those products); *Baena v. Woori Bank*, 515 F. Supp. 2d 414, 421 (S.D.N.Y. 2007) (defendants' alleged lies were "strong circumstantial evidence" of their state of mind and intent to defraud at earlier point in time).[2]

Second, the October 2014 valuations are relevant to Sotheby's actual knowledge of Bouvier's fraud in auctioning *Tête*—which occurred in October-November 2014, almost simultaneously with the October 2014 valuations. The Court already found "Valette knowingly hid Bouvier's involvement in buying, selling, and auctioning the sculpture" when Valette omitted Bouvier from the provenance listed in the catalog for the auction in November 2014. MSJ Order at 48. The jury can draw the inference that Valette knew of Bouvier's fraud not only because of the provenance omission but also because Valette was simultaneously and dramatically increasing valuation figures in a manner similar to what he did before in 2011 and 2012. MSJ

---

[2] The summary judgment opinion does not preclude the admission of the 2014 valuations. *Contra* D. Br. at 4. The only cited case on the issue of whether the 2014 and later valuations are relevant to actual knowledge, *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 414 (S.D.N.Y. 2021), does not preclude the argument advanced here. *Berdeaux* held only that where a bank learned of a fraud only several months *after* it facilitated the fraudster's transfer of funds, the bank did not have actual knowledge at the time of the transfer. Accent is not arguing that the October 2014 valuations are what gave Sotheby's actual knowledge of Bouvier's earlier fraud; instead the October 2014 valuations, which Sotheby's prepared in the midst of the fraud, are evidence of what Sotheby's knew, as early as 2011 and continuing through October 2014 and beyond; and they show a pattern of conduct by Sotheby's to aid and abet the fraud through inflated valuations that closely matched the prices Plaintiff paid so as to conceal the fraud.

Order at 46-47. Just as the 2011 and 2012 emails must be considered in establishing Sotheby's knowledge of fraud for the later Da Vinci and Klimt transactions, so too can the October 2014 valuations establish Sotheby's knowledge of fraud for the *Tête* auction.

**December 2014 Price Manipulations.** Valette again manipulated values of an artwork in December 2014, increasing its value within hours in a draft, then final, auction catalog sent to Bouvier, and switching his informal tone to a formal one. PX-237, PX-238, PX-239, PX-240. Bouvier forwarded the final, formal email and catalog to Accent. PX-241, PX-215, PX-216. The jury can find that Valette's December 2014 emails show that Sotheby's knew of Bouvier's fraud starting in 2011 and continuing thereafter and that it aided and abetted the fraud through a pattern of inflated valuations.

**Bouvier's Relationship with Rybolovlev.** As Sotheby's concedes, documents reflecting what it understood about Bouvier's relationship with Rybolovlev are relevant, so they should not be excluded. D. Br. at 2. For example, PX-125 shows Sotheby's discussing Peretti's "Russian client." PX-130 should not be excluded as it similarly shows that Peretti was negotiating on behalf of a "client." PX-128 and PX-129 should not be excluded because they show Rybolovlev travelling to view the artwork that is the subject of Valette's March 31, 2011 email (PX-131) describing Peretti's client as a "young, fast moving billionaire," and therefore make clear that Rybolovlev is that client.

**Prices Paid by Bouvier.** Bouvier's prices are relevant to show Sotheby's knowledge. Sotheby's will argue that it had no knowledge of Bouvier's fraud and that its relationship with Bouvier aligned with routine practices in the art market. Exhibits PX-230 and PX-231 belie that argument. Sotheby's employees discuss Bouvier purchasing artwork for prices far above what Sotheby's believed possible. That behavior is *inconsistent* with art industry practices and labelled

a "red flag" by Sotheby's own policy, which explains that when a "[c]lient seems oddly unconcerned about price levels," it "may cause concern about a client or transaction" and employees should "contact the Compliance Department immediately." PX-221 at 13-14.

### 2.   Evidence of Bouvier's Fraud and Breach of Fiduciary Duty

Emails in which Bouvier consistently told Sazonov that he was negotiating *on Accent's behalf*, claiming to be engaged in hard-fought negotiations to drive down prices *for Accent's benefit*, and seeking *authority from Accent* to conclude deals, to change deal terms, to offer more money, or to change strategy are all relevant to whether Bouvier was Accent's agent.[3] That these emails relate to works not at issue is of no moment. Sotheby's itself relies on transactions not at issue in the case—the first four sales contracts—to undermine agency (MSJ Order at 7); Accent can use documents from these and other transactions showing otherwise. Because Bouvier's status as Accent's agent is a central question at trial, all of Bouvier's dealings with Accent's representatives are relevant, even if they predate the works at trial. Bouvier's claims in these emails to act on Accent's instructions, and in its best interest, over the course of many years are also relevant to show it was reasonable for Accent to later rely on Bouvier's representations for the works that remain at issue. If needed, the jury can be instructed that Accent is not seeking to hold Sotheby's liable for the artworks or negotiations described in these emails.

Purchase invoices and commission invoices issued by Bouvier to Accent are also relevant to agency.[4] These invoices not only corroborate Rybolovlev's testimony that he and Bouvier established an agency relationship through oral agreement, but also serve as independent proof that such a relationship existed. The pattern of Bouvier issuing Accent an invoice for purchase of artwork, followed by an invoice for Bouvier's "administrative and due diligence services" show

---

[3] PX-22, PX-29, PX-30, PX-31, PX-33.
[4] PX-41, PX-42, PX-43, PX-44, PX-45, PX-46, PX-48, PX-51, PX-54, PX-55, PX-56, PX-57, PX-58, PX-59, PX-61, PX-64.

that Bouvier did *not* flip works for an all-in price, as a dealer would, but instead billed his art agent services separately and consistently with what Accent believed he was doing as its agent. *See Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 45 (2d Cir. 1991) (holding a pattern of dealing can establish a fiduciary duty).

### 3.    Evidence of Sotheby's Motive and Credibility

Contracts and payments between Sotheby's and Bouvier for other works remain relevant.[5] Beginning in 2011 and continuing for the next several years, Bouvier spent hundreds of millions of dollars buying artwork through Sotheby's. Preserving and facilitating that volume of sales establishes Sotheby's motivation to assist Bouvier's fraud and explains why it tolerated behavior that its own internal policies called a cause for concern and further investigation. *See* PX-221 at 14 (listing as a "red flag" when "Purchases or consignments are inconsistent with client's trade, business or collecting and living habits, are disproportionate to the client's means, or diverge from past practices"). Moreover, these contracts and payments confirm that Bouvier repeatedly sold Accent works for prices far higher than what he paid, proving that Bouvier's fraud was already in place by the time the works at issue in the trial were sold, thereby establishing that Accent's reliance on Bouvier's representations regarding the works remaining at issue was reasonable.

