UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACCENT DELIGHT INTERNATIONAL LTD., | Case No. 18-cv-09011 (JMF) |
| Plaintiff, | **\*ORAL ARGUMENT REQUESTED\*** |
| -against- | |
| SOTHEBY'S and SOTHEBY'S, INC., | |
| Defendants. | |

**MEMORANDUM OF LAW OF DEFENDANTS SOTHEBY'S AND SOTHEBY'S, INC. IN FURTHER SUPPORT OF THEIR MOTION *IN LIMINE* # 3 AND IN FURTHER OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* #9 CONCERNING RESALE EVIDENCE**

**ARNOLD & PORTER KAYE SCHOLER LLP**

250 West 55th Street
New York, NY 10019-9710

*Attorneys for Defendants Sotheby's and Sotheby's, Inc.*

## **TABLE OF CONTENTS**

I. EVIDENCE OF RESALE PRICES ..................................................................................... 1

    A. Da Vinci's *Salvator Mundi* ........................................................................... 1

    B. Modigliani's *Tête* ......................................................................................... 6

    C. The Resale Prices Are Relevant to Show the Actual Value of the
    Works at the Time of Purchase ..................................................................... 10

II. NON-PRICE RESALE EVIDENCE .................................................................. 10

CONCLUSION ............................................................................................................. 16

## TABLE OF AUTHORITIES

**Cases**

*Est. of Newberger v. Comm'r of Internal Revenue,*
    110 T.C.M. (CCH) 615 (T.C. 2015) ........................................................................... 10

*Harkabi v. SanDisk Corp.,*
    No. 08 CIV. 8203 WHP, 2012 WL 2574717 (S.D.N.Y. June 20, 2012)................................ 9

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.,*
    643 F. Supp. 2d 471 (S.D.N.Y. 2009)........................................................................... 5

*In re Puda Coal Sec. Inc., Litig.,*
    30 F. Supp. 3d 230 (S.D.N.Y. 2014)....................................................................... 6, 9

*Precision Trenchless, LLC v. Saertex multiCom LP,*
    No. 3:19-CV-0054 (JCH), 2022 WL 594096 (D. Conn. Feb. 28, 2022) .......................... 6

*Schonfeld v. Hilliard,*
    218 F.3d 164, 178 (2d Cir. 2000)............................................................................. 10

**Rules**

Fed. R. Evid. 703 ................................................................................................................. 9

## PRELIMINARY STATEMENT

Pursuant to the Court's Order dated November 29, 2023, the parties have met and conferred with respect to the admissibility of resale information. The parties did not reach agreement. Plaintiff maintains that resale information regarding the artworks at issue is irrelevant and inadmissible, but Defendants submit that the appropriate foundation to admit resale prices can and will be laid by Defendants' expert Harry Smith, and that the jury may therefore weigh those prices in assessing not only the reasonableness of Sotheby's UK's valuation for Leonardo Da Vinci's *Salvator Mundi*, as the Court already has concluded, but also in determining the actual value of the *Salvator Mundi* and the actual value of Modigliani's *Tête* on the dates Plaintiff acquired them.[1]

Further, Defendants seek clarification as to whether Defendants may introduce certain evidence Plaintiff sought to exclude in its *in limine* motion under the umbrella of "resales," where the evidence does not mention the price of those resales and is to be used for other purposes. Defendants addressed this evidence in its brief opposing Plaintiff's motion, ECF No. 561, at 35, but the Court has not yet ruled on the dispute.

## I.   EVIDENCE OF RESALE PRICES

### A.   Da Vinci's *Salvator Mundi*

Harry Smith's testimony at trial will lay the groundwork for admission of the 2017 sale price for the *Salvator Mundi* for purposes of assessing the painting's value in May 2013. Smith's analysis, as explained in his reports and at his deposition, ties the 2017 resale price to the work's value as of the date of Plaintiff's acquisition in May 2013.

---

[1] Defendants do not seek to admit evidence of the price at which Plaintiff resold Klimt's *Wasserschlangen II*.

