UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ACCENT DELIGHT INTERNATIONAL LTD., | |
| Plaintiff, | Case No. 18-cv-9011 (JMF) |
| -against- | |
| SOTHEBY'S and SOTHEBY'S, INC., | |
| Defendants. | |

## [PROPOSED] JOINT PRETRIAL ORDER

Pursuant to Rule 6.A of Your Honor's Individual Rules and Practices in Civil Cases, and the Court's Order dated May 2, 2023 (Dkt. 534), Plaintiff Accent Delight International Ltd. and Defendants Sotheby's and Sotheby's, Inc. respectfully submit the following proposed Joint Pretrial Order:

## I.    FULL CAPTION

*Accent Delight International Ltd. v. Sotheby's and Sotheby's, Inc.*, No. 18 Civ. 9011.

## II.    PARTIES AND COUNSEL

The names, law firms, addresses, and telephone and fax numbers of trial counsel are as follows:

For Plaintiff:

Daniel J. Kornstein, Esq.
O. Andrew F. Wilson, Esq.
Zoe Salzman, Esq.
Vasudha Talla, Esq.
Sarah Mac Dougall, Esq.

Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor.
New York, NY 10020

1

Tel. No.:  (212) 763-5000
Fax No.:  (212) 763-5001
Email: dkornstein@ecbawm.com
Email: awilson@ecbawm.com
Email: zsalzman@ecbawm.com
Email: vtalla@ecbawm.com
Email: smacdougall@ecbawm.com

For Defendants:

Marcus A. Asner, Esq.
Sara L. Shudofsky, Esq.
Benjamin C. Wolverton, Esq.
Yiqing Shi, Esq.
Sahrula Kubie, Esq.

Arnold & Porter Kaye Scholer LLP
250 W 55th Street
New York, NY 10019
Tel:  212) 836-8000
Fax:  (212) 836-8689
marcus.asner@arnoldporter.com
sara.shudofsky@arnoldporter.com
benjamin.wolverton@arnoldporter.com
yiqing.shi@arnoldporter.com
sahrula.kubie@arnoldporter.com

Neal Kumar Katyal, Esq. *(Pro hac vice)*
Will Havemann, Esq. *(Pro hac vice forthcoming)*

Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel:  (202) 637-5600
Fax:  (202) 637-5910
neal.katyal@hoganlovells.com
will.havemann@hoganlovells.com

## III.    SUBJECT MATTER JURISDICTION

### A.    Plaintiff's Statement as to Jurisdiction

This Court has subject-matter jurisdiction to adjudicate the claims at issue in this trial under 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of a foreign state, Defendants are citizens of New York, and the amount in controversy exceeds $75,000.

B.       **Defendants' Statement as to Jurisdiction**

Defendants do not challenge this Court's subject-matter jurisdiction to adjudicate the

claims at issue in this trial.

IV.     **SUMMARY OF CLAIMS AND DEFENSES REMAINING TO BE TRIED**

A.       **Plaintiff's Claims To Be Tried**

Plaintiff asserts that the following claims remain to be tried: (1) its aiding-and-abetting

fraud claims based on Accent Delight's purchase of Magritte's *Le Domaine d'Arnheim*, Accent

Delight's purchase of Klimt's *Wasserschlangen II*, Accent Delight's purchase of Modigliani's

*Tête*, Accent Delight's purchase of Da Vinci's *Salvator Mundi*, and the auction of Modigliani's

*Tête*; and (2) its aiding-and-abetting breach of fiduciary duty claim based on Accent Delight's

purchase of da Vinci's *Salvator Mundi*. All of Plaintiff's other claims have been either granted or

dismissed. *See* Dkt. 64 at 20, 177 at 22, 306 at 9, 510 at 74.

B.       **Defendants' Defenses To Be Tried**

Defendants assert that the following defenses remain to be tried:  (1) Plaintiff's claim for

breach of fiduciary duty with respect to Accent Delight's purchase of Da Vinci's *Salvator Mundi*

is barred by the three-year statute of limitations for breach of fiduciary claims seeking monetary

damages; (2) Plaintiff's claims related to Accent Delight's purchase of Magritte's *Domaine*

*d'Arnheim* and Accent Delight's purchase of Modigliani's *Tête* are barred on the ground that

Defendants are not liable for the actions of employees of its foreign subsidiaries with respect to

those transactions; (3) Plaintiff will not be able to prove its claims; and (4) Plaintiff will not be

able to prove damages, including compensatory or punitive damages.  Defendants do not assert

any of the other defenses identified in their Answer to the Second Amended Complaint.  *See* Dkt.

300, at 48–59.

## V.        JURY TRIAL AND NUMBER OF TRIAL DAYS NEEDED

This case will be tried before a jury. Plaintiff estimates that 2–3 weeks of trial days will be necessary. Defendants estimate that 5–7 weeks of trial days will be necessary.

## VI.       JOINT STATEMENT SUMMARIZING NATURE OF THE CASE

At this trial the jury will be called upon to resolve a dispute involving five fine art transactions.  The Plaintiff is Accent Delight International Ltd., a company that purchased the artworks and which is owned by a trust established for a man named Dmitry Rybolovlev and his family.  The two Defendants are Sotheby's and its subsidiary Sotheby's Inc., which are companies that are in the business of brokering sales of fine art, including art masterpieces, through either private transactions or public auctions.

The Plaintiff will argue that its art advisor, a man named Yves Bouvier, committed fraud and breach of fiduciary duty against Plaintiff, and that the Defendants Sotheby's and Sotheby's, Inc. aided and abetted Bouvier in doing so.  The Plaintiff will argue that it was defrauded in connection with five art transactions.  With respect to one of those transactions, the Plaintiff will also argue that Bouvier owed Plaintiff a fiduciary duty and that, with Defendants' assistance, Bouvier breached that fiduciary duty.  Among other things, the Plaintiff will argue that Bouvier cheated it by buying artworks for one price, lying to the Plaintiff about the price he paid, and charging the Plaintiff another price that was significantly higher than the price he paid.  The Plaintiff will argue that the Defendants aided and abetted Bouvier in doing so by, among other things, creating documents and making statements about the artworks that helped convince the Plaintiff to trust the prices quoted by Bouvier.

Yves Bouvier, who lives overseas, is not one of the parties in this case.

The Defendants contest the Plaintiff's allegations.  They will argue at trial, among other things, that it was not reasonable for the Plaintiff to rely on the lies Bouvier told the Plaintiff

about the prices he paid to buy the artworks without asking for any kind of documentation about how much Bouvier paid for the art, and therefore the Plaintiff cannot prove that it was defrauded, which is a necessary first step in proving any aiding and abetting claims against the Defendants. Further, the Defendants will argue that, as part of their regular business activities, they facilitated purchases of art by Bouvier, a long-time client of the Defendants, from the private sellers who owned the art.  The Defendants will argue that they did not have any knowledge of Bouvier's alleged fraud or breach of fiduciary duty against the Plaintiff, and specifically about any of Bouvier's lies to the Plaintiff about the prices he paid to acquire the art, and that they did not assist Bouvier in any such misconduct.

Each side will present evidence on many additional issues and make many other arguments.  For now, I've given you a very general introduction to the case and some of the core arguments the jury will be hearing about in the course of the trial.

