O1B3ACC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ACCENT DELIGHT INTERNATIONAL
LTD.,

                    Plaintiff,

          v.                          18 Civ. 9011 (JMF)

SOTHEBY'S and SOTHEBY'S, INC.,

                    Defendants.          Trial

------------------------------x

                                      New York, N.Y.
                                      January 11, 2024
                                      8:45 a.m.

Before:

                    HON. JESSE M. FURMAN,

                              District Judge
                              -and a jury-


                         APPEARANCES

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
     Attorneys for Plaintiff
BY:  DANIEL J. KORNSTEIN
     O. ANDREW F. WILSON
     ZOE A. SALZMAN

ARNOLD & PORTER KAYE SCHOLER LLP
     Attorneys for Defendants
BY:  MARCUS A. ASNER
     SARA L. SHUDOFSKY
     BENJAMIN C. WOLVERTON
     YIQING SHI


Also Present:  Yana Agoureev, Interpreter (Russian)
               Elana Pick, Interpreter (Russian)


                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

(Trial resumed; jury not present)

THE COURT:  You may be seated.  Good morning.  Welcome back.  As you undoubtedly know, we've been having some issues with the realtime feed.  I gather we're working on it.  There is some sort of technical problem.

In the meantime, there is a workaround.  It seems to be working for me at the moment.  I'm also told part of the problem is the wi-fi is being overly taxed.  I was fairly liberal in granting electronic devices upon request in this case.  Perhaps I'll rethink that going forward.  I would ask if you don't need to be on wi-fi in the courtroom, really you shouldn't be on electronic devices.  Please shut your wi-fi off so we can minimize the load and therefore ensure the realtime works.

Any issues from plaintiff?

MR. WILSON:  Your Honor, just an update and question about the logistics for the 30(b)(6) testimony.  The parties met and conferred overnight and we're in agreement on the process, but I wanted to lay it out for the Court.

First of all, the deposition exhibits have been double stamped so there is now the trial stamp which is in yellow that says Plaintiff's Exhibit X, and then there is a white stamp that says Deposition Exhibit.  I can proffer one up to the Court if you want to see it in advance.

THE COURT:  Nope, that's fine if everybody is okay

O1B3ACC1

with that. I'll just explain that to the jury or perhaps you can tell me when you are playing it so the jury hears.

MR. WILSON: You anticipated my only other question is there were two issues that I think would be good for the jury to understand. The first is what a 30(b)(6) witness is. And I have a short description, but the Court is probably better positioned to explain to the jury what the 30(b)(6) is.

THE COURT: I was prepared to do that, but to the extent you have a suggestion, I'm always ears.

MR. WILSON: No, I'm sure we are on exactly the same page. Just that this witness was designated to speak on behalf of Sotheby's and Sotheby's, Inc. as a corporate witness, and her testimony binds Sotheby's and should be considered as Sotheby's testimony.

THE COURT: Effectively what I was going to say. Any objection from defense counsel?

MS. SHUDOFSKY: No, your Honor.

THE COURT: Great.

MR. WILSON: All right. That was all for the 30(b)(6). We anticipate playing that at some point today, and I will stand up and tell the Court that our next witness will be a video testimony from a witness designated pursuant to 30(b)(6) and allow the Court to explain it. And then before we play the videos, I will indicate that we will move three exhibits into evidence through the clips, and then I will

O1B3ACC1

publish them to counsel and the Court so that you can hear there's no objections for the three, and once we have moved each of them into evidence, then we'll play the clips.

THE COURT:  Great.

MR. WILSON:  Thank you.

THE COURT:  Anything from defense counsel?

MR. ASNER:  Two small issues.  We understand the Wildenstein documents are coming in through a custodian and the Court will be issuing an instruction that they're not going to be offered for the truth of the matter asserted.  Number one. A reminder on that one.  Secondly, your Honor, I think --

THE COURT:  Not just that.  But I'm also planning to give the limiting instruction that they are to be considered only with respect to the agency issue.

MR. ASNER:  Yes.  That too.  And your Honor, I think it may be lost on the jury sometimes to say just not offered for the truth of the matter asserted, but even say just that, for example, you cannot take this for that this was a statement -- depending on the statement -- this was actually a statement by Mr. Bouvier or that Mr. Bouvier in fact said this or that what Mr. Bouvier said was true.  Depending on the context, your Honor.

THE COURT:  I'll take that under advisement.

MR. WILSON:  Just the documents that the jury is going to see this morning, the four documents are correspondence that

O1B3ACC1

Mr. Bouvier signed, and I think it would be quite confusing to give an instruction which suggests that they aren't what they purport to be.  The instruction that this may not be what Bouvier said will inject a lot of confusion.

THE COURT:  I think I can handle this, thanks.

MR. ASNER:  We had one issue.

MS. SHUDOFSKY:  I want to raise an issue about marking of demonstratives.  We intend to use a demonstrative exhibit with Mr. Wittman which lays out his opinions as an aid to discuss those opinions with the jury.  We intended to mark the document for identification and intend to show it to the jury and not introduce it into evidence unless your Honor wants us to proceed otherwise.

THE COURT:  That sounds good to me, and I'll explain to the jury that means it's not in evidence.

MS. SHUDOFSKY:  Thank you, your Honor.

MR. ASNER:  One housekeeping matter.  Because this is obviously impacts the defense and our ability to prepare. Plaintiff has represented that the witness later today will be Dmitry Rybolovlev.  So, we are prepared but I wanted -- I wanted to put that on the record, because things have been a little slipperier than I'm used to and I want it clear.

MR. WILSON:  Your Honor, first of all, I don't think characterizing our conduct as slippery is fair.

THE COURT:  Tell me who the next witnesses are likely

O1B3ACC1

to be today since as of yesterday it was Wildenstein, Wittman, 30(b)(6), but there was no mention of Mr. Rybolovlev.

MR. WILSON:  After court concluded, we tried to meet and confer with Sotheby's about their estimated length of their cross-examinations and they declined to give us any precise estimate beyond one hour to 10 minutes.  And so examining what the run of witnesses might be, it became difficult for us to conclude that we would be able to fill the time that we had. So we indicated to Sotheby's that although we previously were not, did not --

THE COURT:  Just cut to the chase.  When do you think he will be testifying today?

MR. WILSON:  It's hard for to us say, because we don't know how long Sotheby's crosses will be.  Our next witnesses after Wildenstein will be Wildenstein, Wittman, then the 30(b)(6) testimony, and then if we still have time, Bouvier testimony, and if we still have time after that, it would be Mr. Rybolovlev.

THE COURT:  Let's get Mr. Sazonov back on the stand and we'll get the jury out and get started.

(Continued on next page)

(Jury present)

THE COURT:  You may be seated.  Good morning.  Welcome back, ladies and gentlemen, and glad to see everybody managed to get into the building hopefully without incident.

We will continue with the redirect testimony of Mr. Sazonov, and I anticipate finishing his testimony this morning.  I'm sure he's relieved to hear that.

And with that, Mr. Sazonov, with a reminder you remain under oath, Ms. Salzman, you may proceed.

MS. SALZMAN:  Thank you, your Honor.

MIKHAIL SAZONOV,

REDIRECT EXAMINATION

BY MS. SALZMAN:

Q.  Good morning, Mr. Sazonov.

A.  Good morning.

Q.  Can you hear me okay today?

A.  Yes.

Q.  As the judge said, I have just a few more questions for you today, so hopefully we can get you out of here soon.

I'd like to take you back to PX 70, which is an exhibit about the Magritte painting you were asked about on cross-examination.

Toby, could you put that up on the screen for us, please.  Okay.

Do you see that, Mr. Sazonov, on your screen?

O1b3acc1                        Sazonov – Redirect

A.   Yes.

Q.   So, taking a look here at the top portion of this document, you received an e-mail from Mr. Bouvier on November 12, 2011, right?

A.   That's right.

Q.   And the subject of Mr. Bouvier's e-mail to you was "Magritte," right?

A.   That's right.

Q.   And specifically, in his e-mail to you, do you see where Mr. Bouvier wrote to you, "Attached is the file of the painting, the comments (very important)."

Do you see that reference to the comments?

A.   That's right.

Q.   And then just a little lower down, a few lines lower in his cover email, Mr. Bouvier said to you again, "As the comments says, it is an icon of the artist's."

Do you see that reference to the comments?

A.   Yes.

Q.   Attached to Mr. Bouvier's e-mail was a file called Magritte.

We lost our zoom in there, Toby.

And attached to this e-mail of Mr. Bouvier's was an attachment with the file name Magritte_domaine_ofarnheim_comments, right?

A.   Right.

O1b3acc1                          Sazonov - Redirect

Q.  When you got this e-mail from Mr. Bouvier that drew your attention in two places to this comments file, what was your understanding?

A.  My understanding was that this was very important information that I should -- that I should read.

Q.  Sorry.  I lost you there.  The door was opening.

Can you say that one more time, please?

A.  I understood that it was very important information that I should read, that related to the Magritte painting.

Q.  And I think you told us on direct examination you did in fact read those comments, correct?

A.  That's right.

Q.  Let's go and see what you saw back on November 12, 2011. Toby, could you take us to page 3, please, the comments file.

Can we go forward.

Little tech issue, bear with us, please.

Do you recognize this, Mr. Sazonov, as the comments file that Mr. Bouvier drew your attention to?

A.  That's right.

Q.  And these comments, Mr. Sazonov, are specifically about the *Domaine d'Arnheim* painting, correct?

A.  Correct.

Q.  So for example, the first line of these comments reads *"Domaine d'Arnheim* is one of Magritte's most famous compositions."

O1b3acc1                    Sazonov - Redirect

        Do you see that?

A.   That's right.

Q.   And did you read that back in November 2011?

A.   Yes, I did.

Q.   And the comments go on to describe the *Domaine d'Arnheim* in a lot of detail, correct?

A.   That's right.

Q.   And in the last of the four paragraphs in this comments file, the author wrote "This painting has acquired iconic status."

        Do you see that line?

A.   Yes.

Q.   And the last line of this comments field was "Le *Domaine d'Arnheim*, like the *Empire des Lumières*, is the perfect illustration of this."

        You see that?

A.   That's right.

Q.   So when you read this -- withdrawn.

        Just to remind us, *Empire des Lumières* is the French name of a painting called *Empire of Lights*, correct?

A.   That's right.

Q.   When you read this comments file that Mr. Bouvier sent you and drew your attention to, you saw the comment draw a comparison between *Domaine d'Arnheim* and *Empire of Light*, correct?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

A.   Absolutely.

Q.   And what did you understand that to mean, what impression did that make on you, if any?

A.   Well, I thought that, first of all, the *Domaine d'Arnheim* was described as a very important iconic, famous composition. And that it was compared to *Empire des Lumières*, *Empire of Lights*, which was also a very well known iconic composition, as was the clear analogy drawn between the two.

Q.   When you say there was a clear analogy drawn between the two, is it your testimony that you understood that clear analogy to be presented here in this comments file that we're looking at right now?

A.   Yes.   It just says in the last sentence, "The *Domaine d'Arnheim*, like the *Empire des Lumières*, is a perfect illustration of this."   Just very clear.

Q.   And you had read these comments on November 12, 2012, correct, Mr. Sazonov?

A.   That's right.

Q.   Let's go now to DX 251, please, Toby, another exhibit you were shown by Ms. Shudofsky on cross-examination.   And Toby, could you please take us to the English translation, I think it's page 4 of the exhibit if I have that right in my notes. Perfect.   Thank you.

         And you see at the bottom of this e-mail thread between you and Mr. Bouvier, I am going to draw your

attention -- and maybe Toby can call out for us the bottom e-mail on the page, please.

So this is an e-mail that you got from Mr. Bouvier three days later on November 15, 2011, right?

A.   That's right.

Q.   So three days after getting the comments file that we were just looking at in PX 70, you got this e-mail, right?

A.   That's right.

Q.   And again the subject line is "Magritte," correct?

A.   Yes.

Q.   And Mr. Bouvier writes to you in his cover e-mail, "Here we see at the bottom a famous subject like a good *Empire of Light* would sell for 40 million euros at a private sale."

Do you see that?

A.   That's right.

Q.   Did you read that at the time?

A.   Yes, I did.

Q.   This is the e-mail where Mr. Bouvier forwarded you an e-mail written by Samuel Valette from Sotheby's, correct?

A.   Correct.

Q.   Let's take a look at that.  That's on page 5 of the exhibit, please, Toby.

And Mr. Valette's e-mail forwarded on to you by Mr. Bouvier was dated November 14, 2011, correct?

A.   That's right.

Q.   And in this e-mail, Mr. Valette wrote in the bottom paragraph, "In light of these recent developments, and the unsatisfied demand, it is clear that in a private sale, a large iconic painting such as *The Empire of Lights* below would be negotiated for around 40 million euros."

Do you see that?

A.   Yes.

Q.   And did you read that when you received that e-mail from Mr. Bouvier on November 15, 2011?

A.   That's right.

Q.   What did you understand Mr. Valette to be saying here?

A.   Mr. Valette was saying here that a large iconic painting, such as The Empire of Light, basically, paintings that would be like analogous to the *Empire of Light*, would be worth around 40 million euros.

Q.   Toby, can you show us these two documents side by side, please, this one from DX 251 that we're looking at and PX 70 the comments file we were just looking at a moment ago please.

On PX 70, go to page 3, please, for the comments.  And if you could just highlight for us the last line of the comments, "Le *Domaine d'Arnheim* like the *Empire des Lumières* is the perfect illustration of this."  Just that last sentence if you can, please.

And then on DX 251, if we can go back to that page 5 we were just looking at, and if you could highlight for us that

sentence we were just looking at with Mr. Sazonov, "A large iconic painting such as *The Empire of Lights* below would be negotiated for around 40 million euros."

Mr. Sazonov, by the time you made the decision to pay $43.5 million to purchase Magritte's *Domaine d'Arnheim* painting, you had received both these documents, PX 70 and DX 251, correct?

A.   That's correct.

Q.   And what, if any, impact did these two documents, PX 70 and DX 251, have on your decision to pay $43.5 million to buy the Magritte *Domaine d'Arnheim* painting?

A.   Well, from this e-mails, I understood that the painting in question, *Domaine d'Arnheim*, was as good or even better than *L'Empire des Lumières* on the one hand, and on the other hand, that a painting such as that, as *Empire des Lumières*, would be negotiated around 40 million euros, so the price point was very clear.

So I concluded that the price around 40 million euros was right or about right for the painting in question.

Q.   And back in November 2011, do you remember whether the euro or the dollar was worth more?

A.   The euro was worth more.

Q.   Okay.  Let's move now to the Modigliani *Head* sculpture, and specifically I want to take you back to PX 76, another document that Ms. Shudofsky asked you about on cross-examination.  And

O1b3acc1                       Sazonov - Redirect

if we can, please, go to page 3 to start, Toby, please.

Now we're looking later in time, we're in July of 2012, right?

A.   That's right.

Q.   And in this e-mail from Mr. Bouvier to you with the subject line "Modigliani *Head*," Ms. Shudofsky drew your attention to a line at the bottom where Mr. Bouvier wrote to you, "I will do this same analysis with Christie's to see if their expert is as strong."

Do you see that?

A.   That's right.

Q.   And that's right below the line where he told you, "All the same, I wanted to reassure you that the estimates by Mr. Samuel Valette, senior director, senior international specialist Impressionist and Modern art are similar.  80 to 100 in euros, i.e. between 100 and 125 in U.S. dollars."

Do you see that?

A.   Right.

Q.   And Ms. Shudofsky asked you on cross-examination whether you ever asked Mr. Bouvier to get you the Christie's analysis. Do you recall that testimony?

A.   That's right.

Q.   And you said no, right?

A.   Right.

Q.   And did Mr. Bouvier ever offer to -- well, withdrawn.

Did Mr. Bouvier ever follow up on this suggestion that he would get you a Christie's analysis on the Modigliani *Head* sculpture?

A.   No, he didn't.

Q.   Did Mr. Bouvier ever give you a Christie's analysis for the Modigliani *Head* sculpture?

A.   No, he didn't.

Q.   Did Mr. Bouvier ever give you a Christie's analysis for any of the works you bought through him?

A.   No, he didn't.

Q.   Let's look at the analysis Mr. Bouvier did give you for the Modigliani *Head* work.  It begins on the bottom of this same page, from SamuelValette@Sotheby's.com dated July 25, 2012.

Do you see that, Mr. Sazonov?

A.   Yes.

Q.   And let's click to the next page so we can read the analysis Mr. Valette provided.  Can we call that out, please Toby, the whole page.  We are in small font here.  Thank you.

Now, you received this e-mail from Mr. Valette on July 25, 2012, correct?

A.   Right.

Q.   And you told us already you read it, right?

A.   Yes.

Q.   And in particular, you read Mr. Valette's opinion that "Taking into account the scarcity of works" I am reading from

O1b3acc1                         Sazonov - Redirect

the bottom of the last paragraph, Toby.

"Taking into account the scarcity of works of this caliber available on the market, see the price of 43 million euros obtained in 2010 for a lesser piece, the impossibility of finding a superior work by Modigliani, and the very high current demand for the greatest masterpieces of modern sculpture, it is a piece whose value should be between 80 and 100 million euros."

You see that, Mr. Sazonov?

A.   Yes.

Q.   Did you ever come to learn that Mr. Valette sold the *Tête* sculpture to Mr. Bouvier for 31.5 million euros just two months after he wrote this e-mail?

A.   Yes, I did.

MS. SHUDOFSKY:  Objection.

THE COURT:  How did you come to learn that?

THE WITNESS:  In discovery.  But much later.

THE COURT:  Sustained.  The jury will disregard that answer.

Q.   Let's go back to what you did know back in September 2012 when you got this e-mail.

You testified on cross-examination that after receiving this e-mail, Accent agreed to pay 37.5 million euros in cash, plus a Degas painting to buy the Modigliani *Head* sculpture, correct?

A.   Right.

Q.   So before you made the decision to buy this sculpture for 37.5 million euros cash, plus the Degas, you had seen this e-mail from Mr. Valette at Sotheby's, correct?

A.   That's right.

Q.   And when you saw Mr. Valette opine that this sculpture was worth between 80 and 100 million euros, how did that make you feel about the price Mr. Bouvier told you you had to pay to buy this artwork?

A.   Well, I felt good, because I had a feeling that I was making a good deal.

Q.   Why did you think you were making a good deal?

A.   Because we paid 37.5 million, plus the painting which was worth 25 at most, i.e., at most 62.5 million, while here, the price was said to be around 80 to 100 million euros.  So, that was a good deal.

        MS. SALZMAN:  No further questions.  Thank you, Mr. Sazonov.

        THE COURT:  Any recross?

        MS. SHUDOFSKY:  Yes, your Honor.

RECROSS EXAMINATION

BY MS. SHUDOFSKY:

Q.   If we can show Mr. Sazonov Plaintiff's Exhibit 70. Ms. Salzman was just asking you questions about this exhibit, right, the e-mail you got from Mr. Bouvier on November 12?

