O1CVACC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ACCENT DELIGHT INTERNATIONAL
LTD.,

                    Plaintiff,

          v.                          18 Civ. 9011 (JMF)

SOTHEBY'S and SOTHEBY'S, INC.,

                    Defendants.          Trial

------------------------------x

                                      New York, N.Y.
                                      January 12, 2024
                                      9:00 a.m.

Before:

                    HON. JESSE M. FURMAN,

                              District Judge
                              -and a jury-


                         APPEARANCES

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
      Attorneys for Plaintiff
BY:  DANIEL J. KORNSTEIN
     O. ANDREW F. WILSON
     ZOE A. SALZMAN

ARNOLD & PORTER KAYE SCHOLER LLP
      Attorneys for Defendants
BY:  MARCUS A. ASNER
     SARA L. SHUDOFSKY
     BENJAMIN C. WOLVERTON
     YIQING SHI


Also Present:  Yana Agoureev, Interpreter (Russian)
               Elana Pick, Interpreter (Russian)


                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

O1CVACC1

(Trial resumed; jury not present)

THE COURT:  Good morning.  Welcome back.

I'm told there are some issues.

MS. SALZMAN:  There are a few your Honor.  You anticipated me.  Good morning.

THE COURT:  Good morning.

MS. SALZMAN:  So we have some issues both for Mr. Rybolovlev's anticipated cross-examination, as well as the examination of Mr. Sainty, who will take the stand immediately following him.

To begin with, Mr. Rybolovlev, there are two issues.

The first is that the defense informed us last night for the first time that they were going to show Mr. Rybolovlev Russian translations of some exhibits.  We have never seen those translations before.  There was an agreement between the parties memorialized in the joint pretrial order on page 10 that all translations would be provided in advance.  We still have not seen those.  So we would object to the use of any translations which we have not had the opportunity to review for accuracy.

The second issue for Mr. Rybolovlev's testimony is pursuant to your Honor's ruling on Monday, there was a direction to meet and confer to redact some of the auction-related catalogs.  And for one of those documents, DX-176, the defense has still not redacted two mentions to the

O1CVACC1

auction price guaranty, which was $100 million.  We've requested those redactions and not heard back from them.

So those are the two issues for Mr. Rybolovlev.

Should I continue on to Mr. Sainty or sit down on those for now?

THE COURT:  Sit down on those for now.  Thank you.

MS. SALZMAN:  Thank you.

MR. ASNER:  Your Honor, the Russian translations are not translations that are going to the jury.  Rather, these are documents that, pursuant to the Court's procedure, we provided to the defense as ones that we anticipated cross-examining Mr. Rybolovlev about, so he's had the documents.  It's really as a courtesy.  He can use them or he cannot use them.

Frankly, we were sort of hopeful to save the efforts of Ms. Agoureev, the translator, but these are all -- none of these are things that will go to the jury, it's just an aid.

These are documents that he has prepped with because we provided notice of them and they are documents that have been in the case for a very long time.  So presumably he either has the translation or has gone over these with his attorneys.  Frankly, I don't think there are going to be that many of them or, frankly, that controversial.  He can use them or he can't use them.  If he has trouble reading something and doesn't like the translation, doesn't want to use it, he can consult with the interpreters.

THE COURT:  Let's take it as it comes, but it doesn't sound problematic.  In looking at the terms of the parties' agreement on page 10, it is limited to evidence, exhibits that the party intends to introduce into evidence, and it doesn't sound like that is the plan here so it's not inconsistent with that.

MS. SALZMAN:  The concern, your Honor, is that having not seen the translations, they didn't send them to us, even as of now, we don't know if they are accurate translations.  And as has been well-established by Mr. Asner, Mr. Rybolovlev does not speak or read French or English, so he cannot verify that the translations being shown to him are, in fact, correct and, therefore, an aid to his testimony.  And there is a risk of witness confusion, at the very least, and misleading testimony as a result.  I don't understand.  The fact that he doesn't speak French or English is well-known.  They provided Russian translations of documents for his deposition.

THE COURT:  I got it, Ms. Salzman.

I think the reality is if they don't use these, they are going to use the services of an interpreter, and that would be on the fly and no one would be in a position to know if those are accurate translations either.  So it's kind of six of one, half dozen of the other.  I'll see how it's done in the course of the examination.  The witness can also obviously say, I don't know, you know, if this is an accurate translation.  I

O1CVACC1

mean, he's capable of answering questions.  So we'll see what the question is and I'll certainly take steps to ensure that nothing is misleading or problematic.  If you have an objection at the time, you can lodge it at the time.

MS. SALZMAN:  I would just say we have complete confidence in the court-certified translators who are here in court, so that approach is preferrable, your Honor.

MR. ASNER:  And then, your Honor, I'll just add these are court-certified translations, so you are spot on.

So, your Honor, with respect to Defendants' Exhibit 176, we're not intending to use that so the redaction issue is moot.

THE COURT:  So that's a moot issue.

Next on Mr. Sainty.

MS. SALZMAN:  On Mr. Sainty, your Honor, there are two categories of issues.  The first are defendants' objections to our exhibits that we intend to use with Mr. Sainty.  The second category are our objections to the defense exhibits that they intend to use on cross-examination.

To begin with the first, the defense has informed us that they object to us using with Mr. Sainty all of the exhibits which pertain to Sotheby's, in our view, inflated valuations of the Modigliani *Tête*, the Magritte, and the da Vinci.  It's about ten exhibits.  But they are all concerning those three valuations.

O1CVACC1

We had specifically teed up for your Honor that we were concerned Sotheby's was trying to hold us to a double standard, where their expert, Harry Smith, can testify about the valuations, and our expert, Mr. Sainty, could not.

Sotheby's, in ECF document 606, specifically conceded that Mr. Sainty could opine on the reasonableness of those valuations; and your Honor ruled accordingly in ECF 613 that Mr. Sainty is not precluded from offering his opinions on the reasonableness of these valuations.  So we don't want to get into a fight about this with the witness on the stand, I think your Honor's instruction is crystal clear, and we should be permitted to examine Mr. Sainty accordingly.

MR. WOLVERTON:  Your Honor, the problem with plaintiff's exhibits for Mr. Sainty is that it goes far beyond what the Court has ordered he will be allowed to testify about. Plaintiff is not just attempting to proffer the final versions of the estimates that Mr. Valette provided or the final version of the Sotheby's UK insurance valuation for the Leonardo da Vinci.  They are also proffering internal Sotheby's correspondence in which employees at Sotheby's are debating the value for the *Salvator Mundi* in which they are preparing the cover letter for -- that went along with the valuation and the emails in which Yves Bouvier is forwarding on Valette's estimates to Mikhail Sazonov.

And the Court has ruled that both experts in the case

can opine on the reasonableness of the estimates and the reasonableness of the insurance valuation, that is, the monetary values set forth in those documents.  But it has also ruled that neither expert can summarize the facts, recite the content of emails, or perform the role of either counsel or the jury in interpreting documents.

THE COURT:  Okay.

MS. SALZMAN:  We understand and agree with that limitation.

However, the emails in question are the process by which Sotheby's created these documents.  The emails, for example, between Mr. Bell and Mr. Valette agreeing to change the value of the da Vinci valuation, the fact that Mr. Valette initially valued the Magritte and the *Tête* for lower amounts than he ultimately sent to Mr. Bouvier and then were passed on to plaintiffs, that is the process by which Sotheby's arrived at those numbers and, therefore, that bears on the reasonableness of those numbers.

THE COURT:  All right.  I understand both sides' positions.  I'll be attuned to it.  It's a little hard for me to say in the abstract because it depends, frankly, on the testimony and what foundation, if any, is laid for these documents.  I think the lines and the contours of my ruling are pretty clear.  I'm not going to permit the witness to just essentially do what you can do in closing, which is summarize

evidence and make an argument.  But to the extent that these are the kinds of documents that an expert would rely upon in opining on and forming an opinion about the reasonableness of the valuation, then I think he would be permitted to testify about them and explain how they contributed to his opinion.

So I think we'll take it as it comes.  You can make an objection if you think that it's crossing the line that I charted in my opinion and I'll rule at that time.

Anything else?

MS. SALZMAN:  Just the final issue, your Honor.  We have some objections to the exhibits the defense has previewed they intend to use on Mr. Sainty's cross-examination.  These are all new documents that were not listed on the joint pretrial order.  So we received notice of them for the first time last night.

There are two news articles.  It's DX-1004 and DX-1007 concerning works that are not the four works at issue in this trial and from, I believe, 2022 and the other one is undated, so I'm not sure when it's from.  But they are rank hearsay and it's a blatant attempt to go beyond your Honor's ruling as to putting other prices in front of the jury for later in time sales of artworks.

The second category of documents are now marked as DX-1003 and DX-1008.  DX-1003 are UK anti-money laundering laws that came out in 2022.  I have no understanding as to why those

would be relevant to this case.  They were not in effect at the time.  They are not the law that your Honor will use to charge the jury in this case.  So that seems extremely confusing, at best, and, we would suggest, prejudicial as a result.

And DX-1008 is a write-up on Mr. Sainty's website concerning these new UK anti-money laundering laws, so the same concern applies.  There's no relevance and a high potential for juror confusion about the appropriate legal standard here.

And then the final document, your Honor, is DX-1006.  These are Mr. Sainty's unaudited financial statements for his company from 2022.  I see absolutely no relevance.  He's obviously going to testify he's being compensated as an expert here.  They are free to cross-examine him about that.  But to put his unaudited company financial statements into the record, those are obviously sensitive materials and they are irrelevant, in our view, your Honor.

MR. ASNER:  Your Honor, if I can respond.

We're not necessarily intending to introduce any of these into evidence.  But there are several issues that Mr. Sainty has testified to at his deposition and put into his report that, frankly, are things that we would need them to show to Mr. Sainty as a way of undercutting his position.  And we may or may not offer them under the various rules, such as -- such as 902.6 -- or 902(6).

But, your Honor, I'll give you some examples.  So, for

O1CVACC1

example, with the British Art Market Federation, Mr. Sainty took a position in his expert report and in his deposition that the standards in the art market were very, very strict.  And also at times he veered into that that was required by law, and he talked about that being the standard in 2011 through 2015.

The law has gotten considerably stricter since then.  But even under the present law, under the most strict standard, which is the British standard, that is not the law.  And so what we would -- if we got to it, unless he gave it up, is that we would try to introduce the relevant statements from, frankly, something that I think he would rely upon, which is the BAMF, the British Art Market Federation guides on this under 803(18).

With respect to the articles Mr. Sainty -- the newspaper articles, Mr. Sainty said, for example, during his deposition that Mr. Valette's estimate that a value of an *Empire of Lights* by Magritte could never get anywhere near to 40 million euros or dollars, I forget which one it was.  In fact, I want to be able to say that, in fact, it did sell -- that exact painting sold for 80 million euros just a couple of years later.  So it's something that I think would go into cross.  I think if he concedes it, then I don't have to put those in.

THE COURT:  Why were they not on the exhibit list?

MR. ASNER:  Because it's cross-examination and we

didn't know we would use them until we started preparing for the cross. So it's not -- I mean, I did provide them to them yesterday.

Some of these other items, for example, his own website, we did use earlier versions of pages from his own website during his deposition and we're using them now. So I think these are all things that really I'm not necessarily going to introduce them into evidence, but I'm providing them as a courtesy, as I understand the Court's rulings, in order to be able to cross-examine him and then, if he doesn't go there, be able to force him.

THE COURT: All right. Let's take this up later, since I don't think we're going to getting it in before the break. And I want to get the jury out, since it's 9:14.

Can we get Mr. Rybolovlev on the stand, please?

MR. WOLVERTON: Your Honor, please, there are four issues with documents that we'd like to address that pertain to Mr. Rybolovlev.

THE COURT: I know I want to move along, but you've still got to speak slowly so I can understand you and the court reporter.

What was that?

MR. WOLVERTON: Yes. I'm sorry.

There are four documents that we'd like to address with the Court that defendants plan to use during

O1CVACC1

Mr. Rybolovlev's cross.

THE COURT:  Okay.

MR. WOLVERTON:  Just quickly, your Honor, they are all statements by a party.  But like the 56.1 statements that the Court addressed earlier this week, they are not ones that the witness will be able to lay a foundation for, and so we'd like to just address those with the Court now.

THE COURT:  Is there an objection to them from plaintiffs?

MS. SALZMAN:  There is, your Honor.  These are not court filings.  One of the documents is an article written by a reporter, and the other two are -- if I understand the ones you're referring to correctly --

MR. WOLVERTON:  That's some of -- yeah, three of them are those documents.

MS. SALZMAN:  Maybe you could tell us what documents you're talking about, that would be helpful.

MR. WOLVERTON:  Yeah, of course.

So the first document is DX-189.  That's actually a chart of all of the artworks that plaintiff has acquired that was created by Emery Celli.

MS. SALZMAN:  There's no objection to that document, your Honor, in the joint pretrial order.

THE COURT:  Great.  Next.

MR. WOLVERTON:  So we just wanted to tee that up so

O1CVACC1

that it can be admitted.

And then the other ones are the ones that Ms. Salzman was referring to. So DX-130 is a set of talking points that was created by plaintiff's attorneys Paul Weiss.

THE COURT: Didn't we discuss this yesterday?

MR. WOLVERTON: Yes. But your Honor said that you would be inclined to admit them upon the laying of appropriate foundation; and so I wanted to just briefly address the foundation so that we could have those pre-admitted, essentially.

MS. SALZMAN: I think your Honor's ruling was clear that they had to lay a foundation and they could admit them if they could do that.

THE COURT: I think that's right, unless they're self-authenticating in some way, in which case there is no need to lay a foundation. But why don't you briefly address it and then I want to get started.

MR. WOLVERTON: Yes, your Honor.

It's not entirely clear from the face of the document, but DX-130 is a set of talking points that was produced by plaintiff's attorneys Paul Weiss from plaintiff's referral to -- of their case to the S.D.N.Y.

Plaintiff produced them because we asked for all of their communications and documents provided to the U.S. Attorney's Office. It's clear from the document itself that it

O1CVACC1

is a set of talking points that's confirmed from the metadata to the file; that it was prepared for a December 2nd, 2015 referral meeting; and that the information was, in fact, provided to the U.S. Attorney's Office.

So we do think that that is self-authenticating.  And plaintiffs also have not objected to authenticity on it; they've only raised the hearsay objection.

THE COURT:  As you know, you do have to authenticate and lay a foundation.  I don't see how, looking at this, it's self-authenticating.  But you can try to introduce it and either lay a foundation through Mr. Rybolovlev or offer it as self-authenticating and I'll rule at that time.  But I think you have an uphill battle.

MR. WOLVERTON:  And then, your Honor, just quickly with respect to 115 -- excuse me, I'm sorry.  Actually, 114, that's the --

THE COURT:  Can I express frustration that we didn't discuss this last night?  Because these exhibits were referenced last night; this was an opportunity to talk about it last night.  That would have been the time to do this rather than trying to do it at 9 a.m. this morning when I want to get the witness on the stand and the jury back in the box.  So let this be a warning going forward, if this happens again, I'm not going to be happy and I'm not happy right now.

MR. WOLVERTON:  Yes, your Honor.  Understood.

O1CVACC1

THE COURT:  Meaning you're done?

MR. WOLVERTON:  We're done.

THE COURT:  Great.

Rybolovlev on the stand.  Jury in the box.

Let's go.

(Jury present)

THE COURT:  Good morning, ladies and gentlemen.

Welcome back.  Thank you for being here on time.  And my apologies for getting started a few minutes later this morning.  I don't like when that happens, but every once in a while there are some technical things that we need to deal with to really save you time as much as anything.

So we will continue with the direct testimony of Mr. Rybolovlev.

Mr. Rybolovlev, I remind you that you remain under oath.  And with that, Mr. Kornstein, you may proceed.

MR. KORNSTEIN:  Thank you, your Honor.

Toby, would you put Defense Exhibit 251 on the screen. It's admitted into evidence already.

Your Honor, may I approach the bench to give a hard copy to the witness?

THE COURT:  You may.

DMITRY RYBOLOVLEV,

    called as a witness by the Plaintiff,

    having been previously duly sworn, testified as follows:

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

DIRECT EXAMINATION (continued)

BY MR. KORNSTEIN:

Q. Have you ever seen this document before?

A. Yes.

Q. Who showed it to you?

A. Michael Sazonov.

Q. Do you recall about when that was?

A. It was at the very moment when we discussed the purchase of the Magritte painting.

Q. And the document is in French. You don't speak French; correct?

A. I don't speak French.

Q. Did someone explain what the document was?

A. So yes, Michael Sazonov gave me a general description of what this document is about.

Q. Based on his translation to you and what he said to you, what is your understanding of the gist of the document?

A. So I understood that the painting that we are discussing is quite expensive, priceless; and that its price is basically the same or even higher than the price of the painting *The Empire of Lights*. And the price for *The Empire of Lights* was approximately in the ballpark of 40 million. And that in the preparation of this document, Sotheby's participated.

Q. You see on the first email in the string is from Mr. Valette to Mr. Bouvier dated November 14th, 2011? Page 5

of the exhibit.

A.   Yes, I see it.

Q.   And if you go to the next page, you see it's signed from Mr. Valette with his full signature block showing his position at Sotheby's?

A.   Yes.

Q.   And just below that is Sotheby's' name?

A.   Yes.

Q.   What did the fact that this email came from someone at Sotheby's have on you and your decision to buy the painting?

A.   It was key in my decision.

Q.   In what way?

A.   Because we had our doubts regarding the price of the artwork.  And this basically relieved all our doubts.

Q.   Did there come a time in 2013 when there was an article in the Austrian press about the price of the Klimt painting that you paid?

A.   Yes, it was actually Michael Sazonov who told me about this.

Q.   And based on what he told you, what was your understanding of the article?

A.   So he basically told me about the situation that Yves Bouvier actually sent him the documents, the information regarding this article.  So there was an article actually published in the press that the transaction regarding the

purchase of the Klimt painting was worth approximately 120 million.

