O1HVACC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ACCENT DELIGHT INTERNATIONAL
LTD.,

                    Plaintiff,

          v.                          18 Civ. 9011 (JMF)

SOTHEBY'S and SOTHEBY'S, INC.,

                    Defendants.         Trial

------------------------------x

                                      New York, N.Y.
                                      January 17, 2024
                                      9:00 a.m.

Before:

                    HON. JESSE M. FURMAN,

                                 District Judge
                                 -and a jury-


                         APPEARANCES

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
      Attorneys for Plaintiff
BY:   DANIEL J. KORNSTEIN
      O. ANDREW F. WILSON
      ZOE A. SALZMAN

ARNOLD & PORTER KAYE SCHOLER LLP
      Attorneys for Defendants
BY:   MARCUS A. ASNER
      SARA L. SHUDOFSKY
      BENJAMIN C. WOLVERTON
      YIQING SHI


Also Present:  Yana Agoureev, Interpreter (Russian)
               Elana Pick, Interpreter (Russian)


                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

(Trial resumed; jury not present)

THE COURT:  Good morning.  Welcome back.

Mr. Asner.

MR. ASNER:  Good morning, your Honor.

We just wanted to acclimate the Court to an issue that may come up with objections today.

Your Honor, you admitted -- the Court admitted yesterday Defendants' Exhibit 598 and gave a limiting instruction with respect to hearsay.  And I'm not revisiting that.  Our motion was actually on Federal Rule of Evidence 404(b).  And so to the extent -- you may remember this is the --

THE COURT:  Yes, I know.

MR. ASNER:  The Kvetch email.

THE COURT:  I got it.

MR. ASNER:  To the extent Mr. Kornstein tries to argue that Mr. Valette is doing his wild west routine in connection with other situations, we would say that's squarely within 404(b) and not permitted.

THE COURT:  Okay.

MS. SALZMAN:  If you'd like to hear a response, your Honor, this is not a 404(b) issue, this is the Magritte transaction at issue in this case.  It is not another act.  It is this act, this case, this transaction.  It's not applicable at all.

O1HVACC1                      Valette - Direct

THE COURT:  I agree, which is why I overruled that objection.  But I think the point is that they use it in connection with other transactions to say that it shows a propensity then that might, you know, pose some 404(b) issues.  But I certainly agree to its admissibility.

All right.  Anything else or could we get Mr. Valette back on the stand?

MR. ASNER:  Not from the defense, your Honor.

THE COURT:  All right.  Let's get Mr. Valette back on the stand, please, and we'll get the jury.

Good morning, Mr. Valette.  Welcome back.

(Jury present)

THE COURT:  You may be seated.  Welcome back, ladies and gentlemen.  Good morning.  Hope you all managed to stay warm on your way in today.  It's very cold.

We will continue with the direct testimony of Mr. Valette.

Mr. Valette, you remain under oath.

And with that, Mr. Kornstein, you may begin.

MR. KORNSTEIN:  Thank you, your Honor.

SAMUEL DAVID VALETTE,

     called as a witness by the Plaintiff,

     having been previously duly sworn, testified as follows:

DIRECT EXAMINATION (continued)

BY MR. KORNSTEIN:

O1HVACC1                        Valette - Direct

Q.   When we broke yesterday afternoon, Mr. Valette, we were
talking about the visit to the Frieze Art Fair in London in
October 2013.  You recall that?

A.   Yes, I do.

Q.   And you were there with Mr. Rybolovlev, his daughter Katya,
and you said there was another woman.

A.   Yes, I remember there was another lady.

Q.   And wasn't -- weren't you told that her name was Tetiana
Bersheda and that she was Mr. Rybolovlev's lawyer?

A.   That I don't remember.  I remember there was another lady,
but I don't remember who she was.

Q.   And how long were you in the company of these three people
that day?

A.   I would say maybe half an hour, maybe 45 minutes, something
like this.

Q.   Are you sure it wasn't several hours as you walked through
the exhibition?

A.   I don't think it was that long.  I mean, it may have been,
it was a long time ago, but it felt quite short, I would say
maybe 45 minutes.  I think the total of the fair was quite
short, if I remember correctly.

Q.   And did you have -- did you speak at all during this visit?

A.   I spoke with Mr. Rybolovlev's daughter, who, if I remember
correctly, spoke French.  And I think she was the one that was
speaking, too.  I may have exchanged a few words with the other

lady, but I don't remember talking to Mr. Rybolovlev, apart from greeting him outside the fair, you know saying hello, basically.

Q. And you knew who he was from the other previous two meetings that you personally had?

A. I knew who he was, yes.

Q. And during this time that you were with him for whether it was a half hour, 45 minutes or whatever, did you mention at all that you were his key client manager from Sotheby's?

A. No, I didn't.

Q. Did you mention that to either his daughter or the other woman who was with them?

A. No, I didn't.

Q. Let's talk about the da Vinci sale.

Am I correct that the da Vinci was sold for $83 million?

A. Mr. Bouvier's company, Blancaflor, bought it for $83 million, yes.

Q. And of that, $3 million was a commission for Sotheby's?

A. That is correct.

Q. And did you have any involvement with that sale?

A. Yes, I did.

MR. KORNSTEIN:  Toby, please show Plaintiff's Exhibit 16 to the Court and counsel and the witness.

Q. Do you recognize this document?

O1HVACC1                        Valette - Direct

A.   Yes, I do.

Q.   What is it?

A.   It's a contract, private treaty sale agreement, between Sotheby's New York and Blancaflor Investment.

        MR. KORNSTEIN:  Offer it into evidence, your Honor.

        MR. ASNER:  No objection, your Honor.

        THE COURT:  Admitted.

        (Plaintiff's Exhibit 16 received in evidence)

        MR. KORNSTEIN:  May I publish?

        THE COURT:  You may.

Q.   So this is the basic contract for that transaction?

A.   It's the contract, yes, the purchase agreement, yes.

Q.   And on the first page in paragraph 1, it shows that the purchase price is 83 million, 1A, and the commission is $3 million for Sotheby's; correct?

A.   Yes, point -- yes, that is correct.

Q.   And on page 6, it also shows the purchase price of 83 million; correct?  Schedule one, the next page.  Right?

A.   Yes, that's what it says.

Q.   Were you involved at all in the viewing of the painting by Mr. Rybolovlev?

A.   Well, I brought the painting to Mr. Rybolovlev's apartment at the request of Mr. Bouvier, yes.  But I didn't have a discussion with Mr. Rybolovlev about the picture, if that's what you mean.  I just want to be precise.

O1HVACC1                        Valette - Direct

Q.   And were you involved in the process of arranging for the painting to be delivered to Mr. Rybolovlev's apartment?

A.   Yes.  Yeah.

MR. KORNSTEIN:  Toby, please show Plaintiff's Exhibit 144 to the witness, the Court, and counsel.

Q.   Are you familiar with this document, sir?

A.   Yes.

Q.   Can you tell us what it is?

A.   It's a -- it's a chain of email between myself and some colleagues.

MR. KORNSTEIN:  Offer it into evidence, your Honor.

MR. ASNER:  No objection, your Honor.

THE COURT:  Admitted.

(Plaintiff's Exhibit 144 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.   So this is a document that starts with an email from you, March 18th, 2013.  And you write to Alex Bell, who's one of your colleagues at Sotheby's:  Alex, could you let me know who in OMP New York -- what is OMP New York?

A.   OMP means Old Master Paintings.  So that would be the department in New York at Sotheby's.

Q.   Could you let me know who in OMP New York is centralizing the logistics so I can put Daisy Edelson in touch.

Now, who is Daisy Edelson?

A.   Daisy Edelson was a colleague at Sotheby's who was the business director of the Impressionist and Modern Art Department.

Q.   And then you get a response from Alex who says:  It's Marina Phelan; correct?

A.   That is correct.

Q.   Then you write an email to Daisy at 12:14 on the same date, you tell her that the contact is Marina.  And then in the fourth line, you say:  What you and I need to organize is a presentation to the client at his place.

     Did you understand who the client referred to?

A.   Well, at this stage, Mr. Bouvier asked us to bring the picture to 15 Central Park West.  I'm not sure I knew the address at the time I wrote this email, but he did.  And so that meant that the client, Mr. Bouvier, wanted us to get a picture there.  At this time I didn't know that he wanted us to get it to Mr. Rybolovlev's apartment.

Q.   And then in the next line, you write:  In any case, I will come to pick up the work to the office and bring it to the client (near Central Park) where it will stay with me for an hour or so, then I will bring it back to Sotheby's.  Correct?

A.   That is correct.

Q.   And then in the next email, Daisy writes to you:  Can you get his address for me.  And you respond:  Will do.

A.   That is correct.

Q.   You knew you weren't bringing it to Mr. Bouvier's apartment; correct?

A.   Well, I was -- Mr. Bouvier asked us to bring it to this place, which we did.  I didn't know who owned the apartment at the time.

Q.   You knew it wasn't Mr. Bouvier's?

A.   It was where Mr. Bouvier wanted it to be.  But I didn't assume it was his apartment.

Q.   By that time you had been working with Mr. Bouvier for six years, since 2007.  You didn't -- well, did you know whether or not he had an apartment in New York City?

A.   I didn't.  But, you know, what he said was you need to get this picture to this place.  So, you know, that's what he requested and so that's what we did.

Q.   And you understood that the place was the client's place, as you wrote in your email?

A.   Well, yeah, as in this is where Mr. Bouvier wants us to bring it.

Q.   Did Sotheby's have an agreement with the sellers of the painting?

A.   Yes, we did.

Q.   And was that in writing?

A.   I think there were several contracts over time, but yes.

         MR. KORNSTEIN:  Toby, would you please show Plaintiff's Exhibit 147 to the witness, Court, and counsel.

O1HVACC1                              Valette - Direct

Q.   Do you recognize this document, sir?

A.   Yes.

Q.   Can you tell us what it is?

A.   So this is a document between Sotheby's and R.W. Chandler,

LLC, which was the seller of the Leonardo da Vinci.

           MR. KORNSTEIN:  Offer it into evidence, your Honor.

           MR. ASNER:  No objection.

           THE COURT:  Admitted.

           (Plaintiff's Exhibit 147 received in evidence)

           MR. KORNSTEIN:  May I publish?

           THE COURT:  You may.

Q.   All right.  And as you can see, in the second paragraph,

the wording is:  We will bear the cost, that is, the sellers

will bear the cost to pack and ship the property — which refers

to the da Vinci painting — from its current location to our

premises in New York.  Do you see that?

           MR. ASNER:  Objection, your Honor, to the

misinterpret --

           THE COURT:  First of all, let's publish it.

           MR. ASNER:  Sorry.

           THE COURT:  Second, Mr. Kornstein, why don't you try

that again.

           MR. KORNSTEIN:  Yes.

Q.   You see in the second paragraph, and this is Sotheby's

contract, Sotheby's is saying:  You, meaning the sellers.  You

hereby grant to us the right to bring the property to the premises of, and show the property to, (1) potential purchaser, during which time we will maintain physical security of the property.

And in the next sentence it says: If the potential purchaser offers to purchase the property, we will communicate such offer to you. And then the next sentence says: If no offer is made by the potential purchaser and no offer communicated to you is acceptable, and so on.

My question to you is the words "potential purchaser" refer to the person or entity that's going to buy the painting, to purchase the painting; correct?

A. Yes.

Q. So you were bringing it to the premises of the person that was going to buy the painting; correct?

A. Well, Mr. Bouvier was going to be the purchaser, and Mr. Bouvier asked us to bring the picture to this premise. So in that sense, yes, this is Mr. -- you know, the request to bring the picture was coming from Mr. Bouvier.

Q. But the premises belonged to Mr. Rybolovlev?

A. That I didn't know at the time.

Q. But that's what the document says that Sotheby's entered into with the sellers, that they were only supposed to bring the painting to the premises of the purchaser, and those were not the premises of Mr. Bouvier?

THE COURT:  Is that a question?

Q.  Isn't that correct?

A.  I think what it says is that it grant us the right to bring the property to the premises of, and so the property to one potential purchaser.

What happened was that Mr. Bouvier --

MR. KORNSTEIN:  Move to strike, your Honor.

A.  Sorry.

THE COURT:  Overruled.  Go ahead.

A.  What happened was that Mr. Bouvier, who was a very good client of Sotheby's, asked us to bring the property to this place.  There was no reason for -- I mean, we do off-site all the time, you know, off-site viewings.  And there was no reason for us not to.  So we did.

Q.  Mr. Valette, but the wording is "the premises of the potential purchaser," doesn't say "the premises of Mr. Bouvier."  The premises didn't belong to Mr. Bouvier, did they?

A.  They didn't -- the premises did not belong to Mr. Bouvier, no.

Q.  And even further down in the letter, in the contract, the last paragraph on the first page, in the middle of it, again, it says:  For the avoidance of doubt, this shall include the period of time during which we show the property to the potential purchaser; correct?

O1HVACC1                    Valette - Direct

A.   Sorry, where --

Q.   In the middle of the last paragraph on the first page.

THE COURT:   It's not on the screen.

Q.   The third sentence, "For the avoidance of doubt."

A.   Oh, yes.

Q.   And isn't it correct that Mr. Bouvier had seen the painting before then?

A.   That I -- I'm not sure.  I think Mr. Peretti came to see the work at Sotheby's.  I'm not sure Mr. Bouvier came.  I'm sure Mr. Peretti saw it.  But, in any case, I mean, I agree with you, Mr. Bouvier asked us to bring the picture there, at this place.

Q.   And were you involved in the drafting of Exhibit 147?

A.   I was not.  I mean, I didn't write this document at all. I'm not sure I even saw it at the time, to be honest.  It's possible, but I was not really dealing with the sale side, it was more my colleagues.  I was involved, I'm not saying I wasn't.

Q.   Would you agree with me that reading the language of the contract, it applies to showing the painting at the premises of the person who was going to buy it?

MR. ASNER:   Objection.

THE COURT:   Sustained.

MR. KORNSTEIN:   Would you please, Toby, show Plaintiff's Exhibit 142 to the witness, Court, and counsel.

O1HVACC1                    Valette - Direct

Q.  Do you recognize this document?

A.  Yes, I do.

Q.  And it appears to be an email from Marina Phelan to Alex Bell with a copy to you?

A.  Yes, that is correct.

Q.  Okay.

A.  The subject is "Jack."

        MR. KORNSTEIN:  Offer it in evidence.

        MR. ASNER:  No objection.

        THE COURT:  Admitted.

        (Plaintiff's Exhibit 142 received in evidence)

        MR. KORNSTEIN:  May I publish?

        THE COURT:  You may.

Q.  Now, you say the subject is "Jack."  It that a code name for the da Vinci --

A.  Yeah.

Q.  -- project?

A.  That is correct.

        THE COURT:  Again, first of all, can we blow up the text on this since it's not really legible.

        Second, Mr. Kornstein and Mr. Valette, just make sure, Mr. Valette, you wait for the question to finish before you give an answer; and make sure you wait for the answer to finish before you pose a question just to make the court reporter's life a little easier.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

O1HVACC1                          Valette - Direct

MR. KORNSTEIN: Yes, your Honor.

Q.  So this email, which is on March 21st, 2013, states: Just for your information, just spoke to Sam.  An adviser is coming in this afternoon at around 3:30 to view.  And then we are scheduled for a visit to the client's house tomorrow morning at 10 a.m.

Do you know who the adviser is that is referred to?

A.  I think that's Jean-Marc Peretti who came to see the picture.

Q.  And were you with him when you saw the picture?

A.  I was.  I mean, I can picture him seeing the picture at Sotheby's in a viewing room, so yeah, I was with him when he saw it, yes.

Q.  And were you ever with Mr. Bouvier when he saw the viewing, apart from in Mr. Rybolovlev's apartment?

A.  I don't remember Mr. Bouvier being at this meeting.  I remember Mr. Peretti.

Q.  And you see toward the end of the sentence: We are scheduled for a visit to the client's house tomorrow.

Now, that's referring to the apartment on Central Park West?

A.  Yes.  Ultimately, that meant the apartment on Central Park West.

Q.  And the client is referring to Mr. Bouvier --
Mr. Rybolovlev?

A.   Well, it's a way of saying this is the place where Mr. Bouvier wants to -- us to send the picture to.  So, you know, I think Marina Phelan, who was my colleague in Old Master at the time, you know, that was a shorthand of saying visit to the place that the client want us to take the picture to, if you wish.

Q.   You don't think it was a shorthand for saying the client's house means Mr. Rybolovlev's apartment?

A.   Well, we didn't know that it was Mr. Rybolovlev's.  So at the time he couldn't have meant that is what I'm saying.  With hindsight, yes.  But at the time, that not what he meant.  And she's talking about a house.  It was an apartment.  I mean, you know, it was -- it was quite vague.

          MR. KORNSTEIN:  Move to strike what he said someone else meant.

          THE COURT:  All right.  Well, I'll instruct the jury that obviously Mr. Valette can't testify as to what someone actually meant because he can't look into somebody else's mind. But I'll allow the testimony just with respect to what Mr. Valette understood the other person to mean.

Q.   Are you saying, Mr. Valette, that you arranged for taking this very expensive painting to an apartment and you didn't know whose apartment it was?

A.   I didn't know whose apartment it was, that is correct.

Q.   Okay.  And isn't it true that insurance had to be arranged

for the painting while it was being shown at the apartment?

A.   Yes, you're right, insurance had to be arranged, yes.

Q.   And didn't the insurance papers have to designate who is the owner of the apartment?

A.   I don't think so.  I mean, I'm not extremely familiar with insurance papers and policies, but I -- I don't think it needs to say who the owner is.  I think the insurers need to know maybe the location and that, you know, Sotheby's is going to be there and that sort of things.  But -- and again, I'm not a specialist for insurance.

Q.   Didn't Sotheby's also have to arrange for security for the painting at the viewing?

A.   Yes.  I mean, we moved the picture from Sotheby's York Avenue to 15 Central Park West, and I think we went through the courtyard in a car with security, you know, absolutely.  And then I went up with Mr. Bouvier.  I don't remember that there was security.  It was me in the elevator.  I don't think so.

          MR. KORNSTEIN:  Toby, would you show Plaintiff's Exhibit 145 to the witness, Court, and counsel.

Q.   Are you familiar with this document?

A.   Yes, this is an email between my colleague Marina Phelan and myself.

          MR. KORNSTEIN:  Offer it into evidence, your Honor.

A.   It's a chain of email.

          MR. ASNER:  Excuse me.  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 145 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.  In this email, Marina writes to you on March 21st, 2013: Please can you let me know the address and name of the management company for the client's home.  Do you see that?

A.  I do.

Q.  And then you respond:  Sure.  Will let you know this p.m. as soon as we speak.  I know it is one of the big ones on Central Park West, so I don't think there will be major issue.

Remember that?

A.  That is correct.

Q.  And that was referring to Mr. Rybolovlev's apartment?

A.  Well, at the time I think Mr. Bouvier had told me that it was a big, you know, apartment building on Central Park West, which is what I relayed to my colleague.  The subject of the email is:  "Just in case we need building insurance stuff."  So it's sort of the logistics.

Q.  Now, on the day of the actual viewing, you met Mr. Bouvier in the lobby of the building at 15 Central Park West; is that correct?

A.  Yes.  The way I remember it is that I think we arrived with the car in the courtyard, and then I -- I met Mr. Bouvier, I think, in the lobby of the building.  And then we went up to

the apartment.

Q.   And what happened when you went into the apartment?

A.   So the doors open -- sorry, the elevator door open.  I have a memory of a big foyer and big windows on the back wall giving on Central Park at the height of the trees, I remember.  And Mr. Rybolovlev arrived.  I think he was coming from inside the apartment.

Q.   Did you recognize him?

A.   I recognized him.

Q.   You knew what he looked like, you had met him before?

A.   I had met him before in September 2012.

Q.   And did you shake hands with him?

A.   I don't remember shaking hands.  There was another lady with him who I could not recognize, but there was a lady.  And, yeah, I mean, we didn't, you know -- I don't think we shook hands.  He was basically meeting Mr. Bouvier and they were -- seem to be happy to see each other and sort of, you know, seemed to know each other very well.

Q.   But were you part of that group?  It was Mr. Bouvier, yourself, and Mr. Rybolovlev?

A.   I was more in the background, if you wish.  And then I think I opened -- the picture was in a crate, by the way.  I think I opened the crate.  And Mr. Bouvier took the picture with Mr. Rybolovlev in a side room.  So we were -- we were in the foyer and then there's another room and another room.  And

O1HVACC1                        Valette - Direct

they went in this room, the two of them.  I was not part of that meeting.  I stayed behind.  That lasted for about, I don't know, maybe half an hour, 20 minutes, I couldn't remember exactly.  And then they came out.  I put the picture back in the box and left.  I did not talk to Mr. Rybolovlev, I don't -- during this meeting.

Q.  Wasn't there an issue about the da Vinci painting relating to its authenticity?

A.  I don't think so.  I mean, look, you know, look, I'm not an Old Master expert, so, you know, I'm not -- maybe not the best person to answer.  But the Old Master pictures, especially this picture, was a rediscovery, right.  It had been found as a named Old Master in a small auction house maybe ten years before, if I'm not wrong.

And so its journey from, you know, a -- sort of a named Old Master worth $1,000, to being a da Vinci was quite a long journey.  And they had the sellers, the dealers, had to get the consensus from experts to get there.  So, you know, with a picture which has been rediscovered, there's always the possibility of different views.

But I think at the time we offered it, there was enough consensus that this was by Leonardo da Vinci.  And my colleagues from the Old Master Department were comfortable selling it as a Leonardo da Vinci, which is a big deal because, you know, we guarantee the authenticity for four years, I

think, to the buyer. And in the case of an Old Master picture, it's more complicated than in the case of a Monet or a Picasso, if you wish.

Q. Isn't it true though that there still was some debate within the art academic community as to whether or not it was an authentic da Vinci?

A. I think you're right. I think there was debate. I think there will always be debate. It's the nature of the beast, I will say.

Q. And don't you recall at the viewing at Mr. Rybolovlev's apartment a discussion with him and Mr. Bouvier and yourself about authenticity?

A. Absolutely not. There was no discussion involving myself. Maybe Mr. Bouvier discussed with Mr. Rybolovlev the authenticity. I didn't hear anything about their discussion. I mean, you know, I could not tell you what Mr. Rybolovlev voice sound like, you know. I just don't know.

Q. Were you present when the painting was actually brought up to his apartment?

A. Yes, I was. I met Mr. Bouvier in the lobby.

Q. Did Mr. Bouvier have the painting at that time?

A. No.

Q. It was already up in the apartment?

A. No, no, no, no. I just to -- sorry if I wasn't clear. We got into the car from Sotheby's in this kind of -- I remember a

big SUV with security.  We got into the courtyard of the building and I had the picture.  And I met Mr. Bouvier in the lobby to go up, but I had the picture, yes.

Q.  So you and Mr. Bouvier brought the picture up to the apartment?

A.  Yes, that is correct.

Q.  And you and Mr. Bouvier set it up in the room in the apartment?

A.  So I didn't remember setting it up.  And that's where, you know, it gets blurry.  I think I'm the one who unpacked it, you know, take it out of the crate.  But the way I remember is for Mr. Bouvier to take it to this room.  I don't remember setting it up in this room.

Q.  Was Mr. Rybolovlev present at that time?

A.  Yes, because he -- he got there, you know, when we got out in the foyer.  The way I see it is Mr. Rybolovlev coming from the right with this lady.

Q.  Was the painting set up before or after Mr. Rybolovlev arrived?

A.  It was -- the painting was set up after Mr. Rybolovlev arrived, if I'm correct.  I mean, the way I remember it is unpacking, and then Mr. Bouvier and Mr. Rybolovlev went to the -- to the -- this room where was it.  And I kind of remember having the picture in my hand when Mr. Rybolovlev was in the foyer with the lady, so the picture could not have been

set up before, if you see what I mean, you know.

