O1Q3ACC1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ACCENT DELIGHT INTERNATIONAL
    LTD.,
4
                    Plaintiff,
5
                v.                          18 Civ. 9011 (JMF)
6
    SOTHEBY'S and SOTHEBY'S, INC.,
7
                    Defendants.             Trial
8
    ------------------------------x
9                                           New York, N.Y.
                                            January 26, 2024
10                                          8:50 a.m.

11  Before:

12                  HON. JESSE M. FURMAN,

13                                  District Judge
                                    -and a jury-
14

15                      APPEARANCES

16  EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
        Attorneys for Plaintiff
17  BY:  DANIEL J. KORNSTEIN
        O. ANDREW F. WILSON
18      ZOE A. SALZMAN

19  ARNOLD & PORTER KAYE SCHOLER LLP
        Attorneys for Defendants
20  BY:  MARCUS A. ASNER
        SARA L. SHUDOFSKY
21      BENJAMIN C. WOLVERTON
        YIQING SHI
22      SAHRULA KUBIE

23
    Also Present:  Yana Agoureev, Interpreter (Russian)
24                 Elana Pick, Interpreter (Russian)

25

O1Q3ACC1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning.  Welcome back.  Things are

3     not quite going as smoothly this morning.  Two jurors had train

4     delays on the 4, 5, 6, because there are some major delays.

5     Ms. Smallman will be a few minutes late, but hopefully it will

6     all work out.

7          Anyway, one issue we need to discuss is PX 473.  I

8     entered an order on that score this morning.  Let me say that I

9     agree with the defendants' particularized objections, that is

10    to say, I agree that paragraph 443 is not going to come in

11    regardless.  I don't think that anything defendants did opened

12    the door to that.  So, that would be stricken in any event.

13         I agree that paragraph 398 is inadmissible because it

14    references works, which is a defined term at the time of

15    summary judgment to include works that are no longer at issue

16    here, and thus is misleading.  And the lack of dispute with

17    respect to that proposition -- it's not clear what it means in

18    the context of this trial.

19         And I agree that some of the paragraphs are disjointed

20    and lacking context which would be confusing.  Defendants cite

21    two examples, I found a few others.  So to the extent that the

22    document comes in, I can identify those as well.

23         But I raise a broader concern, which is it struck me

24    that the document was entirely cumulative of evidence that's

25    already in the record, and in that regard, not clear to me it

O1Q3ACC1

1    should come in at all.

2              So, plaintiff, do you want to tell me why I'm wrong?

3              MR. WILSON:  No, your Honor.  We're going to drop the

4    exhibit.

5              THE COURT:  All right.  There you go.  What else do we

6    have to discuss?

7              MR. KORNSTEIN:  Your Honor, about the *Tête* auction

8    claim, we listened to what you said yesterday, we heard what

9    you said.  We had been considering that issue ourselves, we

10   want to see how the evidence came in.  Last night we talked

11   among ourselves and with our client.

12             To streamline what's left of the proceedings, we will

13   withdraw the *Tête* auction claim.

14             THE COURT:  Okay.

15             MR. KORNSTEIN:  It may save some briefing.

16             THE COURT:  All right.  Certainly will save some

17   argument.  Very good.  So that claim is deemed withdrawn.  I

18   will advise the jury that they won't be asked to deliberate on

19   that and shouldn't speculate as to why.

20             I guess one question that you should ponder and

21   discuss with each other is whether I should do that before

22   closings, to explain why there is no reference to the auction,

23   or wait until the instructions after closings.  But we can

24   discuss that at the charge conference.

25             Anything else?

O1Q3ACC1

1          MS. SHUDOFSKY:  Just wanted to confirm with your Honor

2    how you would like the defendants to raise the Rule 50

3    application after plaintiff rests.  Should we simply state on

4    the record we move pursuant to Rule 50 on all claims?

5          THE COURT:  No.  I was under the impression that,

6    given our discussion yesterday, that I would deem you to have

7    made that motion without the need to articulate it on the

8    record in front of the jury.  And then we can take it up after

9    the jury leaves.

10          MS. SHUDOFSKY:  Understood, your Honor.  Thank you.

11          THE COURT:  Anything else?  I was expecting a longer

12    discussion.

13          MR. ASNER:  Your Honor, if I could, I'd like to just

14    take a moment with Mr. Ruprecht, because I was going to address

15    the *Tête* auction claim, and I need to confer about whether I

16    can just skip all of that.

17          THE COURT:  I think you should skip all of it.

18          MR. ASNER:  I have to look whether there is something

19    in there that I need.

20          THE COURT:  That's fine.  We have at least another

21    five minutes, it is not yet 9.  So I am going to stay on the

22    bench, but you have a few minutes to roam and do whatever you'd

23    like.

24          (Pause)

25          MR. ASNER:  Your Honor, we do think that the Court

O1Q3ACC1

1    should say something about that not being in the case.  I'm a

2    little concerned if we don't say that's no longer in the case

3    that I will -- the jury will wonder why I'm not asking Bill

4    Ruprecht about it, since there is that e-mail where I went

5    through with all of the charts and essentially auction

6    guarantee that he had to approve, and I don't want anybody to

7    think that I'm intentionally hiding the ball on something.  If

8    the Court could just say that that is no longer an issue in the

9    case or something like that.

10            THE COURT:  Plaintiff?

11            MS. SALZMAN:  I think the appropriate time is in the

12    charge.  At this point I think the jury's been inundated with

13    documents.  The idea they are going to focus on this seems far

14    fetched, and we would like the opportunity to propose the

15    proper way to frame it.  And I'm sure defense counsel would

16    like the opportunity to weigh in on that too.

17            THE COURT:  I agree.  I find it far fetched to think

18    that the jury will read anything into not going into it.  There

19    is a lot going on in this case.  Mr. Ruprecht is really at the

20    tail end of the case, and much of what he's already said is

21    arguably cumulative.

22            He's already made clear he had limited involvement in

23    a number of the transactions.  I think they will presumably

24    infer he didn't have a whole lot to do with it and he won't be

25    crossed on it.  In that regard, it is not as if the absence of

O1Q3ACC1

1    asking about it won't be called to their attention.

2            MR. ASNER:  I get it.  It is more of a pedological,

3    psychological thing.  We did spend a great deal of time on

4    that, as you know.

5            THE COURT:  I understand.  For your psychological

6    needs, look elsewhere, not to me.

7            MR. ASNER:  I was thinking it wasn't my psychological

8    needs, although that's a different discussion, perhaps.

9            THE COURT:  Can we get Mr. Ruprecht on the stand

10   because we do have our jury here and we will get them and get

11   going.

12           Mr. Asner, am I correct in hoping that that means your

13   remaining direct will be a little shorter?

14           MR. ASNER:  It will definitely be a little shorter.  I

15   think when I said 10 to 15, I probably should have said 15 to

16   20, so now it's 10 to 15.

17           THE COURT:  Actually I think you said 20 to 30, but

18   I'm happy to hear you thought it was lower.

19           MR. ASNER:  I didn't review the transcript on that.

20           THE COURT:  All right.  Very good.

21           (Continued on next page)

22

23

24

25

O1Q3ACC1                    Ruprecht - Direct

1           (Jury present)

2           THE COURT:  Welcome back.  Good morning.  Another

3   rainy day.  I know there were some major delays on the 4, 5, 6

4   this morning and I think a couple of you fell victim to it.  I

5   very much appreciate, number one, you were here on time for us

6   to more or less start on time anyway, and number two, that you

7   let us know, just so we could plan accordingly.  So thank you

8   for that.  And thank you who were here on time, because however

9   you got here, worked.  That's also great.  So thank you.

10          We will continue with the direct testimony of

11  Mr. Ruprecht.  Mr. Ruprecht, you remain under oath, and I

12  remind you to speak loudly, clearly, and into the microphone.

13          And Mr. Asner, you may proceed.

14          MR. ASNER:  Thank you very much, your Honor.

15   WILLIAM RUPRECHT,

16       called as a witness by the Defendant,

17       having been previously sworn, testified as follows:

18  DIRECT EXAMINATION (Continued)

19  BY MR. ASNER:

20  Q.  Mr. Ruprecht, good morning.  Let's take a look at

21  Defendant's Exhibit 685.

22          Mr. Ruprecht, before we broke, we were talking about

23  this picture, which is Klimt's *Wasserschlangen*.  Were you

24  involved in the sale of this picture?

25  A.  Yes, I was involved with the sale of the painting.

O1Q3ACC1                    Ruprecht – Direct

1   Q.  Who was the buyer?

2   A.  I interacted with Jean-Marc Peretti I believe on behalf of

3   Blancaflor.

4   Q.  Who was the seller?

5   A.  The seller is a complex answer to who is the seller, in

6   that there was a woman in Austria who had possession of the

7   picture.  In the end of the day, I believe there were a number

8   of groups who became beneficiaries or got benefit from the sale

9   of the picture.

10          A woman, however, in Austria who had it from the war

11  years forward was in possession of the picture.

12  Q.  Now, what role, if any, did you have in negotiating the

13  sale to Blancaflor, Peretti?

14  A.  I was asked by Sam Valette and Melanie Clore to fly to

15  Paris to meet Peretti and discuss the sale of the picture,

16  which I did.

17  Q.  Where did those discussions take place?

18  A.  Those discussions took place in a hotel room in the Bristol

19  Hotel.

20  Q.  In Paris?

21  A.  Yes.

22  Q.  Who were involved in the discussions that day?

23  A.  Sam Valette, myself, and Jean-Marc Peretti.

24  Q.  If you would, sir, please describe your memory of those

25  negotiations.

O1Q3ACC1                         Ruprecht - Direct

1    A.  We had the typical pleasantry, hi, how are you, that kind

2    of stuff.  That quickly evolved into a discussion of the

3    picture, the quality of the picture, and how we rated it.  And

4    then we began a discussion about securing a bid for the sale of

5    the picture, which I don't remember the details of, other than

6    to say that it started someplace in the 130s and it ended up

7    somewhat below that in the 120s as a price for the painting.

8    Q.  So, let's take a look at plaintiff -- I'm sorry.  So it was

9    you and Mr. Peretti and who else was with you?

10   A.  Sam Valette.

11   Q.  Was there anyone else there?

12   A.  Not to my memory, no.

13   Q.  Let's take a look at Plaintiff's Exhibit 341 which is in

14   evidence.  You see there is a series of e-mails between you and

15   Mr. Vinciguerra.  The bottom e-mail you write, this is

16   September 11, 2012, "Klimt done at 126 million."

17              Is that the Klimt *Wasserschlangen*?

18   A.  Yes, that's the picture that we were discussing, yes.

19   Q.  And then you say "shhh."  Why was it to be quiet?

20   A.  Yes, that was just a reference to being confidential.

21   Q.  And why was it supposed to be confidential?

22   A.  Just about everything in the art business is confidential

23   between buyers and sellers, and I didn't want anybody with a

24   very significant value or important picture talking about it in

25   a way that could interrupt or upset the transaction.

O1Q3ACC1                      Ruprecht - Direct

1   Q.  And then it says "Deal subject to Lucian's next efforts

2   with heirs."

3            Who is Lucian being referred to there?

4   A.  Lucian Simmons is a man at Sotheby's who worked in many

5   cases with families who might have been involved with their art

6   having been taken from them, and he negotiated with many

7   parties, often, to build what I call sort of a Lego of pieces

8   in order to create transactions when there were disputes about

9   who might have a claim to a work of art.

10  Q.  And then Mr. Vinciguerra responds, "Wow.  Congrats.  What

11  is our commission?"  And you say, "Just under 8 as I recall."

12           The number 8, is that percentages or millions or do

13  you remember?

14  A.  I don't actually remember the specifics of the commission,

15  but I believe that would have been 8 million.

16  Q.  Let's take a look at Plaintiff's Exhibit 13.  This is in

17  evidence.

18           Mr. Ruprecht, I want to first off identify, there's

19  some initials right in the middle of the first non-bolded

20  sentence.  Whose initials are those?

21  A.  Those are my initials.

22  Q.  And then it says we agree to pay -- I'm sorry.  We agree to

23  pay Sotheby's a purchase price of -- first it says 140 million,

24  and then it says 126 million.

25           Why did it originally say 140 million?

O1Q3ACC1                    Ruprecht - Direct

1    A.  I don't recall but, all I could do is speculate.

2    Q.  Do you have an understanding for why it said 140 million?

3    A.  As I said, my speculation, and it is only that --

4           THE COURT:  Let's leave that, Mr. Ruprecht, let's not

5    speculate.  So next question.

6    Q.  Is that your handwriting crossing it out?

7    A.  No, that's not my handwriting.

8    Q.  But the initials above it are your handwriting?

9    A.  Those are my initials.

10   Q.  And then let's go down.  You see that there in paragraph 2,

11   it says "You and Sotheby's agree that the sale of the property

12   under this agreement and Sotheby's and the seller's obligations

13   hereunder will be subject to the fulfillment of all the

14   following conditions precedent" and it says not later than 27th

15   April 2013, and then that's crossed out and it says

16   December 31, 2012.

17   A.  I see that, yes.

18   Q.  Whose handwriting is December 31, 2012?

19   A.  That looks like my handwriting.

20   Q.  And the initials to the right of that, are those your

21   initials?

22   A.  Those would be mine.

23   Q.  And let me just ask you.  What is the conditions precedent

24   that is supposed to be resolved by December 31, in general

25   terms?

O1Q3ACC1                        Ruprecht - Direct

1    A.  Well, what the letter, the contract states is that we would

2    have secured the right to move the picture out of Austria, and

3    that the various parties who had a claim or an interest in some

4    of the money from the sale of the picture would have agreed and

5    understood what their participation was going to be in the

6    proceeds.

7    Q.  So those conditions precedent needed to be met before the

8    transaction was final?

9    A.  Transaction could not take place without those things being

10   realized.

11   Q.  If we could go to the next page.  And the next page.  You

12   see on the left, there's a signature for and on behalf of

13   Sotheby's Kunstauktionen.  Is that the Austrian subsidiary?

14   A.  I believe that's the case.

15   Q.  And whose signature is that?

16   A.  That's my signature.

17   Q.  Then it says September 11, 2012.  Do you see on the right,

18   there is a signature and a name Yves Bouvier, 11

19   September 2012?  Do you see that?

20   A.  Yes.

21   Q.  Was Mr. Bouvier actually in the room with you for this?

22   A.  No, sir, he was not.

23   Q.  Now, were these conditions precedent -- we can drop that.

24   Were the conditions precedent ultimately resolved?

25   A.  Yes, the various parties came to an agreement with Lucian

O1Q3ACC1                        Ruprecht - Direct

1     Simmons, and Austria gave the painting a right to be removed
2     from Austria.
3     Q.  Now, the plaintiff here has alleged -- we've just seen that
4     the sale price was 126 million.  The plaintiff here has alleged
5     that they purchased the Klimt for $183.8 million.  When did you
6     first learn that?
7     A.  I never had any idea of that while I was working at
8     Sotheby's.  I would have only understood that from looking at
9     newspapers after I had left Sotheby's.
10    Q.  Did Sotheby's make any money on that resell between the
11    overage between 126 million and 183.8 million?
12    A.  No.  I don't believe Sotheby's would have participated in
13    any way in that transaction.
14            THE COURT:  Can you remind us when you left Sotheby's?
15            THE WITNESS:  My -- I was notified that my employment
16    was concluded, going to be concluding some time in November of
17    2014.  And they asked me to stay in a ceremonial capacity for
18    several months while they recruited a new chief executive.
19            THE COURT:  So when you say you didn't learn about --
20            THE WITNESS:  I did not know about it -- excuse me --
21    until after I left the company.
22            THE COURT:  So --
23            THE WITNESS:  Which, I can't tell you.  I could go
24    back to my calendar as to what the last day I was there.  But I
25    suspect that was some time in February or first week of March

O1Q3ACC1                    Ruprecht - Direct

1   of --

2   Q.  To be clear, did you first learn about this in the press

3   when the news of the --

4   A.  I learned about this in the press.  Not from anybody at

5   Sotheby's.

6   Q.  This was the press involving the Bouvier-Rybolovlev affair?

7   A.  Correct, that's correct.

8   Q.  Let's take a look at Defendant's Exhibit 686.  Do you

9   recognize this painting?

10  A.  This is a painting attributed to Leonardo da Vinci.

11  Q.  Generally speaking, what role, if any, did you have in this

12  transaction?

13  A.  None.

14  Q.  Have you ever met an individual named Dmitry Rybolovlev?

15  A.  No, sir.

16  Q.  Prior to yesterday and today, had you ever seen him before?

17  A.  No, sir.

18  Q.  As far as you know, while you were the chief executive

19  officer of Sotheby's, did Sotheby's ever transact with him?

20  A.  Not to my knowledge.

21  Q.  What understanding, if any, did you have of a relationship

22  he may have had with Bouvier or Blancaflor?

23  A.  I believe I heard his name once from Sam Valette.

24  Q.  Best as you can recall, what did you hear?

25  A.  I don't remember when in the period of Sam's engagement

O1Q3ACC1                    Ruprecht - Direct

1   with Jean-Marc Peretti would have taken place, but at some

2   point in that, he said something to the effect of I believe

3   Peretti/Bouvier has a client named Mr. Rybolovlev.

4   Q.  Do you know an individual named Michael Sazonov?

5   A.  No, I do not.

6   Q.  Do you know a woman named Elena Rybolovleva?

7   A.  I do not know that person.

8   Q.  Do you know a woman named Ekaterina Rybolovleva?

9   A.  I don't know that person.

10  Q.  Have you heard of Accent Delight, other than this

11  litigation?

12  A.  No, I've never heard of the company except here.

13  Q.  While you were CEO, are you aware of any of the Sotheby's

14  entities transacting with Dmitry Rybolovlev or the people that

15  I just mentioned at all?

16  A.  Not to my knowledge.

17  Q.  Prior to the media reports of the dispute between

18  Mr. Rybolovlev and Yves Bouvier, did you have any understanding

19  of a relationship that Bouvier or Peretti or Blancaflor may

20  have had with Mr. Rybolovlev?

21          MR. WILSON:  Objection.

22          THE COURT:  Sustained.  Asked and answered.

23  Q.  The judge asked you earlier when you left Sotheby's.  When

24  you left, did you have a severance agreement?

25  A.  Yes, I believe a separation agreement, yes.

O1Q3ACC1                    Ruprecht - Cross

1    Q.  Is there anything in that agreement that impacts your

2    testimony today?

3    A.  No, I do not believe so.

4    Q.  Are you being paid to testify today?

5    A.  Unfortunately not.

6              MR. ASNER:  I have no further questions.

7              THE COURT:  Cross-examination?

8    CROSS-EXAMINATION

9    BY MR. WILSON:

10   Q.  Good morning, Mr. Ruprecht.

11   A.  Good morning, sir.

12   Q.  As chief executive of Sotheby's, either you or the general

13   counsel needed to approve the creation of confidential client

14   accounts; is that right?

15   A.  We established a system to create confidential accounts at

16   the request of clients.

17   Q.  And part of that system was to require the chief executive

18   or the general counsel to approve the creation of that account;

19   is that fair?

20   A.  I believe those were the approvals, yes.

21   Q.  And your approval for a confidential client account was

22   necessary, regardless of which Sotheby's subsidiary worked with

23   the client, right?

24   A.  I believe that's a true statement, yes.

25   Q.  And you know that Yves Bouvier was approved for a Sotheby's

O1Q3ACC1                    Ruprecht - Cross

1   confidential client account, right?

2   A.  I do not recall that, but no reason to dispute it.

3   Q.  By 2010, you testified that you knew who Jean-Marc Peretti

4   was, right?

5   A.  I believe by 2010 I did know that, yes.

6   Q.  And you knew that Jean-Marc Peretti worked with Yves

7   Bouvier and Blancaflor, right?

8   A.  That is correct, yes.

9          MR. WILSON:  Toby, let's bring up Plaintiff's Exhibit

10  138, please.

11  Q.  Now, if you look, Mr. Ruprecht, at the second-to-last

12  e-mail, you'll see that Melanie Clore is forwarding you an

13  e-mail below.  Do you see that?  June --

14  A.  4:09 p.m., yes.

15  Q.  Melanie Clore writes to you, "FYI, they got them to 3

16  million commission.  Sam and David Ober have done a great job."

17  Do you see that?

18  A.  Yes, sir.

19  Q.  And the document she's forwarding you is a document

20  regarding a transaction; is that fair?

21  A.  Yes.

22  Q.  And you respond that that's awesome, right?

23  A.  Yes.

24  Q.  And then Ms. Clore writes back, Peretti's second six --

25          MR. ASNER:  I don't think this is in evidence.

O1Q3ACC1                         Ruprecht - Cross

1                MR. WILSON:  I apologize.

2                THE COURT:  Sustained.

3                MR. WILSON:  Your Honor, we move it into evidence.

4                MR. ASNER:  No objection.

5                THE COURT:  Admitted.

6                MR. ASNER:  I just got confused.

7                THE COURT:  That's fine.

8                MR. WILSON:  Slow start for all of us.  Now may we

9     publish it to the jury please?

10               THE COURT:  You may.

11               (Plaintiff's Exhibit 138 received in evidence)

12    Q.  Let's try that a little bit of review.  Mr. Ruprecht, the

13    e-mail that you and I were discussing and now the jury can see

14    is the second from the bottom, and you'll see that one's at

15    4:09, right?

16    A.  "FYI they got them the $3 millions commission," yes.

17    Q.  You respond "awesome" to that and then go on to talk about

18    the terms of that deal, right?

19    A.  Yes.

20               MR. WILSON:  Thank you, Toby, and then let's go to the

21    next one above it.  Great.

22    Q.  Melanie Clore responds to you, "Peretti's second $60

23    million dollars pic from us.  And Sam and I have a Rodin

24    carving at circa" or around "15 million lined up for him next

25    week."  Do you see that?

O1Q3ACC1                       Ruprecht - Cross

1    A.  Yes, sir.

2    Q.  And then you responded to that e-mail with great, and then

3    a question, has to be private.

4              Do you see that?

5    A.  Yes, I do.

6    Q.  By that you mean does it have to be a private sale as

7    opposed to an auction?

8    A.  That would have been the question, yes, sir.

9    Q.  And then let's go up one more e-mail, please.  Here,

10   Ms. Clore writes back to you, and she says "Peretti's man won't

11   buy at auction, and the seller insists on it going privately

12   too.  I did try."

13             You see that?

14   A.  Yes, I see it.

15   Q.  So you understood from Ms. Clore's e-mail to you that

16   Peretti's man wouldn't do an auction sale, he would only do the

17   private sale; is that fair?

18   A.  Meaning he wouldn't buy in an auction, only in a private

19   sale.  That appears to be what this says, yes.

20             MR. WILSON:  Thank you, Toby.  You can take that down.

21   Q.  Now, you never personally learned the source of

22   Blancaflor's funds, other than its potential affiliation with

23   art storage; is that right?

24             MR. ASNER:  Objection.

25             THE COURT:  Sustained.

O1Q3ACC1                         Ruprecht - Cross

1    Q.  Well, do you know what the source of revenues was for

2    Blancaflor?

3    A.  I do not know the -- I do not know that.

4    Q.  Earlier in your responses to questions from Sotheby's

5    counsel, you described your responsibility for deal approval as

6    being like a speed bump, right?

7    A.  Yes, sir.

8    Q.  And for certain deals, Sotheby's employees were required to

9    go over that speed bump, right?

10   A.  I'm sorry, I don't understand what you mean to go over a

11   speed bump.  You mean, they had to pause for discussion with

12   the senior members of the organization.

13   Q.  And where your approval was required for a transaction in a

14   circumstance where they were required to pause, you needed to

15   give that approval or the deal would not go forward, right?

16   A.  I believe the governance was it had to be either me or the

17   chief operating officer, or if not available, one other person.

18   But in general, you are correct, those transactions could not

19   proceed without the approval of one of the senior members of

20   staff.

21   Q.  Now, one of the deals you approved was the sale to

22   Blancaflor of Magritte's *Domaine d'Arnheim*, right?

23               MR. ASNER:  Objection.

24               THE COURT:  Overruled.

25               Yes or no?

O1Q3ACC1                    Ruprecht - Cross

1        THE WITNESS:  I do not believe I approved the

2    transaction.  I believe I was notified of that transaction.

3    Because the commission, if I recall from the earlier

4    correspondence you showed me, did not require my approval but

5    it required notification to me.

6    Q.  You were notified of the transaction, right?

7    A.  I was notified of the transaction.  Nisha Amin I think I

8    saw yesterday sent me an e-mail to that effect.

9        MR. WILSON:  Toby, please bring up Plaintiff's Exhibit

10   184.  And let's jump to the second page.  This is in evidence.

11   Third page then, please.  And if we can just blow up the bottom

12   e-mail to start.

13   Q.  You'll see in this e-mail dated November 25, Nisha Amin

14   writes to you, "Please find attached the image of a Magritte,

15   *L'Domaine d'Arnheim* that Sam has been working on for his

16   buyer." You see that?

17   A.  Yes.

18   Q.  And she goes on, "The seller will be happy with the offer

19   of 24.5 million net to them, and we will be earn 7 percent or

20   1.6 million as per our guidelines for this price bracket."  You

21   see that?

22   A.  Yes.

23   Q.  Then she writes, "Your approval is required due to the

24   level of the sale;" right?

25   A.  I see that, yes.

O1Q3ACC1                    Ruprecht - Cross

1    Q.  And is that correct, that due to the level of the sale,
2    your approval was required?
3    A.  I don't mean to be argumentative, sir, but I don't believe
4    that the governance required my approval.  I've never met an
5    administrator who didn't like my signature on documents because
6    it in effect covered their behind on the transaction.  So, I
7    believe this is one of those situations where my notification
8    was required, but any opportunity that somebody like this could
9    get to get my signature on a document, they would pursue it.
10   Q.  All right.  And Nisha Amin is pursuing your signature or
11   your approval on this document in this e-mail; is that fair?
12   A.  That's correct.
13   Q.  And let's go up one more e-mail.  And here, when you
14   respond, you gave her the approval that she was looking for,
15   right?
16   A.  Yes, sir.
17   Q.  Thank you.  We can take that down.
18          You also approved the private sale of Klimt's *Water*
19   *Serpents II*, right?
20          MR. ASNER:  Objection.
21          THE COURT:  Overruled.
22   A.  I was involved with the negotiation and signed the contract
23   for that -- the purchase of that work of art, yes.
24   Q.  One of the reasons that you were involved in those
25   negotiations was because of your status; is that right?

O1Q3ACC1                    Ruprecht - Cross

1   A.  I don't actually know the answer to that question, sir.

2   Sam Valette asked me to fly to Paris to meet with Peretti, and

3   that may well have been the reason he asked me to do it.

4   Q.  Well, isn't it more than that?  Don't you believe that the

5   reason you were asked to go to Paris for this meeting was one

6   based on status, rather than any substantive or unique

7   negotiating ability that you might have had?

8   A.  I don't know the answer to that question, sir.

9   Q.  You gave a deposition in this case, right?

10  A.  Hmm-hmm.

11          THE COURT:  Is that a yes?

12  A.  Yes, I'm sorry, yes.

13  Q.  When you gave that deposition, you took an oath to tell the

14  truth, right?

15  A.  Yes, indeed.

16  Q.  And you did tell the truth in that deposition, right?

17  A.  Certainly believe that's the case, yes.

18  Q.  I am going to take you to a portion of that deposition at

19  pages 33:22-34:7.

20          MR. ASNER:  No objection.

21  Q.  Did I ask you the following question and did you give the

22  following answer in that deposition:

23  "Q.  Why did Melanie Clore ask you to go to this meeting in

24  Paris with Mr. Peretti about the Klimt?

25  "A.  I believe the reason I was asked to go to Paris for this

O1Q3ACC1                        Ruprecht - Cross

1  meeting was one based on status, rather than on any substantive

2  or unique negotiating ability that I might have had.  It was an

3  important painting, and they wanted me to be involved with the

4  discussion."

5  A.  Understood.

6  Q.  I asked you those questions and you gave those answers,

7  right?

8  A.  That's certainly what it appears to be from the deposition,

9  yes.

10  Q.  You testified in response to the question from your own

11  counsel that you had no role in the da Vinci transaction,

12  right?

13  A.  No, I do not believe I had a role in that transaction.

14  Q.  Can we bring up Plaintiff's Exhibit 355, please.  This is

15  in evidence.  And if we can pull out the very bottom e-mail.

16  That's perfect.  Thank you.

17            Now, in this bottom e-mail, you can see that Bruno

18  Vinciguerra is writing in March of 2013, and ultimately this is

19  an e-mail that you were sent.  And if you look in the second

20  portion of this e-mail, he writes "The last thing in is a 100

21  million PT," I think that probably refers to private treaty,

22  right?

23  A.  I see it now, yes.

24  Q.  So he writes, "Last thing in is a $100 million private

25  treaty deal that JM brought us.  He wants to buy through us a

O1Q3ACC1                        Ruprecht - Cross

 1   Leonardo currently owned by a pool of dealers/investors."
 2           Do you see that?
 3   A.  Yes, sir.
 4   Q.  And he goes on, "Auction would be 40 to 60, ask price is
 5   150.  And our guys think it can go for around 100 million."
 6           Do you see that?
 7   A.  Yes.
 8   Q.  And then he goes on to describe the deal that Sam wants,
 9   right?
10   A.  Yes, I see it.
11   Q.  And then above that, you respond, "I'll do it only if you
12   close in March."  Right?
13   A.  Yes, I see that.
14   Q.  Does this refresh your memory that you had an e-mail
15   exchange with Mr. Vinciguerra in March of 2013 concerning the
16   terms of the Leonardo da Vinci deal?
17           MR. ASNER:  Objection.
18           THE COURT:  Sustained.
19   Q.  Do you see that Mr. Vinciguerra responds to your direction
20   that you would only do the Leonardo deal if it closes in March,
21   do you see that response immediately above?
22   A.  Yes, sir.
23   Q.  He responds, "I understand your logic and I will use the
24   argument to push.  That being said, just between you and me, we
25   will also welcome a few million in Q2."

O1Q3ACC1                        Ruprecht - Redirect

1          Do you see that?

2     A.  Yes, I see it.

3     Q.  You understood that he was accepting that your desire was

4     to close the Leonardo deal in March, but that he also thought

5     if you got a few million in Q2, that would be okay as well,

6     right?

7     A.  Indeed, yes.

8     Q.  And you respond, "Be greedy for now."  Right?

9     A.  Yes, sir.

10         MR. WILSON:  Thank you, Mr. Ruprecht.  Those are all

11    my questions.

12         THE COURT:  Any redirect?

13         MR. ASNER:  Very briefly.

14    REDIRECT EXAMINATION

15    BY MR. ASNER:

16    Q.  Mr. Ruprecht, we can put up Plaintiff's Exhibit 355.  What

17    was the role you served in the transaction, if any, for the

18    Leonardo deal?

19    A.  It appears that I encouraged Mr. Vinciguerra to aim for a

20    higher commission on the transaction than he currently had in

21    hand.

22    Q.  And other than requesting or requesting that and then the

23    timing of Q1 versus Q2, did you have any role in negotiating or

24    directing this transaction?

25    A.  Absolutely none.

O1Q3ACC1                          Smith – Direct

 1            MR. ASNER:  No further questions, your Honor.

 2            THE COURT:  You may step down, Mr. Ruprecht.  Thank

 3   you.

 4            (Witness excused)

 5            THE COURT:  Defendants' next witness?

 6            MR. WOLVERTON:  Defendants call Harry Smith.

 7            (Witness sworn)

 8            THE DEPUTY CLERK:  Can you please state and spell your

 9   full name for the record.

10            THE WITNESS:  My name is William Smith.  I'm known as

11   Harry Smith.  I spell it W-I-L-L-I-A-M, second word S-M-I-T-H.

12            THE COURT:  Mr. Smith, if you could pull your chair up

13   so you're right next to the microphone, just speak loudly,

14   clearly, and if you can an inch or two away from the microphone

15   that would be better, and also speak slowly.  And also don't

16   speak when Mr. Wolverton is speaking.

17            With that, you may proceed.

18    WILLIAM SMITH,

19         called as a witness by the Defendant,

20         having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. WOLVERTON:

23   Q.  Good morning, Mr. Smith.

24   A.  Good morning.

25   Q.  Could you please tell us the company that you work for and

O1Q3ACC1                    Smith - Direct

1    what you do for a living?

2    A.  I work for Gurr Johns.  I am an art valuer and an art

3    advisor.

4    Q.  What is Gurr Johns?

5    A.  Gurr Johns is an art valuation and art advisory firm.

6    Q.  Could you explain just a bit of detail what it is that you

7    do at Gurr Johns?

8    A.  Well, I am the CEO of Gurr Johns.  But in my day-to-day

9    work, I value art, and I advise collectors on the purchase and

10   sale of works of art.

11   Q.  Do you have any particular specialty within the field of

12   art?

13   A.  Most recently my specialty is what we call the Classic 20th

14   Century Artists Group, and Impressionist Art.

15           So art really from about 1870 to about 1950.

16   Q.  How about Modern Art.  Would you include that within your

17   specialty?

18   A.  Yes, Modern Art is, generally speaking, any 20th century

19   art.

20   Q.  Mr. Smith, have you been retained to provide expert

21   testimony in this case?

22   A.  I have.

23   Q.  On what topics have you been retained to expert testimony?

24   A.  I've been asked to provide testimony on practices of the

25   art market and valuations generally, the valuation practices in

O1Q3ACC1                         Smith - Direct

1  relation to the Leonardo, and art market valuation practices in

2  general form.  And also to give some comment on the e-mail

3  traffic that was exchanged between parties on the Modigliani

4  *Tête* and the Magritte painting *Domaine d'Arnheim*.

5  Q.  Will part of your testimony be in rebuttal to the opinions

6  expressed by plaintiff's experts Guy Stair Sainty and Robert

7  Wittman?

8  A.  It will.

9  Q.  Do you have a standard rate for your work as an expert?

10  A.  I do.

11  Q.  Are you charging that rate in this case?

12  A.  Yes, I am.

13  Q.  What is the rate you are charging?

14  A.  $750 per hour.

15  Q.  Is your compensation in this case impacted at all by the

16  substance of your opinion?

17  A.  No.

18  Q.  Mr. Smith, let's begin by learning a little bit about more

19  you about how you became a specialist in the art market and in

20  appraising art.

21      Could you describe your educational background.

22  A.  Yes, I was educated privately in the United Kingdom at a

23  school called Charterhouse.  At the age of 19, I went to

24  Bristol where I studied at the university business studies, and

25  I studied there for a further two or three years.

O1Q3ACC1                          Smith - Direct

 1    Q.  Then how is it you came to work in the art market?

 2    A.  After I left Bristol, I applied for a job at Christie's.

 3    Q.  How long were you at Christie's for?

 4    A.  Three years.

 5    Q.  When did you join Christie's?

 6    A.  1970.

 7    Q.  So, sitting here today, how long have you worked in the art

 8    market?

 9    A.  Over 50 years.

10    Q.  What happened after you left Christie's?

11    A.  Immediately after I left Christie's, I set up as a private

12    dealer for about one year, after which I formed an art advisory

13    business, which ran as an art advisory business for about 10

14    years.

15    Q.  When did you form that business?

16    A.  1975.

17    Q.  Then what happened after that?

18    A.  1985, I came across a company called Gurr Johns which was a

19    very well-known valuation business in the U.K.  And I managed

20    to acquire the business and become the CEO.

21    Q.  Have you been the head of Gurr Johns since then?

22    A.  I have.

23    Q.  Could you explain how the advisory side of your business

24    works.

25    A.  Yes.  We advise our clients on the purchase and sale of

O1Q3ACC1                          Smith - Direct

works of art.  We advise them on the quality, the value, the

condition, what they should be paid.  We also act as a

discretionary screen so that they, the collectors aren't

necessarily publicly known, which for many of our clients is a

very important factor.

Q.  As part of your advisory business, do you ever have

occasion to work with art dealers?

A.  I do.

Q.  How often?

A.  Nearly half the time.  We work a lot with art dealers.

Q.  How about auction houses, do you have occasion to work with

them?

A.  Yes, I do.

Q.  How much, well, how often would you say?

A.  Oh, the other half, really.

Q.  So, sticking with your advisory business, can you give us a

sense in dollars of how much business you typically conduct in

a given year acting in an advisory capacity?

A.  It varies, of course, because when a major collection comes

in, the totals can rocket skyward.  But in a typical year, we

might value or advise on acquisitions and sales of between 60

and $90 million.

Q.  And roughly how much of that you would say is attributable

to auction business with auction houses?

A.  Well, recently rather than less than half.

O1Q3ACC1                          Smith - Direct

1   Q.  Which auction houses do you typically work with?

2   A.  We work with them all.  Sotheby's, Christie's, Phillips,

3   Bonhams; all the auction houses.

4   Q.  You mentioned that your specialty in the art field includes

5   Impressionist and Modern Art.  How active would you say you are

6   in that market?

7   A.  In the last 25 years, we've been one of the biggest

8   purchasers of 20th century art for a number of major

9   collections.  We've also handled a number of major sales in

10  that period too.