Other evidence, including emails showing Valette and Sotheby's employees traveling on Peretti's private plane, illustrates Sotheby's close relationship with Bouvier and Peretti, and are also relevant to motive and credibility. PX-235. That close relationship is further shown by Sotheby's actions after Bouvier's fraud became public: rather than severing its connections with Bouvier, Sotheby's doubled down on assisting its co-conspirator, including accelerating payments to Bouvier as a favor to him, Valette visiting Bouvier in person to provide him support,

---

[5] PX-6, PX-7, PX-8, PX-9, PX-10, PX-12, PX-15, PX-371, PX-242.

and Vinciguerra eagerly courting Peretti to consign artwork for auction.[6] The jury should hear this evidence in assessing Sotheby's witnesses' credibility and determining whether Sotheby's actions were more consistent with a co-conspirator than an uninvolved third party.

### B.   Defendants' Common Interest Agreement with Bouvier

Defendants cannot trumpet their lack of post-fraud dealings with Bouvier and then deny Plaintiff the opportunity to rebut their asserted neutrality. Sotheby's wants to tell the jury "Defendants have not transacted with Bouvier since Plaintiff's allegations against Bouvier became public—a fact that Bouvier complained about at his deposition." D. Br. at 10. But, Sotheby's having opened this door, the jury is entitled to know that, after the fraud became public, Sotheby's did the opposite of what an innocent bystander would do. Instead of severing ties with Bouvier and cooperating with Accent to bring him to justice, Sotheby's voluntarily gave Bouvier millions, visited and supported him, courted his business, *see supra* Section A(3), and then joined forces with him in a common interest agreement against Accent.

"The fact that a joint defense agreement exists is a permissible topic for cross-examination." *Island Intell. Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675, 2012 WL 526722, at *12 (S.D.N.Y. Feb. 14, 2012). Courts regularly deny motions to preclude common interest agreements. *See, e.g.*, *Harris Corp. v. Fed. Express Corp.*, No. 607 Civ. 1819, 2010 WL 11474447, at *2 (M.D. Fla. July 19, 2010) (denying motion *in limine* because the joint defense agreement "demonstrates a common interest" and "is relevant to establish the bias of [a witness].")*; U.S. ex rel. Health Dimensions Rehab., Inc. v. RehabCare Grp., Inc.*, No. 12 Civ. 00848, 2013 WL 5340910, at *2 (E.D. Mo. Sept. 23, 2013) (denying *motion in limine* because "the United States may establish the existence of any such [common interest] agreement with parties to the agreement, as evidence of possible bias"); *Koito Mfg. Co. v. Turn-Key-Tech,*

---

[6] PX-243, PX-244, PX-245, PX-246, PX-288.

*L.L.C.*, 02 Civ. 0273, 2003 WL 25674799, at *8 (S.D. Cal. Apr. 10, 2003) (denying motion *in limine* because defendant could "cross-examine a witness as to bias, including the fact of a joint defense agreement").

Sotheby's cited case, *Warren Distribution Co. v. InBev USA L.L.C.*, No. 07 Civ. 1053, 2008 WL 4371763 (D.N.J. Sept. 18, 2008), supports Accent's argument. In declining to compel discovery of the substance of a common interest agreement, the court observed that "the only arguably relevant information in the Agreement has been disclosed" as the "Plaintiffs already know the agreement was entered into[.]" *Id.* at *3. *Warren*, therefore, suggests that the *existence* of a common interest agreement—what Accent seeks to introduce at trial—may be relevant. *See also*, *e.g.*, *Blackmon v. Bracken Constr. Co., Inc.*, 338 F.R.D. 91, 94-95 (M.D. La. 2023) (compelling disclosure of common interest agreement after finding it was "particularly relevant in this case").[7]

Accent is not offering the common interest agreement as evidence of a prior act but rather to rebut Sotheby's claim of neutrality after the fraud became public. Both Sotheby's cases expressly "[left] open the possibility that such evidence ***may*** be used on cross-examination to impeach or otherwise establish the bias of a witness." *Partylite Gifts, Inc. v. MacMillan*, No. 10 Civ. 1490-T-27EAJ, 2012 WL 13059665, at *2 (M.D. Fla. Sept. 13, 2012); *see also Wendel v. Int'l Real Estate News*, No. 19 Civ. 21658, 2020 WL 13421523, at *4 (S.D. Fla. June 29, 2020). At minimum, the Court should do the same here.

---

[7] Sotheby's other cases also do not support precluding the common interest agreement. Far from holding common interest agreements are inadmissible at trial, *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class* merely noted that the "hardly surprising" common interest agreement between a patentee and licensee was insufficient evidence of conspiracy to survive a summary judgment challenge. 868 F.3d 132, 154 (3d Cir. 2017). And in both *Wendel v. Int'l Real Estate News*, and *Partylite Gifts, Inc. v. MacMillan*, the courts found only that a common interest agreement could not be used as evidence of states of affair pre-dating the agreements. 19 Civ.21658, 2020 WL 13421523, at *4 (S.D. Fla. June 29, 2020); 10 Civ.1490-T-27EAJ, 2012 WL 13059665, at *2 (M.D. Fla. Sept. 13, 2012).

### C.   The Jury Can Draw an Adverse Inference Based on Bouvier Invoking His Right Not to Answer

#### 1.   The Designated Bouvier Testimony is Relevant

Bouvier's relationships with Accent and Sotheby's are **central issues**. The jury is entitled to hear that Bouvier refused to answer cross-examination about these topics. Bouvier claims that the 2% fee he charged Accent on the purchase prices was not the commission of an agent, but rather compensation for some separate "due diligence" services; Sotheby's has designated extensive testimony from Bouvier about these so-called due diligence services (*e.g.*, Bouvier Tr. 323:3-324:24). The jury is entitled to know that when Accent's counsel tried to cross-examine Bouvier about these services, including by pointing out how incongruous it was for Bouvier to be claiming he performed due diligence while also claiming that Sotheby's did all the due diligence, Bouvier refused to answer and invoked his right against self-incrimination, *id.* at 325:21–31, 326:18–327:17.

The jury is also entitled to hear Bouvier invoked the privilege rather than answer questions about his common interest agreement with Sotheby's, because that is further evidence of their close collaboration even after the fraud was public and is permissible evidence of bias. Bouvier Tr. at 67:13–19, 69:1–13; *see supra,* Section B.

#### 2.   The Jury Can Draw an Adverse Inference Against Sotheby's

Bouvier's privilege invocation gives rise to an adverse inference against Sotheby's under the four-part *LiButti v. United States* test. 107 F.3d 110, 123-24 (2d Cir. 1997). First, Bouvier and Defendants possessed a close business relationship, which is "the most significant circumstance" in assessing whether to attribute an adverse inference, because "[t]he closer the bond, whether by reason of blood, friendship or business, the less likely the non-party witness would be to render testimony in order to damage the relationship." *Id*. at 123. "Bouvier

frequently worked with these Sotheby's entities to buy and sell art, conducting over eight hundred transactions with Sotheby's entities between 2005 and 2015." MSJ Order at 10. Their business relationship could not have been "closer." *Libutti*, 107 F.3d at 123-24. Second, Sotheby's and Bouvier have "precisely the same interest" in defeating Accent; Bouvier "is pragmatically a noncaptioned party in interest" and "the assertion of the privilege advances the interests of both the non-party witness [Bouvier] and the affected party [Sotheby's] in the outcome of the litigation." *Id.* Third, "the non-party witness [Bouvier] was a key figure in the litigation and played a controlling role," *id.*, as Sotheby's acknowledges. D. Br. at 10 n.5.