The Court has already ruled that Smith's reliance in both his direct and rebuttal reports on Plaintiff's resale of the *Salvator Mundi* for $450.3 million was reasonable and relevant to his assessment of the €100 million insurance valuation Sotheby's UK prepared for that artwork in January 2015—rejecting Plaintiff's argument to the contrary.  ECF No. 510, at 72 ("As the insurance value should estimate the replacement value of the work, Smith Rep. 12, comparing the later sales price of *Salvator Mundi* to the insurance valuation is clearly a reasonable and reliable tool."); *see also* ECF No. 397-3 ("Smith Rep."), ¶ 65 ("With hindsight, we now know that this painting was very substantially undervalued, as it sold at auction in November 2017 for $450.3 million."); ECF No. 397-10 ("Smith Rebuttal Rep."), ¶ 68 ("Mr Sainty's criticism of Sotheby's insurance valuation of the *Salvator Mundi* by Leonardo da Vinci seems to be entirely misdirected, as we now know with hindsight that the painting commanded a price far more than either Sotheby's or Mr Bouvier or the Plaintiffs could have predicted.").

Smith's analysis of Sotheby's UK's insurance valuation laid out clearly why any assessment of the artwork's value before 2017 had it wrong, and that analysis—which did not depend on any time period-specific market conditions—applies equally to the May 2013 period, as Smith's reports and deposition testimony make clear.  Smith opined that the fact that valuers of this work before its sale in 2017 did not understand its value is attributable to three factors: (1) the fact that not since the 1960s had there been any true comparable artwork on the market; (2) the fact that the painting was widely reported to be in damaged condition and heavily restored; and (3) the fact that there was a small but vocal minority of scholars who continued to dispute its attribution as a Leonardo.  Smith Rep. ¶¶ 65, 69.  Smith concluded that these factors led art market participants (like himself, Sotheby's UK, Bouvier, Plaintiff, and Christie's in the lead-up to the 2017 auction) to misapprehend the value of the artwork before its auction, at

2

which time all of the specialists who had previously valued it were proved wrong.  Smith Rep.

¶ 65 ("The fact that Sotheby's, and in fact virtually the entire art market (including Christie's),

did not appreciate the extraordinary result that this painting would make at auction simply serves

to highlight the extreme difficulty in placing replacement values on unique masterworks.");

Smith Rebuttal Rep. ¶ 68 ("[T]he painting commanded a price far more than either Sotheby's or

Mr Bouvier or the Plaintiffs could have predicted.  The fact that Mr Bell felt that

USD $125,000,000 at the time was too high was an opinion which, rather like my own, was

fairly widely held, but the market decided otherwise.").

Critical to the instant motion is an understanding of Smith's analysis of why prior valuers

got it wrong.  According to Smith, and as he would testify at trial, closer-in-time views on the

artwork's value were too low not because of any subsequent changes in the market place, but

because those views focused on factors that were later proved to be irrelevant.  Smith Tr. at

35:15–36:9, 195:10–196:2.  The very same factors Smith cited for the "fairly widely held"

misunderstanding of the *Salvator Mundi*'s value in January 2015 (at the time of Sotheby's UK's

insurance valuation) were equally present in May 2013 (at the time of Plaintiff's acquisition),

namely:  (1) a valuer in May 2013, as in January 2015, could not have pointed to any recent

comparable sale of a Da Vinci painting; (2) the painting was as damaged and as heavily restored

in May 2013 as it was in January 2015; and (3) there existed in May 2013 as in January 2015 the

same vocal minority of scholars who contested the painting's attribution as a Leonardo.  Smith