## VII. PEOPLE, PLACES, AND INSTITUTIONS LIKELY TO BE MENTIONED AT TRIAL

### A. People

1. Yves Bouvier

2. Dmitry Rybolovlev

3. Samuel Valette

4. Bill Ruprecht

5. Bruno Vinciguerra

6. Alexander Bell

7. Mikhail Sazonov

8. Yuri Bogdanov

9. Ekaterina Rybolovleva

10. Jean-Marc Peretti

11. Tetiana Bersheda

12. Gregoire Billault

13. Sanford Heller

14. Daisy Edelson

15. Franka Haiderer

16. Helena Newman

17. Jane Levine

18. Simon Shaw

19. Dario Tabladini

20. Holli Taylor

21. Melanie Clore

22. Michael Macaulay

23. Robert Wittman

24. Guy Stair Sainty

25. Harry Smith

26. Alex Parish

27. Robert Simon

28. Warren Adelson

29. Nicholas Acquavella

30. Tania Rappo

31. Steve Cohen

32. Nisha Amin

33.     Alexander Platon

34.     Richard Purchase

35.     Philip Hook

36.     Antonia Serra

37.     Lucian Simmons

38.     Marina Phelan

39.     Mitchell Zuckerman

40.     Thomas Boyd-Bowman

41.     Thomas Bompard

42.     Florent Giacobino

43.     Elena Rybolovleva

44.     Marc Bonnard

45.     Olga Khorobrykh

46.     Simona Fedele

47.     Eric Bechenit

48.     Sergey Chernitsyn

49.     Brian Cattell

50.     James Gallon

51.     Mari-Claudia Jimenez

52.     Henry Wyndham

53.     Rose Stella

54.     Jonathan Olsoff

55.     Bill Acquavella

56.   Tsutomu Takashima

57.   Larry Gagosian

58.   Guy Wildenstein

59.   Lionel Pissarro

60.   Joachim Pissarro

61.   Ashton Hawkins

62.   Seth Harrison

**B.**   **Artists**

1.   Leonardo Da Vinci

2.   Pablo Picasso

3.   Aristide Maillol

4.   Auguste Rodin

5.   Henri Matisse

6.   François-Xavier Lalanne

7.   René Magritte

8.   Amedeo Modigliani

9.   Gustav Klimt

10.   Henri de Toulouse-Lautrec

11.   Mark Rothko

12.   Paul Gauguin

13.   Paul Cézanne

14.   Claude Monet

**C.**    **Places**

    1.    15 Central Park West, New York, New York

    2.    Geneva Free Port, Geneva, Switzerland

    3.    Kunsttrans Vienna, Vienna, Austria

    4.    Frieze Art Fair, London, U.K.

    5.    Pinacothèque de Paris, Paris, France

    6.    Le Bristol Paris, Paris, France

    7.    Hôtel Plaza Athénée, Paris, France

**D.**    **Institutions**

    1.    Sotheby's (Delaware-based entity)

    2.    Sotheby's Inc. (New York-based entity)

    3.    Sotheby's (UK-based entity)

    4.    Accent Delight International Ltd.

    5.    Xitrans Finance Ltd.

    6.    AS Monaco Football Club

    7.    Blancaflor Investments Ltd.

    8.    MEI Invest Ltd.

    9.    Arrow Fine Art LLC

    10.    Eagle Overseas Company Limited

    11.    Kinsride Finance Ltd.

    12.    Natural le Coultre

    13.    Acquavella Galleries

    14.    Heller Group

15. Giraud, Pissarro, Ségalot

16. Rigmora Holdings Ltd.

17. Wildenstein & Co. Gallery

## VIII.   TRIAL BY A MAGISTRATE JUDGE

The parties do not consent to trial by a magistrate judge.

## IX.   STIPULATIONS

The parties stipulate that:

### A.   Factual Stipulations

**Magritte's *Le Domaine d'Arnheim***

1. The following statements made by Yves Bouvier related to a purported negotiation between Bouvier and the seller of Magritte's *Le Domaine d'Arnheim* that never happened, and therefore the statements were false:

   a) In PX 35:

      i) "The price was proposed in USD instead of Euros, i.e., 60 USD. I told him that it was unthinkable and that he already got 55 USD. I said that 40 USD was the maximum. He'll never let it go for that amount. I think that at 50 he will accept it."[1]

      "Le prix a été proposé en Usd à la place de l'Euro soit à 60'usd. Je lui ai dit que c'était inenvisageable et déjà obtenu 55 Usd. J'ai dit que 40 usd était le maximum. Ace montant il ne lâchera jamais. Je pense qu'à 50 il acceptera."

      ii) "I tried but 42 is mission impossible even at 42.5. He is stuck at 50. I need a little more, in principle I don't want to offer 45, I'll offer 44 take it or leave it with a deadline to answer and I will him leave with that. Today he's not moving."

      "J'ai essayé mais 42 c'est mission impossible même a 42,5. Il est bloqué a 50. J'ai besoin d'un peu plus, par principe je ne veux pas proposer 45, je proposerai 44 à prendre ou à laisser avec un delai pour répondre et je le laisse.  Aujourd'hui il est bloqué"

---

[1] The parties have agreed that each party will serve, sixty days before trial, translations of any exhibits containing non-English languages that the party intends to introduce into evidence at trial, and that the opposing party will serve any revisions to those translations thirty days before trial.  The parties respectfully request that the English translations of the exhibits quoted in these stipulations be conformed to the final translations of those exhibits.

iii) "Given the importance of this work, I proposed 43.5 USD with the offer open until Friday 12:00. I allowed myself to propose this number telling myself that it's your number 42.5 + my fees 2% of around 1 for a total of 43.5."

"Étant donne l'importance de l'oeuvre, j'ai proposé 43,5 Usd avec cette offre ouverte jusqu'à vendredi 12h00. Je me suis permis ce chiffre en me disant que c'était ton chiffre de 42,5 + mes frais 2% environ 1 soit un total de 43,5."

b)  In PX 364:

i)  "Good news, I can confirm that the deal is done at 43.5 with fast payment."

"Bonne nouvelle, je te confirme que l'affaire est faite à 43,5 avec paiement rapide."

c)  In PX 377:

i)  "The price was proposed in USD instead of Euros, i.e. 60 USD. I told him that it was unthinkable and that he already got 55 USD. I said that 40 USD was the maximum. He'll never let it go for that amount. I think that at 50 he will accept it."

"Le prix a ete propose en Usd a la place de l'Euro soit a 60'usd. Je lui ai dit que c'etait inenvisageable et deja obtenu 55 Usd. J'ai dit que 40 usd etait le maximum. Ace montant il ne lachera jamais. Je pense qu'a 50 il acceptera."

ii)  "I tried but 42 is mission impossible even at 42.5. He is stuck at 50. I need a little more, in principle I don't want to offer 45, I'll offer 44 take it or leave it with a deadline to answer and I will leave him with that. Today he's not moving."

"J'ai essayé mais 42 c'est mission impossible même a 42,5. Il est bloqué a 50. J'ai besoin d'un peu plus, par principe je ne veux pas proposer 45, je proposerai 44 à prendre ou à laisser avec un delai pour répondre et je le laisse. Aujourd'hui il est bloqué."

iii)  "I'm sticking to the 43.5 proposal open until Friday. It would be counterproductive to go to 44 now."

"Je reste avec la proposition de 43,5 ouverte jusqu'à vendredi. Cela serait contre productif de passer à 44 maintenant."

***Klimt's Wasserschlangen II***

2.  The following statements made by Yves Bouvier related to a purported negotiation between Bouvier and the seller of Klimt's *Wasserschlangen II* that never happened, and therefore the statements were false:

a)  In PX 36:

i)  "They're stuck at 180 and ready to walk; I think they would do 190. But I will have to twist them to get 185 with quick payment and sale at 30 days."

"Ils bloquent pour 180 et sont à la rupture; je pense qu'ils sont prêt à 190. Mais je dois pouvoir les tordre pour atteindre 185 avec paiement de dépôt et solde 30 jours."

ii) "Done at 183,800[.]"

"Fait a 183,800."

b) In PX 384:

i) "We resumed the discussion, and, after reflection, their last price given our arguments:
- discretion
- confidentiality
- speed of payment
The price is 220.
I think it will be difficult to go much lower.
Perhaps with rapid payment they'll risk accepting 200.
They know the other potential buyers and they will certainly find another taker at a price higher than 200.
I think that if we manage to deal at around 180 it's a miracle.
I have arguments in reserve to get there.
But I need a cap from DR before using them."