O1b3acc1                        Sazonov - Recross

A.   Right.

Q.   If I can go to the comments or the attachment.  Now,
Ms. Salzman focused you on the last line of this page, right,
the line that says "*L'Domaine d'Arnheim*, like *The Empire of
Lights*, is the perfect illustration of this."

         You see that line?

A.   Right.

Q.   And that's the line that your lawyer was focused on a
moment ago with you, right?

A.   Right.

         MS. SALZMAN:  Objection.

         THE COURT:  Sustained.  To be clear, it is not his
lawyer.  They represent Accent Delight.

         MS. SHUDOFSKY:  Understood.

Q.   Ms. Salzman was asking you about this last line of
Plaintiff's Exhibit 70, right?

A.   Right.

Q.   Now let me focus your attention on the line that comes
before it, where the author of this piece is writing about the
artist René Magritte, right?

A.   That's right.

Q.   What that line reads is "No other artist has managed to
combine aesthetic identity and intellectual depth with such
virtuosity," right?

A.   That's right.

O1b3acc1                         Sazonov - Recross

Q.   And then on the next line the author writes that "The *Domaine d'Arnheim*, like *The Empire of Lights*, is the perfect illustration of this."  Right?

A.   Right.

Q.   And by "of this," what's meant is a reference to the aesthetic identity and the intellectual depth of this artist, right?

          MS. SALZMAN:  Objection.

          THE COURT:  Sustained.

Q.   Was it your understanding when you read the last line and specifically the reference to the perfect illustration of this, that the author meant to reference the aesthetic identity and intellectual depth of this painter's work?

A.   And virtuosity, yes.

Q.   And the virtuosity of René Magritte's work, right?

A.   Right.

Q.   Basically the author was saying that this --

          THE COURT:  Sustained.

Q.   So there is no reference in Plaintiff's Exhibit 70, and specifically in this document in front of you, this portion of the document in front of you, to monetary value, right?

A.   That's right.

Q.   There is no reference to money or commercial value of any of these pieces, right?

A.   That's right.

Q.   And specifically, there is no reference to the monetary value of the *Domaine d'Arnheim*, right?

A.   That's right.

Q.   You said I think a moment ago that you understood that the *Domaine d'Arnheim* was as good or even better than *The Empire of Lights*, right?

A.   Right.

Q.   And that's something that Mr. Bouvier told you, right?

A.   That's right.

Q.   Is it Mr. Bouvier who told you that, in his opinion, the *Domaine d'Arnheim* was even better than the *Empire of Lights*, right?

A.   That's right.

Q.   You didn't see that in this Plaintiff's Exhibit 70 that we're looking at, the portion we're looking at that discusses the aesthetic identity and intellectual depth of René Magritte's work, right?

A.   That's right.

Q.   Let's show Mr. Sazonov Plaintiff's Exhibit 76.  If you could go down a little to the bottom.  This is the e-mail that -- go further down.  Looking for the e-mail from Mr. Valette.

        You see this is the e-mail you were asked about earlier in which Mr. Valette talked about the value of the *Tête* should be between 80 and 100 million euros.

          You see that?

A.   That's right.

Q.   And Mr. Valette sent this e-mail on July 25, 2012, right?

A.   That's right.

Q.   That's when you saw this e-mail, right?

A.   I saw it when Mr. Bouvier forwarded it to me.

Q.   If you go upwards on this exhibit you'll see when Mr. Bouvier forwarded it to you.  And you'll see that was July 25, 2012, right?

A.   That's right.

Q.   So that's when you saw Mr. Valette's e-mail, yes?

A.   Right.

Q.   And Accent Delight didn't buy the *Tête* in July of 2012, right?

A.   No.

Q.   You didn't buy it in August or September of 2012, right?

A.   I don't remember now the exact date.

Q.   You remember yesterday we had a discussion about this, and you said it was purchased in January of 2013?

A.   Yes.

Q.   So you didn't -- I'm sorry.  Accent Delight did not buy the *Tête* in July or August or September or October of 2012, right?

A.   That's right.

Q.   You didn't buy it in November or December of 2012, right?

A.   That's right.

O1b3acc1                          Sazonov - Recross

Q.   As we were talking about it yesterday, Accent Delight purchased this painting after the lies that Mr. Bouvier made about his negotiation for the *Tête* that he sent to you in November and late December of 2012, right?

A.   That's right.

Q.   And you purchased it because you believed Mr.  -- withdrawn.

     Accent Delight purchased the *Tête* because you believed Mr. Bouvier's lies that he made to you in December of 2012 about the purported negotiations for the *Tête*, right?

A.   No, this is not why we purchased the *Tête*.

Q.   You told us yesterday that you believed Mr. Bouvier's lies about his negotiations, right, in December of 2012?

A.   That's right.

Q.   And the price you paid was the price that Mr. Bouvier told you Accent Delight had to pay if it wanted to purchase the *Tête*, right?

A.   That's right.

          MS. SHUDOFSKY:  No further questions.

          THE COURT:  All right.  I think --

          MS. SALZMAN:  Nothing further.

          THE COURT:  Mr. Sazonov, you are formally excused at this time.  You can step down.

          Have a good day.  Just watch your step.

          (Witness excused)

O1b3acc1                          Gotds - Direct

THE COURT:  Plaintiff, please call your next witness.

MR. WILSON:  Your Honor, the plaintiffs call Claudine Gotds of Wildenstein & Co.

CLAUDINE GOTDS,

     called as a witness by the Plaintiff,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WILSON:

Q.  Good morning, Ms. Godts.

A.  Good morning.

Q.  Can you please tell us your occupation.

A.  I'm vice president at Wildenstein & Co.

THE COURT:  Just move the microphone up a little closer to your mouth.  You can bend it up.

Q.  What is Wildenstein & Co.?

A.  We are an art dealer.

Q.  Can you describe generally what the work is of Wildenstein & Co. as an art dealer?

A.  We purchase art, works of art, various media, we sell works of art.  That's basically it.

Q.  This morning we've asked you to come to trial so that you can show us, we would like to show you and discuss four documents that Wildenstein produced from --

THE COURT:  Mr. Wilson, just ask a question, okay.  She testifies; you don't.

MR. WILSON:  Well, your Honor, I'm trying to orient her.

THE COURT:  Just show her the four documents.

Q.  Toby, can you please pull up Plaintiff's Exhibit 347 for identification.

Ms. Godts, what are your responsibility as vice president at Wildenstein?

A.  Basically in charge of administration and operations of the company.

Q.  And was Wildenstein sent a subpoena to produce documents in this case?

A.  Yes.

Q.  And how did Wildenstein maintain the records that it produced in this case?

A.  We have them in electronic form and in paper form.

Q.  And can you describe for us in general terms how Wildenstein went about retrieving and producing the documents that you provided in this case?

A.  We looked through the records to find the documents that were requested.

Q.  I'd like to turn your attention to the document on the screen that we've marked for identification as Plaintiff's Exhibit 347.  And if you look in the bottom-right-hand corner, you can see a series of letters and numbers that lawyers call Bates numbers.

O1b3acc1                          Gotds - Direct

Do you recognize the letters WCO?  Toby, immediately above that.

A.  Yes.

Q.  Did you recognize this to be a document that was produced bid Wildenstein & Co.?

A.  Yes.

Q.  Before I ask you some questions about the specifics of this communication, I'd like to ask you some questions about the regular practices of the gallery with regard to correspondence. Is it a regular practice of the gallery's employees to receive communications like this from its clients?

A.  If the employee is involved in this type of negotiation, yes.

Q.  And is the activity reflected in this communication part of the gallery's routine business activities?

A.  Yes.

Q.  Is it the regular practice of the gallery to create or maintain records of the communications it sends or receives like this at the same time as they were sent or received?

A.  Yes.

Q.  And is it a regular part of your company's business to maintain a record of these kinds of communications because they reflect inquiries and negotiations that are part of the gallery's business?

A.  Yes.

O1b3acc1                    Gotds - Direct

Q.  Has this document been kept in your company's files?

A.  Yes.

MR. WILSON:  Your Honor, at this time plaintiffs proffer this Exhibit 347 into evidence.

THE COURT:  Preserving all prior objections, any objection?

MS. SHI:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 347 received in evidence)

MR. WILSON:  May we publish it to the jury?

THE COURT:  You may.

Let me give the jury a couple instructions.  First of all, you are about to see some documents, or at least this document and I suspect maybe three others, from Wildenstein & Co., Ms. Godts's company.  These documents are being introduced into evidence on the issue of whether Mr. Bouvier acted as an agent for Mr. Rybolovlev and his entities, including Accent Delight.

You may consider these documents only for that purpose.  You may not consider them for any other purpose, including whether defendants had actual knowledge of or substantially assisted in Mr. Bouvier's alleged fraud and breach of fiduciary duty.

As with all evidence, what weight, if any, you give to this document and any other documents admitted through this

O1b3acc1                      Gotds - Direct

witness is up to you.

Let me also say that in this document or the others there may be certain statements made or purportedly made by Mr. Bouvier. You may not consider his statements for their truth. That is to say, you may consider them for the fact that they were said, but you can't assume or treat them that what he is saying when he says something in these documents, that what he's saying is actually the truth.

With that, you may proceed.

MR. WILSON: Thank you.

Q. Do you have the document in front of you?

A. I do.

Q. Let me turn your attention first to the bottom of this communication. Do you see who has signed the document?

A. I do.

Q. Who is that?

A. Yves Bouvier.

Q. Just to orient you, this is a two-page document.

Toby, let's just scroll to the next page. And you can see the original is in French and we have translated it into English. So let's please turn back to the first page.

If you look at the top of the document, can you see that there is a line concerning the subject matter of the communication?

A. I do.

O1b3acc1                      Gotds - Direct

Q.   What is the subject matter of this communication?

A.   "Painting by Claude Monet Waterlilies No. 1726 and Paul Gaugin."

Q.   You see the communication is addressed to Michelle?

A.   Yes.

Q.   Who is Michelle?

A.   This is Ms. Michelle Le Marchant.  She is my predecessor.

Q.   Did she have the same position at Wildenstein then that you do now?

A.   Yes.

Q.   Toby, let's enlarge the middle of the communication that begins with Mr. Rybolovlev, and then going down to two or three paragraphs below that, please.

     In this passage the communication reads, "Mr. Rybolovlev wanted to invest a significant amount in a Gaugin painting, he fell in love with the paintings of this artist when visiting the exhibition dedicated to him in New York.

     "He found the painting presented very beautiful, but he saw more attractive paintings at the New York exhibition.

     "As a result, he considers that the price requested for this painting much too high.  He asked me to find out if there were high quality Gaugin paintings in private collections."

     Do you see that?

O1b3acc1                        Gotds - Direct

A.  I do.

Q.  And then a little bit lower down, Toby, if we can pull out the following paragraph.  "He confided to me."

You can see here that the subsequent paragraph it's written, "He confided to me that he was willing to pay 35 million for the painting that he saw, he thought that at this price this painting would be a good deal.  I'm sending you this information only to give you an idea of this client's financial capacity."

Do you see that?

A.  I do.

Q.  Thank you, Toby.  You can go back to the main document.

Is it typical for Wildenstein & Co. to receive inquiries from people like Mr. Bouvier on behalf of their clients about specific works of art or artists?

A.  In this case I would say yes.

Q.  And let's go back to the last section, Toby, please, with a call out starting with "thank you" and going into the postscript.

So, in conclusion you can see the author writes, "Thank you for your cooperation.  Best regards, Yves Bouvier." And in the postscript it's written "Can you send this message to Thérèse because I believe that Mr. Guy is going to Paris next week.  As agreed, dear Michelle, I am going to see you in New York next week."

Do you see that?

A.  I do.

Q.  We can take that down now, Toby.  And please pull up for the witness Plaintiff's Exhibit 351 for identification.

Ms. Godts, as before, you can see in the bottom-right-hand corner of this document a Bates number beginning with the letters WCO?

A.  I do.

Q.  And is this a document that you recognize having been produced by Wildenstein & Co.?

A.  Yes.

Q.  Is it your regular practice to -- is it the gallery's regular practice to receive communications like this from clients?

A.  Yes.

Q.  Is the activity reflected in this communication part of the gallery's routine business activities?

A.  Yes.

Q.  Is it the regular practice of the gallery to create or maintain records of communications it sent or received like this one at the same time as they were sent or received?

A.  Yes.

Q.  And is it a regular part of your company's business to maintain a record of these kinds of communications because they reflect inquiries and negotiations that are part of the

O1b3acc1                      Gotds - Direct

gallery's business?

A.   It is.

Q.   Has this document been kept in your company's files?

A.   Yes.

        MR. WILSON:  Your Honor, plaintiffs submit Plaintiff's Exhibit 351 for admission into evidence.

        MS. SHI:  No objection.

        THE COURT:  Admitted.

        (Plaintiff's Exhibit 351 received in evidence)

        MR. WILSON:  May we publish it to the jury?

        THE COURT:  You may.

Q.   Ms. Godts, this is a three-page document that contains one page translated into French with a translation certificate at the end.  Toby, can you -- thank you.

        You can see the original is in French, and then let's turn back to the first page, please.  Now, Toby can you call out the bottom, please, of the beginning with thank you.

        In this document, Ms. Godts, do you see who the individual is who has concluded the communication?

A.   Yes.

Q.   Who is that?

A.   Yves Bouvier.

Q.   Thank you, Toby, let's turn to the top of the document and please call out from the subject line down to the second paragraph.

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

O1b3acc1                         Gotds - Direct

Q.   What is the subject line for this communication?

A.   "Painting by Paul Gaugin *Te Fare*."

Q.   Do you see who this is addressed to?

A.   Yes.

Q.   And it is the same Michelle as the previous document?

A.   Correct.

Q.   And do you see in the first line it is written, "Thank you for your cooperation and for the warm welcome you gave us in New York.  Please thank Mr. Guy for the trust he showed in us by handing over the file for the aforementioned painting.  We would be grateful if you could send him the following remarks."

Do you see that?

A.   I do.

Q.   And then, Toby, if we can go back to the main document and pull out the section beginning with "the purpose of this comparison" and those two paragraphs.

The author goes on to write, "The purpose of this comparison is to demonstrate to Mr. Rybolovlev that the *Te Fare* painting is indisputably superior to Mr. Rothschild's painting regardless of the client's visual sensitivity.  Moreover, it would be great if it was possible to establish an artistic link between the *Te Fare* painting and one of the major works of the exhibition in New York dedicated to Paul Gaugin."

Do you see that?

A.   I do.

O1b3acc1                         Gotds - Direct

Q.  And then, Toby, can we go down, please, to basically the bottom half of the communication, I think we can get that all in one call out beginning with "we would" and going to bottom.

So if you look down in the call out into the second paragraph, Mr. Bouvier picks up, "We would like to send the following information to Mr. Rybolovlev.  The estimated price of the painting by the owner is $50 million.  After negotiations, we obtained a net price of $45 million.  Our goal is to demonstrate to Mr. Rybolovlev that the *Te Fare* painting is the best on the market and that its price is lower than that of Mr. Rothschild's painting, despite the superiority of the work."

Do you see that?

A.  I do.

Q.  And then Mr. Bouvier goes on, "We voluntarily wish to announce a price higher than the requested price of $40 million.  As the client likes to negotiate, discount obtained is essential in Mr. Rybolovlev's consideration."

Do you see that?

A.  I do.

Q.  And then if you jump down one more paragraph, Mr. Bouvier writes, "Mr. Rybolovlev will be back in Geneva Monday, November 4, 2002.  Given his significant activity, it would be desirable for the *Te Fare* painting to come to Geneva."

Do you see that?

O1b3acc1                      Gotds - Direct

A.  I do.

Q.  From time to time, does the gallery send paintings to other cities for viewing?

A.  Yes.

Q.  Thank you.  We can take that down, Toby, and please put up Plaintiff's Exhibit 346 for identification.

Ms. Godts, this is the third document to show you this morning and you can see in the bottom-right-hand-corner the Bates numbering WCO.  Do you see that?

A.  I do.

Q.  Do you recognize this to be a document that Wildenstein & Co. produced in this case?

A.  Yes.

Q.  Is it a regular practice of the gallery's employees to make and send communications like this one?

A.  Yes.

Q.  Is the activity reflected in this communication part of the gallery's routine business activities?

A.  Yes.

Q.  Is it the regular practice of the gallery to create records of the communications it sent or received, like this, at the same time as they were sent or received?

A.  Yes.

Q.  And is it a regular part of your company's business to maintain a record of these kinds of communications because they

reflect inquiries and negotiations that are part of the gallery's business?

A.   Yes.

Q.   Has this document been kept in your company's files?

A.   Yes.

MR. WILSON:  Your Honor, plaintiffs move that this Plaintiff's Exhibit 346 is admitted into evidence.

MS. SHI:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 346 received in evidence)

MR. WILSON:  May we publish it to the jury?

THE COURT:  You may.

Q.   Ms. Godts, this is a multipage document that's been translated from French into English.

Toby, can we just cycle through as before so the witness can see the original.  Thank you.  One more page. Terrific.

And here you can see -- in the French, I think you can see there was an actual signature on the original.  Did you see that?

A.   I saw that, yes.

Q.   Terrific.  Let's go back to the English then, please.  If we can call out the top of the document, please.

Who is this document addressed to?

A.   To Mr. Yves Bouvier.

O1b3acc1                         Gotds - Direct

Q.  And who is it addressed from?

A.  Guy Wildenstein.

Q.  Who is Guy Wildenstein?

A.  He is the president of the company.

Q.  What is the date on this document?

A.  October 28, 2002.

Q.  Do you see Mr. Wildenstein begins "Dear sir.  In response to your question is it possible to establish an artistic link between *Te Fare* and the New York exhibition dated to Paul Gaugin" and he has a full colon.  Do you see that?

A.  I do.

Q.  We can go back to the main document, please.  And do you see in the balance of this communication, Mr. Wildenstein goes on to describe the work by Paul Gaugin?

A.  Yes.

Q.  Let's go to the second page, please.  And let's call out the top part of this, please.

        Do you see in this top paragraph, Mr. Wildenstein writes, "Finally, I believe that you may imply to Mr. Rybolovlev that, if the painting were to appeal to him, the owners who are in joint ownership would be likely to consider an offer slightly lower than the one which, after negotiation, you were already able to get."

        Do you see that?

A.  I do.

O1b3acc1                    Gotds - Direct

Q.   And then in the next sentence, he writes, "Also, I confirm that I am doing what is necessary for the painting to be sent to you in Geneva."

Do you see that?

A.   I do.

Q.   Is it typical for Mr. Wildenstein to communicate with representatives of buyers about the price of artworks?

A.   Yes.

Q.   Thank you, Toby.  We can put that down and let's pull up the final document, Plaintiff's Exhibit 315 for identification. If you look at the bottom corner of this document, you can see the Bates number beginning WCO?

A.   I do.

Q.   And do you recognize this to be a document that Wildenstein & Co. produced in this case?

A.   Yes.

Q.   Is it a regular practice of the gallery's employees to receive communications like this from its clients?

A.   Yes.

Q.   And is the activity reflected in this communication part of the gallery's routine business activities?

A.   Yes.

Q.   Is it the regular practice of the gallery to create or maintain records of the communications it sends or receives like this at the same time as they were sent or received?