Q.   And what was the price that you had paid?

A.   Around 180.

Q.   What was your reaction when you heard this information?

A.   So it's only part of the story.  Also, Michael told me what Bouvier relayed to him in this message that he had sent him.

Q.   Based on what Mr. Sazonov told you what Mr. Bouvier had told him, what was your understanding of what that was?

A.   Well, first and foremost, Bouvier was actually the one who sent this article in the first place.  So -- and he himself proposed to demonstrate, to show, the financial payments regarding Sotheby's.

     And considering the fact that during the viewing we actually saw a Sotheby's employee present there, and taking into consideration that we completely trusted Mr. Bouvier and that we also trusted Sotheby's, we couldn't even imagine that Sotheby's could participate in something like this.  And we did not ask for the documents, even though at that very moment, that particular time we were extremely close to unraveling the fraud.

Q.   And moving ahead to November 2014, was there any article in the press about the da Vinci painting that came to your attention?

A.   Yes, I think there was an article, I think it was in *New*

*York Times.*  And Yuri Bogdanov was the one who told me about this article.

Q.  Can you tell us what the article was about based on your conversation with Mr. Bogdanov?

A.  So the information in that article was attributed to the fact that the painting by Leonardo da Vinci was sold for $80 million.

Q.  And what did you pay for it?

A.  Around 117.

Q.  And what effect did that have on you at that time, November of 2014?

A.  So I wanted to discuss this matter with Yves Bouvier.

Q.  Did you?

A.  Yes, I did.

Q.  And what happened in that conversation?

Let me back up.

Since Mr. Bouvier speaks French and you don't speak French, was there someone who translated?

A.  So Yuri Bogdanov was the one doing the interpretation, and actually the conversation was in English.

Q.  Based on the translation by Mr. Bogdanov of what Mr. Bouvier was saying, what was your understanding?

A.  During that meeting, we actually discussed several issues. Because at that point in time we have already made attempts to sell the artwork.  And Bouvier was actually the one responsible

O1CVACC1                        Rybolovlev - Direct

for selling the pieces of art and he could not manage to sell anything.

So during that conversation, I asked him, Why can't we sell anything? Does it mean that we purchased it too high, that the purchase price was too high?

Well, he explained it that, you know, it's the market and there's a certain situation in the market currently, but he will, of course, sell it.

And so when I asked him a question regarding this article, he told me that, you know, the journalists, they don't know the exact price. There was also a dealer markup that was not considered and everything was absolutely correct. So at that point in time I believed him, but the doubts lingered.

Q. Now, a few minutes ago you mentioned that you were close to unraveling the fraud in 2013, when you're talking about the article about the Klimt.

A. Yes. If we would have asked for the financial documents, he could have not produced them. So -- and if that would have happened, we would have gone forward with this.

Q. Okay. Moving back again to November of 2014, did you take any steps after *The New York Times* article came out about the price of the da Vinci?

A. So at that point in time, no. And the fact that it was my birthday also had its effect. I decided to wait a little bit and see, maybe he would manage to sell the paintings.

Q.   And did there come a time when you did realize that something was not right with the way Mr. Bouvier had been dealing with you?

A.   So it happened on December 30th.

Q.   Of what year?

A.   2014.

Q.   Where did it happen?

A.   So it was in St. Bart's, on the island of St. Bart's.

Q.   And what were the circumstances?  Who was present?  Where were you and how did this happen?  And if there are any conversations from somebody who does not speak Russian, just tell us who was translating and that it was based on your understanding.

A.   So it was actually lunch at a restaurant.  And I had lunch with a friend of mine.

Q.   Who?

A.   Idan Offer.  So he was there and also his wife was there as well.  So their families are -- their family actually is an avid collector of art.  So I was present there and my girlfriend as well.  And she was the one doing the translation.

So -- and there was also one other person present. And my friend introduced him as one of the best consultant experts in the art industry.  And that was actually Sandy Heller.

Q.   Tell us what happened, your understanding based on the

translations.

A. So of course at some point in time the conversation turned to art and we started talking about Modigliani. And actually Sandy brought it up and he told me, you know, I actually took part in the sale of one of the paintings of Modigliani. Sculptures. Painting of Modigliani.

Q. And based on the translations, what did you understand that he said after that?

A. Well, because I had my doubts regarding Bouvier at that time. So I asked him what was the price, the sale price. And he actually quoted me a totally different price.

Q. What happened next?

A. So I was in a state of shock. My friend actually told me that he thought I was having a heart attack because I turned completely pale. Because really quickly, I understood, I comprehended that this has to do not with one painting. And the volume of transactions that was channeled through Yves Bouvier basically attested to the fact that the damages were astronomical. So I left the table after that.

So at first, my first impulse was to call Tania Rappo. And I wanted to tell her, Listen, I just found out what Yves is actually doing. But then I had another thought that entered my mind, that maybe she's somehow connected because they were extremely close at that time.

So instead, I called Michael. And actually, I asked

Michael's advice, should I or should I not call Tania, and he said I shouldn't.

Q.   And when you say "Michael," do you mean Mr. Sazonov?

A.   Yes.  So that's how it was.

Q.   And did you have any further conversation the next day with anyone about this?

A.   So -- well, yes, in the morning.  Because the remainder of the day and the whole night I was still stewing and thinking about this.

So next morning, I organized a meeting with Sandy. And told him about what paintings were purchased.  Well, in general terms, not all of them, of course.  To get basically a very preliminary estimate from him regarding his thoughts about their worth so I could approximately understand the amount and volume of damages.

Q.   How did you go about showing him or talking about the paintings that were involved?

A.   Well, these are very famous paintings.  The images of these paintings are online.  And I don't remember if I had some documents to show him with me at that meeting, but he knew.

Q.   And what were your conclusions and understandings at the end of that meeting, the second meeting, the day after?

A.   That the damages were from 500 million to one billion.

Q.   On all the artwork deals that you did through Mr. Bouvier?

A.   Yes, approximately that was the amount.

Q.   Moving into the next month, January of 2015, did you think you had any legal claims against Sotheby's at that time?

A.   No.

Q.   Did you in any way reach out to Sotheby's?

A.   Yes.  I actually at that point in time did know Dan Loeb, and he was a member of the board of Sotheby's and one of the major shareholders.  And through him, I asked for Sotheby's' help --

            MR. ASNER:  Objection.

A.   -- in figuring out what happened.

            THE COURT:  Hold on.

            Overruled for the moment, but I'll listen.  Go ahead.

A.   So Sotheby's would assist in getting to the bottom of the situation.

            MR. ASNER:  Your Honor, can I do a voir dire on this?

            THE COURT:  Sure.

            MR. ASNER:  Mr. Rybolovlev, you just testified that you reached out and asked for Sotheby's' help.  Who did you talk to — you — talk to at Sotheby's?

            THE WITNESS:  So there was a phone conversation that I had with Dan Loeb.  Well, of course, somebody was doing the translation for me at that time, but the conversation was with Dan Loeb.

            MR. ASNER:  So you had a conversation with Dan Loeb, and he gave you through an interpreter information of who to

contact at Sotheby's, right?

THE WITNESS:  So I don't really recall the details of how it all transpired, but I know that he sent all the information to the legal department of Sotheby's.  Not the information, but he actually referred -- sent my lawyers to the legal department of Sotheby's.

MR. ASNER:  So to be clear, Mr. Rybolovlev, you had no direct conversations with anybody from the legal department of Sotheby's; isn't that correct?

THE WITNESS:  No, I did not.

MR. ASNER:  Objection, your Honor.

THE COURT:  All right.  Well, I think at the moment the witness testified that he spoke to Dan Loeb, who's on the board of Sotheby's, and I think that's really all that he's testified to.

MR. ASNER:  He was talking a little bit further about conversations after the conversation with Mr. Loeb.

MR. KORNSTEIN:  No.

THE COURT:  I think not until the voir dire actually, but, in any event, Mr. Kornstein, you may proceed.

The objection is overruled to the extent there were questions posed on direct.

BY MR. KORNSTEIN:

Q.  When did you first come to think that you had a legal claim against Sotheby's?

O1CVACC1                          Rybolovlev - Direct

A.   Well, I'm not a lawyer, I can't say for sure.  But there was a legal procedure that happened and, as a result, we received some documents and that's when I found out.

Q.   Do you recall when that happened?

A.   It was the end of 2016.

Q.   You had mentioned just before that Mr. Loeb through the translator had -- would ask for assistance, and he said that you should speak to the legal department.  Did the legal department talk to you or your lawyer?

          MR. ASNER:  Objection, your Honor.

          THE COURT:  Sustained.

Q.   So did this whole experience, from 2003 through the end of 2014, and what you found out afterwards in the Sotheby's documents, make you angry?

A.   Yes.

Q.   Who were you angry at?

A.   I was angry with Tania Rappo, Yves Bouvier, and Sotheby's.

Q.   And why were you angry with Sotheby's?

A.   Because when the largest company in this industry with such a profound reputation does these actions, it makes it incredibly difficult for clients like me that have experience in business to somehow understand what's going on.

Q.   Why did you bring this lawsuit against Sotheby's?

A.   So it's not an issue of money.  Well, not only of money. It's important for the art market to be more transparent.

Because as I have already mentioned, when the major company in this industry, the largest company in this industry, is involved in actions of this sort, you know, clients don't stand a chance.

Q.   Thank you, Mr. Rybolovlev.  No further questions.

        THE COURT:  Cross-examination.

        MR. ASNER:  Thank you, your Honor.

CROSS-EXAMINATION

BY MR. ASNER:

Q.   Good morning, Mr. Rybolovlev.  Can you hear me?

A.   Yes, I do.

        MR. ASNER:  So if we could show the witness Defendants' Exhibit 683.

Q.   Mr. Rybolovlev, do you recognize this?

A.   So actually can I get a hard copy of the whole document, if it's at all possible?

Q.   It's just one page, Mr. Rybolovlev, that's it.

A.   Okay.

Q.   Do you recognize that?

A.   Yes, I do.

        MR. ASNER:  Your Honor, I ask that this be --

Q.   Well, what is it, Mr. Rybolovlev?

A.   It's a painting by Magritte.

Q.   Is that the picture that you purchased, *Domaine d'Arnheim*?

A.   As far as I can recall, yes.

O1CVACC1                     Rybolovlev - Cross

MR. ASNER:  Your Honor, I would offer this into evidence and ask that it be published to the jury.

MR. KORNSTEIN:  No objection.

THE COURT:  Admitted.

(Defendants' Exhibit 683 received in evidence)

MR. ASNER:  All right.  If we could keep that up, and then at the same time put up Defendants' Exhibit 251 that Mr. Kornstein asked about this morning.

Q.  Now, you see this is an exhibit that Mr. Kornstein asked you about this morning, do you see that?

A.  So can I get it in a hard copy of the document?

Q.  I think it's the hard copy that Mr. Kornstein gave you this morning.

A.  All right.  Wait a second.  Yes, that's it.

Q.  Okay.  Mr. Rybolovlev, Mr. Kornstein asked you some questions about this this morning, and he directed your attention down to the email where Mr. Valette is writing about the Magritte market.  Do you see that?

A.  I see what?  Excuse me, I didn't --

Q.  Do you see the email that we're looking at at the screen now?

A.  Yes.

Q.  And do you see that he is talking about three paintings, the first is a picture of an umbrella with a glass on top?

A.  Yes.

O1CVACC1                       Rybolovlev - Cross

Q.   And do you see the next one down is a Gouache of -- it's a little hard to see that way, a schoolteacher with something on top of his head, looks like a moon on top of a bowler hat?

A.   Yes.

Q.   And then you see below that there's a paragraph that Mr. Kornstein focused on with a discussion of *The Empire of Lights,* do you see that?

A.   I don't know.  I can't read it.  It's in English.

          (Continued on next page)

MR. ASNER:  Could the interpreter read the first line of that paragraph for Mr. Rybolovlev in Russian.

(Pause)

Q.  Do you see that paragraph concerns *The Empire of Lights*?

A.  Yes.

Q.  You see on the next page, this is the picture that's being referred to, *The Empire of Lights*?

A.  Yes.

Q.  And you'll agree with me that *The Empire of Lights* that is on the right side of this screen is not the same picture as the picture that you purchased; is that correct?

A.  Yes.

Q.  Now, let's go and go back to the exhibit.  Right.  And you see, Mr. Kornstein asked you if it was from somebody from Sotheby's, and you look at the bottom portion of this.  You see there, below Mr. Valette's signature block, his telephone number and his mobile number.  Do you see that?

A.  Yes.

Q.  Now, if we could go to the text.  Go up a little bit.  In the e-mail that Mr. Valette wrote, there is no mention of the *Domaine d'Arnheim*; is that correct?

A.  I don't know.  I didn't read it.

Q.  We'll get you the Russian version.

A.  Yes.

MR. ASNER:  If we could approach, your Honor.

O1C3ACC2                         Rybolovlev - Cross

THE COURT:  You may.

Q.  And Mr. Rybolovlev, this is Defendant's Exhibit 251.  It is a big binder, but we're not going to go through all of it, don't worry.

A.  I found it.

Q.  So, my question, Mr. Rybolovlev, was in Mr. Valette's e-mail here, on this e-mail, do you see any mention of *Domaine d'Arnheim* which is the picture you bought as depicted in Defendant's Exhibit 683?

MR. KORNSTEIN:  Objection, your Honor.

THE COURT:  Overruled.

A.  No.

Q.  So, now let's go up to the next e-mail, and this is an e-mail you see from Mr. Bouvier to Michael Sazonov, right?

A.  Give me a second.

What page is that on?

Q.  I have Bates number P0005885.  Do you see that?

A.  Yes, I do.

Q.  You see this is an e-mail from Mr. Bouvier to Mr. Sazonov?

A.  Yes.

Q.  You see that Mr. Bouvier in the third paragraph mentions *Domaine d'Arnheim*?

A.  Yes, I do, I see it.

Q.  Then you see that he talks about "I made some discrete inquiries on the Magritte market" and then he talks about an

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1C3ACC2                            Rybolovlev - Cross

*Umbrella* sold for 10 million USD, and a small paper for 4 million USD.

A.   Yes.

Q.   And then in the last sentence on this page, it says, "A famous subject like a good *Empire of Light* would sell for 40 million euros at a private sale."

          Do you see that?

A.   Yes, I do.

Q.   If we go to the next page of Mr. Bouvier's e-mail to Mr. Sazonov, he writes, Mr. Bouvier writes, "By analogy, it can be estimated that the *Domaine d'Arnheim*, which is the most beautiful and most important and best in the series, is worth at least the same price as *The Empire of Light*."

          Do you see that?

A.   Yes.

Q.   And that's in Mr. Bouvier's e-mail, correct?

A.   Yes.

Q.   We can drop those.

          You mentioned in your testimony this morning that there was an article in The New York Times regarding the da Vinci, the Leonardo da Vinci?

A.   Yes.

Q.   And so we're all on the same page, let me show you what's been marked as Defendant's Exhibit 686 for identification, your Honor.

Mr. Rybolovlev, do you recognize this picture?

A.   I do.

Q.   Is this the da Vinci that you purchased through Mr. Bouvier?

A.   Yes.

Q.   Now, when you spoke with?

THE COURT:  Do you want to offer it?

A.   Are you saying --

MR. ASNER:  I will, your Honor.  I'll offer it and ask it be displayed to the jury.

MR. KORNSTEIN:  No objection.

THE WITNESS:  Are you saying through or from?

MR. ASNER:  Through.  I said through.

THE COURT:  It is admitted and can be published.  And much as we would all want this to be the da Vinci, I take it this is just a picture of it, correct?

MR. ASNER:  Your Honor, I don't have access to it or I'd put a sticker on it and show it to everybody.

THE COURT:  We're all sad about that.

MR. ASNER:  Next trial.

(Defendant's Exhibit 686 received in evidence)

Q.   So, during your conversation with Mr. Bouvier about The New York Times article, that was in, what is it, October of 2014; is that correct, around?

A.   No, actually, it was closer to November 22, maybe that day

or the day, prior because my birthday is on --

Q.   Your birthday, right.  November 22.

And during that, Mr. Bouvier gave you an explanation through an interpreter for why The New York Times article was not of a concern; is that correct?

A.   Yes.

Q.   And one of the things he mentioned was that there was a dealer markup and other costs associated with the da Vinci purchase and transaction that you were involved with.  That's one of the things he mentioned, correct?

A.   Yes, he actually mentioned several extra costs, and I think he also mentioned the dealer markup as well.

Q.   Now, let's go forward then to your meeting in St. Barts. That's in the Caribbean, correct?

A.   Yes.

Q.   And that's December 30, 2014, correct?

A.   Yes.

Q.   And you had a lunch at the Eden Rock Hotel that day?

A.   Yes.

Q.   And during that, you had a conversation through an interpreter with Sandy Heller, the art expert?

A.   Yes.

Q.   And you mentioned that you discussed a Modigliani painting; is that correct?

A.   Yes.

Q.   If we could put up for identification Defendant's Exhibit 687.

         Do you recognize this as the Modigliani painting that you purchased?

A.   Yes.

Q.   And this is the Modigliani painting that you were discussing with Mr. Heller?

A.   Yes.

         MR. ASNER:  Your Honor, I would offer this into evidence and ask that it be published to the jury.

         MR. KORNSTEIN:  No objection.

         THE COURT:  Admitted.

         (Defendant's Exhibit 687 received in evidence)

Q.   How much did you pay for this painting?

A.   Somewhere around 120.

Q.   120 million U.S. dollars?

A.   Right now I can't recall.

Q.   And you learned that this came from Steve Cohen, the billionaire and owner of the Mets.  Is that correct?

A.   Well, that's what Bouvier told me.

Q.   That's what Bouvier told you?

A.   Yes, when he was showing me the painting.

Q.   And that's also what Mr. Heller told you as well; isn't that correct?

A.   Yes.

Q.   Okay.  We can put that down.

     You mentioned an individual named Dan Loeb who for a period of time was on the board of directors of Sotheby's; do you recall that?