Q.  Are you aware that Sotheby's brought a lawsuit against the sellers of the da Vinci?

MR. ASNER:  Objection, your Honor.

THE COURT:  Sustained.

A.  Lawsuit.

THE COURT:  Sustained.

THE WITNESS:  Sorry.

Q.  Well, are you --

MR. KORNSTEIN:  Toby, could you please show Exhibit 266 for identification to the witness, Court, and counsel.

Your Honor, this is a complaint filed in this court by Sotheby's, a statement by the party.

THE COURT:  It's not in evidence at the moment.

MR. ASNER:  And it's misidentified.  It's Plaintiff's Exhibit 266.

MR. KORNSTEIN:  Offer it into evidence.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 266 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

BY MR. KORNSTEIN:

Q.  Have you ever seen this document before?

A.  I haven't seen this document before, before preparing for

this witness statement.

Q.  Would you look at page 10, paragraphs 34 and 35.

Do you see those paragraphs?

A.  Yes, I do.

Q.  All right.  So paragraph 34 says:  The following day on, March 22nd, 2013 --

THE COURT:  Hang on.

Can we call out 34, please.  Go ahead.

Q.  The following day, on March 22nd, 2013, also at Bouvier's request, Sotheby's and the defendants — that's referring to the sellers of the painting — arranged for the painting to be delivered to Bouvier for a private viewing at an apartment on Central Park West.  Bouvier met Valette in the lobby of the apartment building and escorted him to an apartment where a small group of people was gathered.  Bouvier and one of the men in the room took the painting into a separate room to view the work, returning to the main room after a few minutes.  This third man did not introduce himself to Valette, nor did they speak to each other.  Valette had seen this third man on an earlier occasion in Europe and recognized him as someone associated with a previous sale involving Bouvier.

Did you provide the information for that paragraph?

A.  I didn't.  I mean, I -- I didn't write this and I didn't read it before preparing for this court case.

THE COURT:  Well, the question was did you provide the

information that went into that paragraph?

THE WITNESS:  I'm sure there was interview, so yes, in that sense, yes.

Q.  Let's look at paragraph 35.  There it is written:  It was not, however, until much later that Valette and Sotheby's learned that this third man was Rybolovlev.  See that?

A.  I see that, yes.

Q.  That's not correct?

A.  That is not correct.  You're right.

Q.  Did you see this document, this paragraph, before preparing for this case?

A.  I didn't.

Q.  And no one checked it with you to verify it?

A.  No, not that I remember.  And you're right, this is not correct.

Q.  It's false?

A.  It's false, yes.

Q.  And this was a false statement in a filing in a federal court by Sotheby's?

MR. ASNER:  Objection, your Honor.

THE COURT:  Sustained.

MR. KORNSTEIN:  Can we see page 1, the first page, please.

Q.  This is the title page of the document.  You see it's Sotheby's against the sellers; correct?

O1HVACC1                    Valette - Direct

A.   Sotheby's, Inc. against, yes, R.W. Chandler, etc., which I think were the companies associated with the sale of the da Vinci.

Q.   Okay.

          MR. KORNSTEIN:  Can we turn to page 4, paragraph 8.

Q.   In paragraph 8, the document says:  The defendants' claims -- and these are the sellers.  The defendants' claims are entirely without merit.  These defendants — referring to the sellers — are experienced art professionals, experts in their fields, who voluntarily sold the Leonardo for a huge profit at a price they agreed to after direct arm's-length negotiations.  You see that?

A.   That is correct.

Q.   Is that a truthful statement?

A.   That is correct to me.  I think they bought it for $1,000 or so.  And we sold it for $80 million net to them.  So that would be a huge profit, yes.  And they agreed to this price. And they were art professionals and experts in old masters, so I think that's correct.

Q.   And you agree that it was sold after direct arm's-length negotiations?

A.   I don't know what -- I'm not quite sure I understand what that means, if I'm being, you know, candid, from a definition.

Q.   Well, did you provide any of the information for this paragraph?

O1HVACC1                        Valette - Direct

A.  I didn't, no.

Q.  Okay.  So as far as you know and as far as you were concerned, the negotiations between the sellers and the buyer of the painting were perfectly arm's-length and normal negotiations; correct?

A.  The negotiation between the seller and the buyer were normal negotiations, yeah.  I mean, you know -- I mean, look, if I may, you know, you say normal negotiations.  It's hard to qualify -- you know, there's as many negotiations as there are deals, you know.  So all I'm trying to say is it's difficult to say there's one way and only way to do a negotiation.  I think that's fair.

Q.  I understand.  Okay.

        Did you provide any documents to Mr. Bouvier about the da Vinci painting?

A.  Yes, I did.

        MR. KORNSTEIN:  Toby, would you show Plaintiff's Exhibit 78 to the Court and counsel and the witness.

Q.  Are you familiar with that document?

A.  I think that's a document -- if you don't mind going through it.

Q.  Sure.

A.  Yes, I think that's -- looks like a document I would send Mr. Bouvier.  This is a document that lists pictures by Leonardo da Vinci, and that looks like a document I would send

O1HVACC1                        Valette - Direct

to Mr. Bouvier in relationship with the sale of the picture.

MR. KORNSTEIN:  Offer it into evidence, your Honor.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 78 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.  So this is a document you sent on April 2nd, 2013 to Mr. Bouvier; correct?

A.  If you show me the email with the date, I'll be happy to confirm, but I don't remember the date.  It looks like something I would send, yes, absolutely.

MR. KORNSTEIN:  Can we see the first page of the document, please.

MR. ASNER:  I think this is the first page.

MR. KORNSTEIN:  No, the cover, the email.

THE COURT:  This is the first page of this exhibit, Mr. Kornstein.

Q.  You do recall sending this information?

A.  As I say, this looks like a document that, you know, I would send to Mr. Bouvier in the course of -- it lists the works by da Vinci, etc.  But if you show me the email I sent, then I can tell you -- I can confirm.

MR. KORNSTEIN:  Can we show Exhibit 79 to the witness, Court, and counsel.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1HVACC1                          Valette - Direct

MR. ASNER:  Can we see the English?

MR. KORNSTEIN:  Page 2.

Q.  Do you recall this document?

A.  That's an email that I sent to Mr. Bouvier entitled "Notices."

MR. KORNSTEIN:  Offer it into evidence.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 79 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.  Now, what is this document?

A.  If you could show me the attachment, this time I could tell you.  It looks like it's an email where I sent -- okay.  There you go.  That's the picture.  That's the Leonardo.  With a note, information on the provenance, along information on the panel, which is the support of the picture.  And then I think there's a lot of information about the -- there you go, provenance here, exhibition, literature.

Yeah, I did send that, sure.  That was prepared -- I would have thought this was prepared by the Old Master Department because I wouldn't do it myself, but I would send it on.

Q.  And this is dated April 22nd, 2013, just about one month after the viewing at Mr. Rybolovlev's apartment; correct?

O1HVACC1                    Valette - Direct

A.   I'm not sure.  Can I see the beginning?

Q.   Yes.  Page 2.

A.   Sorry, I can't remember the dates like this.

          So this is --

Q.   April 22nd.

A.   April 22nd.

Q.   And the viewing was March 22nd.

A.   Okay.  Then if it was March 22nd, yes, a month later.

Q.   Right.  As of April 22nd, the sale has not been consummated yet?

          MR. ASNER:  Objection.

Q.   Isn't it true?

          THE COURT:  Hold on.  Overruled.

          Can we specify which sale we're talking about.

          MR. KORNSTEIN:  The sale of the da Vinci.

          THE COURT:  But from whom to whom?

          MR. KORNSTEIN:  From the sellers to Mr. Bouvier's company, Blancaflor.

          THE COURT:  Thank you.

A.   I don't remember the exact date the contract was signed between Sotheby's and Blancaflor.  So I can't -- I mean, I -- if you say so, you probably correct.  I'm not -- but if you show me the date of the contract, then I can confirm whether it was before or after.  That was definitely then a month after the viewing then.

O1HVACC1                    Valette - Direct

Q.  If you look at Exhibit 16 --

          MR. KORNSTEIN:  If we could show the witness Exhibit
16 in evidence.

          MR. ASNER:  PX or DX?

Q.  May 2nd.

          THE COURT:  Mr. Kornstein, there's plaintiff's
exhibits and defense exhibits, so let's try to --

          MR. KORNSTEIN:  Plaintiff's Exhibit 16 in evidence,
your Honor.

          THE COURT:  All right.  Let's just try to use the
appropriate qualifier so we know which one we're talking about.

          All right.

Q.  You see that is dated May 2nd?

A.  That is correct.  So the agreement to purchase the da Vinci
by Blancaflor, the contract is dated May 2nd, 2013.

          MR. KORNSTEIN:  So now going back to Plaintiff's
Exhibit 79, we can see that, Toby.

A.  So yes, I can now confirm that this was before the
agreement was signed.

Q.  Okay.  And you sent this to Mr. Bouvier at his request?

A.  I would think so.  I mean, you know, in the course of
selling art to Mr. Bouvier and in the course of every single
transaction, I would send him a lot of documents relating to
the art he was buying that would give him as much information
as possible on the works.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

So whether it was at his request -- if I may, if I read my email. It says here's a short version and a long version. And so he probably ask me for a short version and a long version, especially in this case, because the long version is really long, I think it's probably, I don't know, 40 pages or something, which, you know, is a bit of a -- you know, it can be a bit long. So I think he maybe said, Why don't you send me a short version as well.

Q. And, in fact, isn't it true that from your point of view, Sotheby's got the best price for the painting for the sellers that could be gotten in the circumstances?

A. Well, at the time, that's -- that's what we thought, that, you know, it was a good deal. I mean, they had bought it for $1,000 or so and, you know, they sold it for 80 million. At the time it sounded like a -- like a great deal. I mean, they had wanted more. To be fair, they started much higher. But, you know, 80 million is still an awful lot of money.

MR. KORNSTEIN: And would you please look at Plaintiff's Exhibit 210 for identification, just to the witness, Court, and counsel.

Q. Do you recognize this document?

A. Yes.

Q. Can you tell us what it is?

A. That is an email -- it's a series of email between Mr. Bouvier and myself. I don't know if the -- the first

one -- I'm not sure the first one is the first one because it says R-E, means probably there's some emails before that, I don't know.

Q.   Okay.

A.   In the chain.

MR. KORNSTEIN:   Offer it into evidence, your Honor.

MR. ASNER:   No objection.

THE COURT:   Admitted.

(Plaintiff's Exhibit 210 received in evidence)

MR. KORNSTEIN:   May I publish?

THE COURT:   You may.

MR. KORNSTEIN:   If you turn to the English version, Toby.

Q.   Now, the email at the bottom or in the middle of the page is dated April 21st, 2013, from you to Mr. Bouvier.  And the subject line is "Drafts."  And then it has comments of various kinds about the da Vinci; correct?

A.   Yeah.  It says "Drafts," and then there is the basic cataloging of the work, and then a notice, a note, if you wish, on the picture.  And if you can scroll down after I can tell you exactly what it is.

Q.   That's fine.

And then Mr. Bouvier responds.  And it's maybe because the time differences, he writes to you and says:  Please send me the file as well.  Is this the sheet you want to put on

Sotheby's letterhead for me?  By the way, the news about the expo insurance in London -- any news.

So he's asking you, am I correct, to put this information in the email below on Sotheby's letterhead for him?

A.  I'm not sure.  Is this the sheet you want -- he's saying you want.  So maybe I told him that I had to send him information because he's asking me.  He said, Is this what you want to put on Sotheby's letterhead for me.  Because, you know, as part of what we do, we have to do this for our buyers, you know, we have to provide them, you know, all the information we can on the work.  I think that's what it says here.

Q.  So you knew that what you were going to send to Mr. Bouvier would be sent to the buyers?

A.  Mr. Bouvier was the buyer.

Q.  And then you respond saying:  Hello, Yves.  Yes, I'll give him the document -- I'll give you the document with Sotheby's letterhead on Monday.  Scan of the National Gallery catalog. I'm waiting for the reinsurance return.  I'll try to call you.

You wrote that?

A.  Yes.  It's just the -- there's one word here.  If it's possible to see the French, because say they are waiting for the reinsurance return.  I don't know what that means.  The rest is, I give you the doc with Sotheby's letterhead on Monday.  That's clear.  And scan of the National Gallery catalog.  I think I meant, you know, this picture had been

exhibited in the National Gallery in London, if I'm not wrong. And I think that's probably what I meant. And I'm waiting for the reinsurance return. I'm not sure what that means. So if you have the French, I can maybe help.

MR. KORNSTEIN: If we can turn to page 1 of the exhibit, Toby. There's the French.

A. Yeah. So it's not reinsurance, it's (speaking French). I'm waiting for feedback regarding insurance, not reinsurance.

Q. Fine. Now, let me ask you this: If Mr. Bouvier was the buyer, why did he -- why do you think he needed it on Sotheby's letterhead if you had sent it to him already?

A. I think I was going -- the way I read it, when he says, Is this what you want to send me on Sotheby's letterhead, which is I wanted him to get it on Sotheby's letterhead, I think for the -- in this particular case, if I remember correctly, my colleagues in the Old Master Department were really keen for the communication on this picture to be as complete as possible, you know.

As you pointed out earlier, totally right, there was a consensus on the authenticity, but, you know, there were potentially dissenting voices. And so the Old Master Department really -- you know, for them it's -- it was very important for them that the whole, sort of, file would follow the picture. Because if you read the letter, if you read the note, it says, you know, while most of the experts agree, some

O1HVACC1                    Valette – Direct

are dissenting, and you understand that some are dissenting, you know what I mean.  There's a bit of caveats in the note. And I think the Old Master Department, they are much more knowledgeable than I was about, you know, these sort of things.

So I think it was more us wanting to send him with the Sotheby's letterhead than the other way around.

(Continued on next page)

Q.  Isn't it true, sir, that you understood that he was going to pass on that information with Sotheby's letterhead to someone else?

A.  Not necessarily, no.

Q.  You knew at this time that he had been flipping works quickly to Mr. Rybolovlev, correct?

A.  No.  I knew at the time that Mr. Rybolovlev was one of his clients.  Not the sort of velocity at which he was selling to him.

Q.  You were aware that Bouvier was flipping paintings very quickly?

A.  Yes, as part of his activities.  But he never told me to whom he was selling.

Q.  You understood that Mr. Bouvier was a major client of Mr. Bouvier.  Mr. Rybolovlev was a major client?

A.  I understood Mr. Rybolovlev was a client of Mr. Bouvier, yes.

Q.  Can ask we see Plaintiff's Exhibit 473 for identification, court, witness, and counsel.

        THE COURT:  It's Plaintiff's Exhibit.

Q.  Have you seen this document before?

        It an e-mail from you to Mr. Bouvier?

A.  Yes, it is an e-mail.

        MR. ASNER:  Objection.  This is not on their exhibit list.  I haven't seen this.

O1H3ACC2                    Valette - Direct

THE COURT:  Hang on.

MR. ASNER:  If we can scroll through it, maybe I can withdraw the objection, but I don't know.

MR. KORNSTEIN:  Can you scroll through it.  The cover e-mail.

THE COURT:  Please don't characterize something that's not in evidence.

(Pause)

MR. ASNER:  If we can go to the first page again, just so I can see it.

MR. KORNSTEIN:  Go to the first page, please.

MR. ASNER:  Okay.  I've seen it now, your Honor.

THE COURT:  Is there an objection?

MR. ASNER:  No objection.

MR. KORNSTEIN:  May I publish?

THE COURT:  First I'll admit it, now you may publish.

(Plaintiff's Exhibit 473 received in evidence)

Q.  You recall this e-mail to Mr. Bouvier?

A.  That is an e-mail I sent to Mr. Bouvier, yes.

Q.  And that was on April 2, about a little more than a week after the viewing?

A.  Yeah, April 2.

Q.  And this was the cover e-mail for the photographs of the other paintings by Leonardo?

A.  Yes, so, it is an e-mail where I've put the paintings in

public collections and in private collections by Leonardo.  And I point out that 17 and 18 are listed as Leonardo and another artist.

So yeah, it is a list of works by Leonardo that I sent to Mr. Bouvier, which I hoped was as exhaustive as possible. There are very few pictures by the artist which I consider authentic.

Q.  And you understood, didn't you, that Mr. Bouvier was going to pass on these documents to someone else?

A.  Not necessarily.  I mean, the way I see -- it was a possibility.  This list is absolutely accurate, and it was not prepared by me.  I'm sure it was prepared by the Old Masters department.  I really think this is accurate, and all these pictures are by Leonardo and very exhaustive, so it can be passed onto whoever wants to see it.  It is not a problem.

But whether I knew that Mr. Bouvier would pass it on, not necessarily.

Q.  Let's move on to January of 2015.  Do you recall Mr. Bouvier asking for a valuation of the da Vinci painting at that time?

A.  Yes, that is correct.

Q.  And you recall that he wanted as high a valuation as possible?

A.  He wanted a high valuation, that is correct.

Q.  And you contacted Alex Bell about that valuation?

A.   Yes.  It was an insurance valuation.  Just to be precise.
He wanted a high insurance valuation.
Q.   Toby, can you show the witness Plaintiff's Exhibit 171 for
identification, and the Court and counsel.
        Let's go to the first e-mail in the chain which would
be at the bottom.  That's an e-mail from you to Alex Bell.
        Alex Bell is head of the Old Masters department?
A.   Yes, I think he is.
        MR. ASNER:  Is this in evidence?
        THE COURT:  It is in evidence.  Would you like to
publish?
        MR. KORNSTEIN:  Yes, your Honor.
        THE COURT:  You may.
        Do you want to start your answer again, Mr. Valette.
        THE WITNESS:  Yes.
A.   Alex Bell is a colleague in London.  Who I think was, is
the co-head worldwide for Old Master paintings.
Q.   You write to Mr. Bell, "Attached is the old insurance
certificate just as an FYI.  Better to do it in letter format
rather than formal valuation.  Ideally, you write a nice
emphatic paragraph about the incredible rarity of the work,
etc., no more than half a page, insist on the difficulty to
come up with a single accurate figure, and conclude that we
think a figure in the region of XXX 125?  Would be an
appropriate insurance number.  Hope that is clear and simple.

One page is fine."

          Do you recall that?

A.  Yes, I do.

Q.  And then you read important that I have that by Monday?

A.  Sorry?

Q.  Is there more to that -- can you go -- right.  "Important that I have it by Monday"?

A.  Yes, on the second page, yes.

Q.  Go back to the previous page.  Then, Alex responds to you, "Dear Sam.  I do need to talk about this because we cannot do these things by letter unless it is covered by our conditions of valuation."

          What are conditions of valuation?

A.  So when Sotheby's does insurance valuations, there are conditions of valuations which are these documents are printed, I think it is the -- so how can I explain that.

          The back page, basically, lists the conditions of valuations when we do a formal insurance valuation, and I think that's what Mr. Bell is referring to.

Q.  Then he goes on.  "In any event, I don't think I can realistically say more than $100 million which is after all 25 percent more than he paid for it.  Have talked to George Wachter about this too."

          George Wachter is who?

A.  George Wachter I think at the time the co-head of the Old

Master department worldwide.

Q.  He goes on, "Can we just do a normal valuation?  Why would he want that in a letter format.  Sorry to be difficult" three exclamation points.  "Thanks, Alex."

Do you remember getting that e-mail?

A.  Yes, I do.

Q.  And do you remember you wrote a response?

A.  I think we can have a look at it because it's just there.

Q.  Can we -- okay.  So you write back.  "Okay to do a valuation, no problem, but I think he will really appreciated need a nice cover letter emphasizing the uniqueness of the work, etc."

When you say he will really appreciate, who are you referring to?

A.  Yves Bouvier.

Q.  This was almost two years, certainly more than a year and a half after the sale.  Correct?

A.  Yes.

Q.  And you knew that Mr. Bouvier flipped works frequently and quickly?

A.  I knew he could flip works, yes.

Q.  You knew that he did flip works quickly?

A.  Well --

Q.  You testified about that?

A.  Not all the works he bought.  He couldn't know that.

Q.   I --

          THE COURT:  Gentlemen, one at a time.  It's very important so everybody can understand and the court reporter can take it down what you're saying.

Q.   And you didn't ask him whether he had flipped that work by then, did you?

A.   I didn't.

Q.   In fact, you didn't take any steps to satisfy yourself that he was still the owner of the painting?

A.   I didn't ask him, no.

Q.   Then you go on, "I send him regularly articles or information on his purchases reiterating their comparative importance, etc. and I haven't done it this one simply because there are no comparables.  So a cover letter is nice.  Price wise, remember they wanted 150 and we started negotiation, they were 125 and we were happy to offer it at this price to him.  In his view, he got the bargain of the century.  Many thanks."

          Do you recall that e-mail?

A.   Yes.

Q.   You had seen Mr. Rybolovlev at the viewing in March of 2023, do you recall that?

A.   In March of 2013.

Q.   Yes.

A.   Yes.

Q.   Right.  And did it ever pass your mind that he bought the

O1H3ACC2                       Valette - Direct

painting?

A.   Well, it was a possibility, but the deal was done quite a few weeks after this viewing.  And so, while it was a possibility, you know, I didn't know.  I couldn't be sure.

Q.   And it never occurred to you to ask Mr. Bouvier if Mr. Rybolovlev bought the painting?

A.   I didn't ask him, no.

Q.   Then Mr. Bell writes back to you, in the same e-mail chain, and he says, "Understood and I think it's better that we do a valuation.  Who should I address a covering letter to?  I agree it's difficult to establish exactly what it is worth, but the only firm fact is what we sold it for and I am happy to say it is worth 25 percent more than that, which is a good return on an Old Master in a couple of years.  I will do this from New York.  Franka" And who is Franka?

A.   Franka was at the time the head of valuations at Sotheby's in London.

Q.   So Alex Bell says, "Franka is ready to prepare something on Monday.  Thanks."

     Then you respond to that e-mail, by saying, "Okay, I wouldn't mention percentage increase in your letter or that sort of thing -- maybe simply what an insurance price should be today."

     Do you recall that?

A.   Yes, I do.

O1H3ACC2                    Valette - Direct

Q.  Now, isn't it true the reason you didn't want the percentage increase shown in the letter is that if that letter were shown to Mr. Rybolovlev, or any other buyer from Mr. Bouvier, it would indicate the price that Mr. Bouvier paid?

A.  That is not the reason.  I can explain why.

Q.  No.

        Then Mr. Bell responds to your e-mail about not including the percentage increase, "Yes, of course that's fine. I'll send everything to you in draft to review."

A.  That is correct.

Q.  Now, had you ever had a conversation with Alex Bell telling him about meeting Mr. Rybolovlev in the apartment where the viewing took place?

A.  No, I don't think I did, no.

Q.  Did you tell anyone at Sotheby's about meeting Mr. Rybolovlev at the apartment for the viewing?

A.  No, I didn't.

Q.  So other than Mr. Bouvier, no one -- well.  Let me rephrase that.

        No one at Sotheby's except yourself knew that Mr. Rybolovlev was at the viewing in March?

A.  That is correct.

Q.  Do you know someone named Pippa Dean?

A.  Pippa Dean, I think she was Alex Bell's assistant.  She was working at Sotheby's.

Q.  Do you recall her having a question about who the buyer of the painting was of the da Vinci?

A.  I don't remember, no.

Q.  Please show Defendant's Exhibit 617 to the witness, Court and counsel, please.

       Do you recall ever seeing this e-mail chain?

A.  No, I'm not copied on this e-mail.

Q.  Is this similar to other e-mails that are regularly kept in the course of business at Sotheby's?

A.  These are e-mails between Pippa Dean and some colleagues, so they look like Sotheby's e-mails, yes, absolutely.  But I'm just not on it.

Q.  It is the regular course of Sotheby's to business to keep such e-mails?

A.  Keep, I don't know what you mean by keeping.  They are in the system if you wish, but I don't know if they're kept, that, I just don't know.