11  Q.  Does that include, does that activity include both private

12  sales and auctions?

13  A.  Yes, it does.

14  Q.  Could you give us a sense of some of the artists that you

15  have transacted on?

16  A.  Major transactions we have done in Picasso where we have

17  bought paintings at over $50 million.  We've also been involved

18  in the sale of major work by Gustav Klimt.  We've been involved

19  in other purchases of significant artists like Rodin.  We've

20  been involved in purchases of works by Modigliani as well.

21  Q.  Could you maybe describe just a few of the noteworthy

22  transactions you've been involved in?

23  A.  Yes, I was commissioned to advise and buy a major work in

24  Europe, which at the time was a Picasso, was the highest price

25  paid in Europe for a work by that artist.

O1Q3ACC1                        Smith - Direct

1              More recently we were asked to advise on the sale of a

2      major work by Vincent Van Gogh, which was sold here in New York

3      for $80 million.  And we've been asked to advise on quite a

4      number of other transactions in the 15 to $30 million range

5      individually.

6      Q.  So, those sound like more one-off transactions.  Are you

7      involved in maintaining collections for your advisor clients?

8      A.  Yes, we do, we've been involved in both the purchase and

9      building of collections, and also involved in the disposal of

10     collections.  So we've done a number of major collections.

11     Q.  You mentioned having transactions regarding Modigliani

12     artworks.  Could you tell us a little bit about which artworks?

13     A.  I can't give you the precise artwork, because there is

14     client confidentiality involved, but I've bought two paintings

15     by Modigliani of his early works, his Caryatid works, and we

16     also advised on the sale of a later painting, which at that

17     time sold for the second highest price ever achieved in auction

18     for a painting by Modigliani.

19     Q.  How about Magritte.  Have you ever transacted on a Magritte

20     work?

21     A.  Yes, I have.

22     Q.  I know you said your specialty is in Impressionist and

23     Modern works, but have you ever advised or transacted regarding

24     Old Master transactions?

25     A.  Yes, I've done a number of earlier transactions too of

O1Q3ACC1                        Smith - Direct

1    earlier works, yeah.

2    Q.  How about artworks by Leonardo da Vinci?

3    A.  I've never transacted a work by Leonardo da Vinci, because

4    apart from drawings, there has never been one on the market.

5    But I did give advice on the potential purchase of a Leonardo

6    da Vinci drawing.

7    Q.  I'd like to move on to discuss something just a little bit

8    about your art valuation business.

9         Could you give us a sense of how that business works?

10   A.  Yes, our art valuation business is located in London and

11   New York.  Those are major main bases.  We have smaller offices

12   elsewhere in the United States.  We're just about to open an

13   office in Paris.

14        We advise on the value for a number of different

15   purposes, retail replacement, insurance purpose, fair market

16   value, fair market value for estate tax purpose, or for divorce

17   purpose, and from time to time we do valuations for collateral

18   or bank lending purposes.

19   Q.  Maybe you could give us a sense in dollar figures again of

20   how much, typically speaking, your firm appraises in a given

21   year?

22   A.  It's about $10 billion.

23   Q.  Billion with a B?

24   A.  Billion with a B.

25   Q.  Could you please describe a few of the noteworthy instances

O1Q3ACC1                              Smith - Direct

1    in which you've provided expert appraisal services?

2    A.  Most of our appraisals are pretty confidential, but some of

3    the -- perhaps best known one, we were engaged by the United

4    Nations in the late 1990s to advise on value the works of art

5    that were looted by the Iraqi invasion of Kuwait.  The United

6    States froze some Iraqi funds here, and used it as a

7    compensation fund, and we were asked to go out there, assess

8    the value of the items lost, and provide valuations for those

9    who had their artworks stolen.

10   Q.  Have you ever testified as an expert witness before?

11   A.  Yes, I have.

12   Q.  On what kinds of matters did you give testimony?

13   A.  Principally art market practice.

14          MR. WOLVERTON:  Defendants proffer Mr. Smith as an

15   expert in the field of the art market and the valuation of art.

16          MR. WILSON:  No objection.

17          THE COURT:  So received.

18          Ladies and gentlemen, I previously gave you some

19   instructions about expert witnesses.  Those instructions apply

20   here too, and I will give you some further instructions in the

21   final instructions that I give you before your deliberations.

22   You may proceed.

23   Q.  Mr. Smith, I think you said at the outset that you were

24   asked to provide expert opinion regarding the valuation that

25   Sotheby's prepared for the *Salvator Mundi*.  Do I have it right?

O1Q3ACC1                          Smith - Direct

1    A.  You do.

2    Q.  Was that in connection with the insurance valuation that

3    Sotheby's in London prepared for that artwork in January 2015?

4    A.  Yes, it was.

5    Q.  Could you explain what you were asked to do regarding that

6    valuation?

7    A.  Yes, I was asked to do two things.  One was to do a

8    valuation myself as of that date.  The second was to do a

9    valuation as if I was standing in Sotheby's shoes at the same

10   date, and to give some comment on the valuation itself.

11   Q.  If we could please pull up DX 650, it's already admitted so

12   I ask that it be published.  If we could turn to the next page.

13           So, Mr. Smith, just to be sure you and I are on the

14   same page, is this the valuation that you reviewed and provided

15   an analysis of?  And maybe we can flip through it.

16   A.  Yes, it is.

17   Q.  Could you describe at just a high level your views on this

18   valuation after having conducted the two analyses you

19   mentioned?

20   A.  It seems a perfectly professional and well-produced

21   valuation.

22   Q.  So we'll get to the substance of your opinion in more

23   detail in just a moment.  But, could you describe it a little

24   more detail the two analyses you conducted.

25   A.  Yes.  I looked at the valuation itself, I looked at the

O1Q3ACC1                        Smith - Direct

1    value that was put on, which was 100 million euros, which I

2    think equates to 113 million U.S. dollars.  I was aware that

3    the painting had been sold for $83 million, which I considered

4    to be the fair market value at the time, and that was my

5    assumption.  And I looked at the 36 percent differential

6    between the purchase cost and the insurance value, and that

7    seemed to me to be a perfectly reasonable uplift for

8    replacement.

9    Q.  Mr. Smith, I think you maybe you need to pull the

10   microphone down just a little bit.

11   A.  Sorry.

12   Q.  Thank you.  We can pull this down for now.

13             Just taking a step back.  Could you explain what the

14   term valuation typically refers to in the art market?

15   A.  Well, the valuation is a document, it is a certificate of

16   value.  It is done for a variety of different purposes.  Gives

17   the recipient a status of value at the time, the valuation is

18   produced.

19   Q.  So you mentioned that they can be done for a variety of

20   different purpose.  What different purposes can they be

21   prepared for?

22   A.  For insurance, one values for retail replacement value.

23   And for fair market value is, generally speaking, considered to

24   be willing buyer, willing seller valuation with both parties

25   being in full possession of all the relevant facts.  And then

O1Q3ACC1                          Smith - Direct

1    there is a lower valuation, which is called either a distressed

2    valuation or fire sale valuation or forced sale valuation.

3    Q.  What type of valuation was the one that you analyzed, the

4    one prepared by Sotheby's in January 2015?

5    A.  As a retail replacement valuation.

6    Q.  Could you explain what the purpose of a retail replacement

7    valuation is?

8    A.  It's to put the recipient back into a position financially

9    and compensate them for the work that has been lost.  In other

10   words, the value is a compensatory amount, a sum of money in

11   their pocket that lets the person who has lost the painting or

12   lost the work of art go out and purchase another one in a

13   reasonable space of time.

14   Q.  And you mentioned a loss.  What do you mean by a loss?

15   A.  Well, a loss could be theft, it could be a fire, it could

16   be destruction, or it could be damage beyond repair.

17   Q.  How does the act of obtaining an insurance valuation assist

18   an artwork owner in guarding against a los?

19   A.  It doesn't prevent the loss taking place.  But it helps

20   financially protects him, should that happen.

21   Q.  Generally speaking, what would happen after a client or an

22   artwork owner who has lost a painting receives the funds that

23   they're owed for that painting?

24   A.  They would go out into the market and try to purchase

25   another work or an equivalent work.

O1Q3ACC1                              Smith - Direct

 1    Q.  What do you mean when you say an equivalent work?

 2    A.  Well, all art is unique.  With some exceptions in

 3    sculpture, it is pretty much impossible to find an exact

 4    replica.  So you would go out there and find a work that was as

 5    near as possible to compensate you for the work that you lost,

 6    and with a similar quality, condition, and value terms.

 7    Q.  How does an insurance valuation or a retail replacement

 8    valuation compare to, say, some of the other types of

 9    valuations that you mentioned?

10    A.  Oh, insurance or retail replacement valuation is always

11    much higher.

12    Q.  How much higher would you say?

13    A.  It varies.  I mean, different actors in the industry have

14    different formulas.  Auction houses typically who express

15    values often in a range of values use the low end of the range

16    of value and then double it.

17              Lloyds of London is a big insurer.  They quite often

18    take the high end of the range of value and double that.

19              My firm tends to use a figure between the two.  We try

20    and assess between the range of values where the fair market

21    value might lie, and double that figure.

22    Q.  I should have asked this earlier, but I've been using

23    retail replacement value and insurance value.  Is there a

24    difference between those two terms?

25    A.  Not a big deal.  No.  The insurance value and the retail

O1Q3ACC1                    Smith - Direct

1    replacement value are the same thing.

2    Q.   Back to what you were saying.  You were saying an insurance

3    valuation is typically significantly higher.  Why is that?

4    A.   Well, because the retail price is always higher than the

5    fair market price.  And maybe I could give a simple, very

6    simple, easy to understand example.  I call it the meat pie

7    example.  The meat pie example.

8          If you go to a store and buy a meat pie for $5, the

9    storekeeper will have bought that meat pie say for $3.  $3

10   would be in the art market terms the fair market value, and the

11   $5 would be the retail replacement value.

12         So you're looking at the cost of the transaction, the

13   difference between the buying and the selling.  And while I'm

14   not trying to equate the great works of art we are talking here

15   to meat pies, the principle is exactly the same.

16   Q.   So you've been using the word retail.  Can I ask what you

17   mean by that?

18   A.   Retail is a shop, a gallery, somebody who owns stock who

19   would want to sell it either for -- may not actually own it

20   outright, he may be selling it on behalf of somebody, but at a

21   retail price.

22   Q.   So in using your example, those shops, those galleries, are

23   those the sellers of the meat pies?

24   A.   Yes.  Move on from meat pies maybe.

25   Q.   I think so.

O1Q3ACC1                        Smith - Direct

| | |
|---|---|
| 1 | So why is it that needing to go to the retail market |
| 2 | results typically in a higher cost? |
| 3 | A.  Because, as I explained, in the meat pie example, the |
| 4 | gallerist will always add a profit margin.  He has to do that |
| 5 | to stay in business.  He buys at one price and he sells at a |
| 6 | higher price. |
| 7 | Q.  If someone were to go to the market and try to replace a |
| 8 | work that has been lost, let's say for a masterpiece, how easy |
| 9 | or difficult might that be? |
| 10 | A.  Very difficult indeed. |
| 11 | Q.  Why is that? |
| 12 | A.  There are very, very few masterpieces in the marketplace. |
| 13 | Q.  What would someone need to do in order to go out and find a |
| 14 | suitable replacement?  Could you outline those steps? |
| 15 | A.  Yes.  What one would do if one was looking for replacement |
| 16 | is obviously to get paid by the insurance company, have the |
| 17 | sums of money in your bank account to transact.  Then go into |
| 18 | the marketplace, look at the retail market.  You may have to go |
| 19 | into more than one country.  Masterpieces are so rare that it's |
| 20 | likely they will be either in -- the main markets are Europe, |
| 21 | United States, and the Far East.  There could be maybe only one |
| 22 | or two masterpieces in all those jurisdictions, and they may |
| 23 | not be of the type of painting you are looking to replace. |
| 24 | It is a very difficult process and takes a long time. |
| 25 | (Continued on next page) |

O1QVACC2                      Smith – Direct

1   BY MR. WOLVERTON:

2   Q.  So that process that you described, in the art market, does

3   an appraiser typically take that process into account when

4   preparing a retail replacement valuation?

5   A.  Yes, they should do, because he should take into account

6   every cost that the owner of the painting and the owner of the

7   valuation should have to pay in order to put him back to where

8   he was to start with.

9   Q.  What impact, if any, do those considerations have on the

10  ultimate value of the insurance valuation?

11  A.  Well, they raise it.

12  Q.  What impact, if any, does the availability of great

13  masterpieces have on the ultimate value of an insurance

14  valuation?

15  A.  Well, because there are virtually no masterpieces on the

16  market, and those that do exist in private collections, there's

17  a huge excessive demand over supply.  And to replace a

18  masterpiece always requires a premium price.  So that should be

19  additionally taken into account when valuing a masterpiece as

20  opposed to a routine work of art.

21  Q.  That status of demand being greater than supply, is that

22  something that, in your experience, stays relatively constant

23  over time or does that change over time?

24  A.  Well, the masterpiece market is shrinking over time.  Most

25  artists, not all of them, are dead and, therefore, the supply

O1QVACC2                          Smith - Direct

1    of that masterpiece is very limited.

2            Everyone that gets acquired by a museum or a national

3    institution means there's one left in the marketplace.  And

4    it's been a constant factor throughout my long career in the

5    art world that the number of supply of masterpieces is

6    continually diminishing.

7    Q.  Now, that diminishing supply that you mentioned, is that

8    also something that an appraiser in the art market would take

9    into account when doing a retail replacement value or is that

10   not something they should consider?

11   A.  No, they should take that into account.

12   Q.  Is it appropriate, in your view, for an art appraiser to

13   consider the views of its client about what level an insurance

14   valuation should be issued at?

15   A.  With insurance valuations — and one must remember these are

16   compensatory amounts.  There's a very big difference between an

17   insurance valuation and a fair market valuation.

18           So the client's views as to regard to the level of

19   protection that they want are very important.  The client might

20   say he wants very good protection, just like somebody might say

21   they'd want two locks on their front door, rather than one.

22   That should be taken into account.

23           The underlying figure for a retail replacement value

24   is -- the figure is not a fair market value.  So it's perfectly

25   acceptable for a client's views of security to be taken into

O1QVACC2                            Smith - Direct

1   account.

2   Q.  You were just discussing the preferences of the client.

3   How is it that an appraiser should determine what the client's

4   needs and preferences are?

5   A.  Well, they should have a conversation with him.

6   Q.  Is it appropriate for an appraiser to share drafts of a

7   valuation with a client?

8   A.  Absolutely.  It's very common.

9   Q.  And how about for insurance valuations in particular, is

10  that particular or atypical?

11  A.  With insurance valuations it's more common than not.

12  Q.  And is that appropriate, in your view?

13  A.  Absolutely appropriate.

14  Q.  Let's say that a draft valuation is shared with a client,

15  and this is for an insurance valuation.  And the client came

16  back and requested that it be $10 million higher.  In your

17  view, would it be appropriate for the appraiser to take that

18  into account and increase the valuation or would you find that

19  not appropriate?

20  A.  It would be appropriate provided it was a retail

21  replacement valuation, yes.

22  Q.  How about if a client had a view or expressed a preference

23  in what currency a valuation should be issued at, would it be

24  appropriate for an appraiser to take that view into account or

25  would you find that not appropriate?

O1QVACC2                          Smith - Direct

1    A.  No, that's fine.  That's absolutely appropriate.  Many

2    people, many collectors, like to insure in the same currency

3    that they purchase in.

4    Q.  Mr. Smith, it might be helpful if you could walk us through

5    the process by which an art appraiser typically conducts an

6    insurance valuation.

7              MR. WOLVERTON:  Your Honor, may we show the witness

8    and counsel -- can we bring up Demonstrative Exhibit DX-1016.

9              THE COURT:  You may.

10             MR. WOLVERTON:  No, your Honor.

11             THE COURT:  Excuse me?  I said you may.

12             MR. WOLVERTON:  Oh, I thought you said to me.

13             THE COURT:  No, I said you may.

14             MR. WOLVERTON:  I accidentally asked you.

15             THE COURT:  Okay.

16             MR. WOLVERTON:  I was speaking to Dan, but thank you.

17             Your Honor, this is a demonstrative exhibit that we

18   proposed.  May we publish it to the jury?

19             THE COURT:  It already is.

20             MR. WOLVERTON:  Oh, great.

21             THE COURT:  Just as I told you a couple times and will

22   tell you again at the close of the case, a demonstrative is not

23   evidence, but it's just to aid you in understanding the

24   testimony of the witness, which is the evidence.

25             But with that understanding, you may consider this.

O1QVACC2                          Smith - Direct

1              Go ahead.

2      BY MR. WOLVERTON:

3      Q.  Mr. Smith, are these the -- does this demonstrative exhibit

4      accurately reflect the steps for setting out an insurance

5      valuation, in your view?

6      A.  Yes, it does.

7              MR. WOLVERTON:  So if we can just go to the next

8      slide, maybe click through these.

9      Q.  So the first one I see here is understand the client's

10     needs.  Is that what we were discussing earlier about having a

11     conversation with the client?

12     A.  Yes.  And again, this is an insurance valuation.  The whole

13     purpose is protection, financial protection for the client.  So

14     talking to client about their needs is a very important first

15     step.

16             MR. WOLVERTON:  If we could now click to the next

17     page.

18     Q.  This one reads: "Analyze the artwork."  Maybe we could move

19     briefly through these sub-bullets.

20             Could you describe what significance there is to the

21     quality of composition when analyzing an artwork?

22     A.  Well, the quality of composition is obviously one of the

23     key factors, and it is where the expertise of the valuer is

24     most important.  He has to look at the painting to see if it is

25     a high-quality painting, if it's a great painting, even if it's

O1QVACC2                          Smith - Direct

1    a masterpiece painting.  That is where his long experience and

2    expertise comes into play.

3    Q.  I'll actually just take one step backwards.  If you could

4    explain, before we go into the rest of the sub-bullets, the

5    significance of step 2 and what that means as you understand

6    it.

7    A.  Well, step 2 is looking at the painting and, you know,

8    making a judgment of what you're looking at.

9    Q.  And why is that significant to the valuation process?

10   A.  With an artwork, looking at it is pretty important.

11   Q.  So Mr. Smith, I think you had just finished discussing the

12   quality of composition.  How about rarity, what is the

13   significance of that factor?

14   A.  Rarity is another factor, as we discussed a little earlier,

15   which has an impact on value.  So one needs to make a judgment

16   on how rare this is.  If it's very rare, it will be more

17   valuable; if it's very common, it will be slightly less

18   valuable.

19   Q.  And how about the next sub-bullet, subject matter.  What

20   significance does that have?

21   A.  That is a -- subject matter is subjective, and -- but there

22   is no question that subject matter does impact value.  So, you

23   know, a very violent painting of an unpleasant subject or

24   something that was inappropriate would obviously be worth

25   considerably less than a painting which had a very beautiful or

1    calm composition.

2    Q.   And how about importance, what is the significance of an

3    artwork's importance to the insurance valuation process?

4    A.   Well, importance is another -- is another factor that goes

5    into the part of values as it were.  And this is a little bit

6    of an expert's, sort of, judgment on how the painting fits

7    within the artist's total body of work.

8             So here we have a painting; and it may be a very fine

9    painting, but it may just be, you know, not a particular

10   significant work in the artist's life or history or work.  But

11   if it has great importance, that adds considerable value.

12   Q.   And size, shape, dimensions?

13   A.   These are small issues, but they need to be taken into

14   account.  The market has prejudices against certain shapes and

15   sizes.  Obviously, if a painting is of enormous dimensions,

16   it's going to be more difficult to transact, therefore be of

17   slightly less value.  If it's equally very, very small, that

18   has -- may have a negative effect.

19            Bizarrely, the market doesn't like circular paintings

20   or oval painting, and even less likes sort of paintings of

21   unusual shapes.  So the shape, size and dimension is another

22   consideration but just needs to be taken into account.

23   Q.   How about medium and support, what does that refer to?

24   A.   Medium support.  Medium is what it is made of, in other

25   words, is this an oil paint, is it a watercolor, is it -- what

O1QVACC2                        Smith - Direct

1    is the substance that the paint is made from.  And medium --

2    some media are more stable, more -- less subject to damage than

3    others, which is another positive factor.

4              Support is what is the object painted on.  So support

5    is the word that would normally mean canvas or wood or metal or

6    in some reason -- some very rare occasions things like ivory.

7    And of course, in the ivory case you have a big negative there

8    because there are no rules about the importation and

9    exportation of rare species.

10   Q.  And then the last factor you have under analyzing the

11   artwork is condition.  Could you explain what that means and

12   the significance that it has, if any, to an artwork's value.

13   A.  Well, condition is a very important factor in a valuation.

14   Every artwork that's -- the day it leaves the artist's studio,

15   it's in perfect condition.  And from then on it can be subject

16   to damage, it can slowly deteriorate.  And so the condition of

17   the work is a very important factor to consider.  And if a work

18   is in an unusually really good condition, that is a very

19   positive factor.  And if it's in particularly poor condition,

20   other things being equal, it is a big negative factor.

21             MR. WOLVERTON:  If we could move just to the next

22   slide, I'd like to highlight step 3.

23   Q.  This one reads:  "Identify comparables."

24             Mr. Smith, could you please briefly explain what a

25   comparable is and what this step entails.

O1QVACC2                          Smith - Direct

 1   A.  Well, a comparable is a similar work that may have gone

 2   through the market.  Until the advent of the internet,

 3   comparables were largely found in catalogs and libraries.  The

 4   value is memory.

 5          Now we have a great body of work that's available on

 6   the internet.  There are websites that can be searched and

 7   there's a good deal of information out there.  But finding

 8   accurate comparables is a very important part of the valuation

 9   process.

10   Q.  And why is that important?

11   A.  Because they give you hard data on actual pricing.

12   Q.  If we can move on to step 4.  This reads:  "Analyze

13   comparables and adjust for market changes."

14          What do you mean by this?

15   A.  Well, it's very unlikely that an exact comparable will have

16   been sold within a very short space of time immediately prior

17   to the valuation date.  Therefore, one has to look at -- find a

18   comparable.  And if it has been sold some years earlier, then

19   prices have obviously changed quite a lot since then, and

20   particularly for the very best works of art they rise

21   continually.

22          But they don't necessarily rise in a straight line.

23   Artworks, you know, rise rapidly when a new level of demand

24   comes in for a particular artist.  And Modigliani is an example

25   of that.  Whereas they say, Well, what one needs to do is to

O1QVACC2                        Smith - Direct

1   find something very similar, if you can.  It may have been sold

2   a few years earlier.  You then have to look at what's happened

3   to the market for that work in the intervening period and make

4   the necessary adjustment.

5   Q.  So you have two sub-bullets under this factor.  The first

6   one is the market demand for an artist's works.  How does that

7   fit into the analysis that you just described of comparables

8   and the adjustments for market changes?

9   A.  Well, that is what I was just saying a second ago, is that

10  we look at the change in market demand between the time the

11  comparable was sold and the date of the valuation and make the

12  appropriate adjustment.

13  Q.  And the price achieved for similar works, that's what you

14  were describing as well?

15  A.  Yes, yes, that's exactly -- they are linked, those two.

16  Q.  If we can move to step 5.  You have as this factor:

17  "Identify fair market value."  Could you describe what this

18  step in the process entails?

19  A.  This is the point at which all of previous four steps have

20  come into play.  I always think of this in terms of sort of

21  base camp.  Here we have fair market value because the fair

22  market value is the root, it's the foundation for every other

23  type of value.  Other values aren't necessarily higher or

24  lower, but once you've got fair market value, you've got your

25  foundation in place.

O1QVACC2                           Smith - Direct

```
 1   Q.  And how does one identify the fair market value, to the
 2   extent that's different than the process you were describing
 3   for step 4?
 4   A.  Well, no, that is the result of steps 1 to 4.
 5   Q.  And then for step 6, we move there, it says:  "Adjust fair
 6   market value to achieve retail replacement value."  Could you
 7   describe what that process entails.
 8   A.  Yes.  I mean, we now have fair market value established
 9   under point 5.  Point 6, now we're here to do an insurance
10   valuation, not fair market value.  We have the basic
11   information we need; fair market value has been set.  We then
12   need to look at an increase in that and to adjust it to achieve
13   a full retail replacement value.
14   Q.  And you have a number of factors listed under here.  Maybe
15   we can just move through those.
16        So first is state of the market and recent prices paid
17   for comparable works.  How does that factor into the adjustment
18   of the value that you were just mentioning?
19   A.  Well, this is in some ways a repeating of some of the
20   earlier valuation steps.  When you've got your fair market
21   value, you need to look and say, Well, is this painting -- is
22   the market really strong for this.  And if it's rising all the
23   time, we need to compensate for that.
24        What a recipient of an insurance valuation does not
25   want to have is a situation where he's commissioned a valuation
```

O1QVACC2                        Smith - Direct

 1  and he goes out and finds that the market has left him behind

 2  and he's got a figure that's too low.

 3  Q.  And how about the availability or lack thereof of finding a

 4  suitable replacement?  To use your analogy, how does that help

 5  the appraiser to get from base camp to the insurance value?

 6  A.  Well, the availability is a key factor.  Because if there

 7  are none available, they have to -- the recipient of the

 8  insurance compensation has to go into the market and say either

 9  I'm bidding big here and see if something can be, you know,

10  tempted out of a private collection by a generous offer, or he

11  has to wait.  And if he's waiting and the market is moving

12  upwards all the time, you've got to take that into account too.

13  Q.  And how about the costs related to finding suitable

14  replacement, what are the costs that you're referring to here?

15  A.  Well, the -- I mean, these -- these works can be very hard

16  to find.  And the average collector may not have the resources

17  to search the entire market.  He may need to hire somebody.

18  And he may need to go out there and hire somebody who's an art

19  adviser or a dealer.  And that art adviser and dealer will help

20  him, but he will help him for a cost.  That cost needs to be

21  taken into account as well.

22  Q.  And then finally, you have the master work premium

23  persuading owners to sell.  First of all, what is a master work

24  premium?

25  A.  Well, master works are significantly more expensive than

O1QVACC2                          Smith - Direct

1   the average.  People -- it's not generally known, but in the

2   art market, a master work isn't just ten percent higher than

3   the average; it might be 150 percent higher.  And so there is a

4   great premium paid for the really greatest pieces.  And these

5   works also are rare and are in very reluctant -- very often in

6   the hands of reluctant collectors who don't particularly want

7   to sell.  But in my experience, most collectors will sell

8   ultimately if the money is big enough.

9   Q.  Could you give us an example of how that dynamic plays out

10  in a negotiation with an owner of an artwork?

11  A.  Yes.  One might go to a dealer or an adviser and say, Yes,

12  I would like to find a great work by, say, Picasso.  I've lost

13  this one.  And they would say, Well, they are not on the

14  market, but we do know a few private collectors who've got

15  them.  And, you know, the value of this piece, they might --

16  you know, the reasonable retail price might be, say, $50

17  million.  But they are not going to sell for $50 million, they

18  can sell for $50 million when they want to sell.  Now they need

19  $70 million to persuade them.  It's called getting it

20  off-the-wall price.

21  Q.  You said that was off-the-wall price?

22  A.  Yeah.

23  Q.  And why is it called that?

24  A.  Well, because it's on the wall of a collector, and you want

25  it to be on your wall.

O1QVACC2                          Smith - Direct

1    Q.  If we could move to step 7.  With this you have add

2    replacement costs/margin to the fair market value and arrive at

3    insurance value.  Could you explain what that means?

4    A.  Well, that is taking all those points under 6, putting them

5    together, adding them all up, and you get to a figure.  And

6    that figure, in addition to the fair market value, is your --

7    is your replacement -- retail replacement value.

8    Q.  And then on step 8, you have discussion with client.  So at

9    this stage -- just to clarify, at this stage you already have

10   an insurance value in mind.  Could you explain what then

11   happens?

12   A.  Then it's very common at that point — and again, I must

13   stress, this is the client's looking for compensation.  You go

14   to the client, you explain how you got this figure, you talk

15   about the rarity, the difficulty of finding another one, the

16   costs of getting it, getting one out of a private collection or

17   whatever it may be, and you discuss the figure with them.

18        And they may say, Well, I'm happy with that, or they

19   may say, Look, I really want a bit more protection, and they

20   might want it increased slightly.  For insurance purposes, that

21   is of no consequence because they are paying the insurance

22   premium, they are paying for extra protection.

23   Q.  And then as the last step on this demonstrative, you have

24   "finalizing valuation."  Could you explain what you mean when

25   you say that?

O1QVACC2                          Smith - Direct

1    A.   Yeah.  That is the last stage.  At that point, a figure has
2    been agreed, it's been discussed with the client, it's been
3    thoroughly analyzed.  It needs to be produced.  It's then
4    produced, certified, and sent to the client.  The client then
5    has the finished document.
6    Q.   What do you mean by certified?
7    A.   Normally, a valuation is certified by the valuation
8    business, they have to be signed, signed and certified.
9    Q.   Is that an important step in the process?
10   A.   Yes, it is, very important step.
11   Q.   Why is it important?
12   A.   Because basically the value is, therefore, giving his
13   certificate to the value, it gives the client the certainty.
14   As like any certificate that is signed, a certificate isn't
15   signed isn't much use.  And one that's signed, he can then take
16   it to his insurance company, they will insure it for that sum
17   of money, and he's fully protected.
18   Q.   Mr. Smith, I'd like to move on to discussing your analysis
19   of the Leonardo da Vinci valuation that Sotheby's conducted.
20   Maybe we can start with the two analyses that you did in
21   reaching your conclusions, beginning first with the analysis
22   you mentioned on whether or not the valuation margin was a
23   reasonable one.
24        First of all, what, if any, documents did you review
25   as part of your analysis on whether the Leonardo da Vinci

O1QVACC2                         Smith - Direct

1    valuation was issued at a reasonable amount?

2    A.  Well, when I first analyzed it, I didn't see any documents

3    at all; I just looked at the valuation itself.

4    Q.  Just the valuation?

5    A.  Yes.

6    Q.  Could you walk us through the analysis that you did then

7    for the *Salvator Mundi* valuation.

8    A.  I started with the assumption that the 83 million, which

9    was the price paid for the painting, was a fair market value.

10   You have to have an assumption of fair market values before.

11            And I looked at the insurance figure, which was, in

12   dollar terms, 113 million.  And there was a 36 percent

13   increase.  I considered that to be fair, perhaps at the

14   slightly lower end of the range that I would have put on it.

15   But there is a range.  And if the client was happy with that,

16   then that would have been acceptable.

17   Q.  And Mr. Smith, if you look back to this demonstrative, does

18   this accurately reflect that analysis that you mentioned of

19   calculating the differential between the $83 million purchase

20   price and the $113 million insurance price?

21   A.  Yes, it does.

22   Q.  Just to be clear, did you conduct an analysis of some kind

23   and conclude that the amount that Bouvier paid for the *Salvator*

24   *Mundi* was its fair market value as part of this analysis?

25   A.  At this point I just looked at the two figures.  Later on I

O1QVACC2                              Smith - Direct

1  did my own -- I stood in Sotheby's shoes, as it were, and I did

2  my own.  And I did some analysis of comparables at that point.

3  Q.  You testified that you -- in your view, the 36 percent was

4  a reasonable lift, and that yours may have been higher.  Why

5  was that reasonable in light of the artwork that was being

6  valued?

7  A.  I'm sorry, can you repeat the question.

8  Q.  Yeah, of course.  Just a moment ago, you were saying that

9  you determined that this 36 percent insurance adjustment was

10  reasonable, and that yours might have been higher if you had

11  done it.  What did you mean by that?

12        MR. WILSON:  Objection.

13  A.  Insurance valuations --

14        THE COURT:  Hold on, Mr. Smith.  Mr. Smith, hold on.

15        If there's an objection, you have to wait.

16        But the objection is overruled.

17        Now you may answer.

18  A.  Can I have the question again, please.

19  Q.  Yeah.  So I was asking about your comment that the 36

20  percent insurance adjustment between 83 million and $113

21  million was reasonable, and asking -- asking why that was

22  reasonable, why you decided that was reasonable in light of the

23  artwork that was being valued?

24  A.  Because I thought that 36 percent uplift was at the low end

25  of the range, but was a reasonable amount.  I would have put it

O1QVACC2                         Smith - Direct

1    a little higher, but, you know, the art is -- subjective art

2    valuation is a subjective business and it seemed to be okay.

3    Q.  What, if any, factors pertaining to the *Salvator Mundi* in

4    particular did you consider in deciding that that amount was

5    reasonable?

6    A.  Well, at that stage I looked at the assumption of 83

7    million as the purchase, as the fair market value.  And I

8    thought that a 36 percent uplift would have been fair at that

9    point.

10   Q.  What, if any, significance did the rarity of works by

11   Leonardo da Vinci play to that analysis?

12   A.  Well, it's -- it's -- the Leonardo is an extremely rare

13   artist; in fact, there are none left, effectively.  And when I

14   did my own valuation, I came up with a higher figure because I

15   felt actually we needed to have a bigger margin of protection.

16   Q.  And did you consider at all the condition of the artwork as

17   you were undertaking this analysis?

18   A.  I did.  In fact, mostly Leonardos are not in very good

19   condition.  But here, with such a rare artist, the condition,

20   yes, it's not good, but it's such an unusual work that you'd

21   probably -- that would be less of a major factor than if it

22   were routine work.

23   Q.  A few minutes ago we were just discussing the possibility

24   of finding a replacement for a work.  Did you reach any view on

25   whether it would be easy, difficult, possible, to find a

O1QVACC2                          Smith - Direct

1   replacement for a work like the *Salvator Mundi*?

2   A.  There are two possibilities out there.  There are no works

3   out there that are completely by Leonardo.  There are two very

4   similar works in private hands.  One is a -- they are both

5   fetching the same subject, they are a Madonna and child.  One

6   is in a British aristocratic collection belonging to a duke

7   called the Duke of Buccleuch.  And that picture is very

8   unlikely to come on the market because under British tax law,

9   there is a very, very large percentage of the value tied up in

10  deferred taxes.  So whatever figure one offered the duke, most

11  of it would go to the British government.  And I suspect he'd

12  rather keep the picture than have the government take all his

13  money.

14          The other work is in private hands, very similar

15  subject.  There is considerable debate about how much, if any,

16  Leonardo painted of either of those two pictures.  And that

17  one, I believe, is privately owned.  That's possibly the only

18  picture that could have any connection with Leonardo that could

19  possibly be bought.

20  Q.  Did you consider any other artworks or sales of artworks

21  either before or after the date of the valuation in deciding

22  that this was a reasonable insurance adjustment?

23  A.  Well, what I did was -- are you referring to the valuation

24  that I checked in Sotheby's on my own valuation, which I did

25  when I stood in Sotheby's shoes.

O1QVACC2                          Smith - Direct

1    Q.  For now, let's stick with your analysis of the Sotheby's
2    *Salvator Mundi* valuation.  We can get to your own independent
3    valuation in a little bit.
4    A.  Well, I looked at -- I looked at the -- I knew that the
5    *Salvator Mundi* had been on the market for a while.  I assumed
6    the fair market value was 83 million.  I looked at the final
7    price and I assessed that that was the 36 percent that was --
8    and not an unreasonable figure.  Again, I say a little bit on
9    the low side.
10   Q.  So those were events that happened before the valuation.
11            How about events that happened after the valuation, is
12   that something that is appropriate to take into account?
13   A.  Yes.  It's perfectly possible in an insurance valuation to
14   review it in the light of subsequent events.  We all -- with
15   valuations, we're making a subjective figure we hope are
16   accurate or sometimes too high, sometimes too low, sometimes
17   way off.  And, you know, subsequent events can be very helpful
18   and very beneficial in pointing -- its real facts pointing to
19   whether we were accurate or not.
20   Q.  Now, why -- you mention that subsequent events can be
21   helpful to assessing an insurance valuation in particular.  Why
22   is that?
23   A.  Well, because subsequent events are real data.  So when you
24   do the valuation, you only have the data up to the date of the
25   valuation.  Subsequent events is data after the valuation.

O1QVACC2                          Smith - Direct

```
 1    And, you know, that can give you an indication of whether your
 2    figure was accurate or not.
 3    Q.  Can you explain how an art appraiser would typically take
 4    into account post-valuation events when assessing whether or
 5    not an insurance valuation is reasonable?
 6    A.  Yes.  And what would happen would be he would issue the
 7    valuation.  And if subsequent events proved that he was too
 8    high or too low, he may contact the client and say, Look,
 9    subsequent events have shown that I'm a little bit on the high
10    side or far too much on the high side or far too low, and do
11    you want me to adjust the valuation.  And that would be
12    perfectly acceptable and frequently happens.
13    Q.  What subsequent events did you look to in assessing the
14    reasonableness of this valuation?
15    A.  Well, there was a -- the painting itself was -- was sold
16    subsequently.
17    Q.  This same painting was sold subsequently?
18    A.  The same painting was sold two years later.
19    Q.  And so when did that sale take place?
20    A.  2017.
21    Q.  What did it sell for?
22    A.  $450 million.
23              THE COURT:  Can I interrupt for one moment.
24              I'm going to give you an instruction about that
25    testimony.  You can consider that testimony in connection with
```

O1QVACC2                        Smith - Direct

1    evaluating the reasonableness of the 2015 insurance valuation

2    of which you've heard and of which the witness is testifying.