Because the first three factors so strongly favor an adverse inference, it does not matter that the fourth factor, the degree of Sotheby's control over Bouvier, is disputed. *Compare supra* (B) *with* D. Br. at 9-10. Sotheby's own cases make that clear. In *S.E.C. v. McGinn, Smith & Co.*, the court found "it is clear that neither Lynn Smith nor the Trust controlled David Smith," but still went on to find an adverse inference should be drawn because, "given the nature of the relationships, the complete identity of interests, and David Smith's role both in this litigation and as to Lynn Smith and the Trust, the absence of significant control over David Smith is far outweighed by the other factors." 752 F. Supp. 2d 194, 210 (N.D.N.Y. 2010). Similarly, in *Willingham v. County of Albany*, the court found "[t]here is no evidence that Trice exercised any control over Gilkey's actions, but it appears throughout the underlying events and the course of this litigation that Trice has accepted and followed Gilkey's leadership and actions and joined with Gilkey," and held that "imputing adverse inferences from Gilkey's invocation of the privilege to Trice appears trustworthy and any adverse inferences found applicable against Gilkey here will, therefore, also be applied against Trice." 593 F. Supp. 2d 446, 453 (N.D.N.Y. 2006).

As in *McGinn* and *Willingham,* an inference should be drawn against Sotheby's here. "In this case, a fact finder could reasonably draw the inference that [Bouvier] invoked [his Swiss equivalent of the] Fifth Amendment privilege because [he] did in fact defraud [Plaintiff]. The reliability of that inference does not change because the potential finding of fraud would be to the detriment of [Sotheby's]. Insofar as the case involves proving the existence of a fraud, the interests of [Sotheby's] and [Bouvier] are aligned. Thus, the Fifth Amendment invocations" should be admitted against Sotheby's. *John Paul Mitchell Sys. v. Quality King Distribs., Inc.*, 106 F. Supp. 2d 462, 471 (S.D.N.Y. 2000).

### D.      The So-Called "Erroneous" Privilege Log Entry Is Admissible

Accent is entitled to introduce what Sotheby's calls its "erroneous privilege log entry." D. Br. at 12. Privilege logs may be "admitted into evidence as proof of the non-privileged content of the underlying privileged documents." *Feld v. Fireman's Ins. Co.*, No. 12 Civ. 1789, 2019 WL 13254353, at *5 (D.D.C. June 21, 2019); *Heckler & Koch, Inc. v. German Sport Guns GmbH*, No. 11 Civ. 01108, 2014 WL 12756372, at *6 (S.D. Ind. May 15, 2014) (same). Just like other discovery responses, privilege logs are admissible as opposing party statements or impeachment evidence. *See Scoma v. City of New York*, No. 16 Civ. 6693, 2021 WL 1784385, at *12 (E.D.N.Y. May 4, 2021) (denying "plaintiff's motion to preclude his pleadings and discovery responses" allowing "defendants to use such evidence as admissions and for impeachment purposes"); *see also Skinner v. City of New York*, No. 15 Civ. 6126, 2017 U.S. Dist. LEXIS 104650, at *13 (E.D.N.Y. April 7, 2017) (holding that "statements made by plaintiff and/or his counsel in the pleadings and through the course of discovery, constitute party admissions that may be introduced by an opposing party for the purpose of impeachment").[8]

---

[8] Sotheby's cited authority to the contrary is unpersuasive: Other courts, including those in this Circuit, have declined to follow the ruling in *Old Republic Ins. Co. v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, No. 03

Sotheby's privilege log is probative of a central issue in the case: whether Sotheby's 2013 due diligence investigation into Bouvier included Rybolovlev is relevant to Sotheby's knowledge of the Bouvier-Rybolovlev relationship and Sotheby's knowledge of Bouvier's fiduciary status and his fraud. Sotheby's argument that this entry was "erroneous" lacks evidentiary support and is not a basis for preclusion. Sotheby's made the statement in the privilege log and is subject to examination about it, regardless of their later attempts to "correct" it. The mistake argument is also not believable: there were 2,372 entries on the privilege log and *only this one* referred to Sotheby's doing "due diligence of Rybolovlev" prior to the public revelation of the Bouvier fraud. PX-151 at entry # 1693.[9] The jury is entitled to consider the privilege log.

### E.     Sotheby's Own Policies Are Relevant and Admissible

Sotheby's ten internal policies are relevant, as Sotheby's admits. They do not create **any** prejudice, much less undue prejudice. They should not be excluded.

First, as the Court already ruled—and even Sotheby's now admits, D. Br. at 15— Sotheby's policies are relevant to the jury question of agency. MSJ Order at 38–40 ("Sotheby's . . . had a code of business conduct it applied worldwide to all employees, boards of directors, consultants, and other third parties representing Sotheby's. Similarly, Sotheby's had worldwide compliance policies.") (citing ECF Nos. 468-17, 468-18, 468-19; ECF No. 468-4 at 108-09). "Taken together," these policy documents and other evidence, "are sufficient for a reasonable jury to find that Sotheby's exercised sufficient control over its subsidiaries to be held liable for their actions with respect to the" transactions at issue. *Id.* at 40. Sotheby's refused to stipulate to

---

Civ. 5238, 2006 WL 3782994 (N.D. Ill. Dec. 21, 2006) that privilege logs are inadmissible altogether. *See, e.g.*, *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, Nos. 6:12 Civ. 00196, 6:13 Civ. 00743, 2018 WL 3135847, at *13 (N.D.N.Y. June 27, 2018) (noting that a privilege log may constitute a party admission but excluding on the facts of that case); *RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am.*, No. 18 Civ. 6449, 2023 WL 2403258, at *9 (E.D.N.Y. March 7, 2023) (same).
[9] Sotheby's incorrectly suggests Plaintiff wants to use entry # 1943. D. Br. at 12. But it is entry # 1693.

agency. *See* Opp. Kornstein Decl. at ¶ 3. Plaintiff therefore is entitled to introduce—and the jury is entitled to weigh—Sotheby's policies in deciding the issue of agency.

Second, evidence of violations of or deviations from Sotheby's internal policies is probative of Sotheby's knowledge of Bouvier's fraud and breach of fiduciary duty. *See, e.g.*, *Liu Yao-Yi v. Wilmington Tr. Co.*, 301 F. Supp. 3d 403, 421 (W.D.N.Y. 2017) ("[A]ctual knowledge may be inferred—particularly where there are clear allegations that the aider and abettor has manifestly changed its normal operating procedures to encourage the primary tortfeasor's fraudulent conduct."). Valette and other Sotheby's employees deviated from Sotheby's internal policies multiple times. *See* ECF No. 470, ¶¶ 281-346, 376-78, 382, 408-17. The Court has already held that Accent "may offer the policies [itself] and make arguments on the basis of them" regarding Defendants' knowledge. MSJ Order at 68.