Rep. ¶ 69 ("Perhaps the greatest name in art history, Leonardo da Vinci's oils have been

unobtainable since the National Gallery of Washington bought a work in the 1960's—some 60

years ago."); PX-16 at 10 (May 2013 private sale agreement) ("Whilst the overwhelming view of

the principal scholars in this field has been in favour of the attribution to Leonardo, there is,

perhaps inevitably with a re-discovery of this importance, scepticism expressed by a minority of those scholars who have considered it.") (listing dissenting scholars); Sainty Rep. at 27 ("By the time the painting came up for sale, it was badly damaged and restored extensively.").  Indeed, Plaintiff's own expert Guy Stair Sainty opined that Sotheby's UK's valuation in 2015 should have reflected the price the sellers accepted in *May 2013*, rejecting any notion that market changes between May 2013 and January 2015 could have increased the *Salvator Mundi*'s value. ECF No. 371-3 ("Sainty Rep."), at 27–28 (opining that the valuation "failed to adhere to market norms" because the 2015 valuation "reflected not the price that the owners ultimately accepted, but a much higher value that supported the price for which Bouvier had sold it to Plaintiffs.").

As Smith's reports and deposition testimony made clear, and as he would testify at trial, the painting's 2017 auction sale price proved to be a better measure of its value than the work's prior offering prices, prior private sale figure, and prior valuations.  Smith Tr. 35:15–36:9. Smith's opinion is that the true measure of the *Salvator Mundi*'s value, as proven in the 2017 auction, was not a function of market conditions, but was a function of its status as a "trophy" piece, as opposed to a piece for traditional Old Master collectors.  *Id.* at 39:7–39:16 (agreeing that marketing was driven by "brand appeal" and "aimed more at trophy hunters than traditional collectors").  The trophy hunters, not traditional collectors, competed hotly for this unique masterpiece through ever-increasing bids, proving earlier conceptions of its value to be much too low.  *See id.* at 199:7–200:12 ("The Christie's sale was fact and a transaction.  Money changed hands.  The painting was sold.  It was on the open market.  There were several bidders over a hundred million.  There was more than one bidder over 200 million.  There were two bidders over 300 million.  Those are facts.  Those are hard cash.").

Smith's analysis of the factors that led to the artworks' prior under-valuation is the exact same for May 2013 as it is for January 2015, which is clear from Smith's reports and deposition testimony.  According to Smith, prior conceptions regarding the value of the artwork—including conceptions held at the time of the painting's sale in May 2013—prevented the market from identifying an authoritative price for the artwork until it was finally sold for $450.3 million. Smith Tr. 195:10–196:2 ("[W]e also know that before it was sold the original vendors of the Salvator Mundi were insuring it for I think $150 million.  I mean, I think the critical thing here is that this work is so unusual, so unique, so difficult—we now know that virtually any figure had a wide range of probability of not being 100 percent accurate because nobody could actually get it right, including Christie's when they sold it, the guy who bought it, Alex Bell, me.  Everybody got it slightly wrong because it's such a difficult thing to put a price on."); *id.* at 35:15–36:9 ("[An oil painting by Leonardo is virtually unobtainable.  So we know from sort of the, if you like, history of this painting that the price bounced around all over the place.  The original vendors were looking for huge sums of money, then they had to take less, then they went up a bit, then they went down a bit, and then finally it came to auction and made an absolutely astonishing amount.  No art expert could have predicted with any accuracy any of those figures.").  Although plain from the face of his analysis, Smith can also readily confirm that the conditions underpinning his views of Sotheby's UK's valuation of the artwork in May 2015 were present with equal force in May 2013.  *See In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009) (Fed. R. Civ. P. 26 "does not limit an expert's testimony simply to reading his report . . . .  The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report."); *see also Precision Trenchless, LLC v. Saertex multiCom LP*, No. 3:19-CV-0054 (JCH), 2022 WL

5

594096, at \*6–7 (D. Conn. Feb. 28, 2022) (allowing testimony where "opposing counsel 'affirmatively solicited' those opinions" at the expert's deposition).