"On a repris la discussion et après réflexion leur dernier prix compte tenu de nos arguments:
- discrétion
- confidentialité
- rapidité de paiement
Le prix est de 220. Je pense qu'il va être difficile d'aller beaucoup plus bas. Peut-etre qu'avec un payement rapide ils risquent accepter 200[.] Ils connaissent les autres acquéreurs potentiels et ils trouveront certainement un autre preneur à un prix superieur 200. Je pense que si on arrive à traiter au environ de 180 c'est un miracle. J'ai des arguments en reserve pour y arriver. Mais j'ai besion d'un cap de la part de DR avant de les utiliser."

**Modigliani's *Tête***

3. The following statements made by Yves Bouvier related to a purported negotiation between Bouvier and the seller of Modigliani's *Tête* that never happened, and therefore the statements were false:

a) In PX 19:

    i) "For the Tête, I'll try at 35+Degas, but I'm 99% sure I'll be thrown out. This is mission impossible, but it will allow the first stone to be laid."

    "Pour la Tete je vais essayer à 35+ Degas, mais je pense me faire jeter à 99%. C'est une mission impossible mais cela permettra de poser la première pierre."

b) In PX 37:

    i) "The proposal of 36.5 + Degas was rejected without any possible discussion. After discussions so as not to miss out definitely on the deal, I finally concluded at 37.5 E + Degas."

    "La proposition de 36,5 + Degas a été refusée sans discussion possible. Apres discussions pour ne pas rater définitivement l'affaire, j'ai finalement du conclure à 37,5 E + Degas."

    ii) "For the payment, tell me when you can, and I will get [him] to wait."

    "Pour le paiement, dis moi quand tu pourras et je ferai patienter."

c) In PX 277:

    i) "I will, without guarantee, try to propose the purchase of the Modigliani Tête with the Degas painting as payment and a sum budgeted between 35E and 40E, depending on the result of the negotiation. To this end, I need to know the possible payment deadlines."

    "Je vais sans garantie essayer de proposer l'achat de la Tête de Modigliani avec en paiement le tableau de Degas et une somme budgetée entre 35E et 40 E suivant le résultat de la négociation. A cet effet j'ai besoin de connaitre les délais de paiement possible."

d) In PX 325

    i) "For the tête, it is very difficult, the owner is in negotiations with Qatar."

    "Pour la tête c'est très difficile le propriétaire est en tractations avec le Qatar."

    ii) "I did not imagine that Qatar would decide so quickly for the tête.

    Three solutions:

    - We try to negotiate the exchange today.

    - We fight to buy in cash against Qatar.

    - We wait to see if Qatar buys, and if they don't we'll come back at a later date under better conditions.

I will let you decide, but I need a position at the latest at the beginning of the afternoon; if there's no response from you, it will automatically be solution 3."

"Je n'imagines pas que le Qatar se déciderait si vite pour la tête. Trois solutions:

-on essaye de négocier l'échange aujourd'hui.
-on se bat pour acheter en cash contre le Qatar.
-on attend de voir si le Qatar achète, et si ils n'achètent pas on revient éventuellement a la charge ultérieurement dans de meilleures conditions.
Je vous laisse vour prononcer mais j'ai besoin d'une position au plus tard en tout début d'après-midi, sans réponse de votre part se sera automatiquement la solution 3."

iii) "Just to keep you informed of the situation of the Tête following decision 3. I think I did what was necessary to ensure that the sale with Qatar did not happen…We must now let the owner marinate a little. I'm following the file and I'll let you know when it's the right time and what price to offer. (No obligation)"

"Juste pour te tenir informée de la situation de la Tête suite à la décision 3. Je pense que j'ai fait le nécessaire pour que la vente avec le Qatar ne se fasse pas… Il faut maintenant laisser mariner un peu le propriétaire. Je suis sur le dossier et je vous dirai quand se sera le bon moment et quel prix proposer. (Sans obligation)"

iv) "I think this is the right time to make an offer. Qatar being left out. The seller got back to me and decided to close this transaction before the end of 2012. At least sign a sales contract. Basically, now that there is no more Qatar, he's asking me to find a solution for him. He is in a position of interest but is not financially obliged to sell. If you want, I think this is the right time to make an offer to conclude this transaction in 2012 (even if the payment is for 2013).

Price analysis:

- The starting price was 100 USD, that is about 75 E.

- The net price for sellers was 70 E expected with Qatar.

- The House +25 E, that is the cost price 85 E

- Now that I pushed aside Qatar, I think they want 65 E.

- In my opinion, the ideal price to pay is 65 BUT IN USD!
If you want, tell me what amount you want to invest, and I'll think about what strategy to adopt for trading in order to get to your amount."

"Je pense que c'est le bon moment de faire une offre. Le Qatar étant mis de coté. Le vendeur est revenu a moi a décidé de clôturer cette transaction avant fin 2012. Au minimum signer un contrat de vente. En gros, maintenant qu'il y a plus le Qatar il me demande de lui trouver une solution. Il est en position de demandeur, toutefois il n'est financièrement pas obligé de vendre. Si vous le souhaitez, je pense que c'est le bon

moment pour faire une offre pour conclure cettre transaction en 2012 (même si paiement est pour 2013)[.] Analyse du prix:

- le prix de départ était de 100 Usd soit environ 75 E.
- le prix net pour les vendeurs était de 70E espéré avec le Qatar.
- la Maison + 25E soit prix revient 85 E
- Aujourd'hui que j'ai mis à l'écart le Qatar, je pense qu'ils veulent 65 E.
- A mon avis le prix idéal à payer est 65 MAIS EN USD!
Si vous le souhaitez, dites moi quel montant vous souhaitez investir et je réfléchis quelle stratégie adopter pour la négociation afin d'arriver à votre montant."

e) In PX 326:

   i) "I start my appointment in 5 minutes."

   "Je commence mon rendez vous dans 5 min."

   ii) "They're really tough. I am defending Degas for now."

   "C'est des vrais durs. Je defend le Degas pour le moment."

f) In PX 327:

   i) "I am at the end. Their latest and non-negotiable proposal with fast payment is 40E + Degas. I will try to scratch again, but I will really need a little margin from DR."

   "Je suis a bout. Leur derniere proposition et non negociable avec paiement rapide est à 40E+Degas. Je vais encore essayer de gratter encore mais j'aurai vraiment besoin d'une petite marge de DR."

g) In PX 401:

   i) "They are not interested in the exchange at 35E + Degas. They think that it is not equivalent. Moreover, they come from the idea that the value is at least 65 E. Several strategies are possible, that is:
- to increase the offer a little bit
- to make a proposal without resumption.
- I'm waiting, but I am very pessimistic.
- propose an exchange with another painting, I spoke about Picasso without extending, but they are not connected Picasso, in my opinion, the Van Gogh would be appropriate."

   "Ils ne sont pas intéressés par l'échange à 35E + Degas. Ils trouvent que ce n'est pas équivalent. Par ailleurs ils partent de l'idée que la valeur est au minimum de 65 E. Plusieurs stratégies sont possible soit:

     - augmenter un petit peu l'offre

- faire une proposition sans reprise.

- attendre mais je suis très pessimiste.

- proposer un échange avec un autre tableau, j'ai parlé Picasso sans m'étendre, mais ils ne sont pas branché Picasso à mon avis le Van Gogh serait approprié."

ii) "I said that I didn't have the capacity to increase the supply and we left it like that for today; the encounter was short. I think they have another customer in mind; I will try to find out who it is."

"J'ai dit que je n'avais pas les capacités d'augmenter l'offre et on est resté comme cela pour aujourd'hui, le rendez-vous était court. Je pense qu'ils ont une autre idée de client, je vais essayer de trouver qui est-ce."

h) In PX 402:

i) "I'm resuming the discussion this afternoon. I'll keep you informed."

"Je reprend la discussion cette après-midi. Je te tiens informé."

ii) "The discussion has been postponed until tomorrow."

"La discussion a été reportée à demain."

**Da Vinci's *Christ as Salvator Mundi***

4. The following statements made by Yves Bouvier related to a purported negotiation between Bouvier and the sellers of Da Vinci's *Christ as Salvator Mundi* that never happened, and therefore the statements were false:

a) In PX 26:

i) "Another top collector interested. Serious in my opinion, I think M'Salini [sic], Italian Bouygues of construction[.] Important private museum[.] 90 was not considered[.] They don't want to lower the price, but at least got 10% for rapid payment. 135. It is essential that we wrap it up this evening so as not to lose our touch. Need substantial DR assistance to increase the offer."