O1b3acc1                          Gotds - Direct

A.  Yes.

Q.  And is it a regular part of your company's business to maintain a record of these kinds of communications because they reflect inquiries and negotiations that are part of the gallery's business?

A.  Yes.

Q.  And finally, has this document been kept in your company's files?

A.  Yes.

          MR. WILSON:  Plaintiffs move that Plaintiff's Exhibit 315 is admitted into evidence.

          MS. SHI:  No objection.

          THE COURT:  Admitted.

          (Plaintiff's Exhibit 315 received in evidence)

          MR. WILSON:  May we publish this to the jury, your Honor?

          THE COURT:  You may.

Q.  Toby, let's, as before, let's cycle through to -- I believe this document is also translated.  So you can see the original is in French, and then we've translated it into English.  Can you please turn back to the -- perfect.

          So we're looking at Plaintiff's Exhibit 315.  Let's look at the very bottom, I think perhaps you can see even without a call out the author of this communication.

A.  Yes.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

O1b3acc1                        Gotds - Direct

Q.   Who is that?

A.   Yves Bouvier.

Q.   Looking at the top, do you see what the date of this document is?

A.   Yes.

Q.   What is the date?

A.   November 5, 2002.

Q.   It's written you see that date is written after Geneva, right?

A.   Yes.

Q.   And the subject matter of this communication is also the Gaugin *Te Fare*, right?

A.   Correct.

Q.   And Mr. Bouvier begins, "Dear sir," and then after his introduction, do you see in the second paragraph he writes, "I hereby confirm that we presented Paul Gaugin's painting this morning to Mr. Rybolovlev."

A.   Yes.

Q.   Now, Toby, can we please pull out the bottom half of this communication, beginning with "I don't think."  Here Mr. Bouvier writes, "I don't think he is going to make an offer on this paining because the subject doesn't appeal to him.  I perhaps should have shown him the Ektachrome beforehand."

     Do you know what an Ektachrome is?

A.   It's a transparency.

O1b3acc1                       Gotds - Direct

Q.   And --

A.   So a transparency, sort of a negative of a picture of the painting.

Q.   I see.  So that would be a way that someone might look at an image to understand what the painting looked like?

A.   Correct.

Q.   So Mr. Bouvier writes, "I perhaps should have shown him the Ektachrome beforehand, but I did not want to leave an image of and a description of this work.  You can never be too careful."

     Do you see that?

A.   I do.

Q.   Then Mr. Bouvier goes on to write, "Mr. Rybolovlev informed me that he still wanted to make an offer for Mr. Rothschild's painting.  He asked me my opinion regarding price that he ought to offer.  I did not answer.  I simply told him that I had to consider the question with care.  If you have any suggestions, I would appreciate your advice."

     Do you see that?

A.   I do.

Q.   And then in the next paragraph, Mr. Bouvier writes, "In addition, he asked me to look for a Tahiti work by Gaugin with an important subject.  I explained to him that this type of work belonged only to museums, but that I was going to try and find the information anyhow."

     Do you see that?

O1b3acc1                          Godts - Cross

A.  I do.

Q.  And then finally, Mr. Bouvier concludes, "I look forward to receiving your instructions and comments and please do not hesitate to contact me should you require any further information."

        Do you see that?

A.  I do.

Q.  Is it typical for someone like Mr. Bouvier to ask the Wildenstein Gallery for recommendations to find paintings for their clients?

A.  That would be -- yeah.

        MR. WILSON:  I have no further questions.

        THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. SHI:

Q.  Ms. Godts, when did you start working at Wildenstein & Co.?

A.  I started in 1986.

Q.  Mr. Wilson showed you four documents today.  You did not send any of these letters, right?

A.  I did not.

Q.  And you did not receive any of these letters, right?

A.  No.

Q.  You were not part of the discussion between Mr. Bouvier and any Wildenstein employee in the negotiation described in these letters, right?

A.   No.

Q.   Have you ever met Mr. Bouvier?

A.   I have not.

Q.   Have you ever met Mr. Rybolovlev?

A.   I have not.

Q.   You have no personal knowledge about any of the things described in the letters, right?

A.   I don't.

Q.   You don't know whether any of the statements described in the letters are true, right?

A.   I don't.

Q.   You don't know whether any of the events described in the letters actually happened, right?

A.   I don't.

Q.   I want to direct your attention to DX 351.

        THE COURT:  DX or PX?

        MS. SHI:  Sorry.  PX 351.

Q.   Can you go down to the page and start with a paragraph "we voluntarily wish" -- there we go.

        So Mr. Bouvier writes here to an employee of Wildenstein & Co. that "We will we voluntarily wish to announce a price higher than the requested price of USD 40 million dollars, right?

A.   Yes.

Q.   And if we go up a little bit.  And Mr. Bouvier writes here

O1b3acc1                          Godts - Cross

that "We would like to send the following information to Mr. Rybolovlev."

Do you see that?

A.  I do.

Q.  And Mr. Rybolovlev -- sorry.  Mr. Bouvier continues to write, "the estimated price of the painting by the owner is USD 50 million dollars," right?

A.  Yes.

Q.  And he writes he wished to send the information to Mr. Rybolovlev.  "After negotiations, we obtained a net price of USD 45 million dollars," right?

A.  Correct.

Q.  If you go down a little bit.  Do you see that Mr. Bouvier writes to an employee of Wildenstein & Co. that "we would be grateful if you could confirm your agreement with our aforementioned price policy."

Do you see that?

A.  I do.

MS. SHI:  No further questions.

THE COURT:  Thank you, Ms. Godts.  You may step down. You are excused at this time.

(Witness excused)

(Continued on next page)

THE COURT:  Plaintiff, next witness.

MS. SALZMAN:  The plaintiff calls Robert Wittman, please.

May I briefly approach to remove the last witness's binder, your Honor.

THE COURT:  You may.

ROBERT WITTMAN,

   called as a witness by the Plaintiff,

   having been duly sworn, testified as follows:

THE COURT:  Pull yourself close to the microphone please and speak loudly and clearly into the microphone.

You may proceed.

MS. SALZMAN:  I apologize, your Honor.

THE COURT:  That's okay.

MS. SALZMAN:  I was just going to ask if there was a bottle of water for the witness.

THE WITNESS:  There is.

MS. SALZMAN:  Perfect.

May I proceed to inquire, your Honor?

THE COURT:  You may.

DIRECT EXAMINATION

BY MS. SALZMAN:

Q.  Thank you.  Good morning, Mr. Wittman.

A.  Good morning.

Q.  Can you hear me okay?

A.  I can hear you fine.

Q.  Great.

Mr. Wittman, do you have any expertise or experience in art fraud investigations?

A.  Yes.

Q.  Can you tell us a little bit about that, please?

A.  Well, I started in the FBI in 1988; and I was a special agent for 20 years.  My job at the FBI for 20 years was to do investigations into art crime, which included fraud and theft.

Q.  What was your position at the FBI, Mr. Wittman?

A.  I was a special agent.

Q.  What does that mean?

A.  Well, that means that I was commissioned by the Department of Justice — the federal government — to do investigations, collect evidence and materials that the government was interested in when it came to criminal investigations.

Q.  Now, you said you began at the FBI in 1988, did I hear you right?

A.  Yes, ma'am.

Q.  And how long did you remain at the FBI?

A.  Twenty years.

Q.  And did you hold the title of special agent that entire time?

A.  Yes, I was a special agent my entire career.

Q.  And give us a sense, if you can, before becoming a special

agent, did you have to undergo any training?

A. Yes. Before becoming an agent, at the time I had to do 16 weeks of training at Quantico, Virginia, to pass special agent training classes.

Q. And following your training at Quantico, were you assigned to any particular division or jurisdiction of the FBI?

A. Yeah. After graduation in 1988, I was assigned to the Philadelphia field office. My first case involved thefts from local museums in Philadelphia, artwork.

Q. And I think you told us that over the course of your 20 years with the FBI, you specialized in art fraud and art crime cases; is that right?

A. Yes. Ultimately, I was working on art cases throughout my career. By the time I was done, I had recovered about $300 million worth of stolen art and involving fraudulent art in cases that were criminal.

Q. Tell us a little bit more about how you focused on art fraud and art crime cases at the FBI. What did that entail for you?

A. Well, that would be, you know, an investigation into what exactly was happening with the facts of any specific case. You'd have to look at that. And that's basically how we would do it.

Q. Are you familiar with something called the National Art Crime Team at the FBI?

O1BVACC2                      Wittman - Direct

A.   Yes.

Q.   What is that?

A.   In 2004, I started -- I founded the National Art Crime Team at the FBI, which is a team of agents that are specifically trained on how to do art crime investigation.

Q.   You said you founded that team?

A.   Yes, ma'am.

Q.   What do you mean by that?

A.   Well, I had a done a case in Sweden.  And I came back and realized that basically there were only two agents in the country who were doing these cases, myself and a very good friend of mine, Jim Wynne, who was an agent here in New York. Between us, we handled all the art crime cases.  And the art industry in the United States is a multi-billion-dollar industry, so there's a lot to be done.

Q.   And once you founded the National Art Crime Team, Mr. Wittman, what was that team's jurisdiction?

A.   The world.  We covered cases throughout the United States and throughout the world.

Q.   And did you continue to work with the National Art Crime Team up until the time you retired from the FBI?

A.   Yes, for three years.  I was actually the senior investigator of the team, which meant that during the training period the agents on the team would be constantly contacting me to find out ideas on how to do different types of

investigations. So before anything went through, they would contact me before it went to headquarters for a file opening, so to speak.

Q. Are you familiar with something called the FBI's Cultural Property Investigative Manual?

A. Yes.

Q. What is that?

A. That's a manual of -- well, basically it's a manual of investigative techniques on how to do art crime investigation. I was coauthor of that in 2001. We produced it and sent it to all 56 field offices of the FBI, all the different property crime squads, and to the legal attachés around the world. So everybody in the FBI who had anything to do with these types of investigations would have gotten a copy of that.

Q. During your service with the FBI, did you have occasion to sit on any tasks forces?

A. Yes, I was on the state department's cultural heritage task force out of Washington. Also, I was on a jewelry theft task force in Philadelphia, going after smash-and-grab jewelry theft types of crime, and task forces of that nature.

Q. During your time at the FBI, did you have occasion to do any teaching or training?

A. Yes.

Q. Tell us a little bit about that, please.

A. Well, I received training from the Zales Corporation on how

to identify jewelry and jewelry in general.  Also from the GIA, the Gemological Institute of America, to determine how to identify diamonds and see what was looked at, you know, when we look at diamond investigations.

I was also -- I went to art school for a year at the FBI to be able to identify art and learn a little bit about art history.  The difference between say, a Mérot and a Renoir, for art people, that's kind of a laughable thing; but for police officers, it's a big deal knowing the difference between a Mérot and a Renoir because, you know, police officers don't usually run into that type of thing.

Q.  So you just told us about some of the training you did as an FBI special agent.  Did you, yourself, while at the FBI, have occasion to teach or train others?

A.  Yes.

Q.  And tell us a little bit about that, please.

A.  I did trainings for the FBI at Quantico for the undercover school.  I was actually a certified undercover agent for almost 18 years of my career; so I ended up working a lot of undercover cases, you know, acting in different capacities in our crime cases.

And so as a result, I also taught at the school itself and do these types of investigations.  I worked with the National Parks Service.  I gave them training as well on how to protect their resources at the national parks.  I worked with

Homeland Security Investigations, did training with them at the Smithsonian.

So yeah, I did a lot of training for national police agencies, and a lot of international training through Interpol as well.

Q.  And what about since retiring from the FBI in 2008, have you had occasion to conduct any teachings or trainings?

A.  Yes, I teach around the world.  Just recently, last month, I was in Vienna teaching customs officers, prosecutors, and police officers how to do cultural property, cultural heritage investigations, transport of cultural property across international borders such as Ukraine.

I was in Toronto in November working with the Toronto Police Department, where we trained 200 officers from the Ottawa area -- I'm sorry, the Ontario area police officers. And we did a one-day conference where I was a keynote speaker there and instructor.

Last year I did lectures, a series of lectures for the University of Pennsylvania, Museum of Archeology, also for the Smithsonian, for Christie's, and also for Sotheby's.

Q.  Are you a member of any art-related organizations or associations?  Maybe "member" is not the right word.  Are you affiliated -- do you work with any art-related organizations or associations?

A.  I work with the -- well, I'm in the FBI Agents Association,

of course.  But I also work with the AAM, the American Association of Museums.  I was the vice chairman of their standing security committee for two years.  So I am involved with some of the security parts for museums and institutions.

Q.  And over the course of your career, Mr. Wittman, have you received any awards or recognitions for your work?

A.  Yes.

Q.  Can you give us few examples?

A.  I received the Order of Merit for Distinguished Service from the President of Peru on a case; a white cross of police merit from the government of Spain; the attorney general's award for law enforcement excellence.  The government is big on giving plaques and medals.  In the private sector you get money, but it's cheaper to get plaques and medals, as the judge knows.

Q.  Fair enough.

You testified that there came a time when you left the FBI; correct?

A.  Yes, in 2008 I retired.

Q.  And when you retired from the FBI, what did you do next?

A.  I started my own company, Robert Wittman Incorporated.

Q.  What is that company?

A.  We do art investigation for fraud, for theft.  We do collection management.  We help people with their collections. We sell collections for them in a very transparent way.  And we

do due diligence provenance reviews.  We review material for people who are going to buy artwork to make sure it's not stolen.  We do expert witness testimony such as in this case.

Q.  And before we get to expert testimony, you mentioned the word "collections" a few times.  Can you just explain to the jury what you mean, what kind of collections?

A.  It could be anything.  I mean, recently we had a case involving a woman who called, who had a series of steamer trunks in her basement, and it was a farmhouse in Maryland. And these trunks hadn't been opened since the 1930s.

So she had called and said we want to know what's in these trunks.  They had these locks on them.  So we went and unlocked them.  And we found over $2 billion worth of original books, first editions, *Moby Dick*, these types of things.  It was an amazing find.

And then so we were able to give her an idea of the value of her material.  We packed it up in good storage materials and left her with an idea of what she had.

Q.  In connection with your work you advising people through Robert Wittman Incorporated, do you have any ongoing work with art fraud or art crime?

A.  Yes, we do investigations into art theft.  I have a number of cases going right now involving that.  We do get called in on art fraud cases as well on occasion, forgeries, fakes, and, you know, situations where people feel like they've been taken

O1BVACC2                      Wittman - Direct

advantage of.

Q.  Now, you mentioned expert testimony.  Is something you've done since leaving the FBI provide expert testimony?  I said that really badly.  Let me withdraw that.  Let me try that again.

Have you had occasion to provide expert testimony since retiring from the FBI, Mr. Wittman?

A.  Yes.

Q.  And have you been recognized as an expert witness in the field of art crime and art fraud by courts before?

A.  Yes.

Q.  Has any court ever declined to recognize you as an expert in art fraud or art crime?

A.  No, I've never been -- it's never been declined as an expert.

Q.  Has any court ever limited your testimony as an expert witness in any way?

A.  A few times.

Q.  And just give us a sense of why that would be.

A.  Well, sometimes the reports are -- you know, I would generate would be -- would go beyond what an expert witness would want to do; in other words, it would go into the facts of the case.  And an expert witness is not supposed to do that.

So for those reasons, in those situations, it was limited not to be able to make opinions about facts, but just

to talk about the indicia of what art fraud involves.

Q.   Have there ever been occasions, Mr. Wittman, where someone sought to engage your services as an expert witness and you declined to do that work?

A.   Yes.

Q.   And can you give us an example of that?

A.   Well, having been --

MS. SHUDOFSKY:   Objection, your Honor.

THE COURT:   Sustained.

Q.   Are you compensated for your work as an expert witness, Mr. Wittman?

A.   Yes.

Q.   And how are you compensated?

A.   With my expert witness business, what I do is it's twofold. So the first part is the expert report, and that's dependent upon the size of the case, how much work it's going to entail. I had cases where I've had tens of thousands of pages of depositions that we'd have to review and go through.  So in those situations where the cases have that much material, I charge a flat rate.  And then once the expert report is written, it's all done, submitted, and accepted, then I charge an hourly rate.

Q.   And did there come a time, Mr. Wittman, where you were retained as an expert witness by the plaintiff, Accent Delight, in this case?

A.   Yes.

Q.   And are you being compensated for your work in this case?

A.   Oh, yes.

Q.   And did you charge a flat rate?

A.   I charge a flat rate for the expert report.

Q.   And what was that?

A.   The flat rate for this report was 50,000.

Q.   And did you also charge an hourly rate for the work after the report?

A.   Yes, I charge a normal hourly rate of $350 an hour.  So that's for any testimony, anything after the expert report, it's 350 an hour.

Q.   Does your compensation as an expert witness, Mr. Wittman, whether it's in this case or in any other case, does it depend on the outcome of the case?

A.   Oh, no.

Q.   And does your compensation as an expert witness depend on the substance of the opinions or testimony you offer?

A.   No.

          MS. SALZMAN:  At this time, your Honor, the plaintiff requests to qualify Mr. Wittman as an expert in investigating and detecting fraud in the art market and in the indicia of fraudulent conduct in the art market.

          THE COURT:  Any objection?

          MS. SHUDOFSKY:  No objection.

THE COURT:  All right.  So accepted.

Ladies and gentlemen, let me just explain a little bit what's going on here, if you haven't picked it up already.

An expert witness is someone who, by education, experience, training, has acquired learning or experience in a specialized area of knowledge or practice.  Such a witness is permitted to express his or her opinions on matters which he or she has that specialized knowledge or training.  And a party is permitted under some circumstances to present expert testimony to you on the theory that someone who is experienced in a relevant field can assist you in understanding the evidence or in reaching an independent decision on the facts.

I will give you further instructions at the close of the case, as you know, and those will include instructions about how to assess the credibility of witnesses, instructions that apply to experts, as well as other witnesses.

In weighing an expert's opinion, you may consider the expert's qualifications, education, and reasons for testifying, as well as all the other considerations that ordinarily apply, including all of the other evidence in the case.  If you find that the opinion of an expert is based on sufficient data, education, and experience, and the other evidence does not give you reason to doubt his or her conclusions, you would be justified in placing reliance on his or her testimony.  However, you should not accept any witness's testimony simply

because the witness is an expert. The determination of the facts in this case rests solely with you.

Let me also say it wouldn't surprise me, given the nature of the case and Mr. Wittman's expertise, if he uses words like "fraud" or "duty" or "agency," things that are relevant to the case. As you know, I will give you instructions about all of those matters and all the things that you'll need to consider at the conclusion of the case. It's my instructions about the law that applies. To the extent that he uses terms such as that, he's just doing so in a lay sense, not in a legal sense. So please understand that.

You may proceed.

MS. SALZMAN: Thank you, your Honor.

BY MS. SALZMAN:

Q. Mr. Wittman, you mentioned that sometimes when you work as an expert, there is a big file to review, is that what you said?