A.   Yes.

Q.   And he is a billionaire who also lives at 15 Central Park West, like you, right?

A.   Yes.

Q.   Or at least has an apartment there on 15 Central Park West, correct?

A.   Yes.

Q.   In fact, 15 Central Park West has a number of high-wealth individuals living there, or having apartments there, correct?

A.   Yes.

Q.   And as you know, a number of them are high-end art collectors; is that correct?

A.   Well, some of them, yes.  But, I'm not really acquainted with everyone in the building.

Q.   It's a big building.

A.   Yes.

Q.   All right.  Mr. Rybolovlev, I want to go back a little bit in time and talk a little bit about your background that Mr. Kornstein went over, but I'm going to drill in on a couple of things on that, so bear with me.

     Now, you were born in Perm, Russia; is that correct?

A.   Yes.

Q.   Were you born wealthy?

A.   No.

Q.   That was during the time of the Soviet Union; is that correct?

A.   Yes.

Q.   And after high school you said you went to medical school?

A.   Yes.

Q.   Where you trained to be a cardiologist?

A.   Yes.

Q.   That was a fairly rigorous program; isn't that correct?

A.   Yes.

Q.   And as part of that, you would take degrees in -- I mean, excuse me -- you would take courses in biology, chemistry, physics, mathematics; is that correct?

A.   Well, mathematics, no.

Q.   But biology and chemistry at a minimum?

A.   Yes.

Q.   And after that, after graduating with honors from the medical institute, you started working as a doctor for a while, correct?

A.   Well, not for a long time.

Q.   You didn't work as a doctor for a long time, correct?

A.   Couple of months.

Q.   But to graduate with honors is an accomplishment, you would

agree?

A.   I agree.

Q.   And then after working as a doctor for a few months, you decided to try and become a businessman; is that correct?

A.   Well, I tried to combine both for a certain time period.

Q.   And you formed a company called Magnetics; is that right?

A.   Yes, that's true.

Q.   And that involved a treatment for certain ailments using magnetic fields that your father, who is also a doctor, had developed; is that correct?

A.   Yes.

Q.   And at the time, this is in the early '90s, 1990s, correct?

A.   That's true.

Q.   And at the time, you could not always get paid in cash so your clients sometimes would pay you with goods?

A.   Yes.

Q.   And you then started a business of taking the goods that were used to pay for the services you provided through Magnetics, the company, and started selling those goods for more money than you acquired them for; is that correct?

A.   Well, if it happened that way, yes.

Q.   Well, it did happen that way, that you would get goods and you would try and resell them to make money; isn't that correct?

A.   Well, we wanted money, of course, not goods, but some

people just couldn't give us any money.  It was a very strange time in the country when the economy was transitioning from a planned economy to a market one.

Q.  So, you obtained goods from your customers and then tried to sell them for money; is that correct?

A.  Yes.

Q.  And as the Soviet Union transitioned into a market economy, you understood that that was how a market economy works?

A.  I didn't really get it.  Can you repeat that, please.

Q.  Sure.  You understood, you mentioned that this was around the time of some turmoil because the Soviet Union was transitioning to a market economy.

A.  Yes.

Q.  And you understood that as part of that, with your job, you acquired products and then you sold them to try and make a profit; is that correct?

A.  Yes.

Q.  And you made, in the course of that business over the next few years, your first million dollars; is that correct?

A.  Yes.

Q.  Now, did you use lawyers to help you set up the company Magnetics?

A.  Yes.

Q.  And then after a while, you decided that you could go into brokerage and stock market work; is that correct?

O1C3ACC2                          Rybolovlev - Cross

A.   Yes.

Q.   And you went to Moscow to study how to become a stockbroker and work in the stock market; is that correct?

A.   Well, not specifically a broker.  But basically to study and be able to work in the securities market.  I had to have a license from the Ministry of Finance, and in order to obtain such a license, I had to pass a specific exam.

Q.   In fact, you were the first businessman from the region of Perm in Russia to get such a certificate from the Russian Ministry of Finance; is that correct?

A.   So, you mean the first one in -- from the city of Perm, right?

Q.   Yes.  And then in 1992, you opened an investment company, correct?

A.   Yes.

Q.   And you used lawyers to open that investment company, didn't you?

A.   Yes.

Q.   And you used accountants to help you with that business, correct?

A.   Yes.

Q.   And when choosing your lawyers and accountants, you tried to hire people who were competent and hard working and loyal; is that correct?

A.   Yes.

Q.  Then in 1994, you founded a bank, correct?

A.  Well, we can say that, yes.

Q.  Well, did you found a bank in 1994?

A.  I was one of the founders.  There were several of them. And I was the first chairman of the board.

Q.  Of the bank?

A.  So, I was actually the chairman of the managerial board.

Q.  And you had an ownership interest, correct?

A.  Yes, I had a large stake in the bank.

Q.  In fact, you had a controlling stake in that.

A.  No, it was around 30 percent I think.

Q.  But you were on the -- you were the managing board or what was the term you used?

            THE INTERPRETER:  "Managerial board."

Q.  You were on the managerial board?

A.  Yes.

Q.  And to found the bank you used lawyers?

A.  Yes.

Q.  And accountants?

A.  Yes.

Q.  And when the bank was operating, you employed bankers?

A.  Yes.

Q.  And the bank had other employees, correct?

A.  Yes.

Q.  And you, of course, wanted to hire people who were

competent, hard working, thoughtful, and intelligent, correct?

A.   Yes.

Q.   Then in 1995, you started acquiring an ownership interest in a fertilizer company called Uralkali; is that correct?

A.   Yes.

Q.   And you eventually took a controlling interest in Uralkali, correct?

A.   Yes.

Q.   Then in 2000, Uralkali ended up having a combination with a company in Belarus called Belaruskali, which is also a fertilizer company, correct?

A.   Yes, we combined but only regarding the trading aspect.  So it was a common trading company for both.

Q.   And you became the chief executive officer, correct?

A.   I was the chairman of the board as far as I can recall.

Q.   And in connection with that combination, you used lawyers?

A.   Yes.

Q.   You used accountants?

A.   Yes.

Q.   And the combined company was fairly large; is that correct?

A.   Yes.

Q.   Then in 2008, the Uralkali became listed on the London Stock Exchange; is that correct?

A.   I think it was in 2007.

Q.   Okay.  Mea culpa.

2007 it became listed on the London Stock Exchange?

A.   Yes.

Q.   And to become listed on the London Stock Exchange, you needed to comply with a large number of regulatory requirements, correct?

A.   Yes.

Q.   And to do that, you used lawyers and accountants, correct?

A.   Yes.

Q.   And there were a lot of disclosures that Uralkali had to make in order to become listed on the London Stock Exchange, correct?

A.   Yes.

Q.   And when doing that, you knew that you needed to get it right so you needed to hire competent, hard working, intelligent people; is that correct?

A.   Yes.

Q.   And then in 2010, a trust that you controlled or settled by you sold over 50 percent of the shares of Uralkali to a group of investors, correct?

A.   Okay.

Q.   That's a yes, Mr. Rybolovlev?

A.   Yes, but, you know, when dealing with a trust, you don't use the word "control."

Q.   Okay.  Fair enough.  But it was a trust that was settled for the benefit of you and your family, correct?

A.   Yes.

Q.   All right.  And that trust sold a majority interest to a group of investors, correct?

A.   Yes.

Q.   And at that point, you were worth over $7 billion; is that correct?

A.   Around that amount.

Q.   It goes up and down depending on various things?

A.   Yes.

Q.   And Mr. Rybolovlev, in connection with the sale of the interest in Uralkali, you worked with lawyers?

A.   Yes.

Q.   And accountants?

A.   Yes.

Q.   And while you were the head of Uralkali, you would have purchases and sales of goods in connection with supplying fertilizer?

A.   Yes.

Q.   And you would hire people to make sure that all those purchases and sales of those goods were being done appropriately, correct?

A.   Yes.

Q.   And you tried to hire competent people, intelligent people, who would do their job, correct?

A.   Yes.

O1C3ACC2                    Rybolovlev - Cross

Q.  Then you ended up purchasing the Monaco Football Team, and for Americans we would call that soccer.

            You have to say audibly.  Sorry.

A.  Yes.

Q.  And that was in December of 2011, correct?

A.  Yes.

Q.  And to purchase that, you had to negotiate with the Prince of Monaco, correct?

A.  Yes.

Q.  And in connection with purchasing your interest in the Monaco Football Team, you used lawyers and accountants, correct?

A.  Yes.

Q.  Then in September of 2010, your family trust became a major shareholder in the bank of Cyprus; is that correct?

A.  So not majority shareholder, but a large shareholder, yes.

Q.  Originally, it was 9.7 percent stake; is that correct Mr. Rybolovlev?

A.  Yes, somewhere around that.

Q.  Then later, through a Virgin Islands entity that belonged to your trust called Odella Resources Ltd., you ended up making purchases and becoming the largest shareholder of the Bank of Cyprus, correct?

A.  No, actually we just kept the 9.7 percent, that's it.

Q.  You're familiar with Odella Resources?

A.   Right now I can't recall the names.  But, I do remember that we had something around 10 percent, that's it.

Q.   Eventually, you became, through your various holdings, the largest shareholder of the Bank of Cyprus at that time, correct?

A.   I don't know if we were the largest, but it was always around 10 percent.

Q.   The Bank of Cyprus was the largest bank in Cyprus at the time, correct?

A.   Maybe.

Q.   And were you on the board of the Bank of Cyprus?

A.   No.

Q.   Are you familiar with an individual named Wilbur Mills?

A.   I can't recall.

Q.   He was at one point the secretary of commerce of the United States?

        THE COURT:  Do you mean Wilbur Ross?

        MR. ASNER:  You're right.  I'm going way back to the '80s.  Wilbur Ross.  Thank you, Judge.

A.   No, I did not have the pleasure of meeting him.

Q.   You did not know that Mr. Ross was also on the board or was on the board of the Bank of Cyprus?

A.   Right now, I can't recall.

Q.   But in connection with purchasing your shares in the Bank of Cyprus, again, you employed lawyers and accountants,

correct?

A.   Yes.

Q.   Now, Mr. Rybolovlev, you testified on direct testimony that you moved to Geneva, Switzerland, with your family.  What year was that?

A.   It was in 1995.

Q.   Then some time after moving there, you started working with Yves Bouvier to try and acquire art, correct?

A.   Well, after seven years, yeah.

Q.   But you met Mr. Bouvier some time in 2002, right?

A.   Yes.

Q.   And I think you testified on direct testimony that you met him at the free port in Geneva?

A.   Yes.

Q.   And you mentioned that the free port serves as sort of a tax free storage area; is that correct?

A.   Yes.

Q.   And a lot of very high value pieces, art pieces, are stored there, correct, is your understanding?

A.   Yes.

Q.   In fact, you yourself would store art there; is that correct?

A.   Yes.

Q.   You stored, for example, the Modigliani *Tête* there, correct, the statue?

A.   Maybe, yes.

Q.   And you'll agree with me that it's a fairly secure facility, correct?

A.   Well, yes.

Q.   And to enter it, you have to go through security, correct?

A.   As far as I can recall, yes.

Q.   There is a gate around it?

A.   Probably.  It does not look impressive on the outside. There is a fence around it, yes.  But it's not like a fence that goes around the whole property.  So, people can actually freely access the courtyard.

Q.   They can access the courtyard, but to get into where the art is, there is some security I would hope.

A.   Well, the warehouse itself, yes, there is security.

Q.   And typically, you have to show identification and there are guards and cameras, correct?

A.   I don't remember about the ID.

          THE COURT:  Mr. Asner, just make sure you wait for the interpreter to finish her translation before you ask your next question, please.

Q.   Now, all of the art that you purchased was purchased through -- I'm sorry.  Let me withdraw that and start again.

          All of the art that you purchased through Mr. Bouvier was purchased by Xitrans and Accent Delight, correct?

A.   Yes.

Q.   And those are both entities that were set up for your interests, correct?

A.   Yes, and my interests and the interests of the family trust.

Q.   All right.

         MR. ASNER:  Now, your Honor, we raised this before.  I want to show Defendant's Exhibit 189 and offer it into evidence.

         THE COURT:  Any objection?

         MR. KORNSTEIN:  No objection.

         MR. ASNER:  Sorry, your Honor.

         THE COURT:  Admitted.

         MR. ASNER:  If we could display this to the jury.

         THE COURT:  You may.

         (Defendant's Exhibit 189 received in evidence)

         MR. ASNER:  And if we could go through it.  This is a list of artworks purchased by Xitrans and Accent Delight.  And if we could go to -- scroll up, you see the first one is in 2003 and then 2004, and then if we could scroll down.  Go to the next page, please.  And then there is also some furniture. We could go to the next page.  And if we could go to the top just to orient everybody.

         You see the first column is a list of all of the artworks purchased by the plaintiffs.  The next is the date of purchase.  Then the sale price, and the entity that is

purchasing it, and you can see the very first one is Xitrans.

We can drop that for right now.

Q.  Mr. Rybolovlev, am I correct that working with Bouvier, you and the entities that you control, Xitrans and Accent Delight, ultimately purchased 37 pieces of art working with Mr. Bouvier?

A.  Yes, through companies and the family trust.

Q.  Okay.  And you approved all of these purchases by Xitrans and Accent Delight, correct?

A.  Yes.

Q.  Now, I want to show you what's been marked as Defendant's 682.  Mr. Rybolovlev, this is not one of the pieces you purchased; is this correct?

A.  Yes.

Q.  This is one of the pieces you considered purchasing, correct?

A.  No.

MR. ASNER:  Your Honor, I would offer it subject to connection later on with other witnesses.

THE COURT:  Any objection?

MR. KORNSTEIN:  No, depending on what happens later.

THE COURT:  So, well, that is the subject to connection part.

But let me explain to you all what that means.  Every once in a while, as I told you at the beginning of the case, the way a case unfolds is just witness by witness.  Sometimes

there are exhibits or items that in order to sort of understand where they fit in and their relevance and lay the proper foundation for them to be admitted into evidence, it requires pieces from more than one witness.

So, under those circumstances, the rules allow a party to offer an exhibit subject to later connection. If that connection later happens, then it would come into evidence fully and then you may consider it. If that connection doesn't happen, then it will basically be removed from the evidence. So it is admitted subject to connection, and if and when that connection is made, I will remind you of this and tell you it is formally in evidence.

You may proceed.

(Defendant's Exhibit 682 subject to connection received in evidence)

MR. ASNER: Thank you, your Honor. If we could show this to the jury, your Honor.

THE COURT: You may.

Q. Mr. Rybolovlev, this is a picture by Cézanne with a French name that I can't pronounce called Mountain of Victory or something like that. This is not a picture you purchased; is that correct?

A. No. Well, yes, and no. I mean, I did not purchase it.

Q. Thank you for the clarification.

THE COURT: Is it a picture by Cézanne, to your

O1C3ACC2                      Rybolovlev - Cross

knowledge?

THE WITNESS:  Yes.

Q.  Okay.  Well, we can put this down because Mr. Rybolovlev did not purchase this piece.

All right.  Mr. Rybolovlev, I want to ask you about a document that Mr. Kornstein asked you about yesterday.  If we could put up Plaintiff's Exhibit 353 in evidence.

And I believe it should be in your binder with a Russian version if you need it.  So it's Plaintiff's Exhibit 353, so you want to make sure you don't go to the DXs but go to the PXs.

A.  So what is the number?

Q.  I'm sorry.  PX 353.  PX 353.

A.  I don't see it somehow in this big binder.

MR. ASNER:  If I could have Ms. Shi come up and help really quickly, I think she knows where it is.

THE COURT:  Really quickly, please.

Q.  I apologize if there is a lot of.  Documents I promise I won't go through all of them.

THE COURT:  Okay.

Q.  Okay.  Mr. Rybolovlev, this is a document that Mr. Kornstein asked you about yesterday.  Do you recall that?

A.  Yes.

Q.  And you see it's dated April 1, 2003?

A.  Yes.

Q. And this is after you had your discussion with Mr. Bouvier where you understood that you had an agency agreement with him, correct?

A. Yes.

Q. And you testified yesterday, Mr. Rybolovlev, that this -- that actually this letter reflects everything we discussed with Yves. Do you recall testifying to that?

A. Yes.

Q. Now, you testified following your conversation with Yves Bouvier that you understood that you had an agency agreement with him, correct?

A. Yes.

Q. And you understand, Mr. Rybolovlev, that Mr. Bouvier has denied that there is any such agreement between you and him, correct?

A. Now he denies.

Q. I understand that's -- but he denies there ever was an agreement. You understand that, of course?

A. Yes.

Q. And I understand that you have a disagreement with him about that.

A. Yes.

Q. Now, and Mr. Bouvier's position, as you understand, is that he would buy the art and then resell it to you through Xitrans or Accent Delight, correct?

A.   Yes.

THE COURT:   Mr. Asner, I am going to ask you to pause for a moment.   I understand we have a facilities emergency so to speak.   One juror, I'm going to let her take a very quick break, and we'll wait here for a moment.   Everyone can stretch where they are and we'll take our break at the normal time. But go ahead.

(Pause)

THE COURT:   I'll ask that everybody take their seat, please.   Thank you, sorry for the interruption, Mr. Asner, and we will continue.

BY MR. ASNER:

Q.   Before the break, Mr. Rybolovlev, we were talking about Plaintiff's Exhibit 353.   You with me?

A.   Yes.

Q.   And you testified yesterday that this letter reflects everything that we discussed with Yves, correct?

A.   Well, well not everything.   But this letter confirms that an agency agreement did exist.

THE COURT:   Hold on one second, please.

Can you please give that phone to my deputy.   You heard me.   Please give that phone that just went off to my deputy.   Thank you.

Mr. Asner, you may proceed.

MR. ASNER:   Thank you.   I didn't actually hear the

answer, if we could read back the last question, please.