Q.  These e-mails concern the valuation of the da Vinci in 2015?

A.  This is an e-mail 26 of January 2015, and it is titled confidential clients.  And there is --

       THE COURT:  Don't read the e-mail aloud.  But does it concern the valuation of the da Vinci in January 2015?

       THE WITNESS:  Hold on just one second.  I'm just having a look.

O1H3ACC2                         Valette - Direct

Yes, it does.

MR. KORNSTEIN:  Offer it into evidence, your Honor.

MR. ASNER:  Foundation, your Honor.

THE COURT:  Sustained.

Q.  Are you aware that Pippa Dean requested from Ian Woodhall.
Do you know who Ian Woodhall is?

A.  I'm afraid I don't remember.

Q.  Do you recall whether Pippa Dean asked to know who the
buyer was for the purpose of putting the correct account
information in the provenance?

A.  I don't remember, no.

Q.  All right.  Can we show Defendant's Exhibit 18 for
identification to the witness, Court and counsel.  618.

Do you recognize this document?

A.  I'm not copied on this document.

Q.  No, but do you recognize it?

A.  Well, I'm not copied on it so I don't think I've seen it.
It is -- I can tell you what it is.  It is an e-mail from Pippa
Dean.

THE COURT:  Just do you recognize it, yes or no?

THE WITNESS:  No.

THE COURT:  Okay.

Q.  Did you ever learn that Pippa Dean believed that the
provenance will need to show and reflect the new ownership?

A.  I don't remember this conversation.  I was not on the -- on

O1H3ACC2                    Valette – Direct

the chain.

MR. KORNSTEIN:  Offer it into evidence, your Honor.

MR. ASNER:  Foundation.

THE COURT:  Sustained.  Let's take it down, please.

Q.  Would you show, please, exhibit Plaintiff's Exhibit 172 to the witness, Court and counsel.

Do you recognize this e-mail that you wrote?

A.  Yes, I do.

MR. KORNSTEIN:  Offer it into evidence.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 172 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.  In these two e-mails, the first one from Mr. Bouvier to yourself dated January 26, 2015, Mr. Bouvier writes:  Good evening, Sam.  I will let you ask again for the Leonardo estimate.

MR. ASNER:  Objection, your Honor.  Misread.

THE COURT:  Why don't you try that again, Mr. Kornstein.

Q.  Good evening, Sam.  I will let you try again for the Leonardo estimate thank you in advance, Yves.

THE COURT:  Let's do that again.  It says, "Good evening, Sam.  Ask again for the Leonardo estimate.  Thank you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1H3ACC2                          Valette - Direct

in advance, Yves."

Q.   "Good evening, Sam.  Ask again for the Leonardo estimate.
Thank you in advance, Yves."

        Do you recall getting that?

A.   That's what it says.  Would it be possible to see the
French version?

        MR. KORNSTEIN:  Yes.  Can you show the first page.

A.   Okay.  I see what this means.

Q.   And you respond, "Absolutely.  I'm on it.  I will have the
response of the team tomorrow at the latest."

A.   That is correct.

Q.   That was referring to the valuation?

A.   Yes, Mr. Bouvier was asking about the insurance valuation.
I had told him it was prepared by the Old Master paintings
team.  And so, here I'm telling him I'm on it, I will have the
response of the team tomorrow at the latest.

Q.   And would you show the witness Defendant's Exhibit 632 for
identification.  Witness, Court and counsel.

        Do you recognize this document?

A.   Yes, I do.

Q.   It concerns the valuation of the da Vinci in January 2015?

A.   Yes, it does.

        MR. KORNSTEIN:  Offer it into evidence.

        MR. ASNER:  No objection.

        THE COURT:  Admitted.

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

(Defendant's Exhibit 632 received in evidence)

Q.  In this e-mail, Alex Bell writes to Franka, who is head of valuations, Pippa Dean, and yourself, and he says, "All, okay, but the value should be $100 million.  Also, I did a note about the picture when we sold it and that should really appear in the valuation too.  Pippa, can you find that?  Thanks."

Do you recall?

A.  That is what it says, yes, that's correct.

Q.  So, you were very clear at that point that Mr. Bell thought the value should be no more than $100 million.

A.  That's what he says here.  We had a discussion, so I think he started even lower.  And so we discussed about the value. And at this stage in the conversation he thought that the value should be $100 million.

Q.  And did there come a time when you received a draft or the actual -- the draft valuation and the draft letter?

A.  Yes, that is correct.

Q.  Show the witness Defendant's Exhibit 640, and Court and counsel.

Do you recognize this document?

A.  Yes, I do.

Q.  That's an e-mail from Franka to yourself with a copy to Pippa Dean and Alex Bell?

O1H3ACC2                    Valette - Direct

A.   That is correct.

          MR. KORNSTEIN:  Offer it into evidence.

          MR. ASNER:  No objection.

          THE COURT:  Admitted.

          MR. KORNSTEIN:  May I publish?

          THE COURT:  You may.

          (Defendant's Exhibit 640 received in evidence)

Q.   This document has a cover e-mail that says, "Dear Sam. Attached the valuation with Alex's note as draft and his letter as PDF.  Please let me know how many printed copies you require.  Draft will be removed for printing."

          Do you see that?

A.   That's correct.

Q.   Now the draft on the valuation on the third page shows the valuation at 100 million.  Correct?

A.   That is correct.

Q.   And the currency is U.S. dollars?

A.   You're right, yes.

Q.   And the last page of this document is the letter, the cover letter.  Can you show us the last page.  That cover letter is in PDF and is already signed by Alexander Bell, correct?

A.   That's correct.

Q.   And you see in the first sentence, if we could highlight that, the last few words it says "Leonardo da Vinci that you acquired in 2013."  You see that?

A.   Yes, it says work by Leonardo da Vinci that you acquired in 2013.

Q.   Right.  And then you sent this, these documents to Mr. Bouvier, isn't that correct?

A.   Yes, I think I sent him the draft, that's true.

Q.   Can we show Plaintiff's Exhibit 173 to the witness, Court and counsel.  That's already admitted in evidence.

         THE COURT:  You may publish.

Q.   You had not made any changes to the draft that you had just received previously.  You sent it as is?

A.   I think I just, yeah, forwarded him what I had received from the Old Master paintings department, yes.

Q.   And you asked in the cover e-mail "Let me know if this suits you."

A.   Hmm-hmm.

Q.   You were asking Mr. Bouvier if the valuation and the letter suit him?

A.   Yes, that's correct.

Q.   So you were asking Mr. Bouvier to suggest revisions to the valuation that was prepared by Sotheby's?

A.   That's what we do with clients when we send them valuations generally, especially at this level.  So we send them drafts, so they can tell us if they have comments and whether we can accommodate or not if they do.  So that would be normal course of doing what we do.

Q.   And again, this contained the valuation at $100 million, and the cover letter that we saw that had the language in the first sentence "that you acquired in 2013."  Correct?

A.   That's the Alex Bell's letter, yes and at the time of the draft, the value was $100 million, the insurance value, yes.

Q.   Isn't it true that Mr. Bouvier was quite demanding in his request about this valuation?

A.   When he came back with some changes, he wanted a high price for this picture.  In 2013 when we took it at Sotheby's, I think we took it at $125 million insurance, so he wanted a high price.  So, he was not -- he thought $100 million was too low.

Q.   You recall stating previously at your deposition that he was quite demanding in these requests?

A.   Oh, he was quite demanding, like most clients, but yes, I would say he was quite demanding, yes.

Q.   You just wanted to make sure it was the type of document that he wanted?

A.   I want to the make sure that what we sent was, you know, to -- what was suitable for him, yes.

Q.   You didn't want to write something that failed to conform to what he expected?

A.   No, that's not true.  Ultimately, the valuation was done by an Old Masters department.  We had a discussion.  Whatever is sent to Yves Bouvier has been agreed by the Sotheby's team in charge.  What we're trying to do is be as close as possible to

O1H3ACC2                     Valette - Direct

a document that he would find agreeable to him.  But, ultimately, the number in the document is the number which has been decided by the Old Masters department and Alex Bell and his team after discussions, etc.  But, you know, Mr. Bouvier did not put this number.  We did.

Q.  And you gave a deposition in this case, isn't that correct?

A.  That is correct.

Q.  And you gave that deposition under oath?

A.  Yes.

Q.  And do you recall being asked this question and giving this answer at page 235 of your deposition:

"Q.  And do you recall that you sent the draft to him in Word, the cover note?

"A.  I would, I would have sent them in Word, I assume that it was probably prepared by my assistant, and then I sent him in Word, you know, asking him if that suits him.  Because you know, he was the one requesting this document, and so I just want to make sure that that was the type of document he was requesting.  I wanted to, you know, not write something which was not conformed to what he expected.  So I sent him in Word document.  I'm not quite sure why it was sent in Word document, probably because it was really a document for discussion, you know, so I say here is the attestation, let me know if that suits.  If it, you know, if it suits then we can transform it into PDF and there it goes I would assume."

Do you recall giving that answer?

A.   You're reading my deposition, I did, absolutely.  But I don't know if that --

THE COURT:  One at a time.

THE WITNESS:  Sorry.

THE COURT:  One at a time.

Is there an objection?

MR. ASNER:  Yes, your Honor.  Not sure what the impeachment is.

THE COURT:  Well, not sure that matters.

So in any event, did you give that answer, Mr. Valette?

THE WITNESS:  Mr. Kornstein is reading from my deposition so I did.  But I don't know if it is relating to this document.  You know, I sent Mr. Bouvier a lot of document. This was prepared by the Old Master department with a discussion with me.  But, I'm not sure that what you're referring to refers exactly to this document.

THE COURT:  Okay.

THE WITNESS:  But I -- I agree, that's true what I said in my deposition.

Q.   And were changes made in the document after discussion between you and Mr. Bouvier?

A.   Sorry.  I missed just the beginning.  What?

Q.   You sent a draft of the valuation and a draft of the cover

letter. Were changes made in the draft of the cover letter or the final of the cover letter that was signed by Mr. Bell as a result of conversations you had with Mr. Bouvier?

A. Yes, absolutely. That's correct.

Q. And did he request the changes?

A. Well, I sent him the draft, and then he had a few changes that he requested which I passed on, if I remember correctly, to my colleagues in the Old Master department, and as long as they were fine with it, then we resent him a final version.

Q. Do you recall stating under oath that if Bouvier wants something changed in the letter, fine, we don't care.

A. Well, I mean, if you can read me my whole thing. I mean, the thing is, I think what I meant was if he asked us something that we feel is okay to change, we don't care. Like, as long as, you know, we feel comfortable with the change.

        If he asks, if he says I want you to put $150 million, we're not going to send it to him, you know. But if he ask for a change which is acceptable, then we do it. We try and be as accommodating as possible with our clients within the realm of what we can do, yes.

Q. And these changes that Mr. Bouvier requested, they were as a result of phone conversations, not e-mails, correct?

A. I think most of the time would be phone conversation, yes, there may be some e-mails, but yeah.

Q. In this particular instance with this document, there were

O1H3ACC2                      Valette - Direct

phone calls.

A.   I think so.  I don't remember exactly, but I'm sure, I sent him the draft so typically he would call me back and suggest changes, which I would pass on to my colleagues, so, I think, yes, I think there must have been a phone conversation.

Q.   Can you show the witness Plaintiff's Exhibit 304 in evidence.  And show it to the jury and everyone else, too.

     Do you recall this e-mail?

A.   Yes, I do.

Q.   And you recall the first e-mail in the chain which starts at the second page, bottom of the second page.  You wrote that on January 27, 2015, to Franka, the head of valuations, Pippa Dean and Alex Bell.  This is what you write:  "Thank you, Franka and Pippa.  Rereading the document.  Could you change the first line of Alex letter to 'Dear Mr. Bouvier, further to your request, please find enclosed our valuation document for the exquisitely beautiful and highly important work by Leonardo da Vinci *Salvator Mundi*.'"

     What you were asking is that the last part of that original sentence "that you acquired in 2013," be deleted.  Correct?

A.   Well, two things.  The further to your request, which I think was not in the initial letter.  And that, you know, Mr. Bouvier asked us to provide, it was not a proactive valuation.  So it was a valuation which was requested by him.

So that is what it refers to. And I don't think that was in the initial letter.

And the second part, which is to say Leonardo da Vinci, *Salvator Mundi*, names the picture in question. And takes out that you acquired in 2013.

Q.   And that was at the request of Mr. Bouvier?

A.   That's correct.

Q.   You had sent it to him with that language still in there. "That you acquired in 2013"?

A.   Yeah, I sent it to him the previous draft, the draft, and he had a couple of requests which I passed on to my colleagues. They didn't seem -- major.

Q.   And you also asked that the currency be changed to euros. You wrote "Alex, he would prefer euros since it was insured for 110 euros. Can you live with 100 euros, about 110 U.S. dollars, that would be really great. Could you kindly e-mail me a new draft? Many thanks everybody for your efforts and sorry for the request for a quick turnaround. He is a very demanding client but also a great one."

You're referring to Mr. Bouvier?

A.   Yes, I'm referring to Mr. Bouvier.

Q.   And the response, the first response was from Franka Haiderer. And she writes to you with copy to Alex, "As soon as Alex confirms, I can prepare the document." You write back, "Thanks very much."

Then Alex responds.

A.   Sorry, I'm not following the --

MR. ASNER:  Objection, your Honor.  I'm not sure what he's reading from.

MR. KORNSTEIN:  The top e-mail on 304.

Q.   Alex responds, "The most I could live with is 95 million euros.  That's about $107 million today.  As I calculate the picture cost around 61 million euros, the then equivalent of $80 million.  That does represent a very significant appreciation in euros over less than two years.  I just don't see what evidence there is to justify more than that.  95 million euros is already really stretching it.  Sorry not to be more accommodating."

You saw that?

A.   That is correct.

Q.   You didn't accept that as is, did you?

A.   Well, I thought that 95 million euros was a, was a bit of a weird number.  Kind of too precise in a way.  You know, it's not a mathematical science, but if you start saying 95 million euros, why not 90.  And I was more comfortable with a round number.  I think most of the time the insurance prices are on sort of simple round numbers, not always, I'm not saying that.  But 95 seemed weirdly precise, if you see what I mean, like we knew something why it should be worth 95.  So I say can you live with 100 euros, which he accepted in the end.  And that's

O1H3ACC2                        Valette - Direct

what we published I think.

Q.  Toby, can you show the witness the first two pages of Plaintiff's Exhibit 175, those two pages are in evidence.  And those can be shown to the jury as well.

This is an e-mail chain that you were involved in either sending or receiving?

A.  Yes, it is an e-mail chain regarding the valuation with my colleague Alex Bell, and I think there is also Pippa Dean and Franka Haiderer.

Q.  You see on the first page, the e-mail from Pippa Dean to Franka and you copied to Alex says "The updated letter is attached.  Alex, will you please confirm the value."  And that's the quote from your e-mail about the euros.

You see that?

A.  Yes, that's what it says.

Q.  Right.  And can you show the witness, Court and counsel the third page.

Was that the revised letter that Pippa Dean was referring to?

A.  That is correct.

MR. KORNSTEIN:  I ask that the third page be admitted into evidence.

MR. ASNER:  No objection.

THE COURT:  Admitted.

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

(Plaintiff's Exhibit 175 page 3 received in evidence)

Q.  If you look at that letter, it eliminates those last three words or four words in the first sentence at the end.  Instead of just -- it ends now just Leonardo da Vinci, *Salvator Mundi* period.  What is omitted is "that you acquired in 2013."  Correct?

A.  Well, if I may say, just -- I agree with you.  But *"Salvator Mundi"* replaces "that you acquired in 2013."  The previous version didn't say *Salvator Mundi*.  It just said Leonardo da Vinci, just to be clear.

Q.  Okay.  Now, you then responded to the e-mail from Pippa Dean saying:  If you can live with 100 euros, $110, that would be really great.  That you're sending to Alex.  At this level I don't think it makes much of a difference, and for his peace of mind it is important.  Thanks so much.

Whose peace of mind are you referring to?

A.  Yves Bouvier.

Q.  You didn't even know whether he owned the painting at that time?

A.  Well, he asked for the valuation, and he wanted a high valuation.  So, you know, I thought that -- I thought 95 to 100 at this level is academical.  It doesn't make much difference and it was important to him.  So, yes.

Q.  All right.  Now, can we show Exhibit 176 for

identification.  Actually I think it's in evidence already.

Do you recall this e-mail?

A.  Yes, I do.

Q.  And this is on January 28, 2015, you write to Alex, "Could you kindly let me know if you are okay with 100 euros?  I know it is academical at this level, but you know our clients.  I promised I would send him on Monday and I am two days overdue so I really need to send the document ASAP.  Thanks so much for your help and apologies for the trouble."

Remember sending that?

A.  Yes, I do.

Q.  And you were still pressing to get the higher valuation?

A.  I was, you know, arguing for 100 million euros, if Alex could live with it.

Q.  And Alex writes back, "Yes, that's okay.  I have asked Pippa to turn this round as soon as possible.  Thanks, Alex."

And you write back in capital letters "thank you" with some exclamation points?

A.  Yes, I did.

Q.  Did you send the final version with the increased valuation and the revised letter to Mr. Bouvier?

A.  I think I sent him the final valuation at 100 million euros, and the final letter which contained the changes we looked at, yes.

Q.  Can we have the Plaintiff's Exhibit 177 that's in evidence

shown to the witness and the jury.

You recognize this?

A.  Yes, I do.

Q.  This is the e-mail that you sent to Mr. Bouvier enclosing the new valuation, the final one saying that the letter would follow?

A.  That is correct.

Q.  And this valuation is at 100 million euros?

A.  Would you show it to me?  I can confirm.

Q.  On page 4.

A.  That is correct.

Q.  And on page 5.

A.  I think there is a mistake -- sorry.

Q.  You see right underneath the valuation is the list of provenance?

A.  That's correct.

Q.  And the provenance does not list either Blancaflor or Mr. Bouvier by name?

A.  That is correct.

Q.  And then you sent the actual final letter to Mr. Bouvier?

A.  Yes, I see in the provenance, just to be clear, it says if I may --

Q.  No.  There is no question.

Plaintiff's Exhibit 178, please show the witness, I think that's for identification only, and Court and counsel.

Do you recognize this e-mail?

A. That is an e-mail from myself to Yves Bouvier.

Q. On January 28, 2015, and attached to it is the final letter signed by Alex Bell?

A. Yeah, again, if you don't mind showing me the letter I can confirm. But it looks like it. Yeah, that is correct.

THE COURT: Are you offering that exhibit? Are you offering that exhibit?

MR. KORNSTEIN: Yes, your Honor.

MR. ASNER: No objection.

THE COURT: Admitted.

(Plaintiff's Exhibit 178 received in evidence)

MR. KORNSTEIN: May I publish?

THE COURT: You may.

Q. If you look at the attachment, it is a letter which misses the wording at the end of the first sentence "that you acquired in 2013."

Now Mr. Valette, by omitting the phrase "that you acquired in 2013," if Bouvier showed that document to someone else who bought the painting, it would conceal the fact that Bouvier had bought it in 2013. Correct?

MR. ASNER: Objection.

THE COURT: Sustained.

Q. Did Mr. Bouvier tell you why he wanted that language omitted?

A.   No.  He said he wanted an insurance valuation and that he had, you know, minor changes to the letter.  That's all.

I mean, look, the first sentence didn't state *Salvator Mundi*.  So it kind of made sense to add it after Leonardo da Vinci.

And I would think from a purely formal, but from a purely formal way, it was Blancaflor Investments who acquired the picture and this one was sent to him as a personal person.  So maybe, maybe that's why -- I mean, but at the time -- I didn't think about it, to be fair.  You know, it was -- he asked these two minor changes, I asked my colleagues to, you know, make them in the letter and send it back.  I think, you know, it didn't take a long time, I mean, I think we were all working on other things and I didn't spend a lot of time on it.

Q.   Well, in that last phrase that was omitted "that you acquired in 2013," you didn't suggest to Mr. Bouvier that just change the word "you" to "Blancaflor"?

A.   No, no, I didn't.

Q.   Isn't it true that the combination of deleting the phrase "that you acquired in 2013" and deleting in the valuation any comments about the percentage increase, that someone who read those documents would not know that Mr. Bouvier had acquired the painting in 2013 at the price of $83 million?

MR. ASNER:  Objection.

THE COURT:  Sustained.

Q.  Can we have the excerpt from Mr. Valette's deposition, page 202, line 21, to page 203, line 16 played.

THE COURT:  Hang on one second, please.  Any objection?

MR. ASNER:  No objection.

THE COURT:  All right.  You may proceed.

(Video playing)

"Q.  Isn't it correct that Bouvier ask that you delete the reference to his acquiring it in 2013?"

THE COURT:  We'll circle back to this.  Next question.

Q.  In February, the next month, did Mr. Bouvier ask you to send the valuation to anyone?

A.  Mr. Bouvier asked me to FedEx the valuation to a Mrs. Bersheda.

Q.  You knew at that time that Ms. Bersheda was Mr. Rybolovlev's attorney?

A.  I really don't think I did.  I had no interaction.  I came to understand much later that I think Mrs. Bersheda was the person at the Frieze viewing.  But I didn't know her at the time.  And Mr. Bouvier asked for an insurance valuation, and asked me to send it to this person, which I did.  I had no problem, given that, you know, the document was a Sotheby's document, a valuation, I mean, we could send it to whoever he wanted.

Q.  Are you aware of a Sotheby's policy called Criteria for

O1H3ACC2                      Valette – Direct

Major Valuations?

A.   That rings a bell.

Q.   Can we show Exhibit 179 to the witness, Court and counsel.

        Looking at Exhibit 179, do you recall that this is Criteria for Major Valuations issued by Sotheby's and in effect at that time?

A.   I have to say I don't remember reading this recently.  I suppose it is, but --

        MR. KORNSTEIN:  Your Honor, this is already in evidence.  So we can publish to the jury.

        THE COURT:  Hang on.  All right.  You may.  It's plaintiff's exhibit, for the record.

Q.   According to this document, issued by Sotheby's, "Valuations represent a regular and extremely important part of our business, but one where the group carries significant potential risk for a number of reasons."

        We go to the third paragraph.

        THE COURT:  Is there a question, Mr. Kornstein?

Q.   Do you agree with that first paragraph?

        MR. ASNER:  Objection.

        THE COURT:  Sustained.

        Do you recognize this document, Mr. Valette?

        THE WITNESS:  To my -- I mean, I don't.  I don't think I've -- I've seen it recently.  I mean, I don't remember reading it.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

THE COURT:  So let's take it down, please.

Q.  Have you participated in live reviews for valuations?

A.  Yes, I have.

Q.  And in preparation for participating in live reviews, did you familiarize yourself with Sotheby's policies about live reviews for valuations?

A.  Look, you know, I been at Sotheby's for 20 years and I've done a lot of valuations, but, I if -- you know, we don't read the policy before doing a valuation, if that's the question. So, we just do it as part of our job.  I don't know if I'm answering --

Q.  You don't read the policy before doing the valuation.  Do you even know what the policies are before doing valuations?

A.  Well --

THE COURT:  One at a time.

A.  We value pictures every day.  You know, for auctions, for insurance, for private sales, for all sorts of reasons.  So I'm sure there are policies of valuation, but we've sort of integrated them at this stage, because it's so much part of what we do.  That's all I'm trying to say.  We don't go to the manual every time we do valuation, if that's fair to say.

Q.  Do you know what the criteria are for major valuations?

A.  I couldn't, I couldn't give them to you on top of my head. We just, you know, the way we work on valuations, we meet as a team, we discuss our opinion, we look at comparables, we

O1H3ACC2                    Valette - Direct

discuss the market, and then we come up with a valuation.  I suppose that's what the criteria says.

Q.  Well, are you aware that valuations is an increasingly litigious area?

A.  I haven't been a part of any other litigious affair.

Q.  Are you aware that issues that have been used to attack otherwise sound valuations include overly aggressive valuations under pressure from a client?