3    It is not relevant to and you may not consider it in assessing

4    the fair market value of the painting in 2013, when the

5    original transaction that you've heard about occurred.

6           Thank you.

7    Q.  How does that price relate to other comparable artworks in

8    the art market?  Or, excuse me, could you place that in context

9    relative to other master work sales in the art market?

10   A.  $450 million is the highest price that we're aware of any

11   work of art selling for.

12   Q.  And how does that price, 450 million, factor into your

13   analysis?  And if you see on the screen, I have a demonstrative

14   that perhaps you can -- you can help illustrate.

15   A.  Yes.  Well, what it means -- what my analysis was, that

16   both my valuation and Sotheby's valuation were far too low.

17   Q.  And could you explain why that is?

18   A.  Because the subsequent price, it was so high that we

19   clearly hadn't appreciated this painting was going to sell for

20   such very large amount of money.

21   Q.  Well, why does the fact that it was a large amount of money

22   have significance to an analysis of a retail replacement value?

23   A.  Well, it would be very unlikely.  I mean, if one had

24   received $113 million for it or, in my case, my valuation, a

25   slightly higher figure, both of those would have been

O1QVACC2                          Smith – Direct

1    completely inadequate to replace this picture.  It was an

2    extraordinary price.

3    Q.  Thank you.

4            MR. WOLVERTON:  I think we can take this down for the

5    moment.

6    Q.  So Mr. Smith, that was your first analysis relating to

7    opining on the reasonableness of the *Salvator Mundi* valuation.

8            I think you mentioned that you also conducted your own

9    valuation for that artwork.

10   A.  Yes, I did.

11   Q.  Could you walk us through how you did that?

12   A.  Yes.  I was asked to do my own valuations if I was

13   approaching the painting from a fair market value at that time.

14   And in doing that, I considered -- I carried out the first

15   steps that we saw earlier, up to the fair market value level.

16           Clearly there are no Leonardos or there was no oil

17   painting by Leonardo.  I managed to find a drawing by Leonardo

18   that gave me some guidance.  And I looked at three other works

19   which I felt were reasonable comparables.

20           The first work was a major Renaissance painting sold

21   by an artist called Pontormo which was sold in 1989 to The

22   Getty Museum for, at that time, $35 million.  And clearly the

23   market between 1989 and 2015 had appreciated considerably.

24           The second work that I considered was a painting -- a

25   very small painting by Raphael which went on the market in UK

O1QVACC2                          Smith - Direct

1   and was bought by the British National Gallery.  And that was a

2   tiny work, and that was sold for -- that wasn't sold 50

3   million, it was -- The Getty Museum, again, offered $50 million

4   for that.  That was in 2004.  Again, I adjusted both those

5   prices as values for the intervening market time and raised

6   them accordingly.

7            The third work was actually a work by Leonardo, but

8   was a pencil drawing; but at least it gave me an indication.

9   You know, there's a rough correlation between a demand for an

10  artist when they work in pencil.  Clearly works in oil are far

11  more valuable, but pencil drawings, small pencil sketch, which

12  made $11 million.

13           So those are my three guiding points, because there

14  was nothing in the open market that gave me a real steer on the

15  picture, on the value.

16  Q.  What do you mean there was nothing in the open market?

17  A.  Well, there were no great Renaissance paintings, apart from

18  the Pontormo that had come to the market up to that point.

19  Q.  So a bit earlier we were discussing a few factors like the

20  quality and rarity of the work, the condition of the item.  Did

21  you take those factors into account as well when conducting

22  your own valuation?

23  A.  Yes, I did, yes.

24  Q.  And how did those factors -- how did you take those factors

25  into account?

O1QVACC2                          Smith - Direct

1     A.  Well, I did it as I would in any valuation, I adjusted
2     upwards and downwards accordingly.
3              The point about a Leonardo valuation is that the work
4     is -- it's a work of its own.  Most of the rules, the way you
5     apply them, it's not something you can replace.  Although it
6     was in poor condition, the condition issue was not of such a
7     major factor as it would have been an in ordinary work of art.
8     Q.  And ultimately, you said that you -- when you got to base
9     camp, let's say, can you explain what you assessed at that
10    amount?
11    A.  Yes, I assessed it about $80 million.
12             THE COURT:  Can you, sorry, say that more slowly.
13             THE WITNESS:  I'm sorry, your Honor.
14             Yes, I assessed it at about $80 million.
15             THE COURT:  And just to clarify, in this case, this
16    opinion that you're describing was fair market value, not --
17             THE WITNESS:  Fair market value of $80 million, yes.
18             THE COURT:  And as of 2015?
19             THE WITNESS:  At 2015.
20             THE COURT:  Okay.
21    BY MR. WOLVERTON:
22    Q.  Mr. Smith, I should have asked you earlier, but with
23    respect to the 2017 sale price that we were discussing, is that
24    something that you took into account when reaching the fair
25    market value and the retail replacement value?

O1QVACC2                          Smith - Direct

1    A.  No I didn't take that into account.

2    Q.  So you excluded that from your --

3              THE COURT:  Can I clarify.

4              I think earlier you testified that you did take it

5    into account in assessing the retail replacement value; is that

6    correct?

7              THE WITNESS:  No, your Honor.  I did not take it into

8    account when I carried out this valuation, it was only later

9    when I was asked to look at both valuations with hindsight.

10   But I realized that both of them are far too low.

11             THE COURT:  Okay.

12   Q.  And, sorry, maybe I can just clarify that quickly.

13             Mr. Smith, I think you said you had done two analyses.

14   And one was assessing the insurance margin and the other was

15   assessing or conducting your own valuation.  Which of those did

16   you take hindsight into account?

17   A.  I didn't take -- I didn't take hindsight into account in

18   either of these two valuations.  I looked at them after the

19   event.  If I'd taken hindsight into account, I would have put a

20   much higher value, retail replacement value than 140 million.

21   Q.  I had understood you to say that when you were looking at

22   the -- whether or not the insurance margin was reasonable, that

23   you had taken the $450 million into account?

24             MR. WILSON:  Objection.

25             THE COURT:  Hold on.

O1QVACC2                          Smith – Direct

1          Sustained.

2     Q.  Okay.  So I think you were just describing that you're at

3     base camp at this point.  Can you explain what steps you took

4     to apply the retail replacement adjustment that you have

5     reflected here in this demonstrative?

6     A.  Yes.  I started off with a very slightly lower figure, a

7     fair market value of $80 million.  I believed that finding a

8     painting of this stature would require a bigger margin than the

9     36 percent that Sotheby's had placed on it, so I put a margin

10    of 75 percent on it.

11    Q.  Why did you find that finding a suitable replacement would

12    require higher than the 36 percent margin that Sotheby's had on

13    it?

14    A.  That's a subjective judgment really.  I mean, it's just a

15    question of I felt you'd need to go in with a slightly bigger

16    figure than they did.  They were both within a reasonable

17    range, but my view was better to be too high than not high

18    enough.

19    Q.  So taking both of the two different analyses that you did

20    with respect to the Leonardo da Vinci valuation, how do those

21    two different analyses relate to one another?

22    A.  Well, my valuation was –– had a bigger spread between the

23    fair market value and the assumed fair market value Sotheby's

24    put on it and the retail replacement value than Sotheby's did.

25    Q.  And are those two analyses, are they –– are the conclusions

O1QVACC2                         Smith - Direct

1    that they led you to, are they consistent with one another?

2    A.  I think so.  There was -- there is a spread between 113 and

3    140.  It's quite a large figure.  But I think in this instance

4    they are both within a reasonable range.

5    Q.  And what conclusion did this analysis in particular

6    creating your own valuation lead you to reach?

7    A.  That -- well, I concluded that I got the right figure.

8    Q.  That you got the right figure?

9    A.  Well, I think that my figure -- my conclusion was that they

10   were both within a reasonable range, but I would have preferred

11   to have been slightly on the high side.

12           MR. WOLVERTON:  Thank you.  I think we can take this

13   down.

14   Q.  Mr. Smith, did you ever have occasion to conduct a

15   valuation for the *Salvator Mundi* before the one that you

16   prepared as part of this case that we were just discussing?

17   A.  Yes, I did.

18   Q.  Can you describe that valuation.

19   A.  Yes.  My firm was instructed by a finance house to conduct

20   a valuation for art-lending purposes on the *Salvator Mundi* and

21   a number of other paintings.

22   Q.  And did you ultimately certify that valuation?

23   A.  No, I did not.

24   Q.  So could you explain why you didn't?

25   A.  We submitted some draft figures to the instructing client,

O1QVACC2                         Smith - Direct

1   and the *Salvator Mundi* valuation was not proceeded with.

2   Q.  And when was that valuation?

3   A.  That was in 2015.

4   Q.  And in the drafts that you provided, what values were you

5   analyzing?

6   A.  I put $38,000,000 for the bank's fair market value, and $19

7   million for distress -- what I call distress sale value, which

8   might be equally to fire sale value, say.

9   Q.  So I don't think we've discussed those kinds of valuations

10  yet.  I think first you said was it the bank's fair market

11  value?

12  A.  That's correct.

13  Q.  What is that?

14  A.  Well, a bank, when lending against art, wishes to have a

15  fair market value placed on a very conservative level.  Their

16  interest is obviously in lending money.  The main interest

17  though is protecting their loan.  Therefore, they -- within the

18  range of fair market values, they would like to have the lowest

19  possible figure that one could reasonably sustain which,

20  generally speaking, means that you take -- you take and

21  emphasize the negatives and don't emphasize the positives so

22  much.

23  Q.  And then the other type of valuation you gave was, I think

24  you said, liquidation -- or fire sale value?

25  A.  Fire sale.  It's sometimes known as fire sale value or it's

O1QVACC2                              Smith - Direct

1    a type of valuation where you have to sell a work of art

2    immediately on the market without regard to any time -- with

3    no -- extreme time pressure, no adjustment for market forces,

4    you have to sell it for cash straightaway.  And that is

5    effectively just sell it now and get the cash in.

6    Q.  So just to clarify, did both of the values that you

7    mentioned, did they take into account the fact that the

8    valuations were for lending purposes?

9    A.  Yes, they did.

10   Q.  If that was already -- if that is already an assumption

11   that's baked in, so to speak, to the fire sale valuation that

12   you mentioned, why is that consideration also taken into

13   account for the fair market value or bank's fair market value

14   valuation that you did?

15   A.  Well, the bank, looking at liquidating an asset on which it

16   has loaned money, would wish to adopt two process.  Initially,

17   they would probably wish to sell with time on their side and

18   with -- taking into account the actions that would lead to the

19   best possible result in terms of the sale.

20            However, they also have to have the worst possible

21   scenario placed in front of them, which is they need to sell it

22   for immediate cash and liquidate it at once.  And in the art

23   market, which is a very, very difficult market to sell things

24   in, it's -- particularly in speed, particularly with the worst

25   circumstances, that the discounts can be very large indeed.

O1QVACC2                          Smith - Direct

1    Q.  When you worked on these drafts of these valuations, did

2    you -- was this before or after the 2017 sale price that we

3    were discussing for the Leonardo da Vinci?

4    A.  It was before.

5    Q.  Mr. Smith, I'd like to move on to discussing some of the

6    correspondence that Mr. Sainty discussed in his opinion.  But

7    I'd like to start by asking, so this -- the valuation, the

8    *Salvator Mundi* valuation, was prepared in January 2015, after

9    the artwork had been purchased in May 2013.  Do you share that

10   understanding?

11   A.  Yes, that's my understanding.

12   Q.  Is it typical for a client to request an insurance

13   valuation for an artwork, let's say, almost two years after

14   they had purchased it?

15   A.  It's perfectly reasonable.  I mean, they would sometimes

16   ask for two days after they purchase it, sometimes two years

17   after they purchase, sometimes two months.  It just -- it

18   just -- it comes down to whenever they feel they need that

19   valuation.

20   Q.  And why is that?

21   A.  That would just -- just depends when they decide they want

22   to have a valuation.  I mean, they may -- they may have -- I

23   can't give an explanation as to why it was exactly two years,

24   but it's normal.  It's perfectly normal for somebody who

25   purchases an artwork to go back and ask for an insurance

O1QVACC2                          Smith - Direct

1   valuation at a later stage.  They may just have been slow

2   getting around to it.

3   Q.  What about if the person who bought it, let's say they are

4   an art dealer and they sold it on to one of their clients,

5   would it be typical or atypical for that dealer to reach out to

6   an auction house and to -- the auction house from which they

7   purchased the artwork, and request an insurance valuation?

8   A.  Well, a dealer might do the insurance valuation himself or

9   he might ask for an insurance valuation from the auction house.

10  Perfectly reasonable.  Auction houses have big valuation

11  departments, as we do.  And we frequently carry out valuations

12  for dealers.  And those dealers will take that insurance -- our

13  insurance valuations and maybe pass them on to their clients.

14  Q.  Just to clarify, is that true even after the dealer has

15  already sold the artwork to somebody else?

16  A.  It normally happens after the artwork has been sold.

17  Q.  So I want to sort of continue with this hypothetical where

18  an art dealer has purchased an artwork from an auction house

19  and they sold it on to their client.  And then the dealer comes

20  back a few years later and asks for an insurance valuation.

21        Mr. Sainty suggested that before the auction house

22  issues the valuation, it would need to find out who owned the

23  artwork at that amount.  Do you agree with him?

24  A.  No, I don't.

25  Q.  Can you explain why?

O1QVACC2                          Smith - Direct

1    A.  Because in my experience, they never ask for that

2    information.  They are only dealing with the counterparty.

3    Q.  Are there circumstances in which an auction house may want

4    to verify the ownership of an artwork?

5    A.  There are some very rare circumstances where they -- maybe

6    where they had credible information that there might be some

7    sort of criminality involved, but that would be very, very

8    unusual.  And it's unlikely that any dealer that had a regular

9    trade with a major auction house would be party to such a

10   thing.

11   Q.  Do you have occasion to ask auction houses for valuations

12   for your client?

13   A.  We ask for market valuations from time to time.  We don't

14   ask very often for insurance valuations because we carry out

15   those ourselves.  It's our business.

16   Q.  On those occasions that you do ask for valuations,

17   typically, are you asked to provide proof of ownership?

18   A.  No.

19   Q.  How about when you issue valuations, do you require proof

20   of ownership typically from your clients?

21   A.  No.

22   Q.  And why is that?

23   A.  Because the assumption is that the client is in good faith

24   asking for a valuation for works that he owns.  He may even

25   be -- we may be doing a valuation for a representative of the

O1QVACC2                         Smith - Direct

1  client.  So they wouldn't be able to give us proof of

2  ownership.

3  Q.  So moving on to some others of Mr. Sainty's opinions, he

4  suggested that $100 million was too high for the Leonardo

5  valuation.  What did you think of the analysis that he

6  conducted?

7  A.  I thought --

8            THE COURT:  Hold on one second.

9            Did you mean 100 million euros or $100 million?

10           MR. WOLVERTON:  Euros.

11           THE COURT:  Let's try that question again.

12  Q.  So Mr. Sainty suggested that 100 million euros was far too

13  high for the Leonardo valuation.  What did you think of his

14  analysis?

15           MR. WILSON:  Objection.

16  A.  I thought it was faulty.

17           THE COURT:  Overruled.

18  Q.  I'm sorry, can you repeat your answer?

19  A.  I thought his analysis was faulty.

20  Q.  Why did you think that?

21  A.  Because it was clear that he was conflating fair market

22  values with replacement values; in other words, he was mixing

23  them up.  He was looking at apples and pears, rather than

24  apples and apples or pears and pears.

25           THE COURT:  In this country we usually compare apples

O1QVACC2                        Smith - Direct

1   and oranges, not pears, but --

2   Q.  How is it you know that that's something he didn't take

3   into account?

4   A.  Well, it's quite clear to me that -- because he expressed a

5   view that the picture had increased in value.  Well, the

6   painting deserved a 36 percent uplift in value the day it was

7   sold, assuming that the fair market value was $83 million.  An

8   increase in value assumed that -- in my reading of his

9   analysis, was that he was thinking that the valuation, the fair

10  market valuation, had increased by that amount.

11  Q.  You might remember that as part of his analysis, he was

12  shown a number of internal Sotheby's communications related to

13  the preparation of the *Salvator Mundi* valuation.  And

14  Mr. Sainty claimed that the preparation of the valuation did

15  not conform to art market standards.  So I think we've -- I

16  know those emails have been shown a lot during this trial and I

17  don't think we need to go through all of them with you,

18  Mr. Smith.  I think I'll just show a few of the documents that

19  Mr. Sainty referenced.

20          MR. WOLVERTON:  If we could please pull up and publish

21  Plaintiff's Exhibit 171, which is already in evidence.

22  Q.  Mr. Smith, did you review this communication in preparing

23  to give your opinion?

24  A.  Yes, I did.

25          MR. WOLVERTON:  And maybe we can just scroll down to

O1QVACC2                          Smith - Direct

1   the bottom and you could sort of see.

2   Q.  And so you'll see it begins with:  Attached the old

3   insurance certificate, just as an FYI.  And there was initially

4   a request to do it in letter format.  But then ultimately they

5   decided to do it in a formal valuation.

6           Does that all sound correct to you, Mr. Smith?

7   A.  There's nothing unusual here.  Valuations sometimes are

8   sent out in letter format.  I would expect a valuation for a

9   work of this stature to have a formal document with a

10  certificate.  But there is no art market standard that requires

11  it has to be certified.  Not in the UK, in any event.

12          MR. WOLVERTON:  I think we can take this down.

13  Q.  How, if at all -- well, I should say do you recall having

14  reviewed other communications in addition to that one relating

15  to the process by which the valuation was put together?

16  A.  Yes, I do.

17  Q.  How, if at all, did reviewing those communications impact

18  your view that the Sotheby's insurance valuation was issued at

19  a reasonable amount?

20  A.  It seemed to me that Sotheby's had conducted quite a

21  careful analysis of the values.  They discussed it amongst

22  their specialists and I think that it was done in a fairly

23  professional way.

24  Q.  Do you remember Mr. Sainty testifying that the Sotheby's

25  employees in the emails that he had reviewed were not

O1QVACC2                        Smith - Direct

1    discussing important issues for a valuation since the emails

2    didn't debate important issues like the significance or subject

3    of the work?

4    A.   Yes, I don't think that is a particularly important factor.

5    I mean, it was clear that this was just correspondence

6    between -- there were no doubt a lot of other discussions going

7    on behind the scenes, verbal discussions between specialists.

8    Q.   Let me ask about how you conduct valuations at Gurr Johns.

9    When you're preparing a valuation with your colleagues, do you

10   put all of the discussions that you're having in emails or do

11   you have conversations outside of the email traffic as well?

12   A.   We have many conversations outside.  We meet together.  If

13   we did everything in email, we'd be typing all day long.  So we

14   have discussions, we may make, sort of, summary -- a summary of

15   our general view, and that may be circulated.  But no, a

16   valuation isn't done purely on an email traffic, that's only a

17   tiny part.  It's the tip of a valuation iceberg.

18   Q.   Do you recall Mr. Sainty testifying that the employees in

19   those emails had called the *Salvator Mundi* very important, but

20   that in Mr. Sainty's view, it was actually, relatively

21   speaking, in Leonardos, of those surviving paintings, it's not

22   the most important picture by a long way?

23   A.   Well, it's a very, very important painting.  There are no

24   Leonardos.  I mean, to speak negatively about a painting of

25   this importance is extraordinary in my view.  Most Leonardos

O1QVACC2                        Smith – Direct

1   are in public collections; they are never coming onto the

2   market.  There are only 16 works in existence that are accepted

3   by him.  And those one or two that might be out there, there's

4   considerable debate.

5            This is a very important work.  I don't understand how

6   Mr. Sainty could say anything negative about the importance of

7   the work.  Certainly you could say negative things about the

8   condition, but not the importance.

9   Q.  In support of his opinion, you might recall Mr. Sainty

10  testifying that at the time of the valuation, the highest price

11  paid for an Old Master work was for Rubens' *Massacre of the*

12  *Innocence* for 55 million pounds.  What is your view on that

13  contention as it relates to the value of the Leonardo?

14  A.  It's a very different painting; but it was a very fine

15  painting.  I think that the *Massacre of the Innocence* today

16  would be worth over 150 million pounds.

17  Q.  Why is that your view?

18  A.  Well, because curiously enough, another great work by

19  Rubens came on the market at the same time.  We're talking

20  about comparables here.  That work was resold for 26 million

21  against seven million, so that's nearly four times the price.

22  And if one were to apply that master works, and the *Massacre of*

23  *the Innocence*, although a tough subject, was a real master

24  work, if one applied that multiple to the 55 million pounds or

25  $69 million, you're talking about a very large figure indeed.

O1QVACC2                          Smith - Direct

1    Q.  So does the sale that -- does the fact that Mr. Sainty
2    identified that at the time the highest price was that Rubens
3    sale, does that, in your view, undermine whether it was
4    reasonable to issue the insurance valuation for 100 million
5    euros?
6    A.  Well, no.  I think that what Mr. Sainty was doing was he
7    was identifying -- he was pointing out that one work had sold
8    at the time for 69 million some many years earlier, but he had
9    not taken adjustment of the changes in market value into
10   consideration when he made that criticism.
11   Q.  Do you also recall Mr. Sainty testifying about a private
12   transaction where the British government bought two major
13   masterpieces by the Venetian 16th century painter Titian from
14   the Duke of Sutherland for, together, 100 million pounds?
15   A.  I do recall that.
16   Q.  What is your view on Mr. Sainty's view -- what is your
17   opinion on Mr. Sainty's comment that that sale undermines the
18   reasonableness of the *Salvator Mundi* valuation?
19   A.  Well, that sale was at a figure which was considerably
20   lower than the open market figure.  Because the Duke of
21   Sutherland had an enormous tax liability tied up in those
22   pictures.  And the British government allow a tax rebate; they
23   give you tax credits if you sell directly to them.  So the
24   figure was artificially reduced by virtue of the tax benefits
25   that the duke received.

O1QVACC2                        Smith - Direct

1            MR. WOLVERTON:  Can we please pull back up DX-650.

2    This is already admitted.  If we could go to page 9 of the

3    attachment.  You should see a section called "Further Notes."

4    Q.  Mr. Smith, do you remember Mr. Sainty testifying about this

5    portion of the Leonardo valuation?

6    A.  I do.

7    Q.  And do you recall him testifying that, in his view, this

8    write-up in the valuation did not satisfy him in regard to what

9    he would expect to see on the condition of the work?

10   A.  I do recall that, yes.

11   Q.  So I'll just read from the second paragraph where it

12   begins:  More significantly, however, in explaining its having

13   been overlooked, is the fact that its appearance had been

14   radically altered by over-painting, which obscured much of its

15   original painted surface.  This disfiguring repainting had

16   evidently been undertaken some time ago, and the painting is

17   recorded in this crude state in a photograph preserved at the

18   Witt Library Courtauld Institute, London, taken when the

19   painting was in the Cook collection in England.

20           And then I actually will read one more sentence:  At

21   the time of its re-emergence in 2005, it was also evident that

22   the picture's support, a walnut panel, had been compromised by

23   attempts to minimize its curvature and stabilize its movement.

24   The most recent being a mahogany and oak cradle affixed in the

25   late 19th century.

O1QVACC2                          Smith - Direct

1              Having read those statements to you, Mr. Smith, do you
2      agree or not agree with Mr. Sainty that this write-up did not
3      satisfactorily describe the condition of the artwork?
4      A.  I think it described it pretty accurately.  It's not a full
5      condition report; but you wouldn't include a full condition
6      report in an insurance valuation.  A condition report is a long
7      document.  This is a fairly accurate and succinct description
8      of the state of the painting prior to its restoration and
9      discovery.
10     Q.  Do you recall Mr. Sainty describing this write-up as really
11     more of a sales pitch?
12     A.  I don't see it as a sales pitch because the painting --
13     this is just an accurate and reasonable statement of fact.
14     There's no -- there's no sales pitch element that I can see in
15     that statement.
16     Q.  Mr. Smith, I'd like to give you a hypothetical.  If I told
17     you that this write-up was taken from the private sale
18     agreement between Blancaflor and Sotheby's back in 2013, in
19     your view, would it be appropriate or not appropriate to take a
20     write-up that had been included in the contract for sale in
21     2013 and put it in the 2015 valuation?
22     A.  I think that's perfectly reasonable.  They are both being
23     issued to the same people.
24     Q.  Why do you think that would be a reasonable thing to do?
25     A.  This note is just effectively that, that's what it is.

1    It's not part of the valuation, it's just a description of the

2    painting.  It's a little bit of, if you like, sort of extra

3    that -- it's giving some weight to the fact this is a very

4    important picture and giving a bit of background.  The fact

5    that this is included in the valuation, as well as in the sales

6    invoice, entirely understandable.

7    Q.  Mr. Sainty testified that 100 million euros was too high of

8    an insurance value for this artwork because it had been

9    purchased for around $80 million and nothing suggested that it

10   had increased in value by 25 percent or more between that time.

11   He also called it an extraordinary increase in two years' time.

12           What is your reaction to Mr. Sainty's opinion that the

13   Leonardo valuation reflected an extraordinary increase in value

14   in two years' time?

15   A.  Well, this valuation was an insurance valuation, it's not a

16   fair market value evaluation.  I mean, he was -- he was mixing

17   apples and oranges.

18           THE COURT:  Apples and oranges.

19   Q.  Mr. Smith, I'd like to move on to hear your views on some

20   of the estimates that you mentioned when you first sat down

21   that were provided by Samuel Valette.

22           I'd like to start with the estimates for the artwork

23   *L'Empire des Lumières* by Magritte, and the analysis of the

24   Magritte market.

25           Before we get to those, I know you said earlier that

O1QVACC2                          Smith - Direct

1    as part of your art market activities, you had transacted on
2    works by Magritte; is that right?
3    A.   That is correct.
4    Q.   Do artworks by Magritte and other surrealists fall within
5    your area of specialty in the art market?
6    A.   Yes, they do.
7    Q.   So I'd like to show you DX-692 which is already admitted in
8    evidence.
9         MR. WOLVERTON:   And let's please publish.   Thank you.
10   Q.   Mr. Smith, are you familiar with this artwork?
11   A.   I am.
12   Q.   And what is it?
13   A.   It's a painting by Magritte called *L'Empire des Lumières*.
14   Q.   What importance, if any, does this artwork have within the
15   body of works by Magritte and other surrealists artists?
16   A.   It's a very important work.   It's biggest in series.   It's
17   probably his single best known image.
18   Q.   Why is it -- why do you think it's very important?
19   A.   Well, Magritte clearly attached considerable importance to
20   the work because he painted it so many times in a variety of
21   different formulae.   And it has a huge popularity in the
22   market.   It's the work that seems to be the most expensive.   I
23   personally don't think it's necessarily his greatest work, but
24   it is the work that the art market likes best.
25        MR. WOLVERTON:   Okay.   I think we can pull this down.

O1QVACC2                        Smith - Direct

1   Q.  I'd like to turn to the estimates now, Mr. Smith.  Did you

2   have an occasion to review the estimates that Mr. Sainty was

3   commenting on?

4   A.  Yes, I did.

5   Q.  I'd like to show you PX-182, which is already admitted into

6   evidence.

7            MR. WOLVERTON:  Let's please publish.

8   Q.  Is this one of the documents that you reviewed in

9   connection with preparing your opinion?

10  A.  Yes, it is.

11  Q.  So I'd like to go ahead and read these two paragraphs.  It

12  begins with:  It was a pleasure to talk to you about the

13  current market for surrealist works and that of Magritte in

14  particular.

15           THE COURT:  Mr. Wolverton, can I stop you.  Since

16  we've seen this a number of times, we can do this more quickly,

17  so just ask the question.

18           MR. WOLVERTON:  Okay.

19  Q.  Mr. Smith, you'll see that the date of this email is

20  November 11th, 2011.  Do you agree with Mr. Valette's statement

21  that as of that date, the latest sales had shown that auctions

22  are stronger than ever for Magritte's best paintings?

23  A.  I do.  I have -- I mean, at that date, ten of the 15

24  highest prices paid for Magritte had been achieved in the

25  previous year or 18 months before that date.

1    Q.  And would you classify this particular *L'Empire des*

2    *Lumières* as one of Magritte's best paintings?

3    A.  Certainly one of his most valuable paintings.

4    Q.  What do you mean by that distinction?

5    A.  It is one of his best paintings.  I'm being a little

6    critical of it.  But I just find that he overworked the

7    subject, in my view.  But, yes, it is one of his best paintings

8    and certainly one of his most valuable paintings, if not the

9    most valuable painting.

10   Q.  I am curious to hear your views on why you think it's

11   overworked?

12   A.  Well, it seems to me -- and, you know, this is my

13   subjective judgment, so I don't want anybody to take it as

14   fact.  But it seems to me that in -- he painted this painting

15   first in 1948.  And within ten years, he'd painted something

16   like 14 or 15 works, and he carried on painting this subject.

17   In other words, he got into a process whereby he and his dealer

18   realized this was a really commercial subject, and he kept

19   painting it in order to make money.  That's what artists paint

20   pictures for.

21   Q.  So looking at the second paragraph, what is your view on

22   Mr. Valette's description of the *L'Empire des Lumières* as a

23   large iconic painting by Magritte?  Do you think that's a fair

24   statement?

25   A.  I do.

O1QVACC2                          Smith - Direct

1    Q.  And could you explain why you think that's fair, that the
2    word "iconic" would apply?
3    A.  Yes.  Iconic -- it's clearly an iconic painting because it
4    is one of the best-known subjects.  It's an icon of his work.
5    There are other icons in Magritte's output, but this is
6    possibly the best known one.
7    Q.  What is your view on Mr. Valette's statement that there was
8    unsatisfied demand in the market?
9    A.  I think that's absolutely right.  There was very, very
10   strong demand.  And for every buyer there is an unsatisfied
11   underbidder.
12   Q.  And how about do you have a view on Mr. Valette's statement
13   that there was financial power of the bidders in the market?
14   A.  Well, I can't really comment on the financial part that
15   Mr. Valette knew about, because he presumably knew more about
16   those bidders in the market than I did.
17   Q.  How about Mr. Valette's view that a painting -- that such a
18   painting would be subject to intense competition at auction?
19   A.  I would agree with that.
20   Q.  And then finally, you'll see that Mr. Valette estimated
21   this piece to be between $40 million and $60 million, with a
22   result that should approach the high range of that estimate.
23          What is your view on that estimate?
24   A.  I think that was -- that was a -- you know, a reasonable --
25   a reasonable -- but, you know, reasonably strong estimate, but,

O1QVACC2                          Smith - Direct

1   I mean, justifiable.

2   Q.  And why is that your view?

3   A.  Well, because we know now, talking about hindsight, that a

4   painting like this sold for considerably more than that figure.

5   Q.  What's the sale you're referring to?

6   A.  Well, there was a sale by the *L'Empire des Lumières*.  I

7   think it was the same painting that sold for $70 million.

8   Q.  And when was that?

9   A.  That was in London and it was, I think, two years ago.

10  Q.  Do you have a view -- well, actually, withdrawn.

11          Mr. Valette uses the term "auction estimate" here.  Is

12  it typical or not typical for an auction estimate to be given

13  as a range between two numbers?

14  A.  Almost invariable.  Auction estimates are nearly always in

15  ranges.

16          MR. WOLVERTON:  Think we can pull this down.

17          We'll show you Exhibit PX-375, which is also already

18  in evidence, so we can please publish.

19  Q.  Mr. Smith, is this also one of the documents you reviewed

20  in connection with preparing your opinion?

21  A.  Yes, I did.

22  Q.  And you might remember that Mr. Sainty was shown various

23  differences between this email and the one that we were just

24  looking at.  And you'll see that they also have the same date.

25  I'm just going to draw your attention to a few of the

O1QVACC2                          Smith - Direct

1    statements in this email.

2          So looking at the second sentence, this email now

3    includes the phrase "but also very strong for lower-level

4    paintings."  So just to connect that up, it says that:  The

5    latest sales have shown that auctions are not only stronger

6    than ever for Magritte's best paintings, but also very strong

7    for lower-level paintings.

8          What is your view on that statement?

9    A.  I think it is accurate.  The Magritte market was strong

10   right across the board.

11   Q.  So for lower-level paintings as well?

12   A.  Yes.  Absolutely.

13   Q.  And maybe we can turn to some of the examples that

14   Mr. Valette gave.

15         I want to show you what has been -- maybe we can step

16   away from this briefly and I can show you what has been marked

17   for identification as DX-1020.

18         MR. WOLVERTON:  And let's just show it to counsel, the

19   Court, and the witness.

20   Q.  Do you recognize this document -- or, excuse me, do you

21   recognize this artwork?

22   A.  Yes, I do.

23   Q.  Can you tell us what it is?

24   A.  Well, it's a surrealist work called *Les vacances de Hegel*,

25   that's French.  We call it *Hegel's Holiday*, which is a

O1QVACC2                          Smith - Direct

1    translation.  And it's interesting, very good work by Magritte,

2    but it is not one of his iconic works.

3              MR. WOLVERTON:  Your Honor, we would move that this be

4    admitted into evidence.

5              THE COURT:  Any objection?

6              MR. WILSON:  No objection, your Honor.

7              THE COURT:  Admitted.

8              (Defendants' Exhibit 1020 received in evidence)

9              MR. WOLVERTON:  May we publish?

10             THE COURT:  You may.

11   Q.  Mr. Smith, thinking back to Mr. Valette's email, was it an

12   accurate statement that as of November 11, 2011, would it be

13   accurate to say on that date that last week this painting had

14   sold for $10.1 million?

15   A.  Yes, it was accurate.

16   Q.  Do you agree or not agree with Mr. Valette that this is

17   "not a painting that is part of a major series by the artist"?

18   A.  I agree with him.

19   Q.  What, in your view, if anything, did that sale show about

20   the market demand for works by Magritte as of November 2011?

21   A.  It showed it was very strong.

22   Q.  And then I know you said that this was not a painting that

23   is part of a major series.  Would you also agree that this is a

24   "lower-level painting"?

25   A.  I wouldn't call it a lower-level painting, but I would call

O1QVACC2                          Smith - Direct

1   it a midlevel painting.

2   Q.  Could you explain that.

3   A.  Well, if we're looking at the range of paintings, you have

4   the top-level paintings, which are some of the big series and

5   the iconic works.  You have the midlevel, which this might fall

6   into that category.  And then the lower-level paintings,

7   generally speaking, in value terms, would be the -- would be

8   the works on paper, not oils and, generally speaking, on a much

9   smaller scale.

10  Q.  Do you agree that the price reached by this painting sale

11  was a good barometer in November 2011 of the high demand for

12  Magritte's works?

13  A.  I think it was, yes.

14          MR. WOLVERTON:  If we could just turn back to

15  Mr. Valette's email.  That was PX-375.

16  Q.  Is there anything that is factually inaccurate about the

17  market report that Mr. Valette pulled together?

18  A.  I see nothing factually inaccurate in this email.

19          MR. WOLVERTON:  Perhaps we could move on to DX -- I'd

20  like to show for identification what's been marked as DX-1021.

21  We can only show to counsel, the Court, and the witness.

22  Q.  Mr. Smith, do you recognize this artwork?

23  A.  Yes, I do.

24  Q.  And what is it?

25  A.  It's another Magritte painting.  It's called *A*

O1QVACC2                          Smith - Direct

1   *Schoolteacher*.  It's one of -- it is an iconic work, although

2   this is a very small work.  There is -- in fact, I have valued

3   it myself, the large-scale work of this artist.  And it's quite

4   possibly a self-portrait.  It might or might not be; he never

5   painted himself face-on.  It's a very good work, albeit on a

6   very small scale, and not in oil, it's in gouache.  Gouache is

7   a water-soluble medium, not dissimilar to watercolor.

8                MR. WOLVERTON:  If we could please move back to

9   PX-375.

10               THE COURT:  Did you want to offer that?

11               MR. WOLVERTON:  Oh, yes, please.  Defendants move to

12   offer this into evidence.

13               MR. WILSON:  No objection.

14               THE COURT:  Admitted.

15               (Defendants' Exhibit 1021 received in evidence)

16               THE COURT:  Do you want to show it to the jury?

17               MR. WOLVERTON:  Yes, please.  I'm sorry.

18               THE COURT:  All right.  Go ahead.

19               MR. WOLVERTON:  Now we can please move back to PX-375.

20   BY MR. WOLVERTON:

21   Q.  So what is your view on Mr. Valette's statement that the

22   little gouache, *The Schoolteacher*, sold for more than USD $4

23   million in February of 2011?  Is that an accurate statement?

24   A.  Yes, it is.

25   Q.  What, if any, significance do you give to the fact that the

1   painting was a little gouache?