Sotheby's also has identified no prejudice from this evidence being admitted. *See generally* D. Br. at 13-15. The policies are not a "sideshow," they are evidence of the questions the jury is deciding.

The rest of Sotheby's arguments go to weight, not admissibility. Weight of evidence is not a proper basis for a motion *in limine*: that is for the jury to decide at trial. "A motion *in limine* is used to obtain pretrial rulings on the admissibility of evidence, not to determine the sufficiency of the evidence or merits of an issue." *Williams v. Rushmore Loan Mgmt. Servs. LLC*, No. 3:15 Civ. 673, 2017 WL 822793, at *1 (D. Conn. Mar. 2, 2017) (collecting cases). "[M]otions *in limine* [that] would effectively serve as a form of advance trial of substantive portions of the case, or indeed as a substitute for the trial itself" must be denied. *TVT Recs. v. Island Def Jam Music Grp.*, 250 F. Supp. 2d 341, 344 (S.D.N.Y. 2003).

F.        **The Dispute Between Sotheby's, Inc. and the *Salvator Mundi* Owners**

Accent is entitled to introduce evidence from the dispute between Sotheby's and the

sellers of Da Vinci's *Salvator Mundi* because it contains non-hearsay party admissions, bears

directly on issues to be tried, and is not unduly prejudicial. The Court should deny Sotheby's

request to preclude (1) the declaratory judgment complaint Sotheby's filed against the Da Vinci

sellers and (2) the mediation statement the Da Vinci sellers submitted in that case.

1.        **Sotheby's Own Complaint Is Admissible Non-Hearsay**

Sotheby's complaint is not hearsay. It is an admission of a party opponent. Fed. R. Evid.

801(d). As Sotheby's admits, Sotheby's declaratory judgment complaint contains a statement by

Valette that is directly contrary to his deposition testimony. D. Br. at 18. That the statement was

made by Sotheby's lawyers in a court filing makes it explicitly non-hearsay. Fed. R. Evid.

801(d)(2)(C).

The statement in the complaint that, during the Da Vinci viewing, Valette did not know

who Rybolovlev was (PX-266 ¶ 35) is directly contrary to his sworn testimony under oath, and

Accent is entitled to impeach Valette with that statement. Valette's knowledge of who

Rybolovlev was at the time of the Da Vinci viewing is relevant to a central issue in the case: his

knowledge of Bouvier's relationship with Rybolovlev. The jury is entitled to know that

Sotheby's represented to this court that Valette did not know who Rybolovlev was at the 2013

Da Vinci viewing, while Valette admitted under oath that he knew, as early as 2012, that

Rybolovlev "had some kind of business relationship with Mr. Bouvier," Valette Tr. 66:12-13,

and that at the Da Vinci viewing, "I saw a man, who was Mr. Rybolovlev, come in. So sure, he

was very comfortable in this flat, and so, you know, I assume it was his flat," *id.* 70:20-24.

Sotheby's assertion that its complaint was "attorney error" is without any evidentiary

foundation (D. Br. at 18) and is also incredible: this is a statement about the knowledge of

Sotheby's main witness (Valette), on a critical issue (his knowledge of Rybolovlev), and two whole paragraphs expand on it. *See* PX-266 ¶¶ 34–35.[10] "The law is quite clear that such pleadings constitute the admissions of a party-opponent and are admissible in the case in which they were originally filed as well as in any subsequent litigation involving that party." *United States v. McKeon*, 738 F.2d 26, 31 (2d Cir. 1984); *see also Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003). Sotheby's complaint is admissible.

### 2.    The Mediation Statement is Also Admissible

The mediation statement (PX-433) is also admissible as non-hearsay: it contains party admissions that Sotheby's witnesses Valette and Bell made to the Da Vinci sellers, which are relevant to Valette's and Sotheby's knowledge of Bouvier's fraud; and Accent is entitled to impeach Valette, Bell, or the Da Vinci sellers at trial, if any of them testify inconsistently with the facts described in the mediation statement. As with the declaratory judgment complaint, the probative value of this evidence outweighs any prejudice to Sotheby's that could result from the jury learning of a separate legal proceeding. To mitigate even this minimal potential prejudice, the legal portion of the mediation statement (pages 14 to the end of PX-433) could be redacted. The Court can also give a limiting instruction informing the jurors that they may not consider any claims the Da Vinci sellers may have had against Sotheby's.

### G.    The Wildenstein and Acquavella Evidence Is Relevant to Agency

The Acquavella and Wildenstein documents are crucial evidence that Bouvier held himself out as an agent for Accent—and the dealers with whom he worked recognized him as such. Sotheby's own description of these materials establishes their relevance to Bouvier's

---

[10] Sotheby's reference to an error in Accent's original complaint is a red herring. Whatever errors the original complaint contained do nothing to justify preclusion of Sotheby's declaratory judgment complaint and, in any event, Sotheby's is not seeking to introduce the original complaint as a trial exhibit. *Contra* D. Br. at 19.

fiduciary relationship with Accent. *See* D. Br. at 20-21. Sotheby's arguments go to weight, not admissibility, and are not the proper subject of a motion *in limine*. *See Williams*, 2017 WL 822793, at *1; *TVT Recs.*, 250 F. Supp. 2d at 344-45. The jury, not the Court, must decide what the Acquavella and Wildenstein documents do or "do not support." *Contra* D. Br. at 21.

The Acquavella documents are from Bouvier's purchase of Picasso's *Les Noces de Pierrette* in 2004, "one of the first four artworks purchased at the beginning of Plaintiff's relationship with Bouvier." D. Br. at 21. There was a contract for this purchase (DX-7) and some other early purchases and "Sotheby's argues that these four sales contracts show that Bouvier was not Plaintiffs' agent, but rather an arms-length dealer and therefore did not owe a fiduciary duty to Plaintiffs." MSJ Order at 7. The Acquavella documents, however, show that Acquavella understood Bouvier was acting on behalf of his "client" (PX-2, PX-3), Bouvier himself said he was acting for a "buyer" (PX-4), and that when Acquavella explained it was contractually obligated to sell "only to principals, directly" (PX-2), Bouvier identified "Xitrans Finance Ltd." and explained "[t]he company Xitrans Finance Ltd. belongs to Mr. Dmitry RYBOLOVLEV. . ." (PX-314), and handwrote "Xitrans Finance Ltd" into an early draft of the sales contract (PX-5). This is crucial evidence of Bouvier's agency. Moreover, Sotheby's has put this specific transaction at issue (despite the Court's ruling that Bouvier's testimony about the contract is inadmissible, MSJ Order at 7-8), and so cannot argue "Plaintiff's proffered evidence would require mini-trials on a negotiation and a transaction that occurred long ago (more than twenty years and almost twenty years ago, respectively) as to which none of Plaintiff's trial witnesses can testify." D. Br. at 22-23. Accent is entitled to disprove Sotheby's argument, including with the Acquavella documents.