Plaintiff can cross-examine Smith by suggesting (as Plaintiff did at his deposition) that the subsequent resale price is irrelevant because of a possible increase in market value or because of post-auction views of scholars about the attribution of the work, and Plaintiff can have Sainty echo those positions (arguments that Smith squarely rejected).  Sainty Rep. at 27–28 (criticizing Sotheby's UK's insurance valuation for "reflect[ing] not the price that the owners ultimately accepted, but a much higher value");[2] Smith Tr. 214:5–215:4 (rejecting position that Sotheby's UK's 2015 assessment of the work's insurance value focused on an appreciation in value from its 2013 resale price); *id.* at 200:21–201:16 (opining that auction sale price "trumped" any post-auction debates on attribution).  But the jury should be given the opportunity to agree or disagree with Smith that prior understandings of the value of the *Salvator Mundi* were proved wrong when the artwork sold at auction in 2017, and that the 2017 auction price is the measure of the work's value in May 2013 and January 2015.

### B.   Modigliani's *Tête*

Plaintiff contends that the price at which Bouvier acquired the *Tête* in September 2012 (€31.5 million) is *ipso facto* the actual value of the work at the time that Plaintiff acquired it in

---

[2] Although the Court excluded Sainty's speculation that internal Sotheby's UK correspondence showed that Sotheby's UK's insurance valuation "was merely acquiescing to Bouvier's demand for the price for this valuation" and his views as to how the valuation was conducted, Sainty can still offer his opinion that the valuation was defective because of its divergence from Bouvier's acquisition price.  Smith's rebuttal opinion on that issue, countering Sainty's analysis, is admissible whether or not Plaintiff elects to elicit testimony from Sainty on that topic.  *See In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 255–57 (S.D.N.Y. 2014), *aff'd sub nom. Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016) (allowing rebuttal expert testimony notwithstanding that plaintiffs "chose to withdraw their accounting expert on the same topics," because the testimony "addresses core issues in this case . . . and rebuts plaintiffs' claim;" moreover, there "is no legal basis" to "grant plaintiff a unilateral veto right over the type of proof the [opposing party] may offer in their own defense" by withdrawing their experts).

January 2013.  The work's 2014 auction sale price of $70.7 million will come into evidence in connection with Plaintiff's claim for the proceeds from that auction, but Smith's testimony regarding the value of Modigliani's *Tête* around the time of Sotheby's UK's sale of the work in September 2012 will also lay an appropriate foundation for the jury to consider the work's resale price in November 2014 to assess the value of the work at the time Plaintiff acquired it.

To start, Smith's testimony at trial will already establish that the actual value of the *Tête* around the time of Plaintiff's purchase was much closer to the artwork's 2014 resale price than to the €31.5 million Bouvier paid to acquire it.  As set forth in his rebuttal report, Smith will testify that Samuel Valette's informal estimate in July 2012 that the artwork had a value of between €80-100 million was reasonable:  "The stone heads by Modigliani are incredibly rare and difficult to value, and the rarity of these heads (combined with a large number of inauthentic examples, usually cast in bronze) make the works exceptionally desirable.  At the time of these emails in July 2012, the market for works by Modigliani was particularly strong, and prices for his artworks were difficult to predict with precision.  Mr Valette's assessments of the range of potential auction price that might be achieved by the sale of an exceptional Modigliani *Tête* strikes me as perhaps optimistic, but reasonable."  Smith Rebuttal Rep. ¶ 63.[3]

Smith will defend that opinion in response to Plaintiff's attack that it is inconsistent with the prior auction record of €43 million set for another *Tête* sculpture in 2010, a sculpture that Smith regards as inferior to the *Tête* at issue, and with Bouvier's acquisition price of €31.5 million.  Smith Tr. 229:10–230:7 ("[This is probably the greatest stone head by Modigliani one

[3] Defendants inadvertently failed to include Smith's rebuttal opinions regarding Samuel Valette's estimates for Modigliani's *Tête* and Magritte's *Domaine d'Arnheim* in the list of topics they identified for his testimony in the parties' August 31 Joint Pretrial Order, *see* ECF No. 548, Part X.C.24, and respectfully request that they be allowed to amend the JPTO to include those topics.