"Autre collectionneur top intéressé. A mn avis sérieux, je pense M'Salini. Bouygues italien de la construction. Musee privé important. 90 pas considé. Ne veulent pas baisser le prix, quand même obtenu 10% pour paiement rapide. 135. Imperatif conclure ce soir pas perdre la main. Beson importante aide DR pour augmenter offre."

ii) "100 rejected without delay reflection!"

"100 rejeté sans delai réflexion!"

iii) "He's a real tough one but I am fighting hard and taking as much time as needed."

"Un vrais dur mais je me bas et prend le temps nécessaire."

iv) "I have now offered 120."

"J'ai offert en ce moment 120."

v) "Yes, but I offered 125."

"Oui mais j'ai proposé 125"

vi) "Concluded at 127.5."

"Conclu à 127,5"

5.  On January 12, 2015, Plaintiff initiated a foreign legal proceeding against Yves Bouvier raising claims of fraud and breach of fiduciary duty.

6.  On May 4, 2015, a foreign lawyer for Plaintiff, Tetiana Bersheda, introduced into evidence in that foreign legal proceeding a copy of the valuation for Leonardo Da Vinci's *Salvator Mundi* that Samuel Valette had sent directly to Bersheda at Bouvier's request.

7.  On March 25, 2016, Plaintiff filed a proceeding pursuant to 28 U.S.C. 1782 to obtain documents from Defendant Sotheby's, Inc. relating to Yves Bouvier's acquisition of artworks that were subsequently acquired by Plaintiff (the "§ 1782 Proceeding").

8.  On November 17, 2016, Defendant Sotheby's, Inc. produced documents to Plaintiff in satisfaction of the § 1782 Proceeding.

9.  On December 16, 2016, Plaintiff and four Sotheby's-affiliated entities—Defendant Sotheby's, Inc., Sotheby's UK, Sotheby's SA, and Sotheby's Kunstauktionen GmbH— entered into an agreement that tolled for one year the running of the statute of limitations for any claim Plaintiff might have against the above four entities relating to their direct or indirect involvement with Yves Bouvier.

10. On October 2, 2018, Plaintiff filed this lawsuit against Defendants Sotheby's and Sotheby's, Inc.

11. Plaintiff became the owner of Rothko's *No. 6* on September 8, 2014.

### B.    Other Stipulations

1.    The parties stipulate to the authenticity of any proposed exhibit comprised of email(s)/file(s) maintained and produced by either Defendants or Plaintiff, provided that neither party has raised an objection to such exhibit under Federal Rules of Evidence 901/902.  This stipulation does not apply to exhibits as to which any party has asserted a Rule 901/902 objection or to any exhibits that were produced by third parties.

### C.    Stipulations Regarding Elements of Fraud, Breach of Fiduciary Duty

1.    Plaintiff's position: The Court directed the parties to confer and address in the proposed joint pretrial order whether it would be appropriate to treat certain elements of fraud and breach of fiduciary duty as established pursuant to Fed. R. Civ. P. 56(g). *See* MSJ Order (ECF No. 510) at 58 n.18, 59 n.19. The parties conferred but were unable to reach a stipulation on this issue. Plaintiff will be filing a motion in limine arguing that these elements should be treated as established in this action, and proposed jury instructions reflecting that these elements have been established in this action.

2.    Defendants' position: With respect to four of the five transactions at issue, Defendants have stipulated to the falsity of multiple statements made by Bouvier, as set forth in Part IX.A above.  Plaintiff should be held to their burden of proof with respect to the remaining elements of their claims.

## X.    WITNESSES[2]

### A.    Witnesses to be Called by Plaintiff and Defendants

1.    Yves Bouvier (by deposition)

Plaintiff's Statement: Yves Bouvier will testify about inviting Samuel Valette to stay on his yacht; his common interest agreement with Sotheby's; his communication with people about the Works[3]; Sotheby's

---

[2] Unless specifically indicated otherwise, all witnesses will testify in person.

[3] The parties define the "Works" to mean any artworks about which Yves Bouvier and/or his affiliates and Plaintiff and/or their affiliates transacted or contemplated transacting between 2002 and 2015, to the extent that testimony regarding such artworks is ruled admissible.  By using the term "Works" herein, neither party concedes that evidence regarding all such artworks is admissible, and both parties reserve the right to challenge the admissibility of evidence concerning any such artworks.

preparation of the Da Vinci valuation and cover letter; and his so-called "due diligence" services to Plaintiff.

Defendants' Statement: In addition to the topics identified in Plaintiff's Statement, Yves Bouvier will testify about the nature of his activities in the art market; his business relationship with Dmitry Rybolovlev and his affiliates; Plaintiff's/Xitrans Finance Ltd.'s acquisitions and/or sales of Works (to the extent testimony on such Works is ruled admissible); Plaintiff's/Xitrans Finance Ltd.'s, and/or Dmitry Rybolovlev's activities in the art market; his business relationship with Jean-Marc Peretti; his and Jean-Marc Peretti's business relationships with Sotheby's[4]; transactions between Sotheby's and Blancaflor Ltd. regarding Works (to the extent testimony on such Works is ruled admissible); his and Jean-Marc Peretti's representations to Sotheby's regarding the nature of their art market activities; Blancaflor Ltd.'s obtaining of an insurance valuation of Leonardo Da Vinci's *Salvator Mundi* from Sotheby's; Blancaflor Ltd.'s obtaining of insurance valuations of other Works from Sotheby's (to the extent testimony on Sotheby's insurance valuations for Works other than the *Salvator Mundi* is ruled admissible); Plaintiff's/Xitrans Finance Ltd.'s solicitation and use(s) of the insurance valuation for the *Salvator Mundi*; and Plaintiff's/Xitrans Finance Ltd.'s solicitation and use(s) of valuations regarding other Works (to the extent testimony on Sotheby's insurance valuations for Works other than the *Salvator Mundi* is ruled admissible).

2.      Samuel Valette

Plaintiff's Statement: Samuel Valette will testify about Sotheby's relationship with and knowledge of Yves Bouvier and Jean-Marc Peretti; Sotheby's policies and procedures; Sotheby's participation in transactions concerning Works acquired by Plaintiff; Sotheby's knowledge of Bouvier's relationship with Plaintiff and Dmitry Rybolovlev; his role as Mr. Rybolovlev's KCM; Sotheby's assistance to Bouvier in inflating the prices paid by Plaintiff and in concealing material information from Plaintiff including provenance and price; Defendants' relationship with other Sotheby's entities, including Sotheby's UK, Sotheby's Austria, and Sotheby's AG; and Valette's compensation during the relevant time period.

Defendants' Statement: In addition to the topics identified in Plaintiff's Statement, Samuel Valette will testify about Sotheby's business

---

[4] The use of the term "Sotheby's" by Defendants in Part X of the JPTO shall mean one or more of Defendant Sotheby's, Defendant Sotheby's, Inc., and/or their subsidiaries, and is not a waiver of Defendants' defense that Plaintiff's claims related to Accent Delight's purchase of Magritte's *Domaine d'Arnheim* and Accent Delight's purchase of Modigliani's *Tête* are barred on the ground that Defendants are not liable for the actions of employees of its foreign subsidiaries with respect to those transactions.  *See supra* Part VI.

relationship with Yves Bouvier and Jean-Marc Peretti and his understanding of their art market activities; Sotheby's procurement and brokering of artwork transactions (including private and auction sales); Sotheby's brokerage of transactions concerning Works (to the extent testimony on such Works is ruled admissible); his communications with or regarding Yves Bouvier and/or Jean-Marc Peretti concerning Works (to the extent testimony on such Works is ruled admissible); his knowledge of and interactions with Dmitry Rybolovlev and Ekaterina Rybolovleva; Sotheby's preparation of valuations and its methods of conducting valuations; Sotheby's preparation of the insurance valuation of Leonardo Da Vinci's *Salvator Mundi*; Sotheby's preparation of insurance valuations of other Works (to the extent testimony on Sotheby's insurance valuations for Works other than the *Salvator Mundi* is ruled admissible); the relationship between Defendants, their subsidiaries, and the employees of those subsidiaries; emails Plaintiff introduces into evidence as to which he was a sender or recipient; and his lack of any knowledge about any representations or misrepresentations Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including his lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

3.      William Ruprecht

Plaintiff's Statement: William Ruprecht will testify about Sotheby's relationship with and knowledge of Yves Bouvier and Jean-Marc Peretti; Sotheby's policies and procedures; Sotheby's participation in transactions concerning Works acquired by Plaintiff; Sotheby's knowledge of Plaintiff and Dmitry Rybolovlev; and Defendants' relationship with other Sotheby's entities, including Sotheby's UK, Sotheby's Austria, and Sotheby's AG.