A. Yes, ma'am.

Q. Did you have occasion to review a file in this case?

A. Yes.

Q. And was it big or small or --

MS. SHUDOFSKY: Objection, your Honor.

THE COURT: Overruled.

A. It was very big.

Q. And did you form opinions about this case?

A.   Yes.

Q.   And are you here today to tell us about your review of the case file?

A.   No.

Q.   What are you here today to do?

A.   I'm here today to talk to you about the indicia of or indications when I've seen fraud in art crime cases, having worked other cases, many different cases.  I've seen different indicia of fraud and how it's done.  And that's what I'm going to talk about today.

Q.   Before we get to indicia of fraud, Mr. Wittman, tell us, if you will, a little bit more about the high-end art market.  What are some of the types of transactions that occur in this market?

A.   Well, some of them can go very big.  The two major types of -- I guess the transactions would be in an auction, which would be public, and people, you know, buying things and the price being publicized.  Or it's the private sales, which are all confidential usually and there's no public announcement of prices.

Q.   In your experience working in the art market, are there any publicly available records for these private sales?

A.   No.

Q.   And what role, if any, has the confidential nature of these private sales played in some of the art fraud investigations

you've worked on?

A.   It's taken a big role.  Because the private sales and the opacity, the fact that it's opaque, no one knows prices and no one knows who's paying what or how much, it lends itself to a situation where people could take advantage of one another.

          MS. SHUDOFSKY:  Objection, your Honor.

          THE COURT:  Overruled.

Q.   In your experience over the decades at the FBI, and since then working in the art market, have you ever come across art agents?

A.   Yes.

Q.   And what are those, to your understanding?

A.   Art agents are advisers, to my understanding, that have a relationship with a client.  Usually it's a relationship of trust between the client and that person, that they are going to do the right thing for their client.

Q.   And what do you mean "do the right thing for their client"?  Just give us an example or two of what you've seen art agents do for their clients.

A.   Well, they negotiate a situation where they will buy or sell artwork.  It doesn't have to be artwork, it could be anything.  It could be high-end collectibles, high-value assets, jewelry, anything like that.  And they make --basically, they make a deal to represent that client and to not take advantage by overcharging or by passing the material to

that client for what they paid for it for a commission.

Q.   You mentioned a commission.  What is that?

A.   A commission is a percentage that's paid to the art agent.
Usually it's a percentage of the total amount of the sale or
the buy, it could be either way.  And it's a percentage that's
given to the agent for his work.

Q.   And who gives the agent that percentage or commission?

A.   Usually it's the client.  But it could be -- it could be
the seller as well.  It could be the seller's commission on
both ends.  So it could be the seller and the buyer or just the
buyer.

Q.   And in your experience in the art market, is there any
typical way of memorializing compensation arrangements between
art agents and their clients?

A.   I've seen contracts --

          MS. SHUDOFSKY:  Objection.  Scope, your Honor.

          THE COURT:  Overruled.

A.   I've seen actual contracts.  In fact, when we do these
types of deals, we've read a contract because I don't want to
get sued, so we keep it clean.  But I've also seen, you know,
just basically, you know, oral contracts where people
negotiate, talk to each other, and they trust each other so
they do it without a written contract.

Q.   And how common, in your experience, Mr. Wittman, are oral
agreements of that kind in the art market?

MS. SHUDOFSKY: Objection. Scope.

THE COURT: Overruled.

A.   I think that they are not as common as written contracts, but they do exist.  I would think that in today's world, there's more of the written contracts because of the situations that have arisen in the past 20 years and because of the value of the art market that is going through -- it's going through the roof, the values.  So as a result, it's become a very, very technical, shall we say, situation.  So I think that there were more of these oral contracts in the past, but they still exist today.

Q.   Now, over the course of your career, Mr. Wittman, have you worked on any cases that involve dishonest art agents?

A.   Quite a few.

Q.   Give us a sense of some of those cases, please.

A.   Well, one case I specifically remember that was involving a dishonest set of art agents.  There was two of them, in fact. Was a case involving these two individuals who were buying these antique firearms, million-dollar pieces, for a collector.

And they had a deal with the collector to get a ten percent commission.  This is what they would make, which was lot of money.  But what they were doing is they were buying these pieces sometimes for 50 percent of what they would sell to the client.

And then on top of that, they were using third parties

to actually write letters, things like that, to convince the client that they were -- he was getting a good deal.

Q. Now, in the case you just described, just to make sure we understand what you're saying, the agents worked for the buyer?

A. That's correct.

Q. Okay. And when you say there was a ten percent commission arrangement, who was that arrangement between?

A. Between the buyer and the two agents. The dealers that he was working with, they were supposed to buy the material from him, pay the price, whatever that price was, and then pass that on to him and then get a ten percent commission.

Q. And was that arrangement between the agents and the buyer in that case, was it in writing, was it oral, how was it?

A. That was an oral arrangement.

Q. And what, in fact, happened in that case?

A. Well, they marked up the prices extraordinarily, in fact, sometimes double. So they would buy, say, one of these items for $500,000, and then turn around and charge the buyer a million dollars plus the commission. So they got 1.1 million, actually charging ten percent above, you know, the commission they'd gotten for the amount. So they did this on a number of different occasions. Ultimately, we were able to -- we convicted them for fraud in federal court in Philadelphia, criminal fraud.

Q. And you mentioned that in that case the agents had obtained

letters from third parties.  What do you mean by that?

A.   They were soliciting letters from outside third parties to talk about how great the guns were — these were firearms, Colt firearms, antiques — how great they were and how valuable they were.  And then they would take those letters and they would present it to the buyer; so the buyer would then feel like a competition, feel excited about buying these guns.  And it convinced him that the price he was paying was the actual price.

Q.   And who was writing these letters?  When you say "third parties," what do you mean by that?

A.   They were actually paying people on the outside, people who were supposedly objective, who were not involved, to convince the buyer to buy these things.

Q.   Did the buyer in the case you're telling us about, Mr. Wittman, did he do any kind of investigation or due diligence into these antique firearms on his own, independent of his agents?

A.   Well, he did investigation into the provenance.  He was interested in the truth that they were real, they were what they were supposed to be.  But he trusted his agents for the prices because he -- you know, he had a relationship of trust, he had confidence in them.

Q.   So you gave us an example of a case you worked on that involved dishonest art agents.  In your experience working in

that case and in other cases over your career, are there any well-known indicators of fraud by art agents in the art market?

A.  Yes, there's different indicia that any investigator has to look at.  As an investigator, one of the first things you're going to do is look at the relationship, the relationship of trust and how that was created.  That was one of the first things.

Q.  So when you say "relationship of trust," who's that relationship between?

A.  It would be between the buyer and the art agent or the art person that's representing them.

Q.  And what do you mean by "a relationship of trust"?

A.  Well, that would be the buyer would have confidence that that person was working in his best interest so he would trust him.  And usually that's the way you would look at that, as an investigative technique, would be to find out how that person infiltrated that buyer, in other words, how that happened.

        And usually we would look at it from the standpoint of what we call a vouch or a bond.  And, you know, law enforcement terms, up would be showing up to places where the buyer would be, just having to start up a conversation and meeting them.  That's also an undercover activity.  Or by being vouched in by someone.  Someone close to that person would bring them in, introduce them, give them the *bona fides* because they were trusted, so they would introduce that person.  And then that

person would be able to go in and work his kind.

Q.  And in a situation involving a vouch, as you call it, who's providing the vouch?  Give us an example of who would be able to do that?

A.  It could be a family member, it could be a friend that's trusted by the buyer, it could be any of those people who are familiar to the buyer.

And the other thing that you'd look at in that situation too, and this is from a preliminary investigation. There's two types of investigations at the FBI; one is a preliminary, where we look at a case at the beginning to see if we should open a full-field investigation.  So for the preliminary investigation, we'd look at that and possibly find out there's any payments being made to that person who did the vouch.  And if that was the case, that would lead to the next step.

Q.  Okay.  And what would be the next thing you would look for in such an indication -- such an investigation?

A.  There's many things you could do.  The next one I would normally look at would be communications between that agent and the buyer.  In other words, what is he telling him?  Is he saying that, you know, he's doing a great job for him?  Are these negotiations that he's making, are they real or is he fabricating things?  Is he lying to his buyer?  Trying to explain to the buyer, telling the buyer he's working very hard

for him, when in reality he wasn't doing anything.  That's what happened in the case I told you about with the two individuals with the firearms.

Q.  When you're looking at the communications that are going on between the agent and the buyer in these cases, what kind of communications are you looking for there?

A.  It's usually about the severity of the negotiations.  We had to really try hard to get this price.  These people wanted a lot more money, but we're working hard to get that price down for you.  We're taking care of you.  And usually it's about the negotiations themselves.

Q.  Okay.  And if you move forward in the investigation, if you've looked at the relationship of trust, as you've told us, and then you've looked at the communications, the negotiations, is there any other indication you would look for in such an investigation?

A.  Oh, yeah.  I guess the major check would be the markup; how much are they charging the buyer compared to what they were paying to get this material.  So that's the third thing we'd look at before we would start a field investigation.

        And if we saw there were humongous markups, large markups over and above what they were paying that the dealer -- not the dealer, the buyer didn't know about, in other words, didn't realize that he was overpaying, then that would be something we'd have to look into more closely.

O1BVACC2                          Wittman - Direct

Q.   Now, when you gave us that example, when you told us about that case a few minutes ago that you had worked on with the two dishonest agents, you mentioned that there were letters from third parties used in that case as well; correct?

A.   Yes.

Q.   And have you had occasion to investigate other cases that involved using third parties to assist dishonest art agents?

A.   Yes, yes.  I had another case involving a group of dealers who were going around talking to families.  And what they would do is they would go to a family that they had identified as having great artifacts.  And this is -- again, this is a military type of, you know, material, like Civil War artifacts and things of that nature.

So they would go to the family and they would tell them that they were working for a museum.  And they were getting a ten percent commission from the museum on what they were buying from the family.  So the museum was paying for the material and they were getting ten percent.

So in one case, they went to a family and they bought this material.  And they bought it for $80,000 and convinced the family to give this material to them for the museum because they were only going to get a ten percent commission and the museum was going to create an exhibition of this family's material which would, you know, be like a -- you know, a good thing, you know, for the family to have.  So they agreed to do

it.

          Well, they paid $80,000 for this material.  Went back to the museum.  Within one week, they charged the museum 880,000 for the material.  So they got their ten percent commission plus 800,000 more.  Of course, when the family found that out, there was a big problem, and so they were basically cheating these families out of their heritage.

Q.  Based on your experience investigating cases in the art market, Mr. Wittman, are you familiar with any well-known indicators of fraudulent activity by third parties who assist dishonest art agents?

A.  Yes.  With the case involving the firearms, they were bringing in those third-party individuals, paying them to write these fake letters.

          Also, in that case involving the two dealers who were getting the material for the families, they were using the museum's, you know, *bona fides* to be able to convince people that this was a legitimate deal.

          Working undercover, having done those cases and learning those techniques, I use those techniques oftentimes in undercover cases where I was dealing with criminals on the other end.  Once they saw me doing that, they felt comfortable dealing with me because they knew I was one of them.

Q.  So pulling back a bit from the specifics of some of the cases you've worked on over the course of your career, let's

talk at a higher level about whether you have any opinions as to well-known indicators of fraudulent conduct by third parties in these kinds of transactions.  Are there any such indicators, in your opinion?

A.  So if I'm going to do that investigation, the first thing we're going to look at is whether or not I think the third party knows that the person they are dealing with, the agent, that person they are dealing with who's buying the art from them to turn over is not the final person; in other words, is not the buyer, there's a third-party buyer, and that's the principal.  So the first thing we have to do, we have to assure that they know that that's the situation, that there's another person out there who's actually paying the money.

Q.  So let me just unpack that and make sure we follow what you're saying here, Mr. Wittman.

You said the first thing you'd look for in such an investigation is whether there is knowledge that the agent they are interacting with is not the -- did you say the final buyer?

A.  Correct.

Q.  Okay.

A.  Not the buyer.  Not the buyer.

Q.  Okay.

A.  Not the buyer, just pass through.

Q.  Okay.  Just a pass-through.  Okay.

And then you used the term "principal."  What did you

mean by that?

A.   That's a person who's actually buying the material, putting the money out, paying for it.

Q.   Is the principal the same as the agent in the example you just gave us?

A.   No, no, the agent is working for the principal.  So what's happening there is he's the one that's actually paying for it; he's actually buying the material, and so pass-through.

Q.   In such an investigation, the first thing you would look for is knowledge that the agent is acting on behalf of a principal.  Is there a second thing you would look for?

A.   Well, then I would look and see if the agent, the go-between, was requesting information; in other words, requesting letters, statements, emails, you know, talking about how great the art is, how much it's worth, how valuable it is, how unique it is, and whether or not that third party was giving that material to the agent.

Q.   So I think you just anticipated my question, but just so we're clear, who's requesting the material and from who?

A.   The agent is requesting the material from the third party. Not the buyer; the buyer has no knowledge of it.  He's requesting it from the third party.

Q.   And in your experience investigating these kinds of cases, what is the purpose of obtaining materials like that from a third party?

O1BVACC2                       Wittman - Direct

A.   Well, again, it gives the appearance that there's a negotiation, but it also gives credence to the material itself. In other words, it makes the buyer more confident, more, I guess, reliant upon the agent to want to be able to pay these prices.  In the case involving the firearms, it made it more competitive, made it more high because the letters were saying things like, I would be interested in buying that at that price.

Q.   And in such an investigation, having established that the third party has knowledge the agent is buying for a principal, and then that the third party is providing the agent with materials about the works, is there any third factor you would look for?

A.   Yes.  Most of the times -- well, from what I've seen, the material goes from the third party to the agent, to the person in between.  And then that partner will supply that to the buyer, and that builds his *bona fides*; it shows his negotiations, you know, his techniques, how hard he's working; and also shows how great the material is, you know, how -- the value of the material so that it would support his pricing.

Q.   And I think you testified a moment ago that the buyer, the principal, doesn't know anything about the relationship or the dealings between the third party and the agent, is that what you said?

A.   Right.  The buyer wouldn't know that the third party was

doing this at the behest of the agent.

Q.   And why in the cases you've investigated -- withdrawn.

Why doesn't the buyer or the principal know about the dealings or the relationship between the agent and the third party, in your experience?

A.   The agent wouldn't tell him.

Q.   Why not?

A.   Because the agent is -- again, it's hiding his source and he's getting a higher price.  And then ultimately, the third party, in all the cases I've looked at that had this situation happening, was a benefactor in some way.  In the case involving the firearms, the dealers were paying them cash to write the letters.  In other cases, they might be the person selling the material.  So it all depends.  They benefit in some way by doing this, participating in this situation.

Q.   Thank you, Mr. Wittman.  No further questions at this time.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MS. SHUDOFSKY:

Q.   Good morning, Mr. Wittman.

A.   Good morning.

Q.   I'm going to show you a demonstrative exhibit.  It's been marked for identification as Defendants' Exhibit 1011.

MS. SHUDOFSKY:  And your Honor, if we could publish this.

THE COURT:  You may.

Ladies and gentlemen, let me give you a brief instruction though, since this is the first time you're seeing something that counsel just described as a demonstrative exhibit.

A demonstrative exhibit is not an exhibit in the sense that it's not going to be admitted into evidence; it's not part of the evidence in this case.  But under some circumstances — and frequently with experts — counsel are permitted to use what is called a demonstrative basically on the theory that it will assist you in understanding the witness's testimony, understanding the witness's opinions.

So you may consider this in conjunction with the testimony that you're about to hear.  But to be clear, it's the testimony that is the evidence, not the demonstrative that is the evidence.  The demonstrative is being shown to you simply as an aid to assist you in understanding the testimony.

With that, you may proceed.

BY MS. SHUDOFSKY:

Q.  Mr. Wittman, you testified just a few minutes ago about what you describe as three indicia of a third party assisting fraudulent activity by a dishonest agent in the art industry; is that right?

A.  Yes.

Q.  And let me review each of those with you.

So your first indicia — put it up on the screen — is that an individual or entity has knowledge that a buyer is operating on behalf of a principal; is that right?

A.   Yes.

Q.   And you mean that the buyer is an agent for somebody else, right?

A.   Yes.

Q.   So your first indicia is that a third party knows that a buyer is an agent for somebody else, right?

A.   Well, yes, but the -- yes.

Q.   Your opinion is you're talking about the individual has knowledge that a buyer is an agent.  So if the individual doesn't have knowledge that a buyer is an agent, then your first indicia doesn't apply at all, right?

A.   Yes, they have to know.  That's correct.

Q.   Whether Indicia No. 1 of your opinion applies in any given case depends on the facts of the case, right?

A.   Oh, absolutely.  Everything is fact-sensitive.

Q.   So let's go to the second indicia of a third party assisting fraudulent activity by dishonest agent.  And here, the second indicia is the individual or entity prepares supporting materials about the value or quality of an artwork at the agent's request.  And according to the agent's instructions, in order to support an inflated price, the agent is seeking to convince the principal to pay.  That's your

second indicia, do I have that right?

A.   Yes, ma'am.

Q.   Okay.

THE COURT:  Just keep your voice up, please.

Q.   Let me just unpack that with you.

So let's start with the first part.  A third party prepares supporting materials about the value or quality of an artwork.  And I'm going to give you an example.

An example of that might be if a third-party buyer -- I'm sorry, if the third party sends a buyer a document certifying that the artwork is, let's say, an authentic Andy Warhol painting, that would be an example of an entity sending supporting materials about the value or quality of an artwork, right?

A.   Yes.

Q.   And it would also include sending the agent an email explaining in flowery language that the Andy Warhol painting is a very important work of art, right?

A.   You're referring to like puffing it, puffing up, puffery?

Q.   Sending one's opinion that an Andy Warhol painting is an important work of art, that's an example of a third party preparing materials about the value or quality of an artwork, right?

A.   Yes.

Q.   And this could also include providing an estimate for the

Andy Warhol painting, right, telling the buyer what the piece might be worth, right?

A.  They could.

Q.  And you're not suggesting that doing the things that I have just listed for you is automatically fraudulent, right?

A.  Oh, no, it's all fact-sensitive.

Q.  So art market participants regularly provide materials regarding the value or the quality of an artwork as part of their regular legitimate business activity, right?

A.  Sure.

Q.  So let's look at the rest of your Indicia No. 2.  So you say that the third party prepares supporting materials in order to support an inflated price.  Do you see that?  That's part of your opinion.

A.  Yes.

Q.  Now, that's the key part of your Indicia No. 2, right, that the materials are being sent to support an inflated price, right?

A.  Yes.

Q.  And when you say "inflated," you mean fraudulent, right?

A.  Not necessarily.  It's inflated if -- if the buyer knows that the price is above what is being offered, then it's not fraudulent.

Q.  Well, when you use it in this context, in the context of Indicia No. 2, you're talking about the individual preparing

materials in order to support a fraudulent price; isn't that right?