THE COURT:  Keep going please.

MR. ASNER:  If we could read back the last question.

(The record was read)

A.  Well, it doesn't reflect everything.  But it does confirm and reflect that there was an agency agreement.  There was an agency relationship as far as I can recall.

Q.  And this reflects, as you say, the agency agreement between you and Mr. Bouvier, correct?

A.  Yes.

Q.  All right.  Now, let's take a look at this a little closer if you would.  You see, let's go to the bottom this is written to you in Geneva, correct.  Let's go to the very top of it. You see it's written to you, Mr. Dmitry Rybolovlev, on 26 Beautiful Fountain Way, 1223 Colgony, Geneva?

A.  Yes.

Q.  And if we could go to the very last page, you see it is signed Mr. Bouvier, Yves Bouvier?

A.  Yes.

Q.  All right.  If you go to the first page again, thank you, Dan, let's go through this.

Do you see he writes, "Dear sir."  And then he writes, "We thank you for your timely manner and to follow up on today's telephone interview with your manager, we would like to share our comments and remarks with you."

A.   Yes.

Q.   Do you understand the manager to refer to Michael Sazonov?

A.   I think so, yes.

Q.   And then the second paragraph says, "As you know, the owner of this masterpiece has, for some time, entrusted us with the sale of this painting."

Do you see that?

A.   Yes.

Q.   And so, you understood from this, did you not, that Mr. Bouvier in fact was working as an agent for the owner of this painting, correct?

A.   I said maybe.  It looks a bit strange, but it is what it is.

Q.   Well, Mr. Rybolovlev, the only reason I'm asking you about this is that you testified yesterday, and you testified today, that this reflected your understanding of your relationship with Mr. Bouvier, that you represented was an agency relationship where he was your agent.

THE COURT:  Sustained.  Let's ask a question, please.

A.   Yes, yes.

Q.   Actually didn't have to answer that.  It was sustained.

Mr. Rybolovlev, you testified yesterday, did you not, that this was your understanding, this letter reflected your understanding that you had an agency relationship where Mr. Bouvier served as your agent, correct?

A.   Yes.

Q.   And in fact, this letter makes it very clear that Mr. Bouvier is in fact serving as an agent for -- or at least he's been entrusted with the sale of a painting with another owner, correct?

A.   Yes.

Q.   And so, if we go down a little bit further in this, you'll see the paragraph not quite at the bottom of the page, the one right before it, "You will easily understand that the owner will not wait two or three months until the end of June 2003 to obtain a final offer."

Do you see that?

The owner he is referring to here is not you, correct?

A.   Yes, it's not me.

Q.   Mr. Rybolovlev, at this point in time, in 2003, you had known Bouvier for a while, correct?

A.   A couple of months, yes.

Q.   It's April of 2003; you met him in 2002, correct?

A.   Yes, end of 2002.

Q.   Were you on familiar terms with him at this point?

A.   No.

Q.   We could put that down.

Now, stepping back, in connection with acquiring the art for your collection, you testified that you delegated many of the technical details to Mr. Sazonov.

THE INTERPRETER:  We can put down this binder?

MR. ASNER:  You can put that away.

THE INTERPRETER:  If you can kindly repeat the question.

MR. ASNER:  I will.

Q.  Let's changing topics, slightly.  Sorry about that.  And I apologize for the bulky binder.

In connection with acquiring art for your collection, you testified that you delegated many of the technical details of that to Mr. Sazonov, right?

A.  Yes.

Q.  And you testified yesterday that one of the tasks that you assigned to Mr. Sazonov was to formalize the relationship with Mr. Bouvier, correct?

A.  Yes.

Q.  Mr. Kornstein asked you, "Did you write down the terms of this agreement?"  And you answered, "So I have a lot of interests and also I have a lot of businesses, so mostly I delegate those kind of situations to the right people."

Correct?

A.  Yes.

Q.  And the person you delegated the writing down of the terms of agreement to was Michael Sazonov, correct?

A.  Yes.

Q.  Now, at the time you used a law firm in Switzerland called

Lenz & Staehelin, correct?

A.   Yes.

Q.   And I'm going to use L&S to save everybody, the shorthand L&S.  Will that be easy for you to understand?

A.   Yes, all right.

          All right.  I got it now.

Q.   Just for simplicity we'll use L&S.

          And L&S is one of the top firms in Switzerland, correct?

A.   One of the major ones, yes.

Q.   And you hired L&S because they were good lawyers who would look after your interests, correct?

A.   Well, it looks like it, yes.

Q.   Well, did you hire them because they were bad lawyers?

A.   No.  It was Michael's job.  He was the one making the decision, who to hire, what lawyers to hire.  It was not my decision.

Q.   And you hired Mr. Sazonov because you expected him to be competent and diligent, correct?

A.   Yes.

Q.   And you knew, before you hired him, that he had gone to one of the top business schools in France, correct?

A.   Yes.

Q.   And that he had an extensive work experience working in the financial world, correct?

A.   Yes.

Q.   And you expected Mr. Sazonov to formalize the agreement that you understood you had entered into with Mr. Bouvier, correct?

A.   Yes, but he has broad authorities regarding when and how to do it.

Q.   You never --

A.   I'm just saying that he was not obligated to do it instantly.  And furthermore, there was no transaction pending at that point in time.

Q.   You never checked with Mr. Sazonov whether he had in fact formalized the relationship with Mr. Bouvier by entering into a written agency agreement.

A.   No.

Q.   And in fact, you know now that Mr. Sazonov never actually entered into a written contract with Mr. Bouvier setting forth the nature of the relationship between you, or Xitrans and Accent Delight, and Mr. Bouvier, correct?

A.   Yes.

Q.   And Mr. Rybolovlev, you had directed Mr. Sazonov to do that, but he ended up not doing that, correct?

A.   I will repeat myself probably.

         Oral agreements can be formalized on paper in different ways, and it all depends on the specific situation. If Michael Sazonov decided that this is the correct way to do

it, then it was the correct way to do it.

Q.   So you trusted Mr. Sazonov.

A.   Yes.

Q.   Did you ever look at what he had entered into with
Mr. Bouvier?

A.   What do you mean?

Q.   Did you ever ask him for what was the written agreement he
had entered into, if any, with Mr. Bouvier?

A.   No.  Because I voiced -- I voiced my demands, and then it
was up to him how to formalize it.  Because the paintings were
being purchased and everything was in working order.  So I had
no reason to have doubts or questions.

Q.   Everything was in working order until it wasn't, right?

A.   Well, yes.

Q.   Now, with respect to the first four transactions that
Xitrans entered into with Mr. Bouvier, there were contracts
with the sellers of those, correct?

A.   Yes, but I found out about this when the fraud was
uncovered.

Q.   By the fraud, you mean you found out about this when you
learned about, after your conversation with Sandy Heller on
December 30, 2014, correct?

A.   Yes.

Q.   And you never asked to look at any sales documents with the
sellers of the work until 2015, correct?

A.  Yes.

Q.  "Yes" meaning you never saw them before 2015?

A.  I didn't see them, yes.

        THE COURT:  Just please wait for the finished answer.

Q.  Before 2015, in fact, you never saw any documentation showing money that Bouvier -- excuse me.  Let me rephrase that.

        Before 2015, you never saw any documents showing that the money that was paid to Mr. Bouvier was in fact forwarded to the sellers of the artwork; is that correct?

A.  No.

Q.  That was Mr. Sazonov's responsibility, right?

A.  Yes.

Q.  And you hired him because you believed he was competent and diligent in doing his job, correct?

A.  Yes.

Q.  You understand the term "trust but verify"?

A.  I understand.

Q.  Now, at any point in time before December 2014, did Mr. -- are you aware of whether Mr. Sazonov ever asked for or received any documents from Mr. Bouvier verifying that the money you paid for the art in fact went to the sellers of the art?

        THE INTERPRETER:  Can you repeat this, please, from the interpreter.

        MR. ASNER:  Sure.

Q.  At any point in time, before December of 2014, did you

become aware that Mr. Sazonov never asked for any of the contracts between Mr. Bouvier and the sellers of the artworks?

THE COURT:  Sustained as to form.  That had so many negatives in it, I'm not sure I understood it.

MR. ASNER:  I'll try again.

Q.  The time period before 2014, December 2014, with me?

A.  Yes.

Q.  Before that time period, were you aware that Mr. Sazonov had never asked for any of the contracts between Bouvier and the sellers of the artworks that you were buying?

A.  I did not know that.

Q.  At any time before December 2014 -- you with me -- are you aware that Mr. Sazonov never received from Mr. Bouvier any of the contracts that he and Mr. Bouvier had entered into with the sellers of the artworks?

A.  No.

Q.  Did you ever check with Mr. Sazonov about whether he was doing his job?

A.  What do you mean by the word "check"?  Maybe you can just elaborate on that.

Q.  Let me ask you.  Did you do any checking about whether Mr. Sazonov was doing his job?

A.  For me it's very important that everything continues to work.  There is a massive amount of documentation that's involved with it.  I don't have the physical capabilities or

other capabilities to check everything with that.  I don't consider myself to be an expert in different fields.  I'm not a lawyer.  I'm not a financial director.  I have very limited knowledge in those fields.  These are very specific fields. And how can I check?

THE COURT:  Mr. Rybolovlev, the question was, did you do any checking about whether Mr. Sazonov was doing his job. So, is the answer yes or no?

THE WITNESS:  No.

Q.  Mr. Rybolovlev, you spent $2 billion for art.  Correct?

A.  Yes.

Q.  And you trusted Mr. Sazonov to do his job appropriately, correct?

A.  Yes.

Q.  Let me change gears briefly.

You were granted powers of attorney to act on behalf of Xitrans and Accent Delight, correct?

A.  Yes.

Q.  Let me show you what's been marked as Defendant's Exhibit 180.  I believe it's not in evidence.

MR. ASNER:  It is in evidence, your Honor.  If we could display it to the jury.

THE COURT:  Let me just check.  You may.

Q.  So, this is signed by Michael Sazonov.  Do you see that?

A.  Can I have the Russian version, please.

Q.   Sure.  It should be in your binder under DX 180.  If you need help, we can come up and help you with that big binder.

MR. ASNER:  Your Honor, if my colleague can approach and assist.

THE COURT:  Please.  Maybe going forward, better to have smaller multiple binders than one gigantic one, if we need to do this again.

MR. ASNER:  You're preaching to the choir.

Q.   Do you have that in front of you?

This is a general power of attorney giving you the ability to act on behalf of Xitrans, correct?

A.   Yes.

Q.   And Xitrans is one of the two entities that was established to acquire art on behalf of you and your family?

A.   Yes.

Q.   And do you see on the bottom Michael Sazonov is the director of Xitrans?

A.   Yes.

Q.   And you recognize his signature there?

A.   Yes.

Q.   You see on the third line, second line to the third, it says "Do hereby nominate, constitute, and appoint Mr. Dmitry Rybolovlev of Russia as the attorney."

Do you see the definition?

A.   I see it, yes.

Q.   And let's go to the second paragraph.  It says "You are authorized to take all and any necessary actions and sign all necessary documents."

          Do you see that?

A.   Yes.

Q.   And then you see in the third paragraph, it states that "Xitrans agrees to ratify and confirm whatever our said attorney," meaning you, "shall do or purport to do or cause to be done."

          Correct?

A.   Yes, I see it.

Q.   Then if we go back to the first paragraph, it allows you to use your experience, expertise, and special knowledge in any kind of artwork, for the purposes of identifying valuable items and art pieces suitable for investment.

          Do you see that?

A.   I see it.

Q.   So this letter contemplates that you would have the experience, expertise, and special knowledge required to be the attorney in fact for Xitrans, correct?

A.   Yes.

Q.   And it goes on to say that that would include, without limitation, paintings, as well as for proceeding with any action including, without limitation, undertaking appraisals, discussing and negotiating prices, participating in auctions,

and taking all necessary actions of the acquisition or subsequent disposal of paintings and other valuable work.

Correct?

A.  Yes.

Q.  Now, this is, you would agree, this is a very carefully written agreement between Mr. Sazonov, as the director of Xitrans, laying out your role and responsibility with respect to Xitrans, the entity that was set up for you and your family, correct?

A.  I don't really get it.  What was the question?

Q.  I'll start again.  I'll do it a different way.

This is a document that was written by lawyers laying out your role as an attorney in fact for Xitrans, the company or the entity that was set up for your family and you.

A.  So, the question is whether or not it was written by a lawyer?  Or what is the question?

Q.  Yes.  Was it written by a lawyer.

A.  I think it was.

Q.  Now, as far as you know, Xitrans, while it had this agreement with you, never had a written document setting out the scope of Mr. Bouvier's authorities and duties as an agent, correct?

A.  And what is the question?

Q.  I thought I had the question there.  I'll move on.

Let me show you what's been marked as Defendant's

Exhibit 181.  I believe this is not in evidence, your Honor.

THE COURT:  Well, it also happens to be actually 11:30 so let's break there for the morning.

Ladies and gentlemen, you know the drill.  Don't discuss the case, don't do any research about the case, continue to keep an open mind.  Please be ready to go a minute or two before noon and enjoy your break.  Thank you.

(Jury excused)

THE COURT:  Mr. Rybolovlev, you can step down if you wish.

Mr. Asner, any estimate on how much longer on cross or what percentage you've gotten through?

MR. ASNER:  I've gotten through about half, your Honor, maybe a little bit more.  It's hard to gauge, but with the interpretation it takes a little longer, but I'm guessing between an hour and two.  You can't hold me to it, I am afraid, or maybe you can, but I'd ask you not to hold me to it.

THE COURT:  Understood.  Just wanted to get an estimate.  And do you have views on whether -- well, now he's left -- whether Mr. Rybolovlev should be restricted in his communications with counsel?  He is the party representative but it is cross.

MR. ASNER:  Yes, your Honor, I think he should be restricted.  Obviously they can talk about grabbing lunch, but they can't talk about what I'm going through right now or about

O1C3ACC2                    Rybolovlev - Cross

his testimony.

THE COURT:  Any objections to that from plaintiff's counsel?

MR. KORNSTEIN:  No, sir.

THE COURT:  If you can make sure no one on your team communicates about the substance of his testimony and that he's told that, that would be great.

Anything from plaintiff's counsel?

MR. KORNSTEIN:  Nothing, your Honor.

THE COURT:  Defense counsel?

MR. ASNER:  No, your Honor.  Thank you.

THE COURT:  Two things.  One is I don't think we have copies of the exhibits that were discussed this morning that were not on the exhibit list that might be used with Mr. Sainty.  If you can make sure we get those so I can see them, that would be great.

Second, my law clerk will make inquiry of the gentleman whose phone went off, and on the basis of that, I will decide whether and when he gets it back.  So you can stay there.  And let that be a warning to everybody, if you have a phone or device in here, make sure it is off.  And if it's not, you may lose it forever.  Thank you.

(Recess)

(Continued on next page)

A F T E R N O O N   S E S S I O N

12:00 P.M.

THE COURT:  Let's get Mr. Rybolovlev back on the stand, please.

I did provide the gentleman's phone.  It is now off.  As long as you remain in this room, this is to remain off, please.  And we'll get the jury.

MS. SALZMAN:  We seem to be missing the interpreters.

THE COURT:  I would go find them.  Otherwise, he'll have to try in English.

(Jury present)

THE COURT:  Welcome back, ladies and gentlemen.  Hope you've enjoyed your break.  We will continue with the cross-examination of Mr. Rybolovlev.

Mr. Rybolovlev, I remind you that you remain under oath.  And with that, Mr. Asner, you may proceed.

MR. ASNER:  Briefly, Dan, if we could put back up DR-180 briefly.  I mean DX-180, sorry.

BY MR. ASNER:

Q.  Mr. Rybolovlev, we were looking at this earlier.  It's just a quick question.  It's the document we were looking at earlier.

THE INTERPRETER:  Open the binder or not?

MR. ASNER:  We don't need the binder, I don't think.

Q.  This is a general power-of-attorney; correct?

O1CVACC3                          Rybolovlev - Cross

A.   Well, I'm not a lawyer, but I think that's what it is.

Q.   And this appoints you to be the person acting on behalf of Xitrans in connection with the acquisition of the artworks?

A.   Is this a question?

Q.   I said is that correct?

A.   Yes.

Q.   So in connection with acquiring artworks for Xitrans, you're the boss?

A.   I just can say that everything that is written out in the power-of-attorney, that's what it is, and I don't have anything other to add.

Q.   Let's go to Defendants' Exhibit 181.  And I don't believe this is yet in evidence, so we have it marked for identification.  If we could go to the next exhibit in your binder.

A.   So if I can have some assistance, I would really appreciate it.

Q.   Do you recognize this, sir?

A.   Yes.

          MR. ASNER:  We offer it into evidence, your Honor.

          MR. KORNSTEIN:  No objection.

          THE COURT:  Why don't we have the witness identify what it is.

Q.   Mr. Rybolovlev, is this a general power-of-attorney by Accent Delight to you?

O1CVACC3                        Rybolovlev - Cross

A.   Yes.

THE COURT:  Admitted.  And you may publish.

(Defendants' Exhibit 181 received in evidence)

MR. ASNER:  If we could display it to the jury.

Q.   Do you see in the first paragraph, it says:  Know all men by these presents that we, the undersigned, Accent Delight international Limited, the company, of British Virgin Islands, do hereby nominate, constitute, and appoint Mr. Dmitry Rybolovlev of Russia, the attorney, in his personal capacity as our true and lawful attorney to act for us in our name and on our behalf.  And then it goes on.  Do you see that?

A.   Yes, I do.

Q.   And then it lays out what your role is as the attorney-in-fact under this general power-of-attorney.

Are you with me?

A.   Yes.

Q.   And you have the power to proceed with all and any lawful acts and, in particular, to use your experience, expertise, and special knowledge in any kind of artwork, including, but not limited to, paintings, drawings, statues, and antique furniture, investments in art and valuable items for the purposes of identifying valuable items and art pieces suitable for investment.  And it goes, including various types of art pieces and activities in the art market.  Do you see that?