A.  That I don't know.

Q.  Don't know.  Never heard that before.

A.  I haven't, no.

Q.  Never discussed that as part of understanding what to do with valuation meetings?

A.  I don't remember discussions about that, no.

Q.  And are you aware that the deliberate misuse of the valuation provided is also an issue that has been used to attack valuations?

A.  That sounds right, but I haven't heard this phrase before.

Q.  In issuing the valuation of the da Vinci in 2015, were any comparables used?

A.  Well, that's a good point.

Q.  Just yes or no.

A.  Oh, I'm very happy to explain.

Well, no.  Okay.  There was, there were comparables, actually.  But not comparables in the sense of another da

O1H3ACC2                      Valette - Direct

Vinci, because, you know, there simply isn't.  So, there were comparable in Old Masters, where they have to come up with other Old Master artists which they can compare it to.  But also trophies, you know, and that's where I could come in to discuss, because in a way this picture was, you know, more comparables to, you know, an amazing Monet or an amazing Picasso.  It was in this trophy category.

So there were comparables, but not by the same artist. It is not as simple as, if you wish, you want to value a, you know, a 1942 Picasso still life, then you may have, you know, 10 other pictures you can use to value this picture.

With this type of picture, it's very different.

Q.  Did you participate in a live review committee that discussed those comparables?

A.  I was not part of the -- I don't know if there was a live review for the Leonardo.  I was not part of it.  That was an Old Master department, but I was allowed to have an opinion and my colleagues could hear it if they wanted.

THE COURT:  Can you explain what a live review is.

THE WITNESS:  So the live review is the meeting that colleagues would have to exchange opinion on the value of a picture and go through comparables, other pictures, and the rationale behind where they would land in terms of value.  So that would be the live review.  I don't know it is still in place today.  It definitely was in place at the time.  Yeah.

Q.  Now, since you didn't participate in the live review, the comments that you made just before about comparables with other artists, you don't know if that was considered?

A.  Oh, no, because we have discussions with Alex Bell.  We don't have to have the live review to have discussions about pictures.  So I would come from a different angle than Alex.  So it is all part of a discussion.

I think at the time Alex was in New York, so he was probably talking to his colleagues in New York, not his colleagues in London.

Q.  But, there is nothing in writing about those discussions, is there, other than what we've talked about?

A.  That I don't know.  I wasn't part of the live review, so maybe they had.  I'm not aware of it.

Q.  And to your knowledge, there was no live review?

A.  That I don't know.  I couldn't tell you.

Q.  And there was no valuation file kept, was there?

A.  That I don't know.  I can't tell you.

Q.  Isn't it a requirement to keep a valuation file, a written valuation file?

A.  I don't think so.  I think it is digital now.  Everything is done by computer.  So, I think most of it -- we used to have like big files, paper files and keep images of paper files, but I think by then it was mostly digital.

I don't know if that answers the question.

O1H3ACC2                        Valette - Direct

Q.   Do you know whether a member of the valuation department took notes of the review meeting to be kept in the system and given to legal in memo form?

A.   That I don't know, because I wasn't in the meeting.

Q.   You don't know whether any meeting took place?

A.   I don't know.  I'm sure they talked about it.  You know, if I may, when we value pictures, we talk about it, but it can be very informal.  We're not necessarily in the same country at the same time.  We talk on the phone.  That's how valuation are made.  But, so I can't tell you because I wasn't there.  I don't know how they did it.

Q.   And if you don't know what the criteria are for major valuation, you don't know if the valuation that we're talking about complied with the criteria, isn't that correct?

        MR. ASNER:  Objection.

        THE COURT:  Sustained.

Q.   Well, it is correct that you don't recognize Exhibit 179 that's in evidence, Criteria for Major Valuations, you did not recognize that document?

        MR. ASNER:  Asked and answered.

        THE COURT:  Sustained.

Q.   You don't recall ever having read it?

        MR. ASNER:  Asked and answered.

        THE COURT:  Sustained.

Q.   Can we please see Plaintiff's Exhibit 258 for the Court and

O1H3ACC2                     Valette - Direct

counsel.

This is the e-mail, the cover e-mail that you wrote about sending the valuation to Madam Bersheda.  Do you recall that?

A.   This is an e-mail from my assistant at the time, subject DHL tracking number.

Q.   And you did follow through and send it?

A.   She did send it, my assistant did.  She's -- this one is not from me to her.  It is from her to me.  She's saying here is the tracking number.  Thanks.

Q.   You understood it was sent?

A.   Sorry?

Q.   It was sent?

A.   It was sent, yeah, yeah, I'm sure she did it.

MR. KORNSTEIN:  Move this exhibit into evidence, your Honor.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 258 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.   The jury can see this now.

Let's talk about the Klimt.  You recall that in between 2012 and the spring of 2013, the Klimt was being discussed as a possible transaction with Mr. Bouvier?

A.   I think you are referring to Klimt, the *Wasserschlangen*.

Q.   Yes.   The *Water Serpents II*?

A.   Mr. Bouvier signed a contract to buy it in I think September 2012.   But there were several conditions, etc., etc., so it sort of went up to I think July 2013 when it was finally paid.   But he signs the purchase agreement in September 2012 if I'm not wrong.

Q.   Can we see Plaintiff's Exhibit 13 for the witness, Court and counsel.

          Is this the contract that you were just referring to?

A.   That is correct.   Yeah, 11th of September 2012.

          MR. KORNSTEIN:   Offer it into evidence, your Honor.

          MR. ASNER:   No objection.

          THE COURT:   Admitted.

          MR. KORNSTEIN:   May I publish?

          THE COURT:   You may.

          (Plaintiff's Exhibit 13 received in evidence)

Q.   You can see, Mr. Valette, that the purchase price that Blancaflor and Mr. Bouvier paid was $126 million?

A.   That is correct.

Q.   And do you recall what the commission to Sotheby's was?

A.   So I think that -- sorry.   This is my thought process.

          I think that the net to seller was maybe 98, and there were -- I think the commission for Sotheby's was maybe 10 or 12 percent.

Q.   Does the figure $8.5 million sound right?

A.   That sounds right, yeah.  I'm sure you're right.

Q.   Can the witness be shown Plaintiff's Exhibit 103 for identification.  Witness, Court and counsel.

This is a long document, collection of documents.  Do you recognize it?

A.   Yes, I do.

Q.   Can you tell us what it is?

A.   It is a document dated 24 July 2013.  Private sale transaction.  This is an internal document which states the price, the total purchase price, the sales price, net to seller, and commission and various other information.  And then we moved on to e-mails and that's --

MR. KORNSTEIN:  Offer it into evidence.

MR. ASNER:  No objection.

THE COURT:  Admitted.

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

(Plaintiff's Exhibit 103 received in evidence)

Q.   If we turn to page 2 of the document, Toby.  Is that your signature on the bottom third signing for Sotheby's?

A.   Top, the first signature, yes, that is mine.

MR. ASNER:  Objection to the form of the question.

THE COURT:  The first signature on the bottom portion of the page, is that your answer?

THE WITNESS:  Yes, the one that is now highlighted is mine.

Q.  Go to the next page, please.  On this page, the last substantive line says Sotheby's net commission $8.5 million?

A.  That is correct.

Q.  And to your recollection, was that the commission earned by Sotheby's on this transaction?

A.  If Nisha who is my colleague says so, I'm sure she's right.

Q.  Her e-mail is directed to Dear Bill.  Who is that?

A.  Oh, just to specify, because I hadn't done so, I'm not copied to this e-mail.  I'm just realizing.

Q.  But the document is in evidence.

A.  Yeah, I'm sure it's right, so just to be precise.

Sorry, I'm sorry.

Q.  Dear Bill?

A.  This is Bill Ruprecht, the CEO of the company at the time.

Q.  And he responds, "Private sale form approval" and he writes "Yep," correct?

A.  He writes "yep."

Q.  And on page 28 of this document, can we go to page 28, Toby.  What is this document page?

A.  This is called a compliance checklist for private sale.

Q.  What is that checklist?

A.  That is something that the administrator of the document -- sorry.  The administrator of the department of the sale would

do I think after each private sale, you know, to check that all the documents -- all the relevant documents have been correctly filled.

Q.  And that's standard for all private sales?

A.  I think so, I mean, in various forms and mostly I would think so.  I mean, yeah.  This looks to me like a typical compliance checklist which is signed by Daisy Edelson, who was the business director in New York at the time.  And it is received by Jane Levine who was the chief compliance officer I think at the time.

Q.  There is a space for a specialist signature.  Can you make out what who that signature is?

A.  I'm sorry.  It says Daisy Edelson.

Q.  Her name is printed on the left and then that's her signature on the right?

A.  That is correct.

Q.  Can you turn to page 32, please, Toby.

What does this page refer to?

A.  This is a high value lot questionnaire.

Q.  What is that?

A.  This says "private, privileged, confidential internal Sotheby's document."

So, high value lots, so very important works, I think it's done by a certain value.  Before the sale would be completed, it would be submitted to a committee, which is

O1H3ACC2                    Valette – Direct

called a high value lot committee, which if I remember

correctly comprises of the chief legal officer, the chief

compliance officer, and I mean, a few others.  So that they can

sort of check everything and, you know, give their approval.

Q.  And are the members of the high value lot committee located

in New York?

A.  It is a good question, because sometimes they have trouble

to meet.  They can be located in New York and London.  I think

in this case you have, if you have the chief compliance

officer, that would have been Jane Levine, I think she was on

the committee so she was in New York, yes.

Q.  And John Olsoff?

A.  The chief legal officer was in New York.  I think there was

Lucian Simmons, who was a colleague who was in New York.  I

think he was in New York.  He travels a lot, but I think he was

in New York.  So I think the three of them were in New York,

yes.

Q.  These people on the high value lot committee were involved

in all approvals for private sales of a certain amount?

A.  Yes.  Unless, you know, I'm not always 100 percent sure of

the individual on this committee, but this functions if you

wish.

Q.  And that would be true wherever the private sales were

taking place within the Sotheby's empire?

          MR. ASNER:  Objection.

O1H3ACC2                    Valette - Direct

A.   "Empire," I don't know.

        THE COURT:  Sustained as to form.

Q.   This would be true wherever the transactions occurred for Sotheby's.

A.   Yeah, yeah.  I think it is based on the value of the work and, you know, wherever the transaction takes place.  It would go to the high value lot committee in the end.

Q.   Can we show the witness -- we can take down that exhibit. Can we show Plaintiff's Exhibit 100 for identification to the witness, Court and counsel.

        Take a look at this document, please tell me if you recognize it?

A.   Yes, I do.

Q.   What is it?

A.   It is an e-mail chain between Sotheby's colleagues and I'm cc'd on these e-mails.

        MR. KORNSTEIN:  Offer it into evidence, your Honor.

        MR. ASNER:  No objection.

        THE COURT:  Admitted.

        MR. KORNSTEIN:  May I publish?

        THE COURT:  You may.

        (Plaintiff's Exhibit 100 received in evidence)

Q.   The first e-mail in this chain is -- can we go to the third page, please, is from Bill Ruprecht, the CEO, to Lucian Simmons, Andrea Jungmann -- who is Andrea Jungmann?

A.   She is the managing director of Sotheby's Austria.

Q.   And Antonia Serra?

A.   She was the general counsel for Europe at the time.

Q.   And you received a copy of this e-mail it shows?

A.   I did, yeah, I was cc'd.

Q.   And the substance of the e-mail is "126.  Done."

Does the 126 refer to the sales price?

A.   That is correct.

Q.   That was $126 million that Blancaflor paid?

A.   Correct.

Q.   And "done" means done deal?

A.   Yeah, we had a handshake deal.

Q.   The e-mail on the first page in the middle from Mr. Ruprecht to Lucian Simmons, he writes "Your turn Lucian."

Now, was Mr. Ruprecht involved in this transaction?

A.   Yes, he was.

Q.   How much was he involved?

A.   Well, he's quite involved, yes, he was.  No, he was involved.  I mean, give you a call in July to let me know about the picture.  He was kind of, yeah, he was involved in the transaction.

Q.   And he was based in New York as CEO?

A.   That is correct.

Q.   And I also see a reference to "cottonmouth" on at least some of these e-mails.  Was that a code name for this

O1H3ACC2                              Valette – Direct

transaction?

A.   That is correct.

Q.   Can we see Plaintiff's Exhibit 344 for identification, witness, Court and counsel.

          Do you recognize that document?

A.   Yes, I do.

Q.   What is it?

A.   So this is a chain of e-mails between myself, a colleague, and Yves Bouvier, and Yves Bouvier's assistant.

          MR. KORNSTEIN:  Offer it into evidence, your Honor.

          MR. ASNER:  No objection.

          THE COURT:  Admitted.

          (Plaintiff's Exhibit 344 received in evidence)

          MR. KORNSTEIN:  May I publish?

          THE COURT:  You may.

Q.   In this document, on February 26, 2013, you write to Bouvier, "Here is a sample letter.  Would it be possible for you to mail it back to me signed on Blancaflor letterhead?  Yesterday's meeting went well.  It seems that the Austrian authorities want to reassure themselves about the geographical origin of the buyer and the possibility to apply for loans, free to the buyer to accept or refuse of course."

          The attachment, if you look at page 2, is what you are enclosing, the sample letter.  And you write:  We hereby authorize Sotheby's Austrian subsidiary, Sotheby's, to inform

                         SOUTHERN DISTRICT REPORTERS, P.C.
                                   (212) 805-0300

the Austrian export authorities that subject to the obtaining

of an export license from Austria, the property will be

acquired by a European collector who owns an important

collection of art and regularly loans these works to

exhibitions and museums.

          Who are you referring to?

A.  So, just at the beginning of your sentence, you say that

you wrote.  I didn't write that, by the way.  It was agreed to

by Antonio Serra, the general counsel, on the suggestion of

Andrea Jungmann.  Just to be clear, I agree that was what was

written, but I didn't write it personally, just to be clear.

Q.  You enclosed it though in your e-mail?

A.  Yeah, yeah, absolutely, no, I did.  I agree with you.

          So this was referring to Yves Bouvier.

Q.  Do you understand Yves Bouvier to be a European collector

who owns an important collection of art and regularly loans

those works to exhibitions and museums?

A.  Well, at most his activities Mr. Bouvier was also a

collector as well as a businessman, you know.  Free port owner,

etc.  And one of his big, he was the owner or investor or part

owner of the Pinacothèque de Paris.  Which was a private museum

in Paris at the time.

          Yes, he was a dealer.  But he was also a collector.

And I think what was important at the time for my colleague

Andrea Jungmann was the geographical location of the buyer

which was I think the Austrian authorities were reassured he was somebody European.  Because it would have been worried that the picture could go 20,000 miles away.  And also that it could come back to Austria for potential loans, I think that was key for them.  And that's why we wrote this letter.

MR. KORNSTEIN:  Move to strike the latter part.

THE COURT:  Denied.  Next question.

Q.  Can you name one museum that Mr. Bouvier lent works of art to?

A.  I would think the Pinacothèque de Paris.

Q.  That's a museum or gallery?

A.  No, it was a private museum.  It was an exhibition space.

THE COURT:  One at a time.

Q.  Can you name any other museum that he loaned a work of art to?

A.  I don't know.  He was participating in -- you know, yeah, Pinacothèque is the one that comes to mind.

Q.  Can you name any exhibitions that he loaned works of art to?

A.  Well.  He would organize art fairs, that sort of things, so, you know, in a sense sending works to exhibitions there. And I think as part of his art shipping business, he would organize that sort of things as well.

So, it seemed correct to say that at the time.  And he agreed to it.  We submitted this language to Mr. Bouvier, and

O1H3ACC2                      Valette - Direct

he agreed to sign it.

Q.   Are you saying because Mr. Bouvier agreed to it, that was correct?

A.   No, that's not what I'm saying.  What I'm saying is this is what we wrote.  But Mr. Bouvier was in agreement with that.

Q.   And you didn't write that he was a dealer.

A.   No.  We didn't.

Q.   And on the first page, we see that Mr. Bouvier wrote back, and that was with the signed version of the document?

A.   On the first page, I think you're referring to an e-mail from Mr. Bouvier's employee.

Q.   Employee, yes.

A.   Nadia.  And she sends me back the document signed, saying "please find attached the desired document."  I don't know what she means "I hope it's well received."  If you show me the French, I can tell you.

Q.   Did you think that letter that Bouvier signed and was drafted by Sotheby's was completely honest?

A.   I think it was correct.  And it was yeah, I think it was correct.

Q.   You don't think it was misleading?

A.   I don't think it was misleading.  I think it was correct.

Q.   And do you regard Mr. Bouvier's primary activities as an art dealer?

A.   Mr. Bouvier, I regard him as a businessman who is an art

dealer, yes, and with many, many different activities.

Q. Very well. Can you show the witness, Court and counsel Plaintiff's Exhibit 345.

Do you recall this document?

A. Yes, I do.

Q. What is it?

A. It is an e-mail between Yves Bouvier's employee, myself, copying Yves Bouvier, dated 16 of July 2013, subject Klimt.

MR. KORNSTEIN: Offer it into evidence.

MR. ASNER: No objection.

THE COURT: Admitted.

(Plaintiff's Exhibit 345 received in evidence)

MR. KORNSTEIN: May I publish?

THE COURT: You may.

Q. Attached to this document is what?

A. So here it says -- I'm sorry. Would it be possible to go back to the -- okay. So just so I read it properly. Fine. And then if I may, so it basically, the first, the body of the e-mail is just asking for $126 million as payment and gives the bank details of Sotheby's in Austria. And says you can call the transfer cottonmouth, which was the code of the private sale. And if you show me the rest, I can tell you what it was.

MR. KORNSTEIN: Can you flip through, please, Toby.

A. Sorry. I'm going to have to go back to the beginning just to see what it is.

O1H3ACC2                     Valette – Direct

Yes.  So, yeah, so essentially it is a document that confirms that the condition precedents had been met for the sale to go through.

Q.  Can we show the witness Defendant's Exhibit 198 and to the Court and counsel.

Do you recognize this document?

A.  Yes, I do.

Q.  What is it?

A.  This is a letter written by Antonia Serra, dated 24th of October 2013.

Q.  And you've seen this before?

A.  It does ring a bell, yes.

MR. KORNSTEIN:  Offer it into evidence, your Honor.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Defendant's Exhibit 198 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.  Mr. Valette, you see that there is no addressee indicated on the front of the letter.  Correct?

A.  That is correct.

Q.  And this is a letter on Sotheby's letterhead from, as you said, general counsel for Europe.

A.  That is correct.

Q.  Do you know if there had been an addressee listed and it

was removed?

A.  I've no idea.  I agree with you it is bizarre to have no addressee.  But I have no idea.

Q.  So but, you agree it is bizarre not to have any addressee?

A.  Yeah, normally there is an addressee to a letter.  But, I don't know.  Maybe there was a reason, I have no idea.

Q.  Was the reason because it would have been addressed to Blancaflor or Mr. Bouvier, and that might have --

        MR. ASNER:  Objection, your Honor.

        THE COURT:  Sustained.

Q.  Are you aware of any other Sotheby's letter that you've seen in your many years at Sotheby's that had the space for an addressee, with nothing written on it?

A.  Oh, I can't -- look, what I can agree with you is that normally there should be, if the letter is addressed to someone, there should be an addressee.  But, and I have no idea why there isn't one.

        To your question, you know, am I aware of any other case, I don't know.

Q.  But you admit it's bizarre?

A.  Yeah, yeah, yeah, I agree.

Q.  You knew at this time for the Klimt that Mr. Bouvier was buying on behalf of somebody else?

A.  No, certainly not.

        MR. ASNER:  Objection.

O1H3ACC2                     Valette - Direct

Withdrawn.

THE COURT:  You may answer.

A.  No, absolutely not.

THE COURT:  And that brings us to 11:30, so we will break there.

Ladies and gentlemen, you know the drill.  Don't discuss the case, don't do any research about the case. Continue to keep an open mind and be ready at or just before noon.  We'll pick up there.  And please enjoy your break.

(Jury excused)

THE COURT:  Mr. Valette, you may step down, subject to the same instructions as yesterday.

Mr. Kornstein, any estimate on how much, what percentage you have remaining?

MR. KORNSTEIN:  Less than an inch.

THE COURT:  Can you translate that?

MR. KORNSTEIN:  Less than an hour.

THE COURT:  Okay.  Anything to discuss from plaintiffs?

I'll take that as a no.  Anything from defense?

MR. ASNER:  No, your Honor.

THE COURT:  Folks in the back, my deputy tells me she's had to throw out a fair bit of garbage each day of trial. This isn't Madison Square Garden.  If you brought any garbage into the courtroom, take it with you so she doesn't have to do

O1H3ACC2                    Valette – Direct

that.  That's not part of her job description.

I'll see you at noon.

(Recess)

(Continued on next page)

A F T E R N O O N   S E S S I O N

12:00 P.M.

THE COURT:  You may be seated.  We'll get the jury.

MR. KORNSTEIN:  Judge, before the jury comes in, before the break you asked how long I had and I said an hour. Be on the safe side, I'll say an hour and a half.

THE COURT:  All right.  I wasn't going to hold you to it, but just for my planning purposes.  Thank you.

(Jury present)

THE COURT:  You may be seated.  Welcome back.  I hope you enjoyed your break.

We will continue with Mr. Valette's direct testimony.

Mr. Valette, you remain under oath.  And I remind you both to try to avoid talking over one another.

And with that, you may proceed, Mr. Kornstein.

MR. KORNSTEIN:  Thank you.

BY MR. KORNSTEIN:

Q.  Mr. Valette, in all the years that you worked with Mr. Bouvier, did you ever ask him if he resold paintings to Mr. Rybolovlev?

A.  No, I haven't.

Q.  And in all the years you worked with Mr. Bouvier, did you ever ask him whether he was an agent for Mr. Rybolovlev or his company?

A.  It was asked of him, and he replied that he was -- not

Mr. Rybolovlev, sorry.  What I meant was Mr. Bouvier --

THE COURT:  Hang on.  Hang on.

Just answer the question.  Did you ever ask -- did you ever ask Mr. Bouvier whether he was an agent for Mr. Rybolovlev?

THE WITNESS:  No, the answer is no.

Q.  And did you ever ask Mr. Bouvier if he was an agent for Mr. Rybolovlev's companies, either Xitrans or Accent Delight?

A.  No.

Q.  Did it ever occur to you that that might be a question to ask?

A.  Mr. Bouvier was always clear that he was buying, that he was the buyer, that Blancaflor was buying the works, and that he was not the agent for anyone.  So he was always very clear.

Q.  You never asked him about Mr. Rybolovlev or his companies?

A.  I never asked him about Mr. Rybolovlev, no.

Q.  For the Klimt *Water Serpents II*, did there come a time when there was a viewing of the painting with Mr. Rybolovlev and Mr. Bouvier?

A.  That is correct.  There was a viewing of the picture, yes.

Q.  And that was in the summer of 2012?

A.  I believe that was in early September 2012.

Q.  And where did that take place, in Vienna?

A.  It took place -- sorry.  It took place in Vienna, yes.  In a warehouse outside of Vienna, to be precise.

Q.   And did you go there with Mr. Bouvier?

A.   I don't think so.  The way I remind -- I remember it, I think I was at the -- at this place which was like a shipper's, you know, storage facility outside of Vienna.  The way I remember it, Mr. Bouvier came in after I was there, and I think Mr. Rybolovlev came in after Mr. Bouvier.

Q.   And was Mr. Sazonov present?

A.   I don't -- I don't know -- I didn't know who was Mr. Sazonov before this court case.  I have no idea what he looks like.

Q.   Was anyone else present besides Mr. Bouvier, yourself, and Mr. Rybolovlev?

A.   So Mr.  -- I remember opening the door to Mr. Rybolovlev. I remember him coming in the room.  I think there was one or two bodyguards.  I couldn't be entirely sure.  I think I remember at least one bodyguard because I think I stayed outside.  And there was one guy outside which had arrived with Mr. Rybolovlev.  And he, in my memory, looked like bodyguard.