2   A.  Well, little gouache clearly is not as valuable as a large

3   oil.  This was such a good subject that it made a very good

4   price.  $4 million for this painting, which is very small

5   indeed, is -- was a very high price indeed.

6   Q.  You might remember that Mr. Sainty said he disagreed with

7   Mr. Valette's commentary on the state of the market, because

8   the record price for the artist at that point was $12.5

9   million; and that in 2010, there had been a number of paintings

10  that had gone unsold, and some had fetched less than $10

11  million.  What is your view on Mr. Sainty's criticism?

12  A.  Well, I disagree with him.  It was clear to me the market

13  for Magritte was strong then and getting stronger.

14          Every year, any artist, whether a large number of

15  works, a few works go unsold, it may not be that there's no

16  demand for them, it may be just the people who are selling them

17  are a bit too greedy.  There was no question that the price of

18  the market for Magritte at this time was strong, as indicated

19  by my researches, which showed that ten of the 50 most

20  expensive works had been sold within a year or two of that date

21  at that time.

22  Q.  And then now just looking at the last paragraph, I think as

23  Mr. Wilson pointed out with Mr. Sainty, the word "auction" has

24  been removed from the phrase "auction estimate."  So now it

25  just says estimate.  But then the numerical values are not

O1QVACC2                          Smith - Direct

1     changed.  You said previously that you agreed with

2     Mr. Valette's assessment or thought it was reasonable.  Does it

3     change your opinion the word "auction" has been removed so that

4     it now only says "estimate"?

5     A.  No, because it's a range.  Clearly any professional in the

6     art market would know that that was an auction estimate.  No

7     one at auction houses puts ranges of prices on it.  It's

8     clearly an auction estimate.

9               MR. WOLVERTON:  So we can take this down.

10              And I'd like to please show the witness and publish,

11    since it's in evidence, PX-183.

12    Q.  Mr. Smith, did you also review this document in preparing

13    your opinion in this case?

14    A.  I did.

15    Q.  So I believe that Mr. Wilson with Mr. Sainty already

16    established that the only change in this document and the one

17    that we were just looking at was that the prior one gave an

18    estimate of the *L'Empire des Lumières* in the range of 40 to $60

19    million USD; whereas this one says:  In private sales, a large

20    iconic painting such as *The Empire of Lights* would be

21    negotiated for around 40 million euros.  And then it does still

22    go on to say that such a painting on public sale would be the

23    subject of intense competition.

24              Is it typical or atypical when providing an estimate

25    for a private sale to list the estimate as, you know, not in a

O1QVACC2                         Smith - Direct

1    range, as just a single figure?

2    A.  Yes.  Private sales have single prices; auction estimates

3    have a range of prices.

4    Q.  The prior range given was in U.S. dollars, but this one's

5    in euros.  Do you know what the equivalent of 40 million euros

6    was in November 2011?

7    A.  I believe it was $54 million.

8    Q.  So how does an estimate of the equivalent of $54 million

9    compare to the prior one that we were looking at, 40 to 60?

10   A.  It's pretty much the same, just slightly higher than the

11   halfway point.

12   Q.  I know you gave your view on the prior estimate that we

13   were looking at.  Do you have any different view on this

14   estimate, taking into account the revisions that were made that

15   it's now a private sale?

16   A.  No, I think it's effectively the same; it's just expressed

17   differently for a private sale as opposed to an auction

18   estimate.  It's essentially the same figure.

19   Q.  And what about the analysis that Mr. Valette provides

20   throughout the email, do you think that supports or does not

21   support or somewhere in between the estimate that Mr. Valette

22   gave?

23   A.  No, I think his -- his comments on the market and his

24   estimates were -- were factually accurate at the time.

25   Q.  So Mr. Sainty criticized Mr. Valette's estimate here on the

O1QVACC2                          Smith - Direct

1    ground that no Magritte had ever fetched anything like that
2    amount of money.  What is your view on that criticism?
3    A.  Can you just repeat the question?  Sorry.
4    Q.  No problem.
5         So Mr. Sainty criticized Mr. Valette's estimate on the
6    ground that no Magritte had ever fetched anything like this
7    amount of money.  What is your view on that criticism?
8    A.  Well, he's -- he isn't taking into account that a great
9    work always outperforms the previous -- previous record prices.
10   I mean, what happens is if a work as good as that, as large as
11   that, come on the market, it would have outperformed any price
12   that would have been paid previously.
13   Q.  One comment on -- if we move up a little bit.  You'll see
14   that the little gouache, *The Schoolteacher*, is described as an
15   iconic image.  In your view, is *The Schoolteacher*, the one we
16   were looking at a few minutes ago, is that an iconic image?
17   A.  I think it is.  It is one of the great iconic images of
18   Magritte's works.
19   Q.  And then the next paragraph, where it discusses the
20   *L'Empire des Lumières*, it also refers to the *L'Empire des*
21   *Lumières* as an iconic image.  How is it possible that both can
22   be iconic images, when one sold for $4 million and one is being
23   estimated at $40 million?
24   A.  Well, they are quite different pictures.  The iconic little
25   gouache is a very small painting painted in gouache, which is a

1  water-soluble medium, not very stable, requires glass, and

2  doesn't have the same sort of strength and structure as an oil

3  painting.  And so I mean if that -- again, I'm sorry, I'm going

4  back to apples and oranges again.  Here we have -- he's

5  comparing a small gouache with a major oil painting.  They are

6  not the same.

7  Q.  Well, I'm trying to get at the idea that both of these are

8  being described as iconic.  Does the use of the phrase

9  "iconic," in your view, would it apply to an artwork?  Does

10 that suggest a monetary value for the artwork?

11 A.  Iconic images will always sell at a premium price because

12 they are iconic, and there is a monetary volume in that.  And

13 for a small gouache, $4 million is a very high price at that

14 time.

15 Q.  So it's possible that an iconic image can be worth

16 something like $4 million, but it could also be worth something

17 like 40 million euros, would you agree with that?

18 A.  I do agree with that, yes.

19 Q.  What do you understand the term "iconic" to mean when

20 applied to an artwork?

21 A.  It's -- it's an image which represents the public idea of

22 the artist.  In other words, it is something that is -- I mean,

23 if we go back to Leonardo, the iconic image of Leonardo is

24 obviously the *Mona Lisa*.  It is for -- I hate to say this word,

25 it's like that sort of brand.  You know, Magritte is known for

O1QVACC2                          Smith - Direct

1   the schoolmaster series and *The Empire of Lights* series and, to
2   some extent later, the *Domaine* series.  And these are works
3   which represent the artist at his highest level.
4   Q.  So considering these three emails as a whole, you might
5   remember that Mr. Wilson and Mr. Sainty referred to them as
6   valuations.  Would you use that term to describe a series of
7   emails like this?
8   A.  Absolutely not.
9   Q.  How would you characterize these types of emails?
10  A.  They were discussions.  And these -- these are more of a
11  sales pitch than a valuation.
12  Q.  And why do you say it's closer to sales pitch than
13  valuation?
14  A.  Because throughout the email there is a -- you know,
15  there's comments which refer to the strength of the market, the
16  importance of paintings, the fact that the Magritte market was
17  much in demand at the time.  This is not a valuation at all.
18  Q.  Is there any difference in the art market standards that
19  apply to a valuation versus a sales pitch?
20  A.  Yes, very different.
21  Q.  Well, how about a sales pitch, what art market standards
22  apply to that?
23  A.  None at all.  You do your best to try and sell the
24  painting.
25  Q.  Well, are there any parameters --

O1QVACC2                        Smith - Direct

1   A.  You do have to tell the truth.

2   Q.  Well, having called these emails valuations, Mr. Sainty

3   said that they failed to live up to the market standards for

4   valuations.  What is your view on that criticism?

5   A.  They are not valuations.

6   Q.  You might also remember that Mr. Sainty referred to this

7   last paragraph which appeared -- if we could go down to just --

8   oh, I'm sorry.  Right.

9          So you might remember that Mr. Sainty referred to this

10  last paragraph, which appeared in all three of the emails we

11  were looking at, as an estimate for a painting such as *L'Empire*

12  *des Lumières*.  And Mr. Sainty testified that the email

13  estimated some other painting aside from the *L'Empire des*

14  *Lumières*, but the email doesn't say what the other painting

15  was.  What is your view on that characterization?

16          MR. WILSON:  Objection.

17          THE COURT:  Overruled.

18  A.  Can you say it again please.

19  Q.  Yes.  So Mr. Sainty testified in regard to this -- the

20  final paragraph in these three emails that Mr. Valette had

21  provided an estimate for a painting such as an *L'Empire des*

22  *Lumières*, and testified that the email estimated some other

23  painting aside from the *L'Empire des Lumières*, but that the

24  email doesn't say what the other painting was.  What's your

25  view on Mr. Sainty's characterization?

O1QVACC2                          Smith - Direct

1    A.  Well, he's -- he's criticizing the comment, but this is

2    just talking about a generic type of painting, a major iconic

3    work by the artist such as -- I read it as a group of

4    paintings, not a specific painting.

5    Q.  Reading this paragraph in the whole with the rest of the --

6    with the rest of the email, do you -- actually, withdrawn.

7            Mr. Smith, in your experience in the art market, have

8    you ever received an email like this one?

9    A.  Oh, yes, I receive them from time to time.

10   Q.  Have you received emails like this from auction houses?

11   A.  Yes.

12   Q.  In what context do you typically receive these kinds of

13   emails?

14   A.  Typically, I receive them in the context of them pitching

15   for a consignment auction.  We've also received them in

16   pitching for a private sale as well, so we've received -- we've

17   received them in both contexts.

18   Q.  Let's take a hypothetical of a situation where an auction

19   house's client who, let's say, is an art dealer requested that

20   something like these emails we've been reviewing is prepared.

21   Would that be typical or atypical in the art market?

22   A.  It's quite typical.

23   Q.  Would providing that kind of document, emails like this to

24   a client upon their request, be consistent or inconsistent with

25   art market standards?

O1QVACC2                         Smith - Direct

1   A.   It's quite normal.   There's no particular art market

2   standard that applies to these sort of emails, but it's

3   something that routinely happens.

4   Q.   In what context are those requests typically made of

5   auction houses?

6   A.   They are normally made in anticipation of the transaction.

7   Q.   If we scroll up to the top of the email, you'll notice that

8   the email is addressed to "Mr. Bouvier" rather than using his

9   first name.   Would you expect an email like this to be drafted

10  informally or somewhat formally?

11  A.   I think it's possible to say I don't think there's -- it

12  depends how -- I have no real view on that.   I mean, it doesn't

13  seem to me to carry any great significance.

14  Q.   And then we walked through the various revisions that were

15  made to this email over the course of a few days.   Each time

16  the email was sent as a clean email rather than as a reply,

17  sort of, on the chain.   Is that the kind of thing that one

18  would see in the art market when a specialist is providing an

19  opinion, that they might be revisions to emails?

20  A.   I see it from time to time.   I don't really have a very

21  strong view about whether they are clean emails or chains.

22  Personally, I don't like chains of emails because I always end

23  up looking at the wrong one.   So it might be -- it's not of

24  significance, in my view.

25  Q.   Would it be typical or atypical to request that revisions

O1QVACC2                        Smith - Direct

1   be made to the type of, you know, sales pitches that you were

2   referring to or to a market analysis, for example?

3   A.  I think that would be fairly typical.

4   Q.  Is sending a draft of a market analysis like this, is that

5   typical or atypical in the art market?

6   A.  I've seen -- drafts are very common, because they are

7   discussing a range of figures, prices, and that's not unusual

8   at all.

9   Q.  Mr. Smith --

10              MR. WOLVERTON:  We can take this down, please.

11  Q.  Before I show you the next document that Mr. Sainty

12  discussed with plaintiff's counsel, I'd like to show you an

13  image of an artwork.

14              MR. WOLVERTON:  If we could please pull up DX-683,

15  which is already admitted.

16  Q.  Mr. Smith, are you familiar with this artwork?

17  A.  I am.

18  Q.  And what is it?

19  A.  It's a painting called the *Domaine d'Arnheim*.

20  Q.  And what importance, if any, does this artwork have within

21  the body of works by Magritte and other surrealist artists?

22              THE COURT:  Actually, before you answer that question,

23  we're going to take our break; so we'll have Mr. Wolverton ask

24  it again after the break.

25              Ladies and gentlemen, a couple of things, aside from

O1QVACC2                          Smith - Direct

1   my usual instructions.

2              My understanding is that a member of the jury

3   department and the court is here just to give you some forms

4   that relate to jury payment, that sort of thing.  So I just

5   want to give you a heads-up about that.

6              Second, as I told you yesterday, I do expect that at

7   the end of the day I'll give you more information and update

8   for what my expectations will be next week and what it means

9   for our schedule and the like.

10             With that, the usual instructions apply:  Don't

11  discuss the case, don't do any research about the case,

12  continue to keep an open mind, and be ready to go just before

13  noon.  So enjoy your break.

14             (Jury not present)

15             THE COURT:  You may be seated.

16             Mr. Smith, you may step down.  Just be ready to go a

17  minute or so before noon.

18             Mr. Wolverton, estimate on how much you have remaining

19  on direct?

20             MR. WOLVERTON:  I think I want to say probably about

21  an hour.

22             THE COURT:  All right.  And just out of curiosity --

23  Mr. Smith, you can step down.

24             (Witness not present)

25             THE COURT:  Any estimate on the length of cross?

O1QVACC2                          Smith - Direct

1          MR. WILSON:  Two hours, maybe a little bit less.

2          THE COURT:  All right.  So it sounds like we will

3     spill into Monday.

4          Has the development this morning with respect to the

5     auction claim, does that change defendants' plan with respect

6     to calling Mr. Shaw?

7          MS. SHUDOFSKY:  Yes, it does, your Honor.  We're not

8     going to be calling him.

9          THE COURT:  So does that mean that you -- what happens

10    after Mr. Smith?

11         MS. SHUDOFSKY:  I expect that we will rest.  We'll

12    just have a conversation amongst us to make sure there's

13    nothing else we want to put into evidence.

14         THE COURT:  Okay.  So then it sounds like we may

15    finish relatively early on Monday.  I hate to bring the jury in

16    for a very short day, but I guess -- well, we'll take it as it

17    comes.  I'll see — and perhaps discuss it with you at the end

18    of the day before I dismiss them — what I am going to tell them

19    to do.

20         All right.  I'll see you at noon.  Thank you.

21         (Luncheon recess)

22         (Continued on next page)

23

24

25

O1Q3ACC3

1                        AFTERNOON SESSION

2                            12:00 p.m.

3              (In open court; jury not present)

4              THE COURT:  I'm going to give the jury a few extra

5      minutes because some of their break was eaten up by the tax

6      form issue that I had referenced before.

7              So, given that, we may as well take care of some

8      business.  Plaintiff filed a letter concerning the jury

9      instructions.  Let me address one issue in there which is the

10     euro-dollar issue.  I'm wondering if we can postpone that.

11     What I would propose is that with respect to the relevant

12     transaction, I ask the jury to return a verdict in euros, which

13     is what the transaction occurred in.  And then we can, assuming

14     there a plaintiff's verdict on that issue, then we can brief

15     the question of whether the relevant date is the date of breach

16     or the date of judgment and do that calculation.

17             But I assume there is no dispute I can take -- since I

18     can take judicial notice of the exchange rate and it is a

19     question of just arithmetic, it strikes me it is easier to ask

20     the jury not to do the math.  To return a verdict in euros, and

21     if there is a verdict, then to do that ourselves after

22     appropriately briefing the issue.

23             Everyone seems to be nodding.  Defense counsel?

24             MR. ASNER:  That's fine.

25             THE COURT:  Okay.

O1Q3ACC3

1              MS. SALZMAN:  That's fine with plaintiff as well.

2              THE COURT:  No need to respond to that now.  We'll

3       deal with that in the event that it becomes relevant.

4              On the other issues, I leave it to defense counsel I

5       guess whether you want to file a reply.  Candidly, I already

6       have a draft of the jury instructions, and I will certainly

7       look at plaintiff's letter.  But upon first look, not sure it

8       will result in me changing anything that's in my current draft.

9       And I'm sure we can deal with it at the charge conference.

10             If you wish to be heard, I would need a letter sooner

11      rather than later.

12             MR. ASNER:  I got it about three minutes ago.  So, I

13      will take a look at it.  We'll confer about whether we'll put

14      in anything.

15             My first glance is that misunderstands conscious

16      avoidance, having done a number of these before.  But in any

17      event, we can let us take a closer look, your Honor, and we can

18      advise the Court whether we want to put in the a response.  If

19      we did, we would do that probably by tomorrow.

20             THE COURT:  I think for my own 2 cents, which I'm sure

21      are worth something here, the conscious avoidance point is

22      probably the one most worth addressing.

23             I will tell you that I currently have a conscious

24      avoidance instruction in my draft, but I intended to flag it as

25      something that we should discuss, whether that is warranted and

O1Q3ACC3

1    there is an evidentiary basis for it.  Plaintiffs have now

2    submitted something on that, and maybe to the extent you

3    disagree, that might be an appropriate thing for you to file a

4    response on.

5         MR. ASNER:  I think the thing that snags at me

6    initially is that the first prong with conscious avoidance is

7    establishing a high probability.  And the theory has shifted a

8    little bit in that previously it was knowledge of the lies, and

9    now it appears, at least from my first glance, to be knowledge

10   that there was an agency understanding and that there was

11   inflated prices.

12        Under either theory that the plaintiffs are going to

13   be pressing, they have to prove that there is a high

14   probability that Sotheby's knew of either the lies -- I think

15   there's zero evidence that we knew of the lies -- and then with

16   respect to knowledge of agency, I don't think that there is a

17   high probability that we knew.  In fact, all the evidence

18   points in the opposite direction.

19        So that's where I'm working it through in my mind.

20        THE COURT:  As I said, I would think that maybe

21   submitting something on that would be helpful.

22        MR. ASNER:  Okay.

23        THE COURT:  Just to share my 2 cents.  It's possible

24   that there should be an instruction without limit.  It's

25   possible there shouldn't be an instruction.  There is also a

O1Q3ACC3

1    middle ground which is there is an evidentiary basis to support

2    the instruction as to some of the elements that the jury would

3    need to find knowledge with respect to, but not others.

4           So, I'm not intimating a view on that.  But I just --

5           MR. ASNER:  My only point is what I need to think

6    through is whether I believe the threshold issue of whether the

7    evidence supports a finding of a high probability is a question

8    for the Court.  And so, and I don't think it does, but

9    obviously this is the first I've seen their letter.

10          THE COURT:  I think it's very clear that it's a

11   question for the Court whether there is an evidentiary basis.

12   It's for the jury to make a finding that would support an

13   instruction.  But we can leave it there for now.

14          Why don't I give you, I mean, I observe Shabbat so I

15   won't look at it before sundown tomorrow anyway.  But would you

16   give me a time that you want to get something in tomorrow, if

17   you want to file something?

18          MR. ASNER:  Yes.  To the night.  So, at some point

19   tomorrow night, we would be able to get that for you.

20          THE COURT:  How about by sundown?

21          MR. ASNER:  Okay.  By sundown, yes.  Some of our team

22   also observes Shabbat.

23          THE COURT:  Well, how about this.  Shabbat ends at

24   5:50.  I'll give you until 7 o'clock.

25          MR. ASNER:  Very generous.

O1Q3ACC3

1           THE COURT:  I think we're ready to go.

2           What I'm likely to do, two things to flag.  One,

3    before I dismiss the jury I may have you join me at sidebar so

4    we can think through how much remains and what the schedule is

5    Monday.

6           Just so you know where I am on that score, although I

7    said yesterday that in an ideal world we'd do both closings in

8    one day, I think if we're going to have very little testimony

9    on Monday, one option would be to do the charge conference

10   first, let them come in late, finish the evidence, and then

11   proceed directly into plaintiff's closing, which may not enable

12   us to do both in one day.  That strikes me as better than

13   wasting the better part of a day.

14          So, just flagging that, put a pin in it, as they say,

15   and we can discuss it.  We may discuss it before I dismiss the

16   jury.

17          Let's get Mr. Smith back on the stand and jury is

18   ready to come out.

19          MR. ASNER:  Did you envision having argument later

20   today on some of the points?

21          THE COURT:  I think likely yes, at the conclusion of

22   the time, given Shabbat.

23          Mr. Smith.

24          (Jury present)

25          THE COURT:  Welcome back, ladies and gentlemen.  I

O1Q3ACC3                          Smith - Direct

1    gave you a few extra minutes, since I gather some of your break

2    was eaten up by the jury form issues.  So there you have it.

3            We'll pick up where we left off with Mr. Smith's

4    direct testimony.

5            Mr. Smith, I remind you that you remain under oath,

6    and with that, Mr. Wolverton, you may proceed.

7            MR. WOLVERTON:  Thank you, your Honor.

8    BY MR. WOLVERTON:

9    Q.  Mr. Smith, I want to go back to Plaintiff's Exhibit 183 for

10   just a moment.  It is already in evidence so it can be

11   published.

12           I want to go down to the bottom paragraph here.  And

13   Mr. Smith, you'll remember this is where Mr. Valette wrote that

14   "It is clear that in private sales a large iconic painting such

15   as *The Empire of Lights* below would be negotiated for around 40

16   million euros."

17           What artwork, if any, do you view that statement as

18   estimating?

19   A.  Well, that's an estimate of the *Empire of Lights*.

20   Q.  Thank you.  We can bring this down.

21           And now we can go back to Plaintiff's Exhibit 70,

22   please.  Which I'm sorry.  Is it -- no.  It's Defendant's

23   Exhibit 683.  It is already admitted so we ask it be published

24   again.

25           Mr. Smith, just before break, I had asked you what

O1Q3ACC3                          Smith – Direct

1   importance, if any, this artwork has within the body of works

2   by Magritte and other Surrealist artists.

3   A.  Well, it is an extremely important painting.  It was in the

4   collection of Edward James.  Edward James was an American

5   British Surrealist art collector, who financed, effectively,

6   Magritte in his early days before he became successful.

7        Magritte exhibited this painting to great acclaim, and

8   turned down a number of offers to purchase it, and eventually

9   sold it to Edward James, who I think got a sort of privileged

10  access, because of his relationship with the artist.

11       It's also a series.  It is also, and very importantly,

12  dates from 1938, which was the peak of the Surrealist movement.

13  The Surrealist movement of artists sort of faded out after the

14  Second World War, and this is an unusual painting because it is

15  a fully mature work from the key moment in the artist's career.

16  Q.  Can we please now show the witness Plaintiff's Exhibit 70,

17  which is already admitted so I ask it be published.  If we

18  could go to the second page, please.

19       Mr. Smith, did you review this document in preparing

20  your opinion in the case?

21  A.  I did review it, yes.

22  Q.  What information is included on this page?

23  A.  Well, the description of the painting, the artist's name,

24  the work and details of the work itself, its provenance, which

25  is the history of previous ownerships, long list of exhibitions

O1Q3ACC3                         Smith – Direct

1    that the painting was included in, including some very major

2    exhibitions.  And then a series of what is called bibliography,

3    which is documents and entries in scholarly books, starting

4    with a letter from Magritte to Edward James dated May 6, 1938.

5    Q.  Is this kind of information something that you typically do

6    or do not receive when interacting with an auction house about

7    a work that you are considering purchasing?

8    A.  If it's available, they would absolutely include it.  It

9    supports the importance of the picture to some considerable

10   degree.

11   Q.  I know you act in an advisory capacity primarily.  Is it

12   typical or not typical for auction houses to send this

13   information to their dealer clients?

14   A.  Yes, exactly the same.  They wouldn't treat them any

15   different.

16   Q.  If we could just go up to the top a little bit.  I'm sorry.

17   Let's go to the next page.

18           Mr. Smith, do you agree with the first line, first

19   sentence of this paragraph which says that the *Domaine*

20   *d'Arnheim* is one of Magritte's most famous compositions, or do

21   you not agree with that?

22   A.  I do agree with that.

23   Q.  I think you explained the basis for that opinion probably

24   when you were introducing us to this work.  Is that essentially

25   the same -- is that analysis you gave us essentially the reason

O1Q3ACC3                    Smith - Direct

1    that you agree with this?

2    A.  Also it is the first of a first fully developed version of

3    a series.

4    Q.  Why does that contribute to it being one of Magritte's most

5    famous compositions?

6    A.  Well, because, first of all, it is in a series.  Secondly,

7    it is the first fully developed work which carries particular

8    weight, in my view.  In many of these Magritte series, they

9    sort of lose impact, the larger they get.  So, the first of the

10   *L'Empire des Lumières* carries more weight than the 12th

11   *L'Empire des Lumières*.  By then one can almost think of

12   Magritte in production mode.

13        The *Domaine d'Arnheim* was a follow on from an earlier

14   slightly unsuccessful attempt to produce this concept of sort

15   of the eagle's head in the mountainside, which he called the

16   *Précurseur*.

17        And this one clearly is where everything came

18   together.  He was very, he was obviously very proud of the

19   work.  He, he, it developed out of -- he was very interested in

20   the works of Edgar Allan Poe, and he wrote about how some of

21   Poe's works influenced the painting.  It's clear a major work.

22   Q.  Mr. Sainty testified that he doesn't agree with this

23   statement.  Because apart from the *Empire of Lights*, well,

24   yeah.  Excuse me.

25        He said that because there are other works which have

O1Q3ACC3                          Smith – Direct

1   obtained more fame for the artist than *Domaine d'Arnheim*.

2          What is your view on Mr. Sainty's statement that there

3   are other works that have obtained more fame than the *Domaine*

4   *d'Arnheim* and that therefore this is not one of Magritte's most

5   famous compositions?

6   A.  Well*, The Empire of Lights* series probably has obtained

7   greater public recognition.  As I said earlier in my testimony,

8   I'm not entirely sure if I agree with it being a better

9   painting, but it is certainly better known.

10         But this is, you know, this is very widely known, this

11  series, and actually, in my view from an art expert standpoint,

12  a better painting than many of the *Empire of Light* pictures.

13  Q.  I see that in this paragraph there is a reference to Edward

14  James.  Is that the collector you were discussing earlier?

15  A.  That is correct.

16  Q.  And what impact, if any, does the fact that Edward James

17  was affiliated with this painting have on the significance of

18  the artwork?

19  A.  Any painting, particularly any Surrealist painting, that

20  belonged to Edward James, has a premium and significant

21  element.  He was the biggest collector and supporter of the

22  Surrealist art movement.

23  Q.  I think a moment ago you testified that this painting was

24  the first canvas -- excuse me.  That it was the first of the

25  series.  Do you agree then with the statement that the painting

O1Q3ACC3                          Smith - Direct

1    is the first canvas in a series of nine iconic works?

2    A.  Yes.  I mean, there are only three of them are in oil.  But

3    that is absolutely correct, yes.

4    Q.  Would you use the word "iconic" to describe the *Domaine*

5    *d'Arnheim* series?

6    A.  I would, yes, I would.

7    Q.  Just to remind you, you also used the word "iconic" to

8    describe the School Teacher we looked at a bit ago?

9    A.  I would.

10   Q.  I'd like you to, Mr. Smith, to focus on this second

11   paragraph which refers to the composition of the canvas.  It

12   says, "It surprises us with a view of an extended mountain.  It

13   is a triumph of atmospheric effects and visual metamorphosis."

14   There is references to Caspar David Friedrich and the

15   romanticism of Edward Allan Poe.

16           What is your view on the analysis that's set forth in

17   this paragraph?

18   A.  This is clearly a sales pitch.  He's describing the picture

19   in glowing terms.  It notes, in my view, but he's doing his

20   very best to make sure that the qualities and the importance of

21   the painting are fully recognized in this text.

22   Q.  And do you agree that those, the qualities and the

23   importance of this painting should be recognized?

24   A.  I do, yes, they are there.

25   Q.  How about your view of the third paragraph, where the

O1Q3ACC3                         Smith - Direct

1    write-up says that -- it refers to *Le Précurseur*.  And refers

2    to the *Domaine d'Arnheim* as an answer to the problem of that

3    prior work.  It then says all the Surrealist elements are

4    arranged to perfection.

5             What is your view on that part of the analysis?

6    A.  I think it is exactly my opinion is the same as the

7    previous paragraph.  It is factually accurate, it's well

8    argued, it is an enthusiastic support of the picture, but it

9    merits it.

10   Q.  I think you've already testified with respect to the next

11   paragraph, that the painting, this painting has acquired iconic

12   status.

13            Does the fact that the work has achieved iconic status

14   means it is likely to have a high monetary value?

15   A.  Yes, it does.

16   Q.  Typically speaking?

17   A.  Yes, it does.

18   Q.  What in your view is the interplay between a work being

19   iconic and its monetary value?

20   A.  You can't give a percentage or say that there is a fixed

21   ratio.  But, iconic works always command a premium.

22   Q.  I think you explained earlier that when you used the term

23   "iconic," you referred to the significance of the piece, either

24   because of the subject or its place in the body of work?

25   A.  Yes.  Mostly the significance of the piece in the artist's

O1Q3ACC3                    Smith – Direct

1    general body of work, his output, it is his sort of major works

2    that he's known for.

3    Q.  Mr. Smith, I think you were just discussing a moment ago

4    the exhibition and the declined offers to buy the artwork as

5    well as the fact that the artwork was sold to Edward James, so

6    I'll focus on the last couple of sentences where it says,

7    "Magritte's role in 20th century art is indisputable and no

8    other artist has managed to combine aesthetic identity and

9    intellectual depth with such virtuosity.  And the *Domaine*

10   *d'Arnheim*, like the *L'Empire des Lumières* is the perfect

11   illustration of that."

12           What is your view on that portion of the analysis?

13   A.  That is the opinion of the author.  It's quite a subjective

14   opinion.  I think that it an accurate opinion up to a point.

15   It is quite a strong support for the picture, but it merits it,

16   as I said.  And *Domaine d'Arnheim* and *L'Empire des Lumières* is

17   both a great series.  As I said earlier, personally I'm a

18   supporter of the *Domaine d'Arnheim* one on this one rather than

19   the *L'Empire des Lumières* side.

20   Q.  I think we can put this down.

21           Mr. Smith, I think you said at the outset of this

22   morning that in addition to witnessing and reviewing portions

23   of Mr. Sainty's testimony, you were also familiar with

24   Mr. Wittman's testimony; is that right?

25   A.  Yes, I am.

O1Q3ACC3                        Smith – Direct

1   Q.  Are you familiar with the fact that Mr. Wittman discussed

2   as purported indicia of assisting fraudulent or criminal

3   activity by a third party assisting a dishonest agent?

4   A.  I read his statement on that.

5   Q.  So Mr. Wittman identifies as one of those indicia that the

6   third party prepares supporting materials about the value or

7   quality of an artwork at the agent's request and according to

8   the agent's instructions in order to support an inflated price

9   the agent is seeking to convince the principal to pay.

10          So, I want to ignore Mr. Wittman's use of the word

11  inflated and the remainder of that purported indicia.

12          So to be clear, I am going to be asking you about

13  instances where a third party provides supporting materials

14  about the value or quality of an artwork, at the agent's

15  request and according to an agent's instructions.

16          My question is, in your experience in the art market,

17  is it typical for an auction house say to send an agent

18  supporting materials about the value or quality of an artwork?

19  A.  It's very common.

20  Q.  And I'll ask the same question with respect to dealers.  Is

21  it typical for say an auction house to send a dealer supporting

22  materials about the value or quality of an artwork?

23  A.  Yes.  They would not distinguish between an agent and a

24  dealer.

25  Q.  How often, if at all, do you receive supporting materials

O1Q3ACC3                      Smith - Direct

1    from auction houses regarding the value or quality of artworks?

2    A.  I've received them from time to time.  In fact, I received

3    one relatively recently on a painting.  It's not uncommon and

4    it's a well-established practice.

5    Q.  Now, another one of Mr. Wittman's indicia continued from

6    the last one.  It is that the materials are delivered to the

7    ultimate buyer, invoking the credibility of the individual or

8    entity that authored the materials to convince the buyer to buy

9    a particular work or other future works at the inflated prices

10   sought.

11          And just like the last one, I want you to ignore the

12   portion of that that refers to inflated prices.

13          So, following from the prior example that I gave you,

14   let's assume that the auction house has provided supporting

15   materials to the agent or a dealer, and that those materials

16   speak to the value or quality of an artwork.

17          Is it typical in the art market that the agent or

18   dealer might then provide those materials to an ultimate buyer?

19   A.  Yes, it is typical.

20   Q.  You mentioned that you personally had received these kinds

21   of materials from auction houses.  Has it happened that you

22   also have provided those materials to your own clients?

23   A.  Yes, I did the other day, exactly that.

24   Q.  I'd like to move on now to hear your views about two

25   estimates that were provided by Mr. Valette for the artwork

O1Q3ACC3                    Smith - Direct

1   *Tête* by Modigliani.  I know you said earlier that your art

2   market activities have involved transacting on works by

3   Modigliani.

4              Do you have any experience with *Tête* sculptures in

5   particular?

6   A.  Yes, I've valued them.  When I say them, there are not very

7   many of them, so I valued one in particular.  I prefer not to

8   identify it because clearly it's a confidential matter, but it

9   is one of the major *Tête*s that still exists in private hands.

10  Q.  When did you conduct that appraisal?

11  A.  Within the last 12 months.

12  Q.  If we could please pull up DX 684, it's already admitted

13  into evidence.

14             Mr. Smith, are you familiar with this artwork?

15  A.  Yes, I am.

16  Q.  What is it?

17  A.  It's *Tête* by Modigliani.

18  Q.  Could you explain what importance, if any, this sculpture

19  has within the body of works by Modigliani.

20  A.  Well, these stone sculptures were made early in his career,

21  and they are extremely uncommon.  They're very rare.  He didn't

22  make very many of them.  Most of them are in public ownership.

23  Until 2013, I think it was, no major *Tête* had appeared on the

24  market.  And unsurprisingly, one big price drew out more than

25  one subsequent one, and three have been sold over the last 10

O1Q3ACC3                      Smith - Direct

1   or 15 years.

2   Q.  Do you have a view on this particular sculpture, this

3   particular version of the *Tête*, as to its quality and

4   importance?

5   A.  I do.

6   Q.  Could you share that with us?

7   A.  I think it's by far the finest of them all, and really

8   great work.  It has all the qualities one is looking for in a

9   Modigliani *Head*.  That stretch features, the relevance to

10  African art which was hugely influential in Paris in about

11  1910, both Picasso, Modigliani, and others were all looking at

12  early tribal art, mainly from West Africa and incorporating it

13  into their modern designs.  And here is a fantastic work by the

14  artist.  Appears in great condition.  Fully worked.

15  Everything -- there is hardly a thing you could criticize about

16  it.  It is terrific.

17  Q.  Mr. Smith, you might want to pull the microphone a little

18  closer.

19  A.  Sorry.

20  Q.  Thank you, Mr. Smith.  I think we can pull this one down.

21  So I'd like to turn now to the estimates, the actual estimates

22  that Mr. Valette provided.

23          Mr. Smith, did you have an occasion to review them?

24  A.  Yes, I did.

25  Q.  Can we please show the witness Plaintiff's Exhibit 186

O1Q3ACC3                        Smith - Direct

1    which is already in evidence.  And please publish.  You can

2    go -- thank you.

3                 Mr. Smith, is this one of the documents you reviewed

4    in preparing your opinion?

5    A.  Yes, it was.

6    Q.  What is your view on Mr. Valette's statement in the opening

7    line that the piece is absolutely extraordinary?

8    A.  Well, I completely agree with him.

9    Q.  And is that for the reasons you were explaining when I

10   showed you the picture?

11   A.  Exactly.

12   Q.  Mr. Valette writes that "It is for sure the most beautiful

13   in private hands and I do not know any superior piece in public

14   collection."

15                 What is your view on that statement?

16   A.  I think it's pretty much accurate.  It is quite a

17   statement.  I'm certain he is correct in referring to a

18   sculptures by the artist in private hands.  There may be one or

19   maybe more in public collections that are almost as good.  But

20   this can stand up against any work of sculpture by Modigliani

21   that exists in public or private collections.

22   Q.  Let me ask, because I know Mr. Sainty disagreed with

23   Mr. Valette.  Do you find that this statement, that it's the

24   most beautiful sculpture in private hands and that there is no

25   superior piece public collection, do you find that to be a

O1Q3ACC3                        Smith - Direct

1    statement of personal opinion or of an objective fact?

2    A.  It's really an opinion.

3    Q.  Mr. Sainty said that he disagreed with Mr. Valette because

4    the most famous sculpture by Modigliani is a full-sized

5    sculpture in the National Gallery of Australia which he said

6    was a superior piece.  Are you familiar with that artwork?

7    A.  I've never seen it first hand, but I've seen an image of

8    it.

9           MR. WOLVERTON:  I'd like to show the witness please

10   for identification DX 1023.  It is not in evidence so if we

11   could publish to counsel, the Court and the witness.