Similarly, by Sotheby's own account, the Wildenstein documents show that, as early as 2002, "Bouvier identified his 'client' and his 'customer' for the prospective purchase as Rybolovlev. *See* PX-347, PX-351." D. Br. at 20. Bouvier wrote he "presented Paul Gauguin's painting this morning to Mr. RYBOLOVLEV," (PX-315), Wildenstein understood he was negotiating on Rybolovlev's behalf (PX-346), and Bouvier wrote he was "going to ask our client if he wants to make an appropriate offer" (PX-347) and that "As the client likes to negotiate, the discount obtained is essential in Mr. RYBOVLOVLEV's consideration." (PX-351). Like the Acquavella documents, these documents provide further evidence to the jury that Bouvier was acting as Plaintiff's agent.

If Sotheby's is entitled to dispute Bouvier's agency relationship with Accent, including through the use of the early sales contracts, Accent is entitled to introduce evidence to the contrary, such as the Acquavella and Wildenstein documents.

### H.    Evidence Regarding Bouvier's Arrest or Other Criminal Proceedings

Sotheby's cannot preclude Accent from introducing evidence of Bouvier's arrest, while simultaneously seeking to admit evidence about prejudicial and irrelevant charges pending against Plaintiff's representatives. *See* Pl. Br. at 22-25. That is an unacceptable double standard. All evidence and argument about all the foreign proceedings should be precluded. *See id.*

## II.    SANFORD HELLER'S TESTIMONY SHOULD NOT BE LIMITED

Sanford Heller is a fact witness, not an undisclosed expert. His testimony about the "high-end art market and practices and policies of auction houses generally," D. Br. at 25, is based on his personal perception of events pertinent to the case and is therefore proper lay witness testimony.

Where a lay witness has "prior experience" or "knowledge generally about [an] industry because of their work history"—not only are they permitted to testify about that experience—but

also "there [is] no need for expert testimony" since it would be "duplicative of the lay witness['s.]" *United States v. Mendlowitz*, No. 17 Crim. 248, 2019 WL 6977120, at *7 (S.D.N.Y. Dec. 20, 2019), *aff'd*, No. 21-2049, 2023 WL 2317172 (2d Cir. 2023); *see also United States v. Patel*, No. 3:21 Crim. 220, 2023 WL 2643815, at *41 (D. Conn. Mar. 27, 2023) ("Where . . . a lay witness's testimony is limited to their personal perceptions and does not profess any specialized opinion, such testimony is admissible."). It is only "[t]o the extent that any lay witness's testimony extends beyond the scope of personal perception" that "such testimony is inadmissible." *Id.*[11]

Here, Heller has extensive prior experience and general industry knowledge. This knowledge bears on his personal perception of facts relevant to this case; Heller is an art market expert whose connections and experience allowed Accent to start piecing together the facts of Bouvier's fraud. How he was able to know this and provide information to Accent necessarily involves his background knowledge of the industry. Sotheby's intends to have multiple fact witnesses (including Valette, Ruprecht, Vinciguerra, and Bell) all testify about general art market practices such as the "procurement and brokering of artwork transactions (including private and auction sales)" based on the understanding they gained through their work at Sotheby's. ECF No. 548 at 19-21. Heller, Accent's only fact witness who has knowledge of the art market, must similarly be allowed to testify about his understanding of the art market which he gained through his work as an art agent. Sotheby's has also designated deposition testimony for Heller about general art market practices. *See, e.g.*, Heller Tr. 22:2-14; 56:7-21; 59:11-16; 181:21-182:6

---

[11] *See also United States v. Hild*, No. 19 Crim. 602, 2022 WL 17484992, at *50 (S.D.N.Y. Dec. 7, 2022) (holding that "witnesses could testify about the financial concepts at issue in the case so long as their testimony was based on their own perceptions and observations and involved reasoning that the jury could understand"); *United States v. Yannotti*, 541 F.3d 112, 125-26 n.8 (2d Cir. 2008) (finding coconspirator's testimony concerning a phone conversation in which he did not participate "easily" satisfied Rule 701(a), and explaining that the testimony was "rationally based on his own perception because it derived from his direct participation in the loansharking activities of the charged enterprise, not on participation in the loansharking activities of some unrelated criminal scheme").

(testimony about work he did for another client, not Rybolovlev). Accent must be allowed to rebut that and elicit similar market testimony.

Accent will not seek to introduce testimony from Heller where he is applying his specialized knowledge to facts outside of his personal perception, since that is the line between expert and lay witness testimony. Accordingly, the Court should not preclude his testimony on any of the disclosed topics.

## III.   BOUVIER'S CONTEMPORANEOUS PURCHASE PRICES, NOT YEARS' LATER RESALE PRICES, SET THE VALUE OF THE WORKS AT THE TIME OF THE FRAUD

The flaw in Sotheby's compensatory damages motion is two-fold. First, the motion fails to consider the contemporaneous (almost simultaneous) timing of Bouvier's and Accent's purchases as the measure of the value of the works at the time of the fraud, that is, when Accent bought them. Second, and building on its failure, Sotheby's tries to smuggle into evidence the prices at which Accent resold the works years later, irrelevant evidence designed only to prejudice, confuse, and mislead the jury. Each of these flaws would alone be enough to deny Sotheby's compensatory damages motion; together, their misbegotten synergy creates an overwhelming reason to do so.

### A.   Sotheby's Ignores the Contemporaneous Timing Transactions

The "tell" that betrays Sotheby's sleight-of-hand resembles the "curious incident" of the dog that did not bark in the night in the Sherlock Holmes story "Silver Blaze." Like the bark-less dog, Sotheby's is silent regarding the contemporaneous timing of both Bouvier's and Accent's purchases. Sotheby's blinks the reality of that crucial and indisputable fact, illustrated here:

| Artwork | Date of Bouvier's Purchase | Date Accent Agreed on Price with Bouvier | Accent's Resale Date | Time Between Accent's Purchase and Resale |
|---|---|---|---|---|
| Magritte | December 8, 2011 | November 22, 2011 | February 2017 | 5 years, 3 months |
| Klimt | September 11, 2012 | September 11, 2012 | November 2015 | 3 years, 2 months |
| Modigliani | September 25, 2012 | December 28, 2012 | Provided to Bouvier in September 2014, auctioned in November 2014 | 1 year, 10 months |
| Da Vinci | May 2, 2013 | May 3, 2013 | November 2017 | 4 years, 6 months |

This chart shows that Bouvier's purchases were nearly simultaneous with Accent's, whereas the resales occurred years later. Given this reality, Sotheby's studied failure to say one word about the timing of the transactions is more than curious; it is suspicious.

      This is especially so because, as the parties agree, the crucial issue for the jury is evidence of the value of "each artwork when Plaintiff purchased it."  D. Br. at 29. *See also* N.Y. Pattern Jury Instr. Civil § 3.20. The contemporaneous timing of the Bouvier purchases and the Accent purchases establishes the value of the works at the time Accent bought them, and the difference between those prices as the measure of Accent's damages. It is not just a "relevant data point," as Sotheby's argues, it is the only relevant evidence in this case. D. Br. at 29.