could buy.  And I could see it—I could have seen this being worth more than double the one that sold for [€]43 million at Christie's, which itself was a multiple of the pre-sale estimate."); *id.* at 237:16–238:9 ("Q. Given that the highest ever price at that time for a [*Tête*] was 43 million euros and given that two months later this exact [*Tête*] sold for 31.5 million euros, do you think that a July 2012 valuation of this work for 80 to 100 million euros was reasonable? [] A. I've answered that already.  And I said yes because it's a masterpiece.  It is far better than the one that made 43 million.  Mr. Bouvier, if he did indeed buy this thing for 31 million got a bargain.  Why it was sold so cheap you would really have to ask Sotheby's.  There must have been some circumstances to force that sale through so cheaply, I'm sure of it.").  Accordingly, although Smith will not testify about the factual circumstances surrounding Bouvier's purchase, he can testify that Bouvier's purchase price did not reflect the artwork's value and that the *Tête* at issue could have been expected to sell for double the price garnered by the inferior *Tête*.  *Id.*[4]

     In his original report, Smith explained his methodology for assessing the reasonableness of valuations and estimates, which includes the use of "hindsight" to apply post-valuation sales data to "deduce if some of the valuations . . . were within a reasonable range of values at the time of their valuation, and if they were high or low."  Smith Rep. ¶ 55.  Smith can explain how this same methodology applies to his assessment of Valette's estimates of the *Tête* in 2012.  *See*

---

[4] As discussed in Defendants' response to Plaintiff's motion *in limine* to exclude evidence of resale information, Defendants will proffer evidence showing that Bouvier was able to acquire the *Tête* for much less than its actual value, due to the sellers' desire to avoid a public auction or further efforts to sell the work privately at a higher price, and in order to achieve a quick sale—notwithstanding Sotheby's UK's view that the *Tête* should sell for at least €55 million.  *See* PX-278 (reflecting consignment of the *Tête* with Sotheby's UK for a minimum price of €55 million); PX-112 and DX-530 (memorializing that sellers of the *Tête* "wanted the sale to be very private and this was the only basis of [the] work changing hands," and that "[i]n discussing [Bouvier's] lower offer, we suggested to them that with more time we could find another buyer," an option they "rejected because they are very sensitive to people knowing the work is for sale").

*Harkabi v. SanDisk Corp.*, No. 08 CIV. 8203 WHP, 2012 WL 2574717, at *3–4 (S.D.N.Y. June 20, 2012) ("Nothing in Rule 26(a)(2) requires the expert report to contain all of the supporting data within its four corners so long as the report clearly explains its methodology.") (citation omitted); Fed. R. Evid. 703 advisory committee's note ("Facts or data upon which expert opinions are based may . . . be derived from . . . . presentation at the trial," including "the familiar hypothetical question or having the expert attend the trial and hear the testimony establishing the facts"); *see also In re Puda Coal*, 30 F. Supp. 3d at 255–57 (allowing rebuttal testimony even though opposing party withdrew their experts).  Admission of the *Tête*'s 2014 auction price of $70.7 million will allow the jury to test Smith's view that the value of the *Tête* at the time of Bouvier's purchase was likely twice that of the prior auction record of €43 million (for an inferior *Tête*).  Smith would testify as to how the 2014 auction price (which the jury will already know about) sheds light on the artwork's value in 2012, and how the 2014 auction sale price supports Smith's view that Valette's assessment of the artwork's value in 2012 was reasonable (if perhaps optimistic) based on the artwork's rarity and superiority over other works from the series.  Plaintiff can of course argue that Bouvier's €31.5 million purchase price is a better approximation of its value, and can proffer testimony from their own expert in support of their position.  *See* Sainty Rep. at 23–24 (noting that, at the time of Valette's estimate, "the highest price for a Modigliani stone sculpture, another, slightly smaller *Tête*, was €43,185,000 ($52,300,000 including premium) sold in June 2010" and that "just two months after providing this valuation at €80 million to €100 million, Valette was involved in the sale of the work to Bouvier for €31.5 million.").  But the jury should be given the chance to decide which expert's analysis, and which comparable sale prices, are most convincing.