Defendants' Statement: In addition to the topics identified in Plaintiff's Statement, William Ruprecht will testify about Sotheby's business relationship with Yves Bouvier and Jean-Marc Peretti and his understanding of their art market activities; Sotheby's brokerage of transactions concerning Works (to the extent testimony on such Works is ruled admissible); Sotheby's procurement and brokering of artwork transactions (including private and auction sales); the corporate structure of Defendants and their affiliated entities and the relationship between Defendants, their subsidiaries, and the employees of those subsidiaries; emails Plaintiff introduces into evidence as to which he was a sender or recipient; and his lack of any knowledge about any representations or misrepresentations Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including his lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier

paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

4.    Bruno Vinciguerra

Plaintiff's Statement: Bruno Vinciguerra will testify about Sotheby's relationship with and knowledge of Yves Bouvier and Jean-Marc Peretti; Sotheby's policies and procedures; Sotheby's participation in transactions concerning Works acquired by Plaintiff; Sotheby's knowledge of Plaintiff and Dmitry Rybolovlev; and Defendants' relationship with other Sotheby's entities, including Sotheby's UK, Sotheby's Austria, and Sotheby's AG.

Defendants' Statement: In addition to the topics identified in Plaintiff's Statement, Bruno Vinciguerra will testify about Sotheby's business relationship with Yves Bouvier and Jean-Marc Peretti and his understanding of their art market activities; Sotheby's brokerage of transactions concerning Works (to the extent testimony on such Works is ruled admissible); Sotheby's procurement and brokering of artwork transactions (including private and auction sales); the corporate structure of Defendants and their affiliated entities and the relationship between Defendants, their subsidiaries, and the employees of those subsidiaries; emails Plaintiff introduces into evidence as to which he was a sender or recipient; and his lack of any knowledge about any representations or misrepresentations Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including his lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

5.    Alexander Bell

Plaintiff's Statement: Alexander Bell will testify about the viewing, sale, and valuation of Da Vinci's *Christ as Salvator Mundi* and related Sotheby's policies and practices.

Defendants' Statement: In addition to the topics identified in Plaintiff's Statement, Alexander Bell will testify about Sotheby's business relationship with Yves Bouvier and Jean-Marc Peretti and his understanding of their art market activities; Sotheby's procurement and brokering of artwork transactions (including private and auction sales); Sotheby's brokerage of Blancaflor Ltd.'s acquisition of Leonardo Da Vinci's *Salvator Mundi*; Sotheby's preparation of valuations and its methods of conducting valuations; Sotheby's preparation of the insurance valuation of Leonardo Da Vinci's *Salvator Mundi*; emails Plaintiff introduces into evidence as to which he was a sender or recipient; and his lack of any knowledge about any representations or misrepresentations

Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including his lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

6.      Dmitry Rybolovlev (interpreter required, at Plaintiff's expense)

Plaintiff's Statement: Dmitry Rybolovlev will testify about Plaintiff's relationship with Yves Bouvier; his meetings with Samuel Valette, including at the Klimt viewing, the Da Vinci viewing, and the Frieze art fair; Bouvier's negotiation of the purchase of artworks on Plaintiff's behalf; his receipt of materials created by Sotheby's; Plaintiff's reliance on Sotheby's reputation and materials; his discovery of Bouvier's fraud; Plaintiff's discovery of Sotheby's role and assistance to Bouvier in the fraud.

Defendants' Statement: In addition to the topics identified in Plaintiff's Statement, Dmitry Rybolovlev will testify about his experience and success in business; his decision to enter into a purported relationship of trust with Yves Bouvier; his affiliation with Plaintiff/Xitrans Finance Ltd. and reasons for using Plaintiff/Xitrans Finance Ltd. to acquire artworks; Plaintiff's/Xitrans Finance Ltd.'s decisions to acquire artworks; his and Plaintiff's/Xitrans Finance Ltd.'s failure to ask Bouvier for any documentation concerning the purchase of Works from the original owners, including the prices for which Works were purchased; his and/or Plaintiff's/Xitrans Finance Ltd.'s activities in the art market; Plaintiff's/Xitrans Finance Ltd.'s efforts to obtain financing using artworks as collateral (to the extent testimony on Sotheby's insurance valuations for artworks other than the *Salvator Mundi* is ruled admissible); Plaintiff's/Xitrans Finance Ltd.'s pursuit of legal claims against Yves Bouvier; and Plaintiff's contemplation of pursuing legal claims against Sotheby's.

7.      Mikhail Sazonov

Plaintiff's Statement: Mikhail Sazonov will testify about Plaintiff's relationship with Yves Bouvier; Bouvier's negotiation of the purchase of artworks on Plaintiff's behalf; Plaintiff's reliance on Sotheby's reputation and materials; Plaintiff's discovery of Bouvier's fraud; and Plaintiff's lack of knowledge of Sotheby's role and assistance to Bouvier in the fraud.

Defendants' Statement: In addition to the topics identified in Plaintiff's Statement, Mikhail Sazonov will testify about his experience in business and affiliation with Plaintiff/Xitrans Finance Ltd. and Dmitry Rybolovlev; Plaintiff's/Xitrans Finance Ltd.'s decisions to acquire artworks; the written contracts for the first four transactions between Plaintiff/Xitrans

Finance Ltd. and Bouvier's companies; his and Plaintiff's/Xitrans Finance Ltd.'s failure to ask Bouvier for any documentation showing the prices for which Works were purchased from the original owners or confirming that the money transferred by Plaintiff/Xitrans Finance Ltd. to Bouvier to purchase Works was paid to the original owners; Plaintiff's/Xitrans Finance Ltd.'s activities in the art market; Plaintiff's/Xitrans Finance Ltd.'s efforts to obtain financing using artworks as collateral (to the extent testimony on Sotheby's insurance valuations for artworks other than the *Salvator Mundi* is ruled admissible); Plaintiff's/Xitrans Finance Ltd.'s pursuit of legal claims against Yves Bouvier; and Plaintiff's contemplation of pursuing legal claims against Sotheby's.

8.   Yuri Bogdanov

Plaintiff's Statement: Yuri Bogdanov will testify about Plaintiff's relationship with Yves Bouvier; Bouvier's negotiation of the purchase of artworks on Plaintiff's behalf; Plaintiff's reliance on Sotheby's reputation and materials; Plaintiff's discovery of Bouvier's fraud; Plaintiff's discovery of Sotheby's role and assistance to Bouvier in the fraud.

Defendants' Statement: In addition to the topics identified in Plaintiff's Statement, Yuri Bogdanov will testify about his experience in business and affiliation with Plaintiff/Xitrans Finance Ltd. and Dmitry Rybolovlev; Plaintiff's/Xitrans Finance Ltd.'s decisions to acquire artworks; Plaintiff's/Xitrans Finance Ltd.'s activities in the art market; Plaintiff's/Xitrans Finance Ltd.'s efforts to obtain financing using artworks as collateral (to the extent testimony on Sotheby's insurance valuations for artworks other than the *Salvator Mundi* is ruled admissible); Plaintiff's/Xitrans Finance Ltd.'s pursuit of legal claims against Yves Bouvier; and Plaintiff's contemplation of pursuing legal claims against Sotheby's.