A.  Yes.

Q.  So if I read this Indicia No. 2 using that substitution for the word with identical meaning, it would say the individual or entity prepares supporting materials about the value or quality of an artwork at the agent's request and, according to the agent's instructions, in order to support a fraudulent price, the agent is seeking to convince the principal to pay, right?

A.  Yes.

Q.  So when you say the materials are in order to support a fraudulent price, you mean that the third party's purpose is to help the agent commit fraud, right?

A.  It could be.

Q.  Well, isn't that what you're saying here, that the purpose of the third party is to send materials to help the agent commit fraud, right?

A.  Could be.

Q.  When you say "could be," isn't that the basis of your Indicia No. 2, that what makes it an indicia of a third party assisting fraud is that the third party is sending materials to the agent for the purpose of helping the agent commit fraud? That is essential to your Indicia No. 2, right?

MS. SALZMAN:  Objection.

THE COURT:  Overruled.

O1BVACC2                       Wittman - Cross

A.   Yes.

Q.   So if the third party's purpose is to help an agent commit fraud, that is an indicia of fraud, that's your opinion, right?

A.   Yes.

Q.   So let's go back to the example of the Andy Warhol.  And let's say somebody prepares an overview of an Andy Warhol painting and explains how great a work of art it is.  Do you understand that first assumption?

A.   Yes.

Q.   Okay.  And then let's say the third party says that the -- in his or her opinion the painting is worth $50 million, so that's what the person puts as his or her estimate.  And let's say the person gave her good-faith honest estimate that the Andy Warhol painting is worth $15 million.  Are you with me so far with my assumptions?

A.   Go back and do it again.

Q.   I'm asking you to assume that the third party gave her good-faith, honest estimate that the Andy Warhol painting, the example I'm using, is worth $15 million.  That's what I'm asking you to assume.

A.   Fifteen, okay.

Q.   $50 million.

A.   50 or 15?

Q.   Five zero, let's say.

A.   Okay.

Q.  And let's say the person didn't know that anyone was committing fraud, and the person who gave the estimate didn't intend to help anyone commit fraud.  Now do you understand all of my assumptions?

A.  I do.

Q.  Okay.  So in the example that I've just given you, the situation that I've given you in which somebody provides a good-faith, honest estimate that a piece of art is worth $50 million and didn't know anything about any intent by anyone to commit fraud, your Indicia No. 2 wouldn't apply at all in that case, right?

A.  No.

Q.  So if the third party didn't know that the agent was lying to his principal, then the third party's actions are not an indicator of assisting in fraud, right?

A.  Right.  Knowledge is important here.  If there's no indication of knowledge, then there would be no fraud by the third party.

Q.  Okay.  So it's fair to say, Mr. Wittman, that whether your Indicia No. 2 applies in any given case depends entirely on the facts of the case, right?

A.  Oh, absolutely.  It's always the facts of the case; everything is fact-sensitive.

Q.  So let me go to your Indicia No. 3, please.  And your indicia here is the materials are delivered to the ultimate

buyer, invoking the credibility of the individual or entity that authored the materials to convince the buyer to buy a particular work or other future works at the inflated prices sought.  That is your Indicia No. 3 of a third party assisting fraud by a dishonest agent, right?

A.  Yes, ma'am.

Q.  So I see that here you're also referencing inflated prices and, once again, as you just told me a minute ago, when you use the word "inflated prices," you mean fraudulent prices, right?

A.  Yes.

Q.  And you mean, once again, this is -- this is the key to your indicia, that the third party in providing the materials intends to assist an agent in committing fraud, right?

A.  Yes.

Q.  And if that's not why the materials are being sent, if the purpose is not to help anyone commit fraud, then your Indicia No. 3 doesn't apply at all, right?

A.  If there's no intent to commit the crime and there's no knowledge, then no, it wouldn't be -- it wouldn't be a fraudulent situation.

Q.  And your third indicia assumes that an agent is going to defraud his principal; is that right?

A.  Yes.

Q.  And your third indicia, I think, as you just said, assumes that the third party who provides the materials has knowledge

that the agent is going to try to defraud his principal, right?

A.   Yes.

Q.   So once again, whether your Indicia No. 3 applies at all is entirely dependent on the facts of any particular case, right?

A.   Absolutely.

Q.   And in response to Ms. Salzman's questions earlier, you were talking about a case of yours in which a -- I think you referred to a dishonest agent paid a third party cash to write a fake letter or fake letters; is that right?

A.   That's correct.

Q.   And in that situation, the third party wrote fake letters to help in a fraud, right?

A.   Yes, ma'am.

Q.   And so you'll agree with me that if the third party wrote good-faith, honest letters, providing, for example, an opinion about -- or an estimate about a work of art and that was the third party's good-faith, honest opinion, then no indicia of your -- none of your indicia could apply, right?

A.   If there's no intent to defraud the collector and it was -- it was their honest opinion, there would be no -- there would be no indicia of fraud.

Q.   Now, you talked also about what you described as indicia of fraudulent activity by a dishonest agent in the art industry.

A.   Yes.

Q.   And I want to just go over a few of those points with you.

Let's turn to the third indicia you talked about. This is that a purported agent charges significant markups on artworks that exceed the agreed-upon commission without disclosing such markups to the buyer. That's your third indicia of -- indicia of fraudulent activity by a dishonest agent in the art industry; is that right?

A. Yes.

Q. So I'm going to -- first thing I'm going to do is ask you to assume -- well, let me withdraw that.

You said that if an agent charges what you call a markup that exceeds the agreed-upon commission, that's an indicia of fraud by the agent, right?

A. I'm not sure. Is this for the third party or for the agent?

Q. This is your third indicia, I think you just told me, for indicia of fraudulent activity by a dishonest agent --

A. By an agent.

Q. -- in the art industry, right?

So I think you said that if an agent charges what you describe as a markup or you call a markup that exceeds the agreed-upon commission, that's an indicia of fraud by the agent, right?

A. Yes, but it wouldn't be the agreed-upon commission. In other words, if they charge a markup over and above the agreed-upon price that they were supposed to get, the actual

price, the commission is based on the price.  So it wouldn't be upon exceed the agreed-upon commission.

In other words, if the purported -- if the agent charges a significant markup, says, I want double what I paid for it, but doesn't tell him that the person is paying double, that's not the commission, that's the actual price of the artwork.

Q.  I believe you testified about the commission situation. Basically, an agent and a principal have an agreement, and they agree that the agent is going to get a certain percentage in connection with some kind of transaction?

A.  Correct.  That's not the markup.  That's not the price. That's the commission.

Q.  Okay.

A.  That's the profit that the agent would get for doing the deal.  The markup is what he's charging his principal, his buyer.

Q.  Well, in your situation, the agent or the principal have an agreement that the agent is only going to get paid some kind of agreed-upon commission, right?

A.  Correct.

Q.  And in your assessment, then that agent who has an agreement that provides that he's only going to get a certain commission, then he goes ahead and he charges more for whatever the art is?

O1BVACC2                        Wittman - Cross

A.   Right.

Q.   He charges something over and above what the buyer or the principal understands or what the buyer is paying, right?

            THE COURT:  Can we start that question over please?

            MS. SHUDOFSKY:  Yes.

            THE COURT:  Thank you.

Q.   When you're talking about a markup, you're talking about --

            THE COURT:  Ms. Shudofsky, hang on.

            Mr. Wittman, I'll ask you to just wait for Ms. Shudofsky to finish the question before you answer just so the court reporter doesn't have to try and take down two people speaking simultaneously.

            THE WITNESS:  Thank you.

            THE COURT:  Go ahead.

BY MS. SHUDOFSKY:

Q.   Let me go at it in a different way.  I'm going to ask you to assume that there's no agency relationship.

A.   Okay.

Q.   You'll make that assumption.  So if there's no agency relationship, then what you call a markup is not an indicator of fraud, right?

A.   Correct.

Q.   Because you can't be a dishonest agent if you're not an agent, right?

A.   Then you don't have a relationship with the buyer and the

buyer believes to be, you know, a representation.  If you don't have that; correct.

Q.  So I'm going to ask you to assume that there was no agreement about a commission.  If there was no agreed-upon commission, it's not possible to charge an amount that's more than an agreed-upon commission, right?

A.  Correct.

Q.  You've been talking about agents in the art market.  And I want to talk for a minute about dealers in the art world.

A dealer buys an artwork and at some point he sells the artwork for more money than what he paid for it, right?

A.  Yes.

Q.  And a dealer --

A.  Hopefully.

Q.  A dealer makes a profit on that resale of the art, right?

A.  That's correct.

Q.  And that's the legitimate business activity of an art dealer, right?

A.  Yes.

Q.  Art dealers buy things, they sell things, and they make money on it, right?

A.  That's correct.

Q.  And in the art world, a dealer and a client can have an arm's-length relationship between them, right?

A.  What do you mean by "arm's-length"?

O1BVACC2                    Wittman - Redirect

Q.  Well, a dealer can -- it really goes to the point I just made.  But a dealer can have a particular client, and maybe that client is interested in particular kinds of artwork, and the dealer looks out.  And if the dealer comes across some particular artist, they might sell a work to that client, right?

A.  Yes.

Q.  And in that situation, the dealer may buy a piece of art and sell it and make money on the sale, right?

A.  Yes.

Q.  So you don't take the position that a dealer and a client of a dealer must necessarily have an agency relationship, right?

A.  No.

Q.  And the existence of an agency relationship is a question that depends on the facts and circumstances of any particular case, right?

A.  Yes.

          MS. SHUDOFSKY:  No further questions.

          THE COURT:  Any redirect?

          MS. SALZMAN:  Very briefly, your Honor.

REDIRECT EXAMINATION

BY MS. SALZMAN:

Q.  Hello, Mr. Wittman.

A.  Hello.

O1BVACC2

Q.  Can someone operating in the art world, can they charge both a commission and a markup on the same work?

A.  Depends on the agreement or the understanding that the buyer has.  If the buyer believes that he's paying the same price that the art adviser paid for the material, then no.  If the buyer says to him, I don't care what you paid for it, I'll pay whatever you want, then it's a different deal.  It's a different relationship.

Q.  And if -- let's assume -- we had a lot of assumptions on cross-examination.  Let me give you one as well.

If you assume that a third party, say an employee of an auction house, gives a knowingly inflated valuation to an art agent to pass on to that art agent's client, to help that agent charge an inflated price, would that be an indicator of fraud?

A.  Yes.

Q.  Thank you, Mr. Wittman.

THE COURT:  All right, Mr. Wittman.

You may step down.  Thank you.

(Witness excused)

THE COURT:  Plaintiff, next witness please.

MR. WILSON:  Your Honor, at this time the plaintiffs will call a 30(b)(6) witness by video deposition.

THE COURT:  All right.  Ladies and gentlemen, let me explain what's about to happen.

Mr. Wilson, how long is this video?

MR. WILSON:  The video -- it's a series of individual clips, and together they are about 30 minutes; so it may take us slightly past when we ordinarily would break.  We could pause it and resume the clips after the break as well.

THE COURT:  All right.  Well, let's take it one step at a time.

Let me explain what's about to happen.

So first of all, in litigation in federal court in this country, there's a process called discovery before trial, which is a process during which basically the parties exchange certain information, get documents and the like, and they also take what are known as depositions.  Those are basically opportunities to question somebody, either a party in the case or somebody with relevant information, under oath in much the same way that you're seeing here except that there's no judge present.  So that's what a deposition is.

And under some circumstances, the rules that govern trials permit parties to then show portions of the deposition at trial.  And there's a process to basically decide which portions can be shown and for the judge, for me, to rule on any objections at that time.  All of which is to say whatever you're about to see has gone through that process and I have ruled as admissible in this case and you can consider as you do all the other evidence in the case.  And as I've said, what

weight, if any, you give to any evidence in this case is up to you.  All of which is to say you can and should treat any deposition testimony that you see as if it were testimony given here in court.

You heard Mr. Wilson make reference to 30(b)(6).  That's a reference to a rule.  Lawyers like to make things complicated, but it's a rule that governs in federal court.  It's a rule that permits a party to designate a witness to speak on behalf of an organization such as a corporation.

The witness that you're about to hear from was designated to speak on behalf of the defendants in this case, that is, Sotheby's and Sotheby's, Inc.  So the witness's testimony by virtue of that rule binds the defendants and should be considered as if it were the defendants' testimony.

With that, let's proceed.  And I may interrupt, depending on timing and if there's a natural break, but go ahead.

MR. WILSON:  Your Honor, in this series of clips, there are several documents presented, and so plaintiffs --  Toby, if you could put up on the screen for identification Plaintiff's Exhibit 259 for identification, please.

Your Honor, in advance of playing the corporate representative deposition, plaintiffs move into evidence Plaintiff's Exhibit 259.

THE COURT:  Any objection?

O1BVACC2

MR. ASNER:  No objection, your Honor.

THE COURT:  Admitted.

(Plaintiff's Exhibit 259 received in evidence)

MR. WILSON:  And your Honor, we will publish this to the jury during the course of the recordings.

THE COURT:  That's fine.

One further explanation, in fact, if you could just show it briefly now.

MR. WILSON:  Can you please publish it, Toby.

THE COURT:  You'll notice, ladies and gentlemen, that there is a yellow exhibit sticker on the bottom that says "Plaintiff's Exhibit 259."  That is the exhibit number for purposes of this trial, so it will be referred to throughout trial as Plaintiff's Exhibit 259.  That's what it will be labeled when you receive it during your deliberations when you have all of the evidence in the case.

You'll notice that the top right there is an exhibit sticker label, that says "Exhibit Deposition Exhibit 106."  That's because when the deposition occurs, things are marked in much the same way that you've seen them labeled during trial.  But because that's sometimes many months or many years even before the trial, it doesn't always correspond to the exhibits that are ultimately used at trial.  So there's sometimes a discrepancy between those two things.

All of which is to say during this deposition and

perhaps subsequent depositions that you may see, there may be references to documents by reference to a particular exhibit number that doesn't correspond to the exhibit number that is actually being used during this trial.  I just don't want there to be any confusion, so hopefully you can just follow that, but wanted to explain.

So it is the Plaintiff's Exhibit 259 for this particular example that we will treat this as.

Go ahead.

MR. WILSON:  Thank you, Toby.

Can you put up the next exhibit for identification, which is Plaintiff's Exhibit 303 for identification.

THE COURT:  Maybe we could do this more quickly.  Can you just give me a list of what I assume is coming in through this deposition.

MR. WILSON:  Yes, your Honor.  It's this Plaintiff's Exhibit 303, and one other, Plaintiff's Exhibit 179.  That's all.

THE COURT:  All right.

Any objection to those two, Mr. Asner?

MR. ASNER:  No objection, your Honor.

THE COURT:  All right.  So those three are admitted.

(Plaintiff's Exhibits 179, 303 received in evidence)

THE COURT:  And with that, you can proceed.

MR. WILSON:  Thank you.

Toby, can you please play the corporate representative deposition clips.  Thank you.

(Video played)

THE COURT:  All right.  Let's stop there, since it's 11:29.

Ladies and gentlemen, when we resume, we'll pick up with the remainder of this videotaped deposition.

As you know, don't discuss the case, don't do any research about the case, continue to keep an open mind.  We're beginning to pick up some speed and make some progress, but still haven't heard all of the evidence.

With that, please be ready to go a minute or two before noon and enjoy your break.  Thank you very much.

(Jury not present)

THE COURT:  You may be seated.

All right.  A couple of quick things.

First, you may have noticed or you may know the court reporters are not going to be recording the videotapes because they are already transcribed, so just so you're aware of that.

I do think a record should be on the docket of what is being played.  To the extent that it corresponds with what was already filed for the deposition designations, which I think it does here, then I think that's already been done.  But going forward, let's just make sure that if it's not on the docket somewhere, that it is when it's played.

O1BVACC2

Second, I will need time allocations, how much is attributable to each side with respect to each of the videotapes that is played. Again, I think the transcripts that you filed have a time marker at the end. And to the extent that everything is played that is in the transcript, maybe that does it, but if you can just confer with one another and hopefully agree upon how many minutes are chargeable to each side, that would be helpful.

Third, just going forward, I'm a big fan of saving time where we can. Where it's possible, for example, with the Wildenstein documents to, sort of, lay the proper foundation as to more than one document at a time, I would prefer that you do that just to save time in front of the jury rather than in that instance doing the business records foundation for all four. If it's disputed and there's an issue, then it may be necessary to break them up. But to the extent that we can kind of do that in bulk, I think that would be great.

And then lastly, just a reminder that at some point we'll want the jury to know that the translations are all agreed upon by both sides. So I assume that you were discussing how to handle that, but I expect you to come back to me on that at some point.

Anything from plaintiff before we break?

MS. SALZMAN: No, your Honor.

And we are working on the translation stipulation, as

O1BVACC2

you requested.  We're just waiting to hear back from the defense on that.

THE COURT:  All right.

And after this is the Bouvier deposition; is that right?

MS. SALZMAN:  Correct, your Honor.

THE COURT:  And how long is that?

MS. SALZMAN:  A little over 15 minutes, I believe, your Honor; in the range of 15 to 20 minutes.

THE COURT:  And then it would be Mr. Rybolovlev?

MS. SALZMAN:  Correct.

THE COURT:  Okay.  Anything from defendants?

MR. ASNER:  No, your Honor.

THE COURT:  All right.  Please be ready to go a minute or two before noon.  Enjoy your break.  Thank you.

(Luncheon recess)

(Continued on next page)

O183ACC3

                        AFTERNOON SESSION

                             12:00 p.m.

          (In open court; jury not present)

          MR. KORNSTEIN:  We received this morning the exhibits

that defendant wants to use on cross-examination of

Mr. Rybolovlev.  We have some issues with that.  We can either

take it up now or at another break.

          THE COURT:  How long do you expect the direct of

Mr. Rybolovlev to be?

          MR. KORNSTEIN:  It may be this afternoon.

          THE COURT:  It may take the rest of the afternoon?

          MR. KORNSTEIN:  It may.  Because of translations, so

yes.

          THE COURT:  Let's take it up at the end of the day

then.

          I assume -- I understand that Mr. Rybolovlev purchased

property from the former president.  I assume that will not be

introduced by anyone in this case.  Is that correct?

          MR. KORNSTEIN:  Correct for plaintiff.

          MR. ASNER:  Yes.

          THE COURT:  I figured not really relevant or doesn't

appear to be relevant, and some obvious prejudicial issues

there.

          Let's get the jury and resume with the video.

          (Jury present)

THE COURT:  Welcome back, ladies and gentlemen.  I hope you enjoyed your break.  And we will continue with the videotape deposition of the 30(b)(6) deposition of the defendants.

You may continue.

(Video playing)

THE COURT:  I think that concludes the video, correct?

MS. SALZMAN:  The plaintiff calls Yves Bouvier by video deposition.

THE COURT:  Ladies and gentlemen, you're about to watch and hear another videotape deposition.  Let me say two things about this one.  First of all, conducted under absolutely different circumstances, because Mr. Bouvier was not present in the United States when this deposition occurred.  It was an examination that occurred I believe in Switzerland.  But there are circumstances or ways in which that can be done in connection with cases going on in the United States.  And that's what happened here.  And we followed the same process, namely, both sides can identify portions of the deposition that they wish to use at trial, and if there are any disputes about it or objections, then I rule on those.