A.   Yes, I do.

Q.   And do you see in the second paragraph that you are authorized to take all and any necessary actions and sign all necessary documents?

A.   Yes.

Q.   And do you see that in the third paragraph, Accent Delight, the entity in the British Virgin Islands that is set up for you and your family, agrees to ratify and confirm whatever you shall do and purport to do and cause to be done; correct?

Now, these two power of attorneys that we just looked at, Defendants' Exhibit 180 and Defendants' Exhibit 181 --

THE COURT:   Hang on, Mr. Asner.   I'm not sure that the witness answered your prior question.

MR. ASNER:   I thought he had, but okay.

THE COURT:   Was there an answer?

A.   Can you repeat it please?  I lost track.

MR. ASNER:   Can we have the question reread?

THE COURT:   It is:  Do you see that in the third paragraph, Accent Delight, the entity in the British Virgin Islands that is set up for you and your family, agrees to ratify and confirm whatever you shall do and purport to do and cause to be done; correct?

THE WITNESS:   Yes, I do see.

THE COURT:   All right.  Mr. Asner, please make sure you wait for the translation, even if you know what the answer is going to be.

MR. ASNER:  Thank you, your Honor.

Q.  Now, Defendants' Exhibit 180 and 181 give you authority to act on behalf -- legal authority to act on behalf of Xitrans and Accent Delight in connection with the acquisition of artworks; correct?

A.  Yes.

Q.  And it was your responsibility, wasn't it, Mr. Rybolovlev, to execute these responsibilities; correct?

A.  Yes.

Q.  And although you have the power-of-attorney by both Xitrans and Accent Delight, you never told Michael Sazonov to get from Yves Bouvier any sales agreement that Bouvier had entered into to buy any artwork; correct?

A.  Yes.

Q.  You never told Michael Sazonov to verify that the money that you paid for art went to the prior owners of the art; correct?

A.  Yes.

Q.  Michael Sazonov worked for you, Mr. Rybolovlev; is that correct?

A.  Yes.

Q.  And Mr. Rybolovlev, I think you testified that your wealth was around seven billion at this time?

A.  Yes.

Q.  And about two billion of the wealth was used to buy art

O1CVACC3                          Rybolovlev - Cross

through Yves Bouvier?

A.   Yes.

Q.   And you never directed Michael Sazonov to find the verification that, in fact, Mr. Bouvier was paying the money that you paid to him to the sellers of the art; correct?

A.   No.

MR. ASNER:  All right.  We can put that down.  Let's put up Defendants' Exhibit 686 again.  It's in evidence, your Honor.

Q.   Remind us, this is the *Salvator Mundi* by Leonardo da Vinci; is that correct?

A.   Yes.

Q.   And you paid $127.5 million for this, Mr. Rybolovlev?

A.   Yes.

Q.   And as you understood it, that was the price that Mr.  -- excuse me.  Withdrawn.

As you understood it, that was the price that Mr. Bouvier and Mr. Sazonov told you was the amount that they needed to pay the sellers of this in order to get that amount, to get the picture?

MR. ASNER:  Your Honor, let me withdraw that and start again.  I garbled it.

Q.   As you understood it, 127 million .5 U.S. dollars was the price that Mr. Bouvier told you and Mr. Sazonov that the sellers of the da Vinci painting needed in order to sell you

the painting; correct?

A.  Yes.

Q.  Let's go to Defendants' Exhibit 685 for identification.  Do you recognize this piece, your Honor -- long day.

THE COURT:  I do, but I'm not testifying.

Q.  Mr. Rybolovlev, you've been promoted.  I'm going to try that one again.

Mr. Rybolovlev, do you recognize Defendants' Exhibit 685?

A.  Yes.

Q.  This is *Wasserschlangen II*, *Water Serpents II*, by Gustav Klimt; is that correct?

A.  Yes.

Q.  And this is one of the art pieces that you purchased?

A.  Yes.

MR. ASNER:  I offer this into evidence, your Honor.

MR. KORNSTEIN:  No objection.

THE COURT:  Admitted.

(Defendants' Exhibit 685 received in evidence)

Q.  Now, Mr. Rybolovlev, Accent Delight paid $183.8 million to buy *Wasserschlangen*, *Water Serpents II*?

A.  Yes, somewhere around that amount.

Q.  Give or take a few million?

A.  I think 183, yes.  A lot of numbers, so I can't remember them all, but I believe you.

Q.   And you paid that amount because that's the price that Mr. Bouvier told you and Mr. Sazonov that he had to pay to the sellers to get the painting, right?

A.   Yes.

Q.   Let's show you what's been marked as Defendants' Exhibit 688 in evidence.

          MR. ASNER:   I'm sorry.   I had the wrong number, your Honor.   684 not in evidence.

Q.   Do you recognize this, sir?

A.   Yes.

Q.   What is it?

A.   This is a sculpture by Modigliani.

Q.   And is this the sculpture that you purchased?

A.   Yes.

          MR. ASNER:   We offer this into evidence.

          MR. KORNSTEIN:   No objection.

          THE COURT:   Admitted.

          (Defendants' Exhibit 684 received in evidence)

Q.   Now, Mr. Rybolovlev, you purchased this sculpture by Modigliani for 37.5 million euros plus a painting by Degas; correct?

A.   Yes.

Q.   And Degas is another artist; correct?

A.   Yes.

Q.   And you paid that money and that painting because that's

the price that Mr. Bouvier told you and Mr. Sazonov that you had to pay in order to buy the painting from the sellers; correct?

A.   No, not exactly.

Q.   Well, that is the price that Mr. Bouvier told you and Mr. Sazonov that you had to pay in order to get this sculpture; correct?

A.   Yes, but we paid because Sotheby's gave evaluation.

Q.   Mr. Rybolovlev, my question is you paid that amount, and that amount was the amount that Mr. Bouvier told you and Mr. Sazonov you had to pay in order to get the sculpture from the sellers; correct?

A.   No, we paid because Sotheby's provided a evaluation.

Q.   Mr. Rybolovlev, I understand, and your lawyer is going to be able to argue your case.  I'm asking you a different question.  And if you can answer my question, I would appreciate it.

          THE COURT:  Counsel, I think his answer was no.

Q.   Then let me ask you, Mr. Rybolovlev, did you pay 37.5 million euros and a Degas to buy this sculpture?

A.   Yes.

Q.   And that is the amount that Bouvier told you and Mr. Sazonov that you needed to pay in order to acquire this sculpture; is that correct?

A.   I'm confused.  You know, if the questions can be a bit

shorter.

Q.  I try.

Mr. Rybolovlev, Mr. Bouvier told you that in order to acquire this sculpture, you needed to pay 37.5 million plus the Degas; is that correct?

A.  Bouvier said that this we had to do, yes.

Q.  And that was in January of 2013; correct?

A.  Yes, but --

Q.  Let's go to defendants' exhibit --

THE COURT:  Hold on.

MR. ASNER:  I'm sorry, did he finish?

THE COURT:  I don't think he did.  What was the translation?

THE INTERPRETER:  Yes, but probably yes.

MR. ASNER:  Let's go to Defendants' Exhibit 683.  I don't believe it is -- oh, it is in evidence, your Honor.

BY MR. ASNER:

Q.  This is the *Domaine d'Arnheim* that we looked at earlier. You don't need to look at the catalog.  Just the picture.

This is the *Domaine d'Arnheim* that we looked at earlier.

A.  Yes.

Q.  And you paid 43.5 million euros -- I mean dollars to buy the *Domaine d'Arnheim*?

A.  Yes.

Q.   And that was the price that Mr. Bouvier told you and Mr. Sazonov that you had to pay to the seller in order to acquire this painting?

A.   Yes.

Q.   Okay.  We could drop that.

Let's go back to Defendants' Exhibit 686.  This is the *Salvator Mundi*.  You don't need to pick it up.

I'm going to show you Plaintiff's Exhibit 80.

MR. ASNER:  If we could put up Plaintiff's Exhibit 80.

A.   All right.

Q.   Mr. Rybolovlev, do you see that this is an email from Michael Sazonov to Olga Khorobrykh, who is your assistant, dated March 25, 2013?

A.   Yes.

Q.   And do you see that it says:  Attachment Modestini Treatment Reportill.pdf?

A.   Yes.

MR. ASNER:  Now, if we could offer this into evidence, your Honor.

MR. KORNSTEIN:  No objection.

MR. ASNER:  If we can show it to the jury.

THE COURT:  I think this is in evidence.

MR. ASNER:  I didn't have it in my list, your Honor.

So if we could scroll through this, Dan.

Q.   You see that this is a report from a woman named Dianne

Modestini?

A.   Is that a question?

Q.   Do you see that this is a report by a woman named Dianne
Modestini?

A.   Yes.

Q.   And she was the restorer who worked on the Leonardo
da Vinci *Salvator Mundi*?

A.   Yes.

Q.   And you received this at the time?

A.   Yes.

Q.   Now, Mr. Rybolovlev, you submitted a declaration in this
litigation; correct?

A.   Yes.

Q.   And, in fact, you submitted two declarations in this
litigation; correct?

A.   Yes.

Q.   And they were translated into Russian so that you could
understand them before you signed them; correct?

A.   Yes.

Q.   And one of them was submitted and signed to you -- signed
by you on May 26, 2022; correct?

A.   Yes.

Q.   And you swore under oath that what you said was true;
correct?

A.   Yes.

Q.   Now, in paragraph 4 of that declaration, you swore:  In addition, Bouvier provided Sazonov with a copy of the restoration report for this work by Dianne Modestini, and Sazonov provided that to me.  That's this report; correct?

A.   Yes.

Q.   Then you go on and you say:  We have learned through discovery in this case that it was Sotheby's that provided Bouvier with the Modestini report.  And then you cite to -- you say:  Valette's email to Bouvier attaching the report is attached as, and then there's an Exhibit 15 in your declaration.  You said that; correct?

A.   Yes.

Q.   Your statement "We have learned through discovery in this case that it was Sotheby's that provided Bouvier with the Modestini report" is not true, is it, Mr. Rybolovlev?

A.   At that point in time, when we received the report, we did not actually know who this report was from, but Bouvier was the one who produced it.  But during the discovery process, we found out that this report was sent to Bouvier by Valette.

Q.   And Mr. Rybolovlev, what you just testified to is not correct, is it?

A.   What do you mean?  I don't understand.

Q.   Okay.  Well, let's look at the attachment -- I'm sorry, the attachment modifier where it says Modestini Treatment Reportill.pdf.  Do you see that?

A.   Yes.

MR. ASNER:  And if we could put this to one side and put up Plaintiff's Exhibit 31.  Let me see if it's in evidence.  I'm sorry, 81, excuse me.  Not in evidence.

Q.   Mr. Rybolovlev, on the right-hand side, you see a condition report, an email from Mr. Valette to Mr. Bouvier.  Is that what you're referring to in your declaration?

A.   Well, the report was sent by Valette.

Q.   Sent by Valette -- I'm sorry, please.

THE COURT:  Well, let --

A.   Yes.  The report was sent by Valette.

THE COURT:  Just listen to the question.  The question was:  Is this document on the right-hand side of the screen, is that the document that you were referring to in your declaration?  That's a yes or a no.

THE WITNESS:  I have to take a look because is that the complete document or is it just part of it?

Q.   Okay.  Well, I can show you the declaration.

MR. ASNER:  If I can approach, your Honor, if we have another copy.

THE COURT:  You may.

MR. ASNER:  Your Honor, if I can just approach with my copy to save time.

THE COURT:  You may.

Q.   Mr. Rybolovlev, I'm showing you what's the declaration that

you submitted on -- dated March 26, '22.

A.   Can I see it in Russian, please.

Q.   Of course.  And then I want to focus your attention on paragraph 34.

A.   All right.

Q.   And then in paragraph 34, you say you learned through discovery in this case that it was Sotheby's that provided Bouvier with the Modestini report.  But let's email to Bouvier attaching the report that's attached as Exhibit 15.

Then Exhibit 15 to your declaration is attached.  And take a look, but is this the same as the exhibit we were just talking about?

A.   There's nothing in Russian, right?

Q.   Do we have a Russian version of this exhibit in the binder?  Yes.

THE COURT:  All right.  So Mr. Asner, why don't you step back to the podium, please.  Ms. Shi can come assist finding in the binder and then we'll go from there.

A.   In my understanding, if it was sent by Valette, so it was sent by Sotheby's.

Q.   I understand.  But right now is this the same document?

A.   Yes.

MR. ASNER:  Okay.  So I would offer Plaintiff's Exhibit 81, your Honor.

MR. KORNSTEIN:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 81 received in evidence)

MR. ASNER:  All right.  So if we could put plaintiff's exhibit up and show it to the jury.

THE COURT:  You may.

Q.  And you see here that -- if we could scroll through both of them just to compare them.

You see the second page is -- and go to the next page. Do you see that these are both the Modestini report?

A.  I cannot tell you.  Both documents are in English.

Q.  Well, Mr. Rybolovlev, we just went through that the exhibits in your declaration are Plaintiff's Exhibit 80 and Plaintiff's Exhibit 81; correct?

A.  Yes, but I was looking at the Russian version.  Well, okay, let's make it this way.  It looks like that, let's do it this way.

Q.  Fair enough.

And we can go through it page by page if you prefer.

A.  Well, we don't have to do that.

Q.  Okay.  Very good.

Now, if we could go to the first page of both documents.  Now, you see that the attachment in the email that Mr. Valette sent to Yves Bouvier is titled Modestini Treatment Report.pdf.  Do you see that?

A.  Yes.

Q.   And you see there's a space between "Modestini" and "Treatment" and a space between "Treatment" and "Report"?

A.   Just one second.  Yes, I can see that.

Q.   All right.  Now, let's look at the version that Mr. Sazonov forwarded to your assistant, Olga Khorobrykh.  Do you see that there, the file name is Modestini Reportill.pdf?

THE COURT:  I think you mean Modestini Treatment Reportill.

Q.   Modestini Treatment Reportill.pdf.

A.   Yes.

Q.   And you see no spaces between "Modestini" and "Treatment"?

A.   Yes.

Q.   And you see the "ill" added?

A.   Just one second, please.  Hold on.  There are no spaces between what and what?

Q.   "Modestini" and "Treatment."

A.   Well, I do have a space here in my version.

Q.   So let's take a look then.  You see on PX-81, which I believe is the one on the right, that there is a space between the words "Modestini" and "Treatment"?

A.   But actually the space here is much -- is bigger than right here.

Q.   Okay.  And do you see then on the one on the left, which is Plaintiff's Exhibit 81, in addition to having smaller spaces, you see an I-L-L at the end?

THE COURT:  Mr. Asner, not to cause confusion or more confusion, but I think on the left is Plaintiff's Exhibit 80.

MR. ASNER:  You're right.

Can we go to the full screen so I can see the exhibit number.

Q.  Do you see the one on the left, Plaintiff's Exhibit 80, has I-L-L at the end, and the one on the right does not have I-L-L at the end?

A.  Yes.

Q.  Okay.  Now, I want to keep the one you received from Sazonov, Plaintiff's Exhibit 80, which is on the left, I want to keep that on the screen.  And I want to now put up Defendants' Exhibit 165, which is in evidence.

Now, Mr. Rybolovlev, before working directly with Mr. Bouvier in connection with the purchase of the *Salvator Mundi*, you already had an avenue to the sellers of the da Vinci; correct?

A.  I need a copy in the Russian language, please.

Q.  Well, I actually was just asking you, before putting this up or before focusing you on this, before you were working with Mr. Bouvier to purchase the Leonardo da Vinci painting, you already had an avenue to the sellers of the da Vinci through an individual named Seth Harrison; correct?

A.  Seth Harrison is a person who works in biotechnology field. And he had someone who asked him if that was causing any

interest or not.  And after that, we transferred everything to Bouvier.

Q.  My question was simpler:  You were working with Mr. Harrison before working with Mr. Bouvier regarding the Leonardo da Vinci?

A.  We were not working with him.  He just mentioned -- he just said, Is there any interest or not?

Q.  Okay.  We'll go there later today.  But for right now, I want you to focus just on the very first portion of this document.  Do you see it?  If we could blow it up.

And do you see that this is an email from Seth Harrison to Michael Sazonov; correct?

A.  Yes.  Judging from what I see, yes.

Q.  And do you see that Seth Harrison, who has a connection with the prior owners of the Leonardo, sent an email that says: Forward:  Leonardo.

A.  Yes.

Q.  And do you see over in Exhibit 80, it says:  "Subject: Forward:  Leonardo"?

A.  Yes.

Q.  And then you see attachments.  And the first attachment from Mr. Harrison to Mr. Sazonov is Modestini Treatment Reportill.pdf.  Do you see that?

A.  Yes, I can see that.

Q.  So we can drop these.

Mr. Rybolovlev, when you said in your declaration that you received Plaintiff's Exhibit 80 from Sotheby's, in fact, that was a mistake?

A.   And why?

Q.   Because, in fact, as we just saw, Mr. Sazonov received it from Seth Harrison?

A.   But I didn't see that.

Q.   I understand.

A.   Actually, right now is the very first time that I learned that it had been sent.

Q.   And that's fair, because we all make mistakes.

THE COURT:  Sustained.

Q.   Was it a mistake in your declaration?

A.   My understanding that if -- my understanding is that if the document is sent by vice president of Sotheby's, so this document is from vice president of Sotheby's.

Q.   Mr. Rybolovlev, in your declaration, you stated that the document you received from Michael Sazonov came from Sotheby's. And that's just not true, is it?

A.   In my understanding of the document came from, well, I can only reiterate what I have already told you.  Maybe I was mistaken in my understanding, but that's what my understanding was.

Q.   And that understanding was provided to you by other people; isn't that correct?

A.   I saw the document.

Q.   I think we've covered that.

          THE COURT:  I agree.