Q.   All right.  Was there anybody else?

A.   I don't think there was, no.  I don't remember anybody else.

Q.   You don't speak Russian; correct?

A.   I don't speak Russian, no.

Q.   And Mr. Bouvier doesn't speak Russian?

A.   That I don't know.  I don't think so, but I don't --

O1HVACC3                          Valette - Direct

Q.   Was there somebody who was translating for Mr. Rybolovlev?

A.   So I was not party to any conversation with Mr. Rybolovlev or Mr. Rybolovlev and Bouvier, so I don't know.

Q.   How long did this viewing last?

A.   Maybe 20 minutes.

Q.   And during that, did anyone say anything?

A.   Well, the way I remember it, I think Mr. Bouvier and Mr. Rybolovlev went to see the picture.  So it was like a conference room, if you wish, you know, in a -- in a nondescript building.

I remember the painting being -- I think it was on an easel; that there was a -- I think there was natural light in the back with, you know, more windows.  And I think Mr. Bouvier and Mr. Rybolovlev were, you know, looking at it on one hand, and I was either at the door or outside.  I did not -- I don't remember hearing any conversation or whatsoever.

Q.   Well, were you introduced to Mr. Rybolovlev?

A.   I don't know.  I don't think so, no.  No, I wasn't actually.  I remember seeing him come in and going to see Mr. Bouvier.

Q.   How did you know it was Mr. Rybolovlev?

A.   Well, because I knew at this stage what he looked like.

Q.   You knew for the Klimt viewing what he looked like.

A.   Yes.

Q.   That was the first time you met him in person?

A.   The first time I saw him, yes.

Q.   And how did you know what he looked like?

A.   Well, you know, I mean, I was his KCM by then, so I don't know as part of the KCM or -- at the time I think he was already the owner of Monaco Football Club, which is a football club, very well-known football club in France.  And so I saw him, but I didn't talk to him at this location.

Q.   And you testified earlier that you had done no research of any kind about Mr. Rybolovlev, isn't that true?

A.   No, no research in particular, no.

Q.   Now, what was your function at this viewing?

A.   Well, I arranged for Mr. Bouvier to come and see the picture.  I think Mr. Peretti came in as well, maybe before Mr. Bouvier.  I don't remember seeing Mr. Bouvier and Mr. Peretti together in the room.  But my role was basically to try and sell this picture to Mr. Bouvier.

Q.   And didn't you speak at this meeting and say how beautiful the painting was?

A.   I -- I think I spoke to Mr. Bouvier, of course.  But that would have been before Mr. Rybolovlev arrived.  I -- I really didn't speak to Mr. Rybolovlev at the time.

Q.   At the meeting, didn't you say -- you say you spoke to Mr. Bouvier.  What did you speak to him about?

A.   You know what, we speak in front of pictures, so, you know, we would talk about the painting.  But Mr. Rybolovlev wasn't

there.  I mean, I -- I really didn't have a conversation with Mr. Bouvier and Mr. Rybolovlev, that I am really sure about.

Q.  Did you talk about how beautiful the painting was?

A.  That is the sort of thing I would say to Mr. Bouvier, sure. I mean, you know, we would look at the picture and, to be fair, the picture speaks for itself.  I mean, it's a magnificent picture, extraordinary.  So there's not much to say when you're in front of it.

Q.  But I'm asking what you said.  You said you said it was a beautiful picture?

A.  No, I -- look, I really don't remember my conversation with Mr. Bouvier, but that was along these lines, I suppose.

Q.  Isn't it true that, in fact, you did have a conversation with Mr. Bouvier and Mr. Rybolovlev in which you were saying how wonderful the painting is, that it's the best Klimt; isn't that true?

A.  I did not have a conversation with Mr. Rybolovlev and Mr. Bouvier together.  It simply didn't happen.

Q.  And your function there was to vouch for the painting? What were you doing there?

A.  Not vouch for the painter.  You know, we were arranging for Mr. Bouvier to see the painting.  I think he had said something like he was coming with a friend or he had a friend that was coming or something like this.  And the -- what we were doing was, you know, arranging for this viewing essentially.

Q.   Now, by that time, the summer of 2012, you already knew that Mr. Bouvier and Mr. Rybolovlev had some sort of a business arrangement?

A.   Yeah, that they had -- that Mr. Bouvier was a client of -- sorry, that Mr. Rybolovlev was one of the clients of Mr. Bouvier.  I didn't know it any specific arrangement that they had or didn't have together, just to be clear.

Q.   You knew that Mr. Rybolovlev was a potential buyer of the painting?

A.   Well, that he was a potential client of Mr. Bouvier.

Q.   And you knew that Mr. Rybolovlev was going to that viewing to see whether he would be interested in buying that painting; correct?

A.   Well, Mr. Bouvier would say something like a friend of mine would come and see it.  And sure, when Mr. Rybolovlev came, had a look at the picture.  I don't know what they talked about. Maybe Mr. Bouvier was trying to sell him the picture, sort of, you know, preselling the picture before he bought it from us, possibility.  But what I was focusing on was selling this picture to Mr. Bouvier.

Q.   And to do that, you were talking about how good the painting was?

A.   Look, of course.  I mean, when we sell pictures, we tell, you know, the buyer that they're good pictures, sure.  I don't remember a specific conversation, but I would agree with you

O1HVACC3                       Valette - Direct

that, of course, I would definitely tell Mr. Bouvier that this is probably the best Klimt that he could ever buy.  I think it's -- you know, it's up there in terms of quality.  It's a wonderful picture.

Q.  Did Mr. Bouvier insist on unusual secrecy or confidentiality for the viewing?

A.  He always insisted on confidentiality.  So that not unusual, I would say.  But it was consistent with his usual request.

Q.  Wasn't Mr. Bouvier's concern for confidentiality unusual compared to other clients of Sotheby's?

A.  No, I would say that it was on par with generally dealers who play at this level.  You know, they all want confidentiality; they don't want their deals to be, you know, out in the public.

Q.  And when I'm talking about confidentiality, I'm talking about at the viewing that there could not be any Sotheby's employees with the Sotheby's logo.

A.  Well, at the Klimt, I don't remember.  But that would be the typical request that Mr. Bouvier would say, that he didn't want, you know, people with Sotheby's logo, you know, around his deals.

Q.  And that's not a typical request of Sotheby's clients to say they don't want people with Sotheby's logos at a viewing, isn't that true?

O1HVACC3                        Valette - Direct

A.  Well, I would say dealers would rather maintain complete confidentiality.  And if there are people with Sotheby's logo, maybe that would, you know, develop a source or maybe some people around there would know that Sotheby's was handling a picture.  So in that sense, it's -- I would say it's on par with the deals that we do with big dealers want to maintain confidentiality.

Q.  So there was a concern that having knowledge that Sotheby's was involved would somehow violate confidentiality?

A.  I think the dealers, and Mr. Bouvier included, you know, always wanted to maintain their deals confidential.  And so, you know, they would ask that sort of things.  So that's why I think it was more or less on par with other big deals that we've done with other dealers.

Q.  Before lunch — or what we call lunch — we talked about whether Bill Ruprecht was involved in this transaction.  Was Mr. Vinciguerra also involved?

A.  I think Mr. Vinciguerra was eventually involved, yes.  I mean, Mr. Ruprecht was definitely involved at the beginning; but Mr. Vinciguerra was involved, yes, absolutely.  But a bit later on, I would say, in the deal, which was very complex and took much longer to complete than we hoped.  And so Mr. Vinciguerra was involved in this complex deal.

Q.  And Mr. Vinciguerra was the chief operating officer of Sotheby's?

O1HVACC3                           Valette - Direct

A.   Yes, that is correct.

Q.   And he was located in New York, place there?

A.   That is correct.

Q.   Do you recall having any communications with Andrea Jungmann about the viewing?

A.   Sure, yes, I would.  I would have communication with her.

MR. KORNSTEIN:  Can you show the witness, please, Exhibit 140 for identification.

MR. ASNER:  PX or DX?

MR. KORNSTEIN:  Plaintiff's Exhibit 140.

Q.   Do you recognize that document?

A.   Yes, that would be a chain of emails between -- between colleagues and myself with regard to this viewing.

MR. KORNSTEIN:  Offer into evidence.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 140 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.   Going to the first email on the chain, which is on the last page, that's an email from Andrea to yourself, Daisy Edelson, Simon Shaw, Lucian Simmons.  Actually, the first email is further down, just says:  Confirmed for the 3rd on my, it's cut off.  But you write -- Andrea writes:  Could you please tell me when you plan to arrive so that I can arrange the meeting.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Do you see that?

A.   Yes, that's what she wrote.

Q.   And then a little later in the chain, she writes to you again on August 27th at 1:28:  It all depends on Sam now, I guess.  The work is very likely in the storage of a shipping company.  As soon as I have the time from Sam and with whom he comes, we can schedule the rest.  We will have access that day early afternoon onwards.

So you were arriving with other people?

A.   No, I think she was -- she meant, you know, she was probably talking about the clients, you know, the client who was supposed to come and who was supposed to come.  I mean there was Jean-Marc Peretti, there was Yves Bouvier, there was Yves Bouvier's friend.  So, you know, I think that's what she meant.

Q.   All right.  And then you write back, you say:  Hi, Andrea.  Do you think it's okay if I tell 3 p.m. at the warehouse to the adviser.  Do you see that?

A.   Yes.

Q.   Who's the adviser?

A.   Hold on.  Let me just have a look.

I mean, the way I look -- the adviser would have been Jean-Marc Peretti.

Q.   And what did Jean-Marc Peretti have to do with this transaction?

A.  Peretti was advising for Mr. Bouvier and negotiating for him.  He's actually the one who negotiated the deal with Bill Ruprecht, Jean-Marc.

Q.  Okay.  And then in the two sentences down:  Would you have the address of the warehouse?  I should know later today/tomorrow if the principal is coming.

Who was the principal?

A.  The principal would have been Yves Bouvier, yeah.

Q.  You refer to him as the principal?

A.  Well, in this case I would, yes.  I mean, sometimes -- I mean, not very often, but sometimes I would say, you know, Peretti was the adviser and Bouvier was the -- Bouvier was the buyer, so --

Q.  Sometimes you called him a client?

A.  Yes.

Q.  Principal usually has an agent.  Did that occur to you also?

A.  Not really.  I mean, it's -- it's the -- you know, sometimes we use different words to say the same thing.

Q.  Do you recall that the premises had to be cleared before the principal got there?

A.  I think that would have been a request from Mr. Bouvier, yes.  I mean, as part of his deals generally, he wanted -- you know, you do want to have a lot of people in the rooms when he would come and see pictures.  So yes, that would make sense.

O1HVACC3                    Valette - Direct

Q.   Do you know why?

A.   Well, I think he -- he didn't want people to -- I mean, look, if I may, he was coming with this person who was his friend, you know.  The way I see it is that he didn't want to reveal his source to his friend if he was trying to sell him the picture.  And he didn't want -- he was really concerned about confidentiality.  So the more people you have in a place like this, you know, the less confidential it is.  So it would make sense for him to ask for that.

Q.   Did there come a time when an article was published in the Austrian press about the transaction?

A.   Yes, I remember that.

Q.   What do you remember about it?

A.   Well, I think there was -- so this sale was confidential. Seller had signed a confidentiality agreement; the buyer had signed a confidentiality agreement.  And this article which comes out, which sort of basically puts it out there with -- you know, I remember I think there was price of the picture in the article or there was a price.  I think it gives the name of the seller, you know, all this information which was supposed to remain confidential.  I was thinking it was not a good day, you know, when you have something like this happen.

Q.   And the article said what the price was that Mr. Bouvier paid?

A.   Well, I don't know if -- I don't even know if the price was

correct, but there was definitely a price, I remember, in this article. And I think on top of the price, it just gave the name of the seller and the whole story, you know, just out there.

Q. And wasn't Mr. Bouvier very furious when the article came out?

A. He was always furious when article came out about his deals. So, you know, there was another article, I think about the Leonardo, which came out at some point. He was not happy.

Q. Did Mr. Bouvier frequently get furious?

A. No, no, no. I mean, I can't say he would get furious frequently, but, you know, he was an exacting client.

Q. Well, he became a friend of yours, didn't he?

A. Not a friend, but he was a client with whom I had a good relationship, yes, of course. I wouldn't say a friend, but, you know, we were friendly.

Q. You mentioned about the article. In fact, didn't you write an email which you said he was apoplectic?

A. So yes, yeah, I think I see what you're referring to. That could either refer to Yves Bouvier or Jean-Marc Peretti, but yes.

        MR. KORNSTEIN: Can we show the witness Exhibit 196, Plaintiff's Exhibit 196. The witness, Court, and counsel.

A. I mean apoplectic --

        THE COURT: There's no question.

O1HVACC3                      Valette - Direct

THE WITNESS:  I'm so sorry.

Q.  Do you recognize this document?

A.  Yes, I do.

Q.  What is it?

A.  It's an email exchange between colleagues, including myself, and then between Bruno Vinciguerra and myself.

MR. KORNSTEIN:  Offer it into evidence, your Honor.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 196 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.  The first email is from Andrea Jungmann to everybody on that email:  Matthew Weigman, Lauren Gioia, Lucian Simmons, Antonia Serra, and yourself.  The subject is cottonmouth.  That is the code word for this transaction with Klimt?

A.  That is correct.

Q.  She's enclosing the article that appeared in the press.

A.  Yes, I think she's giving the link with the article in the newspaper called *The Standard*.

Q.  And she has a translation?

A.  Yes.

Q.  And you write:  This is a disaster.  The client is apoplectic and I am at a loss for words.  Correct?

A.  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1HVACC3                        Valette - Direct

Q.  You say "apoplectic."

A.  I did say that, yes.

Q.  How did -- well, first, who was the client that you were referring to?

A.  So in this case, that's why I'm saying sometimes -- I wonder -- I don't know if I called Jean-Marc Peretti or if I called Bouvier in this case.  I may have called Jean-Marc Peretti, who was, you know, a negotiator and, you know, close to Mr. Bouvier.  And apoplectic is something Jean-Marc Peretti could very well be because he was kind of always -- you know, that's his -- Mr. Bouvier is generally much colder.

So maybe I simply had called Mr. Peretti to inform him, and he was apoplectic, which, you know, Mr. Bouvier couldn't have been happy, I'm not trying to minimize that.  But I'm just saying that apoplectic, I'm wonder if that doesn't refer more to Peretti than to Bouvier because of their character.

Q.  Mr. Valette, who did you call, Mr. Peretti or Mr. Bouvier when this article came out?

A.  I -- I'm not sure.  I called one of them for sure.  But I'm not sure if I called Mr. Peretti or Mr. Bouvier.

Q.  And the person you called was apoplectic, do you mean he was screaming?

A.  He was not happy, yeah.

Q.  And you don't remember who that was?

O1HVACC3                        Valette - Direct

A.   I'm sorry, it was eleven years ago.  I'm not sure.  But the two of them are in -- I'm not denying the fact that they were apoplectic at all.  I'm just saying that I can't remember exactly if I was talking to one or the other.  You see, in the email after that -- sorry.  Can I explain?

Q.   Well, in the email from Mr. Vinciguerra, the chief operating officer, he says to you:  Did you send the article to JM?  That refers to --

A.   Jean-Marc Peretti.

THE COURT:  One at a time, gentlemen.

Q.   And you respond:  Yes, I am having it translated into French.

You also sent it to Mr. Bouvier, didn't you?

A.   I'm not sure I sent it to Mr. Bouvier or just Mr. Peretti.  But the result was the same.  You know, they were not happy.

Q.   Both were apoplectic?

A.   I think both were -- you know, Mr. -- I think Mr. Peretti was apoplectic and Mr. Bouvier couldn't have been happy.  I'm just -- essentially, I agree with you, but I'm not entirely sure to whom I spoke.

Q.   Do you recall you had mentioned an article about the da Vinci painting coming out in the press?

A.   Yes.

Q.   And that was in *The New York Times*?

A.   Yes, there was a *New York Times* article about it, yes.

O1HVACC3                    Valette - Direct

Q.  And that was in March of 2014?

A.  I can't remember the date, but if you say so, I'm sure you're right.

Q.  And the article talked about the price for that painting that was paid by the buyer?

A.  Yes, I think if I remember -- it's a fairly long article. And that was infuriating because this deal was supposed to be confidential as well.  And here it is, you know, people from the art market commenting on it, yeah.

Q.  You say it was infuriating.  Was it infuriating in reality because Mr. Rybolovlev could then see what the article was saying the price paid by Bouvier was?

          MR. ASNER:  Objection.

          THE COURT:  Sustained.

Q.  Did Mr. Bouvier say he was concerned about the price that he paid was being reflected in the article?

A.  I really don't remember.

Q.  Well, isn't it true if the prices reported in *The New York Times*, anybody could read that and react to it?

A.  That's correct.

Q.  Including Mr. Rybolovlev?

A.  If he reads *The New York Times*, yes.

Q.  Or if it's brought to his attention?

A.  Of course.  Anybody reading *The New York Times* would read that, including Mr. Rybolovlev, of course.

O1HVACC3                        Valette - Direct

Q.   Let's talk about the *Tête*, the Modigliani Head sculpture.
That was sold to Mr. Bouvier's company for 31.5 million euros?

A.   That is correct.  To Blancaflor, yes, 31.5 million euros,
in September 2012.

        MR. KORNSTEIN:  Okay.  And can we show the witness
Plaintiff's Exhibit 14 for identification, witness, Court, and
counsel.

Q.   Do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   It's a contract between Sotheby's UK with the address in
London, and Blancaflor Investments regarding the Modigliani
*Tête*.

        MR. KORNSTEIN:  Move it into evidence, your Honor.

        MR. ASNER:  No objection.

        THE COURT:  Admitted.

        (Plaintiff's Exhibit 14 received in evidence)

        MR. KORNSTEIN:  May I publish?

        THE COURT:  You may.

Q.   You see in paragraph 1 it says the price is 31,500,000
euros; correct?

A.   That is correct.

Q.   Did you sign this on behalf of Sotheby's?  Look on page 2.

A.   I think I did.  If you show me, I can confirm.  Yes, that's
my -- yeah, that's me.

O1HVACC3                       Valette – Direct

Q.   That's your signature?

A.   Yup.  That's me.

Q.   Which letters are there?

A.   Sorry.

Q.   All right.  And that was September 25th, 2012; correct?

A.   Yeah, that's correct, sorry.  I didn't put the date myself as a mistake.

Q.   And did Sotheby's prepare a packet, the private sale treaty packet that included some of the information like it did for the Klimt?

A.   Yes, I think we would have preferred something like this, yes, for almost every transaction.

         MR. KORNSTEIN:  Can we show Plaintiff's Exhibit 114 to the witness and counsel and the Court.  And can we flip through the pages so the witness can see what it is.

Q.   Do you recognize this document?

A.   Yes.  I mean, some emails I'm not on, but yes, these are documents from Sotheby's.

         MR. KORNSTEIN:  Offer it into evidence.

         MR. ASNER:  No objection.

         THE COURT:  Admitted.

         (Plaintiff's Exhibit 114 received in evidence)

         MR. KORNSTEIN:  May I publish?

         THE COURT:  You may.

Q.   This is the deal packet that was created by Sotheby's in

O1HVACC3                    Valette - Direct

connection with the *Tête* sale?

A.   Well, just to be clear, you know, when you say do we send information to Mr. Bouvier, yes, we do, of course.  But this information is internal, just what we've seen.  So this would not have been sent to Mr. Bouvier.  He would have received the cataloging, you know, list of the other Tête, the literature.

But what we just saw, which was if you show me again, I can tell you exactly what it was, we would have sent him.  But this says private sale treaty.  What I have in front of me is internal, so that we would not send to Mr. Bouvier, just to be clear.

Q.   Okay.  And if you turn to the third page, that has a few emails on it.

A.   I'm not on these emails, but these are emails between some colleagues of mine regarding the *Tête*, yes.

Q.   And in the one in the middle from Holli Chandler to Iain Fleming — spelled differently than the spy author — it shows the purchase price as 31,500,000 euros?

A.   That is correct.

Q.   And the commission for Sotheby's is 1,500,000 euros?

A.   That is correct.

Q.   And was Mr. Ruprecht involved in approving this transaction as well?

A.   So yes, you're right.  In approving the transaction, he was involved not in the deal, but in the approval.  Ultimately, I

think, it was below the threshold for commissions, so Nisha had to ask him, you know, about the commission.  So that's what he had to approve.

Q.  But if you look at the one, two, three, four, fifth page, you see there is an email from Bill Ruprecht at the bottom responding to an email from Nisha Amin about the transaction?

A.  Yes, that is correct.

Q.  And on the next page --

MR. KORNSTEIN:  Can we show the next page, please.

Q.  There was another email to Mr. Ruprecht and he responded; correct?

A.  He did, yes.

Q.  And then going back to the page before, Mr. Ruprecht writes:  "Yep" in that email at the top.

A.  Yes, I think he's -- Nisha is asking him if she can proceed with the contract, and he said "yep."

Q.  Okay.  All right.  Now, isn't it true that in connection with the events leading up to the sale, you had in your files an estimate of the value of this particular sculpture at eight million euros?

A.  I think I see which document you're referring to.

Q.  Well, first I'm asking whether you recall it from 2010, a valuation estimate of eight million euros for this particular sculpture?

A.  So over the course of preparing for this hearing, I was

O1HVACC3                    Valette - Direct

made aware of this document, yes.

Q.  And it was a document in Sotheby's files?

A.  It was in Sotheby's files, yes, apparently in a paper file, yes.  It was a 2010 valuation, I think.

Q.  Correct.

A.  Well, I'm not sure.  If we look at this document, it would be interesting to know whether there's a date on it.  I mean, it would be interesting to see.  Because, you know, values for these things, they evolve dramatically over the years.  So it would be good to see from this particular document where it says eight million, there's a date.  Because it could be also well earlier than that.

Q.  And in what kind of a file was this document?

A.  That probably would have been some sort of paper file, you know, like in a plastic -- plastic file.

Q.  And it was a file on Modigliani?

A.  I think it was a file on this *Tête*.

Q.  Okay.

        MR. KORNSTEIN:  Can we show the witness Plaintiff's Exhibit 185 for identification, Court and counsel.  And show the second page also.

Q.  Do you recall this document?

A.  Yeah, that looks like one of my doodles.

Q.  Okay.  And can you show --

        MR. KORNSTEIN:  Well, first, offer it into evidence,

O1HVACC3                          Valette - Direct

your Honor.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 185 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

MR. KORNSTEIN:  Can you, Toby, turn to the page that has the figure of the *Tête* with an $8 million estimate, fair market value.  Flip through.  Yes.

Q.  And you see there it says fair market value, eight million euros.  Is that what you were referring to?

A.  That's the document I remember.  But you see there's no date on this document, as far as I know.  So that could be from any time.  And we value this piece for a long time, so I think that was a -- you know, obviously much older than when we sold the *Tête*.  Also, the photographs look like it was, you know, in the old collection at the time.  I think that's my take on it is, that this was an old document, not contemporaneous to the sale of the *Tête* that we did.

Q.  Look on the first page.

MR. KORNSTEIN:  Can you go back to the first page please, Toby.

Q.  You mentioned there's some doodling there from yourself?

A.  Yes.  If we can go to the French.

Q.  There is a binder that has this document.  Does your

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1HVACC3                    Valette - Direct

handwriting on the first page give any indication of the date?

A.   Yes.  It says -- I think if you go to the French, it says on top there's a -- it says there's a date.

MR. ASNER:  Go to the French in the exhibit.

A.   Which is not linked to the second document, by the way.  So if you go to the French with the -- oh, yeah, there you go.

So here you see on the top of this document it says "290814."  And it says below, contenders property from private collection.  So this, I think, refers to the time when we sold -- the second time we sold the *Tête* in 2014, because the date says 290814.  The document you showed me before was probably in the same file, but a much older one, the one which has no date on it, I think.

Q.   Can you look at page 5 of this document.

MR. KORNSTEIN:  Is this page 5?  And what about on page 1?