12   Q.  Do you recognize this artwork?

13   A.  I do.

14   Q.  What is it?

15   A.  It is a full carving by Modigliani of a full figure.

16          MR. WOLVERTON:  Defendants move this be admitted.

17          THE COURT:  Any objection?

18          MR. WILSON:  No objection.

19          THE COURT:  Admitted.

20          (Defendant's Exhibit 1023 received in evidence)

21          MR. WOLVERTON:  May we publish?

22          THE COURT:  You may.

23   Q.  Mr. Smith, do you agree with Mr. Sainty that this sculpture

24   is the most famous by Modigliani, and is a superior piece to

25   that of the *Tête* that Mr. Valette described?

O1Q3ACC3                          Smith - Direct

 1   A.  No, I don't agree with him.

 2            THE COURT:  Can we clarify, is this the sculpture in

 3   the National Gallery of Australia to which you were referring

 4   before?

 5            THE WITNESS:  Yes, it is, your Honor.

 6            MR. WOLVERTON:  Thank you, your Honor.

 7   Q.  Mr. Smith, I think you said you didn't agree.  Could you

 8   elaborate on that?

 9   A.  I think it is a work, it's just a large work.  It is not a

10   terribly successful work.  It's clearly -- he hasn't finished

11   it.  If you look at the lower part, it's still not properly

12   worked up.  The head is quite damaged.  The back of the head

13   has got, is not particularly, not well finished.  The body

14   hasn't really worked.

15            I think -- I think the reason why there aren't very

16   many full-length standing nudes by Modigliani is he didn't find

17   them very successful.  And he stuck with heads alone.  That is

18   what the market is looking for.

19   Q.  Thank you, I think we can pull this down.

20            Mr. Smith, Mr. Sainty also said that there was a very

21   good *Tête* in the Metropolitan Museum of Modern Art, and that

22   that was -- and that was part of why he disagreed with

23   Mr. Valette.

24            I'm sorry.  He said, yeah, he said it was in The Met.

25   And that was part of why he disagreed with Mr. Valette.

O1Q3ACC3                          Smith - Direct

1              Can we please show Mr. Smith for identification an

2        exhibit marked as DX 1022, just to counsel, the Court, and the

3        witness, please.

4              Mr. Smith, do you recognize this artwork?

5        A.  Yes, I do.

6        Q.  What is it?

7        A.  It is the *Tête* that's in The Met.

8              MR. WOLVERTON:  Defendants move it be admitted.

9              MR. WILSON:  Your Honor, we were presented these as

10       demonstrative exhibits and not for evidence.  So we don't

11       object to them as demonstratives, but I don't think there is a

12       basis to have them as evidence in the record.

13             THE COURT:  I'll allow it admitted.

14             (Defendant's Exhibit 1022 received in evidence)

15             MR. WOLVERTON:  May we publish, your Honor?

16             THE COURT:  You may.

17       Q.  Mr. Smith, was this the *Tête* that Mr. Sainty was testifying

18       about?

19       A.  I believe it was.

20       Q.  Do you agree with Mr. Sainty that this sculpture is more

21       famous and superior to that of the *Tête* that Mr. Valette was

22       describing?

23       A.  I don't believe it is superior.  It could be more famous,

24       because it's in a major museum, and the other is in a private

25       collection.

O1Q3ACC3                          Smith - Direct

1            But if you compare them side by side, the line of the

2   jaw on this sculpture is much less elegant than the *Tête* that

3   is the subject of this trial.  And it is a very good piece, but

4   it just doesn't quite get it.  It's not as good as the *Tête*,

5   mainly because what you're looking for is sort of vertical

6   elegance, you are looking for that lovely sort of sweet line.

7   And here, the jaw's just a little bit heavy.

8   Q.  If you we can go back to Plaintiff's Exhibit 186.

9            So Mr. Valette also made the statement that the

10  proportions are perfect.  What is your view on that statement?

11  A.  It's an opinion, obviously.  I think it is a very, very

12  well-proportioned piece.

13  Q.  Is it true that this *Tête* that's being described is the

14  largest?

15  A.  I believe so, yes.

16  Q.  Is it true that Modigliani placed it at the highest

17  pedestal at the 1912 Salon d'Automne?

18  A.  There is an image of it in that position, yes.

19  Q.  And then in the next sentence he lists out various criteria

20  that Mr. Valette says is dear to the most discerning

21  collectors.

22           Do you agree that an iconic subject is dear to the

23  most discerning collectors?

24  A.  Yes, it is.

25  Q.  Do you have a view whether the *Tête* meets that criteria?

O1Q3ACC3                        Smith - Direct

1   A.  I believe it does.

2   Q.  How about a perfect and documented provenance.  Is that a

3   criteria that is dear to the most discerning collectors?

4   A.  That is a really important element of this particular

5   piece.

6   Q.  Well, tell us your view on whether this particular *Tête*

7   meets that criteria?

8   A.  It does.

9   Q.  Do you find -- in your opinion, is an excellent state of

10  preservation a criteria that is dear to the most discerning

11  collectors?

12  A.  I haven't been able to examine it first hand, so I can't

13  comment on the state of preservation.  But from the image, it

14  looks like it's in excellent condition.

15  Q.  Do you think that's a criteria that is dear to discerning

16  collectors, just generally?

17  A.  Yes, absolutely.

18  Q.  And then how about a very high rarity.  Is that something

19  that most discerning collectors find dear?

20  A.  They do, yes.

21  Q.  And do you think that this *Tête* meets that criteria?

22  A.  It does.

23  Q.  In the next paragraph, Mr. Valette referenced the *Tête* as a

24  part of a very select circle of Modern sculpture like

25  Giacometti *Homme Qui Marche*, The Walking Man, or Matisse's

O1Q3ACC3                         Smith - Direct

1    Backs.

2              What is your view on that statement?  Do you think all

3    these of these sculptures are part of a very select circle of

4    Modern sculpture?

5    A.   There are a number of -- very small number of great 20th

6    century sculptures.  Giacometti is one.  Matisse is another.

7    Brâncusi is a third.  Modigliani is a fourth.  Even Rodin

8    worked in the 20th century.  They all, all their greatest works

9    form a group of some of the greatest sculptures ever made.

10   Q.   Just to be clear, that would include the *Tête*?

11   A.   That would indeed, yes.

12   Q.   Do you read this statement as suggesting that the *Tête* is

13   similar to either The Walking Man or Matisse's Backs in terms

14   of composition?

15   A.   Absolutely not.  They could not be more different.

16   Q.   I'm sorry, but just to clarify, do you read this e-mail as

17   suggesting that they are similar in composition?

18   A.   I'm sorry.

19             MR. WILSON:  Objection.

20             THE COURT:  Sustained.  Don't answer the question,

21   please.

22   Q.   Mr. Smith, is it accurate that The Walking Man is from an

23   edition of six, and made $103 million in 2010?

24   A.   Yes, it is accurate, yes.

25   Q.   Is it accurate that the Matisse Backs from an edition of 10

O1Q3ACC3                        Smith - Direct

1   was sold as part of a private sale of around $150 million in

2   2011?

3   A.  I wasn't -- I don't know the precise details, but I

4   understand it is correct.

5   Q.  Do you agree with the statement that the Head is a unique

6   sculpture carved from stone unlike the two other artworks, the

7   Matisse and the Giacometti?

8   A.  Yes, I do.

9   Q.  Do you agree it is extremely difficult to set a price on a

10  masterpiece like the *Tête*?

11  A.  It is always difficult to set a price on a masterpiece.

12  Q.  Is it true that the price of 43 million euros was obtained

13  in 2010 for an inferior *Tête*?

14  A.  I agree with that.

15  Q.  What is that a reference to?

16  A.  That reference to a sculpture which was sold in Paris in

17  2010, for $43 million.  It was the first of the series of three

18  *Tête*s that I mentioned earlier.

19  Q.  And could you describe the circumstances of that sale.

20  A.  Yes.  It was a discovery, it was the first time a major

21  Head by Modigliani had come up to the market.  There were no

22  references to what it might sell for.  A very low estimate was

23  put on it.  The market generally took great -- was very excited

24  by it.  I myself had some interest in purchasing the piece for

25  a collector, unfortunately not at $43 million though.  And it

O1Q3ACC3                          Smith - Direct

1    sold for a multiple of its extremely low estimate.

2    Q.  If you please take this down just for a moment and we can

3    move to DX 1012, to show just the witness.  Just the witness,

4    the Court and counsel, please.

5         Mr. Smith, do you recognize the artworks shown in this

6    image?

7    A.  Yes, I do.

8    Q.  What are they?

9    A.  On the left-hand side is the *Tête* that is the subject of

10   this litigation.  On the right-hand side is the *Tête* that was

11   sold in Paris in 2010.

12        MR. WOLVERTON:  Defendants move to admit DX 1012.

13        MR. WILSON:  No objection.

14        THE COURT:  Admitted.

15        (Defendant's Exhibit 1012 received in evidence)

16        MR. WOLVERTON:  May we publish, your Honor?

17        THE COURT:  You may.

18        Mr. Smith, do you see there are some measurements in

19   this depiction, appear to be in inches?

20        THE WITNESS:  I do see that, your Honor.

21        THE COURT:  Do you know if those are accurate

22   reflections of the sizes of these two sculptures?

23        THE WITNESS:  I understand it is.  But they are based

24   on auction catalog measurements, which are not always

25   100 percent accurate.  So within tolerance of some limitations,

O1Q3ACC3                          Smith - Direct

1    I think they are accurate.

2    BY MR. WOLVERTON:

3    Q.  Mr. Smith, which is the one which is the *Tête* that was sold

4    by Christie's?

5    A.  The image on the left, the *Tête* on the left.

6            Sorry.  I'm sorry.  Christie's, the image on the

7    right.

8    Q.  Mr. Valette called that piece an inferior piece.  What is

9    your view on that statement?

10   A.  It is inferior to the item on the left.

11   Q.  Why is that your view?

12   A.  Well, it's slightly smaller, although I don't regard that

13   as being a big issue.  It has more to do with the carving of

14   the sculpture, the overall design, the hairline is better,

15   there is a very nice verticality in what we call the left *Tête*

16   and the mouth is more worked, very long stretched nose.  They

17   both have long stretched noses, but the one on the left is that

18   much better.

19           The whole piece works so much better as a whole, and

20   it's set on a sloping shoulder, rather than a square block.

21   All in all, it's just that much better.

22           It is one piece, and of course, the one on the right

23   isn't quite finished.  It has an unworked part of stone on the

24   back of the head.

25   Q.  Mr. Sainty suggested that he preferred the hair on the

O1Q3ACC3                          Smith - Direct

1   Christie's *Tête*.  Do you share his view?

2   A.  No, I don't share the view.  He's obviously entitled to his

3   own view.

4   Q.  If we could please go back to Plaintiff's Exhibit 186.  So

5   at the end of this e-mail, Mr. Valette estimated that the piece

6   should be worth between 70 and 90 million euros, perhaps even

7   more.

8        In your view, was that a reasonable estimate for the

9   *Tête* as of the date of this e-mail, July 2012?

10  A.  Yes, I think it was.  I mean it was an absolute

11  masterpiece, and therefore, considerably better than the one

12  that had previously been sold some years earlier at Christie's.

13  Q.  We can put this down and please put up Plaintiff's Exhibit

14  187, which is already admitted and I ask that it be published.

15       Mr. Smith, you can see this is primarily the same

16  e-mail.  Although in the subject line I think there was a

17  change to add the phrase -- if I'm pronouncing it correctly --

18  Ceroni 12.  What is Ceroni a reference to?

19       THE COURT:  No offense, Mr. Wolverton, but that's 22

20  in Roman numerals.

21       MR. WOLVERTON:  That's the digital watches.

22  A.  The references to Ceroni is the standard reference book on

23  Modigliani's works.

24  Q.  And then if you look at the bottom paragraph, Mr. Valette's

25  estimate now states that this is a piece that should be worth

O1Q3ACC3                         Smith - Direct

1    between 80 and 100 million euros, and then the phrase "perhaps

2    even more" has been eliminated.

3              What is your view on Mr. Valette's new estimate, 80 to

4    100, without the "perhaps even more"?

5    A.   Very similar to the previous estimate.

6    Q.   Mr. Sainty said that the market did not assess a Modigliani

7    *Head* as anywhere near this amount.

8              He pointed to two sales of *Tête* sculptures that

9    predated Mr. Valette's e-mail.  One he said sold for 3.5

10   million euros 12 years before, another sold for 2.9 million in

11   2007.

12             And then he also pointed to the Christie's *Tête* sale.

13   Do you recall that?

14   A.   I do.

15   Q.   Mr. Smith, I'd like to show you a document that we have

16   marked for identification as DX 1019 for identification.  Let's

17   just show counsel, the Court and the witness, please.

18             I'm sorry.  Actually this is the incorrect exhibit.

19   Take this down.

20             Mr. Smith, are you familiar with the artworks that

21   Mr. Sainty was discussing?

22   A.   I'm fairly familiar.  I saw one of it when it came up for

23   auction, the one in 2002.  I don't recall the other one.  But

24   I've seen the image of it.

25   Q.   So I know we've already discussed the Christie's *Tête*.

O1Q3ACC3                          Smith - Direct

1   But, in your view, does the two other *Tête* purchases --

2            MR. WOLVERTON:  I'm sorry.  I have the exhibit now.

3   Can we put up DX 1014.

4   Q.  Mr. Smith, do you recognize these artworks?

5   A.  Yes, I do.

6   Q.  Can you describe what they are?

7   A.  Well, they're all carved stone heads by Modigliani.

8            MR. WOLVERTON:  Defendants move DX 1014 be admitted.

9            MR. WILSON:  No objection.

10           THE COURT:  Admitted.

11           (Defendant's Exhibit 1014 received in evidence)

12           MR. WOLVERTON:  And that we publish it.

13           THE COURT:  You may.

14           And from left to right, can you just say what is

15   depicted here, Mr. Smith?

16           THE WITNESS:  Yes, your Honor.  On the left we have

17   the *Tête* that is the subject of this litigation.  Next to that

18   towards the right we have the Christie's work.  Then we have

19   the work that was sold I think it was in 2007.  And then on the

20   left, on the right-hand side we have a much less valuable work

21   which was sold around about the same date.  On or about the

22   same date.

23           THE COURT:  Are those the *Têtes* that are referenced in

24   the e-mail that you just saw?

25           THE WITNESS:  No.  I don't think they are.

O1Q3ACC3                      Smith - Direct

1           THE COURT:  Okay.

2    BY MR. WOLVERTON:

3    Q.  Mr. Smith, are these the *Tête* sculptures that Mr. Sainty

4    was referencing?

5    A.  That is correct.  Yes.

6    Q.  How in your view -- we've already discussed the Christie's

7    *Tête*, so maybe we can discuss the two others.  How in your view

8    does the *Tête* that Mr. Valette was describing in his e-mail

9    compare to the other two *Tête* sculptures?

10   A.  Well, they're vastly -- it's vastly superior.  The other

11   two are, well, particularly the one on the right, is a really

12   modest little thing which has nothing to do with what you are

13   looking for in Modigliani.  Which is the long straight

14   stretched sort of African mask head.

15          The one in the center to the right is a little bit too

16   human representational.  They are significantly inferior works

17   to the left two.

18   Q.  What is your view on Mr. Sainty's statement that these

19   other artwork sale prices show that the art market did not

20   value a *Tête* by Modigliani as worth anywhere near 80 to 100

21   million euros?

22   A.  Well, the comparable one was the one that was sold at

23   Christie's for over 43 million euros, I which is over $50

24   million.  The other two are not comparables at all.

25   Q.  We can take this down.  And just go back to PX 187 briefly.

O1Q3ACC3                           Smith - Direct

1            In your view, was an estimate for the Modigliani *Tête*

2       that is being described in this e-mail of between 80 and 100

3       million euros reasonable as of the date of this e-mail?

4       A.  I think that was acceptable, yes.

5       Q.  Could you explain why you think that?

6       A.  Well, because this was an e-mail that was sent to encourage

7       a transaction.  So, and clearly the estimate was designed to

8       bring the work for sale.  And this is a significantly superior

9       piece to one that made over $50 million.  And really superior

10      pieces can easily make double the comparable which is inferior.

11      Q.  Just as a general matter, do you have a view on whether it

12      is appropriate for a specialist at an auction house to revise

13      and to revise a prior estimate that they provided a client?

14      A.  Yes, they do that all the time.

15      Q.  Mr. Sainty analyzed this e-mail as a valuation and claimed

16      it failed to comport with the standards for valuation.  Do you

17      agree with him on that characterization?

18      A.  No.

19            MR. WILSON:  Objection.

20            THE COURT:  Overruled.  You can answer.

21      A.  No, it is not a valuation.

22      Q.  In your experience in the art market, have you received

23      e-mails similar to this?

24      A.  Yes, I have, yes.

25      Q.  How about from an auction house?

O1Q3ACC3                        Smith – Direct

1   A.  Oh from --

2              MR. WILSON:  Objection.  Asked and answered.

3              THE COURT:  Sustained.

4   Q.  We can take this down, please.

5              So Mr. Smith, I'd like to walk you through some of the

6   other opinions that Mr. Sainty offered and hear your thoughts

7   about those issues.

8              To begin with, Mr. Sainty opined on what he says are

9   the norms and practices for agents and dealers and in the way

10  that they differ from one another.

11             But if we could just take a step back.  In your

12  opinion, how easy or difficult is it for an art market actor,

13  like an auction house, to distinguish between someone who is

14  acting as a dealer and someone who is acting as an undisclosed

15  agent say?

16  A.  It's not possible for them to determine the difference.

17  Q.  Why is that?

18  A.  Unless they're advised as to that situation.  They treat

19  the counterparty, whether it is an agent or a dealer, as their

20  principal counterparty.  So, they cannot tell whether the

21  person they're dealing with is acting as an agent or as a

22  dealer.

23  Q.  Well, you said unless they were told that.

24             Is that typically information that auction houses are

25  given by people acting in an advisory capacity?

O1Q3ACC3                          Smith - Direct

1    A.  No, generally speaking, they don't give that information

2    out.

3    Q.  Is the relationship between a dealer-client and that

4    dealer's own clients something that an auction house, in your

5    experience, typically makes efforts to gain insight into?

6    A.  No, they, generally speaking, respect the relationship

7    between a dealer and his clients.  They don't try and gain

8    insight there because it is for commercial sensitivity

9    purposes.

10   Q.  Does it ever occur in the art market that someone acting as

11   an agent for a buyer declares openly they're acting as an

12   agent?

13   A.  Very rarely, but it can happen.

14   Q.  How about yourself?  Do you declare when you purchase

15   artworks through auction houses that you are acting as an agent

16   for someone?

17   A.  Generally speaking, I do not declare I'm acting as an agent

18   for anybody.  Own exception to that is if I have concerns about

19   the size of the transaction where I may not myself get

20   reimbursed for the purchase that I make.  Because as an agent

21   buying on an undisclosed basis, you take full liability for the

22   purchase.

23   Q.  So in that instance, how would the contract with the

24   auction house be structured?

25   A.  We disclose the ultimate purchaser to the auction house,

O1Q3ACC3                        Smith - Direct

1  and they would make a contract directly with them.

2  Q.  Mr. Smith, how about Mr. Sainty's views regarding what

3  information art market participants like auction houses have

4  about their clients?

5       Mr. Sainty suggested that major auction houses keep

6  and track information regarding their clients, such as

7  information about the relationship between their clients, and

8  the people who buy from or through those clients.

9       What are your views on that claim?

10 A.  My view is they have very little information on that.

11 Mainly because agents and dealers acting as agents, and dealers

12 acting as principals, do not let that information out.  And one

13 has to remember that people who buy through agents are looking

14 to maintain confidentiality.  They do not want their affairs to

15 be known about by a wide group of people.

16 Q.  Are you referring to collectors in that instance?

17 A.  Collectors in particular.

18 Q.  Why is that your view, that collectors prefer

19 confidentiality?

20 A.  Most collectors do not like to have their affairs widely

21 known.  They maintain -- confidentiality is a very, very high

22 priority for them.

23 Q.  In your experience, you were just saying that dealers and

24 agents likely wouldn't give that information to an auction

25 house.  Is that something typically that an auction house would

O1Q3ACC3                        Smith - Direct

1    ask for?

2    A.   They might ask for it.  They wouldn't get it willingly.

3    Q.   Generally speaking, what type of information do auction

4    houses maintain about potential collectors?

5    A.   Well, they maintain information on the collectors that deal

6    with them directly.  They don't typically maintain much

7    information on collectors who buy through third-party agents,

8    be they dealers or professional art advisors.

9    Q.   Why would the focus be on collectors who buy with them

10   directly as opposed to ones who buy through third parties?

11   A.   When they're buying directly, they're dealing with a direct

12   counterparty, so they would need to have the same, essentially

13   the same information from the collectors as they would from the

14   dealer or the agent they're dealing with.

15   Q.   Thank you, Mr. Smith.

16        So, the next topic I'd like to discuss with you is the

17   due diligence standards that Mr. Sainty discussed.  Mr. Sainty

18   testified that due diligence standards in the art market

19   between 2011 and 2015 required that an auction house find out

20   who the ultimate buyer of an artwork was when selling pieces to

21   dealers and art advisors.

22        He referred to that as finding out the source of

23   funds.

24        Do you agree with Mr. Sainty that due diligence

25   standards between 2011 and 2015 required an auction house to

O1Q3ACC3                      Smith - Direct

1    find out who the ultimate buyer of an artwork was?

2           MR. WILSON:  Objection.

3           THE COURT:  Overruled.

4    A.  Can you repeat the question, please?

5    Q.  Yes.  Do you agree with Mr. Sainty that due diligence

6    standards required an auction house to find out the identity of

7    an ultimate buyer, again, between 2011 and 2015?

8    A.  No, I don't agree with Mr. Sainty.

9    Q.  Can you explain why you don't agree?

10   A.  Because in my experience, they never made those inquiries.

11   Q.  Back between 2011 and 2015, was there any legal requirement

12   for an auction house to ascertain the identity of an ultimate

13   buyer when selling an artwork to a dealer or even an agent?

14   A.  In the normal course of business, no.  There could be an

15   exception if they had direct evidence of some sort of criminal

16   activity.

17   Q.  So apart from any legal requirement, did industry practice,

18   art market practice, require that an auction house between 2011

19   and 2015 ascertain the identity of an ultimate buyer when

20   selling artworks to a dealer or an agent?

21   A.  It never happened.  They didn't ask that information.

22   Q.  So, if an auction house wasn't required or expected to do

23   that kind of due diligence, what due diligence were they

24   expected to do between 2011 and 2015?

25   A.  They did very limited due diligence.  They worked largely

O1Q3ACC3                          Smith - Direct

1    on their knowledge of the counterparty, the client that they

2    were transacting with, and they took as from their experience

3    of dealing with -- so they, generally speaking, provided they

4    had long experience or some experience of transacting with

5    somebody, they were happy to continue.  They didn't do further

6    due diligence beyond that.

7    Q.  You mentioned due diligence on their counterparty.  What,

8    typically speaking, would that type of due diligence have

9    looked at between 2011 and 2015?

10   A.  There would be no specific due diligence.  They would just

11   look at the pattern of activity, and just provided the

12   counterparty had been reliable person in the past, they would

13   accept that as enough.

14   Q.  So I know you said that due diligence standards wouldn't

15   require trying to identify the ultimate buyer in a transaction.

16           Would they have included trying to figure out what a

17   dealer or agent intended to do with an artwork, whether it be

18   selling it, keeping it, flipping it, that sort of thing?

19   A.  No.  Once sale had taken place, they would have no real

20   interest thereafter.

21   Q.  Could you explain what the term "source of funds" means in

22   connection with the art market?

23   A.  Well, source of funds means the same in the art market as

24   any other market.  It means that the money was obtained in a

25   legal and clean way.

O1Q3ACC3                        Smith - Cross

1              MR. WOLVERTON:  Thank you, Mr. Smith.  I don't have

2    any further questions right now.

3              THE COURT:  Cross-examination.

4    CROSS-EXAMINATION

5    BY MR. WILSON:

6    Q.  Good afternoon, Mr. Smith.

7    A.  Good afternoon, Mr. Wilson.

8    Q.  You've acted as an art advisor, right?

9    A.  That's correct.

10   Q.  And one thing an art advisor does is help a buyer purchase

11   art, right?

12   A.  That's correct.

13   Q.  Art advisors can have their own accounts to buy art, right?

14   A.  What do you mean by that?

15   Q.  Well, generally, art advisors can make purchases for their

16   clients routed through that art advisor's own account, right?

17   A.  That is correct, yes.

18   Q.  And would you agree with me that advisors and dealers

19   generally prefer to have the transaction routed through their

20   own account, in order to preserve the confidentiality of their

21   own clients?

22   A.  I would agree with that.

23   Q.  Would you agree that that is an entirely normal process

24   used to shield the buyer from publicity or solicitation by

25   auction houses, and is a measure that the collector normally

O1Q3ACC3                          Smith - Cross

1   demands?

2   A.  The collector may require it.  It's -- but I would agree

3   with the general thrust of your statement, yes.

4   Q.  You testified earlier that when you are acting as an art

5   advisor, you don't disclose to an auction house generally when

6   you are acting as an agent.  Do you recall that?

7   A.  I don't disclose anything to the auction house.  I just

8   tell them, when I am acting as an art advisor and buy at

9   auction, I just register the bid and make the purchase.

10  Q.  And in that circumstance, when you are acting as an agent

11  and you make the purchase, you sign the contract with the

12  auction house, right?

13  A.  I do.

14  Q.  You would agree with me, wouldn't you, that it's not proper

15  to markup an artwork for which you're acting as an agent?

16          MR. WOLVERTON:  Objection.

17          THE COURT:  I'll allow it.  Go ahead.

18  A.  Can you repeat the question, please?

19  Q.  When you have a clear agency role, it would not be proper

20  to also markup the artwork for which you are acquiring as an

21  agent, right?

22          MR. WOLVERTON:  Same objection.

23          THE COURT:  Same ruling.

24  A.  When you say markup, what do you mean?

25  Q.  You are you familiar with the phenomenon of art dealers

O1Q3ACC3                         Smith - Cross

1  flipping works?

2  A.  Yes, I am.

3  Q.  When an art dealer flips a work, they markup the price from

4  the price that they purchase to what they sell; is that fair?

5  A.  That's correct.

6  Q.  So when I say markup, I'm referring to the phenomenon of

7  marking up the price.  Do you understand that?

8  A.  Yes, I do.

9  Q.  With that understanding, do you agree with me that when an

10  art agent has a clear legal agency role, it would not be proper

11  to also markup the artwork for which they are acquiring as an

12  agent?

13  A.  They should not markup the price of the artwork itself.

14  They would charge a commission.

15          MR. WOLVERTON:  Objection.

16  Q.  You shouldn't charge a commission and also do a markup at

17  the same time, right?

18  A.  That is correct.

19  Q.  You personally have never charged a markup when you were

20  being paid a commission in the same transaction, have you?

21  A.  No, I've never done that.

22  Q.  You testified earlier briefly about your views on

23  Mr. Wittman's opinions.  Do you remember that?

24  A.  Yes, I do.

25  Q.  You're not a fraud expert, are you?

O1Q3ACC3                    Smith - Cross

1    A.  No, I'm not a fraud expert.

2    Q.  You never worked in the FBI, did you?

3    A.  I've never worked in the FBI.

4    Q.  You're here as an art market expert, right?

5    A.  I'm an art market expert.

6    Q.  You are the chairman of Gurr Johns, right?

7    A.  I am.

8    Q.  Your company Gurr Johns does business with Sotheby's,

9    right?

10   A.  We do business with Sotheby's.

11   Q.  Your company does about 10 to $15 million a year of

12   business with Sotheby's, right?

13   A.  Not in the last year or two, it's been considerably less.

14   It varies, depending on how successful they are in pitching to

15   us.

16   Q.  It does vary.  In fact, it varies, some years a large

17   collection might be 25 million or 20 million or 50 million,

18   right?

19   A.  That's correct.

20   Q.  Sotheby's is also paying you for your opinions, right?

21   A.  Sotheby's is paying my fees, yes.

22   Q.  And you remember that you had a deposition in this case?

23   A.  I do.

24   Q.  And at the time of your deposition, about two years ago,

25   Sotheby's had paid you about $50,000 for your opinion at that

O1Q3ACC3                        Smith - Cross

 1    point in the case?

 2    A.  If you say so.  I haven't recalled it, but I'm sure that's

 3    correct.

 4    Q.  And since then you've continued to be paid by Sotheby's for

 5    your work in this case, right?

 6    A.  That's correct.

 7    Q.  And you've been paid $750 for every hour that you worked

 8    for Sotheby's in this case, right?

 9    A.  Correct.

10    Q.  And you're being paid by Sotheby's today to testify, right?

11    A.  I am.

12    Q.  You testified earlier a little bit about due diligence.  Do

13    you remember that?

14    A.  Yes.

15    Q.  And you agree that for an auction house like Sotheby's,

16    it's important to understand what's going on in the art market,

17    generally, right?

18    A.  When you say what's going on, I'm not quite sure what

19    you're referring to.

20    Q.  Would you agree that it's Sotheby's business to be aware of

21    trends in the art market?

22    A.  They are aware of art price trends, I'm sure.

23    Q.  And Sotheby's is generally aware of prominent collectors

24    too, right?

25    A.  They are aware of the prominent collectors that are

O1Q3ACC3                           Smith - Cross

1    disclosed to them, I suppose.

2    Q.  Well, Sotheby's needs to have a good pulse on the market,

3    right?

4    A.  I think they have a pretty good pulse on the market, yes.

5    Q.  And Sotheby's is aware of the interests of the prominent

6    collectors that are known to them, right?

7             MR. WOLVERTON:  Objection.

8             THE COURT:  Sustained.

9    Q.  Let's talk about e-mail estimates.  You don't think that

10   there are any particular art market standards for e-mail

11   estimates, you testified earlier, right?

12   A.  That is correct.

13   Q.  But you did acknowledge that e-mail estimates from auction

14   houses like Sotheby's should be truthful at least, right?

15   A.  Any estimate and facts should be truthful from any

16   business.

17   Q.  You would agree that an art market estimate, even if it is

18   in an e-mail, should not be misleading, right?

19   A.  It should not be false.

20   Q.  It can be misleading, but it shouldn't be false?  Is that

21   the distinction you're drawing?

22   A.  No, it should not be misleading either.

23   Q.  Right.  It shouldn't be misleading.  If an auction house

24   like Sotheby's sends an e-mail, that e-mail shouldn't be

25   misleading.  You agree with that?

O1Q3ACC3                      Smith - Cross

1    A.  Misleading is a very subjective word.  But I would agree

2    that an e-mail should not be deliberately misleading.

3    Q.  One e-mail valuation you considered was for works by

4    Magritte.  Do you remember that?

5    A.  I do.

6            MR. WILSON:  Toby, can we please put up Plaintiff's

7    Exhibit 375 in evidence.

8    Q.  This is the document that you were looking at earlier,

9    right?

10   A.  Correct.

11   Q.  And you noted in the first paragraph that Mr. Valette

12   writes about the strong Magritte market, right?

13   A.  Yes.

14   Q.  And did you know that when Mr. Valette wrote this e-mail,

15   in 2011, that there were 15 Magritte paintings that had been

16   auctioned in the previous year?

17   A.  That's quite possible.

18   Q.  Did you know that of those 15, just one of them sold for a

19   little over $10 million?

20   A.  Yes, that was the highest price at that time.

21   Q.  Right?

22   A.  Apart from the one much earlier.

23   Q.  We'll get to that.

24           But in the year preceding -- in this market for

25   Magritte, there were 15 works, one sold for a little over $10

O1Q3ACC3                              Smith – Cross

1    million, the next three highest sold for between 7 and 8

2    million.  Did you know that?

3    A.  I'm sure that's correct.

4    Q.  And did you know that after that, there was one that sold

5    for just under 6 million?

6    A.  Quite possibly.

7    Q.  And then 10 of the 15 works in the preceding year sold for

8    less than 5 million?

9    A.  If you say so.

10   Q.  And did you know that one of those 15 didn't sell at all?

11   It was put up for auction but no one wanted to buy it?

12   A.  That's possible, they do, some artists don't sell.

13   Q.  Let's go to the bottom paragraph, please.  Here,

14   Mr. Valette writes -- I'm sure everybody can name this by

15   heart.  "That a large iconic painting such as *The Empire of*

16   *Lights*," you see that, right?

17   A.  I do.

18   Q.  And he estimates that a work such as *The Empire of Lights*

19   could sell privately for 40 million euros, right?

20   A.  That's correct.

21   Q.  Now, 40 million euros would be about $55 million, right?

22   A.  I'm sorry, my thing says 40 million.

23   Q.  This says 40 to 60.

24   A.  40 to 60, yes.

25   Q.  And 40 million euros would be about -- here it's 40 to 60

O1Q3ACC3                          Smith - Cross

1    U.S. dollars.  Let's talk about that.

2              So for 40 to 60 million U.S. dollars, do you know how

3    that compares to the highest price for an *Empire of Lights*

4    ever?

5    A.   The highest price before that I think was about $12

6    million.

7    Q.   Right.  Let's pull up Defendant's Exhibit 504, please.  And

8    if we can go to page 2, please.  And this is an e-mail from Sam

9    Valette to Beatrice Stern.

10             Did you review this amongst the materials that you

11   were looking at when evaluating the reasonableness of

12   Mr. Valette's estimate?

13   A.   I don't recall this e-mail.

14   Q.   If you look at the second-to-last paragraph in this e-mail.

15   He writes, "As a reminder, the record amount paid for a

16   Magritte at auction is $12.6 million."  Do you see that?

17   A.   I do.

18   Q.   All right.  So, at this time, Mr. Valette was estimating

19   that the Magritte or a work such as the *Empire of Lights* could

20   be sold for four times what he knew was the highest price ever

21   paid for a Magritte in history, right?

22   A.   Magritte that sold for $12 million was sold many years

23   earlier.

24   Q.   Well, up until December 31, 2015, no Magritte had ever sold

25   for more than that, right?

O1Q3ACC3                    Smith - Cross

1    A.  Correct.

2            MR. WILSON:  We can take that down, please.

3    Q.  Now, Mr. Valette wrote that a work such as *Empire of Lights*

4    might sell for as much as 40 to $60 million.

5            You don't think that the *Domaine d'Arnheim* is a work

6    such as *Empire of Lights*, do you?

7    A.  In that e-mail he was referring to the *Empire of Lights*.

8    Q.  No, I'm asking you a different question.

9    A.  I'm sorry.

10   Q.  I'm asking you is the *Domaine d'Arnheim* a work such as *The*

11   *Empire of Lights*?

12   A.  Well, they're obviously different subjects.

13   Q.  Well, that's one difference.  But my question is I want you

14   to answer the specific question.

15           Would you say that the *Domaine d'Arnheim* is a work

16   such as *The Empire of Lights*?

17   A.  Yes, the *Domaine d'Arnheim* is, in my view, as I explained

18   earlier, is a more important work than many of the *Empire of*

19   *Lights*. but *The Empire of Lights*, because it's so well known,

20   that they tend to make very high prices.

21   Q.  Right.  They tend to make higher prices than the *Domaine*

22   *d'Arnheim*, right?

23   A.  They tend to make, I would say that *The Empire of Lights*

24   is -- well, the best works by *The Empire of Lights*.  The

25   problem with the *Empire of Lights* is it is a large series and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1Q3ACC3                         Smith - Cross

1   the largest and earliest would certainly make more.  Once we

2   get down to sort of version 11 or version 12, I think, frankly,

3   we're dealing with replicas almost.  So it depends on the work

4   you're referring to.

5   Q.  Mr. Smith, would you agree that *The Empire of Lights* is

6   significantly more valuable than the *Domaine d'Arnheim*?

7   A.  Which *Empire of Lights* are you referring to?

8   Q.  Any of them.

9   A.  No, I wouldn't agree with that.

10  Q.  Did you write a rebuttal report in this case?

11  A.  I did.

12  Q.  And did you sign that report?

13  A.  I did.

14  Q.  And did you review it before you signed it?

15  A.  Yes, I did.

16  Q.  Do you think your rebuttal report is accurate?

17  A.  I do.

18          MR. WILSON:  Can we bring up just for the witness and

19  counsel, please, a copy of Mr. Smith's rebuttal report.

20  Q.  Do you recognize this to be your rebuttal report?

21  A.  Yes, I do.

22          MR. WILSON:  And Toby, if we can go to the last page,

23  please.  That's page 23.

24  Q.  Do you recognize that to be your electronic signature?

25  A.  Yes, I do.

O1Q3ACC3                    Smith - Cross

1  Q.  Then let's please go to page 19, paragraph 61.  And if we

2  can highlight the section in the middle paragraph here, that's

3  very helpful.  It should begin "setting aside."  Terrific.

4          So I'm going to read a section of your report back to

5  you and ask if you agree with what you wrote.

6          You wrote --

7          THE COURT:  Hang on one second, please.  You may

8  proceed.

9  Q.  You wrote, "Setting aside that neither I nor Mr. Sainty can

10  reliably opine on what was in the head of a given Sotheby's

11  employee at a given time, the documents Mr. Sainty points to

12  did not even mention the *Domaine d'Arnheim*, let alone provide

13  for an informal valuation of that work as Mr. Sainty contends.