      What Bouvier paid, by definition, reflects "the fair market value of an asset such as a work of art" because it is "the price that a willing buyer and a willing seller would agree to in an arm's length transaction." *Arthur Properties, S.A. v. ABA Gallery, Inc.*, No. 11 Civ. 4409 LAK, 2011 WL 5910192, at *3 (S.D.N.Y. Nov. 28, 2011) (quoting *United States v. Broad. Music, Inc.,* 426 F.3d 91, 95 (2d Cir. 2005)). Fair market value "is the price for which the property would sell if there was a willing buyer who was under no compulsion to buy and a willing seller under no compulsion to sell." *Arthur Properties*, 2011 WL 5910192, at *3 (quoting *Keator v.*

*State,* 23 N.Y.2d 337, 339 (1968)). "[N]o evidence is more probative of [a painting's] fair market value than its direct sale price." *Est. of Newberger v. Comm'r of Internal Revenue*, 110 T.C.M. (CCH) 615 (T.C. 2015) (auction sale of a Picasso was evidence of its fair market value at time of decedent's death nine months earlier).

The prices that Bouvier paid for these artworks, when Accent bought them from Bouvier, are the ***evidence*** of their value at the time of the fraudulent transactions.[12] *Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) ("recent sale price . . . negotiated by parties at arm's length, is the best *evidence* of its market value") (emphasis added); *W. T. Grant Co. v. Srogi*, 52 N.Y.2d 496, 500 (1981) (relying on "purchase price set in the course of an arm's length transaction of *recent vintage*") (emphasis added); *Schulhof v. Jacobs*, 54 Misc.3d 1221(A), 2017 WL 825863 (Sup. Ct. N.Y. Cnty. Feb. 27, 2017), *aff'd*, 70 N.Y.S.3d 462 (1st Dep't 2018) (in calculating fraud damages, court accepted painting's value as the amount for which art agent sold it); *Cmty. Ass'n of the E. Harlem Triangle, Inc. v. Butts*, 200 A.D.3d 599, 599 (1st Dep't 2021) (in calculating fraud damages, court accepted property's value as $42 million offer made by purchaser).

Sotheby's cites no case, and we are aware of none, where a court disregarded a ***contemporaneous*** sale or offer price negotiated at arm's length between willing parties as evidence of value ***at that time***. In *King v. Wang*, the court noted only that a "*prior* sale" may not represent "*current* fair market value," but did not address sales, like here, that occurred within days or months of the fraudulent transaction. No. 14 Civ. 7694 (LJL), 2021 WL 5237195, at *13 (S.D.N.Y. Nov. 9, 2021) (emphasis added). *Kumiva Group* and *Flatiron Acquisition Vehicle*

---

[12] Most of Sotheby's cases are irrelevant because those plaintiffs, unlike Accent, did not present evidence of value at the time of the fraudulent transaction. D. Br. at 30-31; *New York Wheel Owner LLC v. Mammoet Holding B.V.*, 481 F. Supp. 3d 216, 236 (S.D.N.Y. Aug. 21, 2020); *Danco Enter.s, LLC v. LiveXlive Media, Inc.*, 209 A.D.3d 428, 429 (1st Dep't 2022); *Kumiva Grp., LLC v. Garda USA Inc.*, 146 A.D.3d 504, 507 (1st Dep't 2017); *Kaushal v. Singh*, 55 Misc.3d 127(A), 55 N.Y.S.3d 692 (App. Term. 1st Dep't 2017).

involved plaintiffs who conceded that the negotiated sales price was an unreliable marker of value because that price was fraudulently inflated. D. Br. at 30; *Kumiva Grp.*, 146 A.D.3d at 507; *Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, 502 F. Supp. 3d 760, 799 (S.D.N.Y. 2020).

The contemporaneous timing of the transactions undercuts and easily disposes of Sotheby's other makeweight arguments. The contemporaneous transactions render expert and appraiser testimony unnecessary to establish the value of the artworks at the time of Accent's purchases. Value can be determined using "a recent sale price, the price at which the party offered to sell the asset, or the price offered in the contract"; expert testimony is not required. *Credit Suisse First Bos. v. Utrecht-Am. Fin. Co.*, 84 A.D.3d 579, 580 (1st Dep't 2011); *In re Refco Inc. Sec. Litig.*, No. 07 Civ. 8663 (JSR), 2011 WL 13243784, at *8 (S.D.N.Y. Mar. 28, 2011) (permitting lay witness testimony on value of investment); D. Br. at 33 (cases permitting non-expert evidence of value). Where contemporaneous sales of the artwork at issue exist, expert evidence is irrelevant or secondary. *See Schonfeld*, 218 F.3d at 181 ("agreed upon sales price" serves as competent evidence of market value better than expert testimony); *Arthur Properties*, 2011 WL 5910192, at *3 (differing opinions on value of painting can coexist "unless and until" a sale between willing parties takes place); *Faller Group, Inc. v. Jaffe*, 564 F. Supp. 1177, 1183 (S.D.N.Y. 1983) (rejecting expert testimony on fair market value in lieu of the price plaintiff agreed to pay defendant).

Nor should Sotheby's be able to present evidence that Bouvier's unspecified "tactics with the original owners drove them to accept below-market amounts." D. Br. at 31. Sotheby's offers no details of what these tactics were, which artworks they relate to, and whether or how those tactics resulted in below-market sales. No foundation exists to present such speculation as

evidence. It also would confuse the jury and be far more prejudicial than probative on the issue of actual value.

Sotheby's is confused about Accent's calculation of fraud damages for Modigliani's *Tête*. D. Br. at 31. Pursuant to the Court's summary judgment ruling, Accent seeks damages arising out of two transactions involving *Tête*: (1) Accent's purchase of *Tête* in December 2012, and (2) Bouvier's auction of *Tête* in September 2014 without remitting the proceeds to Accent. Accent's damages from the 2012 purchase of *Tête* are governed by the same methodology as the other four purchases at issue: the difference between the price that Bouvier paid for *Tête* in October 2012 (€31.5 million), and the price Accent paid for it a few months later (€62.5 million). For the 2014 auction, Accent's damages consist of "the proceeds of the auction [which Bouvier kept] instead of using the Modigliani to offset the cost of a Rothko painting," MSJ Order at 56, *i.e.*, $66,562,500. No conflict exists: these are two separate transactions, resulting in separate damages, but both rely on ***contemporaneous*** sales data.

### B. Years' Later Resale Prices Are Irrelevant to the Artworks' Value at the Time of the Fraud, and Sotheby's Seeks to Introduce Those Prices for Improper Motives

The resale prices Accent sold the works for years later are irrelevant and prejudicial. Sotheby's wants to introduce these prices, not to show their value at the time of the fraud—because it cannot—but to improperly prejudice the jury. Accent's resales occurred between three and more than five years after Accent bought the art. That long time lapse makes those resale prices irrelevant to the values when the fraudulent transactions occurred. *See Wang*, 2021 WL 5237195, at *20 (excluding expert appraisals of artwork value because "there is no analysis of how the value of that item at any particular time (whether in 2004, 2010, 2013, or any other date) relates to the value it should have in 2019."); *Est. of Kollsman v. Comm'r of Internal Revenue*, 113 T.C.M. (CCH) 1172 (T.C. 2017), *aff'd,* 777 F. App'x 870 (9th Cir. 2019); *Est. of Newberger*

*v. Comm'r of Internal Revenue*, 110 T.C.M. (CCH) 615, 2015 WL 9426272, at *1 (T.C. 2015)

(rejecting valuations relying on high sales prices after valuation date that did not reflect market

conditions on valuation date).