C.      **The Resale Prices Are Relevant to Show the Actual Value of the Works at the Time of Purchase**

At the November 29 conference, the Court instructed that resale prices could be admitted at trial to evidence actual value at the time of Plaintiff's purchases if Defendants lay a foundation showing "whether or how those prices relate to or are reflective of the value at the relevant time—namely, the time of plaintiff's purchase." Nov. 29, 2023 Hr'g Tr. 28:10–12. Defendants can lay a foundation for the *Salvator Mundi* and the *Tête* resale prices through their expert Harry Smith for all the reasons discussed above. The Court should permit this evidence at trial on the question of Plaintiff's damages. *See Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000) (allowing a party to "negate the relevance of a prior arm's-length purchase price" through other evidence of value, including expert testimony and evidence of sales of comparable assets) (cleaned up); *Est. of Newberger v. Comm'r of Internal Revenue*, 110 T.C.M. (CCH) 615 (T.C. 2015) (admitting evidence of subsequent resale data because an expert could demonstrate the relevance of that subsequent resale data to an earlier date); *cf. King v. Wang*, No. 14-CV-7694 (LJL), 2021 WL 5237195, at *17–19 (S.D.N.Y. Nov. 9, 2021) (excluding expert who adjusted appraised values based on market conditions, but "failed to articulate any coherent methodology as to what adjustments he made to bring that data point to present value," "applied no market analysis whatsoever," and "simply chose the approximate number without any analysis").

II.     **NON-PRICE RESALE EVIDENCE**

In addition to the above-discussed evidence regarding the prices at which Plaintiff resold artworks it acquired from Bouvier, Defendants also intend to proffer at trial various pieces of evidence relating in some way to resales but having nothing to do with the price of any resale. Plaintiff moved to exclude all evidence that had anything to do with resales, and in opposing Plaintiff's motion Defendants articulated how these exhibits were relevant to trial issues

10

unrelated to price.  ECF No. 561, at 35.  The Court's ruling on Plaintiff's motion did not address whether this non-price-related evidence could be admitted at trial.  Defendants' proffered non-price evidence falls into four categories, along with a handful of one-off documents, all aimed at probing relevant trial issues not relating to the value of the artworks sold.

     *First*, Defendants proffer a handful of Plaintiff's written consignment agreements with its agent Sanford Heller and sale agreements (that Heller arranged) for Plaintiff's works.  The consignment agreements show Plaintiff's understanding of how to enter into a written contract to engage the services of an agent in connection with the purchase or sale of art, in contrast to Plaintiff's purported oral agreements with Bouvier.  Plaintiff will be free to argue that it only entered into such contracts after it was deceived by Bouvier, but Defendants should be free to argue that, as sophisticated businessmen advised by sophisticated lawyers, Rybolovlev and Sazonov well understood how to protect their interests regarding expenditures of hundreds of millions of dollars.  The sale agreements also are relevant to rebut Plaintiff's claim that Defendants must have had information on the identity of Bouvier's clients and his relationship to them, given that neither Plaintiff nor its agent Heller obtained such information when Plaintiff resold its artworks.  The exhibits at issue are DX-110 (consignment agreement for the resale of ███████████████████████); DX-118 (consignment agreement for the resale of ████████████████████); DX-125 (consignment agreement for ████████████████ ██); DX-129 (sale agreement for ████████████████); DX-134 (consignment agreement for ████████████████████████████████); DX-136 (consignment agreement for ████████████████████████); and DX-137

(consignment agreement for ).[5] Any price-related
information contained in these exhibits can easily be redacted.