9.   Sanford Heller

Plaintiff's Statement: Sanford Heller will testify about meeting Dimitry Rybolovlev and revealing Bouvier's fraud to him; the high-end art market and practices and policies of auction houses generally; and the indicia of an agency relationship in the art market.

Defendants' Statement: In addition to the topics identified in Plaintiff's Statement, Sanford Heller will testify about his relationship with Plaintiff/Xitrans Finance Ltd., including his retention and consignment agreements with Plaintiff/Xitrans Finance Ltd.; Plaintiff's/Xitrans Finance Ltd.'s activities in the art market; Plaintiff's/Xitrans Finance Ltd.'s efforts to obtain financing using artworks as collateral (to the extent testimony on Sotheby's insurance valuations for artworks other than the *Salvator Mundi* is ruled admissible); Plaintiff's/Xitrans Finance Ltd.'s pursuit of legal

claims against Yves Bouvier; and Plaintiff's contemplation of pursuing legal claims against Sotheby's.

10.   Warren Adelson

Plaintiff's Statement: Warren Adelson will testify about the process of selling *Salvator Mundi*, including dealings with Sotheby's employees and a contract with Sotheby's; emails that are introduced into evidence as to which he was a sender or recipient; and interactions with Sotheby's employees after the sale of the artwork.

Defendants' Statement:  In addition to the topics identified in Plaintiff's Statement, Warren Adelson will testify about his and his co-owners' efforts to sell Leonardo Da Vinci's *Salvator Mundi* prior to and/or contemporaneously with Sotheby's brokerage of the painting's sale to Blancaflor Ltd., including efforts facilitated by Ashton Hawkins and Seth Harrison to sell the painting to Dmitry Rybolovlev or his related entities.

11.   Alexander Parish

Plaintiff's Statement: Alexander Parish will testify about the process of selling *Salvator Mundi*, including dealings with Sotheby's employees and a contract with Sotheby's; emails that are introduced into evidence as to which he was a sender or recipient; and interactions with Sotheby's employees after the sale of the artwork.

Defendants' Statement:  In addition to the topics identified in Plaintiff's Statement, Alexander Parish will testify about his and his co-owners' efforts to sell Leonardo Da Vinci's *Salvator Mundi* prior to and/or contemporaneously with Sotheby's brokerage of the painting's sale to Blancaflor Ltd., including efforts facilitated by Ashton Hawkins and Seth Harrison to sell the painting to Dmitry Rybolovlev or his related entities.

12.   Robert Simon

Plaintiff's Statement: Robert Simon will testify about the process of selling *Salvator Mundi*, including dealings with Sotheby's employees and a contract with Sotheby's; emails that are introduced into evidence as to which he was a sender or recipient; and interactions with Sotheby's employees after the sale of the artwork.

Defendants' Statement:  In addition to the topics identified in Plaintiff's Statement, Robert Simon will testify about his and his co-owners' efforts to sell Leonardo Da Vinci's *Salvator Mundi* prior to and/or contemporaneously with Sotheby's brokerage of the painting's sale to Blancaflor Ltd., including efforts facilitated by Ashton Hawkins and Seth Harrison to sell the painting to Dmitry Rybolovlev or his related entities.

**B.**     **Witnesses to be Called by Plaintiff**

1.     Ekaterina Rybolovleva

Ekaterina Rybolovleva will testify about Plaintiff's relationship with Yves Bouvier; her attendance at the Frieze art fair with Samuel Valette and Dmitry Rybolovlev; Plaintiff's reliance on Sotheby's reputation and materials, and Plaintiff's discovery of Bouvier's fraud.

2.     Robert Wittman

Robert Wittman will testify about the high-value art market and how transactions usually occur; the indicia of fraudulent conduct in the high-end art market; conduct that is uncommon or suspicious in the high-end art market; and conduct that is typical of those who engage in art fraud.

3.     Guy Stair Sainty

Guy Stair Sainty will testify about the high-end art market and practices and policies of auction houses generally; the indicia of an agency relationship in the art market; and market standards for valuations.

4.     Nicholas Acquavella

Nicholas Acquavella will testify about the Acquavella Galleries' dealing with Yves Bouvier in connection with Plaintiff's purchase of *Les Noces de Pierrette* and will authenticate documents produced by Acquavella Galleries in this matter and respond to Sotheby's objections to the same.

5.     Wildenstein & Co. Document Custodian

A document custodian from Wildenstein & Co. will testify in order to authenticate trial exhibits consisting of documents produced by Wildenstein & Co. in this matter and respond to Sotheby's objections to the same.

**C.**     **Witnesses to be Called by Defendants**

18.     Gregoire Billault

Gregoire Billault will testify about Sotheby's business relationship with Yves Bouvier and Jean-Marc Peretti and his understanding of their art market activities; Sotheby's procurement and brokering of artwork transactions (including private and auction sales); emails Plaintiff introduces into evidence as to which he was a sender or recipient; and his lack of any knowledge about any representations or misrepresentations

Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including his lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

19.   Daisy Edelson

Daisy Edelson will testify about Sotheby's preparation of auction catalogues; Sotheby's preparation of the auction catalogue for Amedeo Modigliani's *Tete*; and emails Plaintiff introduces into evidence as to which she was a sender or recipient.

20.   Franka Haiderer

Franka Haiderer will testify about Sotheby's preparation of valuations and its methods of conducting valuations; Sotheby's preparation of the insurance valuation of Leonardo Da Vinci's *Salvator Mundi*; the relationship between Defendants, their subsidiaries, and the employees of those subsidiaries; emails Plaintiff introduces into evidence as to which she was a sender or recipient; and her lack of any knowledge about any representations or misrepresentations Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including her lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

21.   Jane Levine

Jane Levine will testify about Sotheby's policies, practices, and efforts to comply with all applicable laws (to the extent testimony on Sotheby's compliance policies is ruled admissible); Sotheby's procurement and brokering of artwork transactions (including private and auction sales); Yves Bouvier's and Jean-Marc Peretti's representations to Sotheby's regarding the nature of their art market and business activities; Sotheby's interactions with Plaintiff's/Xitrans Finance Ltd.'s counsel Tetiana Bersheda in 2015 following Plaintiff's/Xitrans Finance Ltd.'s filing of claims against Yves Bouvier; non-privileged information regarding the provenance and authentication of Sotheby's Privileged Documents; the corporate structure of Defendants and their affiliated entities and the relationship between Defendants, their subsidiaries, and the employees of those subsidiaries; emails Plaintiff introduces into evidence as to which she was a sender or recipient; the declaratory judgment action complaint filed by Defendant Sotheby's, Inc. on November 21, 2016 (PX-266); and her lack of any knowledge about any representations or misrepresentations Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including her

lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

22. Helena Newman

Helena Newman will testify about Sotheby's business relationship with Yves Bouvier and Jean-Marc Peretti and her understanding of their art market activities; Sotheby's brokerage of transactions concerning Works (to the extent testimony on such Works is ruled admissible); Sotheby's procurement  and brokering of artwork transactions (including private and auction sales); Sotheby's preparation of valuations and its methods of conducting valuations; emails Plaintiff introduces into evidence as to which she was a sender or recipient; and her lack of any knowledge about any representations or misrepresentations Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including her lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

23. Simon Shaw

Simon Shaw will testify about Sotheby's preparation of auction catalogues; Sotheby's preparation of the auction catalogue for Amedeo Modigliani's *Tete*; and emails Plaintiff introduces into evidence as to which he was a sender or recipient.