Second, if I'm not mistaken, this deposition was conducted in French, not in English.  And I think what you will see -- counsel, you can correct me if I'm wrong -- are English subtitles that correspond to the French that is being used

during the deposition.

I don't remember, I don't think from voir dire that any of you understand French, but to the extent you do have any understanding of French or figure out any of the French that's being spoken, I instruct you it is the English language translation that has been agreed upon here that is the evidence. So, to the extent you do know French or can understand anything that's spoken in French in the video, disregard that and please pay attention to the English. That's to ensure all of you are on the same page and basically are considering the same evidence. So it is the English translation that is the evidence that you are about to hear and not the French original.

With that, you may proceed.

MS. SALZMAN: Thank you, your Honor.

(Video deposition of Yves Bouvier playing)

MS. SHUDOFSKY: Objection, your Honor.

(Video playing)

THE COURT: All right. Ladies and gentlemen, let me mention that a moment ago, you heard Mr. Bouvier twice invoke what he referred to as Section 166 or Article 166 of the Civil Procedure Code and declined to answer a question on that basis. Specifically, what that involved, Mr. Bouvier invoked his right not to answer those questions under a Swiss law that allows a witness who is not a party to a proceeding to refuse to

cooperate and establish facts that could expose him to liability.

For the question and questions that Mr. Bouvier declined to answer, namely, did you do your own due diligence before acquiring the artwork allegedly from Sotheby's, you are permitted -- but not required -- to draw the inference that Mr. Bouvier did not do his own due diligence before acquiring the artwork from Sotheby's. You may not, however, draw any inference based on Mr. Bouvier's refusal to answer the questions that his answer to the questions would have been unfavorable to the defendants in this case. So I want you to understand that.

I know there was an objection at some point lodged during the video we'll discuss later. But that objection is overruled.

Next witness.

MR. KORNSTEIN:  The plaintiff calls Dmitry Rybolovlev to the stand.

THE COURT:  In a moment you can proceed, Mr. Kornstein, but just briefly, similar to the instructions here, you'll see or you've now seen that Mr. Rybolovlev is testifying with the assistance of a Russian language interpreter.

To the extent that any of you understands Russian, that is not the evidence that you are to consider. You are to

consider the translation that is given, and that is to say the English language translation of his testimony that is the evidence that you are to consider.

With that, you may proceed with Mr. Kornstein.

DMITRY RYBOLOVLEV,

     called as a witness by the Plaintiff,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. KORNSTEIN:

Q.   Who is the plaintiff in this case?

A.   The company Accent Delight.

Q.   Do you have any connection with that company?

A.   Yes, the trust of the family of Rybolovlev is the owner of that company.

Q.   What is your relationship to the company, specifically?

A.   I have a power of attorney.  And this power of attorney, I have this power of attorney to basically render investment decisions and to sell and purchase artwork.

Q.   What does Accent Delight do?

A.   Purchases artwork and invests in artwork.

Q.   Where were you born?

A.   So I was born in the city of Perm that was in the former Soviet Union.

Q.   What part of the former Soviet Union is it geographically?

A.   So somewhere in the middle of the former Soviet Union.

Q.  Did there come a time when you left Russia?

A.  Yes, it happened in 1995.  Myself and my family, we moved to Switzerland.

Q.  Where do you live now?

A.  So, in Monaco, for over 10 years already.

Q.  Can you tell us about your education and training.

A.  So, I graduated from high school in the city of Perm.  And also there, in the city of Perm, I graduated from medical school with honors.

Q.  What did you do after graduating from medical school?

A.  So, several months I was working in the emergency department of the hospital.  So, and later on, myself and my father, we organized a company to render medical services.  So, that actually was a time where you could engage in business in Russia.  Because before that time, you could wind up in jail if you were an entrepreneur.

Q.  What did you do next?

A.  So after some time, after my first experience in business that I acquired, I was very -- I became very interested in stocks and so I went to Moscow to study in this respect.  So, and I was actually one of the first to pass the exam to be engaged in buying and selling stocks.

Q.  What did you do next?

A.  So I opened the very first investment company and investment fund in the Perm region.  So it actually happened

during the time when the country was going through the process of privatization. So, actually, privatization is when the state was selling shares of different companies, enterprises.

Q. What did you do under that system?

A. So, it was a whole process as a result of my taking part in different operations in the market, buying and selling shares in the market. So I managed to acquire the controlling stake in Uralkali, in this company, through all of these operations and maneuvers. So, Uralkali is a company that basically produces fertilizers.

Q. What happened after you acquired a controlling share in that company?

A. So, and what awaited me next is to transform the Soviet-style company into a market, a modern company, and that was not an easy feat to do. And then we managed to access the London Stock Exchange with this company.

Q. And then what?

A. Well, and later on, in 2010, the company was sold.

Q. Was what you just said in terms of Uralkali the source of your wealth?

A. Yes, it happened in two stages. Basically the first stage was the IPO, and the stock market, and the second stage of wealth acquisition was the sale of the company itself.

Q. Would you explain an IPO.

A. Basically an IPO is when a non-public company issues its

shares to the stock market and becomes public.

Q.  Did there come a time when you became interested in buying art?

A.  Yes.

Q.  How did that come about?

A.  So, we purchased a new house for myself and my family, in Geneva, Switzerland.  And the owner, the previous owner of that house was a collector.  And so, basically, his house, his whole house was constructed in such a way that you had to have paintings on the walls of that house.  So you had spotlights for each and every painting, and it was already pre-installed in the walls of the house.

So, I had to either get something on the wall for that very spotlight, or I had to change something with the house.

So, as my friend said, each and every one of us has his own way that he finds himself in art, and my way was through electricity and lighting and lightbulbs.

Q.  Was there any particular work of art in the house at the time that attracted your attention?

A.  So, yes, the former owner of the house actually had Marc Chagall displayed on the primary wall of his residence.  So and I loved the artist, and I decided why not, I should also find a large piece by Chagall.  So, that's how I actually acquired my first painting, *The Grand Cirque* by Marc Chagall.

Q.  Did there come a time when you met a man named Yves

Bouvier?

A.   So, yes, actually, when the painting was already purchased, myself and my ex-wife and Tania Rappo, we went to the free port in Geneva to take a look at the painting.  So, and in that very space, in that room, where the painting was displayed, I saw Yves Bouvier.

Q.   Do you know where the painting was displayed, where the room was?

A.   So, actually, the free port in Geneva is organized in such a way that different companies rent space in the free port to store their artwork.  But they also have a special room for viewing, and that's where I saw or viewed the painting and encountered Yves Bouvier.

Q.   Can you tell us what your understanding of a free port is.

A.   So it's a customs free zone, and artwork can be stored there without crossing the border.

Q.   You mentioned Tania Rappo.  Who is she?

A.   So when we moved to Switzerland, while nobody spoke French, amongst my family, so and she was the wife of our dentist, she is from Bulgaria but she spoke Russian well, and she was of the same orthodox faith.  So we started to meet and engage with Tania Rappo more and more often, and a deep friendship developed.  And by this particular time, I had complete faith and trust in that person.  And she also became the godmother of my child.

Q.   What was Tania Rappo's connection to the Chagall painting?

A.   So, Tania was actually the first person, one of the first people who came into with us in that new house.  She is a very active woman, she knows a lot of, things and she's socially very active.  And friends actually described her that she's so active, and so social, that she can talk with a wall.  She can engage a wall in conversation.

So, she had different friends, acquaintances, and so she started calling up all her friends and acquaintances, and it was quite an interesting process to find the right artwork.  So we wanted to reduce the number of intermediaries because there was a lot of those.  And at that point in time she really helped and, thus, I started to trust her even more.

Q.   Was she involved in the purchase of the Chagall painting?

A.   Yes, she helped in the negotiation process.

Q.   Let's go back to the first meeting with Mr. Bouvier.  Who was present at that meeting at the free port?

A.   So Bouvier, Tania, myself, and my ex-wife.

Q.   How long did the meeting, that first meeting take place?

A.   The meeting didn't last too long.  So we came, we looked at the painting, had a rather short conversation with Bouvier, and that was that.

Q.   Do you recall what year this meeting took place?

A.   So, it happened around 2002.

Q.   You mentioned a conversation.  Do you speak French?

A.  No, I do not.

Q.  Did someone translate -- let me back up.

What language did Mr. Bouvier speak?

A.  He spoke French.

Q.  Did someone translate what he said for you?

A.  Yes, Rappo.

Q.  And did your wife at the time also speak French?

A.  Well, by that time, yes.

Q.  Based on the translation that Rappo gave of what Bouvier was saying, can you tell us what you understood to have been said by him in the conversation via the translation?

MR. ASNER:  Your Honor, request for instruction.

THE COURT:  Yes.

Ladies and gentlemen, you may recall something on this front came up during openings, and I mentioned something at the time, but let me explain it now since we're now in the right context.

I'm going to permit Mr. Rybolovlev to testify regarding what Ms. Rappo said Mr. Bouvier said, since as you just heard, Ms. Rappo was translating Mr. Bouvier from French into Russian that Mr. Rybolovlev was speaking.

Because Mr. Rybolovlev can't testify directly as to what Mr. Bouvier said, you can't consider the testimony that you are about to hear as for the truth of what Mr. Bouvier allegedly said or for that matter that the fact Mr. Bouvier

actually said it.  All you can do is rely on it for what Mr. Rybolovlev was told that Mr. Bouvier said by Ms. Rappo. And you can only consider that in connection with the effect it had on Mr. Rybolovlev, and that is it to say, what his understanding was.  But you can't rely on this to be proof that Mr. Bouvier actually said these things.

You may proceed.

BY MR. KORNSTEIN:

Q.  What was your understanding of what Mr. Bouvier said at that meeting, the first meeting?

A.  So he said we did not manage to avoid all the intermediaries and the price could have been lower.

Q.  Did you say anything in response?

A.  Right now, I can't recall.

Q.  Was anything else -- do you understand whether anything else was said at the meeting, that first meeting?

A.  No, right now, I will not be able to recall.  But we all loved the painting.

Q.  And who did you understand Mr. Bouvier to be?

A.  At that particular time, I did not really understand who he was, and I couldn't comprehend how he found himself there at that very particular moment, because nobody really invited him, or that's what I thought.  Well, just that he had some relation to that company that was in this free port.

Q.  After that first meeting, what happened next; was there

another meeting?

A.   Yes, at some point in time, Tania Rappo said that it would

be interesting to meet Bouvier because he has a very

interesting proposal that he wanted to voice.

Q.   When Rappo told you that, where did that happen?

A.   Right now, I can't recall, but maybe it was in our house

that she told me this at a certain point in time.

Q.   After that conversation with Ms. Rappo, when was the next

meeting with Mr. Bouvier?

A.   Well, after a short period in time, there was another

meeting.

Q.   Where did that meeting take place?

A.   In our home, in Geneva.

Q.   Who was present?

A.   Bouvier, Rappo, myself, and my ex-wife, and my eldest

daughter could have also participated for part of that meeting.

It is because the meeting took place in my home, and she was

just at home at that time.  She was at that time very

interested in the life of adults and so she could have

eavesdropped.

Q.   How old was she then?

A.   12, 13 at that time.

Q.   What time of day did the conversation occur?

A.   Around the daytime.

Q.   What is the name of your eldest daughter?

A.   Katya.

Q.   Did a conversation take place at that time?  Just whether the conversation occurred.

A.   Yes, there was a conversation.

Q.   And did someone translate what Mr. Bouvier was saying for you?

A.   Yes, Rappo did.

Q.   Can you tell us what your understanding was, based on the translation that Ms. Rappo gave of what Mr. Bouvier was saying, what was your understanding of what was said?

A.   So Bouvier started the conversation with mentioning that the art market is very difficult, there is a lot of intermediaries involved.  And he also said that it is very important to have direct access to the owners of the art, that the closer you are to the owners, the less the price will be. And that he has these capabilities because a lot of owners, they store their artwork in free port.

Q.   Was it your understanding whether anything else was said by him as translated by Tania Rappo or did you respond to what he said?

A.   He actually made a proposal to me that he could provide these services.

Q.   Based on the translation that Rappo gave of what Mr. Bouvier said, what is your understanding of the proposal that he made?

A.   That he will act in our best interest and search for artwork for the best price.  Because he mentioned that he has this unique ability, this benefit, to have a direct access to the owners of the artwork.

Q.   Did he say, as translated by Rappo, anything else about what he was proposing?  What was your understanding?

A.   Well, in general, that was the understanding, basically he was proposing typical agency services.

Q.   Did you respond to what he said through Rappo with the translation?

A.   Yes, I said that it's quite interesting, and asked how much are his services worth.

Q.   Based on the translation that Rappo gave of what Bouvier said, what is your understanding of what his response was to what you said?

A.   He responded 2 percent.

Q.   Was anything else said at that meeting?

A.   So, yes, he demanded that confidentiality exist, especially for the services that he was going to provide me, that it all be confidential.

Q.   Did you come to any agreement at that meeting with Mr. Bouvier?

A.   I didn't haggle with him during that conversation.  I said that 2 percent is quite acceptable for me.  So I agreed.

          MR. ASNER:  Request for instruction, your Honor.

THE COURT:  Well, I think the jury gets the point, but again, all of what Mr. Rybolovlev is testifying about is just what Ms. Rappo told him is what Mr. Bouvier said.  He's not in a position to know that Mr. Bouvier actually said that.  So I'm admitting it, but for the limited purpose of just the effect it had on Mr. Rybolovlev, that is to say, actions he took, things that he understood.  But it is not evidence that Mr. Bouvier actually said those things, let alone that what he purportedly said was true.

BY MR. KORNSTEIN:

Q.  Did Mr. Bouvier stay in the meeting after that or did he leave?

A.  He left.  And Rappo remained at the meeting.

Q.  Before Mr. Bouvier left, did you come to a handshake about it?

A.  As far as I can recall, yes.

Q.  After Mr. Bouvier left, so who was left in the meeting?

A.  So it was Tania Rappo, me, and my ex-wife.

Q.  And did you discuss anything about what had happened with the meeting with Mr. Bouvier?

A.  Yes, but it was mostly Tania Rappo doing the talking.

Q.  What did she say?

A.  She said that the proposal looks very interesting, and she asked me if I liked Yves, and a lot of things.

Q.  How long did that conversation go on about?

A.   Right now, I can't recall.

Q.   How important -- well, was it important to you that Tania Rappo was endorsing Mr. Bouvier?

A.   Yes, of course, because I trusted her completely.  And she has been living in Geneva for quite some time and she understands local specifics.

Q.   So, after that follow-up meeting, after Bouvier had left, what was your understanding of the arrangement that you understood you would come to with Mr. Bouvier?

A.   A typical agency relationship with a commission of 2 percent.

Q.   When you say a typical agent relationship, what do you mean?

A.   So, there's two types of relationships that exist.  So, the first type of relationship, if you purchase directly from the seller, you negotiate the price, you access the market, you do the research, and then you either purchase the artwork, or you do not.

Well, not specifically for art.  I'm speaking in general terms, so there are two types of a relationship in general terms.

And there is a second type of relationship when you have an agent who acts in your best interests and basically searches for the best piece for you, and you do not haggle with him.  You do not negotiate with the agent.  Because it's like,

you know, negotiating with yourself.  And he receives a commission after the transaction takes place.

Q.  Do you know if there is a difference between an agent and a dealer?

A.  So, approximately that's how it works.  As I have explained, a dealer and an agent.  And I didn't have any inclination that Bouvier could have been a dealer because he didn't even have purchase power, the money, to acquire artwork of that caliber.

Q.  How did you know that?

A.  Because he was engaged in the business of renting out storage space in free port.  So you can't make a lot of money there.

Q.  So, was Bouvier going to identify works of art for you to purchase?

A.  Yes.

Q.  Was he going --

A.  Yes, to identify, to search, to find this artwork, and to negotiate the best price.

Q.  And what was your understanding of Bouvier's compensation for doing this work?

A.  So 2 percent from the transaction amount.

Q.  Did the deal also involve Bouvier getting any other compensation from you?

A.  No.

Q.   Did you write down the terms of this agreement?

A.   So, I have a lot of interests and also I have a lot of businesses.  So mostly I delegate these kind of situations to the right people.

Q.   And in this situation, who did you delegate to?

A.   Mikhail Sazonov, I told him about all of this, this endeavor.  And Mikhail Sazonov was supposed to decide how and in what way he was supposed to formalize the relationship with Bouvier.  That was his responsibility.

Q.   And at that time, did you know whether Bouvier and Rappo had any sort of financial arrangement, based on work that he would do for you?

A.   No.

Q.   So, this was all in 2002?

A.   Yes, somewhere around that time, maybe end of 2002, beginning of 2003.

Q.   Did there come a time when Mr. Bouvier proposed a purchase of art for you, after that?

A.   Yes, in 2003, he proposed that I purchase a painting by Van Gogh.

Q.   Toby, could you put Exhibit 353 on the screen for the judge and counsel.  Plaintiff's Exhibit 353.

        Do you see that, Mr. Rybolovlev?

A.   Yes, I do.

Q.   Do you recognize it?

O183ACC3                      Rybolovlev - Direct

A.  I do.

Q.  What is it?

A.  So it is a letter that Yves Bouvier sent addressed to me.

          MR. KORNSTEIN:  Toby, could you switch to page 3, the English translation.

          Your Honor, move it into evidence, please.

          THE COURT:  Let's wait for the English, please.

          MR. ASNER:  No objection, your Honor.

          THE COURT:  Admitted.

          (Plaintiff's Exhibit 353 received in evidence)

          MR. KORNSTEIN:  May I publish, your Honor?

          THE COURT:  You may.

Q.  When you received this letter, what did you think?

          MR. ASNER:  Objection.

          MR. KORNSTEIN:  All right.  I'll rephrase.

          THE COURT:  The question is withdrawn.  Mr. Kornstein, just keep your voice up, please.

          MR. KORNSTEIN:  Yes.

          Toby, would you go to page 5.

          MR. ASNER:  Your Honor, my Russian is a little rusty.

          MR. KORNSTEIN:  Well, the English version is on page 3, and the Russian is on page 5.

          MR. ASNER:  We're showing the Russian version to the jury.  And to me.

          THE COURT:  Correct.  Is there a question?

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

BY MR. KORNSTEIN:

Q.  Mr. Rybolovlev, what was your reaction when you got this letter?

A.  So, actually this letter reflects everything that we discussed with Yves.

THE COURT:  Could you actually put the English page on one side and the Russian on the other, perhaps.  Is that doable?  Next question.

Q.  Can you tell us in what ways it reflected what you had agreed to?

A.  So if we actually look at paragraph 2, he writes, "As you know, the owner of this masterpiece has entrusted us with the sale of this painting."

Q.  Why is that consistent with your understanding?

A.  So, it shows that he is not the owner of the painting, that he may be actually the agent of the owner as well, and because here, you can see that the owner entrusted him with the sale of the painting.  That's what it says.