Q.   Now, let me go to March of 2013.  We'll go back to the Seth Harrison issue.

          In March of 2013, as you understand it, Mr. Sazonov was approached by Seth Harrison to determine whether you had an interest in buying Leonardo da Vinci's *Salvator Mundi*; correct?

A.   Yes.

Q.   And you had a business relationship with Mr. Harrison already; correct?

A.   Yes.

Q.   Now, after Mr. Harrison approached you, you scheduled a meeting in New York for you to view the *Salvator Mundi*; correct?

A.   Could you repeat that please?

Q.   After you were approached by Mr. Harrison, you scheduled a meeting in New York to view the *Salvator Mundi*; correct?

A.   I do not recall.

Q.   The viewing that was going to be set up by Mr. Harrison never happened, in any event; correct?

A.   No, it did not happen.

Q.   You entered into a strategy with Mr. Sazonov and Mr. Bouvier to try and drive down the price; correct?

          THE INTERPRETER:  From the interpreter, I'm sorry, the

end of your question?

Q.   You entered into a plan with Mr. Sazonov and Mr. Bouvier to drive down the price that the sellers would be able -- would be willing to accept; correct?

A.   This is what Bouvier suggested.  He said -- he said that if we go direct, so that will be more money than he would -- that he could do it.

Q.   Okay.  So let's walk through the plan that Bouvier suggested and go through it.

          MR. ASNER:  Let's put up Defendants' Exhibit 48.  This is in evidence.

A.   Okay.  Let's do that.  Well, and the number?

Q.   Number -- Defendants' Exhibit 48.

A.   Can we get assistance from someone who's familiar with these binders?

Q.   Yes.  Are you with me, Mr. Rybolovlev?

A.   Yes.

Q.   Okay.  Now, I want to focus you on the middle paragraph here, the one that says March 24th at 8:07 a.m.  So -- I'm sorry, 10:07 a.m.

A.   Just a second, please.  I can't see it.  I can see it in the Russian version.  For some reason, my version shows French and Russian, just mixture of both languages.

          MR. ASNER:  Can you point her.

          Your Honor, just for ease, if we could have Ms. Shi

stand over there for a moment, make it go faster.

THE COURT:  I would say depends how long we're contemplating, but okay.

Q.  All right.  So Mr. Rybolovlev, are you at the email from Mr. Bouvier to Mr. Sazonov at 10:07 a.m.?

A.  Yes, I can see it.

Q.  Okay.  And then he writes:  Hi, Mike.  Below is the text that I sent on Friday to DR.  "DR" is you; correct?

A.  Yes.

Q.  When I surprised him by taking the Leonardo with me to Katia's apartment.  Correct?

A.  Yes.

Q.  And then he says:  Did DR confirm to you the strategy decided on to break the morale and deflate the price?

A.  So what is your question, sir?

Q.  Do you see where it says:  Did DR confirm to you the strategy decided upon to break the morale and deflate the price?

A.  That's Bouvier's terminology.  Yes, I can see it.

Q.  Okay.  And the people whose morale Mr. Bouvier was proposing to break were the previous owners of the *Salvator Mundi* painting; correct?

A.  For me, the Russian translation that is here is -- is not quite clear because the Russian translation says to break the principal.  What kind of principal is meant here?  I'm not sure

I understand.  I'm not sure I understand what is this whole thing about.  The only thing that Bouvier shared with us and what he calls his strategy was that his words were as follows: If they know that a Russian businessperson wants to do it, so the price will be inflated.  And if you go through me, it will be deflated.

Q.  Okay.  So he had a strategy and you agreed to the strategy; correct?

A.  Well, it was not a strategy.  Actually, what he did, he offered himself to serve as an agent with respect to this transaction.  And then I agreed to it.  So the issue at the bottom of it was whether we were going to go with him or without him.

Q.  All right.  And you see Mr. Sazonov responds to this by saying:  Thank you, Yves.  Strategy already implemented.  Visit canceled.

A.  Yes.

Q.  And Mr. Rybolovlev, that was a visit to view the Leonardo da Vinci that had previously been scheduled through Mr. Harrison?

A.  At this point in time, I do not recall any details.

Q.  Okay.  Let's go further down in the body --

A.  It was --

Q.  I'm sorry.  Please.

A.  It was -- it was about ten years ago.

Q.   Let's go to the next page.

A.   Okay.

Q.   All right.  And you see that -- if we could blow this up.

You see it starts out by Leonardo da Vinci's *Salvator Mundi* painting is very beautiful, and I understand and share the fascination for this work.  Do you see that?

A.   Where is it?

Q.   The very top sentence says:  Leonardo da Vinci's *Salvator Mundi* painting is very beautiful, and I understand and share the fascination for this work.

A.   No, I understand what you are reading, but you are reading from the English version.  Where can I find it in the Russian translation?

Q.   It should be on the top of the page.

A.   Well, we need help because --

THE INTERPRETER:  From the interpreter, my apologies.

Even I can't find it in the Russian version, but I can see it in the English version.  And I have already interpreted for Mr. Rybolovlev.

A.   Yes.

Q.   Okay.

A.   It's in the middle of the page actually.

THE COURT:  Let's let Ms. Shi return.

A.   Well, it's teeny tiny.  It's very hard to see.

Q.   No, I know with the translation it gets complicated.  I

apologize for that, Mr. Rybolovlev.

Following down, it then talks about the Leonardo -- it indicates that it has some significant problems and that it's in a damaged condition.  Do you see that?

A.  You know, we are a bit confused here.  So these were sent from Bouvier?

Q.  Yes.  I think it's --

A.  By Bouvier?

Q.  Yes.  If we could go to the top, we'll reorient you, Mr. Rybolovlev.  So just to reorient you, if we go to the middle, Yves Bouvier writes:  Hi, Mike --

A.  I'm so sorry.  Is it from Bouvier to Mr. Sazonov?

Q.  It is from Bouvier to Vera Voitenkova.

A.  So that's from Bouvier?

Q.  I'm sorry, from Vera Voitenkova to Mr. Bouvier.  And then Mr. Bouvier writes:  Below is the text that I sent on Friday to DR.

A.  It's very confusing.

MR. ASNER:  I'm sorry, can I get the answer back?

THE COURT:  He said:  It's very confusing.

MR. ASNER:  It is very confusing.

One moment, your Honor.

Dan, could you go to the French original, and then we can scroll through that just so we can see it.

Now, let's go to the end.

Q.   And then you see, Mr. Rybolovlev, there is a --

Mr. Rybolovlev, do you see here on the screen,

Mr. Rybolovlev -- you can make it a little smaller so that we

can read it.  Do you see that this is the text that Mr. Bouvier

sent to you in Russian?

A.   Mr. Bouvier sent to Sazonov.

          MR. ASNER:  Go up a little bit further again.  Up

further.

Q.   Okay.  So the one at 10:07, it says in French, but the

English version we looked at a moment ago, essentially says:

Here's the text that I sent to DR.

A.   How could he send it to me?

Q.   Because he's forwarding it to you, Mr. Rybolovlev.  Let's

go to the Russian version at the bottom.

          THE COURT:  Mr. Asner, you're asking questions, he's

testifying.  So please be careful.

          I'll remind the jury that it's the witness's answers,

not the lawyer's questions, that are evidence.

Q.   Mr. Rybolovlev, do you see the body of the text in Russian

that there's something that says strategy in capital letters?

          MR. ASNER:  Can we put up this portion and the English

portion.

A.   Yes, I can see it.  The answer was yes, I can see it.

          MR. ASNER:  We're going to wait for a moment to put up

the English portion.  Okay.  So technical problem solved.

Q.  And do you see that on the right is the English and on the left is the Russian?

A.  Yes.

Q.  And you see that Mr. Bouvier wrote that he recommended canceling the visit and saying there is no longer interest in the *Salvator Mundi*?

A.  Yes.

Q.  The strategy says the sellers know that the painting will be presented to a Russian billionaire this Tuesday.  They are sure of themselves and expect a lot from the meeting.

A.  Yes.

Q.  He then writes:  For the sake of modesty and to shake their confidence, I recommend canceling the visit and saying that there is no longer any interest.

A.  Yes.

Q.  And you understood that when you received this in Russian, that he meant to shake the confidence of the sellers of the *Salvator Mundi* by convincing them that the Russian billionaire was not interested?

A.  And where is the question here?

Q.  Is that correct?

A.  What is correct?

Q.  Is the strategy that you agreed to was to shake the confidence of the sellers of the da Vinci by representing to them falsely that the Russian billionaire was not interested?

A.  Yes, ultimately, as I said, we agreed with Yves Bouvier or that we are going to go through Yves Bouvier and not through the person who was suggested by Mr. Harrison.

Q.  And you agreed to cancel the meeting that had already been set up for Tuesday; correct?

A.  I do not have a clear recollection with respect to that meeting.  You know, what happened ten years ago, even the meetings were very good, it's hard to do.  But to memorize those meetings who were not -- which, in fact, did not happen or were canceled, it's not possible.

Q.  But you know that the plan here was to convince the sellers of the da Vinci that the billionaire was no longer interested in order to trick them into dropping their price?

A.  Tricking them is not the -- is not the issue.  In Mr. Bouvier's logic, it was that he wanted to get his fingers into this deal because if we go with an open name of the person who is interested, so it excludes Mr. Bouvier.  Going through him is using Mr. Bouvier.

Q.  Okay.  And the strategy, rather than telling the sellers that you were still interested in the *Salvator Mundi*, was to pretend that you were not interested; correct?

A.  Yeah.  Well, it -- it looks like that.  If we are not showing interest, that means that they could -- they could not see us, we are not seen by them.

Q.  Okay.  And the strategy was more involved than just that,

right?  In fact, the strategy was to revert to a museum situation and conduct museum-type negotiations with the trustees, like the Dallas Museum; correct?

A.   Actually, it was Mr. Bouvier's idea that he would not be negotiating on behalf of himself, but he would represent that he was negotiating on behalf of a museum.  That's -- actually, that's the idea that he proclaimed.

Q.   And in fact, to be specific, the idea was to approach the sellers under the guise of the Pinacothèque and conduct negotiations.  And the Pinacothèque is a museum; correct?

          THE INTERPRETER:  From the interpreter, I didn't get the name of the museum.

          MR. ASNER:  Pinacothèque.

A.   I do not recall at this point in time what specifically he wanted to do.

Q.   But it was a ruse and it was phony, isn't that true, Mr. Rybolovlev?

A.   One more time.  That was his idea.  His idea of how he would like to represent himself.

Q.   And Mr. Rybolovlev, you agreed to that ruse, didn't you?

A.   I agreed with the -- with the statement, his statement that if my name is mentioned, then -- I agreed with him that if my name is not said, then the price will be lower.  But if Mr. Bouvier wanted to present himself or to represent some kind of a museum, that had nothing to do with me.  I didn't have

anything like that.  He did talk about it.  He said that he would do it that way.  But whatever he did, that was his own idea.

Q.  Earlier this morning when Mr. Kornstein was talking to you, you talked about how you want to shine a bright light onto the art world and focus on transparency.  Were you being transparent with Seth Harrison here?

A.  Mr. Seth Harrison is a person who works in the field of biotechnologies.  He is not involved in art market and there was no interest of his in this situation.

Q.  So Mr. Rybolovlev, is it okay for you to not be transparent in your dealings with the da Vinci sellers?

A.  It's absolutely normal to me if my name is not known by the seller.

Q.  It's normal that your name is not known to the seller.  But is it okay for you to come up with a ruse to convince them that you are no longer interested and to agree to another potential buyer being just created, is that okay?

A.  One more time.  I think that I have already responded to your question.  It's normal.  It's normal for me if a seller does not know my name.

(Continued on next page)

Q.  Did you tell Mr. Bouvier, when he proposed this ruse, to not do it, to not lie?

A.  To not do what?

Q.  Did you tell Mr. Bouvier, when he proposed to come up with a lie to tell the da Vinci sellers about who was interested and who was not interested, did you tell him not to do that?

A.  No.

Q.  He worked for you; at least that's what you're saying.

A.  One more time.  He wanted to get this transaction, this deal for himself.  He and I actually sold on his logic that my name would not be known.  And after that, whatever ideas, and after that, whatever ideas he had or whatever he was going to do, it's not in my power to tell him what to do and how to do it.  But, but when he presented that idea, I did not tell him don't do it.

Q.  Mr. Rybolovlev, you just said it wasn't in your power to tell Mr. Bouvier what to do and what not to do.  But you testified this morning that you thought he was your agent.  Isn't that correct?

A.  One more time, please.

So, one more time.  How he would -- how he was going to do it, what he was going to say, that was up to him.

THE COURT:  I think we've plowed this ground, so let's bring it to a close, please.

MR. ASNER:  Okay.

Q.  You didn't tell Mr. Sazonov to stop this ruse, did you?

A.  No, I didn't tell him.

Q.  All right.  Let's move on.

Mr. Rybolovlev, let me show you what's been marked as Defendant's Exhibit 703.  Do you recognize this picture? There's no binder.  It's just in front of you.

Do you recognize this?

A.  Yes.

Q.  Is this Rothko No. 6 that you purchased?

A.  Yes.

MR. ASNER:  And if I could admit it into evidence, your Honor?

MR. KORNSTEIN:  No objection.

THE COURT:  Admitted.

(Defendant's Exhibit 703 received in evidence)

MR. ASNER:  If we could show it to the jury, your Honor.

THE COURT:  You may.

Q.  Now I'm right, am I not, that Accent Delight –- you don't need the binder for it now.

Am I right, am I not, that Accent Delight acquired this Rothko on September 8, 2014, correct?

A.  Yes, you're right.

Q.  All right.  Mr. Rybolovlev, I want to put in front of you –- I don't need it in front of you.

Plaintiff's Exhibit 472 is in evidence, it is a stipulation.  Mr. Rybolovlev, you don't need the exhibit.

Mr. Rybolovlev, you said you met with Sandy Heller at the Eden Rock Hotel in St. Barts on December 30, 2014, correct?

A.  Yes.

Q.  And earlier this morning, you said that after that, you became aware of what you alleged were Mr. Bouvier's fraudulent activities, correct?

A.  Yes.

Q.  And then you also said that you came to believe that Sotheby's somehow was involved in those activities when you received materials through legal process in the United States, correct?

A.  Yes.

MR. ASNER:  Now, Mr. Rybolovlev, under stipulation PX 472, your Honor, if I can read it into the record, paragraph 7.

THE COURT:  You may.

MR. ASNER:  The parties have stipulated on March 25, 2016, plaintiff filed a proceeding pursuant to 28 U.S.C. 1782 to obtain documents from defendant Sotheby's, Inc., relating to Yves Bouvier's acquisition of artworks that subsequently were acquired by plaintiff.  Defined as the 1782 proceeding.

Q.  Now --

THE COURT:  Can I interrupt for a second.

MR. ASNER:  Please.

THE COURT:  I want to explain to the jury, because I don't like to leave questions unanswered.  28 U.S. Code Section 1782 is a statute, a law passed by Congress that allows a party in the United States to seek discovery, seek information within the United States, for use in connection with litigation outside of the United States.  So, that is a reference to that provision of law, and as you just heard, the parties stipulated that on that date, plaintiff filed a proceeding under that law as Mr. Asner described.  Go ahead.

Q.  Now, your meeting with Sandy Heller was December 30, 2014, correct?

A.  Yes.

Q.  And you started proceedings overseas in several jurisdictions in January and February of 2015, correct?

A.  Yes.

Q.  And you waited until March 25, 2016, to file this 1782 petition in the United States, correct?

A.  Well, it seems like that, yes.

Q.  All right.  Now, Mr. Rybolovlev, at a later point in time, you put up for auction at Christie's the *Domaine d'Arnheim* and the *Salvator Mundi*, correct?

A.  Probably.  I cannot remember that well, but probably that's what happened.

Q.  I'm not going to ask you questions about the sale price or any guarantees or anything like that, so I'm not going to ask

O1C3ACC4                    Rybolovlev - Cross

about that.

But if we could look at Defendant's Exhibit 581.

A.  Yes.

Q.  Do you see Defendant's Exhibit 581?

A.  Yes, but it's in English.

MR. ASNER:  We have a technical issue.  Dan, should I go to 588 for right now?

A.  Well, I actually found the Russian version.

Q.  You found the Russian version.  For some reason it's not coming up on the screen.  Let's see if we can go to 588.

So, Mr. Rybolovlev, let's go to Defendant's Exhibit 588.  Can you put that up on the screen, Dan.  Ah. Mr. Rybolovlev, do you see that this is the Postwar and Contemporary Art auction catalog for Christie's?

A.  Yes.

MR. ASNER:  I offer this into evidence, your Honor.

MR. KORNSTEIN:  No objection.

THE COURT:  Admitted.

(Defendant's Exhibit 588 received in evidence)

Q.  If we could go to the entry for the *Salvator Mundi*.  And we can stop on this page.  Now, if we could blow up the top portion.  This is the auction of the *Salvator Mundi* at Christie's, is that correct?

MR. ASNER:  I'm sorry, your Honor.  If we could offer it into evidence.

THE COURT:  It was admitted.

MR. ASNER:  May we publish it to the jury?

THE COURT:  You may.

MR. ASNER:  For the jury, if we could go to the very first page.

Q.  Very first page is the cover page of the walk, do you see that?  If we can scroll slowly through.  You see this is the *Salvator Mundi*; you see that, sir?

A.  Yes.

Q.  And then if we can stop on this page.  This is the write-up for the auction catalog at Christie's; is that correct, sir?

A.  So it looks like it.

Q.  And this is when you sold the piece at auction, correct?

A.  Yes.

Q.  And if we could blow up the top half.  Do you see the language over in the left, top-left-hand corner, it says "property from a private European collection"?

A.  Yes.

Q.  It doesn't say "property of Dmitry Rybolovlev," does it?

A.  Yes, it does not.

Q.  And that's traditional, as you've learned in the art world, to not list the name of the person who is selling the art piece, correct?