Q.   Now, you see some handwriting in the right-hand column on page 1?

A.   Yes.  Well, there's no -- yeah, what I'm looking at is a translation which is not very clear to me.

Q.   Okay.  So you cannot place in time when this estimate of fair market value of eight million euros was made?

A.   I cannot.  But it would have to be before 2010, because in 2010, Christie's sold a sculpture for, you know, estimated four to six million and they sold it for 40-something, so ten times.

So by then, the price would have been higher.  So I think it's an older one.  Maybe it's from, you know, much -- much before. I mean, I think we've been following this piece for a long time, so, you know, you would have very different values in this file, I would think.

MR. KORNSTEIN:  Can we show the witness exhibit Plaintiff's Exhibit 74 for identification, the Court and counsel.

Q.  Do you recognize this document?

A.  Yes, I do.

Q.  What is it?

A.  This is a series of email between myself and Yves Bouvier with a copy to Jean-Marc Peretti.

MR. KORNSTEIN:  Move it into evidence, your Honor.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 74 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

MR. KORNSTEIN:  Toby, can you turn to the English language version.

Q.  The email at the bottom is an email that you wrote to Mr. Valette -- Mr. Bouvier?

A.  Yes, that's correct.

Q.  And Mr. Bouvier responded:  Please also mention the list of

O1HVACC3                        Valette - Direct

Modi's — meaning Modigliani's heads — the one that was sold by Christie's.  Do you see that?

A.  I'm just reading the email, if I may.

Yes.  So yeah, okay.  So I've read this one.  If I may see the answer.

Q.  You wrote that answer; correct?  He wrote that answer to you?

MR. ASNER:  Objection.

(Indiscernible crosstalk)

THE COURT:  Hold on.  Hold on.

Can we call out the answer, please.  Thank you.

A.  Yes, it says:  Please also mention on the list of Modi's heads the one that was sold by Christie's.  Because this list, if I remember correctly, that I sent him with the email was essentially taken from the Ceroni, which was the authoritative books on Modigliani and also Modigliani sculptures.

And the one that Christie's sold, which I just mentioned back in 2010, either was not in the Ceroni or had been misphotographed in the Ceroni.  So I think he was referring to that.  So I sent him a new list, including the one at Christie's, which is perfectly authentic.  So there's no reason obviously not to put it, and the price that it achieved, which was 40 or 43 million euros at the time.

MR. KORNSTEIN:  Would you turn to page 18 of the document, Toby.

Q.  And is that top figure in the right hand underneath it what you were referring to?

A.  Yes.  So this is where it gets a bit confusing.  I think this is the image that is in the Ceroni.  But the Christie's actual one, the image was miss -- Ceroni made a mistake, basically.  But my commentary is referring to the one sold at Christie's.  It shows the image is not exactly that one.  I don't know if I'm clear.  There's a mistake in the Ceroni about this one, I think.

Q.  Now, the email that started this chain, the one you wrote on Monday, June 25th, 2012 at 7:27, had Mr. Bouvier requested that email from you?

A.  No, I sent him an email to let him know that this sculpture was going to become available for an acquisition.

Q.  Did it occur to you that he was going to use this to send to someone else?

A.  It was a possibility.  The list of works that I sent is completely accurate.  And you know, what I say in my email I did believe in and I still do.  So it was a possibility that it would send it on, but, you know, as long as I -- as long as it's not truncated, then it's fine.

Q.  He asked you to add about the Christie's sale.  Did that mean to you that he was going to send that on to a potential buyer?

A.  Not specifically; just that the document was not entirely

O1HVACC3                       Valette - Direct

accurate, the one I had sent him, the first one.  And then the second one sort of would make more sense because the Christie's sale was an important one.

MR. KORNSTEIN:  Can we show the witness, please, Exhibit 203, Court and counsel.

Q.  Do you recall this email?  Do you recognize this document?

A.  Yes, I do.  It's -- yeah, it's the -- I think it's the -- yeah.

Q.  That's between you and Mr. Bouvier?

A.  Sorry, it's a -- it's an email between myself, Mr. Bouvier, and a copy to Jean-Marc Peretti, subject:  "Modigliani."

MR. KORNSTEIN:  Okay.  And can we introduce this into evidence, your Honor?

MR. ASNER:  No objection.

THE COURT:  For the record, it's Plaintiff's Exhibit 203.  Admitted.

(Plaintiff's Exhibit 203 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.  All right.  Now, this document starts with the email that we looked at before from June 25th at 7:27, your description of the *Tête*, right?

A.  Yes, that's correct.  It's an email that I wrote to Mr. Bouvier talking about the *Tête* before -- I think it was before we had it formally for sale.

Q.  And you send a cc to Mr. Peretti?

A.  That is correct.

Q.  And Mr. Bouvier responds:  Please send me the document comparing the heads as a normal file so that I can include the translations.  Correct?

A.  Yes.  Correct.  Yes, that's what he wrote.

Q.  Did you understand that the translations were going to be into Russian?

A.  No, I didn't.

Q.  Did Mr. Bouvier say why he wanted translations?

A.  No, he didn't.

Q.  Did he say why he was going to include the translations?

A.  No, he didn't.

Q.  Did it occur to you to ask?

A.  I didn't ask.

Q.  And did you send him the document comparing the heads in the normal file?

A.  What he meant by normal file was probably Word, so I don't know if I did.  I mean, you would probably see the chain of emails if I did.  If he's asking, you know, in a Word document, no problem for me to send him.

Q.  And if you sent it in a Word document, he could make changes or additions or subtractions in that document; correct?

A.  Yes, he could.

Q.  Did you ever see what he did with the document you sent

O1HVACC3                          Valette - Direct

him?

A.  No, I didn't.

Q.  When you write to Mr. Bouvier in this email -- let me move on.

        MR. KORNSTEIN:  Let's look at Exhibit 186.

        MR. ASNER:  PX or DX?

        MR. KORNSTEIN:  Plaintiff's Exhibit 186.

        Can we see the English, please.

Q.  Do you recall this email?

A.  Yes, I do.

        MR. KORNSTEIN:  And this is already in evidence, your Honor.

Q.  This is an email from yourself to Mr. Bouvier?

A.  That is correct.

Q.  And this one you sign with your formal signature block at the bottom?

A.  That is correct.

Q.  That was unlike the previous emails we saw about the *Tête*; isn't that correct?

A.  I'm sure you're right.  I don't -- I don't remember, but, yes, in this one you have my title.

Q.  And did Mr. Bouvier ask you to include your full signature block?

A.  That I don't remember.

Q.  Did he sometimes ask you to write formal emails?

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

O1HVACC3                    Valette - Direct

A.  Yes, he did.

Q.  And when he asked you to write a formal email, you would include your signature block?

A.  Yeah, I would think generally, yes, that would make sense.

Q.  And when we say "formal," in French there's the difference between using tu or tu twaye and vous, vous being formal to tu twaye being much more informal and friendly?

A.  Yes, in French, yes, you're right.  And also, you know Monsieur, when you say shall Monsieur, you know you're being formal vous.  Or if you say first name and to you.

Q.  Okay.  Now, in this email to Mr. Bouvier on July 24th, which was sometime after the first set of emails, you again are talking about the sculpture.  You say:  It's absolutely extraordinary.  It's for sure the most beautiful sculpture of the artist in private hands and I do not know any superior piece in public collection.  You go on to compliment it.  You call it an iconic subject, a perfect and documented provenance and excellent state of preservation of very high rarity.

        Correct so far?

A.  Yes, that's correct.  That's what I wrote.

Q.  And then in the next paragraph, in the middle, you distinguish it from some other pieces and you say:  The Head is a unique sculpture carved from stone by Modigliani.  It is extremely difficult to set a price on such a masterpiece. Taking into account the scarcity of works of this caliber

available on the market, see the price of 43 million euros obtained in 2010 for an inferior piece, the impossibility of finding a superior work by Modigliani, and the very high current demand for the greatest masterpieces of modern sculpture, this is a piece that should be worth between 70 and 90 million euros, perhaps even more.  I would love to discuss this further in advance when the time comes.

Recall that?

A.   Yes, I do.

Q.   And that was sent on Tuesday, July 24th, 2012 at 20 after 5 in the afternoon, right?

A.   Correct.

Q.   Okay.  Do you recall sending another email less than -- well, less than 12 hours later, possibly 12 hours, on September 25th -- July 25th at 8:18 a.m.?

A.   I recall sending another email.  I don't remember the time exactly, but yes, I do.

Q.   And that was the next day.

A.   That's correct.

MR. KORNSTEIN:  Show the witness Plaintiff's Exhibit 187, which is also in evidence already.  And you can show the jury as well.

Q.   So this is an email you sent at 3:18 in the morning, which was less than 12 hours after you sent Exhibit 186, where you were praising the *Tête* and estimated value of between 70 and 90

O1HVACC3                    Valette – Direct

million euros; correct?

A.   Well, I say 70 to 90, perhaps even more, to be precise.

Q.   Right.  And in this email, Exhibit 187, you now have bumped that estimate up to between 80 and 100 million euros; correct?

A.   That's what I wrote.  That piece should be worth -- you know, it's very difficult to price.  And I compare it to other works and I say it should be worth between 80 to 100 million euros.

Q.   And isn't the rest of the language of that email identical to what you sent the day before, the only thing that changes is the amount of the estimate?

A.   Yeah, I think it's -- that's correct.  I haven't read, you know, side-by-side, but I'm sure you're right.

Q.   Wasn't it as a result of a phone call discussion with Mr. Bouvier that you made the change?

A.   I had a phone call with Mr. Bouvier between the two email, yes, that's correct.

Q.   And he wanted it made higher?

A.   He wanted me to precise my thoughts.  Because I had say it could be worth 70 to 90, perhaps even more.  And he said, you know, can you specify what you mean by "even more."  And so I specified it that I thought it could be worth between 80 and 100, yes.

Q.   So you changed your views in less than 12 hours after a phone call with Mr. Bouvier?

MR. ASNER:  Objection.

THE COURT:  Sustained.

MR. KORNSTEIN:  Can we look at Plaintiff's Exhibit 76 for identification and look at the English version, please.

Q.  Do you recognize this document?

A.  I have not seen this document prior to preparing for this audition.

THE COURT:  Mr. Kornstein, this is in evidence.  Do you want to publish?  You may publish.

MR. KORNSTEIN:  Can we publish, please.

Q.  So you see this is a document from Mr. Bouvier to Mr. Sazonov about the Head.  And you see at the bottom Mr. Bouvier includes your email with the 80 to 100 million euro value, do you see that?

A.  Yes, I do see that.

Q.  And you see in Mr. Bouvier's email to Michael Sazonov, who is an adviser to Mr. Rybolovlev, he writes toward the bottom: Now that Dmitry has no interest in this and in order to do -- talking about the Matisse, to do a better estimate of the price and reinforce me in my assessment, I have asked Sotheby's in complete confidentiality for an estimate without commitment. See attached email.  That's the email from you.

All the same, I wanted to reassure you that the estimates of Mr. Samuel Valette, senior director, senior international specialist impressionist and modern art, are

O1HVACC3                          Valette - Direct

similar, 80 to 100 euros, that is between 100 and 125 U.S.

dollars.  Do you see that?

A.  Yes, I do.

Q.  And you see at the top, Mr. Sazonov writes to Bouvier:

I've sent your email to DR?

A.  Yes, I see that.

Q.  You were aware when you were composing your emails to

Mr. Bouvier that he was going to send it on to other people?

A.  I was not aware, it was a possibility, but I never know to

whom.

Q.  But you knew it was a possibility?

A.  Sure, it was a possibility that he would send it on to

somebody else.

Q.  And you knew that by July of 2012, he had a business

relationship with Mr. Rybolovlev?  You had testified to that.

A.  Yes, yeah, yeah, of course.  Yeah, yeah.

Q.  And you knew that he was flipping works quickly?

A.  Sometimes, yes.

        MR. KORNSTEIN:  Can we show from Mr. Valette's

deposition, page 277, line 15 to page 278, line 11.

        THE COURT:  Any objection?

        MR. ASNER:  I'm sorry, no objection.

        THE COURT:  You may proceed.

        (Video deposition played as follows)

"Q.  The question is did you speak to Bouvier between the first

O1HVACC3                        Valette - Direct

and the second letter?  That's a simple question.

"A.  And if you will let me answer you, the whole truth, which I have to, I will tell you that in the course of pitching this sculpture to Mr. Bouvier, I sent him a first email saying that, you know -- which is an appreciation of what I think personally of the piece, which is an extraordinary work, I do believe, from the bottom of my heart that this is an extraordinary work and that I think that it could be worth 70 to 90.  I spoke to Mr. Bouvier, who said, Well, do you think it could be worth more?  And I said, Yeah, sure, it could be worth more.  And then he said, Well, then write it down.  And I did send him a second email saying that the work could be worth 80 to 100 million euros."

            MR. KORNSTEIN:  That's all with this.

BY MR. KORNSTEIN:

Q.  Did there come a time after the sale of the *Tête* when Sotheby's had an auction for the *Tête*?

A.  Yeah.  Yes, that's correct.

Q.  When was that?

A.  In November 2014.

Q.  And was there a guarantee and consignment agreement in connection with that auction?

A.  Yes, there was.

            MR. KORNSTEIN:  Can we show the witness Plaintiff's Exhibit 17 for identification.

O1HVACC3                     Valette – Direct

Q.   Do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   It's a guarantee and consignment agreement between Sotheby's New York and Blancaflor Investments regarding the *Tête*.

MR. KORNSTEIN:  Offer it into evidence.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 17 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.   At this time did you take any steps to see who was the owner of the sculpture?

A.   Well, the owner was Blancaflor.  We had sold it to Blancaflor not even two years before, and Blancaflor was re-consigning it.

Q.   My question is this:  You knew that Blancaflor often resold or flipped works of art.  What steps did you take to see if Blancaflor was still the owner?

A.   Mr. Kornstein, we sold it to Blancaflor less than two years before.  Blancaflor say that they owned the piece.  If I was to ask for Blancaflor what proof they had that they owned it, they would have simply sent me back the contract we signed less than two years ago.

O1HVACC3                     Valette - Direct

Q.  So you didn't check?

A.  No.  They say they owned it, it was obvious.  We had sold it to them.  We picked it up in the same place.  You know, there was no -- nothing to say that this was not the case.

Q.  And there was also nothing to say that they had not resold it to somebody else, flipped it quickly?

A.  They didn't say they did.  They stated that they had the piece, we're still, you know, the owners.  And as I said, what I could have asked is, you know, send us the bill of sale and they would have simply sent the bill of sale that we sent them when they bought it less than two years before.

Q.  So you're saying that if you had asked a question, there was a possibility he would have lied to you?

A.  I think if I would have -- they say that they own the work.  So I don't know if, you know -- as far as I'm concerned, it was not a lie.  They owned it.  We sold it to them.  They came back saying that they owned it.  There was no reason to think there was any lie there.

Q.  Mr. Valette, you testified that you knew that he frequently flipped works that he bought; correct?

A.  Yes, but not every single thing he bought.

Q.  And you said sometimes he flipped them very quickly?

A.  Yes, that happened.

Q.  Did you ask him whether he flipped this work?

A.  I did not ask him --

Q.   Thank you.

A.   -- whether he flipped it.

          MR. KORNSTEIN:   Now, can we look at Plaintiff's
Exhibit 119 for identification only.

Q.   Do you recognize this document?

A.   Yes, I do.

Q.   Can you tell us what it is?

A.   It's an email between myself and a colleague, Daisy
Edelson, regarding Blancaflor designation.

          MR. KORNSTEIN:   Move it into evidence, your Honor.

          MR. ASNER:   No objection.

          THE COURT:   Admitted.

          (Plaintiff's Exhibit 119 received in evidence)

          MR. KORNSTEIN:   May I publish?

          THE COURT:   You may.

Q.   So in this email, September 30th, 2014, in connection with
the auction of the Tête, Daisy Edelson writes to you, and the
subject is Blancaflor designation.

          Blancaflor is Mr. Bouvier's company?

A.   That is correct.

Q.   And she writes:  Just making sure you're okay to use the
same one on the Magritte and Picasso that we're using for the
Modi, property of a private European collector.  That's what
she wrote to you?

A.   Yes, she did.

Q.   And you respond.  And again, the subject of your email is "Blancaflor designation."  You write:  Better to cover the tracks slightly and designate as property from a private European collection.  Correct?

A.   Well, I say -- to her question I replied:  Maybe better to cover the tracks slightly and designate as property from a private European collection, yes.

          I'm happy to explain.

Q.   You'll get a chance, don't worry about that.

          MR. KORNSTEIN:  Can we show the witness Plaintiff's Exhibit 120.

Q.   Do you recognize this document?

A.   There's not much there.  It's an email between me and Mr. Peretti.  Subject:  Modi.

          MR. KORNSTEIN:  Can we flip through to show the witness the contents.

Q.   Do you recognize it?

A.   Yes, that would be the cataloging for the work before it was included in the sale catalog Sotheby's New York in November 2014.

          MR. KORNSTEIN:  Offer into evidence, your Honor.

          MR. ASNER:  No objection.

          THE COURT:  Admitted.

          (Plaintiff's Exhibit 120 received in evidence)

          MR. KORNSTEIN:  May I publish?

O1HVACC3                        Valette - Direct

THE COURT:  You may.

Q.  Looking at page 3 of this document, you see near the top the provenance?

MR. KORNSTEIN:  Can we go back to the provenance.  Can we call out -- yes.

Q.  So the provenance section does not mention Blancaflor or Bouvier, does it?

A.  We never mention --

MR. KORNSTEIN:  Move to strike, your Honor.  I just asked if it mentions it.

THE COURT:  I don't think he said anything.

Just yes or no, does the provenance section mention Blancaflor or Bouvier?

THE WITNESS:  No, it doesn't.

Q.  Are you familiar with Sotheby's worldwide guidelines regarding property due diligence?

A.  I'm sure there's one.  If you show me the document, I can tell you if I'm familiar.

Q.  Well, do you read any of the policies that Sotheby's issues to all of its employees?

A.  From time to time.  But, you know, there may be a few years before I have read it.

(Continued on next page)

O1H3ACC4                    Valette - Direct

Q.  Show the witness Exhibit Plaintiff's Exhibit 303 in evidence.

Does this refresh your recollection, as to --

A.  Yes, that looks like a Sotheby's worldwide guidelines with respect to property due diligence.

THE COURT:  One at a time, gentlemen.

THE WITNESS:  Sorry.

Q.  This was also in force at the time of the auction, correct?

A.  Yes, it is dated March 2016, but I'm sure, I don't think it would have changed a lot between 2014 and 2016, I agree.

THE COURT:  Do you want to publish, Mr. Kornstein, since this is in evidence?

MR. KORNSTEIN:  Yes, your Honor.  It's in evidence.

THE COURT:  You may.

Q.  You see the heading of the document, it is what I said, Sotheby's worldwide guidelines?

A.  That is correct.

Q.  It says in the introduction, "The document sets out Sotheby's worldwide guidelines regarding due diligence in relation to property and should be followed in relation to the public or private offering of any object by Sotheby's."

Do you see that?

A.  That is correct.

Q.  It says after the indent:  The policy applies to all employees, correct?

A.   That is correct.

Q.   And it says, "It is your responsibility to familiarize yourself with the rules contained in this policy."

A.   That is correct.

Q.   And then you go to page 2, please.  And you see the number 2.  And it says you were supposed to make initial inquiries of the current owner in respect to the object's provenance. Questions that are appropriate to address to the current owner are:  How long they've owned the object?  How did they acquire it?  And from whom did they acquire it?

     Did you ask those questions to Mr. Bouvier about the *Tête*?

A.   We had just sold it to him, so I didn't have to.

Q.   You sold it two years before.

A.   Less than two years before, and he stated that he still owned it.  So there was no -- it was a no brainer for me.  I didn't -- sometimes this is a document which is valid for every single transaction, so sometimes you have works which haven't been on the market for 50 years, so you have to go through these things for sure.

     This is a piece we sold less than two years before.

Q.   Mr. Valette, look at the bottom of the page to the writing in italics.  It says, "The answers to these inquiries must be documented by the specialist department in writing, and such documentation must be retained in the file for sale.  Please

O1H3ACC4                          Valette - Direct

see the due diligence checklist at annex 1."

You didn't do that, did you?

MR. ASNER:  Objection.

THE COURT:  I think you previously testified that you didn't ask these questions of Mr. Bouvier in connection with this auction, correct?

THE WITNESS:  Yes, that is correct.  Having said that, if I may just to -- can I --

THE COURT:  Let's leave it there.

THE WITNESS:  There are other questions, but that's --

Q.  Look at page 4 of this document.  That is called the due diligence checklist?

A.  That is correct.

Q.  And it says "The specialist department responsible for including property in sale, whether public auction or private, should designate a knowledgeable person in their department to make inquiries regarding the provenance of the property.  Such inquiries should include the issues below.  Checklists may be used to record the inquiries made and the answers given."

Do you see that?

A.  I do.

Q.  Did you ask any of these factors to Mr. Bouvier about the *Tête* at the time of the auction?

A.  If we go into the document, I can tell you what was asked or not, because there seems to be quite a lot of, you see what

O1H3ACC4                    Valette - Direct

it means.  It start consider the nature of the object, etc., etc.  So you can go through that if you want.

Q.  You didn't fill out this checklist, did you?

A.  Oh, not me, no.  I never, I never fill out this checklist.  So in 20 years at Sotheby's, I don't do this.  Maybe somebody else does, but I certainly don't.

Q.  Thank you.  Now can we show the witness Exhibit 97.  Plaintiff's Exhibit 97 in evidence.  Show the English.

Do you recognize this document?

A.  So I think there's two things in this document.  There is an e-mail on top from Mr. Bouvier to Mr. Sazonov, which I've never seen, which I wasn't copied, so that I don't recognize.  And then below, there seems to be a copy and paste of an e-mail that I did send Mr. Bouvier on December 18.  So, there is something I recognize, but something I don't, if I may say it.

MR. KORNSTEIN:  Offer it into evidence, your Honor.

THE COURT:  It's already in evidence.

MR. KORNSTEIN:  Publish, please, to the jury.

THE COURT:  Already published.

MR. KORNSTEIN:  Okay.

THE COURT:  Next?

Q.  You see in your e-mail December 18 to Mr. Bouvier, you're talking about Rodin's sculpture called *Eve*?

A.  That is correct.

Q.  You say in your e-mail that:  I think magnificent *Eve*

belonging to your client would be particularly well showcased during a great sculpture exhibition preparing for England.

Now, this e-mail has your signature block with your positions at Sotheby's, correct?

A.   Yes, that's correct.

Q.   And did Mr. Bouvier ask you to use your formal signature block?

A.   That I don't remember.  He did ask, he did send me this *Eve* amongst others, this one he must have told me he had sold it on, because I say this magnificent *Eve* by Rodin belonging to your client.  So and I think at this stage, Mr. Bouvier's client and Mr. Bouvier wanted to resell it, and I was hoping that we would get the chance to resell it.

Q.   And you see in the e-mail above that you hadn't seen before, Mr. Bouvier sends to Mr. Sazonov the comments that you wrote in the e-mail below?

A.   Yes, I never seen that, by the way, but yes.  You're right.

Q.   Going back to the due diligence checklist, you're not aware of anyone else at Sotheby's filling out the due diligence checklist for the *Tête* auction?

A.   There is a lot of people involved in these auctions.

Q.   Are you aware of anyone filling out the checklist?

A.   I don't know.

Q.   Okay.  So that means you don't?

A.   I'm not aware.  But it may have been done.  It is just that

O1H3ACC4                    Valette - Direct

I don't --

Q. You are not aware.

All right. Let's talk about the Magritte. The Magritte was sold to Blancaflor for $24.1 million?