14  Rather, those e-mails describe the market for Magritte artworks

15  generally, including the *Empire des Lumières*" or *Empire of*

16  *Lights*, which you write is "different from and significantly

17  more valuable than the *Domaine d'Arnheim*."

18          Right?

19  A.  Right.

20          MR. WILSON:  We can take that down.

21          THE COURT:  Ladies and gentlemen, I want to let you

22  know as part of the rules that govern litigation in federal

23  court as well, when a party intends to call an expert at trial,

24  they're required to produce a report in advance that includes

25  information concerning the opinions that they propose to offer,

O1Q3ACC3                           Smith - Cross

1    and the materials on which they've relied on the like.

2              So, just to explain what that rebuttal report was, I

3    wanted to share that.

4              Go ahead.

5              (Continued on next page)

O1QVACC4                         Smith - Cross

 1  BY MR. WILSON:

 2  Q.  Mr. Smith, you think *The Empire of Lights* is a far better

 3  series than *Domaine d'Arnheim*, right?

 4  A.  It's a far more commercial and more valuable series.

 5  Q.  Wouldn't you just say that it's far better, period?

 6  A.  All of us have our own personal opinions.  The market

 7  values The *Empire of Lights* series more highly.  But in my

 8  view, within *The Empire of Light* series there are great

 9  paintings and less good paintings.  We can't just -- we can't

10  just opine on the whole series as if the quality and value was

11  the same right the way through from number one to number 16,

12  whatever it was.

13  Q.  Mr. Smith, you gave a deposition in this case earlier,

14  right?

15  A.  I did it.

16  Q.  And before you sat for that testimony, you took an oath to

17  tell the truth, right?

18  A.  I did.

19  Q.  And that's the same oath that you took today, right?

20  A.  I believe so, yes.

21  Q.  And you did tell the truth in your deposition didn't you?

22  A.  I did, yes.

23  Q.  I'm going to refer you to a portion of your deposition at

24  page 240, lines 6 through 20.  I asked you the following

25  question and you gave the following answer:

O1QVACC4                          Smith - Cross

1    "Q.  So if you go to the second page of this — referring to an

2    exhibit at the time — you'll see -- let's just see.  Do you see

3    the last line of the text that says:  'As with the *L'Empire des*

4    *Lumières — Empire of Lights* — the subsequent series of works

5    entitled the *Domaine d'Arnheim* are the cornerstone of his —

6    meaning Magritte's — oeuvre, the outstanding works from an

7    extraordinary career.  Do you see that?

8    "A.  Yes, I do.

9    "Q.  Do you agree with that?

10   "A.  I think *L'Empire des Lumières* is a far better series.

11   I've never been a huge fan of *Domaine d'Arnheim*, but it's a

12   very important picture and as -- and it's very hard to get a

13   major Magritte."

14        Did I ask you those questions and did you give those

15   answers in your deposition?

16   A.  I believe so.

17   Q.  Sotheby's also asked you to evaluate Mr. Valette's *Tête*

18   estimate, right?

19   A.  Yes, they did.

20        MR. WILSON:  Toby, can you please pull up Plaintiff's

21   Exhibit 186 at page 2, and put it beside Plaintiff's Exhibit

22   187 at page 2.  Can we just highlight the very last line of the

23   third paragraph with the 70 to 90 on the left and 80 to 100 on

24   the right.

25   Q.  So these are two emails that Mr. Valette wrote within 24

O1QVACC4                        Smith – Cross

1    hours of each other.  Did you review both of them when you

2    considered the reasonableness of his email estimate?

3    A.  Yes, I did.

4    Q.  And the one on the left that happens to be written on July

5    24th, he estimates the piece would be between 70 and 90 million

6    euros, right?

7    A.  And perhaps more.

8    Q.  Right.  And on the other one he goes up to 80 to 100

9    million euros, period, right?

10   A.  Yes.

11   Q.  So you recognized that Mr. Valette raised his estimated

12   value by $10 million in 24 hours; correct?

13            MR. WOLVERTON:  Objection.

14            THE COURT:  Sustained.

15            MR. WILSON:  We can drop those, please.

16            Can we bring up the demonstrative exhibit that we were

17   looking at, DX-1014, please.

18            THE COURT:  To be clear, this was --

19            MR. WILSON:  Evidence.

20            THE COURT:  -- offered and admitted in evidence, so

21   it's no longer just a demonstrative.

22            MR. WILSON:  That's all right.

23   Q.  We can all remember that there was an exhibit that you were

24   looking at that compared a number of the Modigliani heads,

25   right?

O1QVACC4                    Smith - Cross

1    A.  Yes, I can.

2    Q.  And you'll remember that you compared two of them.  One

3    of -- the one that sold at Christie's for 43 million, and the

4    other that was the subject of this case, right?

5    A.  That's right.

6    Q.  Here we go.  And I think -- all right.  Do you see that now

7    in front of you?

8    A.  Yes, I do.

9    Q.  And so if we're looking at the demonstrative, the one

10   second from the left is the one that sold for the record price,

11   right, of 43 million euros?

12   A.  That was sold in 2010 for that price, yes.

13   Q.  Right.  And you thought that Mr. Valette's estimate of the

14   one to the left of it at double the price was a reasonable

15   valuation, right?

16   A.  Well, it was a little bit less than double the price, but

17   it's a far better piece.

18   Q.  Well, an estimate of 80 to 100 million euros would be more

19   than double the price, wouldn't it be?

20   A.  Sorry, I was thinking it was 80 to $100 million.  Yes.

21   Fine.

22          MR. WILSON:  Okay.  We can take that down.  Thank you.

23   A.  There had been a very large change in the market at that

24   time though.

25   Q.  Well, there may or may not have been a large change in the

O1QVACC4                           Smith - Cross

1    market, but that wasn't my question, Mr. Smith.

2             Sotheby's asked you to do your own valuation of the

3    da Vinci in this case, right?

4    A.  They did.

5    Q.  And in that valuation, when you were doing your own

6    valuation, you tried to prepare the valuation as if you were

7    back in time in 2015, without the benefit of knowing anything

8    that happened after 2015, right?

9    A.  Right.

10   Q.  As I'm asking you these questions, can we call that a retro

11   valuation?

12   A.  That -- I mean, valuation, yes, you can call it that, I

13   think.

14   Q.  Right.  Well, there's a lot of valuations running around in

15   this case.  And just so that we're clear, when you're imagining

16   that you're in 2015, but you're actually in 2021, but you're

17   imagining you're in 2015, I'm going to call that a retro

18   valuation, okay?

19   A.  Okay.

20   Q.  You prepared your retro valuation for Sotheby's in 2021,

21   right?

22   A.  Correct.

23   Q.  And Sotheby's was not the first company to pay you to value

24   the da Vinci though, right?

25   A.  Correct.

O1QVACC4                          Smith - Cross

1   Q.  Athena Art Finance also paid you to value the da Vinci,

2   right?

3   A.  They paid my company, yes.

4   Q.  And when Athena paid you to value the da Vinci, you didn't

5   need to imagine it was 2015, because it was 2015, right?

6   A.  Correct.

7   Q.  Is it fair to say that your valuation for Athena was

8   different than your Sotheby's valuation?

9   A.  It was a different valuation.

10  Q.  Right.

11          MR. WILSON:  Let's bring up Plaintiff's Exhibit 167

12  just for counsel and the witness, please.  Now, if we go to

13  page 2 of this document.

14  Q.  Do you recognize this to be the draft valuation that Athena

15  Finance paid your firm, Gurr Johns, to prepare in 2015?

16  A.  That is correct.

17          MR. WILSON:  Plaintiffs move this into evidence.

18          MR. WOLVERTON:  No objection.

19          THE COURT:  Admitted.

20          (Plaintiff's Exhibit 167 received in evidence)

21          MR. WILSON:  Can we publish to the jury, your Honor?

22          THE COURT:  You may.

23  BY MR. WILSON:

24  Q.  All right.  So looking at this document, you recognize this

25  to be the valuation that you prepared back actually in 2015,

O1QVACC4                        Smith - Cross

1    right?

2    A.  It is the draft valuation.

3    Q.  Right.  It is the draft valuation that you prepared

4    actually in 2015, right?

5    A.  Right.

6            MR. WILSON:  Now, let's go into the second page,

7    please.  And perhaps we can just pull out that top part of the

8    document.  Really it's the first paragraph that I want to look

9    at.  Perfect.

10   Q.  So this is the beginning of the draft valuation.  And if

11   you look into this larger paragraph, it reads that on September

12   10, 2015, at the request of Andrea Danese, for Athena Art

13   Finance Corp., he caused William H. Smith — that's you, right?

14   A.  Right.

15   Q.  An appraiser of tangibles of the kind and character set

16   down, etc. — if we go to the end of that line — to examine and

17   appraise the fair market value and the liquidation value of

18   property belonging to a private client of Athena, right?

19   A.  Correct.

20           MR. WILSON:  All right.  Let's then turn two more

21   pages down, please.  We can go to the scope of work section.

22   Q.  Now, in the scope of work section, we can pull out the use

23   or user -- or use of appraisal.  Do you see that section?

24   A.  Yes, I do.

25   Q.  And immediately above it it's the use of appraisal.  That's

O1QVACC4                          Smith - Cross

1    the one.  The use of the appraisal is for fair market value and

2    liquidation value, right?

3    A.  Correct.

4    Q.  And then if we go down a couple more pages, we can see the

5    work itself that you valued.

6              MR. WILSON:  And let's enlarge the section on the

7    da Vinci, please.

8    Q.  This is an image of the work that you valued for Athena in

9    2015, right?

10   A.  Correct.

11   Q.  And you actually got to go and see the work in person when

12   you looked at it in 2015, right?

13   A.  Yes, I did.

14   Q.  You were in Singapore?

15   A.  I was.

16   Q.  And when you did your retro valuation in 2021, pretending

17   it was 2015, you actually didn't view the work again, did you?

18   A.  No, I didn't see it a second time.

19   Q.  So when you were actually looking at the work in Singapore,

20   you noted the condition, right?

21   A.  Well, the condition is well-known anyway.

22   Q.  Right.  Well, you noted it in your valuation, right?

23   A.  I did.

24   Q.  And what you noted about the condition of the da Vinci was

25   that there was extensive filling of cracks and old splits and

O1QVACC4                        Smith - Cross

1    losses, right?

2    A.   Indeed.

3    Q.   And after valuing the work and looking at it in person in

4    your draft valuation, you attributed the fair market value to

5    be $38,000,000, right?

6    A.   Fair market value for art loan purposes.

7    Q.   So let's talk about art loan purposes for a minute.

8            When Gurr Johns is valuing a work for fair market

9    value for art loan purposes, it chooses a value in the bottom

10   range of fair market value, is that fair?

11   A.   Not necessarily.  We choose a value that is -- that is

12   conservative.

13   Q.   It's conservative.  But in monetary terms, isn't it fair to

14   say that it's -- they tend to be ten to 20 percent down from

15   what a normal fair market value would be?

16   A.   I wouldn't apply a particular percentage, no.

17   Q.   Let's go back to your deposition.  This is going to be at

18   page 43, line 24, through page 45, line 3:

19   "Q.   When you say generally speaking, is there a difference

20   between the definition of fair market value that you just gave

21   and what you did?

22   "A.   Well, all appraisers, when they are appraising for

23   collateral purposes -- "

24   Q.   That's the same as bank value, right?

25   A.   Yes, it is.

O1QVACC4                          Smith – Cross

1    Q.  So you go on:  Well, all appraisers, when they are

2    appraising for collateral purposes, take a very conservative

3    approach to it because there is an inherent risk that because

4    it's for collateral and it may need to be sold under pressure,

5    i.e., not a true fair market value.  So that's why we produce a

6    liquidation value as well.

7               "A liquidation value is, if you like, a sale under

8    extreme pressure for immediate conversion into cash.  The art

9    market is, as I'm sure you're aware, is a very illiquid market,

10   and any pressure to sell in a short time frame can lead to a

11   very dramatic drop in values.

12              "So generally speaking, all values for collateral

13   purposes tend to be on the conservative side.  They tend to be

14   ten to 20 percent down.  That's not easy to say that there

15   isn't a fair market value.  There is no absolutely precise

16   figure for fair market value.  It's often -- it's an assessed

17   figure.  There's no precision in these things.  And you can say

18   that a fair market value for a painting might be between a

19   million dollars and $2 million.  You might then want to put 1.5

20   million on it.  But if you want to be conservative, you put one

21   million on it and it could still be a fair market value."

22              Did I ask you that question and did you give that

23   answer in your deposition?

24   A.  Yes, I did, yes.

25   Q.  So if you take the high end of your ten to 20 percent

O1QVACC4                        Smith - Cross

1   discount and you apply that to your $38,000,000 fair market

2   value here, you would need to add another, say, 7.6 million to

3   your figure, right?

4   A.  I haven't done the mathematics, but what I would like to

5   explain here is --

6   Q.  Well, let's do the math first.  Let's do the math first.

7   A.  Okay.

8   Q.  So 20 percent of 38, I think that is going to be 7.6.  Ten

9   percent of 38 would be 3.8.  Do you agree with that?

10  A.  Yes.

11  Q.  And so if we double 3.8, it's going to get to be 7.6,

12  right?

13  A.  Indeed.

14  Q.  If we understand that you're ten to 20 percent lower for a

15  bank fair market value, if we add that 20 percent — and I'm

16  going the top end of your range — it's going to take us to 45.6

17  for a normal fair market value, right?

18  A.  I disagree with that.  I agree with your math.

19  Q.  Okay.  That's all I'm asking.

20  A.  All right.

21  Q.  Thank you.

22          So the 20 percent addition for your conservative fair

23  market value would be about 46 million, right?

24  A.  If you say so.

25          MR. WILSON:  Let's take this down, please, Toby, and

O1QVACC4                          Smith - Cross

1  pull up Plaintiff's Exhibit 1001 as a demonstrative exhibit.

2  And maybe we can -- can we run this through as a Power Point,

3  so we do it one piece at a time, please.  Or we could do it all

4  at once.  Here we go.

5  Q.  All right.  So we've put together a demonstrative to walk

6  through a timeline of your valuations of the da Vinci and also

7  other relevant data points, so we'll just do this one step at a

8  time.

9        So in 2013, you know that Mr. Bouvier paid Sotheby's

10  for the da Vinci 83 million, right?

11 A.  Correct.

12 Q.  And then same year, Accent paid Bouvier $127.5 million,

13 right?

14 A.  Correct.

15 Q.  Now, in 2015, two years later, Sotheby's prepared its

16 insurance value for Mr. Bouvier and they gave an insurance

17 value of 113 million.  Are you with me so far?

18 A.  Yup.

19 Q.  So in the same year, about nine months later, you also

20 prepared a valuation of the da Vinci for Athena, and that was

21 for 38 million, right?

22 A.  Mm-hmm.  Right.

23 Q.  Or if we gross it up, it could be 46.

24        And then in 2021, six years later, you imagined that

25 it was 2015, when you were making your valuation for Sotheby's,

O1QVACC4                        Smith – Cross

1   and you came up with 80 million, right?

2   A.   Correct.

3   Q.   And you also prepared an insurance valuation in the same

4   retro style that you thought if you -- if it was 80 in 2015,

5   then you would think that 140 would be a reasonable insurance

6   value as of 2015, right?

7   A.   Right.

8   Q.   And so the relationship between your fair market value,

9   sort of, retro 2015 value, the 80 million you came up with and

10  the 140 million, the relationship was about 75 percent

11  increase, right?

12  A.   Right.

13  Q.   And if you took -- if you took your actual 2015 valuation

14  and you grossed that up to 46 to have it to be on par, an even

15  fair market value comparison, and you added 75 percent to that,

16  that would be about 80 million, right?

17  A.   I believe you.

18  Q.   So if we tried to come up with what a 75 percent increase

19  for insurance value purposes based on your actual 2015, that

20  would be 80 million, right?

21          MR. WOLVERTON:   Objection.

22          THE COURT:   Overruled.

23  Q.   You can answer.

24  A.   Can you repeat the question?   I'm sorry.

25  Q.   Sure.   2015, you had a $38,000,000 bank value which has an

O1QVACC4                          Smith – Cross

1    equivalent of 46 million fair market value, right?

2    A.  Right.

3    Q.  And if you were building an insurance valuation on top of

4    that 46 million and you used the same markup for insurance

5    value that you did when you did it for Sotheby's of 75 percent,

6    it would be 46 fair market and 80 million insurance value,

7    right?

8    A.  I follow your math.

9    Q.  All right.

10         MR. WILSON:  We can take that down, please.

11   Q.  Do you agree with me that as of 2015, there was no

12   unanimity that the *Salvator Mundi* was even by Leonardo

13   da Vinci?

14   A.  There's no unanimity today.

15   Q.  Right.  And would you agree that the work had been severely

16   damaged through past restoration?

17   A.  Yes, it had been damaged in past restoration.

18   Q.  Now, let's talk briefly about insurance valuations.

19         You testified earlier about general market standards

20   for insurance valuations, right?

21   A.  I did.

22   Q.  And you would agree that when a valuer is preparing a

23   valuation for insurance purposes, it needs to be as accurate as

24   possible, right?

25   A.  Of course.

O1QVACC4                          Smith - Cross

1    Q.  And you also testified though that you think clients can

2    influence the value, right?

3    A.  Of insurance valuations, they can have some input.

4    Q.  Right.  But you would agree that a valuer should not give

5    in to a client and prepare an overly aggressive valuation

6    because of client pressure, right?

7    A.  I don't know what you mean by "overly aggressive."

8    Q.  Can a client be overly aggressive with a valuer or not?

9    A.  Are we talking about insurance valuations?

10   Q.  We certainly are.

11   A.  Okay.  "Overly aggressive" is a subjective term.  I mean, I

12   would say that a client can have input into the insurance, it's

13   a protection figure.  They can decide the level of protection

14   they want within reason.

15   Q.  So you don't think that there can be an overly aggressive

16   valuation based on client input?

17               MR. WOLVERTON:  Objection.

18               THE COURT:  Hold on.

19               First of all, Mr. Smith, just wait for the question to

20   finish before you begin your answer, please.

21               I'll allow it.  Go ahead.

22   A.  Just repeat, please.

23   Q.  Sure.  You don't think that there can be an overly

24   aggressive valuation as a result of client pressure?

25   A.  It's possible, of course.

O1QVACC4                          Smith - Cross

1    Q.  And that would not be a good thing, right?

2    A.  No.

3    Q.  You testified also that sometimes clients ask a valuer to

4    change currency, right?

5    A.  Correct.

6    Q.  And it's okay for a valuer to change the currency, right?

7    A.  It is.

8    Q.  But it wouldn't be okay to change the currency if the

9    result was that the overall value became excessive, do you

10   agree with that?

11   A.  If it became excessive?

12   Q.  Correct.

13   A.  Just excessive, yes.

14   Q.  But you understand that when you change a currency, it can

15   influence the value because not every currency is the same

16   value, right?

17   A.  Of course.  Yes.

18   Q.  So if you want to change the currency and keep the value

19   the same, you may need to change the amount because the

20   currency is worth different things, right?

21   A.  If you want to keep the same value, yes.

22   Q.  Right.  And so if you change the currency and you keep the

23   value the same, for example, if you had $100 million and you

24   converted that to 100 million euros, that would impact the

25   value, right?

O1QVACC4                          Smith - Cross

```
1    A.  It would.

2              MR. WILSON:  Let's bring up Defendants' Exhibit 1016,

3    if we can.

4    Q.  This is a demonstrative that you went through with

5    Sotheby's counsel, right?

6    A.  It is, yes.

7    Q.  And this captures for you the steps that a valuer might

8    take when conducting a valuation, right?

9    A.  Correct.

10   Q.  Now, you bookend your steps at the beginning with

11   understanding the client's needs, number one thing.  And then

12   towards the end, once you get to step 8, there's a discussion

13   with the client, right?

14   A.  Correct.

15   Q.  Now, in between those bookends, I counted 19 steps and

16   subparts.  Does that sound right?

17   A.  Sounds right.

18   Q.  All right.  So Sotheby's asked you to give an opinion on

19   the 2015 valuation of the da Vinci.  We've been talking about

20   that, right?

21   A.  Correct.

22   Q.  And you reviewed emails relating to that.

23             MR. WILSON:  Toby, let's bring up Plaintiff's Exhibit

24   171, please.

25   Q.  This is one of the documents that you looked at, right?
```

O1QVACC4                        Smith - Cross

1   A.  I didn't see these emails when I was doing the initial 2015

2   valuation.  I saw these later.

3   Q.  You reviewed this with your counsel today on your direct

4   testimony?

5   A.  Oh, yes, sorry.  Today, yes.

6   Q.  Right.  And this is one of the documents that led to the

7   insurance valuation in 2015, right?

8               THE COURT:  Hang on.

9               Let's be very clear, since there was a valuation done

10  in 2015, multiple ones.

11              THE WITNESS:  Yes.

12              THE COURT:  I think we need to be a little more

13  precise.

14  Q.  All right.  You did two things with respect to the

15  da Vinci, you did what I call the retro valuation, right?

16  A.  Right.

17  Q.  And then you also -- you looked at Sotheby's valuation that

18  they did in 2015, right?

19  A.  Yes.

20  Q.  And for Sotheby's valuation in 2015, you came to -- you

21  reviewed it and you tried to come to some conclusions about

22  whether it was reasonable or not, right?

23  A.  I did.

24  Q.  And among the documents that you have now reviewed that

25  relate to the Sotheby's 2015 valuation is a series of email

O1QVACC4                          Smith – Cross

1   exchanges between Sam Valette and Alex Bell, right?

2   A.   Correct.

3   Q.   And this is one of those, right?

4   A.   That's right.

5   Q.   And as you're looking at this Plaintiff's Exhibit 171,

6   other than the concern about the value itself, this doesn't

7   reflect any of the other 19 steps for a valuation, does it?

8   A.   This is just an email.  I have no idea what -- whether they

9   did the 19 steps separately and they didn't write emails about

10  them.  This is just -- this is just an email between two

11  parties.  They may have done all 19 before --

12  Q.   Right.  Let's come to that separately.

13          But let's just start with the email that's in front of

14  us.  This doesn't reflect your 19 steps, right?

15  A.   No, this is just a preliminary email.

16  Q.   Right.

17          MR. WILSON:  So let's pull up Plaintiff's Exhibit 304,

18  please.

19  Q.   You testified that you reviewed other documents as well.

20  Did you review this one?

21  A.   Yes, I did.

22  Q.   And this doesn't reflect your 19 steps of valuation, does

23  it?

24  A.   No, it's another -- just another generalized email.

25          MR. WILSON:  All right.  Let's go to Plaintiff's

O1QVACC4                          Smith - Cross

1    Exhibit 175, please.

2    Q.  Here's another one.  This is another email exchange between

3    Alex Bell and Sam Valette.  Does this reflect the 19 steps of

4    valuation?

5    A.  No, it doesn't.

6              MR. WILSON:  Let's pull up Plaintiff's Exhibit 176,

7    please.

8    Q.  Here's another one.  Exchange between Sam Valette, Alex

9    Bell.  Does this reflect any of your 19 steps of valuation for

10   insurance valuations?

11   A.  It may be that Alex had done the 19 before he wrote the

12   email, but it doesn't reflect it, no.

13   Q.  Well, let's -- setting aside what may have happened that's

14   not in the email, I'm interested in what's in the email.  The

15   email itself doesn't reflect any of the 19 steps that you set

16   forth that would be appropriate for an insurance valuation,

17   right?

18   A.  I wouldn't expect them to be set out in an email.

19   Q.  I'm not asking you --

20             THE COURT:  Hang on.

21             Just answer the question.  The email does not

22   reflect --

23             THE WITNESS:  No, it does not reflect it.

24   Q.  And in coming to your conclusions about the reasonableness

25   of Sotheby's valuation of the da Vinci in 2015, you didn't

O1QVACC4                    Smith - Cross

1   review other documents that demonstrated the 19 steps that you

2   set forth, right?

3   A.  I did not, no.

4           MR. WILSON:  All right.  We can take that down.

5           Thank you.

6   Q.  Mr. Smith, you know that at some point after this Sotheby's

7   2015 valuation, that the da Vinci sold at auction, right?

8   A.  I do.

9   Q.  And you used that fact, that subsequent auction price, to

10  support your opinion, right, as a matter of hindsight?

11  A.  When I reviewed it, it was a matter of hindsight; it didn't

12  support my valuation.

13  Q.  Right.  But as a test for whether you thought the 2015

14  valuation was reasonable, you considered that subsequent sale,

15  right?

16  A.  Yes, I did.

17  Q.  Now, today you testified that that auction price was

18  extraordinary, right?

19  A.  It was.

20  Q.  You would agree with me that it was a freak occurrence,

21  right?

22  A.  It was an outlier.

23  Q.  Well, you used those exact words, "freak occurrence," when

24  talking to a journalist from *The Art Newspaper*, right?

25  A.  It's quite possible.

O1QVACC4                        Smith - Cross

1    Q.  Well, did you use the word "freak occurrence" or not?

2    A.  I can't recall.  But if you say so, I'll accept it.

3    Q.  All right.  And you declined to comment on whether the

4    da Vinci would ever sell for that amount ever again, right?

5    A.  I have no idea what it might sell for in the future.

6    Q.  Well, when I specifically asked you in your deposition

7    whether it would ever sell for that again, you declined to

8    comment, right?

9    A.  I agree.

10   Q.  You called the auction of the da Vinci a freak occurrence

11   before Sotheby's retained you to give them an opinion in this

12   case, right?

13   A.  If you say so.

14           THE COURT:  Well, Mr. Wilson is not --

15           THE WITNESS:  I can't remember the precise date, your

16   Honor.

17           THE COURT:  That's fine.  But my point is you're

18   testifying.  Mr. Wilson isn't.  So if you can't remember, say

19   you can't remember.

20           THE WITNESS:  I can't recall the date.

21   Q.  Let's go to your deposition.  This is at page 40, line 17,

22   through page 41, line 7.

23           THE COURT:  40, 17?

24           MR. WILSON:  That's what I have.  Bear with me.

25           THE COURT:  I don't think that -- can you double-check

O1QVACC4                          Smith - Cross

1   that?

2              MR. WILSON:  I'm checking it, your Honor, before I

3   read it.  I believe it begins at page 39, line 17, and it goes

4   to page 40, line 7.

5              MR. WOLVERTON:  Objection.

6              THE COURT:  Sustained.

7   Q.  Do you remember giving a quote to the publication *Art*

8   *Newspaper* that attributed to you the view that Christie's sale

9   was a freak occurrence?

10  A.  I don't recall it.

11  Q.  I'd like to read to you the question -- when I asked you

12  that question and the answer that you gave.

13             MR. WOLVERTON:  Objection.

14             THE COURT:  Sustained.

15             MR. WILSON:  Then I won't get to.

16  Q.  Using a freak auction from later in time to justify your

17  opinion is a form of hindsight, right?

18  A.  Using any auction price in a later time is a form of

19  hindsight.

20  Q.  "Hindsight" means looking back at something with the

21  benefit of something you've learned since, right?

22  A.  Correct.

23  Q.  And you testified that subsequent events sometimes can be

24  very helpful and very beneficial in trying to understand

25  something in the past, right?

O1QVACC4                         Smith – Cross

1    A.  Yes.

2    Q.  But when you were considering Sotheby's 2015 estimate, you

3    didn't take into account everything that you learned since,

4    right?

5    A.  No, I did not.

6    Q.  You know that in 2021, the Prado Museum cataloged the

7    *Salvator Mundi* not as a work by da Vinci himself, but instead

8    among his attributed works, workshop, or authorized and

9    supervised by Leonardo, right?

10   A.  I did read that.

11   Q.  You know that the Prado is located in Madrid, the capital

12   of Spain, right?

13   A.  I do know the Prado is located in Spain.

14   Q.  And the Prado is one of the greatest art museums in the

15   world, you would agree?

16   A.  It's a great museum.

17   Q.  And you did not take into account that the Prado downgraded

18   the *Salvator Mundi* when you considered your valuation, right?

19   A.  There's been considerable debate about the attribution of

20   this painting, and this was just another -- another event in a

21   series of discussions.  So I did not take it particularly

22   seriously into account.

23   Q.  In your opinion, the 2021 downgrading of the Leonardo

24   da Vinci from an authorized work to an attributed work,

25   workshop or authorized and supervised by Leonardo, as opposed

O1QVACC4                          Smith - Cross

1    to being by Leonardo, was not a significant enough event to

2    include in your consideration of the valuation?

3    A.   Well, it's one of many conflicting opinions of this.  So we

4    can't change the value every time an academic comes out and has

5    a different opinion.

6    Q.   The Prado Museum is not an academic, is it?

7               THE COURT:  All right.  I think we've made the point.

8               Let's move on.

9               MR. WILSON:  Your Honor, I do have the article that

10   was the subject of this conversation before which I'd like to

11   show the witness as impeachment.

12              THE COURT:  You may show the witness to refresh his

13   recollection, but you may not show it for impeachment.

14              MR. WILSON:  Yes, that's my intent.

15              Toby, can you please bring up just for the witness the

16   article we were referring to earlier.

17   Q.   Do you see this to be an article --

18              THE COURT:  Can we put a number on this, plaintiff's

19   exhibit, just for the record.

20              MR. WILSON:  Certainly.  I think we're up to

21   Plaintiff's Exhibit 1002 for a demonstrative, or is that the

22   way you'd like it numbered, your Honor?

23              THE COURT:  I'd just like it marked, so I need a

24   number.

25              MR. WILSON:  There it is.  Plaintiff's Exhibit 1002.

O1QVACC4                          Smith - Cross

1              THE COURT:  Okay.

2    Q.  Do you recognize this to be an article --

3              THE COURT:  Mr. Wilson --

4              MR. WILSON:  Yes.

5              THE COURT:  You don't describe something that's not in

6    evidence.  Just ask him to look at a particular --

7              MR. WILSON:  All right.

8              THE COURT:  -- page or what you want him to look at

9    and then we'll go from there.

10             MR. WILSON:  Thank you, your Honor.

11             So let's walk through this, Toby, so that the witness

12   can review it.  And perhaps we can highlight for him the

13   section.  Can we keep going down.

14             THE COURT:  Can we get a question?

15             MR. WILSON:  I apologize, your Honor.  I'm just trying

16   to find the section that's relevant.

17             Let's go to the third paragraph, Toby, please, of the

18   document.

19   BY MR. WILSON:

20   Q.  You can read the topic sentence of that paragraph and

21   perhaps that will refresh your recollection.

22             THE COURT:  Just read to yourself, Mr. Smith, what is

23   highlighted on the screen.  And then Mr. Wilson will ask you

24   another question.

25             And ladies and gentlemen, just to explain what's going

O1QVACC4                    Smith - Cross

 1    on here, when a witness doesn't remember something, the rules

 2    permit a lawyer to show something to the witness for purposes

 3    of refreshing that witness's recollection.  When that is done,

 4    the exhibit is not offered on that basis, at least into

 5    evidence, and therefore is not something that you're seeing.

 6    That's why it's not on your screen.

 7          And Mr. Wilson in a moment is going to ask if having

 8    read that, it now refreshes Mr. Smith's recollection.  And it

 9    is his answer that is the evidence.  Whatever is on the screen,

10    whatever it may be, is not relevant for your purposes.

11          I had a professor who used to say, You can refresh

12    recollection with anything, even if it's a bowl of fettuccine.

13    If it refreshes the witness's recollection, you're golden.

14          So with that, Mr. Wilson, you may proceed.

15          MR. WILSON:  Just one last thing.  If we could go up

16    to the top of the document --

17          THE COURT:  I think we've already done that.

18          Let's ask a question, please.

19          MR. WILSON:  All right.

20    BY MR. WILSON:

21    Q.  Does this refresh your memory that the opinion that the

22    subsequent sale at auction of the da Vinci was a freak

23    occurrence was attributed to you?

24    A.  Well, I read what it says.

25          THE COURT:  No, no, that's not the question.

O1QVACC4                          Smith - Cross

1          THE WITNESS:  I'm sorry.

2          THE COURT:  The question is, having seen that,

3   whatever it may be, does it refresh your recollection that you

4   were quoted in *The Art Newspaper*, I think was the earlier --

5          THE WITNESS:  I was quoted that or presumably it

6   happened.  I don't recall it.

7          MR. WILSON:  All right.  We can take that down.

8          Thank you.

9   BY MR. WILSON:

10  Q.  Mr. Smith, you think the da Vinci is unique, right?

11  A.  Well, every work of art is unique.

12  Q.  Is the da Vinci any different?

13  A.  The da Vinci is unique in its own right, yes.

14  Q.  And when you were trying to do your own retro valuation,

15  you couldn't find a comparable for it because of its

16  uniqueness, right?

17  A.  I could not find another oil painting by da Vinci, no.

18  Q.  As a result of that, your real opinion is that the

19  valuation of the da Vinci was almost guesswork, right?

20  A.  No, it was more than guesswork.  I mean, I found as close

21  as I could comparables that were, in my view, relevant.  It was

22  not just a guess.

23  Q.  I'd like to play a clip to you from your deposition at page

24  35, line 6, through page 36, line 11.

25          THE COURT:  You may proceed.

O1QVACC4                          Smith - Cross

1             MR. WOLVERTON:  No objection.

2             (Video played as follows)

3      "Q.  What guidelines did you use to try to arrive at value if

4      you determined that you couldn't apply comparables?

5      "A.  In the case of the Leonardo, it was purely a matter of

6      experience.  I mean, it was just saying, What do we think?

7      When you're dealing with a unique work, it is the -- the

8      science of art appraisal, which is only an art anyway in

9      itself, and not a science, and becomes almost guesswork.

10            "And we can see with the Leonardo, I personally, when

11     I saw it in Singapore, I didn't like the painting very much.  I

12     thought that it was -- I couldn't tell the extent of the

13     restoration.  I was quite negative about it.  I felt that this

14     painting could easily have been challenged from an authenticity

15     standpoint.  I knew that a number of major museums had already

16     rejected it.

17            "Having said that, a Leonardo -- an oil painting by

18     Leonardo is virtually unobtainable.  So we know from the sort

19     of, if you like, the history of this painting that the price

20     bounced around all over the place.  The original vendors were

21     looking for huge sums of money, then they had to take less,

22     then they went up a bit, then they went down a bit.  And then

23     finally it came to auction and made an absolutely astonishing

24     amount.

25            "No art expert could have predicted with any accuracy

O1QVACC4                        Smith - Redirect

 1    any of those figures.  To be honest, we were not much more

 2    qualified to value that picture than you would be."

 3    Q.  Did I ask you that question, did you give that answer?

 4    A.  You did and I did give that answer.

 5              MR. WILSON:  I have no further questions.

 6              THE COURT:  Redirect.

 7    REDIRECT EXAMINATION

 8    BY MR. WOLVERTON:

 9    Q.  Mr. Smith, Mr. Wilson was asking you questions about your

10    relationship to Sotheby's, your commercial relationship to

11    Sotheby's.  And I think that you said that you received pitches

12    from Sotheby's.

13              How would you characterize your commercial

14    relationship with Sotheby's?

15    A.  Well, Sotheby's and Gurr Johns are competitors.  We

16    challenge each other over collections, we challenge each other

17    over valuations, we challenge each other sometimes over

18    employees.

19    Q.  And when Sotheby's pitches to you, in that context they are

20    trying to get you as what?

21    A.  Well, they're pitching to us in order for us to appoint

22    them, if possible, for the consignment of art for sale.  That

23    is the normal process.

24              MR. WOLVERTON:  If we could pull up PX-189, please.

25    Oh, I'm sorry, it should be PX-188.

O1QVACC4                              Smith - Redirect

1    Q.  Mr. Smith -- actually, can I ask you, with respect to the

2    2010 auction of the *L'Empire des Lumières* that Mr. Wilson was

3    asking you about, how does that artwork compare, in your

4    opinion, to the one that Mr. Valette described in his November

5    2011 emails?

6    A.  Can you just repeat that question for me.

7    Q.  Yeah.  So Mr. Wilson was asking you about a 2010 auction of

8    *L'Empire des Lumières*, which I think he and you agreed, was the

9    record price for a Magritte as of that time.

10   A.  I don't think the sale was in 2010.  It was earlier.

11   Q.  I apologize.  When was the sale?

12   A.  I think the sale was in 2000 -- I can't remember, 2006,

13   something like that.

14   Q.  How does that -- how does the *L'Empire des Lumières* from

15   that 2006 sale compare to the one that Mr. Valette was --

16   referenced in his November 2011 analysis of the Magritte

17   market?

18   A.  The one that Mr. Valette illustrated was the best picture

19   of the group.  It was a very good picture indeed.  I mean, the

20   prime example, I suppose you'd call it.

21   Q.  And if the 2006 auction was, it sounds like, an inferior

22   *L'Empire des Lumières* compared to the one that Mr. Valette

23   referenced, what, in your view, does the auction price from

24   that 2006 auction reflect about the accuracy or inaccuracy of

25   Mr. Valette's estimate?

O1QVACC4                          Smith - Redirect

1    A.  I believe Mr. Valette's estimate was pretty accurate.  The

2    market had substantially risen in the intervening period for

3    Magritte.

4    Q.  I think Mr. Wilson asked you whether the *L'Empire* is more

5    valuable than the *Domaine*.  And you respond -- at one point I

6    think you were played videotape -- or, excuse me, Mr. Wilson

7    read to you that you had said that the *L'Empire des Lumières*

8    was a far better series.  I want to just focus on that comment.