Resale evidence is also irrelevant because Accent's profits, if any, do not factor into the

computation of compensatory damages. The New York Court of Appeals long ago held:

> The seller's fraud is ordinarily complete and its effect exhausted at the time of the
> sale and transfer of the chattel. The buyer might sell or retain what he had bought.
> Subsequent increase or decrease of value might bring profit or loss to the buyer,
> but such profit or loss would be the result of subsequent events and of choice by
> the buyer whether to hold or sell. It would not be the direct result of the seller's
> wrong nor increase or diminish his liability.

*Hotaling v. A.B. Leach & Co.*, 247 N.Y. 84, 88 (1928).

Fraud damages are measured "as of the date of sale." *Merrill Lynch & Co. Inc. v.

Allegheny Energy, Inc.*, 500 F.3d 171, 182-83 (2d Cir. 2007). In *Merrill Lynch*, the Second

Circuit rejected Sotheby's argument: it reversed the trial court's finding that the plaintiff suffered

no damages because the company it bought based on fraudulent representations had performed

positively in the year after the purchase; instead it held that "damages should be awarded

Allegheny to the extent that the purchase price overstated GEM's value *on the date of sale* as a

result of Merrill Lynch's misrepresentations and omissions." *Id.* at 183 (emphasis added).[13]

Sotheby's is trying to prejudice the jury with the irrelevant resales because one of those

resale prices ($453 million for the Da Vinci) was so high that it would necessarily distort the

jury's view of the case.[14]  For the reasons given above, that extraordinary price—an outlier sale

---

[13] The Second Circuit's reasoning is binding and more recent and detailed than Sotheby's cited case, *Halkedis v. Two E. End Ave. Apt. Corp.*, 161 A.D.2d 281, 282 (1st Dep't 1990), which does not even mention *Hotaling* and addressed this issue in a single sentence without reasoning.

[14] Sotheby's noted that the "art world was stunned" by the Da Vinci's resale price in 2017 and characterized it as an "outlier." Sotheby's, *Peak Performance: The Art Market Beyond $1 Million 2018-2022*, at 10, *available at* https://www.sothebys.com/en/docs/pdf/sothebys-insight-report-the-art-market-beyond-1-million-march-2023-1-pdf.pdf?locale=en. The singularity and unexpected nature of the 2017 resale price renders it unreliable as a marker of the work's value when Accent bought it in 2013.

made four and a half years after Accent bought the work—has no relevance to any issue in the case, but Sotheby's wants the jury to know about it in the hope that it will make the jury less sympathetic to Accent and disinclined to award damages. That is the real but hidden and improper reason Sotheby's wants to get those resale prices in. Such evidence is not only irrelevant, it would be highly misleading and confusing to the jury and extraordinarily prejudicial to Accent. By contrast, in compliance with New York law, Accent is not trying to introduce evidence to the jury that it lost money when it resold the Magritte in February 2017 for approximately $10,400,000 (five years after buying it for $43,500,000). *See* DX-187; PX-47. In compliance with the same New York law, Sotheby's cannot be allowed to introduce the Da Vinci or other resales. The Court should deny Sotheby's *in limine* motions, and grant Accent's *in limine* motion that seeks to exclude such evidence and any mention of it by defense witnesses or counsel. *See* Pl. Br. at 25-31.

### C.    Accent Does Not Seek "Lost Profits" or "Benefit of the Bargain" Damages

Contrary to Sotheby's argument, Accent's claim for fraud damages is distinct from its breach of fiduciary duty damages, and neither claim seeks lost profits.

Accent's fraud damages are *not* identical to its breach of fiduciary duty damages. For the breach of fiduciary duty claim for the Da Vinci, Accent's damages are: (1) the amount of the markup secretly added by Bouvier to the price, *plus* (2) the *entire* amount of the commission paid by Accent to Bouvier, *plus* (3) the commission received by Sotheby's. For Accent's fraud claims for its four purchases of artwork, Accent's damages are: (1) the amount of the markup secretly added by Bouvier to the price, *plus* (2) the amount of the commission paid by Accent to Bouvier **on the markup only**. For its fraud claim, Accent seeks the amount of Bouvier's commission on the markup only because it would have had to pay a commission on the value of the artwork at the time of purchase; in contrast, for its breach of fiduciary duty claim, Accent can recover the

entirety of Bouvier's commission because, as a faithless servant, Bouvier is liable not only for his secret profits but also his compensation. *See Lamdin v. Broadway Surface Advert. Corp.*, 272 N.Y. 133, 138 (1936); *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020).[15] Similarly, Accent does not seek Sotheby's commission as damages for its fraud claim, but it is entitled to do so for its breach of fiduciary duty claim. *Interpool Ltd. v. Patterson*, 874 F. Supp. 616, 620 (S.D.N.Y. 1995).

New York law rejects "benefit of [the] bargain" damages for fraud claims. *See, e.g.*, *Sager v. Friedman*, 270 N.Y. 472, 481-82 (1936). It also rejects claims seeking recovery of profits that would have been realized absent the defendants' fraud. *See Starr Found. v. Am. Int'l Grp., Inc.*, 76 A.D.3d 25, 27-28 (1st Dep't 2010). Accent seeks neither—it seeks only the out-of-pocket losses it sustained when it bought the artworks at far more than their true value at that time. Sotheby's attempts to manufacture a lost profits argument that is premised on the resale evidence Accent seeks to exclude. Accent is not arguing that it was entitled to make more profit when it resold the works; Accent believes the resales, and any lost profits, are irrelevant.

Sotheby's lost profits cases miss the mark. D. Br. at 32-33. *Negrete v. Citibank, N.A.* says nothing at all about damages; the Second Circuit affirmed the dismissal of fraud claims at the motion to dismiss stage because, unlike here, "Citi was not prohibited from profiting on its trading by way of a markup." 237 F. Supp. 3d 112, 123 (S.D.N.Y. 2017), *aff'd* 759 Fed. App'x 42, 47-48 (2d Cir. 2019). In *Kumiva*, the plaintiff had no evidence of the company's "value" on the merger date; the court held that the plaintiff failed to show both the value of the company and that it paid more than the value and could not recover on a theory that it would have made a "lower offer" but for the fraud. 146 A.D.3d at 508. Here, by contrast, there is unrebutted

---

[15] Sotheby's has no authority for the proposition that breach of fiduciary duty damages are measured by the "benefit of the bargain."

evidence of value (Bouvier's contemporary purchase prices) and the amount Accent paid above value; there is no need to resort to a theory that it would have made a lower offer. *Connaughton v. Chipotle Mexican Grill, Inc.*, in which a chef did not expend any money but claimed only that the defendant's conduct caused him to refrain from soliciting other buyers for his restaurant concept, involved a "quintessential lost opportunity" and underscores that Accent is not seeking lost profits. 29 N.Y.3d 137, 143 (2017). *First Nationwide Bank v. Gelt Funding Corp.* is inapposite—it involves the "specific context of a fraudulently induced loan." 27 F.3d 763, 768 (2d Cir. 1994). None of these cases call into question New York law: Accent's damages are the difference between what it paid and what Bouvier paid. Sotheby's attempts to confuse and prejudice the jury should be denied.