*Second*, Defendants proffer four exhibits comprised of the auction catalogues from the
Christie's sales of Magritte's *Domaine d'Arnheim* and Da Vinci's *Salvator Mundi*. *See* DX-581
(excerpt of Christie's Magritte catalogue); DX-588 (excerpt of Christie's Da Vinci catalogue);
DX-673 (full Christie's Magritte catalogue); DX-674 (full Christie's Da Vinci catalogue).
Plaintiff will argue at trial that Defendants intentionally prepared the November 2014 auction
catalogue for Modigliani's *Tête* in a manner designed to trick Plaintiff into not realizing it was
Bouvier who had consigned the piece, and that it did so by "omitting" Bouvier's name from the
provenance of the artwork and from the property designation. The proffered exhibits show that,
when Plaintiff sold its own artworks for sale through Christie's, the provenance and designations
for those two artworks also listed Plaintiff's ownership of the works anonymously, just like in
the *Tête* auction catalogue. *See* DX-581 (designating the *Domaine d'Arnheim* as "Property From
an Important Private Collection" and listing final provenance as "Acquired by the present owner
in December 2011"); DX-588 (designating the *Salvator Mundi* as "Property From a Private
European Collection" and listing final provenance as "Acquired from the above by the present
owner"). These auction catalogues for works Plaintiff sold through Christie's, in which neither
the provenance nor the designation identifies plaintiff as the seller, show that Plaintiff well
understood, and had its own reasons for embracing, the industry norm of auction houses that the

---

[5] In light of the Court's ruling excluding evidence pertaining to the artworks at issue in Plaintiff's
dismissed claims, Defendants withdraw the following consignment and sale agreements
regarding (DX-112, DX-116, DX-117, DX-119, DX-121, DX-122, DX-
123, DX-124, DX-127, DX-128, DX-133, DX-194, DX-203). Defendants also withdraw DX-
138 (consignment agreement for ), which is a duplicate
of DX-137, and DX-126 (consignment agreement for ),
which is a duplicate of DX-125.

seller is *not named in catalogues*.  Put another way, Plaintiff's argument that the *Tête* auction catalogue evidences fraudulent intent is significantly undermined by Plaintiff's adherence to the same art market practices when it put artworks up for auction.  (The Christie's auction estimate for Magritte's *Domaine d'Arnheim* can easily be redacted from DX-581; the Christie's catalogue for the *Salvator Mundi* at DX-588 does not include an estimate and would require no redaction.)

   *Third*, Defendants proffer evidence regarding ████████████████████████ for Rothko's *No. 6* following its seizure by Singaporean authorities pending the resolution of Plaintiff's claims against Bouvier.  *See* DX-188 (chart created by Plaintiff's counsel identifying ████████████████████████); DX-246 (Heller email documenting ████████████████████ Rothko following its seizure by Singapore authorities).  Plaintiff incorrectly characterize these exhibits as "resale" documents, but the exhibits have nothing to do with any resale information.  Rather, the exhibits show that Plaintiff continued to claim ownership of the Rothko well into 2021 by ████████████████████████ over the property they claimed to have acquired from Bouvier by trading in Modigliani's *Tête*.  (████████ likely continues to the present, but Defendants only received documents in discovery into 2021.)  These exhibits are highly relevant to assessing the ownership interest Plaintiff obtained when it traded in the *Tête*, which the jury must weigh against the value of the *Tête* in assessing any damages Plaintiff obtains with respect to that transaction.  Moreover, and separate from the question of Plaintiff's ownership of the artwork, the ████████████████████████ ████ are party statements and relevant to the jury's assessment of the value of the Rothko that Plaintiff claimed to have purchased by trading in the *Tête* (and therefore to any assessment of damages for that transaction), particularly given that Plaintiff claims the Rothko was worth only

13

$80 million (the price Bouvier paid to acquire it).[6] *See* DX-188 at 35 (reflecting [redacted]); DX-246 (reflecting [redacted]). Since DX-188 also details [redacted] Plaintiff obtained for works other than Rothko's *No. 6*, Defendants propose to redact references to other [redacted] so that only information about the Rothko will be presented to the jury.