24. Harry Smith

Harry Smith will testify about art market standards for the valuation of artworks and the accepted methods and practices for conducting such valuations; the reasonableness of Sotheby's insurance valuation of Leonardo Da Vinci's *Salvator Mundi*; the reasonableness of Sotheby's insurance valuations of other Works (to the extent testimony on Sotheby's insurance valuations for Works other than the *Salvator Mundi* is ruled admissible); the reasonableness of Samuel Valette's informal estimate regarding the value of Amedeo Modigliani's *Tete*; the reasonableness of Samuel Valette's emails regarding the Magritte market; the price achieved by the November 2014 auction of Modigliani's *Tete* and its relationship to the value of that artwork on the date Plaintiff acquired it; the price achieved by the November 2017 auction of Leonardo Da Vinci's *Salvator Mundi* and its relationship to the value of that artwork on the date Plaintiff acquired it; the market standards governing high-value art transactions; the roles and practices of art market participants with respect to high-value art transactions; his opinions in rebuttal to the opinions of Plaintiff's experts

Guy Stair Sainty and Robert Wittman elicited at trial or as set forth in their expert reports; and the authenticity of Christie's catalogues from the auctions of Rene Magritte's *Domaine d'Arnheim* and Leonardo Da Vinci's *Salvator Mundi*.

25.   Dario Tabladini

Dario Tabladini will testify about Sotheby's business relationship with Yves Bouvier and Jean-Marc Peretti and his understanding of their art market activities; Sotheby's brokerage of transactions concerning Works (to the extent testimony on such Works is ruled admissible); Sotheby's procurement and brokering of artwork transactions (including private and auction sales); emails Plaintiff introduces into evidence as to which he was a sender or recipient; and his lack of any knowledge about any representations or misrepresentations Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including his lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

26.   Holli Taylor

Holli Taylor will testify about Sotheby's business relationship with Yves Bouvier and Jean-Marc Peretti and her understanding of their art market activities; Sotheby's brokerage of transactions concerning Works (to the extent testimony on such Works is ruled admissible); Sotheby's procurement and brokering of artwork transactions (including private and auction sales); emails Plaintiff introduces into evidence as to which she was a sender or recipient; and her lack of any knowledge about any representations or misrepresentations Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including her lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

27.   Tetiana Bersheda (by deposition)

Tetiana Bersheda will testify about her role as Plaintiff's/Xitrans Finance Ltd.'s attorney in connection with pursuing claims against Yves Bouvier; her receipt and use of Sotheby's insurance valuation of Leonardo Da Vinci's *Salvator Mundi*; and her receipt and use of Sotheby's Privileged Documents.

28.     Melanie Clore (by deposition)

Melanie Clore will testify about Sotheby's business relationship with Yves Bouvier and Jean-Marc Peretti and her understanding of their art market activities; Sotheby's brokerage of transactions concerning Works (to the extent testimony on such Works is ruled admissible); Sotheby's procurement and brokering of artwork transactions (including private and auction sales); Sotheby's preparation of valuations and its methods of conducting valuations; emails Plaintiff introduces into evidence as to which she was a sender or recipient; and her lack of any knowledge about any representations or misrepresentations Yves Bouvier made to Dmitry Rybolovlev or his affiliates, including her lack of any knowledge that Yves Bouvier was lying to Dmitry Rybolovlev or his affiliates about the prices Yves Bouvier paid to acquire the Works, about Yves Bouvier's negotiations with the original owners of the Works, or about any other topic.

29.     Jean-Marc Peretti (by deposition)

Jean-Marc Peretti will testify about the nature of his activities in the art market; his business relationship with Yves Bouvier; his and Yves Bouvier's business relationships with Sotheby's; and his involvement in transactions between Sotheby's and Blancaflor Ltd. concerning Works (to the extent testimony on such Works is ruled admissible).

30.     Michael Macaulay (impeachment witness only)

Michael Macaulay will testify about his interactions with Ekaterina Rybolovleva to the extent necessary to rebut Ms. Rybolovleva's testimony regarding such interactions and impeach Ms. Rybolovleva's credibility.

## XI.    DEPOSITION DESIGNATIONS

Consistent with the Court's November 27 order, the parties will revise their deposition designations and counter-designations in light of the Court's rulings and commentary. Dkt. 580 at 2. Unless and until the Court orders otherwise, no later than 96 hours before any deposition testimony will be played or presented at trial, the parties will submit any objections to the designations and counter-designations for the Court's resolution according to the Court's preferred format. *Id.* at 2-3.

## XII.    EXHIBITS AND OBJECTIONS

Consistent with Rule 6.A.xii of the Court's Individual Rules and Practices in Civil Cases, the parties have: (i) indicated with a single asterisk those exhibits to which no party objects on any ground; and (ii) identified their objections to each other's exhibits by indicating the number of the applicable Federal Rule of Evidence that is the basis of the objection.[5]

### A.    Plaintiff's Trial Exhibits

See Appendix A.

### B.    Defendants' Trial Exhibits

See Appendix B.

---

[5] The parties assert the objections raised herein in a good faith attempt to comply with Rule 6(A)(xii) of the Individual Rules and Practices in Civil Cases of Judge Furman.  However, depending on the course of trial, the evidence adduced at trial, and the Court's rulings as to the admissibility of various categories of evidence, the parties reserve the right to object to the introduction of documents listed herein despite having not indicated an objection herein.  Moreover, the parties' objections herein are made without knowledge as to the purpose for which any particular document may be introduced, and the parties may object to the introduction of documents based on the purpose for which they are used even if an objection is not indicated herein.  The parties further reserve the right to object at trial to the admission of any evidence for which the other party fails to establish sufficient foundation to support the admissibility of such evidence.

## XIII.   STATEMENT OF DAMAGES

### A.   Plaintiff:

Plaintiff seeks total compensatory damages (before statutory pre-judgment interest) of $232,578,781.81 and exemplary damages in an amount to be determined by the jury.

Plaintiff's damages are calculated by the traditional out-of-pocket measure of damages. *See Reno v. Bull*, 226 N.Y. 546, 553 (1919); *see also* N.Y. Pattern Jury Instr. Civil § 3:20. Damages are the difference between the prices paid by Plaintiff and the prices paid by Bouvier, that is, "the difference between the value of the thing bought . . . and its purchase price." *Hanlon v. Macfadden Publications*, 302 N.Y. 502, 511 (1951) (quoting Restatement (First) of Torts § 549(a)). The prices Bouvier secretly paid represent the fair market value of each work at the time of purchase.  *See Crown Cork & Seal Co. Master Ret. Tr. v. Credit Suisse First Bos. Corp.*, No. 12-CV-05803-JLG, 2013 WL 978980, at *11 (S.D.N.Y. Mar. 12, 2013) (citing *Acticon AG v. China North East Petroleum Holdings Ltd.,* 692 F.3d 34, 38 (2d Cir.2012)). "[The] fraud is complete at time of sale and subsequent events do not increase or diminish liability." *Merrill Lynch*, 500 F.3d at 182–83 (citing *Hotaling v. A.B. Leach & Co.,* 247 N.Y. 84, 87–88 (1928)).

For the fraud claims for Accent's four purchases, the compensatory damages will be: (1) the amount of the markup secretly added by Bouvier to the price, plus (2) the amount of the commission paid by Plaintiff to Bouvier on the markup only, plus (3) annual interest of 9% under CPLR 5001 and 5004 multiplied by the number of years since each transaction occurred.[6]

This damage calculation is illustrated here:

| 1. | **MAGRITTE (December 2011)** | |
|----|------------------------------|-----------------|
| | Amount of Bouvier Secret Markup | $19,400,000 |

---

[6] The figures for pre-judgment interest are approximate and will be calculated to the date of judgment by the Clerk of the Court.