(Continued on next page)

BY MR. KORNSTEIN:

Q.   Is there anything else in the letter that was consistent with your understanding?

A.   So paragraph 4, second part.  So moreover, we prefer to work directly not to share the commission with the American agent.

Q.   And why is that consistent with your understanding?

A.   Because he's actually speaking about his commission.

Q.   Is there anything else in the letter that reflects your understanding of the arrangement?

A.   Well, yes.  Because also end of next paragraph he says that the owner is not going to wait to receive the final offer.  He will easily understand that the owner will not wait to receive the final offer.

Q.   After reading this letter, did you have any doubts that your understanding of the agreement with Bouvier was exactly as you had said to us?

A.   No.

Q.   Is there anything in this letter that indicates Mr. Bouvier would be selling this work of art from himself as the owner?

A.   No.

Q.   Did there come a time when you learned there were four written contracts for the first four art purchases that you made with Mr. Bouvier?

A.   Yes, but that was after the fact when the fraud was

uncovered.

Q.  Do you recall what year you discovered the fraud?

MR. ASNER:  Objection, your Honor.

THE COURT:  All right.  Let me interrupt and just remind you that witnesses during trial may use terms that will also appear in my final instructions, that is to say, "fraud," "agent," "duty," so on and so forth.

It's my instructions that control.  And when you hear a witness testify about those matters, it's just their lay understanding of those terms.  It's ultimately up to you — and up to you alone — to determine whether the plaintiff in this case proves its claims.  And I will explain what it needs to prove in order to do that.

With that, you may answer the question.

A.  So it happened around the end of 2014.  I think it was December 30th.

Q.  All right.  And these written contracts, these four earlier written contracts, did you ever find out about when they were written?

A.  I didn't really understand the question.  If you can repeat it, please.

Q.  Let me ask a different question.

Do you know if Bouvier got a commission on each of those four sales?

A.  Yes, of course.

Q.  And do you know how much that commission was as a percentage?

A.  It was always two percent.

Q.  Are you familiar with a company called Xitrans, X-I-T-R-A-N-S?

A.  Yes.

Q.  What is it?

A.  So the company Xitrans was established specifically for art purchases right from the very beginning when we began purchasing artwork.

Q.  And do you have any connection with that company?

A.  Yes, I was the sole shareholder of that company.

Q.  Was the company connected with any family trust?

A.  At that point in time, no.

Q.  Did it become at some other time?

A.  Yes.  When the family trusts were organized, it was handed over to one of the trusts.

Q.  Did you have any function at Xitrans?

A.  So at first my function, my position was the sole shareholder of Xitrans.  And then I had the power-of-attorney.

Q.  And what was the power-of-attorney for?

A.  I had the power-of-attorney to invest funds into artwork.

Q.  Did there come a time when you met a man named Samuel Valette?

A.  Yes, there came a time like that.

O1BVACC4                        Rybolovlev - Direct

Q.   How many times have you met him in person?

A.   Three times.

Q.   Have you seen his name on any documents?

A.   Yes, I did.

Q.   Do you remember the first time that you met him?

A.   Yes, it happened in 2012, during the viewing of the Klimt painting.

Q.   Where did that take place?

A.   In Vienna.

Q.   Who else was present?

A.   Yves Bouvier and Michael Sazonov.

Q.   Again, since you don't speak French, did anyone translate if either Mr. Bouvier or Mr. Valette spoke?

A.   Mikhail Sazonov did the translating.

Q.   Can you tell us what happened at that meeting, at that viewing?

A.   So Valette introduced Klimt's painting.

Q.   All right.  Let me -- again, that's based on the translation that Sazonov gave of what Valette said; is that correct?  And that's your understanding of what Valette said?

A.   Yes.

Q.   And what else did you understand Valette to have said?

            MR. ASNER:  Your Honor, can I do a brief voir dire?

            THE COURT:  You may.

            Ladies and gentlemen, "voir dire," fancy lawyer term,

again, lawyers like to complicate things.  It's just an opportunity for Mr. Asner in this case to interrupt the direct testimony to ask some questions that pertain to the subject that we're discussing and that concern the admissibility of some of this evidence.

You may proceed.

MR. ASNER:  Your Honor, I can do it right here.  It will be very quick.

Mr. Rybolovlev, I'm Marcus Asner.  I represent Sotheby's and Sotheby's, Inc.

When Mr. Sazonov and Mr. Rybolovlev and Mr. Valette spoke, did they speak in French?

THE WITNESS:  Yes, as far as I can recall.

MR. ASNER:  Thank you.

THE COURT:  Okay.  Next question.

BY MR. KORNSTEIN:

Q.  What else did you understand was said at that meeting?

A.  So Mr. Valette introduced this artwork, this painting; and also explained what this painting was, that it was a masterpiece, that it was unique.  And we all of us discussed that as well because the painting was fantastic.

Q.  We're talking about the *Water Serpents II*?

A.  Yes.

Q.  And did anyone -- was it your understanding that anyone explained where Mr. Valette was from?

A.  As far as I can recall, when Bouvier was introducing him, he said that he's from Sotheby's.

Q.  Did he talk about what his role at Sotheby's was based on your understanding?

A.  No.

Q.  In what kind of a building did this viewing take place?

A.  It was some kind of a warehouse.

Q.  At that time did you know whether the deal being proposed was simple or complex for any reason?

A.  It's hard for me right now to recall at what point in time I had the understanding that the transaction was not a simple one.  So but I had that understanding that it's not a simple transaction that would take some time.

Q.  And did you have any understanding who was in charge of the transaction?

A.  It's hard for me to recall right now, but at a certain point in time I came to understanding that Sotheby's was in charge.

Q.  Did Mr. Valette's comments as translated by Mr. Sazonov have any impact on your decision to buy the painting?

A.  It goes without saying.

Q.  Can you say a little bit more than that about what the impact was for you.

A.  When an expert tells you about an artwork and says that it is fantastic, unique, one of a kind, so you inevitably absorb

O1BVACC4                          Rybolovlev - Direct

that information and react.

Q.  Do you recall when the next time occurred when you met Mr. Valette in person?

A.  Yes, it happened in my apartment in New York.

Q.  What was the occasion?  What was Mr. Valette doing in your apartment?

A.  So at a certain point in time Bouvier asked for a meeting in New York, and so we agreed.  And so when I entered the room, right in front of me the painting by Leonardo da Vinci was displayed on the chair.

Q.  Do you recall when this happened, month and year?

A.  It happened in 2013.

Q.  Do you recall the month?

A.  In March.

Q.  And at that time were you considering buying this particular painting by Leonardo?

A.  Yes.

Q.  So you're in your apartment and you find the Leonardo painting.  What happened next?

A.  Well, I was in my apartment, yes.  I just went into the room where Bouvier was waiting for me, yes.  And it was quite unexpected.  I didn't expect to see the painting there in the room.  So it was a double effect, so to speak.  Of course I was affected by the artwork itself because the painting is astonishing and I did not expect to see it.  That was also a

surprise.

Q.  Was there anyone else present besides you and Mr. Bouvier?

A.  So after we left that particular room and moved to a different room, Mr. Valette was waiting for us there.

Q.  Was there any other person present?

A.  So my ex-girlfriend was there and she did the translating.

Q.  Based on the translation that your ex-girlfriend gave, can you tell us what Mr. Bouvier and what Mr. Valette said and what you said in response.

MR. ASNER:  Again, brief voir dire, your Honor.  Brief voir dire, really just the language.

THE COURT:  Okay.

MR. ASNER:  Mr. Rybolovlev, can you let us know what language Mr. Valette and Mr. Bouvier spoke during that occasion?

THE WITNESS:  They spoke English.

THE COURT:  Do you speak English, Mr. Rybolovlev?

THE WITNESS:  No, but my girlfriend did.

THE COURT:  All right.  Ladies and gentlemen, this probably goes without saying, but to the extent that Mr. Rybolovlev testifies about any conversations in which somebody served as the translator, unless I tell you otherwise, my instructions earlier control and you are to consider it only with respect to what he was told and the effect it had on him, but not for the truth that that is what was actually said, let

alone that it was true.

Go ahead, Mr. Kornstein.

BY MR. KORNSTEIN:

Q.   What did you talk about with Mr. Bouvier and Mr. Valette?

A.   We discussed the painting.  The same thing, that the painting is incomparable.  And as far as I remember, we discussed its authenticity.

Q.   Why did you talk about its authenticity?

A.   One of my business partners actually was the first one who told me about this painting.  And accordingly, since Yves Bouvier was our agent, I detracted him to research this issue. He came back to me and said that it was authentic.

Q.   When you saw Mr. Valette, did you recognize him?

A.   Yes.  Well, but more likely, you know, I entered and I didn't recognize him immediately.  And Bouvier said, Do you remember, you guys met already.  That's how I remember it.  And at that point in time I did recall that I remembered him.

Q.   And did you see any sign of recognition on Mr. Valette's part that he had seen you before?

A.   Yes.

Q.   And how were you dressed?

A.   Well, at home usually I'm dressed quite informally.

Q.   And how were they dressed?

A.   Casual.

Q.   And had you expected them to be there?

A.   I did expect Mr. Bouvier, but I did not expect Mr. Valette.

Q.   And did Mr. Valette talk about the value of this Leonardo painting?

MR. ASNER:  Objection.

THE COURT:  Sustained.

Q.   What did Mr. Valette say about the painting as translated through the ex-girlfriend?

MR. ASNER:  Objection still.

THE COURT:  Sustained.

MR. KORNSTEIN:  Don't answer.

The objection is sustained.

Q.   What did Mr. Valette say as it was translated?

MR. ASNER:  Objection.

Q.   What did you understand Mr. Valette said by virtue of the translation?

A.   It was like some kind of a joint discussion.  And it is difficult for me to give you the details, but it was like a joint discussion.  And everyone expressed their admiration, admiration upon seeing this picture, admiration by different aspects of this painting.

Q.   And how long did your conversation with Mr. Bouvier and Mr. Valette last?

A.   Not for a long time.  Can't recall at this point in time exactly how long, but not long time.  Not for a long time.

Q.   When Mr. Bouvier introduced you to Mr. Valette on that

O1BVACC4                      Rybolovlev - Direct

occasion, did Mr. Valette say that he remembered -- well, did you understand that Mr. Valette recognized you?

MR. ASNER:  Objection.  Asked and answered.

THE COURT:  Sustained.

Q.  On this occasion, was Mr. Valette friendly?

A.  Yes.

Q.  And did you shake hands with him?

A.  Yes.

Q.  Do you know whether they arrived, Mr. Bouvier and Mr. Valette, together to your apartment?

A.  I don't know that.

Q.  That was in March of 2013.

When was the next time you saw Mr. Valette in person?

THE INTERPRETER:  Through the interpreter.

I'm sorry, did you say 2014 or 2013?

MR. KORNSTEIN:  Should be 2013.

A.  Next time it was in London.

Q.  About when?

A.  October of 2013.

Q.  And what was the occasion?

A.  Well, it was an art exhibition in London, and we were going -- my eldest daughter and I were going to visit.  And Bouvier promised that he would organize the viewing and asked Valette to do that, to set it up.

Q.  Was there anyone else besides yourself and your eldest

daughter who was with you with Mr. Valette on that occasion?

A.   Yes, Tetiana Bersheda, my attorney, was present.

Q.   And how long did this visit at the art fair last?

A.   It took time, you know, because you usually walk through and there are different rooms, different venues.  You go from gallery to gallery, so it does take time as a whole.

Q.   And did Mr. Valette speak during this visit to the art fair in London?

A.   Well, yes.  If you spend a lot of time, definitely there was a discussion.  I do not recall all the subject matter and all the topics that were discussed, but, yes, we did discuss lots of things.

Q.   Did someone translate what he was saying for you?

A.   Both Katia and Tetiana, so they took turns.

        THE COURT:  And what language or languages did Mr. Valette and Mr. Bouvier speak on that occasion?

        MR. KORNSTEIN:  Mr. Bouvier wasn't present on that --

        THE COURT:  Oh, excuse me.  Apologize.  Let me try that again.

        What language or languages did Mr. Valette speak on that occasion?

        THE WITNESS:  At this point in time I can't recall because all of these people speak good French and good English, so I don't recall specifically which language they are speaking in.

THE COURT:  Were they speaking in a language that you didn't speak; is that correct?

THE WITNESS:  Correct.

BY MR. KORNSTEIN:

Q.  Based on the translations that you received, can you remember anything about what Mr. Valette said?

A.  No, no specifics or nothing specific.  Nothing bad could be memorable.

Q.  On any of these three occasions when you met personally with Mr. Valette, did he say anything about being your key client manager from Sotheby's?

A.  No, never.

Q.  Did you ever learn that Mr. Valette had been appointed as your key client manager by Sotheby's before the discovery of what Mr. Bouvier had been doing in 2014?

A.  No.

Q.  What was your understanding of the relationship, if any, between Mr. Valette and Mr. Bouvier as of that time up to 2013?

A.  They were close enough.  Well, at least Mr. Valette was the only person that Mr. Bouvier left me spend time one-on-one in business, in art business -- I'm sorry, or art business or in art business.

Q.  What did Mr. Bouvier -- what did you understand Mr. Bouvier was saying to you based on translations, if that's how it happened, about your meeting with other people in the art world

or the art market?

MR. ASNER:  I'm sorry, your Honor.  Objection.

THE COURT:  Sustained.

MR. ASNER:  I don't understand the question.

THE COURT:  Sustained.

Q.  Don't answer.

Did you have any contact with other people in the art business of selling art?

A.  Yes.

Q.  And what did you understand -- or what did you mean when you said that Bouvier would only allow Valette to be the only one for you to be with?

A.  Once I had a meeting with Larry Gagosian, and Bouvier was very unhappy about that.

Q.  How did you learn that?

THE COURT:  You said happy or unhappy?

THE WITNESS:  Unhappy.

Well, he told me -- he told me so himself.  And for some certain period of time under different circumstances and different variations, both he and Tania Rappo somehow worked on me in order to prevent me from communication or interaction with Larry Gagosian.

Q.  Can you tell us who Larry Gagosian is?

A.  Well, I would say that he was the founder and is the founder and the owner of one of the most well-known galleries

as of today.

Q.   When was the first time that you understood you bought any work through Sotheby's, any artwork?

A.   Well, I never had an understanding that I was buying something through Sotheby's.

Q.   Before 2011, you had made other purchases of art using Mr. Bouvier; correct?

A.   Yes, before 2011.

Q.   Yes.

A.   Yes.

Q.   And after 2011, did you continue to use Mr. Bouvier to buy art for yourself and for Accent?

A.   Yes.

Q.   Did you ever come to understand that Sotheby's was involved in some of the works of art that you bought after 2011?

          THE INTERPRETER:  My apologies.  Could you repeat the question.

Q.   Did you ever come to understand that Sotheby's was involved in any of the purchases of art after 2011?

A.   Well, Yves showed me some documents with the Sotheby logo; and it was my understanding that he went to Sotheby for some kind of services.

Q.   Was that about any particular work of art?

A.   No, it was on several paintings.

Q.   At the Klimt viewing you mentioned before that Mr. Valette

was introduced to you as someone from Sotheby's?

A.  Yes.

Q.  And at that time did you know whether Sotheby's had any other connection with the Klimt sale?

A.  At that point in time, most likely, no.

Q.  Was there a reason why you would not know whether Sotheby's was involved in transactions?

MR. ASNER:  Objection to form.

THE COURT:  Sustained.

Q.  How did Mr. Bouvier's role affect your knowledge of whether Sotheby's was involved in transactions, if at all?

MR. ASNER:  Same objection.

THE COURT:  Sustained.

Q.  Were you shown any written materials about the four works that are at issue in this case?

A.  Yes.

Q.  Let's talk about the Magritte painting.

Do you remember the Magritte painting *Domaine d'Arnheim*?

A.  Yes.

Q.  What was it about this painting that was attractive to you?

A.  I like Magritte, all of it, and I told Bouvier about that.

Well, typically, when we visited some art exhibitions or went to some galleries, that was the way for me to shape my art -- taste in art.  So that's why he knew about my taste in

art and how this taste was shaping up.  And, you know, it just happened that when I started taking a liking in some painter, in some very short period of time, a painting by this painter would show up, would appear.

Q.   Who did you visit galleries with?

A.   Not galleries, I meant museums and art exhibitions.

Q.   And who would you view that with?

A.   With Tania Rappo, with Bouvier.  Mainly those were the people.  Occasionally Mikhail Sazonov was present, Michael Sazonov.

Q.   Between 2003 and 2011, had Tania Rappo been talking to you at all about Bouvier?

        MR. ASNER:  Objection.  Hearsay.

        THE COURT:  Hold on.

        I'll just allow you to say yes or no.  So you may answer, but yes or no.

A.   Yes.

Q.   What did she tell you?  Not for the truth of what she said, just what did she say to you?

        THE COURT:  Sorry.  There was an objection?

        MR. ASNER:  No.

        THE COURT:  Okay.  I'm not sure why anyone is looking at me then, but go ahead and answer.

        MR. ASNER:  You're the judge.  We look at you.

A.   Well, she kept saying that, Look at him.  He does a very

good job.  And look at fine works of art that he has access to. And right now I understand that she was kind of working on me all the time.  And gradually it would be I was included in the circle of friends.

Q.  Again, up to 2011, did you know whether Rappo and Bouvier had any financial arrangement based on your art transactions?

A.  No.

Q.  In connection with the Magritte painting, were there any concerns that you had about buying it?

A.  Yes.  Yes, Michael Sazonov had some concerns with regard to the price.  And it seemed to me that it was pretty high.

Q.  Let's go back to -- you said just before that Bouvier became one of your circle of friends.  How did that happen?

A.  You know, gradually when you communicate with people, interact with people, and Tania Rappo -- my interaction with Tania Rappo was more frequent.  And I had a feeling that Mr. Bouvier, we don't see him, but he is a constant presence during our meetings.

Q.  And did you become friendly with Mr. Bouvier?

A.  Yes.  Gradually he was present at my birthday parties and birthday parties of my daughters' birthdays.

Q.  And were these large parties, small parties?  What are we talking about?

A.  Just to clarify that, Mr. Bouvier was present just at one birthday party of Mr. Rybolovlev's daughter.  When he was

present at my birthday parties in Hawaii or in New York, there was a pretty small circle of people, maybe ten people, 12 people, ten people, 15 people.  And when my daughter turned 25, it was pretty big celebration.  There were a lot of people. And he was also invited.

Q.  Did you go to any sport events with him?

A.  Yes, football.  He -- he went -- he came to football matches when my team was playing.

Q.  When you say "football," that's European football, not American football?

A.  Yes, it's soccer.

Q.  And you had mentioned a team, your team.  What is that?

A.  It's soccer.  It's a soccer club, Monaco.

Q.  You mentioned that Mr. Sazonov was concerned about the price of the Magritte.  Did you have any reaction to the price that was being asked for the Magritte?

A.  Yes, I had my concerns.  I love the painting, but I had major discomfort regarding the price.

Q.  Did anything from Sotheby's persuade you that the price was okay?

A.  Yes.

          MR. KORNSTEIN:  Toby, could you put Plaintiff's Exhibit 70 on the screen.  It's already in evidence, your Honor, so we can put it on for the jury as well.