A.  Well, it varies.  It's 50-50, to be more precise.

Q.  50-50?

A.   Well, I'm not a specialist, but that's my opinion.   If it's an estate sale and the person is well known, then the name is listed.   Because, you know, it's listed like the sale of the collection of him or her.   It's hard for me to say percentage-wise, but I think it could be that way as well.

Q.   Sure.   So for example, if a painting came from the estate of Jacqueline Kennedy Onassis, the auction house might list it came from the estate of Jacqueline Kennedy Onassis, for example?

A.   I don't know.

Q.   Let's look at the provenance.   And you see this is a list of some of the prior owners?

A.   Yes.

Q.   And then you see at the bottom there is a reference to a Robert Simon?

A.   Yes.

Q.   And he's the one who discovered the *Salvator Mundi* as a *Salvator Mundi* -- as a Leonardo da Vinci?

A.   Yes.

Q.   And as you understand it, he acquired that at an estate sale for under $10,000; is that correct?

A.   I think so.

Q.   And then it refers to a private sale involving Sotheby's in New York; do you see that?

A.   Yes.

Q. And then it says "acquired from the above by the present owner." And the present owner is you at this point in time, correct?

A. Well, it's probably the case, yes.

Q. We can put that down.

Now, Mr. Rybolovlev, here we are in 2024. In hindsight, you would agree with me that your decision to work with Mr. Bouvier was a mistake.

A. Yes.

Q. And sitting here today, you would agree that your decision to hire and delegate everything to Mr. Sazonov was a mistake. Correct?

A. I think that even if Mr. Sazonov at some point in time did in fact formalize this relationship as an agency contract, this would not have stopped Mr. Bouvier.

Q. You think that Mr. Sazonov did a good job, Mr. Rybolovlev, did you?

A. He worked for me for 15 years. And in general, I was pleased with his work.

Q. Are you pleased with his work now, Mr. Rybolovlev?

A. All of us could make mistakes, you know. But if the system was in working order, and if the system was transparent, as it is in other businesses, nothing like this would have happened here as well.

Q. Mr. Rybolovlev, my question for you is, do you think that

Mr. Sazonov did a good job in the job that you assigned him to do?

A. Well, let's put it this way. There was room for improvement.

Q. Mr. Rybolovlev, sitting here today, do you regret not instructing Mr. Sazonov to get the documents showing how much Yves Bouvier had paid to acquire the artworks that you ended up buying?

A. You know, for Bouvier, it would not have been, actually, a deterrent, an issue. He could have presented documents from an offshore company. It doesn't work that way. For Bouvier, it was not a problem to prepare for a situation like that. He would have presented documents to a certain company, and then said that, well, this company is the company of the buyer. And it's impossible to check that out. Whose company is this, that's impossible to check. So to ask him about that makes no sense.

Q. Mr. Rybolovlev, you knew who the sellers of the *Salvator Mundi* were, didn't you?

A. Well, their names were known, yes. Let's put it this way.

Q. And you had an avenue to talk directly with them through Seth Harrison, your friend, correct?

A. Yes.

Q. And you knew who the seller of the Klimt *Wasserschlangen* was, right?

A.  I don't know who the seller was exactly.  I had an inclination, I had some general knowledge that it was a family. But who from the family was selling, I did not have -- but probably, I could have found out.

Q.  And in fact, Mr. Bouvier told you that the seller was an Austrian woman named Ursula Ucicky, and you knew that, didn't you?

A.  Right now, I don't know, I don't remember.  But, in general terms, it was possible to establish who the seller was, but the transaction there was not a simple one.  It was rather difficult.  Maybe that woman actually was the organizer of that sale, I don't know.

Q.  Mr. Rybolovlev, you testified a moment ago that Mr. Sazonov's performance had room for improvement.

A.  Yes.

Q.  Now, Mr. Rybolovlev, you had the power of attorney, placing you in charge of the art acquisitions for Xitrans and Accent Delight, correct?

A.  Yes.

Q.  You're the boss.

A.  Generally speaking, yes.

Q.  You're the captain of the ship, right?

A.  Yes.

Q.  Mr. Rybolovlev, are you familiar with the term "the buck stops here"?

O1C3ACC4                         Rybolovlev - Redirect

A.  No, I do not know this term.  But I understand it and it's true.

Q.  And it's true; the buck stops here is true?

A.  Yes.

MR. ASNER:  No further questions.  Thank you very much, sir.

THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. KORNSTEIN:

Q.  Can we have Plaintiff's Exhibit 81, please, put on the screen.  It's in evidence.

This is an e-mail from Sam Valette to Mr. Bouvier attaching the Modestini report for the da Vinci painting, correct?

A.  Yes.

Q.  And Mr. Asner asked you, well, let's scroll through a little bit of Plaintiff's Exhibit 81.  Okay.  That's fine. Now, Mr. Asner asked you some questions about your declaration from May of 2022, paragraph 34, and in that paragraph, you said that it was Sotheby's that provided Bouvier with the Modestini report.

A.  Yes.

Q.  And Plaintiff's Exhibit 81 shows that that's a correct statement.

A.  Yes.

Q.   You've had experience as a businessman.

A.   Yes.

Q.   Before 2003, did you have any experience in the art market?

A.   No.

Q.   Why didn't your experience in the business world, your business experience, help you in the art market?

A.   Because it was not transparent, the art market.

Q.   And Mr. Asner asked about your efforts to hire good people for various tasks.  Remember that?

A.   Well, I try, yes.

Q.   And when you retained or agreed with Mr. Bouvier that he would be your agent, did you think he was a good person for that job?

A.   Yes, that's what I thought.

Q.   What was that based on?

A.   Well, I thought about that for quite some time.

     He behaved in a way of a person that, you know, makes you trust him.  And Tania Rappo introduced him and the way that she introduced him and the way she spoke about him, all of that increased my trust.  And as for Tania Rappo, I had complete trust in her.

     So when you trust people, and I'm not a person who trusts easily, but when a person is like a member of your family, there is a point in time, and that you start to completely and utterly trust a person.

Q.   Talking about the Magritte painting, when you asked questions about the value of the Magritte, how did Bouvier answer those questions or calm your concerns?

A.   Can I have a moment, please.

So he said that it's an extraordinary work of art, that it is a unique opportunity, and all that story with the *Empire of Lights* came into play, and all the documents from Sotheby's, and all that together produced the impression that everything is fine, that it's the correct way to go, a good transaction.

Q.   For the Modigliani and sculpture, the *Tête*, the *Head*, when you asked questions about the value of that work of art, how did Bouvier respond or calm your concerns?

A.   Well, the key was the document from Sotheby's, of course. Where, in that document, the valuation was given from 80 to 100 million.

Q.   And -- I'm sorry.

A.   When you see such a valuation, such an estimate, and, you know, I didn't really like that artwork.  But he was convincing me that it's a good investment.  He knew that I didn't like it, so he had to convince me that it's a good business decision, a good investment.  And when you're provided an estimate by the most respected organization in the industry, what other decision can you reach?

Q.   For the da Vinci, how did Bouvier and anyone else deal with

your concerns about the authenticity?

A.  So, when we approached him the first time, he said that it is a forgery, and he said shouldn't be involved in that.  But now I understand why he said that, because the idea did not come from him initially.  But then, he was in a position where he had to somehow reverse course.  And that is why I asked him, is it authentic?  Is it real or not?  And it was a key issue for me.  Because if it is a da Vinci, it's a priceless artwork.  And if it is not a da Vinci, then the price is limited.  And the documents that were provided were very important.

Q.  Which documents are you referring to?

A.  There is a document provided by Sotheby's where there is an illustration of the opinions of experts regarding this artwork.  Because it's very important for the expert community to consider this painting to be authentic.

Q.  Did -- I'm sorry.  Go ahead.

A.  And in this document, there is a description what experts attested to the fact that this is an authentic painting.

Q.  Did anything that happened at the viewing of the da Vinci in your apartment in any way bear or address your concerns about authenticity?

MR. ASNER:  Objection.  Scope, your Honor.  Not covered on cross.

THE COURT:  Sustained.

Q.  In general, why is it that you relied on Sotheby's?

A.   Who could I else rely on?

          MR. KORNSTEIN:   No further questions.

          MR. ASNER:   Very brief, your Honor.

          THE COURT:   Very briefly, yes.

RECROSS EXAMINATION

BY MR. ASNER:

Q.   Mr. Rybolovlev, you said that you relied upon Sotheby's because of concerns about the authenticity of the *Salvator Mundi*.  Is that correct?

A.   Yes.

Q.   And that gave you comfort that, in fact, the *Salvator Mundi* was in fact a painting painted by Leonardo da Vinci, correct?

A.   Yes.

Q.   And when you --

A.   When Sotheby's sells a painting through itself, through Sotheby's, of course it gives you comfort, in general terms.

Q.   And Mr. Rybolovlev, you're not telling the Court here that you think that the *Salvator Mundi* that you later resold is not by Leonardo da Vinci, are you?

A.   No.

Q.   In fact, Sotheby's effectively gave you material that you relied upon to convince you that it was by Leonardo da Vinci and you have no doubt about that material, correct?

A.   No doubt.

Q.   When you consigned it to Christie's, you made

representations that you felt it was authentic, correct?

MR. KORNSTEIN:  Beyond the scope of redirect, your Honor.  Objecting.

THE COURT:  Sustained.

Q.  Mr. Kornstein asked you about the *Tête*.  Do you recall that?

A.  Asked me about what?

Q.  He mentioned that you relied upon an estimate that Samuel Valette provided to Mr. Bouvier that the *Tête* could be worth between 80 and 100 million euro.  Do you recall that?

A.  Can you repeat that, please.

Q.  You testified just now with Mr. Kornstein that you saw an e-mail from Mr. Valette estimating that the -- I'm sorry.  That the Modigliani *Tête*, the stone sculpture, could be worth 80 to 100 million euros.  Do you recall that?

A.  Yes.

Q.  And that was in July of 2012, correct?

A.  I don't remember exactly, but, you know.  If you say that, that's probably true.

Q.  When you bought it, the *Tête*, in January of 2013, you paid 37.5 million euros, plus a painting by Degas, correct?  Is that correct?

A.  Yes.

Q.  And internally, in the books of Accent Delight, you had that worth the total amount, with the Degas and the 37.5, as

being worth 62.5 million euros, correct?

MR. KORNSTEIN:  Objection.  Beyond the scope.

THE COURT:  Overruled.

A.  Well, it looks like it.

Q.  So you didn't pay 80 million euros or 100 million euros for the Modigliani *Tête*, correct?

A.  No, thank God.

MR. ASNER:  Thank you, no further questions.

THE COURT:  All right.  Mr. Rybolovlev, you may step down.

(Witness excused)

THE COURT:  Plaintiff's counsel, next witness.

MR. WILSON:  Plaintiffs call Guy Sainty.

THE COURT:  You may approach, Mr. Wilson.

MR. WILSON:  Thank you.

 GUY STAIR SAINTY,

     called as a witness by the Plaintiff,

     having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. WILSON:

Q.  Good afternoon, Mr. Sainty.

A.  Good afternoon.

Q.  Have you been retained to reach an opinion in this case?

A.  I have.

Q.  What topic or topics were you asked to give an opinion on?

O1C3ACC4                        Sainty - Direct

A.   On the art market, on art practices, on valuations, and the way the art market or the way the art market operates.

Q.   Before we turn to those opinions, can you please summarize your education for us.

A.   I was educated born and educated in England.  I went to high school in London, a school called Westminster.  I then went to study history of art in Italy, and then I went to law school.

Q.   And how did you make your way into the art business?

A.   Well, I've been interested in art early.  When I was a school I bought my first works of art for 7 pounds, like $10 something.  My cousin worked to Sotheby's, so I was a frequent visitor to the auction rooms and around the art market.

And after leaving Westminster, I wanted to go to the Cordoba Institute, which is the premiere university for history of art.  They didn't really take undergraduates, but they offered me a conditional place if I learned Italian.  So I went to study at the University of Rome, but they were on strike. So, I went to the Societa Dante Alighieri, which is a sort of a cultural institute, studied Italian, and did some volunteer work in the Doria Pamphilj Collection, which is a great private collection open to the public.

I went to all the museums.  I went to Florence, Naples, and various other places looking at painting to kind of try and learn everything I could.  I stayed there for a year

O1C3ACC4                          Sainty - Direct

and a half.

And it was also suggested I learn German.  I thought I would go to Germany, but my parents thought that the law was a more secure profession than the art market.  So, arranged -- and I had a close relation who was an appeal court judge, and actually he helped me enter -- get into what's called the Inner Temple to study to be a barrister.  And I went to law school for three years.

And while I was there, I was looking at paintings and going around the art market.  And my cousin was still at Sotheby's.  And I was sharing a flat in London with a chap who worked in Christie's, which is Sotheby's great rival.

So I decided that I didn't want to be a lawyer, and went to work for a London gallery.

THE COURT:  Your loss.

Q.  Tell us from that early experience, just at a high level, can you summarize your work experience having come into art.

A.  I came in not having worked in the art business, of course, to actually have a proper job in a gallery that had been founded in the 19th Century.  It was kind of fading a bit, but it was a very useful learning experience.

But after just under five years there, I decided that I wanted to go out on my own.  And that's very difficult because I didn't have any money.  I sold my car, went to America.  My uncle was actually a leading antique dealer in New

York City on 57th Street called Stair & Co.  It was a very well-known company and he offered me an office.  And that kind of gave me a start.

And I met initially a major collector called Mrs. Jayne Wrightsman.  If you go to the Metropolitan Museum, you'll see her name all over the place.  I sold her a painting, then I sold her another one.  And I was running around America looking for paintings to sell kind of as an agent to other dealers in London.  Because at the time, the London art market was the dominant market for European art.  Not so much in America.  There was a strong market for American art and for some 20th Century art, but not so much for the earlier art that most interested me.

But then, I obtained some works on consignment, some important early 20th Century paintings, and that interested me as well.  But they were very expensive and I couldn't afford it.  And what I found I was good at was looking at perhaps a work that was in an auction or somewhere, maybe in an art dealer that they hadn't cataloged correctly, they hadn't recognized what it really was.  So it was easier for me to find paintings that were undervalued like that, and demonstrate what they were, than it was to try and compete in the top end of the paintings I had been given at this time, these early 20th Century paintings, which I sold too, but they were in the million dollar range, which was an awful lot of money back in

the early 1980s.  It is today.  But it was big money for art then.

THE COURT:  Let me stop you there and just ask Mr. Wilson to pose another question, please.

Q.  Can you just tell us currently what your role is.  What your job is?

A.  Well, I'm now an art dealer primarily.  That means that I buy and sell paintings.  I sometimes get them on consignment from sale as well from private people who want to sell paintings through me.  And I act occasionally as an art advisor to private collectors.

Q.  Can you describe some of the places where works you have sold have been shown?

A.  Well, in the Metropolitan Museum, I think there were at least eight or nine pictures that I once owned.  The Frick Collection has a sculpture that was mine.  National Gallery in Washington, London, Edinburgh, Australia, the Getty Museum in California, Dallas Museum, Houston Museum, Chicago Art Institute, National Gallery of Canada, the Louvre.  A lot of other famous museums.

Q.  Do you have experience other than working as a dealer for your gallery in the art market?

A.  Well, yes, I have actually as an advisor to individual collectors, both who wish to sell works and who wish to buy works on a commission basis.

O1C3ACC4                        Sainty - Direct

I've also done valuations for insurance, for estates, you know, estate valuations. And for gifts to public institution, museums.

I served on the IRS Art Advisory Committee for -- I can't remember the exact dates, but between six and seven years. That is a committee that advises the commission of the United States Revenue Service on values of works of art that appear in audited tax returns. So they could be works of art that were going to be given to a museum or they're in somebody's estate, and the committee was I think, as I recall, 21 people, with seven people from the IRS who had some kind of art education, seven people from the museum and academic world, and seven people from the museum and dealer world. We would meet and we would get a huge package of value -- of paintings, with details of paintings mainly. Some drawings. And then we would go through that individually, and we would all meet in Washington and we would assess as a matter of consensus whether these values were reasonable and represented fair market value. And that was a really good, interesting experience. I've also done insurance valuations as well.

Q. Well, I think you just anticipated the question I was going to ask about, other than the insurance valuations and the IRS valuations, are there other examples of valuations that you've done?

A. Yes, I've been asked, for example, the Metropolitan Museum

put on an exhibition of the great French 19th Century painter called Ingres, and the U.S. government offers an indemnity to foreign lenders when they lend to museum exhibitions, because the cost of insurance is so enormous that the museums cannot stage a show without that assistance.  So the U.S. government offers an insurance indemnity.  They need somebody to do an independent valuation.

So, for example, for that particular exhibition, I did the valuation of all the foreign loans, and many of them were in the 40, 50, 60 million dollar range at the time.  This was 30 years ago.

And I've also done individual valuations for museums where they might be lending a painting and they wanted an assessment of the value.  Another case where a museum had a work damaged and they wanted my opinion as to the cost of the repair, and what it would reduce the value of the painting by, because they were going to claim on their insurance.

Q.  Can you give us an example of a few things that you've published in the field of art.

A.  Well, I've written two exhibition catalogs, co-written, the exhibitions were in my gallery which was then in New York, and they went to museums in the United States.  Exhibition went on from my gallery.

And one of them I wrote jointly with the current director of the Morgan Library, who had worked for me at the

O1C3ACC4                    Sainty - Direct

time.  And the other one I worked with a whole series of scholars, it was a substantial book on early 19 Century French painting.

And I've written a lot of exhibition catalogs and written also a great deal of sort of details of works of art, because I do my own research.  And so when I write an expert text on a work, I do all the work, the research myself.

Q.  And have you ever served as an expert in a lawsuit before?

A.  I have.  I think on five occasions going back to 1998.

Q.  Compared to the time that you spend in your profession as a dealer, how much approximately do you spend being an expert in lawsuits?