A. The Magritte *Domaine d'Arnheim*, yes, that's correct.

Q. And the seller was asking for a price of 25 million?

A. The seller wanted -- it took quite a long time, but eventually the seller wanted $25 million net to them, yes.

Q. Can we show Plaintiff's Exhibit 184 to the witness. Plaintiff's Exhibit 184.

Do you recognize this document?

A. Yes, that would be an internal document.

MR. KORNSTEIN:  Offer it into evidence.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 184 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q. If you look at page 3 of this document, you see an e-mail from Nisha Amin to Bill Ruprecht on November 25, 2011?

A. Yes, I do.

Q. And it talks about the offer of $24.5 million for this work?

A. That is correct.

Q. And that the commission for Sotheby's would be $1.6

O1H3ACC4                    Valette - Direct

million?

A.   That is correct.

Q.   And you see that Mr. Ruprecht, who was chief executive

officer, responds giving his okay?

A.   Yes, he says "Go for it, many thanks."

Q.   And this was the packet prepared internally at Sotheby's,

an internal Sotheby's document?

A.   That's I think what we call the administrative packet.  So

it's to do with the business directors and the admins,

everything to do with the sale from an administrative point of

view.

Q.   And toward the end of this package, can we go to the fifth

page, the signature page.  That's your signature?

A.   Yes, more legible.

Q.   More legible than the other one.

Isn't it true that in May of 2009, Sotheby's valuation

for this work, Magritte *Domaine d'Arnheim*, was 1.2 million

pounds?

A.   It's possible.  I mean, if you show me a document, I can

tell you.  But, I don't think I valued this picture before the

time of the sale.

Q.   Well, can we show the witness Plaintiff's Exhibit 181 for

identification.

Do you recognize that document?

A.   It says first draft not suitable for submission to third

parties. I mean, it looks like a draft of a valuation from May 2009.

Q. It is a Sotheby's document. You can see on the lower-right-hand corner.

A. Yeah, it says Sotheby's. That's the logo. So that looks correct.

MR. KORNSTEIN: Offer it into evidence, your Honor.

MR. ASNER: One moment, your Honor, just checking. Foundation.

THE COURT: Do you recognize this document, Mr. Valette?

THE WITNESS: Look, I'm not sure I had seen it before, but it looks like a –- this is a Sotheby's logo, it says first draft. So, looks to me like a Sotheby's document.

THE COURT: I'll overrule the objection. Admitted.

(Plaintiff's Exhibit 181 received in evidence)

MR. KORNSTEIN: May I publish?

THE COURT: You may.

Q. Does Sotheby's routinely make drafts of values of various works of art?

A. Say that again?

Q. Does Sotheby's routinely make drafts of values of works of art?

A. Yeah, there is always drafts and, you know, these things are apparently the first draft from May 2009.

Q.  Right.  And it shows a value of 1.2 million pounds.
Correct?

A.  Yes, it does.

THE COURT:  It also says 700,000 to 900,000 pounds.
Can you explain what that --

THE WITNESS:  Yes.  So, typically what it looks like
is you would have an auction estimate which would be 700 to
900,000.  So the 1.2, which probably would be the insurance
prices.  So whoever wrote this document, which I certainly
didn't, probably that was the number which is jotted down.

But you know, I draw your attention to the fact this
is a first draft and it probably changed quite a lot over the
years.

Q.  So the higher number is an insurance value?

A.  Probably, yeah.  The way typically we would do it, that
would make sense.

Q.  So the lower number is the 700/900,000 pounds would be the
value, as estimated, as of that date?

MR. ASNER:  Objection.

THE COURT:  Sustained.

Q.  Say again what does the first line, the 700,000/900,000
pounds represent?

A.  So, just to be clear, this is a first draft.  So what
somebody jotted down, 700 to 900 pounds, which looks to me they
probably thought could be an estimate.

O1H3ACC4                          Valette - Direct

Q.   Okay.   Thank you.

A.   But, you know, it certainly says first draft not suitable for submission to third parties, so I think this is probably more like a working document internal to Sotheby's as of May 2009.

Q.   Okay.   Can we show the witness Defendant's Exhibit 502.

          Do you recognize this document?

A.   Yes, I do.

Q.   Can you tell us what is it is?

A.   This is an e-mail that I sent to my colleague Alex Platon, Helena Newman, and Nisha Amin, colleagues from London on I think it is February 9 or September 2nd, 2011.   Probably September 2, 2011.

          MR. KORNSTEIN:   Offer it into evidence, your Honor.

          MR. ASNER:   No objection.

          THE COURT:   Admitted.

          (Defendant's Exhibit 502 received in evidence)

          MR. KORNSTEIN:   May I publish?

          THE COURT:   You may.

Q.   Looking at the second page of this document, the image at the bottom of that page, that's the *Domaine d'Arnheim*?

A.   That is the *Domaine d'Arnheim*, yes, that's correct.

Q.   And the second bullet point says we have $9 million net offer?

A.   That is correct.

O1H3ACC4                      Valette - Direct

Q.   And it says Hubert is trying to organize a meeting with the owner?

A.   Yes, that's Hubert d'Ursel, my colleague in Belgium.

Q.   So, in September of 2011, there was an offer of $9 million for this work, correct?

A.   Yeah, that's correct.

Q.   And can we show the witness Defendant's Exhibit 504 for identification.  The English, please.

     Have you seen this document before?

A.   Yes, I have.

Q.   Did you write the e-mail in the middle?

A.   Yes, that's an e-mail between myself, sorry.  Between Beatrice Stern who is a colleague in New York, and myself.

          MR. KORNSTEIN:  Move it into evidence, your Honor.

          MR. ASNER:  No objection.

          THE COURT:  Admitted.

          (Defendant's Exhibit 504 received in evidence)

          MR. KORNSTEIN:  May I publish?

          THE COURT:  You may.

Q.   Now, looking at your e-mail, you write to Beatrice --

Beatrice is who?

A.   This is Beatrice Stern, a colleague in New York who had a relationship with the seller of the Magritte.

Q.   And in the last sentence of the big paragraph you write, "What would an extraordinary price be for this painting, $20

                      SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

O1H3ACC4                    Valette - Direct

million in your view?  As a reminder, the record amount paid for a Magritte at auction is 12.6 million for an iconic *Empire of Light* piece.  Let me know what you think.  I think we need to strike while the iron's hot."

         You wrote that?

A.  Yes, what I -- so no, I did write these things.  That's true.

Q.  Thank you.  And in essence were you asking her to name her price?

A.  Not Beatrice.  But, what I was asking Beatrice was to call the owner of the work who she knew well, and we were not going anywhere because we had offered $9 million, he was not interested.  We had offered $12 million, he was not interested.  And Mr. Bouvier really wanted this piece and he was clear he wanted it.  And I said, look, why don't we change tactic and you go and say what price do you want, what is your price.  And he came back -- actually at this stage we hadn't had his reply.  And the public price, the public top price for Magritte at the time at auction was 12.6 for an iconic *Empire of Light*.

Q.  Can we show the witness -- can we take this down and show the witness Plaintiff's Exhibit 251 for identification.

         Do you recall, do you recognize this document?

A.  Yes, I do.

Q.  What is it?

A.  It's an e-mail between my assistant at the time and myself

O1H3ACC4                    Valette - Direct

titled Magritte *Domaine d'Arnheim*.

MR. KORNSTEIN:  Offer it in evidence, your Honor.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 251 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.  Can we have the first page of the English translation.

In this series of e-mails, you start by writing to Mr. Bouvier, "Here is a picture of the Magritte we were talking about."  That's the *Domaine d'Arnheim*?

A.  That is correct.

Q.  "After considerable urging, the owner confided that he would accept to sell for 25 million U.S. dollars."

A.  That is correct.

Q.  You write, "Please let me know if you would like us to move ahead."

Right?

A.  Yes, I did.

Q.  And your assistant sent that on to Mr. Bouvier?

A.  Yeah, I think she -- she sent a draft of it actually.  So, I think I couldn't send it for some reason.  So she is the one who sent me this as a draft, probably for me to approve it, so she could send it to Mr. Bouvier.

Q.  And that was on November 10, 2011, correct?

O1H3ACC4                    Valette - Direct

A.   October or November.  I think it was probably November 10, yeah, I mean.

Q.   Is it correct that the next day there was a flurry of e-mails from you to Mr. Bouvier?

A.   If you can show me, I'm not sure.

Q.   You don't remember?

A.   I mean, I was e-mailing with Mr. Bouvier all the time.

Q.   Can we show the witness Plaintiff's Exhibit 71.

         Do you recognize this document?

         MR. ASNER:  Can we scroll.

         MR. KORNSTEIN:  Can we scroll through it a little bit.

Q.   Do you recognize it?

A.   Yeah, yeah, that sounds correct.  It's an e-mail sent to Mr. Bouvier and Mr. Peretti with the catalog of the Magritte and the list of other works, because the *Domaine d'Arnheim* is part of a series, and so I think what you have is a list of works from this series in the list.

         MR. KORNSTEIN:  Offer it into evidence.

         MR. ASNER:  No objection.

         THE COURT:  Admitted.

         (Plaintiff's Exhibit 71 received in evidence)

         MR. KORNSTEIN:  May I publish?

         THE COURT:  You may.

Q.   Would you look at page 8 of the document, and look at the last paragraph.

O1H3ACC4                    Valette - Direct

First, do you recall writing this paragraph?

A.  I don't think I wrote it.  It was probably written by a cataloger in the Impressionist art department.  But I agree with what it says.  But I don't think I wrote it actually.  I'm pretty sure I did not write it.

Q.  Well, the paragraph says "The painting has acquired iconic status."  Now the painting that is being referred to is *Domaine d'Arnheim*.

"Not only for the elegance and harmony of its composition, but also for its importance it had in the eyes of the artist.  When it was exhibited at the Palais des Beaux Arts in 1938, Magritte declined several offers to buy it.  He finally decided to accept that of Edward James, the English aristocrat, who was at the center of the Surrealist movement.  Magritte's role in 20th century art is indisputable.  No other artist has managed to combine aesthetic identity and intellectual depth with such virtuosity.  *Domaine d'Arnheim*, like *L'Empire des Lumières*, is the perfect illustration of this."

You provided this comment to Bouvier?

A.  I sent him the cataloging which included this note.  Yes.

Q.  Can we see Plaintiff's Exhibit 70 in evidence.

This is a document that starts at the bottom, Mr. Bouvier -- on the same date, November 11, 2011 -- sends to Michael Sazonov.  "Hello Mike.  Attached is a less pale photo

closer to reality.  I'll do some research and give you some more info later.  I'll come back to you with the price.  Have a good day Yves."

Can we scroll down to the next e-mail.  And Sazonov writes back "thank you."

And Bouvier writes again to Sazonov, "Hello Mike, attached is the file of the painting.  The comments (very important), the list of the three paintings and six gouaches of *Domaine d'Arnheim*, the list of variants of *Domaine d'Arnheim*. You'll find that this painting is the most beautiful of all and in my opinion far superior to *L'Empire des Lumières*.  As the comment says, it is an icon of the artist's.  The best proof is the one retained during the Dmitri era.  I'll study the price and get back to you.  Have a good weekend."

As you can see here, Mr. Bouvier sent to Mr. Sazonov a copy of the comments that you had sent to him.  Right?

A.   Well, I mean, just to be clear, I wasn't copied to this e-mail.

Q.   No --

A.   It seems to me that indeed he sent a copy of the note.  I don't know what he sent, if he sent the rest with the cataloging, but it looks to me like a copy of the note which was attached to my e-mail to him, to Mr. Bouvier.

Q.   Which in the last sentence compares the *Domaine d'Arnheim* to the *Empire of Lights*.

A.    Well, it compares.  It says those combined aesthetic identity and intellectual depth with such virtuosity.  It shares importance.  That's what it says.

Q.    Can we show Plaintiff's Exhibit 182 to the witness.  It is in evidence.

Now, this is an e-mail that you sent to Mr. Bouvier. Correct?

A.    That is correct.

Q.    And you were using the formal tone here, it is Dear Mr. Bouvier, and you give your formal signature block?

A.    That is correct.

Q.    And in it, you give an estimate or what you say is, "I confirm that an estimate for the auction of a large iconic painting such as *Empire of Lights* below would be around 40 to 60 million U.S. dollars, with a result that I think should approach the high range of the estimate.  Such a painting would be the subject of intense competition between the biggest collectors and the largest museums in the world."

That's what you wrote to Mr. Bouvier.

A.    That's correct, that's what I wrote.

Q.    And that was on the same day that you had sent your comments comparing or the comments from Sotheby's comparing *Empire of Lights* to *Domaine d'Arnheim*.

A.    Oh, to be clear, the comments were --

THE COURT:  Just yes or no.  Was it the same day?

O1H3ACC4                      Valette - Direct

A.   I don't know.  If you can show me, I can tell you.

Q.   It was the document we were just looking at.

A.   I don't know the dates by heart unfortunately.

Q.   Exhibit --

A.   I'm sure you're right.

Q.   Exhibit 71, please show the witness Exhibit 71 to the left of Exhibit 182.

You see that was November 11 also?

A.   That is correct.  November 11, yes.

Q.   And this second e-mail was November 11 at 10:36?

A.   Yes, that's correct.

Q.   45 minutes later?

A.   Yeah, that's correct.

Q.   Can we play from Mr. Valette's deposition page 154, line 17, to page 155, line 3.

MR. ASNER:  No objection.

THE COURT:  You may.

(Video playing)

"Q.   Is it correct that you would often write to Mr. Bouvier in the familiar form, just Yves or using tutoyer?

A.   So I would write to Mr. Bouvier regularly using Yves or tutoyer, and from time to time he would ask me for more formal e-mails, market reports or e-mails, and he would ask them to be more formal.  And then in these cases, I would address him as Monsieur Bouvier, and there have been a few examples."

MR. KORNSTEIN:  Thank you.  We can take that down.

Can we show the witness Plaintiff's Exhibit 375.  And this is in evidence so it can be published to the jury.

Q.  Now, this is an example of a formal e-mail from you to Mr. Bouvier, correct?

A.  Yes.  This is a market report in formal format that I have sent Mr. Bouvier.  That's correct.

Q.  Dear Mr. Bouvier instead of Dear Yves, and you sign it with your full Sotheby's titles and status, correct?

A.  That is correct.

Q.  In it you talk about the market for Magrittes, and it is also dated November 11.

That was a busy day for you, wasn't it?

A.  They often are.

Q.  Right.  And in the last item before the photograph, the photograph -- that's *The Empire of Lights*?

A.  That is this *Empire of Lights*, yes.

Q.  And your comment is "Given these recent developments and the unmet demand, it is clear that the estimate for a large iconic painting such as *The Empire of Lights* below would be around 40 million to 60 million U.S. dollars."

You wrote that?

A.  Yeah, that's what I wrote.

Q.  And --

A.  I think, you know, that's correct.

O1H3ACC4                    Valette - Direct

Q.   That's what you wrote?

A.   That's what I wrote, absolutely.  I agree with you.

Q.   Can we show the witness Plaintiff's Exhibit 183 which is in evidence.

     Do you see that document?

A.   Yes, I do.

Q.   Do you recognize that document?

A.   Yes, I do.

Q.   And do you notice any change in that document in that last paragraph from what you had sent earlier?

A.   Yes, I do.

Q.   What is the change?

A.   The change is that I say -- I'm now talking about private sales rather than auction estimates, and I say it is clear that in private sales of a large iconic painting such as *The Empire of Lights* below would be negotiated for around 40 million euros.  Which is in 40 to $60 million, a estimate 40 million euros in private sale kind of makes sense.

Q.   Did you make these changes after a discussion with Mr. Bouvier?

A.   Yes, I did.  Mr. Bouvier asked me what a private sale price would be for the *Empire of Light*.

Q.   Would it be fair to say that any time you made changes in various e-mails of this formal type, it would be after a discussion with Mr. Bouvier?

A.   When I would send him a market report and if he had comment, then if they made sense, I could incorporate them.

Q.   Those comments would usually be in form of a phone call, not in writing?

A.   I guess most of the time, I mean, I'm just trying to think. Before that, e-mails, he would ask for it to be sent in normal doc, so that was kind of a comment.  But, I would agree with you that most of the time he probably would just pick up the phone and it would be a conversation.

Q.   In fact, other than that request for it to be in a normal file form, there were no requests for changes that were made in writing, they were always on the phone, correct?

A.   Oh, that I don't know.  We would need to see all the e-mails that we exchanged with Mr. Bouvier to confirm that. But I agree with you in general, I would think that most of the -- we would have most of the conversation on the phone.

Q.   Can we show the witness Defendant's Exhibit 251.  Before we talk about 251, on the last e-mail, the currency was changed from U.S. dollars to euros, correct?

A.   I'm sorry.  I didn't get that.

Q.   Going back to Exhibit 183, the currency was changed to 40 million euros instead of 40 to 60 million U.S. dollars?

A.   Yes.  The estimate was in U.S. dollars and here the private sale price is around 40 million euros.

Q.   Let's go to DX 251 and the English version.  Do you recall,

do you recognize this document?

A.  I have never seen this document.

Q.  Look further to the next page.  And this is already in evidence.

THE COURT:  You may publish.

MR. KORNSTEIN:  Please publish.

A.  Okay.  So the next page is my market report which seems to be truncated, by the way, because I don't see the *L'Empire des Lumières*.  So you have my market report at the bottom.

Q.  Well, in the next page you'll see your signature.

A.  My e-mail, that's my document.  I don't think there is any changes -- it's in English, but...

Q.  Right.  And then if we go back.  We see the next e-mail is from Mr. Bouvier to Mr. Sazonov.  And he's sending to Mr. Sazonov, he said "I made some discrete inquiries on the Magritte market, and you will, when you see the attached e-mail that an ordinary *Umbrella* will sell for $10 million and a small paper for $4 million, a famous subject like a good *Empire of Light* would sell for 40 million euros at a private sale."

You see that?

A.  I see that, yes.

Q.  You see that Mr. Bouvier sent some of your writing and some of your previous writing had been sent as well, to Mr. Sazonov on behalf of Mr. Rybolovlev.  Correct?

A.  Well, just to be clear --

O1H3ACC4                     Valette - Direct

THE COURT:  The exhibit speaks for itself.

THE WITNESS:  Yeah.

THE COURT:  Next question.

Q.   Can we show the witness Plaintiff's Exhibit 94.

Do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   It is an e-mail between, so it is a chain of e-mail between colleagues including myself regarding the Magritte deal.

MR. KORNSTEIN:  Offer it into evidence, your Honor.

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 94 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.   In this exhibit, you write to Helena Newman, Nisha Amin, Melanie Clore and Holli Chandler:  For you only.  Magritte done deal.  Please let's keep this strictly confidential between us for now please.  Brussels not aware.

A.   That's correct.

Q.   Was Brussels under the jurisdiction of Hubert d'Ursel?

A.   He was the managing director.  I don't know about the jurisdiction.  He was the managing director.

Q.   He was the Sotheby's employee who's in charge of Belgium?

A.   Yes, that's correct.

Q.   And you had kept it a secret from him?

A.   No.   That's not what happened.   I started the deal with him because he thought he could get the picture.   And when he couldn't, I went through another colleague, which was Beatrice Stern, who had a better relationship I think with the owner, and was able to get this price.   So I didn't keep him -- keep it secret from him.

But, after I went through Beatrice Stern, I did not involve Hubert d'Ursel.   So what I didn't want was for him to learn that this deal had gone through.   I mean, I had to tell him, basically, I had to tell him, look, I went through somebody else and did the deal.

And when it says confidential Brussels not aware, means don't go and tell Hubert, because he's not going to understand what's happening.

Q.   I understand.   And the response from Nisha Amin was "great" in caps with exclamation point.   I will e-mail Bill.   That's Bill Ruprecht?

A.   That is correct.

Q.   "For approval since it is high value." And he gave his approval, correct?

A.   Correct.

Q.   "I will not say who it is from."

A.   Correct.

Q.   Did you tell her to not to say who it is from?

A.   No.   What I told her is what I wrote below.   "Please keep this strictly confidential between us four for now, please Brussels not aware etc. many thanks Sam."

Q.   Did you understand what she meant when she said I will not say who it is from?

A.   No.

Q.   Do you recall a meeting in June of 2013 in Geneva with you, Jane Levine, Mr. Bouvier, and Mr. Peretti?

A.   Yes, I do.

Q.   And Jane Levine is the chief of compliance, the compliance officer for all of Sotheby's at the time?

A.   At the time, yes.

Q.   And the reason for the meeting was Mr. Bouvier's growing importance as a customer or client of Sotheby's?

A.   I think Jane wanted to meet him.   He had become a very important client, and she wanted to meet him to know him.

Q.   You understood that it was Jane Levine's job to look at these transactions and make sure that she knows what it's about?

A.   Well, she was the head of compliance.   So I think it was part of her job, yes.

Q.   How many meetings actually took place on that occasion?

A.   Three meetings if I'm remember correctly.   Yes.   Yes, three meetings.

Q.   Three meetings?

A.   Yes.

Q.   And all in toto approximately how much time is spent in these meetings?

A.   I would say maybe an hour and a half with Mr. Bouvier at his office, then maybe an hour, one hour and a half with Mr. Peretti at his gallery, and then we had some sort of lunch or drinks, I can't remember, for maybe an hour.

I think so roughly.  I don't remember by the minute, but roughly.

Q.   In all of these meetings, did Mr. Rybolovlev's name come up?

A.   No, it didn't.

Q.   Did the name of any of his companies, Accent Delight or Xitrans, come up?

A.   No, it didn't.

Q.   Did you mention at all your understanding, did you mention to Jane Levine your understanding that Mr. Bouvier had been flipping works frequently very quickly?

A.   Yeah, I think she knew that, yes.

Q.   Did you say it to Ms. Levine?

A.   Yes, she asked me, you know, who he was, and I said, look, he's a businessman, he is an art investor, sometimes he flips works very quickly, sometimes he keeps them for a while.  You know, I mean, I think we would have had this conversation, sure.

Q.   And did you mention anything about Mr. Rybolovlev being a client of Mr. Bouvier to Ms. Levine?

A.   No, I didn't.

Q.   Did you mention anything about Mr. Rybolovlev being present at the viewings of both the Klimt and the da Vinci at this time?

A.   No, I didn't.

Q.   Didn't you think it was relevant to Jane Levine's purpose of the meeting to find out about the increasing sales to Mr. Bouvier to mention that Mr. Rybolovlev was involved in the purchases of some major works?

A.   Well, as I said before, I knew that, you know, I knew in 2012 that Mr. Rybolovlev was a client of Mr. Bouvier, but I didn't know for which particular transactions.  And I had seen him twice so it was a possibility.  But, no, I didn't discuss this with Jane.

Q.   You knew that she had come from New York and had been trying to set up this meeting for some time?

A.   Hmm-hmm.

Q.   And you knew that she was there because she was looking at increasing volume of the transactions by Mr. Bouvier, correct? You knew that was the purpose?

A.   I don't know if it was the increasing volume, but yes, I agree, she wanted to meet him because he was becoming a bigger and bigger client.

O1H3ACC4                     Valette – Direct

Q.   And you didn't think it was relevant to tell her about Mr. Rybolovlev's connection to Mr. Bouvier?

A.   I had seen Mr. Rybolovlev twice.  Mr. Bouvier bought maybe 40 pictures in total over the period.  I didn't think that was particularly relevant, no.

Q.   You didn't.

Now, at the meeting, did Mr. Bouvier show any financial information to Ms. Levine?

A.   I remember a presentation.

Q.   Didn't that presentation consist of a PowerPoint deck of various businesses but no --

A.   That's correct.

Q.   But no financial information?

THE COURT:  Gentlemen, one a time.

A.   I don't remember financial information.  I remember, as you say, some sort of PowerPoint document with various businesses.

Q.   And isn't it true that Ms. Levine didn't ask any questions about financial information on the part of Mr. Bouvier or his companies?

A.   I don't know that she asked any financial information.  I think, well, she asked, she asked him point blank, she said, you know, you know, what is your business, what do you do, when you buy, do you buy as a dealer, are you an agent for someone.  I think she did ask him all these questions.