9              Were you referring to commercial value, artistic

10   value, or something else?

11   A.  The *L'Empire des Lumières* series started off with a great

12   work.  And then I believe gradually he diminished it by

13   painting too many versions of it.  That's just my personal a

14   view.

15             The *Domaine* is a tougher subject.  Much less appealing

16   than the *L'Empire des Lumières*.  But the *L'Empire des Lumières*

17   certainly is the most valuable series of Magritte's works.

18   Q.  And I think Mr. Wilson had read to you a quote where you

19   had said that you had never been a fan of the *Domaine*

20   *d'Arnheim*.  What did you mean by that?

21   A.  Well, it's a tough subject.  And, you know, it -- it --

22   it's a painting which, in a way, you can see why Edward James

23   bought it, because he was interested in tough surrealism.  I

24   don't -- it's not -- I mean, it's a painting which is -- I

25   think is quite impressive, but it's not one of my most favorite

O1QVACC4                         Smith - Redirect

1    Magrittes.

2    Q.  What do you mean by it's a tough subject?

3    A.  Well, it just -- it doesn't have immediate, sort of --

4    quite such immediate appeal as some of the other Magrittes that

5    one comes across visually, commercially.  I mean, I suppose

6    one's got to really look at here is the commercial market likes

7    subjects which have immediate appeal.  This is a tougher

8    subject.  It doesn't have that -- quite that immediate appeal.

9            MR. WOLVERTON:  If we could pull up Plaintiff's

10   Exhibit 167.  Hopefully, this is the right exhibit.  Yes.  And

11   if we could go to -- it's page 5 of the PDF or page 3 of the

12   attachment.

13   Q.  I want to read you this line, use of appraisals, fair

14   market value, and liquidation value appraisal for art loan

15   purposes.  Mr. Wilson didn't read the end of that definition

16   for art loan purposes when he was reading the definition --

17           THE COURT:  Mr. Wolverton, just ask the question.

18   Q.  Is that part of the definition important to the use of the

19   appraisal?

20   A.  It's very important indeed.  It's key.

21   Q.  And why is that?

22   A.  Because the purpose of the valuation sets the tone for the

23   entire valuation.

24   Q.  Mr. Wilson also asked you if you agreed with his math, and

25   then you wanted to explain yourself, and that was in connection

O1QVACC4                        Smith - Redirect

 1   with the Athena art loan and in comparison to the insurance

 2   valuation that you did.  What was the explanation that you

 3   wanted to offer?

 4   A.  I'm sorry, can you just repeat the question.

 5   Q.  Yeah.  There was -- at one point Mr. Wilson had asked you

 6   if you agreed with his math.  And you had said you agreed with

 7   his math, but that you wanted a chance to explain.  And this

 8   was in connection with the Athena Art Finance loan.

 9   A.  Yes.  Mr. Wilson did a calculation which reset the fair

10   market value by adding 20 percent.  Art loan valuations are

11   always considered -- considered on a conservative basis.  I

12   indicated a 20 percent reduction.  But there were other issues

13   here which played into my mind at the time, such as the

14   condition of the painting and the fact that there was

15   disagreement over the -- over full authorship of the picture

16   which Mr. Wilson pointed out later.

17          MR. WOLVERTON:  We can take this down.

18   Q.  You also went through a couple of emails with Mr. Wilson

19   where he asked you to identify the application of the 19

20   factors that you had identified for insurance valuations.

21          In your view, is it a reliable methodology to review

22   the email correspondence of someone who prepared a valuation to

23   piece together how they came to that valuation?

24   A.  No, I don't think it is, actually.  I think that the email

25   correspondence is just a -- just for lack of summary, I think I

O1QVACC4                        Smith - Redirect

1    referred to it before as a tip of an iceberg.  All the 19 steps

2    I outlined would have been done; they wouldn't have been sent

3    out in email between them.

4              MR. WOLVERTON:  If we could please bring up DX-1016.

5    Q.  Mr. Smith, why do you view the $450 million sale price as

6    relevant to assessing the Leonardo da Vinci valuation that

7    Sotheby's prepared?

8    A.  Well, it's fact.  It was a price that was paid.  And actual

9    prices carry more weight in valuations than estimations.

10   Q.  And I know that Mr. Wilson played you your video where you

11   talked about how it was unexpected.  I know this was an

12   auction.  Were there other bidders besides the winning bid?

13             MR. WILSON:  Objection.

14             THE COURT:  Overruled.

15   Q.  I'm sorry, could you repeat that?

16             THE COURT:  Go ahead.

17   A.  There would have been an underbidder; there would have been

18   a counterbid at less -- slightly less than 450 million.  But it

19   didn't get there on its own.  It had competition.

20   Q.  Do you know if there were multiple bidders above 200

21   million?

22   A.  I was -- I did not attend the auction, but I understand

23   there were multiple bidders up to about half that price.  And

24   the last 100 million or so was down to two people.  But, you

25   know, I'm -- I can't say that with certainty.

O1QVACC4                        Smith – Recross

1    Q.  Thank you, Mr. Smith.  That's all.

2              MR. WILSON:  Very briefly, your Honor.

3              THE COURT:  Very briefly.

4    RECROSS EXAMINATION

5    BY MR. WILSON:

6    Q.  Mr. Smith, when you were just trying to explain how it was

7    that your Gurr Johns estimate of $38,000,000 in 2015 was so

8    low, you pointed to two points:  Number one, condition; and

9    number two, disagreement about the attribution of the work.

10   Right?

11   A.  Right.

12   Q.  Now, nothing changed about the condition of the work

13   between when you looked at it in 2015 and your retro valuation,

14   right?

15   A.  Nothing changed.

16   Q.  And nothing changed about the disagreement over the

17   attribution.  There was disagreement in 2015 and there was

18   disagreement in 2021, right?

19   A.  I'm not sure I totally agree with that.  There seemed to be

20   a greater consensus later on.  The academic opinions of this

21   swing backwards and forwards.

22   Q.  Right.  Well, it's fair to say that there was disagreement

23   about the attribution in 2015, right?

24   A.  There was.  There's been disagreement about attribution

25   throughout the entire process of this painting -- discovery of

O1QVACC4

1    this painting.

2            MR. WILSON:  No further questions, your Honor.

3            THE COURT:  All right.  Thank you, Mr. Smith, you may

4    step down.

5            (Witness excused)

6            MR. WOLVERTON:  Can I ask one question, your Honor?

7            THE COURT:  No.

8            MR. WOLVERTON:  Okay.

9            THE COURT:  All right.  Defense counsel, next witness.

10           MR. ASNER:  The defense rests, your Honor.

11           THE COURT:  All right.

12           Well, ladies and gentlemen, we've reached a

13   significant moment, which is to say you've seen both parties

14   now rest.

15           Give me a moment.

16           Counsel, can I see you at sidebar so we can just talk

17   about scheduling, and I can then discuss with the jury.

18           I'm going to ask you a question and ask you to

19   communicate with Ms. Smallman in the box, which is, I had told

20   you at the beginning of the case that when we got to summations

21   and deliberations, that I was going to ask you to stay longer,

22   that is to say, past 2:30, have a full day, 9 to 5.  Because it

23   just becomes harder to sort of manage the schedule and for a

24   variety of other reasons.

25           I was expecting to tell you at the end of today that I

O1QVACC4

1    anticipated on Tuesday doing that, but things moved more

2    quickly, which I'm sure everybody is happy with.  Which means

3    that Monday may be a day where, if you could do it, stay until

4    5, might be very helpful.  Having said that, because I didn't

5    give you advanced warning, I don't want to spring it on you.

6    And if anyone has an appointment or something that can't be

7    changed, then I would want to take that into consideration.

8         So that's a long way of saying if you can -- if

9    Ms. Smallman can go to you while I'm talking with counsel, and

10   you can let her know if anyone has an irreconcilable problem or

11   conflict on Monday afternoon that would prevent you from

12   staying later until 5, that would be very helpful, and then

13   I'll be back to you.  So give me a moment.

14        (At sidebar)

15        THE COURT:  All right.

16        MR. ASNER:  My proposal is there's a lot of legal

17   issues that will be decided.  What I would suggest is that we

18   resolve all of that, putting the charge conference on Monday,

19   and that we do all of the -- both plaintiff and defense on

20   Tuesday, and send it to the jury then.  I think it just is

21   cleaner for everybody, gives us a chance to take stock in and,

22   you know, have the day to argue and resolve legal issues.

23        MS. SALZMAN:  It's rare, but I agree with Mr. Asner.

24        MR. ASNER:  Oh, my God.

25        MS. SALZMAN:  Write that down.

O1QVACC4

```
1          THE COURT:  Can you give me a sense of why you think
2     the legal issues are so significant?  I mean, you know, I
3     anticipate -- hang on.  I anticipate some argument about the
4     charge, but I don't think it's that complicated.  And we can
5     have argument right now on the Rule 50 issues.  It just strikes
6     me, squandering a day, you know, just is not great.  And the
7     jury wants to get back to its life, I want to get back to the
8     rest of my life, I'm sure all of you do as well.
9          I'm skeptical.
10          MR. ASNER:  I know you're skeptical.
11          Look, they're not squandering a day because they
12     wouldn't have to come in, right.  And we were thinking that
13     they would come in for a small amount of time.  So I think
14     actually that, yes, there will be legal issues that we'll argue
15     now, but I understand that there's a bunch of arguments that
16     are being prepared right now and we will brief that.  No doubt
17     they will want to put in their briefs.  And it could be
18     lengthy.
19          And then undoubtedly, I mean, they put in a letter
20     just today on conscious avoidance.  And I have some initial
21     thoughts on that, but there's a lot that can be hashed out.  I
22     just think going -- part of this actually is that how the
23     summations are framed will depend a lot on the jury
24     instructions.  I mean, as of this morning, I thought we were
25     going to be arguing about, you know, the auction.
```

O1QVACC4

1          So it's moving very fast.

2          MS. SALZMAN:  Can I ask just a question?  Is it your

3     Honor's preference to provide a draft charge ahead of the

4     charge conference for the parties to review?

5          THE COURT:  Yes.

6          MS. SALZMAN:  When will we have that?

7          THE COURT:  Depends when we are doing all of this.

8     I'm currently thinking I will get it to you by email sometime

9     on Sunday, and give you overnight.  We would have the charge

10    conference first thing Monday morning at 9, and then start with

11    summations at 10.  And I think if the jury can stay later, we

12    can actually get summations done on Monday.

13         MS. SALZMAN:  Would we also have the verdict sheet on

14    Sunday night?

15         THE COURT:  Yes.

16         MS. SALZMAN:  We're prepared to proceed with

17    summations on Monday, if that's your Honor's wish.

18         THE COURT:  Give me a moment.

19         That's what we're going to do.

20         Notwithstanding your agreement, I just think plowing

21    ahead and getting this done is in everybody's interest.  And

22    you have two full days, the weekend, to prepare.  And it is

23    what it is.

24         So I'll let the jury go in a moment.  And then we can

25    have some discussion on the Rule 50 issues.  And then we can

O1QVACC4

1    discuss whether it's worth spending your time focusing on

2    briefing that or preparing for summations.  All right?

3            MS. SALZMAN:  Thank you, Judge.

4            MR. ASNER:  Very good.

5            (In open court)

6            THE COURT:  All right.  So my understanding from

7    Ms. Smallman is that you could stay likely until 5 on Monday;

8    that one of you may have to make some arrangements, but I would

9    ask you to do that.  Because -- well, I would ask you to do

10   that.

11           Here's the drill:  So the evidence is now closed and

12   in, so you have now seen all the evidence.  But you should

13   continue to keep an open mind.  You should continue not to

14   discuss the case with anyone.  You should continue not to do

15   any research about the case.  That's because there are some

16   important things remaining to be done.

17           There are the lawyers' closing arguments, which is

18   their opportunity, as I will tell you more on Monday, to make

19   arguments to you about the conclusions that you should draw

20   from the evidence and try to tie it all together for you, since

21   obviously it's been a reasonably long trial and you've heard

22   and seen a lot.  After they finish their arguments, I would

23   give you my instructions on the law.

24           I think, in all likelihood, we will probably just do

25   the summations on Monday, and then I may instruct -- give you

O1QVACC4

1    instructions on Tuesday, and at that point you would begin your

2    deliberations.  But some of it will depend on how long each of

3    these things takes, and that's a little hard to predict and

4    something we'll discuss after you leave.

5            But between now and then, there are some issues, legal

6    issues, that we need to tend to.  And for that reason, I'm

7    going to -- we're going to start a little later on Monday,

8    which is to say I'm going to allow you to come in a little

9    later, but ask you to stay later.

10           So if I could ask you to be in the jury room by 9:45

11   in anticipation that we will start no later than 10, that would

12   be great.  And I'll have Ms. Smallman keep you posted if

13   there's any adjustment to that, but that's my expectation and

14   plan at the moment.  And then we would probably stay till 5 and

15   with a longer lunch, suffice it to say, and breaks, if that is

16   feasible.

17           On the lunch front -- hang on one second.  All right.

18   I'll tell you more about lunch on Monday.  I'll tell you more

19   about lunch now.

20           To make your lives a little bit easier and as a little

21   perk, once we get to this stage and we have the lunch break,

22   we're actually going to provide you with lunch.  So when you

23   come in on Monday, you'll have some forms in the jury room or

24   Ms. Smallman will give you some forms that you can use to

25   select what you would like us to get you, and we'll arrange for

O1QVACC4

```
 1   you to get lunch.  That way you can relax and enjoy the break

 2   between -- in all likelihood, between summations.  But, again,

 3   there's a lot I'm juggling here and managing a lot, so bear

 4   with me.  That's where I think things are headed and what

 5   things are looking like at the moment.

 6           So long story short, be here by 9:45, same thing, in

 7   the jury room, and hopefully ready to go shortly thereafter.

 8   Look for lunch order forms and plan to stay until 5.  And if

 9   that changes, I'll let you know on Monday morning.

10           In the meantime, don't discuss the case with anyone,

11   keep an open mind, and don't do any research about the case.

12   You have now heard all the evidence but, as I said before,

13   there's some very important steps still remaining, and in due

14   course you will have ample opportunity to discuss the case at

15   least with one another before you're ultimately excused, at

16   which point you can discuss it with anyone.  But in the

17   meantime, resist the temptation.  And once again, going into

18   the weekend, if you're seeing friends and family, you know,

19   resist the temptation.  Don't tell them yet what you've been up

20   too.  That day will come, but it's not here yet.

21           So with that, enjoy your weekend.  We will see you a

22   little later on Monday morning.  And have a great weekend.

23           Thank you.

24           (Jury not present)

25           THE COURT:  You may be seated.
```

O1QVACC4

1          In deference to those over 50 here, I propose that we

2     take a five-minute recess and then take up matters thereafter.

3          Does that sound good, Mr. Asner, I assume?

4          MR. ASNER:  I'm good.  And I am over 50.

5          THE COURT:  All right.  I don't know what you mean by

6     you're good, but --

7          MR. ASNER:  I mean I'm good with the break.

8          THE COURT:  Gotcha.

9          Let's take a five-minute break.

10          Obviously, be careful if you go into the hall, as the

11     jurors may be leaving.  But we'll pick things up in five

12     minutes.  Thanks.

13          (Recess)

14          THE COURT:  You may be seated.

15          All right.  So I have some logistics-type issues.  But

16     since the Rule 50 motion might, I suppose, have some bearing on

17     some of it, why don't we start there, unless there's anything

18     else you think we ought to discuss first.

19          MS. SHUDOFSKY:  We're ready to start, your Honor.

20          THE COURT:  Go ahead.

21          MS. SHUDOFSKY:  I'm going to do a little bit of a tag

22     team here, but I want to address defendants' Rule 50 motion

23     with respect to plaintiff's breach of fiduciary duty claim on

24     the *Salvator Mundi*.  We think that motion should be granted and

25     this is not a claim that should go to the jury.  And that's

O1QVACC4

1    because there's no -- no reasonable jury could find for

2    plaintiffs that plaintiff has met its burden on the equitable

3    estoppel argument that they are making.

4              Plaintiff has to prove, in order to establish

5    equitable estoppel, that there was an affirmative

6    misrepresentation, plaintiff relied on that misrepresentation,

7    which delayed it in filing suit; and plaintiff further has to

8    prove that it was diligent in pursuing claims against

9    Sotheby's.  And as we know, plaintiff can't rely on any of the

10   evidence it's relying on to prove the underlying breach of

11   fiduciary duty in connection with making its equitable estoppel

12   argument.  And so what it boils down to is that plaintiff is

13   relying exclusively on the *Salvator Mundi* insurance valuation.

14             And with respect to the insurance valuation, there is

15   no evidence from which a reasonable jury could find that

16   plaintiff has met its burden.

17             Putting aside for the moment whether or not there's

18   any evidence showing that there was any affirmative

19   misrepresentation — and we think the evidence is overwhelming

20   that the insurance valuation was reasonable, but putting that

21   completely aside, getting to the second element — there's no

22   evidence at all that plaintiff relied on the *Salvator Mundi*

23   insurance valuation and that it affected or delayed it in

24   bringing this suit.

25             So if we start first with the testimony at trial, no

O1QVACC4

 1    witness of plaintiff's testified that they even saw the

 2    insurance valuation.  Mr. Sazonov did not testify that he saw

 3    it, Mr. Rybolovlev did not testify that he saw it, Mr. Heller

 4    didn't testify that he saw it.  So nobody even saw it, much

 5    less that they relied on to, to their detriment.

 6            So when we look to what other evidence there was in

 7    the case that even related to any connection between the

 8    insurance valuation and plaintiff, a sole piece of evidence is

 9    that in early February 2015, at Mr. Bouvier's request, Sam

10    Valette sent the insurance valuation to Tetiana Bersheda.  Now,

11    we haven't obviously heard from Tetiana Bersheda, so there's no

12    evidence from her that she relied on it, that she in any way

13    tricked her into thinking that she had no claim against

14    Sotheby's.  What we do know, all the evidence we do know about

15    what Ms. Bersheda did with that insurance valuation cuts

16    completely the other way against plaintiff's equitable

17    estoppel.

18            So we know that Bersheda got the insurance valuation

19    in February.  It's not disputed that plaintiff first learned of

20    the alleged fraud on December 30th, 2014.  And it's undisputed,

21    because it's a stipulated fact, that on January 12th, 2015,

22    plaintiff filed an action against Bouvier in a foreign legal

23    proceeding alleging fraud and breach of fiduciary duty.  So we

24    know that at the time Bersheda got this insurance valuation,

25    weeks later plaintiff already was under the -- had formed the

O1QVACC4

1    opinion that they had been massively defrauded by Yves Bouvier.

2            And what did Bersheda do with that insurance

3    valuation?  We know, because, again, it's a stipulated fact,

4    she submitted the insurance valuation in March of 2015, I think

5    it was, into the legal proceeding that plaintiff had brought

6    against Bouvier.  So she used the *Salvator Mundi* insurance

7    valuation by Sotheby's as evidence in that proceeding to prove

8    fraud and breach of fiduciary duty.

9            So there's not a whiff of any indication in the

10   evidence that Bersheda was in some way misled by that valuation

11   and lulled into thinking that Sotheby's had done anything wrong

12   or that Bouvier hadn't done anything wrong.  They used it

13   affirmatively as evidence of the fraud and breach of fiduciary

14   duty.  So there's nothing with respect to that provision of the

15   insurance valuation to Bersheda that would support plaintiff's

16   equitable estoppel theory on those two elements:  reliance on

17   the misrepresentation and the misrepresentation allegedly in

18   some way causing them a delay in bringing the suit.

19           Then looking at other evidence that's come into trial,

20   there's been a lot of focus on the cover letter that Sotheby's

21   sent to Bouvier in connection with the insurance valuation.

22   But that cover letter did not ever go to plaintiffs.  There's

23   no evidence that plaintiff saw that cover letter.

24           So the cover letter which has been the subject of a

25   lot of discussion at trial, has absolutely no bearing, no

O1QVACC4

 1    relevance whatsoever with respect to plaintiff establishing

 2    equitable estoppel.

 3            Then we have testimony from Jane Levine.  But I'll

 4    start at the outset and say there's no evidence that there was

 5    any discussion about the insurance valuation between Bersheda

 6    and Levine.  It was not one of the documents that Ms. Bersheda

 7    sent to Jane Levine.  So there's really no connection between

 8    the insurance valuation and Jane Levine.  But I know plaintiff

 9    is arguing that somehow Jane Levine's decision or failure to

10    provide information to Bersheda is suggesting somehow that's

11    relevant to equitable estoppel.  It isn't.  As your Honor has

12    already found, a nonresponse is not the kind of specific

13    affirmative misrepresentation that can support an equitable

14    estoppel claim in the absence of a fiduciary relationship.  And

15    here, there clearly wasn't a fiduciary relationship.  So

16    whatever it was that Jane Levine didn't do by way of not

17    providing information to Bersheda doesn't provide any support

18    for the equitable estoppel claim.

19            So with respect to the second and third elements of

20    equitable estoppel which plaintiffs relied on the insurance

21    valuation and acted in some way or was put off or delayed in

22    filing suit, there's no evidence in this trial that supports

23    either of those two elements and, therefore, there's no basis

24    to send the *Salvator Mundi* fiduciary -- breach of fiduciary

25    claim to the jury.

O1QVACC4

1         But, of course, there is yet another hurdle for

2    plaintiff to overcome, another element they have to establish.

3    And that is that they acted diligently in connection with

4    pursuing the claims.  And again, there is no evidence

5    whatsoever that plaintiff acted with diligence in pursuing

6    their claims.

7         And if you go back here to the Bersheda/Jane Levine

8    back-and-forth, which plaintiff seems to be heavily relying on,

9    that evidence cuts precisely against plaintiff with respect to

10   this element.  They seemed to be arguing vigorously to the jury

11   yesterday that there was -- when Jane Levine didn't respond,

12   that she was being somehow, you know, obstinate, interfering,

13   not providing information, not giving them the information they

14   desperately wanted, she basically, according to their argument,

15   gave plaintiff a cold shoulder.  But instead of pursuing that

16   information through some other fashion, plaintiff did

17   absolutely nothing.

18        Because we also know, and it's a stipulated fact in

19   this case, that plaintiff filed its 1782 proceeding in March of

20   2016, which is a year after they didn't get information from

21   Jane Levine.  So they completely sat on their -- sat on their

22   hands and made no effort whatsoever to pursue additional facts

23   from Sotheby's or to pursue -- initiate a court proceeding and

24   have the Court order that Sotheby's provide more information.

25   There is no evidence that they did anything.  They only sat

O1QVACC4

1    around and, a year later, they filed their 1782.  So the jury

2    hasn't heard any evidence that would in any way support that

3    prong of the equitable estoppel burden that plaintiff has to

4    prove.

5           So at the end of the day, they haven't proved the

6    second and third elements, or they haven't even introduced

7    elements that could support the second and third elements.  And

8    they haven't introduced any evidence that could support the

9    last element.  So, your Honor, we don't think there's anything

10   to justify sending the *Salvator Mundi* breach of fiduciary claim

11   to the jury because plaintiff has not or cannot establish

12   equitable estoppel, and no reasonable the jury could find that

13   that burden has been met.

14           THE COURT:  Okay.

15           MS. SHUDOFSKY:  If that is out of the case, then the

16   only standard that's going to apply to any of the claims here

17   is clear and convincing with respect to the fraud claims.

18           THE COURT:  Let's hold off there.  I think it might

19   make sense to do this issue by issue.

20           So unless you have anything further on equitable

21   estoppel, why don't I hear from plaintiff on that.

22           MS. SALZMAN:  Thank you, your Honor.

23           First, we would like the opportunity to brief all

24   these issues, as was previously discussed --

25           THE COURT:  Well, I think it was discussed if they

O1QVACC4

1    briefed it, I would give you an opportunity to brief it.  They

2    have now argued it.

3          Is there any evidence in the record that anyone

4    associated with Accent Delight, other than -- well, is there

5    any evidence other than the email sent to Ms. Bersheda that

6    supports the conclusion that the insurance valuation was seen

7    by someone at Accent Delight?

8          MS. SALZMAN:  Well, I think exactly the stipulation

9    that Sotheby's is relying on in a way that we just don't

10   understand.  There's no dispute that the valuation was sent --

11         THE COURT:  Hold on.

12         Can somebody remind me what number the stipulation is?

13         MS. SALZMAN:  It's the one --

14         MS. SHUDOFSKY:  472, your Honor.  Plaintiff's Exhibit

15   472.

16         MS. SALZMAN:  He wants to know which one you're

17   referring to.

18         MS. SHUDOFSKY:  I'm sorry.

19         THE COURT:  No, no, that's what I was looking for,

20   exhibit number.

21         MS. SHUDOFSKY:  Paragraphs 5 and 6 were the ones --

22   and 7 were the ones I referenced.

23         MS. SALZMAN:  So the filing of the insurance valuation

24   in the Monaco proceedings shows reliance.  I don't understand

25   how they are arguing that that shows we knew there was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O1QVACC4

1   wrongdoing by Sotheby's.  On the contrary, we believed that to

2   be a legitimate insurance valuation and it was used in an

3   attempt to bring Mr. Bouvier to justice.  There's absolutely no

4   evidence in the record suggesting --

5            THE COURT:  But hold on.  You have to show not that

6   you relied on it in some form or fashion, but that you relied

7   on it to lull you into a belief that you didn't have a valid

8   claim against Sotheby's.

9            I think Ms. Shudofsky's point is that the only

10  evidence of any use is that you used it affirmatively in

11  connection with bringing a case against Mr. Bouvier to prove

12  fraud, which is to say that you actually saw it as evidence

13  that supported a fraud claim, not one that would defeat a fraud

14  claim.

15           MS. SALZMAN:  But a fraud claim against Mr. Bouvier,

16  your Honor.

17           THE COURT:  Hold on.

18           I mean, your claim against Sotheby's is that they

19  aided and abetted Bouvier's fraud.  So if Ms. Bersheda and

20  Accent Delight -- if Accent Delight recognized as of February

21  or March 2015 that they had -- well, if by March 2015 they had

22  the insurance valuation, brought a fraud claim against

23  Mr. Bouvier and relied on the insurance valuation in connection

24  with bringing that fraud claim, it, I think, leads to the

25  conclusion that there was -- that that insurance valuation did

O1QVACC4

1    not lull them into thinking that they didn't have a valid fraud

2    claim.  To the contrary, they viewed it as consistent with

3    their fraud claim.

4         MS. SALZMAN:  The issue is whether we knew we had a

5    valid fraud claim against Sotheby's.  There's no dispute we had

6    brought proceedings against Mr. Bouvier, believed ourselves to

7    be the victim of a fraud by Mr. Bouvier.

8         The equitable estoppel is whether Sotheby's engaged in

9    an affirmative misrepresentation to deceive us as to whether we

10   had a claim against Sotheby's.  That is the key difference

11   here, your Honor.

12        Because we received an insurance valuation from

13   Sotheby's in February 2015.  It, along with many, many other

14   documents, everything we could obtain from Sotheby's, from

15   other third parties, from Mr. Bouvier himself, from our own

16   records, were filed in the Monaco proceedings.  That is all

17   true.  But there is no basis for the argument that our attempts

18   to prosecute Mr. Bouvier for fraud may mean we knew we had a

19   claim against Sotheby's.  And the evidence is to the contrary.

20        During that same period of time, in March and April,

21   we saw Ms. Bersheda's emails to Ms. Levine asking her for more

22   information about Sotheby's dealings with Mr. Bouvier, and

23   specifically about Mr. Bouvier and the da Vinci.  That was an

24   email dated April 19th, 2015, from Ms. Bersheda to Ms. Levine.

25   There is absolutely nothing in the record from the

O1QVACC4

1    stipulations, from Ms. Levine's testimony, from anywhere, that

2    we knew the insurance valuation was fraudulent.  On the

3    contrary, at that point in time, all we had was what appeared

4    to be a legitimate, *bona fide* Sotheby's valuation.  It, along

5    with every other piece of the file --

6         THE COURT:  But it didn't prevent Accent Delight from

7    thinking, realizing, knowing it, whatever word you want to use

8    here, as of March 2015, that it had been defrauded by Yves

9    Bouvier.

10        MS. SALZMAN:  No, your Honor.  But that's not the

11   question in this case.  It's whether it prevented us from

12   knowing we had a claim against Sotheby's.  There's certainly no

13   dispute when you have a claim --

14        THE COURT:  The only way in which an inflated

15   valuation could deter you from filing a suit — and let's assume

16   for the moment that it is an inflated valuation, I understand

17   defendants dispute that and there's certainly a basis in the

18   record to support that.  Let's assume for the sake of argument

19   that it is inflated.  I think the theory is that plaintiff was

20   lulled into believing that the $127.5 million purchase price

21   was a fair price and, therefore, wasn't defrauded at all.  I

22   don't understand the theory that that insurance valuation

23   prevented plaintiff from connecting the dots to Sotheby's.  I

24   think the theory is that it lulled plaintiff into thinking it

25   was a reasonable price.  But the proof that that isn't the case

O1QVACC4

1   is that plaintiff already filed a lawsuit against Mr. Bouvier

2   on alleging that he was defrauded.

3           MS. SALZMAN:  So just to -- to reset what the issue

4   here is, your Honor, following the summary judgment decision,

5   it was also undisputed at the time of the summary judgment

6   briefing and decision that by the time we obtained the

7   Sotheby's insurance valuation, we knew we had a fraud claim

8   against Yves Bouvier; and we had, in fact, already begun a

9   proceeding against him in Monaco.  That's the same today as it

10  was then.

11          The issue in this case is not whether we knew we had a

12  fraud claim against Yves Bouvier.  It is whether we had a basis

13  to sue Sotheby's at that time, at the same time as we sued

14  Mr. Bouvier.  And that is the key distinction.  We did not have

15  that knowledge, your Honor.  What we received from Sotheby's --

16          THE COURT:  And what is the evidence in the record

17  that anyone at Accent Delight relied upon the insurance

18  valuation in delaying suit against Sotheby's?  I don't think --

19  did Mr. Sazonov or Mr. Rybolovlev testify to that effect?  I

20  don't think either of them testified that they ever saw the

21  insurance valuation; is that correct?

22          MS. SALZMAN:  I think you are correct about that.  But

23  Accent Delight is --

24          THE COURT:  But the only evidence in the record that

25  anyone at Accent Delight saw the insurance valuation is the

O1QVACC4

1    fact that it was emailed to Tetiana Bersheda.

2            MS. SALZMAN:  And was later used by Accent Delight in

3    a legal filing.  There is no dispute it was received by the

4    plaintiff, Accent Delight.

5            THE COURT:  But no one has testified that it was

6    relied upon; that the reason as of 2015 that they didn't

7    believe that they had a lawsuit to bring against Sotheby's was

8    because they received that valuation and it reassured them in

9    some way.

10           MS. SALZMAN:  It's undisputed that it was relied upon,

11   your Honor.  That's what Sotheby's is saying, that it was used

12   in an effort to prosecute Mr. Bouvier.

13           THE COURT:  That's not the standard.  The standard is

14   that it was relied upon to erroneously believe that they didn't

15   have a plausible claim against Sotheby's.  What's the evidence

16   to support that?

17           MS. SALZMAN:  It's like asking a witness to testify to

18   a negative, your Honor.

19           THE COURT:  No, it's actually not.  It would have been

20   very easy if Mr. Sazonov had received it and said, Oh, I

21   received that, thought that we paid a fair price and,

22   therefore, didn't bring suit.  That would be establishing that

23   element.  But no witness testified to anything of that sort.

24           MS. SALZMAN:  Well, there was testimony from

25   Mr. Sazonov that there were questions and suspicions about

O1QVACC4

1    Sotheby's at that time, exactly as your Honor found on the

2    summary judgment decision.  There were questions, there were

3    suspicions, there was no evidence.  All we had were what

4    appeared to be legitimate documents from Sotheby's, including

5    this insurance valuation, which was received in that key period

6    of time.

7            When attempts were made by Mr. Rybolovlev, as he

8    testified about, to follow up with Dan Loeb, those were routed

9    to the lawyers.  Thereafter, Ms. Bersheda followed up with Jane

10   Levine.  And the record is clear that in response to those

11   inquiries, Ms. Levine provided no information.  So there was no

12   revelation from Sotheby's that this insurance valuation was

13   inflated at Yves Bouvier's request.  And at a time when

14   Sotheby's knew that Yves Bouvier --

15           THE COURT:  But as I said in the summary judgment

16   opinion, you can't rely on silence, absent a fiduciary duty.

17   And there's no argument there's a fiduciary duty here.  You

18   can't rely on silence to satisfy your burden with respect to an

19   affirmative misrepresentation.

20           I understood the argument -- and maybe I didn't

21   understand it well enough at the time of summary judgment and

22   should have granted summary judgment on this.  But put that

23   aside, I understood the argument that there was an affirmative

24   misrepresentation made in that insurance valuation.  And I

25   think the only plausible misrepresentation is that it was

O1QVACC4

1    inflated.  But I think the point is that if within a month of

2    receiving it that was relied upon in bringing a claim that the

3    value was falsely inflated by Bouvier, it was not relied upon

4    to delay realization of that.  Quite the opposite.

5            MS. SALZMAN:  There is no proof in the record that the

6    way the valuation was used was to suggest that we knew there

7    was a claim against Sotheby's or we knew that there had been

8    inflation of the valuation.  The valuation was filed in the

9    Monaco proceedings, along with thousands of other documents,

10   literally every piece of document that we had about the

11   artworks at the time.  There is no evidence in the record, no

12   testimony, no stipulation, no email that says that the argument

13   we made in Monaco was that, Look at the Sotheby's valuation.

14   It proves Yves Bouvier engaged in fraud because Sotheby's

15   inflated a valuation to meet its demands.  That was not the

16   argument presented and there's no evidence to that.

17           THE COURT:  But you pointed to that -- that may be so,

18   but you pointed to that paragraph as your evidence that it was

19   relied upon to conclude that you didn't have a valid claim.  It

20   doesn't establish that.  If anything, one can draw the opposite

21   inference that you saw it as consistent with a valid claim of

22   fraud against Mr. Bouvier.  I don't know how you get to the

23   logical leap to viewing it as you didn't understand that or

24   understand that you had a claim against Sotheby's.  There's a

25   disconnect here that I'm just not getting.

O1QVACC4

1          MS. SALZMAN:  I feel like I am also not getting the

2    disconnect, your Honor.  Maybe I'm just tired on a Friday

3    afternoon.

4          But I certainly agree with your Honor there's an issue

5    of fact here.  And what inferences can be drawn and --

6          THE COURT:  I didn't say that.  So you're not

7    expressing agreement.

8          MS. SALZMAN:  You just laid out two possible

9    interpretations of the fact that we used the -- we filed the

10   valuation in the Monaco proceedings.  One is that we used it to

11   argue there was a fraud, and one is that we used it just as

12   part of a large evidentiary filing in Monaco.  Either inference

13   is equally possible.

14         THE COURT:  No.

15         MS. SALZMAN:  So there is no evidence that we used it

16   to make an argument that Sotheby's had inflated this valuation.

17   That is not the case.

18         THE COURT:  All right.  Can I ask another question,

19   which is, is there any evidence in the record that the letter

20   upon which there was quite a bit of testimony and evidence,

21   that that was provided to plaintiff?

22         MS. SALZMAN:  No, there is no evidence that the letter

23   was provided to plaintiff.  But the letter remains relevant,

24   your Honor, because it shows the affirmative misrepresentations

25   and the lengths Mr. Valette was willing to go to to conceal

O1QVACC4

1    Mr. Bouvier's acquisition of the work.

2            THE COURT:  Okay.  So we'll agree that it can't be

3    used to prove the reliance and -- or reliance element because

4    there's no plausible way it could have been relied upon because

5    there's no evidence that it was seen.

6            MS. SALZMAN:  I would agree with that, your Honor.

7            But I do think that it is powerful evidence of the

8    affirmative misrepresentation and goes to -- I mean it bears

9    heavily on what was in -- what was Mr. Valette's intent here,

10   what was he engaged in.  Was it as defense has tried to argue,

11   a good-faith insurance valuation or was it an attempt to cover

12   up Mr. Bouvier's fraud and Sotheby's role in it?

13           And there we do think the letter is very relevant to

14   that first prong.

15           THE COURT:  Okay.  And what about the due diligence?

16           MS. SALZMAN:  Again, the evidence here, your Honor, is

17   the same as it was in summary judgment or stronger.

18           It is undisputed that in the beginning of January, we

19   learned for the first time of the Bouvier fraud by, I believe,

20   January 27th, if I have the date correctly, somewhere at the

21   end of January proceedings were brought against Mr. Bouvier in

22   Monaco.  Thereafter, we received the misleading and inflated

23   valuation from Sotheby's.  Thereafter, Mr. Rybolovlev testified

24   he made efforts to inquire and learn more about Sotheby's role.