## IV.   ACCENT'S COUNTER DEPOSITION DESIGNATIONS ARE PROPER

There is nothing improper about Accent's counter deposition designations. They include "other parts" of the transcript "that in fairness should be considered with the part introduced." Fed. R. Civ. P. 32(a)(6); *see also* Fed. R. Evid. 106 (same). Rule 106 "is an expression of the rule of completeness. . . . The rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial." Rule 1-07 and accompanying Note, *Preliminary Draft of Proposed Rules of Evidence for the United States District Courts and Magistrates*, 21-22 (March, 1969)); *see also* Fed. R. Civ. P. 32(a)(6), Advisory committee's note to 1970 amendment. All of Accent's counter designations add necessary context to the designations Sotheby's has made.

Sotheby's vague, unspecific assertion that 154 of Accent's 177 counter designations "far exceed" the scope of Rule 106 is insufficient given the broad scope of the Rule. "Under this rule, the omitted portion of a statement *must* be placed in evidence if necessary to explain the admitted

27

portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion." *United States v. Castro*, 813 F.2d 571, 575-76 (2d Cir. 1987) (emphasis added); *see also United States v. Williams*, 930 F.3d 44, 59 (2d Cir. 2019). For example, Sotheby's objected to all but two of Accent's counter designations from Bouvier's deposition testimony. All of Accent's designations are admissible given that Bouvier played a central role in the fraud, he will only be testifying via deposition, and Sotheby's is disputing his fiduciary relationship with Accent. Sotheby's cannot cherry pick Bouvier's deposition and preclude the jury from hearing the parts it does not like or which put in context the parts it is using. The same is true for the rest of Accent's cross-designations.

## V.   SEALING TESTIMONY AND EXHIBITS IS UNWARRANTED OR PREMATURE

Trials are presumed open to the public. Fed. R. Civ. P. 77(b); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17 (1980). Despite this presumption, Sotheby's seeks the extraordinary relief of preventing counsel and witnesses from referring to its clients and their artworks in open court. D. Br. at 35. Sotheby's has not made the showing required for a blanket restriction on counsel and witnesses from stating this information in open court and wholesale redactions of this information from trial exhibits.[16] At best, the request is premature and should be assessed during trial.

It will be cumbersome and confusing for counsel and witnesses not to be able to mention the identities of the sellers of the works at issue in this trial—Magritte's *Domaine d'Arnheim*, Modigliani's *Tete*, and Klimt's *Wasserschlangen II*. Sotheby's itself asserts that Bouvier's negotiations with the original sellers are relevant to the value of the artwork. D. Br. at 31. Many

---

[16] Accent has moved *in limine* to exclude three of the exhibits in their entirety for which Sotheby's has proposed redactions. Pl. Br. at 26; DX-131; DX-135; DX-187. With respect to DX-106, it is redundant with the parties' stipulations of fact, ECF No. 548 at 17, No. 6, but Accent does not oppose the redactions proposed by Sotheby's.

exhibits refer to these sellers by name throughout. *E.g.*, DX-514; DX-525; DX-527; DX-530, DX-598. Sotheby's does not seek to preclude the jury from hearing the Da Vinci sellers' names; in fact, both sides have listed them as witnesses. ECF No. 548 at 24. There is no reason to treat the sellers of the other works any differently.

Restricting the ability of counsel and witnesses to state in open court the names of sellers and artwork that are contained in trial exhibits "will likely cause unending confusion to the witnesses, the jury, and perhaps even the attorneys." *Tourangeau v. Nappi Distributors*, No. 2:20 Civ.00012, 2023 WL 2164381, at *4 (D. Me. Feb. 22, 2023) (declining to restrict the ability of counsel and witnesses to reference at trial the employees, client names, and sales figures contained in exhibits). For example, several exhibits showcase Sotheby's extensive work with its clients, in stark contrast to Valette's utter failure to cultivate Rybolovlev. *See, e.g.,* DX-593. This contrast supports the inference that Valette knew Bouvier was Rybolovlev's agent.

Sotheby's cannot justify sealing this information under the familiar standard set forth in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006). Accent has already agreed to redact spreadsheets, charts, and other compilations of Sotheby's clients, artworks, sales history and commission and pricing information. *See, e.g.*, PX-223, PX-226. But the other emails and documents that Sotheby's seeks to redact are different: they contain at most a reference to a few clients or artworks, often not even using full names, and do not include sensitive pricing or sales information. *See, e.g.*, DX-501, DX-504, DX-562, DX-595, DX-596. While the Court accepted Sotheby's assertions at the summary judgment stage, restricting discussion at trial is a more drastic remedy and Sotheby's must now provide "specific examples or articulated reasoning" of the concrete harms to privacy interests or its competitive interests. *Coventry Cap. US LLC v. EEA Life Settlements, Inc.*, No. 17 Civ. 7417, 2017 WL 5125544, at *3 (S.D.N.Y.

Nov. 2, 2017). While prices and values may be referenced in documents, sealing is not warranted when no confidential method to reach those figures is disclosed and the documents discuss nothing more than "the same strategy that every seller of goods and services employs—try to get the highest price in return for the least consideration." *Id.* The age of these documents and transactions (2011-2014) also weighs against sealing. *In re Upper Brook Co.*, No. 22 Mc. 97, 2023 WL 172003, at *6 (S.D.N.Y. Jan. 12, 2023) (denying sealing where movant failed "to show that the information is not 'stale'" or "why disclosure would still cause harm"); *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 250 (S.D.N.Y. 2009) (diminished interest in sealing where the relevant documents were seven to fourteen years old and movant failed to explain their continued sensitivity); *Dawson v. Merck & Co.*, No. 11 Civ. 1876, 2021 WL 242148, at *8 (E.D.N.Y. Jan. 24, 2021) ("Stale business records cannot support the necessary finding of harm").

At best, Sotheby's request is premature. Whether Sotheby's can justify keeping this information from the public record, and whether that should be done through wholesale restrictions on counsel questioning and witness testimony, are context-specific decisions involving a balancing of interests that should be assessed at trial. *See Lugosch*, 435 F.3d at 120.

## CONCLUSION

The Court should deny Sotheby's motions *in limine,* except Accent agrees not to introduce evidence of Bouvier's arrest, provided Sotheby's is similarly precluded from introducing pending charges against Accent's representatives.

Dated:  October 5, 2023
      New York, New York

<div style="margin-left:50%;">

Respectfully submitted,

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

  /s/
Daniel J. Kornstein
O. Andrew F. Wilson
Zoe Salzman
Vasudha Talla
Sarah Mac Dougall
600 Fifth Avenue, 10th Floor
New York, NY 10020
Tel. No.: (212) 763-5000
Fax No.: (212) 763-5001

*Attorneys for Plaintiff*

</div>