*Fourth*, Defendants have marked as exhibits a number of documents pertaining to Plaintiff's efforts to obtain financing using its artworks as collateral. *See* DX-93, DX-94, DX-131, DX-132, DX-135, DX-190. Defendants do not plan to proffer these exhibits (with the exception of DX-109, addressed separately below) because the Court has excluded from evidence the four insurance valuations prepared by Sotheby's UK in October 2014 as well as an updated valuation prepared in February 2015. ECF No. 580, at 1; *see also* ECF No. 553, at 3–4. Plaintiff, however, has informed Defendants that it takes the position that the valuations are nevertheless admissible. Defendants will address Plaintiff's meritless position in an upcoming filing, and will withdraw these exhibits if the Court rejects Plaintiff's continuing attempt to proffer the excluded valuations.

*Finally*, the remaining exhibits proffered by Defendant that were subject to Plaintiff's motion likewise probe issues that are unconnected to resale price information. DX-109, which pertains to Plaintiff's efforts to pursue loans from [redacted] using its artworks as collateral, will explain the circumstances of the valuations provided by Gurr Johns in September

[6] Plaintiff presumably will argue that their assigned values for Rothko's *No. 6* reflect only their insurance values and so do not bear on the artwork's actual value. That position, however, would be in direct conflict with Plaintiff's allegation that the €100 million insurance valuation prepared by Sotheby's UK for Da Vinci's *Salvator Mundi* reflected a "fraudulent price" for that artwork given its differential from Bouvier's 2013 acquisition price. *See* ECF No. ¶180–83. Defendants should be allowed to cross-examine Plaintiff's witnesses with their statements regarding the value of Rothko's *No. 6* and the inconsistency in Plaintiff's position.

2015.  While Plaintiff suggests that those valuations are incompatible with Smith's expert testimony valuing the same works, DX-109 verifies Smith's claim that the valuations were prepared for purposes of using artworks as loan collateral.  DX-120 is an email exchange between Plaintiff and Heller that shows Plaintiff's understanding that a work's value may be greater than the specified sales price, and that art is difficult to value and subject to a range of reasonableness.  Specifically, in a joint sale of two works, Heller advised that ████████████

████████████████████████████████████████████████████."  The relevance of DX-120 is not related to the prices at which Plaintiff sold any particular work.  The Court has already denied Plaintiff's motion to exclude DX-130, finding it relevant to Rybolovlev's sophistication in business (and the document does not include any information about Plaintiff's art resales).  DX-169, the notes from Plaintiff's Rule 30(b)(6) deposition (and a party statement) sets forth information about Plaintiff and its art transactions generally, and can easily be redacted to remove pricing information.  As to the last document that was the subject of Plaintiff's motion to exclude resale evidence, DX-176 is ████████████████████████████

████████ for the auction of the *Salvator Mundi*, which evidences that ████████████████

████████████████████████████████████████████████████████

████████████████████.  *See* ECF No. 285 ¶ ("Bouvier was first introduced to Plaintiffs' representative, Dmitry Rybolovlev, in 2003[.]").

<p align="center">*          *          *</p>

All of this evidence is probative of issues in the case, and Plaintiff's attempt to exclude the documents should be rejected.

## CONCLUSION

For the foregoing reasons and those set forth in Defendants' prior *in limine* briefs,

Defendants' motion *in limine* to include resale price information should be granted, and

Plaintiff's motion to exclude information relating to resales should be denied.

Dated: New York, New York
      December 12, 2023

          ARNOLD & PORTER KAYE SCHOLER LLP


By:   /s/ Marcus A. Asner
      Marcus A. Asner
      Sara L. Shudofsky
      Benjamin C. Wolverton
      Yiqing Shi
      Sahrula Kubie
      250 W. 55th Street
      New York, NY 10019-9710
      Tel: 212.836.8000
      Fax: 212.836.8689
      marcus.asner@arnoldporter.com
      sara.shudofsky@arnoldporter.com
      benjamin.wolverton@arnoldporter.com
      yiqing.shi@arnoldporter.com
      sahrula.kubie@arnoldporter.com

      *Attorneys for Defendants Sotheby's and Sotheby's, Inc.*

16