|  | | |
|---|---|---|
|  | 2% of Bouvier Secret Markup | $388,000 |
|  |  |  |
|  | Markup plus 2% of Markup | $19,788,000 |
|  | Interest at 9% for 12 years | $21,371,040 |
|  |  |  |
|  | **TOTAL** | **$41,159,040** |
|  |  |  |
| **2.** | **KLIMT (September 2012)** |  |
|  |  |  |
|  | Amount of Bouvier Secret Markup | $57,800,000 |
|  | 2% of Bouvier Secret Markup | $1,156,000 |
|  |  |  |
|  | Markup plus 2% of Markup | $58,956,000 |
|  | Interest at 9% for 11 years | $58,366,440 |
|  |  |  |
|  | **TOTAL** | **$117,322,440** |
|  |  |  |
| **3.** | **DA VINCI (March 2013)** |  |
|  |  |  |
|  | Amount of Bouvier Secret Markup | $44,500,000 |
|  | 1% of Bouvier Secret Markup | $445,000 |
|  |  |  |
|  | Markup plus 1% of Markup | $44,945,000 |
|  | Interest at 9% for 10 years | $40,450,000 |
|  |  |  |
|  | **TOTAL** | **$85,395,000** |
|  |  |  |
| **4.** | **MODIGLIANI (TÊTE) SALE (September 2012)\*** |  |
|  |  |  |
|  | Amount of Bouvier Secret Markup | $41,991,351.00 |
|  | 0.8% of Bouvier Secret Markup | $335,930.81 |
|  |  |  |
|  | Markup plus 0.8% of Markup | $42,327,281.81 |
|  | Interest at 9% for 11 years | $41,904,008.99 |
|  |  |  |
|  | **TOTAL** | **$84,231,290.80** |
|  |  |  |
|  | \* Although the *Tête* sale and commission were in Euros, for purposes of a judgment, they should be converted into U.S. dollars at the rate of exchange prevailing on the date the underlying tort was committed. *Hoppe vv. Russo-Asiatic Bank,* 235 N.Y. 37, 39 (1923); *Vishipco Line v. Chase Manhattan Bank,* 660 F.2. 854, 867 n. 7 (2d Cir. 1981). | |

Thus, on the four purchases, compensatory damages before interest amount to $166,016,281.81.

For the Modigliani Tête auction, "[T]he auction of the Modigliani proximately caused Plaintiffs' injuries; Plaintiffs were damaged because Bouvier kept the proceeds of the auction instead of using the Modigliani to offset the cost of a Rothko painting, so the auction was the necessary step in enabling Bouvier to reap those profits." March 1, 2023 Decision at 56. Compensatory damages will be the difference between (1) the value of what Accent purchased through Bouvier, i.e., Rothko's *No. 6* for $80 million; and (2) the value of what Accent provided Bouvier in return, i.e., the Tête (valued at €60 million) and cash payments of €25 million, together totaling the equivalent to $104,550,000. Compensatory damages on the Tête auction will be $24,550,000 plus $24,304,500 in statutory interest, making a total of $48,854,500.

The damage calculation is illustrated here:

| 5. | TETE AUCTION (November 2014) | |
|---|---|---|
| | Value of Rothko's *No. 6* | $80,000,000 |
| | Value of consideration paid to Bouvier for Rothko's *No. 6* | $104,550,000 |
| | Compensatory damages | $24,550,000 |
| | Interest at 9% for 11 years | $24,304,500 |
| | **TOTAL** | $48,854,500 |

Before interest, Plaintiff's compensatory damages for aiding and abetting on all five transactions comes to $190,566,282. With total statutory pre-judgment interest of $186,395,989, the grand total of damages plus interest on all five transactions is $376,962,271.

With respect to the breach of fiduciary duty claim for Da Vinci's *Salvator Mundi*, Accent's damages are: (1) the amount of the markup secretly added by Bouvier to the price, <u>plus</u> (2) the <u>entire</u> amount of the commission paid by Accent to Bouvier, <u>plus</u> (3) the commission

received by Sotheby's, plus (4) annual interest of 9% under CPLR 5001 and 5004 multiplied by the number of years since Accent purchased the Da Vinci. If a jury awards damages for both aiding and abetting fraud and aiding and abetting a breach of fiduciary duty with respect to Da Vinci's *Salvator Mundi*, Accent will seek only the higher of either award.

| 6. | DA VINCI (March 2013) | |
|---|---|---|
| | Amount of Bouvier Secret Markup | $44,500,000 |
| | Bouvier's Commission | $1,275,000 |
| | Sotheby's Compensation | $3,000,000 |
| | | |
| | Markup plus Bouvier's Commission plus Sotheby's Compensation | $48,775,000 |
| | Interest at 9% for 10 years | $43,897,500 |
| | **TOTAL** | **$92,672,500** |

Before interest, Plaintiff's compensatory damages for aiding and abetting breach of fiduciary duty comes to $48,775,000. With statutory pre-judgment interest, the total is approximately $92,672,500.

Depending on how they view the evidence of these intentional torts, the jury may also award exemplary damages. *See Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 509 (2d Cir. 1991) (punitive damages available under New York law in cases involving "gross, wanton, or willful fraud or other morally culpable conduct"); *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03 CIV. 3748 (DAB), 2006 WL 278138, at *15 (S.D.N.Y. Feb. 2, 2006) (punitive damages have "been awarded and upheld in cases involving intentional torts").

## B.     Defendants

Defendants assert that Plaintiff will not be able to prove damages at trial, including compensatory or punitive damages. Defendants agree that the proper measure under New York law of any compensatory damages awarded to Plaintiff on its aiding and abetting fraud claims is

out of pocket damages, but Defendants dispute Plaintiff's position as to how such compensatory damages are determined.  Defendants' position as to how compensatory damages, if any, are to be determined is set forth in Defendants' motion *in limine* on this issue and in Defendants' Proposed Jury Instructions.  Defendants also do not agree that any compensatory damages awarded for Plaintiff's purchase of Modigliani's *Tête* should be calculated by converting Euros into dollars at the rate of exchange prevailing on the date the underlying tort was committed, and contend instead that any award of compensatory damages for that transaction should be awarded in Euros (the currency with which Accent Delight purchased the artwork and paid Bouvier's alleged commission).  As Defendants will argue in a forthcoming motion to preclude, Defendants object to Plaintiff's attempt to withdraw its damages claim for the proceeds of the *Tete* auction and to substitute an entirely new damages claim seeking the difference between the value of Rothko's *No. 6* and the amount that Plaintiff paid for the Rothko, as Plaintiff's new theory of damages was not disclosed to Defendants until December 12, 2023, on the eve of trial. In addition, although Plaintiff does not specify the date of conversion used as a basis for its claim that the alleged consideration it paid to acquire Rothko's *No. 6* is "the equivalent to $104,550,000," Defendants likewise contend that, if the jury determines that Plaintiff paid consideration for that transaction in Euros (or consideration having a value denominated in Euros), any award of compensatory damages for that transaction should also be awarded in Euros (the currency with which Plaintiff alleges to have paid).  Defendants' position as to the standard for determining whether and in what amount to award punitive damages is set forth in Defendants' Proposed Jury Instructions.

## XIV.  LESS THAN UNANIMOUS VERDICT

    **A.**    **Plaintiff:** Plaintiff consents to a less than unanimous verdict.

    **B.**    **Defendants:** Defendants do not consent to a less than unanimous verdict.

Dated: December 15, 2023
       New York, New York

Respectfully submitted,

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By:    */s/ Daniel J. Kornstein*
Daniel J. Kornstein
O. Andrew F. Wilson
Zoe Salzman
Vasudha Talla
Sarah Mac Dougall
600 Fifth Avenue, 10th Floor
New York, NY 10020
Tel. No.: (212) 763-5000
Fax No.: (212) 763-5001

*Attorneys for Plaintiff*

ARNOLD & PORTER KAYE SCHOLER
LLP

By:    */s/ Marcus A. Asner*

Marcus A. Asner
Sara L. Shudofsky
Benjamin C. Wolverton
Yiqing Shi
Sahrula Kubie
250 W. 55th Street
New York, NY 10019-9710
Tel: 212.836.8000
Fax: 212.836.8689
marcus.asner@arnoldporter.com
sara.shudofsky@arnoldporter.com
benjamin.wolverton@arnoldporter.com
yiqing.shi@arnoldporter.com
sahrula.kubie@arnoldporter.com

Neal Kumar Katyal *(Pro hac vice)*
Will Havemann *(Pro hac vice forthcoming)*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel: 202.637.5600
Fax: 202.637.5910
neal.katyal@hoganlovells.com
will.havemann@hoganlovells.com

*Attorneys for Defendants*