          On page 1, can you call out who it's from and who it's

to at the top.

Q.  Do you see this is from Bouvier to Sazonov, November 12, 2011?  And in the first paragraph --

MR. KORNSTEIN:  Can you call out the first paragraph.

Q.  Attached is the file of the painting.  The comment is very important.

And toward the end of that paragraph or the second paragraph says:  This painting is the most beautiful of all.  He says:  Far superior to the *Empire of Lights*.

And you see that he goes on to call it an icon of the artist's.  I understand you don't read English, but do you recall seeing this document?

A.  Can I look at the whole document, please, not just this excerpt.

MR. KORNSTEIN:  Can you show page 3., in particular, the last paragraph.

Q.  Does any of that look familiar?

A.  Yes.

Q.  Which part looks familiar?

A.  So this painting was compared to a different painting by the same artist, the *Empire of Lights*.  And also it was said here that it's of the same high level as the previous one.

MR. KORNSTEIN:  Toby, can you please put Plaintiff's Exhibit 137 just for the judge and counsel.

Q.  Mr. Rybolovlev --

MR. KORNSTEIN:  Can we turn to page 24 of the document for the witness.

Q.  Looking at that page, do you recall seeing this document ever before?  Do you recognize it?

A.  Yes.

Q.  What is it?

A.  So in this -- so basically there's a description of both paintings --

MR. ASNER:  Objection, your Honor.  It's not in evidence.

THE COURT:  All right.  Just let me interrupt.

Without describing the contents of the document, do you recognize this document and, if so, just generally, what is it?

THE WITNESS:  So actually, this is a document about the Magritte painting, *Domaine d'Arnheim*.

MR. KORNSTEIN:  Move it into evidence, your Honor.

MR. ASNER:  I just want to see, did the witness say that he had seen this before?

Q.  Have you seen it before?

A.  Yes, I did.

MR. ASNER:  No objection, your Honor.

THE COURT:  Admitted.

(Plaintiff's Exhibit 137 received in evidence)

MR. KORNSTEIN:  May I publish, your Honor?

THE COURT:  You may.

Q.  On page 24, the last paragraph at the bottom, do you recognize that paragraph?  It's in Russian, but --

A.  Yes.

Q.  And what is it that you recognize about that paragraph?

A.  Well, it's written in this paragraph -- yes, you mean this paragraph right here, the big one, right?

Q.  Right.

A.  Basically, that this painting is of iconic status.

Q.  Mr. Bouvier, would you like to have it -- I apologize.

Mr. Rybolovlev, would you like a hard copy of that document?

A.  Yes.

MR. KORNSTEIN:  Your Honor, may I approach?

THE COURT:  You may.

Okay.  Is there a question, Mr. Kornstein?

MR. KORNSTEIN:  Yes.

Q.  Is the last paragraph on the page 24 that we were looking at in Russian a translation of the paragraph in the English version that talks about the iconic status?

MR. ASNER:  I'm going to object.

THE COURT:  Sustained.

Can I ask you a question, Mr. Rybolovlev?

When did you see this document in Russian?

THE WITNESS:  I can't recall right now.  So usually

O1BVACC4                          Rybolovlev - Direct

regarding Bouvier documents, I would either receive the

document in Russian directly from Bouvier, or Michael Sazonov

would do the translation into Russian.  So that's how I got the

document.

THE COURT:  And you know who, if anyone -- well, do

you know who prepared this particular document, the Russian

language document?

THE WITNESS:  Right now I will not be able to recall.

BY MR. KORNSTEIN:

Q.  Would you look at the first page of the document that has

the exhibit tab.  What language is most of the document in?

A.  English.

Q.  And was the part that is in Russian part of the document

when you received it?

A.  Right now I can't recall.

MR. KORNSTEIN:  Toby, would you please put up Exhibit

PX-251 that's already in evidence.

MS. SALZMAN:  DX.

MR. KORNSTEIN:  DX.  Oh.

THE COURT:  Mr. Kornstein, do you mean DX, as in

defendants' exhibit?

MR. KORNSTEIN:  We'll come back to it, your Honor.

We'll move on.

Q.  Let's talk about the sculpture, the Modigliani *Tête*.  Did

you have any concerns about whether or not to buy that

particular work of art?

A.   Yes.

Q.   What were your concerns?

A.   Well, I didn't really like it.  And I also had my doubts about the price.

Q.   What persuaded you to buy it?

A.   Well, Yves Bouvier persuaded me.  He produced specific documents that convinced me.

          MR. KORNSTEIN:  Toby, can you put PX-76 up that's already in evidence.  Page 3 of that document, put that up.  Actually, go back to the first page.  I'm sorry.  Go back to the first page.  I'm sorry.  Use page 3, that's the English translation.

Q.   This is an email from Mr. Sazonov to Mr. Bouvier that says:  I translated your email to DR.  And then below that is the email from Valette to Bouvier.  You see that it's signed with the full signature block from Samuel Valette, Senior Director, Senior International Specialist, Impressionist and Modern Art?

A.   Yes.

Q.   And it shows in his email address the connection to Sotheby's?

A.   Yes.

Q.   And you see in the last part of Mr. Bouvier's email to Sazonov, the third paragraph from the bottom where he says:  I wanted to reassure you that the estimates by Mr. Samuel

Valette, Senior Director, Senior International Specialist

Impressionist and Modern Art, are similar to 80 to 100 in

euros, between 100 and 125 U.S. dollars.  Do you see that?

A.  Yes.

Q.  And did you see on page 4 of that document, this is what

Valette sent to Bouvier, and then Bouvier forward to Sazonov,

who sent it to you, the reference to the price in the last line

of the big paragraph?  Do you see that?

A.  Yes.

        MR. ASNER:  Brief voir dire, your Honor.

        THE COURT:  Okay.

        MR. ASNER:  Mr. Rybolovlev, did you receive a Russian

translation of this?

        THE WITNESS:  I can't recall.

BY MR. KORNSTEIN:

Q.  Did you focus on the numbers in looking at this and talking

to Mr. Sazonov?

A.  Yes, yes, we discussed it on several occasions.  And, of

course, Sotheby's' opinion was key in me making the decision.

        MR. KORNSTEIN:  Toby, would you please put PX-77 on

the screen.  That's already in evidence.  And turn to page 2,

please.

Q.  It says:  Hello, Mike.  This is from Bouvier to Sazonov,

April 2013.  To be forwarded as requested to DR in New York.

        MR. KORNSTEIN:  Toby, would you just proceed with the

pages after that slowly.

Q.   Okay.  Now, Mr. Rybolovlev, you see these images.  Do you see anything in Russian on those -- in the writing?

A.   Yes, I do.

Q.   And is it correct that there is Russian writing describing the works here in Russian?

A.   Yes, it's true.

Q.   And do you know what painting this particular document was in reference to?

A.   Yes, so this document was in reference to the painting *Salvator Mundi*.

Q.   And what is this document?

A.   So I asked Bouvier to compile the list of paintings done by Leonardo da Vinci to understand how many of those were in private hands.

THE COURT:  And that's where we will stop for the day, since it is exactly 2:30, ladies and gentlemen.

You know the drill.  Don't discuss the case.  Don't do any research about the case.  Continue to keep an open mind about the case.  And please be in the jury room no later than 8:45 tomorrow to finish off the week.

And with that, get home safely, have a good afternoon and evening, and I'll see you tomorrow.  Thank you.

(Jury not present)

THE COURT:  You can be seated.

O1BVACC4                         Rybolovlev - Direct

Mr. Rybolovlev, you can step down.

All right.  Mr. Kornstein, any estimate of how much longer you have on direct of Mr. Rybolovlev?

MR. KORNSTEIN:  Maybe a half hour.

THE COURT:  Can you find a microphone.

MR. KORNSTEIN:  Maybe a half hour, maybe less.

THE COURT:  All right.  And obviously there will be some cross, but assuming we get to next witnesses tomorrow, can somebody at the front table give me a preview?

MR. WILSON:  The next witness after Mr. Rybolovlev is expected to be Mr. Sainty, who is an expert.  And then we need to hear from Sotheby's about the expected length of their cross, if there's anybody after Mr. Sainty.

THE COURT:  How long do you expect the direct of Mr. Sainty to be?

MR. WILSON:  Around an hour, hour and a half.

THE COURT:  Okay.  Anything else from the front table?

MR. WILSON:  Well, your Honor, depending on the length of cross, it's possible that we will have either deposition testimony, Mr. Heller, or Mr. Acquavella.  At this point, neither Mr. Heller or Mr. Acquavella are available.  But given the pace of testimony, we're trying to make efforts to see if either one of them is available.  And so as soon as we learn of either one of them, their plans change, we'll inform Sotheby's.

THE COURT:  Okay.  And did you want to raise the issue

regarding cross-examination and exhibits to be used?

MR. KORNSTEIN:  Yes, your Honor.

We did receive a list of the exhibits that defense plans to use in cross-examining.  And we have objections that we'd like to be resolved in advance; whether that's now or tomorrow morning, it's up to you.

THE COURT:  Let's use our time now.

So tell me what the story is.

MR. KORNSTEIN:  One of the exhibits, DX-114, is a journalist writing an article about Mr. Rybolovlev.  Hearsay classic.  And two other exhibits, 115, DX-115, is also a hearsay, supposedly a biography, part of a bio; and DX-130 is a document that purports to be some sort of bio, things written about Mr. Rybolovlev.  We don't understand how that can come in.

Then they have a series of five documents that are paintings that are not part of the works at issue and just don't understand the relevance of them.

THE COURT:  What are the exhibit numbers?

MR. KORNSTEIN:  Those are 680, 681, 682, and 704 and 705.  Defendants' exhibits.

THE COURT:  All right.  Is that the full list?

MR. KORNSTEIN:  Yes.

THE COURT:  Okay.  Mr. Asner?

MR. ASNER:  Your Honor, sorry.  114, 115, and 130, the

O1BVACC4                        Rybolovlev - Direct

Court ruled on those already in ECF 557.  These are documents that actually were prepared by the plaintiff.  I believe 130, if I have it right, was actually something they submitted to the U.S. Attorney's Office.

And then with respect to some of the exhibits, I don't know whether I'll use them.  I'm trying to remember which ones were the ones that -- I think the *Nymphéas* --

THE COURT:  Hang on.  ECF 557 seems to be a memorandum of law filed by plaintiff, so that can't be the right ECF number.

MR. ASNER:  Let me have my team pull that one.

THE COURT:  577 maybe?

MR. ASNER:  577 is correct, your Honor.

THE COURT:  Okay.  Keep going.

MR. ASNER:  Your Honor, I don't need 704 and 705.  And I don't need 680 or 681, your Honor.

THE COURT:  Okay.  That leaves 682.

MR. ASNER:  I will use 682, your Honor.

THE COURT:  So do you want to address it?

MR. ASNER:  Yeah, your Honor.

This was a picture that -- if I have it right, that Yves Bouvier purchased through Sotheby's.  It was a -- considered but not sold to Dmitry Rybolovlev for about $100 million, a little bit more than that.  We do at least want to contemplate the possibility of using it to show that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Mr. Rybolovlev did not purchase it, in order to prove in part that Mr. Bouvier had other clients in addition to Mr. Rybolovlev.  It will be about a ten-second portion of the cross.

THE COURT:  All right.  So I'll reserve judgment and see what the relevance is at the time.

Mr. Asner, can you -- given that document number 577 contained rulings to a dozen or so motions, can you just orient me which one we're talking about there on the first three, 114, 115, and 130.

MR. ASNER:  Yeah.  Your Honor, so it was Accent Delight's motion *in limine* number seven.  And the motion was granted in part and denied in part on page 3 of your Honor's order.  The first bullet is Rybolovlev's source of wealth and estate planning.  And the motion is denied without prejudice to specific objections at trial.  And then evidence of his wealth and sophistication are fair game.

THE COURT:  And were those exhibits explicitly referenced in that briefing?  I just don't remember offhand.

MR. ASNER:  Yes, your Honor.  Sure.  Page 18 of document 561, DX-14, DX-15, DX-130, and then that continues on, your Honor, into the next page.  So the Court ruled on this, your Honor.

MR. KORNSTEIN:  Your Honor, the --

THE COURT:  Hold on one second, please.

All right.  Mr. Kornstein?

MR. KORNSTEIN:  Yes.  The prime motion, your Honor, was addressed to relevance and prejudice, not hearsay.  That was not ruled on by the Court.

MR. ASNER:  I can address the hearsay issue.

THE COURT:  Okay.

MR. ASNER:  So 115 and 130 are actually statements by the plaintiff.  And 114, when you crawl through it, is actually ratified by the plaintiff.

THE COURT:  All right.  Well, if that proves to be the case and a foundation is laid, then sounds like there's no hearsay issue.  But I'll wait and see if a proper foundation is laid; and it is either ratified by or clear that it isn't the plaintiff's or Mr. Rybolovlev's own statements.

All right.  Anything else from the plaintiff?

MS. SALZMAN:  We were wondering, your Honor, we've all been trying to keep track of the time allotments, you mentioned it earlier.  Would there be a point where you might share with us what you think the time is up to so that we can just make sure we're on the same page?

THE COURT:  Yes, when you run out of time.

No, I'm just kidding.

MS. SALZMAN:  Ideally, before then, if that would be possible.

THE COURT:  Yes.  Give me one second.

So what I currently have — but this does not include the times attributable to both sides for the videos that are played, so you'd have to subtract those times and you need to get those for me — is that plaintiffs have -- plaintiff has 29 hours and 39 minutes remaining; and defendants have 40 hours and 55 minutes remaining, again, minus whatever time is attributable to the depositions.

On that score, if you can submit that -- actually, I think that -- correct me if I'm wrong, I was following the transcript that you had filed with respect to the deposition designations, and it looked like there were some deviations between that and what was played, so I'm guessing that maybe decisions were made.

MR. WILSON:  It was reordering.  We flipped one of the entries, so it came in a different order, but they are the same ones.

THE COURT:  Okay.  Then you don't need to refile it. If there's a difference between what you filed before for objection purposes and what's played, then it should be filed on the docket so there's a record.  But if you can file something that indicates, you know, who's accountable for what time on those two depositions, that would be great.

Speaking of those depositions, I don't know, Ms. Shudofsky, if you want to explain the objection, but I don't really understand, since everybody presumably agreed upon

and heard -- or was heard on their objections with respect to the video before, I don't understand why someone would object to a videotape being played.

MS. SHUDOFSKY:  It was just a reference to essentially a request for a limiting instruction with respect to the invocation.  I had thought the tape was going to play for much longer, so I raised it then in case it was an opportune time for your Honor to provide the limiting instruction then.

THE COURT:  Gotcha.  Okay.

I had peeked ahead and saw that it was the last portion, so decided to just wait until it was completely over.

All right.  Anything else from plaintiff?

MS. SALZMAN:  Is it possible to get from the defense just a ballpark on their crosses?  Because we do have witnesses who are not in the country at the moment, and if we keep them here tomorrow, we would like to get a ballpark of that today.

THE COURT:  Sure.  Obviously a little hard to know in advance, but how long would you anticipate Mr. Rybolovlev's cross would be?

MR. ASNER:  Ballparks change in size throughout the country, your Honor.  I can only give a very, very rough take. Right now, so far, Mr. Rybolovlev's testimony has not been very involved, so I can't really say.  I don't know what's going to happen tomorrow.

THE COURT:  I'm assuming it's not going to be much

O1BVACC4                        Rybolovlev - Direct

more involved then either.  Mr. Sazonov is clearly the primary person engaging with the relevant people here because he spoke the relevant languages.  So I'm guessing it's going to be similar in nature.

MR. ASNER:  So what we're going to do is obviously try and trim and target, focus tonight.  So I'm guessing, if you're holding me to it, I'm saying about three hours, but I can't really say for sure.  And then I don't know what Mr. Sainty is going to say.  He was -- he was a little verbose during his deposition, so obviously we have rulings, and it could be anywhere from an hour to three hours, maybe more.  I don't know.

MS. SALZMAN:  So I think based on those estimates, your Honor, asking a witness to fly in from abroad, we would prefer not to do that.  We have Mr. Valette starting on Tuesday, and the remainder of our witnesses will all be in New York City next week ready to testify after Mr. Valette.  But if we could, for tomorrow, just conclude with Mr. Rybolovlev and Mr. Sainty, it seems like we will come -- perhaps fill the day or go over or come very close to based on those estimates.

MR. ASNER:  Your Honor, you have rules.  And, you know, we have been moving around trying to comply with those rules.  They have a number of witnesses.  And they knew about this issue for quite some time, your Honor.

Obviously, I'm giving an estimate, but I can't promise

O1BVACC4                        Rybolovlev - Direct

I'm going to fill up the day tomorrow.

MS. SALZMAN:  We are also doing our best to comply with your Honor's rules and what is, I think, everybody is probably happy to see a fast pace so far.  I know I'm sure the jury is happy to see it.

We're doing our best.  We have, after Mr. Sainty -- Mr. Acquavella is a third party we don't have full control over.  We don't really have any control over him.  And Mr. Heller is also a third party who is not in the United States at the moment.  So we are doing our very best, your Honor.

THE COURT:  All right.  Well, part of your best should be having a witness here, since, as you know, if you don't have a witness here and it's time for the next witness, I'll deem you to have rested.  So plan accordingly.

Anything else from plaintiff?

MS. SALZMAN:  Not today, your Honor.

THE COURT:  Defendants?

MR. ASNER:  No, your Honor.

THE COURT:  Okay.  I have a plea with an in-custody defendant in 13 minutes, so would ask you to clear the tables as quickly as you can and make your way out of the room, unless you want to stay, since you have a constitutional right to remain in the room.  Have a good afternoon.  Thank you.

(Adjourned to January 12, 2024 at 8:45 a.m.)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

INDEX OF EXAMINATION

Examination of:                                    Page

 MIKHAIL SAZONOV

Redirect By Ms. Salzman . . . . . . . . . . . 500

Recross By Ms. Shudofsky . . . . . . . . . . . 511

 CLAUDINE GOTDS

Direct By Mr. Wilson . . . . . . . . . . . . . 517

Cross By Ms. Shi . . . . . . . . . . . . . . . 535

 ROBERT WITTMAN

Direct By Ms. Salzman . . . . . . . . . . . . 538

Cross By Ms. Shudofsky . . . . . . . . . . . . 566

Redirect By Ms. Salzman . . . . . . . . . . . 580

 DMITRY RYBOLOVLEV

Direct By Mr. Kornstein . . . . . . . . . . . 593

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 347   . . . . . . . . . . . . . . . . . . . . 520

 351   . . . . . . . . . . . . . . . . . . . . 525

 346   . . . . . . . . . . . . . . . . . . . . 529

 315   . . . . . . . . . . . . . . . . . . . . 532

 259   . . . . . . . . . . . . . . . . . . . . 584

 179, 303 . . . . . . . . . . . . . . . . . . 585

 353   . . . . . . . . . . . . . . . . . . . . 608

 137   . . . . . . . . . . . . . . . . . . . . 630