A.  I don't know.  1 percent, 2 percent.

Q.  And the 1 percent being on which side of the ledger?

A.  Well, I've acted for both plaintiffs and defendants, I mean, hired by the lawyers to both.  In cases against auctioneers, and a case involving a personal injury claim by an artist who had been injured in an accident, and the insurance company was disputing his claim.

Q.  Do you have a standard rate as an expert?

A.  I do.

Q.  What is it?

A.  $850 an hour.

Q.  Are you charging that rate in this case?

A.  I am.

Q.  Does your compensation depend on the outcome of this case?

A.  No.

Q.  What methodology did you use in this case to arrive at your opinions?

A.  My experience fundamentally in the art market as a professional art dealer, who has interacted with the auctioneers both as a buyer and as a seller, I have, as I say, advised clients, I've acted in different roles in the art market, and all of that together has given me the experience that I have applied.

Q.  What of that experience are you drawing on for your opinions here?

MR. ASNER:  Objection.

THE COURT:  Sustained.

Q.  Have you been qualified by a court to be an expert before?

A.  I have been qualified to be a court -- in a case in London, my qualifications to speak on the auction world were disputed by the defendants.  And the high court judge in that case disputed or rejected that objection, and qualified me specifically as able to talk on all aspects of the art market.

MR. WILSON:  Your Honor, we request that Mr. Sainty be qualified as an expert to provide opinion testimony in this case concerning art market standards.

MR. ASNER:  No objection, your Honor.

THE COURT:  All right.  So received.

And ladies and gentlemen, I previously gave you instructions regarding expert witnesses. Those instructions obviously apply to Mr. Sainty as well.

Q. Mr. Sainty, we've prepared some demonstrative exhibits to illustrate different dynamics in the art market. Toby, if we could please pull up the first one and we can walk through them together.

THE COURT: Do you have a number?

MR. WILSON: These are demonstrative exhibits that were presented in opening, and we are returning to use the same ones.

THE COURT: They really should be marked.

But in any event, ladies and gentlemen, as you know, I also previously instructed you about demonstratives. These are just things that the parties can show you to assist in understanding the testimony of an expert witness, and they're not technically evidence. The evidence is the witness's testimony, but you can consider these in understanding that testimony.

With that, you may proceed.

MR. WILSON: Thank you, your Honor.

Toby, can you animate this first transaction, please.

Q. Mr. Sainty, looking at this demonstrative, can you, first of all, describe what the roles of the buyer and the seller would be in a transaction where the seller is selling directly

to the buyer.

A.   Well, the seller is the owner of the painting or work of art, and wants to sell it.  And the buyer is a collector, usually, who wants to buy the work of art.  And there is an exchange of money, one between the other.  The buyer pays the seller, and the seller passes title to the buyer.

It is a fairly rare transaction, however.

Q.   When you say it is fairly rare to have a buyer purchase directly from a seller, why is that?

A.   Because the buyers are unlikely to know where the seller is.  The seller is not in a public place.  Somebody perhaps with a work of art in their house, and the buyer is in their house, and they don't know each other, and there is no real place for the market.

It does happen sometimes, when they might know each other personally.  But otherwise, very unusual.

Q.   So Toby, let's go to the next demonstrative, please.  We can animate this transaction, too.

So in this demonstrative, Mr. Sainty, you see there are other actors in the transaction.  the buyer, the agent advisor, and the seller.  Can you tell us how the roles of these players are different than in the previous transaction.

A.   Well, they're different because the buyer employed an agent or advisor in some way to help them acquire works of art, be sure that the works of art are genuine, and give them advice on

O1C3ACC4                    Sainty - Direct

the price.  And they may also know, from their experience, where a privately owned work is owned.  So they might know that that particular seller has a particular work of art that the buyer would want to buy.  And the buyer would need to inform the agent advisor what they were looking for, what kind of painting, what kind of work of art.  Was it a particular artist or a particular school, and the kind of price range that they were able to operate in.  The sort of money they had available.

Q.  So, and other than the selecting and sourcing of transactions, are there other tasks that art advisors typically perform for the buyer?

A.  Well, the advisor's job is to serve the buyer effectively. And so, the advisor might also advise on restoration, if it's necessary.  Particularly when it's coming from an original seller, because an original seller may have had a painting on their wall for 50 years, and it may be discolored or it may need conservation.  So the agent advisor is in a position as somebody who is knowledgeable enough to advise the buyer how to proceed to put the painting in order so it can hang on the wall.

Q.  How is an art advisor compensated typically?

A.  Well, they operate in different ways.  There are art advisors who are on a retainer, and they might get a commission as well as on the purchase of individual works.  There's advisors who might act for one individual deal, so on an

individual deal they get probably a higher commission, and they aren't on a retainer. And then there are occasions when -- and they might have a contractual relationship with the buyer or they might not. They might have a less formal relationship.

And the commission rate can vary, very much, according to the value of the work of art. Because it costs as much effort and time and research with a painting that's worth $100,000 in all likelihood as one that's worth 100 million. So, on the $100,000 painting if the agent advisor is operating on commission, their commission is likely to be close to 10 percent. If it is a $100 million painting, it is probably going to be closer to 2 percent. Simply because that's still a very substantial reward for their work.

Q. In your answer, you talked about commissions, but you used the word "retainer." Can you just explain what a retainer is, please?

A. That would effectively be an annual kind of a salary. An amount paid upfront by the buyer to the advisor, sort of a good-faith payment, I will give you for the next year, you'll be on a retainer for perhaps 50,000 or 100,000 or whatever it is, the amount will vary with different art advisors and also different skill bases of the art advisor. They aren't all equally good.

Q. You also mentioned contracts between buyers and advisors. Is that relationship always, does it always involve a contract?

O1C3ACC4                    Sainty – Direct

A.   I don't think it always does involve a contract.  And I can say that from my own experience, because when I've acted as an art advisor, and I have on several occasions, it's usually a quite informal relationship where the client has asked for the advice, I've said, you know, or will I find a painting, and I said yes, I will.  I want 5 percent, and the client has said fine, if you find it, and that's how it's worked in high value transactions.

So, I think it can be a contractual basis; it can be an informal basis like that.

Q.   What roles, if any, do advisors have in the art transaction itself, the purchase?

A.   Quite often they will be the party that actually accepts the invoice.  So, I don't know if I can mention the deal that I did with Mr. Harry Smith, for example.

Q.   Certainly.

A.   The art expert for Sotheby's is a Harry Smith who runs an important art advisory service called Gurr Johns.  And a few years ago I had a sculpture that I had acquired in an auction in Madrid with two other dealers, and we bought it there.  It was by a Danish Neoclassical artist, early 19th Century sculptor, but completely unknown in Spain.

So they had put an estimate of $6,000 on it.  6,000 euros on it.  And I spoke to two colleagues who I thought, well, they would have seen that too.  Let's see what they think

about it.  And we agreed we would buy it together.  And I think we bought it for 150,000 euros, so we weren't the only people who recognized it.

We brought it to an art fair, and a gentleman saw it there, I think he saw it first.  He was a well-known personality in the City of London.  He was a collector.  He saw it, he expressed interest in the work.  And then he called in Gurr Johns and Harry Smith, and they came to look at the work.  They did research.  They asked, they negotiated the price, and we had been asking a substantial, substantially more than we had paid for the work, because soon after we had bought it, a pair of very similar but slightly larger and slightly more ornate sculptures by the same artist had been sold in Sotheby's for $2.4 million, and they were more important works.  But we were asking, therefore, we weren't asking -- we were asking close to half a million I think for ours.  And then Mr. Smith, acting for this client, came and negotiated us down and got a better price for him.

Q.  Does having an agent or advisor have any relationship to confidentiality in a transaction?

A.  Certainly.  Because certainly in the initial stages of a negotiation, one might be approached.  We as a gallery, as a dealer, we're approached by art advisors who are looking for works of art by a particular artist or a particular school or particular subject for a client.  And they don't usually tell

O1C3ACC4                          Sainty - Direct

us who the client is.  They're coming and they provide a kind of discretion between the client and themselves, which at that stage we don't have to think about who the buyer is, and they will tell us what they're looking for.  They perhaps give us an indication of the price range that they're looking for.

If we have something like it, we will say this is what we have and this is what we're asking for it.  We'll give them photographs and details.  They'll take the photographs back to their clients, and we may never hear anything more about again. Often we don't.  Or sometimes they will come and say, yes, my client would like to come and see it.  That's very common.

Client comes and see it, we're introduced to them, we know who they are at that point.  But we understand that that's a -- the client wants confidentiality.  And so, then the agent or advisor will, if we arrive at a price, the agent advisor will be the one usually to whom we invoice for the sale of a work of art.

Q.  Toby, can you turn to the next demonstrative slide, please. And then let's animate this transaction, too.

And then the second animation as well.  Thank you.

Mr. Sainty, here we've illustrated a transaction where there is a seller, and a buyer, and in between there is a dealer.  Can you tell us what role a dealer has in a typical art transaction of this nature.

A.  Well, in this transaction, I'm the dealer without beard.

O1C3ACC4                      Sainty - Direct

And I either bought a painting from somebody, or I have got it on consignment, the owner has given it to me to sell on their behalf.  And they would give it to me to sell either on the basis of a commission, or on a basis of a net sale price to them.  It can vary.

And if I've bought the painting, then I'm likely to have bought it perhaps from a private seller.  But more often, I buy paintings in little auctions scattered across Europe or all across.  I look at literally thousands of auction lots every year.  Every day, in the auction season, in the main season, in London, I get catalogs from all over the place.  And I go through them.  And I look.  Most of what I see is no good.  But every now and again I think there is something that I think that's really interesting, and I'll go and see it or I'll have somebody go see it on my behalf.  And we will hopefully bid on it and buy it at the auction.  In which case, I then have it cleaned and I take it to a restorer and I might have to reframe it, and I will offer it to the person I think could be a likely buyer.  And the likely buyer will either be interested or not.  And if they're not, I'll go and find somebody else.

THE COURT:  And that brings us exactly to 2:30, so we will end there for the day and the week.

Ladies and gentlemen, let me give you a couple instructions and a couple comments about the schedule next week.  First, on the schedule front, I am mindful that there's

some weather forecasts for Tuesday, that there's some snow forecast for Tuesday.  Obviously I'll keep a close eye on it. Unless and until you hear otherwise, you should plan to be here at the usual time on Tuesday.  But, obviously if I anticipate that it will be unsafe or problematic, we will let you know. And if you have any concerns or issues, please reach out to us. I think Ms. Smallman is going to send an e-mail to each of you or to all of you to ensure you have the relevant contact information.  Just stay in touch.  But hopefully it will be a non-issue and we will be able to carry on as we have and make good use of everyone's time.

Second, just for your planning purposes, I wanted to give you a heads up that next Thursday we're going to have a slightly different schedule, because I have a commitment in the afternoon and other court business that I can't move.  So we're going to end that day earlier, I don't know exactly what time, but certainly no later than 1, maybe even a little earlier. For that reason we'll probably have just one short break in the morning rather than do the half hour break that day, and then I'll let you out early, so to speak.  So just wanted to give you a heads up about that so you can plan accordingly, if you have any plans you wanted to make.

I also note that another of you is having an issue or has an issue with an employer.  If you can give the information to Ms. Smallman, I'll certainly do what I can do to help you

O1C3ACC4                    Sainty - Direct

out and hopefully that will be a non-issue.  Just let Ms. Smallman know how I can assist.

With that, let me say the following.  It's really the standard instructions.  That is to say, don't discuss the case with each other with anyone, with your friends, your family, your employers.  But I want to emphasize that, because we're heading into a long weekend.  On that score I should remind you, we're not going to sit on Monday, it's Martin Luther King Day, it is a federal holiday, the courthouse will be closed, so we will not have trial on Monday.

I'm sure you'll be spending time with family and friends and enjoying yourself and getting a break for this.  As tempting as it may be to tell folks what you've been up to and what's going on, and things about the case, don't do it. Again, that can only cause you headaches and us headaches.  So there will come a day when you're excused from jury service where you can share whatever stories you want about this, but that day has not come and is not this weekend.

Please, as tempting as it may be, resist and don't talk about the case.

Don't do any research about the case, as tempting as it may be as well, and continue to keep an open mind.

And with that, get home safely, have a wonderful long weekend.  And unless I tell you to do otherwise, we will see you hopefully same time on Tuesday morning.

O1C3ACC4

Thank you very much.

(Jury excused)

THE COURT:  Mr. Sainty, you may step down.  You are excused at this time.  And obviously stay in touch with counsel, but unless and until you hear otherwise, you should be back here on Tuesday morning before 9 o'clock ready to continue.

(Witness temporarily excused)

THE COURT:  First, if you were wondering, the time tallies are plaintiff has 27 hours 43 minutes remaining, defendants have 37 hours 26 minutes remaining.

Second, Mr. Wilson, can you tell me how much more you anticipate on direct?

MR. WILSON:  Well, now we have the weekend, we may be able to slim it down a little bit.  But it is in the neighborhood of three hours.

THE COURT:  I thought you said an hour to an hour and a half.

MR. WILSON:  I had, and then spent some time working through it yesterday, and I have a better sense of the timing.  And as I said, I am going to try to slim it down, but I think we'll certainly, we will finish direct on Tuesday and I'm going to try to do it as much as we can to get it done before the break, but it may go into the afternoon.

THE COURT:  And can you give me a rundown of the

O1C3ACC4

schedule next week.

MR. WILSON:  We have a non-party witness Nicholas Acquavella that will be very short, and we're working with his counsel to try to fit him in.  There's been a request to try to get him on Tuesday.  So, we'll sort through that and be in touch with Sotheby's to give them notice about when exactly he will appear.  And then I think we turn to Mr. Valette, who is being called adverse in our case.

THE COURT:  And my recollection is you anticipated that would likely be a few days.  Is that correct?

MR. WILSON:  Yes, I think between direct and cross, I think it will take a couple of days.

THE COURT:  Okay.  You obviously heard my discussion with the jury about the weather on Tuesday.  You all should be monitoring it as well, and we'll discuss if there seems to be any issue.  And you also heard my comment about the schedule on Thursday.  All right.

And just so I have a sense, my sense was that we were moving a little more rapidly than folks were anticipating.  Is that an accurate statement?  Are we making good time?  Do we have a revised estimate or can you over the weekend look at where we are and how much more time you anticipate for plaintiff's case, etc.?

MR. WILSON:  Barring something unexpected, we expect that plaintiffs will be finished with our case next week.  And

O1C3ACC4

you're right, your Honor, we are moving at a brisk clip and faster than anticipated.

THE COURT:  All right.  Music to my ears or art to my eyes, whatever expression.

Mr. Asner, anything from defendants?

MR. ASNER:  No, just for scheduling, I anticipate Mr. Valette's direct will be lengthy.  And he's covering a lot of ground.  We obviously will take the weekend in light of what they have put in to see what we can trim, because it was a trimmed down version of what we anticipated.  So, their case was a trimmed down version of what we anticipated.  So, we'll see if we can trim stuff over the weekend, but it is a lengthy direct.

THE COURT:  Understood.  I would certainly encourage both sides to trim, as I've admonished you to do since the final pretrial conferences.  I think it's in your interests and the jury's as well.

MR. WILSON:  Just also we are planning to call Sandy Heller after Mr. Valette, just to give you a sense about how the rest of the evidence will proceed.  But he'll be I think a short witness, probably an hour or less on direct.

THE COURT:  So, just so I know, there are various witnesses who are on both sides' lists whom you have not mentioned.  I know three of them are testifying as part of the defense case.  Mr. Ruprecht, Mr. Vinciguerra, and was there one

O1C3ACC4

other?  Mr. Bell.

But, am I correct in inferring that you are not planning to call Mr. Bogdanov, Mr. Adelson, Mr. Parish, or Mr. Simon?

MR. WILSON:  That's correct, your Honor.

THE COURT:  Okay.

MR. ASNER:  There's also Elena Rybolovleva.

MR. WILSON:  The status of whether or not she will be testifying is up in the air, depending on certain other issues we're working through.  So at this point, we don't have confirmation she will be testifying, and we'll give as much advance notice if it happens.  We expect in any case that will be after Mr. Valette.

THE COURT:  Okay.  Any updates from defendants?

MR. ASNER:  No, your Honor.  Not really.

THE COURT:  All right.  I'll encourage you to take a look at it and assess.

Anything else from either side?

MR. ASNER:  Not from the defendants, your Honor.

MR. WILSON:  Not from the plaintiffs, your Honor.

THE COURT:  All right.  It's not my practice once trial's started to encourage settlement.  I'm happy to finish up the trial.  But, suffice it to say, I trust and know that you are aware that those discussions can continue, and I would certainly encourage you to keep open lines throughout trial and

O1C3ACC4

over the long weekend.  But absent me telling you we're not resuming on Tuesday, you will be here Tuesday same time, and I'll see you then.

Enjoy your long weekend.  Have a good break.  Thanks.

(Adjourned until January 16, 2024, at 9:00 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 DMITRY RYBOLOVLEV

Direct By Mr. Kornstein . . . . . . . . . . . 661

Cross By Mr. Asner . . . . . . . . . . . . . . 672

Redirect By Mr. Kornstein . . . . . . . . . . 756

Recross By Mr. Asner . . . . . . . . . . . . . 760

 GUY STAIR SAINTY

Direct By Mr. Wilson . . . . . . . . . . . . . 762

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 81    . . . . . . . . . . . . . . . . . . . . 730

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 683   . . . . . . . . . . . . . . . . . . . . 673

 686   . . . . . . . . . . . . . . . . . . . . 678

 687   . . . . . . . . . . . . . . . . . . . . 680

 189   . . . . . . . . . . . . . . . . . . . . 694

 682 subject to connection   . . . . . . . . . 696

 181   . . . . . . . . . . . . . . . . . . . . 717

 685   . . . . . . . . . . . . . . . . . . . . 721

 684   . . . . . . . . . . . . . . . . . . . . 722

 703   . . . . . . . . . . . . . . . . . . . . 747

 588   . . . . . . . . . . . . . . . . . . . . 750