Q.   Did she ask him how much money he earned a year from his

businesses?

A. No.

Q. Did she ask for any financial statements from him or his businesses?

A. No, I don't remember that, no.

Q. Did she ask anything about the source of funds for these purchases?

A. No, I don't remember. I don't remember her asking him. I mean, she talked about, you know, the whole purpose of the meeting that he was showing his businesses which were vast, from real estate to shipping to art, whatever. So I think the sort of, it was giving a sense of his financial surface. I think that's, but no, in detail it didn't come up with his bank accounts, you know.

Q. Did she ask him why the volume of his transactions suddenly rose in 2011?

A. I don't remember that she mentioned 2011. I think she asked him what was his strategy, why was he buying these pictures, etc., etc., but I don't remember that we particularly discussed 2011.

Q. There were no questions at all about his financial resources in terms of money?

A. Well, I think the whole point was that she could judge from, you know, what she could get. His sort of financial, you know, platform if you wish. But, you know, she didn't ask to

O1H3ACC4                    Valette - Direct

see, I don't remember her asking to see accounts. I don't know if you can do that.

Q. And Mr. Bouvier didn't offer to show her any financial information, isn't that correct?

A. No, yeah, that's correct. I don't remember him, no, yeah, you're right.

Q. Are you familiar with Sotheby's know your client guidelines?

A. Yes.

Q. Can you show the witness Plaintiff's Exhibit 222.

Is this what you understand to be Sotheby's know your client guidelines?

A. Okay. So, yeah, it looks like Sotheby's document.

MR. KORNSTEIN: Your Honor, we have a stipulation with counsel that all of these corporate policies, even though they may have a different date, were substantially the same at the time in question. And that's Plaintiff's Exhibit 302.

MR. ASNER: No objection. It is in a stipulation.

THE COURT: You are offering 302?

MR. KORNSTEIN: I'm offering 302 into evidence.

THE COURT: Admitted.

MR. ASNER: No objection.

(Plaintiff's Exhibit 302 received in evidence)

MR. KORNSTEIN: And also offering Plaintiff's Exhibit 222 into evidence.

O1H3ACC4                    Valette - Direct

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 222 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.  So, you see on the first page in the first paragraph, it says "This guidance note explains the requirements for verifying your client's identity and supplements Sotheby's worldwide anti-money laundering policy."

Then you see just below that, "For all clients, new or existing, we must know the true identity of the person or entity who owns the property or funds in question."

A.  Correct.

Q.  "And understand the source of the client's funds."

A.  Correct.

Q.  "And you must verify this information within a reasonable time after entering into a relationship with such client, and in any event, before entering into a financial transaction with the client."

A.  That is correct.

Q.  Tell me how you verified the source of the funds that Mr. Bouvier used to pay for his various transactions.

A.  Well, it says here that you must know the true identity, and we knew the true identity of Mr. Bouvier.  I mean, he didn't pretend to be anyone else.  And understand the source of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

the client's funds, and I mean, we did.  He was paying from particular institutions.  He showed he had activities, that sort of things.

So I think for these two things, I think we had actually a pretty good understanding.

Q.  Do you know what the source of his funds were?  Not what bank he paid from.  But the source of the funds, where did he get the money from?

A.  Well, you know, look, he had his all his businesses, and also he was a dealer.  So, when you are a dealer, you don't need to have $300 million in the bank account to deal in pictures.  You can have deals with your clients, you can have a payment schedule, that sort of thing.

So, understanding the source of the client's funds, we did.  Mr. Bouvier had many businesses, he was a prominent businessman, he was -- he had quite a public profile at the time.  So, I think we did understand the source of his funds.

Q.  But you had no financial information about any of his businesses or Mr. Bouvier personally, isn't that correct?

MR. ASNER:  Objection.

THE COURT:  Overruled.

A.  I didn't have financial information as in accounts or anything, no, I didn't.

Q.  Right.  And look at page 3 of this document, please. Toward the bottom, the part about agents for undisclosed

principals, do you see that?

A.   That is correct.

Q.   Are you familiar with this paragraph?

A.   Yes.

Q.   Where it says "Agents for undisclosed owners.  Dealers who wish to keep the names of their clients confidential, you must ensure we know and trust the agent concerned, following the rules set forth above."

Do you see that?

A.   I do.

Q.   And it goes on to say "You should confirm that the agent knows personally and/or has conducted appropriate due diligence on its clients' identities and activities."

You see that?

A.   Yeah, that's correct.

Q.   Is that something that you regularly did?

A.   Yeah, I mean, I believe this is to do, and all of this to do with it says before you engage in transactions with agents for undisclosed owners, as in if you're coming to Sotheby's with a picture, and you're telling me you are the agent for the owner of the painting, you know, I'm going to need to know who this owner is.  This is what it refers to.

Q.   And what if you come to Sotheby's and you say I'm going to buy a picture, do you ask whether he has a principal?

A.   Well, the client who buy paintings at Sotheby's, they tell

O1H3ACC4                        Valette - Direct

us whether they're a principal or whether they are agent.

Q.   What if they don't tell you, but they really are a principal or they're an agent?

A.   Well, it's very, I mean, if you are buying as a principal when you are an agent, you're taking a lot of risks.  Because if you are buying as a principal, you are on the hook for the price of the transaction.  So I don't think that it happens very often, you know.  People would probably more tend to be hiding behind their clients so they can say there is a payment problem, to say my client is not paying, that sort of thing.

Q.   Let's look at the first sentence of this paragraph.  "In the context of ordinary auction and private sale transactions with an agent who you know or you believe is acting on behalf of a principal whose identity is not disclosed, we must treat the agent as our client for purposes of customer due diligence and verification of identification."

Do you see that?

A.   Yeah, that's correct.

Q.   And did it ever occur to you that he could have been an agent for an undisclosed principal?

A.   No, he was a buyer, and he stated at numerous times that he was a buyer.

Q.   And you took him at his word?

A.   Well, he was -- he was signing the contract, he was paying for the pictures from bank accounts which were linked to his

O1H3ACC4                      Valette - Direct

companies.  So there was no, I mean, he was paying on time.  There is no reason to believe that there was anything else going on.

Q.  You never asked him where he got the money from to pay?

A.  I did not ask him where he got the money from to pay.  Like I never ask, I don't think I ever asked a client where he got the money to pay.  I mean, it's not, like, the kind of discussion you have with our clients, you know, when you're engaged in a transaction at this level, you don't say where did you get the money from.  I mean, especially with dealers.

Q.  So is it correct then that you never checked the source of the funds, because you never asked the client where they get the money from?

            MR. ASNER:  Objection.

            THE COURT:  Sustained.

Q.  Are you familiar with the Sotheby's worldwide anti-money laundering combating terrorist financing policy and anti-tax evasion facilitation policy?

A.  Yes, I am.

Q.  Can you show the witness Plaintiff's Exhibit 221.

            Is this the policy that you were referring to?

A.  Yeah, that is correct.

            MR. KORNSTEIN:  Offer it into evidence.

            MR. ASNER:  Objection.

            THE COURT:  Objection?

O1H3ACC4                     Valette – Direct

MR. ASNER:  No objection.

THE COURT:  Admitted.

(Plaintiff's Exhibit 221 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  Yes.

Q.  Looking at the first page, you see in the second paragraph, second line, this policy applies to all employees.  You see that?

A.  Yeah.

Q.  Second line?

A.  I see that?

Q.  Two lines below that, it says "It is your responsibility to familiarize yourself with the rules contained in this policy and to ensure compliance with them."

You see that?

A.  Yes, that's correct.

Q.  "All employees must be vigilant in the fight against money laundering."

Is that correct?

A.  That is correct.

Q.  And you see two paragraphs down, "You must ensure that you understand your individual responsibilities under this policy, any applicable procedures, as well as your general obligation to report any suspicions of criminal conduct on the part of a client to the compliance department immediately."

You understand that?

A.   That is correct.

Q.   Then just below that, the heading is "Raise concerns, do not ignore them."  In bold.  Then the text says, "If you have any concerns about the activity of a client or legality of a transaction in which Sotheby's is involved, you must raise those concerns with the compliance department or via the hotline immediately."

A.   That is correct.

Q.   And go to page 2.  You see the next-to-the-last paragraph says, You are required to comply in good faith, that's the wrong -- right.  Page 2 of Exhibit 221.

"You are required to comply in good faith with both the letter and spirit of this policy.  No exceptions may be made."

Correct?

A.   It says you are required to comply in good faith, yes, with both the letter and spirit.  No exceptions may be made unless you have obtained approval in advance from the compliance department.

Q.   Below that it says, "Failure to follow these rules may give rise to individual criminal liability on part of the individual employees and directors and corporate criminal or civil liability on the part of the company."

You see that?

O1H3ACC4                    Valette – Direct

A.  Yes, I do.

Q.  Would you turn to page 4.  There it has a section at the top about identifying the client, which is very similar to what we saw in the know your client rules, correct?

A.  Yeah, that's correct.

          I'm sorry.

Q.  On page 7, you see the section dealing with source of wealth, source of funds.

          "There is an understanding of the way in which our clients have obtained the property they consign and sell through us, and an understanding of the way they have obtained the underlying wealth that enabled them to obtain the property, lies at the heart of our anti-money laundering strategy. Business getters, client contacts, and specialist departments are primarily responsible for knowing their clients sufficiently well to form a good faith belief through personal knowledge, internet checks, and/or other background checks that they are not engaged in criminal activity, and that their wealth and any property consigned does not represent the proceeds of crime."

          You see that?

A.  That is correct.

Q.  Turn to page 12, please.  You see the section about suspicion.  "Sotheby's may not establish or maintain a business relationship or conclude a transaction with a client if at any

O1H3ACC4                    Valette - Direct

time we are suspicious about the client, the source of funds."

It goes on, "Suspicion is a subjective test.  You cannot be

instructed to be suspicious or not to be suspicious."

          Do you see that?

A.  Yeah, I do.

Q.  And then at the bottom it says, "All employees are required

to report any suspicious transactions or suspected fraud to the

compliance department."

A.  That is correct.

Q.  Then on the next page, at the top, "To be aware of abnormal

transactions or dealing patterns, see the red flag section

below, even from existing clients.  Keep a full record of all

conversations or any relevant circumstances underlying your

suspicions.  These should be passed immediately to one of the

lawyers in the compliance department."

          You see that?

A.  Yes, that's correct.

Q.  "Activity which may cause concern red flags."

          Are you familiar with that section also?

A.  Sure.

Q.  Turn to the next page.  You are see the second full

paragraph, it says that "The client repeatedly requests

exceptions to normal policies and procedures in order to

maintain an unusual degree of secrecy."

          Do you see that?

O1H3ACC4                        Valette - Direct

A.   I do.

Q.   And you see three paragraphs down from that, "If the client
seems oddly unconcerned about price levels or determining the
suitability of the property to its needs."

A.   That is correct.

Q.   Then the paragraph after that, "Purchases or consignments
are inconsistent with the client's trade, business, or
collecting and living habits, are disproportionate to the
client's means or diverge from past practices.  For example, a
client who for the past three years has made total annual
purchases of $100,000 suddenly buys a diamond for $8 million."

          You see that?

A.   I do.

Q.   And did you think any of these comments applied to yourself
and Mr. Bouvier and Blancaflor?

A.   I don't, no.

Q.   And if you turn to page 19 of this document.  Management
responsibilities at the top.

          Were you consider a manager as of the time between
2011 and 2014?

A.   Well, it say managers are employees who have one or more
persons reporting to them.  Now I have some reports, but at the
time I was a specialist, so I think I was more in the
specialist category.  I had nobody actually reporting to me at
the time.

Q.  Okay.

A.  Maybe, you know, I have an assistant.

Q.  Okay.

A.  But, it says managers --

THE COURT:  If you are reading to yourself, read to yourself.  Otherwise read slowly and clearly.

THE WITNESS:  I'm sorry about that.

Q.  In the course of your relationship with Mr. Bouvier, you had Sotheby's get some gifts for him, isn't that correct?

A.  Yeah, quite rarely, but yes.

Q.  And didn't you have Sotheby's get him two cases of wine for about 10,000 English pounds?

A.  That was back in 2011, yes.

Q.  Correct?

A.  Yes, that's correct, yes.

Q.  And didn't you also arrange for Sotheby's to get him, get Mr. Bouvier seats at a horse show in Hong Kong, and those seats cost 55,000 Hong Kong dollars?

A.  I think that's a little bit different.  If I remember correctly, Mr. Bouvier was into -- he had show jumping horses or he was into show jumping, and he asked us to take a table at this Hong Kong show jumping event where we could invite our clients, because he was somehow connected with the event.  This event or something.  That's a little different.

Q.  Well, and you agreed?

A.   Well, if I remember correctly, I think I just passed it on to my colleagues in Hong Kong to see if they wanted to do it. Of course if they wanted to do it, I would be happy because then we have a happy client and you know.  That's -- that's a good outcome.  But, ultimately it was their decision.  I don't know if they took a table or not.

Q.   You encouraged them?

A.   Of course, yeah, yeah, of course.

Q.   You said how important the client is?

A.   I wouldn't -- Mr. Bouvier was an important client, yes.

Q.   You said the client expected to receive that?

A.   Expected, I don't know if I said that.  If you showed me the e-mail I can tell you, but...

Q.   Show the witness, please, Plaintiff's Exhibit 227 for identification.

A.   So this -- sorry.  Do I reply?

Q.   First, do you recognize this document?

A.   Yes, I do.

Q.   What is it?

A.   It is an e-mail chain between Patty Wong, who was a colleague in Hong Kong, Bruno Vinciguerra, who we talked about, Kevin Ching who I think at the time he was the Hong Kong managing director, and myself.

          MR. KORNSTEIN:  Offer it into evidence.

          MR. ASNER:  No objection.

O1H3ACC4                    Valette - Direct

THE COURT:  Admitted.

(Plaintiff's Exhibit 227 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  You may.

Q.  You write My main client -- by that you mean Bouvier and Blancaflor -- will be in Hong Kong attending the jumping show in February and suggests Sotheby's take a table for eight persons.  Could we look into that.  I copied Bruno, the COO of the company, who knows the client as well, many thanks.  Correct?

A.  That is correct.

Q.  That was after receiving a request from Mr. Bouvier?

A.  Yes, that's correct.

Q.  And you get a response from Patty Wong, and she says:  A table at the main competition is, final is February 23, is HKD 55,000.  I have been to these riding events often, and if we are not guests of the main sponsor Longines to ensure a good table to entertain our guests, we will need to book right away and perhaps take two tables to make my own group.  I know how important the client is and we will oblige if that is what the client expects.

Do you recall that?

A.  Yeah, I agree.

Q.  You traveled from time to time in Mr. Bouvier's private plane?

O1H3ACC4                      Valette - Direct

A.  Yes, that are is correct.  We came to America to see a picture I think once or twice, yes.

Q.  And you stayed from time to time on Mr. Valette's yacht?

A.  Mr. Bouvier's yacht.  I don't have one.  Yes, Mr. Bouvier's yacht, yes.

Q.  And after one such occasion, you sent him an e-mail with one word.  Remember that?

A.  I do remember.

Q.  And that one word was fantastique?

A.  Fantastique, yes.

Q.  Show the witness Exhibit 234, please.

        Do you recognize that document?

A.  Yes, I do.  That's a translation of it.

Q.  And we can show him the French.  That was after staying on Mr. Bouvier's yacht?

A.  Yes.

Q.  That was in July of 2011?

A.  That is correct.

Q.  That was before you were appointed key client manager for Mr. Rybolovlev?

A.  Yes, that's correct.

Q.  But you were working on a number of projects with Mr. Bouvier?

A.  Well, I had sold for Mr. Bouvier back since 2007 and 2010, and he had started buying as well important things, so yes.

O1H3ACC4                       Valette - Direct

Q.   And when you did fly on Mr. Bouvier's private plane, you didn't pay anything?

A.   No, no, no, I didn't.

Q.   And you didn't pay for any stay on the yacht?

A.   No, I didn't.

         MR. KORNSTEIN:  Offer to move Plaintiff's Exhibit 234 into evidence.

         MR. ASNER:  No objection.

         THE COURT:  Admitted.

         (Plaintiff's Exhibit 234 received in evidence)

         MR. KORNSTEIN:  May I publish please?

         THE COURT:  You may.

Q.   The one-word response after his visit on the yacht.

         You stayed on the yacht more than once, correct?

A.   Yes, that's correct.

Q.   And you recall in July of 2012 staying on the yacht?

A.   Yeah, that's possible.

Q.   Show the witness Plaintiff's Exhibit 323.

         Do you recognize this document?

A.   Yes, I do.

         MR. KORNSTEIN:  Offer it into evidence.

         MR. ASNER:  Objection.

         THE COURT:  Was that no objection?

         MR. ASNER:  No objection.

         THE COURT:  Admitted.

(Plaintiff's Exhibit 323 received in evidence)

MR. KORNSTEIN:  May I publish?

THE COURT:  Yes.

Q.  You write -- well, Mr. Bouvier writes to you July 8, 2012, "I hope your stay was nice.  Can you give an update tomorrow for the date of the arrival of the Head in Geneva."

Was that after you stayed on the yacht?

A.  Yes, I think so.

Q.  And you write back "The stay was fantastic.  I'll give an update tomorrow for the date of arrival."

A.  That is correct.

Q.  In French you called it fantastique?

A.  Yes.

MR. KORNSTEIN:  Can we play from Mr. Valette's deposition page 332, line 17, to page 334, line 12.

MR. ASNER:  No objection.

THE COURT:  You may.

(Video playing)

"Q.  Did you ever spend time on a yacht that Mr. Bouvier either owned or leased?

"A.  Mr. Bouvier invited me on his boat, and I spent a few days and some time on his boat, a few times.

"Q.  What kind of boat is it?

"A.  A, it's a motorboat.  Or it was a motorboat.

"Q.  A motorboat?

"A.   Motor.   Motor.   Motorboat.

"Q.   What's in it?

"A.   No, no, sorry.   No sails.   Motor.   Motorboat.   Is that not a word?

"Q.   Motorboat is a word.   It usually means a relatively small boat.   Was it -- is it more properly called a yacht?

"A.   Look I'm not a, I'm not a boat person.   So I can't tell you.   It was big enough, if that's the question.   It was a nice boat with no sails and that he kept in the Mediterranean, and I went a few times.

"Q.   Where was the port?

"A.   That's a good point.   I think it was in the south of France, maybe Nice or something like this.

"Q.   And did you sleep on the boat?

"A.   I did sleep on the boat, yes.

"Q.   How many people could sleep on the boat?

"A.   I think there were, if I remember correctly, maybe three -- two -- three rooms, three bedrooms I believe.   It is not a huge boat, but it was a decent size.

"Q.   Okay.   And you said you spent a few times on the boat. How many times?

"A.   I think I went there two or three times as far as I can remember."

          MR. KORNSTEIN:  Stop there.

          THE COURT:  Actually, we're going to stop there all

together for the day because it's two minutes past our normal hour.

Ladies and gentlemen, first, just a reminder that tomorrow we are going to have a slightly different schedule. We are going to just take a short break in the morning and we will end for the day around lunchtime, probably around 12:45, give or take, but I'll let you know tomorrow. And actually, we are going to have to do the same thing on Friday. I have another thing in the afternoon on Friday, so we're going to have to do that same thing. So both days you'll get out of school early, so to speak, and we'll have just a short break, rather than our longer short break.

With that, my usual reminders apply. Don't discuss the case, don't do any research about the case. Continue to keep an open mind.

I can tell you we're making pretty good progress. By the end of the week, I hope I'll have a little bit better handle on things and can perhaps give you a status update. But, for the moment I can assure you we are making good use of your time and that's good news. So with that, please be in the jury room tomorrow same time by 8:45 so we can get started promptly.

Get home safely, stay warm, and have a good afternoon. Thank you.

(Jury excused)

THE COURT:  You may be seated.

Mr. Valette, you may step down and subject to the same instructions again.

Mr. Kornstein, that was the longest hour and a half I've ever experienced.  What's your estimate on how much time remains?

MR. KORNSTEIN:  Five minutes.

THE COURT:  Five minutes?

MR. KORNSTEIN:  Yes.

THE COURT:  Great.  Then Mr. Asner, you said two to three days total you think?

MR. ASNER:  Yes, your Honor.  We're going to constantly try and trim and we are trimming.

THE COURT:  Great.  Good.  So, certainly before the end of the week, I'll want a little bit of a sense of what you anticipate your case will look like next week so I can plan accordingly.

There was a letter filed earlier today by plaintiff with respect to certain exhibits that are anticipated with Mr. Heller.  Obviously it sounds like we have a little bit of time to get to it, but I assume defendants will want to respond.

MS. SHUDOFSKY:  Yes, your Honor.  I haven't looked at it yet, but we'll do so immediately after this session.

THE COURT:  Make sure by the close of -- well, by

O1H3ACC4                    Valette - Direct

3 o'clock tomorrow, no later.  But if you can get it sooner, all the better.

Anything for plaintiff?

MR. KORNSTEIN:  No, your Honor.

THE COURT:  Anything for defendants?

MR. ASNER:  No, your Honor.

THE COURT:  I once again have another proceeding, so clear out as quickly as you can.  And a reminder to those in the back to throw out your garbage.  Thank you very much.

Have a good day and I'll see you tomorrow.

(Adjourned until January 18, 2024, at 9 a.m.)

INDEX OF EXAMINATION

Examination of:                                              Page

 SAMUEL DAVID VALETTE

Direct By Mr. Kornstein  . . . . . . . . . . . 990

PLAINTIFF EXHIBITS

| Exhibit No. | Received |
|---|---|
| 16 | 993 |
| 144 | 994 |
| 147 | 997 |
| 142 | 1001 |
| 145 | 1005 |
| 266 | 1010 |
| 78 | 1015 |
| 79 | 1016 |
| 210 | 1020 |
| 473 | 1025 |
| 172 | 1035 |
| 175 page 3 | 1048 |
| 178 | 1051 |
| 258 | 1060 |
| 13 | 1061 |
| 103 | 1062 |
| 100 | 1066 |
| 344 | 1068 |
| 345 | 1072 |

140 . . . . . . . . . . . . . . . . . . . . . . .1086

196 . . . . . . . . . . . . . . . . . . . . . . .1091

14 . . . . . . . . . . . . . . . . . . . . . . .1095

114 . . . . . . . . . . . . . . . . . . . . . . .1096

185 . . . . . . . . . . . . . . . . . . . . . . .1100

74 . . . . . . . . . . . . . . . . . . . . . . .1102

203 . . . . . . . . . . . . . . . . . . . . . . .1105

17 . . . . . . . . . . . . . . . . . . . . . . .1114

119 . . . . . . . . . . . . . . . . . . . . . . .1116

120 . . . . . . . . . . . . . . . . . . . . . . .1117

184 . . . . . . . . . . . . . . . . . . . . . . .1124

181 . . . . . . . . . . . . . . . . . . . . . . .1126

251 . . . . . . . . . . . . . . . . . . . . . . .1131

71 . . . . . . . . . . . . . . . . . . . . . . .1132

94 . . . . . . . . . . . . . . . . . . . . . . .1141

302 . . . . . . . . . . . . . . . . . . . . . . .1148

222 . . . . . . . . . . . . . . . . . . . . . . .1149

221 . . . . . . . . . . . . . . . . . . . . . . .1154

227 . . . . . . . . . . . . . . . . . . . . . . .1161

234 . . . . . . . . . . . . . . . . . . . . . . .1163

323 . . . . . . . . . . . . . . . . . . . . . . .1164

DEFENDANT EXHIBITS

Exhibit No.                                      Received

632 . . . . . . . . . . . . . . . . . . . . . . .1037

640 . . . . . . . . . . . . . . . . . . . . . . .1038

198   . . . . . . . . . . . . . . . . . . . . . .1073

502   . . . . . . . . . . . . . . . . . . . . .1128

504   . . . . . . . . . . . . . . . . . . . . .1129