25   Thereafter, Ms. Levine testified she engaged in communications

O1QVACC4

 1    with Ms. Bersheda on the same subject.  And thereafter, we

 2    brought a proceeding under 1782, which finally at the end of

 3    2016 yielded the documents that Sotheby's had never turned over

 4    before and that we had never obtained before.

 5            THE COURT:  Right.  I think the point that

 6    Ms. Shudofsky was making is that the testimony of Ms. Levine, I

 7    think, made clear that at least as early as, I think it was,

 8    March 2015, it was quite clear that Ms. Bersheda, that Accent

 9    Delight, you know, was very interested in determining what

10    Sotheby's role was in connection with this.  And the record is

11    quite clear that Ms. Levine didn't particularly help shed light

12    on that, that is to say didn't provide the information that she

13    was seeking.

14            I think Ms. Shudofsky is pointing to the fact that

15    between, I think, the last communication, might have been in

16    May of 2015, if I remember correctly, maybe April, I think May

17    2015 to March 2016, when the 1782 petition was filed, which I

18    remember well, because got it on Part 1, which is why I'm

19    sitting here today, that that ten-month period, there's no

20    evidence that Accent Delight did anything over the course of

21    that ten-month period to determine if it had a claim or not.

22    And in that sense, you know, to the extent that you have to

23    demonstrate due diligence throughout that period, there's no

24    evidence to support that.

25            MS. SALZMAN:  Well, I would say during that period, I

O1QVACC4

1    think it is, again, undisputed Accent Delight was litigating

2    against Mr. Bouvier all over the world and trying to obtain

3    evidence.

4            THE COURT:  I understand you were busy, but that's not

5    the standard.  The standard is whether you exercised due

6    diligence in seeking -- determining whether you had a claim

7    against Sotheby's.  Is there any evidence in the record that

8    anything was done between the last call with Ms. Bersheda and

9    the 1782 petition?

10           MS. SALZMAN:  Other than litigating all over the world

11   and trying to get as much information as we could about a

12   massive and complex fraud, no, but that is exactly what we were

13   doing.

14           This is a litigation, as your Honor has observed, I

15   think, many times, in the many times you've written on this

16   case, that span the globe.  There was litigation in Monaco, in

17   France, in Hong Kong, in Singapore, eventually Switzerland, at

18   one point almost in the United Kingdom, and then also here.

19           During the course of all those proceedings, it was a

20   massive battle to extract evidence from Mr. Bouvier, from Tania

21   Rappo, from the other entities that were involved in this

22   fraud, and ultimately also from Sotheby's.  So there was no --

23           THE COURT:  But nothing prevented Accent Delight from

24   filing a 1782 petition in May of 2015, did it?

25           MS. SALZMAN:  No, your Honor, I do not think anything

O1QVACC4

1    prevented that, other than the reality of the fact that this

2    was an incredibly complex fraud which we were unpacking piece

3    by piece.  I'm not aware of any case law that says due

4    diligence requires you to every day be filing a case.  This is

5    not an instance — so if you look at the case law on due

6    diligence — where someone sat back and did nothing for a long

7    period of time and just watched the statute of limitations

8    clock tick down.  What was going on here was an attempt to

9    prove and, frankly, understand and get our arms around a fraud

10   that involved 38 artworks across the globe and many, many

11   different people and, it turned out, many, many different shell

12   companies and all kinds of entities that weren't what they were

13   supposed to be.

14          So it did take time to unpack all of that, your Honor.

15   But on these facts, with the fraud of this scale, that is not,

16   as a matter of law, an evidence of lack of due diligence, and

17   that issue should go to the jury for its consideration.

18   Sotheby's can make all these arguments to the jury; we can make

19   all our arguments.  But as a matter of law, that on this

20   record, in this case, this is not a plaintiff that slept on its

21   rights.

22          (Continued on next page)

23

24

25

O1Q3ACC5

1          THE COURT:  Okay.  Ms. Shudofsky.

2          MS. SHUDOFSKY:  Just a few comments on that last

3   point.  What plaintiff was doing in that interim between the

4   last communication with Jane Levine was April.  What they were

5   doing between April 2015 and March 2016 certainly is not in

6   evidence.  But in any event, it's no excuse for plaintiff

7   sitting on their hands with respect to Sotheby's.

8          Sotheby's is the defendant in this case.  Plaintiff

9   had to have sued Sotheby's by March of 2016 unless they could

10  meet their burden with respect to equitable estoppel.  And with

11  respect to that, they have not met their burden, and they did

12  sit on their hands for that entire period of time, and there is

13  no evidence from which this jury could deduce that they were

14  diligent in any way, shape, or form as with respect to

15  Sotheby's, the only defendant in this case.  What they did with

16  respect to Mr. Bouvier is a totally separate matter.

17         I point out I think it was Mr. Bouvier who did file a

18  1782 in the year 2015.  He was being chased all around the

19  world by Mr. Rybolovlev, but he did find the opportunity to

20  file a 1782.  Plaintiffs didn't do it.

21         With respect to the first part of Ms. Salzman's

22  argument, I think the disjoint here is that plaintiff is not

23  appreciating that it has the burden to show that it relied on a

24  alleged misrepresentation, and that it delayed in filing suit.

25  It is not for them to say that Mr. Rybolovlev didn't know yet

O1Q3ACC5

1    if he had enough of a claim.  They had to have relied on

2    something and that had to have put them off, lulled them into

3    thinking they didn't have a claim.  And there is just no

4    evidence in the record here to suggest that anyone on

5    plaintiff's side relied on it.

6         And I don't want to belabor the point with respect to

7    Ms. Bersheda's filing, but I don't see how any reasonable jury

8    could infer anything, other than they viewed that filing as

9    some evidence of fraud, and that's why they filed it in their

10    case against Yves Bouvier.

11         And by the way, I know Ms. Salzman said a few times

12    that there was a massive filing of everything under sun in

13    Monaco.  That's not in evidence.  What this jury will hear is

14    solely that in a filing in that foreign legal proceeding, the

15    plaintiff, Ms. Bersheda, used this piece of evidence, this

16    insurance valuation, against Bouvier to prove fraud.  And so I

17    don't think there is any other way that any other inference the

18    jury could find from that, other than one that cuts exactly

19    against plaintiff as to equitable estoppel.

20         THE COURT:  Do you want to move on to the next item.

21         MR. ASNER:  Yes, your Honor.  So, we also want to move

22    that there is no clear and convincing evidence with respect to

23    actual knowledge of fraud.

24         As the Court knows, clear and convincing evidence

25    requires a high probability.  And there is no evidence with

O1Q3ACC5

1    respect to any of the four fraud claims that Sotheby's knew of

2    the lies that Bouvier was telling to the plaintiff.  And there

3    was no evidence that Sotheby's knew of the prices that Bouvier

4    was charging plaintiff.

5         Let me start with the easiest ones, and that is really

6    the *Salvator Mundi* and the Klimt.  Even if you take and believe

7    all of the evidence that the plaintiffs have put forward,

8    including Mr. Rybolovlev's testimony and Mr. Sazonov's

9    testimony, with respect to the da Vinci, the only thing that

10   they received was a -- I think it was Plaintiff's Exhibit 77,

11   which was a bunch of pictures and lists of da Vinci paintings

12   that existed.  Nothing regarding price.

13        And then they received the Modestini report, which

14   they inaccurately thought came from us, but in fact came from

15   the da Vinci sellers.  And the Modestini report, which is very

16   long and interesting and thorough, makes no mention of price.

17        With respect to Mr. Rybolovlev's testimony, which of

18   course differs from Mr. Valette's, but let's credit

19   Mr. Rybolovlev for this purposes, the discussion that he

20   alleges occurred with Mr. Valette was entirely about the beauty

21   of the piece and authenticity.  Again, no reference to price.

22        So, there is zero evidence that Sotheby's knew

23   anything about the lies that Mr. Bouvier was charging.  And

24   there no evidence that we, certainly not by clear and

25   convincing evidence, that we knew anything about lies or about

O1Q3ACC5

1    inflation, if we want to go with the theory that they were

2    pushing in the letter this morning.

3           We think there is nothing with respect to the *Salvator*

4    *Mundi*, and that should be knocked out, because they have not

5    met their burden, and it is not just -- I think the clear and

6    convincing standard is very important here.  It is not that is

7    it more likely than not.  I think we would win under

8    preponderance, even as a matter of law, but clear and

9    convincing evidence, high probability.  There is not high

10   probability.  There is not a high probability that we knew any

11   of that, because there is zero evidence that we knew any of

12   them.

13          With respect to the Klimt, it's similar.  I think the

14   only thing that Mr. Rybolovlev testified to was that there was

15   a conversation in Vienna in the warehouse, and again, we don't

16   think it happened.  But, crediting what Mr. Rybolovlev said, he

17   said that there was a discussion about how beautiful the

18   picture was.  No discussion of price.  And in fact, we've seen

19   zero, zero pieces of evidence from Sotheby's about the price.

20   The only piece of evidence about the price that has been seen

21   in the entire time was the contract that started out at 140

22   million, and was knocked down to 126 million.

23          So, there were some pieces floating around --

24          THE COURT:  Can I interrupt you for a second.  You are

25   making an argument there is no evidence that there was any

O1Q3ACC5

1   discussion with respect -- with Sotheby's as to price.  But why

2   is that necessary to draw an inference that there was knowledge

3   that Mr. Bouvier was engaged in fraud?

4           First of all, to the extent that there is a history

5   here and a relationship here, I understand the plaintiff's

6   theory to be that there is plenty of evidence of communications

7   between the two, that there's evidence that -- drawing

8   inferences in favor of the plaintiff, viewing it in their

9   favor, etc., that Mr. Valette inflated estimates in these

10  formal e-mails that he understood would be forwarded, that he

11  understood that Mr. Rybolovlev was a client.  Let's assume for

12  the sake of argument that he understood that those were going

13  to be forwarded to Mr. Rybolovlev.  They were inflated.

14          I think the argument is that he was -- I mean, that

15  taking it all together, the totality of the circumstances, he

16  basically was in cahoots with Bouvier and understood what was

17  going on, that Bouvier was flipping these to Rybolovlev for

18  significantly more than he was buying them, and needed

19  Sotheby's assistance by providing documents that would support

20  the inflated price.

21          That's the plaintiff's theory.  I don't think

22  knowledge of the particular price, let alone knowledge in the

23  record, is necessary to that.

24          MR. ASNER:  But, I think the point I'm making with

25  respect to the last two transactions is that there are zero

O1Q3ACC5

1    statements by Sotheby's supporting any inflated price.

2            THE COURT:  That's not a knowledge issue.  That's a

3    substantial assistance issue I would think.

4            MR. ASNER:  So knowledge and substantial assistance.

5    But what I'm pointing to is that at this point, and also clear

6    and convincing with substantial assistance as well, is at this

7    point there is zero pointing to -- if we had known that he was

8    charging -- if we had, for example, put forward an inflated

9    price, and if instead of -- we put 140 but in fact we think

10   it's worth 450 million, then that might be a different story.

11   But that's not what we have here.

12           What we have is the only value that Sotheby's was

13   talking about with Bouvier and Peretti was the 140.  I'm

14   talking about for the Klimt.  And there is nothing, we were

15   talking about, the only value we were talking about with

16   Bouvier was the 83 which was resolved.  There is no e-mail that

17   can evidence that we had any knowledge of an inflated price

18   that was going to be passed on to support Bouvier's fraud.

19           I think with those two in some ways they're very easy,

20   because we win under a clear and convincing standard, both with

21   respect to reasonable reliance -- both with respect to

22   misstatement, knowledge of the lie, because we didn't know

23   about the lies, one, and we didn't know about any inflated

24   amounts because there's zero evidence that between us and

25   Sotheby's, about anything about an inflated amount.  So those

O1Q3ACC5

1    would be out.

2        With respect to both the Magritte and the *Tête*, there

3    is no knowledge and there was nothing in the evidence that

4    suggested that we knew about the lies.  And this is not a

5    breach of fiduciary duty claim.  These are fraud claims.  And

6    so, mere -- the fact that you're selling something to a dealer

7    who is then selling it for more, that's how business works.

8    And even if you assume that they somehow decided to be tricked

9    and deceived by Bouvier when Bouvier adds on, say, for example,

10   the *Domaine d'Arnheim* is prettier than the other one, even

11   assume that they reasonably relied upon that, there is no

12   knowledge of the misstatement.  And under a fraud claim, there

13   has to be a misstatement.  It has to be knowingly false.  And

14   for aiding and abetting fraud, we have to have actual knowledge

15   of that misstatement.  And they have to prove that by clear and

16   convincing evidence, and they have shown zero evidence that we

17   had actual knowledge about any misstatement that Bouvier said,

18   with respect to the Magritte, any evidence about what Bouvier

19   said with respect to the *Tête*.

20       And add to it, you look at it and you say, okay, we

21   sell the *Tête* in September.  The e-mail was in July.  The

22   e-mail says 80 to 100 million euros, they buy it for a little

23   over 60 million in January.  I know it is a reliance point, but

24   it also goes to that is not aiding and abetting and inflation

25   because it actually isn't inflated.

O1Q3ACC5

1          So, your Honor, we would suggest that that is, that

2     they can't meet the burden as a matter of law, under a clear

3     and convincing standard.

4          And Bouvier's -- by the way, Bouvier's lies on the

5     Klimt to Dmitry were in November and December the evidence

6     shows.  Mr. Valette's e-mail was in July.  So, for the *Tête*,

7     yeah.

8          THE COURT:  Okay.  Ms. Salzman.

9          MS. SALZMAN:  Thank you, your Honor.  So, we do not

10    need to prove that Bouvier bcc'd Valette on his phony

11    negotiation e-mails or that Valette knew to the penny the

12    markup Bouvier was charging.

13         There are two sets of lies at issue in this case, and

14    the evidence shows that Sotheby's had actual knowledge of both.

15         First, the evidence at trial is far stronger than it

16    was at summary judgment that Sotheby's knew Yves Bouvier was

17    our agent.  That means that he should have been acting in out

18    best interests, not as a dealer.

19         The evidence is much stronger now following the trial

20    where both Mr. Vinciguerra and Mr. Ruprecht gave testimony that

21    called into serious question what Mr. Valette said on that

22    account.

23         Sotheby's, the second set of lies is that Sotheby's

24    knew Mr. Bouvier was inflating values.  It is something an

25    agent is not supposed to do.  An agent, unlike a dealer, is

O1Q3ACC5

1    supposed to act in the best interests of his client, and there

2    is evidence that Sotheby's helped him do that inflating.  And

3    the timeline here is key.  Mr. Asner just skipped around

4    between the works like they all happened in a vacuum.

5              THE COURT:  Can we stop for one second.  I think

6    you're trying to mush together a breach of fiduciary claim and

7    a fraud claim.

8              I think knowing that someone was an agent and

9    therefore was a faithless agent because the prices were

10   inflated doesn't support a fraud claim.  You have to

11   demonstrate falsity and intentionality.

12             MS. SALZMAN:  We certainly have that, but Mr. Asner

13   just argued we can't prove actual knowledge of fraud because

14   it's just the activities of a regular art dealer, and there is

15   evidence to suggest that Sotheby's and Mr. Valette in

16   particular did not understand Mr. Bouvier to be a regular

17   dealer, but rather to be an agent.  Which puts a different

18   light on the inflated e-mails and sales pitches he was doing.

19             And I'm sorry if I'm conflating things.  I am a bit

20   tired this afternoon.

21             But, as your Honor assessed it in the summary judgment

22   opinion, the timeline is key here.  Because what happens first

23   is the Magritte work in November 2011, and for that there is a

24   volume of evidence before the jury now that Mr. Valette worked

25   closely with Mr. Bouvier to inflate the value of that work in a

O1Q3ACC5

1    way that we allege, and they dispute, of course, was highly

2    misleading and fraudulent.

3              Thereafter, the next work are the fraudulent e-mails

4    that Mr. Valette wrote inflating the value of the Modigliani

5    *Tête* sculpture in the summer of 2012.  So by the time we get to

6    the Klimt, in September of 2012, those two works, those two

7    deals have already happened.  And Mr. Valette has already, as

8    your Honor observed on summary judgment, engaged in conduct

9    that we believe a reasonable jury could certainly find shows

10    knowledge of the fraud, and substantial assistance of it.

11              So what happens at the Klimt?  He, Mr. Valette, sets

12    up that viewing in Vienna for someone he describe as in an

13    e-mail at the time as a principal that the premises need to be

14    cleared for.  Now, I know he disputes knowing that was

15    Mr. Rybolovlev, although he admits he saw him there and somehow

16    recognized him.

17              Thereafter, at that viewing, there was testimony from

18    both Mr. Sazonov and Mr. Rybolovlev that Mr. Valette gave him

19    in essence the same verbal sales pitch that he did in writing

20    for the Modigliani and the Magritte.  Same with the da Vinci.

21    That's a few months after the Klimt.  The viewing is actually

22    at Mr. Rybolovlev's own apartment.  So Mr. Valette's attempts

23    to deny he didn't know Mr. Rybolovlev was the real buyer in

24    interest for that painting, in our view, are simply incredible.

25              Again, the testimony from Mr. Rybolovlev, and I

O1Q3ACC5

1    appreciate it's disputed by Mr. Valette, that's what the jury

2    is here for, was there was a sales pitch done by Mr. Valette

3    which convinced him there was a legitimate Leonardo da Vinci,

4    and that the price of 127.5 million was the fair market price

5    for such an authentic Leonardo da Vinci.

6            So, the evidence at this point, having sat through

7    three weeks of trial and countless e-mails, and very important

8    testimony from Mr. Valette and the other Sotheby's employees,

9    is stronger than it was at summary judgment. And it should

10   absolutely go to the jury on all four works.

11           THE COURT:  Okay.

12           MR. ASNER:  Your Honor, I guess you wouldn't be

13   surprised if I thought we sat through two different trials, but

14   anyway, that's not the issue.

15           Look, let me just focus briefly on the da Vinci and

16   the Klimt.  Inflating prices is not fraud.  This is a fraud

17   claim, not a breach of fiduciary duty claim.  They need to have

18   an affirmative misstatement.  The misstatement that they have

19   identified is the purchase price.  And there is zero

20   evidence --

21           THE COURT:  I think it's the false representation that

22   there were hard-fought negotiations and getting the sellers

23   down to this and that when those --

24           MR. ASNER:  All of the B.S. that Bouvier presented

25   that ultimately led to a hard-fought balance that ended up at

O1Q3ACC5

1    127.5, or with the Klimt at 183.8.  That all ends up at a

2    purchase price that is false.  And that's the misrepresentation

3    that is being charged here.  That's what they're pressing.  And

4    there is zero evidence that Sotheby's had any knowledge about

5    that.  And they have to prove actual knowledge by clear and

6    convincing evidence.

7            So, your Honor, I think that it may be different if

8    this was a breach of fiduciary duty claim, because then you

9    have this whole agency thing and inflation.  But inflation is

10   not fraud.  And there is no evidence, even if you cast it in a

11   very, very broad brush, which I think your Honor has to do

12   here, there is no evidence that suggests that we had any

13   knowledge, and certainly not clear and convincing, which

14   plainly is much higher than preponderance.

15           And again, going to the da Vinci, and going to the

16   Klimt.  Crediting everything that they say, at the da Vinci, we

17   had a conversation in Dmitry Rybolovlev's apartment, Sam

18   Valette knew it was Dmitry Rybolovlev, which he, by the way,

19   conceded.  And during the conversation, they talked about how

20   pretty the picture was and it was a real da Vinci.  That

21   doesn't change anything.  They're not arguing it is not a real

22   da Vinci.  In fact Mr. Rybolovlev said, you know, with all his

23   heart, he thinks it is a real da Vinci.  And that's, by the

24   way, why he agreed in the auction catalog to pass it off as a

25   real da Vinci because it is.

O1Q3ACC5

1          And similarly with the Klimt, I'm sorry.  With --
2    yeah, with the Klimt.  There was no discussion about price
3    coming out of Sotheby's, and there zero evidence suggesting
4    that Sotheby's did anything, other than make a showing which
5    you do with practically every high end picture, and talk about
6    how pretty the picture is.  Of course there is a dispute about
7    that.  But crediting everything that Mr. Rybolovlev and
8    Mr. Sazonov says, it's talking about that.  Now, putting aside
9    that Mr. Sazonov doesn't know who he talked to.  But that's a
10   different issue.  But even if you credit that Mr. Sazonov and
11   Mr. Rybolovlev talked to Valette, nothing about price, and so
12   there is no fraud claim that exists here for those two.
13          And we will argue -- I made my argument, we'll put in
14   the briefing on the Magritte and the *Tête*.  We think those fail
15   too.  But, we think certainly, before the weekend or shortly
16   before it would be really nice, because we think it's
17   appropriate to at least knock those two out.  It would also
18   save my -- lower the time of the closing argument.
19          THE COURT:  Then you wouldn't be able to use two of
20   your poster boards.
21          MR. ASNER:  Your Honor, I might just donate them to it
22   chambers.  They're very pretty.
23          THE COURT:  All right.  I'm guessing that is probably
24   a crime.  But, anything else from --
25          MR. ASNER:  Not to chambers.  I think that's not to

O1Q3ACC5

1    you, it's to chambers.

2              THE COURT:  Anything else from defendants?

3              MS. SHUDOFSKY:  No, we'll put some other things in our

4    briefing, your Honor, but nothing further for this oral

5    argument.

6              THE COURT:  And let's talk about the concept of

7    briefing.  What you were thinking and then we can discuss

8    whether I agree.  What are your thoughts on that?

9              MS. SHUDOFSKY:  We were intending to put in full

10   briefing with respect to the Rule 50 motion on an array of

11   issues for your Honor's consideration.

12             THE COURT:  When?

13             MS. SHUDOFSKY:  I would anticipate Sunday, if that

14   could work for your Honor.  But if it had to be earlier, it

15   would be.

16             THE COURT:  Okay.

17             MS. SHUDOFSKY:  I'm informed Saturday also works for

18   us, your Honor.

19             MR. ASNER:  We would like a ruling obviously before

20   Monday, given it impact the summations.  And that's a lot of

21   work as you can imagine, particularly if we're doing slide

22   shows.

23             THE COURT:  Okay.

24             MS. SALZMAN:  If your Honor intends to reserve

25   judgment, I'm anticipating this will be a substantial brief

O1Q3ACC5

1    given the three-week record that would have to be summarized.

2    And if your Honor intends to reserve judgment until after the

3    verdict, I mean, we would appreciate a substantial amount of

4    time to respond to it in order to do the record justice.  I

5    mean, we're at your Honor's disposal, but given the volume I

6    imagine is coming our way, we would certainly appreciate

7    adequate time to respond.

8              THE COURT:  Let me ponder that for a moment.

9              Tell you what, let's take a six minute break so I can

10   give this some thought and figure out the best way forward.

11   And then I will return and share some thoughts.  Thank you.

12             (Recess)

13             THE COURT:  So, I am going to grant the motion with

14   respect to the breach of fiduciary duty claim on the ground

15   that there is no evidence to support the equitable estoppel

16   argument that plaintiffs would need to prevail upon to allow

17   that claim to go forward.  It is plaintiff's burden to

18   demonstrate the elements of equitable estoppel, and I agree

19   with Ms. Shudofsky.

20             I think due diligence is a closer question, although I

21   think it probably, on that, if it were that and that alone, I

22   would probably reserve judgment and let the jury weigh in in

23   the first instance, or at least I would need to go through the

24   record a little bit more carefully than I can right now.

25             But I see no evidence whatsoever in the record to

O1Q3ACC5

1    support the second prong, namely that Accent Delight relied

2    upon the insurance valuation, which is the only affirmative

3    misrepresentation that plaintiffs point to, that there was any

4    reliance upon that to deter plaintiff from believing,

5    understanding, realizing, whatever word you want to use, that

6    they had a claim against Sotheby's.  I just don't see it.  For

7    the reasons that Ms. Shudofsky I think articulately argued.

8              So I'm going to grant the motion on that ground, which

9    streamlines the case a bit and leaves just the fraud claims.

10   On that, given the burden of proof, I have to say there is some

11   force to Mr. Asner's arguments, but I am going to let those

12   claims go to the jury and I'll reserve judgment on that.

13             Defendants can file their brief over the weekend if

14   they want.  For that matter, to the extent that I've only ruled

15   on one prong of equitable estoppel, if you've already briefed

16   it, you can include that as well and give the plaintiff an

17   opportunity to respond in due course.

18             The reality is I'm not -- I am going to give plaintiff

19   an opportunity to respond in like kind, and that just means you

20   are not going to have a ruling on those before Monday, which

21   effectively means that I will reserve judgment, allow the jury

22   to deliberate, and if there is a need to rule after a verdict,

23   then I will consider it anew.

24             So, what's your thought.

25             MR. ASNER:  Your Honor, I just had -- that's sounds

O1Q3ACC5

1    perfect.  I just had one question, your Honor.  Since equitable

2    estoppel is out, it would seem to me that all of the evidence

3    with respect to the valuation and the letter also should not be

4    argued to the jury, because that only comes in to equitable

5    estoppel.

6            THE COURT:  I think that's right.  Plaintiff?

7            MS. SALZMAN:  I think, your Honor, as we were just

8    discussing a few moments ago, that it is powerful evidence as

9    to Mr. Valette's understanding of Yves Bouvier's relationship

10   with Dmitry Rybolovlev.

11           THE COURT:  Hold on.  I think what I understand

12   Mr. Asner's saying is that all the evidence concerning the 2015

13   valuation is not relevant, is relevant only to equitable

14   estoppel, and if that is out of the case, it shouldn't be

15   argued to the jury.

16           What bearing does the 2015 valuation have on whether

17   there is an aiding and abetting fraud claim for transactions

18   that all occurred in 2013 or earlier?

19           MS. SALZMAN:  I would agree that the -- I'm sorry.  I

20   do not agree that it is irrelevant to what happened earlier,

21   because what we have to prove here is that Sotheby's had actual

22   knowledge of Mr. Bouvier's fraud.  The fact that two years

23   after the da Vinci sale Mr. Valette was willing to modify the

24   valuation at Mr. Bouvier's request, and specifically to alter

25   that cover letter to conceal his acquisition of the painting is

O1Q3ACC5

1    very powerful evidence that Mr. Valette had actual knowledge of

2    the fraud back in 2013 when he furthered it.  Why else would he

3    do that?  Why else?  And there was no explanation from

4    Mr. Valette.  It was very striking during his testimony, he

5    could not explain -- Mr. Asner I don't think even asked him to

6    try to explain why he removed the reference to Mr. Bouvier's

7    acquisition in that letter.

8            THE COURT:  I think he did explain.  Whether the jury

9    believes that or not is a different story.  But, I certainly

10   think he explained.

11           MS. SALZMAN:  Well, perhaps I guess what I'm saying is

12   I don't think he offered a credible or believable explanation

13   that made any sense.

14           So look, I want to think a little carefully how I say

15   this.  I think it's certainly true that some of the details

16   about maybe what Mr. Smith was testifying about the valuation,

17   maybe those are no longer relevant.  But the edits that were

18   made at Mr. Bouvier's request specifically to conceal his

19   acquisition of that painting are highly relevant.  It is not --

20   and to precisely Mr. Valette's intent and motivation here, your

21   Honor, and his actual knowledge.

22           This is later in time.  And why in 2015 is he

23   concealing Mr. Bouvier's acquisition of the painting if it's

24   all legitimate and above board.

25           So I do think that evidence, your Honor, I want to

O1Q3ACC5

1   think a little more clearheadedly about where exactly we draw

2   the lines.  I think I agree that some of the details that went

3   into the valuation may no longer be relevant.  But the

4   modifications that were done at Bouvier's request to bump up

5   that value and to conceal his acquisition, those do reflect

6   back on what Mr. Valette knew back during this entire period of

7   time, and I think the jury absolutely should consider it for

8   that purpose.

9        MR. ASNER:  Your Honor, you actually addressed this

10   sort of issue in the summary judgment with respect to the

11   valuations more generally.  And in fact, dismissed all of those

12   because the valuations that happened some time afterwards could

13   not have been relied upon.  And the issue here is, is there --

14        THE COURT:  But I think the argument that Ms. Salzman

15   is making it's not that.  Obviously it couldn't be relied upon

16   for the actions that were taken two years prior.  But in

17   essence, it is evidence that Mr. Valette was, let's say,

18   engaged in the coverup, construing it in the light most

19   favorable to plaintiff, and that therefore the jury could infer

20   from that and his willingness to cover up Bouvier's fraud,

21   again construing in the light most favorable to them, that he

22   was aware of the fraud two years prior.  And that he only would

23   have been willing and able to do that if he was aware of the

24   fraud.  Otherwise he wouldn't have basically lent his name to

25   the edits and other things that he pushed.

O1Q3ACC5

1          That's the argument, which I think is different than

2     the argument that was pressed on summary judgment.

3          MS. SALZMAN:  Correct.  At summary judgment the other

4     valuations for other works that were ultimately dismissed,

5     Sotheby's only role was in providing those valuations.  And

6     your Honor said later in time valuations, you can't use those

7     to prove substantial assistance of a fraud that occurred

8     several years earlier.

9          That's not the issue here.  We certainly would agree

10    to any limitations -- the 2015 valuation did not convince us to

11    buy the da Vinci.  We are not arguing that.  But it is powerful

12    evidence, given the modifications, as to Mr. Valette's actual

13    knowledge.

14         MS. SHUDOFSKY:  Your Honor, I think we all maybe have

15    to go back and look at the record, but I'm pretty sure that

16    plaintiff basically made this argument at summary judgment with

17    respect to all the valuations.  Basically arguing that they

18    went to the state of mind of Sotheby's at the time of the

19    purchases.  And I think your Honor found that these, whatever

20    had happened years later was not probative of the state of mind

21    of anyone at Sotheby's at the time of the transactions.

22         And I think your Honor would have excluded this

23    *Salvator Mundi* valuation along with the other October 2014

24    valuations, but for the equitable estoppel piece, and it is for

25    that reason your Honor allowed it in.

O1Q3ACC5

1        But for equitable estoppel, the *Salvator Mundi*

2   valuation wouldn't have been in this case and we wouldn't have

3   been at this point.

4        So, I do think your Honor has addressed this, and I

5   think it was the correct ruling at the time and is the correct

6   ruling now, that one shouldn't look at what happened two years

7   later as probative of what happened years before at the time of

8   the transactions.

9        THE COURT:  All right.  I think my preliminary ruling

10  is that I'll allow plaintiff to argue from it in the way that

11  Ms. Salzman has suggested, but I'll certainly leave it to you

12  if you want to file something and look at the record and make

13  an argument, you know how to find me.  But, at least

14  preliminarily, I will not preclude argument based on that.

15       What else?  I think I had indicated, Mr. Asner spoke

16  to what I said, which is they could file their brief over the

17  weekend but then I would give plaintiff an opportunity to

18  respond.  I think we can wait and see what they file and talk

19  Monday about how much time you need or want.  If that makes

20  sense.

21       MS. SALZMAN:  That's appreciated, your Honor.  Thank

22  you.

23       THE COURT:  If not, I suppose awaiting the jury's

24  verdict, since that may change the landscape.  But bottom line

25  is I won't require a response before Monday morning, let's put

O1Q3ACC5

1    it that way.

2              MS. SALZMAN:  That's very appreciated.

3              THE COURT:  I guess given that, do defendants want

4    more time?  In other words, do you want to defer filing a

5    brief?

6              MR. ASNER:  We'll take a little bit more time.  My

7    team is mutinying on that one.  So yes, we're good on that.

8              THE COURT:  All your associates can thank me later.

9              MR. ASNER:  They already have.

10              THE COURT:  Couple other things.  Summations, who is

11    doing them for each side?

12              MS. SALZMAN:  I'll be doing it for the plaintiff, your

13    Honor.

14              MR. ASNER:  I'll be doing it for the defense.

15              THE COURT:  Time.  How long would you like and then

16    we'll discuss whether you get it.

17              MS. SALZMAN:  May we have two and a half hours, your

18    Honor?

19              MR. ASNER:  That sounds reasonable.

20              THE COURT:  Great.  I'll give you max of two and a

21    half hours each.

22              Exhibits.  I'm arranging for a large monitor, TV, to

23    be in the jury room.  I think the best would be, well, bottom

24    line is can we get a wiped laptop that is loaded with all of

25    the exhibits that have been admitted into evidence, and only

O1Q3ACC5

1    those, and can both sides coordinate on that, agreed on and

2    make sure you're on the same page.  And when the jury retires

3    to deliberate, I would give them that laptop as well as any

4    physical exhibits, I don't think there were many, but the

5    catalog I know.  And that would enable them to view it on the

6    monitor.

7             Is that feasible?

8             MS. SALZMAN:  We can work on that, your Honor, yes.

9             THE COURT:  Defendants?

10            MR. ASNER:  Sure.

11            THE COURT:  Great.  And I think that we will have an

12   HDMI cable to connect the laptop to the monitor, but just in

13   case, if your tech people could bring that along with the

14   laptop, that would be great.

15            And you will need to be in a position when the jury

16   retires to deliberate to confirm that you are both in agreement

17   that the laptop has all of what is admitted into evidence and

18   only what was admitted into evidence.  So, I expect both sides

19   to verify that.

20            Charge and charge conference.  As I said, I'll plan to

21   e-mail counsel on Sunday, probably Sunday evening, I'll aim for

22   somewhere by 6 or 7 in the evening to provide you with a copy

23   of the draft charge.  What I'm going to ask is let's start a

24   little bit earlier so we are safer and in predicting we can

25   start on time with the jury, so why don't you plan to start at

O1Q3ACC5

1    8:45 on Monday.  If that's okay.  And we'll do the charge

2    conference at 8:45, however long it lasts and go from there.

3            Here's how this works.  Number one, it will be

4    annotated so it will give you some indication of the source at

5    least of the substantive charge.  I don't necessarily include

6    annotations with respect to the standard charges, other than I

7    would just cite other cases of my own, which doesn't seem to be

8    very helpful.  So that's number one.  Those will come out of

9    the version that goes to the jury.  I do provide the jury with

10   a written copy to follow along and for them to take into the

11   jury room.  But that copy will not have the annotations.  It

12   will also have line numbers on each page.

13           What I will do is, beginning with plaintiff and then

14   defendants, ask you to identify anything to which you have an

15   objection or any correction that you think ought to be made.

16   On that score, no matter how many times we read it, there is

17   also something, some typos, so no ego here.  If you find any

18   typos, I would be very happy for you to point them out.  I'd

19   rather catch them and the more eyes the better.  So, don't

20   hesitate to bring those up.

21           But bottom line is I'll start with plaintiff and

22   expect you to go from page number and line number from

23   beginning to end identifying anything to which you have an

24   objection or correction or request.  It is not enough just to

25   object.  You need to have alternative language if you want me

O1Q3ACC5

1    to consider it.  So, and then once we do that, once I do that

2    with plaintiff, I would do that with defendants, and we would

3    go from there.

4             Any questions about any of that?

5             MS. SALZMAN:  No, your Honor.

6             MR. ASNER:  Not from defense.

7             THE COURT:  I think that covers my agenda.  Anything

8    I'm missing any questions, anything to discuss?  From

9    plaintiff?

10            MS. SALZMAN:  Nothing from the plaintiff, your Honor

11   thank you.

12            THE COURT:  From defendants?

13            MR. ASNER:  Not from the defense.

14            THE COURT:  All right.  In that case I will see you

15   Monday morning at 8:45.  I hope you have a restful weekend.

16   I'm guessing that might not be the case, but I will see you

17   8:45 Monday morning.

18            Thank you very much.

19            (Adjourned until January 29, 2024, at 8:45 a.m.)

20

21

22

23

24

25

1               INDEX OF EXAMINATION

2    Examination of:                          Page

3     WILLIAM RUPRECHT

4    Direct By Mr. Asner . . . . . . . . . . . .2269

5    Cross By Mr. Wilson . . . . . . . . . . . .2278

6    Redirect By Mr. Asner . . . . . . . . . . .2288

7     WILLIAM SMITH

8    Direct By Mr. Wolverton . . . . . . . . . .2289

9    Cross By Mr. Wilson . . . . . . . . . . . .2405

10   Redirect By Mr. Wolverton . . . . . . . . .2447

11   Recross By Mr. Wilson . . . . . . . . . . .2453

12                 PLAINTIFF EXHIBITS

13   Exhibit No.                          Received

14    138 . . . . . . . . . . . . . . . . . . .2280

15    167 . . . . . . . . . . . . . . . . . . .2423

16                 DEFENDANT EXHIBITS

17   Exhibit No.                          Received

18    1020 . . . . . . . . . . . . . . . . . . .2352

19    1021 . . . . . . . . . . . . . . . . . . .2354

20    1023 . . . . . . . . . . . . . . . . . . .2385

21    1022 . . . . . . . . . . . . . . . . . . .2387

22    1012 . . . . . . . . . . . . . . . . . . .2392

23    1014 . . . . . . . . . . . . . . . . . . .2396

24

25